

The Law Offices of

# PHILLIPS & BORDALLO

A Professional Corporation
410 West O'Brien Drive, Suite 102 Hagåtña, Guam 96910-5044
Tel: (671) 477-ABCD (2223) • Fax: (671) 477-2FAX (2329)
" I Erensia, Lina'Ia', Espiritu-ta"



DISTRICT COURT OF GUAM
FILED
JUL 23 2004
MARY L. M. MORAN
CLERK OF COURT

Attorneys for Petitioners

## DISTRICT COURT OF GUAM
## TERRITORY OF GUAM

CIVIL CASE NO. 04-00006

JULIE BABAUTA SANTOS, *et al.*,

        Petitioners,

    vs.

FELIX A. CAMACHO, etc., *et al.*,

        Respondents,

CHRISTINA M. S. NAPUTI,

        Applicant for Intervention,

CHERMAINE R. TORRES,

        Applicant for Intervention.

**PETITIONERS' OPPOSITION TO
APPLICANTS FOR INTERVENTION
NAPUTI AND TORRES' MOTIONS TO
INTERVENE WITH MEMORANDUM OF
POINTS AND AUTHORITIES IN
SUPPORT THEREOF.**

## OPPOSITION TO MOTION TO INTERVENE

Applicants for Intervention Christina M.S. Naputi (hereinafter "Naputi") and Charmaine R. Torres (hereinafter "Torres") (hereinafter collectively referred to as the "Applicants") filed motions to intervene in the above class action. The Petitioner, individually and on behalf of all those similarly situated (hereinafter "EIC Class"), through her attorneys of record Phillips and Bordallo, P.C., by Michael F. Phillips, now provides this opposition to the motions. This opposition is supported by the following memorandum of points and authorities, the pleadings on file, and such other evidence and arguments as the court may permit at the hearing of this motion.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I. INTRODUCTION

The Applicants base their Motions for Leave to Intervene on a number of arguments all pointing to nothing more than their desire for more money. Naputi Motion and Memorandum of Points and Authorities (hereinafter "Naputi Memorandum") at p. 6, lines 17-18 ("Petitioner/Intervenor has an interest in the litigation and particularly the subject amount of payment."); Torres Memorandum of Points and Authorities (hereinafter "Torres Memorandum") at p.7-8, lines 21-22 and 1-2 ("Applicant's position, which she seeks to protect, is that the [sic] proposed settlement agreement entered into by Petitioner Santos is insufficient in scope and in amount to compensate Applicant . . .."). Without a doubt, all parties would prefer higher numbers in their favor. And whether a jail house attorney or armchair quarterback, every attorney wanting a share of a contingency award without any previous participation or contribution to the case will

always claim they could have squeezed more out of the Government. But, this is not the standard for the Court's review of the proposed Settlement Agreement, nor is it the standard for intervention which is at issue here.

Petitioner Santos' case made headlines across the media when first filed on February 12, 2004. See Exhibit "A", attached hereto. Respondents answered with a host of denials and defenses notwithstanding their initial political positions. Counsels for Applicants sat back for months, did nothing, and now rush in without any shame after settlement to add nothing more to the case than a virtual copy of Petitioner Santos' original Complaint.

## II. ARGUMENT

The Applicants seek to intervene in this Class Action pursuant to Federal Rules of Civil Procedure Rule 24(a) and (b), which provides as follows:

> (a) Intervention of Right. Upon timely application anyone shall be permitted to intervene in an action: (1) when a statute of the United States confers an unconditional right to intervene; or (2) when the applicant claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.

> (b) Permissive Intervention. Upon timely application anyone may be permitted to intervene in an action: (1) when a statute of the United States confers a conditional right to intervene; or (2) when an applicant's claim or defense and the main action have a question of law or fact in common. When a party to an action relies for ground of claim or defense upon any statute or executive order administered by a federal or state governmental officer or agency or upon any regulation, order, requirement, or agreement issued or made pursuant to the statute or executive order, the officer or agency upon timely application may be permitted to

intervene in the action. In exercising its discretion the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties.

In addressing a motion to intervene in class action suits, the "Court must strike a 'balance between keeping class litigation manageable and allowing affected parties to be adequately heard . . .'" In re Lorazpam & Clorazepate Antitrust Litigation, 205 F.R.D. 363, 367 (D. D.C. 2001) (quoting Twelve John Does v. District of Columbia, 117 F.3d 571 (D.C. Cir. 1997)).

## A. Applicants Fail to Show Compliance with Rule 24(a) Standard

The Ninth Circuit establishes a four part test for determining, under Rule 24(a), if an applicant has a right to intervene:

> (1) the motion must be timely;
> (2) the applicant must assert a "significantly protectable" interest relating to property or a transaction that is the subject matter of litigation;
> (3) the applicant must be so situated so that disposition of action may as a practical matter impair or impede the interest; and
> (4) the applicant's interest must be inadequately represented by the parties.

Kootenai Tribe of Idaho v. Veneman, 313 F.3d 1094, 1107-1108 (9th Cir. 2002).

The Applicants bear the burden of establishing its right to intervene. James Wm Moore, ed, 6 *Moore's Federal Practice* §24.03[1][a] (Bender 2004). The criteria established above are mandatory, and the failure to satisfy any one of the criteria justifies denial of the application to intervene. Id. Despite the label "intervention of right," courts exercise some discretion in weighing a motion to intervene under Rule 24(a)(2). Id. at §24.03[5][a].

1.     Applicants' Motions Are Untimely.

Timeliness is a flexible concept; its determination is left to the district court's discretion. United States v. Alisal Water Corp., 370 F.3d 915, 921 (9th Cir. 2004) (citing Dilks v. Aloha Airlines, 642 F.2d 1155, 1156 (9th Cir. 1981)). "The purpose of the [timeliness] requirement is to prevent a tardy intervenor from derailing a lawsuit within sight of the terminal. As soon as a prospective intervenor knows or has reason to know that his interests might be adversely affected by the outcome of the litigation he must move promptly to intervene." Sokaogon Chippewa Community v. Babbit, 214 F.3d 941, 949 (7th Cir. 2000) (citations omitted) (alteration in original).

Courts weigh three factors in determining whether a motion to intervene is timely: "'(1) the stage of the proceeding at which an applicant seeks to intervene; (2) the prejudice to the other parties; and (3) the reason for and length of the delay.'" Alisal Water Corp., 370 F.3d at 921 (quoting Cal. Dep't of Toxic Substances Control v. Commercial Realty Projects, Inc., 309 F.3d 1113, 1119 (9th Cir. 2002)).

> Whether intervention be claimed of right or as permissive, it is at once apparent, from the initial words of both Rule 24 (a) and Rule 24 (b), that the application must be "timely." If it is untimely, intervention must be denied. Thus, the court where the action is pending must first be satisfied as to timeliness. Although the point to which the suit has progressed is one factor in the determination of timeliness, it is not solely dispositive. Timeliness is to be determined from all the circumstances. And it is to be determined by the court in the exercise of its sound discretion; unless that discretion is abused, the court's ruling will not be disturbed on review.

NAACP v. New York, 413 U.S. 345, 365-366 (1972) (superseded by statute on other grounds as stated in United States v. American Tel. & tel. Co., 714 F.2d 178 (D.C. Cir. 1983)) (emphasis added).

Both Applicants generally assume that because of the stage of proceedings, their applications are timely. Naputi Memorandum, p. 8, lines 20-21 ("no court has determined the merits of this particular case, nor is it clear any substantial discovery has been conducted. Thus this petition to intervene is timely filed."); Torres Memorandum, p. 6, lines 20-23 ("Other than the filed pleadings in the case, the merits of the case have not been adjudicated in any way or even addressed by the parties. Instead, the case has proceeded directly from the pleading stage to a tentative settlement without any proceedings on the merits. Thus, this motion is clearly timely.").

As the U.S. Supreme Court establishes in NAACP, the point to which the suit has progressed is merely one factor in the determination of timeliness, and not solely dispositive as the Applicants prefer. In this class action, although only four months passed between the filing of the original complaint and the settlement, the issues resolved by the proposed settlement did not lay dormant since the government reversed its position in 1996. Rather, these same issues were publicly discussed and debated in the years that followed, including the highly publicized Supreme Court proceeding brought by members of the Guam Legislature in June, 2000. In Re Request of I Mina' Bente Sing'ko Na Liheslaturan Guahan Relative to the Application of the Earned Income Tax Credit Program to Guam Tax Payers ("The EIC Question"), 2001 Guam 3. Even after the Court declared that the Government of Guam was obligated to pay unpaid refundable earned income taxes to qualfied Guam taxpayers, the Applicants and their counsel, well aware of their alleged interests in these issues, did nothing.

More than a year ago, the Pacific Daily News published a story practically urging anyone, including Applicants and their counsel, to file a lawsuit to enforce the earned income tax credit program:

> Guam's income tax form forbids island taxpayers from claiming the Earned Income Credit, which has allowed low-income workers elsewhere in the country to pay less tax or receive a refund. A space where Guam taxpayers are supposed to claim the special credit, or EIC, is blacked out with "Not Applicable." . . . [Deputy Tax Commissioner John] <u>Camacho acknowledged that the department's stand on the EIC is open for taxpayer challenge in a court setting</u>. But Camacho said the issue is best resolved in District Court, a federal court. <u>Island taxpayers who decide to challenge the department can back up their case with a Guam Supreme Court ruling and a local law in their favor</u>.

(emphasis added). Gaynor Dumat-ol Daleno, Pacific Daily News, March 13, 2003. See Exhibit "B", attached hereto. Of course, at that time, Applicants and their counsel did not find it necessary to protect their "significant" interests.

Petitioner Santos filed this class action on February 12, 2004, again receiving widespread media attention. Even after the parties settled the case on June 14, 2004, again with highly publicized media attention, Naputi still needed an additional two weeks to file her motion to intervene. Torres needed an additional three weeks to determine that her interests finally needed this Court's attention.

Aside from assuming that the stage of proceeding is determinative of timeliness, Naputi offers one further assertion, that since the "petition was filed immediately after notice was first published and weeks before the next hearing . . . intervention in no way postpones this litigation." Naputi Memorandum, p. 9, lines 1-2. Torres sets forth a similar claim: "The deadline for class members to opt-out of the tentative settlement is more than a month away. Thus, the instant motion for intervention may be resolved

7

prior to any other hearings on this matter." Torres Memorandum, p. 7, lines 1-4. The Applicants' additional support for their claim of timeliness would be valuable if timeliness included an analysis of prejudice to the other parties effectuated or caused by the actual hearing and debate of a motion to intervene. Common sense dictates that such a standard is in error, as courts would have to deny the applications as soon as filed to avoid the type of "prejudice" Applicants are referring. Petitioner would in effect be limited to claiming prejudice for the delay caused by researching and drafting this opposition and having to show up at the scheduled hearing.

The second factor to be weighed in determining whether a motion to intervene is timely is the prejudice to the other parties that would be caused by the granting by this Court of the motion, not the delay caused by the requirement to hear the motion. See Alisal Water Corp., 370 F.3d at 922 ("The district court found that the parties would be greatly prejudiced if Silverwood's motion to intervene was granted.") (emphasis added); and Corley v. Jackson Police Dep't, 755 F.2d 1207, 1210 (5th Cir. 1985) ("The second factor relates to prejudice to the parties if appellants' intervention is allowed.").

"In evaluating prejudice, courts are concerned when 'relief from long-standing inequities is delayed.'" Id. (quoting Alaniz v. Tillie Lewis Foods, 572 F.2d 657, 659 (9th Cir. 1978)) (emphasis added). See also Cal. Dep't of Toxic Substances Control, 309 F.3d 1113, 1119 (9th Cir. 2002) (holding that granting a motion to intervene would "unnecessarily prolong the litigation, threaten the parties' settlement, and further delay cleanup and development of the [Landfill]") (alteration in original); Presidential Life Ins. Co. v. Milken, 946 F. Supp. 267, 277 (S.D. N.Y. 1996) (settling defendants and plaintiff class would be "severely prejudiced" by exposing them to litigation risks and delaying

8

distribution of settlement proceeds.); New York News, Inc. v. Kheel, 972 F.2d 482, 487 (2d Cir. 1992) (describing situation where parties had agreed to settle and allowing intervention would upset settlement and revive disputes, resulting in substantial prejudice to settling parties); and Farmland Dairies v. Commissioner of New York State Dep't of Agric. & Mkts., 847 F.2d 1038, 1044 (2d Cir. 1988) (listing as one interest substantially prejudiced by intervention the 'interest in avoiding continuing litigation' and realizing fruits of settlement).

The proposed settlement of this class action clearly attempts to resolve long-standing inequities by providing a steady stream of payments from the Government of Guam to qualified taxpayers, and requiring the full implementation of the earned income tax program in 2004 and beyond. The Government of Guam has already complied with the first installment of Three Million Dollars ($3,000,000) under the proposed settlement, and will have made payments totaling Twenty Million Dollars by the end of June, 2005. See Exhibit "C", attached hereto. Although the delay caused by the motions in terms of scheduling a hearing and opposing the motions is required and potentially uneventful, the further delay that would ensue should either of the Applicants' motions be granted is unmistakable.

Neither of the Applicants mince words in their opposition and disagreement to the proposed settlement, yet both also find it reasonable to assert that their interventions would cause no prejudice to the original parties. Torres Memorandum, p. 7-8, line 22; 1-2 (The "proposed settlement agreement entered into by Petitioner Santos is insufficient in scope and in amount . . .."); p. 6, line 24 ("[T]here is no prejudice to the existing parties based on this motion to intervene."); Naputi Opposition to Torres' Motion

for Leave to Intervene ("Naputi's Opposition"), p. 5, lines 9-17 ("Applicant Torres seeks to intervene solely upon her general objection to the proposed settlement agreement, and only so that she may be able to obtain a greater amount in compensation than the proposed agreement allows. Petitioner/<u>Intervenor Naputi has already previously propounded the same exact claim</u> on behalf of herself and those similarly situated, as one of several collateral arguments justifying her intervention.") (emphasis added); Naputi Memorandum, p. 9, line 2 ("[I]ntervention in no way postpones this litigation."). An attorney with the law firm representing Naputi also made it abundantly clear where they stand on the proposed settlement agreement:

> 'But we looked at the settlement and noticed no work was done on the case and an attorney was hoping to get around $6 million,' [Attorney Thomas] Fisher said. 'The Earned Income Tax Credit is a tax credit for Guam's working poor. . . . If any class of people on this island needs to be protected, it's the working poor and we owe them a lot more than just cooking up these thoughtless, ham-handed, unfair settlements.'

Steve Limtiaco, *Pacific Daily News*, July 1, 2004, p.3. (elipses in original). See Exhibit "D", attached hereto.

Thus, we have two Applicants vehemently opposed to a proposed settlement agreement which provides an immediate stream of payments to class members after years of non-payment by the Government, and both assert that their intervention will not delay the proceedings or prejudice the original parties. Both Applicants represent a clear and present danger to the proposed settlement agreement and the prompt distribution of the settlement funds. Demanding a full recovery, Applicants' intent in litigating the various issues in this case demonstrates that if either or both are allowed to intervene, delay and prejudice to the original parties is not probable or speculative, but

PHILLIPS & BORDALLO

10

generally guaranteed. Applicants have no other objective than to threaten and delay in every manner possible the distributions guaranteed under the proposed settlement agreement. Although Petitioner disputes Naputi counsel's description of the proposed settlement agreement as "thoughtless," "ham-handed" or "unfair," such debates are better left for the fairness hearing.

A consideration of the second factor to be weighed by this Court establishes that Applicants' intervention would jeopardize the proposed settlement and severally prejudice the original parties' interest in the prompt resolution of this class action, the avoidance of continued litigation, and prolonged delay of earned income tax credit payments. The arguments and descriptions of the proposed settlement agreement set forth by the Applicants establish that their primary objective is to revive the issues in this class action and upset the settlement reached between the parties. See Corley, 755 F.2d at 1210 (Trial court did not abuse discretion in denying motion to intervene where putting negotiated settlement at risk would prejudice parties); Scardelleti v. Debarr, 265 F.3d 195 (4th Cir. 2001) (The threat of further delay and prospect of complicated litigation which might have unraveled settlement crafted by parties were sufficient bases for concluding that untimely motion prejudiced parties); County of Orange v. Air California, 799 F.2d 535, 537-38 (9th Cir. 1986) (concluding that motion to intervene was untimely even though filed just two days after the parties notified the district court of proposed settlement because the district court concluded that allowing intervention might undo the resolution of protracted litigation) (emphasis added); and Pittney v. Bowes, 25 F.3d 66, 72 (2d Cir. 1994) ("jeopardizing a settlement agreement causes prejudice to the existing parties to a lawsuit.").

As the Seventh Circuit Court explained in <u>Sokaogon</u>, Applicants' disagreement with the settlement is insufficient:

> The [Applicant] wants to intervene because it does not like the Settlement Agreement. . . . The [Applicant], however, cannot use alleged legal problems with the Settlement Agreement to bootstrap itself into this litigation. That the [Applicant] waited until settlement was imminent strongly suggests that the [Applicant] was not interested in intervening in the litigation but in blocking a settlement between the parties--or, at a minimum, this settlement. If the [Applicant] wanted to participate in the litigation, it should have moved to intervene when the suit was filed, or shortly thereafter. . . . As it now stands, intervention by the [Applicant] serves no conceivable purpose other than to block a settlement agreement that it does not like.

<u>Sokaogon</u>, 214 F.3d at 948 (alterations added).

The third factor weighed in determining whether a motion to intervene is timely is the reason for and length of the delay. Naputi does not address this factor specifically, while Torres explains that there was no delay. Torres Memorandum, p. 7, lines 5-12. Considering the often front page attention that the issues addressed in this class action received throughout the years, including the government's change of position in 1996, the filing of the declaratory judgment action by the Guam Legislature in 2000, the decision of the Supreme Court upholding taxpayers' right to refundable earned income tax credits, and the filing and settlement of this class action, its hard to believe Torres' assertion that she became aware of the settlement only after notice was published in the newspaper. In any event, no legitimate reason has been set forth explaining Applicants' decision to wait as long as they did to protect their alleged interests in this class action, including the two or three weeks after the settlement agreement was entered into by the parties.

Based on the foregoing, this Court should find that the weighing of the three factors in determining whether a motion to intervene is timely supports a denial of Applicants' motions as untimely. Contrary to claims by counsel for Applicants that they seek to assist Guam's working poor by fighting for full compensation, their ultimate objective in opposing the settlement agreement is to delay payments, some of which have already been set aside, to those same working poor who have waited for years without the same assistance these counsels now suddenly offer. The Applicants have only demonstrated a determination to delay the relief finally obtained by the proposed settlement.

2. Applicants Have No Significantly Protectable Interest Relating To The Property Or Transaction That Is The Subject Of This Class Action.

Applicants both claim that their "significantly protectable" interest is their interest in additional money. Any arguments for either more money or claims to a higher percentage of the recovery are properly raised as part of the fairness hearing. In addition to an absolute right to opt out of the settlement, all members have the right to provide objections and then participate in the hearing on final approval - to assert the settlement is unfair. See Rule 23(e)(4)(A). Finally, class members may enter an appearance through counsel if the member so desires. See Rule 23(c)(2)(B).

The Applicants confuse their right to object with a claim to intervention. Applicants will have a forum for all their arguments and the exact same opportunity requested if they simply file their objections and participate in the fairness hearing. The silence of Rule 23(a)(4)(A)'s text regarding intervention, together with its unqualified right of a class member to object, yields the conclusion that an objector wishing to file written material or be heard orally at a Rule 23(e) hearing need not file an intervention

petition, and under the circumstances of the motions at hand, should not be allowed to proceed as intervenors. In <u>Thompson v. Metropolitan Life Ins. Co.</u>, the intervenors "had the right to object at the fairness hearing, and they could have opted-out of the settlement and litigated elsewhere. Where class members' differences of opinion with class counsel on a negotiated settlement can be adequately addressed through the Court's consideration of the objections, <u>intervention is unnecessary and unwarranted</u>." 216 F.R.D. 55, 70 (S.D. N.Y. 2003) (citing <u>In re NASDAQ</u>, 187 F.R.D. 465, 491 (S.D. N.Y. 1998)) (emphasis added). Similarly, the Applicants simply disagree with the amount that was settled in this case for distribution to class members, an issue appropriately reviewed at the fairness hearing. Intervention is neither unnecessary and unwarranted. See also <u>Ring v. The Metropolitan St. Luis Sewer District</u>, 41 S.W.3d 487, 492 (Mo. Ct. App. 2000) ("Both the named Ring class members, and the Barnes-Jewish class members and the Roberts class members seek the same benefits, a fair monetary refund of the overcharges paid to MSD. <u>While there is a difference of opinion as to the amount they should receive in the settlement, their interests are identical.</u>") (emphasis added).

An intervenor who appears to introduce duplicative facts or an argument put forth by current parties will usually fail in their effort to join a suit. See, for example, <u>Cajun Electric Power Cooperative, Inc. v. Gulf States Utilities</u>, 940 F.2d 117, 120-121 (5th Cir. 1991) (affirming a denial of intervention because the putative intervenor "brings no unique arguments to the litigation"); <u>In re Domestic Air Transportation Antitrust Litigation</u>, 148 F.R.D. 297, 336-37 (N.D. Ga. 1993) (denying intervention under Rule 23(b) because proposed intervenors had not "demonstrated that their interests are

14

PHILLIPS & BORDALLO

unique to them or that they are different in any way from the interests of the class as a whole"); 6 *Moore's Federal Practice* §24.03[5][a] (Intervention is not favored if the applicant will contribute no unique arguments to the litigation); and Public Serv. Comp. of New Hampshire v. Patch, 136 F.3d 197, 205 (1st Cir. 1998) (holding that "it is settled beyond peradventure . . . that an undifferentiated, generalized interest in the outcome of an ongoing action is too porous a foundation on which to premise intervention as of right").

In this case, we have not one, but two copycat would-be intervenors advancing only duplicative, carbon copies of the legal and factual inputs already in the case. The Applicants should be denied entry into the litigation. The Applicants would only frustrate efficiency by increasing the transaction costs of the litigation for both the court and the exiting parties. See Wilderness Society v. Mortan, 463 F.2d 1261, 1263 (D.C. Cir. 1972) (denying the intervention effort and, in a concurring opinion, warning that intervention can make "the manageable lawsuit become an unmanageable cowlick"); and Smuck v. Hobson, 408 F.2d 175, 179 (D.C. Cir. 1969) (observing that the "decision whether intervention of right is warranted thus involves an accommodation between two potentially conflicting goals: to achieve judicial economies of scale by resolving related issues in a single lawsuit, and to prevent the single lawsuit from becoming fruitlessly complex or unending").

Naputi expresses concern that "[t]he results of this case will be binding on all class members as res judicata and, accordingly, [Naputi] is entitled to participate in the litigation of her case." Naputi Memorandum, p. 6, lines 18-20. Under Naputi's standard, every member of the class would be entitled to intervene, with or without

15

further justification. In light of Naputi's opt out option, ability to object, challenge, and appeal the Court's decision on the Settlement Agreement, Naputi fails to present sufficient reason for her intervention as a named party. Naputi does not need to be a named party in order to have her attorneys continue to represent her in these proceedings.

Naputi also presents conclusionary statements arguing the proposed Settlement Agreement "seeks to compensate persons for claims which lie beyond the statute of limitations." Naputi Memorandum at p. 3, lines 5-8. "The total amount of the settlement...[is] more than one half of the projected total liability." Naputi Memorandum, p. 3, lines 7-10. Naputi makes unintelligible claims that her significantly protectable interest in additional money is supported by an analysis of the applicable statute of limitations. She states that "[p]ayments to persons whose claims are within the statute of limitations will be reduced to less than fifty percent (50%) of the amount to which the person was entitled because of the payments to persons whose claims lie outside the statute of limitations." Naputi Memorandum, p. 3, lines 13-18. Naputi, whose every claim is included in the Settlement Agreement, may lodge any objections to the size and coverage of the Settlement Agreement during the upcoming fairness hearing. Naputi again fails to present the Court with any new or additional claims not included in either the class or Settlement Agreement. She also fails to present the Court with a substantive argument explaining how her claims are prejudiced even if the Government is convinced to pay claims dating back more than three (3) years.

Naputi assumes the Government would settle for a higher amount per claimant if the number of claimants were reduced, yet produces no evidence or logic to support

this assertion. As was discussed with the Court during the scheduling conference, there is a strong argument supporting Petitioner Santos' claim that the Government cannot be allowed to benefit from its horrendous behavior including the issuance of an incorrect, misleading, possibly fraudulent Revenue Ruling purporting to terminate the applicability of the EITC program to Guam taxpayers while prohibiting taxpayers from even filing an application or claim for EITC. Naputi assumes that the application of the statute of limitations issue is not subject to any legal uncertainty. Obviously, the Government felt Petitioner Santos' arguments against its statute of limitations defense had merit or the Government would have never insisted on inclusion of claims dating back more than three (3) years and presumably would have settled for much less. In addition, because the statute of limitations is an affirmative defense (that can be waived), it is inappropriate for one alleged group of class members to use it as a means to distinguish other class members in this context.

Finally, Naputi includes in her hodgepodge of "significantly protectable interests", if indeed it was her attempt to so include, the assertion that the settlement "excludes parties who would be eligible for the refund upon filing a late return." Naputi Memorandum, p.4, lines 1-2; p.7, lines 10-11. Thus, according to Naputi, she "must also be allowed to protect...the interests of those who are eligible for a refund upon filing a return." Id., p.8, lines 12-15. Naputi's attorneys misread or misrepresent the requirements entitling class members to EITC refunds under the Settlement Agreement. Again, it appears that on the one hand Naputi objects to extending the coverage of settlement to more potential claimants than necessary, yet attempts to increase the class even further, in Naputi's words, "reducing the amount available to each class

member." Under the settlement, potential claimants will be provided one (1) year from the final approval of the Settlement Agreement in which to qualify and submit their application for an EITC refund. Additionally, all potential applicants will be receiving the required forms and all necessary information through the mail. Naputi's arguments are speculative and unreasonable. There is nothing inappropriate about the Class and Government attempting to bring finality to the numbers in the time provided. If no reasonable time limit existed, the Class would have to wait for years before determining what percentage of the Sixty Million Dollar ($60,000,000) settlement each member will receive.

This Court should deny Applicants' motions since neither have demonstrated a significantly protectable interest relating to the property or transaction that is the subject of this class action.

### 3. Disposition Of The Class Action Would Not Impair Or Impede Applicants' Ability To Protect Their Interests.

Torres attempts to justify her impairment of her interests in additional money by simply claiming that an approval of the settlement would result in less money! Torres' Memorandum at p.8, lines 9-10 ("Settlement of this case would severely impair Applicant's interest in maximizing the amount of just compensation for her EIC claims."). If satisfaction of Rule 24 (a)(2) was that simple, every class member in any class action proposing settlement for less than the potential full recovery would satisfy the Rule 24 (a)(2) criteria, a ridiculous proposition. Indeed, Torres cites no authority for her proposition. The reason is obvious, no such authority exists.

The Applicants undermine their own arguments by asserting that claims are being settled for less than 100%, but then noting that opt-out claimants might obtain a

18

PHILLIPS & BORDALLO

"worthless judgment." Torres Memorandum at p.8, line 18-20 ("If Applicant opts out of the class, and pursues a separate claim against Respondents, she may be faced with a worthless judgment if no funds remain to pay for claims of members who opt out."); Naputi Memorandum at p. 4, lines 3-10 (Should persons opt-out of the settlement to protect their interests in receiving full payment . . . those persons may, after separate litigation, receive unfunded judgments against the Respondent Government of Guam, and would then be unable to seek immediate enforcement of the judgment."). These arguments implicitly acknowledge the risks of recovering notwithstanding the merits of the case from a purely legal standpoint. More importantly, these arguments fail to allege a proper impairment of interest under Rule 24(a)(2).

Naputi attempts to argue that if persons who opt-out litigate their claims against the Government then the class members unfairly stand at the front of the long line of Government creditors. This argument has no merit, as it would relax the standard for intervention to just about anyone having outstanding claims, of any sort, against the Government. Naputi's argument is that she does not want to see yet another creditor paid with limited tax dollars that in theory might have been used to go towards satisfying the claims she may wish to bring. This logic gives new meaning to the proverbial "crab mentality" but in any event is not supported in law or fact.

The Applicants would prefer a higher settlement amount for themselves, although like Petitioner Santos, do not want to accept the risks inherent in a trial on the merits. The Applicants clearly understand the consequences of releasing a bird in the hand while firing blindly at two in the bush. Naputi admits that those opting out because they wish to receive their full EITC payment may "receive unfunded judgments." "Those

19

judgement holders would be required to stand in line behind other judgment creditors of Respondent Government of Guam." Id., lines 6-10. This is exactly what Petitioner Santos prevented by ensuring a guaranteed payment of Sixty Million Dollars ($60,000,000) and immediate full implementation of the EITC program. The only consequence more painful than not receiving EITC payments would be to overcome each of the Government's many defenses, prevail on appeal, and then find at the end of the long journey a Government unable to pay a judgment or fully implement the EITC program. With the proposed settlement, qualified class members are already in a position to obtain payments without the delay caused by further litigation and without the risks of delayed payment (ie., standing in line behind other judgment creditors). The Government of Guam in fact has already deposited Three Million Dollars ($3,000,000) into the EIC Settlement Fund in accordance with the proposed settlement, and, if the settlement is finally approved, will have paid Twenty Million Dollars ($20,000,000) by the end of June, 2005.

In In re Lorazpam, the District Court held that the intervenors presented no impairment of interest under Rule 24(a)(2), finding that the intervenors "may still opt out and preserve their rights; there are no restraints on the ability of any defendant to settle with any opt outs nor on the ability of any opt out, including the [intervenors] if they choose to do so, to pursue their own claims independently. If they choose to stay in the class, on the other hand, they may still file objections with the Court concerning the settlement's fairness . . ." 205 F.R.D. at 367.

In In re: Vitamins Antitrust Class Actions, et al., the Appellants argued that their interest under Rule 24(a) in "being able to opt out of the class and 'go it alone

unhampered by any judgment in the class action' qualifies as 'an interest relating to the . . . transaction which is the subject of the action." 215 F.3d 26, 28 (D.C. Cir. 2000). The Court responded:

> Of course, in passing on the proposed settlement agreement, the district court has a duty under [Rule] 23 (e) to ensure that it is fair, adequate, and reasonable and is not the product of collusion between the parties. . . . But the district court's duty is to the class members themselves; it lacks the power to conduct a free-ranging analysis as to the broader implications of the proposed settlement agreement. . . . In any event, appellants do not deny that their sole actual concern is that the MFN clause limits their ability to reach a settlement more lucrative than that offered to the class. Consequently, their arguments fall outside the zone of interests protected by Rule 23(e).

Id. at 30 (citations omitted) (emphasis added).

Similarly, both Applicants assert that they are also seeking to protect the impairment of their interests if they opt out of the class. Even if this Court were to indulge in Applicants' attempt to prematurely debate the fairness of the terms of the proposed settlement, their assertions that their interests may be impaired "if they opt out" is misplaced. The fairness of the proposed settlement agreement will be judged as it concerns the class members, and not those who opt out and seek legal redress elsewhere. Indeed, by opting out the Applicants "escape the binding effect of the class settlement." Mayfield v. Barr, 985 F.2d 1090, 1093 (D.C. Cir. 1993) ("Our decision rests on the principle that those who fully preserve their legal rights cannot challenge an order approving an agreement resolving the legal rights of others.").

Even the interests of members opting out were relevant, the Applicants fail to demonstrate how Petitioner Santos' successful negotiation of a settlement impairs or impedes their ability to pursue any legitimate claim they may wish to put forward.

21

Because this settlement, if found to be fair by the Court, will not result in a decision or ruling on the merits of the case, the Applicants remain free to litigate these same claims on behalf of herself and all others opting out. The Settlement Agreement does not prejudice the Applicants in any recognized fashion. Their right to litigate their claims independently is not impaired. The Applicants have not asserted an interest which is likely to be impaired or impeded by the instant proceedings.

Naputi also asserts that she "must intervene to protect, at a minimum, those claims for refunds that arose in tax year 2000." Naputi Memorandum, p. 7, lines 21-22. Again, she asserts that this interest must be protected in the context of her "potential" decision to opt out. (Were Intervenor/Petitioner . . . to opt out of the action in an attempt to preserve their interests, they would do so at the risk of extinguishing their claims for an entire tax year." Id. at p.7-8, lines 23; 1-2) (emphasis added). In effect, Naputi sat on her rights, yet her attorneys want to revive her stale claims from tax year 2000. In fact, the Naputi attorneys argue their client has an entitlement to EITC refunds for a year arguably beyond the applicable statute of limitations. According to their arguments, those opting out "may lose the right to pursue claims for tax year 2000 since the claim would be time barred." Naputi Memorandum, p. 4, lines 11-13. Naputi still asserts the statue of limitations for those claims has run. Id., p. 7, lines 21-23. Yet, while she remains critical of Petitioner Santos for her success in obtaining payments for tax years dating back more than three (3) years ago, Naputi herself wishes to revive what she herself has described as "stale claims." As provided above, Naputi's arguments are misplaced, but most importantly, fail to even approach an acceptable standard under Rule 24(a)(2).

This Court should deny Applicants' motions since the disposition of the class action would not impair or impede either of the Applicants' ability to protect their alleged interests.

> 4.    Applicants Fail To Show That They Are Inadequately Represented.

The Ninth Circuit considers three factors in determining the adequacy of representation: (1) whether the interest of a present party is such that it will undoubtedly make all of a proposed intervenor's arguments; (2) whether the present party is capable and willing to make such arguments; and (3) whether a proposed intervenor would offer any necessary elements to the proceeding that other parties would neglect. Arakaki v. Vayetano, 324 F.3d 1078, 1086 (9th Cir. 2003) (citation omitted).

The most important factor in determining the adequacy of representation is how the interest compares with the interests of existing parties. Id. (citation omitted) (emphasis added). When an applicant for intervention and an existing party have the same ultimate objective, a presumption of adequacy of representation arises. Id. (citation omitted). If the applicant's interest is identical to that of one of the present parties, a compelling showing should be required to demonstrate inadequate representation. Id. (citation omitted).

Naputi again wishes to proceed prematurely with both a debate on the fairness of the settlement agreement and an analysis of the adequacy of representation under the Rule 23(a)(4) standard applicable to class certifications. The Rule 24(a) standard, on the other hand, is clearly explained by the factors considered by the Ninth Circuit in Arakaki.

PHILLIPS & BORDALLO

23

As provided above and in the arguments set forth by both Applicants, their interests in additional money adds absolutely nothing of value to this class action. How the Applicants' interests in additional money compares to the Petitioner and the class' interest in settling this long-standing dispute is the most important factor for this Court to consider. Petitioner submits that in the context of the proposed settlement, the Applicants' interest in additional money is identical to the interests further by Petitioner and the class. The settlement agreement providing for a recovery not to Applicants' desires is addressable through the Court's consideration of the fairness of the settlement, to include timely objections made by any class member who wishes to do so. Thus, the Applicants' interests in additional money is not inadequately represented by Petitioner merely because their motive to litigate this case until a full recovery is obtained is different from that of Petitioner. See In re NASDAQ Market-Makers Antitrust Litigation, 187 F.R.D. 465, 491 (S.D. N.Y. 1998) (Applicant's "only evidence of inadequate representation is that class counsel negotiated a settlement of which he does not approve. This difference of opinion can be adequately addressed through this Court's consideration of the fairness of and timely objections to the settlement. Intervention as of right is unnecessary and unwarranted."); and Washington Elec. Coop, Inc. v. Mass. Municipal Wholesale Elec. Co., 922 F.2d 92, 98 (2d Cir. 1990) ('[A] putative intervenor's interest is not inadequately represented merely because its motive to litigate is different from that of a party to the action.").

Quite simply, based on complaints filed by Applicants, the "mirror image" of the complaints filed by Petitioner, Petitioner is at a loss as to what legal or factual claims would be introduced by the Applicants that Petitioner has not already introduced and

24

asserted, or would have been introducing and asserting if not for the negotiation and completion of the proposed settlement agreement. The Applicants appeared to reach deep to differentiate their claims and assertions, but they utterly fail to offer any necessary elements to the proceeding. See Torres Memorandum, p. 10, lines 23-27 ("[Applicant's and Petitioner Santos' claims clearly share questions of law and fact in common. The first question is whether the Government of Guam must pay the EIC; second, which individuals are entitled to received the EIC; third, what amounts of EIC are to be received by qualified persons."). See Blake v. Barnes, 554 F.2d 947, 955 (9th Cir. 1977) ("Because the Commissioner seeks injunctive relief while the plaintiffs seek recovery of damages does not alter the fact that before either forms of relief are granted the initial violations by the defendants must first be proven . . . There is no evidence that the plaintiffs are incapable representing the Commissioner's interests or that they are unwilling to do so. Indeed, the Commissioner's brief states that much of the plaintiff's complaint in state court and their complaints in federal court were based on identical factual allegations and claims as alleged by the Commissioner in his complaints."). "The [Applicant] has not pointed to any necessary element which would be added to the suit because of his intervention." Id.

Thus, the legal claims are the same, the injuries are the same, and the facts are the same. The Applicants and Petitioner have identical claims and the same ultimate objective – the implementation of the earned income tax credit program which will result in the payment of unrefundable earned income taxes to qualified taxpayers. Applicants have not demonstrated any compelling showing of inadequate represenation, nor have they established any reasonable arguments overcoming a presumption of adequacy of

By asserting that they seek additional money, both Applicants oppose the settlement range proffered by the settlement agreement. See Naputi's Opposition, p. 5-6, lines 23-25. However, both Applicants assume that a recovery short of 100% is inherently unfair to the class:

> [T]he dollar amount of the settlement by itself is not decisive in the fairness determination, and the fact that the settlement fund may equal only a fraction of the potential recovery at trial does not render the settlement inadequate. 'In fact, there is no reason, at least in theory, why a satisfactory settlement could not amount to a hundredth or even a thousandth part of a single percent of the potential recovery.'

In re PainWebber, 171 F.R.D. at 131 (citations omitted).

> Ultimately, the exact amount of damages need not be adjudicated for purposes of settlement approval. . . . the 'essence of a settlement is compromise. A just result is often no more than an arbitrary point between competing notions of reasonableness.' . . . 'The weighing of a claim against compensation cannot be . . . exact. Nor should it be, since an exact judicial determination of the values at issue would defeat the purpose of compromising the claim . . .'

In re NASDAQ, 187 F.R.D. at 478 (citations omitted).

Both Applicants also seek to "find out" what are the total claims applicable in this class action. Naputi asks that justification be presented supporting the acceptance of the Settlement Agreement. Naputi's attorneys argue that at this time, there is nothing on the record establishing "Petitioner Santos' counsel attempted to discover the true amount in arrears or had any basis, rational or otherwise, for compromising the claim at sixty million dollars ($60,000,000)." Naputi Memorandum, p.4, lines 14-19. Naputi also challenges whether counsel for Petitioner was properly prepared for trial. Id. at p. 11, lines 3-11. See Declaration of Michael F. Phillips in Support Of Petitioner's Motion For

An Order Appointing Class Counsel ("MFP Declaration"), Par. 21 ("I successfully negotiated an expedited trial schedule with the Government of Guam. During the Scheduling Conference, I informed this Court that I was prepared to file a Motion for Summary Judgment. However, soon after the expedited scheduling order was issued by this Court, a change in policy by the administration occurred, and meaningful settlement negotiations commenced resulting in the Settlement Agreement preliminarily approved by this Court").

Naputi fails to explain why all such challenges cannot be made during the fairness hearing. Naputi presents no alternative theory regarding the financial state of the Government but claims she must enter as a named plaintiff, "just in case." The Applicants' concerns eliminates one of the key factors considered in settling a class action.

> Appellants offer nothing more than speculation about what damages 'might have been' won had they prevailed at trial. This court has aptly held that 'it is the very uncertainty of outcome of litigation and avoidance of wasteful and expensive litigation that induce consensual settlements. The proposed settlement is not to be judged against a hypothetical or speculative measure of what *might* have been achieved by the negotiators.'
> Thus, 'the very essence of a settlement is compromise, a yielding of absolutes and an abandoning of highest hopes.' . . .
> 'The fact that a proposed settlement may only amount to a fraction of the potential recovery does not, in and of itself, mean that the proposed settlement is grossly inadequate and should be disapproved.'

Linney v. Cellular Alaska Partnership, 151 F.3d 1234, 1242 (9th Cir. 1998)) (citations omitted) (italics in original).

Indeed, the lack of discovery is not fatal to the settlement agreement as Applicants seem to believe. See Id. at 1239 ("In the context of class action settlements,

'formal discovery is not a necessary ticket to the bargaining table' where the parties have sufficient information to make an informed decision about settlement.").

Naputi also attempts to find justification to intervene based on alleged inadequate notices provided as directed by this Court. Naputi implies Petitioner's counsel violated the Federal Rules as a result of notice through publication as opposed to individual mailings. "Petitioner Santos' counsel failed to insure proper notice to the class, by foregoing individual notice and publishing a defective and inadequate notice in the local newspaper..." Naputi Memorandum, p. 13, lines 6-9. This matter was discussed with the Government and the Court, and the Court approved and ordered notice by publication. Since then, the Government and Petitioner have agreed to provide an increased level of notice. This does not make the original notice procedure "defective." All contents of the original published notice were reviewed by the Government and the Court. Nevertheless, Naputi's arguments are misplaced. See In re: Vitamins, 215 F.3d at 30 ("Appellants' alternative tack invokes their right to opt out, starting with the notice protections of Rule 23(c)(2). But the rule by its terms is purely procedural. Any substantive right to be free of ancillary effects flowing from a class settlement must be found elsewhere.") (emphasis added).

Naputi reaches further and further to find some reason to intervene. Counsel for Naputi alleges the court-ordered notice is defective because class counsel might have received more than just ten percent (10%) of the funds recovered. "Were a claimant to know the truth of the matter - - that their (sic) refund might be reduced by as much as 25% (the Ninth Circuit's benchmark for attorney's fees) - - that claimant might well opt out of the settlement." Naputi Memorandum, p.14, line 22 - p.15, line 2. Petitioner's

PHILLIPS & BORDALLO

29

reference to the standard contingency award in the Ninth Circuit is all the more reason to specifically inform potential class members of class counsel's request and the Court's previous award of attorneys fees in the amount of only ten percent (10%).

Finally, Naputi attempts to raise conflicts issues as to counsels for Petitioner and counsel for Torres, apparently under the standard applicable to a fairness hearing. See Naputi Memorandum, p. 11, lines 21-23 (quoting Rule 23(a)(4) standard rather than Rule 24(a) standard). In any event, Naputi claims "actions by Petitioner's counsel . . . indicate an uncomfortable closeness with Respondent which casts in doubt the adequacy of representation." Naputi Memorandum, p.15, lines 18-19. Naputi also bases her claim on misinformation. "Petitioner Santos' counsel ...is actively seeking employment with the ...Lt Governor ...as his legal counsel." Naputi Memorandum, p 10, line 20-23. "Additionally, during the pendency of these proceedings, [Petitioner's counsel] actively represented signatory Respondent [Lt. Governor Moylan]." Id., p. 10, line 23 - p. 11, line1. Petitioner's counsel is not seeking employment with the Lt. Governor of Guam, and limited his representation to the trial and Supreme Court case which have since terminated. See MFP Declaration, Par. 12. Naputi fails to raise any legitimate conflicts issue, and instead raises speculative concerns of collusion without any support in fact or law.

Interestingly, Naputi also questions the representation of Torres in her Opposition, citing law firm partner and former District Judge Unpingco's early participating in these proceedings, and other connections with the Governor's office. Indeed, Torres' law firm recently represented Respondent Lou Perez in the trial and Supreme Court case terminated earlier, has various contracts for legal services with

30

PHILLIPS & BORDALLO

deparmtnets and agencies under the supervision of Respondent Government of Guam, and the executive branch of the Government of Guam administration remains primary tenants of a partner in the law firm representing Torres, and has various legal contracts Nevertheless, counsel for Naputi fails to address any issues related to their representation of Naputi. Attorneys representing Naputi are actively representing the Republican Party of Guam. One partner in their firm is the spouse of a Republican Senator. One or more are former legal partners of the Attorney General of Guam. One or more have represented the Attorney General in a domestic case, one or more have represented the Attorney General in a criminal case, and one or more have received a contract for legal services from the Attorney General of Guam.

Even if this Court finds that Applicants' motions are timely; that Applicants have asserted a "significantly protectable" interest relating to property or a transaction that is the subject matter of this class action; and that Applicants are so situated so that disposition of action may as a practical matter impair or impede their interests, neither Applicant has demonstrated under the Rule 24(a) standard that their interest are inadequately represented by Petitioner. Indeed, as discussed above, the fairness hearing offers Applicants the opportunity to address almost every assertion that they set forth in their arguments supporting a finding of inadequacy of counsel. The Applicants have presented nothing, besides conclusory allegations, that their interests are not adequately protected. Applicants make no showing, other than innuendo, that representation by class counsel is inadequate. As such, Applicants' motions for intervention as of right should be denied.

**B. Applicants should Not be Permitted to Intervene under Rule 24(b)**

Under Rule 24(b), Applicants may be permitted upon timely application to intervene if an applicant's claim or defense and the main action have a question of law or fact in common. "In exercising its discretion the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties." Rule 24(b).

The Applicants have not shown a claim or defense that has a question of law or fact in common with the main action. Rather, they have simply embraced Petitioner's claims. Indeed, the Applicants have merely cited their concern about the fairness, reasonableness, and adequacy of proposed settlements. While they may have an interest in receiving the full amount of their claims, they have neither articulated a particular claim or defense of their own nor any prejudice that will result from having to decide whether or not to opt-out that would necessitate intervention at this stage. See In re Lorazpam, 205 F.R.D. at 368.

Moreover, even if a common question of law or fact has been identified, this Court must consider "whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties." Fed.R.Civ.P. 24(b)(2). With respect to this inquiry, Applicants have supplied nothing of substance. However, counsels for Applicants have demonstrated in their motions that allowing permissive intervention of would "effectively scuttle" the settlement agreement and undoubtedly work sever, undue delay and prejudice to the rights of the present class members. See Woodward v. Nor-Am Chem. Co., 1996 U.S. Dist. LEXIS 8836, 9-10 (S.D. Ala., 1996) ("The likely result of allowing [permissive] intervention is that all parties would effectively be sent back to the

32

drawing board to begin settlement efforts anew. By contrast, a denial of intervention would in no way prejudice the rights of [Applicants], who would still be armed with the right to initiate a class action lawsuit of their own . . . Under these circumstances, the Court believes that the benefits to premissive intervention would be minimal, while the potential harm would be quite sever."). As thoroughly discussed above, the Applicants offer absolutely no assistance to this Court in its orderly procedures leading to the resolution of this class action. In consideration of the foregoing, including the timeliness standard discussed above, Applicants motions for permissive intervention should be denied.

## C. Naputi Fails To Justify Her Request For An Article III Judge

"[Naputi] requests that the ...motion be heard by an (sic) Judge empowered by Article III of the United States Constitution or alternatively, a regular District Court Judge, but not a local judge acting under designation or a magistrate judge." Naputi Memorandum, p.18, lines 16-19. Naputi's sole mission in these proceedings is to disrupt the settlement between the named parties to this case. Without any authority whatsoever, counsel for Naputi allege a right to an Article III Judge. These arguments have failed even with the United States as a party to the litigation. The standard for the removal of a United States Magistrate is that of "extraordinary circumstances." See U.S.C. §636 (c)(4). While counsel for Naputi make extraordinary arguments, they have not alleged the existence of any extraordinary circumstances. The Court should not permit counsel for Naputi to "judge shop" as their last ditch effort to get their hands on a portion of the recovery.

PHILLIPS & BORDALLO

## III. CONCLUSION

Based on the foregoing, Applicants have failed to demonstrate that their applications for leave to intervene in this class action are timely; that they claim an interest relating to the property or transaction which is the subject of this class action and that they are so situated that the disposition of this class action may as a practical matter impair or impede their ability to protect their interests; and that their interests are inadequately represented by existing parties. As such, Applicants' motion for intervention as of right under Rule 24(a) should be denied. This Court should also deny Applicants' motion for permissive intervention under Rule 24(b). The prejudice to the original parties are severe, while they have demonstrated little if any prejudice should their motions be denied. Undoubtedly, based on all of the arguments set forth above, counsels for the Applicants are likely to continue to search further and further for different angles and claims which may give them further hope of participating in this class action. By primarily addressing their interests in an opt-out scenario, counsels for the Applicants demonstrate that class members wishing to opt-out certainly will have no problem obtaining the appropriate representation to further their alleged interests in full compensation. However, under the standards at issue in these motions, Applicants wholly fail to demonstrate a need to intervene in this matter.

Respectfully submitted this 23rd day of July, 2004.

PHILLIPS & BORDALLO, P.C.
Attorneys for Petitioner

By: _____
Michael F. Phillips

34



Home • News • Entertainment • Bridal Guide • Communities • Classifieds • Coupons • Homes • Customer Service • F

Archive (1999- )

[    ] SEARCH

Chamorro Standard
Time: 11:29 AM
7/21/2004

**Home**
**News**
  Local News
  Lifestyle
  Islandstyle
  Local Sports
  Elections
  Opinion
  Police Blotter
  Gov't Meetings
  Nation/World
  Technology
  Space & Science
  Weather

**News Products**
  Bridal Guide
  Cruising
  Live it up
  Man, Land & Sea
  Oh Baby
  Vibe
  2003 Year in
  Review

**Entertainment**
**PIKA Style**
**Communities**
**Classifieds**
**Coupons**
**Homes**
**Customer Service**
**Funerals**

**NEWSLETTERS**
◊ BREAKING NEWS
◊ MORNING UPDATE
◊ SPECIAL OFFERS
**CLICK HERE NOW!**



Local News  -  **Saturday, February 14, 2004**

☑ SUBSCRIBE TO THE PACIFIC DAILY NEWS

# GovGuam to pay tax credit

**By Gene Park**
Pacific Daily News; epark@guampdn.com

A class-action lawsuit has been filed in federal court against the government of Guam to implement the Earned Income Tax Credit Program, which allows low-income workers in the nation to pay less tax or receive a refund.

> **TO THE POINT**
>
> • Gov. Felix Camacho said his administration will begin to implement the Earned Income Tax Credit program after a class-action lawsuit was filed in federal court yesterday that seeks to force the government to pay the special credit.

Julie Babauta Santos, represented by attorney Mike Phillips, filed the suit in the U.S. District Court of Guam on behalf of herself and others who are eligible for the special credit. Court documents name Gov. Felix Camacho, Art Ilagan, director of the Department of Revenue and Taxation; Lourdes Perez, director of the Department of Administration and Attorney General Douglas Moylan.

Phillips said Santos is a resident of Dededo, works in a retail business and qualifies for the special credit, or EIC. He said his client is asking that the government implement the program, and retroactively pay all the unpaid refundable EIC from 1998 to 2003.

Court documents state that amount is approximately $112.4 million. Taxpayers were last able to claim the special credit in 1997, which cost about $18 million, according to Pacific Daily News files.

Governor's spokesman Shawn Gumataotao yesterday said Camacho ordered the tax department on Monday to identify taxpayers eligible for the credit and begin making payments.

In 1996, Camacho, who was a senator at the time, sponsored a law that made EIC applicable to Guam.

Gumataotao said the annual cost for the lost years will be $25 million from the General Fund, and money will need to be appropriated for future years. He said the governor will be working with the Legislature to identify where the money will come from.

According to Rev and Tax documents, about 20,300 residents are owed the





credit for last year.

A Supreme Court of Guam ruling in 2001 and local law state that Guam taxpayers are entitled to the same credit U.S taxpayers receive elsewhere.

The previous administration had said the tax department does not have enough money to pay the EIC, and a ruling in 1996 by then-Tax Commissioner Joseph Duenas stated the department is not required to pay the credit because he considered it an unfunded mandate by the federal government.

Speaker Ben Pangelinan, who filed the declaratory judgment request in 2000 for the court ruling, yesterday said there is no dispute that taxpayers are due.

"If the governor is saying we're having all these additional revenues, we need to begin reserving the money as required by law, like they do for the income tax refunds," Pangelinan said.

Pangelinan said income tax refunds and EIC should be taken off the top of the General Fund, while the remaining money be used for government agencies.

Paul Terlaje, administrator of the tax department's Taxpayer Services Division, said, with limited funds, it will be difficult to pay out the EIC on top of tax refunds.

"It is difficult as it stands now to pay the regular returns," Terlaje said. "This is just going to compound our workload."

Attorney General Douglas Moylan yesterday said his office will be reviewing the lawsuit, and expects to speak with the named respondents by the end of the month.

✉ Email this story

**Originally published Saturday, February 14, 2004**





www.coconutvilla.com

www.pikaruguam.com

Home | News | Entertainment | Pika Style | Bridal Guide | Communities
Classifieds | Coupons | Homes | Customer Service | Funerals

Contact Us | Subscribe | Place an ad
Copyright ©2004 Pacific Daily News. All rights reserved.
Use of this site indicates your agreement to the Terms of Service
(Terms updated 12/20/02)








KUAM.COM Keyword Search - Get exactly what you're looking for - better search results!
**FAQs for KUAM.COM Keyword Search**

| |
|---|
| Decision 2004 |
| Listen to i94-FM Live |
| KUAM News Archives |
| KUAM Weblogs |
| Our 50th Anniversary |
| Mobile & Wireless News |
| Search KUAM.COM |
| Village Voice |
| Week-in-Review |
| Interact with KUAM |
| Chatrooms |
| Familiar Faces |
| Community Outreach |
| Meet the Newsteam |
| Contact Us |
| Jobs at KUAM |

# Phillips launches class action suit in order
## Earned Income Tax Credit



**by Sabrina Salas, KUAM News**
**Friday, February 13, 2004**



**E-mail this artic**
**Printable versio**



**Have a hot news tip?**

**Want us to work on a story or cover an event?**
**Let us know about it!**

Attorney Mike Phillips is hoping Governor Felix Camacho will suppc action lawsuit his office has filed to force the Government of Guam Earned Income Tax Credit program. The program is designed to b workers and most especially single parents not receiving adequa workforce.

According to Attorney Phillips, as a senator Governor Camacho aut EITC legislation and consistently supported the program while in the L added that he also expects Attorney General Douglas Moylan to su because the law is clear and simply needs to be enforced. Attorne would be surprised if the Governor or the AG turned their backs on th poor after their previous support of this cause.

Phillips' firm filed class action in light of a Supreme Court implementation. The attorney says Speaker Ben Pangelinan won this Supreme Court of Guam a few years ago, but the government has ch



law and the Court's decision.

Late this afternoon, Governor's spokesperson Shawn Gumataotao Governor Camacho has ordered to begin the process of paying out E applied.

Gumataotao added that it will cost $25 million and that the Governor h the Legislature to move this process forward in the future.

Copyright © 2000-2004 by Pacific Telestations, Inc.
Terms of Use | Privacy Statement

This site is best experienced using Microsoft Internet Explorer 6 or higher



**Home**   **News**   **Entertainment Communities**   **Classifieds**   **Coupons**   **Real Estate**   **Fu**

Chamorro Standard
Time: 3:41 PM
7/23/2004



Subscribe NOW!

Subscription PAYMENT

**News**
- Guam News
- Lifestyle
- Local Sports
- Opinion
- Weather
- Technology
- Nation/World
- Government
- Meetings
- Police Blotter



**PDN NEWSLETTERS**
- BREAKING NEWS
- MORNING UPDATE
- SPECIAL OFFERS
**CLICK HERE NOW!**

**News Products**
**Cruising**

August 2003
Issue

- Bridal
- Cruising
- Island Style
- Maila Halom
- A guide to living on Guam
- Man, Land & Sea
- Oh Baby
- Pika Salutes
- Vibe
- Vibe Extreme
- 2002 Year in Review

**Entertainment**

**Communities**
- Northern Weekly
- Central Weekly

✉ Email this story
Wednesday, March 12, 2003

# Tax credit in legal limbo

**By Gaynor Dumat-ol Daleno**
Pacific Daily News

Guam's income tax form forbids island taxpayers from claiming the Earned Income Credit, which has allowed low-income workers elsewhere in the country to pay less tax or receive a refund.

A space where Guam taxpayers are supposed to claim the special credit, or EIC, is blacked out with "Not Applicable."

Deputy Tax Commissioner John Camacho mentioned several reasons why the Department of Revenue and Taxation bars taxpayers from claiming the EIC. Among them:

• The department does not have money to pay the EIC, which cost about $18 million the last time it was paid to Guam taxpayers in 1997.

• A 1996 decision by Joey Duenas, tax

**COMING TOMORROW**

**All about W2s:** What to do if you lost or haven't received your W2.

THE LAW

• Guam Public Law 24-61 says:

"For Fiscal Year 1998 and each year thereafter Department of Revenue and Taxation is author on a continuing basis to spend funds from the provisions of refunds ... in such amounts as are necessary to pay the Earned Income program subsidies ... up to a maximum amount for any f year of Fourteen Million Dollars ($14,000,000.0

THE RULING

• To read the Guam Supreme Court ruling, go www.justice.gov.gu/supreme/op2001Guam03.h

TAX FILING

The deadline for tax filing is April 15. The department's office at Tiyan will close its office p.m. but a drop box will accept completed tax returns for seven more hours, or until midnight.

≡ Southern Weekly

**Classifieds**
**Coupons**
**Real Estate**
**Funerals**

**Customer Service**

commissioner at the time, said that the federally mandated EIC does not apply to Guam, and the department continues to follow that decision today.

The department's position contradicts a Guam Supreme Court ruling and a local law that essentially say Guam taxpayers are entitled to the same credit that U.S. taxpayers receive elsewhere.

Guam taxpayers are missing out on the EIC. According to wire reports, it gives an increased maximum credit for the 2002 tax year of $4,140 for families with two or more qualifying children, $2,506 for families with one qualifying child and $376 for an individual without children.

"The Earned Income Credit (EIC) is a special credit for lower income workers," according to the Internal Revenue Service Web site, www.irs.gov.

"The credit is subtracted from the amount of tax you owe, so you end up paying less tax and you may get some money back from the government," according to the IRS. "Even if you do not have a tax liability, you might still get some money back."

According to the IRS, a taxpayer can qualify for the credit for tax year 2002 if the taxpayer's

earned income and adjusted gross income are less than the following amounts:

- $11,060 ($12,060, if filing a joint return) if you do not have a qualifying child.

- $29,201 ($30,201, if filing a joint return) if you have one qualifying child.

- $33,178 ($34,178, if filing a joint return) if you have two or more qualifying children.

## Taxpayer challenge

Camacho acknowledged that the department's stand on the EIC is open for taxpayer challenge in a court setting.

But Camacho said the issue is best resolved in District Court, a federal court.

Island taxpayers who decide to challenge the department can back up their case with a Guam Supreme Court ruling and a local law in their favor.

The Guam Supreme Court in February 2001 ruled that Guam taxpayers are entitled to EIC, and stated that the Department of Revenue and Tax director is bound by law to pay the EIC to eligible Guam taxpayers.

Gov. Carl Gutierrez's administration had argued that the EIC does not apply to Guam since

its funding in the continental United States is paid by Social Security taxes and Congress has not appropriated such funding to pay for the EIC on Guam.

"The governor suggests that the absence of any mention of the EIC's applicability to Guam indicates that 'Guam never crossed anyone's mind,'" according to the 2001 court ruling.

The high court disagreed with the then governor's arguments.

"The fact that Guam does not pay certain Social Security taxes should not prevent low-income families, who reside on Guam, from being paid the refundable EIC when there is no indication from Congress that, in designating the beneficiaries of this tax program, Guam low-income families were to be excluded," according to the court.

The court ruling was issued in a case filed by now Speaker Ben Pangelinan. Pangelinan said yesterday he hopes that new Gov. Felix Camacho's administration will review a local law that says Guam taxpayers are entitled to EIC.

The credit is meant to supplement low wages -- especially in the private sector -- to keep people in the work force while at the same time supporting their families, according to Pangelinan.

Guam Public Law 24-61
authorized a Guam EIC
program that mirrors the
federal program.

The law states that, for
fiscal 1998 and each year
thereafter, the
Department of Revenue
and Taxation is
authorized on a
continuing basis to spend
money from a tax refund
fund to pay the Guam
EIC program.

The law states that the
annual amount for EIC
payments must not
exceed $14 million.

Home     News     Entertainment Communities  Classifieds     Coupons     Real Estate     Fu

Contact Us  |  Subscribe  |  Place an ad
Copyright © 2003 Guam Pacific Daily News. All Rights Reserved.
Use of this site indicates your agreement to the Terms of Service (updated 12/20/02)




# GOVERNMENT OF GUAM
### (GUBETNOMENTON GUAHAN)
## DEPARTMENT OF ADMINISTRATION
### (DIPATTAMENTON ATMENESTRASION)
## DIRECTOR'S OFFICE
Post Office Box 884 • Hagåtña, Guam 96932
Tel: (671) 475-1101/1250 • Fax: (671) 477-6788

**Felix P. Camacho**
*Governor*
**Kaleo S. Moylan**
*Lieutenant Governor*

**Lourdes M. Perez**
*Director*
**Joseph C. Manibusan**
*Deputy Director*

July 20, 2004

### Memorandum

To:          Attorney General of Guam

From:        Director, Department of Administration

Subject:     EIC Settlement Funds

This is to confirm that $3.0 M has been set aside as EIC Settlement Funds pursuant to the
Stipulated Order Granting Preliminary Approval of Class Action Settlement, Docket No.
CIV04-00006, filed before the United States District Court of Guam.

c.c. Governor of Guam
     Director, Department of Revenue & Taxation

# Attorneys to challenge EITC settlement

**By Steve Limtiaco**
*Pacific Daily News*
slimtiaco@guampdn.com

Attorney Mike Phillips could be owed $6 million over the next nine years for his role in settling a tax lawsuit against the government of Guam — too much money for the work that was performed, according to local attorneys who have challenged or who plan to challenge the deal that Phillips hammered out for taxpayers.

Phillips represents taxpayer Julie Santos in a class-action lawsuit against the government of Guam, which has failed to pay the Earned Income Tax Credit since 1998. The tax credit, which was created in 1973, is an incentive for the working poor.

Phillips and the government reached a $60 million agreement about two weeks ago, but the agreement is not final and still is in court. The amount is about half of what the government owes.

The proposed settlement, which was signed by federal Judge Joaquin Manibusan, requires Rev and Tax to pay off the $60 million during the next nine years and to pay the tax credit in full from now on.

Under the agreement, Phillips would receive 10 percent, or $6 million, leaving $54 million to be distributed to eligible taxpayers. A motion to intervene was filed

in federal court Tuesday on behalf of taxpayer Christina Naputi, who is represented by attorney Thomas Fisher.

Fisher said the agreement reached by Phillips allows ineligible people to be paid, which reduces the amount of money available for his client Naputi and others like her. Fisher said there is a three-year statute of limitations on tax claims, and he said taxpayers should not be paid for any claims beyond three years.

"We think that the people who have legitimate claims against the government for Earned Income Tax Credit should be compensated," Fisher said. "They should be compensated fully, not 50 percent."

Fisher said no one has taken the government to task to determine how much is actually owed in tax credits.

"We think we have a right to intervene in this action because the class of people — people who are owed the Earned Income Tax Credit — are not being adequately represented by the plaintiff (Julie Santos)," Fisher said.

## Second challenge

Also on the horizon is a second legal challenge, which could be filed during the next few days by attorney Robert Kutz, who said the settlement was improperly reached before basic questions were answered.

**TO THE POINT**

▲ At least two local attorneys said they will challenge the Earned Income Tax Credit settlement, in part because of the $6 million fee that attorney Mike Phillips will make from it.

Among other things, the courts need to determine whether Santos adequately represents the interests of everyone who is affected, Kutz said.

"There's a lot at stake and a lot of people affected. We want to see it done right," Kutz said. "If the case is gonna settle, let's have it settle on a factual basis that's fully disclosed. Let's have the attorneys paid appropriately for what they do."

Kutz said he has spoken with several taxpayers in order to find a group of people who represent a cross-section of those owed money.

Phillips yesterday said he reached a good settlement with the government that guarantees $20 million will be paid during the next year, with $40 million more during the following eight years.

Phillips said he believes the most important part of the settlement "was our ability to guarantee that the government start the program next year. So every per-

son who files next year (for the tax credit) will be paid."

## At a price

Explaining the philosophy behind the agreement, Phillips said getting the government to guarantee $60 million in payments came at a price.

"It doesn't come for free. If you want a guaranteed payment stream, and you want to guarantee the program goes on without any questions, then obviously you have to be prepared to give something in order for the other side to go along with it. Otherwise, they have nothing to lose and, they'll say, 'OK, we'll fight you ...'"

And if that fight were lost, residents would question why a $60 million offer was turned down, Phillips said. "That's the balance," he said.

## Fee questioned

Kutz and Fisher yesterday questioned the proposed $6 million fee for Phillips. Phillips questioned their motives for wanting to be part of the case.

"It's always to be expected when you're near settlement that people pop out and want to join in it, ... especially among attorneys, when it comes to money," Phillips said. He said no one offers to help in a class-action case when there's no money involved.

Fisher said his law firm expects to be fairly paid for the work it does on the tax case.

"But we looked at the settlement and noticed no work was done on the case and an attorney was hoping to get around $6 million," Fisher said. "The Earned Income Tax Credit is a tax credit for Guam's working poor. ... If any class of people on this island needs to be protected, it's the working poor and we owe them a lot more than just cooking up these thoughtless, hamhanded, unfair settlements."

Kutz, who said he plans to work with attorney Larry Teker on the case, said they would charge only a fraction of what Phillips expects to receive.

"He's entitled to be paid. I'm not saying he's done a bad job," Kutz said. "But the money that he would be paid comes directly out of the pockets of these people who are receiving the refund. It's not being paid separately by the government."

Phillips said he did not expect the case to be settled so quickly and said he has worked on other class-action lawsuits for about a decade without being paid.

"That's the way it goes — sometimes it takes you 10 years, sometimes it takes you one year," he said, adding that his fee for those types of cases has always been 10 percent.

# Red Cross begins property damage assessment

**By Mia McCully**
*Pacific Daily News*
mmccully@guampdn.com

Yesterday, American Red Cross volunteers were busy answering phone calls, assisting people with

**DISASTER ASSISTANCE**

▲ **Who**: The American Red Cross.



The men set out yesterday morning at 11 a.m. to assess the Dededo neighborhoods of Astumbo Gardens, Ukudu, Kaiser, Ypaopao Estates, GHURA 501, GHURA 505, GHURA 48, Ysengsong and Asai-



# FRANK BLAS AGUON, JR.
## VICE-SPEAKER

The Honorable Felix P. Camacho
I Maga'Lahen Guahan (Governor of Guam)
Executive Chambers, Suite 408, Pacific News Building
Hagatna, Guam 96932

Dear Governor Camacho:

**Buenas yan Hafa Adai.** This is a follow-up inquiry with your office regarding a very important financial commitment made by your Administration and the Office of the Attorney General. The settlement agreement recently entered into by the aforementioned parties for the future payments of the Earned Income Tax Credit will directly impact the financial budgetary discussions and considerations in the upcoming weeks. The fiscal year 2005 financial impact may reach a level of Thirty Seven Million ($37 million), if funds for the payment of such obligations are not identified outside of the regular government of Guam General Fund stream. Although I question the ability of the two government parties who participated in the formulation of the agreement to make such significant financial commitments without the direct involvement of the appropriating authority, I Liheslaturan Guahan, as Chairman of the Appropriations and Budgeting, General Governmental Operations, Reorganization and Reform Committee, I stand ready to work with your administration toward resolving this issue through identifying a financing scheme that would enable our people who are due their Earned Income Tax Credit to receive their funds within the terms outlined. Therefore, **I urge you to present a financial payment plan for the Earned Income Tax Credit payments for FY 2005 to the Committee no later than Thursday, July 22, 2004, which will provide for compliance with the financial terms of the settlement agreement. Should such financial plan encompass funds from the preliminary fiscal year 2005 budgetary level of $410 million, it is incumbent upon your administration to further identify the areas for such reduction in allocations based on the spending plan received by the Committee.**

In addition, it is imperative that your administration imposes further restrictions on any new hiring of personnel exclusive of critical education, healthcare and law enforcement positions that may unnecessarily increase the cost of the Government of Guam's operations beyond its present personnel level. Please be mindful that *I Liheslaturan Guahan* incorporated unprecedented flexibility in the Fiscal Year 2004 budget in the re-assignment and cross-application of existing government personnel and resources, in recognition of the financial challenges of our government in addressing existing operational and prior year obligations.

Your direct and timely action in the submission of a financial payment proposal for the EITC for the upcoming fiscal year should lead to the proper payment of the Earned Income Tax Credit obligations to eligible recipients in the next year. Should any legislative remedy be necessary to address this situation, aside from the budgetary flexibility and administrative tools that are continued in the fiscal year budget, I stand ready to extend my assistance. **Dangkolo Na Si Yu'os Ma'ase'.**

VICE-SPEAKER FRANK B. AGUON, JR.
Senator, Mina Bente Siete Na Liheslaturan Guahan

CC:    The Honorable Kaleo S. Moylan, Segundo Maga'lahen Guahan
       The Honorable Douglas A. Moylan, Attorney General of Guam, Department of Law
       The Honorable Speaker/Honorable Senators, Mina Bente Siete Na Liheslaturan Guahan


