SHANNON TAITANO, ESQ.
OFFICE OF THE GOVERNOR OF GUAM
Ricardo J. Bordallo Governor's Complex
Adelup, Guam 96910
Telephone: (671) 472-8931
Facsimile: (671) 477-4826

RODNEY J. JACOB, ESQ.
DANIEL M. BENJAMIN, ESQ.
CALVO AND CLARK, LLP
Attorneys at Law
655 South Marine Drive, Suite 202
Tamuning, Guam 96913
Telephone: (671) 646-9355
Facsimile: (671) 646-9403

Attorneys for *Felix P. Camacho, Governor of Guam*

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF GUAM

| | |
|---|---|
| JULIE BABAUTA SANTOS, et. al., <br><br> Petitioners, <br><br> -v- <br><br> FELIX P. CAMACHO, etc., et. al. <br><br> Respondents. | CIVIL CASE NO. 04-00006 <br><br><br> **MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO ATTORNEY GENERAL'S BRIEF** |

**ORIGINAL**

Governor Felix P. Camacho respectfully submits this memorandum in response to the brief filed by the Attorney General on November 8, 2004. The Governor has filed a separate memorandum setting forth why the administrative plan is, regrettably, an improper vehicle for accomplishing the Governor's longstanding goal of providing the EITC to eligible individuals. This memorandum is confined to the other issues raised by the Attorney General.

## **INTRODUCTION**

The Attorney General contends that he may stipulate to the payment of $60 million in public funds on behalf of the Government without an appropriation by the Legislature. And he claims that the Governor has no right to be heard as a defendant in litigation where he (and other Government officers and employees in the executive branch) could be required to spend the non-appropriated funds in violation of the law. Nothing supports these arguments. Although the Attorney General enjoys some independence as an elected official, his independence does not include the power to silence duly-elected lawmakers from doing their jobs and making their positions known to this Court.

Appropriations of public funds occur through the democratic process, where elected lawmakers publicly cast their votes. They then present the appropriation to the Governor for approval. This is an important check on legislative power. Conversely, the Governor may not commit to spend money, or spend money beyond what is in a fund without prior appropriation by the Legislature. This is an important check on executive power. This process has additional safeguards in that it is carried out in public, on the record, and all sides have the right to be heard. These checks and balances exist so that too much power — especially important powers, such as the ability to spend public funds — is not concentrated in the hands of one government official.

That is a far cry from what is occurring in this case. Here, the Attorney General has agreed to a tentative settlement that commits to pay $6 million to an attorney and $54 million to private individuals and quasi-government entities, and tens of millions of dollars in each future tax year, all without an appropriation or fund from which to pay it. This has been done by stipulation without argument from both sides and without any transcripts or records for the public

to see. On top of this, the Attorney General is trying to prevent this important public issue from being heard by this Court by seeking to prevent the Governor from voicing his concerns about the legality of the stipulated settlement and the administration plan. If he were allowed to do so, the Attorney General would destroy the system of checks and balances and concentrate the power to make appropriations in the hands of just one person — him.

An attorney general (and all other government officials for that matter) simply cannot do this under the laws of Guam or any other jurisdiction in the United States. While the Attorney General is free to take and advocate positions he thinks are legally appropriate and justified in the courts, he may not use his role as a lawyer to prevent the other branches of government from performing their duties by similarly resenting their positions in the courts. It is for the courts, not the Attorney General, to decide the merits of these positions.

The Attorney General cites no authority giving him either (1) the right to use the process of stipulation to make Government appropriations; or (2) the right to prevent the Governor from appearing through counsel who will represent his interests. Even the decisions that he cites state that a governor must be allowed a voice in litigation, where, as here, he is named as a defendant. No court in any jurisdiction ever has permitted such an exercise of raw, unchecked power by an attorney general.

## STATEMENT OF FACTS

In February 2004, Julie Babauta Santos filed this action against the Governor of Guam, the Director of the Department of Revenue and Taxation, the Director of Department of Administration, the Attorney General, and the Government of Guam. The lawsuit seeks to recover the Earned Income Tax Credit (EITC) on behalf of all eligible taxpayers.

On March 10, 2004, petitioner filed a stipulation dismissing the Attorney General as a defendant. The next day, the Attorney General entered an appearance on behalf of all defendants and filed an opposition to the petition.

### A. The Settlement Agreement

In June 2004, while the Governor was off-island, the acting governor Lt. Governor Moylan and Attorney General Moylan entered into a settlement agreement with petitioner's

MR041124-382-00010[MP&A re Opp. to AG Brief]    2

Case 1:04-cv-00006    Document 97    Filed 11/24/2004    Page 3 of 15

counsel. No facts regarding how this settlement was negotiated (or even whether there were negotiations) have been provided to the Governor. He has been told by the Attorney General that no documents exist regarding these negotiations or any advice the Attorney General's office provided to the government defendants. (Decl. of Rodney J. Jacob submitted concurrently herewith ("Jacob Decl.") at Exh. F.)

After the settlement was executed, the Attorney General and petitioner's counsel submitted a stipulated proposed order preliminarily approving the settlement. It was signed on June 14, 2004. Days later, another stipulated proposed order was entered awarding petitioner's counsel 10% of the "Settlement Amount."

The settlement agreement provided that the Government of Guam would pay $60 million as the Settlement Amount and that the Government would pay the EITC tax credit in future tax years. The agreement did not identify any appropriation or source of funds to pay the $54 million in purported tax refund claims, the $6 million for petitioner's counsel, or the EITC tax refund claims in future tax years. The agreement was not contingent on the Legislature appropriating funds to make these payments.

**B.  The Governor's Investigation into the Legality of the Settlement**

In August 2004, Charmaine Torres filed a lawsuit similar to this one against a number of parties, including the Governor and the Attorney General. The Governor determined there was a conflict and retained independent legal counsel.

In September 2004, after legal research was done in connection with the Torres suit, the Governor became concerned regarding the legality of the settlement in this case and wrote to the Attorney General's office to inquire as to these concerns. (Jacob Decl. Exh. A.) Principle among the concerns was the issue of how the settlement would be funded. (*Id.*)

The Governor's concern was that committing to pay any money before the Legislature had appropriated it would violate the Illegal Expenditures Act, 5 G.C.A. § 22401(a). That law provides:

> No officer or employee of the government of Guam, including the Governor of Guam, shall:

> (1) Make or authorize any expenditure from, or create or authorize any obligation under, any appropriation or fund in excess of the amount available therein, or for other than an authorized purpose;
>
> (2) Commence, continue, or proceed with any operational activity, construction, improvement, contract, or obligation without an appropriation or fund for the payment thereof; or after any such appropriation or fund is exhausted;
>
> (3) Involve the government of Guam in any contract or other obligation, for the payment of money for any purpose, in advance of the appropriation made for such purpose

5 G.C.A. § 22401(a).

In response, the Attorney General's office sent a letter to the Governor advising him regarding the settlement. It stated that the settlement was illegal with regard to the payment of future EITC tax credits, but legal with regard to the payment of the $60 million. (Jacob Decl. Exh. C.) It further stated that the term regarding future payments could expose the Governor and other Government defendants to criminal prosecution if they proceeded. (*Id.*)

### C. The Attorney General's Efforts to Bind the Governor and Government to an Illegal Agreement

The Governor was concerned that the proposed settlement was illegal and could expose him and all other government employees to criminal punishment if they proceeded. Accordingly, he asked that the Attorney General not take any further actions in this litigation without consulting him. (Jacob Decl. Exh. E.)

On October 25, 2004, petitioner filed a proposed administrative plan. Two days later, the Attorney General's office informed the Governor that it would obtain an extension until November 29 to respond to the proposed plan. (Jacob Decl. Exh. D.) Instead, the Attorney General filed a response to the Plan without consulting his client, the Governor. The Attorney General did not provide this response, which purported to be on behalf of the Governor as well as all other defendants, to the Governor until November 10, 2004.[1]

---

[1] The Attorney General sent a letter alerting the Governor's counsel to his intent that, although purportedly dated Friday, November 5, was not received by the Governor's central files from until less than *one hour* before the filing on the Administrative Plan was due on Monday, November 8, 2004 at 3 p.m.. (Jacob Decl. Exh. F.) The Governor's counsel did not receive that letter until some days later.

In his response, the Attorney General has contended that he was free to take any position he wished in this case without consulting his clients because the "Attorney General is not subject to the direction of the particular officials named as defendants in the litigation," including the Governor, whom he knows holds a contrary position on the legality of the settlement. (AG MPA at 7:11-12.) As a result, the Governor has appeared through independent counsel so that he could be heard by this Court.

## ARGUMENT

### I. PENDING JURISDICTIONAL ISSUES

Because subject matter jurisdiction is at issue in this case as explained in the Governor's concurrently filed brief, he must out of an abundance of caution note the pending need to resolve this issue before other issues are decided.

### II. IF THE ATTORNEY GENERAL HAD THE UNCHECKED POWER TO BIND THE GOVERNMENT TO THE SETTLEMENT AGREEMENT, HE WOULD BE USURPING LEGISLATIVE, EXECUTIVE, AND JUDICIAL FUNCTIONS

#### A. The Legislature's Power of Appropriations

As set forth more fully in the Governor's concurrently filed Objections to the Administrative Plan, the settlement agreement violates the Illegal Expenditures Act and could expose the Governor and his employees to criminal liability. For this reason alone, the Attorney General, as an officer of the Government, lacks the authority to bind anyone to it.

If, as he contends, the Attorney General could bind the Government to such an agreement, while preventing the other branches of government from challenging it, he would be usurping the Legislature's power to appropriate funds subject to the Governor's approval. Guam follows the federal separation of powers doctrine. *In re Request of Gutierrez*, 2002 Guam 1, ¶ 31 (Feb. 7, 2002). "Even absent a finding that one branch has usurped a power exclusively reserved for another branch, a separation of powers violation may still be found if 'one branch unduly interferes with another branch so that the other branch cannot effectively exercise its constitutionally assigned powers.'" *Id.* at ¶ 34 (quotation omitted).

Pursuant to Guam's Organic Act, the "legislative power and authority of Guam shall be vested in a legislature, consisting of a single house, to be designated the 'Legislature of Guam.'" 48 U.S.C. § 1423(a). The power of appropriations belongs solely to the Legislature. *Pangelinan v. Gutierrez*, 2003 Guam 13, at ¶15, *reconsidered in part on other grounds* 2004 Guam 16 (citing 48 U.S.C. § 1423j(a)) (Organic Act "expressly reserves for the Legislature the power to appropriate money"); *United States v. Butler*, 297 U.S. 1, 65 (1936) ("The Congress is expressly empowered to lay taxes to provide for the general welfare. Funds in the Treasury as a result of taxation may be expended only through appropriation."); *Office of Personnel Mgmt. v. Richmond*, 496 U.S. 414, 424 (1990) (quotation omitted) ("no money can be paid out of the Treasury unless it has been appropriated by an act of Congress."); *Cincinnati Soap Co. v. United States*, 301 U.S. 308, 321 (1937); *see also Hart's Case*, 16 Ct. Cl. 459 (1880), *aff'd* 118 U.S. 62 (1886) ("The absolute control of the moneys of the United States is in Congress, and Congress is responsible for its exercise of this great power only to the people.").

Indeed, the United States Supreme Court explicitly has held:

> No officer, however high, not even the President, much less a Secretary of the Treasury or Treasurer, is empowered to pay debts of the United States generally, when presented to them. ... The difficulty in the way is the want of any appropriation by Congress to pay this claim. It is a well-known constitutional provision, that no money can be taken or drawn from the Treasury except under an appropriation by Congress.

*Reeside v. Walker*, 52 U.S. (11 How.) 272, 291 (1851).[2]

The settlement involves several appropriations. It appropriates tens of millions of dollars to pay the EITC in future tax years. It appropriates $6 million to pay petitioner's counsel. It appropriates $54 million into a settlement fund. In turn, under the administrative plan proposed

---

[2] State governments function no differently. *E.g., Cal. State Employee's Ass'n v. State*, 32 Cal. App. 3d 103, 108 (1973) (quotation omitted) ("the power to collect and appropriate revenue of the State is one peculiarly within the discretion of the Legislature"); *Col. Gen. Assembly v. Lamm*, 738 P.2d 1136, 1169 (Col. 1987) ("The power of the general assembly over appropriations is plenary"); 63C Am. Jur. 2d *Public Funds* § 48 (collecting authorities) ("The power of the legislature with respect to the public funds raised by general taxation is supreme, and no state official, not even the highest, has any power to create an obligation of the state, either legal or moral, unless there has first been a specific appropriation of funds to meet the obligation.").

by the Attorney General, this appropriation will then be used to pay the Department of Administration (AG MPA at 4:4), "the Guam Hospital Memorial Fund, the Child Support Collection Division of the Attorney General's Office and the Guam Housing and Urban Renewal Authority." (AG MPA at 4:24-5:2.) If the Attorney General could make such agreements on behalf of the Government and prevent branches responsible for appropriations from challenging them, he, alone, would have plenary power over Government appropriations (including appropriations to himself) in violation of the fundamental separation of powers principles.

### B. The Judiciary's Power to Review and Decide Intergovernmental Disputes

An equally troubling aspect of the Attorney General's position is that if he were allowed to stipulate to the legality of the settlement without presenting his client's view to the Court, he would be inhibiting this Court's power of judicial review. "It is emphatically the province and duty of the judicial department to say what the law is." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803). This duty is especially trenchant, where, as here, issues regarding the separation of powers are presented. *Id.* at 176. Yet, by not explaining to the Court that the Governor believes the settlement is illegal, and by attempting to prevent the Governor from raising this point, he would take away the Court's function of determining the legality of the settlement and arrogate it unto himself.

Under the adversarial system, the only way for effective judicial review to occur is for both sides of a legal issue to receive zealous representation. Here, the Attorney General has taken the conflicting positions that (1) the appropriation for future tax years is illegal (Jacob Decl. Exh. C), (2) any attempt to fund the administrative plan without an appropriation is illegal (AG MPA at 3), (3) but the $60 million appropriation is legal. (Jacob Decl. Exh. C.) This position is presumably based upon some interpretation of the law. But if the Attorney General could prevent the Court from hearing all legal arguments but his own (including those by the affected parties), he would be substituting his decision on what the law is for meaningful review by the Court.

The Attorney General's title of "chief legal officer" does not confer such power. Section 1421g(d)(1) of the Organic Act states only that the Attorney General serves as the "Chief

Legal Officer of the Government of Guam." In the U.S. Code, "chief legal officer" just means "attorney general." *E.g.* 15 U.S.C. § 15g(1) ("The term 'State attorney general' means the chief legal officer of a State...."); *accord* 15 U.S.C. §§ 5714(2), 6106(1); 42 U.S.C. § 1997c(b)(1)(A). As the Oklahoma Supreme Court has held, it is impossible to see how "legislative investiture of the mantle of 'Chief Law Officer' alone confer[s] upon the office a stature which it did not already have...." *Cartwright v. Georgia-Pacific Corp.*, 663 P.2d 718, 722-23 (Okla. 1983); *Williams v. McKiethen*, 1990 WL 265971, at *5 (M.D. La. July 20, 1990) ("chief legal officer" is just an explanatory phrase "without substantive meaning with regard to powers, function or duties"); *Tarantino v. Bd. of Regents*, Guam Super Ct. Civil Case No. 1455-00 (Decision and Order Dec. 5, 2000) at p. 8-9 (rejecting contention that Legislature cannot limit common law powers because of the Organic Act's "chief legal officer" amendment because "[a] review of the House Reports of the 1998 Organic Act Amendments provides no support to Plaintiff's claim that the Attorney General harnesses powers that are immune from local legislation.") (citing H.R. Rep. No. 105-742, 105th Cong. (2nd Sess. 1998)).

The Attorney General's citation to *Moylan v. Camacho*, Super. Ct. of Guam Case No. SP230-03 (Dission Yan Otden Nov. 10, 2003), also does not support his position. *Moylan* held an attorney general has a "dual role" in (1) bringing litigation to enforce the public interest, and (2) acting as counsel for state agencies. *Id.* at 40. *Moylan* dealt with the Attorney General's role in bringing litigation to enforce the public interest. It held that an attorney general may sue the governor when acting in that capacity. It did not discuss an attorney general's powers as counsel for state agencies, much less hold (or even suggest) that an attorney general may elevate his view of the public interest above all others when acting in that capacity. To the contrary, the court explained: "[T]he Court ***does not*** intimate that the Attorney General has the final determination of what is in the public interest. The Governor may very well have a different view of what is the public interest. When their positions conflict as to the public interest, as in the controversy before the court, it is appropriate that the Courts determine what the public interest calls for." *Id.* at 43 (emphasis added).

### C. The Governor's Power to Control the Representation of His Office

The Governor does not quarrel with the general proposition that an attorney general has a duty to represent the public interest. All officers of the government do, including the Governor. But an attorney general may not use his or her role as counsel for government officers and agencies to substitute the attorney's personal view of the public interest for the views of his or her clients when representing the executive branch.

The Organic Act vests the Governor with: (1) "The executive power of Guam...."; (2) "[G]eneral supervision and control of all the departments, bureaus, agencies, and other instrumentalities of the executive branch of Guam"; and (3) "Responsib[ility] for the faithful execution of the laws of Guam and the laws of the United States applicable in Guam." 48 U.S.C. § 1422. The Organic Act's requirement that the Governor maintain ultimate control over executive functions was recently reaffirmed by the Guam Supreme Court in *In re Request of Governor Felix P. Camacho*, 2004 Guam 10. As the court held, the Legislature is free to vest an executive function in a pre-existing officer of its choosing (such as the Attorney General). *Id.* at ¶¶ 51-52. However, **any executive function must ultimately be subject to the Governor's "general supervision and control" as provide for in 48 U.S.C. § 1422.** *Id.* at ¶ 41 ("statutory provisions granting 'exclusive' purview over ... [executive agency] and 'final' submission and approval authority over all federal fund applications to ... [executive agency director], are in derogation of section 1422 of the Organic Act, which grants the Governor the power of general supervision and control over executive branch bureaus"). "[T]he Governor's power ... means that the Governor is vested with the overall power to manage, direct, or oversee such [executive] entities." (emphasis added). *Id.* at ¶ 38.[3]

Accordingly, under *In re Request of Governor Felix P. Camacho*, the ultimate control of any litigation involving him or any executive agency must remain with the Governor. *In re Request of Governor Felix P. Camacho*, 2004 Guam 10, ¶ 41; *see Govt. of Guam v. United*

---

[3] This principle also applies in the federal system. *Bowsher v. Synar*, 478 U.S. 714, 726 (1986) ("To permit the execution of the laws to be vested in an officer answerable only to Congress would, in practical terms, reserve in Congress control over the execution of the laws").

*States*, Dist. Ct. of Guam Civil Case No. 82-0001 (Memorandum Order Aug. 3, 1982) at 6 (representation of the government "is clearly an executive function"). It would be a very hollow executive power indeed if the Governor had the power to set the policy of his office or agencies on the EITC settlement or any other issue, yet the Attorney General could enter the court the next day to reverse this decision and force compliance with an unlawful contract. *State ex rel. Amerland v. Hagan*, 175 N.W. 372, 374 (N.D. 1919) (attorney general's role representing officers and departments "does not mean that the attorney general, standing in the position of an attorney to a client, who happens to be an officer of the government, steps into the shoes of such client in wholly directing the defense and the legal steps to be taken in opposition or contrary to the wishes and demands of his client or the officer or department concerned.").[4] As discussed in the next sections, for this reason, courts universally have held that an attorney general cannot use his position to prevent a governor from being heard by the courts.

Moreover, trying to finalize the proposed settlement without the Governor's permission would expressly violate the limits that the Legislature placed upon the Attorney General's powers. 5 G.C.A. § 6206(a) ("The Attorney General, <u>subject to the approval of the Governor for settlements over $3,000</u>, may settle for money damages any claim against a line agency or autonomous agency under this Chapter. The Attorney General may <u>recommend</u> other relief if appropriate.") (emphasis added).

### III. WHEN AN ATTORNEY GENERAL REPRESENTS AN OFFICER OR AGENCY OF THE GOVERNMENT, HE OR SHE MUST FOLLOW THE INSTRUCTIONS OF THE CLIENT

As the repositories of the public interest, every officer and agency of Guam has the right to present their view of the public interest. This is why the vast majority of courts, including the Guam Supreme Court, hold that an attorney general must follow his or her clients' instructions. *Pangelinan v. Guitierrez*, Sup. Ct. Case No. CVA 02-003 (Order Feb. 10, 2003) at 1 (requiring client's consent before Attorney General could withdraw brief).

---

[4] *Overruled on other grounds in Benson v. North Dakota Workmen's Compensation Bureau*, 283 N.W.2d 96 (N.D. 1979).

The rationale for this rule has been articulated by numerous courts. "To accord the attorney general the power he claims would leave all branches and agencies of government deprived of access to the court except by his grace and with his consent. In a most fundamental sense such departments and agencies would thereby exist and ultimately function only through him." *Motor Club of Iowa v. Dept. of Transp.*, 251 N.W.2d 510, 516 (Iowa 1977). As another court explained:

> [W]e do not accept the Attorney General's contention that, merely because she regards her duty to represent the 'state's' legal interests as being paramount to her duty to represent her statutory client's legal interests, she may, in her sole discretion, so control the course of litigation as to advance her view of the 'public welfare' when it squarely conflicts with the substantive position taken by the policy-making state governmental instrumentality whom she represents as a named party to the litigation.

*Chun v. Bd. of Tr.*, 952 P.2d 1215, 1234 (Haw. 1998).

As yet another court held:

> [T]he Attorney General's right to represent state officials or state agencies cannot be gainsaid, but he must in fact represent them. He cannot ignore his clients and bind the State against their wishes ... The Attorney General's authority does not allow him to close either the mouth of [Phillips] or the ears of the courts.

*League of United Latin Am. Citizens, Council No. 4434 v. Clements*, 999 F.2d 831, 843 (5th Cir. 1993) (en banc) (brackets in original, internal quotations and footnote omitted). The court went on to state: "The Attorney General's power to settle for his clients is certainly no less than that of other lawyers, but ... [it is not] any greater. No lawyer may forge a settlement agreement over the express objection of his client. Here, to the extent that Morales represents the Chief Justice in the Justice's defense of his constitutionally assigned task, he may not ignore him." *Id.*

This rule and the basic principles guiding it have been repeated by numerous other courts. *E.g., Manchin v. Browning*, 296 S.E.2d 909, 921-22 (W. Va. 1982) ("state officers are entitled to have their lawful public policy decisions vindicated in the courts just as individuals are entitled to vindicate their personal rights at law. The courts must be open to all. When the Attorney General refuses to fulfill his duty, as required by law, to provide effective legal assistance to a state officer involved in litigation, such refusal would operate to deny due

process."); *State ex rel. Allain v. Miss. Public Serv. Comm'n,* 418 So.2d 779, 784 (Miss. 1982) (similar); *Frazier v. State by and through Pittman,* 504 So.2d 675, 692 n.17 (Miss. 1987) (similar); *Tice v. Dept't of Transp.,* 312 S.E.2d 241, 245 (N.C. App. 1984) ("[T]he legislature intended that when the Attorney General represents a State department...the traditional attorney-client relationship should exist."); *Public Utility Comm'n of Texas v. Cofer,* 754 S.W.2d 121, 125 (Tex. 1988) ("We emphasize that when a statute confers a right upon the attorney general to represent an agency, it imposes a corollary duty, and the agency has every right to expect the same diligent and faithful representation as any other 'client.'"); *Santa Rita Mining Co. v. Dept. of Property Valuation,* 530 P.2d 360, 362 (Ariz. 1975) (similar); *State ex rel. Howard v. Oklahoma Corp. Comm'n,* 614 P.2d 45, 50 (Okl. 1980) (similar); *see also A.B. Wonpat Guam Int'l Airport Auth'y v. Moylan,* Guam Super. Ct. Case No. SP0055-03, Decision & Order, at 11-12 (May 9, 2003) (Guam Airport Authority free to seek counsel of its own choosing).

Nor is this rule contrary to the Attorney General's ability to maintain his view of the public interest. As one court explained, after an attorney general begins a representation, it is possible that a department's view might diverge from the attorney general's. Such an eventuality does "not give the attorney general the power to impose his will on the department. [Instead,] [i]t might well provide the basis for substitution of counsel with a tardy appearance by the attorney general in behalf of what he perceives to be the state interest." *Motor Club of Iowa,* 251 N.W. 2d at 516; *State ex rel. Allain,* 418 So. 2d at 784 ("The unique position of the attorney general requires that when his views differ from or he finds himself at odds with an agency, then he must allow the assigned counsel or specially appointed counsel to represent the agency unfettered and uninfluenced by the attorney general's personal opinion. If the public interest is involved, he may intervene to protect it."); *Chun,* 952 P.2d at 1239 ("Having perceived herself to be in a conflict of interest with the Board, the Attorney General was ethically obligated to recommend retention of other counsel."). Thus, where he disagrees with his client's instructions, the Attorney General need only withdraw from that representation so that his clients may be heard in the courts.

## IV. THE ATTORNEY GENERAL'S CASES REGARDING AGENCIES AND OFFICERS ARE FAR OFF-POINT

None of the decisions cited by the Attorney General holds that he may evade the appropriations process through stipulation. And none holds that he may use his role as an attorney for Guam's officers and agencies to accomplish what he could not do in his role of bringing litigation in the public interest, *i.e.*, prevent the Governor from being heard by the Court.

Even the decisions he cites expressly note a governor's right to be heard. *See, e.g.*, *Sec'y of Admin. and Fin. v. Attorney Gen.*, 326 N.E. 2d 334, 339 n.8 (Mass. 1975) ("where there is a policy disagreement between the Attorney General and the Governor or his designee, the appropriate procedure would be for the Attorney General to appoint a special assistant to represent the Governor's interests."); *Ex parte Weaver*, 570 So. 2d 675, 684 (Ala. 1990) (regardless of attorney general's views, governor can always intervene to "express his views and take positions contrary to those argued by the attorney general"); *Reiter v. Wallgren*, 184 P. 2d 571, 576 (Wash. 1947) ("it would be an anomalous situation if the Governor, having the supreme executive power of the state, was unable to secure such a determination because of the failure or refusal to act on the part of one having less power. Some of the expressions referred to in our cases above cited are broad enough to indicate that the Attorney General only may maintain an action such as this, and, as applied to the facts in the particular cases, the statements therein contained are correct. But it must be remembered that in none of those cases was the Governor a party, nor were we in any of them called upon to construe the above-quoted provisions of our Constitution concerning the powers, rights, and duties of the Governor.").[5]

Moreover, there are important distinctions about these decisions that are worth noting. In *Feeney v. Commonwealth*, 366 N.E. 2d 1262 (Mass. 1977), for example, the court permitted an attorney general to appeal a decision holding that legislation was unconstitutional, even though the state agency that was sued was willing to concede the issue at that stage. This

---

[5] *Terry v. Wilder*, 29 Va. Cir. 418 (1992) (cited in AG MPA at 8), was overruled by the Supreme Court of Virginia in *Wilder v. Atty. General*, 439 S.E.2d 398, 403 (Va. 1994), which held that the governor could constitutionally remove the attorney general from representing an officer or agency when he perceived a conflict.

decision is consistent with (1) the attorney general's role of defending the legislature, which had passed a resolution urging the attorney general to appeal in that case, *id.* at 1264, (2) the attorney general's right to *bring* litigation to advance the public interest, and (3) the courts' duty to decide the law with the benefit of adversarial briefing. This case in no way supports the notion that an attorney general is empowered to (1) carve inroads into legislative power by stipulation, (2) use his role as counsel for the officers and agencies of the government to forge an agreement that could expose his clients to criminal punishment, while preventing his client from being heard in the courts, and (3) disable the courts from passing on what the law is — which is what the Attorney General seeks to do here.

Furthermore, none of the Attorney General's authorities take into account Guam's Organic Act and laws. The case that does is *Pangelinan v. Guitierrez*, Sup. Ct. Case No. CVA 02-003 (Order Feb. 10, 2003) at 1, where the Guam Supreme Court required the Attorney General to follow the instructions of his client in that case, the Governor and other executive officers.

## CONCLUSION

The Attorney General's powers do not include impeding the elected lawmakers from exercising their functions under the Organic Act, preventing the Governor from being heard in this litigation, or barring this Court from deciding important legal issues. The Governor is entitled to appear through independent counsel and represent his interests in this action. The Governor respectfully asks that the Attorney General's efforts to the contrary be rejected.

Dated this 24th day of November, 2004.

OFFICE OF THE GOVERNOR OF GUAM
CALVO AND CLARK, LLP
Attorneys at Law

By: *Rodney* 
RODNEY J. JACOB