**SHANNON TAITANO, ESQ.**
**OFFICE OF THE GOVERNOR OF GUAM**
Ricardo J. Bordallo Governor's Complex
Adelup, Guam 96910
Telephone: (671) 472-8931
Facsimile: (671) 477-4826

**RODNEY J. JACOB, ESQ.**
**DANIEL M. BENJAMIN, ESQ.**
**CALVO AND CLARK, LLP**
Attorneys at Law
655 South Marine Drive, Suite 202
Tamuning, Guam 96913
Telephone: (671) 646-9355
Facsimile: (671) 646-9403

Attorneys for *Felix P. Camacho, Governor of Guam*

FILED
DISTRICT COURT OF GUAM
NOV 29 2004 9P
MARY L. M. MORAN
CLERK OF COURT

95

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF GUAM

JULIE BABAUTA SANTOS, et. al.,

Petitioners,

-v-

FELIX P. CAMACHO, etc., et. al.

Respondents.

CIVIL CASE NO. 04-00006

**AMENDED MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF OPPOSITION TO PETITIONER'S MOTION FOR APPROVAL OF THE ADMINISTRATIVE PLAN**

ORIGINAL

TABLE OF CONTENTS

INTRODUCTION .......... 1

STATEMENT OF FACTS .......... 2

A. This Action and the EITC .......... 2
B. The Settlement Agreement .......... 3
C. The Governor's Investigation into the Legality of the Settlement .......... 4
D. The Efforts to Bind the Governor to an Illegal Agreement .......... 5

ARGUMENT .......... 6

I. SUBJECT MATTER JURISDICTION MUST BE ADDRESSED BEFORE THERE ARE FURTHER PROCEEDINGS IN THIS CASE .......... 6

II. THE SETTLEMENT AGREEMENT IS ILLEGAL .......... 9

A. The Governor's Organic Act Authority Over Unencumbered Funds .......... 10
B. The Guam Earned Income Program .......... 12
C. The Income Tax Reserve Funds .......... 12
D. Other Laws .......... 14

III. DISCOVERY AND A PROPERLY NOTICED FAIRNESS HEARING MUST PROCEED ANY ADMINISTRATIVE PLAN .......... 14

A. Procedural Issues .......... 16
B. Lack of Adversarial Proceedings .......... 18
C. Conflicts of Interest .......... 18
D. Lack of Discovery .......... 19
E. Attorney's Fees .......... 20
F. Substantive Fairness .......... 20

CONCLUSION .......... 20

## TABLE OF AUTHORITIES

**Cases**

*Ace Heating & Plumbing Co. v. Crane Co.*, 453 F.2d 30 (3d Cir. 1971) .................................... 16

*Allied Chem. Corp. v. Daiflon, Inc.*, 449 U.S. 33 (1980)........................................................ 8,9

*Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997) ........................................................... 15

*Ashoff v. City of Ukiah*, 130 F.3d 409 (9th Cir. 1997) ............................................................. 8

*Bear Valley Mutual Water Co. v. Riddell*, 493 F.2d 948 (9th Cir. 1974) ..................................... 7

*Boyd v. United States*, 762 F.2d 1369 (9th Cir. 1985) .............................................................. 7

*Blackhawk Heating & Plumbing Co. v. United States*, 622 F.2d 539 (Claims Ct. 1980)............. 11

*Class Plaintiffs v. City of Seattle*, 955 F.2d 1268 (9th Cir. 1992)............................................... 15

*Ficalora v. Lockheed Cal. Co.*, 751 F.2d 955 (9th Cir. 1985) ..................................................... 15

*Hanlon v. Chrysler Corp.*, 150 F.3d 1011 (9th Cir. 1998)........................................................ 6,16

*Heyl & Patterson Int'l v. Rich Housing of Virgin Islands, Inc.*, 663 F.2d 419 (3d Cir. 1981)...... 10

*In Re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 738 (3d Cir. 1995) .......................................................................................................................... 16,19

*In Re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454 (9th Cir. 2000) ............................................... 16

*Israel v. United States*, 356 F.3d 221 (2d Cir. 2004) ................................................................ 14

*Jeff D. v. Andrus*, 889 F.2d 753 (9th Cir. 1989)......................................................................... 11

*Lewis & Queen v. N.M. Ball Sons*, 48 Cal. 2d 141 (1957)........................................................... 6

*Local No. 93 v. City of Cleveland*, 478 U.S. 501 (1986) ............................................................ 6

*Martinez v. United States*, 595 F.2d 1147 (9th Cir. 1979)........................................................... 7

*Molski v. Gleich*, 318 F.3d 937 (9th Cir. 2003) ......................................................................... 16

*Morongo Band of Mission Indians v. Cal. State Bd. of Equalization*, 858 F.2d 1376 (9th Cir. 1988) ........................................................................................................................... 6

*Oatman v. Dept. of Treasury*, 34 F.3d 787 (9th Cir. 1994)...................................................... 7,8

*Ortiz v. Fiberboard Corp.*, 527 U.S. 815 (1999) .......... 15,19

*Pangelinan v. Gutierrez*, 2003 Guam 13 (2003) .......... 9,10,12

*Quarty v. United States*, 170 F.3d 961 (9th Cir. 1999) .......... 7,8

*Rand v. United States*, 249 U.S. 503 (1918) .......... 8

*Robert F. Simmons and Assocs. v. United States*, 360 F.2d 962 (Ct. Cl. 1966) .......... 10

*Rock Island R.R. Co. v. United States*, 254 U.S. 141 (1920) .......... 7

*Saunooke v. United States*, 8 Cl. Ct. 327 (1985) .......... 8

*Sorenson v. Sec'y of Treasury*, 475 U.S. 851 (1986) .......... 7,14,17

*Thompson v. Gaskill*, 315 U.S. 552 (1942) .......... 8

*Thompson v. McCombe*, 99 F.3d 352 (9th Cir. 1996) .......... 8

*Tucker v. Alexander*, 275 U.S. 228 (1927) .......... 7,8

*United Investors Life Ins. V. Waddell & Reed, Inc.*, 360 F.3d 960 (9th Cir. 2004) .......... 6

*United States ex rel. Girard Trust Co. v. Helvering*, 301 U.S. 540 (1937) .......... 9

*United States v. Boe*, 543 F.2d 151 (C.C.P.A. 1976) .......... 7

*United States v. Felt & Tarrant Mfg. Co.*, 283 U.S. 269 (1931) .......... 8

*Zucker v. Occidental Petroleum Corp.*, 192 F.3d 1323 (9th Cir. 1999) .......... 15

**Statutes**

11 G.C.A. § 4105 .......... 2,15

11 G.C.A. § 42103 .......... 12,14,17

11 G.C.A. § 42104 .......... 3,12,15

11 G.C.A. § 50105 .......... 13,16

11 G.C.A. §§ 42101-04 .......... 2,12

11 G.C.A. §§ 50103-05 .......... 13,16

26 U.S.C. § 7422 .......... 7,8

26 U.S.C. § 6532 .......... 7,8,10

26 U.S.C. § 7422 .......... 7,8,10

48 U.S.C. § 1421i .......... 2,7,8,13

48 U.S.C. § 1423j .......... 9,11

5 G.C.A. § 22401 .......... *en passim*

**Other Authorities**

1 *Civ. Actions Against the U.S.* § 1:15 .......... 9,11

15 C. Wright, A. Miller & E. Cooper, *Fed. Practice and Proc.* § 3844 .......... 7

7B Wright & Miller, *Fed.* Practice & Proc. § 1786 .......... 21

7B Wright & Miller, *Fed. Practice & Proc.* § 1797 .......... 16,19,20

John C. Coffee, Jr., *Class Wars: The Dilemma of the Mass Tort Class Action*, 95 Colum. L. Rev. 1343, 1367-82 (1995) .......... 15

Guam Public Law 23-74 .......... 2

Guam Public Law 24-59 .......... 2,3,12,15

Guam Public Law 24-61 .......... 2

Guam Public Law 25-43 .......... 13

Guam Public Law 25-176 .......... 2

**Rules**

57 A.L.R. 3d 475 .......... 18

Fed. R. Civ. P. 23 .......... *en passim*

## INTRODUCTION

The Governor long has championed the EITC. But he cannot champion settlement of this case at the expense of the laws of Guam and the public interest. The settlement here is illegal because there is no appropriation or fund supporting its payment. The administrative plan springs from this settlement, and the Governor has no choice but to oppose it as well.

The settlement occurred while the Governor was off-island. A subsequent inquiry (and an opinion letter by the Attorney General) have revealed that the settlement violates Guam's Illegal Expenditures Act. No officer of Guam may authorize expenditure before the Legislature appropriates the money or where there is insufficient money in the fund that is intended to support the expenditure. The settlement here contravenes this law. It would bind the Government to pay $6 million to counsel, $54 million to a settlement fund, and tens of millions of dollars more in future claims, without an appropriation and without adequate money in any available fund. As the Guam Supreme Court held last year, such a contract is void and unlawful.

Even before this issue can be heard, there is a fundamental need to resolve subject matter jurisdiction in this case. Petitioner's complaint does not allege that she exhausted her administrative remedies. The Ninth Circuit repeatedly has held that a court cannot act in a tax refund case without exhaustion. Similarly, no settlement that must be administered by the courts (such as the settlement of a purported class action here) can be enforced absent subject matter jurisdiction over the underlying action. Therefore, even before deciding the other issues, there must be briefing to determine whether the Court has jurisdiction over this proceeding.

And even without the other issues, any attempt to obtain an administrative plan is premature. Before a court may adopt an administrative plan in a class action settlement, it must give final approval to the settlement itself. In class actions, courts safeguard the public interest by ensuring that the terms of a settlement are fair to the parties and public. This requires scrutinizing all circumstances surrounding the settlement to determine whether it is substantively fair and reasonable. These issues must be explored in open court before the settlement (or any administrative plan) may be approved.

## STATEMENT OF FACTS

### A. This Action and the EITC

In February 2004, Julie Babauta Santos filed this action against the Governor of Guam, the Director of the Department of Revenue and Taxation, the Director of Department of Administration, the Attorney General, and the Government of Guam. The lawsuit seeks to recover the Earned Income Tax Credit ("EITC") on behalf of all eligible taxpayers.

Petitioner's lawsuit stems from a 1996 revenue ruling by Guam's Department of Revenue and Taxation, Revenue Ruling 96-001, which took the position that the EITC did not apply to Guam. This ruling purported to be based on 48 U.S.C. § 1421i(d), which states that the Territorial Income Tax mirrors the federal income tax law except where federal law is "manifestly inapplicable or incompatible."

After this ruling, then-Senator (now Governor) Camacho and others insisted that a means be found to fund the EITC. A series of legislation was passed to try to appropriate funds to pay the EITC. This began with Public Law 23-74, which added 11 G.C.A. § 4105 to the G.C.A. That section stated that the EITC would apply on Guam and that: "There is hereby appropriated from the General Fund, on a continuing basis, such funds as are necessary to give this statute its full force and effect." However, 11 G.C.A. § 4105 (and therefore its appropriation) was subsequently repealed by Public Law 25-176, § 24 ("Chapter 4 of Division 1 of Title 11 of the Guam Code Annotated is hereby *repealed* in its entirety.") (italics in original).

The effort to appropriate funds to pay the EITC was continued in Public Law 24-61 in 1997. That law created the Earned Income Program, which mirrored the federal EITC and identified a source of funds for this payment of the EITC. *See* 11 G.C.A. §§ 42101-04. As amended in 1999, the appropriation provision states:

> Authorization to Spend. For Fiscal Year 1998 and each year thereafter, the Department of Revenue and Taxation is authorized on a continuing basis to spend funds from the Provisions of Refunds as set out in "Exhibit A" of Public Law Number 24-59 for Fiscal Years 1998 and 1999 in such amounts as are necessary to pay the Earned Income program subsidies under this Chapter.

11 G.C.A. § 42104 (current through 2004).

The "Provisions of Refunds as set out in 'Exhibit A' of Public Law Number 24-59 for Fiscal Years 1998 and 1999" referenced in 11 G.C.A. § 42104 was a general provision in the 1998/1999 budget for tax refunds of $50.2 million. Unfortunately, the Provisions for Refunds for the 1998 and 1999 Fiscal Years has been exhausted. (Decl. of Jose S. Calvo ("Calvo Decl.") at ¶ 3.) Since that time, the Legislature has failed to make any new appropriation or reserve to pay the previously unpaid EITC amounts. The most that has occurred is the passage of two laws directed at future budgeting for the payment of the EITC in *future* tax years (Chapters 50 of Title 11, as amended in 1999, and Chapter 51 of Title 11, as enacted in 2002). But no appropriation has been made to cover the non-payment of the EITC for all the previous years (1996-1999), and the funds are, in any case, depleted such that they cannot cover the subsequent years (2000-2003).

**B. The Settlement Agreement**

In June 2004, while the Governor was off-island, Acting Governor Moylan and Attorney General Moylan entered into a settlement agreement with petitioner's counsel. The settlement agreement provided that the Government of Guam would pay $60 million as the Settlement Amount and that the Government would pay the EITC tax credit in future tax years. The agreement did not identify any source of appropriation. The agreement was not contingent on the Legislature appropriating funds to make these payments. Yet, it called for a payment of $17 million in the first year alone.

After reaching this agreement, the Attorney General and petitioner's counsel submitted a stipulated order preliminarily approving the settlement that was signed on June 17, 2004. They subsequently submitted a stipulated order for approval of attorney's fees that was signed on June 24, 2004. That stipulation stated that petitioner's counsel was to receive "ten percent (10%) of the Settlement Amount," *i.e.* $6 million.

The settlement agreement contained a stipulation that this case was a class action and that the "class" included individuals who "were and are entitled to be paid refundable earned income tax credits ... for any of the following tax years: 1996, 1998, 1999, 2000, 2001, 2002,

and 2003." Prior to that time, the issue of class certification had not been briefed and no discovery occurred. Tax year 1996 was not even included in petitioner's complaint.

On June 24, 2004, a stipulated order that established the "class notice" was signed. The notice published pursuant to the order stated that there had been a settlement and that class members could opt out. It did not state that they could appear represented by counsel to object. It did not identify the dangers of opting out or in. It did not mention an administrative plan, who would pay for it, or what the plan would be. The Attorney General and petitioner later stipulated that the notice was not adequately published: "The parties agree that the original notice approved by this Court was not published for three full weeks in the local newspapers in accordance with the parties' agreement...Notwithstanding the failure to fully publish the original notice as agreed, the parties agree that individual notices to members of the class regarding the class action and proposed settlement would be best for all parties involved." A revised notice was attached to this stipulation, but it never was sent out to putative class members.

On July 14, 2004, petitioner filed a motion to appoint petitioner's counsel as "class counsel." Two days later, he was appointed "interim class counsel."

**C. The Governor's Investigation into the Legality of the Settlement**

In August 2004, an individual filed a lawsuit similar to this one seeking refunds of the EITC. The Governor and the Attorney General, among others, were named as defendants. Because he perceived a conflict, the Governor retained independent legal counsel.

After conducting legal research in connection with the other lawsuit, the Governor's legal counsel became concerned regarding the legality of the settlement in this case and wrote to the Attorney General's office to inquire as to these concerns. (Decl. of Rodney J. Jacob submitted concurrently herewith ("Jacob Decl.") at Exh. A.) Principal among the concerns was the issue of how the settlement would be funded. (*Id.*)

In response, the Attorney General's office sent a letter to the Governor advising him that the settlement was illegal with regard to the payment of future EITC tax credits, but that it was legal with regard to the payment of the $60 million. (Jacob Decl. Exh. C.) It further stated

that the term regarding future payments could expose the Governor and other Government defendants to criminal prosecution if they proceeded. (*Id.*)

The Governor made multiple oral and written requests for information regarding the negotiation of settlement and the advice that the Attorney General had provided to the government defendants at the time that the settlement was signed. (Jacob Decl. A, E.) He received nothing from the Attorney General for almost two months. On November 8, 2004, the Governor finally received a letter from the Attorney General. It offered no explanation of the negotiations and stated that "there is no written documentation regarding the history of the negotiations leading up to the Settlement Agreement." (Jacob Decl. Exh. F.)

**D. The Efforts to Bind the Governor to an Illegal Agreement**

Given the concerns about the legality of the settlement, the Governor asked the Attorney General to consult him before taking any further steps in this case. On October 25, 2004, petitioner filed the proposed administrative plan. Two days later, the Attorney General's office informed the Governor that it would obtain an extension until November 29 to respond to the plan. (Jacob Decl. Exh. D.) Instead, the Attorney General filed a response to the Plan without consulting his client, the Governor. The Attorney General sent a letter alerting the Governor to this intent that was received by the Governor's central files less than *one hour* before the filing was due on Monday, November 8. (Jacob Decl. Exh. F.)

The Attorney General's response sought to continue to enforce the settlement, but also to impose new terms that were not agreed to by the parties. First, it seeks to have the Department of Administration administer the settlement, rather than the Department of Revenue and Taxation, as the settlement agreement states. Second, it proposes conducting a series of setoffs against any money paid out through the settlement for any money owed to "the Guam Memorial Hospital Authority, the Child Support Collection Division of the Attorney General's Office and the Guam Housing and Urban Renewal Authority." (AG Br. at 4:24-5:2.)[1]

---

[1] The response also attempts to prevent the Governor from asserting his interests through independent counsel. That issue is addressed in a separate concurrent filing.

Because the Attorney General's response did not reflect the Governor's position or disclose the illegality of the contract, the Governor filed a request to be heard by this Court. In response, petitioner's counsel drafted a letter threatening to move for contempt if the Governor did not immediately commences payments under the settlement. (Jacob Decl. H.) On November 12, 2004, the Court issued an Order setting a briefing schedule and explaining that "the Court believes the Defendant should be heard."

## ARGUMENT

Before the Court may enforce the settlement agreement, it must determine: (1) whether the Court has jurisdiction over this case; (2) whether the settlement is legal; and (3) whether it is fair and reasonable. *United Investors Life Ins. V. Waddell & Reed, Inc.*, 360 F.3d 960, 966-67 (9th Cir. 2004) (quotations omitted) ("a district court's duty to establish subject matter jurisdiction is not contingent upon the parties' arguments. It is well established that lack of federal jurisdiction cannot be waived or be overcome by an agreement of the parties."); *Lewis & Queen v. N.M. Ball Sons*, 48 Cal. 2d 141, 147-48 (1957) ("when the evidence shows that the plaintiff in substance seeks to enforce an illegal contract ... the court has both the power and duty to ascertain the true facts in order that it may not unwittingly lend its assistance"); *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998) (in class actions, court must determine "whether a proposed settlement is fundamentally fair, adequate, and reasonable").

### I. SUBJECT MATTER JURISDICTION MUST BE ADDRESSED BEFORE THERE ARE FURTHER PROCEEDINGS IN THIS CASE

Federal subject-matter jurisdiction must exist before the Court can enter a consent decree such as that proposed in this case. "[A] federal court is more than 'a recorder of contracts' from whom parties can purchase injunctions; it is 'an organ of government constituted to make judicial decisions....' Accordingly, a consent decree must spring from and serve to resolve a dispute within the court's subject-matter jurisdiction." *Local No. 93 v. City of Cleveland*, 478 U.S. 501, 525 (1986) (internal citation omitted, ellipses in original). The parties cannot evade jurisdictional requirements by stipulation. *Morongo Band of Mission Indians v. Cal. State Bd. of Equalization,* 858 F.2d 1376, 1380 (9th Cir. 1988) ("The parties have no power to confer

jurisdiction on the district court by agreement or consent."). "If jurisdiction is lacking at the outset, the district court has no power to do anything with the case except dismiss ... and any order other than to dismiss is a nullity." *Id.* at 1380-81 (citing 15 C. Wright, A. Miller & E. Cooper, *Fed. Practice and Proc.* § 3844 at 332 and *United States v. Boe*, 543 F.2d 151, 159 (C.C.P.A. 1976)) (brackets and quotations omitted).

Here, it appears that no subject matter jurisdiction exists. Petitioner states claims for tax refunds and mandamus. Where a petitioner seeks a tax refund, administrative exhaustion is required before a suit to recover the refund may be filed:

> No suit or proceeding shall be maintained in any court for the recovery of any internal revenue tax alleged to have been erroneously or illegally assessed or collected, or of any penalty claimed to have been collected without authority, or of any sum alleged to have been excessive or in any manner wrongfully collected, until a claim for refund or credit has been duly filed....

26 U.S.C. § 7422(a).[2] The Ninth Circuit repeatedly has recognized that a plaintiff's failure to exhaust a tax-refund claim deprives a court of subject-matter jurisdiction. *Quarty v. United States*, 170 F.3d 961, 972 (9th Cir. 1999); *Boyd v. United States*, 762 F.2d 1369, 1372 (9th Cir. 1985); *Martinez v. United States*, 595 F.2d 1147, 1148 (9th Cir. 1979) (per curiam)); *Bear Valley Mut. Water Co. v. Riddell*, 493 F.2d 948, 951 (9th Cir. 1974). Each plaintiff must individually prove exhaustion. *Oatman v. Dept. of Treasury*, 34 F.3d 787, 789 (9th Cir. 1994) ("The district court lacks jurisdiction over claims for refunds pressed by any potential class members who have not satisfied the procedural requirements of 26 U.S.C. §§ 6532 and 7422.") (citing *Sorenson v. Sec'y of Treasury*, 752 F.2d 1433, 1440 (9th Cir. 1985)). Further, the exhaustion requirement cannot be excused based upon futility. As the Ninth Circuit recently reaffirmed:

> An anticipated rejection of the claim, which the statute contemplates, is not a ground for suspending its operation. Even though formal, the condition upon which the consent to suit is given is defined by the words of the statute, and "they mark the conditions of the claimant's right.' *Rock Island R.R. Co. v. United States*, 254 U.S. 141, 143 [(1920)]. Compliance may be dispensed with by waiver, as an administrative act, *Tucker v. Alexander*, *supra* [275

[2] The Organic Act provides that the income tax laws in force in the United States of America "shall be held to be likewise in force in Guam." 48 U.S.C. § 1421i(a). Terminology in those tax laws is changed to make their application to Guam clear. 48 U.S.C. § 1421i(e).

> U.S. 228 (1927)]; but it is not within the judicial province to read out of the statute the requirement of its words, *Rand v. United States*, 249 U.S. 503, 510 [(1918)].

*Quarty*, 170 F.3d at 973 (quoting *United States v. Felt & Tarrant Mfg.*, 283 U.S. 269,273 (1931)).

Because petitioner bears the burden of proving subject-matter jurisdiction and has not alleged or provided any evidence that the exhaustion requirement has been satisfied, the Court lacks jurisdiction. *E.g.*, *Thompson v. Gaskill*, 315 U.S. 442, 447 (1942) ("The record contains no showing of the requisite jurisdictional amount, and the district court was therefore without jurisdiction"); *Ashoff v. City of Ukiah*, 130 F.3d 409, 410 (9th Cir. 1997) ("The plaintiff (here the appellant) bears the burden of establishing subject matter jurisdiction."); *Thompson v. McCombe*, 99 F.3d 352, 353 (9th Cir. 1996) ("A party invoking the federal court's jurisdiction has the burden of proving the actual existence of subject matter jurisdiction.").

None of this can surprise the Attorney General. He has joined in the Governor's motion to dismiss a similar class action precisely because exhaustion and other issues prevent the assertion of jurisdiction over tax refund class actions—which is why almost every court to consider the issue has rejected such class actions. (Jacob Decl. Exh. J at 15-18 (brief of the Governor collecting authorities); Exh. K at 2 (Attorney General's brief joining this argument).) *See Oatman v. Dept. of Treasury*, 34 F.3d 787, 789 (9th Cir. 1994) ("court lacks jurisdiction over claims for refunds pressed by any potential class members who have not satisfied the procedural requirements of 26 U.S.C. §§ 6532 and 7422.") (citation omitted); *Saunooke v. United States*, 8 Cl. Ct. 327, 330-31 (1985) (rejecting class certification in tax refund cases because court had to be able to individually determine that each class member met the jurisdictional prerequisites).

It also appears that petitioner cannot cure the jurisdictional deficiencies by asking for "a writ in the nature of mandamus" in lieu of a tax refund. (*See* Compl. ¶ 27.) Mandamus is a drastic remedy "only to be invoked in extraordinary situations." *Allied Chem. Corp. v. Daiflon, Inc.*, 449 U.S. 33, 34 (1980). "In order to insure that the writ will issue only in extraordinary circumstances, this Court has required that a party seeking issuance have no other adequate means to attain the relief he desires, and that he satisfy the burden of showing that his right to issuance of the writ is clear and indisputable." *Id.* at 35 (citations, quotations and brackets omitted).

Here, the government has provided administrative remedies for obtaining the relief petitioner seeks and the ability to sue for a refund in district court once the remedy is exhausted. That petitioner has chosen not to avail herself of these remedies does not entitle her to extraordinary relief. *United States ex rel. Girard Trust Co. v. Helvering*, 301 U.S. 540, 542-44 (1937) (mandamus for tax refund unavailable where party could pursue administrative remedy and then maintain suit in district court because "mandamus may not be employed to secure the adjudication of a disputed right for which an ordinary suit affords a remedy equally adequate and complete"); 1 *Civ. Actions Against the U.S.* § 1:15 (collecting authorities) ("Because mandamus is not available when other remedies are adequate to afford full relief, a party must first exhaust administrative remedies."). Moreover, neither petitioner nor any putative class members have satisfied "their burden of showing that [their] right to issuance of the writ is clear and indisputable" given their failure to allege or prove exhaustion. *Allied Chem.*, 449 U.S. at 35. For these reasons, briefing and a hearing on jurisdiction should be conducted.

## II. THE SETTLEMENT AGREEMENT IS ILLEGAL

The Organic Act of Guam expressly reserves the power to appropriate money to the Legislature. *Pangelinan v. Gutierrez*, 2003 Guam 13, at ¶15 (2003), *reconsidered in part on other grounds* 2004 Guam 16 (citing 48 U.S.C. § 1423j(a)). Consequently, the Illegal Expenditures Act, 5 G.C.A. § 22401, forbids officers from binding the Government to contracts that spend unappropriated monies or in excess of the amount of money in a fund:

> No officer or employee of the government of Guam, including the Governor of Guam, shall:
>
> (1) Make or authorize any expenditure from, or create or authorize any obligation under, any appropriation or fund in excess of the amount available therein, or for other than an authorized purpose;
>
> (2) Commence, continue, or proceed with any operational activity, construction, improvement, contract, or obligation without an appropriation or fund for the payment thereof; or after any such appropriation or fund is exhausted;
>
> (3) Involve the government of Guam in any contract or other obligation, for the payment of money for any purpose, in advance of the appropriation made for such purpose.

5 G.C.A. § 22401(a).

A violation of this Act voids a contract and makes it unenforceable under Guam law. *Pangelinan*, 2003 Guam 13, at ¶25 ("If contracts violative of statutory prohibitions may be executed by government agencies and subsequently enforced, the power of the legislature and the processes of government itself would be undermined.") (quoting *Heyl & Patterson Int'l v. Rich Housing of Virgin Islands, Inc.*, 663 F.2d 419, 432 (3d Cir. 1981)); *Robert F. Simmons and Assocs. v. United States*, 360 F.2d 962, 965 (Ct. Cl. 1966) ("It is settled law that an agency of the Government cannot create a binding contract without the authority of an appropriation of funds from the Congress to cover the contract. If such an unauthorized contract is entered into, it is a nullity."). As the Attorney General himself explained to the Guam Supreme Court just last year, a contract that violates 5 G.C.A. § 22401 must be declared "Null and Void." (Jacob Decl. Exh. I at 8 (Brief of the Attorney General in *Pangelinan v. Gutierrez*).)

The settlement contract here requires three different expenditures that violate the Illegal Expenditures Act. Without an appropriation, it requires (1) the payment of $6 million in attorney's fees to class counsel; (2) the payment of $54 million in alleged tax refund claims, including $17 million in the first year alone; and (3) the Government to pay the Earned Income Tax Credit in all future tax years, which could cost the Government tens of millions more. Because the Attorney General was his counsel, the Governor requested an opinion regarding these expenditures pursuant to 5 G.C.A. § 30107. The Attorney General opined that any obligation to make future payments violated the Illegal Expenditures Act. He stated that the $60 million provision was legal based upon the Governor's power to spend unencumbered funds under 48 U.S.C. section 1421i(h)(3). (*See* Jacob Decl. Exh. C.) As explained below, the Governor believes that advice to be incorrect.

**A. The Governor's Organic Act Authority Over Unencumbered Funds**

The Attorney General has rationalized that the Governor can use the following Organic Act power to make the $6 million attorneys' fees and $54 million settlement payments:

> Suits for the recovery of any Guam Territorial income tax alleged to have been erroneously or illegally assessed or collected, or of any

> penalty claimed to have been collected without authority, or of any sum alleged to have been excessive or in any manner wrongfully collected, under the income-tax laws in force in Guam, pursuant to subsection (a) of this section, may, regardless of the amount of claim, be maintained against the government of Guam subject to the same statutory requirements as are applicable to suits for the recovery of such amounts maintained against the United States in the United States district courts with respect to the United States income tax. **When any judgment against the government of Guam under this paragraph has become final, the Governor shall order the payment of such judgments out of any unencumbered funds in the treasury of Guam.**

48 U.S.C. § 1421i(h)(2) (emphasis added).

This power does not authorize the $60 million settlement payment in this case. It states the Governor can pay "final judgments" from "unencumbered funds." But nowhere is it stated that the Governor can contract for such "final judgments." Such a reading of this statute would permit the Governor (or Lt. Governor when the Governor was gone) to circumvent the appropriations process for any expenditure. A settlement agreement is a contract. *Jeff D. v. Andrus*, 889 F.2d 753, 759 (9th Cir. 1989) ("An agreement to settle a legal dispute is a contract and its enforceability is governed by familiar principles of contract law."). It is subject to restrictions on the expenditures of unappropriated funds. *Cf. Blackhawk Heating & Plumbing Co. v. United States*, 622 F.2d 539, 542, 553 (Claims Ct. 1980) (enforcing provision of settlement contract that was contingent on funding pursuant to comparable federal Anti-Deficiency Act).

Moreover, the "final judgment" exception does not apply because there has been no final judgment, yet the contract requires payments starting 30 days after preliminary approval was given. Requiring payments before any final judgment is entered further demonstrates that this contract was unlawfully designed to obligate the Government in advance of an appropriation being made (as opposed to in contemplation of this power over unencumbered funds).

The Governor does not have access to anything close to the amount of the monthly payments in unencumbered funds each month that are required by the settlement contract. Under the contract, the Governor is supposed to make payments totaling $17 million in the first year alone. Without violating a Legislative appropriation to fund other projects, the Governor does not have access to $17 million in unencumbered funds in a single year. The only way in which this

contract can be funded is if it forces the Legislature to make an appropriation to meet the contract and avoid having the Government held in contempt[3]—which is exactly the type of forced appropriation that the Illegal Expenditures Act exists to prevent. *See* 5 G.C.A. § 22401(a)(1)-(2) (forbidding obligations in excess of any appropriation or fund).

Finally, as the Attorney General concedes (Jacob Decl. Exh. C), the power to pay final tax judgments cannot authorize the payment of the EITC in the future. By its plain terms, it only applies to final tax judgments; future EITC payments do not fall within authority.

**B. The Guam Earned Income Program**

Under existing law, the settlement also cannot be funded by Guam's Earned Income Program. As explained previously, 11 G.C.A. § 4105 contained an express appropriation to pay the EITC indefinitely, but this was repealed in Public Law 25-176, § 24. As amended in 1999, 11 G.C.A. § 42104 states: "For Fiscal Year 1998 and each year thereafter, the Department of Revenue and Taxation is authorized on a continuing basis to spend funds **from the Provisions of Refunds as set out in "Exhibit A" of Public Law Number 24-59 for Fiscal Years 1998 and 1999** in such amounts as are necessary to pay the Earned Income program subsidies under this Chapter." (emphasis added). However, the bolded text was a reference to a specific set-aside of $50.2 million in Exhibit A to the budget bill for fiscal years 1998 and 1999 (which was P.L. 24-59). This set-aside for tax returns has been spent. (Calvo Decl. ¶ 3.) Guam's Earned Income Program contains no other appropriation. *See* 11 G.C.A. §§ 42101-04 (containing the Program in its entirety). Consequently, this Program has no appropriation to pay the $60 million settlement payment or the EITC in future years. *See* 5 G.C.A. § 22401(2) (prohibition against expenditures of exhausted appropriations or funds).[4]

**C. The Income Tax Reserve Funds**

Another issue not addressed by the Attorney General is funding the settlement from the Income Tax Reserve Funds created by Chapters 50 and 51 of Title 11 of the G.C.A. In

---

[3] Petitioner's counsel recently threatened the Government with a contempt motion if it does not start to make the unlawful payments. (*See* Jacob Decl. Exh. H.)

[4] It also never authorized expenditure of $6 million on attorneys' fees or $7 million in additional administrative costs even when funded.

June of 1999, the Legislature amended the Income Tax Reserve Fund to require that a formula be devised for reserving for EITC payments as well as tax refunds. Under the law, there are yearly reservations to pay each *future* year's income tax refunds, EITC payments, and child tax credits based on the average of such payments over the last three years. 11 G.C.A. §§ 50103-05. This reservation for *future* payments was extended effective October 1, 2002 to require deposits on a monthly and quarterly basis, and transfer to the reserve fund at the end of each year. *Id.* § 51102.

Obviously, these laws only authorize expenditures for tax refunds, the EITC, or the child tax credit. 11 G.C.A. § 50105. They therefore can authorize neither the diversion of $6 million in attorneys' fees, nor $1 million in administrative costs.

However, even as to the $54 million, the settlement fails to comply with the Illegal Expenditures Act. The settlement attempts to pay claims from tax years 1996, 1998, and 1999 (as well as 2000-2003). No reserves for the EITC were occurring at that time because there was no EITC reserves provision until June 1999. *See* P.L. 25-43. The Illegal Expenditures Act states that no officer can "[m]ake or authorize any expenditure from, or create or authorize any obligation under, <u>any appropriation or *fund* in excess of the amount available therein, or for other than an authorized purpose" or to continue such expenditures</u>. 5 G.C.A. § 22401(a)(1)-(2) (emphasis added). If the Governor tried to use the reserve fund to pay for tax years 1996-1999 he would therefore by violating the Act. Yet, this is exactly what the Settlement Agreement requires in Section V(A)(4) of that contract, which states that claims for tax year 1996 and then 1998 must be paid first.

Further, the reserves are done on a year-by-year basis reflecting the present year's need for reserves. This means that the government cannot reserve, for example, more in 2004 than is needed to pay 2004 tax refunds and EITC and child tax credits. *See* 11 G.C.A. §§ 50103-05. Consequently, there cannot be enough in the reserves to both honor the present obligations of the Government going forward (as is required by the reserves law) and pay this settlement as to tax years 1996, 1998, and 1999.

Next, as everyone who lives on Guam knows, Guam does not have *any* income tax reserves at present. The "reserve funds" are exhausted because Guam is trying to pay off a multi-year backlog of refunds developed during the previous administration. Therefore, the settlement could not have been based on these non-existent reserve funds. 5 G.C.A. § 22401(a) (contract is illegal if funds are inadequate or exhausted).

Finally, although sometimes called a "refund" because it is *administered* as though it was a refund, the EITC is actually a social subsidy, and not a true refund at all. *See* 11 G.C.A. § 42103 (explaining that the EITC is a "subsidy"). It "was enacted to reduce the disincentive to work caused by the imposition of Social Security taxes on earned income (welfare payments are not similarly taxed), to stimulate the economy by funneling funds to persons likely to spend the money immediately, and to provide relief for low-income families hurt by rising food and energy prices." *Sorenson v. Sec'y of Treasury*, 475 U.S. 851, 864 (1986) (citations omitted). Thus, "the EIC does permit taxpayers to receive more from the government than they pay in taxes." *Israel v. United States*, 356 F.3d 221, 223 (2d Cir. 2004). It "is a credit unlike other credits in the tax code--not only can it be used 'to off-set tax that would otherwise be owed,' it is 'refundable' even if the taxpayer had no tax liability." *Id.* (quoting *Sorenson*, 475 U.S. at 854). Because it is a subsidy, the only proper source for paying back EITC payments has to be an appropriation.

**D. Other Laws**

Although the Attorney General did not explain this in his opinion letter to the Governor, it appears from his brief that the settlement is illegal because it does not mandate the setoffs required by the Internal Revenue Code. (AG MPA at 4-5.) This defect cannot be cured through the administrative plan because that would require the Court to rewrite the settlement in a manner that was not agreed upon by the parties or disclosed to the putative class members.

## III. DISCOVERY AND A PROPERLY NOTICED FAIRNESS HEARING MUST PROCEED ANY ADMINISTRATIVE PLAN

Before the Court may issue an order approving the administrative plan, it first must finally approve the settlement. In addition to its independent duties to assess the legality of the agreement and inquire into its own jurisdiction to act, Rule 23(e) requires a court to protect

the public interest by ensuring that the settlement is fair and reasonable, paying "undiluted, even heightened attention in the settlement context." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997); *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1290 (9th Cir. 1992) (quoting *Ficalora v. Lockheed Cal. Co.*, 751 F.2d 955, 997 (9th Cir. 1985)) ("Before approving a class settlement, the district court must reach a reasoned judgment that the proposed agreement is not the product of fraud or overreaching by, or collusion among, the negotiating parties.").

"Some courts have described their duty under Rule 23(e) as a 'fiduciary responsibility' of ensuring that the settlement is fair and not the product of collusion." *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 738, 805 (3d Cir. 1995) (citations omitted). Class actions differ from regular cases in that they affect the rights of members of the public who are not before the Court, who have not had the opportunity to consult with counsel, and who have not had an opportunity to be heard. *See Ortiz v. Fiberboard Corp.*, 527 U.S. 815, 847 (1999) ("The legal rights of absent class members … are resolved regardless of either their consent, or, in a class with objectors, their express wish to the contrary"). Further, in class actions, special incentives and opportunities for collusion exist. *E.g., Zucker v. Occidental Petroleum Corp.*, 192 F.3d 1323, 1327 (9th Cir. 1999) ("absence of individual clients controlling the litigation for their own benefit creates opportunities for collusive arrangements in which defendants can pay the attorneys for the plaintiff class enough money to induce them to settle the class action for too little benefit to the class or too much benefit to the attorneys....") (bracket omitted); John C. Coffee, Jr., *Class Wars: The Dilemma of the Mass Tort Class Action*, 95 Colum. L. Rev. 1343, 1367-84 (1995) (giving reasons and collecting cases on collusion).

The settlement here bears numerous worrisome indicia, all of which require discovery and evidentiary hearings before the Court can make an informed determination regarding the fairness of the settlement. Until a fairness determination has been made, no part of the proposed settlement, including the administrative plan, may be approved or enforced.

## A. Procedural Issues

One requirement a court examines in determining whether a settlement is fair and reasonable is whether the proper procedures have been followed. 7B Wright & Miller, *Fed. Practice & Proc.* § 1797.1. Many important procedural protections are not present here:

(1) Class Certification: "Settlements that take place prior to formal class certification require a higher standard of fairness." *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 458 (9th Cir. 2000); *see also Hanlon*, 150 F.3d at 1026 ("The dangers of collusion between class counsel and the defendant, as well as the need for additional protections when the settlement is not negotiated by a court designated class representative, weigh in favor of a more probing inquiry than may normally be required under Rule 23(e)."). Lack of certification also creates additional problems in evaluating fairness that will have to be resolved through factual development. *See* 7B Wright & Miller, *Fed. Practice & Proc.* § 1797 ("Another problem posed by settlements prior to class certification is how the court properly can assess the fairness of the proposed compromise before it determines, at least, the scope of the class.").

(2) Class Counsel: Where, as here, settlement occurs prior to the appointment of class counsel, courts are vigilant to protect against collusion. *Ace Heating & Plumbing Co. v. Crane Co.*, 453 F.2d 30, 33 (3d Cir. 1971) ("when the settlement is not negotiated by a court designated class representative the court must be doubly careful in evaluating the fairness of the settlement ... if it is feasible in the first instance for the court to designate a class representative to conduct settlement negotiations, such a course is highly desirable").

(3) Notice: Lack of proper notice alone is reason to reject a proposed class action settlement. *E.g.*, *Molski v. Gleich*, 318 F.3d 937, 952 (9th Cir. 2003) (notice failing to clearly explain which claims were released violates due process). "Without the notice requirement it would be constitutionally impermissible to give the judgment binding effect against the absentee members of the class. The notice serves to inform the absentees who otherwise might not be aware of the proceeding that their rights are in litigation so that they can take whatever steps they deem appropriate to make certain that their interests are protected." 7B Wright & Miller, Fed. Practice & Proc. § 1786 (collecting authorities).

Here, the parties already stipulated that the only notice that was given thus far was not published according to the terms of the settlement. It was also deficient in several other material respects. FRCP 23(c)(2)(B) requires that class notice at least include: (1) "the class claims, issues or defenses," (2) "that a class member may enter an appearance through counsel if the member so desires," and (3) "the binding effect of a class judgment on class members." Fed. R. Civ. P. 23(c)(2)(B). This notice failed to describe all of the claims, issues or defenses in this case (including exhaustion), did not explain the risks and benefits of opting out, or disclose that class members could appear through counsel to object. It also misstated that class certification was final and that petitioner's counsel was class counsel. The proposed new notice still omits any concrete explanation as to claims, issues, and defenses, or any explanation as to the advantages or disadvantages or opting in or out. And it does not explain to potential class members that it supplants the previous notice, which can only lead to confusion.

Furthermore, the proposed administrative plan adds new material provisions to the settlement agreement that are not disclosed in the actual or proposed "class notices." For example, the proposed administrative plan would allow petitioner's counsel to receive fees before amounts were actually disbursed to class members. This term, which would not be in the interest of the alleged class, was not disclosed in any of the "class notices" (not to mention that it is a new and material term that was not part of the settlement agreement).

Additionally, none of the class notices discussed the $1 million dollars in "administrative fees" called for by the proposed administrative plan. Not only is this a material change to the settlement that would require the Court to rewrite the settlement agreement, it would bind class members to this term without notice and without due process of the law.

Finally, the Attorney General proposes a previously undisclosed procedure to off-set claims that will take significant amounts of money from class members. The new notice gives no warning of this. Although the Governor's counsel is still investigating this matter and will provide supplemental information to the Court, it appears possible that the off-sets could consume a very significant amount of the class's recovery (which already is only 50% of their claims).

(4) Attorney's Fees: Rule 23(h)(1) requires that "a claim for attorney's fees **must** be made by motion." (emphasis added). The rules further provide: "A class member … may object to the motion." Fed. R. Civ. P. 23(h)(2). Here, this issue was resolved by stipulation before the class members even received a notice. No motion was filed; no class member was given the opportunity to object. Moreover, attorney's fees were decided before any determination had been made as to who was class counsel. Thus, it was impossible to consider factors such as the experience of counsel in setting the amount. 57 ALR 3d 475 § 11 (collecting authorities) ("The attorney's standing in the profession with respect to his ability, skill, and integrity appears to be one of the factors most generally recognized as a proper matter for consideration in assessing the value of his services ...").

**B. Lack of Adversarial Proceedings**

There has been a marked absence of any adversarial proceedings between the parties in this case. Almost everything that has occurred to date has been accomplished by stipulations that evade the scrutiny of the adversarial process. Issues that are normally hotly contested in class actions were not briefed or argued, including: (1) Class certification; (2) Class counsel; (3) Class notice; and (4) Attorney's fees. The Attorney General did not litigate exhaustion, which is a fundamental predicate in any tax refund case. The lack of any motions as to any of these issues is doubly problematic because there are no transcripts for the Court or objectors to review in assessing whether the settlement is fair and reasonable. Additionally, according to the Attorney General, there is no written documentation of the negotiations.

Most critically, despite being aware of the illegality of the settlement agreement, the Attorney General has not raised this issue or disclosed his opinion letter to this Court. Instead, the Attorney General has taken the position that the administrative plan should go forward. Where counsel exposes his or her client to criminal liability and consistently sides with the opposing party, all possible red flag are raised.

**C. Conflicts of Interest**

The settlement also creates troubling conflicts. For example, the interests of the class members conflict. The class is comprised of individuals who have time-barred claims, and

those who do not. The settlement actually gives preference to the untimely claims and pays them equally. Thus, a serious question arises as to whether the interests of those with timely claims (who would have a better chance of prevailing were the case to go to trial) have been represented adequately. *See Ortiz*, 527 U.S. at 857 (noting conflict of interest between class members whose claims accrued when defendant was insured and those whose claims accrued afterward because "Pre-1959 claimants accordingly had more valuable claims than post-1959 claimants").

The settlement also has a prejudicial effect on the settling parties. As discussed above, the settlement would put the Governor and many government employees in the untenable position of having to choose between following a law passed by the Legislature or complying with an order of the Court. This creates serious questions as to why the government was advised to enter into this contract.

**D. Lack of Discovery**

No discovery occurred in this case. Without discovery, it is difficult to evaluate whether the amount of the settlement is proportional to the actual exposure. One must wonder how the Attorney General could have agreed to pay tens of millions of dollars without discovery, when his answer to the petition (1) denied that this case was a class action, (2) stated that he lacked information to form a belief as to the truth of the class allegations, and (3) explicitly averred: "Petitioner has not met the class certification requirements set forth in Rule 23(a) and (b) of the Federal Rules of Civil Procedure." (Opp to Pet. ¶¶ 3, 6, Aff. Defense ¶ 6.)

Equally importantly, no discovery has occurred regarding the fairness of the settlement, how it was negotiated, and the advice provided before it was signed. The Governor has requested this information, including his client files, from the Attorney General. The Attorney General has not provided any of it and claims that there is none. Under these circumstances, discovery on fairness must be permitted. *See, e.g.*, *In re Gen. Motors Corp. Engine Interchange Litig.*, 594 F.2d 1106, 1124 (7th Cir. 1979) ("We think that the conduct of the negotiations was relevant to the fairness of the settlement and that the trial court's refusal to permit discovery or examination of the negotiations constituted an abuse of discretion.").

### E. Attorney's Fees

The Attorney General stipulated to pay petitioner's counsel the entire amount of fees he requested in the petition. This amounts to $6 million. Yet, counsel had done nothing beyond file a complaint and "negotiate" the settlement for what appears to have been less than a day. He did not file a single interrogatory, take any depositions, or even ask for one document. Moreover, the proposed administrative plan secures payments of attorney's fees as each payment is made into the settlement fund. This would permit counsel to receive fees before amounts were actually disbursed to class members, which is contrary to the interest of the class. All of these facts raise questions regarding fairness and the public interest that require a public hearing.

### F. Substantive Fairness

Significant questions as to the fairness of the settlement exist. The Government pays $60 million dollars, $6 million of which would go to petitioner's counsel irregardless of how many class members opt in. As a result, all the class members could opt out and separately sue the Government leaving the Government in the same position it was in prior to this litigation, except that petitioner's counsel would be $6 million wealthier. At the same time, the settlement does little for those persons who opt-in. It only provides 50% of their refunds — if they are allowed to keep their refunds at all. Given the setoffs, many opt-ins could receive nothing. This virtually ensures that those with invalid claims will opt-in, while those with valid claims will not. This is not a fair and reasonable substitute for solving this problem through the political process with a proper expenditure of public funds.

## CONCLUSION

For the foregoing reasons, the Governor respectfully asks that the Court deny the motion to approve the administrative plan, vacate the previous order preliminarily approving the settlement, and conduct briefing to determine whether it has subject matter jurisdiction.

Dated this 29thday of November, 2004.

OFFICE OF THE GOVERNOR OF GUAM
CALVO AND CLARK, LLP
Attorneys at Law

By: ______________________
**RODNEY J. JACOB**