

The Law Offices of

# PHILLIPS & BORDALLO

A Professional Corporation
410 West O'Brien Drive, Suite 102 Hagåtña, Guam 96910-5044
Tel: (671) 477-ABCD (2223) • Fax: (671) 477-2FAX (2329)
" I Erensia, Lina'Ia', Espiritu-ta"

FILED
DISTRICT COURT OF GUAM

DEC - 8 2004

MARY L. M. MORAN
CLERK OF COURT

103

Attorneys for Petitioners

## DISTRICT COURT OF GUAM
## TERRITORY OF GUAM

JULIE BABAUTA SANTOS, *et al.*,

Petitioners,

vs.

FELIX A. CAMACHO, etc., *et al.*,

Respondents.

CIVIL CASE NO. 04-00006

**PETITIONER'S RESPONSE TO RESPONDENT GOVERNOR'S OBJECTION TO PETITIONER'S MOTION FOR APPROVAL OF THE ADMINISTRATION PLAN**

The Petitioner, individually and on behalf of all those similarly situated (hereinafter "EIC Class"), through her attorneys of record Phillips and Bordallo, P.C., by Ricardo D. Bordallo, hereby submits this Response to Respondent Governor Felix P. Camacho's Objections to Petitioner's Motion for Approval of the Administration Plan.

# TABLE OF CONTENTS

Table of Authorities ............................................................... i-iii

Background ........................................................................ 2-5

Argument:

A.   RESPONDENT GOVERNOR'S ATTEMPT TO "INTERVENE"
     IN THIS MATTER TO FURTHER DELAY THE PROCEEDINGS
     MUST BE DENIED ......................................................... 6-9

B.   RESPONDENT GOVERNOR'S "CONCERNS" REGARDING
     CRIMINAL LIABILITY AND SETTLEMENT ILLEGALITY ARE
     UNFOUNDED ............................................................... 9-19

C.   THE SETTLEMENT AGREEMENT REACHED BETWEEN THE
     GOVERNMENT OF GUAM AND THE EIC CLASS IS VALID AND
     ENFORCEABLE ........................................................... 19-26

PHILLIPS & BORDALLO

# TABLE OF AUTHORITIES

Allen v. Alabama State Bd. of Educ., 933 F.2d 341, (M.D. Ala 1985) ............ 24

Allen v. Alabama State Bd. of Educ.636 F.Supp. 64 (M.D. Ala. 1985)............ 24

Andrus, 889 F.2d at 759 ....................................................................... 15,16

Armstrong v. Board of School Directors of the City of Milwaukee, 616
F.2d 305 at 312 (7th Cir. 1980)..................................................... 15

Blackhawk Heating & Plumbing Co. v. United States, 622 F.2d 539,
553 (Claims Ct. 1980) ................................................................. 14

Cotton v. Hinton, 559 F.2d 1326, 1331 (5th Cir. 1977) ............................... 15

Edwards v. Cass County, Tex., 919 F.2d 273, 275 (5th Cir.1990) ................. 23

Florida Trailer & Equipment Co. v. Deal, 284 F.2d 567, 571 (5th Cir. 1960).....
27                                                                              26

In re Consolidated Pretrial Proceedings [**7] in the Airline Cases,
582 F.2d 1142 (7th Cir. 1978) ...................................................... 27

In re Dominelli, 820 F.2d 313, 316-17 (9th Cir. 1987) ................................. 14

In Re Request of I Mina' Bente Sing'ko Na Liheslaturan Guahan Relative
to the Application of the Earned Income Tax Program to Guam
Taxpayers, 2001 Guam 3............................................................. 19,26

Gschwind v Cessna Aircraft Co., 232 F3d 1342 (2000, CA10 Kan) ................. 25

Jeff D. v. Andrus, 889 F.2d 753, 759 (9th Cir. 1989) ................................... 14

Kansas City S. R. Co. v Great Lakes Carbon Corp., 624 F2d 822
(1980, CA8 Mo) ........................................................................ 26

Lewis v S.L. & E., Inc., 746 F2d 141 (1984, CA2 NY) ................................. 14

Matter of Dolgin Eldert Corp., 31 N.Y.2d 1, 10, 334 N.Y.S.2d 833, 286
N.E.2d 228 (Ct. App. 1972) .......................................................... 23

Meetings & Expositions, Inc. v. Tandy Corp., 490 F.2d 714, 717 (2d Cir. 1974).. 23

Metropolitan Housing Development Corp. v. Village ofArlington Heights,
616 F.2d 1006 at 1013 (7th Cir. 1980).......................................... 15

PHILLIPS & BORDALLO

Mid-South Towing Co., 733 F.2d at 390 ...................................................... 25

Patterson v. Stovall, 528 F.2d 108, 114 (7th Cir. 1976). 573 F.2d at 963 .......... 27

Rein v. Providian Fin. Corp., 270 F.3d 895 (9th Cir. 2001) ............................... 14

Rivera v. State, 115 A.D.2d 431, 432, 496 N.Y.S.2d 230, 231 (1st Dep't 1985),
    aff'd, 159 F.3d 1347 (2d Cir. 1998))..................................................... 23

Sorenson v. Sec'y of Treasury, 475 U.S. 851 (1986) ....................................... 12

Teal v. Eagle Fleet, Inc., 933 F.2d 341 (5th Cir. 1991)..................................... 23

Thomas v. Colorado Trust Deed Funds, Inc., 366 F.2d 136 .............................. 25

United States v. Guam Waterworks Authority and the Government
    of Guam, Civil Case No. 01-0035 ....................................................... 15

United States v. Government of Guam, Civil Case No. 02-00022...................... 15

Vari-O-Matic Machine Corporation v. New York Sewing Machine Attachment
    Corporation, 629 F. Supp. 257, 258 (2d Cir. 1986) ................................ 23

Vela v. Hope Lumber & Supply Co., 966 P.2d 1196, 1199 (Okla. Ct. App. 1998) . 23

Willengrodt ex rel. Majority Peoples' Fund for the 21st Century, Inc. v.
    Hohri, 953 F. Supp. 557, 560 (S.D.N.Y. 1997) ...................................... 23

## RULES AND STATUTES

Federal Rules of Civil Procedure Rule 23(e)(4)(A)............................ ......7,23,27

Federal Rules of Civil Procedure 54(d) and Rule 23(h) ........................  4

Federal Rules of Civil Procedure 60(b)..................................................7

26 U.S.C. § 6402........................................................... 11, 12

26 U.S.C. § 6401(b)(1) ................................................................. 12

28 U.S.C. §1361........................................................................... 25

42 U.S.C. §§ 2000e ................................................................. 26

PHILLIPS & BORDALLO

iii

48 U.S.C. §1421i(d) ............................................................... 11,20,25

Organic Act of Guam............................................................. 11, 13,17,18

5 G.C.A. §22401(a)(2) and (3) ........................................... 10

11 G.C.A. Chapters 50 and 51.............................................. 17

PHILLIPS & BORDALLO

## BACKGROUND

On February 12, 2004, Petitioner brought this Class Action Petition for the recovery of unpaid refundable earned income tax refunds and to compel the full implementation of the Earned Income Program. On March 11, 2004, Respondents filed an Opposition to the Petition, denying various allegations and setting forth numerous affirmative defenses. This Court issued an expedited Scheduling Order on April 30, 2004, and held a Scheduling Conference on May 26, 2004.

On June 14, 2004, shortly after the local media revealed that the Camacho administration had just paid one taxpayer his 1998 Earned Income Tax Credit payment, the parties entered into a Settlement Agreement, subject to this Court's approval. The proposed Settlement Agreement created a settlement class, known as the "EIC Class," defined to include all persons who (a) filed Guam income tax returns and (b) were and are entitled to be paid refundable earned income tax credits under the Guam Territorial Income Tax and the Earned Income Program for any or all of the following tax years: 1996, 1998, 1999, 2000, 2001, 2002 and 2003. The proposed Settlement Agreement provided for a Settlement Amount of Sixty Million Dollars ($60,000,000) to be made available by the Government of Guam to pay for claims made by members of the EIC Class and other fees and expenses in accordance with the Settlement Agreement.

The Government of Guam agreed to pay into an EIC Settlement Fund the amount of Three Million Dollars ($3,000,000) by July 17, 2004, and a total of Twenty Million Dollars ($20,000,000) by the end of June, 2005. Under the proposed agreement, the Government of Guam also agreed to pay an additional Forty Million Dollars ($40,000,000) over eight years into the fund, and to fully implement and pay

2

refundable earned income taxes for tax years 2004 and beyond, preventing the need for annual lawsuits. Counsel for Petitioner requested and received confirmation that the first installment was deposited by Respondents as required under the Settlement Agreement, MFP Declaration, attached hereto, par. 13.

The Plan of EIC Settlement Administration (the "Administration Plan") defines the recovery achieved for Guam taxpayers who qualify as EIC Class Members, outlines the proposed plan for calculations and payments to individuals, sets out methods used to identify EIC Class Members, and lists the duties and responsibilities of the Department of Revenue and Taxation, and counsel for the parties. All matters relating to the Administration Plan are subject to further orders as the Court may issue.

On June 17, 2004, the Court signed an order granting preliminary approval of a Settlement Agreement entered into between the parties in the above-referenced case. The Settlement Agreement called for payment by the Respondents of sixty million dollars ($60,000,000) in several installments and the creation of an EIC Settlement Fund for the benefit of EIC Class Members. Section V. of the Settlement provides in part that:

> The EIC Settlement Fund shall be administered by the Department of Revenue and Taxation under the supervision and direction of the Court. The Department of Revenue and Taxation shall submit quarterly reports to all parties signing this Agreement, including the Petitioner regarding the administration of the EIC Settlement Fund.

Pursuant to the Order and direction of the Court, the Administration Plan was submitted to the Court for approval on _____. The Administration Plan specifies: (1) the source, custodian, and uses of the EIC Settlement Fund; (2) the duties of the parties, including the Department of Revenue and Taxation; (3) the plan of allocation of the EIC

3

Settlement Fund among EIC Class Members; and (4) provisions governing distribution to EIC Class Members.

This Administration Plan, together with subsequent Court orders, if any, will enable the parties to fulfill their responsibilities by maximizing the return to EIC Class Members filing proper claims while maintaining the integrity of the EIC Settlement Fund and expediting payments to EIC Class Members.

On July 29, 2004, Applicant for Intervention Christina M.S. Naputi filed a motion to intervene. On July 6, 2004, Applicant for Intervention Charmaine Torres filed a motion to intervene.

On July 14, 2004, Petitioner filed a Motion for an Order Approving Class Counsel, or, in the Alternative, for an Order Designating Interim Counsel; for an Order Preliminarily Approving Attorney Fees pursuant to Federal Rules of Civil Procedure 54(d) and Rule 23(h); for an Order Approving Additional Notice to Proposed Class Members; and for an Order Continuing the Hearing on Final Approval and Extending the Objection and Opt Out Date.

On July 16, 2004, this Court vacated the original Objection and Opt Out Date of August 9, 2004 and the November 9, 2004 hearing date on final approval of the Settlement Agreement, pending resolution of two Motions for Intervention. This Court also appointed Michael F. Phillips as the interim counsel for the EIC Class. The order did not address the motion for preliminary approval of attorney fees.

On August 5, 2004, the Honorable John C. Coughenour, United States Chief District Judge for the Western District of Washington, sitting by designation, denied the Motions for Intervention filed by Applicants Naputi and Torres.

4

On October 25, 2004, Petitioner filed a Motion for Orders Approving the Administration Plan and Amended Notice and For Orders Establishing the Fairness Hearing Date and Objection and Opt Out Date, and Vacating the April 30, 2004 Scheduling Order. On November 8, 2004, this Court issued an Order from United States District Judge Morrison C. England of the Easter District of California, informing the parties that Magistrate Judge Joaquin V.E. Manibusan, Jr. would resume his authority over this case through full disposition. On the same date, Respondents, through their attorney of record, Attorney General Douglas B. Moylan, filed their Response to Petitioner's Motion for Orders Approving the Administration Plan, etc.

On November 9, 2004, Respondent Governor, through independent counsel, filed a Request for Hearing and Objection to (1) Petitioner's Motion for Orders Approving the Administration Plan and Amended Notice; and (2) The Attorney General of Guam's MPA in Response to Motion for Orders Approving Administration Plan ("Governor's Request").

On November 12, 2004, this Court, although recognizing that there may be questions as to the timing of such a request, granted a hearing so that Governor Camacho may be heard. The Court scheduled a hearing on this matter for December 17, 2004.

On November 24, Respondent Governor, through independent counsel, filed Points and Authorities in Support of Opposition to Petitioner's Motion for Approval of the Administration Plan. On the same date, Respondent Directors Perez and Ilagan, through independent counsel, filed a Request for Hearing and Objections under the same format as the Governor's Request earlier filed.

5

On November 29, 2004, Respondent Governor, through independent counsel, filed an Amended Memorandum of Points and Authorities in Support of Opposition to Petitioner's Motion for Approval of the Administration Plan ("Governor's A.M.").

On December 6, 2004, Respondents, through their attorney of record Attorney General Douglas B. Moylan, filed a Motion for Relief from this Court's Order issued on November 12, 2004; a Motion to Strike Entry of Appearance of Attorney Mantanona and all Subsequent Documents; a Motion to Strike Entry of Appearance of Calvo & Clark, LLP and Purported Entry of Appearance of Attorney Shannon Taitano and all Subsequent Documents. ("AG Motions for Relief"). On December 7, 2004, Respondents, through their attorney of record Attorney General Douglas B. Moylan, filed a Response to Governor's Objections and Opposition to Petitioner's Motion for Approval of the Administration Plan ("AG Response to Governor").

## ARGUMENT

**A. RESPONDENT GOVERNOR'S ATTEMPT TO "INTERVENE" IN THIS MATTER TO FURTHER DELAY THE PROCEEDINGS MUST BE DENIED**

Respondent Governor Camacho's (the "Governor") Request to be heard by this Court and subsequently filed documents raise questions not only regarding ill-advised timing, but blatant technical deficiencies. See generally AG Motions for Relief; and AG Response to Governor, p.13 ("no motion under FRCP 60(b) to vacate the Court's Order of June 17, 2004 preliminarily approving the Settlement Agreement has been filed."). Petitioner takes note of the Attorney General's requests regarding the inherent deficiencies of the Governor's submissions, and submits this Response subject to this Court's resolution of such deficiencies. Indeed, the Governor's submission seeks to

6

delay the proceedings of this case by requesting this Court to vacate a previous order preliminarily approving the Settlement Agreement, without even attempting to cite and meet the appropriate standard under the Federal Rules of Civil Procedure.

A review of the Governor's submissions demonstrates, as provided below, that his "concerns" have little, if any, relation to Petitioner's Motion for Approval of the Administration Plan, or even as set forth to this Court, the illegality of the Settlement Agreement. Rather, it is apparent the Governor requested a hearing before this Court not to address "concerns" regarding the Administration Plan or the illegality of the Settlement Agreement, but to launch an ill-timed substantive attack in the nature of a weak case for Intervention, or at best in the nature of objections by a class member pursuant to FRCP Rule 23(e)(4)(A), more properly heard at a Fairness Hearing. Another proper description of the Governor's submissions to this Court is the proceeding by a party with arguing the merits of the case despite a valid Settlement Agreement before the Court.

The Governor's submission to this Court is not only wholly lacking with regard to the relief he requests, but is ripe with misleading statements and a blatant misunderstanding of the proceedings in this case. Several misleading statements are repeated throughout his submission or are otherwise generally relied upon for his assertions before this Court. According to the Governor:

> The Governor does not have access to anything close to the amount of the monthly payments in unencumbered funds each month that are required by the settlement agreement.

Governor's A.M., p.11.

However, Petitioner confirmed shortly after the preliminary approval of the Settlement Agreement that the Governor was able to make the largest deposit required under the Settlement Agreement. Only last month, the Governor identified millions of dollars in lapsed funds which were transferred to his office. KUAM News, November 19, 2004, attached as Exhibit "A".

The Governor also alleges throughout his submission that the Settlement Agreement and the Administration Plan calls for the "diversion of $6 million in attorneys' fees," and "$1 million in administrative fees." See Governor's A.M., p.13. The Governor's allegations are completely misplaced. As this Court is aware, the record in this case includes an outstanding motion by Petitioner for the appointment of counsel and for attorney fees. Further, as the record in this case makes clear, only this Court can approve attorney fees pursuant to a motion and only after class members have the opportunity to object. Indeed, the Governor makes the allegation that "no motion was filed" and "no class member was given the opportunity to object." Governor's A.M., p.18. The Governor's apparent failure to properly review the entire record in this case, including the Amended Notice at issue now before the Court, has tainted many of the premature claims he makes throughout his submission. The Governor also asserts wrongly that the Administration Plan "would allow petitioner's counsel to receive fees before amounts were actually disbursed to class members." The Administration Plan does not authorize the expenditure for attorney's fees. The Administration Plan recognizes that "[o]nly upon application by Counsel and approval of the Court" are attorney fees set aside for payment to Counsel.

8

The Governor also alleges a diversion of $1 million in administrative fees, mistakenly referencing the fees as proceeding from the settlement amount of $60 million. See Governor's A.M., p.17.

As more fully discussed below, the Governor has relegated himself to representing the objection-type interests of a class member at a fairness hearing. Nevertheless, the Governor's specific misunderstanding as it relates throughout his submission is important. As the record demonstrates, the government of Guam, through the Department of Revenue and Taxation, agreed to administer the EIC Settlement Fund as part of its consideration for the settlement of the underlying legal dispute. The administration of the settlement by the government of Guam was recognized in the Settlement Agreement and is an additional benefit to the class, having no effect their entitlement to the settlement amount.

## B. RESPONDENT GOVERNOR'S "CONCERNS" REGARDING CRIMINAL LIABILITY AND SETTLEMENT ILLEGALITY ARE UNFOUNDED

In the Governor's Request, the Governor "respectfully asks for the opportunity to submit a brief stating his concerns about the Plan and an opportunity to be heard by this Court." Governor's Request, p.2. The Governor alleges that he "has been deprived of any opportunity to make his concerns known on a matter of great public importance." Governor's Request, p.2. After alleging the apparently common quarrel he has with the Attorney General's representation, he alleges the outrageousness of the Attorney General's failure to disclose the nature of the Governor's "concerns." Governor's Request, p.2-3.

The Governor proceeds to address his concerns as lying in two areas of Guam law. The Governor states that his "concern" is that the Settlement Agreement is "illegal"

9

based on specific provisions of Guam law. The Governor cites 5 G.C.A. §22401(a)(2) and (3) as rendering the Settlement Agreement illegal. The provision provides in part as follows:

> **§22401. Illegal Expenditures.** (a) No officer or employee of the government of Guam, including the Governor, shall . .
>
> .
>
> (2) Commence, continue, or proceed with any operational activity, construction, improvement, contract, or obligation without an appropriation or fund for the payment thereof; or after any such appropriation or fund is exhausted;
> (3) Involve the government of Guam in any contract or other obligation, for the payment of money for any purpose, in advance of the appropriation made for such purpose . . ."

The Governor assumes that the legal dispute resolved by the Settlement Agreement fits within the prohibitions outlined in the provisions above, essentially implying that the payment of refundable earned income tax refunds requires an appropriation. The Governor indeed asserts this exact proposition in his Amended Memorandum:

> . . . although sometimes called a 'refund' because it is administered as though it was a refund, the EITC is actually a social subsidy, and not a true refund at all . . . Because it is a subsidy, the only proper source of paying back EITC payments has to be an appropriation.

Governor's A.M., p.14.

Under the Organic Act of Guam, the income tax laws in force in Guam include, among others, "all provisions of subtitle F which apply to the income tax . . ." 48 U.S.C. §1421i(d). Section 6402, under subtitle F, in conjunction with the substitution of terms provided under Section 1421i(e), provides in relevant part as follows:

> § 6402. Authority to make credits or refund. (a) General rule. In the case of any overpayment, the [Governor or his delegate] . . . may credit the amount of such overpayment . .

10

1

2      . against any liability . . . and <u>shall</u> . . . refund any balance to
        such person.

3    26 U.S.C. § 6402 (empahsis added).

4          The refund of the balance is subject only to specified offsets not applicable here,

5    and certainly not subject to legislative appropriations. The "overpayment" identified in

6    Section 6402 clearly encompasses the excess of credits allowed under the earned

7    income credit provision against tax liability. 26 U.S.C. § 6401(b)(1) ("If the amount

8
     allowable as credits under subpart C of part IV of subchapter A of chapter 1 (relating to
9
10   refundable credits) exceeds the tax imposed by subtitle A . . . the amount of such

11   excess shall be considered an overpayment."). The Governor's attempt to

12   recharacterize refundable earned income credits as subsidies fails to address his or his

13   delegate's <u>authorization and</u> <u>mandate</u> to pay tax refunds under applicable law, without

14   resort to an excuse involving a lack of appropriation.

15         Interestingly, the Governor cites <u>Sorenson v. Sec'y of Treasury</u>, 475 U.S. 851

16   (1986) for support of the purpose of the earned income credits, yet the same case

17   clearly explains the operation of Section 6402(a) and the tax refund process: "[Section]

18
     6402(a) <u>directs</u> the Secretary to credit or refund 'any overpayment' to the person who
19
20   made it. An individual who is entitled to an earned-income credit that exceeds the

21   amount of tax he owes thereby receives the difference as if he had overpaid his tax in

22   that amount." <u>Sorenson</u>, 475 U.S. at 862 (emphasis added). The Supreme Court also

23   explained:

24                  [Section] 6402 provides a <u>mechanism for disbursing</u>
                    <u>overpayments, namely, the income tax refund process</u>. The
25                  refundability of the earned-income credit is thus inseparable
                    from its classification as an overpayment of tax. Petitioner
26                  therefore acknowledges that the excess earned-income

27

28
                                                                              11

PHILLIPS & BORDALLO

credit is an "overpayment" for purposes of §6402(a), <u>the general provision that authorizes all tax refunds</u>. If it were not, the Secretary would lack authorization for refunding it to her.

<u>Id</u>. at 865 (emphasis added).

Without question, the Governor or his delegate, pursuant to the Guam Territorial Income Tax and authoritative case law, is <u>authorized and mandated</u> to provide refunds to taxpayers, including refunds made possible by refundable earned income tax credits, notwithstanding any lack of appropriation.

The Governor also presents a creative but illogical argument regarding Organic Act Section 1421i(h)(2). The provision provides in part as follows:

Suits for the recovery of any Guam Territorial income tax alleged to have been erroneously or illegally assessed or collected . . . or of any sum alleged to have been excessive or in any manner wrongfully collected, under the income-tax laws in force on Guam, may, regardless of the amount of claim, be maintained against the government of Guam . . .. When any judgment against the government of Guam under this paragraph has become final, the Governor shall order the payment of such judgments out of any unencumbered funds in the treasury of Guam.

The Governor argues that the mandate of this provision to the Governor to pay judgments out of unencumbered funds "left out" his authority to "contract for such 'final judgments.'" Governor's A.M., p.11. The argument proceeds therefore that because the mandate to the Governor under the provision above excludes the payments that would be made under the Settlement Agreement, the Governor's payments under the provisions of the Settlement Agreement, even if finally approved by the Court, would result in criminal liability under the Illegal Expenditures Act.

12

The Governor is mistaken as a matter of law. First, the Governor's argument presumes that a "final judgment" is precluded in the context of the Settlement Agreement. The Governor's authority for this presumption is wholly lacking, and is limited to referencing two inapplicable cases: one stating that the enforceability of settlements are generally governed under principles of contract law, and the second referencing the enforcement of a provision of settlement agreement concerning construction contracts which made the agreement subject to a contingency on funding. Governor's A.M. (citing Jeff D. v. Andrus, 889 F.2d 753, 759 (9th Cir. 1989) and Blackhawk Heating & Plumbing Co. v. United States, 622 F.2d 539, 553 (Claims Ct. 1980)).

The existence of a final judgment is not precluded in the context of a settlement agreement. A final judgment or order is one that conclusively determines rights of parties to litigation, leaving nothing for court to do but execute order. Lewis v S.L. & E., Inc., 746 F2d 141 (1984, CA2 NY). Indeed, "[a] judicially approved settlement agreement is considered a final judgment on the merits." Rein v. Providian Fin. Corp., 270 F.3d 895 (9th Cir. 2001) (Citing In re Dominelli, 820 F.2d 313, 316-17 (9th Cir. 1987))(emphasis added).

In the case at hand, not only would final approval of the Settlement Agreement and entry of final judgment conclusively determine the rights of the parties to this case, the Settlement Agreement expressly contemplates a final judgment and release of the claims at issue. See Settlement Agreement, Part II.C ("Upon final approval of the settlement agreement, the Court is expected to enter judgment which will be enforceable against all parties to this Settlement Agreement"); Part II.F ("At least fifteen

13

(15) days prior to the date the Court sets for the hearing on final approval of the Settlement, Petititoner will submit a motion for an Order of Approval and Final Judgment"); and Part III ("each member of the EIC Class hereby expressly and irrevocably waives and fully, finally and forever settles and releases all claims demands, actions . . . which was or could have been alleged in the EIC Class Action . . .").

Second, other than citing two inapplicable cases, the Governor finds support for his proposition that the provision does not support a final judgment in the context of a settlement agreement believing "[s]uch a reading of this statute would permit the Governor (or Lt. Governor when the Governor was gone) to circumvent the appropriations process for any expenditure." Governor's A.M., p.11. The provision enacted by Congress does not apply to "any expenditure." Rather, the provision is limited to cases for the recovery of Guam Territorial income taxes or other penalties or sums collected under the income tax laws. Indeed, the reverse proposition sheds light on the fundamental flaw of the Governor's position. If the Governor's proposition held true, the provision would have to be read as discouraging settlements, rather than encouraging settlements, a principle widely held in practically every jurisdiction, including the Ninth Circuit and federal courts. See Andrus, 889 F.2d at 759; Metropolitan Housing Development Corp. v. Village of Arlington Heights, 616 F.2d 1006 at 1013 (7th Cir. 1980). (Federal courts look with great favor upon the voluntary resolution of litigation through settlement). This rule has particular force regarding class action lawsuits. Armstrong v. Board of School Directors of the City of Milwaukee, 616 F.2d 305 at 312 (7th Cir. 1980); Particularly in class action suits, there is an overriding public interest in favor of settlement." Cotton v. Hinton, 559 F.2d 1326, 1331 (5th Cir.

1977) (citations omitted). See similar results in cases settled before this Court: United States v. Guam Waterworks Authority and the Government of Guam, Civil Case No. 01-0035; and United States v. Government of Guam, Civil Case No. 02-00022.

The Governor's position would necessitate an appropriation by the Legislature for every settlement of a refund suit under the Organic Act provision, a position contrary not only as a matter of law, but contrary to common sense.

A review of the same case cited by the Governor for the wrong reasons demonstrates the authority of this Court to issue a final judgment and recognizes such authority as the foundation of policy favoring settlements:

> We rely on basic contract principles to interpret the Stipulation. An agreement to settle a legal dispute is a contract and its enforceability is governed by familiar principles of contract law. Each party agrees to "extinguish those legal rights it sought to enforce through litigation in exchange for those rights secured by the contract." Since consent decrees and orders have many of the attributes of ordinary contracts, they should be construed basically as contracts. Furthermore, enforceability of these compromise agreements is favored in the law.
>
> > The authority of a trial court to enter a judgment enforcing a settlement agreement has as its foundation the policy favoring the amicable adjustment of disputes and the concomitant avoidance of costly and time consuming litigation.

Andrus, 889 F.2d at 759 (citations omitted)(emphasis added).

More importantly, however, is the Governor's misunderstanding of the operation of Section 1421i. The plain language of the provision does not limit the authority of the Governor or the government of Guam to settle refund suits. Rather, the provision

15

clearly grants taxpayers the right to sue the government of Guam for the refund of taxes _and_ for the payment of any final judgment in such litigation.

Thus, both premises upon which the Governor basis his "concerns" are legally flawed. As provided above, without question, the Governor or his delegate, pursuant to the Guam Territorial Income Tax and authoritative case law, is authorized and mandated to provide refunds to taxpayers, and the Governor's and his predecessor's continued failure to do so has resulted in the filing of this case. Again, without question, a suit for refunds under Section 1421i(h)(2) before the District Court can be settled by the parties with the issuance of a final judgment. The same provision in the Organic Act mandates that the "Governor order the payment of such judgments out of any unencumbered funds in the treasury of Guam."

The Governor attempts to hide behind a misinterpretation of local law in support of his theory that a lack of appropriation raises potential criminal liability under the Illegal Expenditures Act. However, the Governor creates conflicting arguments though his own interpretations. First, as provided above, he asserts that since "EITC is actually a social subsidy . . . the only proper source for paying back EITC payments has to be an appropriation." Governor's A.M., p.14. Second, in his reference to local law, he states: "Obviously, these laws [11 G.C.A. Chapters 50 and 51] only authorize expenditures for tax refunds, the EITC, or the child tax credit." (Citing 11 G.C.A. §50105 ("Any and all expenditures from the Fund shall be for the payment of income tax refunds, earned income tax credits, child tax credits.").

The Governor is thus confronted with provisions of the Organic Act and applicable federal law mandating the payment of refundable earned income tax refunds

16

and judgments on refund suits regardless of any lack of appropriation, and with local law authorizing the same type of expenditures without an appropriation. The provisions of the Illegal Expenditures Act are not implicated in any manner by the Settlement Agreement – not only because no appropriation is necessary to pay tax refunds, whether by judgment or otherwise, but also because a local statute cannot otherwise prevent what is authorized and mandated by the Organic Act and federal law applicable to Guam. See § 1423a ("The legislative power of Guam shall extend to all rightful subjects of legislation not inconsistent with the provisions of this Act and the laws of the United States applicable to Guam."

Nevertheless, the Governor attempts to assert a type of "impossibility" defense in explaining the operation of the "reserve fund" mechanism passed by the local legislature in an attempt to force the government of Guam to pay all types of tax refunds on time: "[T]he reserves are done on a year-by-year basis reflecting the present year's need for reserves. This means that the government cannot reserve, for example, more in 2004 than is needed to pay 2004 tax refunds and EITC and child tax credits." Governor's A.M., p.13. However, the Governor then immediately admits that the "'reserve funds' are exhausted because Guam is trying to pay off a multi-year backlog of refunds developed during the previous administration." Governor's A.M., p.14. Thus, the Governor on one side argues that he cannot legally reserve and/or pay prior year refundable earned income tax refunds, but then admits that the processing of refund payments for multiple prior tax years is essentially an ongoing project. The Governor fails to even attempt to explain his differential treatment, but if based on his so-called "subsidy" argument, the Governor's position has been adequately derailed.

17

In summary, in the Governor's initial contact with this Court, the Governor outlined his "concerns," alleging the local Illegal Expenditures Act renders the Settlement Agreement illegal. In outlining his arguments before this Court, the Governor has continued on the same track originally started by the previous administrations. The Governor attempts to find a way out of every applicable provision mandating he pay refundable earned income tax refunds, whether pursuant to applicable law, or under the Settlement Agreement pursuant to a final judgment. The Governor wrongfully relies on a local statute to defeat not only other local provisions providing a mechanism to pay refunds on time, but to defeat provisions of the Internal Revenue Code applicable to Guam pursuant to the Organic Act, and specific provisions of the Organic Act. The Governor is also well aware of the case decided by the Supreme Court of Guam, holding without subjection to legislative appropriations, that the "Director, pursuant to section 32 of the I.R.C. which applies to Guam through section 1421i, is required to pay the EIC to eligible Guam taxpayers." In Re Request of I Mina' Bente Sing'ko Na Liheslaturan Guahan Relative to the Application of the Earned Income Tax Program to Guam Taxpayers, 2001 Guam 3 (the Supreme Court confronted the same argument in that case as is set forth by the Governor here, based on issuance of Memorandum Opinion No. DRT/DOA 96-001). The Governor's administration, clearly ignoring the direction from the Supreme Court of Guam, federal law, the Organic Act, and local law, now believes only his office and the current Guam Legislature can remedy the situation:

> The Governor believes that the appropriate mechanism for making any refunds should be through a claims process established by the Legislature and Governor . . . Only a

18

structure established by the Legislature and Governor can remedy the current situation.

Letter from Governor Camacho to Speaker Vicente Pangelinan, November 18, 2004, attached hereto as Exhibit "B".

## C. THE SETTLEMENT AGREEMENT REACHED BETWEEN THE GOVERNMENT OF GUAM AND THE EIC CLASS IS VALID AND ENFORCEABLE

Section 1422b of Title 48 U.S.C. provides in part that "[i]n case of the temporary disability or temporary absence of the Governor, the Lieutenant Governor shall have the powers of the Governor. Section 1421g(d)(1) of Title 48 U.S.C. also provides that the Attorney General of Guam is designated as the "Chief Legal Officer for the Government of Guam."

The Local Rules of this Court on Settlement conferences provides as follows:

> LR 16.6 Settlement Conference.
> (a) At any time after an action or proceeding has been filed, any party may file a request for a settlement conference. . . . Each party attending such a conference shall be represented by counsel authorized to participate in settlement negotiations. The Court may require, by Order issued prior to the settlement conference, the client or its authorized representative to personally attend the conference.
>
> (b) Each party appearing at all conferences shall have full authority with respect to all matters on the agenda, including settlement of the action or proceeding.

In the Governor's Request for a hearing before this Court, the Governor asserts that he is entitled to representation by independent counsel, citing that the issue is now pending before the District Court in several cases involving Proposition A. However, in the case cited, there were questions raised as to whether the Attorney General was acting on behalf of the government of Guam. In this case, however, the Attorney

19

General is without question the attorney of record in this case representing Respondents. The Governor was issued a summons from the moment this case was filed. At the first hearing on this matter, the Governor's legal counsel was present, albeit as an "observer." Throughout the proceedings leading to the settlement in June, 2004, the Office of the Attorney General remained the attorney of record in this matter for Respondents, and appeared on their behalf at scheduled hearings.

During the negotiations of the Settlement Agreement, the Governor's cabinet members were intimately involved in the formulation of data and cash flow. Even after the terms of the Settlement Agreement were announced, it was clear that the Governor, whether through his silence or through statements from his office, supported the general terms of the Settlement Agreement and Attorney General Moylan's continued representation of Respondents, including his appearance at the settlement conference. Petitioner confirmed that the administration acted in conformance with the Settlement Agreement when it deposited the first installment of $3 million in July, 2004.

Several proceedings in this matter occurred since the time of the settlement, all of which received strong media attention, including proceedings involving two Applicants for Intervention. As is discussed below, many of the issues raised by the Governor were raised by the Applicants and resolved by this Court's Order denying intervention. The Governor failed to enter at that time and instead, consistent with his posture before this Court from the time this case was filed, allowed the Attorney General to handle the matters of Respondents.

Thus, the Governor, after nine months of proceedings on this matter with the Attorney General acting on behalf of Respondents, essentially argues that a

20

disagreement with the Attorney General regarding the Administration Plan allows him to set forth his posture before this Court. In effect, the Governor is seeking to turn back the clock and assert a position on the merits of this case, while a valid Settlement Agreement remains before this Court. This even after the parties strained to work out an expedited scheduling order, for which this Court was accommodating.

The Office of the Attorney General, as recently as October, during a hearing before this Court, confirmed that Respondents are affirmatively proceeding with the Settlement Agreement. The Governor of Guam and his counsel deliberately chose not to participate in any of the proceedings and allowed the parties to vacate the expedited trial dates. The Governor remained aware of the proceedings from the day he received service upon him of the complaint and summons. For six (6) months after the settlement negotiations culminated in the settlement agreement and the taking of this matter off calendar, the Governor unfairly refrained from participating in either the settling of this matter or even the preliminary matters, and waited until after the dates were removed to voice his first opposition. Indeed, the Governor's posture is more akin to a late intervenor, but possessing all the information necessary to participate early on in the case. Only a few days after the case was filed, Governor Camacho was quoted by the media as supporting the payment of EIC and ordering Director Ilagan to begin processing the refunds. The Office of the Governor was also involved in the only known payout of EIC in several years, to one individual.

FRCP Rule 23(d) gives the court power to determine procedures that ensure the fair and efficient conduct of a class action. A settlement and release will not be set aside merely because the "plaintiff harbors substantial misgivings." Vela v. Hope

21

Lumber & Supply Co., 966 P.2d 1196, 1199 (Okla. Ct. App. 1998). It is settled by law that a court has the inherent power to enforce a settlement in a case pending before it. Vari-O-Matic Machine Corporation v. New York Sewing Machine Attachment Corporation, 629 F. Supp. 257, 258 (2d Cir. 1986); see also Meetings & Expositions, Inc. v. Tandy Corp., 490 F.2d 714, 717 (2d Cir. 1974) (holding that "[a] district court has the power to enforce summarily, on motion, a settlement agreement reached in a case that is pending before it."). In addition, courts favor and do not lightly cast aside stipulations of settlement. See Matter of Dolgin Eldert Corp., 31 N.Y.2d 1, 10, 334 N.Y.S.2d 833, 286 N.E.2d 228 (Ct. App. 1972). See also Willengrodt ex rel. Majority Peoples' Fund for the 21st Century, Inc. v. Hohri, 953 F. Supp. 557, 560 (S.D.N.Y. 1997) (declining to set aside settlement agreement reached in open court and noting that "afterthought or change of mind are not sufficient to justify rejecting a settlement") (citing Rivera v. State, 115 A.D.2d 431, 432, 496 N.Y.S.2d 230, 231 (1st Dep't 1985), aff'd, 159 F.3d 1347 (2d Cir. 1998)).

In Teal v. Eagle Fleet, Inc., the Fifth Circuit upheld a denial of a motion to set aside a settlement agreement. 933 F.2d 341 (5th Cir. 1991). The Court held:

> The district court enjoys broad discretion in controlling its own docket. Edwards v. Cass County, Tex., 919 F.2d 273, 275 (5th Cir.1990). Since the Teals made no showing that their delay in challenging the settlement was warranted, the district court's denial of the motion as untimely was well within the court's discretion. The district court should not be obliged to interrupt the orderly proceedings of its docket to rule on this issue when the Teals could have easily presented these matters earlier. Id. at 275-76.

Id. at 346.

In <u>Allen v. Alabama State Bd. of Educ.</u>, the defendants contended that a

settlement agreement was not binding because the court had yet to approve the

agreement for the plaintiff class. 933 F.2d 341, (M.D. Ala 1985), *vacated on other

grounds*, <u>Allen v. Alabama State Bd. of Educ.</u>636 F.Supp. 64 (M.D. Ala. 1985). The

court explained:

> The process that the court and the named parties
> must follow to meet these Rule 23(e) requirements is often
> both expensive and time-consuming. Here, it will require at
> least one preliminary hearing, appropriate notice to the
> members of the plaintiff class, receipt of any objections by
> class members, filing of briefs by proponents and objectors,
> and a hearing on the settlement during which the proponents
> and objectors must be given full reasonable opportunity to
> present their views and evidence. Moreover, there is the
> added expense to the court and the parties of having to
> delay trial. It is therefore essential that, before embarking on
> such procedure, the court and the parties have some
> assurance that the settlement is binding on the named
> parties. <u>To allow the named parties to repudiate a settlement
> at any time, as long as the court has not approved the
> settlement for the plaintiff class, would permit substantial
> waste and abuse of the court's and the parties' time and
> resources; it would be administratively inefficient and unfair
> to both the court and the parties.</u> This court therefore holds
> that settlement agreement in a class action lawsuit is just as
> binding on the named parties as a settlement is on the
> parties in any other lawsuit, subject of course to the court's
> final approval of the agreement for the plaintiff class.

933 F.2d 341 at 1054. (citations omitted)(emphasis added).

The Court also addressed the contention that attorneys were not authorized to

settle the action:

> The defendants contend that the named plaintiffs and
> plaintiff-intervenors have not authorized their attorneys to
> settle this lawsuit. "An attorney of record is presumed to
> have authority to compromise and settle litigation of his
> client." <u>Mid-South Towing Co.</u>, 733 F.2d at 390, quoting
> <u>Thomas v. Colorado Trust Deed Funds, Inc.</u>, 366 F.2d 136,

23

139 (10th Cir. 1966) (emphasis deleted). This presumption has not been overcome here.

Id.

Here, the Governor has not even filed the proper motions before this Court, and certainly has not set forth nor overcome the standards necessary to set aside the preliminary order in this matter and the Settlement Agreement.

The Governor's untimely submission also asserts for the first time that this Court does not have subject matter jurisdiction. Petitioner is well aware that the parties cannot stipulate to subject matter jurisdiction. Judgment may, in some instances, be void for lack of subject matter jurisdiction; however, this occurs only where there is plain usurpation of power, when court wrongfully extends its jurisdiction beyond scope of its authority. Gschwind v Cessna Aircraft Co., 232 F3d 1342 (2000, CA10 Kan).

This case was filed alleging jurisdiction under both 48 U.S.C. §1421I(h) and 28 U.S.C. §1361. The case presents unique circumstances, as the government of Guam not only continued to refuse to pay refundable earned income tax credits, but publicly alleged that the credit was inapplicable to Guam, including blocking out the applicable provision which would allow taxpayers to claim the credit and completely denying the applicability of the entire program.

The Supreme Court of Guam recognized the situation years ago, stating that the Executive Branch "has ignored their policy mandate and refused to implement the EIC" In Re Request of I Mina' Bente Sing'ko Na Liheslaturan Guahan Relative to the Application of the Earned Income Tax Program to Guam Taxpayers, 2001 Guam 3. This Court was also presented with a similar issue by Applicant Naputi's insistence that the action included stale claims. This Court did not rule on the matter, but "questioned

24

PHILLIPS & BORDALLO

whether the time for making a claim can ever begin to run when a claimant has not been notified of his or her right to such a claim. In other words, since the right to an EIC claim was no longer provided for on the tax return forms, many taxpayers may not have been aware of the fact that they were entitled to such a tax credit." Santos, et al. v. Camacho, et al., Order dated August 5, 2004, Civil Case No. 04-00006.

In Air Line Stewards and Stewardesses Assn. v. Trans World Airlines, Inc, the Seventh Circuit was confronted with a similar situation. 630 F.2d 1164 (7th Circuit 19800. An Intervenor asserted that the district court lacked subject matter jurisdiction to approve a settlement agreement. The court rejected the challenge, reasoning:

> While we believe that in a controverted Title VII case the issues raised by intervenor would be both difficult and interesting, we must recognize that we are here reviewing the propriety of a settlement and not a judgment rendered after a trial. We believe that the issues raised by the intervenor should not be decided on the basis of Title VII law, but rather must be decided on the basis of legal principles regulating judicial review of settlement agreements . . .
>
> Settlements are entered into because of "the very uncertainties of outcome in litigation, as well as the avoidance of wasteful litigation and expense . . . ." Florida Trailer & Equipment Co. v. Deal, 284 F.2d 567, 571 (5th Cir. 1960). Based on these considerations, this court has held that a district court in reviewing a settlement agreement "should not attempt to decide the merits of the controversy . . . (because) any virtue which may reside in a compromise is based upon doing away with the effect of such a decision." Patterson v. Stovall, 528 F.2d 108, 114 (7th Cir. 1976). 573 F.2d at 963. . . .
>
> We do not share the view, under the circumstances of this case, that the parties' agreement is tantamount to an attempt to confer subject matter jurisdiction by consent. . . .
>
> We think the principles favoring settlement of class action lawsuits remain the same regardless of whether the disputed

Case 1:04-cv-00006    Document 110    Filed 12/08/2004    Page 29 of 36

> legal issues center on the jurisdiction of the court over the action. Where, as here, the jurisdictional question is not settled with finality, parties should not be forced to litigate the issue of jurisdiction if they can arrive at a settlement that is otherwise appropriate for district court approval.

Id. at 1167-1169.

The balance of the Governor's submissions raise the same issues and questions raised by the Intervenors, including lack of discovery, proper notice, and the overall fairness of the Settlement Agreement. As already ordered by this Court, these issues are properly raised at the fairness hearing.

## CONCLUSION

Based on the foregoing, Petitioners request appropriate orders granting Petitioner's motions for Orders approving the Administration Plan and Amended Notice, denying the Governor's "request" to have this Court vacate the Order preliminarily approving the Settlement Agreement; and declaring that the settlement agreement is binding on all named parties, subject to the Court's determining later whether the settlement should be approved for the EIC Class.

Respectfully submitted this 8th day of December, 2004.

PHILLIPS & BORDALLO, P.C.
Attorneys for Petitioner

By: _____
Ricardo D. Bordallo

26

Print this story

## Missing money: Governor's chief of staff moves millions into special account

**by Mindy Fothergill, KUAM News**
**Friday, November 19, 2004**

Since they were elected into office, the Camacho/Moylan team has had numerous disagreements. As time has passed, despite efforts to get Governor Felix Camacho and Lieutenant Governor Kaleo Moylan to reunite, the rift between them has only grown. It appears with actions taken by the Governor's chief of staff, communication between the two offices has now completely shut down.

While the governor is off-island, his second-in-command was left with a half-million dollar surprise. As KUAM News did some more research, we confirmed the two top public safety agencies are left with a million dollars less in lapsed funds, as the Governor's Office has transferred all of the money into their accounts.

With Governor Camacho off-island, Acting Governor Moylan was in for a surprise Thursday when he learned his office was missing $500,000. According to Bureau of Budget and Management Research documents, Governor's chief of staff Tony Sanchez requested $189,000 be transferred from the Lieutenant Governor's Office and the Guam State Clearinghouse to the Governor's Office. Sanchez also requested another $310,000 be transferred out of the Lieutenant Governor's account and placed into the Governor's Office.

Legislative Vice-Speaker Frank Aguon, Jr. confirms the Governor advised him of several recent transfers of money, adding that the Governor is required by the budget law to provide notice to the Legislature of any transfers within ten days' time. According to a copy of the notice provided to lawmakers, the half-million dollars from the Lieutenant Governor's Office's budget went to the Governor's Office to cover contractual services and office space rent.

While the island's chief executive and his chief of staff are away from Guam, senior advisor to the Governor George Bamba says under the law, Governor Camacho used his authority to transfer all lapsed funds from the previous fiscal year into a separate account at the Governor's Office. While the transfer report to the Legislature indicates the lapsed funds were going to cover contractual services and rent, Bamba says he doesn't know why that was put in the report.

The advisor says the money will be going to other agencies that may run out of money or need extra funds for increments or overtime. Bamba maintains the Governor would lose his transfer authority ability if the funds had not been transferred, and instead the money would have ended up back in the General Fund. Bamba confirms $1.2 million was transferred out of the Guam Police Department and $1 million from the Guam Fire Department.

# EXHIBIT A

Case 1:04-cv-00006   Document 110   Filed 12/08/2004   Page 31 of 36

With the money in the Governor's separate account, Bamba maintains that money can be transferred back to the agencies, if the need arises.

As for the half-million taken from the Lieutenant Governor's Office's budget, KUAM News has confirmed the money was put back into the acting governor's account late Thursday after the acting governor learned it had been transferred out. Bamba says he authorized the return of the money upon Acting Governor Moylan's request, adding as a matter of courtesy Moylan should have been notified - but wasn't.

Bamba maintains the transfers are the first of more to come, as BBMR continues doing a government-wide search for lapsed funds. Meanwhile, both the Guam Fire and Guam Police departments were not aware of the transfers. While the acting governor was able to get the half-million returned to his office, GPD and GFD are still left holding the short end of the stick, with $1 million less for each agency.

Bamba told KUAM News that he did speak to Acting Governor Moylan and relayed the Governor's apologies. Moylan's spokesperson, Phil Roberto, says Bamba indicated to the acting governor that the transfers were inadvertent and contrary to the Fiscal Year 2005 budget, which clearly separates the budgets of the two offices, as well as their respective lapses.

Roberto says corrections have been made and BBMR has since reversed the transfers back to the Lieutenant Governor's accounts. As for the transfers out of the Guam Police and Guam Fire accounts, Roberto says Acting Governor Moylan is not aware of those transfers, saying the Governor would have to answer for his actions.

**Copyright © 2000-2004 by Pacific Telestations, Inc.**

Print this story

Case 1:04-cv-00006   Document 110   Filed 12/08/2004   Page 32 of 36

P.O. Box 2950 Hagåtña, Guam 96932

TEL: (671) 472-8931 • FAX: (671) 477-4826 • EMAIL: governor@mail.gov.gu

Felix Perez Camacho
*Governor*

Kaleo Scott Moylan
*Lieutenant Governor*

NOV 18 2004

1 6 NOV 2004

The Honorable Vicente C. Pangelinan
Speaker
*Mina' Bente Siete Na Liheslaturan Guåhan*
155 Hessler Street
Hagåtña, Guam 96910

### Re: Settlement Contract in *Santos v. Camacho*, CV Act. CIV 04-00006

Dear Speaker Pangelinan:

The Governor provides this report regarding the above action to the Legislature pursuant to 5 G.C.A. § 22401 (the "Illegal Expenditures Act"). As you know, that section states in the relevant portion of subpart (a):

No officer or employee of the government of Guam, including the Governor of Guam, shall:

(1) Make or authorize any expenditure from, or create or authorize any obligation under, any appropriation or fund in excess of the amount available therein, or for other than an authorized purpose;

(2) Commence, continue, or proceed with any operational activity, construction, improvement, contract, or obligation without an appropriation or fund for the payment thereof; or after any such appropriation or fund is exhausted;

(3) Involve the government of Guam in any contract or other obligation, for the payment of money for any purpose, in advance of the appropriation made for such purpose;

It further states in subpart (e): "Any violation of this Section by an officer or employee of the Executive Branch shall be reported at once to the Governor by the head of the department or agency concerned, and the Governor shall furnish a report thereon, including the action taken, to the Legislature."

In February 2004, Julie Babauta Santos filed the action entitled *Santos v. Camacho*, District Court of Guam Case No. CV04-00006 against the Governor of Guam,

1041

**EXHIBIT B**

the Director of the Department of Revenue and Taxation, the Director of Department of Administration, and the Government of Guam. The lawsuit seeks to recover the Earned Income Tax Credit ("EITC") on behalf of all eligible taxpayers. A copy of the complaint is attached.

On June 14, 2004, while the Governor was off-island, the acting governor (Lt. Governor Moylan) and Attorney General Moylan entered into a settlement agreement with plaintiff's counsel, Michael Phillips ("Settlement Contract"). The Settlement Contract provided that the Government of Guam would pay ten percent (10%) of the $60 million settlement amount, which is $6 million, to Mr. Phillips in attorneys' fees. It further provided that the Government would pay the rest, or $54 million, in alleged tax refunds. And it provided that the Government would pay the EITC tax credit in *future* tax years.

The Settlement Contract does not identify any source of appropriation to pay the $54 million in purported tax refund claims or $6 million in attorneys' fees. The Settlement Contract does not identify any appropriation to pay EITC tax refund claims in future tax years. The Settlement Contract is not subject to the Legislature's decision to appropriate funds to make these payments. In sum, the Settlement Contract completely bypasses the Legislature's power over the appropriation of funds. This is completely contrary to the words and spirit of the Organic Act, which creates a series of checks and balances to stop any one officer (here, the Attorney General) from committing the government to a $60 million obligation without oversight. A copy of the tentatively approved Settlement Contract is attached to this report. Exhibit A to this report summarizes the contract's key terms.

Based upon a stipulation of the parties, the District Court has granted preliminary approval of this Settlement Contract. It has not given final approval. The Governor recently filed an objection with respect to the approval of the Settlement Contract on grounds that it violates Guam law. The District Court acknowledged the Governor's concerns and has set a briefing and hearing schedule on the Governor's objections. A copy of the Court's briefing Order is attached hereto.

Although the Attorney General's office was counsel of record in this matter, the Governor's counsel became concerned regarding these issues and sent a letter to the Attorney General. After a substantial delay, the Attorney General's office issued a legal opinion to the Governor. It stated that the tentatively approved Settlement Contract is illegal with regard to the payment of future EITC tax credits. It stated that the $6 million in attorneys' fees and $54 million in purported tax refunds were legal. A copy of this letter is attached.

Although the finding that the future payments are illegal already voids the contract, the Governor subsequently inquired as to the Attorney General's rationale for finding the $6 million in attorneys' fees and $54 million in purported refund claims legal. The Governor questioned the Attorney General's rationale that these were legal simply because the Governor has the authority to pay final tax judgments from "unencumbered" funds under 48 U.S.C. § 1421i(h)(2). First, the authority to pay final judgments does not necessarily include the power to contract for such a judgment. Second, there are not nearly enough unencumbered funds for the Governor to make the monthly payments required by the settlement contract. Third, $6 million in attorneys' fees is not a payment of a tax refund judgment. Fourth, the Governor can only pay "final" judgments under 48 U.S.C. § 1421i(h)(2) and the settlement requires interim payments even before a final judgment is entered.

The Governor raised these additional reasons for concluding that the settlement was illegal with the Attorney General. The Attorney General refused to respond. Instead, on November 8, 2004 the Attorney General filed papers in District Court that continued to seek to implement an administrative plan for the settlement. The Attorney General filed these documents in the name of the Governor *in direct contravention of the Governor's instructions*. The Attorney General did this even though his own office had agreed that the settlement was illegal. Because of the legal concerns stated above, the Governor has filed papers opposing the Attorney General's recent filing and position regarding the EITC settlement.

The essence of the Governor's filing was to explain to the Court why he has concluded that the contract is illegal and in violation of the Illegal Expenditures Act. *See* 5 G.C.A. § 22401(a)(3). These papers also explained that because it is illegal, no further action can be taken to implement this contract. *See* 5 G.C.A. § 22401(a)(2) (forbidding the participation in any contract that requires the expenditure of non-appropriated funds); *Pangelinan v. Gutierrez*, 2003 Guam 13 (2003) (contract that violates Illegal Expenditures Act is void), *reconsidered in part on other grounds* 2004 Guam 16.

As you know, Governor Camacho is strongly in favor of the Earned Income Tax Credit. He wants to make sure that eligible taxpayers receive the refunds to which they are entitled. But he also knows that no matter how important this tax credit is, the laws of Guam must be followed. Before any money may be paid out, it must be duly appropriated by the Legislature or federal funding must be secured. Neither the Attorney General nor any other official may attempt to override the Legislature's powers to appropriate funds.

The Governor believes that the appropriate mechanism for making any refunds should be through a claims process established by the Legislature and Governor.

The Government should not have to spend $7 million so that qualified taxpayers receive only 50% due to them. Only a structure established by the Legislature and Governor can remedy the current situation. Indeed, without our combined efforts, the Government and our people may never find the right solution. Indeed, a second class action has been filed against the Government and Governor, illustrating that the settlement has not created permanent peace for the Government.

Further complicating this matter is the fact that the settlement states that it may pay taxpayers as little as fifty percent of their claims. If there is to be a solution to this matter, it must be a fair solution that does not arbitrarily cut-off taxpayer's rights in favor of paying attorneys' fees and administrative costs.

We have repeatedly asked the Attorney General, both orally and in writing, for further information regarding the negotiation of the Settlement Contract and the advice his office provided to the government regarding it. We have not received any acknowledgment of this request, much less a response. Along with opposing the illegal contract, the Governor will continue to seek these papers.

Very Truly Yours,

Shannon Taitano
Legal Counsel to the Governor of Guam
On Behalf of the Governor of Guam,
Felix P. Camacho

cc:   All Senators
      Kaleo S. Moylan, Lt. Governor of Guam
      Art Ilagan, Director, Department of Revenue & Taxation
      Lourdes Perez, Director, Department of Administration