

FILED
DISTRICT COURT OF GUAM

FEB - 7 2005

MARY L.M. MORAN
CLERK OF COURT

148

IN THE DISTRICT COURT OF GUAM

TERRITORY OF GUAM

* * *

JULIE BABAUTA SANTOS,
individually, and on behalf
of all those similarly situated,  )

         Plaintiffs,

    vs.

FELIX A. CAMACHO,
Governor of Guam, et al.,

         Defendants.

_____)

   CIVIL CASE
   NO. 04-00006

TRANSCRIPT OF PROCEEDINGS

BEFORE

THE HONORABLE JOAQUIN V.E. MANIBUSAN, JUNIOR
Magistrate Judge

**HEARING ON MOTIONS**

**THURSDAY, JANUARY 25, 2005**
* * *

ORIGINAL

APPEARANCES:


**FOR THE PLAINTIFFS:**

LAW OFFICES OF PHILLIPS & BORDALLO
BY:  MICHAEL PHILLIPS, Esq.
410 West O'Brien Drive
Agana, Guam  96910


**FOR DEFENDANT GOVERNMENT OF GUAM:**

OFFICE OF THE ATTORNEY GENERAL
DOUGLAS MOYLAN, ATTORNEY GENERAL
BY:  ROBERT WEINBERG, Assistant Attorney General
     STEPHEN COHEN, Assistant Attorney General
Guam Judicial Center, Suite 2-200E
120 West O'Brien Drive
Agana, Guam 96910


**FOR DEFENDANT GOVERNOR OF GUAM:**

LAW OFFICES OF CALVO & CLARK
Attorneys At Law
BY:  EDUARDO A. CALVO, Esq
     RODNEY J. JACOB, Esq.
     DANIEL BENJAMIN, Esq.
     ARTHUR B. CLARK, Esq.
655 South Marine Corps Drive
Tamuning, Guam  96911

```
1                           I-N-D-E-X

2

3    GOVERNMENT WITNESS       DIRECT   CROSS   REDIRECT  REDIRECT

4    Artemio B. Ilagan           19 (by Mr. Weinberg)
                                 41 (by Mr. Mantanona)
5                                       43        51

6    Lourdes Perez               57 (by Mr. Cohen)
                                 79 (by Mr. Mantanona)
7                                       82

8    ----------------------------------------------------

9

10                        E-X-H-I-B-I-T-S

11

12   GOVERNMENT EXHIBIT                IDENTIFIED/ADMITTED

13

14   HH - Certificate of Emergency       26        73

15   R  - Charles Troutman letter        51       103

16   KK - Certificate of Emergency       59        73

17   Joint 16 - Mantanona contract       77        78

18   BB - Letter to Attorney General     82        84
                re substitution of counsel
19
     DD - Response from Attorney General 84        86
20

21

22

23

24

25
```

```
 1       HAGATNA, GUAM; TUESDAY, JANUARY 25, 2005; 10:12 A.M.
 2                            * * *
 3            THE CLERK:  Civil case 04-00006, Julie Babauta
 4       Santos, individually, and on behalf of all those
 5       similarly situated, versus Felix A. Camacho, Governor
 6       of Guam, et al.; petitioner's motion for orders
 7       approving the administration plan and amending notice;
 8       motion to strike appearances and pleadings; and motion
 9       for relief from order issued by the Court on November
10       12, 2004.
11            Counsel, please state your appearances.
12            MR. PHILLIPS:  Good morning, Your Honor, Mike
13       Phillips for the petitioner Julie Babauta Santos and et
14       cetera.
15            MR. CALVO:  Eduardo Calvo of Calvo and Clark,
16       on behalf of Felix Camacho, Governor of Guam.
17            MR. JACOB:  Rodney Jacob, Calvo and Clark, on
18       behalf of Felix Camacho, Governor of Guam.
19            MR. BENJAMIN:  Daniel Benjamin, Calvo and
20       Clark, on behalf of Felix Camacho, Governor of Guam.
21            MR. CALVO:  And Your Honor, with us today is
22       Governor Camacho.
23            THE COURT:  The Court notes the presence of
24       the Governor.
25            MS. TAITANO:  Shannon Taitano, Office of the
```

1    Governor, counsel for the Governor of Guam.

2            MR. MANTANONA:  Good morning, Your Honor,

3    Rawlen Mantanona for defendants Artemio Ilagan,

4    Director of Revenue and Taxation, and for Director

5    Lourdes Perez, Director of Department of

6    Administration, also defendant.

7            Thank you, Your Honor.

8            MR. COHEN:  Stephen Cohen on behalf of all the

9    respondents, Your Honor.

10           MR. WEINBERG:  And Rob Weinberg from the

11   Attorney General's Office, also on behalf of all of the

12   respondents.

13           THE COURT:  All right.  The matter is before

14   the Court today based on various motions.  It appears

15   that the government's motion, the Attorney General's

16   motion to strike needs to be heard by the Court first.

17           Mr. Weinberg and Mr. Cohen.

18           MR. WEINBERG:  Yes.  Your Honor, would you

19   want me up here?

20           THE COURT:  Please, you could take the podium

21   if you desire or you can argue there, whatever is more

22   convenient for you.

23           All right, then you may be seated where you're

24   at.

25           MR. WEINBERG:  Thank you, Your Honor.

```
 1              MR. CALVO:  Excuse me, Your Honor, if I may?

 2              THE COURT:  Yes.

 3              MR. CALVO:  I think connected to the motion to

 4    strike, Your Honor, is also our notice of substitution

 5    of counsel, and however it pleases the Court; would the

 6    Court like to deal with that first so that we can enter

 7    our appearance formally as substituted counsel, or as

 8    counsel of record for the Governor of Guam?  It seems

 9    like that might be the first thing that the Court may

10    want to consider.

11              THE COURT:  Well, the Attorney General has

12    filed a motion to strike these notices that have been

13    filed with the Court, so I suppose dealing with either

14    one would resolve the issue before the Court.  See, you

15    don't have a motion that's pending, is that correct?

16    See, I'm only dealing with motions that are pending

17    before the Court.

18              MR. CALVO:  Right.

19              THE COURT:  The motion is by the government,

20    the Attorney General, to strike appearances that have

21    been filed on behalf of the individual defendants.

22              MR. CALVO:  I understand, Your Honor, we --

23              THE COURT:  So that's why I'm proceeding that

24    way, because the Court basically has only the motion to

25    strike and the motion for adoption of the plan before
```

```
 1    it.
 2              MR. CALVO:  It's a little bit of an unusual
 3    situation, as I understand it, Your Honor.  We filed
 4    a notice pursuant to General Rule 1.9 with the proposed
 5    order, so provided the Court deals with that, along
 6    with the motion to strike.
 7              THE COURT:  See, my preference in the
 8    proceeding would be that in dealing with the Attorney
 9    General's motion to strike, in effect we would be
10    hearing your opposition to the motion, and in deciding
11    that issue, ultimately determining whether or not there
12    will be a substitution in the matter.
13              MR. CALVO:  Thank you, Your Honor.
14              THE COURT:  Does that --
15              MR. CALVO:  That answers my question.
16              THE COURT:  All right.  Mr. Weinberg.
17              MR. WEINBERG:  Thank you, Your Honor.
18    (Inaudible.)
19              THE COURT:  All right, sir, I've been advised
20    also to say that in speaking, you need to talk loudly
21    so it could be picked up by the microphone, because
22    we're taping the proceedings.
23              MR. WEINBERG:  Your Honor, I don't know where
24    to begin.  I know this Court is already familiar with a
25    lot of the issues having -- or the questions of law
```

1    that we have presented here as to who controls the

2    representation of the Government of Guam and --

3              THE COURT:  All right, before we proceed,

4    let me ask, are you going to be calling witnesses with

5    respect to this part of the motion?

6              MR. WEINBERG:  We do have, we do anticipate

7    that there will be testimony --

8              THE COURT:  All right.

9              MR. WEINBERG:  -- on these questions, because

10   part of our argument is that the contract for the

11   provisions of legal counsel, and Mr. Mantanona and the

12   Calvo and Clark law firm are not legal under Guam law,

13   so we did --

14             THE COURT:  So who are these individuals that

15   you are intending to call as witnesses?

16             MR. WEINBERG:  Well, Shannon Taitano is one.

17   We anticipated eliciting the testimony also from

18   Lou Perez, the Director of the Department of

19   Administration; possibly from the Governor; and

20   possibly from Art Ilagan, the Director --

21             We were going to go through this process in

22   testimony with them and ask them by what means these

23   attorneys over here are sitting here purporting to

24   represent.  It's our position that (inaudible) don't

25   have legal authority, they do not have a legal contract

1    to represent the Governor or the Director (inaudible).

2           Yes, there will be testimony.

3           THE COURT:  All right.  Let me ask if you

4    could move the microphone closer to you, Mr. Weinberg.

5    It's not picking up.

6           MR. WEINBERG:  (Inaudible.)

7           THE COURT:  So, do you wish to basically make

8    arguments, or do you want to call these witnesses in

9    for purposes of the motion, or --

10          MR. WEINBERG:  However the Court would like

11   to proceed.  I don't think that additional argument is

12   really necessary.  You've read our briefs, I'm sure.

13   So if you'd like us to proceed and put witnesses on,

14   we --

15          THE COURT:  Well, if you think it's necessary

16   for purposes of your motion.

17          (Pause.)

18          MR. WEINBERG:  There are a lot of documents,

19   and if the parties could stipulate or -- as to the

20   admissibility of these documents, it might expedite the

21   matter.

22          THE COURT:  What are the documents that you

23   wish to --

24          MR. WEINBERG:  These are documents produced by

25   the, by the Governor's Office having to do with the

1    contract for Calvo and Clark and Rawlen Mantanona, and

2    other documents related to the procurement of legal

3    services.

4          THE COURT:  Let me ask counsel.  Could there

5    be a stipulation that these documents purport to be

6    what they are?

7          MR. CALVO:  Well, Your Honor, that's -- it's

8    possible.  The problem is that we received documents

9    last night as we were preparing for today's hearing.

10    We have not had, as we expressed to the AG's office

11    prior to the hearing, have not had an opportunity to go

12    through those documents.

13          It might be possible to be able to go through

14    the documents to review whether or not -- to review the

15    documents to determine whether or not testimony is

16    necessary, in the view of the Attorney General's

17    Office.  From our perspective, I don't think any

18    testimony is necessary, but we're prepared to go

19    forward with argument on the propriety of our contract

20    in representing the Governor.  But if it pleases the

21    Court, we will --

22          THE COURT:  Well, I'm only asking Mr. Weinberg

23    because I want him to be able to produce to the court

24    whatever evidence, whatever information you think may

25    be necessary for purposes of your motion to strike.

1     Let's start with the witnesses; you said you

2  wanted to call the Governor to the stand?

3        MR. WEINBERG:  (No audible response.)

4        (Pause.)

5        MR. CALVO:  Your Honor?

6        THE COURT:  Yes, Mr. Calvo.

7        MR. CALVO:  May I suggest that we confer with

8  the AG's office regarding this, because depending on

9  where they're going to go with this, there may be

10  additional evidence that we may want to put into the

11  record also with respect to their proceeding with the

12  evidentiary part of the argument.

13        I'm not sure we could work anything out, it's

14  just that we haven't had the opportunity to try, to

15  perhaps expedite this process, and really --

16        THE COURT:  That's basically what I wanted to

17  say is if you intend to call the Governor, what are you

18  going to ask the Governor, and to see whether the

19  information could be stipulated by counsel.

20        MR. WEINBERG:  We intend to ask the Governor

21  by what means he has hired Calvo and Clark and by what

22  means he has purported to amend the contract with Calvo

23  and Clark; by what means Mr. Rawlen Mantanona has been

24  hired to represent the Director of RevTax and the

25  Director of Administration in this lawsuit.  It's our,

1   part of our contentions here is that these attorneys

2   here are purporting to represent Government of Guam

3   officials and provide legal services in violation of

4   Guam law.  And if that's the case --

5           THE COURT:  All right.  But that's a legal

6   argument, though, that the Court can hear without

7   actually eliciting the testimony -- the basis.  I mean,

8   the documents here would appear to supply the Court

9   with the information that's needed to arrive at the

10  conclusion as to why they're here before the Court

11  today.

12          MR. WEINBERG:  I think the only -- the

13  documents that we're looking at have to do with the

14  contracts that have been produced by the Governor's

15  Office.

16          THE COURT:  And as to those contracts, I don't

17  think there's -- nobody is denying that they represent

18  what they represent to be?

19          MR. CALVO:  That's correct, Your Honor.

20          THE COURT:  All right.

21          MR. CALVO:  At least that's documents that we

22  have.

23          THE COURT:  Your retained contract?

24          MR. CALVO:  Yes.

25          MR. WEINBERG:  Now, on this limited issue of

the legal services by a private law firm, there is also
another question that we want to ask of the Governor,
because it's our understanding that at least with
respect to Mr. Mantanona, he was hired under some --
something the Governor has called an emergency
procurement, and we'd like to ask the Governor about
what the nature of the emergency was under Guam law
that he hired Mr. Mantanona without consultation or the
agreement of the Attorney General.

THE COURT: Well, my reading of that appeared
that that memorandum came from Ms. Taitano.

MR. WEINBERG: Well, I --

THE COURT: Maybe she may be the person that
you need to ask.

MR. WEINBERG: I can get that from Ms.
Taitano.

THE COURT: Okay. Any other information from
the Governor?

MR. WEINBERG: Not on this question having to
do with the Attorney General, with the Attorney General
representing all the respondents.

THE COURT: Okay. The next witness then.

MR. WEINBERG: Do we have anybody else other
than --

MR. COHEN: Yes.

1          (Pause.)

2          MR. WEINBERG:  Lou Perez and Art Ilagan would

3    also be asked to testify as to their requests to the

4    Governor for legal services outside the office of the

5    Attorney General.

6          THE COURT:  All right.  Could that also be

7    answered by Ms. Taitano who issued the, I guess the

8    emergency --

9          MR. WEINBERG:  I don't believe so, Your Honor.

10   They may have asked Ms. Taitano to do that, to do that

11   for her, but I think since they're here, it would be

12   advisable to ask them directly what (inaudible).

13         MR. CALVO:  Again, Your Honor --

14         THE COURT:  Okay.

15         MR. CALVO:  Again, this is something that

16   might be able to be resolved through a stipulation

17   after we confer, if we really are able to get to what

18   Mr. Weinberg is trying to get to.  And quite frankly,

19   at this point I'm not really sure, Your Honor.  But

20   maybe we can confer about that.

21         THE COURT:  All right.  Do you wish some time

22   then to talk together off the record?

23         MR. CALVO:  Right, maybe a 10-minute, 15-

24   minute recess, Your Honor.

25         THE COURT:  Mr. Weinberg?

1  MR. WEINBERG:  No objection.

2  THE COURT:  All right, let's take a 15-minute

3  recess, and hopefully the issue regarding testimony

4  today can be resolved so that we can move forward from

5  there.

6  MR. CALVO:  Your Honor?

7  THE COURT:  Yes.

8  MR. CALVO:  Prior to the recess, I just would

9  like to comment that, as you can see, we have a full

10 courtroom of government officials.  I'm really happy

11 that the court is going through this process to try and

12 find out, you know, what the Attorney General is trying

13 to accomplish here, so that we can get an idea as to

14 how long these very busy people have to be in the

15 courtroom or really, you know, not get back to what

16 they should be doing, which is, you know, working.

17 THE COURT:  Have they be subpoenaed?

18 MR. CALVO:  Yes.

19 THE COURT:  All right.

20 MR. WEINBERG:  (Inaudible) is subpoenaed.

21 And to answer the question, what I'm trying --

22 what the Attorney General's Office would like to do is

23 empty the courtroom, and we can do that as soon as the

24 Court rules that these gentlemen over here do not

25 represent the respondents, and that we do, and then

1  we'll be able to (inaudible).

2          THE COURT:  All right, let's take a 15-minute

3  recess, let me allow counsel to see whether they can

4  resolve this issue.  If not, then we'll be back and

5  we'll continue with the arguments before the Court

6  today.

7          MR. CALVO:  Thank you, Your Honor.

8          THE COURT:  You're welcome.

9              (Recess was taken at 10:55 a.m.)

10             (Proceedings resumed at 11:16 a.m.)

11         THE COURT:  Counsel, are we ready to proceed?

12  Mr. Weinberg?

13         MR. CALVO:  Your Honor?

14         THE COURT:  Mr. Calvo.

15         MR. CALVO:  If I may, just a housekeeping

16  matter.  I was told by my partner here that perhaps the

17  Court had decided with respect to the witnesses in the

18  courtroom, and as far as their availability, and when

19  they might be needed?

20         THE COURT:  Yes.  Well, you know, if they're

21  not needed for the motion to strike, I was inclined to

22  release them at the moment.

23         MR. CALVO:  Until further notice, Your Honor?

24         THE COURT:  Until further notice from the

25  court.

1      MR. CALVO:  Thank you, Your Honor.

2      MR. PHILLIPS:  Your Honor, if I may?

3      THE COURT:  Yes, Mr. Phillips.

4      MR. PHILLIPS:  We, just to the Attorney

5   General, the possibility of releasing certain witnesses

6   subject to a 30-minute call by the Court.  That's my

7   understanding of the agreement, and if that's the

8   agreement I have no objection.  Otherwise, Your Honor,

9   I think it's very important that the witnesses stay

10  because of the fact that they will be needed.

11      THE COURT:  When we come -- when we address

12  your issues?

13      MR. PHILLIPS:  That's correct, Your Honor.

14  I have no objection to them leaving as long as they're

15  subject to call within 30 minutes.

16      UNKNOWN VOICE:  With that understanding, Your

17  Honor.

18      MR. WEINBERG:  And, Your Honor, because I'll

19  be addressing Mr. Phillips's motion, I just would like

20  at least to note for the record that we think it's

21  irrelevant to have testimony on that.  We'd like to be

22  able to address the Court on that issue at that time.

23      THE COURT:  All right.

24      MR. WEINBERG:  The Attorney General subpoenaed

25  these witnesses (inaudible).

1          THE COURT:  I see.  Well, let me release the

2     witnesses, let me release the Governor.

3          Sir, thank you for your patience sitting and

4     waiting; the Court will release you at this time

5     subject to recall based on what has been represented to

6     the court.

7          (Pause.)

8          THE COURT:  Any other matters before we

9     proceed with argument?  Or -- well, Mr. Weinberg.

10         MR. WEINBERG:  No, Your Honor, I think we are

11    ready to call our first witness on the question of the

12    propriety of the counsel's contract to represent the

13    others.

14         THE COURT:  All right, you may call your first

15    witness then.

16         MR. WEINBERG:  Art Ilagan.

17         THE COURT:  Mr. Ilagan.

18         THE CLERK:  Please raise your right hand.

19                   **ARTEMIO B. ILAGAN,**

20    called as a witness on behalf of the Attorney General,

21    was first duly sworn and testified as follows:

22         THE CLERK:  Please state your full name and

23    spell your last name for the record.

24         THE WITNESS:  My full name is Artemio B.

25    Ilagan, I-L-A-G-A-N.

# DIRECT EXAMINATION

BY MR. WEINBERG:

    Q.   Mr. Ilagan, I'm Rob Weinberg for the Attorney General's Office.

        You were an original signatory to the settlement agreement, were you not?

    A.   Yes, sir.

    Q.   And this is in June of last year?

    A.   Yes, sir.

    Q.   Did you have an opportunity to talk to anybody at the Attorney General's Office about that agreement?

    A.   Prior to signing?

    Q.   Have you spoken to anyone prior to, to signing it, yes.

    MR. CALVO:  Objection, Your Honor.  My understanding on the proffer by the Attorney General's Office at this preliminary stage is that they were going to strictly delve into the procurement issue and not the other matters that are going to be before the Court later on, I imagine, this afternoon.

    THE COURT:  Mr. Weinberg, is that a preliminary question?

    MR. WEINBERG:  Well, Your Honor, I think it goes to the issue of why Mr. Ilagan has requested independent counsel.  At one point he was satisfied

```
 1   with counsel's -- with representation from the Attorney
 2   General's Office and at some point later he was not,
 3   and I'm just trying to get to, to find out at what
 4   point he changed his mind about the Attorney General's
 5   Office representing him.
 6          THE COURT:  Why don't we cut into the chase
 7   and ask the question directly?
 8          MR. WEINBERG:  Well, let me ask you that
 9   question directly, Mr. Ilagan.
10   Q.    At what point did you decide that you did not
11   want to be represented by the Attorney General?
12   A.    When you look at the, the circumstances of the
13   settlement, it was really settled too fast.  We were
14   called Friday night; John, my deputy was called Friday
15   night, we met Saturday, we suggested ways to implement
16   a plan that the Lieutenant Governor who was Governor at
17   that time wanted to happen that weekend, it was too
18   short --
19   Q.    Let me slow you down.  When you say we met on
20   a Saturday, who is we?
21   A.    The deputy, John Camacho, myself, and Paul
22   Pablo.
23   Q.    Paul who?
24   A.    Paul Pablo.
25   Q.    And who is he?
```

1    A.    He's the Tax Enforcement Administrator.

2    Q.    And where did you meet?

3    A.    In my office.

4    Q.    Was anyone else present?

5    A.    Joe Rios was there, but he just came in from

6    the states, his father was dying, so he really didn't

7    participate, he went home.

8    Q.    And so back in, this was -- this is in what,

9    June the 13th, or the --

10    A.    This is Saturday night.

11    Q.    Saturday night in June?

12    A.    Right.

13    Q.    Of 2004?

14    A.    Right.

15    Q.    And at that point there, did you -- were you

16    dissatisfied with the Attorney General's

17    representation?

18    A.    Uhm, we never met.

19    Q.    When you signed the settlement agreement where

20    were you; who was present?

21    A.    Uhm, in the conference room, it was John,

22    myself, Paul Pablo, Joey Manibusan --

23    Q.    And for the record, who is Joey Manibusan?

24    A.    He's the deputy director for Department of

25    Administration.

1      Q.    Anyone else present?

2      A.    The media was there.

3      Q.    I'm sorry?

4      A.    The media was there, the Lieutenant Governor

5  was there, the AG was there, uhm, Mr. Mike Phillips was

6  there.

7      Q.    And what reservations did you have about the

8  settlement agreement at that time?

9      A.    We didn't really review it, it was just given

10  to us that day to, to look at.

11        Actually they gave it to us a few minutes

12  before the signature, and then they pulled it back;

13  and then when it was ready for signature they gave it

14  back to us to sign.

15      Q.    Since you've signed it, have you had an

16  opportunity to review the settlement agreement?

17      A.    Yes.

18      Q.    All right.  And since that time, what if any

19  objections or reservations do you have about that

20  settlement agreement?

21      A.    There's a lot of things in there that I didn't

22  see that we can -- that I felt was not fair.  One thing

23  was -- let's see -- allowing only taxpayers who have

24  filed a return to claim EIC; other taxpayers who have

25  not filed because they didn't need to, and we weren't

1   paying EIC at that time didn't have to file, so that

2   the settlement excluded them from filing or claiming

3   EIC.

4           MR. CALVO:  Again, Your Honor, I'd have to

5   object.  I think this is entirely inappropriate.

6           THE COURT:  I'm going to sustain the

7   objection, because it sort of much goes into Mr.

8   Phillips's area.

9           MR. WEINBERG:  And, Your Honor, I don't want

10  to do that either, I want to get to the next question.

11          THE COURT:  All right.

12          MR. WEINBERG:  Which is --

13      Q.   At what point did you communicate your

14  objections or reservations to the Attorney General

15  or --

16          MR. MANTANONA:  (Overlapping.)  Objection,

17  Your Honor.  As counsel for Mr. Ilagan, I'm going to

18  object, because this is not the matter before the

19  Court.  The matter is the, I guess the procurement

20  issue in regards to Mr. Ilagan soliciting my services,

21  so I, I'd ask the Court to get control of this matter

22  back, and bring it back into the actual issue before

23  the Court.  Because there are thousands of issues which

24  are going to be addressed, and the Court wants to deal

25  with each issue specifically.  So if the Court could

1  direct the Attorney General to bring it back to the
2  solicitation.
3          MR. WEINBERG:  Let me see if I can get around
4  -- if I can get to Mr. Mantanona's objection by another
5  way.
6      Q.  At what point did you make the determination
7  that you wanted to hire someone other than the Attorney
8  General's Office?
9      A.  When we were getting notices from the AG's
10 Office that we had to implement the agreement.
11     Q.  And when was that?
12     A.  I can't recall what, what day that was.
13     Q.  Approximately, was it in September?
14     A.  It was last year.  I can't recall.  All I know
15 is that we were getting notices, that, hey, are you
16 guys putting money into this fund?  Are you setting up
17 the programs, are you advertising in the paper?
18     Q.  And what was your response; were you doing
19 those things?
20     A.  Uhm, we did one, and then I realized that
21 there's no appropriation for these things, and it's
22 illegal to do these things.
23     Q.  So at what point did you raise that problem
24 with the Attorney General?
25     A.  The Attorney General never came --

1          MR. CALVO:  (Overlapping) Your Honor, I'm

2     sorry.  I object, Your Honor.  The Attorney General's

3     either the attorney for Mr. Ilagan or the former

4     attorney of Mr. Ilagan, and he's cross -- he's

5     examining him on possibly attorney-client privileged

6     information.  And this is just entirely inappropriate.

7     I think that the proffer by the Attorney General's

8     Office at the outset that he was going to be concerned

9     with procurement issues, really what he said was the

10    emergency, and what he's going through right now, Your

11    Honor, is really the process of the settlement and the

12    litigation and the implementation of the settlement

13    agreement, which is entirely inappropriate, Your Honor.

14         MR. WEINBERG:  Well, I'm trying to get to the

15    question of what's the emergency.  So let me ask you

16    that question, Mr. Ilagan.

17    Q.    You have filed -- you have signed a

18    declaration stating that there was an emergency; is

19    that not correct?

20    A.    Yes.

21    Q.    Let me ask you to look in the notebook that

22    should be sitting in front of you.

23          I'm going to try this thing here.

24          MR. MANTANONA:  Your Honor, at this point

25    I'm going to object to any further questioning of

1   Mr. Ilagan by the Attorney General's Office, unless

2   the Attorney General's Office is going to withdraw

3   from representation of Mr. Ilagan in this case.  He

4   is putting matters before the Court that --

5           THE COURT:  Overruled.  I think the issue

6   is properly before the Court because he's still the

7   attorney, and there's also an entry of appearance that

8   appears to contradict that representation.  I'm going

9   to overrule it for the present time and allow the

10  question to be asked.

11          MR. WEINBERG:  (Using the display machine.)

12  For the technically illiterate here --

13      Q.   Mr. Ilagan, can you read that, can you see

14  that?

15      A.   It's kind of blurry.

16          MR. WEINBERG:  Could I get some assistance?

17          MR. CALVO:  It's not legible from here.

18          THE COURT:  All right.  Counsel, why don't you

19  just direct the witness to the exhibit in the binder so

20  we can look at it.

21  BY MR. WEINBERG:

22      Q.   Mr. Ilagan, if you would, in the binder in

23  front of you at the tab marked HH there's a number of

24  pages of documents, one, two -- the seventh page of tab

25  HH, do you have it?

1    A.    Yes, sir.

2    Q.    Is that a document at the top of it says

3    Certificate of Emergency?

4    A.    Yes.

5    Q.    For procurement of legal services?

6    A.    Yes, sir.

7    Q.    All right.  And that is a document that you

8    signed; is that correct?  And it's dated -- what's the

9    date on that?

10   A.    (Inaudible.)

11   Q.    I'm sorry?

12   A.    November 15, 2004.

13   Q.    November 15, 2004.

14         So from June 14th, of 2004, until November

15   15th, was there -- was there not an emergency with

16   respect to the Attorney General's representation of

17   you?

18   A.    Can you repeat the question?

19   Q.    Yeah, that was poorly phrased.

20         November 15th, which is four months after you

21   signed the settlement agreement, you signed a document

22   declaring that you had an emergency on your hands; is

23   that correct?

24   A.    Yes.

25   Q.    All right.  So November 15th, that or

1    thereabouts is when you decided there was an emergency

2    in the provision of legal services to you?

3        A.    Yes.

4        Q.    Where in, if you know, is -- why did you sign

5    this Certificate of Emergency?  Is there a reason you

6    did that, a legal reason, or a reason under Guam

7    regulations that you did that?

8        A.    I signed it based on what I wrote on this

9    agreement, I needed representation.  I'd been asking

10   for representation for a tax attorney in the past.

11       Q.    And in fact you were being represented by

12   Mr. Steve Cohen of the Attorney General's Office?

13       A.    It's kind of weird that Steve would represent

14   me when he wrote the ruling not to pay the EIC in the

15   last administration, just a very big conflict there.

16       Q.    So, was that -- did you ask the Attorney

17   General for someone other than Mr. Cohen then?

18       A.    No, I didn't.

19       Q.    What else did you  --

20            MR. MANTANONA:  Your Honor, I'm going to

21   object to this line of questioning again because, Your

22   Honor, before the Court are the moving papers of the

23   people in this matter's motion of respondents and

24   Attorney General to strike the entry of appearance

25   of Attorney Rawlen Mantanona, page 8, the entry of

1   appearance and the -- violates Guam procurement law,
2   all it states, Your Honor, is basically that the
3   Attorney General having -- has not approved of any
4   representation, and it seems that this goes way beyond
5   the scope, and actually delves into privileged
6   information.
7           THE COURT:  Well, pursuant to the question of
8   violation of the procurement law, if the procurement
9   law requires that you get the services, you know, you
10  bid it out, then to circumvent that, you have to go
11  through some emergency procedures not to follow what's
12  provided therein --
13          MR. BENJAMIN:  Your Honor?
14          THE COURT:  Which is what the -- which is
15  what they've done in this matter.
16          MR. BENJAMIN:  Your Honor, if I could address
17  the Court.  The issue, however, that Mr. Weinberg and
18  Mr. Cohen's brief does not raise the issue of whether
19  or not the proper procedures were followed as to
20  emergency procurement, it only raises the issue of
21  whether or not the Attorney General's signature appears
22  on the contract.  So any questions regarding whether or
23  not the emergency procurement was correct, there's no
24  warning at all to counsel that they intended to raise
25  this issue.

1    MR. WEINBERG: Your Honor, if I can address

2    that. Our brief talks about the failure to obtain

3    the Attorney General's signature, yes, all right.

4    And our question is, by what authority under the

5    procurement law was Mr. Mantanona hired for Mr. Ilagan

6    and Ms. Perez.

7    THE COURT: All right, just for purposes of

8    moving this forward, really, his declaration speaks for

9    itself. The emergency that he says is present is

10   stated in the certificate, so I think it stands for --

11   MR. WEINBERG: That's what I want to ask him

12   about because, because it's our contention that that is

13   not an emergency within the meaning of the emergency.

14   THE COURT: All right, then you don't need to

15   ask him. That's an argument that you can make to the

16   court.

17   MR. MANTANONA: Thank you, Your Honor.

18   THE COURT: Whether or not he thinks it's an

19   emergency, but whether or not it's an emergency that

20   legally suffices is something for the Court to decide.

21   MR. WEINBERG: Thank you, Your Honor.

22   Q.   Mr. Ilagan, did you prepare this Certificate

23   of Emergency that you signed?

24   A.   It was done with other people involved.

25   Q.   And just in your own words one time, what was

1   the nature of the emergency on November 15th when you

2   signed this?

3           MR. MANTANONA:  Objection, Your Honor; it

4   calls for privilege.

5           THE COURT:  Well, I'm going to sustain the

6   objection because it's, as the Court has stated, the

7   emergency is stated in the certificate.

8           MR. WEINBERG:  Your Honor, if I can have a

9   moment.

10          THE COURT:  All right.

11          (Pause.)

12  BY MR. WEINBERG:

13      Q.   Mr. Ilagan, have you ever, other than

14  Mr. Mantanona, have you ever retained an attorney in

15  your capacity as -- at RevTax?

16      A.   Yes, I have.

17          MR. MANTANONA:  (Overlapping.)  Objection,

18  Your Honor; irrelevant.

19          MR. WEINBERG:  Under this emergency

20  procurement process?

21          MR. MANTANONA:  Objection, Your Honor,

22  irrelevant.

23          THE COURT:  Mr. Weinberg, relevancy?

24          MR. WEINBERG:  Well, Your Honor, this is a

25  wholly unheard of --

1    THE COURT: I mean, it's a really broad

2  question. He could have retained an attorney in his

3  private capacity.

4    MR. WEINBERG: I'm sorry, Your Honor, I

5  thought I was clear. I meant in his capacity as RevTax

6  Director, has he ever done this kind of thing before.

7    MR. MANTANONA: (Overlapping.) Objection,

8  Your Honor; I'm going to renew the objection.

9    MR. WEINBERG: Certificate to obtain a lawyer

10  outside the Attorney General's Office.

11    MR. MANTANONA: Objection, Your Honor. It's

12  still irrelevant as to the actual matter of the

13  procurement of -- it isn't relevant to this

14  procurement.

15    THE COURT: Relevancy? Why would something

16  prior be relevant as opposed to the current

17  certificate?

18    MR. WEINBERG: Sir, I guess the Court has a

19  point. It's either legal or it's not. Whether he's

20  done it in the past or he's done it again, it's either

21  legal or it's not, so I'll withdraw the question.

22    THE COURT: Well, what he's done in the past

23  may be perfectly legal.

24    MR. WEINBERG: I'm sorry, Your Honor?

25    THE COURT: What he's done in the past could

1   be perfectly legal.

2           MR. WEINBERG:  It could have been legal at the

3   time.

4           THE COURT:  Right.

5           MR. WEINBERG:  And so --

6           THE COURT:  So it would have no relevancy

7   then.

8           MR. WEINBERG:  Yes.  Right.

9       Q.   Did you seek to obtain the Attorney General's

10  signature on the contract with Mr. Mantanona once he

11  was selected?

12      A.   (No audible response.)

13          MR. MANTANONA:  Objection, Your Honor; calls

14  for privileged information.

15          THE COURT:  Overruled.

16          THE WITNESS:  Can you repeat the question,

17  sir?

18  BY MR. WEINBERG:

19      Q.   You're aware that under Guam law the Attorney

20  General's signature is required on all contracts;

21  right?

22      A.   Yes.

23      Q.   And you're aware that under Guam law the

24  Attorney General's signature is required on all legal

25  -- or contracts for the provision of legal counsel as

1   well; is that correct?

2        MR. MANTANONA:  Objection, Your Honor; calls

3   for legal conclusion.

4        MR. WEINBERG:  I'm only asking him if he

5   knows.

6        THE COURT:  All right.

7   A.   I don't know for certain, but it may.

8   BY MR. WEINBERG:

9   Q.   Did you attempt to obtain the Attorney

10  General's signature on the contract you signed with

11  Mr. Rawlen Mantanona for legal services?

12  A.   There are certain things that are -- that I

13  have to understand, one of them is the emergency

14  procurement; does that go through the AG when that is

15  procured?  That's the way we were proceeding -- I was

16  proceeding is an emergency procurement.

17  Q.   On whose direction were you proceeding as to

18  this emergency procurement procedure?

19  A.   If, if we look at the case, there's a lot

20  of conflicts that the AG has imposed on Rev and Tax.

21  They want certain things done their way and not the

22  best interests of the department; that's why I felt

23  we needed somebody else to come in and say this is

24  what you have to do.

25  Q.   Now this, you brought something up I want to

1   ask you about.  You just made the statement that --
2   that the Attorney General wants to do it his way and
3   not in the best interests of the department.
4        A.   Well, you know, they agreed to the settlement
5   without meeting with Rev and Tax.  I didn't meet with
6   any of the AG until that Saturday, or the Sunday when
7   we're going to sign.
8        Q.   Did you meet with the Lieutenant Governor?
9        A.   No.
10       Q.   Did any other people in your office meet and
11  discuss --
12            MR. MANTANONA:  Objection, Your Honor.  Again,
13  it goes away from the actual issues before the Court,
14  this motion as to the procurement.
15            THE COURT:  I'll sustain it for purposes of
16  this.
17            MR. WEINBERG:  (Overlapping.)  Your Honor, I
18  don't want to get into that, it's just that he keeps
19  bringing that up as the conflict, as what the basis of
20  his -- and I'm trying to understand the nature of the
21  conflict.
22       Q.   Let's get back to the earlier question.  You
23  did not personally or direct anyone to obtain the
24  Attorney General's signature on Rawlen Mantanona's
25  contract, did you?

1       A.      This was an emergency procurement; does that

2    require the AG's signature?

3       Q.      I'm sorry, are you asking me a question?

4       A.      See, I don't know the law.  You're asking me

5    if I know the law, I'm trying to tell you what I know.

6               MR. MANTANONA:  Objection, Your Honor;

7    argumentative.

8               MR. WEINBERG:  (Overlapping/unintelligible).

9               THE COURT:  Sir, do you want the witness to

10   answer a yes or no or not?

11              MR. WEINBERG:  Your Honor, I apologize.

12              MR. MANTANONA:  Your Honor, I'm going to

13   object to any leading questions on behalf of

14   Mr. Weinberg to his alleged client Mr. Ilagan in this

15   matter.

16              THE COURT:  Well, I'm going to overrule that

17   objection.  The matters before the Court seem to be

18   hostile enough to allow leading questions to be asked.

19   BY MR. WEINBERG:

20      Q.      My question is whether you did or did not

21   attempt to get the Attorney General's signature.

22   Now I will represent to you that the law is -- requires

23   that.  But my question is, whether it requires that or

24   not, did you on the contract you signed with Mr.

25   Mantanona attempt to get the Attorney General's

1    signature?  Is his signature on that contract?

2       A.    No, it's not.

3       Q.    Why is the Attorney General's signature not on

4    that contract, to the extent you know?  I'm not asking

5    you to speculate about the Attorney General.

6       A.    (No audible response.)

7              THE COURT:  I think he's answered that

8    already, Mr. Weinberg.  He said that because he thought

9    it was an emergency they didn't need to go through that

10   procedure.

11   BY MR. WEINBERG:

12      Q.    Is that your understanding?  Your under-

13   standing is that the emergency procurement process

14   does not require going through the Attorney General

15   for the legal contract?

16      A.    Yes.

17      Q.    Who -- where did you learn, get that

18   understanding?

19      A.    Well, I think it's common knowledge; everybody

20   probably knows that, who works for the government.

21      Q.    Can you explain the emergency procurement

22   process to me?

23             MR. MANTANONA:  Objection, Your Honor; it

24   calls for a legal conclusion or legal opinion.

25             MR. WEINBERG:  Only to the extent that he

knows.

Q.    If this is -- we're talking about common
knowledge now.  I want to know what this emergency
procurement process is because this is the first time
the Attorney General's Office has ever seen an
emergency procurement for the provision of legal
services in order to go around the procurement laws
which require in two separate sections that the
Attorney General be a signatory to these contracts.
But if it's common knowledge that this is done, I'd
like to know how that --

Q.    Common knowledge that it's done?  I don't get
what you're saying.

Q.    Maybe I misunderstand your earlier question,
misunderstood it.  You said it was, I believe you said
that it was -- it's common knowledge that you do not
need to get the Attorney General's signature in these
circumstances?

A.    It may have happened in the past, some
emergency like typhoons has happened, and I've heard
procurement was procured, or money was spent on
emergency procurement without going through the
procedures.

Q.    Okay.  All right.  So you're talking about
procurement generally, emergencies?

A.    Yes.

Q.    Like in a typhoon situation?

A.    In emergencies.

Q.    Do you know what conditions would authorize an emergency procurement?

A.    I don't.  I may not, I don't know.

Q.    Well, who -- what I'm trying to understand is, who prepared these documents for you to sign?

A.    Several people did.

Q.    Name one.

MR. MANTANONA:  Objection, Your Honor; calls for privileged information and information -- (unintelligible).

MR. WEINBERG:  Well, if Calvo and Clark would like to state that they did that, I'll accept their representation if they prepared it.

MR. MANTANONA:  Your Honor, I think the record is -- reflects the delegation of authority in this matter.

MR. BENJAMIN:  Your Honor, Calvo and Clark would like to make an objection of executive privilege because Mr. Ilagan is working with the Governor in the Governor's Office and these are entering areas of executive privilege.

THE COURT:  Is it privilege to ask who

1   prepared his statement?

2        MR. WEINBERG:  Your Honor, the executive

3   privilege or the governmental privilege or deliberative

4   process privilege goes to the mental processes involved

5   in formulating a government policy.  In a case like

6   this here, with respect to the attorney-client issue,

7   and with respect to the narrow attorney-client question

8   here, and the narrow question of who said what to whom

9   in the context of selection of attorneys, this

10  privilege has been waived because, because it's been

11  put into issue by Mr. Ilagan and Ms. Perez and Calvo

12  -- and the Governor's Office, who have rejected the

13  Attorney General as their lawyer.  That is the issue.

14       THE COURT:  Well, is it relevant who prepared

15  the certificate?

16       MR. WEINBERG:  I'm just trying to understand

17  the basis of Mr. Ilagan's --

18       THE COURT:  Well, let me sustain that

19  objection on the basis of relevancy.  Whoever prepared

20  it really isn't relevant to the issue before the Court.

21       (Pause.)

22  BY MR. WEINBERG:

23    Q.   Did you select Mr. Mantanona or were you

24  advised that he was selected by someone else?

25    A.   I selected him.

Q.   You did?

A.   Yes.

Q.   And in the procurement, the emergency procurement process it requires that you have I guess three bidders or three proposals?

A.   It does.

Q.   Yes.  And Mr. Mantanona was the low bidder?

A.   I believe he was.

     (Pause.)

     MR. WEINBERG:  Your Honor, I think that's all we have right now.

     THE COURT:  All right.  Mr. Mantanona?

     MR. MANTANONA:  Yes, just a few questions, Your Honor.

### CROSS-EXAMINATION

BY MR. MANTANONA:

Q.   Good afternoon, Mr. Ilagan.

     I'd like to refer you to the same exhibit that the People did, I believe that is HH, the Certificate of Emergency.  Do you recognize that document, sir?

A.   Yes, I do.

Q.   Okay.  Is that a clear and accurate copy of that document?

A.   Yes, it is.

Q.   Okay.  And did you believe the contents of

1  this document to be true when you signed this document?

2     A.    Yes, I did.

3     Q.    Okay.  And I'd like you to review paragraph 6,

4  and -- have you had a chance to review it?

5     A.    Yes.

6     Q.    And is that a correct statement in your

7  opinion?

8     A.    Yes, it is.

9        MR. MANTANONA:  Okay.  For the purposes of the

10  court, can the witness please read paragraph 6.

11        THE COURT:  Oh, I don't think it will be

12  necessary really, because the Court has read it.

13        MR. MANTANONA:  Okay.

14     Q.    So basically you believe that --

15        THE COURT:  Well, Mr. Mantanona, I'm under the

16  impression that the witness believes everything that he

17  stated in the certificate.

18        MR. MANTANONA:  That is correct.

19     Q.    Well, let me ask you this, sir.  Do you feel

20  that you being faced with criminal charges and contempt

21  proceedings qualified as an emergency situation?

22     A.    A what situation?

23     Q.    An emergency situation.

24     A.    Yes, I believe that if somebody's supposed to

25  represent me brings charges to me, I can't -- there's a

1    conflict there.

2        Q.    And you believe that the Attorney General's

3    Office put you in that position?

4        A.    Yes, they did.

5        Q.    And you believe that because of that you'd

6    need separate counsel?

7        A.    Yes, I do.

8            MR. MANTANONA:   Okay.  No further questions,

9    Your Honor.

10           THE COURT:  Mr. Weinberg.

11                   **REDIRECT EXAMINATION**

12   BY MR. WEINBERG:

13       Q.    Just to follow up on Mr. Mantanona.  Paragraph

14   6 of your certificate says that because of the

15   attorney -- "Because the Attorney General is acting on

16   our behalf without consultation and consent he has

17   exposed us to contempt proceedings."  Tell us about

18   that.

19       A.    Well, you know, there's supposed to be a

20   certain amount put aside, which we can't afford.

21   They were questioning if we're putting money aside,

22   they were questioning if we were advertising, putting

23   -- following the settlement agreement, and that if we

24   weren't there's charges that may be --

25       Q.    Essentially, the Attorney General's Office

1  was questioning whether you were complying with the
2  agreement that you signed, wasn't he?

3      A.   That's not the way I interpret that.  That may
4  be your interpretation, but my interpretation is he
5  wants us to do this.

6      Q.   Now, if the settlement agreement requires
7  certain things to be done, moneys to be set aside, that
8  you signed, and the other things that you mentioned,
9  and if you failed to do those things, is not -- and I'm
10 not asking for a legal conclusion -- but is not the
11 possibility that you might be held in contempt or the
12 plaintiff might seek to hold you in contempt a
13 possibility?

14      A.   (No audible response.)

15          MR. MANTANONA:  Objection, Your Honor; calls
16 for the client to speculate.

17          THE COURT:  Mr. Weinberg, legal conclusion?

18          MR. WEINBERG:  I'm trying to get to the nature
19 of what it is he thinks he was threatened with, other
20 than the obvious fact that if he's -- if he doesn't
21 comply with the agreement and the Court order, he may
22 be subject to contempt.  I'm trying to understand the
23 nature of what it is here that's different from that.

24      A.   What I needed was counsel to represent the
25 department, I need somebody to tell me what to do in

1  the best interests of the department, and I thought I
2  wasn't getting that.
3      Q.   And who determines what is in the best
4  interests of the department?
5      A.   The employees of the department.  We -- the
6  process of, of settlement is done within my department,
7  not within the AG's office, not getting his approval
8  for, for a settlement.  Settlements are settled in my
9  office, within my, my department.
10     Q.   So it's your position that you do not need the
11 Attorney General's input at all in settling cases that
12 affect your department?
13     A.   There are certain rights that are, are -- that
14 taxpayers have that are not being represented by the
15 Attorney General, their administrative rights to
16 properly say yes or no to a settlement.  I mean they
17 weren't given that; they're saying you have to settle
18 or else you deal with the AG's office.
19     Q.   Now, if you are ordered to settle a case --
20 if you are ordered by the Court to comply with the law,
21 whatever that is, and the Attorney General signs that
22 document for you, but you don't want to comply with the
23 law, does that entitle you to hire your own lawyer?
24     A.   (No audible response.)
25          MR. MANTANONA:   Objection, Your Honor, calls

1   for, again, a legal conclusion, and for him to

2   speculate as to these questions.

3           MR. WEINBERG:  Mr. Ilagan has testified that

4   he -- that the department gets to make its own policy

5   decisions with respect to the settlement of legal

6   claims.  And I'm trying to understand how far that

7   goes.

8           MR. MANTANONA:  And, Your Honor, I'm going

9   to object to that, a question that is confusing in

10  regards to this matter.  I think Mr. Ilagan is

11  addressing a different kind of settlement, in regards

12  to what he is speaking of, not the settlement in

13  regards to the orders of this court.  I think he's

14  talking about a tax claim or contest or questions in

15  regards to his taxes -- I mean about an individual's

16  claims.

17          Thank you.

18          THE COURT:   What is it directly that you want

19  the witness to respond to?

20          MR. WEINBERG:  With all these objections, I'm

21  losing the question.

22      Q.   But the question is, who gets to make the

23  decision in settlement of lawsuits, or the defense of

24  lawsuits, or the bringing of lawsuits?

25          MR. MANTANONA:  Objection, Your Honor.

1      THE COURT:  I think the witness was saying in

2    that in terms of taxpayer disputes, he determines the

3    settlement posture, the settlement decision.  That's

4    what I gather from his testimony.

5    BY MR. WEINBERG:

6      Q.    Is that your testimony, that, that when a

7    dispute involving the department is in court --

8      THE COURT:  Well, as a taxpayer.  I don't

9    think he said in court, you know the normal taxpayer

10   disputes with the department.

11     MR. WEINBERG:  Well, I'm not talking about

12   resolving taxpayer disputes, I'm talking about where

13   the department through its officials are defendants in

14   court.

15     Q.    And my question is, who gets to make the

16   decision as to what the legal decisions are in that

17   case?

18     MR. MANTANONA:  And objection, Your Honor.

19   Again, that's going to call for a legal conclusion on

20   my client's part.  He needs to --

21     MR. WEINBERG:  I just want to clarify that

22   Mr. Ilagan says he gets to make that call because that

23   is the question we got, we have presented here; because

24   if that's the basis of Mr. Ilagan's objection to the

25   Attorney General, is that he doesn't like the Attorney

1   General's position in the case, then that helps narrow

2   the issues considerably.

3           MR. MANTANONA: Your Honor --

4           MR. WEINBERG: Mr. Ilagan has said that he

5   was afraid he's being threatened with contempt if he

6   complies with the court order -- or if he fails to

7   comply with the court order. And I wanted to explore

8   that because it sounds like he does not want to comply

9   with the court order and the settlement agreement.

10          MR. MANTANONA: Your Honor, then I'm going to

11   object that the Attorney General's line of questioning

12   is an area in which he's actually going to be exposing

13   his own client to any kind of criminal liability.

14          THE COURT: I'm going to -- what I'm going to

15   do is sustain the objection, really. It's not a

16   question that I think that relates to the issue on your

17   motion to strike per se. I think we can decide that

18   issue without getting a response from the witness on

19   that question.

20          (Pause.)

21          MR. WEINBERG: Well, I don't want to beat that

22   door, Your Honor, I was just trying to explore this

23   door that Mr. Ilagan opened about these two paragraphs

24   in the certificate about the nature of Mr. Ilagan's

25   concerns about contempt, and now the threat of criminal

1 proceedings being held against him.

2     Q.    Is that also part of why you wanted your own

3 lawyer and declare this to be an emergency, that you

4 feared criminal prosecution from the Attorney General's

5 Office?

6     A.    Part of it.

7     Q.    Okay.  What is the basis of that, that you

8 will be criminally prosecuted by my office?

9     A.    A lot of things.  The media, the way the media

10 represents certain cases before the public.  The way

11 the AG is very adversarial to the Administration.

12     Q.    And are there more facts here?  We've got

13 the media and an adversarial relationship with the

14 Administration.  What else makes you think you're going

15 to be the subject of criminal liability for what you --

16 for complying with the court order in this case?

17     A.    Uhm, a lot of times I feel I don't have the

18 reputation -- representation I need to run the

19 department.

20     Q.    Are you speaking specifically with respect to

21 this case or just generically that you don't have

22 enough lawyers?

23     A.    Uhm, enough lawyers who can handle what the

24 department needs.

25     Q.    Welcome to GovGuam.  But, what is your concern

1   about criminal liability in this case that warranted

2   you filing a Certificate of Emergency and hiring

3   Mr. Mantanona?  Who told you you were going to be going

4   to jail if you comply with the settlement agreement and

5   court order?

6       A.    I don't know if -- I can't remember if I read

7   something or, uhm, or seen something that says that I

8   will be liable for not following what the Court has

9   ordered based on my representation from the AG.

10      Q.    Do you have any reason to think that you could

11  go to jail because of what you have signed?

12          MR. MANTANONA:  Your Honor, I'm going to

13  object to this line of questioning again.  The Attorney

14  General is questioning, cross-examining, in fact, its

15  own client on information in which the Attorney General

16  himself proffers the criminality of his acts and does

17  not give the defendant -- I mean, Mr. Ilagan any advice

18  of what to follow or not to follow.

19          MR. WEINBERG:  Your Honor, the Attorney

20  General's Office has never threatened anyone in this

21  case with any kind of criminal liability for failure

22  to comply with the court order.  That idea came from

23  somewhere else, and I'm trying to identify it, because

24  Mr. Mantanona opened this door in questioning

25  Mr. Ilagan about paragraph 6 of his certificate, and

1    that's all I'm trying to do.

2            THE COURT:  But the lack of possible criminal

3    consequences is certainly some things here that you can

4    argue before the Court in relation to your motion to

5    strike.  But there's no basis for it based on what the

6    witness has testified to the court today.

7            MR. WEINBERG:  Well, it's just that

8    Mr. Mantanona was, was asking him to corroborate, in

9    essence, what he signed and what I'm hearing is that

10   Mr. Ilagan doesn't even know the basis of why he --

11           THE COURT:  Then I think for purposes of your

12   argument, that will be your argument to the court.

13           MR. WEINBERG:  Well, if it's clear from his

14   testimony, I have no further questions.

15           THE COURT:  That's what he said.

16           MR. WEINBERG:  All right, then I have nothing

17   further then.  Thank you.

18           THE COURT:  Recross, Mr. Mantanona.

19                   **RECROSS-EXAMINATION**

20   BY MR. MANTANONA:

21       Q.   Mr. Ilagan, I'd like you to look at the book

22   again, and look at Exhibit R.

23       A.   (No audible response.)

24       Q.   Have you had an opportunity to find that

25   document, sir?  Are you familiar with this document,

1   sir?

2       A.   (Pause.)  I believe I glanced at it before,

3   I've read it.

4       Q.   You've read this before, sir?

5       A.   I mean, I can't recall.  I've come across some

6   of the issues that are, are presented in the papers.

7       Q.   Can you tell the Court what this document is?

8       A.   (Pause.)  I believe it's the Charles

9   Troutman's --

10      Q.   Legal opinion?

11      A.   Charles Troutman.

12      Q.   Legal opinion?

13      A.   His opinion on what can be paid and what can't

14  be paid.

15      Q.   Okay.  And what's the date of this opinion,

16  sir?

17      A.   October 13th, 2004.

18      Q.   Okay.  Now that you've seen it, does it

19  refresh your memory a little bit about this document?

20      A.   Yes.  I have to read it, I haven't read this

21  since back then.

22      Q.   Okay.  Did you have an opportunity to read

23  this document prior to hiring me?

24      A.   Yes, I did.

25      Q.   Okay.  And in this document, isn't it correct

1   that it points out that part of the EITC, it will be

2   the Attorney General's opinion, or Attorney Charles

3   Troutman --

4           MR. WEINBERG:  Objection; best evidence.

5           THE COURT:  I'm sorry?

6           MR. WEINBERG:  The document speaks for itself.

7           THE COURT:  I'm sorry, I didn't hear the

8   objection.

9           MR. WEINBERG:  I said the document speaks for

10  itself, Your Honor.

11          THE COURT:  Mr. Mantanona?

12          MR. MANTANONA:  Yes, Your Honor, we're just

13  trying to -- the issue comes down as to the need for

14  the emergency procurement, Mr. Ilagan's feelings of

15  his representation.  And Mr. Weinberg asked him about

16  illegal acts; well, this document, Your Honor,

17  specifies that some of the acts contained in the EITC

18  is illegal, and Mr. Ilagan, if he complied with these

19  terms would be criminally liable.

20          MR. WEINBERG:  Well, Mr. Ilagan has yet to

21  testify that he has a current memory of this document,

22  whether this document influenced his decision --

23          The document speaks for itself.  Do you want

24  to offer it?

25          THE COURT:  The document speaks for itself.

1    Why don't you ask the next question then.

2    BY MR. MANTANONA:

3        Q.    Do you remember, after reading this document,

4    if you felt like you wanted to get separate counsel?

5            MR. WEINBERG:   Objection to leading.

6            MR. MANTANONA:   Well, let me ask again.

7        Q.    Mr. Ilagan, okay, after reading this document,

8    did you have any desires to do anything?

9        A.    Uhm, spending is illegal; from reading this

10   document, any spending that is not appropriated is

11   illegal.

12       Q.    Did you want to do anything, sir, for securing

13   of services of anybody?

14       A.    After certain events that has happened, like

15   the AG questioning why hasn't this been done, why

16   didn't we send out these notices as required by the

17   settlement, there was a question of who's representing

18   the department as to is it legal or not.

19       Q.    Okay, sir.

20       A.    They're telling me to do it.

21       Q.    Okay.   They're telling you to do it.   And what

22   does this letter tell you to do?

23       A.    It tells me it's illegal.

24       Q.    And did the Attorney General ever come back

25   and say don't worry about it, or give you any advice in

```
1   regards to this, the conflict?

2       A.    I don't remember them --

3       Q.    Thank you.

4       A.    -- coming back to me.

5       Q.    That's why you wanted your own counsel?

6       A.    Yes.

7             MR. MANTANONA:  Thank you.

8             No further questions, Your Honor.

9             THE COURT:  All right, thank you, sir, you may

10  step down.

11            MR. WEINBERG:  Just a real quick followup on

12  this, Your Honor.

13            THE COURT:  Well, if I keep allowing it, we're

14  never going to get through the witness.

15            MR. WEINBERG:  Limited to the issues that

16  Mr. Mantanona keeps opening up.  But it's one question,

17  Your Honor.

18      Q.    Mr. Ilagan --

19            THE COURT:  Well, do you have any objection,

20  to this question being asked?

21            MR. MANTANONA:  Your Honor?

22            THE COURT:  Do you have any objection to the

23  question being asked?

24            MR. MANTANONA:  Your Honor, I concur with the

25  court that further questions will go on.  Mr. Weinberg
```

1  stated that the best evidence, the document, is there;

2  there's no further review (inaudible).

3       THE COURT:  Well, see, we basically have

4  direct, redirect, cross, recross, nothing further than

5  that.

6       MR. WEINBERG:  My question has to do not

7  with the document but with what happened between the

8  document and this one question, and when he signed,

9  Mr. Ilagan signed the certificate.  And Mr. Mantanona

10 has asked questions about, well, now that he's seen

11 this document he felt he needed to get his independent

12 counsel, I'd like to just follow up on that.

13      THE COURT:  All right, but I'm saying that if

14 I allow you to ask it, and then he actually comes back

15 and asks another question, it's never going to end.

16 And basically we have only four stages, direct,

17 redirect, cross and recross.

18      MR. WEINBERG:  That's fine.

19      THE COURT:  All right, sir, you may step down.

20      MR. WEINBERG:  I'll save it for argument.

21      THE COURT:  Okay.  You may step down.

22      Do you want to call your next witness,

23 Mr. Weinberg.

24      MR. COHEN:  Lou Perez, Your Honor.

25      THE COURT:  All right, Ms. Perez.

1    MR. COHEN: Would the Court mind if I examined

2   the witness here at counsel table?

3    THE COURT: It doesn't matter. Let me see

4   whether -- see, we have a problem picking up. You

5   might try, and if it doesn't pick up, Mr. Cohen, I may

6   have to ask you to go to the podium.

7    MR. COHEN: Can you hear me? I think so. I

8   have a strong voice.

9    THE COURT: Very well.

10                    **LOURDES M. PEREZ**,

11  called as a witness on behalf of the Attorney General,

12  was first duly sworn and testified as follows:

13    THE CLERK: Please state your full name and

14  spell your last name for the record.

15    THE WITNESS: Lourdes M. Perez, P-E-R-E-Z.

16                    **DIRECT EXAMINATION**

17  BY MR. COHEN:

18    Q.   Yes, Ms. Perez, I thank you for appearing here

19  today. I'm Stephen Cohen from the Attorney General's

20  Office. And you're appearing here pursuant to a

21  subpoena, is that correct?

22    A.   That's correct.

23    Q.   Okay. And what is your occupation, please,

24  Ma'am?

25    A.   I'm the Director of the Department of

1    Administration.

2        Q.    And when did you become the Director of

3    Administration?

4        A.    In January of 2003.

5        Q.    Okay.  And you were appointed by Governor

6    Camacho, is that correct?

7        A.    That's correct.

8        Q.    And who is Joseph Manibusan?

9        A.    He's my deputy.

10       Q.    Okay.  And you are a member of the Governor's

11   cabinet, is that correct?

12       A.    That's correct.

13       Q.    You serve at his pleasure?

14       A.    That's correct.

15       Q.    Okay.  And before you became the Director of

16   the Department of Administration, did you have any

17   previous Government of Guam jobs?

18            MR. MANTANONA:  Objection, Your Honor;

19   irrelevant, and leading by her own counsel.

20            THE COURT:  Mr. Cohen?

21            MR. COHEN:  I don't think I'm leading.  I'm

22   just asking if she had some previous government jobs.

23            THE COURT:  Relevancy.

24            MR. COHEN:  I'm trying to establish a

25   knowledge base, Your Honor.

```
1              THE COURT:  Overruled for the time being.

2              MR. COHEN:  Okay.

3         Q.   Now, that notebook in front of you there, that

4    thick notebook, I direct your attention to Exhibit KK.

5    Could you please open that up?  Do you have that?

6         A.   K?

7         Q.   Double K.

8         A.   Yes.

9         Q.   You found that now?

10        A.   Yes, I did.

11        Q.   Thank you.

12             I direct your attention to a single page

13   document, the very top of Exhibit KK, directed to

14   Shannon Taitano, from, it says Director of Department

15   of Administration, and there's a signature after that;

16   is that your signature?

17        A.   Yes, sir, it is.

18        Q.   Okay.  And I see below that there's a line for

19   Director of Department of Revenue and Taxation, and a

20   signature.  Do you recognize that signature?

21             MR. MANTANONA:  Objection, Your Honor;

22   irrelevant.

23             MR. COHEN:  It's a joint document, I'm trying

24   to establish the people who signed the document, Your

25   Honor.
```

```
 1              THE COURT:   Overruled.

 2    By MR. COHEN:

 3        Q.    Do you recognize the signature?

 4        A.    Yes, I do.

 5        Q.    And who is that?

 6        A.    Art Ilagan.

 7        Q.    The gentleman who just testified?

 8        A.    That's correct.

 9        Q.    Did you prepare that document?

10        A.    I, I prepared it, I printed it at my office,

11    yes.

12        Q.    Okay.  And it's on your letterhead?

13        A.    That's my letterhead.

14        Q.    Now you say you printed it at your office.

15    Did you receive the text of that document from any

16    other source?

17        A.    Uh, yes.

18        Q.    And who did you receive that text from?

19        A.    I received it from, uhm, I received it from

20    the Governor's legal counsel.

21        Q.    Okay.  And the text was then given to you on a

22    floppy disk or e-mailed to you and you printed it out;

23    how did that happen?

24              MR. MANTANONA:  Objection, Your Honor;

25    irrelevant again.
```

1    MR. COHEN:  It's not irrelevant; it's a

2  document she signed which has certain legal

3  consequences, Your Honor.

4    MR. MANTANONA:  Well, Your Honor, the document

5  speaks for itself; I don't see what matter it would be

6  relevant.

7    MR. COHEN:  It speaks for itself, but the

8  circumstances under which it was signed are critical to

9  this case, Your Honor.

10    MR. BENJAMIN:  Your Honor, on behalf of --

11    THE COURT:  Let me see, what is the question,

12  under what --

13    MR. COHEN:  I asked her how she received the

14  text of the document.  She's testified she received the

15  text of a document from a source outside of her office,

16  and printed it out on her office, I guess on her

17  computer; I'd like to find out, Your Honor, where she

18  obtained the text.

19    THE COURT:  Well, she did, she said from Ms.

20  Taitano.

21    MR. COHEN:  Okay.

22    Q.   And what did you -- did you sign this in the

23  presence of Mr. Ilagan?

24    A.   I don't recall.

25    Q.   Okay.  But the language then in that document

```
 1    is not your own language; is that correct?
 2         A.    That's correct.
 3         Q.    It came from a source outside of your office?
 4         A.    Yes.
 5         Q.    Okay.  And did you sign this in your office or
 6    some place else?
 7         A.    I really don't recall.
 8         Q.    Okay.  And was Mr. Ilagan present when you
 9    signed it?
10         A.    (No audible response.)
11              MR. MANTANONA:  Objection, Your Honor; asked
12    and answered.
13              THE COURT:  Overruled.
14         A.    I don't recall.
15              MR. COHEN:  You don't recall.
16         Q.    Now after you signed this document, what
17    became of it?
18         A.    It, it was delivered to, uh, the Governor's
19    legal counsel.
20         Q.    So then the Governor's legal counsel asked you
21    to sign this document, is that correct?
22              MR. BENJAMIN:  Objection, Your Honor.
23         A.    No, she did not.
24              MR. COHEN:  She did not.
25              MR. MANTANONA:  Objection, Your Honor.
```

```
 1              MR. COHEN:  Okay, I'll withdraw it.  Excuse
 2   me.
 3              THE COURT:  You made an objection?
 4              MR. BENJAMIN:  Your Honor, the counsel wishes
 5   to inquire about the circumstances, but if counsel
 6   could be instructed to not inquire regarding
 7   circumstances involving Ms. Perez's direct
 8   communications with counsel for the Governor, because
 9   those would be privileged communications (inaudible) --
10              MR. COHEN:  No, I'm not.  Let me just move on,
11   Your Honor.
12              THE COURT:  Move on to the next question
13   then.
14              MR. COHEN:  Okay.
15      Q.   I direct your attention to another document,
16   the second page, dated November 15th; do you see that
17   document?
18      A.   The one on --
19      Q.   The second, the second page of exhibit double
20   K.
21      A.   Yes.
22      Q.   And does your signature appear on that?
23      A.   Yes.
24      Q.   Okay.  And are the circumstances where you
25   obtained this document the same as regarding the
```

1  circumstances you obtained the previous document you

2  testified about?

3      A.    Yes.

4      Q.    The answer is yes?

5      A.    Yes.

6      Q.    Okay.   Now I direct your attention to the

7  third page of Exhibit KK entitled Certificate of

8  Emergency for procurement of regular services; do you

9  see that?

10     A.    Yes.

11     Q.    Okay.   And does your signature appear on that?

12     A.    Yes.

13     Q.    Okay.   Did you prepare this document?

14     A.    (Pause.)   I prepared it, I printed it.

15     Q.    Okay, you printed it.   But the text of this

16  document, did it originate from yourself or from some

17  place outside of your office?

18     A.    It represents my side.

19     Q.    That's not the question I asked you.   The

20  question I asked you is the text, the language of this

21  document, was that provided to you by a source outside

22  of your office?

23     MR. BENJAMIN:   Objection, Your Honor; it's

24  heading into an area of privilege again.   Again,

25  Ms. Taitano was acting as counsel for Ms. Perez, and

1   this is all heading towards privilege.

2          MR. COHEN:  Excuse me, I haven't asked any

3   question remotely -- Now this is a document signed by

4   the witness; I have the right to ask her about the

5   circumstances that she signed it, where she got the

6   language from.

7          I also note that Mr. Benjamin is, of course,

8   is not counsel for this witness.

9          MR. MANTANONA:  Well, Your Honor, on behalf of

10  Ms. Perez, let me object to --

11         THE COURT:  Objection is overruled.

12         MR. COHEN:  Okay.

13  Q.     The question is overruled.  You may answer my

14  question, Ms. Perez.

15  A.     Can you repeat it, sir?

16  Q.     The language used in this document entitled

17  Certificate of Emergency for procurement of services,

18  did this language come from a source outside of your

19  office?

20  A.     Yes.

21  Q.     This is not your own personal language, is it?

22  A.     I don't believe so.

23  Q.     And was this document presented to you for

24  signature, is that correct?

25  A.     It was presented to me.

1    Q.    And who presented it to you for signature?

2    A.    Uh, I don't recall.

3    Q.    Okay.  Now I note another signature

4    purportedly by Mr. Artemio B. Ilagan, Director of

5    Revenue and Tax.  Do you recognize that signature?

6    A.    Uh, yes.

7    Q.    And is that Mr. Ilagan's signature?

8    A.    It appears to be his signature.

9    Q.    Okay.  And did you sign this in the -- did

10   you sign this document Certificate of Emergency for

11   procurement of legal services in the presence of

12   Mr. Ilagan?

13            MR. MANTANONA:  Objection, Your Honor;

14   relevance of the --

15            MR. COHEN:  I'm trying to determine the source

16   of --

17            THE COURT:  I'm going to sustain the

18   objection; it's irrelevant whether Mr. Ilagan was there

19   at the same time, just as long as it's signed by the

20   witness.

21            MR. COHEN:  Okay.

22   Q.    I notice the signature --  or I notice the

23   signature below your signature and Mr. Ilagan's

24   signature, which purports to be that of Felix P.

25   Camacho, Governor of Guam; do you see that?

```
 1      A.    Yes, I do.

 2      Q.    Okay.  Did this, did that signature appear on

 3   this document at the time you signed it?

 4      A.    No.

 5            MR. MANTANONA:  Objection, Your Honor;

 6   relevance as to anything in regards to this case, when

 7   the Governor's signature was put on this document.

 8            MR. COHEN:  Your Honor, that's --

 9            THE COURT:  She already knows that the

10   objection is -- she said no.

11   BY MR. COHEN:

12      Q.    The signature was not there at the time you

13   signed it, right?

14      A.    I kind of believe it was.

15      Q.    The signature which purports to be the

16   signature of Felix P. Camacho, Governor of Guam, that

17   was not present at the time you signed this document;

18   is that my understanding of your testimony?

19            MR. MANTANONA:  Objection, Your Honor; asked

20   and answered.

21            MR. COHEN:  I don't recall her testimony, Your

22   Honor.

23            MR. MANTANONA:  Your Honor, my client

24   testified that it wasn't there when she signed it.

25            MR. COHEN:  All right, fine.  Let's just move
```

1    on.

2        Q.    And this Certificate of Emergency for

3    procurement of legal services, that consists of 11

4    points; is that correct?

5        A.    Yes.

6        Q.    Okay.   Now at the time you signed this

7    document, did you have any understanding as to whether

8    or not those circumstances were true or not true?

9        A.    Yes, sir.

10       Q.    What was your understanding?

11       A.    That they were true.

12       Q.    Okay.   Now, did you, did you make any

13   independent determination from any sources, any rules,

14   regulations or statutes regarding emergency procurement

15   before you signed this document?

16       A.    (No audible response.)

17           MR. MANTANONA:   Objection; asking my client

18   for a legal opinion.

19           MR. COHEN:   I'm not, I'm asking her if she

20   referred to any sources of legal authority, whether it

21   be a statute or a regulation or a rule before she

22   signed this document.

23           MR. MANTANONA:   Your Honor --

24           MR. COHEN:   That's all I'm asking her.

25           MR. MANTANONA:   Then, Your Honor, I'm going to

1  object to that on the issue of privilege; if she was in

2  communication with counsel at the time, then the

3  counsel is acting as her attorney and it's privileged.

4      MR. COHEN:  I didn't ask that question.

5      Q.    The question I asked, I'll repeat it again,

6  is:  Ms. Perez, did you refer to any statute, rule or

7  regulation regarding emergency procurement before you

8  signed this exhibit Certificate of Emergency for

9  procurement of legal services?

10     MR. MANTANONA:  Your Honor, renew the

11  objection.

12     THE COURT:  All right, overruled.

13     MR. COHEN:  You may answer the question.

14     A.    I am aware of the steps to follow in

15  determining or declaring that an emergency exists.

16     Q.    But that's not the question I asked.  The

17  question is, before you signed this document, did you

18  specifically refer to any statute, rule or regulation

19  regarding emergency procurement of services?

20     A.    At the time no, I did not.

21     Q.    You did not, okay.  Now, at the time you

22  signed this document, Certificate of emergency for

23  procurement of legal services, was there a typhoon at

24  that time occurring on the island of Guam?

25     A.    I believe no.

1          Q.   Was there an earthquake occurring at the time,

2     at that time on the island?

3               MR. MANTANONA:   (Overlapping.)  Objection, on

4     irrelevant questioning regards --

5               MR. COHEN:  It goes to what is the emergency

6     under this particular document, Your Honor.

7               MR. MANTANONA:  Then, Your Honor, counsel

8     should ask what she feels constitutes the emergency.

9               MR. COHEN:  That's not the question I'm

10    asking.  I'm asking her if there was a typhoon at the

11    time; she said no.

12              MR. MANTANONA:  Based on that, Your Honor --

13              MR. COHEN:  (Overlapping) The next question

14    I want to ask the witness is, was there an earthquake

15    at this time.

16              MR. MANTANONA:  Your Honor, we renew the

17    objection as irrelevant.

18              MR. COHEN:  Okay.  May the witness answer the

19    question, Your Honor?

20              THE COURT:  I'm going to sustain that

21    objection.

22    BY MR. COHEN:

23         Q.   Was there any civil insurrection at that time?

24         A.   (No audible response.)

25              MR. MANTANONA:  Again, Your Honor, renew --

1          THE COURT:   Sustained.

2    BY MR. COHEN:

3      Q.   Was your office in operation and functioning

4    at that time?

5      A.   Yes.

6      Q.   So there was nothing that caused your office

7    to be out of commission at that time?

8      A.   (No audible response.)

9          MR. MANTANONA:   Objection, Your Honor;

10   irrelevant again.

11         THE COURT:   Overruled.

12         MR. COHEN:   You may answer the question.

13     Q.   The question was, there was nothing which

14   would cause your office to be out of commission at that

15   time when you signed this; is that correct?

16     A.   My office had --

17     Q.   Your office was not shut down?

18     A.   It was not.

19     Q.   For any reason, okay.

20         And you said you printed this out on your own

21   computer; is that correct?

22     A.   I believe I did.

23     Q.   So your computer system was operating at the

24   Department of Administration?

25     A.   That's correct.

1    Q.    Okay.  Now before you signed this exhibit,

2    Certificate of Emergency for procurement of legal

3    services, did you discuss this with the Attorney

4    General of Guam, Mr. Douglas Moylan?

5    A.    No.

6    Q.    Did you discuss it with anybody else in the

7    Attorney General's Office?

8    A.    No.

9    Q.    Did you inform Mr. Moylan or anybody else in

10   the Attorney General's Office of this document before

11   you signed it?

12   A.    I don't believe so.

13   MR. COHEN:  Now, Your Honor, I'd like to offer

14   some of these documents into evidence which have been

15   -- these first 1, 2, 3 pages, and it's a little unclear

16   to me as to whether any of them are part of a joint

17   exhibit.  I'm looking at the documents on the table and

18   I don't see that, and unless I'm corrected by somebody

19   here, by counsel, I'm going to offer the first, second,

20   and third pages of this document as Exhibit UU.

21   MR. MANTANONA:  Your Honor, I'm going to

22   object to the admission of this document as irrelevant.

23   There's nowhere in their brief that they actually

24   raised this issue as whether the Attorney General's

25   Office or the Attorney General signed this document, or

1   signed the procurement.

2          MR. COHEN:  I don't understand this comment

3   why we haven't briefed it.  First the Court said --

4          THE COURT:  (Overlappping.)  Let me see if I

5   understand you.  You're asking that exhibit, is it HH?

6          MR. COHEN:  HH, and there's a bunch of pages

7   in here, and there's --

8          THE COURT:  First, second and the third page

9   be admitted into evidence?

10         MR. COHEN:  We've had testimony of the first

11  page, the second page and the third page so far.

12         THE COURT:  All right, so that's what you're

13  asking to be admitted at this point?

14         MR. COHEN:  That I would like to offer, Your

15  Honor.

16         THE COURT:  Any objection?

17         MR. MANTANONA:  Yes, Your Honor, we believe

18  that it's irrelevant in regards to this matter.  We

19  believe that these issues weren't raised in the

20  People's brief in this matter, and it goes to

21  specifically actually just to the authorization of the

22  Attorney General to my contract.

23         THE COURT:  All right.  Over counsel's

24  objection, the Court will admit Exhibit HH, the first

25  three pages into evidence.

1          MR. WEINBERG:  Your Honor, point of

2     clarification.  I think you're referring to Exhibit KK.

3          MR. MANTANONA:  That's correct.

4          MR. COHEN:  Excuse me, I made an error.

5     Excuse me, it's Exhibit KK.

6          THE COURT:  Okay, KK.

7          MR. COHEN:  Pardon me, Your Honor.

8          THE COURT:  The first three pages of Exhibit

9     KK over counsel's objection --

10          MR. COHEN:  That's the first three pages.

11          THE COURT:  -- are admitted into evidence.

12     BY MR. COHEN:

13     Q.    Ms. Perez, I'd like you to turn to the last

14     document in Exhibit KK, which is a multi-page document

15     entitled Memorialization of Agreement for Professional

16     Services between the Government of Guam and Mantanona

17     Law Office.  Do you see that?

18     A.    (Pause.)  Yes, I do.

19     Q.    Okay.  And I ask you to turn to the last page;

20     does your signature appear on that?

21     A.    Yes, sir.

22     Q.    Okay.  And where did you sign this document?

23     A.    I'm sorry?

24     Q.    Where did you sign it?

25     A.    I signed it at the Governor's Office.

1     Q.    Okay.  Who was present at the time?

2     A.    Uhm, the Governor's legal counsel.

3     Q.    Okay.  And that's Ms. Shannon Taitano?

4     A.    That's correct.

5     Q.    Okay.  Did you prepare this document,

6  Memorialization of Agreement for Professional Services

7  between the Government of Guam and Mantanona Law

8  Office?

9          MR. MANTANONA:  Objection, Your Honor;

10  irrelevant as to the contract's preparation in regards

11  to this matter.  It's obvious from the first letter

12  that the delegation of the procurement was given to

13  Ms. Taitano in this matter.

14          MR. COHEN:  Her signature appears on this,

15  Your Honor; it's quite proper to ask her if she

16  prepared the document she signed.

17          THE COURT:  Well, that would assume that she's

18  an attorney.

19          MR. MANTANONA:  Correct, Your Honor.

20          MR. COHEN:  Excuse me?

21          THE COURT:  That would assume that she's an

22  attorney if she's -- you've asked her whether she

23  prepared the document.

24          MR. COHEN:  I just asked the witness if she

25  personally prepared it.  That was my question.  Perhaps

1    I should rephrase that.

2           MR. MANTANONA:  Your Honor, again, I'm going

3    to object.

4           THE COURT:  Well, maybe you should rephrase

5    the question.

6    BY MR. COHEN:

7       Q.   Was this document prepared by someone other

8    than yourself?

9       A.   Yes, it was.

10      Q.   Okay.  And who was it prepared by?

11      A.   I can't -- I, I assume it was Ms. Taitano.

12      Q.   You don't know for a fact though?

13      A.   I don't.

14      Q.   And that is your signature which appears?

15      A.   Yes.

16      Q.   Now, I direct your attention to another

17   signature on that last page, under the signature block

18   for Artemio Ilagan, Director of Department of Revenue

19   and Taxation, do you recognize that signature?

20      A.   Yes, I do.

21      Q.   And that is Mr. Ilagan's signature?

22      A.   I believe it is.

23           MR. COHEN:  Okay.  Your Honor, I'd offer this

24   document, Memorialization Of Agreement For Professional

25   Services between the Government of Guam and Mantanona

1  Law Office also as part of exhibit double H, Your

2  Honor.

3          MR. MANTANONA:  Your Honor, can I examine the

4  document before the Court admits it?

5          MR. COHEN:  Yeah, the document is in your

6  notebook.

7          MR. MANTANONA:  I want to make sure this is

8  the final or the latest version of this document.

9          MR. COHEN:  Your Honor, as I mentioned before,

10 during the recess we sought to stipulate as to

11 documents to aid -- to ease in their admission, and I,

12 for the life of me, cannot find in my counsel table

13 here this particular document.

14          (Pause.)

15          MR. COHEN:  Okay, I stand corrected, Your

16 Honor.  I do have a document here, apparently it's

17 Joint Exhibit 16 of the parties.  And that's not in

18 this notebook.  I think the witness obviously should

19 review this.

20          I'll try to use this overhead projector, I'm

21 not sure how successful I'll be.

22          THE COURT:  Is there a stipulation to its

23 admissibility?

24          MR. MANTANONA:  Your Honor, I'm still waiting

25 to review the document.

1     MR. WEINBERG:  It's your contract (inaudible).

2     MR. MANTANONA:  I understand that, but I want

3   to see the later version, because the versions were

4   going back and forth.

5     Thank you.

6     (Pause.)

7     MR. MANTANONA:  Your Honor, as long as it's

8   being brought in under this exhibit number, and this is

9   the version it's coming in, I have no objection.

10    THE COURT:  All right, Joint Exhibit 16 then

11  is admitted into evidence without objection.

12    (Pause.)

13  BY MR. COHEN:

14    Q.   And you signed the document November 19th,

15  2004, is that correct?

16    A.   Yes.

17    Q.   And Mr. Ilagan signed it November 19th, 2004?

18    A.   Uhm, I believe he did.

19    Q.   Okay.

20    MR. COHEN:  Okay.  I have no further questions

21  of the witness at this time, Your Honor.

22    THE COURT:  Mr. Mantanona?

23    MR. MANTANONA:  Just a few, few questions,

24  Your Honor.

25  ///

1          **CROSS-EXAMINATION**

2     BY MR. MANTANONA:

3          Q.    Good afternoon, Ms. Perez.

4          A.    Good afternoon.

5          Q.    Just a few questions.  Go back to the KK, I

6     believe the third page, what is this document, Ma'am?

7          A.    Certificate of Emergency.

8          Q.    And did you have an opportunity to review this

9     document before you signed it?

10         A.    Yes, I did.

11         Q.    Did you actually participate in the drafting

12    of this document?

13         A.    Not the actual language, but in terms of the

14    points raised here.

15         Q.    And who prepared that document for you?

16         A.    I believe it was Shannon Taitano.

17         Q.    Ms. Taitano was an attorney -- is an attorney?

18         A.    That's right.

19         Q.    And so these statements, these 11 paragraphs

20    reflect your feelings?

21         A.    Yes.

22         Q.    Okay.  And based upon this, you believed that

23    you needed separate counsel?

24         A.    Yes, I did.

25         Q.    Okay.  And, in fact, did you determine that

1    you needed separate counsel before you even drafted --

2          MR. COHEN:  Objection, Your Honor.  This is

3    outside the scope of my direct examination.  And I move

4    to strike the previous response to the question.  I

5    raised -- other than going through the technical

6    details of this agreement, I asked her no questions as

7    to why she signed it, any dispute she had with the

8    Attorney General, whatever.

9          THE COURT:  But the document you've moved to

10   be admitted into evidence.

11         MR. COHEN:  Yes.

12         THE COURT:  And now that it's evidence,

13   counsel has the right to cross-examine on the document

14   that's been admitted into evidence.

15         MR. COHEN:  Oh, I don't dispute that, Your

16   Honor.  It's my understanding counsel is seeking to

17   inquire as to reasons outside this document bearing on

18   her signature to the document.  And I didn't raise any

19   of those issues in direct examination.

20         MR. MANTANONA:  Your Honor, I'm just -- the

21   statement is -- I'm trying to clarify that my client

22   did sign this document, and whether this document

23   actually reflects her personal feelings and her need

24   for the emergency procurement.

25         THE COURT:  Well, she said yes, I think.

1          MR. MANTANONA:  Then move to strike.

2          MR. COHEN:  No, not that of course.

3          MR. MANTANONA:  Okay.

4     Q.   On the first page, on Page 1 of the KK, do you

5  know that document?

6     A.   Yes.

7     Q.   And can you read the last sentence of that

8  document?

9     A.   The full sentence?

10     Q.   Yes, please.

11     A.   "For the reasons stated in the attached

12  Certificate of Emergency, I wish to delegate my

13  procurement authority to your office to assist me

14  in securing legal representation in the case."

15     Q.   And so who did you give that authority to?

16     A.   To the Governor's legal counsel.

17     Q.   And Mr. Cohen asked you whether you sought the

18  approval or consulted with the Attorney General or his

19  office in regards to this document, and you said no?

20     A.   That's correct.

21     Q.   Why didn't you?

22     A.   I, uhm, I concluded that he would not approve.

23     Q.   Were you seeking to discharge him as your

24  counsel?

25     A.   I was seeking to discharge him as my counsel.

1    Q.    You believed a conflict exists?

2    A.    Yes.

3    Q.    Do you believe a conflict exists today?

4    A.    Yes, I do.

5    Q.    And what relief are you seeking from the Court

6    today?

7    A.    I am seeking for the Court to approve my legal

8    representation by your office, by yourself.

9          MR. MANTANONA:  Thank you.

10         No further questions, Your Honor.

11         MR. COHEN:  I have some redirect, Your Honor.

12                    **REDIRECT EXAMINATION**

13   BY MR. COHEN:

14   Q.    Ms. Perez, I direct your attention to Exhibit

15   BB in the notebook before you.  Would you kindly open

16   that up and turn to exhibit double B.

17         (Pause.)

18         MR. MANTANONA:  Your Honor, can I have the

19   question repeated?  I apologize.

20         MR. COHEN:  I asked her to open to Exhibit BB

21   in the notebook.

22         MR. MANTANONA:  Your Honor --

23         MR. COHEN:  Exhibit notebook.

24         MR. MANTANONA:  I'm going to object to any

25   reference to any -- this is going beyond the scope of

1   his direct, his direct and now my cross.  No references

2   were made to this document.

3           MR. COHEN:  You need to look at it, counsel,

4   before you can raise the objection.

5           MR. MANTANONA:  Well, it wasn't referred to in

6   your cross-examination.

7           MR. WEINBERG:  Mr. Mantanona, I believe that

8   you brought up the question of (inaudible) --

9           THE COURT:  Sir, Mr. Weinberg, we're not

10  picking you up when you're make the statement.

11          MR. WEINBERG:  My apologies, Your Honor.  I

12  was just saying that Mr. Mantanona asked the witness

13  about her desire to discharge the office of the

14  Attorney General and that's what Exhibit BB relates to.

15          MR. COHEN:  Okay.

16      Q.   Have you now turned to Exhibit BB?

17      A.   Yes, I have.

18      Q.   Excuse me?

19      A.   Yes, I have.

20      Q.   Okay.  Have you seen that document before?

21      A.   Yes.

22      Q.   And what is it?

23      A.   It's a letter to the Attorney General

24  requesting that he sign a substitution of counsel for

25  myself.

```
1       Q.    Okay.  And did you sign that?

2       A.    Yes, I did.

3       Q.    And what's the date of that document?

4       A.    December 9th.

5             MR. COHEN:  Your Honor, I offer Exhibit BB.

6             (Pause.)

7             THE COURT:  Mr. Mantanona?

8             MR. MANTANONA:  Your Honor, I have no

9  objections to the document.

10            THE COURT:  All right.  Exhibit BB admitted

11 into evidence without objection.

12            MR. COHEN:  BB, yes.

13      Q.    Ms. Perez, I ask you now to direct your

14 attention to Exhibit DD in the notebook.

15      A.    I see it.

16      Q.    Okay.  Have you seen that document before?

17      A.    Yes, I have.

18      Q.    And is that document Exhibit DD in response to

19 your letter Exhibit BB?

20      A.    Yes, it is.

21            (Pause.)

22            MR. COHEN:  Your Honor, I offer Exhibit DD

23 into evidence.

24            MR. MANTANONA:  Your Honor, we'll object to

25 DD.
```

MR. COHEN:  Your Honor, she has identified
that as her document.

THE COURT:  Well, what's the reason for the
objection?

MR. MANTANONA:  Your Honor, it contains a
legal opinion by the Attorney General's Office, which
is one of the core issues in regards to this position.
It's an opinion.

MR. COHEN:  Let me --

MR. MANTANONA:  It's not relevant to the
solicitation.  Part of it is when he denies her
request, but it contains legal opinions that are not
relevant.

MR. COHEN:  That's entirely irrelevant.

Q.    But let me ask you this, Ms. Perez.  Would you
please read the --

THE COURT:  Wait, hold on, there's an
objection.

MR. COHEN:  Excuse me?

THE COURT:  You're asking that it be admitted
into evidence and it hasn't been resolved yet.

MR. COHEN:  Okay.  I've offered this document
into evidence.  The testimony so far is that the
witness, she's seen this document, she received this
document, and that this document is in response to

1   Exhibit BB which she had sent to the Attorney General.

2   And, indeed, the first paragraph, the first sentence of

3   this exhibit says "I am in receipt of your letter dated

4   December 9th, 2004, requesting that I withdraw my

5   representation of you in the above styled matter."

6       So this is the response of the Attorney

7   General to Exhibit BB which is now into evidence, so

8   it's -- and the witness has testified she received that

9   document.  So it's now proper to have this response

10  offered into evidence and to be admitted into evidence,

11  Your Honor.

12      MR. MANTANONA:  Your Honor, we believe it's

13  improper to admit it into evidence because it contains

14  a legal opinion of the Attorney General in regards to

15  this case.  We'll stipulate that this document is a

16  denial of Ms. Perez's request, but besides that, we

17  refuse to -- or we do not agree that it should go

18  before the Court to have an internal argument contained

19  within the evidence proffering the Attorney General's

20  position.  To me that's improper.

21      Thank you.

22      THE COURT:  All right.  The Court will admit

23  Exhibit DD into evidence.  Any questions of law is to

24  be determined by the Court solely without regard to

25  anything else.

```
 1              MR. COHEN:  Thank you, Your Honor.
 2              I have no further questions of the witness at
 3     this time, Your Honor.
 4              THE COURT:  Mr. Mantanona?
 5              MR. MANTANONA:  Your Honor, at this time, we
 6     have no further questions of Ms. --
 7              THE COURT:  All right.  Thank you, Ma'am,
 8     you're excused.
 9              All right.  The Court notes that it's 12:30,
10     and I can go for another two hours but I need to ask
11     counsel what do you desire to do at the moment.
12              MR. COHEN:  I propose we come back after
13     lunch, Your Honor.
14              MR. CALVO:  Your Honor?
15              THE COURT:  Mr. Calvo.
16              MR. CALVO:  If it please the Court, I would
17     propose we come back after lunch.  However, Your Honor,
18     I think that we've heard enough.  I think that the
19     issue here is the motion to strike as counsel for the
20     People that have been on the stand, and I think there's
21     been a clear exhibition of hostile conduct from people
22     that purport to be counsel for the folks on the stand.
23              THE COURT:  All right, let me ask if there are
24     additional witnesses the government or the Attorney
25     General desires to call.  Mr. Weinberg?
```

1          (Pause.)

2          MR. WEINBERG: (Inaudible.)

3          THE COURT: Sir, let me ask that you pull that

4   mic closer to you again, all right?

5          MR. WEINBERG: Is that better?

6          I was just saying that Ms. Taitano's testimony

7   will be necessary as to the question of the propriety

8   of Calvo and Clark's representation in this case. The

9   last two witnesses had to do with Mr. Mantanona, but

10  Calvo and Clark's testimony I think can --

11         THE COURT: But isn't the issue as I see it,

12  perhaps the Attorney General's argument that they

13  entered into this contract without there being any

14  emergency; that would be your argument I think, right?

15         MR. WEINBERG: In the case of, as we under-

16  stand what, what these gentlemen are doing here, in the

17  case of Mr. Mantanona's representation of Mr. Ilagan

18  and Ms. Perez, the Governor purported to declare an

19  emergency or accept the declaration of an emergency as

20  to his contract in getting them representation, but the

21  Calvo and Clark law firm is here under a different

22  legal argument, I think. I'm sure the Calvo and Clark

23  will correct me --

24         THE COURT: But if it's under a different

25  legal argument, why do you need testimony in regards to

```
 1    a legal argument?

 2            MR. WEINBERG:  There are facts as to, as to

 3    the legality of -- I mean, perhaps we can stipulate as

 4    to what happened with the documents or something, but I

 5    thought it would be just as easy to go through it with

 6    Ms. Taitano.

 7            THE COURT:  Mr. Calvo?

 8            MR. CALVO:  Yeah, I think that -- I guess my

 9    point, Your Honor, is that we spent, you know, a good

10    part of close to three hours, what was a clear showing

11    that the Attorney General's Office is hostile to the

12    people that they purport to represent.  They expand

13    their questioning beyond the relevant issue at hand,

14    they go into attorney-client privilege, they go into

15    non-relevant areas where we have had to object and

16    protect the interests of who they purport they are

17    representing.  And I think there's something --

18            THE COURT:  Okay, let me ask Mr. Weinberg.  As

19    to the legal theory behind the Calvo Clark contract,

20    what facts do you need to undertake?

21            MR. WEINBERG:  I just want to establish in the

22    record, apparently there was a conflict, what we call a

23    conflicts counsel arrangement where the Attorney

24    General had agreed that Calvo and Clark could represent

25    the Governor's Office in two cases, or a couple of
```

1    cases--it might have been more than that. Subsequent

2    to that, and to the Attorney General signing that

3    agreement, Calvo and Clark over a number of -- a number

4    of months and the Governor's Office attempted to get

5    the Attorney General to sign amendments to that

6    contract authorizing Calvo and Clark to represent the

7    Governor in this and other matters that we did not

8    authorize them to.

9        So it's our argument that, that you still need

10    the Attorney General's signature under the laws of Guam

11    on a contract for legal services for the Governor.

12        THE COURT: Why would you need additional

13    facts for purposes of arguing on that issue?

14        MR. CALVO: The only problem, Your Honor, is

15    that the Attorney General refuses to sign our contract.

16    So more appropriately the Attorney General should

17    testify rather than anyone from the --

18        THE COURT: But I thought he's telling me that

19    the Attorney General -- the Governor has requested that

20    a contract that the Attorney General has previously

21    approved be amended to include this case within the

22    coverage of that agreement?

23        MR. CALVO: This case and another case that's

24    already concluded, Your Honor.

25        THE COURT: And they haven't been --

1           MR. CALVO:  The Attorney General refuses to
2    sign the contract.
3           THE COURT:  To amend?
4           MR. CALVO:  Yes.
5           THE COURT:  Or to extend?
6           MR. CALVO:  Right.
7           MR. WEINBERG:  Well, actually to amend to
8    include this case.
9           THE COURT:  And another case?
10          MR. WEINBERG:  And another case.  Correct.
11   And the Attorney General in his discretion has
12   determined --
13          THE COURT:  All right, so based on your
14   refusal to sign, you're saying that they have no
15   authority then to represent the Governor?
16          MR. WEINBERG:  Correct.
17          THE COURT:  That's the legal argument?
18          MR. WEINBERG:  Correct.
19          THE COURT:  So why do we need testimony in
20   that regard?
21          MR. WEINBERG:  Well, also, we're trying to
22   determine the scope of the unlawfulness of this
23   agreement.  The latest version we've seen appears to
24   backdate the agreement back into April of last year.
25   Or the latest version that we've seen, I might be

1    mistaken on this.

2         MR. CALVO:  Your Honor, I think the purpose is

3    to embarrass the Administration.  There's a case that's

4    concluded, Your Honor, where opposing counsel, it was

5    the Moylan versus Camacho case, where opposing counsel

6    representing the Lieutenant Governor was Mr. Phillips

7    here, and he was representing the Lieutenant Governor.

8    The Attorney General had no problem signing that

9    contract.  In fact, Mr. Phillips has been paid in full

10   on that case, which concluded.  We have not had our

11   signed contract returned yet.

12        MR. PHILLIPS:  (Overlapping/unintelligible.)

13        MR. CALVO:  The Attorney General has gone on a

14   sit-down strike with respect to the Administration.

15        THE COURT:  I see we've awakened Mr. Phillips.

16        (Laughter.)

17        MR. PHILLIPS:  For the record, Your Honor, the

18   Attorney General had grave heartache and we had to go

19   through the proper procedures in order to do it.

20        THE COURT:  Well, thank you for finally saying

21   something there.

22        MR. PHILLIPS:  It was totally an emergency

23   (inaudible).

24        MR. CALVO:  It was no knock on Mr. Phillips;

25   I'm happy for him that he got paid.

1          (Laughter.)

2          MR. WEINBERG:  I don't know what the relevance

3    is about Mr. Phillips's contract with the Lieutenant

4    Governor or not.  It's clear, the parties all agree is

5    that the Attorney General has not authorized, he has

6    not signed the contract by which the Calvo and Clark

7    law firm purports to be here and be representing the

8    Governor.

9          THE COURT:  And isn't that something that you

10   can legally argue before the Court as opposed to

11   bringing in additional testimony?

12         MR. CLARK:  Your Honor, if I can address the

13   Court.  I haven't appeared yet before the Court;

14   Arthur Clark, Calvo and Clark firm, just to clarify

15   this contract.

16         In addition, Your Honor, because some of the

17   -- it's not limited as far as the amendment to the

18   contract is not limited to just this case or to the

19   case Mr. Calvo referred to that's been concluded.

20   Matter of fact, I was in court yesterday on the

21   overtime lawsuit where the Attorney General has

22   directly sued the Governor on a writ of mandate to

23   force the Governor to pay overtime, and yet that also,

24   the Attorney General has refused to sign the amendment

25   in order to permit the Governor to retain counsel on

1    that particular case.

2         And Mr. Weinberg is talking about the back-

3    dating of the amendment, Your Honor.  What he's

4    referring to is, even though the Attorney General has

5    been suing the Governor for months and has refused to

6    sign the contract to authorize the attorney -- the

7    Governor to retain counsel to defend himself against

8    the Attorney General's Office, what the Governor is

9    seeking is compensation for Calvo and Clark going back

10   to the date that we actually entered an appearance and

11   started representing the Governor against the cases

12   directly naming the Governor as a defendant.

13         MR. JACOB:  One other point, Your Honor,

14   Rodney Jacob for Calvo and Clark, is that in the Moylan

15   versus Camacho case in the Superior Court, the Attorney

16   General's Office went on the record saying that there

17   was no objection to Calvo and Clark representing the

18   Governor, yet they refused to sign the agreement.  The

19   only issue in this matter is whether the Attorney

20   General can come here, be nakedly hostile against the

21   Governor, the departments in the Administration, and

22   stand up and say there's no contract because the

23   Attorney General won't sign it.  That is the issue

24   they're trying to create which are red herrings.

25         UNKNOWN VOICE:  And it's not proper or right

1   (inaudible).

2        THE COURT:  Wait.  Well, counsel, that's where

3   I think that additional testimony is not needed.  We

4   can come back in the afternoon, argue the legal

5   implications of -- you know, you can make the

6   representation to the court that this occurred and

7   they can certainly counter and say something else,

8   as opposed to bringing in testimony just to delay the

9   proceeding.

10       MR. JACOB:  Your Honor, also if I may?  This

11  is such a serious issue, and the naked hostility of an

12  attorney against a client that they continue to purport

13  to be at least warrants briefing so this court has a

14  full record.  It is such an important issue that these

15  folks have tried to hijack in the name of the very

16  clients that they are outwardly and nakedly hostile to.

17       UNKNOWN VOICE:  And it is a gross violation

18  of --

19       THE COURT:  But that's what we're going to

20  determine when we come back, whether or not the motion

21  to strike should be granted or not, or whether or not

22  we allow the entry of appearances on your behalf, made

23  by you on behalf of these defendants.

24       MR. JACOB:  Your Honor, there was not full

25  briefing in this issue.  They filed a motion to strike

1  and the Court issued an order that said no further

2  briefing was needed on the issue.  Although Calvo and

3  Clark filed an abbreviated issue on this -- memo on

4  this issue, we feel that it is so important and that

5  there are documents that the court should consider

6  before it considers an issue on a procurement issue

7  like this, where they are trying to nakedly hijack

8  these proceedings because the attorney -- the sole

9  reason is because the Attorney General will not sign

10  off on a contract that was lawfully approved through

11  the procurement process.

12        UNKNOWN VOICE:  And Your Honor, again my --

13        THE COURT:  But here's my point though.

14  Here's my point.  We've had the Attorney General filing

15  this motion to strike, and it seems that in the initial

16  moving papers he raises the procurement law as an issue

17  in support of his motion, and what I find troubling

18  though is that if counsel thinks that you haven't

19  briefed it fully, at the same time, you've never come

20  to court and asked the Court to reconsider its prior

21  orders that no further briefing be made, so that you

22  can ask to file additional papers.

23        MR. JACOB:  Your Honor, what we did do was

24  we filed a, what is permitted by Rule 19.1, a

25  substitution.  And all that needs to be done on that

substitution for the purposes of the Governor to be
heard, and which will moot out all of these issues, and
they can be brought in another forum is for the Court
to sign it.  I think that there is definite predicate
here.

The Court has witnessed probably an
unprecedented display of hostility from the Attorney
General's Office who purports to represent line
agencies, but also my client the Governor, and all that
needs to be done is the order for substitution to be
signed.  They beg the question in the motion to strike,
they said, well, strike them, because where is the
substitution.  We filed it, we followed it.  That was
just a joke, I guess.  It's before the court, they
refused to sign it, we've done everything appropriate
according to the rules, and all that needs to be done
to moot out all of this nonsense is that the Court
needs to sign the order, and there's no good reason for
it not to.  And what they're trying to do on the
procurement issues is just a red herring.

MR. WEINBERG:  I can appreciate Mr. Jacob's
enthusiasm.  We have a significant legal question here.
I think the Court probably has heard enough testimony
to know what's going on.  The Court and the parties can
probably stipulate as to documents as to the -- as to

1    the history of Calvo and Clark and the Governor's

2    Office attempting to get their contract amended for

3    this case.  Beyond that, the motion to strike, we have

4    a question of law.

5         THE COURT:  You know, let me just tell counsel

6    what I believe the issue before the Court is, really.

7    It's not so much whether the Court approves the

8    contracts that have been entered, that is entered into

9    with the individual defendants, the issue is who is

10   going to represent who today.  That's the only issue

11   I'm interested in.

12        I don't care how much you're charging your

13   clients, I don't care whether the Attorney General has

14   signed those or not.  The only issue I want to

15   determine today is as to these defendants, who properly

16   can speak for them in court today.  That's what I want

17   to decide, nothing else, as to the motion to strike.

18        So, it seems to me that we can argue that

19   motion without additional testimony.  What has been

20   testified to by Mr. Ilagan and Ms. Perez seems to

21   perhaps bring into play the objections that you have

22   regarding those individuals seeking counsel other than

23   the Attorney General, and it seems to me that those

24   same reasons apply to Calvo and Clark.

25        MR. WEINBERG:  They do at least with respect

1    to the failure to obtain the Attorney General's consent

2    and signature on their contract.  That aspect of the

3    Guam procurement law and the requirement that contracts

4    for legal services be signed and approved by the

5    Attorney General, I think all are in agreement that the

6    Attorney General has refused to sign the contract with

7    Calvo and Clark.

8          THE COURT:  And the Attorney General has also

9    refused to sign the substitution.

10         MR. WEINBERG:  And that as well.

11         THE COURT:  Right.  So that's also going to

12   come into play here.  That's why the Court isn't

13   prejudicing them from arguing really, because you

14   haven't signed the substitution.  They're here before

15   the Court today to make their argument.

16         MR. WEINBERG:  I don't follow what the issue

17   is with the substitution of counsel.  Obviously, if we

18   were to sign that, that would moot the question.  It

19   did in fact look like it was a joke, it was presented

20   to us when it was brought to my office to sign it --

21         THE COURT:  The court hasn't signed the

22   substitution, really, because it would be improper to

23   sign the substitution in light of the motion to strike

24   that's before it.

25         So why don't we come back after lunch and be

1  prepared to argue the motion then, not so much put on

2  additional testimony, but be prepared to argue the

3  motion.  Is that understood?

4        MR. CALVO:  Yes, Your Honor.

5        MR. JACOB:  Thank you, Your Honor.

6        MR. WEINBERG:  Fine, Your Honor.

7        UNKNOWN VOICE:  Yes, Your Honor.

8        THE COURT:  All right.  We have a matter

9  that's set for 2:00.  I'm just going to go to

10 McDonald's and buy the McChicken that's a dollar, and

11 then tell the clerk that I'm a senior, so I can get a

12 drink for 35 cents, so I can have lunch today for a

13 $1.35 and have a quick lunch.  So why don't we have you

14 back around 2:00 so that we can commence right when

15 we're done with this case that's scheduled for 2:00

16 o'clock.

17       MR. PHILLIPS:  Your Honor, if I may address

18 the court?

19       THE COURT:  Yes, Mr. Phillips.

20       MR. PHILLIPS:  Does the Court anticipate

21 addressing the remaining matters today?  Because if

22 not, then I think that will save the witnesses a lot

23 of trouble too --

24       THE COURT:  I think you have a good point

25 there, that we might be hearing only the motion to

1    strike this afternoon.

2          Is there any objection if we release the

3    witnesses as to the other issue?

4          MR. PHILLIPS:  As long as the other issue is

5    being released for the day, Your Honor.

6          THE COURT:  All right, and subject to recall

7    by the Court.

8          MR. PHILLIPS:  I think there's also, although

9    I can't speak for the Court, the possibility the Court

10   might reserve and not resolve that question, and so it

11   might, along with the court's suggestion be more

12   prudent to go ahead and resolve this, and then very

13   quickly move to the next issue, although not today.

14         THE COURT:  And I'm glad that Mr. Phillips is

15   finally making statements to the court this afternoon.

16         I agree with Mr. Phillips, why don't we

17   discharge the witnesses as to your motion for the day

18   and just deal with the motion to strike.  I think it's

19   going to take all afternoon.

20         MR. CALVO:  Your Honor?

21         THE COURT:  Yes, Mr. Calvo.

22         MR. CALVO:  Because of the other matters, and

23   Mr. Phillips has reminded me that we might have some

24   scheduling issues.  If the court anticipates the

25   hearing continuing tomorrow I think on the Governor's

```
 1    side we might have some scheduling matters.  I know

 2    that --

 3            THE COURT:  Why don't we determine that at the

 4    conclusion of this afternoon's proceedings, so that

 5    it's clear that whether the hearing we do set is

 6    convenient for everybody.

 7            MR. CALVO:  Thank you, Your Honor.

 8            UNKNOWN VOICE:  Thank you, Your Honor.

 9            MR. MANTANONA:  Your Honor, administrative

10    matter.  On behalf of Ms. Perez and Mr. Ilagan, we'd

11    like to move in the respondent's R exhibit that was

12    addressed.

13            THE COURT:  I'm sorry, I didn't hear.

14            MR. MANTANONA:  Exhibit R or People's Exhibit

15    R.

16                  (Pause/discussion not audible.)

17            MR. MANTANONA:  Oh, it's joint.

18            THE COURT:  And what's --

19            MR. MANTANONA:  It's respondent's Exhibit R.

20            THE COURT:  Okay.  And what did you want the

21    Court to do?

22            MR. MANTANONA:  Just want to admit it into

23    evidence for the purposes of this hearing.

24            THE COURT:  Oh.  Is there any objection to

25    that?
```

```
 1              MR. WEINBERG:  Mr. Mantanona wants to move

 2    into evidence a legal opinion from the Attorney

 3    General?  Is that what that is?

 4              COUNSEL:  No objection.

 5              THE COURT:  All right, Exhibit R then admitted

 6    into evidence without objection.

 7              All right, counsel, have a good lunch; we'll

 8    see you this afternoon.

 9              COUNSEL:  Thank you, Your Honor.

10              (Recess was taken.)

11              (Proceedings resumed at 2:26 p.m.)

12              THE CLERK:  Civil case 04-00006, Julie Babauta

13    Santos, individually and on behalf of all those

14    similarly situated, versus Felix A. Camacho, Governor

15    of Guam, et al., continued motion to strike appearances

16    and pleadings, and motion for relief from order issued

17    by the Court on November 12, 2004.

18              Counsel, please state your appearances.

19              MR. PHILLIPS:  Mike Phillips for the

20    petitioner, and interim class counsel.

21              MR. CALVO:  Eduardo Calvo for the Governor of

22    Guam.

23              MR. JACOB:  Rodney Jacob for the Governor of

24    Guam.

25              MR. BENJAMIN:  Daniel Benjamin for the
```

1    Governor of Guam.

2         MS. TAITANO:  Shannon Taitano for the Governor

3    of Guam.

4         MR. MANTANONA:  Afternoon, Your Honor, Rawlen

5    Mantanona for the Director of Revenue Taxation, Lourdes

6    Perez, and the Director of Rev -- Adminis -- Rev and

7    Taxation, Artem -- excuse me -- Art Ilagan.

8         MR. COHEN:  Stephen Cohen, counsel for the

9    respondents.

10         MR. WEINBERG:  Rob Weinberg, Attorney

11    General's office, also counsel for all the respondents.

12         THE COURT:  Mr. Weinberg, or Mr. Cohen?

13         MR. WEINBERG:  (Inaudible.)

14         THE COURT:  Yes, why don't we proceed then.

15         MR. WEINBERG:  May it please the Court, the

16    issue is a simple issue, and that is, who controls the

17    litigation, who represents the defendants, the

18    Government of Guam official defendants in this case.

19         I want to get some law out of the way real

20    quick on something we heard testimony about, I just

21    want to bring the Court's attention to, I think it's

22    already been cited, at least with respect to the

23    contracts at issue here.

24         5 Guam Code Annotated Section 5121(b) provides

25    that: "No contract for the services of legal counsel in

the executive branch shall be executed without the

approval of the Attorney General."  That's Guam law.

5 GCA Section 22601 provides that all

contracts -- these are all contracts generally --

"shall, after approval of the Attorney General, be

submitted to the Governor for his signature."

We have two statutes requiring the Attorney

General's signature.  And one in particular with the

provision of legal counsel to the Government of Guam

and its agencies and officials.

THE COURT:  Is that a provision that applies

to autonomous agencies?

MR. WEINBERG:  Your Honor, that's our -- that

is an issue that's currently in litigation at the

moment in the Guam Supreme Court, and it is our

contention that it does apply.

THE COURT:  Okay.

MR. WEINBERG:  That even though autonomous

agencies sometimes have the authority, and in fact as a

matter of practicality, autonomous agencies are still

required to submit all contracts through our office,

and our contention is that legal -- contracts for legal

services also have to be approved by our office.

THE COURT:  Let me ask a question then.  If

that's your belief, if an autonomous agency decides to

1   procure legal services, and let's assume the Attorney

2   General comes to the conclusion that it's not desirable

3   that this firm be legal counsel to that agency, then

4   under your theory, the law firm that's been chosen by

5   the autonomous agency could never represent that agency

6   absent approval on your part?

7         MR. WEINBERG:  That is -- that is our

8   contention, yes, Your Honor.  And that issue actually

9   is before the Guam Supreme Court right now with respect

10  to the airport.

11        THE COURT:  Okay.

12        MR. WEINBERG:  And it has been briefed and

13  argued and we're awaiting a decision.

14        Finally -- finally, under the Administrative

15  Rules and Regulations, 2 GAR Section 212(b), also

16  provide that: "No contract for the services of legal

17  counsel in the executive branch shall be executed

18  without the approval of the Attorney General."

19        So here we've had testimony in this case, and

20  it's all counsel have stipulated that the Attorney

21  General has not approved any of the contracts, or

22  either Mr. Mantanona or the Calvo and Clark with

23  respect to this case.

24        THE COURT:  Has the Attorney General approved

25  the contract for Moylan versus Camacho?

1    MR. WEINBERG: I don't know.

2    And I can report back to the court and I can

3    find out, but I do not know.

4    THE COURT: Okay.

5    MR. WEINBERG: Now, that's just Guam law. But

6    it is the position of this office, as it is in this

7    case and in other cases, that in 1998 Congress amended,

8    the U.S. Congress amended the Organic Act to provide

9    something that Guam has never had before, and that is

10   a chief legal counsel for the Government of Guam. And

11   all that entails is more than just, here's a lawyer.

12   And it also provided that the Legislature may provide

13   that the Attorney General is elected, if it desires,

14   which it did.

15   So in 1998 and 1999 the Legislature, the Guam

16   Legislature provided that the Organic Act established

17   Attorney General shall be elected. And the question

18   now becomes for this court, and some of us, is what

19   does that mean. Does that mean that there's just

20   another lawyer down the hall from the -- from the

21   Governor, or the Director of RevTax, or the Director

22   of Administration, or a line or autonomous agency, and

23   if that person chooses to use that attorney in the

24   Attorney General's Office, he or she may, or if

25   dissatisfied with the attorney, can go hire lawyers

1   outside of it, outside of the Attorney General's
2   Office.
3       And the answer is no.  The answer is, and
4   we've cited lots of case law, that if you look at the
5   title and the concept of the role of chief legal
6   counsel in a constitutional sense, and by which I mean
7   here we have -- it is an office that is established in
8   the Organic Act, it cannot be taken away.
9       Previously, attorneys general came and went at
10  the whim of the Governor, and in essence that's what --
11      THE COURT:  Well, could the Guam Legislature
12  decide tomorrow to abolish the election of the Attorney
13  General?
14      MR. WEINBERG:  I believe so.
15      THE COURT:  So it could?
16      MR. WEINBERG:  It could provide that the --
17  it could take away the election, or how the Attorney
18  General is elected, yes.
19      So to me, that's -- whether the AG is elected
20  or not is not so critical as the fact that it is an
21  office established in the, in the Organic Act.  And
22  here what you have in this case is a carryover of the
23  kinds of interaction between the Governor and the
24  Attorney General you had in prior administrations.
25  Dissatisfied with the legal counsel and the legal

1   direction chosen by the chief legal officer for the

2   Government of Guam, the Governor has directed the

3   Department of Administration and RevTax to sign these

4   documents saying, declaring a state of emergency

5   saying, give us a different lawyer, we think we have a

6   conflict with you, we disagree with your legal

7   analysis, we don't like the legal direction you have

8   chosen for us.

9        Now, we have cited lots of cases that hold

10  that it is the Attorney General, in a constitutional

11  sense like ours, that sets legal policy.  The Governor

12  may set policy, general policy, executive policy, but

13  when a contract is up for review, and when the

14  provision of legal services to the Government of Guam,

15  its agencies, instrumentalities, officers, it is the

16  Attorney General's sole responsibility to decide who

17  that lawyer shall be, and what the course of -- what

18  the direction of litigation will be.

19        Unlike, and there's plenty of authority and

20  we've cited it to the court already, unlike a limited

21  number of jurisdictions that still hold that an

22  Attorney General serves at -- in the same way that a

23  private lawyer would, and a private lawyer has to take

24  directions in sum and substance; it is a different

25  animal with respect to the Attorney General, and a

1   governmental client.

2          I want to point out that in the --

3          THE COURT:  Speaking of constitutional office,

4   is the entitlement to representation, or outside

5   representation different in the cases of, let's say,

6   Perez and Ilagan as opposed to the Governor, because

7   the Governor in effect has a constitutional office and

8   those two do not?

9          MR. WEINBERG:  I think that's a good question.

10  Clearly, with respect to Ilagan and Perez, the Attorney

11  General controls; they are line agencies within the

12  executive branch.

13         Now the Governor, and I have seen case law,

14  case law has been cited I believe, that sometimes the

15  Governor may have a voice, may -- if he has an

16  individual, an individual interest to assert, something

17  where, for example, if the Legislature were somehow

18  encroaching on his authority and you had a separation

19  of powers problem, or issue, where the Governor might

20  be entitled or ought to be entitled, I would argue, to

21  independent counsel of his choosing, if there's a

22  direct conflict as to the Governor's powers and duties.

23         But where you have a situation, as here, where

24  you have a question, is the EITC due and payable -- and

25  I'm not answering that, these are the questions, it is

```
 1  a legal question to be decided -- and how is it to be
 2  paid out, and what's the most efficacious way for the
 3  Government of Guam to resolve this legal question,
 4  goes to --
 5          THE COURT:  If the issue boils down to, how
 6  do you settle it, and the views differ between the
 7  Attorney General and the Governor, is that a situation
 8  where you think the Governor is entitled to independent
 9  representation?
10          MR. WEINBERG:  I don't know about independent
11  representation.  I would go as far as to say that the
12  Governor -- if a Governor has a complaint and has
13  something that he says, it may, it may behoove the
14  Government of Guam to allow him a voice.  It may be
15  advisable to do that.
16          THE COURT:  But how does he show his voice,
17  what's the vehicle in which he transforms his voice to
18  be heard in court?
19          MR. WEINBERG:  (Overlapping.)  Well, with
20  independent, or independent counsel.  The problem is we
21  don't have a provision for that in the law, in Guam.
22          THE COURT:  But let's assume you're suing the
23  Governor; is he then not entitled to independent
24  representation because there's no such authorization
25  in the statute?
```

1          MR. WEINBERG:  I think in that case he is,

2    where we are suing the government -- suing the

3    Governor.

4          THE COURT:  Irrespective that the law is

5    silent in that regard, he is entitled to independent

6    representation?

7          MR. WEINBERG:  I, this is my opinion, yes,

8    like in the Moylan versus Camacho over the Procurement

9    Appeals Board question, the attorney -- the Governor

10   ought to have his own attorney, because he is being

11   sued directly by -- that is a direct conflict.  But

12   where --

13         THE COURT:  But why can't you detach another

14   Assistant Attorney General to represent him?

15         MR. WEINBERG:  That has been offered in the

16   past, and that can be done in the future.  I mean

17   that's one solution is to do that.  And in fact, when

18   the Attorney General first took office, we created

19   conflict laws and created separate divisions where,

20   if we were going to represent somebody, it was going

21   to be one division, but if we were going to sue someone

22   in the government it was another, and there were

23   Chinese walls erected.  And those are possible

24   solutions to this problem, and that can be done.

25              I want to point out that of the cases cited by

1  the Governor for the proposition that he does get to

2  control the substantive --

3          THE COURT:  Well, you know, that just raises

4  another question, really.  If the Attorney General is

5  the chief legal officer and if he decides the policy,

6  why would we think that an Assistant Attorney General

7  can take a position different from the chief legal

8  officer of the Government of Guam?

9          MR. WEINBERG:  I think your question is more

10 one of practicality than -- your question is, can a --

11 could an Assistant Attorney General create a Chinese

12 wall around himself (inaudible), and --

13         THE COURT:  But the AG's argument, though, is

14 the dictates of litigation, that has to be determined

15 by the Attorney General; he solely determines, you

16 know, the litigation posture.  So once he makes that

17 determination, why would an assistant be authorized to

18 go against that policy in the representation of another

19 defendant?

20         MR. WEINBERG:  I think we need to be a little

21 bit more fact specific.  In a case, for example, like

22 this one, all right, just because the Governor

23 disagrees, that does not entitle the Governor to

24 independent counsel, just because he disagrees with

25 whether legally the case against the Government of Guam

1  and its officials is due to be settled.

2      In a case like <u>Moylan v. Camacho</u> where the

3  Attorney General was suing the Governor over his

4  failure to appoint members of the Procurement Appeals

5  Board, I mean, nobody is going to represent the

6  Governor but somebody other than the AG, then the

7  Attorney General, unless you walled off an Assistant

8  Attorney General to represent him.

9      When the Judicial Council, Guam Judicial

10  Council sued the office of Attorney General for --

11  to evict us --

12      THE COURT:  Are you still there, by the way?

13      MR. WEINBERG:  We're still there.  I don't

14  know -- what is today's date?  I'm not sure.  I think

15  we're supposed to be out by the end of next month.

16      The first thing that the Attorney General did

17  was actually offer as attorney from our office to them

18  to represent them to sue us, which the Judicial Council

19  declined and they had their own, and that's not an

20  issue.  But just as a matter of interest, that's what

21  happened.

22      You know, these are --

23      THE COURT:  But did you insist that they be

24  represented by the Attorney General or not?

25      MR. WEINBERG:  No, we did not.  We did not.

1    And in that case, and here's -- I don't mind telling
2    the Court there's some dispute in our office, there is.
3            Here what we have in the Santos case, we have
4    -- it is an entirely executive branch issue, to me --
5    (inaudible) -- and there's some in the office, you have
6    some separation of powers problems in compelling the
7    Judiciary or perhaps even the Legislature to accept
8    counsel of our choosing because of the separation of
9    powers doctrine.  I think it has been resolved in
10   different ways, but --
11           THE COURT:  But didn't the Organic Act say
12   that he's the chief legal officer of the Government of
13   Guam?
14           MR. WEINBERG:  That's what the Organic Act
15   says, we are the chief legal officer.
16           THE COURT:  It didn't say the executive branch
17   only?
18           MR. WEINBERG:  Correct.
19           THE COURT:  So why are we questioning
20   separation of powers?
21           MR. WEINBERG:  I'm not.  I'm saying it's a
22   question that may arise in the future.  And so with
23   respect to foisting an attorney on the Judicial Council
24   when it sued us for eviction, there was some hesitation
25   that you might run into a separation of powers problem

1    in doing that.  You have to resolve the separation of

2    powers consistent with the chief legal officer and what

3    that means.

4           But here in Santos, we are clear that under

5    these statutes that we're dealing with contracts for

6    provision of legal counsel to the executive branch.

7    And here it's clear that under the Organic Act, and

8    these statutes, and the Guam common law which -- or the

9    common law which Guam has adopted, that the Attorney

10   General is -- makes the legal decisions with respect

11   to settling cases or bringing cases or how to defend

12   cases.  And that all of that law has been cited.

13          Again, I keep trying to get to this point.

14   The Governor's Office has --

15          THE COURT:  In other words, the certificate

16   that was filed by Mr. Ilagan and Ms. Perez, from your

17   point of view, they don't have any valid points?

18          MR. WEINBERG:  I don't -- yes, Your Honor.

19   The certificate said -- and what was from Mr. Ilagan's

20   testimony, I'm not quite sure that he really knew what

21   he was even talking about when he talked about a

22   conflict of interest, I couldn't get a straight answer

23   from him as to what he thought, except that what he

24   seemed to be saying was that it was a conflict because

25   the legal positions of the Government of Guam had

1   changed over time.  And that at one time the legal

2   position of the Government of Guam was that you did not

3   pay EITC at all, and now it is, now that legal position

4   is that it should be paid and that the case should be

5   settled.  There may have been more, but I didn't get

6   much of what he said was a conflict.

7        The other was, he was concerned about

8   potential exposure to criminal liability for illegal

9   expenditures for complying with the contract, and I

10  didn't get a straight answer out of him as to what he

11  really thought that was about either.  All right.

12       THE COURT:  Well, he seemed to imply the

13  Troutman memorandum --

14       MR. WEINBERG:  Yes, he was referring to the

15  Troutman memorandum, which if you look at that, all

16  right, says, in the first place that the 60 million

17  dollars that's paid, or that is to be paid out over

18  nine years, that does not have to be appropriated, so

19  that doesn't come under the illegal expenditure

20  provision.  It doesn't have to be appropriated because

21  under the Organic Act and federal law, it's set aside

22  already.

23       And then the question came about attorney's

24  fees and how would that be paid, and the answer to that

25  was, well, the understanding as presented to the court

1   changed over time.  And that at one time the legal

2   position of the Government of Guam was that you did not

3   pay EITC at all, and now it is, now that legal position

4   is that it should be paid and that the case should be

5   settled.  There may have been more, but I didn't get

6   much of what he said was a conflict.

7        The other was, he was concerned about

8   potential exposure to criminal liability for illegal

9   expenditures for complying with the contract, and I

10  didn't get a straight answer out of him as to what he

11  really thought that was about either.  All right.

12       THE COURT:  Well, he seemed to imply the

13  Troutman memorandum --

14       MR. WEINBERG:  Yes, he was referring to the

15  Troutman memorandum, which if you look at that, all

16  right, says, in the first place that the 60 million

17  dollars that's paid, or that is to be paid out over

18  nine years, that does not have to be appropriated, so

19  that doesn't come under the illegal expenditure

20  provision.  It doesn't have to be appropriated because

21  under the Organic Act and federal law, it's set aside

22  already.

23       And then the question came about attorney's

24  fees and how would that be paid, and the answer to that

25  was, well, the understanding as presented to the court

1     is that attorney's fees would likely be paid from a

2     common fund created by the tax returns or the EITC

3     refunds. So that also was excluded.

4          Now, what Mr. Troutman's memo did talk about

5     was that -- was one line about future payouts for

6     future EITC payouts would be due and payable. And the

7     Governor's position appears to be that that is a

8     statement that this is an illegal expenditure. The

9     problem with that is that there's been no illegal

10     expenditure. And frankly, that statement is a red

11     herring, because the future payments, all it is in the

12     settlement agreement is a recognition of what the state

13     of the law is. And nobody disputes that EITC is

14     supposed to be paid, I mean, to those who are qualified

15     and meet the standards.

16          So, and then there was a fourth issue, and I

17     don't recall what that was. But also -- (pause) --

18          What was the fourth issue?

19          MR. CALVO: The administration of a million

20     dollars.

21          MR. WEINBERG: Oh, the million dollars of

22     administrative fee was set in there. And as far as I

23     know, none of that has been done. So, you know, but

24     the point is --

25          THE COURT: Did Mr. Ilagan say that after he

1   published the notice, he found out that he had no

2   appropriations to undertake the other requirements that

3   he was part of under the settlement?

4        MR. WEINBERG:  Well, somebody told him that,

5   and the problem is he did not consult with his lawyers

6   about that, he didn't consult with the Attorney

7   General's Office about that, and bring that to our

8   attention.

9        THE COURT:  What would you have told him?

10       MR. WEINBERG:  We would have examined the

11  question, we would have.

12       You know, part of the deal here is that the

13  Governor has an immediate responsibility to go to the

14  Legislature about how to deal with some of these

15  administrative logistical questions, and whether the

16  Governor has done that or not, we don't know.  But we

17  believe that he has not.  I know that back in July the

18  Legislature sent the Governor a letter and said, you

19  need to come talk to us about how we're going to

20  administer this settlement.  And the Governor has

21  been on notice ever since June and July of the

22  administrative issues that were going to come up.

23       Now, if there were problems with the

24  settlement, then those can be brought to the attention

25  of the court.  The Governor's complaints, or anybody's

1    complaints that a settlement is illegal or that there's

2    a violation of illegal expenditure, that's for the

3    fairness hearing.  As to whether or not the Court can

4    impose this or not, as to whether or not the Court can

5    require the Government of Guam to commit to paying EITC

6    payments in the future, or can commit to making these,

7    to doing these things, those are subject matters,

8    that's a subject to be brought at a fairness hearing.

9    But, what we heard Mr. Ilagan say was that he was -- I

10   mean, I didn't get much from him other than he was

11   essentially confused and he was signing on the dotted

12   line somebody provided for him.  And that's my take on

13   it.

14        But let's look at what he signed.  He signed

15   the Certificate of Emergency, and let's look at what an

16   emergency is under Government of Guam law.  All right.

17   Under 5 GCA Section 5030(x), 5 GCA 5030(x), emergency

18   means "a condition posing an imminent threat to public

19   health, welfare or safety which could not have been

20   foreseen through the use of reasonable and prudent

21   management procedures, and which cannot be addressed by

22   other procurement methods of source selection."

23        All right.  And then in the Administrative

24   Regulation, 2 GAR Section 3113 requires, says that an

25   emergency -- "emergency procurement when there exists a

1    threat to public health, welfare or safety."

2         Again, so the questions I wanted to get to

3    with Mr. Ilagan, but we can all just ask ourselves,

4    from his testimony, what emergency met the definition

5    of, of an imminent threat to public health.  He

6    identified none.  He said, he said he was worried about

7    perceived conflict of interest, or he was worried about

8    potential criminal liability in his personal capacity.

9         Public welfare, imminent threat to welfare?

10   Imminent threat to safety?  So if you look at the

11   definition of what he tried to do to say I don't want

12   my -- I don't want the Attorney General anymore, I want

13   somebody different; Governor, tell me who I should

14   hire.  Mr. Mantanona was the low bidder, I'll take him.

15   He comes up with, somebody comes up with this

16   Certificate of Emergency that doesn't even fit the

17   emergency, the definition of how to make an emergency

18   procurement under Guam law.

19        And again, it just points back to the fact of,

20   if RevTax and line agencies and autonomous agencies and

21   people who are sued get to just declare an emergency

22   and say I need somebody else, I don't like the advice

23   my lawyer is giving me, because he's the chief legal

24   counsel, then you have no chief legal counsel for the

25   Government of Guam.  And what you have is the

1    Governor's Office setting up an independent and

2    autonomous Attorney General's Office, staffed by

3    Calvo and Clark and, and Mr. Mantanona, and God knows,

4    and that's not what the Organic Act says.

5         The Organic Act says there's one chief legal

6    officer for the Government of Guam, and that's the

7    Attorney General.  And it is the Attorney General who,

8    under the common law, decides what is in the best legal

9    interest, not policy, not general policy, but legal,

10   makes legal decisions for the Government of Guam and

11   its agencies and officers.

12        THE COURT:  Well, whether or not you settle

13   for 60 or 40 or 80, is that a legal question or a

14   policy consideration?

15        MR. WEINBERG:  (Pause.)  It's a little bit,

16   it's a bit of both.  Obviously, getting 50 cents on the

17   dollar is a good deal.  But the ultimate question about

18   whether there's liability, and if so, how to minimize

19   and mitigate that liability and the potential damages,

20   that becomes a legal decision for the Attorney General

21   to make.  So a lot of times it's going to appear to be

22   overlap.  But in those cases where, where how to

23   mitigate and minimize the legal liability for the

24   Government of Guam, then it becomes the Attorney

25   General's.

1          Thank you.

2          THE COURT:  Mr. Calvo?

3          MR. CALVO:  Thank you, Your Honor.

4          Well, I think that fundamental to the

5   attorney-client relationship is a right to be

6   represented by counsel who you feel is going to

7   protect your interests, protect the interests of who

8   you represent, and so on.  The Governor of Guam --

9          THE COURT:  Doesn't that apply only to a

10  setting where you retain counsel that's not paid for by

11  the government?

12         MR. CALVO:  I don't think so, Your Honor.  I

13  think that --

14         THE COURT:  See, your right to an attorney

15  now, can a defendant in a criminal case choose let's

16  say Mr. Fisher that's back there, versus a public

17  defender?

18         MR. CALVO:  If he's able to pay for the

19  attorney of his choice, yes; otherwise --

20         THE COURT:  If he is not able to pay.

21         MR. CALVO:  Then it's adequate counsel,

22  through the process, and it could be the Public

23  Defender.

24         In this case, we don't contest that the

25  Attorney General is the chief legal officer for the

1   Government of Guam. He's designated as such under the

2   Organic Act, and we recognize that. And I think if you

3   look at the history of this particular case, you'll see

4   how the Governor has tried to adhere to how things

5   really should work, but really didn't.

6          In this case, this action was filed by

7   Mr. Phillips back in February. The Attorney General

8   came in and represented all respondents in the case.

9   Not much happened in the case, including consultation

10  with the Governor and the other respondents in the

11  case. I think the testimony and the evidence supports

12  that. Nevertheless, the Attorney General was the

13  attorney, as the chief legal officer for the Governor

14  and the other respondents.

15         A settlement was entered into. The settlement

16  was entered into while the Governor was off island. He

17  was not consulted on the settlement agreement, didn't

18  have a chance to review it; nevertheless, as he's off

19  island, the acting Governor is the Lieutenant Governor

20  of Guam and the Attorney General as the chief legal

21  officer for the Government of Guam were working

22  together to enter into this settlement agreement.

23         He got back after the settlement agreement was

24  signed over the weekend of September, I think it was --

25  no, I'm sorry, June -- it was June 13th is when it was

1   signed.  He arrived on the 15th.  He got back and

2   accepted that.  The settlement agreement was signed.

3   However, he was never consulted on the settlement

4   agreement, but nevertheless as the Governor, the chief

5   executive officer for the Government of Guam, tried his

6   best to deal with the agreement that was entered into

7   while he was off island.

8          Through this process, the Governor was

9   concerned about a number of things, including how was

10  funding going to be provided to fund this settlement

11  agreement.  He had communications with the Legislature

12  about that, and there were communications from the

13  Legislature asking where is the money coming from, how

14  is this going to happen.  Over the course of the

15  litigation, there was intervention attempted by several

16  other parties objecting to the settlement agreement.

17  That was dealt with, that raised the concerns of the

18  Governor.  Some of the issues that came out through

19  those procedures and through the public media really

20  raised the Governor's concerns.

21         The Governor went to the Attorney General, his

22  lawyers, and asked him, there's some questions about

23  the legality of the contract, there's some questions

24  about appropriations, there are all these issues that

25  we have to deal with.  He went to the chief legal

1  officer asking for advice.

2           His legal counsel, in house legal counsel,

3  Ms. Taitano wrote a letter, that letter is in evidence,

4  Your Honor, she sent it in September.  She sent it to

5  Mr. Cohen who is here, asking Mr. Cohen, hey, we have

6  these questions about the -- about the contract, about

7  the settlement, how it's going to be applied, whether

8  it's legal or not.  She sent another letter when she

9  didn't get any response in October; there was no

10 response.

11          Then came a letter from Mr. Troutman, from the

12 Attorney General's Office, it's the October 13th

13 letter, and if I may, Your Honor, I'd like to read a

14 couple of provisions in that letter, which could

15 really, really point out why the Governor and the other

16 respondents were concerned about the situation, in

17 addition to the other letters and communications or

18 lack of communication that existed, as alluded to in

19 the testimony this morning.

20          That letter dated October 13th of last year,

21 Your Honor, was from Charles Troutman, and it reads --

22 he wrote it to the Attorney General.  This is the

23 attorney for the Governor who is trying to have the

24 respondents enforce a settlement agreement that the

25 Governor wasn't aware of, wasn't -- didn't participate

1    in, but nevertheless is trying to deal with.  And this
2    letter comes in response, or is in response, or in
3    reaction to the letters sent by Ms. Taitano asking her
4    attorneys, or the Governor's attorneys what was going
5    on.

6         In that letter, it points out that there are
7    four basic parts of the EIC settlement agreement.  The
8    first one regards the 60 million dollar settlement
9    amount; the second regards the attorney's fees to be
10   paid to Mr. Phillips; the third is the commitment to
11   apply and to pay EITC in the future; the fourth is
12   administrative costs.

13        These are all part of the settlement
14   agreement.  It isn't an intention, it isn't an
15   expression of what might happen, it isn't a condition;
16   these are all part of the settlement agreement that was
17   signed by Lieutenant Governor Moylan as he was Acting
18   Governor during the Governor's absence, was signed by
19   the Attorney General, not only as to form, but also as
20   to legality.

21        In the contract itself, the Attorney General's
22   representative signed the contract and opined through
23   his signature that it was a legal contract.

24        Now, after, after looking at this letter, it
25   became clear to the Governor that there were some

1   serious issues here.  And, you know, this morning, Your

2   Honor, we learned that Mr. Cohen was also on the other

3   side of the issue when he was working for the Gutierrez

4   Administration; apparently his opinion was that the

5   EITC did not apply to Guam.  So the Governor, trying to

6   carry out his duties and functions as the executive

7   officer for the Government of Guam, I think could be

8   very concerned as to whether or not he was being

9   adequately represented and whether or not he had the

10  right legal advisors to help him carry out his duties.

11          And if I may, Your Honor, the second to the

12  last paragraph on the last page of Mr. Troutman's

13  letter provides, after discussing his opinion, which

14  quite frankly, Your Honor, we don't agree with after

15  discussing items one and two of the, of the settlement

16  agreement, provides:

17          "However, the expenditure of unappropriated

18  funds for other parts of the settlement that do not

19  come within the scope of the Organic Act provision

20  regarding payment of judgments for unpaid income tax

21  refunds, items 3 and 4 above, would expose the Governor

22  and our clients to the possible liability under 5 GCA

23  Section 22401."

24          What client, what person would not be

25  concerned.  On one hand, the Attorney General, the

1    chief legal officer is saying, why haven't you done

2    this, why haven't you funded the settlement agreement;

3    why haven't you taken the steps regardless of the fact

4    that there's no money to do that.  He's asking the

5    attorney -- he's asking Mr. Ilagan and saying that

6    if you don't, you're exposed to possible contempt

7    proceedings and criminal sanctions on one hand.  On

8    the other hand, there's this opinion which says it's

9    illegal to comply with the settlement agreement.

10            So, I think that there can be no question

11   that there's cause for the Governor and the other

12   respondents to think that, look, you've been forced

13   to enter into an unlawful agreement; now you're being

14   instructed to implement that agreement, then you're

15   being warned by the same office that if you do, you're

16   being exposed to criminal liability.  These are his

17   attorneys.

18            The Governor at that time says, well, you

19   know, maybe I might want to get independent advice and

20   some counsel who is not, you know, all over the place

21   with respect to these issues, and will give me advice

22   I can rely upon, advice that I can trust.  And with

23   that, he went out and sought legal advice, as did the

24   other respondents through the procurement process.

25            Now, there's much to do, and I know the Court

1  doesn't necessarily want to hear about the procurement
2  issues and whether there's an emergency or not, but I
3  offer to the court that every day you're represented
4  by counsel in this conflicted state, giving this
5  conflicted advice, telling you you're exposed to
6  criminal liability is an emergency, every minute that
7  you're being prevented from getting counsel who is
8  going to give you the right advice.

9          You know, there may not be a typhoon, there
10 may not be an earthquake, but there's certainly an
11 emergency.  And it's not only an emergency to yourself,
12 it's an emergency to the office that you represent, to
13 the people that you're responsible to, and to the
14 taxpayers.

15         The Attorney General is very big about saying
16 his duty is to the people of Guam, they elected him,
17 it's his duty, he's the chief legal officer; therefore
18 I could do this, and you have nothing to say about it.
19 Well, the Governor has a duty to the people of Guam,
20 Mr. Ilagan has a duty to the people of Guam, as does
21 Ms. Perez.  And that duty is being impeded by the
22 Attorney General's Office.  He is trying to hijack the
23 ability of those officials to do their job under the
24 guise of litigation, under the guise of legal policy.
25         The court asked a good question: Is 60 million

1   dollars a legal question, or is it an executive
2   function issue, is it an administrative function issue.
3   Well, I think the answer is very clear.  Lawyers, even
4   in private practice, Your Honor, are faced with that
5   decision every day:  Is it a business decision or is it
6   a legal decision.  We give legal advice, we implement
7   legal policies, we take action.  But the decision as to
8   whether or not it's 60 million, 55 million, 70 million,
9   whether or not the government has the ability to pay,
10  whether the government can agree to a one million
11  dollar administrative fee?  That is, Your Honor, I
12  submit, an executive function, an administrative
13  function, a function that's been usurped by the
14  Attorney General, a function that's been hijacked by
15  his office.  And worse yet, he's trying to prevent
16  those executives from getting independent counsel.
17      There has not been one case that has been
18  cited where a Governor or a respondent in a similar
19  situation cannot be represented by counsel.  I think we
20  saw this morning, Your Honor, a gross example of
21  violation of due process here.  Quite frankly, it was
22  really hard to take, Your Honor.
23      We have the Attorney General's Office
24  purporting to represent these people after threatening
25  them with criminal liability and telling them that they

1    would be held in contempt. We had them subpoenaed,

2    Mr. Cohen signed the subpoena papers, for people that

3    he's been consulting with, so they say, as clients.

4    They get them on the stand, Your Honor, and they cross-

5    examine them, they grill them. We have to object,

6    we're going up and down objecting: Relevancy, attorney-

7    client privilege. Nevertheless they continue, they try

8    to get into the substance of the settlement agreement,

9    they have these two people that are up here on the

10   stand intimidated by this process. And it is an

11   intimidating process.

12           Nevertheless their own attorneys, who

13   purported to represent them, are there, you know,

14   bordering, Your Honor, if I may, with no disrespect, on

15   harassment. That's all it was. It was an exercise of

16   harassment this morning. And I think it was a gross

17   miscarriage of justice for the Attorney General's

18   Office to do that. And then on the other hand say that

19   they represent them. That's just wrong, Your Honor.

20   And I hope the Court puts a stop to it.

21           These people need to be represented, the

22   Governor needs to be represented. You cannot allow the

23   Attorney General to hijack this process, you cannot

24   allow him to hijack the functions of the executive.

25           We're aware that the Attorney General has

1    dual roles.  We're not saying that the Attorney General

2    can't espouse his legal policy or what he thinks is

3    right or wrong, we're not saying he can't sue the

4    Governor.  You know, the Court in a different forum has

5    issued an opinion.  What we're saying is that he can't

6    prevent these people from being represented, he can't

7    prevent them from being heard.  That's a disservice to

8    the office of the Governor, to these respondents, and

9    to the people of Guam.

10          We have submitted our -- I'm sorry.

11          THE COURT:  Is the issue as simple as, well,

12   I don't like the representation given to me by the

13   Attorney General, I need independent representation;

14   is the issue as simple as that or not?

15          MR. CALVO:  I don't think it's as simple as

16   that, Your Honor.  I think that, in this case, I think

17   they've gone too far.  I think the Governor could have

18   said, well, wait a minute, why did this agreement which

19   was negotiated over a two or three-day period without

20   consulting my representatives in the way they should

21   have been consulted, or the people in the executive

22   branch, while I was off-island in transit, why did it

23   have to be signed on a Sunday.  Is that the way we

24   conduct business?

25          THE COURT:  I see.  But the Governor has not

1   undertaken any action to either set aside this
2   agreement, if he thinks it's illegal -- I mean, you're
3   talking June, July, August, September, October,
4   November, December, January, Feb --
5           MR. CALVO:  Exactly, Your Honor.
6           THE COURT:  The Governor has not indicated to
7   the court that he thinks it's illegal.
8           MR. CALVO:  That's the very point I'm trying
9   to make, Your Honor.  The Governor gets back -- and
10  there's deference given to the court's views, as his
11  honor was in the Superior Court, to the other actions,
12  to the really, the views of the Attorney General.  The
13  Governor got back and there was deference given, the
14  Governor has tried to work with --
15          THE COURT:  But in representing the public
16  interest, the Governor should come up and step forward
17  and say, hey, this agreement is not legal, change it.
18          MR. CALVO:  Exactly, and that's what we're
19  doing here.  The Governor is not a lawyer.  The
20  Governor sent inquiries to his lawyers at the time.  He
21  wanted to get something back from the Attorney General
22  that says, look, we allay all your concerns, this is
23  the issue, and go through it one by one, so the
24  Governor could have some confidence that he is doing
25  his job.  He has a duty to the public, and he is doing

1    his job.

2           What happened was, is that on the one hand,

3    the Attorney General is trying to implement a

4    settlement agreement, and on the other hand, there's

5    a legal opinion from the Attorney General's Office that

6    comes out in October 13th which says, that's an

7    unlawful contract. You know, essentially, there are

8    two basic points to the contract that are unlawful.

9    And so the Governor is saying, what am I going to do,

10   I've tried to work with the process, I've have tried to

11   work with the Attorney General, I've tried to work with

12   the Lieutenant Governor. It didn't work. I need to

13   have independent counsel.

14          And then if you think it's so easy, Your

15   Honor, here we are today being blocked by the Attorney

16   General's Office. And not only is it not -- is it a

17   question of emotion and objecting to our presentation,

18   they get subpoenaed, Art Ilagan, represented by the

19   Attorney General's Office, Ms. Perez and the Governor

20   get subpoenaed. And the objections, as you heard today

21   and sustained, were about relevancy and attorney-client

22   privilege. The subpoenas, Your Honor, were about

23   intimidation. They were about harassment. So it's not

24   as easy and as simple as I disagree with the Attorney

25   General.

1    When we were trying to look at this case, Your

2  Honor, and trying to figure out, you know, what is

3  really going on, we really looked at the time line in

4  this case and what has happened and whether or not the

5  Governor sat on his --

6    THE COURT: See, one of the concerns I have

7  is, you know, this issue, what prevents any employee in

8  the government from saying, well, I disagree with the

9  Attorney General's position in this matter, I need

10  independent representation, and to come to the court

11  and make the same arguments that you are to prevent the

12  Attorney General from taking over control of the case

13  as, let's say, his duty under the Organic Act, under

14  the laws of Guam.

15    Here, I mean, is there a line that needs to be

16  drawn where that stops or where it begins?

17    MR. CALVO: Yes, I think there is, Your Honor.

18  I think what happens is that the Attorney General

19  really on behalf of the Government of Guam enters into

20  the lawsuit. In this particular case, had we not had

21  this history, had the Attorney General been consulting

22  the respondents in the case, had the Attorney General

23  really decided I represent the Government of Guam, I'm

24  the chief legal officer, the Government of Guam is a

25  party in this action --

1    THE COURT:  If they change those facts and say

2    assume a situation where the parties are consulting but

3    there are differences and opinions in terms of the

4    representation, the defendant wants to see this case

5    move a certain direction, the Attorney General says no,

6    it's gotta go this way, does that scenario call for or

7    justify independent representation?

8    MR. CALVO:  I think it does, Your Honor, and I

9    think that's the way --

10    THE COURT:  Other scenario where there's that

11    divergence of opinions as to the manner or the course

12    which a litigation is to take?

13    MR. CALVO:  When there's a fundamental

14    divergence of opinion as to how the action should be

15    taken, or what action should be taken, and it really is

16    exercise of the authority and the discretion of those

17    public officers, the legal, the chief legal officer on

18    one hand, the Attorney General, and the Governor on the

19    other side, I think that it requires that there be

20    representation that litigates those issues or gets it

21    before the Court so the Court, as you've said in your

22    opinion in the Superior Court, Your Honor, determines

23    what is the public interest, what is right.  But, the

24    Governor cannot not act.  I mean, he has a duty that is

25    as high, or if not higher than the Attorney General's,

1    to the people of Guam, a duty that has --

2              I'm sorry, Your Honor.

3              THE COURT:  Well, see, it seems to me that the

4    AG's opinion here is that, well, you really don't care

5    if you retain independent counsel just as long as it's

6    not government funds that are paying for it, I think is

7    their position.  Because when it comes to government

8    funds and representation by the government, it's the

9    Attorney General that's supposed to provide that

10   representation.

11             MR. CALVO:  I'm not -- I don't think it's

12   about funding, Your Honor.  I mean, if it's about

13   funding, that's wrong.  We disagree.  The Governor is

14   acting in his capacity as the chief executive officer

15   of the island of Guam.

16             THE COURT:  All right.  But in terms of the

17   non-constitutional officers, what prevents the

18   Governor's Office from undertaking the positions that

19   these two directors advocate?

20             MR. CALVO:  Those directors fall under his

21   authority because they're in the executive branch, Your

22   Honor.

23             THE COURT:  So what prevents the Governor from

24   undertaking their representation, so that they're not

25   required to resort to an emergency certificate to get

1    emergency procurement services?

2         MR. CALVO:  I think it was a matter of the

3    need for independent counsel, Your Honor.  I mean,

4    arguably --

5         THE COURT:  That's what I'm saying.  If they

6    are part of the executive, and if the Governor is the

7    head of the executive, why can't we say that there

8    needs to be provided legally by the Governor's Office

9    as opposed to going out and retaining counsel

10   independently?

11        MR. CALVO:  Well, ultimately it is through the

12   Governor's Office, if they're part of the executive

13   branch', it's just that they needed independent counsel

14   to represent them in this matter.  And quite frankly,

15   the barn was on fire, there was an emergency.  There

16   were court filings being made, there were accusations

17   being launched, and there was action being taken, and

18   these officials as well as the Governor had to take

19   action.

20        THE COURT:  I guess my question really is

21   this.  What prevents you from providing that

22   representation as opposed to another attorney?

23        MR. CALVO:  My feeling is that we could, Your

24   Honor.  But I don't think that having another attorney

25   working on the matter actually representing Mr. Ilagan

and Ms. Perez is inconsistent.  This is an undertaking that I think has to have the resources to get accomplished and to represent the parties the right way.  But I think that, you know, theoretically, Your Honor, and legally, we could provide representation to parties within the executive branch under these circumstances.  I just don't think it's necessary.

THE COURT:  It just seems to me that the authority to authorize independent counsel seems to be more reasonable and more logical as it applies to the Governor, the head, than as opposed to officers that are not constitutional, and on the same level as the Attorney General.

MR. CALVO:  Well, as you know, in government, Your Honor, there wasn't a typhoon, there wasn't an earthquake, but oftentimes within the executive branch there is the need for counsel, and sometimes it can't be handled by one office.  I don't think there's anything inconsistent with our position that they have other counsel.  But I don't think there's anything that would prevent us from representing those other respondents in this matter, Your Honor.

THE COURT:  Could there be a potential conflict, being that they're both subordinates of the Governor?

1       MR. CALVO:  I don't believe so, Your Honor.

2       THE COURT:  Okay.

3       (Pause.)

4       THE COURT:  You know, another question that

5  perhaps interests me, Mr. Calvo --

6       MR. CALVO:  Yes, Your Honor.

7       THE COURT:  If you're asking to -- Well, it

8  seems to me you're asking that you be authorized to

9  formally enter the litigation and file papers on behalf

10 of the Governor.

11      MR. CALVO:  That's correct, Your Honor.  We're

12 asking you --

13      THE COURT:  Are you asking for exclusive

14 representation in that regard, or can there be

15 co-existence with the Attorney General?

16      MR. CALVO:  Quite frankly, Your Honor, had

17 there not been this history in this case in the

18 Attorney General representing the Governor, and I was

19 really thinking about this over lunch time, Your Honor,

20 I think that -- I think that we have to represent the

21 Governor.  The Governor cannot be represented by two

22 parties, especially if they're adverse.  I think we saw

23 the exhibition today, and quite frankly, I'm sure that,

24 you know, that's not the way to proceed or how the

25 Court would want us to proceed with the litigation.

1          THE COURT:   (Inaudible.)

2          MR. CALVO:   The Governor -- I'm sorry, Your

3    Honor.

4          We're not saying that we represent the

5    Government of Guam, you know, that's --

6          THE COURT:   I'm just saying that in terms of

7    other parts of this case where there's no dispute

8    between the Attorney General and the Governor, why

9    would it be necessary that you undertake legal matters

10   in that regard as opposed to the Attorney General?

11         MR. CALVO:   I don't think that the case can be

12   divided that way.  We're dealing with a pretty

13   intertwined legal matter now when we're talking about a

14   settlement agreement and the implementation, and the

15   very lawfulness of the agreement that the Attorney

16   General has opined on one hand is legal; on the other

17   hand, has informed the Governor and the other

18   respondents is unlawful.  So I don't think that in a

19   case --

20         I mean there might be conceivably a case in

21   the future that has clear lines and clear divisions

22   where you can have independent counsel for the Governor

23   and the Attorney General involved in the case on

24   discrete separate issues so that you can assure

25   yourself that there aren't any conflicts and there

1    are no inconsistent positions and that we're working

2    together.  That's not this case.  We're way past that,

3    Your Honor.

4         THE COURT:  So on this case, are you then

5    asking the Court that the Attorney General not have any

6    part in the litigation of this case?

7         MR. CALVO:  Quite frankly, Your Honor, what we

8    were thinking, especially after this morning, is that

9    we would bring a -- if the Court finds that we should

10   enter the case, which we think the Court, you know,

11   should, and we're counsel for the Governor, we were

12   contemplating bringing a disqualification motion based

13   upon Rule 1.9, because former counsel, as former

14   counsel for the Governor, the Attorney General is

15   disqualified from proceeding adverse to the Governor in

16   the same matter, or in a substantially related matter.

17   In this case, it's the same matter.

18        THE COURT:  Let me see if I understand.  What

19   did you say again, that you're thinking of filing a

20   disqualifying --

21        MR. CALVO:  Your Honor, if we're allowed to be

22   entered in this case as counsel for the Governor, that

23   means that the Attorney General is former counsel for

24   the Governor.

25        THE COURT:  Well, that's assuming that the

case -- the court says that you are the Governor's representative.

MR. CALVO: That's right.

THE COURT: Exclusively.

MR. CALVO: Yeah, assuming that that's the case. In other words, if our notice in the order is signed allowing us to substitute in, I think, into the case, then the Attorney General is former counsel for the Governor, still counsel for the Government of Guam, but former counsel to the Governor in this care.

THE COURT: So are you saying that in terms of the litigation, the Attorney General has no voice at all in terms of directions in terms of which this case is moving?

MR. CALVO: I think that the Attorney General, Your Honor, is in violation of the Ethical Code. And I know there's some issue as to whether or not the ethical code is something that the Attorney General has to care about, but I think fundamental due process requires that we at least, you know, look at whether or not there's a violation of the Ethical Code under Rule 1.9 of the Ethical Code, regarding former clients.

THE COURT: But in the interest of -- in the public interest, these ethical considerations have been waived. So that in determining the -- in determining

1   the interests of the government, what is in the best

2   interests of the government, the Attorney General can

3   do that irrespective of what the Governor -- Governor's

4   direction is.

5         See, I'm concerned that the Governor will say,

6   this is the case, assuming they let you in, this is the

7   case, this is the scenario, this is the direction that

8   this case is going to take, and then prevents the

9   Attorney General from coming in and saying no, from a

10  legal point of view, this is where it should go.

11        MR. CALVO:  I think that's different, Your

12  Honor.  I think at the outset of this case, if the

13  Attorney General and the Governor would have consulted

14  and they would have worked together to determine

15  whether or not they were on the same page -- or let's

16  say the settlement, which is really where there was

17  divergence ultimately, if they were on the same page,

18  then there wouldn't be any need for independent

19  counsel.

20        THE COURT:  But they're not on the same page.

21        MR. CALVO:  They're not on the same page.

22        THE COURT:  And for purposes of this court,

23  you know, I mean, see, it shouldn't have the Governor

24  as the exclusive voice of what is in the public

25  interest, just as it shouldn't have the Attorney

1    General as the exclusive voice.  Those voices have to

2    be heard.  So if I put you in, that means that the

3    Attorney General's voice is never heard in terms of the

4    direction of this case.

5              MR. CALVO:  Well, I think that, Your Honor --

6              THE COURT:  So you're asking that they not be

7    part of this case.

8              MR. CALVO:  No, I think what happened is, I

9    think there are two voices and the two voices should be

10   heard.  I think that unless the court is going to

11   exempt the Attorney General from the Ethical Rules,

12   under Rule 1.9 in a litigation matter or in a

13   substantially related matter, a former counsel cannot

14   represent an interest adverse to a former client.  In

15   this case, the former client would be the Governor of

16   Guam.  And the Attorney General is clearly adverse to

17   the Governor of Guam.  And the Governor of Guam falls

18   broadly within the rule.  The question is whether the

19   Court is going to exempt the Attorney General from that

20   rule.

21              I think logically, if you play it out, because

22   I think it's important that that second voice be heard,

23   the Government of Guam be heard, is that they be -- the

24   Attorney General gets special counsel to represent the

25   Government of Guam in the matter, since at this point

1    there seems to be divergence of where the Government of

2    Guam thinks we are with the settlement and what the

3    Governor thinks with respect to the settlement.

4            So the question is whether or not the Attorney

5    General is exempt from the Ethical Rules that bind

6    other attorneys.

7            THE COURT:  Well, there are some cases that

8    say they are exempt.

9            MR. CALVO:  I think that some cases say they

10   are, I think a good instructive case is the Duekmajian

11   case which the Court is familiar with.  In that case,

12   the Attorney General represented the parties and the

13   Governor in the matter, then withdrew, and then sued

14   those parties.  The Court in that case determined,

15   based upon the California statutes and I think the

16   Ethical Rule 1.9 or its counterpart in California,

17   that he could not do that, that was inappropriate.

18           This is different than the Camacho Moylan

19   case, or the Moylan Camacho case which Your Honor

20   decided as a Superior Court judge.  In that case there

21   wasn't a representation, then a withdrawal, then

22   entering into the matter.  They were adverse from the

23   outset.  1.9 governs the conduct of a former attorney

24   with respect to his client or her client on a

25   substantially related matter.  And in this case the

1  exact same matter.

2          If it pleases the Court, I know this is -- and

3  I didn't mean to spring this on Your Honor at the last

4  moment, and we have not made the motion because we

5  don't want to get ahead of ourselves, but if the court

6  were to find it appropriate and order that we enter the

7  case on behalf of the Governor, we'd be happy to brief

8  this issue, and, you know, consider filing the motion.

9          THE COURT:  All right.

10         MR. CALVO:  Nothing further, Your Honor.

11         THE COURT:  Mr. Mantanona?

12         MR. MANTANONA:  Yes, Your Honor.

13         Afternoon, Your Honor.  At the outset, we'd

14  like to adopt and join in the same arguments with Mr.

15  Calvo at this point on behalf of the state officers.

16         The Court makes a distinction at this point in

17  regards to the differences or potential differences

18  between the Governor of Guam and state officers.  But,

19  nonetheless, Your Honor, those state officers are

20  parties in a major lawsuit which involves the

21  settlement of 60 million dollars.

22         Further, the position in which --

23         THE COURT:  Well, my only question was whether

24  their interests being in the executive could be

25  undertaken by counsel for the Governor, being that

1   they're part of the executive branch.

2          MR. MANTANONA:  Your Honor, in certain

3   situations I believe that that would be so.  And until

4   this situation, or unless the parties get dismissed

5   out, they are named defendants, and as such they are

6   entitled to separate representation at this point.

7          Counsel, Your Honor --

8          THE COURT:  (Inaudible.)  Separate?

9          MR. MANTANONA:  Separate from the Governor at

10  this point, since they are named defendants.

11         THE COURT:  What makes -- I mean, why can't we

12  take the argument further and say that you can't

13  represent both -- (inaudible) -- one or the other?

14         MR. MANTANONA:  (Overlapping.)  Well, Your

15  Honor, at this point there is no conflict between the

16  two.  And, in fact, at this point there probably isn't

17  a conflict with the Governor's Office at this point.

18  But these are people that the court stated are state

19  officers, directors of departments, they are entrusted

20  with the day-to-day responsibilities of doing the

21  governmental actions to implement the plan proferred by

22  Mr. Phillips  and his client.

23         Your Honor, one point I would like to point

24  out is that even if I come in on behalf of Mr. Ilagan

25  and Ms. Perez and the Calvo firm comes in on behalf of

1   Governor, the Attorney General's Office still
2   represents the parties in this action, so they will not
3   be moot unless Mr. Calvo decides that it would be
4   appropriate to make a motion to disqualify them.  They
5   still will have a voice, theoretically, in this case.
6           Your Honor, as parties in such a case, the
7   defendants are entitled to due process.  Basically,
8   this settlement was done while one of the parties was
9   off island, the other party was basically forced into
10  signing this agreement, and at this point, as later
11  it's been reviewed, it shows that the settlement as
12  proposed is causing severe problems and conflicts.
13  First of all, Your Honor, on behalf -- it is the
14  Attorney General's opinion that there are illegal
15  appropriations in this matter, and there hasn't been
16  any advice on their behalf to their alleged clients
17  on what to do.  At the same time --
18          THE COURT:  Do the defendants have to ask?
19  Have they sought perhaps direction on what to do or
20  not?
21          MR. MANTANONA:  Your Honor --
22          THE COURT:  Is that necessary?  It seems like
23  the Attorney General is saying, well, you haven't gone
24  the additional step to ask for direction.
25          MR. MANTANONA:  I think the judicial step is

1   they haven't spent any money yet. But we're looking at

2   a situation, Your Honor, where one party is going to be

3   required to make a payment of 20 million dollars and

4   which would violate the -- (inaudible) -- but at the

5   same time, but at the same time, if she does not do

6   that act, and complies with the law, then she's in

7   violation of this court's order and could be held in

8   contempt.

9         THE COURT: But can't you certainly come to

10   court and say, well, they shouldn't be held in contempt

11   because these provisions of the settlement agreement

12   are not legal.

13         MR. MANTANONA: Well, Your Honor, I think that

14   it behooves the attorney who represents them to take

15   that position to protect their client. And we do not

16   believe the Attorney General's Office has taken the

17   necessary precautions to protect the interest -- no

18   offense to Mr. Cohen or Mr. Weinberg -- but my clients

19   are swinging in the wind. They're swinging, they don't

20   know which way to go. Why? Because now they're in a

21   situation that they need to get somebody who can give

22   them straight advice, somebody that can tell them,

23   well, this is the settlement agreement, we've already

24   agreed to this, you've already agreed to this, you guys

25   signed it, but no one is letting them speak to the

1    court, no one is addressing their concerns, no one is

2    telling the Courts about this shortage of money, the

3    inability to make these payments.

4         The interest penalties that will accrue if

5    this plan is being implemented, none of that has been

6    addressed.  Those voices, the voices of the parties

7    are being silent in this court, they are being gagged,

8    as co-counsel opined; they're being hijacked, they're

9    being set moot.  That is not the role of defendants,

10   and that is not in compliance with their rights as

11   parties.

12        THE COURT:  You know, there's a statute that

13   affects the Attorney General that says that they have

14   cognizance over all agencies, and I guess autonomous

15   agencies, and it goes further on and says that

16   autonomous agencies -- or agencies that are authorized

17   to hire counsel may do so.  Now, how would that affect

18   let's say the individual that you purportedly

19   represent?

20        MR. MANTANONA:  Well, Your Honor, at this

21   point, these -- as far as I can tell, these two

22   departments are not autonomous agencies, they're line

23   agencies.

24        THE COURT:  And is there anything in the

25   statute that authorizes them to have counsel other than

1    the Attorney General?

2            MR. MANTANONA:   I think at this point, no,

3    Your Honor.  But --

4            THE COURT:  And is there anything in their

5    budget that gives them appropriations to hire an

6    attorney?

7            MR. MANTANONA:  Your Honor, at this point

8    I would have to say that I'm not familiar with the

9    appropriations of either of the Department of Revenue

10   and Taxation or the Department of Administration, and

11   I apologize to the court for that ignorance.

12           But my point, Your Honor, is that in

13   situations and in courts there are decisions that are

14   contained in my brief that states that when there are

15   roles of conduct that apply and that --

16           THE COURT:  Let's assume that everything you

17   say is true, all right.  And let's assume that the

18   budgets, the budgets for these agencies specifically

19   provide none for, let's say, the retention of

20   independent counsel.

21           MR. MANTANONA:  Yes, Your Honor, and that is

22   why my clients have, have sought the assistance of the

23   office of the Governor to advise them to get counsel;

24   they have their own counsel, they work with the

25   Governor, see whether there is an opportunity for them

1    to get separate counsel in this matter.

2         THE COURT: And funding from a source other

3    than their department, is that what it is?

4         MR. MANTANONA: Yes, Your Honor, I believe

5    that actually the funds for my contract I believe are

6    being paid for by the office of the Governor.

7         THE COURT: Okay, I see. That's what I wanted

8    to see really, whether in their budgets the Department

9    of Revenue and Taxation, Department of Administration,

10   they have budgets that allow them to hire attorneys

11   from funds that are appropriated to those agencies.

12   And you're saying no, these are budget -- your funding

13   comes from the Governor's Office budget.

14        MR. MANTANONA: Your Honor, my point being

15   like in Chun versus Board of Trustees, the Hawaii

16   case, the Court stated that in situations -- that it

17   recognizes that the mechanical parts of the rules of

18   professional conduct do not apply to the Attorney

19   General, which is the position proferred by

20   Mr. Weinberg. But in that case, which is really clear

21   on this issue because it's really helpful, it states

22   that the rules of conflict do apply, and that when

23   there is an ability to get separate counsel, the

24   Attorney General should allow those parties, those

25   state officers to get separate counsel. That's all

1  we're asking, Your Honor.

2          THE COURT:  Let's assume the Attorney General

3  says no.  Are you going to ask the Court to order the

4  Attorney General to appoint independent counsel?

5          MR. MANTANONA:  No, Your Honor.  We believe

6  that since there is a conflict with the position of the

7  Attorney General, that the Attorney General is not the

8  proper party to, to select alternative counsel, because

9  the positions are totally adverse.  The positions of

10 the director --

11         THE COURT:  Are you saying also that the

12 Attorney General doesn't need to come to the same

13 conclusion that your clients have come to in order for

14 this process to move forward?

15         MR. MANTANONA:  Well, Your Honor, no.  In

16 fact, in my moving papers, substitutions were sent to

17 Mr. Weinberg, and to the Attorney General, letters

18 explaining, letters requesting for my client the

19 substitution.  In fact, the Court when I filed the

20 first objections, your court stated that we can't

21 address these until substitution of counsel is

22 submitted pursuant to Rule 19.1.  And in fact, those

23 issues were raised by Mr. Cohen in his motion to

24 strike.

25         So to avoid any problems, we did the formal

1    procedures of soliciting, notifying and asking for the
2    substitution.  The Attorney General sent his opinion
3    said, no, I'm not going to do, I'm not going to waive
4    that right, I'm not going to do so.  The Attorney
5    General is superman, he can take and he can do
6    everything.  That, Your Honor, is a wrong position.
7    Case law doesn't support that one hundred percent.  The
8    case and the law in Guam is still undefined.

9          But more importantly, Your Honor, more
10   importantly, to do so would basically state that nobody
11   in this government has another opportunity or an
12   ability to get separate counsel unless the Attorney
13   General agrees.  And that's wrong.  Because to do so
14   would basically throw away two hundred, three hundred
15   areas of law which basically states the defendants and
16   parties in interest have due process rights to be
17   represented, and that their counsel protect and address
18   their interests.

19         And if there is in this basic case, Your
20   Honor, this is the basic core of American law, if there
21   is a conflict in positions, then they are entitled to
22   get separate or different counsel, which will do their
23   attorneys due diligence and responsibility and protect
24   and represent those clients to the full of ability.

25         We do not believe that the Attorney General at

1   this position in support of the settlement agreement

2   can adequately address, or has not adequately addressed

3   those questions, those problems that are addressed by

4   our client. They're just told basically, you know, do

5   what we tell you to do, and if something happens to

6   you, that's -- that's your problem. We can't -- Your

7   Honor, that is not what the American juris system is

8   all about. The American juris system is about, you

9   know, everyone having an opportunity to be heard in

10  court, and that it is the Court to make the

11  determination.

12          And we are asking this court, pursuant to

13  Rule 19.1 to -- for a designation of counsel, because

14  the substitution was refused. So, we have put the case

15  before the Court, we've asked, we've shown the Court,

16  we've complied with the rule, we've shown there's a

17  basis, that there is a definite conflict between the

18  parties that are not being addressed, and there's a

19  desire from the clients, there is a lack, basically,

20  Your Honor, of faith, and confidence in the

21  representation of the Attorney General's Office in this

22  matter on behalf of Ms. Perez and Mr. Ilagan. That

23  alone, Your Honor, that alone calls for a substitution,

24  or allows them to have adequate representation in this

25  matter, which we believe is a very serious matter

1    before the territory.

2          THE COURT:  If the Attorney General changes

3    his position tomorrow and says we wholeheartedly agree

4    with the position of Ms. Perez, and your clients, then

5    where does that leave your position?

6          MR. MANTANONA:  Well, I think that he's going

7    -- you may have a very big problem with the settlement

8    agreement which he's entered into.  I don't think that

9    the Attorney General can actually change his position,

10   Your Honor.  It's already been done, the dye is cast;

11   his position is one, his position is two, and they are

12   not able to join.  And at this point we're just asking

13   for separate counsel.

14         Your Honor, in fact, besides the fact that

15   there's no confidence, there is no, no feeling of

16   security on behalf of the representation, it has gone

17   beyond that, it's confrontational.  Mr. Phillips, if I

18   may, made a very pointed statement to me, that "I can't

19   believe you put your client on the stand; how could you

20   do that?"  I didn't do it, Your Honor; the government

21   did.  They subpoenaed their own clients, and they put

22   them on the stand to put on evidence.  It's something

23   that I, when I tried to examine them, limited it to a

24   few questions, because I understand Mr. Phillips's

25   position, that is wrong.  I'm not doing my duty by

1    questioning my own client on the stand, to opening them

2    up, to exposing them to positions in which Mr. Phillips

3    can bonk me on the head with later.  But, the AG

4    believes that it's proper, and they did so, and put

5    them up there and went into questions of privilege,

6    went into questions of relevance.

7              Your Honor, I have never seen a case that

8    calls more for separate and new counsel to protect the

9    interests of the administrative officers, these state

10   officers, and it's not an unprecedented situation.

11   There's other cases in this government where an AG

12   didn't object to separate counsel for these parties.

13   In fact, the case they mentioned was the representation

14   of the eviction case.  So it's not unprecedented, and

15   it's not the AG won't agree, but it won't agree in this

16   case.

17             Your Honor, I think that this court in such an

18   important case, with so much at stake to the poor of

19   this island, to the taxpayers of this island, in fact

20   to the people of this island generally, on the fair

21   administration of the government, and more importantly

22   the viability, the sustained viability of this

23   government, it needs to make sure that all parties,

24   including my clients, are heard.

25             Thank you, Your Honor.

1      MR. PHILLIPS: Your Honor, may I be heard?

2      THE COURT: Mr. Phillips, you've sat

3  patiently, sir. The court will hear you.

4      MR. PHILLIPS: Thank you very much, Your

5  Honor. May it please the Court.

6      Your Honor, there's one thing I think I've

7  been told more by judges than anything else in my

8  career of doing public interest law, and that is,

9  "Mr. Phillips, if you don't like the law, change the

10 law." And I think that's what we have here, Your

11 Honor, we have a testimony, a lot of it for reasons why

12 we might want to change the elected Attorney General

13 law.

14      Without giving an opinion on it, I will say,

15 Your Honor, I think everyone here will agree that when

16 that law was passed, a lot of people had strong

17 concerns. I remember myself chairing a gubernatorial

18 campaign and having a number of gubernatorial

19 candidates saying: "This isn't the big contest, the big

20 contest is who's going to be elected AG, because that's

21 going to be the most powerful government official in

22 Guam." And I think that's what we have here with

23 regards to the AG at times deciding someone else can

24 represent the government or the AG. Well, that's the

25 AG, and if he's able to handle all of that himself

1    under law, then he's also able to delegate it.  So I

2    think that's a little bit circular, Your Honor.  The

3    fact that he's done it before means that he has the

4    authority to do it, I'm not denying that.

5         But, just to correct, or maybe not to correct,

6    Your Honor, but to add a few points to some of the

7    statements that were made and then I'll make my very

8    quick points and get off.  Your Honor knows in civil

9    cases and events like this, individual clients are not

10   entitled as a matter of due process to have counsel

11   provided for them.  The big, big difference.

12        Sometimes, and I think Mr. Mantanona will

13   agree with me on this, we're not even satisfied in

14   criminal proceedings that the state does enough for

15   criminal defendants, and that's where that applies.

16   Does that mean that people can't go out and hire an

17   attorney on their own.  That's a different question,

18   Your Honor, because that's a question that goes to the

19   individual representation, not the representation of

20   government.  Everybody has been sued in their official

21   capacity, so that's different.  But I again think that

22   that's a misstatement, that not everybody is allowed

23   counsel of their choice, whether they can find the

24   funding or not.  I question whether or not there's a

25   little bit of a conflict here that the Governor's

1    Office aside from paying for four or five attorneys

2    here, is now paying for at least one other attorney

3    that's representing separate parties.

4         Your Honor, another misstatement, and I think

5    after you read something in the PDN a number of times

6    you start to believe it as  -- The Governor never

7    testified that he was unaware of this agreement.  In

8    fact, I seriously doubt the Governor would take the

9    stand and swear under oath that he was unaware of

10   either the negotiations or the settlement agreement.

11   In fact, Your Honor, Mr. Calvo testified -- or didn't

12   testify, excuse me -- represented to the court the days

13   that the Governor returned and when things were done.

14   In actuality, Your Honor, this was entered into later

15   on during the week.

16        And again, it's a small technicality, but a

17   little bit of a misrepresentation;  number one, that

18   the Governor didn't know, and number two, that when he

19   returned it was all over.  It wasn't.

20        In fact, we didn't get before Your Honor for

21   a few days.  I doubt Your Honor has any specific

22   recollection of this case, but we had requested a

23   settlement conference on a Monday, the date that the

24   Governor was scheduled to return, but Your Honor said

25   come in later on in the week.  I believe we came in on

1    a Thursday, maybe four days later.  The Governor was

2    already on Guam.  The Governor was in the loop.  The

3    Governor, if he testifies, will go down a whole litany

4    of facts, Your Honor, that I think will support

5    everything I'm saying.

6         But more importantly, he did not testify,

7    there's no evidence before this court that he was

8    unaware of the settlement agreement, so I would ask

9    that the court not consider that.

10        With regard to the separation agreement, Your

11   Honor -- or excuse me -- the settlement agreement, the

12   concern that one of the parties has is that, well, they

13   don't have an appropriation for the moneys that's

14   supposed to be spent.  But they never mentioned, Your

15   Honor, that in the settlement agreement it specifically

16   refers to existing resources.  It doesn't call for

17   anything new, it doesn't call for anything extra.

18        In the administrative plan, Your Honor, that

19   we submitted, and it's really supposed to be the

20   purpose of the hearing, we were asked by the Department

21   of Revenue and Taxation, for whatever reason, because

22   we never had any problems, we were discussing things

23   openly with them all the time, could you please put

24   that in; we said no problem, we didn't ask them for any

25   justification.  We didn't even ask them why, we said

fine, you want it in, whatever you guys want in, we'll

put in.  And that's pretty much, Your Honor, what built

the administration plan, that's it, it's the plan of

administration; and it's a joint effort by all the

parties that wanted to participate, and everybody was

allowed to contribute.  I don't remember a dispute on

anything.  Comes a surprise that after we filed it,

there were a couple of suggestions or objections.  And

I think they're meaningless, Your Honor, whether, for

example, the Department of Administration handles it or

Rev and Tax as it's called for in the agreement, it's

really not substantial.

But with regard to that, Your Honor, there's

nothing unconstitutional there, there's nothing in

reality for the Governor to fear, there's nothing

involved, there's no basis in that.

With regard to additional payments that don't

go towards the payout of the 60 million, well, of

course everything goes towards the payout of the 60

million.  There's nothing else.  It all goes towards

that, that's the only thing that money can be spent on.

And so it's just not relevant, Your Honor.

But what's interesting, Your Honor, is if we

continue down this path and we say, okay; well, what if

the Governor is doing something that, you know, his

secretary his law clerk, or in this case his legal
counsel, or others feel is in violation of law, they
just stop and say, I want separate counsel.  You can't
do that, Your Honor, you can't do that.  The forum
here, the proper forum I think for this issue, is not
in this case.  Mr. Calvo had some trouble getting his
contract signed.  Don't come here and complain about
it.  I would suggest, Your Honor, you bring a writ.

If they're saying that under law their clients
are entitled to specific performance or to declaratory
judgment, or to a specific act, then there's no
question about it, then I would suggest, respectfully,
maybe file a writ of mandamus and have the Court say,
hey, you start signing those contracts, or from now on
when you're presented a contract from the Governor, you
have 48 hours to sign it.  Something, everything, some
effort.  Nothing, absolutely nothing.  They show up in
court and they say, we want to take over, and we want
to represent the government.  And that's the problem,
Your Honor.  And it's nothing personal against anybody,
not even personal against the Governor, it goes back to
the law.

If there's a problem, there's a problem with
the law, and if there's a remedy, then number one, you
change the law, if you think you're correct under the

law, then go to court and file appropriately.

And it is very similar to the subpoenas. It appears to me that counsel did the right thing. They said that they're baloney, they're all wrong, don't worry, we'll win, but you better show up in court just to make sure, in case we don't. So they advised their clients properly, and that is, follow the subpoena until such time as it's quashed. It was never quashed. And that's the difference here. Until such time as the law is changed or such time that in the proper proceedings there's some kind of overall determination as to who controls the litigation in the government, until that happens, Your Honor, I respectfully suggest that we follow the law. And right now the AG is in charge, that's the way it is.

I think, again all kidding aside, I think we can take judicial notice that if there's one law that people discuss about changing, it's the elected Attorney General law, and that's because in fact it's created somebody that's properly on par with what Congress created in the Governor when they passed the Organic Act in 1950. Super powers, I mean there's no question about it. But that doesn't mean they're not there. And until somebody finds it unconstitutional, and they're not asking for that, this would not be the

1  forum, then it stands and it's very difficult.

2        Secondly, Your Honor, I think the Court should

3  take note that the only reason for this, nothing

4  compelling, the only reason is what Mr. Mantanona said,

5  and that is, he said that, wait a minute, the AG's a

6  signator to that settlement agreement, they can't back

7  out now.  So is the Governor, so is the Director of

8  Administration, so is the Director of BBMR, the

9  Director of Revenue and Taxation, everybody is a

10 signator.  Nobody has done anything, nobody complained,

11 nothing, no events of anything.  Then all of a sudden

12 they all decide to change their mind.  As Mr. Manglona

13 (sic) said, well, somebody is swinging, or something,

14 and they're left out in the open.

15       Well, again, the only purpose is to get out of

16 the agreement.  There's been no testimony, no evidence

17 of anything else other than we want out of the

18 agreement because we have concluded outside of the

19 advice of the AG that it's illegal.

20       And so we've decided that even though the

21 Court signed off on it, even though there's going to be

22 a fairness hearing, even though with the backing of the

23 Attorney General, with the backing of plaintiff and

24 interim counsel, they all say it's okay so far, we feel

25 that we've concluded, and maybe to some extent with

advice of counsel, it doesn't appear that they had
counsel earlier on.  Your Honor, they were concluding
these things on their own, that it's illegal and that
justifies us coming here today and deciding to back
out.

But, Your Honor, that's the only reason
they're here.  This is not a writ proceeding or
anything that is intended to set the tone for exactly
where the AG sits in our government or anything like
that, like it should be.  That's really the forum where
it should be discussed.  They're here for one reason:
Somebody along the way decided a long, long way along
the way, that they wanted to back out of the agreement.
And really, Your Honor, it sounds to me like the one
and only reason they have seems to be money.  And you
know, I think we all can take judicial notice that that
ain't going to go very far.  They're saying, well, I
can't afford it.  You know, tell me about it.  All of
us can't afford anything.

And so, Your Honor, with that being the sole
purpose -- and really just one other small point, Your
Honor.

I represented the elected school board at the
time before the Attorney General had what I refer to as
super powers, and I was surprised, Your Honor, because

1    I thought because the elected school board had a

2    provision that provided for the board to hire its own

3    attorney, I thought that was my license into court, and

4    I learned very quickly from Judge Gatewood at that time

5    that it was not.  And in fact, she was very inclined to

6    allow the AG to go ahead and do what it's supposed to

7    do, represent the government, and she very clearly

8    distinguished between the board hiring counsel and

9    counsel representing a government entity in court.

10        But her exception, the one exception was in

11   that case the government entity was under attack and

12   under attack by the AG, and because its existence was

13   threatened, she found an exception, and I don't think

14   the AG fought it very, very hard, and allowed us to

15   represent the elected school board.  That's prior to

16   the super powers, Your Honor, that's prior to the AG

17   being promoted, and given all the powers that he has

18   today.  But even that, it was a very, very close call,

19   to my surprise, and I never forgot the lesson.

20        But in any event, Your Honor, unless there's

21   any questions, I'll submit on that.

22        THE COURT:  Are you saying that under no

23   circumstances can a government official be not

24   represented by the Attorney General?

25        MR. PHILLIPS:  No, Your Honor, I'm saying

1   under the current law when the Attorney General is in
2   control of litigation, then he, he decides that. That
3   doesn't mean that the individual cannot make
4   representations to the court, as we did that day at the
5   settlement conference, Your Honor. Everybody but the
6   media was there, and we all participated, everybody was
7   free to speak, and -- I'm sorry, go ahead.

8          THE COURT: Isn't it generally true when the
9   parties go with the attorneys, you don't allow the
10  parties to speak, we allow their attorneys to speak on
11  their behalf?

12         MR. PHILLIPS: Yes, Your Honor, and at the
13  same time, the attorney has an obligation to insure
14  that the court is aware of concerns and, or questions
15  if they rise to a certain level, that the clients have.
16  So for example, if my advice is to go a certain way,
17  and we're going a certain way, but I let Your Honor
18  know that there's some concerns here.

19         In the AG's case, Your Honor, I believe that's
20  what they did in their brief, and again, I didn't read
21  it for this purpose, and that was a while back, but I
22  believe they put the Court on notice that the Governor
23  wants to back out. And so I believe that the AG, based
24  on everything I've heard today, fairly summarized
25  exactly the sentiments of the front office.

1        You may also remember, Your Honor, in one of

2   the conferences we had, that I was very open, I said,

3   hey, I heard that you guys are backing out; and the

4   AG's office said no, it's a written agreement and we're

5   going to stand by it.  But at the same time, Your

6   Honor, when they filed their brief with the court, and

7   they were candid, they said the Governor has concerns,

8   et cetera, et cetera, et cetera.  I don't think there's

9   anything wrong with the parties expressing their

10  position, and if that's through the AG, that's fine.

11  I think the AG could find himself or herself in trouble

12  if somebody said, how about this, and they said, well,

13  we're not going to tell the Court, we don't care what

14  you say, we're going to keep it a secret.

15       The big difference between that, Your Honor,

16  and controlling litigation in the government, under the

17  current statute.  And at this point in time, good or

18  bad, I think he has the power to do that.

19       THE COURT:  So if the Governor wants to back

20  out and the Attorney General does not, what

21  representation is made to the court as to that party?

22       MR. PHILLIPS:  I think that's the

23  representation, Your Honor.

24       THE COURT:  That what?

25       MR. PHILLIPS:  That the Governor wants to back

1  out.  As the Attorney General made the representation.

2  That's exactly, although like I said, it's been a while

3  since I read their brief, that I remember reading that

4  paragraph or so where he talked about the fact, or

5  whoever wrote the brief, spoke about the fact that the

6  Governor wants to back out now, or at least it appears

7  that way.

8        THE COURT:  All right.  So again let me ask

9  the question.  If the Governor's position is that he's

10  going to back out --

11        MR. PHILLIPS:  Right.

12        THE COURT:  -- does the Attorney General take

13  that position in terms of the settlement or not?

14        MR. PHILLIPS:  That's his choice, Your Honor,

15  as the chief legal officer, under the current statute.

16        THE COURT:  So he can say no, we're not going

17  to back out?

18        MR. PHILLIPS:  Under the current law, I

19  believe that's what he can say.

20        THE COURT:  And under the current law, the

21  Governor's position then is not made known to the

22  court?

23        MR. PHILLIPS:  No, Your Honor.  I think that

24  at the very least the AG has to make the position known

25  to the court.  I don't think it's of any consequence, I

1 think it puts the Court on notice in case, for example,

2 that's an issue of fact that the Court may feel is

3 important that's been reported to the Attorney General,

4 I think he has an ethical obligation to report that to

5 the court. I think that's separate and apart from

6 controlling litigation.

7         THE COURT: All right. But let's assume that

8 the Governor says I want these five points to be made

9 known to the court as the reasons that I'm objecting,

10 let's say, to the settlement. And the AG says, well,

11 no, I'm just going to tell them that you object to the

12 settlement.

13         MR. PHILLIPS: Your Honor, I think there's a

14 medium there somewhere, and like all other situations

15 like this, especially when you're dealing with the

16 interpretation of statute and powers, I think there's

17 a reasonableness argument, and I think that at the very

18 least the AG would be required to explain to the court

19 enough that gives the Court an idea of why, as we've

20 all discussed today, it's all out in the opening --

21 excuse me -- all out in the open, what the objection

22 is about. But that still doesn't take away from the

23 Attorney General's current ability to control

24 litigation. And so when it comes to the final say

25 with regard to what the government's position is in

```
1    court, I believe, Your Honor, the current statute,

2    that's reserved to the Attorney General.

3         THE COURT:  So the government's position need

4    not necessarily be the Governor's position.

5         MR. PHILLIPS:  That's correct, Your Honor.  In

6    legislation, in Your Honor's court before when you were

7    at the Superior Court, and a number of other places,

8    including the Attorney General's Office.

9         Another good example, Your Honor, remember,

10   because I was representing the speaker at that time, we

11   were brought into chambers here and all consulted

12   regarding, you know, the landfill issues and the

13   Waterworks, and the AG made the decision and everybody

14   followed it.  And that's just the way it went; the

15   speaker never supported that.  They got nothing from

16   the Legislature.  They went off and did it on their

17   own.  And that's the way the ball bounces.  Your Honor

18   understood exactly what the AG's powers were.  Nobody

19   said, "Mr. Phillips, what do you think?"  I mean, they

20   did it in a roundtable discussion, and the judge

21   understood that there were concerns from the

22   Legislature, but, and the very end they didn't say

23   "Mr. Phillips, what's your decision?"  They said

24   Attorney General what's your decision, and that's the

25   way it went.  And that's the way it went for the
```

1  landfill, that's the way it went for Waterworks.  I

2  believe, Your Honor, if I'm not mistaken, that's even

3  the way it went back in the old days with the DOC civil

4  rights cases.  I mean, that's the just the way it is,

5  at certain point in time someone has to be the boss.

6          THE COURT:  We're now in the new days.

7          MR. PHILLIPS:  Now it's even worse.  The

8  Attorney General is even more powerful.

9          THE COURT:  Okay.  Thank you, Mr. Phillips.

10         MR. PHILLIPS:  Thank you, Your Honor.

11         THE COURT:  Mr. Weinberg.

12         MR. WEINBERG:  I'll try and be brief.

13         Thank you, Mr. Phillips; that was -- from his

14  perspective it was very helpful.

15         It is a question about power.  It is a

16  question of -- in fact one of the cases that we cite

17  ex parte comes from my home state, Alabama, which is

18  where 15 years ago I was involved in this same kind

19  of litigation.  This is growing pains for Guam is what

20  I call it.  And what you see is, as super powers,

21  Mr. Phillips said, but it is a shift in the paradigm,

22  in the power of paradigm, where the chunk of policy

23  called legal policy decisions and control of litigation

24  is removed from the Governor and put to a coordinate

25  constitutional or Organic Act officer, the Attorney

1    General.

2          Heretofore, it was the Governor controlled the

3    legal policy because he appointed, hired and fired the

4    Attorney General at will.  Now it is a constitutional

5    or Organic Act official.  And the power that the

6    Governor used to have is, in respect to the control of

7    litigation and legal decisions for Government of Guam,

8    belongs now to the Attorney General.

9          THE COURT:  Control lay in his ability to

10   appoint or remove the Attorney General.

11         MR. WEINBERG:  Part of it.

12         THE COURT:  Control legal policy because he

13   was able to appoint or remove the Attorney General.

14         MR. WEINBERG:  Yes.  Part of it.  But, before

15   you did not, but also what you had was, before the

16   Organic Act amendments, you had the provision for the

17   Attorney General as expressed by the Legislature.  And

18   the Legislature could write or rewrite or unwrite the

19   powers and duties of the Attorney General.  But now

20   what you have is, you have it defined in the Organic

21   Act as the chief legal officer for the Government of

22   Guam.  And before that, the Legislature could do that.

23   So part of the arguments we're making in another case

24   is in the example of autonomous agencies, when the --

25         THE COURT:  See, basically you're saying that

1    the Guam Legislature cannot adopt a statute that says

2    as chief legal officer of the Government of Guam, the

3    Attorney General, has these powers.

4         MR. WEINBERG:  I think -- well, our position

5    is that they can add to the powers and duties of the

6    Attorney General, but they cannot take away from his

7    common law powers and duties, which historically, in

8    the majority of jurisdictions, involves the control of

9    litigation --

10        THE COURT:  But the common law powers as

11   provided by statute says that unless it is not against

12   any other existing law.  See, his statutory common law

13   powers expressly is subject to another law.

14        MR. WEINBERG:  By statute.  But when Congress

15   amended the Organic Act and made him chief legal

16   officer, it took it above that, gave it super powers.

17   But so, our position is that the Legislature cannot

18   take away those historical common law authority to

19   control litigation.

20        THE COURT:  And is that a good policy to

21   adopt, that the Attorney General, irrespective of

22   whether or not what he espouses is really -- what's

23   the word for it -- in the interest, in the governmental

24   interest, is that good policy that he is the final

25   word?

1     MR. WEINBERG:  I think -- I think, yes.  I

2     think it's an outstanding policy, because rather than

3     -- we heard Mr. Ilagan say something I wanted to follow

4     up on it -- he said something about Mr., the Attorney

5     General's interests are concerned with the taxpayers or

6     the people, or something like that.  He's not concerned

7     about the department.

8          And what you have when individual agencies,

9     like Department of Administration or RevTax or whoever

10    says I need to control my own little fiefdom, I need

11    to protect my finances, I need a different lawyer who

12    won't -- who will do what I tell him to do, is you have

13    a multitude of legal policies running around.  You do

14    not have, is it one coherent legal policy for the

15    Government of Guam and its agencies and

16    instrumentalities.

17         And so, is it better to have one Attorney

18    General setting one coherent legal policy for all?

19    Yes.  What if the Attorney General becomes power mad

20    and runs amok?  Well, you know, that's what the elected

21    process is for, and right now we have the elected

22    Attorney General.  And if his policies, if his control

23    of legal decision are not in the best interests of the

24    people of Guam, who are his real clients, and the

25    Government of Guam.

1    THE COURT:  See, that's the troubling part

2  really, whether or not to settle for 50 or 60 million

3  is not a legal question.

4    MR. WEINBERG:  Well, I, I addressed that

5  briefly earlier, I think I disagree, I think it shares

6  legal and policy matters, policy decisions, because

7  you're talking about the potential for liability,

8  you're making liability judgments like an insurance

9  company would in terms of what's in the best interests

10  for the Government of Guam.

11    Now, I want to make sure that the Court

12  understands that, as Mr. Phillips has said, there's

13  been no testimony about a lot of the things that have

14  been represented here today about who said what to

15  whom, who the Lieutenant Governor consulted with.  The

16  Governor had people on staff, his staff were there and

17  present at all sorts of meetings.  We've had no

18  testimony about that, because we limited it by

19  agreement what today's hearings was going to be about.

20  But just because there were representations that the

21  Governor was out of the loop and didn't know what was

22  going on is not an agreed upon presentment of the facts

23  that we have here, and we had reserved that.  That's

24  why, in fact, we subpoenaed the Governor, that's why we

25  had to subpoena our own clients.

1          You know, from the testimony that we had
2     today, let me address that, this hostility that I've
3     been charged with against my own clients, you know, we
4     had to ask questions here about why did you leave the
5     fold.  We are your lawyers.  And the first we hear of
6     it is in November where they're saying that they have
7     retained outside services, Rawlen Mantanona, and that
8     they want us discharged.  And I tried to go into some
9     questions, and there were objections and I let it go,
10    about, well, did you try and consult with the Attorney
11    General if you had these questions, did you -- and we
12    stopped that testimony and we can bring that back for
13    another day.

14         But let's not repaint this with too many
15    emotions about what this testimony was about.  This
16    testimony and the evidence, the arguments have to do
17    with, with two line agencies under the direction of the
18    Governor.  I think that's very clear, the Governor's
19    lawyers prepared all the paperwork, did all -- they
20    delegated their responsibility to Shannon, their
21    procurement authority to Shannon Taitano, I think
22    that's all in evidence, and their legal positions shall
23    we say are consistent with the Governor's philosophy of
24    this case.  So, they made the decision in November.
25    They severed the attorney-client relationship.  And we

1    were inquiring for the Court's purposes why.

2         Now, we keep hearing these protestations about

3    due process, I have a due process right to a lawyer of

4    my choosing, but to be represented and my voice to be

5    heard.  Who is we is the question?  Who is the client?

6         Under the Organic Act, it is the Government of

7    Guam.  Who is the Government of Guam?  In litigation,

8    it's whoever is sued and is before the Court; it's the

9    Governor, the Director of RevTax, Director of

10   Administration.  They are the Government of Guam, and

11   we represent them.

12        Oh, one last thing.  A number of cases cited

13   by the Governor, cases from Hawaii, Iowa, North

14   Carolina, North Dakota, West Virginia, and they're

15   cited -- Mr. Mantanona referred to one as the Chun

16   case from Hawaii.  If the Court will look at those

17   cases closely, you'll see there that the authority of

18   the Attorney General is expressly limited by statute.

19   And you'll see what the courts hold, is they say things

20   like -- let's see -- and we didn't have a chance to

21   distinguish this for the Court because the Court had

22   said it didn't want further briefing at the time.

23        But if the court would just look at those

24   cases, the cases cited by the Governor, Hawaii, Iowa,

25   North Carolina, and North Dakota I think is the case

1   that's cited, you'll find that unlike us, unlike Guam

2   and the majority of jurisdictions that we cite where

3   there's a constitutional basis for the office of the

4   Attorney General being the chief legal officer, those

5   cases cited by the Governor and Mr. Mantanona, the

6   authority of the Attorney General is entirely

7   statutory, which is what we had prior to the Organic

8   Act amendments.

9           I wanted to point out that distinction to the

10  court.  And if there's nothing further, I rest.

11          THE COURT:  In the situation before the Court,

12  you don't believe that there's a conflict between your

13  representation and the desires of those whom you

14  represent?

15          MR. WEINBERG:  I don't perceive there to be a

16  conflict in an ethical sense, if the court is asking

17  that.

18          There is, clearly, the Governor's Office does

19  not want to abide by the agreement that it has signed.

20  It has tendered or is attempting to tender reasons and

21  argument as to the legality of it.  Those questions I

22  think can be answered or can be addressed in a fairness

23  hearing or later down the line.  Those questions will

24  be answered and heard, someone will bring them up, and

25  Mr. Phillips will have to defend whether they're legal

1    or whether they're not.

2          But essentially the Governor doesn't like the

3    Attorney General as his lawyer in this case.  And I

4    think we can all agree on that.  And the question is,

5    when the Governor --

6          THE COURT:  Even if he doesn't like the

7    Attorney General, the Attorney General doesn't like the

8    Governor --

9          MR. WEINBERG:  I think, it seems to be that

10   the feeling appears to be a little mutual.  But that

11   ought to be irrelevant to the question whether there

12   are professional responsibilities.

13         THE COURT:  Why does it become irrelevant

14   when, if a person dislikes the other, then it seems

15   that a rational decision for undertaking the

16   representation, undertaking what it is that they

17   propose to do becomes diminished because of the

18   dislike?

19         MR. WEINBERG:  The reason is, because it's

20   not about personalities, because the Governor and Lou

21   Perez and Art Ilagan are not sued in their individual

22   capacity.  Now what is going out to their pocketbook

23   personally?  They are sued in their representative

24   capacity.  The Governor and the directors of RevTax

25   and DOA will come and go, the Attorney General will

1    come and go.

2              THE COURT:  (Overlapping.)  Well, I suppose --

3              MR. WEINBERG:  I'm sorry.

4              THE COURT:  Well, you know, I suppose we could

5    look at the actions that are being undertaken here as

6    attempts by each party to, let's say, defeat any

7    desires to run for election.

8              MR. WEINBERG:  I should probably reserve

9    comment on that, as to what they're doing to their

10   respective reelection chances.

11             But the point is, it's not about

12   personalities, and they may dislike each other with a

13   passion.  And it may very well be that if we had

14   testimony and the Governor was here to testify and I

15   asked him some hostile questions about, well, did you

16   talk to the Lieutenant Governor right after you got

17   back from wherever you went, and did you reprimand him

18   for signing that thing without you, and why did you

19   send your own press secretary to hold the press

20   conference for everybody, and if I asked questions like

21   this of the Governor, that might be deemed hostile.

22             It's still just the Governor is having buyer's

23   remorse, he's having second thoughts, whatever the

24   reason, and those may be for Mr. Phillips and others to

25   explore.  What the Attorney General knows is that we

1    have what appears to be a valid, binding agreement

2    presented to this court and approved.  Some objections

3    may come up at a fairness hearing or other place, and

4    the court will have an opportunity to reconsider --

5            THE COURT:  Well, there has been conditional,

6    I think, approval.

7            MR. WEINBERG:  Yes, I understand there's

8    conditions.

9            THE COURT:  I mean, it's not an approval of

10   the agreement, it's conditional based on what occurs at

11   a later date.

12           MR. WEINBERG:  And it's not filed, and there

13   may be, you know, it's still up in the air, there are

14   still things that -- but the first time we hear the

15   Governor's objection, I mean this is just from the

16   testimony I think that we heard, was not right when the

17   Governor got back on island in June, and not in July,

18   and not in August, but in September he starts to have

19   some questions.

20           And why in September?  Because Mr. Phillips

21   was saying, hey, we have terms and conditions of the

22   settlement agreement, are you complying with it, and

23   he was asking questions and our office was forwarding

24   those questions on, which our clients apparently

25   determined was harassment of some type and they got

1    scared.  I don't know, but they didn't contact us.  I

2    think the testimony we got that much out.  They did not

3    consult us, they went to the Governor and the Governor

4    helped them get another lawyer, and a month later in

5    November, we're having this question of Calvo and

6    Clark's appearance and Mr. Mantanona's appearance in

7    November, and them attempting to discharge us.

8         And it's at that time there that we're saying,

9    okay, we have two more line agencies and the Governor

10   need to be educated on what the law of Guam is.  And

11   again, it's just growing pains.  And somebody, somebody

12   said here that this court needs to put a stop to it,

13   and it's like, yeah, and the best way to put a stop to

14   it is to tell the government defendants who their

15   lawyer is under the Organic Act, and under Guam law,

16   and that's the Attorney General.

17        THE COURT:  So basically, Mr. Weinberg, your

18   argument is that under Section 5121(b) that you can

19   never, you really can never find any firm representing

20   government personnel, until you approve those contracts

21   is what you're saying?

22        MR. WEINBERG:  (Inaudible.)

23        THE COURT:  They cannot legally represent

24   without your approval, contracts by government

25   employees for legal services?

1    MR. WEINBERG:  I think the law is pretty self-
2    explanatory, Your Honor.  I mean, that's how I read it,
3    that you do not have a valid contract to represent
4    anyone.  It's not -- I'm not even worried about the
5    question of whether illegal payments have been made to
6    Mr. Mantanona or not, or the law firm.  I don't know
7    whether payments have or have not been made, that's not
8    my concern, but --
9         THE COURT:  All right.  So let's assume that
10   the minute you see let's say Ms. Perez, you file a suit
11   against her, and she goes sees Mr. Mantanona, are you
12   saying that at that point in time that representation
13   that is formalized is illegal?
14        MR. WEINBERG:  If we were to sue Ms. Perez?
15        THE COURT:  Right.
16        MR. WEINBERG:  There are -- there are
17   different ways to handle that kind of issue.  And you
18   know, my recommendation to whoever the Attorney General
19   would be is that if she is sued in her official
20   capacity to do something officially, and there is a
21   legitimate dispute, and a real need to sue our client,
22   then our clients ought to be authorized to retain
23   independent counsel of their choice.  That would be my
24   recommendation.  I can't say what a future Attorney
25   General would do.

1    THE COURT: But your position is that no legal

2    representation can commence until that contract is

3    signed by the Attorney General?

4    MR. WEINBERG: Under the current state of the

5    law, yes.

6    THE COURT: All right. So how is this

7    defendant going to be represented at a crucial stage of

8    the proceedings?

9    MR. WEINBERG: Like Ms. Perez?

10   THE COURT: Like Ms. Perez. She has her

11   complaint, she has to appear for it in five days.

12   MR. WEINBERG: Are you talking -- I'm sorry,

13   Your Honor, are you talking --

14   THE COURT: I'm talking about a hypothetical

15   really. You're suing Ms. Perez, there's some writ, she

16   has to appear in court in five days, she goes to see

17   Mr. Mantanona; your position would be that that

18   representation that has taken place there, and let's

19   say whatever arrangements are illegal because you have

20   not signed a legal services contract?

21   MR. WEINBERG: Or -- yes. Or, you know, or in

22   the case of -- Mr. Phillips gave a great example of

23   appearing on behalf of the school board, but he still

24   needed the Attorney General's designation of him as a

25   Special Assistant Attorney General to represent -- is

1    that right?  -- to represent the board.

2        So if Ms. Perez went to Mr. Mantanona and had

3    to appear in court for something she did as Director of

4    Administration, there better be something in the court

5    file that says that Mr. Mantanona is a duly authorized

6    Special Assistant Attorney General to represent her, as

7    is true of the Calvo --

8        THE COURT:  When you're suing her directly?

9    I'm talking about a hypothetical where you're suing her

10   directly, the Attorney General, and she goes to Mr.

11   Mantanona and formalizes a legal relationship, your

12   viewpoint is that that legal relationship is invalid

13   because you haven't yet signed a contract?

14       MR. WEINBERG:  I think, to be hypertechnical,

15   I would have to say yes, that it would be invalid.

16       Now, as a practical matter, that's something

17   that can be worked out.  I mean, either somebody can be

18   authorized to retain independent of the Attorney

19   General's Office, authorized to --

20       THE COURT:  See, now you're talking exceptions

21   to the statute.

22       MR. WEINBERG:  We're talking hypothetical here

23   too.

24       THE COURT:  Right.  And I'm trying to figure

25   out how far those exceptions can go.

1  MR. WEINBERG: Well, as with everything in

2  the law, it's all going to be fact specific. If this

3  situation -- I mean I know what I would advise the

4  Attorney General to do in a situation like this, if it

5  was us suing somebody, I would say, hey, let them get

6  their own lawyer, and, you know, fund it out of their

7  own budget, and that this is, our case here --

8  THE COURT: See, but the attorney may be

9  insistent on his legal rights as chief legal officer,

10  I'm not going to sign any contract.

11  MR. WEINBERG: He may, or she may.

12  THE COURT: Let her undertake her legal

13  representation on her own, and not have it funded by

14  the government. She's being sued in her official

15  capacity.

16  MR. WEINBERG: Well, and another way to deal

17  with that is to have somebody within the office of

18  Attorney General assigned who is segregated off, you

19  know, a Chinese wall is surrounding that Assistant

20  Attorney General. There are -- it just depends on what

21  would happen.

22  In a worst case scenario, were the Attorney

23  General to sue somebody then deny them the opportunity

24  to have counsel, which is not what we have here, this

25  is not the case we have here, all right, in the Santos

1    case here.  But in that case --

2          THE COURT:  But we're trying to deal perhaps

3    with conflict situations, the immediate -- I mean,

4    foreseeable conflict versus one that you say is not

5    apparent here, not foreseeable.

6          MR. WEINBERG:  Yes, but the difficulty I'm

7    having in addressing the Court's concerns is conflicts

8    are fact specific, we need concrete examples of a

9    conflict and what to do in a situation, that kind of

10   situation.  The hypothetical the Court envisions in all

11   likelihood would never happen, because it would be a

12   foolish Attorney General who would sue someone and then

13   deny them counsel, or an opportunity to hire counsel.

14         Now, were that to happen, you might have

15   another matter in Superior Court somewhere on a writ,

16   that in this case there needs to be an exception carved

17   out, or an interpretation.  Part of the issue of the

18   Attorney General's responsibility to sign legal

19   contracts is the interpretation of that statute, which

20   is up on -- in the Supreme Court.

21         Thank you, Your Honor.

22         THE COURT:  Thank you.

23         MR. CALVO:  If I may, Your Honor, just a

24   couple of points?

25         THE COURT:  All right, Mr. Calvo.

1       MR. CALVO:  I'll be brief, Your Honor.

2       First of all, in both Mr. Phillips's argument

3    as well as Mr. Weinberg, there was discussion of

4    matters that I think will be brought up in the next

5    hearing regarding the administrative plan and some of

6    the other issues that I won't address now, but we

7    would, and we're prepared to address, but that we

8    understand for another day.

9       THE COURT:  That's correct, yes.

10      MR. CALVO:  With respect to the law, Your

11   Honor, the Attorney General has not cited one case

12   where the Governor could not be represented or could

13   not be heard.  In fact, the case that he cited from his

14   home state in Alabama, the Court ruled that the

15   Governor could intervene in a proceeding that was

16   brought by the Attorney General on behalf of the state

17   -- I believe it was the state commissioner.  But the

18   Governor in that case was allowed to intervene and to

19   be heard and to be represented.

20      With respect to --

21      THE COURT:  But in that case, is there like a

22   constitutional provision regarding the office of the

23   Attorney General?

24      MR. CALVO:  I'm not sure, Your Honor.

25      THE COURT:  Because he's making a distinction

1    that in the Hawaii case and all these other cases, the
2    Court went in that direction because the office of the
3    Attorney General was a statutorily created office,
4    whereas the office of the Attorney General here in Guam
5    is not, it's in a sense constitutional because it's in
6    the Organic Act.

7            MR. CALVO:  I could answer that for you if you
8    give me a little time, Your Honor, but I know that the
9    Governor in that case was allowed to intervene.  And
10   the reason I raise it is because he gave that as an
11   example, otherwise I wouldn't have mentioned that case.

12           The important point, Your Honor, is that
13   there's no case cited for the proposition that the
14   Governor could not be heard in the matter; whether or
15   not it was a statutory provision or a statutory -- a
16   constitutional provision, there was no case cited for
17   that proposition by the Attorney General.

18           Under Guam law, I think under the Organic Act
19   it's clear that the Governor has the supervisory
20   control of the executive branch.  And in that, in those
21   powers and in that authority, he has the right to hire
22   counsel in situations just like this, where there is a
23   conflict with the Attorney General's Office and there
24   isn't adequate representation.

25           Mr. Phillips raised a point, which I think is

1    a good point, about the duty of the Attorney General,

2    that if the Governor has a claim or has a disagreement,

3    it's the Attorney General's obligation to raise that

4    with the court, especially in a class action where the

5    Court has an affirmative duty to protect the class, to

6    get the issues out and deal with this, whether it's at

7    a fairness hearing on any stage in litigation.

8        In the Attorney General's brief the Attorney

9    General has a section called "Governor's concerns".  He

10   says the Governor has concerns, don't worry about them,

11   they're not relevant, he has nothing to say, I'm not

12   subject to the direction or the concerns or the whims

13   of a client.  That's how he informed the Court he was

14   proceeding.  So the Governor's concerns weren't voiced

15   or expressed to the Court by the Governor's attorney,

16   the Attorney General.

17       That's all I have, Your Honor.

18       THE COURT:  Does anybody else want to say any

19   final word?

20       MR. PHILLIPS:  Your Honor, briefly.

21       Your Honor, I think one way to distinguish the

22   ethical conflict here is that in this case you have the

23   Assistant Attorney General who have done everything in

24   their power to save their clients from me, and that's

25   very different from Mr. Weinberg or Mr. Cohen taking it

1    upon themselves to sue Lou Perez or Art Ilagan.  Then

2    they would be protecting them from them, and that's

3    very different, they would be moving for OSC.

4         Your Honor, I met with them, I did everything

5    I could for an hour to try and get something out of

6    them, they know I was pissed off, I couldn't get

7    anything out from them.  They covered their clients all

8    the way.  I knew I no longer had the free will or the

9    ability or the permission to contact the co-defendants

10   that has always been open in the past, I didn't have

11   that any more, so I couldn't ask them, hey, did you pay

12   the money.  I wrote letters to the AG, no response.

13        Your Honor knows that because in a chamber

14   conference I raised that with them, I said I've heard

15   nothing from you guys, they did every single thing they

16   could to cover for their clients.  And that's the

17   difference, Your Honor.  They may be on the phone with

18   their clients yelling at them saying, hey, you guys

19   gotta do something, Phillips is a nut, but at the same

20   time, Your Honor, that's very different from saying,

21   you guys better hurry up or I'm going to do something,

22   that's when they're pitted like that.  Right now

23   they're the buffer, you know, they may be on the front

24   lines or they may be the general depending on what the

25   issue is, Your Honor, but they're still on the same

1  side, they still are.

2        And that's the difference between them suing

3  one of the witnesses that you heard today, they'd be

4  moving for the OSC.  Today, Your Honor, they've done a

5  good job of, I won't say preventing me, but stalling

6  and doing everything in their power to prevent me from

7  filing an OSC.  And that's their job, and that's the

8  difference, Your Honor, it's not a direct conflict like

9  it would be if they sued their own clients in that

10 sense.

11        THE COURT:  I agree with you, Mr. Phillips,

12 when you said that Phillips is a pugua nut.

13        (Laughter.)

14        Mr. Mantanona?

15        MR. MANTANONA:  A few points, Your Honor.  I

16 find it, that this matter is before the Court and the

17 court can generally see what's going on here, basically

18 appears that the Attorney General and the plaintiffs

19 are consistent in their position; their position is

20 consistently against named defendants, and that is

21 wrong.

22        Further, Your Honor, it appears that there's

23 all this talk about the super powers of the Attorney

24 General's Office, but those super powers have to be

25 defined by court decisions, and by legislation.  It's

1    not an unlimited amount of power as assumed by the

2    government at this point, basing it upon decisions of

3    other courts.  Those other court jurisdictions are

4    nothing more than assisting or persuasive argument,

5    they are not controlling.  It is for this court to

6    determine how the law applies to this jurisdiction.

7                With all due respect, we submit on behalf of

8    Mr. Ilagan and Ms. Perez.  Thank you, Your Honor.

9                THE COURT:  All right.  We've heard excellent

10   arguments, really, from counsel in this matter.  Today,

11   I wish to commend counsel for their arguments; also

12   Mr. Phillips for just sitting there patiently listening

13   to the court, just listening to the arguments that have

14   been made to the court by all other counsel.

15               There's various arguments have been made

16   today, arguments I think that I need to give a second

17   look at, and just deliberate more before a final

18   decision comes out.  And I say that because you've

19   presented arguments to me that still has not convinced

20   me which way to go in this matter.  So I'm going to

21   have to review the arguments that you've made, look at

22   the authorities that have been cited, and make a

23   decision because the decision that ultimately is going

24   to be made here is a very important decision.  And it

25   being an important decision, I have always taken at

1    least a good night's rest in thinking of these issues

2    before deciding, and I have always thought that

3    deciding with a written decision is always best so that

4    we can fully explain the rationale that we have reached

5    in formally deciding the matter.

6           So I'm going to take this motion under

7    submission.  Right now the parties are eager that a

8    decision be made, I will try to be prompt in making

9    the decision, because there are other pending matters,

10   Mr. Phillips's motion, and there may be other motions

11   that perhaps will be made after the Court has decided

12   this matter.

13          So the motion will be taken under submission

14   and to be decided promptly by the Court.  And in so

15   doing that, again, I wish to thank you all, counsel,

16   for being here today, thank you for again enlightening

17   the court in terms of the issues that it must look at

18   in terms of arriving at an informed decision in this

19   matter.  And thank you all for the fine arguments that

20   you've made to the court today.  I'm proud to be here

21   listening to your arguments this morning and afternoon.

22          Thank you very much.  And I hope to get a

23   decision out as soon as possible.

24          Thank you.

25          ALL COUNSEL:  Thank you, Your Honor.

```
1          (Whereupon proceedings concluded at 4:26 p.m.)

2                              *  *  *

3

4

5

6                    CERTIFICATE OF REPORTER

7

8    CITY OF AGANA          )
                            )  ss.
9    TERRITORY OF GUAM      )

10

11        I, Wanda M. Miles, Official Court Reporter

12   of the District Court of Guam, do hereby certify the

13   foregoing pages 1-199, inclusive, to be a true and

14   correct transcript of the digital recording made of the

15   within-entitled proceedings, at the date and times

16   therein set forth.

17        Dated this 4th day of February, 2005.

18

19            Wanda M. Miles

20

21

22

23

24

25
```

Wanda M. Miles
Official Court Reporter
District Court of Guam