1   **SHANNON TAITANO, ESQ.**
    **OFFICE OF THE GOVERNOR OF GUAM**
2   Ricardo J. Bordallo Governor's Complex
3   Adelup, Guam 96910
    Telephone:    (671) 472-8931
4   Facsimile:    (671) 477-4826

5

6   **EDUARDO A. CALVO, ESQ.**
    **RODNEY J. JACOB, ESQ.**
7   **DANIEL M. BENJAMIN, ESQ.**
    **CALVO & CLARK, LLP**
8   Attorneys at Law
    655 South Marine Drive, Suite 202
9   Tamuning, Guam 96913
    Telephone:    (671) 646-9355
10  Facsimile:    (671) 646-9403

11  Attorneys for *Felix P. Camacho, Governor of Guam*
12

13

14              IN THE UNITED STATES DISTRICT COURT
                        DISTRICT OF GUAM
15

16  JULIE BABAUTA SANTOS, et. al.,          CIVIL CASE NO. 04-00006

17                  Petitioners,

18                                          **MEMORANDUM OF POINTS AND**
                                            **AUTHORITIES IN SUPPORT OF**
19          -v-                             **MOTION TO DISQUALIFY**
                                            **ATTORNEY GENERAL'S OFFICE**
20
                                            **[ORAL ARGUMENT REQUESTED]**
21  FELIX P. CAMACHO, etc., et. al.,

22                  Respondents.

23

24

25

26

27  D050210.382-00010[Mtn to Disqualify]v4    ORIGINAL
28

The Governor of Guam, Felix P. Camacho hereby files this memorandum of points and authorities in support of his motion to disqualify the Office of the Attorney General from representing Respondent Government of Guam in this matter. Such representation is prohibited by Guam Rules of Professional Conduct 1.7, 1.9, and 1.11.

## **INTRODUCTION**

The January 25, 2005 hearing revealed in dramatic fashion that the Attorney General's Office has become directly adverse to the Respondents on whose behalf it had been appearing as counsel of record. After subpoenaing their own clients, (including the Governor) to testify at that hearing, Assistant Attorneys General questioned their own clients in a manner designed to harass and intimidate. They even went so far as to request permission to treat one of their own clients as a hostile witness.

Switching sides against ones own clients in the course of litigation is expressly prohibited under the rules that govern attorney conduct in this jurisdiction. Guam Rules of Professional Conduct ("G.R.C.P."), Rules 1.7, 1.9, 1.11. Rule 1.7 prohibits an attorney from representing a party directly adverse to an existing client, as the Attorney General's Office did at the hearing on January 25, 2005. Rule 1.9 prohibits an attorney from representing a party directly adverse to former clients in the same matter, as the Attorney General's Office clearly intends to do as this case continues. Rule 1.11 expressly applies Rules 1.7 and 1.9 to lawyers serving as public officers or employees. That includes the Attorney General's Office.

The unfair and inappropriate conduct by the Attorney General's Office prompted counsel for the Governor to advise the Court during the January 25 hearing that if the Court were to permit the Governor to proceed with separate counsel, the Governor would likely bring a

2

D050210.382-00010[Mtn to Disqualify]v4

motion to disqualify the Attorney General from continuing to represent any party adverse to the Governor in this case.

On February 9, 2005, the Court denied the Attorney General's Motion to Strike and permitted the law firm of Calvo & Clark to substitute as counsel of record for the Governor, and permitted Attorney Rawlen Mantanona to substitute as counsel of record for Respondents Perez and Ilagan. The Court permitted the Attorney General to remain in the case as counsel of record for Respondent Government of Guam. Thereafter, counsel for the Governor respectfully requested that the Attorney General's Office withdraw as counsel of record for the Government of Guam so that the instant motion to disqualify would not be necessary. The Attorney General's Office has refused to withdraw, and the Governor must now proceed with this motion to disqualify.

## I. THE ATTORNEY GENERAL SWITCHED SIDES AGAINST HIS OWN CLIENT *IN THE SAME MATTER* – DISQUALIFICATION IS NOW MANDATORY UNDER RULES 1.7 AND 1.9.

### A. Rule 1.7 Requires Disqualification

The Guam Rules of Professional Conduct ("G.R.C.P.") are based on the ABA Model Rules of Professional Conduct. *See* Supreme Court of Guam Promulgation Order No. 04-002, Feb. 11, 2004. G.R.P.C. 1.7, entitled "Conflicts of Interest: Current Clients," provides, in relevant part:

> [A] lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if:
>
> (1)     the representation of one client will be directly adverse to another client; or
>
> (2)     there is significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer.

3

D050210.382-00010[Mtn to Disqualify]v4

Rule 1.7 protects the trust and loyalty that forms the foundation of the attorney-client relationship. *Attorney Gen. v. Michigan Pub. Serv. Comm'n*, 625 N.W.2d 16, 25 (Mich. App. 2000) ("'human nature being what it is, a dual relationship involving adverse or conflicting interests, constitutes enormous temptation to take advantage of one or both parties to such relationship" ... "*[t[he purpose of [the conflict of interest rules] is to condemn the creation and existence of the dual relationship instead merely of scrutinizing the results that may flow therefrom.*'") (quoting State Bar of Michigan Ethics Committee Formal Opinion 160) (emphasis in original). Rule 1.7 is so strict that an attorney may not represent a party adverse to an existing client even in a wholly unrelated matter. The basic idea behind Rule 1.7 is explained as follows in the official ABA Comments:

> Loyalty to a current client prohibits undertaking representation directly adverse to that client without that client's informed consent. Thus, absent consent, a lawyer may not act as an advocate in one matter against a person the lawyer represents in some other matter, even when the matters are wholly unrelated. The client as to whom the representation is directly adverse is likely to feel betrayed, and the resulting damage to the client-lawyer relationship is likely to impair the lawyer's ability to represent the client effectively.

Comment [6] to ABA Model Rule of Professional Conduct 1.7.

Where, as in this case, an attorney violates Rule 1.7 by switching sides against his client *in the same matter*, disqualification is mandatory and cannot be avoided even if the attorney stops representing of one of the two adverse clients. *Picker Int'l, Inc. v. Varian Assocs., Inc.*, 670 F. Supp. 1363, 1365 (N.D. Ohio 1987); *Int'l Longshoremen's Ass'n Local Union 1332 v. Int'l Longshoremen's Ass'n,* 909 F. Supp. 287, 293 (E.D. Pa. 1995); *City Studios, Inc. v. Reimerdes*, 98 F. Supp. 2d 449 (S.D.N.Y. 2000).

There can be no doubt that the Attorney General's Office has switched sides in this case. As the Court noted in its February 9, 2005 Order, the Attorney General filed pleadings on behalf of the Governor against the Governor's express instructions. (Feb. 9, 2005 Order at 3).

4

D050210.382-00010[Mtn to Disqualify]v4

1   The Attorney General subpoenaed his own clients. The Attorney General repeatedly asked his

2   own clients leading questions. (*E.g.*, RT 19:5-9, 25:17-20, 26:2-28:15, 36:20-37:2.)[1] The Court

3   expressly recognized the open hostility by the Attorney General when it overruled an objection on

4
    the ground that the questions were leading, stating: "The matters before the Court seem to be
5
6   hostile enough to allow leading questions to be asked." (RT 36:12-18.) And when the Governor

7   hired Calvo & Clark to represent him, the Attorney General quickly moved to strike Calvo &

8   Clark's appearance on behalf of the Governor. (Feb. 9, 2005 Order at 3). Thus, even though the

9   Court denied the Attorney General's Motion to Strike and substituted Calvo & Clark as counsel

10  for the Governor, the Attorney General has already violated Rule 1.7. The Attorney General can

11  no longer represent either side in this dispute. Disqualification is now mandatory.

12
             **B.      Rule 1.9 Requires Disqualification**
13

14           Because the Attorney General switched sides against his client *in the same matter*,

15  the analysis is essentially the same under both Rules 1.7 and 1.9. Rule 1.9(a) provides:

16      A lawyer who, has formerly represented a client in a matter shall not thereafter represent
        another person in the same or substantially related matter in which the person's interests
17      are materially adverse to the interests of the former client unless the former client gives
        informed consent, confirmed in writing.
18

19  G.R.P.C. 1.9(a).

20           Like Rule 1.7, Rule 1.9 is derived from the fundamental duty of loyalty owed by

21  all attorneys to their clients. The ABA Canons of Professional Ethics, the precursor to the ABA

22  Model Rules, require that lawyers represent their clients zealously, and maintain the confidences

23  of their clients with complete and undivided loyalty. The application of the rule regarding

24

25

26

27      [1] *See* Reporter's Transcript of the January 25, 2005 hearing filed February 7, 2005. The
        cited excerpts are attached hereto for the Court's convenience.

28

former-client conflicts, and the importance of applying it strictly, was articulated in *T.C. Theatre Corp. v. Warner Bros. Pictures*, 113 F. Supp. 265 (S.D.N.Y. 1953).

> [T]he former client need show no more than that the matters embraced within the pending suit wherein his former attorney appears on behalf of his adversary are substantially related to the matters or cause of action wherein the attorney previously represented him, the former client. The Court will assume that during the course of the former representation confidences were disclosed to the attorney bearing on the subject matter of the representation. It will not inquire into their nature and extent. Only in this manner can the lawyer's duty of absolute fidelity be enforced and the spirit of the rule relating to privileged communications be maintained.

*Id.* at 268-69.

The Supreme Court and the Ninth Circuit recognize the basic purpose to be served by the strict application of the former-client conflict rule, namely, the preservation of the integrity of the legal profession and the avoidance of even the appearance of professional impropriety.

> There are few of the business relations of life involving a higher trust and confidence than that of attorney and client, or, generally speaking, one more honorably and faithfully discharged; few more anxiously guarded by the law, or governed by sterner principles of morality and justice; and it is the duty of the court to administer them in a corresponding spirit, and to be watchful and industrious, to see that confidence thus reposed shall not be used to the detriment or prejudice of the right of the party bestowing it.

*Stockton v. Ford*, 52 U.S. 232, 247, 11 How. 232, 13 L.Ed. 676 (1850).

The former-client conflict rule is violated when a lawyer takes on representation of a new client against a former client in the same matter regardless of whether confidential information was ever actually received from the former client. *Trone v. Smith*, 627 F.2d 994, 998-99 (9th Cir. 1980) (emphasis added); *David Welch Co. v. Erksine & Tulley*, 203 Cal.App.3d 884, 891 (Cal. 1988) (emphasis added; *Damron v. Herzog*, 67 F.3d 211,215 (9th Cir. 1995); *Straub Clinic & Hosp. v. Kochi*, 917 P.2d 1284, 1288-89 (Haw. 1996).In *Trone v. Smith*, the Ninth Circuit explained the importance of a strict application of the former-client conflicts rule:

> The interest to be preserved by preventing attorneys from accepting representation adverse to a former client is the protection and enhancement of the professional relationship in all

6

D050210.382-00010[Mtn to Disqualify]v4

its dimensions. *It is necessary to preserve the value attached to the relationship both by the attorney and by the client.* These objectives require a rule that prevents attorneys from accepting representation adverse to a former client if the later case bears a substantial connection to the earlier one.

. . .

Both the lawyer and the client should expect that the lawyer will use every skill, expend every energy, and tap every legitimate resource in the exercise of independent professional judgment on behalf of the client and in undertaking representation on the client's behalf. That *professional commitment is not furthered, but, endangered, if the possibility exists that the lawyer will change sides later in a substantially related matter.* Both the fact and the appearance of total professional commitment are endangered by adverse representation in related cases. From this standpoint it matters not whether confidences were in fact imparted to the lawyer by the client. The substantial relationship between the two representations is itself sufficient to disqualify.

The rule we state is necessary to implement the following canons of professional ethics: Canon 1 (maintaining *integrity and confidence in the legal profession*); Canon 4 (preserving confidences and secrets of a client); Canon 5 (exercise *of independent professional judgment*); Canon 6 (representing a client competently); Canon 7 (*representing a client zealously* within bounds of the law); Canon 9 (avoiding even the *appearance of professional impropriety*).

*Trone v. Smith*, 627 F.2d at 998-99.

There is absolutely no ambiguity in Rule 1.9(a)'s prohibition against former-client conflicts. If a lawyer used to represent a client in a particular matter but no longer does so, that lawyer is disqualified from representing a different party in that same matter if the different party has interests "materially adverse" to the former client. In short, a lawyer may not switch sides in litigation.

The Attorney General's Office initially appeared on behalf of the Governor *in this case* and advised him that he should go along with the proposed settlement even though it is unlawful. Later, the Attorney General's Office *in this same case* ignored the Governor's instructions and became the Governor's adversary. There can be no clearer example of switching sides.

7

1   If the Attorney General is allowed to continue on behalf of the Government, the

2   situation will only get worse as the case moves toward a hearing on the settlement and the merits

3   of the Administration Plan. Now that the Governor finally has attorneys in this case who are

4   willing to advance his positions and policies, he should not have to continue to defend against the

5   attack that has been launched against him by his former attorneys.

6

7   The integrity of the legal profession must be maintained and the appearance of

8   professional impropriety must be avoided, especially in a case of such public importance and

9   attention as this one. The Attorney General's Office must be disqualified.

10  **II.     RULES 1.7 AND 1.9 APPLY TO *ALL* GOVERNMENT LAWYERS
11           INCLUDING THE ATTORNEY GENERAL**

12  The 2002 amendments to the ABA's Model Rules of Professional Conduct were

13  adopted and made a part of Guam's Rules on February 11, 2004 by Supreme Court Promulgation

14  Order No. 04-002. Among the new provisions inserted into the Guam Rules by Promulgation

15  Order No. 04-002 is a new Rule 1.11 entitled "Special Conflicts Of Interest For Former And

16  Current Government Officers And Employees." Amended Rule 1.11(d)(1) provides as follows:
17

18  Except as law may otherwise expressly permit, *__a lawyer currently serving as a public
        officer or employee: (1) is subject to Rules 1.7 and 1.9__*;

19  Unlike old Rule 1.11 which applied only to conflicts of interest arising from
20

21  successive government and private employment, the new Rule 1.11 imposes the prohibitions

22  against current and former client conflicts (Rules 1.7 and 1.9) upon government attorneys

23  generally, and not just after they have moved to or from the private sector. Comment [1] to ABA

24  Model Rule of Professional Conduct 1.11 ("Paragraphs (a)(1), (a)(2) and (d)(1) restate the

25  obligations of an individual lawyer who has served or is currently serving as an officer or

26  employee of the government toward a former government or private client.").

27

28  D050210.382-00010[Mtn to Disqualify]v4

8

Thus, while decisions from the Guam Superior Court have recognized that the Attorney General's dual role as attorney for the government and guardian of the public interest prevents the mechanical application of Guam's Rules of Professional Responsibility to his office (*See e.g. People v. Castro*, Superior Court of Guam Case No. CF 324-98; *Moylan v. Camacho*, Superior Court of Guam Case No. SP230-03)[2] it is clear from Promulgation Order No. 04-002 that certain core ethical rules such as Rules 1.7 and 1.9 apply to *all* attorneys, including attorneys within the Attorney General's Office.

There is no Guam statute that exempts the Attorney General's Office from compliance with the Guam Rules of Professional Conduct. If there were such a statute, it would be unconstitutional as being in derogation of the Organic Act, which now vests exclusively authority in the Guam Supreme Court to define and regulate the practice of law and conduct of attorneys practicing on Guam. 48 U.S.C. § 1424-1 (a). ("The Supreme Court of Guam shall be the highest court of the judicial branch of Guam (excluding the District Court) and shall … *govern attorney and judicial ethics and the practice of law in Guam, including admission to practice law and the conduct and discipline of persons admitted to practice law*.") (emphasis added). *See Attorney Gen. v. Michigan Pub. Serv. Comm'n*, 625 N.W.2d at 26-27. ("It is the judiciary which has the *exclusive* constitutional prerogative, Const. 1963, art. 3, § 2, to define and regulate the practice of law insofar as judicial proceedings are concerned.") (emphasis in original). The Supreme Court's Promulgation Order No. 04-002 makes it unmistakably clear that government attorneys are not immune from the prohibition against current and former client conflicts in Rules 1.7 and 1.9.

---

[2] The Governor reserves his rights to challenge this order in the appropriate forum.

9

D050210.382-00010[Mtn to Disqualify]v4

Long before the 2002 amendments to the ABA Model Rules, the California

Supreme Court applied the former client conflicts rule to California's Attorney General. *People*

*ex rel. Deukmejian v. Brown*, 29 Cal. 3d 150 (1981). In *Deukmejian*, the Attorney General of

California provided advice the Governor regarding proposed legislation. The Governor signed

the legislation into law and a few years later some public interest groups brought suit against the

Governor and certain state agencies challenging the legislation. The California AG represented

the state agencies and gave them advice regarding the pending suit, but later withdrew from their

representation and initiated a separate suit against those agencies and the Governor seeking the

same relief sought by the public interest groups. *Id.* at 154.

The California Supreme Court held that the Attorney General had violated

California's ethical prohibition against taking a position adverse to a former client in the same

matter. *Id.* at 155. It further held that the Attorney General may withdraw from representation of

state agencies if he believes them to be acting contrary to law, but after withdrawing from such

representation, he may not then take a position adverse to those same clients. *Id.* at 157. It

explained:

> *We have acknowledged 'the Attorney General's dual role* as
> representative of a state agency and guardian of the public interest.'
> The Legislature has impliedly recognized that a conflict might arise
> because of that duality by giving the Attorney General the right to
> withdraw from representation of his statutory clients and to permit
> them to engage private counsel. *We find nothing in that*
> *circumstance, however, to justify relaxation of the prevailing rules*
> *governing an attorney's right to assume a position adverse to his*
> *clients or former clients, particularly in litigation that arose during*
> *the period of the attorney-client relationship.* In short, the Attorney
> General cannot be compelled to represent state officers or agencies
> if he believes them to be acting contrary to law, and he may
> withdraw from his statutorily imposed duty to act as their counsel,
> but he may not take a position adverse to those same clients.

*Id.* at 157 (internal citations omitted).

10

Here too, the Attorney General might have avoided eventually switching sides in this litigation by simply determining in advance whether he would be willing to advocate the positions and policies of the various Respondents. Not only did he fail to do this, he actually appeared on behalf of all Respondents and took actions on their "behalf" without their consent. He then fought vigorously to prevent these Respondents from hiring attorneys who would act on their behalf. These actions are far more extreme than the conduct that led to the disqualification of the California Attorney General in the *Deukmejian* case.

The Attorney General's "dual role" cases such as *State ex rel. Condon v. Hodges*, 562 S.E.2d 623 (S.C. 2002) -- which he often cites for the proposition that he may sue his own clients without violating any ethics rules – do not enable him to avoid disqualification in *this* case. In *Condon v. Hodges*, the Supreme Court of South Carolina held that the Attorney General is permitted to bring suit against his own client (the Governor) without violating the Rules of Professional Responsibility. *Id.* at 632. The Guam Superior Court reached this same result in *Moylan v. Camacho. Moylan v. Camacho, supra* at 41. However, neither *Condon v. Hodges* nor *Moylan v. Camacho* involved an Attorney General attempting to switch sides against a former client in the same litigation.

The "dual role" cases stand for the proposition that the Attorney General may represent adverse state agencies in intragovernmental disputes. *See, e.g., Michigan Public Service*, 625 N.W.2d at 26-27; *Superintendent of Ins. v. Attorney General*, 558 A.2d 1197 (Me. 1989); *State ex rel Allain v. Mississippi Pub. Serv. Comm'n*, 418 So.2d 779 (Miss. 1982). Those cases do not support the conduct of the Attorney General's Office in this case, namely, asserting positions on its own behalf (*i.e.* not on behalf of any particular agency) that are directly adverse to agencies also represented by the Attorney General *in the same matter*. Neither of the Attorney

11

D050210.382-00010[Mtn to Disqualify]v4

General's dual roles of defending the Government and protecting the public interest provides any reason that an attorney general should not be subject to the fundamental ethical rules that prevent every attorney from turning on his or her own clients in the same case.

One of the Attorney General's dual role cases, *Attorney General v. Michigan Public Service*, provides a useful overview of the various "dual role" cases that permit Attorneys General to represent adverse state agencies in intragovernmental disputes. It recognizes that ethics rules cannot be mechanically applied to the Attorney General's Office, but it still concludes that Rule 1.7 must be applied to the Attorney General Office when it is acting as a party litigant against an agency it represents in the same matter. *Michigan Public Service*, 625 N.W.2d at 33. The conclusions it reaches from its survey of the "dual role" line of cases were quoted only partially in an Order prepared by the Attorney General's Office and submitted to the Superior Court of Guam for signature in *Attorney General of Guam v. Y'Asela Pereira, Treasurer, Government of Guam*, Special Proceedings Case 32-03:

> … the rules of professional conduct do apply to the office of attorney general; while mechanical application of these rules is not possible because of the unique nature of that office, thus allowing dual representation in certain circumstances not otherwise permitted in the arena of private practice, the rules do recognize a clear conflict of interest when the AG acts as a party litigant in opposition to an agency or department that she also represents in the same cause of action … a conflict is not necessarily automatic disqualification of the Attorney General as counsel for the state agency or, conversely, a bar to the ability of the Attorney General to pursue an action as a active party.

*Id.* at 2-3 (quoting *Michigan Public Service Commission*, 625 N.W.2d at 34-35). Remarkably, however, the Order prepared by the Attorney General's Office in *Attorney General v. Periera* omitted the last sentence of the paragraph quoted from *Michigan Public Service* in which the court concluded that the Attorney General in that case _would have to get her client's consent in order to avoid disqualification_. *Michigan Public Service Commission*, 625 N.W.2d at 35 ("Rather, consistent with MRPC 1.7, dual representation is permissible if 'the lawyer reasonably

12

D050210.382-00010[Mtn to Disqualify]v4

believes the representation will not adversely affect the relationship with the other client' _and_ _'each client consents [to dual representation] after consultation_.'") (emphasis added). This critical omission of language may explain why the Order prepared by the Attorney General's Office in _Periera_ cites _Michigan Public Service_ as its support for allowing the Attorney General to represent the Government of Guam in _Periera_, which is the exact opposite of the result reached in _Michigan Public Service_.

Far from allowing the Attorney General's dual role to immunize her from the requirements of Rule 1.7, _Michigan Public Service_ held that "a conflict of interest arises when the Attorney General intervenes as a party in opposition to a state agency that she represents as counsel." _Id._ at 34. The court gave the Attorney General twenty-one days to either substitute out of the case or obtain his clients' consent to the continued representation. _Id._ at 35. Here, as in _Michigan Public Service_, a conflict has arisen because the Attorney General is now directly adverse to his own client. He must now get his clients consent to stay in this case.

Cases from a number of jurisdictions have recognized that the Attorney General's dual role requires a modified application of the ethics rules, but no case bestows upon him complete immunity from the rules of ethics. Even cases that have relaxed the ethics rules to allow the Attorney General to represent adverse state agencies in intragovernmental disputes have not gone so far as to allow an AG to initially represent a client and then turn against that same client in the same dispute. _Chun v. Board of Trustees_, 952 P.2d 1215, (Hawaii 1998). In _Chun_, the Hawaii Supreme Court recognized that the Attorney General serves dual roles as an advocate of the state's interests and as the attorney for state agencies, but the court still held that the AG may not represent a state client in litigation and then ignore that client's instructions in the same

litigation by filing an appeal against the wishes of her client. *Id.* at 1240. The reasoning in *Chun*, is directly applicable here:

> We are aware that this court has recognized that, "due to the [Attorney General's] statutorily mandated role[s] in our legal system, we cannot mechanically apply the [Hawaii] Code of Professional Responsibility [HCRP] to the [Attorney General's] office. ... We have never held, however, that the Attorney General is relieved of all obligations to conform her conduct to the HRPC, which are applicable to all lawyers licensed to practice in the courts of this state.

*Id.* at 1236-37.

As a practical matter, it may at times be necessary for an AG's office to represent adverse state agencies in a dispute, particularly if the jurisdiction has an AG's office large and diverse enough so that a level of independence and separateness may be maintained between the attorneys assigned to represent each respective state agency. *See e.g., State ex el Allain v. Mississippi Public Service Comm.*, 418 So2d 779, 784 (Miss. 1982)("The attorney general has a large staff which can be assigned in such manner as to afford independent legal counsel and representation to the various agencies.") It is unclear whether the Guam Attorney General's Office is large and diverse enough to provide truly independent representation to adverse agencies in the same matter. But even if this would be done here on Guam, allowing attorneys within an AG's office to appear in a case on behalf of adverse state clients is a far cry from allowing an Attorney General to start out representing a particular client in a case, and then later turn against that client in the middle of the same case. Even the most relaxed application of the rules of ethics cannot possibly permit conduct so blatantly unfair to a client or so damaging to the integrity of the legal profession.

*Michigan Public Service* and *Deukmejian* are the two dual role cases most factually similar to this case. Both of these cases recognized that the Attorney General's dual role

D050210.382-00010[Mtn to Disqualify]v4

requires a modified application of the rules of ethics, but both still found the Attorney General's conduct warranted disqualification.

Here, as in *Deukmejian*, the Attorney General has turned against his own client (now former client) in the same case. *Deukmejian*, 29 Cal.3d at 156 ("While the record here does not reveal whether the Attorney General acquired any knowledge or information from his clients, the prohibition is in the disjunctive: he may not use information or 'do anything which will injuriously affect his former client.' *Unquestionably the Attorney General is now acting adversely to the position of his statutory clients, one of which consulted him regarding this specific matter*.") (emphasis added). The Attorney General's dual role does not allow him to escape the consequences of switching sides against his own client in the same matter.

The reasoning in these dual role cases applies with equal force here. While the Attorney General may not be subject to mechanical application of the rules of ethics, he is certainly not so far above the law as to be immune to the requirement of fundamental fairness to his clients. See *Moylan v. Camacho*, Superior Court of Guam Case No. SP230-03, at p. 42 ("...no one is above the law"). His actions have violated Rules 1.7 and 1.9 by even the most flexible of applications of those rules.

## CONCLUSION

For the reasons set forth herein, the Attorney General's continued representation of any Respondent in this case is a violation of Rules 1.7 and 1.9. The Governor's motion to disqualify should be granted.

Dated this 16th day of February, 2005.

OFFICE OF THE GOVERNOR OF GUAM
CALVO & CLARK, LLP

By: _____
RODNEY J. JACOB

15

D050210.382-00010[Mtn to Disqualify]v4

# ATTACHMENT



RECEIVED
FEB 07 2005
CALVO AND CLARK, LLP

**FILED**
DISTRICT COURT OF GUAM

IN THE DISTRICT COURT OF GUAM FEB - 7 2005

TERRITORY OF GUAM

MARY L.M. MORAN
CLERK OF COURT

\* \* \*

JULIE BABAUTA SANTOS,               )
individually, and on behalf         )
of all those similarly situated,    )
                                    )
            Plaintiffs,             )
                                    )
    vs.                             )    CIVIL CASE
                                    )    NO. 04-00006
FELIX A. CAMACHO,                   )
Governor of Guam, et al.,           )
                                    )
            Defendants.             )
_____)


TRANSCRIPT OF PROCEEDINGS

BEFORE

THE HONORABLE JOAQUIN V.E. MANIBUSAN, JUNIOR
Magistrate Judge

**HEARING ON MOTIONS**

**THURSDAY, JANUARY 25, 2005**
\* \* \*

**DIRECT EXAMINATION**

BY MR. WEINBERG:

    Q.   Mr. Ilagan, I'm Rob Weinberg for the Attorney General's Office.

        You were an original signatory to the settlement agreement, were you not?

    A.   Yes, sir.

    Q.   And this is in June of last year?

    A.   Yes, sir.

    Q.   Did you have an opportunity to talk to anybody at the Attorney General's Office about that agreement?

    A.   Prior to signing?

    Q.   Have you spoken to anyone prior to, to signing it, yes.

    MR. CALVO:  Objection, Your Honor.  My understanding on the proffer by the Attorney General's Office at this preliminary stage is that they were going to strictly delve into the procurement issue and not the other matters that are going to be before the Court later on, I imagine, this afternoon.

    THE COURT:  Mr. Weinberg, is that a preliminary question?

    MR. WEINBERG:  Well, Your Honor, I think it goes to the issue of why Mr. Ilagan has requested independent counsel.  At one point he was satisfied

1    MR. CALVO:  (Overlapping) Your Honor, I'm

2    sorry.  I object, Your Honor.  The Attorney General's

3    either the attorney for Mr. Ilagan or the former

4    attorney of Mr. Ilagan, and he's cross -- he's

5    examining him on possibly attorney-client privileged

6    information.  And this is just entirely inappropriate.

7    I think that the proffer by the Attorney General's

8    Office at the outset that he was going to be concerned

9    with procurement issues, really what he said was the

10   emergency, and what he's going through right now, Your

11   Honor, is really the process of the settlement and the

12   litigation and the implementation of the settlement

13   agreement, which is entirely inappropriate, Your Honor.

14       MR. WEINBERG:  Well, I'm trying to get to the

15   question of what's the emergency.  So let me ask you

16   that question, Mr. Ilagan.

17       Q.   You have filed -- you have signed a

18   declaration stating that there was an emergency; is

19   that not correct?

20       A.   Yes.

21       Q.   Let me ask you to look in the notebook that

22   should be sitting in front of you.

23            I'm going to try this thing here.

24       MR. MANTANONA:  Your Honor, at this point

25   I'm going to object to any further questioning of

1    Mr. Ilagan by the Attorney General's Office, unless

2    the Attorney General's Office is going to withdraw

3    from representation of Mr. Ilagan in this case.  He

4    is putting matters before the Court that --

5           THE COURT:  Overruled.  I think the issue

6    is properly before the Court because he's still the

7    attorney, and there's also an entry of appearance that

8    appears to contradict that representation.  I'm going

9    to overrule it for the present time and allow the

10   question to be asked.

11          MR. WEINBERG:  (Using the display machine.)

12   For the technically illiterate here --

13      Q.   Mr. Ilagan, can you read that, can you see

14   that?

15      A.   It's kind of blurry.

16          MR. WEINBERG:  Could I get some assistance?

17          MR. CALVO:  It's not legible from here.

18          THE COURT:  All right.  Counsel, why don't you

19   just direct the witness to the exhibit in the binder so

20   we can look at it.

21   BY MR. WEINBERG:

22      Q.   Mr. Ilagan, if you would, in the binder in

23   front of you at the tab marked HH there's a number of

24   pages of documents, one, two -- the seventh page of tab

25   HH, do you have it?

1     A.    Yes, sir.

2     Q.    Is that a document at the top of it says

3  Certificate of Emergency?

4     A.    Yes.

5     Q.    For procurement of legal services?

6     A.    Yes, sir.

7     Q.    All right.  And that is a document that you

8  signed; is that correct?  And it's dated -- what's the

9  date on that?

10    A.    (Inaudible.)

11    Q.    I'm sorry?

12    A.    November 15, 2004.

13    Q.    November 15, 2004.

14    So from June 14th, of 2004, until November

15  15th, was there -- was there not an emergency with

16  respect to the Attorney General's representation of

17  you?

18    A.    Can you repeat the question?

19    Q.    Yeah, that was poorly phrased.

20    November 15th, which is four months after you

21  signed the settlement agreement, you signed a document

22  declaring that you had an emergency on your hands; is

23  that correct?

24    A.    Yes.

25    Q.    All right.  So November 15th, that or

1    thereabouts is when you decided there was an emergency

2    in the provision of legal services to you?

3        A.    Yes.

4        Q.    Where in, if you know, is -- why did you sign

5    this Certificate of Emergency?  Is there a reason you

6    did that, a legal reason, or a reason under Guam

7    regulations that you did that?

8        A.    I signed it based on what I wrote on this

9    agreement, I needed representation.  I'd been asking

10   for representation for a tax attorney in the past.

11       Q.    And in fact you were being represented by

12   Mr. Steve Cohen of the Attorney General's Office?

13       A.    It's kind of weird that Steve would represent

14   me when he wrote the ruling not to pay the EIC in the

15   last administration, just a very big conflict there.

16       Q.    So, was that -- did you ask the Attorney

17   General for someone other than Mr. Cohen then?

18       A.    No, I didn't.

19       Q.    What else did you  --

20            MR. MANTANONA:  Your Honor, I'm going to

21   object to this line of questioning again because, Your

22   Honor, before the Court are the moving papers of the

23   people in this matter's motion of respondents and

24   Attorney General to strike the entry of appearance

25   of Attorney Rawlen Mantanona, page 8, the entry of

1    A.    This was an emergency procurement; does that
2    require the AG's signature?
3    Q.    I'm sorry, are you asking me a question?
4    A.    See, I don't know the law.  You're asking me
5    if I know the law, I'm trying to tell you what I know.
6         MR. MANTANONA:  Objection, Your Honor;
7    argumentative.
8         MR. WEINBERG:  (Overlapping/unintelligible).
9         THE COURT:  Sir, do you want the witness to
10   answer a yes or no or not?
11        MR. WEINBERG:  Your Honor, I apologize.
12        MR. MANTANONA:  Your Honor, I'm going to
13   object to any leading questions on behalf of
14   Mr. Weinberg to his alleged client Mr. Ilagan in this
15   matter.
16        THE COURT:  Well, I'm going to overrule that
17   objection.  The matters before the Court seem to be
18   hostile enough to allow leading questions to be asked.
19   BY MR. WEINBERG:
20   Q.    My question is whether you did or did not
21   attempt to get the Attorney General's signature.
22   Now I will represent to you that the law is -- requires
23   that.  But my question is, whether it requires that or
24   not, did you on the contract you signed with Mr.
25   Mantanona attempt to get the Attorney General's

1    signature?  Is his signature on that contract?

2        A.    No, it's not.

3        Q.    Why is the Attorney General's signature not on

4    that contract, to the extent you know?  I'm not asking

5    you to speculate about the Attorney General.

6        A.    (No audible response.)

7             THE COURT:  I think he's answered that

8    already, Mr. Weinberg.  He said that because he thought

9    it was an emergency they didn't need to go through that

10   procedure.

11   BY MR. WEINBERG:

12       Q.    Is that your understanding?  Your under-

13   standing is that the emergency procurement process

14   does not require going through the Attorney General

15   for the legal contract?

16       A.    Yes.

17       Q.    Who -- where did you learn, get that

18   understanding?

19       A.    Well, I think it's common knowledge; everybody

20   probably knows that, who works for the government.

21       Q.    Can you explain the emergency procurement

22   process to me?

23            MR. MANTANONA:  Objection, Your Honor; it

24   calls for a legal conclusion or legal opinion.

25            MR. WEINBERG:  Only to the extent that he

1          (Whereupon proceedings concluded at 4:26 p.m.)

2                              *   *   *

3

4

5

6                    CERTIFICATE OF REPORTER

7

8    CITY OF AGANA        )
                          ) ss.
9    TERRITORY OF GUAM    )

10

11           I, Wanda M. Miles, Official Court Reporter

12   of the District Court of Guam, do hereby certify the

13   foregoing pages 1-199, inclusive, to be a true and

14   correct transcript of the digital recording made of the

15   within-entitled proceedings, at the date and times

16   therein set forth.

17           Dated this 4th day of February, 2005.

18

19           _Wanda M. Miles_

20

21

22

23

24

25

Wanda M. Miles
Official Court Reporter