1  **SHANNON TAITANO, ESQ.**
   **OFFICE OF THE GOVERNOR OF GUAM**
2  Ricardo J. Bordallo Governor's Complex
   Adelup, Guam 96910
3  Telephone:    (671) 472-8931
4  Facsimile:    (671) 477-4826

5  **RODNEY J. JACOB, ESQ.**
   **DANIEL M. BENJAMIN, ESQ.**
6  **CALVO & CLARK, LLP**
7  Attorneys at Law
   655 South Marine Corps Drive, Suite 202
8  Tamuning, Guam 96913
   Telephone:    (671) 646-9355
9  Facsimile:    (671) 646-9403

10 Attorneys for *Felix P. Camacho, Governor of Guam*

11

12

13

14

**FILED**

DISTRICT COURT OF GUAM

OCT - 3 2005

MARY L.M. MORAN
CLERK OF COURT

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF GUAM

| JULIE BABAUTA SANTOS, et. al., | CIVIL CASE NO. 04-00006 |
|---|---|
| Petitioners, | **DECLARATION OF RODNEY J. JACOB IN SUPPORT OF OBJECTIONS TO MAGISTRATE ORDER OF SEPTEMBER 19, 2005 REGARDING THE GOVERNOR'S MOTION TO DISQUALIFY THE ATTORNEY GENERAL** |
| -v- | |
| FELIX P. CAMACHO, etc., et. al. | |
| Respondents. | |

**ORIGINAL**

I, RODNEY J. JACOB, declare that:

1.     I am a partner with the law firm of Calvo & Clark, LLP, counsel of record for Respondent Felix P. Camacho, Governor of Guam in this action. I make this declaration on personal knowledge, and if called to testify I could and would testify competently thereto.

2.     Attached as Exhibit "1" is a true and correct copy of the Stipulated Order Granting Preliminary Approval of Class Action Settlement, attaching Settlement Agreement dated June 14, 2004, filed on June 17, 2004.

3.     Attached as Exhibit "2" is a true and correct copy of the Memorandum to the Attorney General from Charles Troutman dated October 13, 2004.

4.     Attached as Exhibit "3" is a true and correct copy of a letter to Stephen A. Cohen from Shannon Taitano dated October 28, 2004.

5.     Attached as Exhibit "4" are true and correct copies of (1) letter dated September 9, 2004 to Governor Felix Camacho, Artemio R. Illagan and Lourdes M. Perez from Stephen Cohen; (2) memorandum dated September 15, 2004 to Artemio Ilagan and John Camacho from Stephen A. Cohen; and (3) memorandum dated October 27, 2004 to Shannon Taitano, Artemio R. Illagen and Lourdes M. Perez from Stephen A. Cohen.

6.     Attached as Exhibit "5" is a true and correct copy of the Memorandum of Points and Authorities in Response to Petitioner's Motion for Orders Approving Administration Plain, Etc. filed on November 8, 2004.

7.     Attached as Exhibit "6" are true and correct copies of the Subpoenas in a Civil Action filed on January 6, 2005 for Felix P. Camacho, Anthony Sanchez, Shawn Guamtaotao, Erica Perez, Shannon Taitano, Lourdes M. Perez, Joeday Budomo and Artemio Ilagan.

1    8.    Attached as Exhibit "7" is a true and correct copy of the Transcript of

2    Proceedings held on January 25, 2005 re: Hearing on Motions.

3    9.    Attached as Exhibit "8" is a true and correct copy of the Findings and

4    Recommendation by Magistrate Judge filed on March 16, 2005 in the Schulte vs. The Guam

5    Election Commission, et al.; Civil Action No. 04-00045 and 04-00046 ("*Proposal A Action*") and

6    Order of District Judge David O. Carter filed May 10, 2005 adopting the Findings and

7    Recommendation in full.

8

9    10.    Attached as Exhibit "9" is a true and correct copy of the Order filed on

10   May 10, 2005 in the *Proposal A Action*.

11   11.    Attached as Exhibit "10" is a true and correct copy of the Term Sheet in the

12   *Santos* action signed May 24, 25 & 26, 2005.

13

14   12.    Attached as Exhibit "11" is a true and correct copy of the Settlement

15   Agreement in the *Santos* action dated June 20, 2005.

16   13.    Attached as Exhibit "12" is a true and correct copy of the Defendant's

17   Non-Opposition to Plaintiffs' Motion for Class Certification filed in this action on July 11, 2005.

18   14.    Attached as Exhibit "13" is a true and correct copy of the Order re: Motion

19   to Intervene signed by District Judge Ricardo S. Martinez on September 12, 2005 in the *Simpao*

20   *vs. Government of Guam*, et al.; Civil Action No. 04-00049.

21

22   I declare under penalty of perjury pursuant to the laws of the United States and of

23   the Territory of Guam that the foregoing declaration is true and correct.

24   Executed this 3rd day of October, 2005, in Tamuning, Guam.

25

26

27   _____

     **RODNEY J. JACOB**

28

# EXHIBIT 1



The Law Offices of

# PHILLIPS & BORDALLO

A Professional Corporation
410 West O'Brien Drive, Suite 102 Hagåtña, Guam 96910-5044
Tel: (671) 477-ABCD (2223) • Fax: (671) 477-2FAX (2329)
" I Erensia, Lina'la', Espiritu-ta"



FILED
DISTRICT COURT OF GUAM

JUN 17 2004

MARY L. M. MORAN
CLERK OF COURT

14

Attorneys for Petitioner

## UNITED STATES DISTRICT COURT

## OF GUAM

JULIE BABAUTA SANTOS, individually, )
and on behalf of all those similarly situated, )
                         )
           Petitioner, )
                         )
          vs. )
                         )
FELIX A. CAMACHO, Governor of Guam, )
ART ILAGAN, Director of Department of )
Revenue and Taxation, LOURDES M. )
PEREZ, Director of Department of )
Administration; and GOVERNMENT OF )
GUAM, )
                         )
          Respondents. )
_____)

**DOCKET NO. CIV04-00006**

[~~~~~~~~~~~] STIPULATED
ORDER GRANTING
PRELIMINARY APPROVAL
OF CLASS ACTION
SETTLEMENT

    The Petitioner, individually and on behalf of all those similarly situated (hereinafter "EIC Class"), through her attorneys of record Phillips and Bordallo, P.C., by Michael F. Phillips, and the Governor of Guam, Director of Department of Revenue and Taxation, Director of Department of Administration, and the GOVERNMENT OF GUAM, (hereinafter collectively referred to as "Government of Guam"), through their attorneys of record, the Office of the Attorney General, by Attorney General Douglas B. Moylan, move the Court for an order granting preliminary approval of the parties' Settlement

JULIE BABAUTA SANTOS, Individually, and on behalf of all those similarly situated, Petitioner,    Page 2
vs. FELIX A. CAMACHO, Governor of Guam, ART ILAGAN, Director of Department of Revenue and
Taxation, LOURDES M. PEREZ, Director of Department of Administration; and GOVERNMENT OF GUAM,
Respondents.
[PROPOSED] STIPULATED ORDER GRANTING PRELIMINARY APPROVAL OF CLASS
ACTION SETTLEMENT
DOCKET NO. CIV04-00006

Agreement, attached as Exhibit "A," and in support thereof, stipulate to the following for

purposes of settlement of this case:

1.    Petitioner brings this action on behalf of a class of taxpayers claiming

refunds as a result of the Earned Income Tax Credit program.

2.    "EIC Class" means all persons who (a) filed Guam income tax returns and

(b) were and are entitled to be paid refundable earned income tax credits under the

Guam Territorial Income Tax and the Earned Income Program for any or all of the

following tax years: 1996, 1998, 1999, 2000, 2001, 2002 and 2003.

3.    The EIC Class members, otherwise eligible, are entitled to the Earned

Income Tax Credit, pursuant to a provision in Subtitle A of the Internal Revenue Code

and applied to Guam by operation of the Organic Act, 48 U.S.C. § 1421 et seq.

4.    The Government of Guam is required to pay the Earned Income Tax

Credit to eligible taxpayers.

5.    The Petitioner and Government of Guam wish to settle all claims (defined

in the Settlement Agreement) by the EIC Class against the Government of Guam.

6.    The terms of the Settlement Agreement are incorporated in this Motion.

7.    The Petitioner and Government of Guam seek approval of this action to

proceed as a class action with the certified class including all persons who are within

the EIC Class. The parties also seek approval of the form and manner of notice and

objection procedures as set forth in sections II.D and II.E of the Settlement Agreement,

JULIE BABAUTA SANTOS, individually, and on behalf of all those similarly situated, Petitioner,    Page 3
vs. FELIX A. CAMACHO, Governor of Guam, ART ILAGAN, Director of Department of Revenue and
Taxation, LOURDES M. PEREZ, Director of Department of Administration; and GOVERNMENT OF GUAM,
Respondents.
[PROPOSED] STIPULATED ORDER GRANTING PRELIMINARY APPROVAL OF CLASS
ACTION SETTLEMENT
DOCKET NO. CIV04-00006

and request the Court schedule a hearing date for final approval of the Settlement

Agreement.

8. The Petitioner and the Government of Guam stipulate and agree that this

case should proceed as a class action pursuant to Rule 23 of the Federal Rules of Civil

Procedure for the following reasons and hereby move the Court for such certification:

(a) The EIC Class, described above and composed of the tax payers

entitled to receive the refundable EIC, is so numerous that joinder of all members

is impracticable.

(b) There are questions of law or fact common to the EIC Class.

(c) The claims or defenses of the representative party are typical of the

claims or defenses of the EIC Class.

(d) The representative party will fairly and adequately protect the interests

of the EIC Class.

(e) The prosecution of separate actions by or against individual members

of the EIC Class would create a risk of

(i) inconsistent or varying adjudications with respect to individual

members of the EIC Class which would establish incompatible standards

of conduct for the party opposing the EIC Class.

(ii) adjudications with respect to individual members of the EIC

Class which would as a practical matter be dispositive of the interests of

JULIE BABAUTA SANTOS, individually, and on behalf of all those similarly situated, Petitioner,     Page 4
vs. FELIX A. CAMACHO, Governor of Guam, ART ILAGAN, Director of Department of Revenue and
Taxation, LOURDES M. PEREZ, Director of Department of Administration; and GOVERNMENT OF GUAM,
Respondents.
[PROPOSED] STIPULATED ORDER GRANTING PRELIMINARY APPROVAL OF CLASS
ACTION SETTLEMENT
DOCKET NO. CIV04-00006

the other members not parties to the adjudications or substantially impair

or impede their ability to protect their interests.

(f) The Government of Guam has acted or refused to act on grounds

generally applicable to the EIC Class.

(g) The questions of law or fact common to the members of the EIC Class

predominate over any questions affecting only individual members, and a class

action is superior to other available methods for the fair and efficient adjudication

of the controversy.

9. <u>Judgment</u>.  Upon final approval of the settlement agreement, the Court is

expected to enter judgment enforceable against all parties to this Settlement

Agreement.

10. <u>Notice</u>.

A. Petitioner requests the Court for an order authorizing summary notice

by publication to the EIC Class, substantially in a form to be approved by the

Government of Guam or, in the event of disagreement between the Petitioner and the

Government of Guam, in a form to be approved by the Court (the "Notice").  The Notice

shall inform the EIC Class of the terms of the Settlement Agreement, state the date

scheduled by the Court for the hearing on final approval of the Settlement, and advise

class members of their right to object to the Settlement Agreement and to request

exclusion from the class by delivering or mailing to the Court any written objections or

written requests to opt out of the class by August 9, 2004, or such other date as the



JULIE BABAUTA SANTOS, individually, and on behalf of all those similarly situated, Petitioner,   Page 5
vs. FELIX A. CAMACHO, Governor of Guam, ART ILAGAN, Director of Department of Revenue and
Taxation, LOURDES M. PEREZ, Director of Department of Administration; and GOVERNMENT OF GUAM,
Respondents.
[PROPOSED] STIPULATED ORDER GRANTING PRELIMINARY APPROVAL OF CLASS
ACTION SETTLEMENT
DOCKET NO. CIV04-00006

Court may approve (the "Objection and Opt Out Date"), and to appear at the hearing on

final approval. The Court will hear any and all objections on the date set by the Court

for final approval of the Settlement Agreement.

B.   Subject to approval of the Court, Petitioner and the Government of

Guam agree that the Notice shall be published a total of three (3) times in both the

Pacific Daily News and The Marianas Variety, once per week for three (3) consecutive

weeks beginning the week of June 21, 2004, and ending on the last publication date of

July 9, 2004. Each Notice published in the Pacific Daily News and The Marianas

Variety shall be approximately one full page in size and appear on different days of the

week.   One (1) Pacific Daily News Notice shall be in a Sunday edition.   The

Government of Guam will bear the cost of publishing the Notice. The Petitioner and the

Government of Guam shall provide such additional or alternative notice or notices as

required by the Court.

11. <u>Procedures for Objecting to the Settlement</u>.

Petitioner and the Government of Guam recommend that the Court approve an

Objection and Opt Out Date of August 9, 2004, or thirty (30) days after the last

publication date of the Notice required. Any member of the EIC Class may appear at

the hearing on final approval of the Settlement to present any objections to the

Settlement; provided, however, that no member of the EIC Class shall be heard, unless

his or her objection is made in writing and is filed, together with copies of all other

JULIE BABAUTA SANTOS, individually, and on behalf of all those similarly situated, Petitioner,     Page 6
vs. FELIX A. CAMACHO, Governor of Guam, ART ILAGAN, Director of Department of Revenue and
Taxation, LOURDES M. PEREZ, Director of Department of Administration; and GOVERNMENT OF GUAM,
Respondents.
[PROPOSED] STIPULATED ORDER GRANTING PRELIMINARY APPROVAL OF CLASS
ACTION SETTLEMENT
DOCKET NO. CIV04-00006

papers or briefs to be submitted to the Court at the hearing on final approval of the

Settlement, with the Court no later than the Objection and Opt Out Date.

12. Motion for Court Approval and Entry of Final Judgment. Petitioner and the

Government of Guam request that the Court set a hearing on final approval of the

Settlement for a date that is approximately thirty (30) days after the Objection and Opt

Out Date. At least fifteen (15) days prior to the date the Court sets for the hearing on

final approval of the Settlement, Petitioner will submit a motion for an Order of Approval

and Final Judgment, the Order of Approval and Final Judgment in a form to be agreed

upon by Petitioner and the Government of Guam, not inconsistent with the terms of the

Settlement Agreement; and:

A. Determining that Petitioner and the Government of Guam have

submitted to the jurisdiction of the Court for purposes of this Settlement, that the Court

has jurisdiction to approve the Settlement Agreement as fair, reasonable, adequate, and

in the best interests of the class members and named petitioner pursuant to 48 U.S.C.

§1421i(h) and 28 U.S.C. §1361; Rule 23 of the Federal Rules of Civil Procedure; and

any other applicable rules of the Court;

B. Finding that the notice provided in the Settlement Agreement (a)

constitutes reasonable and the best practical notice; (b) constitutes notice that is

reasonably calculated, under the circumstances, to apprise members of the EIC Class

of the pendency of this action, the terms of the Settlement, the right to object to the

Settlement, the right to opt out of the class, and the right to appear at the hearing on



JULIE BABAUTA SANTOS, individually, and on behalf of all those similarly situated, Petitioner,     Page 7
vs. FELIX A. CAMACHO, Governor of Guam, ART ILAGAN, Director of Department of Revenue and
Taxation, LOURDES M. PEREZ, Director of Department of Administration; and GOVERNMENT OF GUAM,
Respondents.
[PROPOSED] STIPULATED ORDER GRANTING PRELIMINARY APPROVAL OF CLASS
ACTION SETTLEMENT
DOCKET NO. CIV04-00006

final approval; (c) constitutes due, adequate and sufficient notice to all persons entitled

to receive such notice; and (d) meets the requirements of due process under the

applicable law and rules of the Court;

      C.  Reserving for the Court exclusive jurisdiction over this Settlement,

including the administration, consummation and enforcement of this Settlement, and

including all proceedings both before and after the Final Judgment become final and is

no longer subject to appeal;

      D.  Determining that there is no just reason for delay and directing that the

Final Judgment be final and appealable; and

      E.  Incorporating the release set forth in § III of the Settlement Agreement

and forever discharging the Government of Guam from All Claims.

    13.  <u>Effect of Disapproval</u>.  If the Court for any reason (1) determines not to

approve the Settlement Agreement; or (2) does not enter Final Judgment, then the

Settlement Agreement terminates and becomes null and void, except as otherwise

provided in the Settlement Agreement.

    14.  <u>Jurisdiction</u>.  The District Court of Guam shall have continuing, exclusive

jurisdiction over all provisions of this case and over any and all disputes of any kind

relating in any way to, or arising in any way out of, the Settlement Agreement.

/ / /

/ / /

/ / /

/ / /

PHILLIPS & BORDALLO

JULIE BABAUTA SANTOS, individually, and on behalf of all those similarly situated, Petitioner,    Page 8
vs. FELIX A. CAMACHO, Governor of Guam, ART ILAGAN, Director of Department of Revenue and
Taxation, LOURDES M. PEREZ, Director of Department of Administration; and GOVERNMENT OF GUAM,
Respondents.
[PROPOSED] STIPULATED ORDER GRANTING PRELIMINARY APPROVAL OF CLASS
ACTION SETTLEMENT
DOCKET NO. CIV04-00006

///

APPROVED AS TO FORM AND CONTENT:

PHILLIPS & BORDALLO, P.C.                    OFFICE OF THE ATTORNEY
Attorneys for Petitioner                          GENERAL
                                                            Attorneys for Government of Guam

By: _____         By: _____
     Michael F. Phillips                               Douglas B. Moylan


     SO ORDERED, this 72 day of June 2004.

                                _____
                                JOAQUIN E. MANIBUSAN, Jr. ,
                    Magistrate  Judge, District Court of Guam

RECEIVED

JUN 1 4 2004

DISTRICT COURT OF GUAM
HAGATNA, GUAM

PHILLIPS & BORDALLO

### DISTRICT COURT OF GUAM
### TERRITORY OF GUAM

| | | |
|---|---|---|
| JULIE BABAUTA SANTOS, individually, and on behalf of all those similarly situated, | ) ) ) ) | DOCKET NO. CIV04-00006 |
| Petitioner, | ) ) ) ) | |
| | ) | **SETTLEMENT AGREEMENT** |
| vs. | ) ) ) | |
| FELIX P. CAMACHO, Governor of Guam, ART ILAGAN, Director of Department of Revenue and Taxation, LOURDES M. PEREZ, Director of Department of Administration; and GOVERNMENT OF GUAM, | ) ) ) ) ) ) ) | |
| Respondents. | ) ) | |

This Settlement Agreement ("Settlement") is made and entered into, subject to Court approval, as of June 14, 2004, by the Petitioner (as defined below), and the Governor of Guam, the Director of the Department of Revenue and Taxation, the Director of the Department of Administration; and the Government of Guam (collectively the "Government of Guam"), in Docket No. CIV04-00006, pending before Magistrate Judge Joaquin Manibusan, Jr. in the District Court of Guam.

EXHIBIT A

WHEREAS, Petitioner has made certain claims against the Government of Guam based upon the failure of the Government of Guam to implement the Earned Income Program (as defined below) and to pay refundable earned income tax credits to Petitioner and the EIC Class (as defined below), and the Government of Guam's continued denial to the EIC Class of the benefits of the Earned Income Program, as mandated by the Organic Act and Guam law; and

WHEREAS, Petitioner contends that she and the members of the EIC Class are entitled to all unpaid refundable earned income tax credits for the years 1996, 1998, 1999, 2000, 2001, 2002, and 2003, in the approximate amount of One Hundred Twenty Million Dollars ($120,000,000.00); and

WHEREAS, on or about January 4, 1996, the Office of the Attorney General issued Memorandum Opinion No. DRT/DOA 96-001, which adopted Department of Revenue and Taxation Revenue Ruling 96-001, ruling that the Earned Income Tax Credit ("EIC") does not apply to Guam; and

WHEREAS, the Government of Guam refused or failed to implement or otherwise pay refundable earned income tax credits to qualified Guam taxpayers for tax years 1996, 1998, 1999, 2000, 2001, 2002, and 2003; and

WHEREAS, throughout the tax period identified above, with the exception of tax year 1998, the Government of Guam prevented the EIC Class from providing the Department of Revenue and Taxation with the information necessary to prove qualification for refundable earned income taxes by refusing to accept applications or denying the applicability of the EIC; and

WHEREAS, on February 9, 2001, the Supreme Court of Guam held that in <u>In re Request of I Mina Bente Sing 'ko na Liheslaturan Guahan Relative to the Application of the Earned Income Tax Credit Program to Guam Taxpayers ("The EIC question")</u>, the EIC applied to Guam taxpayers and the Government of Guam was obligated to pay the refundable earned income tax credits to eligible Guam taxpayers; and

WHEREAS, despite the Supreme Court of Guam's ruling, the Government of Guam still failed to implement or otherwise pay refundable earned income tax credits; and

WHEREAS, after extensive arm's-length negotiations between Counsel for the EIC Class (as defined below) and Counsel for the Government of Guam (as defined below), this Settlement Agreement has been reached; and

WHEREAS, Petitioner and members of the EIC Class will receive relief directly benefiting them immediately upon execution of this Settlement Agreement by the parties, and when Final Judgment issues; and

WHEREAS, each member of the EIC Class has an undisputed and mathematically ascertainable claim to part of the Settlement Amount (as defined below) recovered on his behalf; and

WHEREAS, Petitioner and the Government of Guam intend this Settlement Agreement to materially alter the legal relationship between the parties by modifying the Government of Guam's behavior and position in ways that directly benefit the Petitioner and the EIC Class, and by entitling the EIC Class to enforce this Settlement Agreement, the Order of Approval and Final Judgment against the Government of Guam; and

WHEREAS, the Petitioner and the Government of Guam intend that notwithstanding the long history of the dispute over the applicability of the EIC on Guam, and the required monitoring and related work necessary and remaining to bring closure to this matter, this Settlement Agreement encourages the efficient resolution of this case; and

WHEREAS, Petitioner's filing of this lawsuit serves as a catalyst motivating the Government of Guam to provide the relief originally sought through litigation; and

WHEREAS, the Government of Guam's dire financial condition, with a deficit over one hundred million dollars, and almost two hundred million dollars in past due cash obligations, operates against any possible or realistic distribution of the total claims for refundable earned income tax credits in the event that Petitioner and the EIC Class succeed on the merits; and

WHEREAS, this Settlement Agreement provides immediate relief and creates an enforceable entitlement to a stream of payments to be made by the Government of Guam; and

WHEREAS, the class representative and Counsel for the EIC Class have concluded, after investigation of the facts, and after carefully considering the circumstances, that it would be in the best interests of the EIC Class to enter into this Settlement Agreement; and both the class representative and Counsel for the EIC Class consider the Settlement set forth below to be fair, reasonable, adequate and in the best interests of the EIC Class, and that all members of the EIC Class will benefit as a result of this Settlement; and

WHEREAS, the Government of Guam has concluded that it will enter into this Settlement Agreement in order to, among other things, avoid the further expense, inconvenience, burden, uncertainty, and risk of this litigation; and

WHEREAS, this Settlement Agreement is not an admission of liability nor to be used against the Government of Guam by any party who may opt out, and does not waive or estop the Government of Guam from pursuing reimbursement from the Federal Government on any legal theory; and

WHEREAS, no preferences will be made in EIC payments based upon hardship exceptions; and

WHEREAS, no interest or penalty will be paid by the Government; and

WHEREAS, Petitioner and the Government agree that with the high risk of either Petitioner and the EIC Class failing on the merits of this case, or the previous possibility of financial inability of the Government to pay this claim, the terms of the Settlement Agreement are fair and just.

NOW, THEREFORE, it is agreed by the undersigned on behalf of the EIC Class and the Government of Guam, that All Claims (as defined below) of the EIC Class against the Government of Guam be settled and compromised, on the following terms and conditions:

## I. DEFINITIONS

For purposes of this Settlement Agreement, the following terms shall have the meanings set forth below.

A. "Administration Plan" means the plan of administration of the EIC Settlement Fund as provided in section V.A of this Settlement Agreement.

B. "All Claims" means all claims, demands, actions, suits and causes of action against the Government of Guam, whether known or unknown, asserted or unasserted, that any member of the EIC Class ever had, could have had, now has or hereinafter can, shall or may have, relating in any way to the conduct, act or omission which was or could have been alleged in the EIC Class Action and where the claims, demands, actions, suits or causes of action concern or relate to the following: (a) the Government of Guam's failure or refusal to implement the Earned Income Program or its failure or refusal to acknowledge or accept requests for refundable earned income tax credits, or its failure or refusal to pay any refundable earned income tax credits, or its denial to Guam taxpayers of the benefits of the Earned Income Program; and (b) refundable earned income tax credits applicable for the tax years 1996, 1998, 1999, 2000, 2001, 2002 and 2003. "All Claims" does not include claims relating to the Government of Guam's conduct, acts or omissions that result in unpaid refundable earned income tax credits applicable for tax year 2004 and all subsequent tax years.

C. "Counsel for the EIC Class" means Michael F. Phillips, Phillips & Bordallo, P.C.

D. "Counsel for the Government of Guam" means Douglas B. Moylan, Attorney General of Guam.

E. "Court" means the District Court of Guam.

F. "Date of Final Approval" means the first date upon which all of the events listed in section I.L below have occurred.

G. "Earned Income Program" means the program enacted by the Guam Legislature, through Public Law 24-61:4, as amended by Public Law 25-03:IV;22

(codified at 11 G.C.A. §42101, *et. seq.*), to mandate the fulfillment of the Government of Guam's obligations under the Guam Territorial Income Tax.

H. "Effective Date of the Settlement" means fifteen (15) days after the Date of Final Approval.

I. "EIC Class" means all persons who (a) filed Guam income tax returns and (b) were and are entitled to be paid refundable earned income tax credits under the Guam Territorial Income Tax (as defined below) and the Earned Income Program for any or all of the following tax years: 1996, 1998, 1999, 2000, 2001, 2002 and 2003.

J. "EIC Class Action" means the class action case filed by Julie Babauta Santos, individually, and on behalf of all those similarly situated, Docket No. CIV04-00006 in the District Court of Guam.

K. "EIC Settlement Fund" means the sub-account created under section IV.A of this Settlement Agreement.

L. "Final Approval" means the occurrence of all of the following events:

　　1. This Settlement is approved in all respects by the Court.

　　2. The Administration Plan (as defined below) is approved by the Court.

　　3. The Court enters an Order of Approval and Final Judgment as provided in section II below.

　　4. The time to appeal or seek permission to appeal from the Court's Order of Approval and/or Final Judgment has expired, or, if appealed, the Order of Approval and Final Judgment have been affirmed in their entirety by the court of last resort to which such appeal has been taken and such affirmance has become no longer subject to further appeal or review.

M. "Government of Guam" or "Government" means the Governor of Guam, the Director of the Department of Revenue and Taxation, the Director of the Department of Administration; and the Government of Guam.

N. "Guam Territorial Income Tax" means the provisions of the Internal Revenue Code, including the provisions providing for the EIC (26 U.S.C. §32), which Congress, pursuant to the Organic Act of Guam (48 U.S.C. § 1421i), applied to Guam as the Guam Territorial Income Tax.

O. "Objection and Opt Out Date" means August 9, 2004, or such other date as the Court may approve, by which members of the EIC Class must file with the Court any written objections to the Settlement and any written requests to opt out of the class.

P. "Payment Rate" means the percentage of refundable earned income tax credits that will be paid to members of the EIC Class based on Settlement Amount and the total claims filed, as further defined under section V of this Settlement Agreement.

Q. "Petitioner" means Julie B. Santos, individually, and the EIC Class.

R. "Settlement Amount" means Sixty Million Dollars ($60,000,000) to be made available to pay for claims made by members of the EIC Class and other fees and expenses in accordance with this Settlement Agreement as further defined in section IV.A below.

## II. COURT APPROVAL, CLASS NOTICE AND OBJECTION PROCEDURES

A. Best Efforts. Petitioner and the Government of Guam agree that they will: (1) recommend approval of this Settlement Agreement to the Court; and (2) use their best efforts to obtain approval of this Settlement Agreement and to carry out its terms.

B. Preliminary Stipulated Order. Petitioner shall submit to the Court on or before June 14, 2004 a proposed preliminary stipulated order preliminarily approving this Settlement Agreement in substantially a form to be agreed upon by Petitioner and the Government of Guam, not inconsistent with the terms of this Settlement Agreement. The proposed preliminary stipulated order shall seek approval of the action to proceed as a class action with the certified class including all persons who are within the EIC Class. The proposed preliminary stipulated order shall also seek approval of the form and manner of notice and objection procedures as set forth in sections II.D and II.E below. The proposed preliminary stipulated order shall also ask the Court to schedule a hearing date for final approval of this Settlement Agreement.

1. The Petitioner and the Government of Guam stipulate and agree that this case should proceed as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure for the following reasons, and will move the Court for such certification:

(a) The EIC Class, described above and composed of the tax payers entitled to receive the refundable EIC, is so numerous that joinder of all members is impracticable.

(b) There are questions of law or fact common to the EIC Class.

(c) The claims or defenses of the representative party are typical of the claims or defenses of the EIC Class.

(d) The representative party will fairly and adequately protect the interests of the EIC Class.

(e) The prosecution of separate actions by or against individual members of the EIC Class would create a risk of

(i) inconsistent or varying adjudications with respect to individual members of the EIC Class which would establish incompatible standards of conduct for the party opposing the EIC Class.

(ii) adjudications with respect to individual members of the EIC Class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

(f) The Government of Guam has acted or refused to act on grounds generally applicable to the EIC Class.

(g) The questions of law or fact common to the members of the EIC Class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

C. Judgment. Upon final approval of the settlement agreement, the Court is expected to enter judgment which will be enforceable against all parties to this Settlement Agreement.

D. Notice.

1. In the motion for preliminary approval of this Settlement Agreement (as set forth in section II.B. above), Petitioner shall apply to the Court for an order authorizing summary notice by publication to the EIC Class, substantially in a form to be approved by the Government of Guam or, in the event of disagreement between the Petitioner and the Government of Guam, in a form to be approved by the Court (the "Notice"). The Notice shall inform the EIC Class of the terms of the Settlement

Agreement, state the date scheduled by the Court for the hearing on final approval of the Settlement, and advise class members of their right to object to the Settlement Agreement and to request exclusion from the class by delivering or mailing to the Court any written objections or written requests to opt out of the class by August 9, 2004, or such other date as the Court may approve (the "Objection and Opt Out Date"), and to appear at the hearing on final approval. The Court will hear any and all objections on the date set by the Court for final approval of the Settlement Agreement.

2. Subject to approval of the Court, Petitioner and the Government of Guam agree that the Notice shall be published a total of three (3) times in both the Pacific Daily News and The Marianas Variety, once per week for three (3) consecutive weeks beginning the week of June 21, 2004, and ending on the last publication date of July 9, 2004. Each Notice published in the Pacific Daily News and The Marianas Variety shall be approximately one full page in size and appear on different days of the week. One (1) Pacific Daily News Notice shall be in a Sunday edition. The Government of Guam will bear the cost of publishing the Notice. The Petitioner and the Government of Guam shall provide such additional or alternative notice or notices as required by the Court.

E. Procedures for Objecting to the Settlement.

Petitioner and the Government of Guam will recommend that the Court approve an Objection and Opt Out Date of August 9, 2004, or thirty (30) days after the last publication date of the Notice required under this Section. Any member of the EIC Class may appear at the hearing on final approval of the Settlement to present any objections to the Settlement; provided, however, that no member of the EIC Class shall be heard, unless his or her objection is made in writing and is filed, together with copies of all other

papers or briefs to be submitted to the Court at the hearing on final approval of the Settlement, with the Court no later than the Objection and Opt Out Date.

F. <u>Motion for Court Approval and Entry of Final Judgment</u>. Petitioner and the Government of Guam will request that the Court set a hearing on final approval of the Settlement for a date that is approximately thirty (30) days after the Objection and Opt Out Date. At least fifteen (15) days prior to the date the Court sets for the hearing on final approval of the Settlement, Petitioner will submit a motion for an Order of Approval and Final Judgment, the Order of Approval and Final Judgment in a form substantially ~~a form~~ to be agreed upon by Petitioner and the Government of Guam, not inconsistent with the terms of this Settlement Agreement; and:

1. Determining that Petitioner and the Government of Guam have submitted to the jurisdiction of the Court for purposes of this Settlement, that the Court has jurisdiction to approve this Settlement Agreement as fair, reasonable, adequate, and in the best interests of the class members and named petitioner pursuant to 48 U.S.C. §1421i(h) and 28 U.S.C. §1361; Rule 23 of the Federal Rules of Civil Procedure; and any other applicable rules of the Court;

2. Finding that the notice provided in this Settlement Agreement (a) constitutes reasonable and the best practical notice; (b) constitutes notice that is reasonably calculated, under the circumstances, to apprise members of the EIC Class of the pendency of this action, the terms of this Settlement, the right to object to this Settlement, the right to opt out of the class, and the right to appear at the hearing on final approval; (c) constitutes due, adequate and sufficient notice to all persons entitled to

receive such notice; and (d) meets the requirements of due process under the applicable law and rules of the Court;

3. Reserving for the Court exclusive jurisdiction over this Settlement, including the administration, consummation and enforcement of this Settlement, and including all proceedings both before and after the Final Judgment become final and is no longer subject to appeal;

4. Determining that there is no just reason for delay and directing that the Final Judgment be final and appealable; and

5. Incorporating the release set forth in § III below and forever discharging the Government of Guam from All Claims.

G. **Effect of Disapproval**. If the Court for any reason (1) determines not to approve this Settlement Agreement; or (2) does not enter Final Judgment, then this Settlement Agreement terminates and becomes null and void, except as otherwise provided in this Settlement Agreement.

## III. RELEASE

Upon Final Approval, each member of the EIC Class hereby expressly and irrevocably waives and fully, finally and forever settles and releases all claims, demands, actions, suits and causes of action against the Government of Guam, whether known or unknown, asserted or unasserted, that any member of the EIC Class ever had, could have had, now has or hereinafter can, shall or may have, relating in any way to the conduct, act or omission which was or could have been alleged in the EIC Class Action and where the claims, demands, actions, suits or causes of action concern or relate to the following: (a) the Government of Guam's failure or refusal to implement the Earned Income Program

or its failure or refusal to acknowledge or accept requests for refundable earned income tax credits, or its failure or refusal to pay any refundable earned income tax credits, or its denial to Guam taxpayers of the benefits of the Earned Income Program; and (b) refundable earned income tax credits applicable for the tax years 1996, 1998, 1999, 2000, 2001, 2002 and 2003. This Release does not include claims relating to the Government of Guam's conduct, acts or omissions that result in unpaid refundable earned income tax credits applicable for tax year 2004 and all subsequent tax years.

## IV. PAYMENT OF EARNED INCOME TAX CREDITS

A. <u>Consideration</u>. As part of the consideration for the agreement herein, and for entry of Final Judgment as provided for in the Settlement Agreement, Petitioner and the Government of Guam agree that the Government of Guam shall pay the Settlement Amount of Sixty Million Dollars ($60,000,000) to the EIC Class. The Settlement Amount shall be paid in such installments as provided below and deposited in a separate sub-account within the Income Tax Refund Reserve Fund (11 G.C.A. § 50102) to be known and designated as the "EIC Settlement Fund." Any and all expenditures from the EIC Settlement Fund shall be for the payment of claims and fees as provided for in this Settlement Agreement, or as otherwise directed by the Court, and for no other purpose. All funds paid into the EIC Settlement Fund shall not be subject to any transfer authority of the Governor, until such time as all monies required to be paid hereunder have been done so.

As further consideration, Petitioner and the Government of Guam agree that the Government of Guam shall continue to implement the Earned Income Program and shall

take the appropriate steps necessary to ensure that refundable earned income tax credits are available and paid for all tax years following Tax Year 2003.

B. Installments Paid Into EIC Settlement Fund.

1. The first installment of *at least* Three Million Dollars ($3,000,000) shall be paid into the EIC Settlement Fund within thirty (30) days of the preliminary approval of this Settlement Agreement.

2. The second through twelfth installments, each consisting of *at least* One Million Five Hundred Forty-five Thousand Four Hundred Fifty-Four Dollars and Fifty-four Cents ($1,545,454.54), shall be paid each month for eleven (11) months following the first installment, for a total of Seventeen Million Dollars ($17,000,000).

3. The thirteenth through twenty-second installments, each consisting of *at least* Five Million Dollars ($5,000,000), shall be paid on or before June 30th of each subsequent year, beginning on June 30, 2006 and ending June 30, 2013.

4. No interest shall accrue against the Government of Guam to any payments required under this Settlement Agreement.

The payment schedule specified herein shall not restrict the Government of Guam from increasing amounts placed into the EIC Settlement Fund before each period specified, and does not specify when payments are to be actually disbursed by the Government of Guam to Class members.

C. Intent to Extinguish Liability.

It is the intent of Petitioner and the Government of Guam that the Settlement Amount completely extinguish the Government of Guam's liability to the EIC Class, excluding those members of the class who request to opt out of the class within the time

period specified in this Settlement Agreement. The Government of Guam's settlement herein shall not constitute an acknowledgment or admission of any legal or financial liability to pay under any legal theory for EIC or otherwise. This Agreement shall be construed simply a resolution of a dispute without admitting liability whatsoever. The Government of Guam agrees that no part of the Settlement Amount and no portion of funds paid into the EIC Settlement Fund shall be used for the potential refund for class members who opt out of the Class.

The Petitioner and the Government of Guam agree that this Settlement Agreement does not waive any party's right to pursue Federal Government reimbursement or payment of any portion of unpaid refundable earned income tax credits, nor constitute a waiver of, or restrict any legal theory which may be applied. In the event that any portion of the Settlement Amount remains in the EIC Settlement Fund after the final payment made to the EIC Class pursuant to the "Payment Rate" established in § V below, the Government of Guam shall pay such remaining amounts to the EIC Class in equal proportion, provided, however, that no member of the EIC Class shall receive payments exceeding one hundred percent (100%) of the refundable earned income tax credit for any tax year for which he or she qualifies under the Guam Territorial Income Tax. Any portion of the Settlement Amount remaining in the EIC Settlement Fund after the final payment made to the EIC Class which equals one hundred percent (100%) of the refundable earned income tax credits for all applicable tax years, and after all other payments are made as required by this Settlement Agreement, shall be transferred to the Income Tax Refund Reserve Fund to be used in accordance with the law applicable to the administration of such fund.

# V. PROCESSES FOR CLAIMING EARNED INCOME TAX CREDITS

A. _Administration Plan_.  Within forty-five (45) days after the preliminary approval of this Settlement Agreement, the Petitioner and the Government of Guam, with the cooperation and assistance of the Department of Revenue and Taxation, shall agree on a plan of administration of the EIC Settlement Fund to be submitted to the Court for approval ("Administration Plan").  The Administration Plan shall at a minimum include the following terms:

1. The EIC Settlement Fund shall be administered by the Department of Revenue and Taxation under the supervision and direction of the Court.  The Department of Revenue and Taxation shall submit quarterly reports to all parties signing this Agreement, including the Petitioner regarding the administration of the EIC Settlement Fund.

2. The procedure upon which the Department of Revenue and Taxation will identify members of the EIC Class, and send a "Second Notice" by mail to the last known address of each member or potential member, or to such other updated address as is provided to the Department of Revenue and Taxation.  The Second Notice shall include a description of the procedure to administer the EIC Settlement Fund and shall include a claim form for eligible members of the EIC Class to process the refundable earned income tax credits to be paid out of the EIC Settlement Fund.  The information requested to process payments to members of the EIC Class shall be the minimum necessary to determine the qualification of members of the EIC Class to refundable earned income tax credits for each applicable tax year.  The Administration Plan shall

adopt a one (1) year time period, to begin on the date the Second Notice is sent to the EIC Class, for the submission of claims for all of the applicable tax years.

3. The procedure to administer the EIC Settlement Fund shall include the determination by the Department of Revenue and Taxation of a "Payment Rate" (i.e. 55%) to be made within thirty (15) days after the Objection and Opt Out Date. The Payment Rate shall be agreed upon by Petitioner and the Government of Guam, and subject to the approval of the Court. The Payment Rate shall be determined by comparing the Settlement Amount with the estimated total refundable earned income tax credits for the EIC Class under the rules and procedures relating to such qualification under the Guam Territorial Income Tax, and in considering the percentage of members of the EIC Class who opt out of the class. The Petitioner and Government of Guam agree that the parties currently project that the Payment Rate will be *at least* fifty percent (50%) if no member of the EIC Class opts out of the class and all members of the EIC Class submit the required information necessary to qualify for and process the refundable earned income tax credits.

Within thirty (30) days after the completion of the one (1) year period after the date the last Second Notice is mailed pursuant to the Administration Plan, the Department of Revenue and Taxation, with the agreement of the Petitioner and the Attorney General of Guam, shall revise the Payment Rate, if necessary, subject to approval by the Court. The Department of Revenue and Taxation shall provide such additional payments as necessary to members of the EIC Class that were paid prior to the date the revised Payment Rate is approved by the Court, in order to fully compensate such members at the rate of the revised Payment Rate.

4. The Department of Revenue and Taxation shall make payments to the EIC Class out of the EIC Settlement Fund by multiplying the Payment Rate by the refundable earned income tax credit for each member of the EIC Class determined to be qualified under the procedures of the Administration Plan. The priority of payment shall be (a) first to qualified members of the EIC Class for tax year 1996; (b) second to qualified members of the EIC Class for tax year 1998; and (c) then to qualified members of the EIC Class for each subsequent year ending with tax year 2003.

Notwithstanding the foregoing, within sixty (60) days after the date the last Second Notice is mailed for Tax Year 1996 pursuant to the Administration Plan, the first installment of Three Million Dollars ($3,000,000) provided in § IV above shall be distributed *pro rata* (equally) to qualified members of the EIC Class for Tax Year 1996. Those eligible for the first Three Million Dollar disbursement shall be those Class members who have applied within forty-five (45) days after the last Second Notice is mailed for Tax Year 1996 in an amount not exceeding the amount payable based on the applicable Payment Rate. If the distributions fail to equal the amount payable to such members based on the Payment Rate, the second and subsequent installments, if necessary, or portions thereof, shall be distributed to such members in order to fully compensate the members at the rate of the Payment Rate.

No priority shall be given to any members of the EIC Class based upon hardship or any other criteria other than as provided herein. The Government of Guam shall not make any payments to any person for EIC outside of this Agreement without the express written consent of the Attorney General of Guam. In addition, any payment of refundable earned income tax credits made to any member of the EIC Class prior to the

Effective Date of the Settlement in excess of the applicable Payment Rate shall be off-set against all other claims made by such member pursuant to this Settlement Agreement.

5. Any other terms of the Administration Plan as required and agreed to by the Petitioner and the Government of Guam, to carry out the terms of this Settlement Agreement, or as required by the Court.

## VI. OTHER PROVISIONS

A. <u>Binding Effect</u>. This Settlement Agreement shall be binding upon, and inure to the benefit of, each member of the EIC Class, the Government of Guam, and their respective heirs, executors, administrators, successors, and assigns.

B. <u>Integrated Agreement</u>. This Settlement Agreement contains the entire, complete and integrated statement of each and every term and provision agreed to by Petitioner and the Government of Guam, and is not subject to any condition not provided for in this Settlement Agreement. This Settlement Agreement shall not be modified in any respect except by a writing executed by all signatories to the Settlement Agreement, with the written approval of the Attorney General of Guam, Counsel for the Government of Guam, and Michael F. Phillips, Phillips & Bordallo, P.C., Counsel for the EIC Class. In entering this Settlement Agreement, neither Petitioner nor the Government of Guam has made or relied on any warranty or representation not specifically set forth in the document.

C. <u>Jurisdiction</u>. The District Court of Guam shall have continuing, exclusive jurisdiction over all provisions of this Settlement Agreement and over any and all disputes of any kind relating in any way to, or arising in any way out of, this Settlement Agreement.

D. <u>Notice</u>. Any notice, request, instruction or other document to be given by the Government of Guam to Petitioner, or vice versa, shall be in writing and (a) delivered personally or by Certified Mail, Return Receipt Requested, to counsel for the parties as follows:

If to the Government of Guam:

Honorable Douglas B. Moylan
Attorney General of Guam
Office of the Attorney General
Guam Judicial Center
120 West O'Brien Drive, Suite 2-200E
Hagatna, Guam 96910

If to the Petitioner:

Michael F. Phillips, Esq.
Phillips & Bordallo, P.C.
410 West O'Brien Drive, Suite 102
Hagatna, Guam 96910

E. <u>Attorneys' Fees</u>. The Petitioner and the Government of Guam agree that *~~~* ~~~in amount to be d~~~ Counsel for the EIC Class shall recover attorneys' fees ~~and court costs in the amount of~~ ~~ten percent (10%) of the Settlement Amount.~~ *by Tyr Caurt.* The recovery of attorneys' fees and court costs shall be from, and not in addition to, the Settlement Amount, and shall be executed in such manner as provided in the Administration Plan, not inconsistent with this Settlement Agreement. The Settlement Amount is attributed to the efforts of Petitioner and Counsel for the EIC Class. Although the value of the benefit conferred by Petitioner and Counsel for the EIC Class to each member of the EIC Class cannot be determined with complete accuracy until all claims are presented, attorneys' fees awarded against the Settlement will shift the costs of litigation to each member of the EIC Class in the exact proportion that the value of each individual's claim bears to the total recovery.

F. Costs of Administration Plan. The Government shall bear all the costs of administering the EIC Settlement Fund and all costs and expenses related to the Administration Plan, with the exception of court costs.

G. Applicability. Nothing in this Settlement Agreement shall be used or construed against the Government of Guam for any reason whatsoever by anyone or entity other than the EIC Class, including those persons who opt out of the class and the Federal Government. This Agreement shall not waive the Government of Guam's right or ability to pursue the Federal Government for any reimbursement, indemnification or otherwise of any amounts the Government of Guam may be legally entitled to receive.

In addition, nothing in this Settlement Agreement shall be used or interpreted as a waiver of the Government of Guam or any official thereunder to any rights it may have to pursue civil recovery or to prosecute any wrongdoing or illegality relating to the Earned Income Tax program or any payments made therein.

H. Amendments. This Agreement may only be amended in writing by Petitioner's counsel on behalf of the EIC Class, and the Attorney General of Guam on behalf of the Government of Guam.

I. Severability. The invalidity or unenforceability of any provision of this Settlement Agreement shall not affect the validity or enforceability of the remainder of this Settlement Agreement.

**IN WITNESS THEREOF,** Petitioner and the Government of Guam have duly executed this Settlement Agreement on this 14th day of June, 2004.

*Petitioner and Counsel for the EIC Class*

_____
Julie Babauta Santos

_____
Michael F. Phillips,
Counsel for the EIC Class

*The Government of Guam*

_____
Kaleo S. Moylan,
Acting Governor of Guam

_____
Art Illagan, Director,
Revenue and Taxation

_____
Douglas B. Moylan,
Attorney General of Guam

_____
Joseph Manibusan,
Acting Director,
Department Administration

Approved as to Legality & Form:

_____
Joseph A. Guthrie,
Deputy Attorney General

# EXHIBIT 2




# GOVERNMENT OF GUAM
## CONSUMER COUNSEL
### OFFICE OF THE ATTORNEY GENERAL
HAGÅTÑA, GUAM

October 13, 2004

## MEMORANDUM

To:        Attorney General

From:      Charles Troutman

Subject:   Santos EITC Settlement — Need for Legislative appropriation of "Refunds"

## CONFIDENTIAL ATTORNEY- CLIENT & WORK PRODUCT COMMUNICATION

You have asked me to advise you on certain questions raised by the Governor and other of our clients with regards to implementing the EITC settlement in the Santos case. In this memo I will examine only the question whether the Governor must seek a legislative appropriation before paying the settlement.

The EITC settlement consists of several elements to be performed by the government of Guam: (1) funding and payment of $60 million in delinquent EITC refunds to qualified taxpayers for tax years 1996 and 1998 through 2003 in accordance with the multi-year schedule established in the settlement agreement; (2) payment of $6 million in attorney fees to class counsel on a pay-as-you-go basis from the $60 million in EITC refunds to occur over the life of the settlement schedule; (3) commitment to apply, and to pay, EITC refunds to qualified taxpayers for all future tax years, commencing with 2004; and (4) payment of approximately $1 million in administrative costs by the Department of Revenue and Taxation to implement the settlement, which amount appears to be in addition to and separate from the $60 million for EITC refunds and attorneys fees.

My opinion is that the Governor does not have to seek an appropriation for items 1 and 2. On the on other hand, he must have appropriations for items 3 and 4. In reaching these conclusions, 1 am assuming that the EITC validly applies to Guam, a matter of doubt to some, but rendered moot by the settlement.

Any answer must stem, first, from the Organic Act of Guam. This settlement will result, *inter alia*, in a judgment for money due against the government of Guam. The Organic Act states that, in such cases:

> When any judgment against the government of Guam under this paragraph [for an unpaid income tax refund] has become final, the Governor shall order the payment of such judgment out of any unencumbered funds in the treasury of Guam. 48 U.S.C.A. §1421i(h)(3).

Courts have long held that Congress has the power to legislate directly for a territory as if Congress were a state legislature. This was recently reaffirmed by the 9 [th] Circuit in *People v. Guerrero*, 290 F.3d 1210 (2002):

> *See, e.g., First Nat'l Bank v. County of Yankton*, 101 U.S. 129, 133, 25 L.Ed. 1046 (1879) ( "[Congress] may make a void act of the territorial legislature valid, and a valid act void. In other words, it has full and complete legislative authority over the people of the Territories and all the departments of the territorial governments."); at 1221-2.

The Organic Act completely occupies the authority Guam has over the Territorial Income Tax, restricting the Legislature to those matters not covered (very few) by the Act. A good example is in Section 11 of the Organic Act where Congress has permitted the Legislature to adopt surcharge on the Territorial Income Tax of up to 10%. While Guam may adopt its own income tax structure pursuant to another federal law, it has not yet done so and, therefore, is still subject to the existing mirror-image income tax imposed by the Organic Act.

It is my opinion, that in the case of paying a <u>judgment</u> obtained against the government for the matters stated in the Organic Act, including refund of taxes (item 1 above), Congress has legislated the authority to pay notwithstanding the absence of a legislative appropriation. In fact, the language is mandatory – "the Governor shall order . . .". If he does not order the payment of a judgment for an unpaid income tax refund from any unencumbered funds, he would be subject to a writ of mandate from the District Court ordering him to do so.



EITC payments are treated as refunds of income tax overpayments under the U.S. Internal Revenue Code mirrored in Guam, and are subject to the same rules as ordinary income tax refunds. *Sorenson v. Secretary of the Treasury of the United States*, 475 U.S. 851, 106 S.Ct. 1600, 89 L.Ed. 2d 855 (1986); *Israel v. United States*, 356 F.3d 221 (2nd Cir. 2004). Accordingly, payment of the judgment to be entered by the District Court of Guam for unpaid EITC refunds covering tax years 1986 and 1988 through 2003 will be subject to the provisions of the Organic Act, 48 U.S.C.A. §1421i(h)(3), requiring the Governor to pay the judgment "out of any unencumbered funds in the treasury of Guam" without regard to appropriation by the Legislature.

There have been no decided cases defining the term "unencumbered funds in the treasury of Guam", although definitions of "unencumbered funds" are found in other contexts. See *United States v. Kim* 111 F. 3d 1351 (7th Cir. 1997)(defining "unencumbered funds" for purposes of the trust fund penalty of Section 6672 of the Internal Revenue Code). However, the common understanding of this term in Guam is that it means any funds not obligated by contract or other order, for example, wages. When it comes to judgments for delinquent income tax refunds, the Organic Act requires that payment be from any unencumbered funds within the treasury of Guam, not just from funds allocated for the purpose of tax refunds by the Legislature. Therefore, the Governor may, and indeed must, pay the judgment for refunds of the EITC from any unencumbered funds in the treasury of Guam.

Moreover, no legislative appropriation will be needed regarding payment of attorney fees to class counsel under the judgment (item 2 above). The attorneys fees to be paid to class counsel are not a separate amount awarded by the court against the government. Rather, the attorney fees are an obligation imposed on the taxpayers and will be paid by them to class counsel from their EITC refunds, which is their property. Because the Governor does not have to obtain an appropriation from the Legislature to pay the judgment for the delinquent EITC refunds covering tax years 1996 and 1998 through 2003, which is the source of the attorneys fees, he does not have to obtain an appropriation for the attorneys fees (I make no opinion as to the reasonableness of the amount of attorneys fees sought by class counsel in the settlement, which is a different issue).

On the other hand, the obligation undertaken by the government in the settlement to pay future EITC refunds on annual basis hereafter to qualified taxpayers (item 3 above), commencing with tax year 2004, is not a money judgment for refunds and, therefore, is not subject to the provisions of the Organic Act, 48 I U.S.C.A. §1421i(h)(3), requiring the

3

Governor to pay a judgment for unpaid refunds "out of any unencumbered funds in the treasury of Guam". Consequently, it is proper and necessary for the Legislature to annually appropriate funds for the payment of such refunds, which the Legislature did for fiscal years 1998 and 1999 in the Guam Earned Income Program, 11 G.C.A. §42104.

Although the U.S. Congress in 31 U.S.C. §1324 has made a continuing appropriation to the Department of Treasury to pay U.S. tax refunds, this appropriation is not mirrored in Guam. The Organic Act provides for mirroring of the Internal Revenue Code which is found in Article 26 of U.S.C., but not Title 31 of U.S.C.

The settlement also provides for a $1 million "pot" to be used as administration costs by the Department of Revenue and Taxation to implement the settlement and the payout under it (item 4 above). As these funds appear to come from the General Fund and are separate from and in addition to the $60 million EITC settlement amount, then there is an absolute requirement that the moneys be appropriated by the Legislature, since these are for the general operations of the Department of Revenue & Taxation. They would not be part of a judgment for delinquent income tax refunds. I assume that the $1 million will be payable over several years and need not be appropriated all at once.

The Governor and our other clients would not be subject to the provisions and penalties set forth in 5 G.C.A. §22401 regarding the expenditure of unappropriated funds to the extent that funds under the EITC settlement (items 1 and 2 above) are paid pursuant to the Organic Act, 48 U.S.C.A. §1421i(h)(3), requiring judgments for unpaid income tax refunds to be paid "out of any unencumbered funds in the treasury of Guam". However, the expenditure of unappropriated funds for other parts of the settlement that do not come within the scope of this Organic Act provision regarding payment of judgments for unpaid income tax refunds (items 3 and 4 above) would expose the Governor and our other clients to possible liability under 5 G.C.A. §22401.

I trust that this memorandum fully answers your questions. I would be pleased to answer any further questions you may have regarding this matter.


*Charles H. Troutman*
CHARLES H. TROUTMAN

# EXHIBIT 3



*Office of the Governor of Guam*

P.O. Box 2950  Hagåtña, Guam 96932
TEL (671) 472-8931 • FAX (671) 477-4826 • EMAIL governor@mail.gov.gu

**Felix Perez Camacho**
*Governor*

**Kaleo Scott Moylan**
*Lieutenant Governor*

2 8 OCT 2004

Stephen A. Cohen
Assistant Attorney General
Office of the Attorney General
Guam Judicial Center, Suite 2-200E
120 West O'Brien Drive
Hagåtña, Guam 96910

Re:  Julie Babauta Santos v. Felix P. Camacho, Governor of Guam, et al;
District Court of Guam, Civil Case No. 04-00006

Dear Steve:

The Governor has received and reviewed Mr. Troutman's memorandum of October 13,
2004. Given the conclusion that at least part of the settlement contract is illegal, the Governor
can see no option but to raise this issue with the Court and Legislature as required by law.
Further, the Governor is not assured by this memorandum that the $60 million payment is legal.
Therefore, before acting, he requires an immediate response with regard to several issues
regarding the validity of that payment.

Mr. Troutman states that the $60 million payment is legal because the Governor has the
power to pay tax judgments from unappropriated funds. However, while the settlement calls for
a judgment, it is still a contract. Equivalent federal law appears to treat settlements as subject to
the restriction on contracting for unappropriated funds. *See Blackhawk Heating & Plumbing Co.
v. United States*, 622 F.2d 539, 542, 553 (Claims Ct. 1980) (enforcing provision of settlement
contract that was contingent on funding pursuant to federal Anti-Deficiency Act). Accordingly,
it appears that the power to pay a judgment under the Organic Act may not be the same as the
power to contract for a judgment. We would like for you to identify definitive authority for the
proposition that the Governor's power to pay judgments extends to contracting for judgments. If
no such authority exists, please tell us how you plan to confirm that the $60 million payment
complies with the Illegal Appropriations law.

We also are concerned because, as you know, there are not nearly enough unappropriated funds in existence each month to make the monthly payments under the settlement. Yet, Mr. Troutman's opinion ignores this issue. We therefore must ask that you provide an explanation as to how it can be legal to contract to pay a judgment on a monthly basis when there are inadequate funds to satisfy that judgment absent an appropriation.

Next, the settlement contract requires interim payments now, before any judgment is final. The Governor's Organic Act power only allows him to pay *final* judgments. This is another potential illegality not addressed by Mr. Troutman regarding which we require an answer.

Further, as you mentioned at our most recent meeting, it is unlawful under Guam law for the Director of Revenue and Taxation to pay untimely tax claims. This settlement appears to require the payment of untimely tax claims. Again, Mr. Troutman's opinion does not address this issue or our earlier questions regarding why claims that appeared barred by the statute of limitations were included. Please also address this issue in your response.

Finally, we remain unclear as to how the Governor can contract to pay a judgment for attorneys' fees. Although the Governor can pay tax judgments out of unappropriated funds, the Organic Act is silent as to attorneys' fees. In this final regard, we found the opinion did not address the Governor's concerns.

As you know, the Governor supports the EITC and its payment to Guam's taxpayers. But he cannot support its payment through unlawful means, especially where millions of dollars are being paid to private attorneys. The Governor is under a continuing duty to report to the Legislature once his investigation of an unlawful contract is complete. Even as it stands now, it is clear that such a report is required because the contract contains unlawful provisions. Further, it also appears that the Governor will have to immediately challenge the validity of the settlement in District Court.

I received the Petitioner's Motion for Orders approving the Administration Plan and Amended Notice and for Order establishing the Fairness Hearing Date and Objection and Opt Out Date and Vacating the April 30, 2002 Scheduling Order and the supporting documents. Therefore, we must respectfully require that these issues be addressed in a written response by next week. We also direct you to take no action on the Petitioner's motion absent the Governor's consent. We also renew our request that we immediately be provided with all documents regarding the history of the negotiations of the settlement contract and the advice provided with regard to the contract.

Very truly yours,

Shannon Taitano

# EXHIBIT 4



## Office of the Attorney General
### Douglas B. Moylan
Attorney General of Guam
Guam Judicial Center, Suite 2-200E
120 West O'Brien Drive
Hagåtña, Guam 96910 USA
(671) 475-3324 (671) 472-2493 (Fax)
www.guamattorneygeneral.com law@mail.justice.gov.gu



September 9, 2004

<u>**HAND DELIVERED**</u>

Felix P. Camacho
Governor of Guam
Attention: Shannon Taitano, Esq.
Adelup, Guam

Artemio R. Ilagan, Director
Department of Revenue and Taxation
Mariner Drive
Tiyan, Guam

Lourdes M. Perez, Director
Department of Administration
Hagåtña, Guam

Re:   Julie Babauta Santos v. Felix P. Camacho, Governor of Guam, et al
      <u>District Court of Guam, Civil Case No. 04-00006</u>

Dear Governor Camacho, Director Ilagan and Director Perez:

You will find herewith copies of the following documents we have received from attorney Michael Phillips in the original Earned Income Tax Credit case:

1.   Letter, dated September 8, 2004;
2.   Parties' Joint Motion for an Order Approving the Administration Plan;
3.   Administration Plan;
4.   (Proposed) Order Approving Administration Plan;
5.   (Proposed) Stipulated Order Approving Additional Notice to the Proposed Class Members; and for Orders Establishing the "Objection and Opt Out Date" and the Hearing on Final Approval of the Settlement Agreement.

Please review the documents and favor us with your comments. Your prompt responses would be appreciated as time is of the essence.

Sincerely,

**DOUGLAS B. MOYLAN**
**Attorney General**

By:

Stephen A. Cohen
Assistant Attorney General

\\AGSERV\SYS\AG_DATA\Solicitor\DATA\COHEN\Santos EITC Letter.1f.doc\sr



# Office of the Attorney General
### Douglas B. Moylan
Attorney General of Guam
Guam Judicial Center, Suite 2-200E
120 West O'Brien Drive
Hagåtña, Guam 96910 • USA
**(671) 475-3324 • (671) 472-2493 (Fax)**
www.guamattorneygeneral.com • law@mail.justice.gov.gu

September 15, 2004

## MEMORANDUM (INFORMATIONAL)

**To:**      Artemio Ilagan, Director,
            Department of Revenue and Taxation

            John Camacho, Deputy Director
            Department of Revenue and Taxation

**Copy:**    Douglas B. Moylan, Attorney General
            Office of the Attorney General

**From:**    Stephen A. Cohen, Assistant Attorney General
            Office of the Attorney General

**Subject:** Earned Income Tax Credit
            **Privileged Attorney-Client & Work Product Communication**

During our meeting yesterday afternoon at Revenue and Taxation, you raised the matter of the Earned Income Tax Credit ("EITC"). You asked whether the Department needs to adopt a formal ruling in order to apply the EITC for 2004 and subsequent years, in view of the Department's ruling on January 4, 1996, in Rev. Rul. 96-001, that the Department was not required to mirror the EITC in Guam.

The answer to your question is "no". As of the present time, and in the absence of any future change of circumstances, the issue you raised was resolved in the Settlement Agreement reached on June 14th in the <u>Santos</u> case, District Court of Guam CIV 04-00006. It provides on pages 14 and 15 that "As further consideration, Petitioner and the Government of Guam agree that the Government of Guam shall continue to implement the Earned Income Program and shall take the

F:\AG_DATA\Solicitor\DATA\cohen\DRT Memo Re EITC.F.doc

appropriate steps necessary to ensure that refundable earned income tax credits are available and paid for all tax years following Tax Year 2003". The Settlement Agreement is signed on behalf of the Government of Guam by the Acting Governor, the Director of the Department of Revenue and Taxation, the Acting Director of the Department of Administration, the Attorney General of Guam and the Deputy Attorney General of Guam, and was preliminarily approved on June 17th by Magistrate Judge Joaquin Manibusan of the District Court.

You indicated yesterday that the Department intends to remove from Form 1040 GU for 2004 and subsequent years any language that prevents qualified taxpayers from claiming the EITC.

I am enclosing for your reference copies of the Settlement Agreement and Judge Manibusan's Order preliminarily approving the Settlement Agreement. I hope you find this information helpful.

STEPHEN A. COHEN

F:\AG_DATA\Solicitor\DATA\cohen\DRT Memo Re EITC.F.doc



## Office of the Attorney General
### Douglas B. Moylan
Attorney General of Guam
Guam Judicial Center, Suite 2-200E
120 West O'Brien Drive
Hagåtña, Guam 96910  USA
(671) 475-3324   (671) 472-2493 (Fax)
www.guamattorneygeneral.com     law@mail.justice.gov.gu

October 27, 2004

**MEMORANDUM**   Confidential Attorney-Client and Work Product Communication

TO:      Shannon Taitano, Esq.
          Legal Counsel to Governor Felix P. Camacho
          Adelup, Guam

          Artemio R. Ilagan, Director
          Department of Revenue and Taxation
          Tiyan, Guam

          Lourdes M. Perez, Director
          Department of Administration
          Hagatna, Guam

FROM:    Stephen A. Cohen
          Assistant Attorney General
          Hagatna, Guam

RE:      Julie Babauta Santos v. Felix P. Camacho, Governor of Guam, et al
          <u>District Court of Guam, Civil Case No. 04-00006</u>

I am enclosing for your information copies of the following motion papers that were served on our office:

1.    Petitioner's Motion for Orders approving the Administration Plan and Amended Notice and for Orders establishing the Fairness Hearing Date and Objection and Opt Out Date, and Vacating the April 30, 2002 Scheduling Order, with attached Administration Plan and Amended Notice of Class Action and Proposed Settlement;

2       Memorandum of Points and Authorities in Support of Petitioner's Motion for Orders approving the Administration Plan and Amended Notice and for Orders establishing the Fairness Hearing Date and Objection and Opt Out Date and vacating the April 30, 2004 Scheduling Order;

2.      [Proposed] Order approving Administration Plan.

I am also enclosing for your information a copy of my letter to attorney Michael Phillips, dated today, requesting a continuance of the date for the defendants' response to his motion.



# EXHIBIT 5



**Office of the Attorney General**
**Douglas B. Moylan**
Attorney General of Guam
**Solicitor's Division**
Guam Judicial Center, Suite 2-200E
120 West O'Brien Drive
Hagåtña, Guam 96910 • USA
(671) 475-3324 • (671) 472-2493 (Fax)
www.guamattorneygeneral.com • law@mail.justice.gov.gu

**Attorneys for Respondents**

FILED
DISTRICT COURT OF GUAM

NOV - 8 2004

MARY L. M. MORAN
CLERK OF COURT

# IN THE DISTRICT COURT OF GUAM
# HAGÅTÑA, GUAM

JULIE BABAUTA SANTOS, individually
and on behalf of all those similarly situated,

        Petitioner,

    vs.

FELIX P. CAMACHO, Governor of Guam;
ART ILAGAN, Director of Department of
Revenue and Taxation; LOURDES M.
PEREZ, Director of Department of
Administration; DOUGLAS B. MOYLAN,
Attorney General of Guam; and
GOVERNMENT OF GUAM,

        Respondents.

Civil Case No. 04-00006

**MEMORANDUM OF POINTS AND
AUTHORITIES IN RESPONSE TO
PETITIONER'S MOTION FOR ORDERS
APPROVING ADMINISTRATION PLAN,
ETC.**

Respondents submit the following Memorandum of Points and Authorities in response
to the Petitioner's Motion for Orders approving the Administration Plan and Amended Notice
and for Orders establishing the Fairness Hearing Date and Objection and Opt Out Date, and
vacating the April 30, 2004 Scheduling Order.

Respondents' Memorandum of Points and Authorities
SANTOS v FELIX P. CAMACHO, et. al.
District Court of Guam Civil Case No. 04-00036

Case 1:04-cv-00006    Document 248-2    Filed 10/03/2005    Page 26 of 29

ORIGINAL

# Factual Background.

On June 14, 2004, the parties entered into a Settlement Agreement to resolve this case. The Settlement Agreement was signed on behalf of the Petitioner by herself and her attorney of record. The Settlement Agreement was signed on behalf of the Respondents by the Acting Governor of Guam, the Acting Director of the Department of Administration, the Director of the Department of Revenue and Taxation, and the Attorney General of Guam, and was approved as to legality and form by the Deputy Attorney General of Guam.

The Settlement Agreement was preliminarily approved by Magistrate Judge Joaquin V.E. Manibusan on June 17, 2004.

Section V of the Settlement Agreement directs the parties to enter into an Administration Plan, which Plan shall cover at a minimum the points set forth in said Section V. The Petitioner's motion seeks the Court's approval of this Plan and certain other relief. This issues raised in this Memorandum of Points and Authorities relate to the proposed Administration Plan and not to the other relief sought by Petitioner, which other relief is not opposed.

Respondents' Memorandum of Points and Authorities
SANTOS v. FELIX P. CAMACHO, et. al.
District Court of Guam Civil Case No. 04-00036

## Discussion.

### Need for Legislative Appropriation.

The proposed Administration Plan in Section III, on pages 5 & 6, provides that the total amount of estimated expenses to administer the EIC Settlement Fund is $975,389, and states that "All such costs shall be the responsibility of the Government of Guam." However, Section III does not stipulate that the expenditure of these funds by the Department of Revenue and Taxation shall be in accordance with an appropriation passed by the Guam Legislature. The Director of the Department of Revenue and Taxation is concerned that were he to expend government funds for this purpose without the Legislature first appropriating the same to the Department of Revenue and Taxation, he could be found to be in violation of 5 G.C.A. §22401 and be subjected to disciplinary action, including removal from office, and be convicted of a misdemeanor. The Organic Act of Guam and the laws of Guam provide that funds for this purpose must be appropriated by the Guam Legislature. 48 U.S.C. §1423j; 5 G.C.A. §22401. Thus, language should be inserted into Section V of the proposed Administration Plan stating that the expenditure of such funds shall be subject to their being appropriated by the Legislature.[1]

### Custodian of EIC Settlement Fund must be Changed.

The proposed Administration Plan in Section II (B), on page 3, establishes a Settlement Fund into which shall be paid the $60 million for delinquent EIC refunds referred to in Section II

---

[1] The Department of Revenue and Taxation estimates that $100,000 and not $75,000 as provided in the proposed Administration Agreement will be needed for postage without regard to the 10 year period, increasing total expenses to $1,000,389.

Respondents' Memorandum of Points and Authorities
SANTOS v. FELIX P. CAMACHO, et. al.
District Court of Guam Civil Case No. 04-00036

Case 1:04-cv-00006    Document 248-2    Filed 10/03/2005    Page 28 of 29

(A). Section II (B) states that "The custodian of the EIC Settlement Fund shall be the Director of Revenue and Taxation". However, the Department of Administration and not the Department of Revenue and Taxation has the power to take charge of the EIC Settlement Fund because the Department of Administration is charged with the responsibility of managing and accounting for all of the various funds of the Government of Guam and is responsible for disbursing monies owed by the government of Guam. 5 G.C.A. §20106, §21110, §21111, §21113, §22101 - §22110, §22201 - §22205, §50102, §50104, & §50107. Thus, the proposed Administration Plan should be revised to make the Director of the Department of Administration as the custodian of the EIC Settlement Fund.

## Compliance with Income Tax Refund Offset Program Required.

Section I (G), page 11 of the proposed Administration Plan, provides that "Unless otherwise prohibited by applicable law, if any EIC Class Member has an outstanding tax liability prior to the payment of any Claim made by such a Member pursuant to the Settlement Agreement and this Administration Plan, then such Claim or Claims shall be reduced by the amount of the applicable tax liability." However, no provision is made for administration of the income tax refund offset program under Section 6402 of the Internal Revenue Code, whereby refunds owed by the Government to taxpayers are to be reduced by past due child support and amounts owed to Government agencies. See: *Sorenson v. Secretary of Treasury*, 475 U.S. 851, 106 S.Ct. 1600, 89 L.Ed. 2d 855 (1986) (holding that refundable earned income tax credits are subject to the income tax refund offset program the same as ordinary income tax refunds). The Department of Revenue and Taxation has entered into agreements with the Guam Memorial Hospital Authority, the Child

Respondents' Memorandum of Points and Authorities
SANTOS v FELIX P. CAMACHO, et. al.
District Court of Guam Civil Case No. 04-00036

Support Collection Division of the Attorney General's Office and the Guam Housing and Urban Renewal Authority for this purpose. The proposed Administration Agreement should expressly take this program into account, and state that the order of the offsets shall be as follows: (1) Accounts receivable, Department of Revenue and Taxation, (2) Child support; (3) Guam Memorial Hospital Authority, and (4) GHURA.

## Revision of Second Notice Requirement.

Page 8, lines 1 – 6 of the proposed Administration Plan, states as follows:

> Within fifteen (15) days after the Effective Date of the Settlement, as defined in the Settlement Agreement, a Notice (identified as the "Second Notice" under the Settlement Agreement) including instructions and procedures to complete and file the Claim Form will be mailed along with the Claim Form to each potential EIC Class Member.

Due to the voluminous amount of materials and cost of postage, the Department of Revenue and Taxation requests that the above language be revised to state as follows:

> Within fifteen (15) days after the Effective Date of the Settlement, as defined in the Settlement Agreement, a **Notice** (identified as the "Second Notice" under the Settlement Agreement) together with the procedure of how to obtain instructions and forms will be mailed to each potential EIC Class Member.

## Concerns of Governor of Guam.

Finally, the undersigned Attorney General discloses to the Court that although the Settlement Agreement was signed by the Acting Governor, the Governor now appears to be having second thoughts about various aspects of the Agreement, and has recently purported to "instruct" the undersigned Attorney General to file no pleadings on his behalf without his

Respondents' Memorandum of Points and Authorities
SANTOS v FELIX P. CAMACHO, et. al.
District Court of Guam Civil Case No. 04-00036

permission as "client." Based upon the nature of this Constitutional office, the Governor is without authority to "instruct" the Attorney General with respect to litigation on behalf of the Government of Guam. By federal law, in the Organic Act of Guam, 48 U.S.C. § 1421g(d)(1), the Attorney General of Guam is designated as the "Chief Legal Officer for the Government of Guam." As such, the position of Attorney General controls all litigation by and on behalf of the Government of Guam, its departments, boards, agencies and instrumentalities. "The Organic Act makes the Attorney General the Chief Legal Officer of the government of Guam. The Governor is head of the executive branch, but *the Attorney General is the chief legal officer of the government of Guam, which includes not only the executive branch, but also the legislative and judicial branches. Thus, the sphere of the Attorney General's legal cognizance is within the entire government of Guam, legislative and judicial, not just the executive branch.*" *Moylan v. Camacho*, Superior Court of Guam, Special Proceeding Case No. SP230-03, "Decision and Order," dated November 10, 2003, p. 38 (Manibusan, J.) (emphasis in bold added).

Even before Judge Manibusan's Decision and Order in *Moylan v. Camacho*, and prior to inclusion in the Organic Act by Congress in 1998 of the term "Chief Legal Officer," the Legislature of Guam recognized that it is the Attorney General who controls litigation on behalf of the Government of Guam. "Notwithstanding any other provision of law, *the Attorney General shall have cognizance of all legal matters... involving the Executive Branch of the government of Guam*, its agencies, instrumentalities, public corporations, autono-mous agencies and the Mayors Council, all hereinafter referred to as 'agency.'" 5 G.C.A. § 30102 (emphasis added). *See also*, 5 G.C.A. § 30109 (the Attorney General shall "[c]onduct on behalf of the government of Guam all civil actions in which the government is an interested party"). Furthermore, 5 G.C.A. § 30103

Respondents' Memorandum of Points and Authorities
SANTOS v FELIX P. CAMACHO, et. al.
District Court of Guam Civil Case No. 04-00036

provides the "Attorney General shall have, in addition to the powers expressly conferred upon him by this Chapter, *those common law powers which include, but are not limited to*, the right to bring suit to challenge laws which he believes to be unconstitutional...." (Emphasis added.)

Because the "real client" of the Attorney General is the people, the Attorney General is generally "not constrained by the parameters of the traditional attorney-client relationship." *Terry v Wilder*, 29 Va. Cir. 418, 431 (1992) (quoting *Feeney v Commonwealth*, 366 N.E.2d 1262, 1266 (Mass. 1977)), *rev'd on other grounds*, 247 Va. 119, 439 S.E.2d 398 (Va. 1994). Unlike private attorneys, whose conduct in litigation may be subject to the whims of many clients, the position of Attorney General – who represents the Government of Guam and all its agencies and instrumentalities – answers to one client only: the people. The Attorney General is not subject to the direction of the particular officials named as defendants in the litigation. Instead, the views of the Attorney General prevail when a conflict arises between the views of the Attorney General and those of the agencies and officers whom the attorney general represents. *Battle v Anderson*, 708 F.2d 1523, 1529 (10th Cir. 1983) (holding that the views of the Oklahoma Attorney General in litigation "must prevail" over the views of the legal counsel for any particular state defendant); *Prisco v State of New York*, 804 F.Supp. 518, 520 (S.D.N.Y. 1992) (holding that Attorney General is authorized to represent individual state officers who are sued in their official capacities, despite claimed conflicts of interest).

While the Attorney General is obligated to represent government officials and agencies to the best of his abilities, he need not – indeed, must not – do so at the expense of the people as a whole. *Connecticut Comm'n of Spec. Revenue v Connecticut Freedom of Information Comm'n*, 387 A.2d 533, 538 (Conn. 1978) (Attorney General's real client is the people); *Reiter v*

Respondents' Memorandum of Points and Authorities
SANTOS v FELIX P. CAMACHO, et al.
District Court of Guam Civil Case No. 04-00036

*Wallgren*, 184 P.2d 571, 575 (Wash. 1947) (while Attorney General may represent state officers,

2 "it still remains his paramount duty to protect the interests of the people of the state");

3 *Commonwealth ex rel. Hancock v Paxton*, 516 S.W.2d 865, 867 (Ky. 1974) (Attorney General

4 represents people, not "machinery" of state government). To do so "would be an abdication of

5 official responsibility." *Feeney v Commonwealth*, 366 N.E.2d 1262, 1266 (Mass. 1977) (quoting

6 *Secretary of Administration and Fin. v Attorney Gen.*, 326 N.E.2d 334, 338 (Mass. 1975). *See*

7 *also Slezak v Ousdigian*, 110 N.W.2d 1, 5 (1961) (Attorney General must do more than espouse

8 individual views of state officials represented); *Ex parte Weaver*, 570 So. 2d 675, 684 (Ala.

9
10 1990) (upholding Attorney General's authority to dismiss state insurance department

11 proceedings over objection of state insurance commissioner); *State ex rel. Derryberry v Kerr-*

12 *McGee Corp.*, 516 P.2d 813, 821 (Okla. 1973) (upholding authority of Attorney General to settle

13 pending litigation). And that is precisely the reason why this Office has taken the position he has

14 on behalf of the Government of Guam defendants in the Proposition A and EITC litigation.

15 Whether the Governor's Office or any named defendant likes it or not, by law in the Organic

16 Act, by statute and the common law, the position Attorney General controls legal policy and

17 litigation decisions for the Government of Guam, its officers, agencies and instrumentalities.

18     Taken to its logical conclusion, if every government official were permitted to express

19 their legal position in court, not only would the Government of Guam not have a coherent

20 uniform legal policy, but the Government of Guam (People) would be subject to court criticism

21 and potential sanctions for maintaining conflicting legal positions. In essence, the Government

22 of Guam would have a incoherent legal policy, and litigation would abound by each government

23
24 official maintaining a disjointed legal position.

25

Respondents' Memorandum of Points and Authorities
SANTOS v FELIX P. CAMACHO, et. al.
District Court of Guam Civil Case No. 04-00036

The position of Attorney General has the exclusive and absolute discretion to set legal policy and to control all aspects of litigation for and against the Territory. *See Ex parte Weaver*, 570 So.2d 675, 677 (Ala. 1990) ("As the state's chief legal officer, 'the attorney general has power, both under common law and by statute to make any disposition of the state's litigation that he deems for its best interest. ... He may abandon, discontinue, dismiss, *or compromise it*'") (emphasis added); *Feeney v. Commonwealth*, 366 N.E. 2d 1262, 1267 (Mass. 1977) upholding authority of Attorney General to prosecute appeal in the U.S. Supreme Court over express objections of state officials); *Slezak v. Ousdigian*, 110 N.W.2d 1, 5 (Minn. 1961) (stating that "the courts will not control the discretionary power of the attorney general in conducting litigation for the state"); *State ex rel. Igoe v. Bradford*, 611 S.W.2d 343, 347 (Mo. Ct. App. 1980) ("It is for the attorney general to decide where and how to litigate these issues involving public rights and duties and to prevent injury to the public welfare"); *Public Defender Agency v. Superior Court*, 534 P.2d 947, 950 (Alaska 1975) (Attorney General possesses "power to make any disposition of the state's litigation which he thinks best"); *State ex rel. Board of Transportation v. Fremont, E. & M.V.R. Co.*, 35 N.W. 118, 120 (Neb. 1887) (recognizing that Attorney General controls litigation and other state officials "cannot control his actions"); *Perillo v. Dreher*, 314 A.2d 74, 79 (N.J. Super. Ct. App. Div. 1974) (recognizing that Attorney General has "the exclusive power to control all litigation to which the State is a party"); *Opinion of the Justices*, 373 A.2d 647, 649 (N.H. 1977) (Attorney General has "broad authority to manage the state's litigation and to make any disposition of a case which he deems is in the state's best interest"); *Michigan State Chiropractic Ass'n v. Kelley*, 262 N.W.2d 676, 677 (Mich. App. 1977)

Respondents' Memorandum of Points and Authorities
SANTOS v FELIX P. CAMACHO, et. al.
District Court of Guam Civil Case No. 04-00036

1    (Attorney General "has statutory and common law authority to act on behalf of the people of the

2    State of Michigan in any cause or matter, such authority being liberally construed").

3

4                            **Conclusion.**

5

6       Based upon the foregoing reasons, the Court should direct that the proposed Administration

7    Plan be revised in accordance with the points raised above.

8       Respectfully submitted this 8th day of November, 2004.

9                            **OFFICE OF THE ATTORNEY GENERAL**
                           DOUGLAS B. MOYLAN, **Attorney General of Guam**

10

11                            **Douglas B. Moylan**

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Respondents' Memorandum of Points and Authorities
SANTOS v FELIX P. CAMACHO, et. al.
District Court of Guam Civil Case No. 04-00036

# EXHIBIT 6

# FILED

**Issued by the**

## UNITED STATES DISTRICT COURT

DISTRICT COURT OF GUAM

JAN - 6 2005

—————— DISTRICT OF —————— Guam

MARY L.M. MORAN

CLERK OF COURT

JULIE BABAUTA SANTOS,

            Petitioner,

**V.**

FELIX C. CAMACHO, Governor of Guam, et al.,

            Respondents.

TO:    FELIX P. CAMACHO, Governor of Guam

## SUBPOENA IN A CIVIL CASE

CASE NUMBER: [1] Civil Case No. 04-00006

RECEIVED

JAN 07 2005

CALVO AND CLARK, LLP

☒ YOU ARE COMMANDED to appear in the United States District Court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| District Court of Guam<br>520 West Soledad Avenue<br>Hagatna, GU | 4th Floor |
| | DATE AND TIME<br>January 19, 2005<br>1:30 p.m. |

☐ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|
| | |

☒ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

**SEE ATTACHED**

| PLACE<br>District Court of Guam<br>520 West Soledad Avenue, Hagatna, Guam | DATE AND TIME<br>January 19, 2005<br>1:30 p.m. |
|---|---|

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
| | |

     Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT)<br>Assistant Attorney General<br>Attorney for Respondents | DATE<br>1/3/05 |
|---|---|

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER

Stephen A. Cohen, Suite 2-200E, Guam Judicial Center, 120 West O'Brien Dr., Hagatna, GU   96910; (671)   475-3324

## PROOF OF SERVICE

|   |   |   |
|---|---|---|
| DATE 1/5/05 2:57 PM | PLACE | |

**SERVED** ~~Camacho~~    Felix P. Camacho

SERVED ON (PRINT NAME)    MANNER OF SERVICE

Francisco M. Santos    Process officer II

SERVED BY (PRINT NAME)    TITLE

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _Jan. 05, 2005_
DATE

SIGNATURE OF SERVER
Francisco M. Santos

ADDRESS OF SERVER

---

### Rule 45, Federal Rules of Civil Procedure, Parts C & D:

#### (c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction which may include, but is not limited to, lost earnings and reasonable attorney's fee.

(2) (A) A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d)(2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to compel production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3) (A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i) fails to allow reasonable time for compliance,

(ii) requires a person who is not a party or an officer of a party to travel to a place more than the place where

person, except that, subject to the provisions of clause (c)(3)(B)(iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held, or

(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies, or

(iv) subjects a person to undue burden.

(B) If a subpoena

(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or

(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena, or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

#### (d) DUTIES IN RESPONDING TO SUBPOENA.

(1) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial-preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, things not produced that is sufficient to enable the demanding party

# DOCUMENTS TO BE PRODUCED BY FELIX P. CAMACHO, GOVERNOR OF GUAM

1.  All contracts, purchase orders, memoranda, executive orders, correspondence, notices and other documents evidencing, relating to and bearing on the hiring of the law firm of Calvo & Clark, LLP and /or Rodney J. Jacob, Esq. and Daniel M. Benjamin, Esq. to provide legal services to you in this case, and any and all correspondence in 2004 and 2005 from you and/or your representatives to the Attorney General or any Assistant Attorneys General regarding this case and any other EITC cases.

2.  All contracts, purchase orders, memoranda, executive orders, correspondence, notices and other documents evidencing, relating to and bearing on the hiring of Rawlen MT Mantanona, Esq. and/or the Mantanona Law Office to provide legal services to Lourdes M. Perez, the Director of the Department of Administration, in this case, and any and all correspondence in 2004 and 2005 from the said Director of the Department of Administration and/or her representatives to the Attorney General or any Assistant Attorneys General regarding this case and any other EITC cases.

3.  All contracts, purchase orders, memoranda, executive orders, correspondence, notices and other documents evidencing, relating to and bearing on the hiring of Rawlen MT Mantanona, Esq. and/or the Mantanona Law Office to provide legal services to Artemio B. Ilagan, the Director of the Department of Revenue and Taxation, in this case, and any and all correspondence in 2004 and 2005 from the said Director of the Department of Revenue and Taxation and/or his representatives to the Attorney General or any Assistant Attorneys General regarding this case and any other EITC cases.

4.  All documents, memoranda, e-mails and other documents evidencing, bearing-on and relating to any payments of Earned Income Tax Credits by the government of Guam to anyone during 2004.

# FILED

**Issued by the**

# UNITED STATES DISTRICT COURT

─────── **DISTRICT OF** ─────── Guam

DISTRICT COURT OF GUAM

JAN - 6 2005

MARY L.M. MORAN
CLERK OF COURT

JULIE BABAUTA SANTOS,

         **Petitioner,**

## V.

FELIX C. CAMACHO, Governor of Guam, et al.,

         **Respondents.**

## SUBPOENA IN A CIVIL CASE

CASE NUMBER: ¹ Civil Case No. 04-00006

**TO:** ANTHONY SANCHEZ, Office of the Governor

RECEIVED
JAN 07 2005
CALVO AND CLARK, LL

☒ YOU ARE COMMANDED to appear in the United States District Court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| District Court of Guam<br>520 West Soledad Avenue<br>Hagatna, GU | 4th Floor |
| | DATE AND TIME<br>January 19, 2005<br>1:30 p.m. |

☐ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|
| | |

☒ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

**SEE ATTACHED**

| PLACE | DATE AND TIME |
|---|---|
| District Court of Guam<br>520 West Soledad Avenue, Hagatna, Guam | January 19, 2005<br>1:30 p.m. |

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
| | |

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER SIGNATURE AND TITLE INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
|---|---|
| Assistant Attorney General<br>Attorney for Respondents | 1/3/05 |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
Stephen A. Cohen, Suite 2-200E, Guam Judicial Center, 120 West O'Brien Dr.
Hagatna, GU 96910; (671) 475-3324

## PROOF OF SERVICE

|  | DATE 5/4 2:50 pm | PLACE |
|---|---|---|
| SERVED | | Anthony Sanchez |

SERVED ON (PRINT NAME)          MANNER OF SERVICE

Francisco M Santos        Process officer II

SERVED BY (PRINT NAME)          TITLE

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on    Jan, 05, 2005

DATE

SIGNATURE OF SERVER

Francisco M Santos

ADDRESS OF SERVER

## Rule 45, Federal Rules of Civil Procedure, Parts C & D:

### (c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction which may include, but is not limited to, lost earnings and reasonable attorney's fee.

(2) (A) A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d)(2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to compel production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3) (A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

   (i) fails to allow reasonable time for compliance;

   (ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in

person, except that, subject to the provisions of clause (c)(3)(B)(iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held, or

   (iii) requires disclosure of privileged or other protected matter and no exception or waiver applies, or

   (iv) subjects a person to undue burden.

(B) If a subpoena

   (i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or

   (ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

   (iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena, or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

### (d) DUTIES IN RESPONDING TO SUBPOENA.

(1) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

## DOCUMENTS TO BE PRODUCED BY ANTHONY SANCHEZ, OFFICE OF THE GOVERNOR OF GUAM

All correspondence, memoranda, e-mails and other documents evidencing,

bearing-on and relating to any payments of Earned Income Tax Credits by the

government of Guam to anyone during 2004.

**F I L E D**

~~DISTRICT COURT OF GUAM~~

JAN - 6 2005

## Issued by the

# UNITED STATES DISTRICT COURT

**MARY L.M. MORAN**
**CLERK OF COURT**

——— DISTRICT OF ——— Guam

JULIE BABAUTA SANTOS,

　　　　　　Petitioner,

## SUBPOENA IN A CIVIL CASE

　　　　**V.**

FELIX C. CAMACHO, Governor of Guam,
et al.,

CASE NUMBER: [1] Civil Case No. 04-00006

　　　　　　Respondents.

TO: SHAWN GUMATAOTAO, Office of the Goveror

RECEIVED

JAN 07 2005

CALVO AND CLARK

[x] YOU ARE COMMANDED to appear in the United States District Court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| District Court of Guam 520 West Soledad Avenue Hagatna, GU | 4th Floor |
| | DATE AND TIME January 19, 2005 1:30 p.m. |

[ ] YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|
| | |

[x] YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

**SEE ATTACHED**

| PLACE | DATE AND TIME |
|---|---|
| District Court of Guam 520 West Soledad Avenue, Hagatna, Guam | January 19, 2005 1:30 p.m. |

[ ] YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
| | |

　　Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
|---|---|
| Assistant Attorney General Attorney for Respondents | 1/3/05 |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
Stephen A. Cohen, Suite 2-200B, Guam Judicial Center, 120 West O'Brien Dr.
Hagatna, GU 96910;　(671) 475-3324

## PROOF OF SERVICE

| | DATE 1/5/5 7:74 | PLACE |
|---|---|---|

SERVED

SERVED ON (PRINT NAME) ___Shawn Guerrero___   MANNER OF SERVICE

SERVED BY (PRINT NAME) ___Francisco M. Santos___   TITLE ___Process officer II___

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on ___Jan. 05/2005___
DATE

SIGNATURE OF SERVER
Francisco M. Santos

ADDRESS OF SERVER

---

Rule 45, Federal Rules of Civil Procedure, Parts C & D:

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction which may include, but is not limited to, lost earnings and reasonable attorney's fee.

(2) (A) A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d)(2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to compel production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3) (A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i) fails to allow reasonable time for compliance,

(ii) requires a person who is not a party or an officer of a

person, except that, subject to the provisions of clause (c)(3)(B)(iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held, or

(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies, or

(B) If a subpoena

(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or

(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena, or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d) DUTIES IN RESPONDING TO SUBPOENA.

(1) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party

## DOCUMENTS TO BE PRODUCED BY SHAWN GUMATAOTAO, OFFICE OF THE GOVERNOR OF GUAM

All press releases and press briefing memoranda in 2004 and 2005 bearing on and relating to the Earned Income Tax Credit and any court cases regarding the Earned Income Tax Credit.

# FILED

DISTRICT COURT OF GUAM

JAN - 6 2005

MARY L.M. MORAN
CLERK OF COURT

### Issued by the
## UNITED STATES DISTRICT COURT

DISTRICT OF ——— Guam

JULIE BABAUTA SANTOS,

        Petitioner,

        **V.**

FELIX C. CAMACHO, Governor of Guam, et al.,

        Respondents.

TO:  ERICA PEREZ, Office of the Governor

## SUBPOENA IN A CIVIL CASE

CASE NUMBER: [1] Civil Case No. 04-00006

RECEIVED
JAN 07 2005
CALVO AND CLARK, LLP

☒ YOU ARE COMMANDED to appear in the United States District Court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| District Court of Guam<br>520 West Soledad Avenue<br>Hagatna, GU | 4th Floor |
| | DATE AND TIME<br>January 19, 2005<br>1:30 p.m. |

☐ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|
| | |

☒ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

**SEE ATTACHED**

| PLACE | DATE AND TIME |
|---|---|
| District Court of Guam<br>520 West Soledad Avenue, Hagatna, Guam | January 19, 2005<br>1:30 p.m. |

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
| | |

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT)<br>Assistant Attorney General<br>Attorney for Respondents | DATE<br>1/3/05 |
|---|---|

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
Stephen A. Cohen, Suite 2-200E, Guam Judicial Center, 120 West O'Brien Dr.
Hagatna, GU 96910 (671) 475-3324

(See Rule 45, Federal Rules of Civil Procedure, Parts C & D on Reverse)

## PROOF OF SERVICE

| | DATE 1/5/5 2,4/2.a | PLACE |
|---|---|---|
| SERVED | | |

SERVED ON (PRINT NAME) Enica Perez    MANNER OF SERVICE

SERVED BY (PRINT NAME) Froncisco M. Santos    TITLE Process officer

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _Jan, 05, 2005_
DATE

SIGNATURE OF SERVER
Francisco M. Santos

ADDRESS OF SERVER

---

Rule 45, Federal Rules of Civil Procedure, Parts C & D:

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction which may include, but is not limited to, lost earnings and reasonable attorney's fee.

(2) (A) A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d)(2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to compel production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3) (A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i) fails to allow reasonable time for compliance;

(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in

person, except that, subject to the provisions of clause (c)(3)(B)(iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held, or

(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies, or

(iv) subjects a person to undue burden.

(B) If a subpoena

(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or

(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena, or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d) DUTIES IN RESPONDING TO SUBPOENA.

(1) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

## DOCUMENTS TO BE PRODUCED BY ERICA PEREZ, OFFICE OF THE GOVERNOR OF GUAM

All press releases and press briefing memoranda in 2004 and 2005 bearing on and relating to the Earned Income Tax Credit and any court cases regarding the Earned Income Tax Credit.

# FILED

## Issued by the

## UNITED STATES DISTRICT COURT

**DISTRICT COURT OF GUAM**

JAN - 6 2005

DISTRICT OF ___Guam___

**MARY L.M. MORAN**
**CLERK OF COURT**

JULIE BABAUTA SANTOS,

      Petitioner,

## SUBPOENA IN A CIVIL CASE

**V.**

FELIX C. CAMACHO, Governor of Guam,
et al.,

CASE NUMBER: [1] Civil Case No. 04-00006

      Respondents.

**RECEIVED**
JAN 07 2005
CALVO AND CLARK, LLP

TO:  SHANNON TAITANO, Legal Counsel to the Governor
          Office of the Governor

[x] YOU ARE COMMANDED to appear in the United States District Court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM 5 |
|---|---|
| District Court of Guam<br>520 West Soledad Avenue<br>Hagatna, GU | 4th Floor |
| | DATE AND TIME<br>January 19, 2005<br>1:30 p.m. |

[ ] YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|
| | |

[x] YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

**SEE ATTACHED**

| PLACE | DATE AND TIME |
|---|---|
| District Court of Guam<br>520 West Soledad Avenue, Hagatna, Guam | January 19, 2005<br>1:30 p.m. |

[ ] YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
| | |

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
|---|---|
| Assistant Attorney General<br>Attorney for Respondents | 1/3/05 |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
Stephen A. Cohen, Suite 2-200E, Guam Judicial Center, 120 West O'Brien Dr.
Hagatna, Guam 96910 (671) 475-3324

(See Rule 45, Federal Rules of Civil Procedure, Parts C & D on Reverse)

## PROOF OF SERVICE

DATE 1/5/05 2:40 PM  PLACE

SERVED _____ Chanson Taitum

SERVED ON (PRINT NAME)                    MANNER OF SERVICE

Francisco M. Santos          Process Officer II

SERVED BY (PRINT NAME)                    TITLE

---

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _Jan, 05, 2005_
DATE

SIGNATURE OF SERVER
Francisco M. Santos

ADDRESS OF SERVER

---

Rule 45, Federal Rules of Civil Procedure, Parts C & D:

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction which may include, but is not limited to, lost earnings and reasonable attorney's fee.

(2) (A) A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d)(2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to compel production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3) (A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i) fails to allow reasonable time for compliance;

(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in

person, except that, subject to the provisions of clause (c)(3)(B)(iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held, or

(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies, or

(iv) subjects a person to undue burden.

(B) If a subpoena

(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or

(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena, or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d) DUTIES IN RESPONDING TO SUBPOENA.

(1) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

## DOCUMENTS TO BE PRODUCED BY SHANNON TAITANO, LEGAL COUNSEL OF THE GOVERNOR

1. All contracts, purchase orders, memoranda, executive orders, correspondence, notices and other documents evidencing, relating to and bearing on the hiring of the law firm of Calvo & Clark, LLP and /or Rodney J. Jacob, Esq. and Daniel M. Benjamin, Esq. to provide legal services to Felix P. Camacho, the Governor of Guam, in this case.

2. All contracts, purchase orders, memoranda, executive orders, correspondence, notices and other documents evidencing, relating to and bearing on the hiring of Rawlen MT Mantanona, Esq. and/or the Mantanona Law Office to provide legal services to Lourdes M. Perez, the Director of the Department of Administration, in this case.

3. All contracts, purchase orders, memoranda, executive orders, correspondence, notices and other documents evidencing, relating to and bearing on the hiring of Rawlen MT Mantanona, Esq. and/or the Mantanona Law Office to provide legal services to Artemio B. Ilagan, the Director of the Department of Revenue and Taxation, in this case.

4. Any and all correspondence in 2004 and 2005 from you and/or the Governor of Guam to the Attorney General of Guam or any Assistant Attorney General regarding this case and any other EITC cases.

# FILED

DISTRICT COURT OF GUAM

JAN - 6 2005

MARY L.M. MORAN
CLERK OF COURT

## Issued by the

## UNITED STATES DISTRICT COURT

DISTRICT OF ———— Guam ————

JULIE BABAUTA SANTOS,

Petitioner,

V.

FELIX C. CAMACHO, Governor of Guam,
et al.,

Respondents.

## SUBPOENA IN A CIVIL CASE

CASE NUMBER: [1] Civil Case No. 04-00006

RECEIVED
JAN 07 2005
CALVO AND CLARK, LLP

TO:   LOURDES M. PEREZ, Director, Department of Administration
Government of Guam

☒ YOU ARE COMMANDED to appear in the United States District Court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| District Court of Guam 520 West Soledad Avenue Hagatna, GU | 4th Floor |
| | DATE AND TIME January 19, 2005 1:30 p.m. |

☐ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|
| | |

☒ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

## SEE ATTACHED

| PLACE | DATE AND TIME |
|---|---|
| District Court of Guam 520 West Soledad Avenue, Hagatna, Guam | January 19, 2005 1:30 p.m. |

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
| | |

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
|---|---|
| Assistant Attorney General Attorney for Respondents | 1/5/05 |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
Stephen A. Cohen, Suite 2-200E, Guam Judicial Center, 120 West O'Brien Dr.
Hagatna, GU 96910, (671) 475-3324

(See Rule 45, Federal Rules of Civil Procedure, Parts C & D on Reverse)

## PROOF OF SERVICE

DATE 1/5/05 3:35 pm     PLACE

SERVED

SERVED ON (PRINT NAME) _Lourdes M. Perez_     MANNER OF SERVICE

SERVED BY (PRINT NAME) _Francisco M. Stites_     TITLE _Process Officer II_

---

### DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _Jan, 05, 2005_
DATE

SIGNATURE OF SERVER
_Francisco M. Stites_

ADDRESS OF SERVER

---

Rule 45, Federal Rules of Civil Procedure, Parts C & D:

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction which may include, but is not limited to, lost earnings and reasonable attorney's fee.

(2) (A) A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d)(2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to compel production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3) (A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i) fails to allow reasonable time for compliance;

(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in

person, except that, subject to the provisions of clause (c)(3)(B)(iii) of this rule, such a person in order to attend trial be commanded to travel from any such place within the state in which the trial is held, or

(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies, or

(iv) subjects a person to undue burden.

(B) If a subpoena

(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or

(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena, or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified condition.

(d) DUTIES IN RESPONDING TO SUBPOENA.

(1) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

**DOCUMENTS TO BE PRODUCED BY LOURDES M. PEREZ, DIRECTOR OF THE DEPARTMENT OF ADMINISTRATION**

1. All contracts, purchase orders, memoranda, executive orders, correspondence, notices and other documents evidencing, relating to and bearing on the hiring of Rawlen MT Mantanona, Esq. and/or the Mantanona Law Office to provide legal services to you in this court case.

2. Any and all correspondence in 2004 and 2005 from you and/or your representatives to the Attorney General of Guam or any Assistant Attorney General regarding this court case and any other EITC court cases.

3. All correspondence, memoranda, e-mails, and other documents evidencing, bearing-on and relating to any payments of Earned Income Tax Credits by the government of Guam to anyone during 2004.



**FILED**

DISTRICT COURT OF GUAM

JAN - 6 2005

MARY L.M. MORAN
CLERK OF COURT

## Issued by the

# UNITED STATES DISTRICT COURT

DISTRICT OF ——— Guam

JULIE BABAUTA SANTOS,

        Petitioner,

## SUBPOENA IN A CIVIL CASE

### V.

FELIX C. CAMACHO, Governor of Guam, et al.,

        Respondents.

CASE NUMBER: ¹ Civil Case No. 04-00006

TO:  ARTEMIO ILAGAN, Director, Department of Revenue & Taxation
             Government of Guam

RECEIVED

JAN 07 2005

CALVO AND CLARK, LLP

☒ YOU ARE COMMANDED to appear in the United States District Court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| District Court of Guam 520 West Soledad Avenue Hagatna, GU | 4th Floor |
| | DATE AND TIME January 19, 2005 1:30 p.m. |

☐ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|
| | |

☒ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

**SEE ATTACHED**

| PLACE | DATE AND TIME |
|---|---|
| District Court of Guam 520 West Soledad Avenue, Hagatna, Guam | January 19, 2005 1:30 p.m. |

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
| | |

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
|---|---|
| Assistant Attorney General Attorney for Respondents | 1-3-05 |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
Robert M. Weinberg, Suite 2-200E, Guam Judicial Center, 120 West O'Brien Dr.
Hagatna, Guam 96910, (671) 475-3324

(See Rule 45, Federal Rules of Civil Procedure, Parts C & D on Reverse)

---

## PROOF OF SERVICE

DATE 1/5/05 3:30 p.m. PLACE

SERVED ___Artemis B Allagar___ ___Artemio I Laogad___

SERVED ON (PRINT NAME)      MANNER OF SERVICE

___Francisca M. Santos___ ___Process officer II___

SERVED BY (PRINT NAME)      TITLE

---

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on ___Jan 5, 2005___
DATE

SIGNATURE OF SERVER
Francisca M. Santos

ADDRESS OF SERVER

---

## Rule 45, Federal Rules of Civil Procedure, Parts C & D:

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction which may include, but is not limited to, lost earnings and reasonable attorney's fee.

(2) (A) A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d)(2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to compel production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3) (A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i) fails to allow reasonable time for compliance,

(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where

person, except that, subject to the provisions of clause (c)(3)(B)(iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held, or

(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies, or

(B) If a subpoena

(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or

(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena, or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d) DUTIES IN RESPONDING TO SUBPOENA.

(1) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party

**DOCUMENTS TO BE PRODUCED BY ARTEMIO B. ILAGAN, DIRECTOR OF THE DEPARTMENT OF REVENUE AND TAXATION**

1. All contracts, purchase orders, memoranda, executive orders, correspondence, notices and other documents evidencing, relating to and bearing on the hiring of Rawlen MT Mantanona, Esq. and/or the Mantanona Law Office to provide legal services to you in this court case.

2. All correspondence in 2004 and 2005 from you and/or your representatives to the Attorney General of Guam or to any Assistant Attorney General regarding this court case and any other EITC court cases.

3. All correspondence, memoranda, e-mails, and other documents evidencing, bearing-on and relating to any payments of Earned Income Tax Credits by the government of Guam to anyone during 2004.

# EXHIBIT 7



RECEIVED
FEB 07 2005
CALVO AND CLARK, LLP

**FILED**
**DISTRICT COURT OF GUAM**

IN THE DISTRICT COURT OF GUAM FEB - 7 2005

TERRITORY OF GUAM

**MARY L.M. MORAN**
**CLERK OF COURT**

\* \* \*

JULIE BABAUTA SANTOS,              )
individually, and on behalf        )
of all those similarly situated,   )
                                   )
              Plaintiffs,          )
                                   )
      vs.                          )     CIVIL CASE
                                   )     NO. 04-00006
FELIX A. CAMACHO,                  )
Governor of Guam, et al.,          )
                                   )
              Defendants.          )
_____)

TRANSCRIPT OF PROCEEDINGS

BEFORE

THE HONORABLE JOAQUIN V.E. MANIBUSAN, JUNIOR
Magistrate Judge

**HEARING ON MOTIONS**

**THURSDAY, JANUARY 25, 2005**
\* \* \*

APPEARANCES:

**FOR THE PLAINTIFFS:**

LAW OFFICES OF PHILLIPS & BORDALLO
BY:  MICHAEL PHILLIPS, Esq.
410 West O'Brien Drive
Agana, Guam  96910

**FOR DEFENDANT GOVERNMENT OF GUAM:**

OFFICE OF THE ATTORNEY GENERAL
DOUGLAS MOYLAN, ATTORNEY GENERAL
BY:  ROBERT WEINBERG, Assistant Attorney General
        STEPHEN COHEN, Assistant Attorney General
Guam Judicial Center, Suite 2-200E
120 West O'Brien Drive
Agana, Guam 96910

**FOR DEFENDANT GOVERNOR OF GUAM:**

LAW OFFICES OF CALVO & CLARK
Attorneys At Law
BY:  EDUARDO A. CALVO, Esq
        RODNEY J. JACOB, Esq.
        DANIEL BENJAMIN, Esq.
        ARTHUR B. CLARK, Esq.
655 South Marine Corps Drive
Tamuning, Guam  96911

```
 1                    I-N-D-E-X

 2

 3    GOVERNMENT WITNESS      DIRECT  CROSS  REDIRECT REDIRECT

 4    Artemio B. Ilagan        19 (by Mr. Weinberg)
                               41 (by Mr. Mantanona)
 5                                        43      51

 6    Lourdes Perez            57 (by Mr. Cohen)
                               79 (by Mr. Mantanona)
 7                                        82

 8          ------------------------------------------------

 9

10                    E-X-H-I-B-I-T-S

11

12    GOVERNMENT EXHIBIT              IDENTIFIED/ADMITTED

13

14    HH - Certificate of Emergency      26          73

15    R  - Charles Troutman letter       51         103

16    KK - Certificate of Emergency      59          73

17    Joint 16 - Mantanona contract      77          78

18    BB - Letter to Attorney General    82          84
             re substitution of counsel
19
      DD - Response from Attorney General 84         86
20

21

22

23

24

25
```

1    HAGATNA, GUAM; TUESDAY, JANUARY 25, 2005; 10:12 A.M.

2                              * * *

3         THE CLERK:  Civil case 04-00006, Julie Babauta

4    Santos, individually, and on behalf of all those

5    similarly situated, versus Felix A. Camacho, Governor

6    of Guam, et al.; petitioner's motion for orders

7    approving the administration plan and amending notice;

8    motion to strike appearances and pleadings; and motion

9    for relief from order issued by the Court on November

10   12, 2004.

11        Counsel, please state your appearances.

12        MR. PHILLIPS:  Good morning, Your Honor, Mike

13   Phillips for the petitioner Julie Babauta Santos and et

14   cetera.

15        MR. CALVO:  Eduardo Calvo of Calvo and Clark,

16   on behalf of Felix Camacho, Governor of Guam.

17        MR. JACOB:  Rodney Jacob, Calvo and Clark, on

18   behalf of Felix Camacho, Governor of Guam.

19        MR. BENJAMIN:  Daniel Benjamin, Calvo and

20   Clark, on behalf of Felix Camacho, Governor of Guam.

21        MR. CALVO:  And Your Honor, with us today is

22   Governor Camacho.

23        THE COURT:  The Court notes the presence of

24   the Governor.

25        MS. TAITANO:  Shannon Taitano, Office of the

1    Governor, counsel for the Governor of Guam.

2         MR. MANTANONA:  Good morning, Your Honor,

3    Rawlen Mantanona for defendants Artemio Ilagan,

4    Director of Revenue and Taxation, and for Director

5    Lourdes Perez, Director of Department of

6    Administration, also defendant.

7         Thank you, Your Honor.

8         MR. COHEN:  Stephen Cohen on behalf of all the

9    respondents, Your Honor.

10        MR. WEINBERG:  And Rob Weinberg from the

11   Attorney General's Office, also on behalf of all of the

12   respondents.

13        THE COURT:  All right.  The matter is before

14   the Court today based on various motions.  It appears

15   that the government's motion, the Attorney General's

16   motion to strike needs to be heard by the Court first.

17        Mr. Weinberg and Mr. Cohen.

18        MR. WEINBERG:  Yes.  Your Honor, would you

19   want me up here?

20        THE COURT:  Please, you could take the podium

21   if you desire or you can argue there, whatever is more

22   convenient for you.

23        All right, then you may be seated where you're

24   at.

25        MR. WEINBERG:  Thank you, Your Honor.

1    MR. CALVO: Excuse me, Your Honor, if I may?

2    THE COURT: Yes.

3    MR. CALVO: I think connected to the motion to

4    strike, Your Honor, is also our notice of substitution

5    of counsel, and however it pleases the Court; would the

6    Court like to deal with that first so that we can enter

7    our appearance formally as substituted counsel, or as

8    counsel of record for the Governor of Guam? It seems

9    like that might be the first thing that the Court may

10   want to consider.

11   THE COURT: Well, the Attorney General has

12   filed a motion to strike these notices that have been

13   filed with the Court, so I suppose dealing with either

14   one would resolve the issue before the Court. See, you

15   don't have a motion that's pending, is that correct?

16   See, I'm only dealing with motions that are pending

17   before the Court.

18   MR. CALVO: Right.

19   THE COURT: The motion is by the government,

20   the Attorney General, to strike appearances that have

21   been filed on behalf of the individual defendants.

22   MR. CALVO: I understand, Your Honor, we --

23   THE COURT: So that's why I'm proceeding that

24   way, because the Court basically has only the motion to

25   strike and the motion for adoption of the plan before

1  it.

2  MR. CALVO:  It's a little bit of an unusual

3  situation, as I understand it, Your Honor.  We filed

4  a notice pursuant to General Rule 1.9 with the proposed

5  order, so provided the Court deals with that, along

6  with the motion to strike.

7  THE COURT:  See, my preference in the

8  proceeding would be that in dealing with the Attorney

9  General's motion to strike, in effect we would be

10  hearing your opposition to the motion, and in deciding

11  that issue, ultimately determining whether or not there

12  will be a substitution in the matter.

13  MR. CALVO:  Thank you, Your Honor.

14  THE COURT:  Does that --

15  MR. CALVO:  That answers my question.

16  THE COURT:  All right.  Mr. Weinberg.

17  MR. WEINBERG:  Thank you, Your Honor.

18  (Inaudible.)

19  THE COURT:  All right, sir, I've been advised

20  also to say that in speaking, you need to talk loudly

21  so it could be picked up by the microphone, because

22  we're taping the proceedings.

23  MR. WEINBERG:  Your Honor, I don't know where

24  to begin.  I know this Court is already familiar with a

25  lot of the issues having -- or the questions of law

1  that we have presented here as to who controls the

2  representation of the Government of Guam and --

3        THE COURT:  All right, before we proceed,

4  let me ask, are you going to be calling witnesses with

5  respect to this part of the motion?

6        MR. WEINBERG:  We do have, we do anticipate

7  that there will be testimony --

8        THE COURT:  All right.

9        MR. WEINBERG:  -- on these questions, because

10  part of our argument is that the contract for the

11  provisions of legal counsel, and Mr. Mantanona and the

12  Calvo and Clark law firm are not legal under Guam law,

13  so we did --

14        THE COURT:  So who are these individuals that

15  you are intending to call as witnesses?

16        MR. WEINBERG:  Well, Shannon Taitano is one.

17  We anticipated eliciting the testimony also from

18  Lou Perez, the Director of the Department of

19  Administration; possibly from the Governor; and

20  possibly from Art Ilagan, the Director --

21        We were going to go through this process in

22  testimony with them and ask them by what means these

23  attorneys over here are sitting here purporting to

24  represent.  It's our position that (inaudible) don't

25  have legal authority, they do not have a legal contract

1  to represent the Governor or the Director (inaudible).

2      Yes, there will be testimony.

3      THE COURT:  All right.  Let me ask if you

4  could move the microphone closer to you, Mr. Weinberg.

5  It's not picking up.

6      MR. WEINBERG:  (Inaudible.)

7      THE COURT:  So, do you wish to basically make

8  arguments, or do you want to call these witnesses in

9  for purposes of the motion, or --

10      MR. WEINBERG:  However the Court would like

11  to proceed.  I don't think that additional argument is

12  really necessary.  You've read our briefs, I'm sure.

13  So if you'd like us to proceed and put witnesses on,

14  we --

15      THE COURT:  Well, if you think it's necessary

16  for purposes of your motion.

17      (Pause.)

18      MR. WEINBERG:  There are a lot of documents,

19  and if the parties could stipulate or -- as to the

20  admissibility of these documents, it might expedite the

21  matter.

22      THE COURT:  What are the documents that you

23  wish to --

24      MR. WEINBERG:  These are documents produced by

25  the, by the Governor's Office having to do with the

1　contract for Calvo and Clark and Rawlen Mantanona, and

2　other documents related to the procurement of legal

3　services.

4　　　　　THE COURT:　Let me ask counsel.　Could there

5　be a stipulation that these documents purport to be

6　what they are?

7　　　　　MR. CALVO:　Well, Your Honor, that's -- it's

8　possible.　The problem is that we received documents

9　last night as we were preparing for today's hearing.

10　We have not had, as we expressed to the AG's office

11　prior to the hearing, have not had an opportunity to go

12　through those documents.

13　　　　　It might be possible to be able to go through

14　the documents to review whether or not -- to review the

15　documents to determine whether or not testimony is

16　necessary, in the view of the Attorney General's

17　Office.　From our perspective, I don't think any

18　testimony is necessary, but we're prepared to go

19　forward with argument on the propriety of our contract

20　in representing the Governor.　But if it pleases the

21　Court, we will --

22　　　　　THE COURT:　Well, I'm only asking Mr. Weinberg

23　because I want him to be able to produce to the court

24　whatever evidence, whatever information you think may

25　be necessary for purposes of your motion to strike.

1    Let's start with the witnesses; you said you

2  wanted to call the Governor to the stand?

3        MR. WEINBERG:  (No audible response.)

4        (Pause.)

5        MR. CALVO:  Your Honor?

6        THE COURT:  Yes, Mr. Calvo.

7        MR. CALVO:  May I suggest that we confer with

8  the AG's office regarding this, because depending on

9  where they're going to go with this, there may be

10  additional evidence that we may want to put into the

11  record also with respect to their proceeding with the

12  evidentiary part of the argument.

13        I'm not sure we could work anything out, it's

14  just that we haven't had the opportunity to try, to

15  perhaps expedite this process, and really --

16        THE COURT:  That's basically what I wanted to

17  say is if you intend to call the Governor, what are you

18  going to ask the Governor, and to see whether the

19  information could be stipulated by counsel.

20        MR. WEINBERG:  We intend to ask the Governor

21  by what means he has hired Calvo and Clark and by what

22  means he has purported to amend the contract with Calvo

23  and Clark; by what means Mr. Rawlen Mantanona has been

24  hired to represent the Director of RevTax and the

25  Director of Administration in this lawsuit.  It's our,

1  part of our contentions here is that these attorneys

2  here are purporting to represent Government of Guam

3  officials and provide legal services in violation of

4  Guam law.  And if that's the case --

5        THE COURT:  All right.  But that's a legal

6  argument, though, that the Court can hear without

7  actually eliciting the testimony -- the basis.  I mean,

8  the documents here would appear to supply the Court

9  with the information that's needed to arrive at the

10  conclusion as to why they're here before the Court

11  today.

12        MR. WEINBERG:  I think the only -- the

13  documents that we're looking at have to do with the

14  contracts that have been produced by the Governor's

15  Office.

16        THE COURT:  And as to those contracts, I don't

17  think there's -- nobody is denying that they represent

18  what they represent to be?

19        MR. CALVO:  That's correct, Your Honor.

20        THE COURT:  All right.

21        MR. CALVO:  At least that's documents that we

22  have.

23        THE COURT:  Your retained contract?

24        MR. CALVO:  Yes.

25        MR. WEINBERG:  Now, on this limited issue of

1  the legal services by a private law firm, there is also

2  another question that we want to ask of the Governor,

3  because it's our understanding that at least with

4  respect to Mr. Mantanona, he was hired under some --

5  something the Governor has called an emergency

6  procurement, and we'd like to ask the Governor about

7  what the nature of the emergency was under Guam law

8  that he hired Mr. Mantanona without consultation or the

9  agreement of the Attorney General.

10         THE COURT:  Well, my reading of that appeared

11  that that memorandum came from Ms. Taitano.

12         MR. WEINBERG:  Well, I --

13         THE COURT:  Maybe she may be the person that

14  you need to ask.

15         MR. WEINBERG:  I can get that from Ms.

16  Taitano.

17         THE COURT:  Okay.  Any other information from

18  the Governor?

19         MR. WEINBERG:  Not on this question having to

20  do with the Attorney General, with the Attorney General

21  representing all the respondents.

22         THE COURT:  Okay.  The next witness then.

23         MR. WEINBERG:  Do we have anybody else other

24  than --

25         MR. COHEN:  Yes.

1           (Pause.)

2           MR. WEINBERG:  Lou Perez and Art Ilagan would

3   also be asked to testify as to their requests to the

4   Governor for legal services outside the office of the

5   Attorney General.

6           THE COURT:  All right.  Could that also be

7   answered by Ms. Taitano who issued the, I guess the

8   emergency --

9           MR. WEINBERG:  I don't believe so, Your Honor.

10  They may have asked Ms. Taitano to do that, to do that

11  for her, but I think since they're here, it would be

12  advisable to ask them directly what (inaudible).

13          MR. CALVO:  Again, Your Honor --

14          THE COURT:  Okay.

15          MR. CALVO:  Again, this is something that

16  might be able to be resolved through a stipulation

17  after we confer, if we really are able to get to what

18  Mr. Weinberg is trying to get to.  And quite frankly,

19  at this point I'm not really sure, Your Honor.  But

20  maybe we can confer about that.

21          THE COURT:  All right.  Do you wish some time

22  then to talk together off the record?

23          MR. CALVO:  Right, maybe a 10-minute, 15-

24  minute recess, Your Honor.

25          THE COURT:  Mr. Weinberg?

1    MR. WEINBERG: No objection.

2    THE COURT: All right, let's take a 15-minute

3    recess, and hopefully the issue regarding testimony

4    today can be resolved so that we can move forward from

5    there.

6    MR. CALVO: Your Honor?

7    THE COURT: Yes.

8    MR. CALVO: Prior to the recess, I just would

9    like to comment that, as you can see, we have a full

10    courtroom of government officials. I'm really happy

11    that the court is going through this process to try and

12    find out, you know, what the Attorney General is trying

13    to accomplish here, so that we can get an idea as to

14    how long these very busy people have to be in the

15    courtroom or really, you know, not get back to what

16    they should be doing, which is, you know, working.

17    THE COURT: Have they be subpoenaed?

18    MR. CALVO: Yes.

19    THE COURT: All right.

20    MR. WEINBERG: (Inaudible) is subpoenaed.

21    And to answer the question, what I'm trying --

22    what the Attorney General's Office would like to do is

23    empty the courtroom, and we can do that as soon as the

24    Court rules that these gentlemen over here do not

25    represent the respondents, and that we do, and then

1  we'll be able to (inaudible).

2          THE COURT:  All right, let's take a 15-minute

3  recess, let me allow counsel to see whether they can

4  resolve this issue.  If not, then we'll be back and

5  we'll continue with the arguments before the Court

6  today.

7          MR. CALVO:  Thank you, Your Honor.

8          THE COURT:  You're welcome.

9              (Recess was taken at 10:55 a.m.)

10             (Proceedings resumed at 11:16 a.m.)

11         THE COURT:  Counsel, are we ready to proceed?

12  Mr. Weinberg?

13         MR. CALVO:  Your Honor?

14         THE COURT:  Mr. Calvo.

15         MR. CALVO:  If I may, just a housekeeping

16  matter.  I was told by my partner here that perhaps the

17  Court had decided with respect to the witnesses in the

18  courtroom, and as far as their availability, and when

19  they might be needed?

20         THE COURT:  Yes.  Well, you know, if they're

21  not needed for the motion to strike, I was inclined to

22  release them at the moment.

23         MR. CALVO:  Until further notice, Your Honor?

24         THE COURT:  Until further notice from the

25  court.

1        MR. CALVO: Thank you, Your Honor.

2        MR. PHILLIPS: Your Honor, if I may?

3        THE COURT: Yes, Mr. Phillips.

4        MR. PHILLIPS: We, just to the Attorney

5 General, the possibility of releasing certain witnesses

6 subject to a 30-minute call by the Court. That's my

7 understanding of the agreement, and if that's the

8 agreement I have no objection. Otherwise, Your Honor,

9 I think it's very important that the witnesses stay

10 because of the fact that they will be needed.

11        THE COURT: When we come -- when we address

12 your issues?

13        MR. PHILLIPS: That's correct, Your Honor.

14 I have no objection to them leaving as long as they're

15 subject to call within 30 minutes.

16        UNKNOWN VOICE: With that understanding, Your

17 Honor.

18        MR. WEINBERG: And, Your Honor, because I'll

19 be addressing Mr. Phillips's motion, I just would like

20 at least to note for the record that we think it's

21 irrelevant to have testimony on that. We'd like to be

22 able to address the Court on that issue at that time.

23        THE COURT: All right.

24        MR. WEINBERG: The Attorney General subpoenaed

25 these witnesses (inaudible).

1          THE COURT:  I see.  Well, let me release the

2     witnesses, let me release the Governor.

3          Sir, thank you for your patience sitting and

4     waiting; the Court will release you at this time

5     subject to recall based on what has been represented to

6     the court.

7          (Pause.)

8          THE COURT:  Any other matters before we

9     proceed with argument?  Or -- well, Mr. Weinberg.

10         MR. WEINBERG:  No, Your Honor, I think we are

11    ready to call our first witness on the question of the

12    propriety of the counsel's contract to represent the

13    others.

14         THE COURT:  All right, you may call your first

15    witness then.

16         MR. WEINBERG:  Art Ilagan.

17         THE COURT:  Mr. Ilagan.

18         THE CLERK:  Please raise your right hand.

19              **ARTEMIO B. ILAGAN,**

20    called as a witness on behalf of the Attorney General,

21    was first duly sworn and testified as follows:

22         THE CLERK:  Please state your full name and

23    spell your last name for the record.

24         THE WITNESS:  My full name is Artemio B.

25    Ilagan, I-L-A-G-A-N.

1  **DIRECT EXAMINATION**

2  BY MR. WEINBERG:

3      Q.    Mr. Ilagan, I'm Rob Weinberg for the Attorney

4  General's Office.

5            You were an original signatory to the

6  settlement agreement, were you not?

7      A.    Yes, sir.

8      Q.    And this is in June of last year?

9      A.    Yes, sir.

10     Q.    Did you have an opportunity to talk to anybody

11 at the Attorney General's Office about that agreement?

12     A.    Prior to signing?

13     Q.    Have you spoken to anyone prior to, to signing

14 it, yes.

15           MR. CALVO:  Objection, Your Honor.  My

16 understanding on the proffer by the Attorney General's

17 Office at this preliminary stage is that they were

18 going to strictly delve into the procurement issue and

19 not the other matters that are going to be before the

20 Court later on, I imagine, this afternoon.

21           THE COURT:  Mr. Weinberg, is that a

22 preliminary question?

23           MR. WEINBERG:  Well, Your Honor, I think it

24 goes to the issue of why Mr. Ilagan has requested

25 independent counsel.  At one point he was satisfied

1   with counsel's -- with representation from the Attorney

2   General's Office and at some point later he was not,

3   and I'm just trying to get to, to find out at what

4   point he changed his mind about the Attorney General's

5   Office representing him.

6          THE COURT:  Why don't we cut into the chase

7   and ask the question directly?

8          MR. WEINBERG:  Well, let me ask you that

9   question directly, Mr. Ilagan.

10     Q.    At what point did you decide that you did not

11  want to be represented by the Attorney General?

12     A.    When you look at the, the circumstances of the

13  settlement, it was really settled too fast.  We were

14  called Friday night; John, my deputy was called Friday

15  night, we met Saturday, we suggested ways to implement

16  a plan that the Lieutenant Governor who was Governor at

17  that time wanted to happen that weekend, it was too

18  short --

19     Q.    Let me slow you down.  When you say we met on

20  a Saturday, who is we?

21     A.    The deputy, John Camacho, myself, and Paul

22  Pablo.

23     Q.    Paul who?

24     A.    Paul Pablo.

25     Q.    And who is he?

1    A.    He's the Tax Enforcement Administrator.

2    Q.    And where did you meet?

3    A.    In my office.

4    Q.    Was anyone else present?

5    A.    Joe Rios was there, but he just came in from

6    the states, his father was dying, so he really didn't

7    participate, he went home.

8    Q.    And so back in, this was -- this is in what,

9    June the 13th, or the --

10   A.    This is Saturday night.

11   Q.    Saturday night in June?

12   A.    Right.

13   Q.    Of 2004?

14   A.    Right.

15   Q.    And at that point there, did you -- were you

16   dissatisfied with the Attorney General's

17   representation?

18   A.    Uhm, we never met.

19   Q.    When you signed the settlement agreement where

20   were you; who was present?

21   A.    Uhm, in the conference room, it was John,

22   myself, Paul Pablo, Joey Manibusan --

23   Q.    And for the record, who is Joey Manibusan?

24   A.    He's the deputy director for Department of

25   Administration.

1      Q.    Anyone else present?

2      A.    The media was there.

3      Q.    I'm sorry?

4      A.    The media was there, the Lieutenant Governor

5  was there, the AG was there, uhm, Mr. Mike Phillips was

6  there.

7      Q.    And what reservations did you have about the

8  settlement agreement at that time?

9      A.    We didn't really review it, it was just given

10 to us that day to, to look at.

11           Actually they gave it to us a few minutes

12 before the signature, and then they pulled it back;

13 and then when it was ready for signature they gave it

14 back to us to sign.

15     Q.    Since you've signed it, have you had an

16 opportunity to review the settlement agreement?

17     A.    Yes.

18     Q.    All right.  And since that time, what if any

19 objections or reservations do you have about that

20 settlement agreement?

21     A.    There's a lot of things in there that I didn't

22 see that we can -- that I felt was not fair.  One thing

23 was -- let's see -- allowing only taxpayers who have

24 filed a return to claim EIC; other taxpayers who have

25 not filed because they didn't need to, and we weren't

1    paying EIC at that time didn't have to file, so that

2    the settlement excluded them from filing or claiming

3    EIC.

4         MR. CALVO:  Again, Your Honor, I'd have to

5    object.  I think this is entirely inappropriate.

6         THE COURT:  I'm going to sustain the

7    objection, because it sort of much goes into Mr.

8    Phillips's area.

9         MR. WEINBERG:  And, Your Honor, I don't want

10   to do that either, I want to get to the next question.

11        THE COURT:  All right.

12        MR. WEINBERG:  Which is --

13   Q.   At what point did you communicate your

14   objections or reservations to the Attorney General

15   or --

16        MR. MANTANONA:  (Overlapping.)  Objection,

17   Your Honor.  As counsel for Mr. Ilagan, I'm going to

18   object, because this is not the matter before the

19   Court.  The matter is the, I guess the procurement

20   issue in regards to Mr. Ilagan soliciting my services,

21   so I, I'd ask the Court to get control of this matter

22   back, and bring it back into the actual issue before

23   the Court.  Because there are thousands of issues which

24   are going to be addressed, and the Court wants to deal

25   with each issue specifically.  So if the Court could

1    direct the Attorney General to bring it back to the

2    solicitation.

3         MR. WEINBERG:   Let me see if I can get around

4    -- if I can get to Mr. Mantanona's objection by another

5    way.

6         Q.   At what point did you make the determination

7    that you wanted to hire someone other than the Attorney

8    General's Office?

9         A.   When we were getting notices from the AG's

10   Office that we had to implement the agreement.

11        Q.   And when was that?

12        A.   I can't recall what, what day that was.

13        Q.   Approximately, was it in September?

14        A.   It was last year.  I can't recall.  All I know

15   is that we were getting notices, that, hey, are you

16   guys putting money into this fund?  Are you setting up

17   the programs, are you advertising in the paper?

18        Q.   And what was your response; were you doing

19   those things?

20        A.   Uhm, we did one, and then I realized that

21   there's no appropriation for these things, and it's

22   illegal to do these things.

23        Q.   So at what point did you raise that problem

24   with the Attorney General?

25        A.   The Attorney General never came --

1       MR. CALVO:   (Overlapping) Your Honor, I'm

2   sorry.  I object, Your Honor.  The Attorney General's

3   either the attorney for Mr. Ilagan or the former

4   attorney of Mr. Ilagan, and he's cross -- he's

5   examining him on possibly attorney-client privileged

6   information.  And this is just entirely inappropriate.

7   I think that the proffer by the Attorney General's

8   Office at the outset that he was going to be concerned

9   with procurement issues, really what he said was the

10   emergency, and what he's going through right now, Your

11   Honor, is really the process of the settlement and the

12   litigation and the implementation of the settlement

13   agreement, which is entirely inappropriate, Your Honor.

14       MR. WEINBERG:  Well, I'm trying to get to the

15   question of what's the emergency.  So let me ask you

16   that question, Mr. Ilagan.

17       Q.   You have filed -- you have signed a

18   declaration stating that there was an emergency; is

19   that not correct?

20       A.   Yes.

21       Q.   Let me ask you to look in the notebook that

22   should be sitting in front of you.

23            I'm going to try this thing here.

24       MR. MANTANONA:  Your Honor, at this point

25   I'm going to object to any further questioning of

1   Mr. Ilagan by the Attorney General's Office, unless

2   the Attorney General's Office is going to withdraw

3   from representation of Mr. Ilagan in this case.  He

4   is putting matters before the Court that --

5           THE COURT:  Overruled.  I think the issue

6   is properly before the Court because he's still the

7   attorney, and there's also an entry of appearance that

8   appears to contradict that representation.  I'm going

9   to overrule it for the present time and allow the

10  question to be asked.

11          MR. WEINBERG:  (Using the display machine.)

12  For the technically illiterate here --

13      Q.   Mr. Ilagan, can you read that, can you see

14  that?

15      A.   It's kind of blurry.

16          MR. WEINBERG:  Could I get some assistance?

17          MR. CALVO:  It's not legible from here.

18          THE COURT:  All right.  Counsel, why don't you

19  just direct the witness to the exhibit in the binder so

20  we can look at it.

21  BY MR. WEINBERG:

22      Q.   Mr. Ilagan, if you would, in the binder in

23  front of you at the tab marked HH there's a number of

24  pages of documents, one, two -- the seventh page of tab

25  HH, do you have it?

1       A.    Yes, sir.

2       Q.    Is that a document at the top of it says

3   Certificate of Emergency?

4       A.    Yes.

5       Q.    For procurement of legal services?

6       A.    Yes, sir.

7       Q.    All right.  And that is a document that you

8   signed; is that correct?  And it's dated -- what's the

9   date on that?

10      A.    (Inaudible.)

11      Q.    I'm sorry?

12      A.    November 15, 2004.

13      Q.    November 15, 2004.

14            So from June 14th, of 2004, until November

15  15th, was there -- was there not an emergency with

16  respect to the Attorney General's representation of

17  you?

18      A.    Can you repeat the question?

19      Q.    Yeah, that was poorly phrased.

20            November 15th, which is four months after you

21  signed the settlement agreement, you signed a document

22  declaring that you had an emergency on your hands; is

23  that correct?

24      A.    Yes.

25      Q.    All right.  So November 15th, that or

1  thereabouts is when you decided there was an emergency

2  in the provision of legal services to you?

3      A.   Yes.

4      Q.   Where in, if you know, is -- why did you sign

5  this Certificate of Emergency?  Is there a reason you

6  did that, a legal reason, or a reason under Guam

7  regulations that you did that?

8      A.   I signed it based on what I wrote on this

9  agreement, I needed representation.  I'd been asking

10  for representation for a tax attorney in the past.

11     Q.   And in fact you were being represented by

12  Mr. Steve Cohen of the Attorney General's Office?

13     A.   It's kind of weird that Steve would represent

14  me when he wrote the ruling not to pay the EIC in the

15  last administration, just a very big conflict there.

16     Q.   So, was that -- did you ask the Attorney

17  General for someone other than Mr. Cohen then?

18     A.   No, I didn't.

19     Q.   What else did you  --

20          MR. MANTANONA:  Your Honor, I'm going to

21  object to this line of questioning again because, Your

22  Honor, before the Court are the moving papers of the

23  people in this matter's motion of respondents and

24  Attorney General to strike the entry of appearance

25  of Attorney Rawlen Mantanona, page 8, the entry of

1    appearance and the -- violates Guam procurement law,

2    all it states, Your Honor, is basically that the

3    Attorney General having -- has not approved of any

4    representation, and it seems that this goes way beyond

5    the scope, and actually delves into privileged

6    information.

7         THE COURT:  Well, pursuant to the question of

8    violation of the procurement law, if the procurement

9    law requires that you get the services, you know, you

10   bid it out, then to circumvent that, you have to go

11   through some emergency procedures not to follow what's

12   provided therein --

13        MR. BENJAMIN:  Your Honor?

14        THE COURT:  Which is what the -- which is

15   what they've done in this matter.

16        MR. BENJAMIN:  Your Honor, if I could address

17   the Court.  The issue, however, that Mr. Weinberg and

18   Mr. Cohen's brief does not raise the issue of whether

19   or not the proper procedures were followed as to

20   emergency procurement, it only raises the issue of

21   whether or not the Attorney General's signature appears

22   on the contract.  So any questions regarding whether or

23   not the emergency procurement was correct, there's no

24   warning at all to counsel that they intended to raise

25   this issue.

1    MR. WEINBERG: Your Honor, if I can address

2    that. Our brief talks about the failure to obtain

3    the Attorney General's signature, yes, all right.

4    And our question is, by what authority under the

5    procurement law was Mr. Mantanona hired for Mr. Ilagan

6    and Ms. Perez.

7    THE COURT: All right, just for purposes of

8    moving this forward, really, his declaration speaks for

9    itself. The emergency that he says is present is

10   stated in the certificate, so I think it stands for --

11   MR. WEINBERG: That's what I want to ask him

12   about because, because it's our contention that that is

13   not an emergency within the meaning of the emergency.

14   THE COURT: All right, then you don't need to

15   ask him. That's an argument that you can make to the

16   court.

17   MR. MANTANONA: Thank you, Your Honor.

18   THE COURT: Whether or not he thinks it's an

19   emergency, but whether or not it's an emergency that

20   legally suffices is something for the Court to decide.

21   MR. WEINBERG: Thank you, Your Honor.

22   Q.   Mr. Ilagan, did you prepare this Certificate

23   of Emergency that you signed?

24   A.   It was done with other people involved.

25   Q.   And just in your own words one time, what was

1    the nature of the emergency on November 15th when you

2    signed this?

3           MR. MANTANONA:  Objection, Your Honor; it

4    calls for privilege.

5           THE COURT:  Well, I'm going to sustain the

6    objection because it's, as the Court has stated, the

7    emergency is stated in the certificate.

8           MR. WEINBERG:  Your Honor, if I can have a

9    moment.

10          THE COURT:  All right.

11          (Pause.)

12   BY MR. WEINBERG:

13     Q.    Mr. Ilagan, have you ever, other than

14   Mr. Mantanona, have you ever retained an attorney in

15   your capacity as -- at RevTax?

16     A.    Yes, I have.

17          MR. MANTANONA:  (Overlapping.)  Objection,

18   Your Honor; irrelevant.

19          MR. WEINBERG:  Under this emergency

20   procurement process?

21          MR. MANTANONA:  Objection, Your Honor,

22   irrelevant.

23          THE COURT:  Mr. Weinberg, relevancy?

24          MR. WEINBERG:  Well, Your Honor, this is a

25   wholly unheard of --

1    THE COURT:  I mean, it's a really broad

2 question.  He could have retained an attorney in his

3 private capacity.

4    MR. WEINBERG:  I'm sorry, Your Honor, I

5 thought I was clear.  I meant in his capacity as RevTax

6 Director, has he ever done this kind of thing before.

7    MR. MANTANONA:  (Overlapping.)  Objection,

8 Your Honor; I'm going to renew the objection.

9    MR. WEINBERG:  Certificate to obtain a lawyer

10 outside the Attorney General's Office.

11    MR. MANTANONA:  Objection, Your Honor.  It's

12 still irrelevant as to the actual matter of the

13 procurement of -- it isn't relevant to this

14 procurement.

15    THE COURT:  Relevancy?  Why would something

16 prior be relevant as opposed to the current

17 certificate?

18    MR. WEINBERG:  Sir, I guess the Court has a

19 point.  It's either legal or it's not.  Whether he's

20 done it in the past or he's done it again, it's either

21 legal or it's not, so I'll withdraw the question.

22    THE COURT:  Well, what he's done in the past

23 may be perfectly legal.

24    MR. WEINBERG:  I'm sorry, Your Honor?

25    THE COURT:  What he's done in the past could

1  be perfectly legal.

2         MR. WEINBERG:  It could have been legal at the

3  time.

4         THE COURT:  Right.

5         MR. WEINBERG:  And so --

6         THE COURT:  So it would have no relevancy

7  then.

8         MR. WEINBERG:  Yes.  Right.

9     Q.   Did you seek to obtain the Attorney General's

10  signature on the contract with Mr. Mantanona once he

11  was selected?

12     A.   (No audible response.)

13         MR. MANTANONA:  Objection, Your Honor; calls

14  for privileged information.

15         THE COURT:  Overruled.

16         THE WITNESS:  Can you repeat the question,

17  sir?

18  BY MR. WEINBERG:

19     Q.   You're aware that under Guam law the Attorney

20  General's signature is required on all contracts;

21  right?

22     A.   Yes.

23     Q.   And you're aware that under Guam law the

24  Attorney General's signature is required on all legal

25  -- or contracts for the provision of legal counsel as

1  well; is that correct?

2     MR. MANTANONA:   Objection, Your Honor; calls

3  for legal conclusion.

4     MR. WEINBERG:   I'm only asking him if he

5  knows.

6     THE COURT:   All right.

7  A.   I don't know for certain, but it may.

8  BY MR. WEINBERG:

9  Q.   Did you attempt to obtain the Attorney

10 General's signature on the contract you signed with

11 Mr. Rawlen Mantanona for legal services?

12 A.   There are certain things that are -- that I

13 have to understand, one of them is the emergency

14 procurement; does that go through the AG when that is

15 procured?  That's the way we were proceeding -- I was

16 proceeding is an emergency procurement.

17 Q.   On whose direction were you proceeding as to

18 this emergency procurement procedure?

19 A.   If, if we look at the case, there's a lot

20 of conflicts that the AG has imposed on Rev and Tax.

21 They want certain things done their way and not the

22 best interests of the department; that's why I felt

23 we needed somebody else to come in and say this is

24 what you have to do.

25 Q.   Now this, you brought something up I want to

1  ask you about.  You just made the statement that --

2  that the Attorney General wants to do it his way and

3  not in the best interests of the department.

4      A.    Well, you know, they agreed to the settlement

5  without meeting with Rev and Tax.  I didn't meet with

6  any of the AG until that Saturday, or the Sunday when

7  we're going to sign.

8      Q.    Did you meet with the Lieutenant Governor?

9      A.    No.

10     Q.    Did any other people in your office meet and

11 discuss --

12          MR. MANTANONA:  Objection, Your Honor.  Again,

13 it goes away from the actual issues before the Court,

14 this motion as to the procurement.

15          THE COURT:  I'll sustain it for purposes of

16 this.

17          MR. WEINBERG:  (Overlapping.)  Your Honor, I

18 don't want to get into that, it's just that he keeps

19 bringing that up as the conflict, as what the basis of

20 his -- and I'm trying to understand the nature of the

21 conflict.

22     Q.    Let's get back to the earlier question.  You

23 did not personally or direct anyone to obtain the

24 Attorney General's signature on Rawlen Mantanona's

25 contract, did you?

1  A. This was an emergency procurement; does that

2 require the AG's signature?

3  Q. I'm sorry, are you asking me a question?

4  A. See, I don't know the law. You're asking me

5 if I know the law, I'm trying to tell you what I know.

6   MR. MANTANONA: Objection, Your Honor;

7 argumentative.

8   MR. WEINBERG: (Overlapping/unintelligible).

9   THE COURT: Sir, do you want the witness to

10 answer a yes or no or not?

11   MR. WEINBERG: Your Honor, I apologize.

12   MR. MANTANONA: Your Honor, I'm going to

13 object to any leading questions on behalf of

14 Mr. Weinberg to his alleged client Mr. Ilagan in this

15 matter.

16   THE COURT: Well, I'm going to overrule that

17 objection. The matters before the Court seem to be

18 hostile enough to allow leading questions to be asked.

19 BY MR. WEINBERG:

20  Q. My question is whether you did or did not

21 attempt to get the Attorney General's signature.

22 Now I will represent to you that the law is -- requires

23 that. But my question is, whether it requires that or

24 not, did you on the contract you signed with Mr.

25 Mantanona attempt to get the Attorney General's

1     signature? Is his signature on that contract?

2        A.    No, it's not.

3        Q.    Why is the Attorney General's signature not on

4     that contract, to the extent you know? I'm not asking

5     you to speculate about the Attorney General.

6        A.    (No audible response.)

7        THE COURT: I think he's answered that

8     already, Mr. Weinberg. He said that because he thought

9     it was an emergency they didn't need to go through that

10    procedure.

11    BY MR. WEINBERG:

12       Q.    Is that your understanding? Your under-

13    standing is that the emergency procurement process

14    does not require going through the Attorney General

15    for the legal contract?

16       A.    Yes.

17       Q.    Who -- where did you learn, get that

18    understanding?

19       A.    Well, I think it's common knowledge; everybody

20    probably knows that, who works for the government.

21       Q.    Can you explain the emergency procurement

22    process to me?

23       MR. MANTANONA: Objection, Your Honor; it

24    calls for a legal conclusion or legal opinion.

25       MR. WEINBERG: Only to the extent that he

1   knows.

2       Q.    If this is -- we're talking about common

3   knowledge now.   I want to know what this emergency

4   procurement process is because this is the first time

5   the Attorney General's Office has ever seen an

6   emergency procurement for the provision of legal

7   services in order to go around the procurement laws

8   which require in two separate sections that the

9   Attorney General be a signatory to these contracts.

10  But if it's common knowledge that this is done, I'd

11  like to know how that --

12      A.    Common knowledge that it's done?  I don't get

13  what you're saying.

14      Q.    Maybe I misunderstand your earlier question,

15  misunderstood it.  You said it was, I believe you said

16  that it was -- it's common knowledge that you do not

17  need to get the Attorney General's signature in these

18  circumstances?

19      A.    It may have happened in the past, some

20  emergency like typhoons has happened, and I've heard

21  procurement was procured, or money was spent on

22  emergency procurement without going through the

23  procedures.

24      Q.    Okay.  All right.  So you're talking about

25  procurement generally, emergencies?

1     A.    Yes.

2     Q.    Like in a typhoon situation?

3     A.    In emergencies.

4     Q.    Do you know what conditions would authorize an

5 emergency procurement?

6     A.    I don't.  I may not, I don't know.

7     Q.    Well, who -- what I'm trying to understand is,

8 who prepared these documents for you to sign?

9     A.    Several people did.

10    Q.    Name one.

11    MR. MANTANONA:  Objection, Your Honor; calls

12 for privileged information and information --

13 (unintelligible).

14    MR. WEINBERG:  Well, if Calvo and Clark would

15 like to state that they did that, I'll accept their

16 representation if they prepared it.

17    MR. MANTANONA:  Your Honor, I think the record

18 is -- reflects the delegation of authority in this

19 matter.

20    MR. BENJAMIN:  Your Honor, Calvo and Clark

21 would like to make an objection of executive privilege

22 because Mr. Ilagan is working with the Governor in the

23 Governor's Office and these are entering areas of

24 executive privilege.

25    THE COURT:  Is it privilege to ask who

1   prepared his statement?

2          MR. WEINBERG:  Your Honor, the executive

3   privilege or the governmental privilege or deliberative

4   process privilege goes to the mental processes involved

5   in formulating a government policy.  In a case like

6   this here, with respect to the attorney-client issue,

7   and with respect to the narrow attorney-client question

8   here, and the narrow question of who said what to whom

9   in the context of selection of attorneys, this

10  privilege has been waived because, because it's been

11  put into issue by Mr. Ilagan and Ms. Perez and Calvo

12  -- and the Governor's Office, who have rejected the

13  Attorney General as their lawyer.  That is the issue.

14         THE COURT:  Well, is it relevant who prepared

15  the certificate?

16         MR. WEINBERG:  I'm just trying to understand

17  the basis of Mr. Ilagan's --

18         THE COURT:  Well, let me sustain that

19  objection on the basis of relevancy.  Whoever prepared

20  it really isn't relevant to the issue before the Court.

21         (Pause.)

22  BY MR. WEINBERG:

23     Q.  Did you select Mr. Mantanona or were you

24  advised that he was selected by someone else?

25     A.  I selected him.

1    Q.    You did?

2    A.    Yes.

3    Q.    And in the procurement, the emergency

4    procurement process it requires that you have I guess

5    three bidders or three proposals?

6    A.    It does.

7    Q.    Yes.  And Mr. Mantanona was the low bidder?

8    A.    I believe he was.

9         (Pause.)

10        MR. WEINBERG:  Your Honor, I think that's all

11   we have right now.

12        THE COURT:  All right.  Mr. Mantanona?

13        MR. MANTANONA:  Yes, just a few questions,

14   Your Honor.

15                   CROSS-EXAMINATION

16   BY MR. MANTANONA:

17   Q.    Good afternoon, Mr. Ilagan.

18        I'd like to refer you to the same exhibit that

19   the People did, I believe that is HH, the Certificate

20   of Emergency.  Do you recognize that document, sir?

21   A.    Yes, I do.

22   Q.    Okay.  Is that a clear and accurate copy of

23   that document?

24   A.    Yes, it is.

25   Q.    Okay.  And did you believe the contents of

1  this document to be true when you signed this document?

2     A.   Yes, I did.

3     Q.   Okay.  And I'd like you to review paragraph 6,

4  and -- have you had a chance to review it?

5     A.   Yes.

6     Q.   And is that a correct statement in your

7  opinion?

8     A.   Yes, it is.

9        MR. MANTANONA:  Okay.  For the purposes of the

10  court, can the witness please read paragraph 6.

11        THE COURT:  Oh, I don't think it will be

12  necessary really, because the Court has read it.

13        MR. MANTANONA:  Okay.

14     Q.   So basically you believe that --

15        THE COURT:  Well, Mr. Mantanona, I'm under the

16  impression that the witness believes everything that he

17  stated in the certificate.

18        MR. MANTANONA:  That is correct.

19     Q.   Well, let me ask you this, sir.  Do you feel

20  that you being faced with criminal charges and contempt

21  proceedings qualified as an emergency situation?

22     A.   A what situation?

23     Q.   An emergency situation.

24     A.   Yes, I believe that if somebody's supposed to

25  represent me brings charges to me, I can't -- there's a

1   conflict there.

2       Q.   And you believe that the Attorney General's

3   Office put you in that position?

4       A.   Yes, they did.

5       Q.   And you believe that because of that you'd

6   need separate counsel?

7       A.   Yes, I do.

8       MR. MANTANONA:   Okay.  No further questions,

9   Your Honor.

10      THE COURT:  Mr. Weinberg.

11              **REDIRECT EXAMINATION**

12  BY MR. WEINBERG:

13      Q.   Just to follow up on Mr. Mantanona.  Paragraph

14  6 of your certificate says that because of the

15  attorney -- "Because the Attorney General is acting on

16  our behalf without consultation and consent he has

17  exposed us to contempt proceedings."  Tell us about

18  that.

19      A.   Well, you know, there's supposed to be a

20  certain amount put aside, which we can't afford.

21  They were questioning if we're putting money aside,

22  they were questioning if we were advertising, putting

23  -- following the settlement agreement, and that if we

24  weren't there's charges that may be --

25      Q.   Essentially, the Attorney General's Office

1   was questioning whether you were complying with the

2   agreement that you signed, wasn't he?

3       A.   That's not the way I interpret that.  That may

4   be your interpretation, but my interpretation is he

5   wants us to do this.

6       Q.   Now, if the settlement agreement requires

7   certain things to be done, moneys to be set aside, that

8   you signed, and the other things that you mentioned,

9   and if you failed to do those things, is not -- and I'm

10  not asking for a legal conclusion -- but is not the

11  possibility that you might be held in contempt or the

12  plaintiff might seek to hold you in contempt a

13  possibility?

14      A.   (No audible response.)

15          MR. MANTANONA:  Objection, Your Honor; calls

16  for the client to speculate.

17          THE COURT:  Mr. Weinberg, legal conclusion?

18          MR. WEINBERG:  I'm trying to get to the nature

19  of what it is he thinks he was threatened with, other

20  than the obvious fact that if he's -- if he doesn't

21  comply with the agreement and the Court order, he may

22  be subject to contempt.  I'm trying to understand the

23  nature of what it is here that's different from that.

24      A.   What I needed was counsel to represent the

25  department, I need somebody to tell me what to do in

1    the best interests of the department, and I thought I

2    wasn't getting that.

3         Q.   And who determines what is in the best

4    interests of the department?

5         A.   The employees of the department.  We -- the

6    process of, of settlement is done within my department,

7    not within the AG's office, not getting his approval

8    for, for a settlement.  Settlements are settled in my

9    office, within my, my department.

10        Q.   So it's your position that you do not need the

11   Attorney General's input at all in settling cases that

12   affect your department?

13        A.   There are certain rights that are, are -- that

14   taxpayers have that are not being represented by the

15   Attorney General, their administrative rights to

16   properly say yes or no to a settlement.  I mean they

17   weren't given that; they're saying you have to settle

18   or else you deal with the AG's office.

19        Q.   Now, if you are ordered to settle a case --

20   if you are ordered by the Court to comply with the law,

21   whatever that is, and the Attorney General signs that

22   document for you, but you don't want to comply with the

23   law, does that entitle you to hire your own lawyer?

24        A.   (No audible response.)

25             MR. MANTANONA:  Objection, Your Honor, calls

1   for, again, a legal conclusion, and for him to

2   speculate as to these questions.

3           MR. WEINBERG:  Mr. Ilagan has testified that

4   he -- that the department gets to make its own policy

5   decisions with respect to the settlement of legal

6   claims.  And I'm trying to understand how far that

7   goes.

8           MR. MANTANONA:  And, Your Honor, I'm going

9   to object to that, a question that is confusing in

10  regards to this matter.  I think Mr. Ilagan is

11  addressing a different kind of settlement, in regards

12  to what he is speaking of, not the settlement in

13  regards to the orders of this court.  I think he's

14  talking about a tax claim or contest or questions in

15  regards to his taxes -- I mean about an individual's

16  claims.

17          Thank you.

18          THE COURT:  What is it directly that you want

19  the witness to respond to?

20          MR. WEINBERG:  With all these objections, I'm

21  losing the question.

22      Q.  But the question is, who gets to make the

23  decision in settlement of lawsuits, or the defense of

24  lawsuits, or the bringing of lawsuits?

25          MR. MANTANONA:  Objection, Your Honor.

1          THE COURT:  I think the witness was saying in

2   that in terms of taxpayer disputes, he determines the

3   settlement posture, the settlement decision.  That's

4   what I gather from his testimony.

5   BY MR. WEINBERG:

6       Q.   Is that your testimony, that, that when a

7   dispute involving the department is in court --

8          THE COURT:  Well, as a taxpayer.  I don't

9   think he said in court, you know the normal taxpayer

10  disputes with the department.

11         MR. WEINBERG:  Well, I'm not talking about

12  resolving taxpayer disputes, I'm talking about where

13  the department through its officials are defendants in

14  court.

15      Q.   And my question is, who gets to make the

16  decision as to what the legal decisions are in that

17  case?

18         MR. MANTANONA:  And objection, Your Honor.

19  Again, that's going to call for a legal conclusion on

20  my client's part.  He needs to --

21         MR. WEINBERG:  I just want to clarify that

22  Mr. Ilagan says he gets to make that call because that

23  is the question we got, we have presented here; because

24  if that's the basis of Mr. Ilagan's objection to the

25  Attorney General, is that he doesn't like the Attorney

1    General's position in the case, then that helps narrow

2    the issues considerably.

3         MR. MANTANONA:  Your Honor --

4         MR. WEINBERG:  Mr. Ilagan has said that he

5    was afraid he's being threatened with contempt if he

6    complies with the court order -- or if he fails to

7    comply with the court order.  And I wanted to explore

8    that because it sounds like he does not want to comply

9    with the court order and the settlement agreement.

10        MR. MANTANONA:  Your Honor, then I'm going to

11   object that the Attorney General's line of questioning

12   is an area in which he's actually going to be exposing

13   his own client to any kind of criminal liability.

14        THE COURT:  I'm going to -- what I'm going to

15   do is sustain the objection, really.  It's not a

16   question that I think that relates to the issue on your

17   motion to strike per se.  I think we can decide that

18   issue without getting a response from the witness on

19   that question.

20        (Pause.)

21        MR. WEINBERG:  Well, I don't want to beat that

22   door, Your Honor, I was just trying to explore this

23   door that Mr. Ilagan opened about these two paragraphs

24   in the certificate about the nature of Mr. Ilagan's

25   concerns about contempt, and now the threat of criminal

1    proceedings being held against him.

2        Q.    Is that also part of why you wanted your own

3    lawyer and declare this to be an emergency, that you

4    feared criminal prosecution from the Attorney General's

5    Office?

6        A.    Part of it.

7        Q.    Okay.   What is the basis of that, that you

8    will be criminally prosecuted by my office?

9        A.    A lot of things.   The media, the way the media

10   represents certain cases before the public.   The way

11   the AG is very adversarial to the Administration.

12       Q.    And are there more facts here?   We've got

13   the media and an adversarial relationship with the

14   Administration.   What else makes you think you're going

15   to be the subject of criminal liability for what you --

16   for complying with the court order in this case?

17       A.    Uhm, a lot of times I feel I don't have the

18   reputation -- representation I need to run the

19   department.

20       Q.    Are you speaking specifically with respect to

21   this case or just generically that you don't have

22   enough lawyers?

23       A.    Uhm, enough lawyers who can handle what the

24   department needs.

25       Q.    Welcome to GovGuam.   But, what is your concern

1  about criminal liability in this case that warranted

2  you filing a Certificate of Emergency and hiring

3  Mr. Mantanona?  Who told you you were going to be going

4  to jail if you comply with the settlement agreement and

5  court order?

6  A.  I don't know if -- I can't remember if I read

7  something or, uhm, or seen something that says that I

8  will be liable for not following what the Court has

9  ordered based on my representation from the AG.

10  Q.  Do you have any reason to think that you could

11  go to jail because of what you have signed?

12  MR. MANTANONA:  Your Honor, I'm going to

13  object to this line of questioning again.  The Attorney

14  General is questioning, cross-examining, in fact, its

15  own client on information in which the Attorney General

16  himself proffers the criminality of his acts and does

17  not give the defendant -- I mean, Mr. Ilagan any advice

18  of what to follow or not to follow.

19  MR. WEINBERG:  Your Honor, the Attorney

20  General's Office has never threatened anyone in this

21  case with any kind of criminal liability for failure

22  to comply with the court order.  That idea came from

23  somewhere else, and I'm trying to identify it, because

24  Mr. Mantanona opened this door in questioning

25  Mr. Ilagan about paragraph 6 of his certificate, and

1    that's all I'm trying to do.

2          THE COURT:  But the lack of possible criminal

3    consequences is certainly some things here that you can

4    argue before the Court in relation to your motion to

5    strike.  But there's no basis for it based on what the

6    witness has testified to the court today.

7          MR. WEINBERG:  Well, it's just that

8    Mr. Mantanona was, was asking him to corroborate, in

9    essence, what he signed and what I'm hearing is that

10   Mr. Ilagan doesn't even know the basis of why he --

11         THE COURT:  Then I think for purposes of your

12   argument, that will be your argument to the court.

13         MR. WEINBERG:  Well, if it's clear from his

14   testimony, I have no further questions.

15         THE COURT:  That's what he said.

16         MR. WEINBERG:  All right, then I have nothing

17   further then.  Thank you.

18         THE COURT:  Recross, Mr. Mantanona.

19              **RECROSS-EXAMINATION**

20   BY MR. MANTANONA:

21      Q.   Mr. Ilagan, I'd like you to look at the book

22   again, and look at Exhibit R.

23      A.   (No audible response.)

24      Q.   Have you had an opportunity to find that

25   document, sir?  Are you familiar with this document,

1    sir?

2        A.    (Pause.)  I believe I glanced at it before,

3    I've read it.

4        Q.    You've read this before, sir?

5        A.    I mean, I can't recall.  I've come across some

6    of the issues that are, are presented in the papers.

7        Q.    Can you tell the Court what this document is?

8        A.    (Pause.)  I believe it's the Charles

9    Troutman's --

10        Q.    Legal opinion?

11        A.    Charles Troutman.

12        Q.    Legal opinion?

13        A.    His opinion on what can be paid and what can't

14    be paid.

15        Q.    Okay.  And what's the date of this opinion,

16    sir?

17        A.    October 13th, 2004.

18        Q.    Okay.  Now that you've seen it, does it

19    refresh your memory a little bit about this document?

20        A.    Yes.  I have to read it, I haven't read this

21    since back then.

22        Q.    Okay.  Did you have an opportunity to read

23    this document prior to hiring me?

24        A.    Yes, I did.

25        Q.    Okay.  And in this document, isn't it correct

1  that it points out that part of the EITC, it will be

2  the Attorney General's opinion, or Attorney Charles

3  Troutman --

4          MR. WEINBERG:  Objection; best evidence.

5          THE COURT:  I'm sorry?

6          MR. WEINBERG:  The document speaks for itself.

7          THE COURT:  I'm sorry, I didn't hear the

8  objection.

9          MR. WEINBERG:  I said the document speaks for

10 itself, Your Honor.

11         THE COURT:  Mr. Mantanona?

12         MR. MANTANONA:  Yes, Your Honor, we're just

13 trying to -- the issue comes down as to the need for

14 the emergency procurement, Mr. Ilagan's feelings of

15 his representation.  And Mr. Weinberg asked him about

16 illegal acts; well, this document, Your Honor,

17 specifies that some of the acts contained in the EITC

18 is illegal, and Mr. Ilagan, if he complied with these

19 terms would be criminally liable.

20         MR. WEINBERG:  Well, Mr. Ilagan has yet to

21 testify that he has a current memory of this document,

22 whether this document influenced his decision --

23         The document speaks for itself.  Do you want

24 to offer it?

25         THE COURT:  The document speaks for itself.

1  Why don't you ask the next question then.

2  BY MR. MANTANONA:

3     Q.    Do you remember, after reading this document,

4  if you felt like you wanted to get separate counsel?

5          MR. WEINBERG:   Objection to leading.

6          MR. MANTANONA:   Well, let me ask again.

7     Q.    Mr. Ilagan, okay, after reading this document,

8  did you have any desires to do anything?

9     A.    Uhm, spending is illegal; from reading this

10  document, any spending that is not appropriated is

11  illegal.

12     Q.    Did you want to do anything, sir, for securing

13  of services of anybody?

14     A.    After certain events that has happened, like

15  the AG questioning why hasn't this been done, why

16  didn't we send out these notices as required by the

17  settlement, there was a question of who's representing

18  the department as to is it legal or not.

19     Q.    Okay, sir.

20     A.    They're telling me to do it.

21     Q.    Okay.   They're telling you to do it.   And what

22  does this letter tell you to do?

23     A.    It tells me it's illegal.

24     Q.    And did the Attorney General ever come back

25  and say don't worry about it, or give you any advice in

1   regards to this, the conflict?

2       A.    I don't remember them --

3       Q.    Thank you.

4       A.    -- coming back to me.

5       Q.    That's why you wanted your own counsel?

6       A.    Yes.

7           MR. MANTANONA:  Thank you.

8           No further questions, Your Honor.

9           THE COURT:  All right, thank you, sir, you may

10  step down.

11          MR. WEINBERG:  Just a real quick followup on

12  this, Your Honor.

13          THE COURT:  Well, if I keep allowing it, we're

14  never going to get through the witness.

15          MR. WEINBERG:  Limited to the issues that

16  Mr. Mantanona keeps opening up.  But it's one question,

17  Your Honor.

18      Q.    Mr. Ilagan --

19          THE COURT:  Well, do you have any objection,

20  to this question being asked?

21          MR. MANTANONA:  Your Honor?

22          THE COURT:  Do you have any objection to the

23  question being asked?

24          MR. MANTANONA:  Your Honor, I concur with the

25  court that further questions will go on.  Mr. Weinberg

1    stated that the best evidence, the document, is there;

2    there's no further review (inaudible).

3            THE COURT:  Well, see, we basically have

4    direct, redirect, cross, recross, nothing further than

5    that.

6            MR. WEINBERG:  My question has to do not

7    with the document but with what happened between the

8    document and this one question, and when he signed,

9    Mr. Ilagan signed the certificate.  And Mr. Mantanona

10   has asked questions about, well, now that he's seen

11   this document he felt he needed to get his independent

12   counsel, I'd like to just follow up on that.

13           THE COURT:  All right, but I'm saying that if

14   I allow you to ask it, and then he actually comes back

15   and asks another question, it's never going to end.

16   And basically we have only four stages, direct,

17   redirect, cross and recross.

18           MR. WEINBERG:  That's fine.

19           THE COURT:  All right, sir, you may step down.

20           MR. WEINBERG:  I'll save it for argument.

21           THE COURT:  Okay.  You may step down.

22           Do you want to call your next witness,

23   Mr. Weinberg.

24           MR. COHEN:  Lou Perez, Your Honor.

25           THE COURT:  All right, Ms. Perez.

1    MR. COHEN: Would the Court mind if I examined

2 the witness here at counsel table?

3    THE COURT: It doesn't matter. Let me see

4 whether -- see, we have a problem picking up. You

5 might try, and if it doesn't pick up, Mr. Cohen, I may

6 have to ask you to go to the podium.

7    MR. COHEN: Can you hear me? I think so. I

8 have a strong voice.

9    THE COURT: Very well.

10              **LOURDES M. PEREZ,**

11 called as a witness on behalf of the Attorney General,

12 was first duly sworn and testified as follows:

13    THE CLERK: Please state your full name and

14 spell your last name for the record.

15    THE WITNESS: Lourdes M. Perez, P-E-R-E-Z.

16              **DIRECT EXAMINATION**

17 BY MR. COHEN:

18    Q.   Yes, Ms. Perez, I thank you for appearing here

19 today. I'm Stephen Cohen from the Attorney General's

20 Office. And you're appearing here pursuant to a

21 subpoena, is that correct?

22    A.   That's correct.

23    Q.   Okay. And what is your occupation, please,

24 Ma'am?

25    A.   I'm the Director of the Department of

1  Administration.

2      Q.   And when did you become the Director of

3  Administration?

4      A.   In January of 2003.

5      Q.   Okay.  And you were appointed by Governor

6  Camacho, is that correct?

7      A.   That's correct.

8      Q.   And who is Joseph Manibusan?

9      A.   He's my deputy.

10     Q.   Okay.  And you are a member of the Governor's

11 cabinet, is that correct?

12     A.   That's correct.

13     Q.   You serve at his pleasure?

14     A.   That's correct.

15     Q.   Okay.  And before you became the Director of

16 the Department of Administration, did you have any

17 previous Government of Guam jobs?

18         MR. MANTANONA:  Objection, Your Honor;

19 irrelevant, and leading by her own counsel.

20         THE COURT:  Mr. Cohen?

21         MR. COHEN:  I don't think I'm leading.  I'm

22 just asking if she had some previous government jobs.

23         THE COURT:  Relevancy.

24         MR. COHEN:  I'm trying to establish a

25 knowledge base, Your Honor.

1          THE COURT:  Overruled for the time being.

2          MR. COHEN:  Okay.

3     Q.   Now, that notebook in front of you there, that

4  thick notebook, I direct your attention to Exhibit KK.

5  Could you please open that up?  Do you have that?

6     A.   K?

7     Q.   Double K.

8     A.   Yes.

9     Q.   You found that now?

10    A.   Yes, I did.

11    Q.   Thank you.

12         I direct your attention to a single page

13 document, the very top of Exhibit KK, directed to

14 Shannon Taitano, from, it says Director of Department

15 of Administration, and there's a signature after that;

16 is that your signature?

17    A.   Yes, sir, it is.

18    Q.   Okay.  And I see below that there's a line for

19 Director of Department of Revenue and Taxation, and a

20 signature.  Do you recognize that signature?

21         MR. MANTANONA:  Objection, Your Honor;

22 irrelevant.

23         MR. COHEN:  It's a joint document, I'm trying

24 to establish the people who signed the document, Your

25 Honor.

1          THE COURT:   Overruled.

2     By MR. COHEN:

3          Q.    Do you recognize the signature?

4          A.    Yes, I do.

5          Q.    And who is that?

6          A.    Art Ilagan.

7          Q.    The gentleman who just testified?

8          A.    That's correct.

9          Q.    Did you prepare that document?

10         A.    I, I prepared it, I printed it at my office,

11    yes.

12         Q.    Okay.  And it's on your letterhead?

13         A.    That's my letterhead.

14         Q.    Now you say you printed it at your office.

15    Did you receive the text of that document from any

16    other source?

17         A.    Uh, yes.

18         Q.    And who did you receive that text from?

19         A.    I received it from, uhm, I received it from

20    the Governor's legal counsel.

21         Q.    Okay.  And the text was then given to you on a

22    floppy disk or e-mailed to you and you printed it out;

23    how did that happen?

24              MR. MANTANONA:   Objection, Your Honor;

25    irrelevant again.

1           MR. COHEN:  It's not irrelevant; it's a

2  document she signed which has certain legal

3  consequences, Your Honor.

4           MR. MANTANONA:  Well, Your Honor, the document

5  speaks for itself; I don't see what matter it would be

6  relevant.

7           MR. COHEN:  It speaks for itself, but the

8  circumstances under which it was signed are critical to

9  this case, Your Honor.

10          MR. BENJAMIN:  Your Honor, on behalf of --

11          THE COURT:  Let me see, what is the question,

12  under what --

13          MR. COHEN:  I asked her how she received the

14  text of the document.  She's testified she received the

15  text of a document from a source outside of her office,

16  and printed it out on her office, I guess on her

17  computer; I'd like to find out, Your Honor, where she

18  obtained the text.

19          THE COURT:  Well, she did, she said from Ms.

20  Taitano.

21          MR. COHEN:  Okay.

22    Q.   And what did you -- did you sign this in the

23  presence of Mr. Ilagan?

24    A.   I don't recall.

25    Q.   Okay.  But the language then in that document

1   is not your own language; is that correct?

2       A.   That's correct.

3       Q.   It came from a source outside of your office?

4       A.   Yes.

5       Q.   Okay.  And did you sign this in your office or

6   some place else?

7       A.   I really don't recall.

8       Q.   Okay.  And was Mr. Ilagan present when you

9   signed it?

10      A.   (No audible response.)

11      MR. MANTANONA:  Objection, Your Honor; asked

12  and answered.

13      THE COURT:  Overruled.

14      A.   I don't recall.

15      MR. COHEN:  You don't recall.

16      Q.   Now after you signed this document, what

17  became of it?

18      A.   It, it was delivered to, uh, the Governor's

19  legal counsel.

20      Q.   So then the Governor's legal counsel asked you

21  to sign this document, is that correct?

22      MR. BENJAMIN:  Objection, Your Honor.

23      A.   No, she did not.

24      MR. COHEN:  She did not.

25      MR. MANTANONA:  Objection, Your Honor.

1    MR. COHEN:  Okay, I'll withdraw it.  Excuse

2    me.

3    THE COURT:  You made an objection?

4    MR. BENJAMIN:  Your Honor, the counsel wishes

5    to inquire about the circumstances, but if counsel

6    could be instructed to not inquire regarding

7    circumstances involving Ms. Perez's direct

8    communications with counsel for the Governor, because

9    those would be privileged communications (inaudible) --

10    MR. COHEN:  No, I'm not.  Let me just move on,

11    Your Honor.

12    THE COURT:  Move on to the next question

13    then.

14    MR. COHEN:  Okay.

15    Q.  I direct your attention to another document,

16    the second page, dated November 15th; do you see that

17    document?

18    A.  The one on --

19    Q.  The second, the second page of exhibit double

20    K.

21    A.  Yes.

22    Q.  And does your signature appear on that?

23    A.  Yes.

24    Q.  Okay.  And are the circumstances where you

25    obtained this document the same as regarding the

1   circumstances you obtained the previous document you

2   testified about?

3      A.   Yes.

4      Q.   The answer is yes?

5      A.   Yes.

6      Q.   Okay.  Now I direct your attention to the

7   third page of Exhibit KK entitled Certificate of

8   Emergency for procurement of regular services; do you

9   see that?

10      A.   Yes.

11      Q.   Okay.  And does your signature appear on that?

12      A.   Yes.

13      Q.   Okay.  Did you prepare this document?

14      A.   (Pause.)  I prepared it, I printed it.

15      Q.   Okay, you printed it.  But the text of this

16   document, did it originate from yourself or from some

17   place outside of your office?

18      A.   It represents my side.

19      Q.   That's not the question I asked you.  The

20   question I asked you is the text, the language of this

21   document, was that provided to you by a source outside

22   of your office?

23      MR. BENJAMIN:  Objection, Your Honor; it's

24   heading into an area of privilege again.  Again,

25   Ms. Taitano was acting as counsel for Ms. Perez, and

1    this is all heading towards privilege.

2         MR. COHEN:  Excuse me, I haven't asked any

3    question remotely -- Now this is a document signed by

4    the witness; I have the right to ask her about the

5    circumstances that she signed it, where she got the

6    language from.

7         I also note that Mr. Benjamin is, of course,

8    is not counsel for this witness.

9         MR. MANTANONA:  Well, Your Honor, on behalf of

10   Ms. Perez, let me object to --

11        THE COURT:  Objection is overruled.

12        MR. COHEN:  Okay.

13   Q.   The question is overruled.  You may **answer** my

14   question, Ms. Perez.

15   A.   Can you repeat it, sir?

16   Q.   The language used in this document entitled

17   Certificate of Emergency for procurement of services,

18   did this language come from a source outside of your

19   office?

20   A.   Yes.

21   Q.   This is not your own personal language, is it?

22   A.   I don't believe so.

23   Q.   And was this document presented to you for

24   signature, is that correct?

25   A.   It was presented to me.

1     Q.    And who presented it to you for signature?

2     A.    Uh, I don't recall.

3     Q.    Okay.  Now I note another signature

4 purportedly by Mr. Artemio B. Ilagan, Director of

5 Revenue and Tax.  Do you recognize that signature?

6     A.    Uh, yes.

7     Q.    And is that Mr. Ilagan's signature?

8     A.    It appears to be his signature.

9     Q.    Okay.  And did you sign this in the -- did

10 you sign this document Certificate of Emergency for

11 procurement of legal services in the presence of

12 Mr. Ilagan?

13     MR. MANTANONA:  Objection, Your Honor;

14 relevance of the --

15     MR. COHEN:  I'm trying to determine the source

16 of --

17     THE COURT:  I'm going to sustain the

18 objection; it's irrelevant whether Mr. Ilagan was there

19 at the same time, just as long as it's signed by the

20 witness.

21     MR. COHEN:  Okay.

22     Q.    I notice the signature -- or I notice the

23 signature below your signature and Mr. Ilagan's

24 signature, which purports to be that of Felix P.

25 Camacho, Governor of Guam; do you see that?

1     A.    Yes, I do.

2     Q.    Okay.  Did this, did that signature appear on

3  this document at the time you signed it?

4     A.    No.

5          MR. MANTANONA:  Objection, Your Honor;

6  relevance as to anything in regards to this case, when

7  the Governor's signature was put on this document.

8          MR. COHEN:  Your Honor, that's --

9          THE COURT:  She already knows that the

10  objection is -- she said no.

11  BY MR. COHEN:

12     Q.    The signature was not there at the time you

13  signed it, right?

14     A.    I kind of believe it was.

15     Q.    The signature which purports to be the

16  signature of Felix P. Camacho, Governor of Guam, that

17  was not present at the time you signed this document;

18  is that my understanding of your testimony?

19          MR. MANTANONA:  Objection, Your Honor; asked

20  and answered.

21          MR. COHEN:  I don't recall her testimony, Your

22  Honor.

23          MR. MANTANONA:  Your Honor, my client

24  testified that it wasn't there when she signed it.

25          MR. COHEN:  All right, fine.  Let's just move

1   on.

2       Q.    And this Certificate of Emergency for

3   procurement of legal services, that consists of 11

4   points; is that correct?

5       A.    Yes.

6       Q.    Okay.  Now at the time you signed this

7   document, did you have any understanding as to whether

8   or not those circumstances were true or not true?

9       A.    Yes, sir.

10      Q.    What was your understanding?

11      A.    That they were true.

12      Q.    Okay.  Now, did you, did you make any

13  independent determination from any sources, any rules,

14  regulations or statutes regarding emergency procurement

15  before you signed this document?

16      A.    (No audible response.)

17          MR. MANTANONA:  Objection; asking my client

18  for a legal opinion.

19          MR. COHEN:  I'm not, I'm asking her if she

20  referred to any sources of legal authority, whether it

21  be a statute or a regulation or a rule before she

22  signed this document.

23          MR. MANTANONA:  Your Honor --

24          MR. COHEN:  That's all I'm asking her.

25          MR. MANTANONA:  Then, Your Honor, I'm going to

1   object to that on the issue of privilege; if she was in

2   communication with counsel at the time, then the

3   counsel is acting as her attorney and it's privileged.

4           MR. COHEN:  I didn't ask that question.

5       Q.    The question I asked, I'll repeat it again,

6   is:  Ms. Perez, did you refer to any statute, rule or

7   regulation regarding emergency procurement before you

8   signed this exhibit Certificate of Emergency for

9   procurement of legal services?

10          MR. MANTANONA:  Your Honor, renew the

11  objection.

12          THE COURT:  All right, overruled.

13          MR. COHEN:  You may answer the question.

14      A.    I am aware of the steps to follow in

15  determining or declaring that an emergency exists.

16      Q.    But that's not the question I asked.  The

17  question is, before you signed this document, did you

18  specifically refer to any statute, rule or regulation

19  regarding emergency procurement of services?

20      A.    At the time no, I did not.

21      Q.    You did not, okay.  Now, at the time you

22  signed this document, Certificate of emergency for

23  procurement of legal services, was there a typhoon at

24  that time occurring on the island of Guam?

25      A.    I believe no.

1    Q.   Was there an earthquake occurring at the time,

2    at that time on the island?

3         MR. MANTANONA:  (Overlapping.)  Objection, on

4    irrelevant questioning regards --

5         MR. COHEN:  It goes to what is the emergency

6    under this particular document, Your Honor.

7         MR. MANTANONA:  Then, Your Honor, counsel

8    should ask what she feels constitutes the emergency.

9         MR. COHEN:  That's not the question I'm

10   asking.  I'm asking her if there was a typhoon at the

11   time; she said no.

12        MR. MANTANONA:  Based on that, Your Honor --

13        MR. COHEN:  (Overlapping)  The next question

14   I want to ask the witness is, was there an earthquake

15   at this time.

16        MR. MANTANONA:  Your Honor, we renew the

17   objection as irrelevant.

18        MR. COHEN:  Okay.  May the witness answer the

19   question, Your Honor?

20        THE COURT:  I'm going to sustain that

21   objection.

22   BY MR. COHEN:

23        Q.   Was there any civil insurrection at that time?

24        A.   (No audible response.)

25        MR. MANTANONA:  Again, Your Honor, renew --

```
 1            THE COURT:  Sustained.
 2   BY MR. COHEN:
 3       Q.   Was your office in operation and functioning
 4   at that time?
 5       A.   Yes.
 6       Q.   So there was nothing that caused your office
 7   to be out of commission at that time?
 8       A.   (No audible response.)
 9            MR. MANTANONA:  Objection, Your Honor;
10   irrelevant again.
11            THE COURT:  Overruled.
12            MR. COHEN:  You may answer the question.
13       Q.   The question was, there was nothing which
14   would cause your office to be out of commission at that
15   time when you signed this; is that correct?
16       A.   My office had --
17       Q.   Your office was not shut down?
18       A.   It was not.
19       Q.   For any reason, okay.
20            And you said you printed this out on your own
21   computer; is that correct?
22       A.   I believe I did.
23       Q.   So your computer system was operating at the
24   Department of Administration?
25       A.   That's correct.
```

1      Q.    Okay.  Now before you signed this exhibit,

2   Certificate of Emergency for procurement of legal

3   services, did you discuss this with the Attorney

4   General of Guam, Mr. Douglas Moylan?

5      A.    No.

6      Q.    Did you discuss it with anybody else in the

7   Attorney General's Office?

8      A.    No.

9      Q.    Did you inform Mr. Moylan or anybody else in

10  the Attorney General's Office of this document before

11  you signed it?

12     A.    I don't believe so.

13         MR. COHEN:  Now, Your Honor, I'd like to offer

14  some of these documents into evidence which have been

15  -- these first 1, 2, 3 pages, and it's a little unclear

16  to me as to whether any of them are part of a joint

17  exhibit.  I'm looking at the documents on the table and

18  I don't see that, and unless I'm corrected by somebody

19  here, by counsel, I'm going to offer the first, second,

20  and third pages of this document as Exhibit UU.

21         MR. MANTANONA:  Your Honor, I'm going to

22  object to the admission of this document as irrelevant.

23  There's nowhere in their brief that they actually

24  raised this issue as whether the Attorney General's

25  Office or the Attorney General signed this document, or

1    signed the procurement.

2           MR. COHEN:  I don't understand this comment

3    why we haven't briefed it.  First the Court said --

4           THE COURT:  (Overlappping.)  Let me see if I

5    understand you.  You're asking that exhibit, is it HH?

6           MR. COHEN:  HH, and there's a bunch of pages

7    in here, and there's --

8           THE COURT:  First, second and the third page

9    be admitted into evidence?

10           MR. COHEN:  We've had testimony of the first

11    page, the second page and the third page so far.

12           THE COURT:  All right, so that's what you're

13    asking to be admitted at this point?

14           MR. COHEN:  That I would like to offer, Your

15    Honor.

16           THE COURT:  Any objection?

17           MR. MANTANONA:  Yes, Your Honor, we believe

18    that it's irrelevant in regards to this matter.  We

19    believe that these issues weren't raised in the

20    People's brief in this matter, and it goes to

21    specifically actually just to the authorization of the

22    Attorney General to my contract.

23           THE COURT:  All right.  Over counsel's

24    objection, the Court will admit Exhibit HH, the first

25    three pages into evidence.

1    MR. WEINBERG:  Your Honor, point of

2 clarification.  I think you're referring to Exhibit KK.

3    MR. MANTANONA:  That's correct.

4    MR. COHEN:  Excuse me, I made an error.

5 Excuse me, it's Exhibit KK.

6    THE COURT:  Okay, KK.

7    MR. COHEN:  Pardon me, Your Honor.

8    THE COURT:  The first three pages of Exhibit

9 KK over counsel's objection --

10    MR. COHEN:  That's the first three pages.

11    THE COURT:  -- are admitted into evidence.

12 BY MR. COHEN:

13    Q.    Ms. Perez, I'd like you to turn to the last

14 document in Exhibit KK, which is a multi-page document

15 entitled Memorialization of Agreement for Professional

16 Services between the Government of Guam and Mantanona

17 Law Office.  Do you see that?

18    A.    (Pause.)  Yes, I do.

19    Q.    Okay.  And I ask you to turn to the last page;

20 does your signature appear on that?

21    A.    Yes, sir.

22    Q.    Okay.  And where did you sign this document?

23    A.    I'm sorry?

24    Q.    Where did you sign it?

25    A.    I signed it at the Governor's Office.

1    Q.    Okay.  Who was present at the time?

2    A.    Uhm, the Governor's legal counsel.

3    Q.    Okay.  And that's Ms. Shannon Taitano?

4    A.    That's correct.

5    Q.    Okay.  Did you prepare this document,

6  Memorialization of Agreement for Professional Services

7  between the Government of Guam and Mantanona Law

8  Office?

9         MR. MANTANONA:  Objection, Your Honor;

10  irrelevant as to the contract's preparation in regards

11  to this matter.  It's obvious from the first letter

12  that the delegation of the procurement was given to

13  Ms. Taitano in this matter.

14         MR. COHEN:  Her signature appears on this,

15  Your Honor; it's quite proper to ask her if she

16  prepared the document she signed.

17         THE COURT:  Well, that would assume that she's

18  an attorney.

19         MR. MANTANONA:  Correct, Your Honor.

20         MR. COHEN:  Excuse me?

21         THE COURT:  That would assume that she's an

22  attorney if she's -- you've asked her whether she

23  prepared the document.

24         MR. COHEN:  I just asked the witness if she

25  personally prepared it.  That was my question.  Perhaps

1    I should rephrase that.

2          MR. MANTANONA:  Your Honor, again, I'm going

3    to object.

4          THE COURT:  Well, maybe you should rephrase

5    the question.

6    BY MR. COHEN:

7    Q.    Was this document prepared by someone other

8    than yourself?

9    A.    Yes, it was.

10   Q.    Okay.  And who was it prepared by?

11   A.    I can't -- I, I assume it was Ms. Taitano.

12   Q.    You don't know for a fact though?

13   A.    I don't.

14   Q.    And that is your signature which appears?

15   A.    Yes.

16   Q.    Now, I direct your attention to another

17   signature on that last page, under the signature block

18   for Artemio Ilagan, Director of Department of Revenue

19   and Taxation, do you recognize that signature?

20   A.    Yes, I do.

21   Q.    And that is Mr. Ilagan's signature?

22   A.    I believe it is.

23         MR. COHEN:  Okay.  Your Honor, I'd offer this

24   document, Memorialization Of Agreement For Professional

25   Services between the Government of Guam and Mantanona

1   Law Office also as part of exhibit double H, Your

2   Honor.

3           MR. MANTANONA:  Your Honor, can I examine the

4   document before the Court admits it?

5           MR. COHEN:  Yeah, the document is in your

6   notebook.

7           MR. MANTANONA:  I want to make sure this is

8   the final or the latest version of this document.

9           MR. COHEN:  Your Honor, as I mentioned before,

10  during the recess we sought to stipulate as to

11  documents to aid -- to ease in their admission, and I,

12  for the life of me, cannot find in my counsel table

13  here this particular document.

14          (Pause.)

15          MR. COHEN:  Okay, I stand corrected, Your

16  Honor.  I do have a document here, apparently it's

17  Joint Exhibit 16 of the parties.  And that's not in

18  this notebook.  I think the witness obviously should

19  review this.

20          I'll try to use this overhead projector, I'm

21  not sure how successful I'll be.

22          THE COURT:  Is there a stipulation to its

23  admissibility?

24          MR. MANTANONA:  Your Honor, I'm still waiting

25  to review the document.

1          MR. WEINBERG:  It's your contract (inaudible).

2          MR. MANTANONA:  I understand that, but I want

3   to see the later version, because the versions were

4   going back and forth.

5          Thank you.

6          (Pause.)

7          MR. MANTANONA:  Your Honor, as long as it's

8   being brought in under this exhibit number, and this is

9   the version it's coming in, I have no objection.

10         THE COURT:  All right, Joint Exhibit 16 then

11  is admitted into evidence without objection.

12         (Pause.)

13  BY MR. COHEN:

14    Q.   And you signed the document November 19th,

15  2004, is that correct?

16    A.   Yes.

17    Q.   And Mr. Ilagan signed it November 19th, 2004?

18    A.   Uhm, I believe he did.

19    Q.   Okay.

20         MR. COHEN:  Okay.  I have no further questions

21  of the witness at this time, Your Honor.

22         THE COURT:  Mr. Mantanona?

23         MR. MANTANONA:  Just a few, few questions,

24  Your Honor.

25  ///

**CROSS-EXAMINATION**

BY MR. MANTANONA:

    Q.    Good afternoon, Ms. Perez.

    A.    Good afternoon.

    Q.    Just a few questions.  Go back to the KK, I believe the third page, what is this document, Ma'am?

    A.    Certificate of Emergency.

    Q.    And did you have an opportunity to review this document before you signed it?

    A.    Yes, I did.

    Q.    Did you actually participate in the drafting of this document?

    A.    Not the actual language, but in terms of the points raised here.

    Q.    And who prepared that document for you?

    A.    I believe it was Shannon Taitano.

    Q.    Ms. Taitano was an attorney -- is an attorney?

    A.    That's right.

    Q.    And so these statements, these 11 paragraphs reflect your feelings?

    A.    Yes.

    Q.    Okay.  And based upon this, you believed that you needed separate counsel?

    A.    Yes, I did.

    Q.    Okay.  And, in fact, did you determine that

1    you needed separate counsel before you even drafted --

2           MR. COHEN: Objection, Your Honor. This is

3    outside the scope of my direct examination. And I move

4    to strike the previous response to the question. I

5    raised -- other than going through the technical

6    details of this agreement, I asked her no questions as

7    to why she signed it, any dispute she had with the

8    Attorney General, whatever.

9           THE COURT: But the document you've moved to

10   be admitted into evidence.

11          MR. COHEN: Yes.

12          THE COURT: And now that it's evidence,

13   counsel has the right to cross-examine on the document

14   that's been admitted into evidence.

15          MR. COHEN: Oh, I don't dispute that, Your

16   Honor. It's my understanding counsel is seeking to

17   inquire as to reasons outside this document bearing on

18   her signature to the document. And I didn't raise any

19   of those issues in direct examination.

20          MR. MANTANONA: Your Honor, I'm just -- the

21   statement is -- I'm trying to clarify that my client

22   did sign this document, and whether this document

23   actually reflects her personal feelings and her need

24   for the emergency procurement.

25          THE COURT: Well, she said yes, I think.

1    MR. MANTANONA:  Then move to strike.

2    MR. COHEN:  No, not that of course.

3    MR. MANTANONA:  Okay.

4    Q.   On the first page, on Page 1 of the KK, do you

5    know that document?

6    A.   Yes.

7    Q.   And can you read the last sentence of that

8    document?

9    A.   The full sentence?

10   Q.   Yes, please.

11   A.   "For the reasons stated in the attached

12   Certificate of Emergency, I wish to delegate my

13   procurement authority to your office to assist me

14   in securing legal representation in the case."

15   Q.   And so who did you give that authority to?

16   A.   To the Governor's legal counsel.

17   Q.   And Mr. Cohen asked you whether you sought the

18   approval or consulted with the Attorney General or his

19   office in regards to this document, and you said no?

20   A.   That's correct.

21   Q.   Why didn't you?

22   A.   I, uhm, I concluded that he would not approve.

23   Q.   Were you seeking to discharge him as your

24   counsel?

25   A.   I was seeking to discharge him as my counsel.

1    Q.    You believed a conflict exists?

2    A.    Yes.

3    Q.    Do you believe a conflict exists today?

4    A.    Yes, I do.

5    Q.    And what relief are you seeking from the Court

6    today?

7    A.    I am seeking for the Court to approve my legal

8    representation by your office, by yourself.

9         MR. MANTANONA:  Thank you.

10        No further questions, Your Honor.

11        MR. COHEN:  I have some redirect, Your Honor.

12                 **REDIRECT EXAMINATION**

13   BY MR. COHEN:

14   Q.    Ms. Perez, I direct your attention to Exhibit

15   BB in the notebook before you.  Would you kindly open

16   that up and turn to exhibit double B.

17        (Pause.)

18        MR. MANTANONA:  Your Honor, can I have the

19   question repeated?  I apologize.

20        MR. COHEN:  I asked her to open to Exhibit BB

21   in the notebook.

22        MR. MANTANONA:  Your Honor --

23        MR. COHEN:  Exhibit notebook.

24        MR. MANTANONA:  I'm going to object to any

25   reference to any -- this is going beyond the scope of

1  his direct, his direct and now my cross.  No references

2  were made to this document.

3       MR. COHEN:  You need to look at it, counsel,

4  before you can raise the objection.

5       MR. MANTANONA:  Well, it wasn't referred to in

6  your cross-examination.

7       MR. WEINBERG:  Mr. Mantanona, I believe that

8  you brought up the question of (inaudible) --

9       THE COURT:  Sir, Mr. Weinberg, we're not

10  picking you up when you're make the statement.

11       MR. WEINBERG:  My apologies, Your Honor.  I

12  was just saying that Mr. Mantanona asked the witness

13  about her desire to discharge the office of the

14  Attorney General and that's what Exhibit BB relates to.

15       MR. COHEN:  Okay.

16  Q.  Have you now turned to Exhibit BB?

17  A.  Yes, I have.

18  Q.  Excuse me?

19  A.  Yes, I have.

20  Q.  Okay.  Have you seen that document before?

21  A.  Yes.

22  Q.  And what is it?

23  A.  It's a letter to the Attorney General

24  requesting that he sign a substitution of counsel for

25  myself.

1    Q.   Okay.  And did you sign that?

2    A.   Yes, I did.

3    Q.   And what's the date of that document?

4    A.   December 9th.

5         MR. COHEN:  Your Honor, I offer Exhibit BB.

6         (Pause.)

7         THE COURT:  Mr. Mantanona?

8         MR. MANTANONA:  Your Honor, I have no

9    objections to the document.

10        THE COURT:  All right.  Exhibit BB admitted

11   into evidence without objection.

12        MR. COHEN:  BB, yes.

13   Q.   Ms. Perez, I ask you now to direct your

14   attention to Exhibit DD in the notebook.

15   A.   I see it.

16   Q.   Okay.  Have you seen that document before?

17   A.   Yes, I have.

18   Q.   And is that document Exhibit DD in response to

19   your letter Exhibit BB?

20   A.   Yes, it is.

21        (Pause.)

22        MR. COHEN:  Your Honor, I offer Exhibit DD

23   into evidence.

24        MR. MANTANONA:  Your Honor, we'll object to

25   DD.

1          MR. COHEN:  Your Honor, she has identified

2   that as her document.

3          THE COURT:  Well, what's the reason for the

4   objection?

5          MR. MANTANONA:  Your Honor, it contains a

6   legal opinion by the Attorney General's Office, which

7   is one of the core issues in regards to this position.

8   It's an opinion.

9          MR. COHEN:  Let me --

10         MR. MANTANONA:  It's not relevant to the

11  solicitation.  Part of it is when he denies her

12  request, but it contains legal opinions that are not

13  relevant.

14         MR. COHEN:  That's entirely irrelevant.

15    Q.    But let me ask you this, Ms. Perez.  Would you

16  please read the --

17         THE COURT:  Wait, hold on, there's an

18  objection.

19         MR. COHEN:  Excuse me?

20         THE COURT:  You're asking that it be admitted

21  into evidence and it hasn't been resolved yet.

22         MR. COHEN:  Okay.  I've offered this document

23  into evidence.  The testimony so far is that the

24  witness, she's seen this document, she received this

25  document, and that this document is in response to

1   Exhibit BB which she had sent to the Attorney General.

2   And, indeed, the first paragraph, the first sentence of

3   this exhibit says "I am in receipt of your letter dated

4   December 9th, 2004, requesting that I withdraw my

5   representation of you in the above styled matter."

6   So this is the response of the Attorney

7   General to Exhibit BB which is now into evidence, so

8   it's -- and the witness has testified she received that

9   document.  So it's now proper to have this response

10  offered into evidence and to be admitted into evidence,

11  Your Honor.

12  MR. MANTANONA:  Your Honor, we believe it's

13  improper to admit it into evidence because it contains

14  a legal opinion of the Attorney General in regards to

15  this case.  We'll stipulate that this document is a

16  denial of Ms. Perez's request, but besides that, we

17  refuse to -- or we do not agree that it should go

18  before the Court to have an internal argument contained

19  within the evidence proffering the Attorney General's

20  position.  To me that's improper.

21  Thank you.

22  THE COURT:  All right.  The Court will admit

23  Exhibit DD into evidence.  Any questions of law is to

24  be determined by the Court solely without regard to

25  anything else.

1             MR. COHEN:  Thank you, Your Honor.

2             I have no further questions of the witness at

3  this time, Your Honor.

4             THE COURT:  Mr. Mantanona?

5             MR. MANTANONA:  Your Honor, at this time, we

6  have no further questions of Ms. --

7             THE COURT:  All right.  Thank you, Ma'am,

8  you're excused.

9             All right.  The Court notes that it's 12:30,

10  and I can go for another two hours but I need to ask

11  counsel what do you desire to do at the moment.

12             MR. COHEN:  I propose we come back after

13  lunch, Your Honor.

14             MR. CALVO:  Your Honor?

15             THE COURT:  Mr. Calvo.

16             MR. CALVO:  If it please the Court, I would

17  propose we come back after lunch.  However, Your Honor,

18  I think that we've heard enough.  I think that the

19  issue here is the motion to strike as counsel for the

20  People that have been on the stand, and I think there's

21  been a clear exhibition of hostile conduct from people

22  that purport to be counsel for the folks on the stand.

23             THE COURT:  All right, let me ask if there are

24  additional witnesses the government or the Attorney

25  General desires to call.  Mr. Weinberg?

1          (Pause.)

2          MR. WEINBERG:  (Inaudible.)

3          THE COURT:  Sir, let me ask that you pull that

4     mic closer to you again, all right?

5          MR. WEINBERG:  Is that better?

6          I was just saying that Ms. Taitano's testimony

7     will be necessary as to the question of the propriety

8     of Calvo and Clark's representation in this case.  The

9     last two witnesses had to do with Mr. Mantanona, but

10    Calvo and Clark's testimony I think can --

11         THE COURT:  But isn't the issue as I see it,

12    perhaps the Attorney General's argument that they

13    entered into this contract without there being any

14    emergency; that would be your argument I think, right?

15         MR. WEINBERG:  In the case of, as we under-

16    stand what, what these gentlemen are doing here, in the

17    case of Mr. Mantanona's representation of Mr. Ilagan

18    and Ms. Perez, the Governor purported to declare an

19    emergency or accept the declaration of an emergency as

20    to his contract in getting them representation, but the

21    Calvo and Clark law firm is here under a different

22    legal argument, I think.  I'm sure the Calvo and Clark

23    will correct me --

24         THE COURT:  But if it's under a different

25    legal argument, why do you need testimony in regards to

1  a legal argument?

2          MR. WEINBERG:  There are facts as to, as to

3  the legality of -- I mean, perhaps we can stipulate as

4  to what happened with the documents or something, but I

5  thought it would be just as easy to go through it with

6  Ms. Taitano.

7          THE COURT:  Mr. Calvo?

8          MR. CALVO:  Yeah, I think that -- I guess my

9  point, Your Honor, is that we spent, you know, a good

10 part of close to three hours, what was a clear showing

11 that the Attorney General's Office is hostile to the

12 people that they purport to represent.  They expand

13 their questioning beyond the relevant issue at hand,

14 they go into attorney-client privilege, they go into

15 non-relevant areas where we have had to object and

16 protect the interests of who they purport they are

17 representing.  And I think there's something --

18          THE COURT:  Okay, let me ask Mr. Weinberg.  As

19 to the legal theory behind the Calvo Clark contract,

20 what facts do you need to undertake?

21          MR. WEINBERG:  I just want to establish in the

22 record, apparently there was a conflict, what we call a

23 conflicts counsel arrangement where the Attorney

24 General had agreed that Calvo and Clark could represent

25 the Governor's Office in two cases, or a couple of

1    cases--it might have been more than that.  Subsequent

2    to that, and to the Attorney General signing that

3    agreement, Calvo and Clark over a number of -- a number

4    of months and the Governor's Office attempted to get

5    the Attorney General to sign amendments to that

6    contract authorizing Calvo and Clark to represent the

7    Governor in this and other matters that we did not

8    authorize them to.

9              So it's our argument that, that you still need

10   the Attorney General's signature under the laws of Guam

11   on a contract for legal services for the Governor.

12             THE COURT:  Why would you need additional

13   facts for purposes of arguing on that issue?

14             MR. CALVO:  The only problem, Your Honor, is

15   that the Attorney General refuses to sign our contract.

16   So more appropriately the Attorney General should

17   testify rather than anyone from the --

18             THE COURT:  But I thought he's telling me that

19   the Attorney General -- the Governor has requested that

20   a contract that the Attorney General has previously

21   approved be amended to include this case within the

22   coverage of that agreement?

23             MR. CALVO:  This case and another case that's

24   already concluded, Your Honor.

25             THE COURT:  And they haven't been --

1    MR. CALVO: The Attorney General refuses to

2    sign the contract.

3    THE COURT: To amend?

4    MR. CALVO: Yes.

5    THE COURT: Or to extend?

6    MR. CALVO: Right.

7    MR. WEINBERG: Well, actually to amend to

8    include this case.

9    THE COURT: And another case?

10   MR. WEINBERG: And another case. Correct.

11   And the Attorney General in his discretion has

12   determined --

13   THE COURT: All right, so based on your

14   refusal to sign, you're saying that they have no

15   authority then to represent the Governor?

16   MR. WEINBERG: Correct.

17   THE COURT: That's the legal argument?

18   MR. WEINBERG: Correct.

19   THE COURT: So why do we need testimony in

20   that regard?

21   MR. WEINBERG: Well, also, we're trying to

22   determine the scope of the unlawfulness of this

23   agreement. The latest version we've seen appears to

24   backdate the agreement back into April of last year.

25   Or the latest version that we've seen, I might be

1    mistaken on this.

2         MR. CALVO:   Your Honor, I think the purpose is

3    to embarrass the Administration.   There's a case that's

4    concluded, Your Honor, where opposing counsel, it was

5    the Moylan versus Camacho case, where opposing counsel

6    representing the Lieutenant Governor was Mr. Phillips

7    here, and he was representing the Lieutenant Governor.

8    The Attorney General had no problem signing that

9    contract.   In fact, Mr. Phillips has been paid in full

10   on that case, which concluded.   We have not had our

11   signed contract returned yet.

12        MR. PHILLIPS:   (Overlapping/unintelligible.)

13        MR. CALVO:   The Attorney General has gone on a

14   sit-down strike with respect to the Administration.

15        THE COURT:   I see we've awakened Mr. Phillips.

16        (Laughter.)

17        MR. PHILLIPS:   For the record, Your Honor, the

18   Attorney General had grave heartache and we had to go

19   through the proper procedures in order to do it.

20        THE COURT:   Well, thank you for finally saying

21   something there.

22        MR. PHILLIPS:   It was totally an emergency

23   (inaudible).

24        MR. CALVO:   It was no knock on Mr. Phillips;

25   I'm happy for him that he got paid.

Case 1:04-cv-00006   Document 248-6   Filed 10/03/2005   Page 28 of 35

1          (Laughter.)

2          MR. WEINBERG:   I don't know what the relevance

3     is about Mr. Phillips's contract with the Lieutenant

4     Governor or not.   It's clear, the parties all agree is

5     that the Attorney General has not authorized, he has

6     not signed the contract by which the Calvo and Clark

7     law firm purports to be here and be representing the

8     Governor.

9          THE COURT:   And isn't that something that you

10    can legally argue before the Court as opposed to

11    bringing in additional testimony?

12         MR. CLARK:   Your Honor, if I can address the

13    Court.   I haven't appeared yet before the Court;

14    Arthur Clark, Calvo and Clark firm, just to clarify

15    this contract.

16         In addition, Your Honor, because some of the

17    -- it's not limited as far as the amendment to the

18    contract is not limited to just this case or to the

19    case Mr. Calvo referred to that's been concluded.

20    Matter of fact, I was in court yesterday on the

21    overtime lawsuit where the Attorney General has

22    directly sued the Governor on a writ of mandate to

23    force the Governor to pay overtime, and yet that also,

24    the Attorney General has refused to sign the amendment

25    in order to permit the Governor to retain counsel on

1   that particular case.

2       And Mr. Weinberg is talking about the back-

3 dating of the amendment, Your Honor. What he's

4 referring to is, even though the Attorney General has

5 been suing the Governor for months and has refused to

6 sign the contract to authorize the attorney -- the

7 Governor to retain counsel to defend himself against

8 the Attorney General's Office, what the Governor is

9 seeking is compensation for Calvo and Clark going back

10 to the date that we actually entered an appearance and

11 started representing the Governor against the cases

12 directly naming the Governor as a defendant.

13       MR. JACOB: One other point, Your Honor,

14 Rodney Jacob for Calvo and Clark, is that in the <u>Moylan</u>

15 <u>versus Camacho</u> case in the Superior Court, the Attorney

16 General's Office went on the record saying that there

17 was no objection to Calvo and Clark representing the

18 Governor, yet they refused to sign the agreement. The

19 only issue in this matter is whether the Attorney

20 General can come here, be nakedly hostile against the

21 Governor, the departments in the Administration, and

22 stand up and say there's no contract because the

23 Attorney General won't sign it. That is the issue

24 they're trying to create which are red herrings.

25       UNKNOWN VOICE: And it's not proper or right

1  (inaudible).

2        THE COURT:  Wait.  Well, counsel, that's where

3  I think that additional testimony is not needed.  We

4  can come back in the afternoon, argue the legal

5  implications of -- you know, you can make the

6  representation to the court that this occurred and

7  they can certainly counter and say something else,

8  as opposed to bringing in testimony just to delay the

9  proceeding.

10       MR. JACOB:  Your Honor, also if I may?  This

11 is such a serious issue, and the naked hostility of an

12 attorney against a client that they continue to purport

13 to be at least warrants briefing so this court has a

14 full record.  It is such an important issue that these

15 folks have tried to hijack in the name of the very

16 clients that they are outwardly and nakedly hostile to.

17       UNKNOWN VOICE:  And it is a gross violation

18 of --

19       THE COURT:  But that's what we're going to

20 determine when we come back, whether or not the motion

21 to strike should be granted or not, or whether or not

22 we allow the entry of appearances on your behalf, made

23 by you on behalf of these defendants.

24       MR. JACOB:  Your Honor, there was not full

25 briefing in this issue.  They filed a motion to strike

1   and the Court issued an order that said no further

2   briefing was needed on the issue. Although Calvo and

3   Clark filed an abbreviated issue on this -- memo on

4   this issue, we feel that it is so important and that

5   there are documents that the court should consider

6   before it considers an issue on a procurement issue

7   like this, where they are trying to nakedly hijack

8   these proceedings because the attorney -- the sole

9   reason is because the Attorney General will not sign

10   off on a contract that was lawfully approved through

11   the procurement process.

12         UNKNOWN VOICE: And Your Honor, again my --

13         THE COURT: But here's my point though.

14   Here's my point. We've had the Attorney General filing

15   this motion to strike, and it seems that in the initial

16   moving papers he raises the procurement law as an issue

17   in support of his motion, and what I find troubling

18   though is that if counsel thinks that you haven't

19   briefed it fully, at the same time, you've never come

20   to court and asked the Court to reconsider its prior

21   orders that no further briefing be made, so that you

22   can ask to file additional papers.

23         MR. JACOB: Your Honor, what we did do was

24   we filed a, what is permitted by Rule 19.1, a

25   substitution. And all that needs to be done on that

1   substitution for the purposes of the Governor to be

2   heard, and which will moot out all of these issues, and

3   they can be brought in another forum is for the Court

4   to sign it.  I think that there is definite predicate

5   here.

6        The Court has witnessed probably an

7   unprecedented display of hostility from the Attorney

8   General's Office who purports to represent line

9   agencies, but also my client the Governor, and all that

10  needs to be done is the order for substitution to be

11  signed.  They beg the question in the motion to strike,

12  they said, well, strike them, because where is the

13  substitution.  We filed it, we followed it.  That was

14  just a joke, I guess.  It's before the court, they

15  refused to sign it, we've done everything appropriate

16  according to the rules, and all that needs to be done

17  to moot out all of this nonsense is that the Court

18  needs to sign the order, and there's no good reason for

19  it not to.  And what they're trying to do on the

20  procurement issues is just a red herring.

21        MR. WEINBERG:  I can appreciate Mr. Jacob's

22  enthusiasm.  We have a significant legal question here.

23  I think the Court probably has heard enough testimony

24  to know what's going on.  The Court and the parties can

25  probably stipulate as to documents as to the -- as to

1  the history of Calvo and Clark and the Governor's

2  Office attempting to get their contract amended for

3  this case.  Beyond that, the motion to strike, we have

4  a question of law.

5       THE COURT:  You know, let me just tell counsel

6  what I believe the issue before the Court is, really.

7  It's not so much whether the Court approves the

8  contracts that have been entered, that is entered into

9  with the individual defendants, the issue is who is

10 going to represent who today.  That's the only issue

11 I'm interested in.

12       I don't care how much you're charging your

13 clients, I don't care whether the Attorney General has

14 signed those or not.  The only issue I want to

15 determine today is as to these defendants, who properly

16 can speak for them in court today.  That's what I want

17 to decide, nothing else, as to the motion to strike.

18       So, it seems to me that we can argue that

19 motion without additional testimony.  What has been

20 testified to by Mr. Ilagan and Ms. Perez seems to

21 perhaps bring into play the objections that you have

22 regarding those individuals seeking counsel other than

23 the Attorney General, and it seems to me that those

24 same reasons apply to Calvo and Clark.

25       MR. WEINBERG:  They do at least with respect

1    to the failure to obtain the Attorney General's consent

2    and signature on their contract.  That aspect of the

3    Guam procurement law and the requirement that contracts

4    for legal services be signed and approved by the

5    Attorney General, I think all are in agreement that the

6    Attorney General has refused to sign the contract with

7    Calvo and Clark.

8              THE COURT:  And the Attorney General has also

9    refused to sign the substitution.

10             MR. WEINBERG:  And that as well.

11             THE COURT:  Right.  So that's also going to

12   come into play here.  That's why the Court isn't

13   prejudicing them from arguing really, because you

14   haven't signed the substitution.  They're here before

15   the Court today to make their argument.

16             MR. WEINBERG:  I don't follow what the issue

17   is with the substitution of counsel.  Obviously, if we

18   were to sign that, that would moot the question.  It

19   did in fact look like it was a joke, it was presented

20   to us when it was brought to my office to sign it --

21             THE COURT:  The court hasn't signed the

22   substitution, really, because it would be improper to

23   sign the substitution in light of the motion to strike

24   that's before it.

25             So why don't we come back after lunch and be

1    prepared to argue the motion then, not so much put on

2    additional testimony, but be prepared to argue the

3    motion.  Is that understood?

4            MR. CALVO:  Yes, Your Honor.

5            MR. JACOB:  Thank you, Your Honor.

6            MR. WEINBERG:  Fine, Your Honor.

7            UNKNOWN VOICE:  Yes, Your Honor.

8            THE COURT:  All right.  We have a matter

9    that's set for 2:00.  I'm just going to go to

10   McDonald's and buy the McChicken that's a dollar, and

11   then tell the clerk that I'm a senior, so I can get a

12   drink for 35 cents, so I can have lunch today for a

13   $1.35 and have a quick lunch.  So why don't we have you

14   back around 2:00 so that we can commence right when

15   we're done with this case that's scheduled for 2:00

16   o'clock.

17           MR. PHILLIPS:  Your Honor, if I may address

18   the court?

19           THE COURT:  Yes, Mr. Phillips.

20           MR. PHILLIPS:  Does the Court anticipate

21   addressing the remaining matters today?  Because if

22   not, then I think that will save the witnesses a lot

23   of trouble too --

24           THE COURT:  I think you have a good point

25   there, that we might be hearing only the motion to

1    strike this afternoon.

2            Is there any objection if we release the

3    witnesses as to the other issue?

4            MR. PHILLIPS:  As long as the other issue is

5    being released for the day, Your Honor.

6            THE COURT:  All right, and subject to recall

7    by the Court.

8            MR. PHILLIPS:  I think there's also, although

9    I can't speak for the Court, the possibility the Court

10   might reserve and not resolve that question, and so it

11   might, along with the court's suggestion be more

12   prudent to go ahead and resolve this, and then very

13   quickly move to the next issue, although not today.

14           THE COURT:  And I'm glad that Mr. Phillips is

15   finally making statements to the court this afternoon.

16           I agree with Mr. Phillips, why don't we

17   discharge the witnesses as to your motion for the day

18   and just deal with the motion to strike.  I think it's

19   going to take all afternoon.

20           MR. CALVO:  Your Honor?

21           THE COURT:  Yes, Mr. Calvo.

22           MR. CALVO:  Because of the other matters, and

23   Mr. Phillips has reminded me that we might have some

24   scheduling issues.  If the court anticipates the

25   hearing continuing tomorrow I think on the Governor's

1  side we might have some scheduling matters.  I know

2  that --

3  　　　　　THE COURT:  Why don't we determine that at the

4  conclusion of this afternoon's proceedings, so that

5  it's clear that whether the hearing we do set is

6  convenient for everybody.

7  　　　　　MR. CALVO:  Thank you, Your Honor.

8  　　　　　UNKNOWN VOICE:  Thank you, Your Honor.

9  　　　　　MR. MANTANONA:  Your Honor, administrative

10  matter.  On behalf of Ms. Perez and Mr. Ilagan, we'd

11  like to move in the respondent's R exhibit that was

12  addressed.

13  　　　　　THE COURT:  I'm sorry, I didn't hear.

14  　　　　　MR. MANTANONA:  Exhibit R or People's Exhibit

15  R.

16  　　　　　　　(Pause/discussion not audible.)

17  　　　　　MR. MANTANONA:  Oh, it's joint.

18  　　　　　THE COURT:  And what's --

19  　　　　　MR. MANTANONA:  It's respondent's Exhibit R.

20  　　　　　THE COURT:  Okay.  And what did you want the

21  Court to do?

22  　　　　　MR. MANTANONA:  Just want to admit it into

23  evidence for the purposes of this hearing.

24  　　　　　THE COURT:  Oh.  Is there any objection to

25  that?

1          MR. WEINBERG:  Mr. Mantanona wants to move
2  into evidence a legal opinion from the Attorney
3  General?  Is that what that is?
4          COUNSEL:  No objection.
5          THE COURT:  All right, Exhibit R then admitted
6  into evidence without objection.
7          All right, counsel, have a good lunch; we'll
8  see you this afternoon.
9          COUNSEL:  Thank you, Your Honor.
10         (Recess was taken.)
11         (Proceedings resumed at 2:26 p.m.)
12         THE CLERK:  Civil case 04-00006, Julie Babauta
13  Santos, individually and on behalf of all those
14  similarly situated, versus Felix A. Camacho, Governor
15  of Guam, et al., continued motion to strike appearances
16  and pleadings, and motion for relief from order issued
17  by the Court on November 12, 2004.
18         Counsel, please state your appearances.
19         MR. PHILLIPS:  Mike Phillips for the
20  petitioner, and interim class counsel.
21         MR. CALVO:  Eduardo Calvo for the Governor of
22  Guam.
23         MR. JACOB:  Rodney Jacob for the Governor of
24  Guam.
25         MR. BENJAMIN:  Daniel Benjamin for the

1  Governor of Guam.

2          MS. TAITANO:   Shannon Taitano for the Governor

3  of Guam.

4          MR. MANTANONA:   Afternoon, Your Honor, Rawlen

5  Mantanona for the Director of Revenue Taxation, Lourdes

6  Perez, and the Director of Rev -- Adminis -- Rev and

7  Taxation, Artem -- excuse me -- Art Ilagan.

8          MR. COHEN:   Stephen Cohen, counsel for the

9  respondents.

10          MR. WEINBERG:   Rob Weinberg, Attorney

11  General's office, also counsel for all the respondents.

12          THE COURT:   Mr. Weinberg, or Mr. Cohen?

13          MR. WEINBERG:   (Inaudible.)

14          THE COURT:   Yes, why don't we proceed then.

15          MR. WEINBERG:   May it please the Court, the

16  issue is a simple issue, and that is, who controls the

17  litigation, who represents the defendants, the

18  Government of Guam official defendants in this case.

19          I want to get some law out of the way real

20  quick on something we heard testimony about, I just

21  want to bring the Court's attention to, I think it's

22  already been cited, at least with respect to the

23  contracts at issue here.

24          5 Guam Code Annotated Section 5121(b) provides

25  that: "No contract for the services of legal counsel in

1　the executive branch shall be executed without the

2　approval of the Attorney General."  That's Guam law.

3　　　　5 GCA Section 22601 provides that all

4　contracts -- these are all contracts generally --

5　"shall, after approval of the Attorney General, be

6　submitted to the Governor for his signature."

7　　　　We have two statutes requiring the Attorney

8　General's signature.  And one in particular with the

9　provision of legal counsel to the Government of Guam

10　and its agencies and officials.

11　　　　THE COURT:  Is that a provision that applies

12　to autonomous agencies?

13　　　　MR. WEINBERG:  Your Honor, that's our -- that

14　is an issue that's currently in litigation at the

15　moment in the Guam Supreme Court, and it is our

16　contention that it does apply.

17　　　　THE COURT:  Okay.

18　　　　MR. WEINBERG:  That even though autonomous

19　agencies sometimes have the authority, and in fact as a

20　matter of practicality, autonomous agencies are still

21　required to submit all contracts through our office,

22　and our contention is that legal -- contracts for legal

23　services also have to be approved by our office.

24　　　　THE COURT:  Let me ask a question then.  If

25　that's your belief, if an autonomous agency decides to

1   procure legal services, and let's assume the Attorney

2   General comes to the conclusion that it's not desirable

3   that this firm be legal counsel to that agency, then

4   under your theory, the law firm that's been chosen by

5   the autonomous agency could never represent that agency

6   absent approval on your part?

7           MR. WEINBERG:  That is -- that is our

8   contention, yes, Your Honor.  And that issue actually

9   is before the Guam Supreme Court right now with respect

10  to the airport.

11          THE COURT:  Okay.

12          MR. WEINBERG:  And it has been briefed and

13  argued and we're awaiting a decision.

14          Finally -- finally, under the Administrative

15  Rules and Regulations, 2 GAR Section 212(b), also

16  provide that: "No contract for the services of legal

17  counsel in the executive branch shall be executed

18  without the approval of the Attorney General."

19          So here we've had testimony in this case, and

20  it's all counsel have stipulated that the Attorney

21  General has not approved any of the contracts, or

22  either Mr. Mantanona or the Calvo and Clark with

23  respect to this case.

24          THE COURT:  Has the Attorney General approved

25  the contract for Moylan versus Camacho?

1      MR. WEINBERG:  I don't know.

2      And I can report back to the court and I can

3   find out, but I do not know.

4      THE COURT:  Okay.

5      MR. WEINBERG:  Now, that's just Guam law.  But

6   it is the position of this office, as it is in this

7   case and in other cases, that in 1998 Congress amended,

8   the U.S. Congress amended the Organic Act to provide

9   something that Guam has never had before, and that is

10  a chief legal counsel for the Government of Guam.  And

11  all that entails is more than just, here's a lawyer.

12  And it also provided that the Legislature may provide

13  that the Attorney General is elected, if it desires,

14  which it did.

15      So in 1998 and 1999 the Legislature, the Guam

16  Legislature provided that the Organic Act established

17  Attorney General shall be elected.  And the question

18  now becomes for this court, and some of us, is what

19  does that mean.  Does that mean that there's just

20  another lawyer down the hall from the -- from the

21  Governor, or the Director of RevTax, or the Director

22  of Administration, or a line or autonomous agency, and

23  if that person chooses to use that attorney in the

24  Attorney General's Office, he or she may, or if

25  dissatisfied with the attorney, can go hire lawyers

1   outside of it, outside of the Attorney General's

2   Office.

3          And the answer is no.  The answer is, and

4   we've cited lots of case law, that if you look at the

5   title and the concept of the role of chief legal

6   counsel in a constitutional sense, and by which I mean

7   here we have -- it is an office that is established in

8   the Organic Act, it cannot be taken away.

9          Previously, attorneys general came and went at

10  the whim of the Governor, and in essence that's what --

11         THE COURT:  Well, could the Guam Legislature

12  decide tomorrow to abolish the election of the Attorney

13  General?

14         MR. WEINBERG:  I believe so.

15         THE COURT:  So it could?

16         MR. WEINBERG:  It could provide that the --

17  it could take away the election, or how the Attorney

18  General is elected, yes.

19         So to me, that's -- whether the AG is elected

20  or not is not so critical as the fact that it is an

21  office established in the, in the Organic Act.  And

22  here what you have in this case is a carryover of the

23  kinds of interaction between the Governor and the

24  Attorney General you had in prior administrations.

25  Dissatisfied with the legal counsel and the legal

1    direction chosen by the chief legal officer for the

2    Government of Guam, the Governor has directed the

3    Department of Administration and RevTax to sign these

4    documents saying, declaring a state of emergency

5    saying, give us a different lawyer, we think we have a

6    conflict with you, we disagree with your legal

7    analysis, we don't like the legal direction you have

8    chosen for us.

9         Now, we have cited lots of cases that hold

10   that it is the Attorney General, in a constitutional

11   sense like ours, that sets legal policy. The Governor

12   may set policy, general policy, executive policy, but

13   when a contract is up for review, and when the

14   provision of legal services to the Government of Guam,

15   its agencies, instrumentalities, officers, it is the

16   Attorney General's sole responsibility to decide who

17   that lawyer shall be, and what the course of -- what

18   the direction of litigation will be.

19        Unlike, and there's plenty of authority and

20   we've cited it to the court already, unlike a limited

21   number of jurisdictions that still hold that an

22   Attorney General serves at -- in the same way that a

23   private lawyer would, and a private lawyer has to take

24   directions in sum and substance; it is a different

25   animal with respect to the Attorney General, and a

1    governmental client.

2            I want to point out that in the --

3            THE COURT: Speaking of constitutional office,

4    is the entitlement to representation, or outside

5    representation different in the cases of, let's say,

6    Perez and Ilagan as opposed to the Governor, because

7    the Governor in effect has a constitutional office and

8    those two do not?

9            MR. WEINBERG: I think that's a good question.

10   Clearly, with respect to Ilagan and Perez, the Attorney

11   General controls; they are line agencies within the

12   executive branch.

13           Now the Governor, and I have seen case law,

14   case law has been cited I believe, that sometimes the

15   Governor may have a voice, may -- if he has an

16   individual, an individual interest to assert, something

17   where, for example, if the Legislature were somehow

18   encroaching on his authority and you had a separation

19   of powers problem, or issue, where the Governor might

20   be entitled or ought to be entitled, I would argue, to

21   independent counsel of his choosing, if there's a

22   direct conflict as to the Governor's powers and duties.

23           But where you have a situation, as here, where

24   you have a question, is the EITC due and payable -- and

25   I'm not answering that, these are the questions, it is

1  a legal question to be decided -- and how is it to be

2  paid out, and what's the most efficacious way for the

3  Government of Guam to resolve this legal question,

4  goes to --

5  THE COURT: If the issue boils down to, how

6  do you settle it, and the views differ between the

7  Attorney General and the Governor, is that a situation

8  where you think the Governor is entitled to independent

9  representation?

10  MR. WEINBERG: I don't know about independent

11  representation. I would go as far as to say that the

12  Governor -- if a Governor has a complaint and has

13  something that he says, it may, it may behoove the

14  Government of Guam to allow him a voice. It **may be**

15  advisable to do that.

16  THE COURT: But how does he show his voice,

17  what's the vehicle in which he transforms his voice to

18  be heard in court?

19  MR. WEINBERG: (Overlapping.) Well, with

20  independent, or independent counsel. The problem is we

21  don't have a provision for that in the law, in Guam.

22  THE COURT: But let's assume you're suing the

23  Governor; is he then not entitled to independent

24  representation because there's no such authorization

25  in the statute?

1    MR. WEINBERG:  I think in that case he is,

2    where we are suing the government -- suing the

3    Governor.

4    THE COURT:  Irrespective that the law is

5    silent in that regard, he is entitled to independent

6    representation?

7    MR. WEINBERG:  I, this is my opinion, yes,

8    like in the <u>Moylan versus Camacho</u> over the Procurement

9    Appeals Board question, the attorney -- the Governor

10   ought to have his own attorney, because he is being

11   sued directly by -- that is a direct conflict.  But

12   where --

13   THE COURT:  But why can't you detach another

14   Assistant Attorney General to represent him?

15   MR. WEINBERG:  That has been offered in the

16   past, and that can be done in the future.  I mean

17   that's one solution is to do that.  And in fact, when

18   the Attorney General first took office, we created

19   conflict laws and created separate divisions where,

20   if we were going to represent somebody, it was going

21   to be one division, but if we were going to sue someone

22   in the government it was another, and there were

23   Chinese walls erected.  And those are possible

24   solutions to this problem, and that can be done.

25   I want to point out that of the cases cited by

1    the Governor for the proposition that he does get to

2    control the substantive --

3              THE COURT:  Well, you know, that just raises

4    another question, really.  If the Attorney General is

5    the chief legal officer and if he decides the policy,

6    why would we think that an Assistant Attorney General

7    can take a position different from the chief legal

8    officer of the Government of Guam?

9              MR. WEINBERG:  I think your question is more

10   one of practicality than -- your question is, can a --

11   could an Assistant Attorney General create a Chinese

12   wall around himself (inaudible), and --

13             THE COURT:  But the AG's argument, though, is

14   the dictates of litigation, that has to be determined

15   by the Attorney General; he solely determines, you

16   know, the litigation posture.  So once he makes that

17   determination, why would an assistant be authorized to

18   go against that policy in the representation of another

19   defendant?

20             MR. WEINBERG:  I think we need to be a little

21   bit more fact specific.  In a case, for example, like

22   this one, all right, just because the Governor

23   disagrees, that does not entitle the Governor to

24   independent counsel, just because he disagrees with

25   whether legally the case against the Government of Guam

1    and its officials is due to be settled.

2           In a case like <u>Moylan v. Camacho</u> where the

3    Attorney General was suing the Governor over his

4    failure to appoint members of the Procurement Appeals

5    Board, I mean, nobody is going to represent the

6    Governor but somebody other than the AG, then the

7    Attorney General, unless you walled off an Assistant

8    Attorney General to represent him.

9           When the Judicial Council, Guam Judicial

10   Council sued the office of Attorney General for --

11   to evict us --

12          THE COURT:  Are you still there, by the way?

13          MR. WEINBERG:  We're still there.  I don't

14   know -- what is today's date?  I'm not sure.  I think

15   we're supposed to be out by the end of next month.

16          The first thing that the Attorney General did

17   was actually offer as attorney from our office to them

18   to represent them to sue us, which the Judicial Council

19   declined and they had their own, and that's not an

20   issue.  But just as a matter of interest, that's what

21   happened.

22          You know, these are --

23          THE COURT:  But did you insist that they be

24   represented by the Attorney General or not?

25          MR. WEINBERG:  No, we did not.  We did not.

1   And in that case, and here's -- I don't mind telling

2   the Court there's some dispute in our office, there is.

3        Here what we have in the Santos case, we have

4   -- it is an entirely executive branch issue, to me --

5   (inaudible) -- and there's some in the office, you have

6   some separation of powers problems in compelling the

7   Judiciary or perhaps even the Legislature to accept

8   counsel of our choosing because of the separation of

9   powers doctrine.  I think it has been resolved in

10  different ways, but --

11       THE COURT:  But didn't the Organic Act say

12  that he's the chief legal officer of the Government of

13  Guam?

14       MR. WEINBERG:  That's what the Organic Act

15  says, we are the chief legal officer.

16       THE COURT:  It didn't say the executive branch

17  only?

18       MR. WEINBERG:  Correct.

19       THE COURT:  So why are we questioning

20  separation of powers?

21       MR. WEINBERG:  I'm not.  I'm saying it's a

22  question that may arise in the future.  And so with

23  respect to foisting an attorney on the Judicial Council

24  when it sued us for eviction, there was some hesitation

25  that you might run into a separation of powers problem

1  in doing that. You have to resolve the separation of

2  powers consistent with the chief legal officer and what

3  that means.

4          But here in Santos, we are clear that under

5  these statutes that we're dealing with contracts for

6  provision of legal counsel to the executive branch.

7  And here it's clear that under the Organic Act, and

8  these statutes, and the Guam common law which -- or the

9  common law which Guam has adopted, that the Attorney

10 General is -- makes the legal decisions with respect

11 to settling cases or bringing cases or how to defend

12 cases. And that all of that law has been cited.

13         Again, I keep trying to get to this point.

14 The Governor's Office has --

15         THE COURT: In other words, the certificate

16 that was filed by Mr. Ilagan and Ms. Perez, from your

17 point of view, they don't have any valid points?

18         MR. WEINBERG: I don't -- yes, Your Honor.

19 The certificate said -- and what was from Mr. Ilagan's

20 testimony, I'm not quite sure that he really knew what

21 he was even talking about when he talked about a

22 conflict of interest, I couldn't get a straight answer

23 from him as to what he thought, except that what he

24 seemed to be saying was that it was a conflict because

25 the legal positions of the Government of Guam had

1 changed over time. And that at one time the legal

2 position of the Government of Guam was that you did not

3 pay EITC at all, and now it is, now that legal position

4 is that it should be paid and that the case should be

5 settled. There may have been more, but I didn't get

6 much of what he said was a conflict.

7        The other was, he was concerned about

8 potential exposure to criminal liability for illegal

9 expenditures for complying with the contract, and I

10 didn't get a straight answer out of him as to what he

11 really thought that was about either. All right.

12        THE COURT: Well, he seemed to imply the

13 Troutman memorandum --

14        MR. WEINBERG: Yes, he was referring to the

15 Troutman memorandum, which if you look at that, all

16 right, says, in the first place that the 60 million

17 dollars that's paid, or that is to be paid out over

18 nine years, that does not have to be appropriated, so

19 that doesn't come under the illegal expenditure

20 provision. It doesn't have to be appropriated because

21 under the Organic Act and federal law, it's set aside

22 already.

23        And then the question came about attorney's

24 fees and how would that be paid, and the answer to that

25 was, well, the understanding as presented to the court

1    is that attorney's fees would likely be paid from a

2    common fund created by the tax returns or the EITC

3    refunds.  So that also was excluded.

4            Now, what Mr. Troutman's memo did talk about

5    was that -- was one line about future payouts for

6    future EITC payouts would be due and payable.  And the

7    Governor's position appears to be that that is a

8    statement that this is an illegal expenditure.  The

9    problem with that is that there's been no illegal

10   expenditure.  And frankly, that statement is a red

11   herring, because the future payments, all it is in the

12   settlement agreement is a recognition of what the state

13   of the law is.  And nobody disputes that EITC is

14   supposed to be paid, I mean, to those who are qualified

15   and meet the standards.

16           So, and then there was a fourth issue, and I

17   don't recall what that was.  But also -- (pause) --

18           What was the fourth issue?

19           MR. CALVO:  The administration of a million

20   dollars.

21           MR. WEINBERG:  Oh, the million dollars of

22   administrative fee was set in there.  And as far as I

23   know, none of that has been done.  So, you know, but

24   the point is --

25           THE COURT:  Did Mr. Ilagan say that after he

1  published the notice, he found out that he had no

2  appropriations to undertake the other requirements that

3  he was part of under the settlement?

4        MR. WEINBERG:  Well, somebody told him that,

5  and the problem is he did not consult with his lawyers

6  about that, he didn't consult with the Attorney

7  General's Office about that, and bring that to our

8  attention.

9        THE COURT:  What would you have told him?

10       MR. WEINBERG:  We would have examined the

11 question, we would have.

12       You know, part of the deal here is that the

13 Governor has an immediate responsibility to go to the

14 Legislature about how to deal with some of these

15 administrative logistical questions, and whether the

16 Governor has done that or not, we don't know.  But we

17 believe that he has not.  I know that back in July the

18 Legislature sent the Governor a letter and said, you

19 need to come talk to us about how we're going to

20 administer this settlement.  And the Governor has

21 been on notice ever since June and July of the

22 administrative issues that were going to come up.

23       Now, if there were problems with the

24 settlement, then those can be brought to the attention

25 of the court.  The Governor's complaints, or anybody's

1  complaints that a settlement is illegal or that there's
2  a violation of illegal expenditure, that's for the
3  fairness hearing.  As to whether or not the Court can
4  impose this or not, as to whether or not the Court can
5  require the Government of Guam to commit to paying EITC
6  payments in the future, or can commit to making these,
7  to doing these things, those are subject matters,
8  that's a subject to be brought at a fairness hearing.
9  But, what we heard Mr. Ilagan say was that he was -- I
10 mean, I didn't get much from him other than he was
11 essentially confused and he was signing on the dotted
12 line somebody provided for him.  And that's my take on
13 it.

14        But let's look at what he signed.  He signed
15 the Certificate of Emergency, and let's look at what an
16 emergency is under Government of Guam law.  All right.
17 Under 5 GCA Section 5030(x), 5 GCA 5030(x), emergency
18 means "a condition posing an imminent threat to public
19 health, welfare or safety which could not have been
20 foreseen through the use of reasonable and prudent
21 management procedures, and which cannot be addressed by
22 other procurement methods of source selection."
23        All right.  And then in the Administrative
24 Regulation, 2 GAR Section 3113 requires, says that an
25 emergency -- "emergency procurement when there exists a

threat to public health, welfare or safety."

Again, so the questions I wanted to get to with Mr. Ilagan, but we can all just ask ourselves, from his testimony, what emergency met the definition of, of an imminent threat to public health. He identified none. He said, he said he was worried about perceived conflict of interest, or he was worried about potential criminal liability in his personal capacity.

Public welfare, imminent threat to welfare? Imminent threat to safety? So if you look at the definition of what he tried to do to say I don't want my -- I don't want the Attorney General anymore, I want somebody different; Governor, tell me who I should hire. Mr. Mantanona was the low bidder, I'll take him. He comes up with, somebody comes up with this Certificate of Emergency that doesn't even fit the emergency, the definition of how to make an emergency procurement under Guam law.

And again, it just points back to the fact of, if RevTax and line agencies and autonomous agencies and people who are sued get to just declare an emergency and say I need somebody else, I don't like the advice my lawyer is giving me, because he's the chief legal counsel, then you have no chief legal counsel for the Government of Guam. And what you have is the

1  Governor's Office setting up an independent and

2  autonomous Attorney General's Office, staffed by

3  Calvo and Clark and, and Mr. Mantanona, and God knows,

4  and that's not what the Organic Act says.

5       The Organic Act says there's one chief legal

6  officer for the Government of Guam, and that's the

7  Attorney General.  And it is the Attorney General who,

8  under the common law, decides what is in the best legal

9  interest, not policy, not general policy, but legal,

10  makes legal decisions for the Government of Guam and

11  its agencies and officers.

12       THE COURT:  Well, whether or not you settle

13  for 60 or 40 or 80, is that a legal question or a

14  policy consideration?

15       MR. WEINBERG:  (Pause.)  It's a little bit,

16  it's a bit of both.  Obviously, getting 50 cents on the

17  dollar is a good deal.  But the ultimate question about

18  whether there's liability, and if so, how to minimize

19  and mitigate that liability and the potential damages,

20  that becomes a legal decision for the Attorney General

21  to make.  So a lot of times it's going to appear to be

22  overlap.  But in those cases where, where how to

23  mitigate and minimize the legal liability for the

24  Government of Guam, then it becomes the Attorney

25  General's.

1    Thank you.

2    THE COURT:  Mr. Calvo?

3    MR. CALVO:  Thank you, Your Honor.

4    Well, I think that fundamental to the

5    attorney-client relationship is a right to be

6    represented by counsel who you feel is going to

7    protect your interests, protect the interests of who

8    you represent, and so on.  The Governor of Guam --

9    THE COURT:  Doesn't that apply only to a

10   setting where you retain counsel that's not paid for by

11   the government?

12   MR. CALVO:  I don't think so, Your Honor.  I

13   think that --

14   THE COURT:  See, your right to an attorney

15   now, can a defendant in a criminal case choose let's

16   say Mr. Fisher that's back there, versus a public

17   defender?

18   MR. CALVO:  If he's able to pay for the

19   attorney of his choice, yes; otherwise --

20   THE COURT:  If he is not able to pay.

21   MR. CALVO:  Then it's adequate counsel,

22   through the process, and it could be the Public

23   Defender.

24   In this case, we don't contest that the

25   Attorney General is the chief legal officer for the

1    Government of Guam.  He's designated as such under the

2    Organic Act, and we recognize that.  And I think if you

3    look at the history of this particular case, you'll see

4    how the Governor has tried to adhere to how things

5    really should work, but really didn't.

6         In this case, this action was filed by

7    Mr. Phillips back in February.  The Attorney General

8    came in and represented all respondents in the case.

9    Not much happened in the case, including consultation

10   with the Governor and the other respondents in the

11   case.  I think the testimony and the evidence supports

12   that.  Nevertheless, the Attorney General was the

13   attorney, as the chief legal officer for the Governor

14   and the other respondents.

15        A settlement was entered into.  The settlement

16   was entered into while the Governor was off island.  He

17   was not consulted on the settlement agreement, didn't

18   have a chance to review it; nevertheless, as he's off

19   island, the acting Governor is the Lieutenant Governor

20   of Guam and the Attorney General as the chief legal

21   officer for the Government of Guam were working

22   together to enter into this settlement agreement.

23        He got back after the settlement agreement was

24   signed over the weekend of September, I think it was --

25   no, I'm sorry, June -- it was June 13th is when it was

1  signed.  He arrived on the 15th.  He got back and

2  accepted that.  The settlement agreement was signed.

3  However, he was never consulted on the settlement

4  agreement, but nevertheless as the Governor, the chief

5  executive officer for the Government of Guam, tried his

6  best to deal with the agreement that was entered into

7  while he was off island.

8       Through this process, the Governor was

9  concerned about a number of things, including how was

10  funding going to be provided to fund this settlement

11  agreement.  He had communications with the Legislature

12  about that, and there were communications from the

13  Legislature asking where is the money coming from, how

14  is this going to happen.  Over the course of the

15  litigation, there was intervention attempted by several

16  other parties objecting to the settlement agreement.

17  That was dealt with, that raised the concerns of the

18  Governor.  Some of the issues that came out through

19  those procedures and through the public media really

20  raised the Governor's concerns.

21       The Governor went to the Attorney General, his

22  lawyers, and asked him, there's some questions about

23  the legality of the contract, there's some questions

24  about appropriations, there are all these issues that

25  we have to deal with.  He went to the chief legal

1   officer asking for advice.

2          His legal counsel, in house legal counsel,

3   Ms. Taitano wrote a letter, that letter is in evidence,

4   Your Honor, she sent it in September. She sent it to

5   Mr. Cohen who is here, asking Mr. Cohen, hey, we have

6   these questions about the -- about the contract, about

7   the settlement, how it's going to be applied, whether

8   it's legal or not. She sent another letter when she

9   didn't get any response in October; there was no

10  response.

11         Then came a letter from Mr. Troutman, from the

12  Attorney General's Office, it's the October 13th

13  letter, and if I may, Your Honor, I'd like to read a

14  couple of provisions in that letter, which could

15  really, really point out why the Governor and the other

16  respondents were concerned about the situation, in

17  addition to the other letters and communications or

18  lack of communication that existed, as alluded to in

19  the testimony this morning.

20         That letter dated October 13th of last year,

21  Your Honor, was from Charles Troutman, and it reads --

22  he wrote it to the Attorney General. This is the

23  attorney for the Governor who is trying to have the

24  respondents enforce a settlement agreement that the

25  Governor wasn't aware of, wasn't -- didn't participate

1  in, but nevertheless is trying to deal with. And this

2  letter comes in response, or is in response, or in

3  reaction to the letters sent by Ms. Taitano asking her

4  attorneys, or the Governor's attorneys what was going

5  on.

6  In that letter, it points out that there are

7  four basic parts of the EIC settlement agreement. The

8  first one regards the 60 million dollar settlement

9  amount; the second regards the attorney's fees to be

10  paid to Mr. Phillips; the third is the commitment to

11  apply and to pay EITC in the future; the fourth is

12  administrative costs.

13  These are all part of the settlement

14  agreement. It isn't an intention, it isn't an

15  expression of what might happen, it isn't a condition;

16  these are all part of the settlement agreement that was

17  signed by Lieutenant Governor Moylan as he was Acting

18  Governor during the Governor's absence, was signed by

19  the Attorney General, not only as to form, but also as

20  to legality.

21  In the contract itself, the Attorney General's

22  representative signed the contract and opined through

23  his signature that it was a legal contract.

24  Now, after, after looking at this letter, it

25  became clear to the Governor that there were some

1    serious issues here.  And, you know, this morning, Your

2    Honor, we learned that Mr. Cohen was also on the other

3    side of the issue when he was working for the Gutierrez

4    Administration; apparently his opinion was that the

5    EITC did not apply to Guam.  So the Governor, trying to

6    carry out his duties and functions as the executive

7    officer for the Government of Guam, I think could be

8    very concerned as to whether or not he was being

9    adequately represented and whether or not he had the

10   right legal advisors to help him carry out his duties.

11          And if I may, Your Honor, the second to the

12   last paragraph on the last page of Mr. Troutman's

13   letter provides, after discussing his opinion, which

14   quite frankly, Your Honor, we don't agree with after

15   discussing items one and two of the, of the settlement

16   agreement, provides:

17          "However, the expenditure of unappropriated

18   funds for other parts of the settlement that do not

19   come within the scope of the Organic Act provision

20   regarding payment of judgments for unpaid income tax

21   refunds, items 3 and 4 above, would expose the Governor

22   and our clients to the possible liability under 5 GCA

23   Section 22401."

24          What client, what person would not be

25   concerned.  On one hand, the Attorney General, the

1    chief legal officer is saying, why haven't you done

2    this, why haven't you funded the settlement agreement;

3    why haven't you taken the steps regardless of the fact

4    that there's no money to do that.  He's asking the

5    attorney -- he's asking Mr. Ilagan and saying that

6    if you don't, you're exposed to possible contempt

7    proceedings and criminal sanctions on one hand.  On

8    the other hand, there's this opinion which says it's

9    illegal to comply with the settlement agreement.

10        So, I think that there can be no question

11   that there's cause for the Governor and the other

12   respondents to think that, look, you've been forced

13   to enter into an unlawful agreement; now you're being

14   instructed to implement that agreement, then you're

15   being warned by the same office that if you do, you're

16   being exposed to criminal liability.  These are his

17   attorneys.

18        The Governor at that time says, well, you

19   know, maybe I might want to get independent advice and

20   some counsel who is not, you know, all over the place

21   with respect to these issues, and will give me advice

22   I can rely upon, advice that I can trust.  And with

23   that, he went out and sought legal advice, as did the

24   other respondents through the procurement process.

25        Now, there's much to do, and I know the Court

1   doesn't necessarily want to hear about the procurement

2   issues and whether there's an emergency or not, but I

3   offer to the court that every day you're represented

4   by counsel in this conflicted state, giving this

5   conflicted advice, telling you you're exposed to

6   criminal liability is an emergency, every minute that

7   you're being prevented from getting counsel who is

8   going to give you the right advice.

9        You know, there may not be a typhoon, there

10  may not be an earthquake, but there's certainly an

11  emergency.  And it's not only an emergency to yourself,

12  it's an emergency to the office that you represent, to

13  the people that you're responsible to, and to the

14  taxpayers.

15       The Attorney General is very big about saying

16  his duty is to the people of Guam, they elected him,

17  it's his duty, he's the chief legal officer; therefore

18  I could do this, and you have nothing to say about it.

19  Well, the Governor has a duty to the people of Guam,

20  Mr. Ilagan has a duty to the people of Guam, as does

21  Ms. Perez.  And that duty is being impeded by the

22  Attorney General's Office.  He is trying to hijack the

23  ability of those officials to do their job under the

24  guise of litigation, under the guise of legal policy.

25       The court asked a good question: Is 60 million

1     dollars a legal question, or is it an executive

2     function issue, is it an administrative function issue.

3     Well, I think the answer is very clear. Lawyers, even

4     in private practice, Your Honor, are faced with that

5     decision every day:  Is it a business decision or is it

6     a legal decision.  We give legal advice, we implement

7     legal policies, we take action.  But the decision as to

8     whether or not it's 60 million, 55 million, 70 million,

9     whether or not the government has the ability to pay,

10    whether the government can agree to a one million

11    dollar administrative fee?  That is, Your Honor, I

12    submit, an executive function, an administrative

13    function, a function that's been usurped by the

14    Attorney General, a function that's been hijacked by

15    his office.  And worse yet, he's trying to prevent

16    those executives from getting independent counsel.

17          There has not been one case that has been

18    cited where a Governor or a respondent in a similar

19    situation cannot be represented by counsel.  I think we

20    saw this morning, Your Honor, a gross example of

21    violation of due process here.  Quite frankly, it was

22    really hard to take, Your Honor.

23          We have the Attorney General's Office

24    purporting to represent these people after threatening

25    them with criminal liability and telling them that they

1   would be held in contempt. We had them subpoenaed,

2   Mr. Cohen signed the subpoena papers, for people that

3   he's been consulting with, so they say, as clients.

4   They get them on the stand, Your Honor, and they cross-

5   examine them, they grill them. We have to object,

6   we're going up and down objecting: Relevancy, attorney-

7   client privilege. Nevertheless they continue, they try

8   to get into the substance of the settlement agreement,

9   they have these two people that are up here on the

10  stand intimidated by this process. And it is an

11  intimidating process.

12          Nevertheless their own attorneys, who

13  purported to represent them, are there, you know,

14  bordering, Your Honor, if I may, with no disrespect, on

15  harassment. That's all it was. It was an exercise of

16  harassment this morning. And I think it was a gross

17  miscarriage of justice for the Attorney General's

18  Office to do that. And then on the other hand say that

19  they represent them. That's just wrong, Your Honor.

20  And I hope the Court puts a stop to it.

21          These people need to be represented, the

22  Governor needs to be represented. You cannot allow the

23  Attorney General to hijack this process, you cannot

24  allow him to hijack the functions of the executive.

25          We're aware that the Attorney General has

1    dual roles.  We're not saying that the Attorney General

2    can't espouse his legal policy or what he thinks is

3    right or wrong, we're not saying he can't sue the

4    Governor.  You know, the Court in a different forum has

5    issued an opinion.  What we're saying is that he can't

6    prevent these people from being represented, he can't

7    prevent them from being heard.  That's a disservice to

8    the office of the Governor, to these respondents, and

9    to the people of Guam.

10        We have submitted our -- I'm sorry.

11        THE COURT:  Is the issue as simple as, well,

12   I don't like the representation given to me by the

13   Attorney General, I need independent representation;

14   is the issue as simple as that or not?

15        MR. CALVO:  I don't think it's as simple as

16   that, Your Honor.  I think that, in this case, I think

17   they've gone too far.  I think the Governor could have

18   said, well, wait a minute, why did this agreement which

19   was negotiated over a two or three-day period without

20   consulting my representatives in the way they should

21   have been consulted, or the people in the executive

22   branch, while I was off-island in transit, why did it

23   have to be signed on a Sunday.  Is that the way we

24   conduct business?

25        THE COURT:  I see.  But the Governor has not

1    undertaken any action to either set aside this

2    agreement, if he thinks it's illegal -- I mean, you're

3    talking June, July, August, September, October,

4    November, December, January, Feb --

5          MR. CALVO:  Exactly, Your Honor.

6          THE COURT:  The Governor has not indicated to

7    the court that he thinks it's illegal.

8          MR. CALVO:  That's the very point I'm trying

9    to make, Your Honor.  The Governor gets back -- and

10   there's deference given to the court's views, as his

11   honor was in the Superior Court, to the other actions,

12   to the really, the views of the Attorney General.  The

13   Governor got back and there was deference given, the

14   Governor has tried to work with --

15         THE COURT:  But in representing the public

16   interest, the Governor should come up and step forward

17   and say, hey, this agreement is not legal, change it.

18         MR. CALVO:  Exactly, and that's what we're

19   doing here.  The Governor is not a lawyer.  The

20   Governor sent inquiries to his lawyers at the time.  He

21   wanted to get something back from the Attorney General

22   that says, look, we allay all your concerns, this is

23   the issue, and go through it one by one, so the

24   Governor could have some confidence that he is doing

25   his job.  He has a duty to the public, and he is doing

1    his job.

2              What happened was, is that on the one hand,

3    the Attorney General is trying to implement a

4    settlement agreement, and on the other hand, there's

5    a legal opinion from the Attorney General's Office that

6    comes out in October 13th which says, that's an

7    unlawful contract.  You know, essentially, there are

8    two basic points to the contract that are unlawful.

9    And so the Governor is saying, what am I going to do,

10   I've tried to work with the process, I've have tried to

11   work with the Attorney General, I've tried to work with

12   the Lieutenant Governor.  It didn't work.  I need to

13   have independent counsel.

14             And then if you think it's so easy, Your

15   Honor, here we are today being blocked by the Attorney

16   General's Office.  And not only is it not  -- is it a

17   question of emotion and objecting to our presentation,

18   they get subpoenaed, Art Ilagan, represented by the

19   Attorney General's Office, Ms. Perez and the Governor

20   get subpoenaed.  And the objections, as you heard today

21   and sustained, were about relevancy and attorney-client

22   privilege.  The subpoenas, Your Honor, were about

23   intimidation.  They were about harassment.  So it's not

24   as easy and as simple as I disagree with the Attorney

25   General.

1　　　　When we were trying to look at this case, Your

2　Honor, and trying to figure out, you know, what is

3　really going on, we really looked at the time line in

4　this case and what has happened and whether or not the

5　Governor sat on his --

6　　　　THE COURT:　See, one of the concerns I have

7　is, you know, this issue, what prevents any employee in

8　the government from saying, well, I disagree with the

9　Attorney General's position in this matter, I need

10　independent representation, and to come to the court

11　and make the same arguments that you are to prevent the

12　Attorney General from taking over control of the case

13　as, let's say, his duty under the Organic Act, under

14　the laws of Guam.

15　　　　Here, I mean, is there a line that needs to be

16　drawn where that stops or where it begins?

17　　　　MR. CALVO:　Yes, I think there is, Your Honor.

18　I think what happens is that the Attorney General

19　really on behalf of the Government of Guam enters into

20　the lawsuit.　In this particular case, had we not had

21　this history, had the Attorney General been consulting

22　the respondents in the case, had the Attorney General

23　really decided I represent the Government of Guam, I'm

24　the chief legal officer, the Government of Guam is a

25　party in this action --

1    THE COURT:  If they change those facts and say

2  assume a situation where the parties are consulting but

3  there are differences and opinions in terms of the

4  representation, the defendant wants to see this case

5  move a certain direction, the Attorney General says no,

6  it's gotta go this way, does that scenario call for or

7  justify independent representation?

8    MR. CALVO:  I think it does, Your Honor, and I

9  think that's the way --

10    THE COURT:  Other scenario where there's that

11  divergence of opinions as to the manner or the course

12  which a litigation is to take?

13    MR. CALVO:  When there's a fundamental

14  divergence of opinion as to how the action should be

15  taken, or what action should be taken, and it really is

16  exercise of the authority and the discretion of those

17  public officers, the legal, the chief legal officer on

18  one hand, the Attorney General, and the Governor on the

19  other side, I think that it requires that there be

20  representation that litigates those issues or gets it

21  before the Court so the Court, as you've said in your

22  opinion in the Superior Court, Your Honor, determines

23  what is the public interest, what is right.  But, the

24  Governor cannot not act.  I mean, he has a duty that is

25  as high, or if not higher than the Attorney General's,

1    to the people of Guam, a duty that has --

2          I'm sorry, Your Honor.

3          THE COURT:  Well, see, it seems to me that the

4    AG's opinion here is that, well, you really don't care

5    if you retain independent counsel just as long as it's

6    not government funds that are paying for it, I think is

7    their position.  Because when it comes to government

8    funds and representation by the government, it's the

9    Attorney General that's supposed to provide that

10   representation.

11         MR. CALVO:  I'm not -- I don't think it's

12   about funding, Your Honor.  I mean, if it's about

13   funding, that's wrong.  We disagree.  The Governor is

14   acting in his capacity as the chief executive officer

15   of the island of Guam.

16         THE COURT:  All right.  But in terms of the

17   non-constitutional officers, what prevents the

18   Governor's Office from undertaking the positions that

19   these two directors advocate?

20         MR. CALVO:  Those directors fall under his

21   authority because they're in the executive branch, Your

22   Honor.

23         THE COURT:  So what prevents the Governor from

24   undertaking their representation, so that they're not

25   required to resort to an emergency certificate to get

1    emergency procurement services?

2         MR. CALVO:  I think it was a matter of the

3    need for independent counsel, Your Honor.  I mean,

4    arguably --

5         THE COURT:  That's what I'm saying.  If they

6    are part of the executive, and if the Governor is the

7    head of the executive, why can't we say that there

8    needs to be provided legally by the Governor's Office

9    as opposed to going out and retaining counsel

10   independently?

11        MR. CALVO:  Well, ultimately it is through the

12   Governor's Office, if they're part of the executive

13   branch', it's just that they needed independent counsel

14   to represent them in this matter.  And quite frankly,

15   the barn was on fire, there was an emergency.  There

16   were court filings being made, there were accusations

17   being launched, and there was action being taken, and

18   these officials as well as the Governor had to take

19   action.

20        THE COURT:  I guess my question really is

21   this.  What prevents you from providing that

22   representation as opposed to another attorney?

23        MR. CALVO:  My feeling is that we could, Your

24   Honor.  But I don't think that having another attorney

25   working on the matter actually representing Mr. Ilagan

 1    and Ms. Perez is inconsistent.  This is an undertaking

 2    that I think has to have the resources to get

 3    accomplished and to represent the parties the right

 4    way.  But I think that, you know, theoretically, Your

 5    Honor, and legally, we could provide representation to

 6    parties within the executive branch under these

 7    circumstances.  I just don't think it's necessary.

 8         THE COURT:  It just seems to me that the

 9    authority to authorize independent counsel seems to be

10    more reasonable and more logical as it applies to the

11    Governor, the head, than as opposed to officers that

12    are not constitutional, and on the same level as the

13    Attorney General.

14         MR. CALVO:  Well, as you know, in government,

15    Your Honor, there wasn't a typhoon, there wasn't an

16    earthquake, but oftentimes within the executive branch

17    there is the need for counsel, and sometimes it can't

18    be handled by one office.  I don't think there's

19    anything inconsistent with our position that they have

20    other counsel.  But I don't think there's anything that

21    would prevent us from representing those other

22    respondents in this matter, Your Honor.

23         THE COURT:  Could there be a potential

24    conflict, being that they're both subordinates of the

25    Governor?

1        MR. CALVO:  I don't believe so, Your Honor.

2        THE COURT:  Okay.

3        (Pause.)

4        THE COURT:  You know, another question that

5   perhaps interests me, Mr. Calvo --

6        MR. CALVO:  Yes, Your Honor.

7        THE COURT:  If you're asking to -- Well, it

8   seems to me you're asking that you be authorized to

9   formally enter the litigation and file papers on behalf

10  of the Governor.

11       MR. CALVO:  That's correct, Your Honor.  We're

12  asking you --

13       THE COURT:  Are you asking for exclusive

14  representation in that regard, or can there be

15  co-existence with the Attorney General?

16       MR. CALVO:  Quite frankly, Your Honor, had

17  there not been this history in this case in the

18  Attorney General representing the Governor, and I was

19  really thinking about this over lunch time, Your Honor,

20  I think that -- I think that we have to represent the

21  Governor.  The Governor cannot be represented by two

22  parties, especially if they're adverse.  I think we saw

23  the exhibition today, and quite frankly, I'm sure that,

24  you know, that's not the way to proceed or how the

25  Court would want us to proceed with the litigation.

1          THE COURT:   (Inaudible.)

2          MR. CALVO:   The Governor -- I'm sorry, Your

3    Honor.

4          We're not saying that we represent the

5    Government of Guam, you know, that's --

6          THE COURT:   I'm just saying that in terms of

7    other parts of this case where there's no dispute

8    between the Attorney General and the Governor, why

9    would it be necessary that you undertake legal matters

10   in that regard as opposed to the Attorney General?

11         MR. CALVO:   I don't think that the case can be

12   divided that way.  We're dealing with a pretty

13   intertwined legal matter now when we're talking about a

14   settlement agreement and the implementation, and the

15   very lawfulness of the agreement that the Attorney

16   General has opined on one hand is legal; on the other

17   hand, has informed the Governor and the other

18   respondents is unlawful.  So I don't think that in a

19   case --

20         I mean there might be conceivably a case in

21   the future that has clear lines and clear divisions

22   where you can have independent counsel for the Governor

23   and the Attorney General involved in the case on

24   discrete separate issues so that you can assure

25   yourself that there aren't any conflicts and there

1  are no inconsistent positions and that we're working

2  together.  That's not this case.  We're way past that,

3  Your Honor.

4         THE COURT:  So on this case, are you then

5  asking the Court that the Attorney General not have any

6  part in the litigation of this case?

7         MR. CALVO:  Quite frankly, Your Honor, what we

8  were thinking, especially after this morning, is that

9  we would bring a -- if the Court finds that we should

10  enter the case, which we think the Court, you know,

11  should, and we're counsel for the Governor, we were

12  contemplating bringing a disqualification motion based

13  upon Rule 1.9, because former counsel, as former

14  counsel for the Governor, the Attorney General is

15  disqualified from proceeding adverse to the Governor in

16  the same matter, or in a substantially related matter.

17  In this case, it's the same matter.

18         THE COURT:  Let me see if I understand.  What

19  did you say again, that you're thinking of filing a

20  disqualifying --

21         MR. CALVO:  Your Honor, if we're allowed to be

22  entered in this case as counsel for the Governor, that

23  means that the Attorney General is former counsel for

24  the Governor.

25         THE COURT:  Well, that's assuming that the

1  case -- the court says that you are the Governor's

2  representative.

3           MR. CALVO:  That's right.

4           THE COURT:  Exclusively.

5           MR. CALVO:  Yeah, assuming that that's the

6  case.  In other words, if our notice in the order is

7  signed allowing us to substitute in, I think, into the

8  case, then the Attorney General is former counsel for

9  the Governor, still counsel for the Government of Guam,

10 but former counsel to the Governor in this care.

11          THE COURT:  So are you saying that in terms

12 of the litigation, the Attorney General has no voice at

13 all in terms of directions in terms of which this case

14 is moving?

15          MR. CALVO:  I think that the Attorney General,

16 Your Honor, is in violation of the Ethical Code.  And

17 I know there's some issue as to whether or not the

18 ethical code is something that the Attorney General has

19 to care about, but I think fundamental due process

20 requires that we at least, you know, look at whether or

21 not there's a violation of the Ethical Code under Rule

22 1.9 of the Ethical Code, regarding former clients.

23          THE COURT:  But in the interest of -- in the

24 public interest, these ethical considerations have been

25 waived.  So that in determining the -- in determining

1    the interests of the government, what is in the best

2    interests of the government, the Attorney General can

3    do that irrespective of what the Governor -- Governor's

4    direction is.

5        See, I'm concerned that the Governor will say,

6    this is the case, assuming they let you in, this is the

7    case, this is the scenario, this is the direction that

8    this case is going to take, and then prevents the

9    Attorney General from coming in and saying no, from a

10   legal point of view, this is where it should go.

11       MR. CALVO:  I think that's different, Your

12   Honor.  I think at the outset of this case, if the

13   Attorney General and the Governor would have consulted

14   and they would have worked together to determine

15   whether or not they were on the same page -- or let's

16   say the settlement, which is really where there was

17   divergence ultimately, if they were on the same page,

18   then there wouldn't be any need for independent

19   counsel.

20       THE COURT:  But they're not on the same page.

21       MR. CALVO:  They're not on the same page.

22       THE COURT:  And for purposes of this court,

23   you know, I mean, see, it shouldn't have the Governor

24   as the exclusive voice of what is in the public

25   interest, just as it shouldn't have the Attorney

1  General as the exclusive voice.  Those voices have to

2  be heard.  So if I put you in, that means that the

3  Attorney General's voice is never heard in terms of the

4  direction of this case.

5        MR. CALVO:  Well, I think that, Your Honor --

6        THE COURT:  So you're asking that they not be

7  part of this case.

8        MR. CALVO:  No, I think what happened is, I

9  think there are two voices and the two voices should be

10 heard.  I think that unless the court is going to

11 exempt the Attorney General from the Ethical Rules,

12 under Rule 1.9 in a litigation matter or in a

13 substantially related matter, a former counsel cannot

14 represent an interest adverse to a former client.  In

15 this case, the former client would be the Governor of

16 Guam.  And the Attorney General is clearly adverse to

17 the Governor of Guam.  And the Governor of Guam falls

18 broadly within the rule.  The question is whether the

19 Court is going to exempt the Attorney General from that

20 rule.

21        I think logically, if you play it out, because

22 I think it's important that that second voice be heard,

23 the Government of Guam be heard, is that they be -- the

24 Attorney General gets special counsel to represent the

25 Government of Guam in the matter, since at this point

1     there seems to be divergence of where the Government of

2     Guam thinks we are with the settlement and what the

3     Governor thinks with respect to the settlement.

4           So the question is whether or not the Attorney

5     General is exempt from the Ethical Rules that bind

6     other attorneys.

7           THE COURT: Well, there are some cases that

8     say they are exempt.

9           MR. CALVO: I think that some cases say they

10    are, I think a good instructive case is the Duekmajian

11    case which the Court is familiar with. In that case,

12    the Attorney General represented the parties and the

13    Governor in the matter, then withdrew, and then sued

14    those parties. The Court in that case determined,

15    based upon the California statutes and I think the

16    Ethical Rule 1.9 or its counterpart in California,

17    that he could not do that, that was inappropriate.

18         This is different than the Camacho Moylan

19    case, or the Moylan Camacho case which Your Honor

20    decided as a Superior Court judge. In that case there

21    wasn't a representation, then a withdrawal, then

22    entering into the matter. They were adverse from the

23    outset. 1.9 governs the conduct of a former attorney

24    with respect to his client or her client on a

25    substantially related matter. And in this case the

1  exact same matter.

2       If it pleases the Court, I know this is -- and

3  I didn't mean to spring this on Your Honor at the last

4  moment, and we have not made the motion because we

5  don't want to get ahead of ourselves, but if the court

6  were to find it appropriate and order that we enter the

7  case on behalf of the Governor, we'd be happy to brief

8  this issue, and, you know, consider filing the motion.

9       THE COURT:  All right.

10      MR. CALVO:  Nothing further, Your Honor.

11      THE COURT:  Mr. Mantanona?

12      MR. MANTANONA:  Yes, Your Honor.

13      Afternoon, Your Honor.  At the outset, we'd

14  like to adopt and join in the same arguments with Mr.

15  Calvo at this point on behalf of the state officers.

16      The Court makes a distinction at this point in

17  regards to the differences or potential differences

18  between the Governor of Guam and state officers.  But,

19  nonetheless, Your Honor, those state officers are

20  parties in a major lawsuit which involves the

21  settlement of 60 million dollars.

22      Further, the position in which --

23      THE COURT:  Well, my only question was whether

24  their interests being in the executive could be

25  undertaken by counsel for the Governor, being that

1  they're part of the executive branch.

2          MR. MANTANONA:  Your Honor, in certain

3  situations I believe that that would be so.  And until

4  this situation, or unless the parties get dismissed

5  out, they are named defendants, and as such they are

6  entitled to separate representation at this point.

7          Counsel, Your Honor --

8          THE COURT:  (Inaudible.)  Separate?

9          MR. MANTANONA:  Separate from the Governor at

10  this point, since they are named defendants.

11          THE COURT:  What makes -- I mean, why can't we

12  take the argument further and say that you can't

13  represent both -- (inaudible) -- one or the other?

14          MR. MANTANONA:  (Overlapping.)  Well, Your

15  Honor, at this point there is no conflict between the

16  two.  And, in fact, at this point there probably isn't

17  a conflict with the Governor's Office at this point.

18  But these are people that the court stated are state

19  officers, directors of departments, they are entrusted

20  with the day-to-day responsibilities of doing the

21  governmental actions to implement the plan proferred by

22  Mr. Phillips and his client.

23          Your Honor, one point I would like to point

24  out is that even if I come in on behalf of Mr. Ilagan

25  and Ms. Perez and the Calvo firm comes in on behalf of

1  Governor, the Attorney General's Office still

2  represents the parties in this action, so they will not

3  be moot unless Mr. Calvo decides that it would be

4  appropriate to make a motion to disqualify them.  They

5  still will have a voice, theoretically, in this case.

6         Your Honor, as parties in such a case, the

7  defendants are entitled to due process.  Basically,

8  this settlement was done while one of the parties was

9  off island, the other party was basically forced into

10 signing this agreement, and at this point, as later

11 it's been reviewed, it shows that the settlement as

12 proposed is causing severe problems and conflicts.

13 First of all, Your Honor, on behalf -- it is the

14 Attorney General's opinion that there are illegal

15 appropriations in this matter, and there hasn't been

16 any advice on their behalf to their alleged clients

17 on what to do.  At the same time --

18        THE COURT:  Do the defendants have to ask?

19 Have they sought perhaps direction on what to do or

20 not?

21        MR. MANTANONA:  Your Honor --

22        THE COURT:  Is that necessary?  It seems like

23 the Attorney General is saying, well, you haven't gone

24 the additional step to ask for direction.

25        MR. MANTANONA:  I think the judicial step is

1    they haven't spent any money yet. But we're looking at

2    a situation, Your Honor, where one party is going to be

3    required to make a payment of 20 million dollars and

4    which would violate the -- (inaudible) -- but at the

5    same time, but at the same time, if she does not do

6    that act, and complies with the law, then she's in

7    violation of this court's order and could be held in

8    contempt.

9          THE COURT: But can't you certainly come to

10    court and say, well, they shouldn't be held in contempt

11    because these provisions of the settlement agreement

12    are not legal.

13          MR. MANTANONA: Well, Your Honor, I think that

14    it behooves the attorney who represents them to take

15    that position to protect their client. And we do not

16    believe the Attorney General's Office has taken the

17    necessary precautions to protect the interest -- no

18    offense to Mr. Cohen or Mr. Weinberg -- but my clients

19    are swinging in the wind. They're swinging, they don't

20    know which way to go. Why? Because now they're in a

21    situation that they need to get somebody who can give

22    them straight advice, somebody that can tell them,

23    well, this is the settlement agreement, we've already

24    agreed to this, you've already agreed to this, you guys

25    signed it, but no one is letting them speak to the

1    court, no one is addressing their concerns, no one is

2    telling the Courts about this shortage of money, the

3    inability to make these payments.

4         The interest penalties that will accrue if

5    this plan is being implemented, none of that has been

6    addressed.  Those voices, the voices of the parties

7    are being silent in this court, they are being gagged,

8    as co-counsel opined; they're being hijacked, they're

9    being set moot.  That is not the role of defendants,

10   and that is not in compliance with their rights as

11   parties.

12        THE COURT:  You know, there's a statute that

13   affects the Attorney General that says that they have

14   cognizance over all agencies, and I guess autonomous

15   agencies, and it goes further on and says that

16   autonomous agencies -- or agencies that are authorized

17   to hire counsel may do so.  Now, how would that affect

18   let's say the individual that you purportedly

19   represent?

20        MR. MANTANONA:  Well, Your Honor, at this

21   point, these -- as far as I can tell, these two

22   departments are not autonomous agencies, they're line

23   agencies.

24        THE COURT:  And is there anything in the

25   statute that authorizes them to have counsel other than

1    the Attorney General?

2         MR. MANTANONA:  I think at this point, no,

3    Your Honor.  But --

4         THE COURT:  And is there anything in their

5    budget that gives them appropriations to hire an

6    attorney?

7         MR. MANTANONA:  Your Honor, at this point

8    I would have to say that I'm not familiar with the

9    appropriations of either of the Department of Revenue

10   and Taxation or the Department of Administration, and

11   I apologize to the court for that ignorance.

12        But my point, Your Honor, is that in

13   situations and in courts there are decisions that are

14   contained in my brief that states that when there are

15   roles of conduct that apply and that --

16        THE COURT:  Let's assume that everything you

17   say is true, all right.  And let's assume that the

18   budgets, the budgets for these agencies specifically

19   provide none for, let's say, the retention of

20   independent counsel.

21        MR. MANTANONA:  Yes, Your Honor, and that is

22   why my clients have, have sought the assistance of the

23   office of the Governor to advise them to get counsel;

24   they have their own counsel, they work with the

25   Governor, see whether there is an opportunity for them

1   to get separate counsel in this matter.

2         THE COURT:  And funding from a source other

3   than their department, is that what it is?

4         MR. MANTANONA:  Yes, Your Honor, I believe

5   that actually the funds for my contract I believe are

6   being paid for by the office of the Governor.

7         THE COURT:  Okay, I see.  That's what I wanted

8   to see really, whether in their budgets the Department

9   of Revenue and Taxation, Department of Administration,

10  they have budgets that allow them to hire attorneys

11  from funds that are appropriated to those agencies.

12  And you're saying no, these are budget -- your funding

13  comes from the Governor's Office budget.

14        MR. MANTANONA:  Your Honor, my point being

15  like in Chun versus Board of Trustees, the Hawaii

16  case, the Court stated that in situations -- that it

17  recognizes that the mechanical parts of the rules of

18  professional conduct do not apply to the Attorney

19  General, which is the position proferred by

20  Mr. Weinberg.  But in that case, which is really clear

21  on this issue because it's really helpful, it states

22  that the rules of conflict do apply, and that when

23  there is an ability to get separate counsel, the

24  Attorney General should allow those parties, those

25  state officers to get separate counsel.  That's all

1   we're asking, Your Honor.

2        THE COURT:  Let's assume the Attorney General

3   says no.  Are you going to ask the Court to order the

4   Attorney General to appoint independent counsel?

5        MR. MANTANONA:  No, Your Honor.  We believe

6   that since there is a conflict with the position of the

7   Attorney General, that the Attorney General is not the

8   proper party to, to select alternative counsel, because

9   the positions are totally adverse.  The positions of

10  the director --

11       THE COURT:  Are you saying also that the

12  Attorney General doesn't need to come to the same

13  conclusion that your clients have come to in order for

14  this process to move forward?

15       MR. MANTANONA:  Well, Your Honor, no.  In

16  fact, in my moving papers, substitutions were sent to

17  Mr. Weinberg, and to the Attorney General, letters

18  explaining, letters requesting for my client the

19  substitution.  In fact, the Court when I filed the

20  first objections, your court stated that we can't

21  address these until substitution of counsel is

22  submitted pursuant to Rule 19.1.  And in fact, those

23  issues were raised by Mr. Cohen in his motion to

24  strike.

25       So to avoid any problems, we did the formal

1    procedures of soliciting, notifying and asking for the

2    substitution.  The Attorney General sent his opinion

3    said, no, I'm not going to do, I'm not going to waive

4    that right, I'm not going to do so.  The Attorney

5    General is superman, he can take and he can do

6    everything.  That, Your Honor, is a wrong position.

7    Case law doesn't support that one hundred percent.  The

8    case and the law in Guam is still undefined.

9         But more importantly, Your Honor, more

10   importantly, to do so would basically state that nobody

11   in this government has another opportunity or an

12   ability to get separate counsel unless the Attorney

13   General agrees.  And that's wrong.  Because to do so

14   would basically throw away two hundred, three hundred

15   areas of law which basically states the defendants and

16   parties in interest have due process rights to be

17   represented, and that their counsel protect and address

18   their interests.

19        And if there is in this basic case, Your

20   Honor, this is the basic core of American law, if there

21   is a conflict in positions, then they are entitled to

22   get separate or different counsel, which will do their

23   attorneys due diligence and responsibility and protect

24   and represent those clients to the full of ability.

25        We do not believe that the Attorney General at

1  this position in support of the settlement agreement

2  can adequately address, or has not adequately addressed

3  those questions, those problems that are addressed by

4  our client.  They're just told basically, you know, do

5  what we tell you to do, and if something happens to

6  you, that's -- that's your problem.  We can't -- Your

7  Honor, that is not what the American juris system is

8  all about.  The American juris system is about, you

9  know, everyone having an opportunity to be heard in

10  court, and that it is the Court to make the

11  determination.

12       And we are asking this court, pursuant to

13  Rule 19.1 to -- for a designation of counsel, because

14  the substitution was refused.  So, we have put the case

15  before the Court, we've asked, we've shown the Court,

16  we've complied with the rule, we've shown there's a

17  basis, that there is a definite conflict between the

18  parties that are not being addressed, and there's a

19  desire from the clients, there is a lack, basically,

20  Your Honor, of faith, and confidence in the

21  representation of the Attorney General's Office in this

22  matter on behalf of Ms. Perez and Mr. Ilagan.  That

23  alone, Your Honor, that alone calls for a substitution,

24  or allows them to have adequate representation in this

25  matter, which we believe is a very serious matter

1 before the territory.

2 THE COURT: If the Attorney General changes

3 his position tomorrow and says we wholeheartedly agree

4 with the position of Ms. Perez, and your clients, then

5 where does that leave your position?

6 MR. MANTANONA: Well, I think that he's going

7 -- you may have a very big problem with the settlement

8 agreement which he's entered into. I don't think that

9 the Attorney General can actually change his position,

10 Your Honor. It's already been done, the dye is cast;

11 his position is one, his position is two, and they are

12 not able to join. And at this point we're just asking

13 for separate counsel.

14 Your Honor, in fact, besides the fact that

15 there's no confidence, there is no, no feeling of

16 security on behalf of the representation, it has gone

17 beyond that, it's confrontational. Mr. Phillips, if I

18 may, made a very pointed statement to me, that "I can't

19 believe you put your client on the stand; how could you

20 do that?" I didn't do it, Your Honor; the government

21 did. They subpoenaed their own clients, and they put

22 them on the stand to put on evidence. It's something

23 that I, when I tried to examine them, limited it to a

24 few questions, because I understand Mr. Phillips's

25 position, that is wrong. I'm not doing my duty by

1   questioning my own client on the stand, to opening them

2   up, to exposing them to positions in which Mr. Phillips

3   can bonk me on the head with later. But, the AG

4   believes that it's proper, and they did so, and put

5   them up there and went into questions of privilege,

6   went into questions of relevance.

7        Your Honor, I have never seen a case that

8   calls more for separate and new counsel to protect the

9   interests of the administrative officers, these state

10  officers, and it's not an unprecedented situation.

11  There's other cases in this government where an AG

12  didn't object to separate counsel for these parties.

13  In fact, the case they mentioned was the representation

14  of the eviction case. So it's not unprecedented, and

15  it's not the AG won't agree, but it won't agree in this

16  case.

17       Your Honor, I think that this court in such an

18  important case, with so much at stake to the poor of

19  this island, to the taxpayers of this island, in fact

20  to the people of this island generally, on the fair

21  administration of the government, and more importantly

22  the viability, the sustained viability of this

23  government, it needs to make sure that all parties,

24  including my clients, are heard.

25       Thank you, Your Honor.

1          MR. PHILLIPS:  Your Honor, may I be heard?

2          THE COURT:  Mr. Phillips, you've sat

3    patiently, sir.  The court will hear you.

4          MR. PHILLIPS:  Thank you very much, Your

5    Honor.  May it please the Court.

6          Your Honor, there's one thing I think I've

7    been told more by judges than anything else in my

8    career of doing public interest law, and that is,

9    "Mr. Phillips, if you don't like the law, change the

10   law."  And I think that's what we have here, Your

11   Honor, we have a testimony, a lot of it for reasons why

12   we might want to change the elected Attorney General

13   law.

14         Without giving an opinion on it, I will say,

15   Your Honor, I think everyone here will agree that when

16   that law was passed, a lot of people had strong

17   concerns.  I remember myself chairing a gubernatorial

18   campaign and having a number of gubernatorial

19   candidates saying: "This isn't the big contest, the big

20   contest is who's going to be elected AG, because that's

21   going to be the most powerful government official in

22   Guam."  And I think that's what we have here with

23   regards to the AG at times deciding someone else can

24   represent the government or the AG.  Well, that's the

25   AG, and if he's able to handle all of that himself

1  under law, then he's also able to delegate it.  So I

2  think that's a little bit circular, Your Honor.  The

3  fact that he's done it before means that he has the

4  authority to do it, I'm not denying that.

5        But, just to correct, or maybe not to correct,

6  Your Honor, but to add a few points to some of the

7  statements that were made and then I'll make my very

8  quick points and get off.  Your Honor knows in civil

9  cases and events like this, individual clients are not

10  entitled as a matter of due process to have counsel

11  provided for them.  The big, big difference.

12        Sometimes, and I think Mr. Mantanona will

13  agree with me on this, we're not even satisfied in

14  criminal proceedings that the state does enough for

15  criminal defendants, and that's where that applies.

16  Does that mean that people can't go out and hire an

17  attorney on their own.  That's a different question,

18  Your Honor, because that's a question that goes to the

19  individual representation, not the representation of

20  government.  Everybody has been sued in their official

21  capacity, so that's different.  But I again think that

22  that's a misstatement, that not everybody is allowed

23  counsel of their choice, whether they can find the

24  funding or not.  I question whether or not there's a

25  little bit of a conflict here that the Governor's

1   Office aside from paying for four or five attorneys

2   here, is now paying for at least one other attorney

3   that's representing separate parties.

4   Your Honor, another misstatement, and I think

5   after you read something in the PDN a number of times

6   you start to believe it as  -- The Governor never

7   testified that he was unaware of this agreement.  In

8   fact, I seriously doubt the Governor would take the

9   stand and swear under oath that he was unaware of

10  either the negotiations or the settlement agreement.

11  In fact, Your Honor, Mr. Calvo testified -- or didn't

12  testify, excuse me -- represented to the court the days

13  that the Governor returned and when things were done.

14  In actuality, Your Honor, this was entered into later

15  on during the week.

16  And again, it's a small technicality, but a

17  little bit of a misrepresentation;  number one, that

18  the Governor didn't know, and number two, that when he

19  returned it was all over.  It wasn't.

20  In fact, we didn't get before Your Honor for

21  a few days.  I doubt Your Honor has any specific

22  recollection of this case, but we had requested a

23  settlement conference on a Monday, the date that the

24  Governor was scheduled to return, but Your Honor said

25  come in later on in the week.  I believe we came in on

1  a Thursday, maybe four days later.  The Governor was

2  already on Guam.  The Governor was in the loop.  The

3  Governor, if he testifies, will go down a whole litany

4  of facts, Your Honor, that I think will support

5  everything I'm saying.

6        But more importantly, he did not testify,

7  there's no evidence before this court that he was

8  unaware of the settlement agreement, so I would ask

9  that the court not consider that.

10        With regard to the separation agreement, Your

11  Honor -- or excuse me -- the settlement agreement, the

12  concern that one of the parties has is that, well, they

13  don't have an appropriation for the moneys that's

14  supposed to be spent.  But they never mentioned, Your

15  Honor, that in the settlement agreement it specifically

16  refers to existing resources.  It doesn't call for

17  anything new, it doesn't call for anything extra.

18        In the administrative plan, Your Honor, that

19  we submitted, and it's really supposed to be the

20  purpose of the hearing, we were asked by the Department

21  of Revenue and Taxation, for whatever reason, because

22  we never had any problems, we were discussing things

23  openly with them all the time, could you please put

24  that in; we said no problem, we didn't ask them for any

25  justification.  We didn't even ask them why, we said

1  fine, you want it in, whatever you guys want in, we'll

2  put in. And that's pretty much, Your Honor, what built

3  the administration plan, that's it, it's the plan of

4  administration; and it's a joint effort by all the

5  parties that wanted to participate, and everybody was

6  allowed to contribute. I don't remember a dispute on

7  anything. Comes a surprise that after we filed it,

8  there were a couple of suggestions or objections. And

9  I think they're meaningless, Your Honor, whether, for

10  example, the Department of Administration handles it or

11  Rev and Tax as it's called for in the agreement, it's

12  really not substantial.

13       But with regard to that, Your Honor, there's

14  nothing unconstitutional there, there's nothing in

15  reality for the Governor to fear, there's nothing

16  involved, there's no basis in that.

17       With regard to additional payments that don't

18  go towards the payout of the 60 million, well, of

19  course everything goes towards the payout of the 60

20  million. There's nothing else. It all goes towards

21  that, that's the only thing that money can be spent on.

22  And so it's just not relevant, Your Honor.

23       But what's interesting, Your Honor, is if we

24  continue down this path and we say, okay; well, what if

25  the Governor is doing something that, you know, his

1    secretary his law clerk, or in this case his legal

2    counsel, or others feel is in violation of law, they

3    just stop and say, I want separate counsel. You can't

4    do that, Your Honor, you can't do that. The forum

5    here, the proper forum I think for this issue, is not

6    in this case. Mr. Calvo had some trouble getting his

7    contract signed. Don't come here and complain about

8    it. I would suggest, Your Honor, you bring a writ.

9         If they're saying that under law their clients

10   are entitled to specific performance or to declaratory

11   judgment, or to a specific act, then there's no

12   question about it, then I would suggest, respectfully,

13   maybe file a writ of mandamus and have the Court say,

14   hey, you start signing those contracts, or from now on

15   when you're presented a contract from the Governor, you

16   have 48 hours to sign it. Something, everything, some

17   effort. Nothing, absolutely nothing. They show up in

18   court and they say, we want to take over, and we want

19   to represent the government. And that's the problem,

20   Your Honor. And it's nothing personal against anybody,

21   not even personal against the Governor, it goes back to

22   the law.

23        If there's a problem, there's a problem with

24   the law, and if there's a remedy, then number one, you

25   change the law, if you think you're correct under the

1   law, then go to court and file appropriately.

2          And it is very similar to the subpoenas.  It

3   appears to me that counsel did the right thing.  They

4   said that they're baloney, they're all wrong, don't

5   worry, we'll win, but you better show up in court just

6   to make sure, in case we don't.  So they advised their

7   clients properly, and that is, follow the subpoena

8   until such time as it's quashed.  It was never quashed.

9   And that's the difference here.  Until such time as the

10  law is changed or such time that in the proper

11  proceedings there's some kind of overall determination

12  as to who controls the litigation in the government,

13  until that happens, Your Honor, I respectfully suggest

14  that we follow the law.  And right now the AG is in

15  charge, that's the way it is.

16          I think, again all kidding aside, I think we

17  can take judicial notice that if there's one law that

18  people discuss about changing, it's the elected

19  Attorney General law, and that's because in fact it's

20  created somebody that's properly on par with what

21  Congress created in the Governor when they passed the

22  Organic Act in 1950.  Super powers, I mean there's no

23  question about it.  But that doesn't mean they're not

24  there.  And until somebody finds it unconstitutional,

25  and they're not asking for that, this would not be the

1   forum, then it stands and it's very difficult.

2          Secondly, Your Honor, I think the Court should

3   take note that the only reason for this, nothing

4   compelling, the only reason is what Mr. Mantanona said,

5   and that is, he said that, wait a minute, the AG's a

6   signator to that settlement agreement, they can't back

7   out now.  So is the Governor, so is the Director of

8   Administration, so is the Director of BBMR, the

9   Director of Revenue and Taxation, everybody is a

10  signator.  Nobody has done anything, nobody complained,

11  nothing, no events of anything.  Then all of a sudden

12  they all decide to change their mind.  As Mr. Manglona

13  (sic) said, well, somebody is swinging, or something,

14  and they're left out in the open.

15         Well, again, the only purpose is to get out of

16  the agreement.  There's been no testimony, no evidence

17  of anything else other than we want out of the

18  agreement because we have concluded outside of the

19  advice of the AG that it's illegal.

20         And so we've decided that even though the

21  Court signed off on it, even though there's going to be

22  a fairness hearing, even though with the backing of the

23  Attorney General, with the backing of plaintiff and

24  interim counsel, they all say it's okay so far, we feel

25  that we've concluded, and maybe to some extent with

1    advice of counsel, it doesn't appear that they had

2    counsel earlier on.  Your Honor, they were concluding

3    these things on their own, that it's illegal and that

4    justifies us coming here today and deciding to back

5    out.

6         But, Your Honor, that's the only reason

7    they're here.  This is not a writ proceeding or

8    anything that is intended to set the tone for exactly

9    where the AG sits in our government or anything like

10   that, like it should be.  That's really the forum where

11   it should be discussed.  They're here for one reason:

12   Somebody along the way decided a long, long way along

13   the way, that they wanted to back out of the agreement.

14   And really, Your Honor, it sounds to me like the one

15   and only reason they have seems to be money.  And you

16   know, I think we all can take judicial notice that that

17   ain't going to go very far.  They're saying, well, I

18   can't afford it.  You know, tell me about it.  All of

19   us can't afford anything.

20        And so, Your Honor, with that being the sole

21   purpose -- and really just one other small point, Your

22   Honor.

23        I represented the elected school board at the

24   time before the Attorney General had what I refer to as

25   super powers, and I was surprised, Your Honor, because

1 I thought because the elected school board had a

2 provision that provided for the board to hire its own

3 attorney, I thought that was my license into court, and

4 I learned very quickly from Judge Gatewood at that time

5 that it was not. And in fact, she was very inclined to

6 allow the AG to go ahead and do what it's supposed to

7 do, represent the government, and she very clearly

8 distinguished between the board hiring counsel and

9 counsel representing a government entity in court.

10 But her exception, the one exception was in

11 that case the government entity was under attack and

12 under attack by the AG, and because its existence was

13 threatened, she found an exception, and I don't think

14 the AG fought it very, very hard, and allowed us to

15 represent the elected school board. That's prior to

16 the super powers, Your Honor, that's prior to the AG

17 being promoted, and given all the powers that he has

18 today. But even that, it was a very, very close call,

19 to my surprise, and I never forgot the lesson.

20 But in any event, Your Honor, unless there's

21 any questions, I'll submit on that.

22 THE COURT: Are you saying that under no

23 circumstances can a government official be not

24 represented by the Attorney General?

25 MR. PHILLIPS: No, Your Honor, I'm saying

1    under the current law when the Attorney General is in

2    control of litigation, then he, he decides that. That

3    doesn't mean that the individual cannot make

4    representations to the court, as we did that day at the

5    settlement conference, Your Honor. Everybody but the

6    media was there, and we all participated, everybody was

7    free to speak, and -- I'm sorry, go ahead.

8         THE COURT: Isn't it generally true when the

9    parties go with the attorneys, you don't allow the

10   parties to speak, we allow their attorneys to speak on

11   their behalf?

12        MR. PHILLIPS: Yes, Your Honor, and at the

13   same time, the attorney has an obligation to insure

14   that the court is aware of concerns and, or questions

15   if they rise to a certain level, that the clients have.

16   So for example, if my advice is to go a certain way,

17   and we're going a certain way, but I let Your Honor

18   know that there's some concerns here.

19        In the AG's case, Your Honor, I believe that's

20   what they did in their brief, and again, I didn't read

21   it for this purpose, and that was a while back, but I

22   believe they put the Court on notice that the Governor

23   wants to back out. And so I believe that the AG, based

24   on everything I've heard today, fairly summarized

25   exactly the sentiments of the front office.

1    You may also remember, Your Honor, in one of

2  the conferences we had, that I was very open, I said,

3  hey, I heard that you guys are backing out; and the

4  AG's office said no, it's a written agreement and we're

5  going to stand by it.  But at the same time, Your

6  Honor, when they filed their brief with the court, and

7  they were candid, they said the Governor has concerns,

8  et cetera, et cetera, et cetera.  I don't think there's

9  anything wrong with the parties expressing their

10  position, and if that's through the AG, that's fine.

11  I think the AG could find himself or herself in trouble

12  if somebody said, how about this, and they said, well,

13  we're not going to tell the Court, we don't care what

14  you say, we're going to keep it a secret.

15    The big difference between that, Your Honor,

16  and controlling litigation in the government, under the

17  current statute.  And at this point in time, good or

18  bad, I think he has the power to do that.

19    THE COURT:  So if the Governor wants to back

20  out and the Attorney General does not, what

21  representation is made to the court as to that party?

22    MR. PHILLIPS:  I think that's the

23  representation, Your Honor.

24    THE COURT:  That what?

25    MR. PHILLIPS:  That the Governor wants to back

1  out. As the Attorney General made the representation.

2  That's exactly, although like I said, it's been a while

3  since I read their brief, that I remember reading that

4  paragraph or so where he talked about the fact, or

5  whoever wrote the brief, spoke about the fact that the

6  Governor wants to back out now, or at least it appears

7  that way.

8      THE COURT: All right. So again let me ask

9  the question. If the Governor's position is that he's

10 going to back out --

11     MR. PHILLIPS: Right.

12     THE COURT: -- does the Attorney General take

13 that position in terms of the settlement or not?

14     MR. PHILLIPS: That's his choice, Your Honor,

15 as the chief legal officer, under the current statute.

16     THE COURT: So he can say no, we're not going

17 to back out?

18     MR. PHILLIPS: Under the current law, I

19 believe that's what he can say.

20     THE COURT: And under the current law, the

21 Governor's position then is not made known to the

22 court?

23     MR. PHILLIPS: No, Your Honor. I think that

24 at the very least the AG has to make the position known

25 to the court. I don't think it's of any consequence, I

1   think it puts the Court on notice in case, for example,

2   that's an issue of fact that the Court may feel is

3   important that's been reported to the Attorney General,

4   I think he has an ethical obligation to report that to

5   the court.  I think that's separate and apart from

6   controlling litigation.

7          THE COURT:  All right.  But let's assume that

8   the Governor says I want these five points to be made

9   known to the court as the reasons that I'm objecting,

10  let's say, to the settlement.  And the AG says, well,

11  no, I'm just going to tell them that you object to the

12  settlement.

13         MR. PHILLIPS:  Your Honor, I think there's a

14  medium there somewhere, and like all other situations

15  like this, especially when you're dealing with the

16  interpretation of statute and powers, I think there's

17  a reasonableness argument, and I think that at the very

18  least the AG would be required to explain to the court

19  enough that gives the Court an idea of why, as we've

20  all discussed today, it's all out in the opening --

21  excuse me -- all out in the open, what the objection

22  is about.  But that still doesn't take away from the

23  Attorney General's current ability to control

24  litigation.  And so when it comes to the final say

25  with regard to what the government's position is in

1  court, I believe, Your Honor, the current statute,

2  that's reserved to the Attorney General.

3        THE COURT: So the government's position need

4  not necessarily be the Governor's position.

5        MR. PHILLIPS: That's correct, Your Honor. In

6  legislation, in Your Honor's court before when you were

7  at the Superior Court, and a number of other places,

8  including the Attorney General's Office.

9        Another good example, Your Honor, remember,

10  because I was representing the speaker at that time, we

11  were brought into chambers here and all consulted

12  regarding, you know, the landfill issues and the

13  Waterworks, and the AG made the decision and everybody

14  followed it. And that's just the way it went; the

15  speaker never supported that. They got nothing from

16  the Legislature. They went off and did it on their

17  own. And that's the way the ball bounces. Your Honor

18  understood exactly what the AG's powers were. Nobody

19  said, "Mr. Phillips, what do you think?" I mean, they

20  did it in a roundtable discussion, and the judge

21  understood that there were concerns from the

22  Legislature, but, and the very end they didn't say

23  "Mr. Phillips, what's your decision?" They said

24  Attorney General what's your decision, and that's the

25  way it went. And that's the way it went for the

1    landfill, that's the way it went for Waterworks.  I

2    believe, Your Honor, if I'm not mistaken, that's even

3    the way it went back in the old days with the DOC civil

4    rights cases.  I mean, that's the just the way it is,

5    at certain point in time someone has to be the boss.

6                THE COURT:  We're now in the new days.

7                MR. PHILLIPS:  Now it's even worse.  The

8    Attorney General is even more powerful.

9                THE COURT:  Okay.  Thank you, Mr. Phillips.

10                MR. PHILLIPS:  Thank you, Your Honor.

11                THE COURT:  Mr. Weinberg.

12                MR. WEINBERG:  I'll try and be brief.

13                Thank you, Mr. Phillips; that was -- from his

14    perspective it was very helpful.

15                It is a question about power.  It is a

16    question of -- in fact one of the cases that we cite

17    ex parte comes from my home state, Alabama, which is

18    where 15 years ago I was involved in this same kind

19    of litigation.  This is growing pains for Guam is what

20    I call it.  And what you see is, as super powers,

21    Mr. Phillips said, but it is a shift in the paradigm,

22    in the power of paradigm, where the chunk of policy

23    called legal policy decisions and control of litigation

24    is removed from the Governor and put to a coordinate

25    constitutional or Organic Act officer, the Attorney

1   General.

2          Heretofore, it was the Governor controlled the

3   legal policy because he appointed, hired and fired the

4   Attorney General at will.  Now it is a constitutional

5   or Organic Act official.  And the power that the

6   Governor used to have is, in respect to the control of

7   litigation and legal decisions for Government of Guam,

8   belongs now to the Attorney General.

9          THE COURT:  Control lay in his ability to

10  appoint or remove the Attorney General.

11         MR. WEINBERG:  Part of it.

12         THE COURT:  Control legal policy because he

13  was able to appoint or remove the Attorney General.

14         MR. WEINBERG:  Yes.  Part of it.  But, before

15  you did not, but also what you had was, before the

16  Organic Act amendments, you had the provision for the

17  Attorney General as expressed by the Legislature.  And

18  the Legislature could write or rewrite or unwrite the

19  powers and duties of the Attorney General.  But now

20  what you have is, you have it defined in the Organic

21  Act as the chief legal officer for the Government of

22  Guam.  And before that, the Legislature could do that.

23  So part of the arguments we're making in another case

24  is in the example of autonomous agencies, when the --

25         THE COURT:  See, basically you're saying that

1  the Guam Legislature cannot adopt a statute that says

2  as chief legal officer of the Government of Guam, the

3  Attorney General, has these powers.

4      MR. WEINBERG:  I think -- well, our position

5  is that they can add to the powers and duties of the

6  Attorney General, but they cannot take away from his

7  common law powers and duties, which historically, in

8  the majority of jurisdictions, involves the control of

9  litigation --

10      THE COURT:  But the common law powers as

11  provided by statute says that unless it is not against

12  any other existing law.  See, his statutory common law

13  powers expressly is subject to another law.

14      MR. WEINBERG:  By statute.  But when Congress

15  amended the Organic Act and made him chief legal

16  officer, it took it above that, gave it super powers.

17  But so, our position is that the Legislature cannot

18  take away those historical common law authority to

19  control litigation.

20      THE COURT:  And is that a good policy to

21  adopt, that the Attorney General, irrespective of

22  whether or not what he espouses is really -- what's

23  the word for it -- in the interest, in the governmental

24  interest, is that good policy that he is the final

25  word?

1          MR. WEINBERG:  I think -- I think, yes.  I

2    think it's an outstanding policy, because rather than

3    -- we heard Mr. Ilagan say something I wanted to follow

4    up on it -- he said something about Mr., the Attorney

5    General's interests are concerned with the taxpayers or

6    the people, or something like that.  He's not concerned

7    about the department.

8          And what you have when individual agencies,

9    like Department of Administration or RevTax or whoever

10   says I need to control my own little fiefdom, I need

11   to protect my finances, I need a different lawyer who

12   won't -- who will do what I tell him to do, is you have

13   a multitude of legal policies running around.  You do

14   not have, is it one coherent legal policy for the

15   Government of Guam and its agencies and

16   instrumentalities.

17         And so, is it better to have one Attorney

18   General setting one coherent legal policy for all?

19   Yes.  What if the Attorney General becomes power mad

20   and runs amok?  Well, you know, that's what the elected

21   process is for, and right now we have the elected

22   Attorney General.  And if his policies, if his control

23   of legal decision are not in the best interests of the

24   people of Guam, who are his real clients, and the

25   Government of Guam.

1          THE COURT:  See, that's the troubling part

2    really, whether or not to settle for 50 or 60 million

3    is not a legal question.

4          MR. WEINBERG:  Well, I, I addressed that

5    briefly earlier, I think I disagree, I think it shares

6    legal and policy matters, policy decisions, because

7    you're talking about the potential for liability,

8    you're making liability judgments like an insurance

9    company would in terms of what's in the best interests

10   for the Government of Guam.

11          Now, I want to make sure that the Court

12   understands that, as Mr. Phillips has said, there's

13   been no testimony about a lot of the things that have

14   been represented here today about who said what to

15   whom, who the Lieutenant Governor consulted with.  The

16   Governor had people on staff, his staff were there and

17   present at all sorts of meetings.  We've had no

18   testimony about that, because we limited it by

19   agreement what today's hearings was going to be about.

20   But just because there were representations that the

21   Governor was out of the loop and didn't know what was

22   going on is not an agreed upon presentment of the facts

23   that we have here, and we had reserved that.  That's

24   why, in fact, we subpoenaed the Governor, that's why we

25   had to subpoena our own clients.

1    You know, from the testimony that we had
2  today, let me address that, this hostility that I've
3  been charged with against my own clients, you know, we
4  had to ask questions here about why did you leave the
5  fold.  We are your lawyers.  And the first we hear of
6  it is in November where they're saying that they have
7  retained outside services, Rawlen Mantanona, and that
8  they want us discharged.  And I tried to go into some
9  questions, and there were objections and I let it go,
10  about, well, did you try and consult with the Attorney
11  General if you had these questions, did you -- and we
12  stopped that testimony and we can bring that back for
13  another day.

14      But let's not repaint this with too many
15  emotions about what this testimony was about.  This
16  testimony and the evidence, the arguments have to do
17  with, with two line agencies under the direction of the
18  Governor.  I think that's very clear, the Governor's
19  lawyers prepared all the paperwork, did all -- they
20  delegated their responsibility to Shannon, their
21  procurement authority to Shannon Taitano, I think
22  that's all in evidence, and their legal positions shall
23  we say are consistent with the Governor's philosophy of
24  this case.  So, they made the decision in November.
25  They severed the attorney-client relationship.  And we

1   were inquiring for the Court's purposes why.

2         Now, we keep hearing these protestations about

3   due process, I have a due process right to a lawyer of

4   my choosing, but to be represented and my voice to be

5   heard.  Who is we is the question?  Who is the client?

6         Under the Organic Act, it is the Government of

7   Guam.  Who is the Government of Guam?  In litigation,

8   it's whoever is sued and is before the Court; it's the

9   Governor, the Director of RevTax, Director of

10  Administration.  They are the Government of Guam, and

11  we represent them.

12        Oh, one last thing.  A number of cases cited

13  by the Governor, cases from Hawaii, Iowa, North

14  Carolina, North Dakota, West Virginia, and they're

15  cited -- Mr. Mantanona referred to one as the Chun

16  case from Hawaii.  If the Court will look at those

17  cases closely, you'll see there that the authority of

18  the Attorney General is expressly limited by statute.

19  And you'll see what the courts hold, is they say things

20  like -- let's see -- and we didn't have a chance to

21  distinguish this for the Court because the Court had

22  said it didn't want further briefing at the time.

23        But if the court would just look at those

24  cases, the cases cited by the Governor, Hawaii, Iowa,

25  North Carolina, and North Dakota I think is the case

1     that's cited, you'll find that unlike us, unlike Guam

2     and the majority of jurisdictions that we cite where

3     there's a constitutional basis for the office of the

4     Attorney General being the chief legal officer, those

5     cases cited by the Governor and Mr. Mantanona, the

6     authority of the Attorney General is entirely

7     statutory, which is what we had prior to the Organic

8     Act amendments.

9           I wanted to point out that distinction to the

10    court.  And if there's nothing further, I rest.

11          THE COURT:  In the situation before the Court,

12    you don't believe that there's a conflict between your

13    representation and the desires of those whom you

14    represent?

15          MR. WEINBERG:  I don't perceive there to be a

16    conflict in an ethical sense, if the court is asking

17    that.

18          There is, clearly, the Governor's Office does

19    not want to abide by the agreement that it has signed.

20    It has tendered or is attempting to tender reasons and

21    argument as to the legality of it.  Those questions I

22    think can be answered or can be addressed in a fairness

23    hearing or later down the line.  Those questions will

24    be answered and heard, someone will bring them up, and

25    Mr. Phillips will have to defend whether they're legal

1   or whether they're not.

2          But essentially the Governor doesn't like the

3   Attorney General as his lawyer in this case. And I

4   think we can all agree on that. And the question is,

5   when the Governor --

6          THE COURT: Even if he doesn't like the

7   Attorney General, the Attorney General doesn't like the

8   Governor --

9          MR. WEINBERG: I think, it seems to be that

10  the feeling appears to be a little mutual. But that

11  ought to be irrelevant to the question whether there

12  are professional responsibilities.

13         THE COURT: Why does it become irrelevant

14  when, if a person dislikes the other, then it seems

15  that a rational decision for undertaking the

16  representation, undertaking what it is that they

17  propose to do becomes diminished because of the

18  dislike?

19         MR. WEINBERG: The reason is, because it's

20  not about personalities, because the Governor and Lou

21  Perez and Art Ilagan are not sued in their individual

22  capacity. Now what is going out to their pocketbook

23  personally? They are sued in their representative

24  capacity. The Governor and the directors of RevTax

25  and DOA will come and go, the Attorney General will

1   come and go.

2           THE COURT: (Overlapping.) Well, I suppose --

3           MR. WEINBERG: I'm sorry.

4           THE COURT: Well, you know, I suppose we could

5   look at the actions that are being undertaken here as

6   attempts by each party to, let's say, defeat any

7   desires to run for election.

8           MR. WEINBERG: I should probably reserve

9   comment on that, as to what they're doing to their

10   respective reelection chances.

11           But the point is, it's not about

12   personalities, and they may dislike each other with a

13   passion. And it may very well be that if we had

14   testimony and the Governor was here to testify and I

15   asked him some hostile questions about, well, did you

16   talk to the Lieutenant Governor right after you got

17   back from wherever you went, and did you reprimand him

18   for signing that thing without you, and why did you

19   send your own press secretary to hold the press

20   conference for everybody, and if I asked questions like

21   this of the Governor, that might be deemed hostile.

22           It's still just the Governor is having buyer's

23   remorse, he's having second thoughts, whatever the

24   reason, and those may be for Mr. Phillips and others to

25   explore. What the Attorney General knows is that we

1    have what appears to be a valid, binding agreement

2    presented to this court and approved.  Some objections

3    may come up at a fairness hearing or other place, and

4    the court will have an opportunity to reconsider --

5             THE COURT:  Well, there has been conditional,

6    I think, approval.

7             MR. WEINBERG:  Yes, I understand there's

8    conditions.

9             THE COURT:  I mean, it's not an approval of

10   the agreement, it's conditional based on what occurs at

11   a later date.

12            MR. WEINBERG:  And it's not filed, and there

13   may be, you know, it's still up in the air, there are

14   still things that -- but the first time we hear the

15   Governor's objection, I mean this is just from the

16   testimony I think that we heard, was not right when the

17   Governor got back on island in June, and not in July,

18   and not in August, but in September he starts to have

19   some questions.

20            And why in September?  Because Mr. Phillips

21   was saying, hey, we have terms and conditions of the

22   settlement agreement, are you complying with it, and

23   he was asking questions and our office was forwarding

24   those questions on, which our clients apparently

25   determined was harassment of some type and they got

1   scared. I don't know, but they didn't contact us. I

2   think the testimony we got that much out. They did not

3   consult us, they went to the Governor and the Governor

4   helped them get another lawyer, and a month later in

5   November, we're having this question of Calvo and

6   Clark's appearance and Mr. Mantanona's appearance in

7   November, and them attempting to discharge us.

8           And it's at that time there that we're saying,

9   okay, we have two more line agencies and the Governor

10  need to be educated on what the law of Guam is. And

11  again, it's just growing pains. And somebody, somebody

12  said here that this court needs to put a stop to it,

13  and it's like, yeah, and the best way to put a stop to

14  it is to tell the government defendants who their

15  lawyer is under the Organic Act, and under Guam law,

16  and that's the Attorney General.

17          THE COURT: So basically, Mr. Weinberg, your

18  argument is that under Section 5121(b) that you can

19  never, you really can never find any firm representing

20  government personnel, until you approve those contracts

21  is what you're saying?

22          MR. WEINBERG: (Inaudible.)

23          THE COURT: They cannot legally represent

24  without your approval, contracts by government

25  employees for legal services?

1    MR. WEINBERG:  I think the law is pretty self-

2    explanatory, Your Honor.  I mean, that's how I read it,

3    that you do not have a valid contract to represent

4    anyone.  It's not -- I'm not even worried about the

5    question of whether illegal payments have been made to

6    Mr. Mantanona or not, or the law firm.  I don't know

7    whether payments have or have not been made, that's not

8    my concern, but --

9    THE COURT:  All right.  So let's assume that

10   the minute you see let's say Ms. Perez, you file a suit

11   against her, and she goes sees Mr. Mantanona, are you

12   saying that at that point in time that representation

13   that is formalized is illegal?

14   MR. WEINBERG:  If we were to sue Ms. Perez?

15   THE COURT:  Right.

16   MR. WEINBERG:  There are -- there are

17   different ways to handle that kind of issue.  And you

18   know, my recommendation to whoever the Attorney General

19   would be is that if she is sued in her official

20   capacity to do something officially, and there is a

21   legitimate dispute, and a real need to sue our client,

22   then our clients ought to be authorized to retain

23   independent counsel of their choice.  That would be my

24   recommendation.  I can't say what a future Attorney

25   General would do.

1    THE COURT:  But your position is that no legal

2  representation can commence until that contract is

3  signed by the Attorney General?

4    MR. WEINBERG:  Under the current state of the

5  law, yes.

6    THE COURT:  All right.  So how is this

7  defendant going to be represented at a crucial stage of

8  the proceedings?

9    MR. WEINBERG:  Like Ms. Perez?

10   THE COURT:  Like Ms. Perez.  She has her

11  complaint, she has to appear for it in five days.

12   MR. WEINBERG:  Are you talking -- I'm sorry,

13  Your Honor, are you talking --

14   THE COURT:  I'm talking about a hypothetical

15  really.  You're suing Ms. Perez, there's some writ, she

16  has to appear in court in five days, she goes to see

17  Mr. Mantanona; your position would be that that

18  representation that has taken place there, and let's

19  say whatever arrangements are illegal because you have

20  not signed a legal services contract?

21   MR. WEINBERG:  Or -- yes.  Or, you know, or in

22  the case of -- Mr. Phillips gave a great example of

23  appearing on behalf of the school board, but he still

24  needed the Attorney General's designation of him as a

25  Special Assistant Attorney General to represent -- is

1  that right?  -- to represent the board.

2      So if Ms. Perez went to Mr. Mantanona and had

3  to appear in court for something she did as Director of

4  Administration, there better be something in the court

5  file that says that Mr. Mantanona is a duly authorized

6  Special Assistant Attorney General to represent her, as

7  is true of the Calvo --

8      THE COURT:  When you're suing her directly?

9  I'm talking about a hypothetical where you're suing her

10  directly, the Attorney General, and she goes to Mr.

11  Mantanona and formalizes a legal relationship, your

12  viewpoint is that that legal relationship is invalid

13  because you haven't yet signed a contract?

14      MR. WEINBERG:  I think, to be hypertechnical,

15  I would have to say yes, that it would be invalid.

16      Now, as a practical matter, that's something

17  that can be worked out.  I mean, either somebody can be

18  authorized to retain independent of the Attorney

19  General's Office, authorized to --

20      THE COURT:  See, now you're talking exceptions

21  to the statute.

22      MR. WEINBERG:  We're talking hypothetical here

23  too.

24      THE COURT:  Right.  And I'm trying to figure

25  out how far those exceptions can go.

1    MR. WEINBERG:  Well, as with everything in

2    the law, it's all going to be fact specific.  If this

3    situation -- I mean I know what I would advise the

4    Attorney General to do in a situation like this, if it

5    was us suing somebody, I would say, hey, let them get

6    their own lawyer, and, you know, fund it out of their

7    own budget, and that this is, our case here --

8        THE COURT:  See, but the attorney may be

9    insistent on his legal rights as chief legal officer,

10   I'm not going to sign any contract.

11       MR. WEINBERG:  He may, or she may.

12       THE COURT:  Let her undertake her legal

13   representation on her own, and not have it funded by

14   the government.  She's being sued in her official

15   capacity.

16       MR. WEINBERG:  Well, and another way to deal

17   with that is to have somebody within the office of

18   Attorney General assigned who is segregated off, you

19   know, a Chinese wall is surrounding that Assistant

20   Attorney General.  There are -- it just depends on what

21   would happen.

22       In a worst case scenario, were the Attorney

23   General to sue somebody then deny them the opportunity

24   to have counsel, which is not what we have here, this

25   is not the case we have here, all right, in the Santos

1     case here.  But in that case --

2             THE COURT:  But we're trying to deal perhaps

3     with conflict situations, the immediate -- I mean,

4     foreseeable conflict versus one that you say is not

5     apparent here, not foreseeable.

6             MR. WEINBERG:  Yes, but the difficulty I'm

7     having in addressing the Court's concerns is conflicts

8     are fact specific, we need concrete examples of a

9     conflict and what to do in a situation, that kind of

10    situation.  The hypothetical the Court envisions in all

11    likelihood would never happen, because it would be a

12    foolish Attorney General who would sue someone and then

13    deny them counsel, or an opportunity to hire counsel.

14            Now, were that to happen, you might have

15    another matter in Superior Court somewhere on a writ,

16    that in this case there needs to be an exception carved

17    out, or an interpretation.  Part of the issue of the

18    Attorney General's responsibility to sign legal

19    contracts is the interpretation of that statute, which

20    is up on -- in the Supreme Court.

21            Thank you, Your Honor.

22            THE COURT:  Thank you.

23            MR. CALVO:  If I may, Your Honor, just a

24    couple of points?

25            THE COURT:  All right, Mr. Calvo.

1    MR. CALVO:  I'll be brief, Your Honor.

2    First of all, in both Mr. Phillips's argument

3    as well as Mr. Weinberg, there was discussion of

4    matters that I think will be brought up in the next

5    hearing regarding the administrative plan and some of

6    the other issues that I won't address now, but we

7    would, and we're prepared to address, but that we

8    understand for another day.

9    THE COURT:  That's correct, yes.

10   MR. CALVO:  With respect to the law, Your

11   Honor, the Attorney General has not cited one case

12   where the Governor could not be represented or could

13   not be heard.  In fact, the case that he cited from his

14   home state in Alabama, the Court ruled that the

15   Governor could intervene in a proceeding that was

16   brought by the Attorney General on behalf of the state

17   -- I believe it was the state commissioner.  But the

18   Governor in that case was allowed to intervene and to

19   be heard and to be represented.

20   With respect to --

21   THE COURT:  But in that case, is there like a

22   constitutional provision regarding the office of the

23   Attorney General?

24   MR. CALVO:  I'm not sure, Your Honor.

25   THE COURT:  Because he's making a distinction

1    that in the Hawaii case and all these other cases, the

2    Court went in that direction because the office of the

3    Attorney General was a statutorily created office,

4    whereas the office of the Attorney General here in Guam

5    is not, it's in a sense constitutional because it's in

6    the Organic Act.

7         MR. CALVO:  I could answer that for you if you

8    give me a little time, Your Honor, but I know that the

9    Governor in that case was allowed to intervene.  And

10   the reason I raise it is because he gave that as an

11   example, otherwise I wouldn't have mentioned that case.

12        The important point, Your Honor, is that

13   there's no case cited for the proposition that the

14   Governor could not be heard in the matter; whether or

15   not it was a statutory provision or a statutory -- a

16   constitutional provision, there was no case cited for

17   that proposition by the Attorney General.

18        Under Guam law, I think under the Organic Act

19   it's clear that the Governor has the supervisory

20   control of the executive branch.  And in that, in those

21   powers and in that authority, he has the right to hire

22   counsel in situations just like this, where there is a

23   conflict with the Attorney General's Office and there

24   isn't adequate representation.

25        Mr. Phillips raised a point, which I think is

1    a good point, about the duty of the Attorney General,

2    that if the Governor has a claim or has a disagreement,

3    it's the Attorney General's obligation to raise that

4    with the court, especially in a class action where the

5    Court has an affirmative duty to protect the class, to

6    get the issues out and deal with this, whether it's at

7    a fairness hearing on any stage in litigation.

8          In the Attorney General's brief the Attorney

9    General has a section called "Governor's concerns".  He

10   says the Governor has concerns, don't worry about them,

11   they're not relevant, he has nothing to say, I'm not

12   subject to the direction or the concerns or the whims

13   of a client.  That's how he informed the Court he was

14   proceeding.  So the Governor's concerns weren't voiced

15   or expressed to the Court by the Governor's attorney,

16   the Attorney General.

17         That's all I have, Your Honor.

18         THE COURT:  Does anybody else want to say any

19   final word?

20         MR. PHILLIPS:  Your Honor, briefly.

21         Your Honor, I think one way to distinguish the

22   ethical conflict here is that in this case you have the

23   Assistant Attorney General who have done everything in

24   their power to save their clients from me, and that's

25   very different from Mr. Weinberg or Mr. Cohen taking it

1  upon themselves to sue Lou Perez or Art Ilagan. Then

2  they would be protecting them from them, and that's

3  very different, they would be moving for OSC.

4     Your Honor, I met with them, I did everything

5  I could for an hour to try and get something out of

6  them, they know I was pissed off, I couldn't get

7  anything out from them. They covered their clients all

8  the way. I knew I no longer had the free will or the

9  ability or the permission to contact the co-defendants

10  that has always been open in the past, I didn't have

11  that any more, so I couldn't ask them, hey, did you pay

12  the money. I wrote letters to the AG, no response.

13     Your Honor knows that because in a chamber

14  conference I raised that with them, I said I've heard

15  nothing from you guys, they did every single thing they

16  could to cover for their clients. And that's the

17  difference, Your Honor. They may be on the phone with

18  their clients yelling at them saying, hey, you guys

19  gotta do something, Phillips is a nut, but at the same

20  time, Your Honor, that's very different from saying,

21  you guys better hurry up or I'm going to do something,

22  that's when they're pitted like that. Right now

23  they're the buffer, you know, they may be on the front

24  lines or they may be the general depending on what the

25  issue is, Your Honor, but they're still on the same

1  side, they still are.

2      And that's the difference between them suing

3  one of the witnesses that you heard today, they'd be

4  moving for the OSC.  Today, Your Honor, they've done a

5  good job of, I won't say preventing me, but stalling

6  and doing everything in their power to prevent me from

7  filing an OSC.  And that's their job, and that's the

8  difference, Your Honor, it's not a direct conflict like

9  it would be if they sued their own clients in that

10 sense.

11     THE COURT:  I agree with you, Mr. Phillips,

12 when you said that Phillips is a pugua nut.

13     (Laughter.)

14     Mr. Mantanona?

15     MR. MANTANONA:  A few points, Your Honor.  I

16 find it, that this matter is before the Court and the

17 court can generally see what's going on here, basically

18 appears that the Attorney General and the plaintiffs

19 are consistent in their position; their position is

20 consistently against named defendants, and that is

21 wrong.

22     Further, Your Honor, it appears that there's

23 all this talk about the super powers of the Attorney

24 General's Office, but those super powers have to be

25 defined by court decisions, and by legislation.  It's

1   not an unlimited amount of power as assumed by the
2   government at this point, basing it upon decisions of
3   other courts.  Those other court jurisdictions are
4   nothing more than assisting or persuasive argument,
5   they are not controlling.  It is for this court to
6   determine how the law applies to this jurisdiction.
7           With all due respect, we submit on behalf of
8   Mr. Ilagan and Ms. Perez.  Thank you, Your Honor.
9           THE COURT:  All right.  We've heard excellent
10  arguments, really, from counsel in this matter.  Today,
11  I wish to commend counsel for their arguments; also
12  Mr. Phillips for just sitting there patiently listening
13  to the court, just listening to the arguments that have
14  been made to the court by all other counsel.
15          There's various arguments have been made
16  today, arguments I think that I need to give a second
17  look at, and just deliberate more before a final
18  decision comes out.  And I say that because you've
19  presented arguments to me that still has not convinced
20  me which way to go in this matter.  So I'm going to
21  have to review the arguments that you've made, look at
22  the authorities that have been cited, and make a
23  decision because the decision that ultimately is going
24  to be made here is a very important decision.  And it
25  being an important decision, I have always taken at

1   least a good night's rest in thinking of these issues

2   before deciding, and I have always thought that

3   deciding with a written decision is always best so that

4   we can fully explain the rationale that we have reached

5   in formally deciding the matter.

6        So I'm going to take this motion under

7   submission.  Right now the parties are eager that a

8   decision be made, I will try to be prompt in making

9   the decision, because there are other pending matters,

10  Mr. Phillips's motion, and there may be other motions

11  that perhaps will be made after the Court has decided

12  this matter.

13       So the motion will be taken under submission

14  and to be decided promptly by the Court.  And in so

15  doing that, again, I wish to thank you all, counsel,

16  for being here today, thank you for again enlightening

17  the court in terms of the issues that it must look at

18  in terms of arriving at an informed decision in this

19  matter.  And thank you all for the fine arguments that

20  you've made to the court today.  I'm proud to be here

21  listening to your arguments this morning and afternoon.

22       Thank you very much.  And I hope to get a

23  decision out as soon as possible.

24       Thank you.

25       ALL COUNSEL:  Thank you, Your Honor.

1    (Whereupon proceedings concluded at 4:26 p.m.)

2                          * * *

3

4

5

6              CERTIFICATE OF REPORTER

7

8    CITY OF AGANA        )
                          ) ss.
9    TERRITORY OF GUAM    )

10

11          I, Wanda M. Miles, Official Court Reporter

12   of the District Court of Guam, do hereby certify the

13   foregoing pages 1-199, inclusive, to be a true and

14   correct transcript of the digital recording made of the

15   within-entitled proceedings, at the date and times

16   therein set forth.

17          Dated this 4th day of February, 2005.

18

19          _Wanda M. Miles_

20

21

22

23

24

25

                    Wanda M. Miles
                 Official Court Reporter
                  District Court of Guam

# EXHIBIT 8



**FILED**
DISTRICT COURT OF GUAM

MAR 16 2005

**MARY L.M. MORAN**
**CLERK OF COURT**

DISTRICT COURT OF GUAM

TERRITORY OF GUAM

| | |
|---|---|
| LOURDES P. AGUON-SCHULTE, )<br><br>Plaintiff, )<br><br>vs. )<br><br>THE GUAM ELECTION COMMISSION, )<br>GERALD A. TAITANO, in his official )<br>capacity as the Executive Director of the )<br>Guam Election Commission, I MINA' )<br>BENTE SIETE NA LIHESLATURAN )<br>GUAHAN (The 27th Guam Legislature) and )<br>FELIX P. CAMACHO, in his official )<br>capacity as the Governor of Guam, )<br><br>Defendants. )<br>_____ ) | CIVIL CASE NO. 04-00045<br><br>(as removed from the Superior Court of Guam<br>Civil Case No. CV-1103-04) |
| JAY MERRILL, on his own behalf and on )<br>behalf of all other similarly situated voters )<br>desirous of casting a vote in favor of )<br>Proposal A at a fair and legal election, )<br><br>Plaintiffs, )<br><br>vs. )<br><br>THE GUAM ELECTION COMMISSION, )<br>GERALD A. TAITANO, in his official )<br>capacity as the Executive Director of the )<br>Guam Election Commission, I MINA' )<br>BENTE SIETE NA LIHESLATURAN )<br>GUAHAN (The 27th Guam Legislature) and )<br>FELIX P. CAMACHO, in his official )<br>capacity as the Governor of Guam, )<br><br>Defendants. )<br>_____ ) | CIVIL CASE NO. 04-00046<br><br>(as removed from the Superior Court of Guam<br>Civil Case No. CV-1111-04)<br><br><br>**FINDINGS AND RECOMMENDATION**<br>**BY MAGISTRATE JUDGE** |

On February 18, 2005, these consolidated cases came before the Court for hearing on the

Lourdes P. Aguon-Schulte v. Guam Election Commission, et al., Civil Case No. 04-00045
Jay Merrill, etc., et al. v. Guam Election Commission, et al., Civil Case No. 04-00046
Order Denying Motions to Strike and Granting Motions to Remand

1   Attorney General's motions to strike the appearances by and pleadings of private counsel and the

2   defendants' motions to remand these actions to the Superior Court of Guam. At the conclusion

3   of the hearing, the Court took the motions under advisement. The Court now issues its findings

4   and recommendation for the parties' and the district judge's review.

5   **BACKGROUND**

6   On or about October 18, 2004, Plaintiff Lourdes P. Aguon-Schulte filed a Complaint

7   (CV 1103-04) in the Superior Court of Guam against the Guam Election Commission, Gerald A.

8   Taitano, in his official and individual capacity, *I Mina Bente Siete Na Liheslaturan Guahan* (the

9   27th Guam Legislature), and Felix P. Camacho, in his official capacity as the Governor of Guam.

10   The plaintiff sought declaratory and injunctive relief, and an order from the Court requiring the

11   Governor to hold a special election on Proposal A.

12   On or about October 25, 2004, Plaintiff Jay Merrill, on his behalf and all others similarly

13   situated, filed a Complaint (CV 1111-04) in the Superior Court of Guam against the Guam

14   Election Commission, Gerald A. Taitano, in his official and individual capacity, *I Mina Bente*

15   *Siete Na Liheslaturan Guahan* (the 27th Guam Legislature), and Felix P. Camacho, in his official

16   capacity as the Governor of Guam. The plaintiffs sought declaratory and injunctive relief, and an

17   order from the Court requiring the Governor to hold a special election on Proposal A.

18   On October 26, 2004, the Attorney General of Guam filed a Notice of Removal of the

19   said cases to the District Court of Guam. In his removal petition, the Attorney General noted that

20   the Plaintiffs complained about alleged violations of their right to vote protected by the First and

21   Fourteenth Amendments to the Constitution and their right to vote for initiatives, a right

22   protected by the Organic Act of Guam, a federal statute. Furthermore, the Attorney General

23   alleged that as Chief Legal Officer of the Government of Guam, he represented all the named

24   defendants in the litigation. At the same time, the Attorney General lodged with this court a

25   Stipulation and Order for Preliminary Injunction in both cases.[1] The Stipulation was executed by

26

27   [1] Copies of the Stipulation and Order for Preliminary Injunction are attached as Exhibits

28   A and B to this Findings and Recommendation.

Lourdes P. Aguon-Schulte v. Guam Election Commission, et al., Civil Case No. 04-00045
Jay Merrill, etc., et al. v. Guam Election Commission, et al., Civil Case No. 04-00046
Order Denying Motions to Strike and Granting Motions to Remand

1    the Plaintiffs' counsel, Thomas L. Roberts, Esq.[2] and the Attorney General, through his assistant,

2    Robert M. Weinberg, on behalf of all the defendants.

3          On or about October 28, 2004, *I Mina Bente Siete Na Liheslaturan Guahan* (the 27th

4    Guam Legislature) filed an entry of appearance through its legislative counsel, Therese M.

5    Terlaje. At the same time, *I Mina Bente Siete Na Liheslaturan Guahan* (the 27th Guam

6    Legislature) lodged an objection to the proposed stipulation and order for preliminary injunction

7    executed between the plaintiffs and the Attorney General, on behalf of the defendant, *I Mina*

8    *Bente Siete Na Liheslaturan Guahan* (the 27th Guam Legislature). On the same day, Felix P.

9    Camacho, the Governor of Guam, filed an appearance through the law firm of Calvo & Clark

10    LLP, as attorneys for the Governor. The Governor simultaneously filed an objection to the

11    proposed stipulation and order for preliminary injunction. On or about the same time, Attorney

12    Cesar C. Cabot entered his appearance for the Guam Election Commission and Gerald Taitano,

13    in his individual and official capacities. Attorney Cabot also objected to the stipulation and order

14    for preliminary injunction on behalf of the Guam Election Commission and Director Taitano.

15          On October 29, 2004, the Attorney General filed motions[3] to strike the appearances of

16    the various counsel, made on behalf of the said named defendants. Also on the same date, the

17    Court denied the Attorney General and the Plaintiffs' request for a temporary injunction.

18          On or about November 22, 2004, *I Mina Bente Siete Na Liheslaturan Guahan* (the 27th

19    Guam Legislature) moved the Court to remand the cases[4] to Superior Court arguing that it did not

20    consent to the removal of the cases to federal court. The Governor, Executive Director Taitano,

21

22        [2] The Plaintiffs in both cases are represented by Attorney Roberts.

23

24        [3] Prior to consolidation of these two cases, the Attorney General filed a motion to strike
appearances and pleadings by private counsel in each action. See Docket No. 18 in Civil Case

25    No. 04-00045 and Docket No. 13 in Civil Case No. 04-00046. All further references to docket
numbers herein shall be to the docket in the lead case, Civil Case No. 04-00046, unless otherwise

26    specified.

27        [4] *I Mina Bente Siete Na Liheslaturan Guahan* (the 27th Guam Legislature) filed a motion
to remand in each case. See Docket No. 28 in Civil Case No. 04-00045 and Docket No. 30 in

28    Civil Case No. 04-00046.

Lourdes P. Aguon-Schulte v. Guam Election Commission, *et al.*, Civil Case No. 04-00045
Jay Merrill, etc., *et al.* v. Guam Election Commission, *et al.*, Civil Case No. 04-00046
Order Denying Motions to Strike and Granting Motions to Remand

1  and the Guam Election Commission have joined in the said motion and for the same reason –

2  that they did not consent to the removal of the Superior Court actions to this Court.[5]

3        The motions to strike and to remand are two of several motions pending before this

4  Court. The Court has decided to hear the motions to strike first since a decision reached therein

5  ultimately decides whether these cases remain with this Court or are remanded back to the

6  Superior Court of Guam.

7                              **DISCUSSION**

8  **I.    Attorney General Provision in the Organic Act of Guam**

9        The pertinent provision of the Organic Act of Guam regarding the Attorney General

10  provides:

11        (d) Attorney General

12        (1) The Attorney General of Guam shall be the Chief Legal Officer of the
      Government of Guam. At such time as the Office of the Attorney General of
13        Guam shall next become vacant, the Attorney General of Guam shall be appointed
      by the Governor of Guam with the advice and consent of the legislature, and shall
14        serve at the pleasure of the Governor of Guam.

15        (2) Instead of an appointed Attorney General, the legislature may, by law, provide
      for the election of the Attorney General of Guam by the qualified voters of Guam
16        in general elections after 1998 in which the Governor of Guam is elected. The
      term of an elected Attorney General shall be 4 years. The Attorney General may
17        be removed by the people of Guam according to the procedures specified in
      section 1422d of this title or may be removed for cause in accordance with
18        procedures established by the legislature in law. A vacancy in the office of an
      elected Attorney General shall be filled –

19
        (A) by appointment by the Governor of Guam if such vacancy occurs less than 6
20        months before a general election for the Office of Attorney General of Guam; or

21        (B) by a special election held no sooner than 3 months after such vacancy occurs
      and no later than 6 months before a general election for Attorney General of
22        Guam, and by appointment by the Governor of Guam pending a special election
      under this subparagraph.

23

24  42 U.S.C. § 1421g(d).

25

26  ─────────────────────────────

27        [5] Subsequent to the filing of its motions to remand, *I Mina Bente Siete Na Liheslaturan
      Guahan* (the 27th Guam Legislature) was dismissed as a named defendant in each case. The
28  motions to remand, however, are still pending as to the remaining Defendants who have joined in
      the motions.

Lourdes P. Aguon-Schulte v. Guam Election Commission, *et al.*, Civil Case No. 04-00045
Jay Merrill, etc., *et al.* v. Guam Election Commission, *et al.*, Civil Case No. 04-00046
Order Denying Motions to Strike and Granting Motions to Remand



1         Because the Attorney General is the Chief Legal Officer of the Government of Guam, he

2 argues that he has exclusive right to represent the Government of Guam's agencies and officials

3 in litigation in which the said agencies and officials are involved. In these actions, an entity of

4 the government of Guam, (the Guam Election Commission), and two government officials,

5 (Felix P. Camacho, the Governor of Guam and Gerald A. Taitano, the Executive Director of the

6 Guam Election Commission) are named defendants. Because the named defendants are parts and

7 parcel of the Government of Guam, the Attorney General has opined that he and only he or his

8 staff attorneys within the Office of Attorney General can legally represent them. The Attorney

9 General has stated the issue pending before this Court is constitutional in nature, *i.e.*, his

10 congressional designation as Chief Legal Officer of the Government of Guam prevents any

11 entity, agency, and official of the Government of Guam from being represented by counsel other

12 than the Attorney General. Furthermore, he asserts that the Guam Legislature has no authority to

13 enact legislation which would allow any official, agency, or entity within the Government of

14 Guam to be represented by any attorney other than the Attorney General. The Court must

15 therefore decide whether Governor Felix P. Camacho, the Guam Election Commission, and its

16 Executive Director Gerald A. Taitano may be represented by the attorneys who have made

17 entries of appearances in this litigation on behalf of the said defendants or whether the Court

18 should strike their entries of appearances as motioned by the Attorney General.

19         In 1998, Congress was petitioned by the people of Guam to amend the Organic Act to

20 allow for the election of their Attorney General. Rather than providing outright for an elected

21 Attorney General, Congress deemed it best to allow the people of Guam to make that

22 determination through local legislation. In order to provide the framework for an elected

23 Attorney General, if such local legislation was to be enacted, Congress was required to create that

24 office (Attorney General) within the framework of Guam's Organic Act. Thus, Congress added a

25 new subsection (48 U.S.C. §1421g(d)) to the Organic Act and created and designated an office of

26 Attorney General of Guam. In so doing, Congress declared the Attorney General "shall be the

27 Chief Legal Officer of the Government of Guam." The Organic Act amendment became law

28 October 27, 1998. See Pub. L. No. 105-291.

<u>Lourdes P. Aguon-Schulte v. Guam Election Commission, *et al.*</u>, Civil Case No. 04-00045
<u>Jay Merrill, etc., *et al.* v. Guam Election Commission, *et al.*</u>, Civil Case No. 04-00046
Order Denying Motions to Strike and Granting Motions to Remand



1    Because Congress did not allow outright for an elected Attorney General and there was

2  insufficient time in 1998 to pass local legislation providing for an elected Attorney General, the

3  selection of the next Attorney General (following the November 1998 gubernatorial general

4  election) would be governed by the appointment provisions of the Organic Act, *i.e.*, by

5  Section 1421g(d)(1). The next Attorney General would thus be appointed by the Governor of

6  Guam with the advice and consent of the Legislature. Furthermore, the Attorney General would

7  serve at the pleasure of the Governor.

8    On June 9, 1999, Substitute Bill No. 52 of the 25th Guam Legislature was signed into law

9  as P. L. 25-44 (the "Act"). The Act provided for the election of the Attorney General. The Act,

10  among other things, set forth the qualifications for the Attorney General, the procedure for the

11  election and removal of the Attorney General, and it further set forth the compensation of the

12  Attorney General. Thus, the enactment by the 25th Guam Legislature of the elected Attorney

13  General bill triggered the Organic Act provisions of Section 1421g(d)(2). The Attorney

14  General's election had to coincide with the election of Guam's governor and the Attorney

15  General would serve a four year term. In addition, the Attorney General could only be removed

16  under certain circumstances and a vacancy would be filled as provided under the provisions of 48

17  U.S.C. § 1421g(d)(2) of the Organic Act.

18    The Court takes note that when the Defendant  Felix P. Camacho was chosen on

19  November 5, 2002 by the People of Guam as their seventh elected Governor of Guam, the People

20  of Guam also chose Douglas B. Moylan as their first elected Attorney General.

21    Whether Guam decided to elect its Attorney General or not, Congress was clear in its

22  1998 Organic Act amendment that the Attorney General was to be the Chief Legal Officer of the

23  Government of Guam. Congress did not articulate further the duties and responsibilities of the

24  Attorney General. One could speculate that Congress may have thought it inappropriate to

25  articulate the duties and responsibilities of that office since Guam's Attorney General had been

26  appointed since the Organic Act's inception in 1950 and continued to remain appointed (48 years

27  of gubernatorial appointments). Moreover, local legislation presently provided areas of duties

28  and responsibilities for the appointed Attorney General.



Lourdes P. Aguon-Schulte v. Guam Election Commission, et al., Civil Case No. 04-00045
Jay Merrill, etc., et al. v. Guam Election Commission, et al., Civil Case No. 04-00046
Order Denying Motions to Strike and Granting Motions to Remand

1    Was Congress's then proclamation of the Attorney General as the Chief Legal Officer of

2  the Government of Guam merely an acknowledgment of all the existing powers of the Attorney

3  General, or did Congress intend to place a deeper and more substantive power into the office, an

4  authority and power which would negate executive as well as legislative intrusion into the

5  Attorney General's authority as Chief Legal Officer of the Government of Guam? Whatever the

6  case may be, it appears to this Court that in interpreting the Attorney General's status as Chief

7  Legal Officer of the Government of Guam, it must attempt to give full meaning and expression to

8  Congress's declaration that the Attorney General shall be the Chief Legal Officer of the

9  Government of Guam. How then does the Court give this declaration full expression and

10 meaning? As it relates to the representation issue before the Court, it appears reasonable and

11 logical to conclude that the Attorney General's authority as Chief Legal Officer would generally

12 be negated and diminished when an entity, agency or official within the Government of Guam is

13 represented by counsel other than the Attorney General. This Court recognizes as fundamental

14 to his authority under the Organic Act the Attorney General's ability to represent entities,

15 agencies and officers of the Government of Guam.

16    Examining the provisions of Guam's Organic Act in relation to the Office of Attorney

17 General of Guam, the Court takes note of the Attorney General's statements that only once

18 previously did Congress enact legislation for an office of the Attorney General, that being the

19 creation of the Office of the Attorney General of the United States. When Congress created the

20 Department of Justice and headed that office with the Attorney General, it reserved, however, to

21 the officers of the Department of Justice, under the direction of the Attorney General, the conduct

22 of all "litigation in which the United States, an agency, or officer thereof is a party, or is

23 interested." 28 U.S.C. § 516. Furthermore, Congress prohibited the heads of all Executive and

24 military departments, unless expressly authorized by law or exempted under section 1037 of title

25 10, from employing an attorney or counsel for the "conduct of litigation in which the United

26 States, an agency, or employee thereof is a party, or is interested, or for the securing of evidence

27 therefor, but shall refer the matter to the Department of Justice." 5 U.S.C. § 3106. Most

28 important, the Attorney General of the United States was required to "supervise all litigation to

Lourdes P. Aguon-Schulte v. Guam Election Commission, et al., Civil Case No. 04-00045
Jay Merrill, etc., et al. v. Guam Election Commission, et al., Civil Case No. 04-00046
Order Denying Motions to Strike and Granting Motions to Remand

1  which the United States, an agency, or officer thereof is a party" unless otherwise provided by

2  law. 28 U.S.C. § 519.

3      In contrast, when Congress provided for the Office of the Attorney General of Guam, it

4  did not reserve to the Attorney General supervision over the conduct of all litigation in which the

5  Government of Guam's agencies and officials were parties.  Congress simply proclaimed the

6  Attorney General the Chief Legal Officer of the Government of Guam.  In this regard, the Court

7  notes that in 1999, the succeeding Attorney General of Guam became the first Attorney General

8  to be designated Chief Legal Officer of the Government of Guam pursuant to the provisions of

9  the Organic Act.  Yet that Attorney General's ability to supervise litigation in which the

10 government's agencies or officials were involved was subject to the Governor's removal

11 authority.

12     There is little legislative history behind Congress's intent in designating the Attorney

13 General as the Chief Legal Officer of the Government of Guam.  It has been argued that the

14 current designation was patterned after the designation of another state attorney general.  A

15 review of state constitutional provisions and statutes does reflect that in many jurisdictions the

16 attorney general has received the designation as chief legal officer for the respective state.  State

17 courts, however, differ in their interpretations of the powers and duties of their attorneys general

18 especially as it relates to the representation of state agencies and officials.  Some courts have

19 taken the position that their attorney general has exclusive right to represent agencies which are

20 involved in litigation.

21     The Organic Act does not contain express language which reserves to the Attorney

22 General of Guam or the Department of Law all litigation in which the Government of Guam or

23 any of its agencies or officers are involved.  A further review of Guam's statutes reveals that

24 there is no specific legislation which requires the Attorney General to represent officials of the

25 Government of Guam when sued as defendants.  The Court, however, recognizes that the power

26 and authority of the Attorney General to represent such agencies and individuals is presumed and

27 implied as contained within his Organic Act designation as Chief Legal Officer of the

28 ///

Lourdes P. Aguon-Schulte v. Guam Election Commission, *et al.*, Civil Case No. 04-00045
Jay Merrill, etc., *et al.* v. Guam Election Commission, *et al.*, Civil Case No. 04-00046
Order Denying Motions to Strike and Granting Motions to Remand



1  Government of Guam. However, while the authority to represent government agencies and

2  officials is implied, it is not expressed.

## II. The Roles of the Attorney General

4  The Organic Act's designation of the Attorney General as Chief Legal Officer of the

5  Government of Guam appears to have adopted basic common law principles regarding the

6  Attorney General's primary role: that of representing the interests of the government the attorney

7  general represents – in other words, the state interest or the public interest. As chief legal officer

8  of the government, it is this interest that the attorney general must at all times represent. In this

9  respect, it can be said that the attorney general's real client is the state he represents or the public

10 interest he represents. It therefore necessarily embodies the principle that if the attorney general

11 finds his duties to the state and the public interest conflicting with his other duties, it is his duty

12 to represent the state and the public interest which is paramount. In this role, the attorney

13 general's responsibility has generally been regarded as being the protector and guardian of the

14 public interest, *i.e.*, the state or government interest which he advocates.

15 In his role as guardian of the public interest and representative of the state and its

16 interests, the attorney general may bring suits against officials and agencies of the government.

17 See <u>Moylan v. Camacho</u>, Superior Court of Guam Special Proceeding No. SP230-03, Decision

18 and Order (November 10, 2003). The Court notes that as advocate of the state government or the

19 public interest, the attorney general has generally not been restricted from prosecuting said

20 actions because of ethics considerations or the application of the rules of professional

21 responsibility to his office.

22 In addition to his role as representative of the state, the state's interest or the public

23 interest, the attorney general also has the dual role and responsibility of representing the

24 instrumentalities of that government, *i.e.*, the agencies and officials in matters in which the said

25 entities are involved as parties in any litigation. While the Court has noted above that the

26 Organic Act does not expressly reserve to the Attorney General the representation of the

27 Government of Guam's agencies and officials in litigation in which they are involved, it is an

28 implied grant of authority. In order to be the Chief Legal Officer of the Government of Guam,

Lourdes P. Aguon-Schulte v. Guam Election Commission, *et al.*, Civil Case No. 04-00045
Jay Merrill, etc., *et al.* v. Guam Election Commission, *et al.*, Civil Case No. 04-00046
Order Denying Motions to Strike and Granting Motions to Remand

1    the Attorney General must necessarily be the primary legal counsel for its employees and

2    agencies. It is in this vein that this matter comes before the Court. As the Chief Legal Officer,

3    the Attorney General has appeared in this action as the legal representative of the Defendants.

4    The Defendants have also made entries of appearances but through separate counsel.

5         In light of the Defendants' conflicting legal representations, the Court must decide who

6    should represent the Defendants in the actions herein. Should the Court allow the Attorney

7    General to represent the Defendants to the exclusion of the other attorneys because he

8    exclusively represents the Governments's agencies and officials as Chief Legal Counsel? The

9    Court finds that in order to resolve this question, it must determine what role and responsibility

10   the Attorney General shoulders when undertaking the representation of the Defendants. The

11   parties offer differing positions.

12        The Attorney General argues that when he assumes the representation of the Defendants,

13   they speak through his voice, regardless of whether his voice represents their position or not.

14   This is so because he is the Chief Legal Officer of the Government of Guam, and this designation

15   prevents the Defendants from having any other attorney represent them other than the Attorney

16   General. The Attorney General justifies this position based upon the need and necessity for a

17   uniform litigation policy which can only be established by the Attorney General. The Attorney

18   General cites case law in various jurisdictions establishing the Attorney General's paramount

19   right to represent government agencies and officials to the exclusion of any other attorney.

20        The Guam Election Commission and Director Taitano argue that the Attorney General's

21   motions to strike should be denied because Guam law authorizes the Commission to have its

22   own attorney. Specifically, 2 GUAM CODE ANN. § 2103(b) authorizes the election board to retain

23   an attorney to advise the board and its executive director on all legal matters pertaining to the

24   Commission. Its attorney is also mandated to "represent the Commission in litigation in which

25   the Commission is interested or involved." The Defendants further argue that the Attorney

26   General's designation as Chief Legal Officer does not prevent the Guam Legislature from

27   allowing autonomous agencies to retain independent counsel. The election board is established

28   as an "autonomous instrumentality and an independent commission of the [G]overnment of

Lourdes P. Aguon-Schulte v. Guam Election Commission, *et al.*, Civil Case No. 04-00045
Jay Merrill, etc., *et al.* v. Guam Election Commission, *et al.*, Civil Case No. 04-00046
Order Denying Motions to Strike and Granting Motions to Remand



1   Guam." 2 GUAM CODE ANN. § 2101. The Defendants cite the court to jurisdictions which have

2   allowed public agencies to employ independent counsel to protect its rights when not prohibited

3   by statute from doing so.

4          The Governor argues he has a right to appear in this litigation to object to the stipulated

5   preliminary injunction agreed to between the Attorney General and Plaintiffs. He emphasizes

6   that he is vested with the executive authority of the Government of Guam, and the Attorney

7   General cannot strip him of his executive authority and duties through the guise of a stipulation

8   for a preliminary injunction. The Governor further argues that once the Attorney General makes

9   a determination to represent him in these actions, the Attorney General must represent and serve

10  his client (the Governor) in the court litigation or, if he cannot do so, he must step aside and

11  allow the entry of independent counsel.

12         The Court has reviewed the decisions of other courts which have had to wrestle with the

13  situation similar to that presented here concerning the powers and duties of an attorney general to

14  represent state officials in civil actions. For instance, in <u>Manchin v. Browning</u>, 170 W. Va. 779,

15  296 S.E.2d 909 (1982), suit was brought against the secretary of state in his official capacity

16  challenging the state apportionment statute as unconstitutional. The matter was referred to the

17  attorney general, who was charged with defending suits against state officials. The secretary of

18  state agreed that the statute was unconstitutional, but the attorney general disagreed. The

19  attorney general attempted to take action that was contrary to the position of the secretary of

20  state. Because of the conflict in their respective positions, the secretary of state requested the

21  attorney general to appoint special counsel to represent him in the federal suit. The attorney

22  general refused, and the secretary of state sought relief before the West Virginia Supreme Court

23  of Appeals. The attorney general asserted that as the chief law officer of the state, he is "charged

24  with representing the public interest in any such litigation without interference from or the

25  approval of any other official." <u>Id.</u> at 783, 296 S.E.2d at 913. The court did not agree with the

26  attorney general's characterization of his powers and duties with respect to suits against state

27  officials. The court stated:

28  ///



Lourdes P. Aguon-Schulte v. Guam Election Commission, et al., Civil Case No. 04-00045
Jay Merrill, etc., et al. v. Guam Election Commission, et al., Civil Case No. 04-00046
Order Denying Motions to Strike and Granting Motions to Remand

1       The Attorney General ordinarily exercises complete control of litigation
2       conducted in his name. When the Attorney General appears in a proceeding on
        behalf of the state in his name, he exercises his discretion as to the course and
        conduct of the litigation. He assumes the role of a litigant and he is entitled to
3       represent what he perceives to be the interest of the state and the public at large.

4       However, the Attorney General's representation of the state as an entity and the
        discretion that accompanies such representations are limited and finite
5       propositions. In some cases, ... the Attorney General is statutorily charged as an
        administrator of the law and appears in civil proceedings on his own motion as the
6       agent and legal representative of the state and the citizens thereof. ...

7       The Attorney General performs quite a different function when he appears to
        defend a state officer [or instrumentality] ... sued in [their] official capacity. In
8       this circumstance the Attorney General does not appear as a party to the action.
        That role is filled by the state officer [or instrumentality] against whom the suit is
9       brought. Rather, the Attorney General's function is to act as legal advisor and
        agent of the ... litigant and to prosecute or defend, within the bounds of the law,
10      the decision or policy of such officer [or instrumentality] which is called into
        question by such lawsuit.
11
12      A problem arises, however, when, as here, the policy advocated by the state
        officer [or instrumentality] conflicts with what the Attorney General perceives to
        be the interest of the state. The [Attorney General] asserts that when such a
13      conflict arises, the Attorney General's duty to represent the interests of the state
        takes preeminence over the interests the state officer [or instrumentality] seek[ ] to
14      advocate. After all, he argues, any suit brought against a state officer [or
        instrumentality] is, in effect, a suit against the state and the interest of the public
15      must predominate.

16      We cannot agree with the Attorney General's characterization of his powers and
        duties with respect to suits against state officials. Ordinarily the state acts only
17      through its officers and agents. ... [I]n the performance of their statutorily
        prescribed duties, some officers [or instrumentalities] . . . are empowered to make
18      good faith policy decisions which implement the laws they administer and
        comport with the requirements of our constitutions. ... When the official
19      policies of a particular state officer or [instrumentality] are called into question in
        civil litigation, that officer or [instrumentality] is entitled to the same access to the
20      courts and zealous and adequate representation by counsel to vindicate the public
        interest, as is the private citizen to vindicate his [or her] personal rights.
21

22   Id. at 788-89, 296 S.E.2d at 918-19 (citations omitted). The Manchin court further declared:

23              Since the Attorney General is designated as the statutory counsel for state
        officers sued in their official capacities, he is required by the Code of Professional
24      Responsibility to make legal counsel available to those officers in such
        circumstances. The Attorney General is required to exercise his independent
25      professional judgment on behalf of a state officer for whom he is bound to provide
        legal counsel. In this regard his duty is to analyze and advise his clients as to the
26      permissible alternative approaches to the conduct of the litigation. The Attorney
        General should inform his client of the different legal strategies and defenses
27      available and of his professional opinion as to the practical effect and probability
        of the outcome of each alternative, so as to enable the officer to make an
28      intelligent decision with respect to how the litigation could be conducted. *He*

Lourdes P. Aguon-Schulte v. Guam Election Commission, et al., Civil Case No. 04-00045
Jay Merrill, etc., et al. v. Guam Election Commission, et al., Civil Case No. 04-00046
Order Denying Motions to Strike and Granting Motions to Remand



1    *should then stand aside and allow his client to exercise his independent judgment*
2    *on which course to pursue.* We emphasize the importance of this independent
     judgment because "advice of counsel" is not a defense to civil or criminal liability
3    for nonfeasance, misfeasance or malfeasance in office. Once the state officer
     whom the Attorney General represents has determined the course he desires the
4    litigation to take, it is the duty of the Attorney General to zealously advocate the
     public policy positions of his client in pleadings, in negotiations, and in the
5    courtroom and to avoid even the appearance of impropriety by appearing to be in
     conflict with the desires of his client.

6            In summary, the Attorney General's statutory authority to prosecute and
     defend all actions brought by or against any state officer simply provides such
7    officer with access to his legal services and does not authorize the Attorney
     General "to assert his vision of state interest." The Attorney General stands in a
8    traditional attorney-client relationship to a state officer he is required by statute to
     defend. His authority to manage and control litigation on behalf of a state officer
9    is limited to his professional discretion to organize legal arguments and to develop
     the case in the areas of practice and procedure so as to reflect and vindicate the
10   lawful public policy of the officer he represents. The Attorney General is not
     authorized in such circumstances to place himself in the position of a litigant so as
11   to represent his concept of the public interest, but he must defer to the decisions of
     the officer whom he represents concerning the merits and the conduct of the
12   litigation and advocate zealously those determinations in court.

13   Id. at 790-91, 296 S.E.2d at 920-21 (emphasis in original, internal citation omitted). The West

14   Virginia Supreme Court of Appeals further held that "[i]f, in the course of advising or counseling

15   a state officer involved in litigation, it becomes apparent that the Attorney General is unable to

16   adequately represent the officers as required by law or that such representation would create

17   professional conflicts or adversity, the Attorney General must appoint counsel to represent such

18   officer." Id. at 792, 296 S.E.2d at 922.

19          The Supreme Court of Hawaii also expressly approved and adopted the Manchin analysis.

20   See Chun v. Board of Trustees of Employees' Retirement Sys. of the State of Hawaii, 87 Haw.

21   152, 174, 952 P.2d 1215, 1237 (1998). In Chun, the retirement board refused to authorize an

22   appeal from a judgment entered in favor of the plaintiffs and against the board, but the state

23   attorney general filed an appeal on behalf of the board anyway. The Supreme Court of Hawaii

24   eventually dismissed the appeal and recognized that "the attorney general's professional

25   obligations as legal counsel to her statutory client – a public officer or instrumentality of the state

26   vested with policy-making authority – may clash with her vision of what is in the best global

27   interests of the state or the public at large." Id. at 170, 952 P.2d at 1233. When the Attorney

28   General's "paramount duty to represent the public interest cannot be discharged without conflict,



Lourdes P. Aguon-Schulte v. Guam Election Commission, *et al.*, Civil Case No. 04-00045
Jay Merrill, etc., *et al.* v. Guam Election Commission, *et al.*, Civil Case No. 04-00046
Order Denying Motions to Strike and Granting Motions to Remand

1 [he] may consent to the employment of special counsel by a state agency or officer." Id. (*quoting*

2 D'Amico v. Board of Med. Exam'rs, 112 Cal. Rptr. 786, 800, 520 P.2d 10, 20 (1974).[6] Thus, the

3 Chun court stated that "[h]aving perceived [himself] to be in a conflict of interest with the Board,

4 the Attorney General was ethically obligated to recommend the retention of other counsel to

5 represent the Board and to take such other action as, in [his] opinion, the circumstances

6 required." Id. at 176, 952 P.2d 1239.

7     In another case, Tennessee *ex rel.* Comm'r of Transp. v. Medicine Bird Black Bear White

8 Eagle, 63 S.W.3d 734, (Tenn. Ct. App. 2001), the state attorney general had been disqualified

9 from simultaneously representing the Tennessee Department of Transportation and the Tennessee

10 Commission of Indian Affairs. The Court of Appeals of Tennessee eventually reversed the trial

11 court's ruling but stated the following with regard to the attorney general's ethical obligations:

12         By statute, the General Assembly has mandated a relationship akin to the
traditional attorney-client relationship between the Attorney General and the state

13 officials and agencies the Attorney General represents. Thus, the Attorney
General owes a duty of undivided loyalty to his or her clients and must exercise

14 the utmost good faith to protect their interests. The Attorney General must (1)
preserve client confidences to the extent public clients are permitted confidences,

15 (2) exercise independent judgment on his or her client's behalf, and (3) represent
his or her clients zealously within the bounds of the law.

16

17         Unlike the conflict-of-interest rules governing the conduct of lawyers
representing private clients, the Attorney General is not necessarily prohibited

18 from representing governmental clients whose interests may be adverse to each
other. The majority rule is that the Attorney General, through his or her assistants,

19 may represent adverse state agencies in intra-governmental disputes. This rule
applies, however, only when the Attorney General is not an actual party to the

20 litigation. When the Attorney General is an actual party to the litigation,

21 ────────────────

22     [6] The Supreme Court of Hawaii also recognized that because of the Attorney General's
various statutorily mandated roles, the Hawaii Code of Professional Responsibility ("HRPC")

23 could not be mechanically applied to the Attorney General's office. Chun, 87 Haw. at 173, 952
P.2d at 1236 (*quoting* Hawaii v. Klattenhoff, 71 Haw. 598, 602, 801 P.2d 548, 550-51 (1990).

24 Nevertheless, the court stated that the Attorney General's office was never relieved of all
obligations to conform its conduct to the HRPC, which was applicable to all attorneys licensed to

25 practice in the Hawaii courts. Id. at 174, 952 P.2d at 1237. Specifically, the court discussed
HRPC Rule 1.7 dealing with conflicts of interest and the comments to said rule which explained

26 that "loyalty to a client is . . . impaired when a lawyer cannot consider, recommend, or carry out

27 an appropriate course of action because of the lawyer's other responsibilities or interests." Id.

28 (*quoting* comment [4] to HRPC Rule 1.7). This rule is similar to Rule 1.7 of the Guam Rules of
Professional Conduct.

Lourdes P. Aguon-Schulte v. Guam Election Commission, et al., Civil Case No. 04-00045
Jay Merrill, etc., et al. v. Guam Election Commission, et al., Civil Case No. 04-00046
Order Denying Motions to Strike and Granting Motions to Remand

1  independent counsel should be appointed for the state agency in order to remedy
   the ethical impediment to the Attorney General's position as a party.

2

3  Id., 63 S.W.3d at 773 (citations omitted).

4  Again, the Court points out the Attorney General's position that only he is authorized to

5  represent the named Defendants and that the named Defendants have no voice. The Attorney

6  General contends that the Defendants' voice, if any, is what he decides is the government's legal

7  position or what he determines to be the governmental or public interest. The Court has alluded

8  above to the Attorney General's authority to sue government entities, agencies and officials on

9  behalf of the public interest. Such was the case in Moylan v. Camacho. Therein, the Attorney

10 General sued the Governor to compel the appointment of members to the Guam's Procurement

11 Board. In that case, the Governor retained the same firm representing him in these cases. The

12 Attorney General never moved to strike the appearances of the Governor's independently

13 retained counsel. A motion to strike was never made because it would have been a conflict of

14 interest for the Attorney General to sue the Governor and represent him at the same time.

15 Moylan v. Camacho thus stands for the proposition that independent counsel may be retained to

16 defend a government official in a case where the Attorney General has a conflict of interest.

17 In determining whether to strike the appearances of the defendants' independent

18 attorneys, the Court looks at the nature of the appearances and the reasons for it. In these

19 consolidated cases, the Plaintiffs have sued the Defendants to obtain an injunction declaring that

20 the Guam Election Commission violated the law by failing to mail ballot pamphlets which

21 contained the complete text of the Proposal A gambling initiative which was to be voted upon

22 during the November 2004 general election. The Court notes that prior to the Defendants filing

23 answers to the Complaints, the Attorney General filed a notice of removal of both cases to this

24 Court. At the same time that the Attorney General filed the removal, it submitted a "Stipulation

25 and Order for Preliminary Injunction." The stipulation provided:

26   1. With respect to the scheduled November 2, 2004 election on the Guam Casino
      Gaming Commission Act, otherwise known as Proposal A ("the Proposal A"), the
27    Guam Election Commission and the Executive Director of the Guam Election
      Commission failed to follow the relevant Guam election statutes and duly adopted
28    Guam election rules governing the peoples' right to vote by initiative.

Lourdes P. Aguon-Schulte v. Guam Election Commission, *et al.*, Civil Case No. 04-00045
Jay Merrill, etc., *et al.* v. Guam Election Commission, *et al.*, Civil Case No. 04-00046
Order Denying Motions to Strike and Granting Motions to Remand

1   Specifically, the failure to follow Guam law constituted a violation of vested
    rights of the registered voters of Guam under the First and Fourteenth
2   Amendments to the United States Constitution, and under the Organic Act, 48
    U.S.C. §§ 1421(b) and 1422(a).

3
    2. The scheduled November 2, 2004 election on Proposal A is constitutionally,
4   organically and statutorily invalid as a result of their failure of the Guam Election
    Commission and the Executive Director of the Guam Election Commission to
5   follow all relevant Guam election statutes duly adopted election rules related to
    the peoples' right to vote by initiative.
6
    3. Pending further order of this Court, the Guam Election Commission and the
7   Executive Director of the Guam Election Commission, their agents, employees
    and assigns, and all those acting in concert with them, are preliminarily enjoined
8   from counting, tabulating or certifying the results of any votes for or against
    Proposal A, and if that is not possible without affecting the other races for elected
9   office, from printing or in any manner reporting, disclosing or certifying the
    results of any votes for or against Proposal A, whether by absentee ballot or
10  otherwise, in connection with the scheduled November 2, 2004 election of
    Proposal A. This provision does not prevent defendants from moving for the
11  disclosure of the results of the vote on Proposal A, after the November 2, 2004
    election.
12

13      The filing of the proposed stipulation caused a flurry of filings of entries of appearances

14  by the then named defendants and objections to the proposed stipulation. *I Mina Bente Siete Na*

15  *Liheslaturan Guahan* (the 27th Guam Legislature) and the Governor filed appearances through

16  independent counsel on October 28th, and the Guam Election Commission and Executive

17  Director Taitano subsequently filed their entries. The Defendants made appearances for the

18  purpose of opposing the execution of the proposed stipulation by this Court.

19      Had the Court executed and approved the proposed stipulation, this would have resulted

20  in (1) the scheduled November 2, 2004 vote on Proposal A being found to have constituted a

21  violation of the rights of the registered voters of Guam under the First and Fourteenth

22  Amendments of the United States Constitution and under the Organic Act; (2) the scheduled vote

23  on Proposal A being found by the Court to be unconstitutional, inorganic, and statutorily invalid

24  based upon the Election Commission and Executive Director Taitano's violation of Guam's laws

25  and rules relative to the people's right to vote by initiative; and (3) the Election Commission

26  would have been enjoined from tabulating the results of the votes on Proposal A on

27  November 2, 2004.

28  ///



Lourdes P. Aguon-Schulte v. Guam Election Commission, *et al.*, Civil Case No. 04-00045
Jay Merrill, etc., *et al.* v. Guam Election Commission, *et al.*, Civil Case No. 04-00046
Order Denying Motions to Strike and Granting Motions to Remand

1    When the Attorney General entered his appearance on behalf of the Defendants, he did so

2   in his role as protector and guardian of the public and government's interest and representative of

3   the Government of Guam. He has come to Court – argued and advocated the legal position of

4   the Government of Guam and *his* views as protector and guardian of the public interest. *He has*

5   *not advocated and is not advocating the legal positions of the Defendants.* The Defendants

6   maintain and advise the Court that they have complied with Guam law relating to the people's

7   right to vote by initiative. Furthermore, they believe that the Proposal A vote on

8   November 2, 2004 was constitutional, organic and statutorily valid. The Court finds the

9   positions of the Attorney General and the Defendants to be directly in conflict.

10   The Defendants entered their appearances and sought only to have their voices heard and

11   their positions defended. Their voices will not be heard and their positions will not be defended

12   if the Court grants the Attorney General's motions to strike their attorneys' appearances. As the

13   Court has pointed out, in the Moylan v. Camacho case, the Attorney General never questioned

14   the ability of the Governor to procure independent counsel. He legally could not because the

15   matter involved a clear conflict and resulted in the representation of the Governor by independent

16   counsel.

17   Having entered his appearance as attorney for the Defendants, the Attorney General has a

18   duty to zealously represent the interests of these Defendants. This entails representing and

19   zealously defending their positions. The Attorney General, however, did not enter his

20   appearance for the purpose of advocating or defending the Defendants' positions. He entered his

21   appearance on behalf of these Defendants for the purpose of advocating the position of the

22   Government – what he believes is in the public interest and should be the legal position of the

23   Government. In essence, he has advocated the position of his primary client (the public and

24   governmental interest) and not those of his secondary clients (the respective Defendants). While

25   the Court does not deny that the Attorney General can advance and advocate the public and

26   governmental position, he cannot do so in the name of and at the expense of the Defendants in

27   this case, his secondary clients. In essence, the Attorney General, in substance, has appeared as

28   ///

Lourdes P. Aguon-Schulte v. Guam Election Commission, et al., Civil Case No. 04-00045
Jay Merrill, etc., et al. v. Guam Election Commission, et al., Civil Case No. 04-00046
Order Denying Motions to Strike and Granting Motions to Remand

1  a separate party in this action even though he has not formally entered an appearance as a

2  separate party.

3       The Court thus finds and concludes that under the circumstances of these cases the

4  Attorney General has a conflict of interest. The Attorney General has chosen to exercise his dual

5  role as (1) representative of the government and protector of the public interest and (2)

6  representative and attorney for the Defendants. The Attorney General cannot represent both

7  interests because these interests directly conflict with each other. Moreover, the Attorney

8  General has confused the issue further by advocating the public and governmental interest in his

9  representation of the Defendants. This poses a direct conflict of interest. See Rule 1.7(a) of the

10  Guam Rules of Professional Conduct.[7] Under the authorities cited by the Court, once the

11  Attorney General decides to undertake the representation of an governmental agency and/or a

12  public official, he has a duty to zealously defend the positions advocated by the said agency or

13  official. If he is unable to do so, the Attorney General must allow the party to be represented by

14  independent counsel. Based upon the conflicts which are clearly apparent in these cases, the

15  Court finds there is a need for independent counsel to represent the Defendants. The Court

16  

17  _____

18     [7] This rule provides:

19  **RULE 1.7: CONFLICT OF INTEREST: CURRENT CLIENTS**

20  (a) Except as provided in paragraph (b), a lawyer shall not represent a client if the
representation involves a concurrent conflict of interest. A concurrent conflict of interest
21  exists if:

22      (1) the representation of one client will be directly adverse to another client; or

23      (2) there is a significant risk that the representation of one or more clients will
    be materially limited by the lawyer's responsibilities to another client, a former
    client or a third person or by a personal interest of the lawyer.

24  

25      Like other courts, this Court recognizes that the Guam Rules of Professional Conduct
can not be mechanically applied to the Attorney General's office. Nevertheless, the
26  unique circumstances presented here clearly present a direct conflict of interest for the
Attorney General. Additionally, the Court takes judicial notice of the fact that the
27  Attorney General's civil division is comprised of a small number of attorneys such that it
would not be feasible for an assistant attorney general to represent the Defendants in this
28  dispute.

Lourdes P. Aguon-Schulte v. Guam Election Commission, et al., Civil Case No. 04-00045
Jay Merrill, etc., et al. v. Guam Election Commission, et al., Civil Case No. 04-00046
Order Denying Motions to Strike and Granting Motions to Remand

1  comes to this conclusion based upon its finding that the Attorney General has opined and

2  concluded that the election board has violated the initiative law and that the Proposal A election

3  was unconstitutional, inorganic and statutorily invalid. The Defendants do not share these

4  positions and the Attorney General cannot defend these positions. The Court must therefore

5  deny the Attorney General's motions to strike the appearances of the attorneys for the

6  Defendants. In so doing, the Court notes that the more appropriate action would have been for

7  the Attorney General to intervene and join this action as a co-plaintiff, or the Attorney General

8  could maintain a new and separate suit against the Defendants rather than espousing the

9  government's position in the course of the representation of the Defendants.

10      The Guam Election Commission has asked the Court to decide the constitutional issue

11  which the Attorney General has advocated before the Court. The election board asks the Court to

12  find that Guam law authorizes the commission to retain its own attorneys to represent them in

13  this matter. It also asks this Court to affirm the recent opinion by the Supreme Court of Guam on

14  the same subject matter. The Court finds that it is not necessary to a decision of this case for this

15  Court to make a finding that the Election Commission has authority to retain its own attorneys to

16  represent the board in this case nor does such a finding resolve the representation issues before

17  the Court. Assuming, the constitutionality of the statute authorizing the *Board* to retain an

18  attorney to *advise* the board and its executive director on all legal matters pertaining to the

19  Commission, the statute does not authorize the board's counsel to represent *Executive Director*

20  *Taitano* in this litigation. The Court will decline ruling on that issue until it is necessary to do so

21  as federal courts generally avoid deciding constitutional issues if a case can be resolved on other

22  grounds. See Lyng v. Northwest Indian Cemetery Protective Ass'n, 485 U.S. 439, 445, 108 S.

23  Ct. 1319, 1323 (1988) ("A fundamental and longstanding principle of judicial restraint requires

24  that courts avoid reaching constitutional questions in advance of the necessity of deciding

25  them.").

26  **III.    Motions to Remand Action to the Superior Court**

27      Having decided to recommend denial of the Attorney General's motions to strike the

28  appearances of counsel representing the Defendants, the Court must therefore also recommend

<u>Lourdes P. Aguon-Schulte v. Guam Election Commission, *et al.*</u>, Civil Case No. 04-00045
<u>Jay Merrill, etc., *et al.* v. Guam Election Commission, *et al.*</u>, Civil Case No. 04-00046
Order Denying Motions to Strike and Granting Motions to Remand



1   that this matter be remanded to the Superior Court of Guam because the Defendants have not

2   consented to the removals. Unanimous consent to the removal by all defendants is a procedural

3   requirement under 28 U.S.C. § 1446 for federal question removal under Section 1441. The Ninth

4   Circuit has stated that "[o]rdinarily, under 28 U.S.C. § 1446(a), all defendants in a state action

5   must join in the petition for removal." <u>Emrich v. Touche Ross & Co.</u>, 846 F.2d 1190, 1193 n.1

6   (9th Cir. 1988). "The failure to join all proper defendants in a removal petition may otherwise

7   render the removal petition procedurally defective." <u>Id.</u> <u>See also</u> <u>Parrino v. FHP, Inc.</u>, 146 F.3d

8   699, 703 (9th cir. 1998), *cert. denied*, 119 S. Ct. 510 (1998); <u>Hewitt v. City of Stanton</u>, 789 F.2d

9   1230, 1232-33 (9th Cir. 1986). Because the Attorney General did not obtain the consent of the

10   Defendants when he removed this action, the removal of these cases from the Superior Court of

11   Guam to this Court was procedurally defective and improper.

12          The Court therefore recommends to the District Judge that the Attorney General's

13   motions to strike be denied and the Defendants' motion to remand be granted. The Court finds

14   the posture of the instant case to be the rare case. Normally, government entities and officials

15   appearing before the Courts will find representation in their respective litigations by the Attorney

16   General. This must be the case because the Attorney General is the Chief Legal Officer of the

17   Government of Guam. In exercising his powers of representation in cases similar to the one

18   before this Court, the Attorney General must decide whether he wishes to advocate the position

19   of (1) the government (the public interest) or (2) the government entity or official involved in the

20   litigation. If the Attorney General desires to advocate the public interest, he must determine

21   whether in the course of representing the public interest he will still be able to zealously advocate

22   and represent the interests and desires of the named government entity or official. If he is unable

23   to do so, or if he finds the agency or official's position to be in conflict with his position, the

24   Attorney General should allow the aggrieved agency or government official to be represented by

25   independent counsel.

26          The Court finds its recommendations and findings herein to be reasonable. Imposing a

27   duty upon the Attorney General to zealously represent the interests of the clients for which the

28   Attorney General has entered his appearance allows those clients to have a voice in the Court

Lourdes P. Aguon-Schulte v. Guam Election Commission, *et al.*, Civil Case No. 04-00045
Jay Merrill, etc., *et al.* v. Guam Election Commission, *et al.*, Civil Case No. 04-00046
Order Denying Motions to Strike and Granting Motions to Remand

1  proceeding. It is crucial in cases similar to the one before the Court that a government agency

2  which maintains that it has not violated election initiative laws, even though the Attorney

3  General has concluded that it has, have the necessary representation to argue and defend that

4  position in the litigation. A failure by this Court to allow that defendant's voice to be heard is a

5  failure by the court's system of fairness and justice.

## CONCLUSION

7  Based on the Court's findings and recommendations, IT IS RECOMMENDED that the

8  Attorney General's motions to strike the appearances of the Defendants' private counsel be

9  denied and the Defendants' motions to remand these cases back to the Superior Court of Guam

10  be granted.

11  Dated this _16th_ day of March 2005.

JOAQUIN V.E. MANISUBAN, JR.
U.S. Magistrate Judge

## NOTICE

**Failure to serve and file written objections to the Report's findings and
recommendations within ten (10) days from the date of its service shall bar
an aggrieved party from attacking such Report and Recommendations
before the assigned/designated District Judge. 28 U.S.C. § 636(b)(1).**

Notice is hereby given that this document was
entered on the docket on _3/16/05_ .
No separate notice of entry on the docket will
be issued by this Court.
Mary L. M. Moran
Clerk, District Court of Guam
By _____  3/16/05
Deputy Clerk         Date



1

2 **Douglas B. Moylan**
Attorney General of Guam
3 Robert M. Weinberg
Assistant Attorney General
4 Civil Division
Guam Judicial Center, Suite 2-200E
5 120 West O'Brien Drive
Hagåtña, Guam 96910 • USA
6 (671) 475-3324 • (671) 472-2493 (Fax)

7 Attorneys for the Government of Guam

8
## IN THE DISTRICT COURT
## FOR THE TERRITORY OF GUAM
9

10 LOURDES P. AGUON-SCHULTE,　　　)
　　　　　　　　　　　　　　　　　　)
11 　　　　　　Plaintiff,　　　　　　)　　Civil Case No. CIV04-00045
　　　　　　　　　　　　　　　　　　)
12 　　　　　　　　　　　　　　　　　　)　(removed from the Superior Court of Guam
　　　　vs.　　　　　　　　　　　　)　　　　　Civil Case No. CV-1103-04)
13 　　　　　　　　　　　　　　　　　　)
THE GUAM ELECTION COMMISSION,　　)
14 et al.　　　　　　　　　　　　　　)　　**STIPULATION AND ORDER FOR**
　　　　　　　　　　　　　　　　　　)
15 　　　　　　Defendants.　　　　　　)　　**PRELIMINARY INJUNCTION**
　　　　　　　　　　　　　　　　　　)
16 

17 　　　　COME NOW Plaintiff Lourdes P. Aguon-Schulte, through her attorneys Dooley Roberts

18 & Fowler LLP, by Thomas L. Roberts, Esq., and all of the Defendants named herein, represented

19 by their counsel, the Office of the Attorney General, Government of Guam, by Assistant

20 Attorney General Robert Weinberg, and hereby stipulate as follows:

21 　　　　1.　　　　With respect to the scheduled November 2, 2004 election on the Guam Casino

22 Gaming Control Commission Act, otherwise known as Proposal A ("Proposal A"), the Guam

23 Election Commission and the Executive Director of the Guam Election Commission failed to

24 

25 follow the relevant Guam election statutes and duly adopted Guam election rules governing the

Page 1

EXHIBIT A

peoples' right to vote by initiative. Specifically, the failure to follow Guam law constituted a violation of vested rights of the registered voters of Guam under the First and Fourteenth Amendments to the United States Constitution, and under the Organic Act, 48 U.S.C. §§ 1421(b) and 1422(a).

2. The scheduled November 2, 2004 election on Proposal A is constitutionally, organically and statutorily invalid as a result of the failure of the Guam Election Commission and the Executive Director of the Guam Election Commission to follow all relevant Guam election statutes and duly adopted election rules related to the peoples' right to vote by initiative.

3. Pending further order of this Court, the Guam Election Commission and the Executive Director of the Guam Election Commission, their agents, employees and assigns, and all those acting in concert with them, are preliminarily enjoined from counting, tabulating or certifying the votes for or against Proposal A, and if that is not possible without affecting the other races for elected office, from printing or in any manner reporting, disclosing or certifying the results of any votes for or against Proposal A, whether by absentee ballot or otherwise, in connection with the scheduled November 2, 2004 election on Proposal A. This provision does not prevent defendants from moving for the disclosure of the results of the vote on Proposal A, after the November 2, 2004 election.

4. All further Proceedings in this case shall be held on the ____ day of

_____, 2004 at the hour of _____ ____.m. to address Plaintiff's

remaining claims for relief as well as any and all other issues the parties may wish to raise.

DOOLEY ROBERTS & FOWLER LLP

Dated: October 27, 2004

By: _____

**THOMAS L. ROBERTS**
Attorneys for Plaintiff Lourdes P. Aguon-Schulte

//

//

**DOUGLAS B. MOYLAN**
Attorney General of Guam

Dated: October 27, 2004

By: _____

**ROBERT M. WEINBERG**
Attorneys for Defendants the Guam Election
Commission, Gerald A. Taitano, in his capacity as
the Executive Director of the Guam Election
Commission, I Mina' Bente Siete Na Liheslaturan
Guahan (The 27th Guam Legislature); Felix P.
Camacho, In His Official Capacity As The Governor
Of Guam

SO ORDERED: this _____ day of _____, 2004.

**RECEIVED**

OCT 27 2004

DISTRICT COURT OF GUAM
HAGATNA, GUAM

**HONORABLE ALEX R. MUNSON**
Judge, District Court of Guam

| | |
|---|---|
| Courtesy copies: | Cesar Cabot, Esq. |
| | For Guam Election Commission |
| | Gerald Taitano |
| | Shannon Taitano, Esq. |
| | For Governor of Guam |
| | Therese Terlaje', Esq. |
| | Legislature of Guam |
| | Joaquin C. Arriola, Jr., Esq. |
| | For proposed Intervenor, Lina'La'Sin Casino |



Douglas B. Moylan
Attorney General of Guam
Robert M. Weinberg
Assistant Attorney General
Civil Division
Guam Judicial Center, Suite 2-200E
120 West O'Brien Drive
Hagåtña, Guam 96910 • USA
(671) 475-3324 • (671) 472-2493 (Fax)

Attorneys for the Government of Guam

# IN THE DISTRICT COURT
# FOR THE TERRITORY OF GUAM

| | |
|---|---|
| JAY MERRILL, etc., et al., ) | Civil Case No. CIV04-00046 |
| Plaintiff, ) | |
| ) | (removed from the Superior Court of Guam |
| vs. ) | Civil Case No. CV-1111-04) |
| ) | |
| THE GUAM ELECTION COMMISSION, ) | **STIPULATION AND ORDER FOR** |
| et al. ) | |
| ) | **PRELIMINARY INJUNCTION** |
| Defendants. ) | |

COME NOW Plaintiff Lourdes P. Aguon-Schulte, through her attorneys Dooley Roberts & Fowler LLP, by Thomas L. Roberts, Esq., and all of the Defendants named herein, represented by their counsel, the Office of the Attorney General, Government of Guam, by Assistant Attorney General Robert Weinberg, and hereby stipulate as follows:

1.     With respect to the scheduled November 2, 2004 election on the Guam Casino Gaming Control Commission Act, otherwise known as Proposal A ("Proposal A"), the Guam Election Commission and the Executive Director of the Guam Election Commission failed to follow the relevant Guam election statutes and duly adopted Guam election rules governing the

peoples' right to vote by initiative. Specifically, the failure to follow Guam law constituted a violation of vested rights of the registered voters of Guam under the First and Fourteenth Amendments to the United States Constitution, and under the Organic Act, 48 U.S.C. §§ 1421(b) and 1422(a).

2.    The scheduled November 2, 2004 election on Proposal A is constitutionally, organically and statutorily invalid as a result of the failure of the Guam Election Commission and the Executive Director of the Guam Election Commission to follow all relevant Guam election statutes and duly adopted election rules related to the peoples' right to vote by initiative.

3.    Pending further order of this Court, the Guam Election Commission and the Executive Director of the Guam Election Commission, their agents, employees and assigns, and all those acting in concert with them, are preliminarily enjoined from counting, tabulating or certifying the votes for or against Proposal A, and if that is not possible without affecting the other races for elected office, from printing or in any manner reporting, disclosing or certifying the results of any votes for or against Proposal A, whether by absentee ballot or otherwise, in connection with the scheduled November 2, 2004 election on Proposal A. This provision does not prevent defendants from moving for the disclosure of the results of the vote on Proposal A, after the November 2, 2004 election.

4. All further Proceedings in this case shall be held on the ____ day of
_____, 2004 at the hour of _____ ___.m. to address Plaintiff's
remaining claims for relief as well as any and all other issues the parties may wish to raise.

DOOLEY ROBERTS & FOWLER LLP

Dated: October 27, 2004                    By: _____

**THOMAS L. ROBERTS**
Attorneys for Plaintiff Lourdes P. Aguon-Schulte

//

//

DOUGLAS B. MOYLAN
Attorney General of Guam

Dated: October 27, 2004                    By: _____

ROBERT M. WEINBERG
Attorneys for Defendants the Guam Election
Commission, Gerald A. Taitano, in his capacity as
the Executive Director of the Guam Election
Commission, I Mina' Bente Siete Na Liheslaturan
Guahan (The 27th Guam Legislature); Felix P.
Camacho, In His Official Capacity As The Governor
Of Guam

SO ORDERED: this _____ day of _____, 2004.

RECEIVED

OCT 27 2004

DISTRICT COURT OF GUAM
HAGATNA, GUAM

_____
**HONORABLE ALEX R. MUNSON**
Judge, District Court of Guam

1

Courtesy copies:     Cesar Cabot, Esq.
2                       For Guam Election Commission
                         Gerald Taitano
3                    Shannon Taitano, Esq.
                         For Governor of Guam
4                    Therese Terlaje', Esq.
5                         Legislature of Guam
                    Joaquin C. Arriola, Jr., Esq.
6                       For proposed Intervenor, Lina'La'Sin Casino

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT 9

FILED

DISTRICT COURT OF GUAM

MAY 10 2005

MARY L.M. MORAN
CLERK OF COURT

DISTRICT COURT OF GUAM

TERRITORY OF GUAM

| | |
|---|---|
| LOURDES P. AGUON-SCHULTE,<br><br>       Plaintiff,<br><br>    vs.<br><br>THE GUAM ELECTION COMMISSION,<br>GERALD A. TAITANO, in his official<br>capacity as the Executive Director of the<br>Guam Election Commission, I MINA'<br>BENTE SIETE NA LIHESLATURAN<br>GUAHAN (The 27th Guam Legislature) and<br>FELIX P. CAMACHO, in his official<br>capacity as the Governor of Guam,<br><br>       Defendants. | CIVIL CASE NO. 04-00045<br><br>(as removed from the Superior Court of Guam<br>Civil Case No. CV-1103-04) |
| JAY MERRILL, on his own behalf and on<br>behalf of all other similarly situated voters<br>desirous of casting a vote in favor of<br>Proposal A at a fair and legal election,<br><br>       Plaintiffs,<br><br>    vs.<br><br>THE GUAM ELECTION COMMISSION,<br>GERALD A. TAITANO, in his official<br>capacity as the Executive Director of the<br>Guam Election Commission, I MINA'<br>BENTE SIETE NA LIHESLATURAN<br>GUAHAN (The 27th Guam Legislature) and<br>FELIX P. CAMACHO, in his official<br>capacity as the Governor of Guam,<br><br>       Defendants. | CIVIL CASE NO. 04-00046<br><br>(as removed from the Superior Court of Guam<br>Civil Case No. CV-1111-04)<br><br><br>**ORDER** |

This matter comes before the Court on Defendants' Motion to Remand and the Attorney

General's Motion to Strike Appearance by and Pleadings of Private Counsel. These motions were referred to the United States Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and General Order No. 04-00016 on December 12, 2004.[1] Docket No. 63. The Magistrate Judge reviewed the submissions and held oral argument on February 18, 2005. Thereafter the Magistrate Judge filed his Findings and Recommendations on March 15, 2005. Docket No. 102. On March 29, 2005 the Attorney General's filed objections to the Findings and Recommendations. Docket No. 104.

The Attorney General states that the Magistrate Judge's recommendation and findings in effect eviscerate the authority of the Attorney General with "respect to litigation decisions of agencies and instrumentalities of the Government of Guam." *See* Docket No. 104, p.2. This Court does not agree. The Magistrate Judge's analysis does not eviscerate the Attorney General's authority as much as he seeks to define the balancing act required of the Attorney General in representing the needs of public with those of elected officials and/or governmental agencies. There are those instances, when the Attorney General may need to step aside and let independent counsel represent elected officials and/or public agencies when the Attorney General is also seeking to represent and protect the public's interests.

Under 28 U.S.C. § 636(b)(1)(C), the Court may accept, reject or modify in whole or in part the Magistrate Judge's recommendation, but must make a *de novo* determination as to any portion of the recommendation has been filed. Having thoroughly considered the entire case and relevant law, the Court hereby adopts the Magistrate's Findings and Recommendations in full. Accordingly, the defendants' Motions to Remand is GRANTED and the Attorney General's Motion to Strike the Appearances of the Private is DENIED. In addition all remaining motions

///
///
///
///

___

[1] At the time of the hearing there were several motions pending before the Magistrate Judge. He decided to consider and rule on the two motions discussed herein first since a decision on those matters could obviate the need to consider the remaining motions.

1  pending are considered moot and will not be further considered by this Court.

2      SO ORDERED this _10_ day of May, 2005.

3

4                                    _llusil O. Carter_

5                          District Judge David O. Carter [*]
                          United States District Judge

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21    Notice is hereby given that this document was
22    entered on the docket on MAY 1 0 2005      .
       No separate notice of entry on the docket will
23    be issued by this Court.
              Mary L. M. Moran
24         Clerk, District Court of Guam

25    By: _____            MAY 1 0 2005
          Deputy Clerk          Date

26

27

28  _____

    [*]The Honorable David O. Carter, United States District Judge for the Central District of California, sitting
by designation.

# EXHIBIT 10

# TERM SHEET

WHEREAS Petitioner Julie B. Santos brought this action seeking to recover refunds of the Earned Income Tax Credit (the "EIC") under the Guam Territorial Income Tax and Guam territorial law in Federal District Court on behalf of herself and those who are similarly situated ("EIC Class"); and

WHEREAS Petitioner named as Respondents Governor of Guam Felix P. Camacho, Director of Administration Lourdes M. Perez, Director of Revenue & Taxation Artemio R. Ilagan and the Government of Guam; and

WHEREAS 48 U.S. C. § 1421i(c) provides that "[t]he administration and enforcement of the Guam Territorial Income Tax shall be performed by or under the supervision of the Governor"; and

WHEREAS 48 U.S. C. § 1421i(d)(2) provides that the Governor of Guam or his delegate has "the same administrative and enforcement powers and remedies with regard to the Guam Territorial Income Tax as the Secretary of the Treasury, and other United States officials of the executive branch, have with respect to the United States income tax; and

WHEREAS 48 U.S.C. § 1421g(d)(1) provides that the Attorney General is the "Chief Legal Officer of the Government of Guam"; and

WHEREAS the Governor has delegated the administration and processing of tax claims under the Guam Territorial Income Tax to the Department of Revenue & Taxation; and

WHEREAS the Governor has delegated the issuance of tax refund checks under the Guam Territorial Income Tax to the Department of Administration; and

WHEREAS a previous settlement agreement was preliminarily approved by the Court on June 17, 2004; and

WHEREAS on July 16, 2004 the Court appointed Petitioner's counsel, Mike Phillips, Esq., Interim Class Counsel; and

WHEREAS after Petitioner moved to adopt an administration plan, the Governor objected and moved to vacate the Court's preliminary approval of the previous settlement, and the parties subsequently disagreed as to the legality of the previous settlement agreement; and

WHEREAS on March 10, 2005 the Parties agreed to take the motions to enter the administration plan and to vacate the preliminary approval of the previous settlement off-calendar and to enter mediation before JAMS Mediator Catherine Yanni, Esq.; and

WHEREAS, the parties have agreed to enter into a new settlement that will pay the EIC Class a total of $90 million for their EIC claims in tax years 1995, 1996, and 1998-2004, as stated herein; and

NOW THEREFORE the parties hereby agree as follows:

1)      The Government will pay the EIC Class not more than $15 million for all EIC claims for tax years 1995, 1996, 1999, and 2000 (combined). This amount shall be divided proportionally among each claimant found eligible by DRT based on the total combined value of their claim or claims for tax years 1995, 1996, 1999, and 2000. In the event that the EIC Class collectively files less valid claims for tax years 1995, 1996, 1999, and 2000 (combined) than the total amount available to pay such claims under this settlement, the remainder shall be utilized to fund general income tax refunds, which shall include claims for EIC, for tax year 2005 and future tax years.

2) The Government will pay the EIC Class not more than $15 million for EIC claims for tax year 1998, based upon the claims already filed for tax year 1998. This amount shall be divided proportionally among each claimant found eligible by DRT based on the value of their claim. In the event that the EIC Class collectively has filed less valid claims for tax year 1998 than the total amount available to pay such claims under this settlement, the remainder shall be utilized to fund claims for tax year 2001 as stated below.

3) The Government will pay the EIC Class not more than $15 million for EIC claims for tax year 2001, together with any remainder from the payment of claims for tax year 1998. This amount shall be divided proportionally among each claimant found eligible by DRT based on the value of their claim. In the event that the EIC Class collectively file less valid claims for tax year 2001 than the total amount available to pay such claims under this settlement, the remainder shall be utilized to fund claims for tax year 2002 as stated below.

4) The Government will pay the EIC Class not more than $15 million for EIC claims for tax year 2002, together with any remainder from the payment of claims for tax year 2001. This amount shall be divided proportionally among each claimant found eligible by DRT based on the value of their claim. In the event that the EIC Class collectively file less valid claims for tax year 2002 than the total amount available to pay such claims under this settlement, the remainder shall be utilized to fund claims for tax year 2003 as stated below.

5) The Government will pay the EIC Class not more than $15 million for EIC claims for tax year 2003, together with any remainder from the payment of claims for tax year 2002. This amount shall be divided proportionally among each claimant found eligible by DRT based on the value of their claim. In the event that the EIC Class collectively file less valid claims for tax year 2003 than the total amount available to pay such claims under this settlement,

the remainder shall be utilized to fund claims for tax year 2004 as stated below.

6)     The Government will pay the EIC Class not more than $15 million for EIC claims for tax year 2004, together with any remainder from the payment of claims for tax year 2003. This amount shall be divided proportionally among each claimant found eligible by DRT based on the value of their claim. In the event that the EIC Class collectively file less valid claims for tax year 2004 than the total amount available to pay such claims under this settlement, the remainder shall be utilized to fund general income tax refunds, which shall include claims for EIC, for tax year 2005 and future tax years.

7)     To make the payments as quickly as possible, the Government shall devote a minimum of 15% of each amount set aside or earmarked for income tax refunds and placed into the Income Tax Refund Reserve Fund (Chapter 50 of Title 11 of the G.C.A.) to pay the $90 million to the EIC Class for EIC claims pursuant to this term sheet. Such reservations shall commence immediately. The deposit and maintenance of the settlement amount within the Income Tax Refund Reserve Fund is intended to avoid the Government's concern regarding any potential violation of the Illegal Expenditures Act (5 G.C.A. §22401), and is not intended nor shall it be interpreted for any other purpose. The Governor may, at his discretion, utilize other funding sources permitted by law. At the Governor's request, class counsel shall cooperate in good faith with any efforts by the Governor to obtain additional funding or otherwise speed payment. The parties acknowledge and understand that it is anticipated that the amounts that can be reserved under the Reserve Fund at present and in the coming months (possibly using a higher percentage of reservation and/or other sources identified by the Governor) will be approximately $15 million, thus permitting the payment of EIC for tax years 1995, 1996, 1999 and 2000 to occur at the same time the settlement receives final approval. In the event that, by the time the

settlement is subject to a fairness hearing, less than $15 million has been reserved, Petitioner shall have the right to terminate the settlement agreement, which shall be void and of no effect, and the previous settlement shall be returned to effect as though the new settlement had never been preliminarily approved, subject to all previously pending motions.

8) Years will be paid sequentially, with all tax year 1995, 1996, 1999, and 2000 claims paid together, and then the next priority assigned to tax year 1998, then tax year 2001, then tax year 2002, then tax year 2003, then tax year 2004. For EIC claims for tax years 1995, 1996, 1999 and 2000, once all claims have been submitted and the amount due to each EIC Class member has been calculated, claims shall be paid in the order filed by the members of the EIC Class. Within each tax year for tax years 1998, 2001, 2002, 2003 and 2004, once all claims have been submitted and the amount due to each EIC Class member has been calculated, claims shall be paid in the order filed by the members of the EIC Class. Notwithstanding the foregoing, DRT retains the right to make individual exceptions to the priority of payments based on standard DRT policies and procedures governing the distribution of general income tax refunds.

9) Claims filed under the Earned Income Program in 1998, as well as claims filed under Executive Order 2005-001 in 2005, shall be treated as EIC claims under the settlement agreement; provided, however, that such claimants shall have the opportunity to opt-out of the settlement. In addition, those claimants who have filed incomplete or defective claims under Executive Order 2005-001 shall have the option to file otherwise timely claims under the procedures to be established in the settlement agreement. The claims period for additional claims is to be determined in final agreement, except that no new claims for 1998 shall be accepted.

Case 1:04-cv-00006    Document 248-12    Filed 10/03/2005    Page 18 of 23

10) As part of this settlement, EIC claims in 2005 and all future years will be paid in the same manner as general income tax refund claims under the applicable federal and territorial laws.

11) Subject to Paragraph 15, the EIC Class shall grant a general release to the Government and its officers and agencies for all 1995-1996 and 1998-2004 tax year EIC claims.

12) EIC Class Counsel's attorneys' fees under this settlement, if any, are to be determined by the Court following a motion under Federal Rules of Civil Procedure 23(h).

13) Upon preliminary approval by the Court of the new settlement agreement, and subject to paragraph 7 of this term sheet, the previous settlement agreement shall be mutually rescinded and of no further force or effect, and the stipulated Order granting preliminary approval to that previous settlement shall be vacated.

14) Petitioner agrees to file an Amended Petition in this Action to reflect changes to the definition of the EIC Class consistent with the terms of this term sheet, the final settlement, and necessarily related issues.

15) The administration of EIC claims under this settlement is to be handled by DRT, DOA, and any other appropriate Government agencies pursuant to the normal procedures for evaluating claims for tax refunds and issuing tax refund checks. All claims under this settlement shall be subject to normal evaluation and deduction procedures, including offsets, audits, and applicable penalties (including those for fraud). Because the claims under this settlement are to be administered as tax refund claims as stated above, the Government shall use the funding for the processing of tax returns and refunds already available and shall not be obligated to obtain separate or additional funding for the administration of claims.

16) Class notice, its dissemination, and other procedural issues will be addressed in the final settlement.

17) No interest shall apply to EIC claims under this settlement agreement.

18) No payments of claims shall occur prior to final District Court approval of settlement.

19) All parties expressly agree and warrant they will cooperate in good faith in the execution and implementation of the settlement.

20) Subject to paragraph 19, this term sheet is expressly contingent upon: (1) memorialization in a final settlement agreement (which shall be drafted consistent with the terms of this Term Sheet), (2) class certification, (3) fairness hearing, and (4) final Court approval. Failure to satisfy any of these conditions shall render settlement void and of no effect.

21) There shall be an opportunity for all class members to opt-out of this settlement pursuant to FRCP 23; provided, however, that the parties shall further discuss the manner in which to minimize the number of opt-outs and to preserve the economic benefit of this Agreement to the Government.

22) Any person opting-out of this settlement must opt-out of the settlement in its entirety, and not just as to particular claim(s) for particular tax year(s).

23) This term sheet remains confidential pursuant to the mediation confidentiality agreement unless expressly waived in writing by the parties.

24) The settlement shall contain non-admission of liability and severability clauses except as contrary to the settlement and such other clauses necessary to fully effectuate parties' intent.

25) The parties recognize and acknowledge the provisions of the Organic Act applicable to the Governor and Attorney General as stated in the recitals to this Term Sheet.

26) The Attorney General and the Governor expressly agree, with respect to this litigation and all future suits for recovery of income tax refunds or credits, that they will endeavor to cooperate with one another in good faith to the best of their abilities with respect to resolution of any legal claims brought or asserted against the Government of Guam and the Governor of Guam.

27) Nothing contained herein shall be construed in any manner to prevent the Office of the Governor or his delegates from consulting with the Office of the Attorney General with respect to this or any other matter involving the Guam Territorial Income Tax laws. Nothing contained herein shall be construed in any manner to prevent the Attorney General from consulting with the Office of the Governor or his delegates with respect to this or any other matter involving the Guam Territorial Income Tax laws. The Governor and Attorney General expressly agree to cooperate to the fullest extent possible with respect to legal issues arising under the Guam Territorial Income Tax laws.

28) The parties recognize that at times their views may differ with respect to the position of the Government of Guam and that the Governor should be authorized to seek separate counsel and advice with respect to independent duties and responsibilities imposed upon him under the Organic Act of Guam and other laws. The Governor and Attorney General expressly recognize, acknowledge and agree it is in the best interest of the Government of Guam that they endeavor to cooperate to the full extent possible in establishing a coherent legal policy with respect to all matters involving the administration of the government and enforcement of Guam Territorial Income Tax laws.

29)	The Governor and Attorney General shall request that the Court stay any decision on the Governor's motion to disqualify the Attorney General and the Attorney General's motion to amend the March 2, 2005 Order to certify the issues presented therein for interlocutory appeal.  Upon preliminary approval of the final settlement, the Governor and the Attorney General shall withdrawal these motions.  Nothing contained herein shall be construed as an admission of law or fact, in favor or against, the merits of the Court's February 9, 2005 or March 2, 2005 Orders.

30)	The parties agree to prepare a joint statement concerning the settlement to be provided to the public at an appropriate time.

**SO AGREED:**


_____
**FELIX P. CAMACHO**
In His Capacity as Governor of Guam

Dated: __5/24/05__

_____
**DOUGLAS B. MOYLAN**
In His Capacity as Attorney General of Guam

Dated: _____


_____
**JULIE B. SANTOS**
Individually, and on Behalf of Those
Similarly Situated

Dated: _5-26-05_

_____
**ARTEMIO B. ILAGAN**
In His Capacity as the Director of the
Department of Revenue & Taxation

Dated: __5/24/05__

_____
**LOURDES M. PÉREZ**
In Her Capacity as Director of the
Department of Administration

Dated: __5/24/05__

_____
**CARLOS BORDALLO**
In His Capacity as Director of the Bureau of
Budget and Management Research

Dated: __5/24/05__

**APPROVED AS TO LEGALITY AND FORM:**

CALVO & CLARK, LLP
Attorneys for Respondent Felix P. Camacho,
Governor of Guam

By: _____
       **RODNEY J. JACOB**

Dated: _5 / 2 4 / 05_____

OFFICE OF THE ATTORNEY GENERAL
Attorneys for Respondent Government of Guam

By: _____
       **STEPHEN A. COHEN**
       Assistant Attorney General

Dated: _____

MANTANONA LAW OFFICE
Attorneys for Respondents Lourdes M.
Perez and Artemio R. Ilagan

By: _____
       **RAWLEN M.T. MANTANONA**

Dated: _5|25|05_____

LAW OFFICES OF PHILLIPS & BORDALLO
Attorneys for Julie B. Santos and Interim Class
Counsel

By: _____
       **MICHAEL F. PHILLIPS**

Dated: _5/25/05_____

Confidential Mediation Term Sheet    Page 10
{G0002454.DOC;1}
Case 1:04-cv-00006    Document 248-12    Filed 10/03/2005    Page 23 of 23

# EXHIBIT 11

# SETTLEMENT AGREEMENT

**WHEREAS** Petitioner Julie B. Santos, on her own behalf and on behalf of an alleged class of similarly situated persons, filed a petition in the case of *Santos v. Camacho, et al.*, District Court of Guam CV04-00006 (the "Petition"), against Respondents Governor of Guam Felix P. Camacho (the "Governor"), Director of Administration Lourdes M. Perez, Director of Revenue & Taxation Artemio B. Ilagan, and the Government of Guam (the "Government") (collectively "Respondents"); and

**WHEREAS** the Petition concerned the alleged failure of the Government and Respondents to accept or pay claims for the earned income credit ("EIC") under federal and territorial law and sought both tax refunds and mandamus relief, and, as amended pursuant to this Settlement Agreement, will include tax years 1995-1996 and 1998-2004; and

**WHEREAS** in their opposition to the Petition, Respondents denied liability for the EIC and asserted numerous defenses including failure to exhaust and the statute of limitations; and

**WHEREAS** 48 U.S.C. § 1421i(c) provides that "[t]he administration and enforcement of the Guam Territorial Income Tax shall be performed by or under the supervision of the Governor," and 48 U.S.C. § 1421i(d)(2) provides that the Governor of Guam or his delegate has "the same administrative and enforcement powers and remedies with regard to the Guam Territorial Income Tax as the Secretary of the Treasury, and other United States officials of the executive branch, have with respect to the United States income tax; and

WHEREAS the Governor has delegated the administration and processing of tax claims under the Guam Territorial Income Tax to the Department of Revenue & Taxation ("DRT"); and

WHEREAS the Governor has delegated the issuance of tax refund checks under the Guam Territorial Income Tax to the Department of Administration ("DOA"); and

WHEREAS on or about June 14, 2004 a previous settlement agreement (the "June 14, 2004 Settlement") was entered in this matter, which was granted preliminary approval by the District Court of Guam (the "Court") on June 17, 2004; and

WHEREAS on July 16, 2004 the Court appointed Petitioner's counsel, Mike Phillips, Esq., Interim Class Counsel; and

WHEREAS after Petitioner moved to adopt an administration plan for the June 14, 2004 Settlement, the Governor objected and moved to vacate the Court's preliminary approval of the June 14, 2004 Settlement and raised challenges to the agreement including whether its payment terms complied with the Illegal Expenditures Act under Guam law; and

WHEREAS, on January 12, 2005, the Governor issued Executive Order 2005-001 (the "Executive Order") to permit the filing of EIC claims, which created a means of determining the nature of any potential class of EIC claimants; and

WHEREAS under the Executive Order, over 15,000 EIC claims have already been filed with DRT, thus providing substantial information regarding the potential class; and

WHEREAS, until all EIC claims have been filed, processed, and audited, it is not possible to determine the total value of such claims; and

WHEREAS it is the intent of Respondents to resolve all or substantially all EIC claims for tax years 1995-1996 and 1998-2004; and

WHEREAS on March 10, 2005 the Parties agreed to take the motions to enter the administration plan and to vacate the preliminary approval of the previous settlement off-calendar and to enter mediation before JAMS Mediator Catherine Yanni, Esq.; and

WHEREAS the Parties, through their counsels, engaged in extensive face-to-face negotiations with the assistance and active participation of the Mediator, from March 31, 2005 through April 2, 2005; and

WHEREAS the Parties continued to engage in subsequent negotiations with the assistance of the Mediator until they agreed to a term sheet; and

WHEREAS the Parties then engaged in subsequent negotiations in connection with the drafting of this final Agreement and conducted inquiries into what notice to the class was reasonably practicable; and

WHEREAS, the Parties have now completed their negotiations and believe they have reached a settlement that will protect the interests of the Government of Guam and fairly resolve the EIC claims of the class identified in the amended Petition.

NOW THEREFORE the Parties hereto hereby agree as follows:

I.    PARTIES TO THIS AGREEMENT

   a. IDENTITY OF PARTIES.  The parties to this Agreement are Petitioner and the EIC Class (defined below), on the one hand, and Respondents, on the other hand (collectively, the "Parties").

**b. DEFINITION OF EIC CLASS.** In this Agreement, the "EIC Class" is defined as including all persons who do not elect to request exclusion from the class under the procedures described below and: (1) were subject to the Guam Territorial Income Tax ("GTIT") established in 48 U.S.C. § 1421i for tax years 1995-1996 and/or 1999-2004 and would have been eligible to file (whether or not they actually filed) for the EIC established in 26 U.S.C. § 32 (as it applied in each respective tax year) if that program were applied in the Territory of Guam; and/or (2) were eligible to receive an EIC credit under certain Guam territorial laws for tax years 1995-1996 and/or 1999-2004 that mirrored the federal EIC law (26 U.S.C. § 32), including the Guam Earned Income Program (Chapter 42 of 11 G.C.A.); and/or (3) actually filed a claim for the EIC with DRT for tax year 1998 under the GTIT or Guam Earned Income Program (Chapter 42 of 11 G.C.A.) on or before April 15, 2002.

## II.  SCHEDULE OF EVENTS

### a. INITIAL SUBMISSIONS, PRELIMINARY APPROVAL, & ISSUANCE OF CLASS NOTICE

i.      Within three days of executing this Agreement, the Parties shall stipulate to the filing of an amended complaint by Petitioner in the form attached hereto as Exhibit "A."

ii.      Within three days of executing this Agreement, the Parties shall file a joint motion in the form attached hereto as Exhibit "B" for preliminary approval of this Agreement, and Petitioner shall file a motion in the form attached hereto as Exhibit "C" for a conditional ruling that this action may proceed as a class action as to the EIC Class, which Respondents shall support. The parties shall further jointly request an

order permitting them to proceed with class notice in the form attached hereto as Exhibit "D" and consistent with the procedures set forth in Section III of this Agreement. As part of this request, the Parties shall request that the Court set the dates for all further events required by this Settlement Agreement consistent with the provisions of this Agreement so that the Parties may include these dates in the notice to the EIC Class.

iii.     So that the class may be advised of the pending motion in the class notice discussed below, Interim Class Counsel or counsel for the EIC Class must file any motion for attorneys' fees and costs within three days of the execution of this Agreement. Attorneys' fees or costs awarded to the counsel for the EIC Class, if any, are to be determined by the Court following such a motion which shall be made under Federal Rules of Civil Procedure 23(h).

iv.     Upon preliminary approval by the Court of this Agreement, the conditional ruling that this action may proceed as a class action, and the order permitting the issuance of the class notice, the previous June 14, 2004 Settlement Agreement shall be mutually rescinded and of no further force or effect, and the stipulated Order dated June 17, 2004 granting preliminary approval to that previous settlement shall be vacated.

b. OPPORTUNITY TO OPT-OUT

i.     Any person wishing to request exclusion from the class and this Settlement shall be required to do so in a signed, written statement that may be mailed by first class mail to the Clerk of Court or filed with the Clerk of Court. Any person who falls within the definition of the EIC Class shall be deemed an EIC Class member unless their written statement either: (1) is filed with the Clerk of Court no later than sixty days (or if the sixtieth day falls on a holidays or weekend, the next day during which the

Office of the Clerk of Court is open) after completion of the Class Notice Period defined in Section III below; or (2) is sent by first class mail to the Clerk of Court postmarked no later than sixty days (or if the sixtieth day falls on a holidays or weekend, the next day during which the Office of the Clerk of Court is open) after completion of the Class Notice Period defined in Section III below. This final date for requesting exclusion shall be known as the "Opt-Out Date."

ii.     Any person requesting exclusion from the class and the Settlement Agreement must request exclusion from the class and the settlement in their entirety, and not just as to particular claim(s) for particular tax year(s).

c. **FINAL CLASS CERTIFICATION, FAIRNESS HEARING, ATTORNEYS' FEES, & FINAL COURT APPROVAL**

i.     The Parties shall request a combined hearing to be held sixty days after the Opt-Out Date in which the Court shall: (1) determine whether to grant final class certification; (2) review comments or objections regarding this Settlement Agreement, and consider its fairness, reasonableness, and adequacy under FRCP Rule 23; (3) determine whether to grant Interim Class Counsel or counsel for the EIC Class' motion for attorneys' fees and costs, if any; and (4) decide whether to grant final Court approval of this Settlement Agreement and enter a final judgment (the "Fairness Hearing"). Any motion to intervene must be filed no later than seven days after the Opt-Out Date.

ii.     At least twenty-eight (28) days prior to the date the Court sets for the Fairness Hearing, the Parties shall file a joint motion for an Order of Approval and Final Judgment, and a proposed form of judgment. The Parties shall cooperate in good faith and with best efforts in the joint drafting of these pleadings.

iii.　At least twenty-eight (28) days prior to the date the Court sets for the Fairness Hearing, Petitioner and Interim Class Counsel shall file a motion for final certification of the EIC Class. Respondents shall support this motion.

iv.　With the permission of the Court, Interim Counsel or counsel for the EIC Class may supplement any attorneys' fees motion with supporting documents no later than twenty-eight (28) days prior to the date the Court sets for the Fairness Hearing. Pursuant to FRCP 23(h)(2), any EIC Class member, or a party from whom payment is sought, may object to the attorneys' fees motion by filing an objection to the motion no later than fourteen (14) days before the Fairness Hearing; any reply shall be due no later than seven (7) days before the Fairness Hearing. The application for attorneys' fees and costs shall be heard by the Court at the Fairness Hearing.

v.　Any EIC Class member may object to the proposed settlement, or comment in favor of the settlement.

vi.　Any EIC Class member objecting to the Settlement Agreement, or any EIC Class member or party objecting to attorneys' fees, or their counsel, shall be heard so long as they have filed a written statement of their objection or objections no later than fourteen (14) days before such a hearing. The Parties may file responses thereto no more than seven (7) days before such the Fairness Hearing.

vii.　Upon granting of final approval of the Settlement Agreement and final class certification after the Fairness Hearing, the Court shall issue a judgment dismissing Petitioner's Complaint with prejudice. Notwithstanding the dismissal, the District Court of Guam shall have continuing and exclusive jurisdiction over this Agreement and any dispute related to this Agreement.

## III.   CLASS NOTICE

**a.** To achieve the best notice that is reasonably practicable, the Parties have determined to engage in both individual notice and notice by publication to the EIC Class.

**b.** Notice by publication shall include the publication of Exhibit "D" in a full-page advertisement reprinted in full twice weekly for not less than four consecutive weeks in the Pacific Daily News and Marianas Variety. Publication in the Pacific Daily News shall include Sunday and any one other day. Publications in the Marianas Variety shall include any two days. Notice by publication shall commence on the first Sunday that occurs seven (7) days after the Court orders the publication of the class notice.

**c.** Individual notice shall consist of DRT mailing Exhibit "D" to the last known address of the individuals who may fall within the EIC Class whose identity it is reasonably practicable to identify, and shall be accomplished as follows:

**i.**      DRT shall first assemble a list of all persons who it is reasonably practicable to identify who may belong to the EIC class. The list shall be developed by assembling a list of the names and social security number (or taxpayer identification number) of the following persons:

**1.** As to tax years 1995-1996, and 1999-2003, DRT shall use its computerized records of individual tax returns to identify the name and social security number (or taxpayer identification number) of all persons whose income level falls within the range of persons who may be eligible to receive the EIC under 26 U.S.C. § 32 as it applied in each respective tax year, and whose filing status otherwise indicates they

could be eligible for the EIC under 26 U.S.C. § 32 as it applied in each respective tax year.

**2.** As to tax years 1995-1996 and 1999-2003, DRT shall also determine the name and social security number of all persons who actually filed Form EIC-GU for each respective tax year.

**3.** As to tax year 1998, because all claims that will be accepted under this Settlement Agreement have already been filed, DRT shall use its computerized records to determine the name and social security number (or taxpayer identification number) of all persons who actually filed claims for tax year 1998 for the EIC under the GTIT or under the Guam Earned Income Program (Chapter 42 of Title 11 of the G.C.A.).

**4.** As to tax year 2004, taxpayers were informed on the GTIT tax return forms for 2004 to complete Form 2004 EIC-GU if they wished to claim the EIC. Therefore, DRT shall determine the name and social security number (or taxpayer identification number) of all persons who actually filed Form EIC-GU for tax year 2004.

**5.** By comparing social security numbers (or taxpayer identification numbers), DRT shall then combine the lists developed into one master list.

**ii.** Once DRT has assembled its master list based on the foregoing provisions, DRT shall match each name and social security number (or taxpayer identification number) identified with the last known address appearing on DRT's computerized records.

**iii.** Except as otherwise specified herein, the Parties have determined that it is not reasonably practicable for DRT to identify any tax filings not yet entered into DRT's computer system or to use such un-entered filings in its determination of

individuals or their last known addresses because this would substantially delay or even prevent DRT's completion of its list.

    iv.    One copy of Exhibit "D" shall then be mailed to each person so identified at the address so identified. Persons identified as potential class members who have potential claims in multiple tax years shall be mailed only one copy of the notice.

    v.    DRT shall complete its list of individuals and last known addresses, and shall mailed Exhibit "D" by first class mail to each individual at their last known address, no later than 35 days after the Court orders the publication of the Class Notice.

    vi.    The Parties acknowledge that it is unlawful under federal law and territorial to disclose individual taxpayer information to any third party except for as authorized by law. None of the forgoing provisions regarding individual notice shall be construed to require such unauthorized disclosures, and DRT shall maintain the confidentiality of the master list and all other lists developed under the forgoing provisions.

    **d.** The completion of the notice by publication and the mailing of the individual notice at the times stated herein shall constitute completion of the "Class Notice Period."

**IV.    SETTLEMENT AMOUNT**

    **a. $90 MILLION TOTAL PAYMENT FOR PAST EIC CLAIMS.** On the terms specified below, and as part of the consideration for the agreement herein, and for entry of Final Judgment as provided for in this Settlement Agreement, the Parties agree that the Government shall pay a total of not more than $90 million to the EIC Class for all EIC claims for tax years 1995-1996 and 1998-2004 ("Settlement Amount").

i.   **TAX YEARS 1995, 1996, 1999, AND 2000**

**1.** The Government will pay the EIC Class not more than $15 million for all EIC claims for tax years 1995, 1996, 1999, and 2000 (combined).

**2.** This amount shall be divided proportionally among each claimant found eligible by DRT applying the requirements of 26 U.S.C. § 32 (applying the version of the statute that was effective in each respective tax year) based on the total combined value of their claim or claims for tax years 1995, 1996, 1999, and 2000.

**3.** In the event that DRT determines there are less eligible claims for tax years 1995, 1996, 1999, and 2000 (combined) than the total amount available to pay such claims under this Agreement, the remainder shall be utilized to fund tax refunds and the EIC in tax year 2005 and future tax years.

ii.   **TAX YEAR 1998**

**1.** The Government will pay the EIC Class not more than $15 million for EIC claims for tax year 1998, based upon the claims already filed with DRT for tax year 1998.

**2.** This amount shall be divided proportionally among each claimant found eligible by DRT applying the requirements of 26 U.S.C. § 32 (applying the version of the statute that was effective in 1998) based on the value of their claim.

**3.** In the event that DRT determines there are less eligible claims for tax year 1998 than the total amount available to pay such claims under this Agreement, the remainder shall be utilized to fund claims for tax year 2001 as stated below.

### iii. TAX YEAR 2001

**1.** The Government will pay the EIC Class not more than $15 million for all EIC claims for tax year 2001, together with any remainder from the payment of claims for tax year 1998.

**2.** This amount shall be divided proportionally among each claimant found eligible by DRT applying the requirements of 26 U.S.C. § 32 (applying the version of the statute that was effective in 2001) based on the value of their claim.

**3.** In the event that DRT determines there are less eligible claims for tax year 2001 than the total amount available to pay such claims under this Agreement, the remainder shall be utilized to fund claims for tax year 2002 as stated below.

### iv. TAX YEAR 2002

**1.** The Government will pay the EIC Class not more than $15 million for all EIC claims for tax year 2002, together with any remainder from the payment of claims for tax year 2001.

**2.** This amount shall be divided proportionally among each claimant found eligible by DRT applying the requirements of 26 U.S.C. § 32 (applying the version of the statute that was effective in 2002) based on the value of their claim.

**3.** In the event that DRT determines there are less eligible claims for tax year 2002 than the total amount available to pay such claims under this Agreement, the remainder shall be utilized to fund claims for tax year 2003 as stated below.

**v.    TAX YEAR 2003**

1. The Government will pay the EIC Class not more than $15 million for all EIC claims for tax year 2003, together with any remainder from the payment of claims for tax year 2002.

2. This amount shall be divided proportionally among each claimant found eligible by DRT applying the requirements of 26 U.S.C. § 32 (applying the version of the statute that was effective in 2003) based on the value of their claim.

3. In the event that DRT determines there are less eligible claims for tax year 2003 than the total amount available to pay such claims under this Agreement, the remainder shall be utilized to fund claims for tax year 2004 as stated below.

**vi.    TAX YEAR 2004**

1. The Government will pay the EIC Class not more than $15 million for all EIC claims for tax year 2004, together with any remainder from the payment of claims for tax year 2003.

2. This amount shall be divided proportionally among each claimant found eligible by DRT applying the requirements of 26 U.S.C. § 32 (applying the version of the statute that was effective in 2004) based on the value of their claim.

3. In the event that DRT determines there are less eligible claims for tax year 2004 than the total amount available to pay such claims under this Agreement, the remainder shall be utilized to fund claims tax refunds and the EIC in tax year 2005 and future tax years.

b. **NO INTEREST.** Members of the EIC Class shall not be paid any interest on their claims for tax years 1995-1996 and 1998-2004.

c. **NO USE OF SETTLEMENT AMOUNT FOR UNAUTHORIZED PURPOSES.** Respondents agree that no part of the $90 million paid under this Agreement shall be used for the potential EIC claims of class members who opt out of the EIC Class, or any other income tax refund claims, except as specifically provided in this Settlement Agreement.

d. **EIC IN FUTURE TAX YEARS.** As further consideration for this settlement, the Parties agree that EIC claims for tax year 2005 and all future years shall be accepted and paid the same as other tax refund claims under the applicable federal and local laws and in accordance with the requirements for the EIC established in 26 U.S.C. § 32.

**V. GOVERNMENT FUNDING FOR THE SETTLEMENT AGREEMENT**

a. **FUNDING SOURCE FOR THE $90 MILLION.**

i. Using its best efforts and good faith to pay the Settlement Amount, the Government shall devote a minimum of fifteen percent (15%) of each amount set aside or earmarked by the Government or Legislature for income tax refunds <u>and</u> placed into either the Income Tax Refund Reserve Fund (Chapter 50 of Title 11 of the G.C.A.) or the Income Tax Refund Efficient Payment Trust Fund (Chapter 51 of Title 11 of the G.C.A.) to pay the Settlement Amount to the EIC Class for EIC claims pursuant to this Agreement. Such reservations of the minimum 15% have already commenced following the execution of the prior term sheet.

ii.     In the event funds are transferred from the Income Tax Refund Efficient Payment Trust Fund to the Income Tax Refund Reserve Fund, or vice-versa, no additional reservation shall be required, because the fifteen percent (15%) is to be reserved the first time any amount is placed into either Fund and not when a transfer occurs between the two Funds.

iii.     If amounts being reserved within the Income Tax Refund Efficient Payment Trust Fund earn interest or investment earnings as provided in Chapter 51 of 11 G.C.A., such interest or investment earnings shall be utilized only for the purposes permitted by law under 11 G.C.A. §§ 51101(a) and 51103.

b. **ASSURANCES TO THE CLASS.**

i.     Respondents represent and warrant that all monies used to pay GTIT tax refunds are and will be first placed into the Income Tax Refund Reserve Fund and/or the Income Tax Refund Efficient Payment Trust Fund prior to the issuance of tax refund checks; therefore, tying the payment of the EIC claims under this settlement to a fixed percentage of the amount placed into those Funds will have the affect of ensuring that EIC claims are paid as money becomes available to pay tax refunds in general.

ii.     After final approval of the Settlement Agreement, to ensure that at least 15% is being set aside for the purposes of fulfilling the Government's obligations herein, DOA shall provide quarterly reports on January 1, April 1, July 1, and October 1 of each year to Class Counsel and the Court documenting:  (1) the total amount of monies placed into the Income Tax Refund Reserve Fund and Income Tax Refund Efficient Payment Trust Fund in the quarter; (2) the total amount of money paid in tax refunds in the quarter; (3) the total amount of money that has been reserved for EIC payments

under this Agreement in the quarter; and (4) the total amount of money paid for EIC claims pursuant to this Settlement Agreement in the quarter. To comply with federal and territorial law requiring the privacy of individual taxpayer's tax returns and related documents, such reports shall not require the disclosure of individual taxpayer information.

c. **CONCERNS REGARDING THE ILLEGAL EXPENDITURES ACT.** The deposit and maintenance of the amounts necessary to pay the Settlement Amount within the Income Tax Refund Reserve Fund and/or Income Tax Refund Efficient Payment Trust Fund is intended to avoid the Government's concern regarding any potential violation of the Illegal Expenditures Act (5 G.C.A. §22401). It is not intended nor shall it be interpreted for any other purpose.

d. **ALTERNATIVE FUNDING SOURCES FOR THE $90 MILLION.** The Governor may, at his discretion, utilize other funding sources for the $90 million permitted by law to pay the EIC claims under this Agreement. At the Governor's request, class counsel and/or the Parties shall cooperate in good faith with any efforts by the Governor to obtain additional funding or otherwise speed payment.

e. **FUNDING FOR THE ADMINISTRATION OF CLAIMS.** Because the EIC claims under this Agreement will be administered as tax refund claims, Respondents shall use the funding for the processing of tax returns and refunds already available and shall not be obligated to obtain separate or additional funding for the administration of claims.

f. **FUNDING FOR CLASS NOTICE.** Respondents shall bear the expense of publishing, mailing, advertising, and/or otherwise disseminating the class notice on the terms stated herein, including the identification of potential individual class members,

which expenses shall be paid from the following account: Governor's Account 5100A050200GA001.

    **g. FUNDING FOR FUTURE TAX YEARS.** EIC claims for tax year 2005 and future tax years shall be funded in compliance with Chapters 50 and 51 of Title 11 of the G.C.A.

## VI. ADMINISTRATION OF THE CLAIMS PROCESS

    **a. EIC CLAIMS TO BE ADMINISTERED AS TAX REFUND CLAIMS SUBJECT TO THE CONTINUING JURISDICTION OF THE COURT.** The administration of EIC claims under this Agreement is to be handled by DRT, DOA, and any other appropriate Government agencies pursuant to existing procedures for evaluating claims for tax refunds and issuing tax refund checks under federal and territorial law. Because the Parties have agreed to administer the Settlement Amount in the manner provided herein, no separate administration plan will be required. Where any matter is not otherwise specified herein or not contrary to any provision herein, the law governing tax refund claims under federal and territorial law shall control.

    **b. HOW EIC CLASS MEMBERS WILL FILE THEIR CLAIMS FOR TAX YEARS 1995-1996 AND 1998-2004**

        **i. PROCEDURES APPLICABLE TO TAX YEARS 1995, 1996, 1999, 2000, 2001, 2002, 2003, 2004.**

        **1.** For tax years 1995, 1996, 1999, 2000, 2001, 2002, 2003, and 2004, EIC Class members must file an EIC claim with DRT or mail a claim to DRT for each tax year in which they wish to make a claim.

2. Claims shall be submitted by submission of Form EIC-GU for each applicable tax year. These are the EIC tax forms employed by DRT, as may be amended from time to time.

3. Forms EIC-GU is and shall be made available at DRT and such other locations as GTIT tax forms are ordinarily made available.

4. If a taxpayer has already filed a Form EIC-GU with DRT, this shall be a claim under this Agreement; provided, however, that such claimants shall have the opportunity to request exclusion from this Settlement Agreement.

5. Those claimants who have filed incomplete or defective claims under Executive Order 2005-001 shall have the option to file a new Form EIC-GU as a substitute.

6. If an EIC Class member has not filed an income tax return for a tax year covered by this Agreement and they wish to submit a Form EIC-GU for that year, they also must file a tax return for that year as a necessary and required part of filing a claim under this Agreement.

7. EIC Class members shall retain the right to amend their tax returns as provided by federal and territorial law, but shall not be required to file an amended tax return for purposes of making a claim for EIC pursuant to this Settlement Agreement. Notwithstanding the acceptance of new tax returns by persons who never previously filed a tax return as stated above, Respondents shall not accept *amended* tax returns unless filed within the time period required by federal and territorial law (which is three years from the date the original tax return was first due, whether or not it was actually timely filed).

## ii.    PROCEDURES APPLICABLE TO TAX YEAR 1998

**1.** To be eligible to receive any payment under this Agreement for tax year 1998, EIC Class members must have filed a claim for the EIC under the GTIT or the Guam Earned Income Program for tax year 1998 on or before April 15, 2002.

**2.** No new or amended tax returns for tax year 1998 shall be accepted.

## c.  WHEN MEMBERS OF THE EIC CLASS MUST FILE THEIR CLAIMS

**i.**    Claims for tax years 1995, 1996, 1999, 2000, and 2001 must be either be (1) filed with DRT on or before January 2, 2006; or (2) mailed to DRT by first class mail that is postmarked on or before January 2, 2006.

**ii.**    Claims for tax years 2002, 2003, and 2004 must be either (1) filed with DRT on or before April 17, 2006; or (2) mailed to DRT by first class mail that is postmarked on or before April 17, 2006.

**iii.**    No new EIC claims for Tax Year 1998 shall be accepted.

## d.  HOW CLAIMS WILL BE PROCESSED

**i.**    In processing claims, Respondents shall retain the right to audit all EIC claims and to deny any claims found to be invalid under the federal and local laws governing EIC eligibility for each respective tax year.

**ii.**    If a claimant is found eligible for the EIC, Respondents shall retain the right to offset the amount of an EIC claim as provided for GTIT refunds in general by 26 U.S.C. § 6402.

**iii.**    Respondents shall retain the right to asses any applicable penalties permitted by federal or territorial law as to any false or inaccurate EIC claims submitted

under this Settlement Agreement, including reducing or denying an EIC claim or assessing fines or other civil or criminal sanctions.

iv.   In the event that a claimant shall be determined by Respondents to have engaged in prohibited conduct under 26 U.S.C. § 32(k) as to EIC claims starting with tax year 1997 (the tax year this section took effect), then this shall foreclose any EIC claim in future tax years consistent with the provisions of 26 U.S.C. § 32(k).

v.   With regard to any denial of an EIC claim or any assessment of any civil or criminal penalties, a member of the EIC Class shall maintain the right to challenge such a determination through all administrative and judicial processes afforded under federal or territorial law to a taxpayer as to any tax refund claim.

vi.   Nothing in this Agreement or the claims process shall be construed to prohibit any portion of any EIC claim being made subject to payment of attorneys' fees and costs, if any, if so ordered by the Court.

e. **WHEN EIC CLAIMS FOR TAX YEARS 1995-1996 AND 1998-2004 WILL BE PAID**

   i.   **CONDITIONS PRECEDENT FOR ANY PAYMENT.**

   **1.** No payments of EIC claims for tax years 1995-1996 and 1998-2004 under this Agreement shall be made prior to final District Court approval of this Settlement Agreement and entry of the final judgment.

   **2.** EIC claims for tax years 1995-1996 and 1998-2004 shall be paid only as the money to pay such claims becomes available under Section V of this Agreement.

3. No claims shall be paid for tax years 1995-1996 and 1998-2004 until the period to make a claim for a particular tax year has expired under the terms of this Agreement.

ii.    **ORDER OF PAYMENT OF EACH TAX YEAR**. Tax years covered by this Agreement will be paid in the following order.

1. First, all claims for tax years 1995, 1996, 1999, and 2000 (collectively) will be paid pursuant to the terms stated herein.

2. Once all claims for tax year 1995, 1996, 1999, and 2000 have been paid, claims for tax year 1998 will be paid pursuant to the terms stated herein.

3. Once all claims for tax year 1998 have been paid, claims for tax year 2001 will be paid pursuant to the terms stated herein.

4. Once all claims for tax year 2001 have been paid, claims for tax year 2002 will be paid pursuant to the terms stated herein.

5. Once all claims for tax year 2002 have been paid, claims for tax year 2003 will be paid pursuant to the terms stated herein.

6. Once all claims for tax year 2003 have been paid, claims for tax year 2004 will be paid pursuant to the terms stated herein.

iii.    **ORDER OF PAYMENT OF EIC CLASS MEMBERS**. Within each tax year, once all claims have been submitted and the amount due to each EIC Class member has been calculated, claims shall be paid in the order filed with DRT by the members of the class.

iv.    **TIMELY PROCESSING AND PAYMENT OF CLAIMS.**

**1.** All claims shall be processed by DRT and shall be processed on the terms and within the time stated below:

**A.** On or before January 2, 2006, DRT will have processed all claims for tax year 1998, and either: (1) determined if the claimant is eligible for the EIC under 26 U.S.C. § 32 (as it applied in 1998) based upon the information provided by the claimant and the amount they are entitled to receive; or (2) informed the claimant that the claim has been selected for an audit, informed the claimant that additional information is required (including the information sought), or informed the claimant that the claim has been denied (including the ground(s) for denial). With regard to claims selected for audits or requiring additional information, DRT shall use best efforts to complete the processing of all such claims by January 2, 2006, understanding that it may not be possible for every single claim to completed in this period given taxpayer's rights to administrative and judicial challenges to a DRT determination as described in this Agreement.

**B.** On or before July 3, 2006, DRT will have processed all claims for tax years 1995, 1996, 1999, 2000, and 2001 and either: (1) determined if the claimant is eligible for the EIC under 26 U.S.C. § 32 (as it applied in each respective tax year) based upon the information provided by the claimant and the amount they are entitled to receive; or (2) informed the claimant that the claim has been selected for an audit, informed the claimant that additional information is required (including the information sought), or informed the claimant that the claim has been denied (including the

ground(s) for denial). With regard to claims selected for audits or requiring additional information, DRT shall use best efforts to complete the processing of all such claims by July 3, 2006, understanding that it may not be possible for every single claim to completed in this period given taxpayer's rights to administrative and judicial challenges to a DRT determination as described in this Agreement.

C. On or before October 16, 2006, DRT will have processed all claims for tax years 2002, 2003, and 2004 and either: (1) determined if the claimant is eligible for the EIC under 26 U.S.C. § 32 (as it applied in each respective tax year) based upon the information provided by the claimant and the amount they are entitled to receive; or (2) informed the claimant that the claim has been selected for an audit, informed the claimant that additional information is required (including the information sought), or informed the claimant that the claim has been denied (including the ground(s) for denial). With regard to claims selected for audits or requiring additional information, DRT shall use best efforts to complete the processing of all such claims by October 16, 2006, understanding that it may not be possible for every single claim to completed in this period given taxpayer's rights to administrative and judicial challenges to a DRT determination as described in this Agreement.

2. After the completion of the processing of claims for each respective tax year; DRT shall calculate the total amount of claims it has found to be valid for that respective tax year. DRT shall then:

A. Identify the portion of the Settlement Amount available to pay for claims for each respective tax year or years under the terms of this Agreement.

**B.** A determination of the exact portion of the Settlement Amount available for tax year 2001 will require that DRT first complete the processing of claims for tax year 1998. A determination of the exact portion of the Settlement Amount available for each of tax years 2002, 2003, and 2004 will require that DRT first complete the processing of claims for each of the preceding tax years.

**C.** Based upon the total amount of claims found valid by DRT for a given year, compared to the portion of the Settlement Amount available to pay claims for that year or those years, DRT shall then determine the percentage of each claim (up to a maximum of 100%) that can be paid from the portion of the Settlement Amount available to pay for claims for each respective tax year or years under the terms of this Agreement.

**D.** Applying the percentages that applies to each tax year, DRT shall then certify to DOA the claims and percentage amounts that should be paid pursuant to the provisions of this Agreement.

**3.** Upon receipt of DRT's certification, and once sufficient funds exist pursuant to the terms of this Agreement, DOA shall pay claims for the certified amount in the order of claim priority stated in Section VI(e)(ii) and Section VI(e)(iii) of this Agreement.

**4.** With regard to amounts of EIC claims identified as being subject to offsets under Section VI(d) of this Agreement, such amounts shall be certified for payment to the appropriate entity or entities. The claimant shall be notified that the offset amount has been paid to such an entity or entities.

**v.** **EXCEPTION FOR HARDSHIP CASES**. Notwithstanding the priority for the payments of EIC claims, the Parties agree that DRT shall retain the right to make individual exceptions to the priority of payments based on standard pre-existing DRT policies and procedures governing the distribution of general income tax refunds.

**vi.** **PROCEDURE GOVERNING CLAIMS APPROVED AFTER CLAIMS FOR THAT TAX YEAR HAVE BEEN PAID.**

**1.** If a class members' claim for a particular year is denied or selected for an audit, and it is later determined in a judicial or administrative process that the claim was valid and should be paid, that class member shall receive the same proportional payment of the amount found to be validly claimed as is paid to class members for that same tax year.

**2.** The funding of such a proportional payment shall depend upon whether DRT already completed the procedures set forth in Section VI(e)(iv)(2) of this Agreement:

**A.** If DRT has not completed the procedures set forth in Section VI(e)(iv)(2), then the claim shall be added to the other approved claims for that tax year and be factored into the calculation of the percentage each claimant will receive for that tax year and the certification for payment of such claims by DRT to DOA under Section VI(e)(iv)(2).

**B.** If DRT has completed the procedures set forth in Section VI(e)(iv)(2), DRT shall certify the payment of the claim (at the same proportional rate as applied to all other claims for that tax year) to DOA to be funded directly from amounts reserved in

the Funds created by Chapters 50 and 51 of Title 11 of the G.C.A., as such amounts become available.

## VII. RELEASE OF CLAIMS BY THE EIC CLASS

a. **GENERAL RELEASE.** Upon final approval of this Settlement Agreement by the Court, each and every member of the EIC Class expressly and irrevocably releases, waives, settles, and discharges all claims (whether legal or equitable), demands, actions (whether judicial or administrative), suits, and causes of action, including without limitation those asserted in *Santos v. Camacho, et al.*, District Court of Guam CV04-00006, against the Government of Guam, the Governor of Guam, the Director of the Department of Revenue & Taxation, the Department of Revenue & Taxation, the Director of the Department of Administration, the Department of Administration, and their employees, officers, agencies, instrumentalities, independent contractors, representatives, attorneys, and agents, whether in their individual or official capacities, with regard to claims for payment of the EIC under federal or Guam territorial law in tax years 1995, 1996, 1998, 1999, 2000, 2001, 2002, 2003, and 2004, or any refusal to accept or pay such claims or to implement any government programs with regard to such claims. Such release and discharge includes all such claims whether known, unknown, asserted, unasserted, suspected, or unsuspected.

b. **COVENANT NOT TO SUE.** Upon final approval of the Settlement Agreement, the EIC Class separately covenants not to sue the Government of Guam, the Governor of Guam, the Director of the Department of Revenue & Taxation, the Department of Revenue & Taxation, the Director of the Department of Administration, the Department of Administration, and their employees, officers, agencies, instrumentalities,

independent contractors, representatives, attorneys, and agents, whether in their individual or official capacities, with regard to claims for payment of the EIC under federal or Guam territorial law in tax years 1995, 1996, 1998, 1999, 2000, 2001, 2002, 2003, and 2004, or any refusal to accept or pay such claims or to implement any government programs with regard to such claims

   c.  **WAIVER OF 18 G.C.A. § 82602.**  With regard to the release of claims stated in Section V(a) above, each and every member of the EIC Class expressly waives their rights under 18 G.C.A. § 82602 or principle of common or civil law that is similar to or analogous to 18 G.C.A. § 82602, which provides: "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM MUST HAVE MATERIALLY AFFECTED HIS SETTLEMENT WITH THE DEBTOR."

   d.  **LIMITATIONS ON RELEASE & COVENANT NOT TO SUE**

   i.  The general release and covenant not to sue stated above shall not be construed to preclude any member of the EIC Class from challenging through the administrative and/or judicial procedures that govern ordinary tax refund claims a particular determination as to: (1) the existence and/or value of their particular EIC claim(s) for tax years 1995-1996, 1998-2004 by DRT, (2) any amount of off-set or other adjustment made to their EIC claims by DRT (including without limitation by way of audit, penalty, intercept program, or off-set); provided, however, that the procedures for payment of such claim(s) and the percentage of such claim(s) to be paid once determined shall remain subject to the terms of this Agreement.

ii.     The general release and covenant not to sue stated above exclude any future claims alleging solely a breach of this Settlement Agreement.

## VIII.   CONDITIONS PRECEDENT & RIGHTS TO TERMINATION

a. If the Court denies preliminary approval of this Agreement and/or denies conditional approval to proceed as a class action, this Agreement shall be terminated and of no further force or effect.   The Parties shall be restored to their respective positions as existed immediately prior to the date of execution of the Term Sheet, without having waived any objections to or support of the June 14, 2004 Agreement.

b. If the Court refuses to grant final class certification or final approval of the Settlement Agreement after the Fairness Hearing, or refuses to enter the final judgment, this Agreement shall be rendered void and of no effect and the conditional and/or final class certification shall be vacated.

c. The Parties acknowledge and understand that it is anticipated that the amounts that can be reserved pursuant to this Settlement Agreement at present and in the coming months (possibly using a higher percentage of reservation and/or other sources identified by the Governor) will be approximately Fifteen Million Dollars ($15,000,000), thus permitting the timely payment of EIC claims for tax years 1995, 1996, 1999 and 2000 after the Court's Order of Approval and Final Judgment and claims have been filed and processed.   If Respondents have failed to reserve at least $15 million for the payment of claims under this Settlement Agreement by the time the Agreement is subject to the Fairness Hearing, Petitioner shall have the right to terminate the Settlement Agreement, which shall be void and of no effect, and the June 14, 2004

Settlement shall be returned to effect as though this Settlement Agreement had never been preliminarily approved, subject to all previously pending motions.

## IX.   MISCELLANEOUS CLAUSES

a. **INTEGRATION**.  This Agreement contains the entire, complete, and integrated statement of each and every term of the Parties' Agreement and is not subject to any terms not specified herein.  It shall not be modified except in a writing signed by all Parties.  No Party has relied upon any warranty or representation unless expressly stated in this Agreement.

b. **NOTICE**.  Any notice, request, instruction or other document to be given by any Party to another Party shall be in writing and delivered personally or by Certified Mail, Return Receipt Requested, to Counsel for the Parties as follows:

<u>If to the Petitioner or the EIC Class:</u>

Michael F. Phillips, Esq.
Phillips & Bordallo, P.C.
410 West O'Brien Drive, Suite 102
Hagåtña, Guam 96910

<u>If to the Governor of Guam:</u>

Felix Camacho, Governor of Guam
Ricardo J. Bordallo Governor's Complex, Adelup
P.O. Box 2950
Hagatna, GU 96932

With copies to:

Shannon Taitano, Esq.
Legal Counsel, Office of the Governor
Ricardo J. Bordallo Governor's Complex, Adelup
P.O. Box 2950
Hagåtña, GU 96932

Rodney J. Jacob, Esq.
Calvo & Clark, LLP
655 South Marine Corps Drive, Suite 202
Tamuning, Guam 96913

If to the Attorney General of Guam:

Honorable Douglas B. Moylan
Attorney General of Guam
Office of the Attorney General
Guam Judicial Center
120 West O'Brien Drive, Suite 2-200E
Hagatna, Guam   96910

If to the Directors of DOA and DRT:

Art Ilagan
Director of the Department of Revenue & Taxation
P.O. Box 23607
Barigada, GU 96921

Lourdes Perez
Director of the Department of Administration
Ricardo J. Bordallo Governor's Complex, Adelup
P.O. Box 884
Hagåtña, GU 96932


With copies to:

Shannon Taitano, Esq.
Legal Counsel, Office of the Governor
Ricardo J. Bordallo Governor's Complex, Adelup
P.O. Box 2950
Hagåtña, GU 96932


Rawlen M.T. Mantanona, Esq.
Mantanona Law Office
Suite 601B, GCIC Bldg.
414 W Soledad Ave.
Hagåtña, Guam 96910

**c. AMENDMENT OF PRIOR CONFIDENTIALITY AGREEMENT.** The Parties hereby amend and enter a limited waiver of their March 31, 2005 Confidentiality Agreement governing their negotiations. This limited waiver shall only permit: (1) the Mediator to disclose to the Court such information as may be required, in the sole discretion of the Mediator, to assist the Court in determining whether to grant preliminary or final approval of this Agreement; (2) the Mediator to require a Party to disclose to the Court such information as may be required, in the sole discretion of the Mediator, to assist the Court in determining whether to grant preliminary or final approval of this Agreement; provided, however, that this limited waiver is not, and shall not be construed as, a waiver of any Party's attorney-client or work product privileges. This limited waiver shall also permit any Party to disclose the Parties' previous term sheet. In all other respects, the March 31, 2005 Confidentiality Agreement shall remain in effect except as ordered by the Court.

**d. NO ADMISSION OF LIABILITY.** This Agreement and any acts undertaken by the Parties pursuant to it are part of a resolution of a dispute and not an admission of liability. They may not be used as such in any other litigation, including any litigation brought by persons who opt-out of this Agreement.

**e. NO WAIVER OF CLAIMS CONCERNING FEDERAL GOVERNMENT.** Nothing in this Agreement or in the final judgment issued pursuant to this Agreement shall be construed to bar, preclude, or waive any right of Respondents to seek federal reimbursement of part or all of amounts paid for EIC claims, whether under this Agreement or otherwise. At the sole discretion of Respondents, Respondents may elect to state a claim or claims against the federal government or its officers, entities, or

agencies as part of answering the amended Petition. If this option is exercised, then the final judgment referenced herein shall instead be a partial final judgment pursuant to FRCP 54(b) that is a final and complete resolution of claims between Respondents and the EIC Class, but not as between Respondents and any such federal defendants. The determination of the Respondents not to exercise this option shall not preclude Respondents from bringing a separate suit or claims in a different action against any federal defendants. Petitioner and class counsel shall cooperate in any efforts by Respondents to obtain reimbursement for all of amounts paid for EIC claims against the federal government or its officers, entities, or agencies, whether under this Agreement or otherwise.

f. **SEVERABILITY.** Except as otherwise specified herein, the provisions of this Settlement Agreement shall be severable.

g. **BINDING NATURE.** This Agreement shall be binding upon, and inure to the benefit of, each member of the EIC Class, each Party, and their respective heirs, executors, administrators, successors, and assigns.

h. **COOPERATION IN GOOD FAITH.** All parties expressly agree and warrant they will cooperate in good faith in the execution and implementation of this Agreement and that they will: (1) promptly recommend approval of this Settlement Agreement to the Court; (2) use their best efforts to publicly promote this Settlement Agreement and work to encourage prospective class members not to opt-out; and (3) use their best efforts to obtain approval of this Settlement Agreement and to carry out its terms.

**IN WITNESS THEREOF,** the Parties have duly executed this Settlement Agreement on the date provided below.

_(signature)_
FELIX P. CAMACHO
Governor of Guam

Dated: **6 - 21 - 05**

_(signature)_
LOURDES M. PEREZ
Director of the Department of Administration

Dated: 6/20/2005

_(signature)_
JULIE B. SANTOS
Individually, and on Behalf of Those
Similarly Situated

Dated: 6-20-05

_(signature)_
ARTEMIO B. ILAGAN
Director of the Department of Revenue &
Taxation

Dated: 6/20/2005

**CERTIFIED FUNDS AVAILABLE (regarding class notice expenses):**
**Account No.:** Governor's Account 5100A050200GA001.
**Amount: $50,000.00**

_(signature)_
JOSE S. CALVO
Certifying Officer

**APPROVED:**

_(signature)_
JOSE S. CALVO
In His Capacity as Acting Director of the
Bureau of Budget and Management
Research

Dated: **6·20·05**

**APPROVED AS TO LEGALITY AND FORM:**

CALVO & CLARK, LLP
Attorneys for Respondent Felix P. Camacho, Governor of Guam

By: _~Rodney~_ _____
RODNEY J. JACOB

Dated: 6/20/05

MANTANONA LAW OFFICE
Attorneys for Respondents Lourdes M. Perez and Artemio R. Ilagan

By: _____
RAWLEN M.T. MANTANONA

Dated: 6/20/05

OFFICE OF THE ATTORNEY GENERAL
Attorneys for Respondent Government of Guam

By: _____
**ROBERT WEINBERG**
Assistant Attorney General

Dated: _____

LAW OFFICES OF PHILLIPS & BORDALLO
Attorneys for Julie B. Santos and Interim Class Counsel

By: _____
MICHAEL F. PHILLIPS

Dated: 6/20/05

# EXHIBIT A

Attorneys for Petitioners

## DISTRICT COURT OF GUAM
## TERRITORY OF GUAM

| | |
|---|---|
| | CIVIL CASE NO. 04-00006 |
| JULIE BABAUTA SANTOS, *et al.*, | |
| Petitioners, | |
| | **AMENDED CLASS ACTION PETITION FOR THE RECOVERY OF EARNED INCOME TAX REFUNDS OR IN THE ALTERNATIVE FOR A WRIT IN THE NATURE OF MANDAMUS** |
| vs. | |
| FELIX A. CAMACHO, etc., *et al.*, | |
| Respondents. | |

The Petitioner, individually and on behalf of all those similarly situated (hereinafter "EIC Class"), through her attorneys of record Phillips and Bordallo, P.C., by Michael F. Phillips, petitions this Court for the recovery of income tax refunds, or, in the alternative, for a writ in the nature of mandamus directed to Respondents, in their official capacities, and by this verified Amended Petition alleges:

## JURISDICTION

1.    This Court has exclusive original jurisdiction pursuant to 48 U.S.C. §§1421i(h) and 1424(b), and 28 U.S.C. §1361. Section 1421i(h) provides this Court with exclusive, original jurisdiction over all judicial proceedings in Guam with respect to the Guam Territorial Income Tax.   Section 1424(b) provides this Court with the jurisdiction of a district court of the United States.   Section 1361 provides this Court with original jurisdiction of any action in the nature of mandamus to compel the performance of duty owed to the plaintiff.

## PARTIES

2.    Petitioner is a United States citizen, a Guam resident, and a taxpayer. Petitioner is over the age of 18 years, and was and is legally qualified to apply for and receive refundable earned income tax credits (the "EIC") which Petitioner is seeking to have implemented and applied to Guam taxpayers.

3.    Respondent Felix P. Camacho, Governor of Guam (hereinafter "Respondent Camacho"), is the Governor of Guam, such office established within the Government of Guam by virtue of the 1950 Organic Act of Guam (the "Organic Act"), 48 U.S.C. §1421, et seq., and responsible for the administration and enforcement of the Guam Territorial Income Tax ("GTIT"). 48 U.S.C. §1421i.

4.    Respondent Art Ilagan, Director of the Department of Revenue and Taxation (hereinafter "Respondent Illagan"), is responsible under the Governor with the administration and enforcement of the GTIT, as provided by 11 G.C.A. §§1104 and 1107.

5. Respondent Lourdes M. Perez, Director of the Department of Administration (hereinafter "Respondent Perez"), is responsible to set aside all money reserved for income tax refunds, earned income tax credits and child tax credits from income tax receipts, as required by the Income Tax Refund Reserve Fund Law. 11 G.C.A. §50104.

6. Respondent Government of Guam, created through the Organic Act, is made up of three (3) co-equal branches of government consisting of the Executive, Legislative, and Judicial branches, and only has those powers granted to it through the Organic Act.

## THE CLASS

7. Petitioner brings this petition on Petitioner's own behalf and on behalf of all persons similarly situated. The EIC Class Petitioner represents consists of the following persons:

> All persons who do not elect to request exclusion from the class and: (1) were subject to the Guam Territorial Income Tax established in 48 U.S.C. § 1421i for tax years 1995-1996 and/or 1999-2004 and would have been eligible to file (whether or not they actually filed) for the EIC established in 26 U.S.C. § 32 (as it applied in each respective tax year) if that program were applied in the Territory of Guam; and/or (2) were eligible to receive an EIC credit under certain Guam territorial laws for tax years 1995-1996 and/or 1999-2004 that mirrored the federal EIC law (26 U.S.C. § 32), including the Guam Earned Income Program (Chapter 42 of 11 G.C.A.); and/or (3) actually filed a claim for the EIC with DRT for tax year 1998 under the GTIT or Guam Earned Income Program (Chapter 42 of 11 G.C.A.) on or before April 15, 2002.

8. The EIC Class, described above and composed of more than 10,000 taxpayers entitled to and qualified to apply for and receive EIC, is so numerous that joinder of all members is impracticable;

9. There are questions of law or fact common to the EIC Class. Each EIC Class member was denied the full implementation of the earned income tax credit program as applied to Guam, including the Government's prohibition or prevention of EIC Class members to file claims for earned income tax credit refunds, and/or the Government's denial or failure to pay earned income tax credit refunds to otherwise qualified EIC Class members. The questions are such that proof of a state of facts common to the members of the class will entitle each member of the class to the relief requested in this Amended Petition.

10. The claims of Petitioner are typical of the claims of the EIC Class. The Petitioner was denied the full implementation of the earned income tax credit program as applied to Guam, including the Government's prohibition or prevention of Petitioner to file claims for earned income tax credit refunds, and/or the Government's denial or failure to pay earned income tax credit refunds to the otherwise qualified Petitioner.

11. The Petitioner will fairly and adequately protect the interests of the EIC Class.

12. In consideration of (a) the minimal interest of members of the EIC Class in individually controlling the prosecution of separate actions, (ii) the extent and nature of the litigation concerning the controversy already commenced by members of the EIC Class, (iii) the desirability of concentrating the litigation of the claims in this Court, and (iv) the difficulties unlikely to be encountered in the management of this class action, the

questions of law or fact common to the members of the EIC Class predominate over any questions affecting only individual members, and this class action is superior to other available methods for the fair and efficient adjudication of the controversy.

13.    Petitioner and members of the EIC Class have a clear right to the relief sought, Respondents have plainly defined, peremptory and non-discretionary duties to implement the provisions of the GTIT related to earned income tax credits, and no other adequate remedy is available.  Petitioner has exhausted her administrative remedies and/or Respondents are estopped from alleging non-exhaustion.  Petitioner and the members of the class Petitioner represents have no plain, speedy, or adequate remedy at law against Respondents other than by maintenance of this class action, because Petitioner is informed and believes, and on the basis of that information and belief alleges, that the Respondents have refused to implement federal and local laws requiring implementation of the earned income tax credit program, including the allowance and acceptance of claims for earned income tax credit refunds, and the payment of earned income tax credit refunds; and that the damage to each member of the class is relatively small, and that it would be economically infeasible to seek the enforcement of laws requiring the implementation of the earned income tax credit program, including the allowance and acceptance of claims for earned income tax credit refunds, and the payment of earned income tax credit refunds, other than by a class action.

## PETITIONER'S CLAIMS

14.   Congress organized Guam as an unincorporated possession of the United States through the Organic Act of Guam, 48 U.S.C. §1421 et. seq.  Congress also provided an income tax scheme for Guam in 48 U.S.C. §1421i ("Income Tax Section").

15.  Guam residents do not pay any income tax to the U.S. federal government; instead, they pay a territorial income tax to the government of Guam.  Rather than writing an entirely new tax code for Guam, Congress applied certain provisions of the Internal Revenue Code, 26 U.S.C. §1 et. seq. ("IRC."), to Guam as the Guam Territorial Income Tax, including Subtitle A, which contains the EIC.  26 U.S.C. §32.

16.  In passing the Income Tax Section, Congress intended to provide uniform treatment for United States and Guam taxpayers.  Only those provisions of the IRC that are manifestly inapplicable or incompatible with the intent of the Income Tax Section do not apply to Guam taxpayers.  The EIC is not manifestly inapplicable or incompatible with the intent of the Income Tax Section.

17.   The EIC was enacted in part to provide special tax benefits to low-income workers by reducing tax burdens and making employment more attractive than welfare.

18.  Under the mirror code, Guam taxpayers have been eligible for the EIC since its effective date in 1975, and remain eligible unless Guam de-links from the IRC and enacts its own tax code.  Guam has not de-linked from the IRC nor has it enacted its own tax code.

19.  On February 28, 1996, Public Law 23-74, sponsored by then-Senator Felix P. Camacho, specifically made the EIC applicable to Guam. Although the provisions of Public Law 23-74 were later repealed, the Guam Legislature, through Public Law 24-

61:4, as amended by Public Law 25-03:IV;22, enacted the Earned Income Program (the "Earned Income Program") to mandate the fulfillment of the Government of Guam's obligations under the Income Tax Section. 11 G.C.A. §42101, et. seq.

20. Section 42103 of Title 11 G.C.A. requires the Earned Income Program be instituted using the same income levels as are used in the EIC law to compute a subsidy which will be paid to residents of Guam who file Income Tax Returns to the Department of Revenue and Taxation.

21. Section 50103 of Title 11 G.C.A. requires Respondent Illagan, in consultation with Respondent Perez and the Director of the Bureau of Budget and Management Research, to establish a formula for reserving income tax receipts to pay income tax refunds, earned income tax credits and child tax credits.

22. Section 50104 of Title 11 G.C.A. requires Respondent Perez to set aside all money reserved for income tax refunds, earned income tax credits and child tax credits from income tax receipts.

23. The Guam Supreme Court recently held that the substantive provisions of the IRC enlisted in the Organic Act, including the EIC, must be applied in mirrored fashion to Guam, and the Governor is required to enforce and administer the EIC. See In re Request of I Mina Bente Singko Na Liheslaturan Guahan Relative to the Application of the Earned Income Tax Credit Program to Guam Taxpayers, 2001 Guam 3 (2001).

24. Respondents have refused to allow or accept claims for EIC from Guam taxpayers, and/or have denied and failed to pay EIC to otherwise qualified Guam

taxpayers, and have publicly continued to allege that the EIC is inapplicable to Guam taxpayers.

25. Respondents have continued to deny Guam taxpayers the benefits of federal and local law relevant to earned income tax credit refunds, including Earned Income Program.

26. Petitioner seeks relief in the form of damages for all unpaid refundable earned income tax credits for the years 1995, 1996, 1998, 1999, 2000, 2001, 2002, 2003, and 2004, in the approximate amount of One Hundred Thirty-Five Million Dollars ($135,000,000.00).

27. In the alternative, Petitioner seeks a writ in the nature of mandamus compelling Respondents to implement the EIC as required by the Organic Act and Guam law, including the to allowance and acceptance of EIC claims from Guam taxpayers, and furthermore, that Respondents pay to Petitioner and the class all unpaid refundable earned income tax credits for the years 1995, 1996, 1998, 1999, 2000, 2001, 2002, 2003, and 2004 in the approximate amount of One Hundred Thirty-Five Million Dollars ($135,000,000.00). Petitioner has a clear right to the relief sought, Respondents have plainly defined, peremptory and non-discretionary duties to implement the EIC, including the allowance and acceptance of EIC claims, and to pay unpaid refundable income tax credits, and no other adequate remedy is available.

28. Petitioner has incurred, and will continue to incur, expenses for costs and attorneys' fees necessary for the investigation, formulation, and prosecution of this action. Those attorney fees and other expenditures will result in a benefit to all members of the class.

WHEREFORE, Petitioner prays for judgment against Respondents as follows:

1. Damages in the approximate amount of One Hundred Thirty-Five Dollars ($135,000,000.00), for the payment of refundable earned income tax credits for the years 1995, 1996, and 1998 through 2004, or some other amount to be shown at trial.

2. In the alternative, a writ in the nature of mandamus compelling Respondents to implement the EIC, including the allowance and acceptance of EIC claims, and pay Petitioner and the class all unpaid refundable earned income tax credits for the years 1995, 1996, and 1998 through 2004, in the approximate amount of One Hundred Thirty-Five Million Dollars ($135,000,000.00), or some other amount to be shown at trial.

3. Petitioner recover costs and attorneys' fees in the amount of ten percent (10%) of the total amount recovered by the class.

4. Payment of Petitioner's costs and attorneys' fees from the amount recovered for the common benefit of the class; and

5. The Court grant such other relief as at law or in equity may be granted, whether or not prayed for herein.

Respectfully submitted this 20th day of June, 2005.

PHILLIPS & BORDALLO, P.C.
Attorneys for Petitioner

BY: _____
MICHAEL F. PHILLIPS

# VERIFICATION

GUAM, U.S.A.　　　）
　　　　　　　　　　） ss.
CITY OF HAGÅTÑA)

    The undersigned, being first duly sworn, deposes and says that she is a party to the above-entitled matter; the foregoing document is true of her own knowledge, except as to matters which are therein stated on her information or belief and as to those matters she believes them to be true.

_____
JULIE BABAUTA SANTOS

SUBSCRIBED AND SWORN to before me this 20th day of June, 2005.

_____
NOTARY PUBLIC

# EXHIBIT B

1    [Appearing Counsel on next page]

2

3

4

5

6

7              IN THE UNITED STATES DISTRICT COURT

8                          DISTRICT OF GUAM

9

10   JULIE BABAUTA SANTOS, et. al.,              CIVIL CASE NO. 04-00006

11                       Petitioners,

12

13                  -v-                          **JOINT MOTION FOR PRELIMINARY
                                                 APPROVAL OF SETTLEMENT
14   FELIX P. CAMACHO, etc., et. al.            AGREEMENT; MEMORANDUM OF
                                                 POINT AND AUTHORITIES IN
15                       Respondents.            SUPPORT THEREOF**

16                                               **[ORAL ARGUMENT REQUESTED]**

17

18

19

20

21

22

23

24

25

26

27

28   {G0003152.DOC;1}                    1
     *Civil Case No. 04-00006*

**SHANNON TAITANO, ESQ.**
**OFFICE OF THE GOVERNOR OF GUAM**
Ricardo J. Bordallo Governor's Complex
Adelup, Guam 96910
Telephone:     (671) 472-8931
Facsimile:     (671) 477-4826

**EDUARDO A. CALVO, ESQ.**
**RODNEY J. JACOB, ESQ.**
**DANIEL M. BENJAMIN, ESQ.**
**CALVO & CLARK, LLP**
Attorneys at Law
655 South Marine Drive, Suite 202
Tamuning, Guam 96913
Telephone:     (671) 646-9355
Facsimile:     (671) 646-9403
Attorneys for *Felix P. Camacho, Governor of Guam*

**RAWLEN M.T. MANTANONA**
**MANTANONA LAW OFFICE**
414 W. Soledad Avenue
GCIC Bldg. Suite 601B
Hagåtña, Guam 96910
Telephone:     (671) 472-3666
Facsimile:     (671) 472-3668
Attorneys for Respondents *Lourdes M. Perez and Artemio R. Ilagen*

**MICHAEL F. PHILLIPS**
**PHILLIPS & BORDALLO, P.C.**
410 West O'Brien Drive
Hagåtña, Guam 96910
Telephone:     (671) 477-2223
Facsimile:     (671) 477-2329
Interim Class Counsel and Attorneys for Petitioner *Julie Babauta Santos*

{G0003152.DOC;1}
*Civil Case No. 04-00006*

**MOTION**

In this Joint Motion, the moving parties (the "Moving Parties"), which are Petitioner Julie B. Santos ("Petitioner"), Interim Class Counsel Mike Phillips, Esq. ("Interim Class Counsel"), Governor of Guam Felix P. Camacho (the "Governor"), and the Director of Revenue & Taxation Artemio B. Ilagan and the Director of Administration Lourdes M. Perez (the "Directors"), jointly move this Court for an order that: (1) Grants preliminary approval to a settlement agreement they executed on June 20, 2005; (2) Sets all necessary Court dates under the Settlement Agreement; and (3) Approves and orders the issuance of the class notice.

This Joint Motion is based upon the accompanying memorandum of points and authorities, the Declaration of Rodney J. Jacob, the files and records in this action, and such other evidence and arguments as may be presented at or before the hearing on this motion.

The Moving Parties request oral argument. Pursuant to Rule 7.1(e)(2), the Moving Parties will work with the Attorney General to agree upon oral argument dates with respect to this and certain other motions that will be at issue before the Court. The required Rule 7.1(e)(2) statement will be filed promptly once the parties are able to reach a scheduling agreement. The Moving Parties will provide notice of the hearing date once the Court provides a date. Respectfully submitted this 20th day of June, 2005.

OFFICE OF THE GOVERNOR OF GUAM
CALVO & CLARK, LLP
Attorneys for Respondent Felix P. Camacho,
Governor of Guam

PHILLIPS & BORDALLO, P.C.
Interim Class Counsel and Attorneys for Petitioner
Julie Babauta Santos

By:_____
    **RODNEY J. JACOB**

By:_____
    **MICHAEL F. PHILLIPS**

MANTANONA LAW OFFICE
Attorneys for Respondents Lourdes M. Perez and
Artemio R. Ilagan

By:_____
    **RAWLEN M.T. MANTANONA**

{G0003152.DOC;1}
*Civil Case No. 04-00006*

1

## MEMORANDUM OF POINTS AND AUTHORITIES

The Moving Parties are requesting that the Court issue an order that:

- Grants preliminary approval to a settlement agreement they executed on June 20, 2005 (the "Settlement Agreement");

- Holds that the Governor has bound the Government of Guam to the Settlement Agreement pursuant to 48 U.S.C. §§ 1421i(c), 1421i(d)(2) and the Court's Orders of February 9, 2005 and March 2, 2005, notwithstanding the Attorney General's failure to execute that Settlement Agreement;

- Sets all necessary Court dates under the Settlement Agreement; and

- Approves and orders the issuance of the class notice.

## I. BACKGROUND

The Court already is familiar with the lengthy history of this action regarding the earned income tax credit ("EIC"), which is the first of three cases to be filed in this Court seeking class-wide relief regarding the Government of Guam's alleged non-payment of that tax credit. Pursuant to a previous stipulation and Order, from March 31 to April 2, 2005 the parties to this litigation engaged in face-to-face negotiations with the assistance of JAMS Mediator Catherine Yanni, Esq. At the conclusion of these negotiations, the parties agreed to continue their negotiations with the assistance of the Mediator. The negotiations were subsequently extended through two subsequent stipulations and orders. As a result of these negotiations, Petitioner, Interim Class Counsel, the Governor, and the Directors agreed to and executed a confidential term sheet. *See* Decl. of Rodney J. Jacob Exh. 1.

{G0003152.DOC;1}
*Civil Case No. 04-00006*

1

On June 20, 2005, Respondents Governor and the Directors executed a settlement agreement with Petitioner and Interim Class Counsel. *See* Decl. of Rodney J. Jacob Exh. 2. The Attorney General of Guam has declined to execute this Settlement Agreement.

## II. ARGUMENT

### A. Preliminary Approval

In seeking preliminary approval of the Settlement Agreement so as to be able to proceed with class notice, the Moving Parties believe that the terms of the Settlement Agreement largely speak for themselves. Further, they are aware that the Court cannot enter any final findings regarding the fairness of the Settlement Agreement until after there is notice and a fairness hearing occurs. *See* FRCP 23(e)(1)(C). Nonetheless, the parties wish to highlight several terms of the Agreement:

- The Agreement will provide for $90 million to be paid to the class by devoting at least 15% of any amount placed into the Government of Guam's tax refund reserve funds, which are the funds used to pay general tax refunds (*see* Settlement Agreement § V(a));

- The Agreement provides for full implementation of the EIC beginning with tax year 2005 for all qualifying taxpayers (*see* Settlement Agreement § IV(d));

- The Agreement covers tax years 1995-1996, and 1998-2004 (*see* Settlement Agreement § I(b));

- Despite creating a class action, the Agreement avoids imposing an undue burden on the Court or the Government by utilizing the existing structures to process tax claims (*see* Settlement Agreement § VI(a));

- The Agreement uses the EIC claim forms created pursuant to Executive Order 2005-001 and otherwise tracks Executive Order 2005-001 in terms of claims

procedures (*see* Settlement Agreement § VI(b))—the same forms and procedures that recently were upheld by the District Court of Guam in the Order dated June 16, 2005 in the case of *Simpao, et al. vs. Govt. of Guam*, Dist. of Guam Case No. CV04-00049;

- By providing a funding mechanisms for each expenditure under the Settlement Agreement, the Agreement addresses the Governor's and the Directors' concerns regarding the Illegal Expenditure Act (5 G.C.A. § 22401) that had caused them to oppose the previous settlement agreement of June 14, 2004 (*see* Settlement Agreement § V); and

- The Agreement leaves the Respondents free to pursue federal reimbursement of the EIC, while providing the class with a final resolution and payment of their claims now (*see* Settlement Agreement § X(e)).

For all of these reasons (and others), the Governor, the Directors, Petitioner, and Interim Class Counsel believe this Agreement represents a fair and reasonable resolution of this matter.

**B.   The Government of Guam's Position**

The Moving Parties have been unable to secure the execution of the Settlement Agreement by the Attorney General (who remains counsel of record for the Government of Guam) despite repeated efforts to do so. However, the Moving Parties do not believe such agreement is necessary. Guam law provides that the client, not the attorney, controls the decision to settle pending litigation. Guam R. Prof. Cond. 1.2(a) ("A lawyer shall abide by a client's decision whether to settle a matter.") Here, pursuant to the Organic Act of Guam, the Governor has the right to decide whether the Government will settle this matter.

The Organic Act provides that "[t]he administration and enforcement of the Guam Territorial Income Tax shall be performed by or under the supervision of the Governor," and that

{G0003152.DOC;1}
*Civil Case No. 04-00006*

3

the Governor of Guam or his delegate has "the same administrative and enforcement powers and remedies with regard to the Guam Territorial Income Tax as the Secretary of the Treasury, and other United States officials of the executive branch, have with respect to the United States income tax." 48 U.S.C. §§ 1421i(c), 1421i(d)(2). Thus, in Orders issued on February 9, 2005 and March 2, 2005, this Court has previously ruled that the Governor controls matters affecting the Guam Territorial Income Tax where there is a disagreement between the Governor and Attorney General.

Consequently, the Moving Parties respectfully contend that the Governor's execution of the Settlement Agreement makes it binding upon the Government of Guam. *See* 48 U.S.C. §§ 1421i(c), 1421i(d)(2). So as to remove any ambiguity, they ask that the Court rule that the Government of Guam is bound by the Settlement Agreement.

## C. Setting of Dates & Issuance of Class Notice

Because it is a class action settlement, the execution of the Settlement Agreement will require that the Court establish a number of Court dates. These are as follows:

- The date by which the "Class Notice Period" defined in Section III(d) of the Settlement Agreement will be completed.

- The "Opt-Out Date" under Section II(b)(i) of the Settlement Agreement.

- The date by which any motions for intervention are to be filed and served under Section II(c)(i) of the Settlement Agreement.

- The date by which the parties to the Settlement Agreement shall file a joint motion for an Order of Approval and Final Judgment, and a proposed form of judgment, under Section II(c)(ii) of the Settlement Agreement.

- The date by which Petitioner and Interim Class Counsel shall file a motion for final certification of the class under Section II(c)(iii) of the Settlement Agreement.

- The date by which any objection or comment on the Settlement Agreement must be filed and served, and the date by which any responses shall be filed, under Section III(c)(vi) of the Settlement Agreement.

- The dates for any additional filings, oppositions, or replies regarding attorneys' fees under Section II(c)(iv)-(vi) of the Settlement Agreement.

- The date for the "Fairness Hearing" as that term is defined in Section II(c)(i) of the Settlement Agreement.

Once these dates are set, the Moving Parties will amend the draft form of class notice, which is Exhibit D to the Settlement Agreement. Along with inserting the dates into the class notice, the Parties also will insert a brief description of Interim Class Counsel's motion for attorneys' fees and costs, should one be filed. They will then submit the draft notice for the Court's approval so that the Court can authorize and order the publication and mailing of this notice pursuant to Section III of the Settlement Agreement.

Respectfully submitted this 20th day of June, 2005.

OFFICE OF THE GOVERNOR OF GUAM
CALVO & CLARK, LLP
Attorneys for Respondent Felix P. Camacho,
Governor of Guam

PHILLIPS & BORDALLO, P.C.
Interim Class Counsel & Attorneys for
Petitioner Julie Babauta Santos


By:_____
    **RODNEY J. JACOB**

By:_____
    **MICHAEL F. PHILLIPS**

MANTANONA LAW OFFICE
Attorneys for Respondents Lourdes M. Perez
and Artemio R. Ilagen


By:_____
    **RAWLEN M.T. MANTANONA**

# EXHIBIT C

**DISTRICT COURT OF GUAM**
**TERRITORY OF GUAM**

| | |
|---|---|
| JULIE BABAUTA SANTOS, *et al.*, | |
| Petitioners, | CIVIL CASE NO. 04-00006 |
| vs. | |
| | **PETITIONER'S MOTION FOR CONDITIONAL CERTIFICATION OF THE EIC CLASS FOR SETTLEMENT PURPOSES.** |
| FELIX A. CAMACHO, etc., *et al.*, | |
| Respondents. | |

The Petitioner, individually and on behalf of all those similarly situated (hereinafter "EIC Class"), through her attorneys of record Phillips and Bordallo, P.C., by Michael F. Phillips, hereby submits this Motion for Conditional Certification of the EIC Class for Settlement Purposes, pending Orders for Final Approval of the proposed Settlement Agreement and for Certification of the Class. This motion is supported by the Points and Authorities below, and is filed concurrently with a joint motion by the parties for preliminary approval of a proposed Settlement Agreement; a motion by

Interim Counsel for the EIC Class for the appointment of class counsel; and a motion by Petitioner for leave to file an amended Petition.

## MEMORANDUM OF POINTS AND AUTHORITIES

This Action was filed on February 14, 2004 on behalf of a class of taxpayers seeking the implementation of the earned income tax credit program and the payment of earned income tax credit refunds for Guam taxpayers. On June 14, 2004, the parties reached a settlement agreement which was preliminarily approved by this Court on June 17, 2004.

The parties subsequently disagreed as to the legality of the June 14, 2004 agreement, and entered into Mediation to resolve their conflicts. The parties have since entered into a new Settlement Agreement. Concurrently with this motion seeking conditional certification of the EIC Class, the parties have filed a joint motion seeking preliminary approval of the proposed Settlement Agreement.

As provided in the amended petition and proposed Settlement Agreement filed with this Court, the proposed "EIC Class" is defined as follows:

> all persons who do not elect to request exclusion from the class under the procedures described [in the Settlement Agreement] and: (1) were subject to the Guam Territorial Income Tax ("GTIT") established in 48 U.S.C. § 1421i for tax years 1995-1996 and/or 1999-2004 and would have been eligible to file (whether or not they actually filed) for the EIC established in 26 U.S.C. § 32 (as it applied in each respective tax year) if that program were applied in the Territory of Guam; and/or (2) were eligible to receive an EIC credit under certain Guam territorial laws for tax years 1995-1996 and/or 1999-2004 that mirrored the federal EIC law (26 U.S.C. § 32), including the Guam Earned Income Program (Chapter 42 of 11 G.C.A.); and/or (3) actually filed a claim for the EIC with DRT for tax year 1998 under the GTIT or Guam Earned Income Program (Chapter 42 of 11 G.C.A.) on or before April 15, 2002.

This action should proceed as a class action pursuant to Federal Rules of Civil Procedure (FRCP) Rule 23(b)(3) consisting of members of the EIC Class for the following reasons:

(1) The EIC Class, described above and is alleged to be composed of more than 10,000 taxpayers entitled to and qualified to receive EIC, is so numerous that joinder of all members is impracticable;

(2) There are questions of law or fact common to the EIC Class. Each EIC Class member was denied the full implementation of the earned income tax credit program as applied to Guam, including the Government's prohibition or prevention of EIC Class members to file claims for earned income tax credit refunds, and/or the Government's denial or failure to pay earned income tax credit refunds to otherwise qualified Guam taxpayers.

(3) The claims of the representative party are typical of the claims of the EIC Class. The representative party was denied the full implementation of the earned income tax credit program as applied to Guam, including the Government's prohibition or prevention of the representative party to file claims for earned income tax credit refunds, and/or the Government's denial or failure to pay earned income tax credit refunds to the otherwise qualified representative party.

(4) The representative party will fairly and adequately protect the interests of the EIC Class.

(5) In consideration of (a) the minimal interest of members of the EIC Class in individually controlling the prosecution of separate actions, (ii) the extent and nature of the litigation concerning the controversy already commenced by members of the EIC

Class, (iii) the desirability of concentrating the litigation of the claims in this Court, and (iv) the difficulties unlikely to be encountered in the management of this class action, the questions of law or fact common to the members of the EIC Class predominate over any questions affecting only individual members, and this class action is superior to other available methods for the fair and efficient adjudication of the controversy.

Pursuant to the proposed Settlement Agreement, the parties have agreed the Petitioner will file a motion for final certification of the class at least 28 days prior the Fairness Hearing to be scheduled by this Court. This motion will be accompanied by a joint motion of the parties for final approval of the proposed Settlement Agreement.

The parties have also, as part of their joint motion for preliminary approval of the proposed Settlement Agreement, requested the Court to approve and order the required class notice pursuant to FRCP Rule 23.

Based on the foregoing, Petitioner respectfully requests this Court to conditionally certify the EIC Class for settlement purposes.

Respectfully submitted this 20th day of June, 2005.

PHILLIPS & BORDALLO, P.C.
Attorneys for Petitioner

By: _____

Michael F. Phillips

# EXHIBIT D

| | |
|---|---|
| ULIE BABAUTA SANTOS, et. al., <br><br> v. <br><br> 'ELIX P. CAMACHO, etc., et. al. Respondents. | CIVIL CASE NO. 04-00006 <br><br> **NOTICE OF PENDENCY AND PROPOSED SETTLEMENT OF CLASS ACTION** |

TO:   ALL PERSONS WHO CLAIMED OR COULD HAVE CLAIMED AN EARNED INCOME TAX CREDIT UNDER THE GUAM TERRITORIAL INCOME TAX OR GUAM TERRITORIAL LAW FOR TAX YEARS 1995, 1996, 1999, 2000, 2001, 2002, 2003, OR 2004; AND ALL PERSONS WHO FILED AN EARNED INCOME TAX CREDIT CLAIM UNDER THE GUAM EARNED INCOME PROGRAM OR THE GUAM TERRITORIAL INCOME TAX FOR TAX YEAR 1998

The above-captioned proceeding ("Litigation") is pending before the District Court of Guam (the "Court"). In the Litigation, Petitioner Julie B. Santos (the "Plaintiff") claims that she and other Guam taxpayers have been denied the right to file claims for earned income tax credit (the "EIC"), and have been denied the right to receive a refund of the EIC. The tax years covered by the Litigation are 1995, 1996, 1998, 1999, 2000, 2001, 2002, 2003, and 2004. The Respondents in the Litigation are the Government of Guam (the "Government"), Governor Felix P. Camacho, Director of Administration Lourdes M. Perez, and Director of Revenue & Taxation Artemio B. Ilagan (collectively "Respondents"). They have filed an opposition denying the claims and asserting various affirmative defenses.

The Court has conditionally ruled that the Litigation may be maintained on behalf of the following Class:

> All persons who do not elect to request exclusion from the class under the procedures described below and: (1) Were subject to the Guam Territorial Income Tax ("GTIT") established in 48 U.S.C. § 1421i for tax years 1995-1996 and/or 1999-2004 and would have been eligible to file (whether or not they actually filed) for the EIC established in 26 U.S.C. § 32 (as it applied in each respective tax year) if that program were applied in the Territory of Guam; and/or (2) Were eligible to receive an EIC credit under Guam territorial law for tax years 1995-1996 and/or 1999-2004 that mirrored the federal EIC law (26 U.S.C. § 32), including the Guam Earned Income Program (Chapter 42 of 11 G.C.A.); and/or (3) Actually filed a claim for the EIC with DRT for tax year 1998 under the GTIT or Guam Earned Income Program (Chapter 42 of 11 G.C.A.) on or before April 15, 2002.

This definition of persons who fall within or are excluded from the Class is referred to in this Notice as the "Class Definition."

## I.   PURPOSE OF THIS NOTICE

The purpose of this notice is to inform you, as a potential member of the Class, of (a) the existence of the Litigation; (b) the proposed Class Action Settlement of the Litigation, described below; and (c) your rights with respect to the proposed Settlement. Those rights include the right to be excluded from the Class and the Settlement. If you are a Class Member and do not request exclusion in compliance with the procedures and deadline stated below, you will remain in the Class and be bound by the Settlement terms.

Plaintiff's Counsel has investigated and evaluated the claims asserted in the Litigation and has determined that the proposed Settlement is fair, reasonable, and adequate for the Class as a whole, in light of the benefits of the Settlement and the disadvantages of continuing the Litigation. The proposed Settlement is a compromise of disputed claims and does not mean that Respondents admit liability.

## II.   SETTLEMENT BENEFITS FOR CLASS MEMBERS

If the Court approves the Settlement, Respondents will make payments totaling up to $90 million to the Class Members to resolve their EIC claims. Class Members will not receive interest on their EIC claims and are waiving any right to interest on their EIC claims. The payment will be divided among Class Members as follows:

**A.   Tax Years 1995, 1996, 1999, & 2000:** The Government will pay the EIC Class not more than $15 million for their EIC claims for tax years 1995, 1996, 1999, and 2000 (combined). This amount shall be divided proportionally among each claimant found eligible for the EIC by the Guam Department of Revenue & Taxation ("DRT") based on the value of their claim, up to 100%. Remaining amounts, if any, shall be utilized to fund tax refunds and the EIC in tax year 2005 and future tax years.

**B.   Tax Year 1998:** The Government will pay the EIC Class not more than $15 million for their EIC claims for tax year 1998. This amount shall be divided proportionally among each claimant found eligible for the EIC by DRT based on the value of his or her claim, up to 100%. Remaining amounts, if any, shall be utilized to fund claims for tax year 2001 as stated below.

**Tax Year 2001:** The Government ⬤ pay the EIC Class not more than $15 million for their EIC claims for tax year 2001, together with any remainder from the payment for tax year 1998. This amount shall be divided proportionally among each claimant found eligible for the EIC by DRT based on the value of his or her claim, up to 100%. Remaining amounts, if any, shall be utilized to fund claims for tax year 2002 as stated below.

**Tax Year 2002:** The Government will pay the EIC Class not more than $15 million for their EIC claims for tax year 2002, together with any remainder from the payment for tax year 2001. This amount shall be divided proportionally among each claimant found eligible for the EIC by DRT based on the value of his or her claim, up to 100%. Remaining amounts, if any, shall be utilized to fund claims for tax year 2003 as stated below.

**Tax Year 2003:** The Government will pay the EIC Class not more than $15 million for their EIC claims for tax year 2003, together with any remainder from the payment for tax year 2002. This amount shall be divided proportionally among each claimant found eligible for the EIC by DRT based on the value of his or her claim, up to 100%. Remaining amounts, if any, shall be utilized to fund claims for tax year 2004 as stated below.

**Tax Year 2004:** The Government will pay the EIC Class not more than $15 million for their EIC claims for tax year 2004, together with any remainder from the payment for tax year 2003. This amount shall be divided proportionally among each claimant found eligible for the EIC by DRT based on the value of his or her claim, up to 100%. Remaining amounts, if any, shall be utilized to fund tax refunds and the EIC in tax year 2005 and future tax years.

G.     **Payment of EIC Claims in Future Tax Years:** If the Settlement is approved by the Court as described below, the Government has agreed to pay the EIC to all qualifying persons in tax year 2005 and future tax years. Persons do not have to be Class Members to receive this benefit.

## III.    CLAIMS PROCESS & DEADLINES

A.     **Deadlines for Submitting a Claim (Except as to Tax Year 1998).** The deadlines for Class Members to submit EIC claims for tax years 1995, 1996, 1999, 2000, and 2001 is January 2, 2006. The deadline for Class Members to submit EIC Claims for tax years 2002, 2003, and 2004 is April 17, 2006.

B.     **Submit a Claim by Filing Form EIC-GU (Except as to Tax Year 1998).** To submit a claim as a Class Member, you must submit the Form EIC-GU applicable to *each* year in wish you wish to make a claim. Claims must be filed with DRT or mailed to DRT on or before the deadline for the applicable tax year stated above. Form EIC-GU can be found at DRT and at other locations where Guam tax forms ordinarily are available. It also can be viewed and printed on-line at http://www.GovGuamdocs.com.

C.     **Tax Return Required For Each Year.** If you have not previously submitted a tax return (e.g. a Form 1040, 1040A, or 1040EZ) for a tax year in which you wish to make an EIC claim, you <u>must</u> submit a tax return for that year along with submitting a Form EIC-GU to make a claim. If you already submitted a tax return for a tax year, you do not need to file a new tax return. However, you can amend the return, if you wish, anytime within three years of when that return was first due. If more than three years have passed since that return was first due, you will not be able to amend it.

D.     **Persons Who Already Filed Form EIC-GU.** If you already submitted a Form EIC-GU for a tax year covered by the Litigation and the proposed Settlement, you do not need to file a new Form EIC-GU for that tax year. However, you may file a new Form EIC-GU within the time otherwise provided to file a claim if you wish to amend your previous filing or to correct an incomplete or defective Form EIC-GU filing. If you have already filed a Form EIC-GU, you will be included within the Class unless you request exclusion under the procedures and deadlines set forth below.

E.     **Procedures Governing Tax Year 1998.** To be eligible to receive any payment under this Agreement for tax year 1998, Class Members must have filed a claim for the EIC under the GTIT or the Guam Earned Income Program for tax year 1998 on or before April 15, 2002. No new or amended tax returns for tax year 1998 will be accepted. If you already filed a tax year 1998 EIC claim as stated herein, you will be included within the Class unless you request exclusion under the procedures and deadlines set forth below.

F.     **Processing of Claims and Governing Laws.** Once submitted, all EIC claims will be processed by the DRT, which shall apply all laws that ordinarily apply to tax refund claims except as otherwise provided in the Settlement. Claims are still subject to an audit, and claims will be denied if found to be invalid under the federal and local laws governing EIC eligibility for each respective tax year. False or inaccurate EIC claims shall remain subject to applicable penalties permitted by federal or territorial law, including reducing or denying an EIC claim or assessing fines or other civil or criminal sanctions. If it is found that you intentionally or recklessly submitted a false claim you can be barred from receiving the EIC in future years beginning with tax year 1997 pursuant to 26 U.S.C. § 32(k), a federal statute that applies to all claims for the EIC beginning January 1, 1997.

**Application of Offsets.** If a claimant is found eligible for the EIC, Respondents shall retain the right to offset the amount of an C claim as provided for GTIT refunds in general by 26 U.S.C. § 6402. If your claim, is subject to an offset, you will be notified garding whom the offset amount has been paid to.

**Right to Contest Particular Determinations.** With regard to any denial of a particular EIC claim or any assessment of any civil criminal penalties, you shall maintain the right to challenge such a determination through all administrative and judicial processes forded under federal or territorial law to a taxpayer as to any tax refund claim.

## ./. When Claims Will Be Paid

**Funding.** The Government has agreed to reserve at least fifteen percent (15%) of all amounts it places into the accounts it uses to ay general tax refunds to pay for the $90 million settlement payment. It is not known exactly how fast money will be reserved. But, the espondents have already commenced reserving money and Respondents will be supplying reports to the Court and Plaintiff's Counsel garding how much money has been reserved so that the Court can monitor compliance with the Settlement. Further, Respondents can tilize other funding should they become available to speed payment.

**Order of Payments.** As money is reserved, and only after final approval of the settlement and entry of the judgment by the ourt, claims will be paid in the following order: (1) claims for tax years 1995, 1996, 1999, and 2000 (collectively); (2) claims for tax ear 1998; (3) claims for tax year 2001; (4) claims for tax year 2002; (5) claims for tax year 2003; and (6) claims for tax year 2004. Vithin each tax year, claims will be paid in the order submitted to DRT.

**Timely Processing of Claims.** On or before January 2, 2006, DRT will have processed all claims for tax year 1998. On or efore July 3, 2006, DRT will have processed all claims for tax years 1995, 1996, 1999, and 2001. On or before October 16, 2006, )RT will have processed all claims for tax years 2002, 2003, and 2004. After the completion of the periods for processing claims for each espective tax year, DRT will calculate the total amount of claims it has found to be valid for that respective tax year and calculate the ercentage of each claim that shall be paid (up to 100%). DRT will then certify the claims and percentage amounts that should be paid ursuant to the provisions of this Agreement. DRT does retain the right to make individual hardship exceptions to the priority of payments ased on standard pre-existing DRT policies and procedures. If your claim is denied or selected for an audit, and it is later determined in a udicial or administrative process that your claim was valid and should be paid, you will receive the same proportional payment of the mount found to be validly claimed as is paid to class members for that same tax year.

## ./. DISMISSAL OF LITIGATION, ENTRY OF JUDGMENT, RELEASE OF CLAIMS, & COVENANT NOT TO SUE

**Final Judgment.** If the Court approves the proposed settlement, it will enter a judgment that will dismiss the Litigation with )rejudice as to all Class Members, except those Class Members who request to be excluded. All people who meet the Class Definition and lo not validly request exclusion from the Class will be forever barred from prosecuting their own lawsuits to recover the EIC or )btain related relief regarding the EIC from Respondents for tax years 1995, 1996, 1998, 1999, 2000, 2001, 2002, 2003, and 2004.

**3. Release of Claims.** Further, upon final approval of the Settlement Agreement, each and every member of the EIC Class will :xpressly and irrevocably release, waive, settle, and discharge all claims (whether legal or equitable), demands, actions (whether judicial or administrative), suits, and causes of action, including without limitation those asserted in the Litigation, against the Government of Guam, he Governor of Guam, the Director of the Department of Revenue & Taxation, the Department of Revenue & Taxation, the Director of the Department of Administration, the Department of Administration, and their employees, officers, agencies, instrumentalities, independent contractors, representatives, attorneys, and agents, whether in their individual or official capacities, with regard to claims for payment of he EIC under federal or Guam territorial law in tax years 1995, 1996, 1998, 1999, 2000, 2001, 2002, 2003, and 2004, or any refusal to accept or pay such claims or to implement any government programs with regard to such claims. Such release and discharge includes all such claims whether known, unknown, asserted, unasserted, suspected, or unsuspected. With regard to the release of claims, each and every member of the EIC Class expressly waives their rights under 18 G.C.A. § 82602 or principle of common or civil law that is similar to or analogous to 18 G.C.A. § 82602, which provides: "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM MUST HAVE MATERIALLY AFFECTED HIS SETTLEMENT WITH THE DEBTOR."

**C. Covenant Not to Sue.** Also upon final approval of the Settlement Agreement, the EIC Class separately covenants not to sue the Government of Guam, the Governor of Guam, the Director of Revenue & Taxation, the Department of Revenue & Taxation, the Director of the Department of Administration, the Department of Administration, and their employees, officers, agencies, instrumentalities, independent contractors, representatives, attorneys, and agents, whether in their individual or official capacities, with regard to claims for payment of the EIC under federal or Guam territorial law in tax years 1995, 1996, 1998, 1999, 2000, 2001, 2002, 2003, and 2004, or any refusal to accept or pay such claims or to implement any government programs with regard to such claims

**D. Limitations.** The general release and covenant not to sue stated above shall not be construed to preclude any Class Member from challenging through the administrative and/or judicial procedures that govern ordinary tax refund claims a particular determination as to:

) the existence and/or value of their particular EIC claim(s) for tax years 1995-1996, 1998-2000 by DRT, (2) any amount of off-set or her adjustment made to their EIC claims by DRT (including without limitation by way of audit, penalty, intercept program, or off-set). The general release and covenant not to sue stated above exclude any future claims alleging solely a breach of this Settlement Agreement.

## I.     COSTS, EXPENSES, AND ATTORNEYS' FEES

Respondents have agreed to pay all costs of mailing and publishing this Notice and administering the Settlement. Plaintiff's Counsel has led a motion asking that if the Court approves the proposed settlement, the Court _____ [TO BE INSERTED ONCE MOTION IS FILED].

## II.     RIGHTS AND OPTIONS OF CLASS MEMBERS

**1.     Remain a Class Member.** If you do not request exclusion from the Class, you will remain a Class Member. On July 17, 2004, the Court appointed Attorney Michael Phillips, Esq. of the law firm of Phillips & Bordallo, P.C., 410 West O'Brien Drive, Suite 102, Hagåtña, Guam 96910 as Interim Class Counsel. Subject to the Court's final appointment of Class Counsel, the Plaintiff and her counsel will represent your interests in connection with the proposed Settlement. If the Court approves the Settlement and the judgment becomes final, you will be entitled to the benefits described in Section II, above. As a Class Member, you will be bound by any judgment or other disposition of the Litigation, even if you do not submit a claim or take advantage of any of the benefits of the Settlement. Furthermore, you and your heirs, executors, administrators, successors, and assigns will be deemed to have agreed to the terms of the release and covenant not to sue described in Section V above.

**1.     Objections to or Comments on the Settlement.** As a Class Member, you have the right to object to or comment on the proposed Settlement or the motion for attorneys' fees and costs. The procedures for doing so are explained in Section VIII(B) below.

**2.     Request Exclusion.** You have the right to request exclusion from the Class. If you request exclusion from the Class, you will not be bound by any judgment or settlement of the Litigation, you will not receive the benefits of the Settlement, and you will not be able to object to or comment in support of the Settlement. If you wish to be excluded from the Class, you must submit a signed, written statement requesting exclusion that either: (1) is filed with the Office of the Clerk of Court, District Court of Guam, 520 West Soledad Avenue, Hagåtña, GU 96910 on or before _____, 2005 at 3 p.m.; or (2) is sent by first class mail to the Office of the Clerk of Court, District Court of Guam, 520 West Soledad Avenue, Hagåtña, GU 96910 bearing a postmark of _____, 2005 or earlier. Any person requesting exclusion from the class and the Settlement Agreement must request exclusion from the class and the settlement in their entirety, and not just as to particular claim(s) for particular tax year(s). If you submit a request for exclusion that does not comply with these requirements, your request will be deemed invalid, and you will not be excluded from the Class.

**3.     Retain Your Own Attorney and Seek Intervention.** You have the right to consult and/or retain an attorney of your choice, at your own expense, to advise you regarding the Settlement and your rights in connection with the Settlement. You also have the right, either personally or through an attorney retained by you, at your own expense, to seek to intervene in the Litigation. Any such motion must be filed no later than _____, 2005.

## VIII.     FAIRNESS HEARING

**1.     Time, Place, and Purpose of Hearing.** A Fairness Hearing will be held on _____, _____ __, at _____, before the District Court of Guam, 520 West Soledad Avenue, Hagåtña, GU 96910, to determine: (1) Whether the proposed settlement of the Litigation on the terms set forth in the Settlement Agreement is fair, reasonable, and adequate for the Class as a whole and should be granted final approval; (2) Whether the certification of the Class should be made final; (3) Whether the Court should enter the proposed judgment dismissing the Litigation with prejudice; and (4) Whether the Court should grant the application of Plaintiff's Counsel for attorneys' fees and reimbursement of expenses, and, if so, in what amount.

**3.     Procedures for Objecting to or Commenting in Support of Settlement**

**1.     Written Objections or Comments.** If you have not requested exclusion from the Class, you, or an attorney retained by you, may file with the Office of the Clerk of Court, District Court of Guam, 520 West Soledad Avenue, Hagåtña, GU 96910 a statement objecting to or commenting on the settlement and/or the motion for attorneys' fees on or before _____, 2005. Such statement must also be served upon all counsel in the litigation, who are: (1) Phillips & Bordallo, P.C., 410 West O'Brien Drive, Suite 102, Hagåtña, Guam 96910; (2) Office of the Attorney General, Guam Judicial Center, 120 West O'Brien Drive, Suite 2-200E, Hagåtña, Guam 96910; (3) Shannon Taitano, Esq., Legal Counsel, Office of the Governor, Ricardo J. Bordallo Governor's Complex, Adelup, P.O. Box 2950, Hagåtña, GU 96932 (4) Calvo & Clark, LLP, 655 South Marine Corps Drive, Suite 202, Tamuning, Guam 96913; and (5) Mantanona Law Office, Suite 601B, GCIC Bldg., 414 W Soledad Ave., Hagåtña, Guam 96910.

**2.     Presentation of Objections and Supporting Comments at Fairness Hearing.** You may also attend the Fairness Hearing, either personally or through an attorney retained by you, at your own expense, and ask to be heard by the Court on your comments or objections.

f you wish to do so, you must submit your o●tions or comments in writing in compliance ● section VIII(B)(1) above and include in our comments a statement that you intend to appear and wish to attend the Fairness Hearing.

## X.    ADDITIONAL INFORMATION

**A.    Rescission of Previous Settlement.** Previously, Respondents had entered into a $60 million settlement agreement dated June 14, 2004 with Plaintiff and had previously published a notice regarding this settlement, which had received preliminary, but not final, Court approval. This settlement would have covered some, but not all, of the Members of the Class identified herein. Motions were subsequently filed by the Governor to cancel that settlement on the grounds, among other things, that its payment terms were unlawful. As part of the new settlement, Plaintiff and her counsel and Respondents have agreed to rescind the previous settlement, which is no longer in effect. It is possible that Class Members under the new settlement will receive more, less, or be unaffected by the new settlement. If Respondents have failed to reserve a least $15 million for the payment of claims under the Settlement Agreement described in this Notice by the time the Agreement is subject to the Fairness Hearing, Plaintiff has the right to terminate the Settlement Agreement, which shall be void and of no effect, and the June 14, 2004 Settlement shall be returned to effect, subject to all previously pending motions.

**B.    Notice of Related Pending Litigation.** There are two other cases pending in the District Court of Guam that seek to establish class actions regarding classes of persons similar to, and overlapping with, the Class identified herein. They are entitled *Torres v. Govt. of Guam*, et al., Dist. Ct. of Guam Civ. Case No. 04-00038 and *Simpao, et al. vs. Govt. of Guam*, Dist. of Guam Civ. Case No. CV04-00049 (the "Other Litigation"). No class has yet been certified in the Other Litigation and the defendants in those cases thus far have opposed class certification. However, it is possible that if a Class Member requests exclusion from this Class, they could later be able to become part of the Other Litigation either by moving to join that Other Litigation or by becoming class members, should either of those cases be certified as class actions. It is not known what the final outcome of the Other Litigation will be. In *Simpao*, the Court has held that the EIC applies to Guam and that filing a tax return establishes jurisdiction over those plaintiffs' claims. It is possible that by moving to join or by becoming part of a class in those cases (if a motion for joinder or class certification were granted), a potential Class Member would ultimately receive less, more, or the same relief as they would receive by remaining a Class Member in this Litigation, or would possibly receive no relief at all. Class Members who do not request exclusion under the procedures set forth in Section VII(C) above will be barred forever from being part of the Other Litigation either as class members or by moving to join those cases.

**C.    Effect of Court Disapproval.** If the Court refuses to grant final class certification or final approval of the Settlement Agreement after the Fairness Hearing, or refuses to enter the final judgment, the Settlement shall be rendered void and of no effect and any class certification shall be vacated.

**D.    Questions.** Any questions regarding the Settlement should be directed to Plaintiff's counsel, Phillips & Bordallo, P.C., 410 West O'Brien Drive, Suite 102, Hagåtña, Guam 96910. You also can contact Plaintiff's Counsel by email at mphillips@phillipsbordallo.com. Please do not submit questions to the Court. Copies of the Settlement Agreement and the pleadings and other documents filed in the Litigation and the Other Litigation are on file in at the District Court of Guam, and may be examined and copied during regular office hours at the Office of the Clerk of Court, District Court of Guam, 520 West Soledad Avenue, Hagåtña, GU 96910.

## X.    DEADLINES

Remember:

- **If you wish to be excluded from the class, you must submit a written statement requesting exclusion that either (1) is filed with the Office of the Clerk of Court, District Court of Guam, 520 West Soledad Avenue, Hagåtña, GU 96910, on or before _____ at 3:00 p.m.; or (2) is mailed by first class mail postmarked on or before to: Office of the Clerk of Court, District Court of Guam, 520 West Soledad Avenue, Hagåtña, GU 96910.**
- **If you wish to submit objections or comments, you must submit file them Clerk of Court at the address listed above and serve them on all counsel listed in section VII*(B)(1) above on or before _____, 2005.**
- **If you wish to intervene, you must file and serve a motion on or before _____, 2005.**
- **The deadline for filing or mailing by first class mail claims for the EIC under the Settlement to DRT for tax years 1995, 1996, 1999, 2000 and 2001 is January 2, 2006.**
- **The deadline for filing or mailing by first class mail claims for the EIC under the Settlement to DRT for tax years 2002, 2003, and 2004 is April 17, 2006.**

Dated: _____ __, 2005

                                          **BY ORDER OF THE
                                          DISTRICT COURT OF GUAM**

# EXHIBIT 12



Office of the Attorney General
Douglas B. Moylan
Attorney General of Guam
Solicitors Division
247 West O'Brien Drive
Hagåtña, Guam 96910 ● USA
Tel. (671) 475-3324 ● Fax. (671) 472-2493
www.guamattorneygeneral.com ● law@mail.justice.gov.gu

**FILED**

DISTRICT COURT OF GUAM

JUL 1 1 2005

MARY L.M. MORAN
CLERK OF COURT

Attorneys for Defendant Government of Guam

# IN THE DISTRICT COURT OF GUAM
# TERRITORY OF GUAM

MARY GRACE SIMPAO, CHRISTINA
NAPUTI, and JANICE CRUZ, on behalf of
themselves and a class of others similarly
situated,

               Plaintiffs,

       vs.

GOVERNMENT OF GUAM,

            Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)
)

Civil Case No. CV04-00049

**DEFENDANT'S NON-OPPOSITION TO
PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION**

On July 5, 2005, Plaintiffs filed a motion for class certification. Defendant, by and
through its undersigned attorney, now files this Non-Opposition to Plaintiffs' Motion for Class
Certification. In addition, Defendant stipulates to August 1, 2005, for a hearing on the motion
for class certification.

     **DATED:**   July 11, 2005.

                           OFFICE OF THE ATTORNEY GENERAL
                           **Douglas B. Moylan, Attorney General**

                           JOSEPH A. GUTHRIE
                           Deputy Attorney General
                           Attorney for Defendant of Guam

Page 1 of 1
*Defendant's Non-Opposition to Plaintiffs' Motion for Class Certification*
District of Guam Civil Case No. CV04-00049

Case 1:04-cv-00006   Document 248-14   Filed 10/03/2005   Page 33 of 42

# EXHIBIT 13

1

2

3

4

5

6                    DISTRICT COURT OF GUAM

7                      TERRITORY OF GUAM

8

9    MARY GRACE SIMPAO, CHRISTINA              )    Civil Case No. 04-00049
     NAPUTI and JANICE CRUZ, on behalf of      )
10   themselves and a class of others similarly )
     situated,                                  )
11                                              )
                                                )
12            Plaintiffs,                       )
                                                )
13       vs.                                    )
                                                )
14   GOVERNMENT OF GUAM,                        )    ORDER RE: MOTION TO INTERVENE
                                                )
15            Defendant.                        )
                                                )
16       vs.                                    )
                                                )
17   FELIX P. CAMACHO, in his official          )
     capacity as Governor of Guam              )
18                                              )
              Intervenor-Defendant             )
19    _____ )

20

21       This matter is before the Court on the Governor of Guam's Motion to Intervene. Pursuant

22   to Local Civil Rule 7.1(e)(3), this matter is appropriate for decision without the need for oral

23   argument.[1]  After reviewing the filings, as well as relevant caselaw and authority, the Court hereby

24   GRANTS the motion and sets forth the basis for its decision herein.

25

26   _____

27       [1]Local Civ.R. 7.1(e)(3) states "[i]n cases where the parties have requested oral argument, such oral
     argument may be taken off calendar by Order of the Court, in the discretion of the Court, and a decision rendered on
28   the basis of the written materials on file."

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**BACKGROUND**

This is the third of three actions filed in the District Court of Guam concerning Guam's Earned Income Tax Credit ("EIC"). Apparently, the Government of Guam had a history of paying its taxpayers the EIC. However, in the years 1995 and 1996, the Government of Guam stopped paying the EIC. As a result of the Government's failure to pay the EIC, the first of the three actions, *Santos v. Camacho, et al.*, Guam Dist. Ct. Civil Case No. CV 04-00006 was filed in February 2004. The *Santos* action sought to create a class action as to all persons alleged to be eligible to receive the EIC under Guam's tax scheme. The named defendants included the Government, the Governor of Guam, and the Directors of Administration and Revenue & Taxation.

In June 2004, while the Governor of Guam ("Governor") was off-island, a proposed $60 million class action settlement was reached in the *Santos* action between the then acting-Governor, the Attorney General, certain government officers, and the plaintiff and her counsel. Benjamin Decl., Exh. B. The Magistrate Judge gave the agreement his preliminary approval on June 17, 2004. *Id.* On June 24, 2004, the Magistrate Judge issued an order approving attorney's fees and costs in the amount of 10 percent of the settlement amount. *Id.*, Exh. C.

Days later, Christina Naputi ("Ms. Naputi"), a plaintiff in the present case, and Charmaine Torres ("Ms. Torres") filed motions to intervene. The Court denied both motions on August 5, 2004. Benjamin Decl., Exh. E. Thereafter, on August 9, 2004, Ms. Torres filed her own putative EIC class action, *Torres v. Government of Guam, et. al.,* Guam Dist. Ct. Civil Case No. CV04-00038. *Id.*, Exh. F. Ms. Torres named the Governor, Attorney General, and the Government as defendants.[2] Meanwhile, Ms. Naputi filed an appeal of the Court's order denying her the right to intervene. *Id.*, Exh. G.

Concerned over possible illegalities with the settlement, the Governor filed an appearance in the *Santos* action through independent counsel in November 2004. Benjamin Decl., Exh. L. The Attorney General moved to strike this appearance. The Magistrate Judge denied the Attorney General's motion and found that the Governor was responsible for complying with any judgment

---

[2]There has been little activity in the *Torres* action.

2

1    regarding Guam's tax and should have his interests in the litigation represented. *Id.,* Exh. N. The

2    Attorney General moved for reconsideration of that decision, which the Magistrate Judge denied.[3]

3    *Id.,* Exh. O.

4           In December 2004, Ms. Naputi dismissed her appeal of the intervention order and filed the

5    instant action with plaintiff Mary Simpao, *Simpao v. Government of Guam,* Guam Dist. Ct. Civil

6    Case No. CV04-00049.[4] Plaintiffs, Naputi and Simpao also sought to create a class action to recover

7    the EIC.

8           In March 2005, the parties in the *Santos* case entered into mediation before JAMS Mediator

9    Catherine Yanni, Esq. Benjamin Decl., Exh. P. In May 2005, all of the parties with the exception

10    of the Attorney General entered into a binding term sheet. *Id.,* Exh. R.

11           On June 7, 2005, the Governor through his attorneys requested that the Attorney General

12    give notice of the term sheet in this action. Benjamin Decl., Exh. T. The Attorney General did not

13    respond to the Governor's request. *Id.* at ¶ 21. The Governor then filed his own notice in this

14    action.

15           On June 14, 2005, the present case came before the Court on the plaintiffs' motion for partial

16    summary judgment. Based in part on the Attorney General's concession on the issue, the Court

17    granted the plaintiffs summary judgment on the issue of whether EIC applies to Guam.

18           On June 20, 2005, all parties and attorneys to the *Santos* mediation, with the exception of

19    the Attorney General, executed a binding settlement agreement for $90 million. Benjamin Decl.,

20    Exh. U. On June 20 and 21, 2005, they filed pleadings to request preliminary approval of the

21    settlement and conditional class certification so that they could proceed with class notice. *Id.,* Exhs.

22    V, W, & X. The Attorney General has yet to approve the settlement.

23    ///

24    ///

25    _____

26           [3]Chief District Judge, Consuelo B. Marshal, sitting by designation, affirmed the
     Magistrate Judge's ruling on this issue. *See Santos v. Camacho et. al.,* Guam Dist. Ct. Civ. Case

27    No. 04-0006, August 12, 2005 Order.

28           [4]Janice Cruz was subsequently added as a plaintiff.

3

1    ///

2                                    **DISCUSSION**

3           The Governor now brings this motion to intervene for the following reasons: (1) his

4    exclusive control over the administration of the Guam Territorial Income Tax ("GTIT") as

5    established by the District Court of Guam; (2) his status as a named defendant in two almost-

6    identical putative EIC class actions; (3) the *Santos* settlement and his need to be able to move to stay

7    this action based on this settlement and to be able to assert that settlement as a defense in this action;

8    and (4) the Attorney General's apparent refusal to represent the Governor's position regarding the

9    GTIT or *Santos* settlement. *See* Memorandum in Support of the Motion to Intervene.

10          The Governor first asserts that pursuant to Rule 24(a) of the Federal Rules of Civil Procedure

11   intervention is allowed as a matter of right. In the alternative, the Governor argues that intervention

12   is permissible under Fed. R. Civ. P. 24(b).

13                  Rule 24(a) provides:

14                  Upon timely application anyone shall be permitted to intervene in an
                    action: (1) when a statute of the United States confers an
15                  unconditional right to intervene; or (2) when the applicant claims an
                    interest relating to the property or transaction which is the subject of
16                  the action and the applicant is so situated that the disposition of the
                    action may as a practical matter impair or impede the applicant's
17                  ability to protect that interest, unless the applicant's interest is
                    adequately represented by existing parties.
18
     Fed. R. Civ. P. 24(a).
19
            The Ninth Circuit has adopted a four-prong test for intervention.  A party seeking to
20
     intervene as a matter of right must show: (1) the application is timely; (2) the applicant has a
21
     significant protectable interest relating to the property or transaction that is the subject of the action;
22
     (3) the disposition of the action may, as a practical matter, impair or impede the applicant's ability
23
     to protect its interest; and (4) the existing parties may not adequately represent the applicant's
24
     interest. *United States v. Alisal Water Corp.*, 370 F.3d 915, 919 (9th Cir. 2004) (quoting *United*
25
     *States v. City of Los Angeles*, 228 F.3d 391, 397 (9th Cir. 2002)).  The applicant for intervention
26
     bears the burden of proving that all four requirements for intervention have been met. *Alisal Water*,
27
     370 F.3d at 919. "In determining whether intervention is appropriate, courts are guided primarily
28

                                                    4

1   by practical and equitable considerations, and the requirements for intervention are broadly

2   interpreted in favor of intervention." *Id.* "[C]ourts generally construe [the Rule] broadly in favor

3   of proposed intervenors." *United States v. City of Los Angeles*, 228 F.3d at 397.

4   'A liberal policy in favor of intervention serves both efficient
    resolution of issues and broadened access to the courts. By allowing

5   parties with a *practical* interest in the outcome of a particular case to
    intervene, we often prevent or simplify future litigation involving

6   related issues; at the same time, we allow an additional interested
    party to express its views before the court.'

7
    *Id.* at 397-398 (citations omitted).

8
        Before even addressing the four-prong test, the plaintiffs first claim that the Governor cannot

9   be added as a party in this action because he could not have been named as a defendant when the

10  action was first brought. Therefore, intervention is improper. Specifically, the plaintiffs argue that

11  Congress has limited the scope of Guam's waiver of sovereign immunity in a tax refund suit.

12  Pursuant to 48 U.S.C. § 1421(h)(2) only the Government of Guam may be made a party.

13
        (2) Suits for the recovery of any Guam Territorial Income Tax alleged to

14      have been erroneously or illegally assessed or collected, or of any penalty
        claimed to have been collected without authority, or of any sum alleged to

15      have been excessive or in any manner wrongfully collected, under the
        income tax laws in force in Guam, pursuant to subsection (a) of this section,

16      may, regardless of the amount of the claim, be maintained against the
        government of Guam subject to the same statutory requirements as are

17      applicable to suits for the recovery of such amounts maintained against the
        United States in the United States district courts with respect to the United

18      States Income Tax.

19  48 U.S.C. § 1421(h)(2).

20      In this instance, the Court finds that the issue of whether the Governor of Guam could be

21  made a party is inapplicable to the analysis of whether intervention in this matter is proper. The

22  Court is not persuaded that the caselaw cited by the plaintiffs precludes the Governor from seeking

23  to intervene. The Governor's role is inextricably intertwined with respect to the GTIT, the subject

24  matter of this case, and his interests should be represented. Accordingly, the Court focuses on

25  whether there is a basis to permit the Governor of Guam to intervene as a matter of right under the

26  four-prong test for intervention.

27      As noted above, a party seeking to intervene as a matter of right must show four things. One

28  of the first things the party must show is that the application is timely. Timeliness is a threshold

5

1   issue requirement for intervention as a right. *League of United Latin Am. Citizens v. Wilson*, 131
2   F.3d 1297, 1302 (9th Cir. 1997). In determining whether a filing is timely, courts consider "(1) the
3   stage of the proceeding at which an applicant seeks to intervene; (2) the prejudice to other parties;
4   and (3) the reason for the length of the delay." *Alisal Water*, 370 F.3d at 921 (quoting *Cal. Dep't*
5   *of Toxic Substances Control v. Commercial Realty Projects, Inc.*, 309 F.3d 1113, 1119 (9th Cir.
6   2002)).

7        The plaintiffs argue that the motion is untimely because the cause of action is not in the
8   "early stage." Further, they claim that this Court has already found in favor of the plaintiffs by
9   ruling that the defendant "must pay the EIC in full to eligible claimants and that all tax returns filed
10  during relevant years constitute sufficient claims made for EIC amounts due to those taxpayers (*i.e.*,
11  none of the claims are time barred)." Plaintiffs' Opposition to Proposed Intervenor-Defendant Felix
12  P. Camacho's Motion to Intervene, p. 12. The plaintiffs have misread this Court's prior order. At
13  no time did this Court state that the claims were not time barred. In fact, the Court stated that "it
14  would refrain from addressing whether the statute of limitations would act as a bar to many of the
15  claims pursued in a refund suit." *See* June 15, 2005 Order, Docket No. 99. The only conclusion this
16  Court previously reached was that the EIC applied to Guam.

17       The Court finds that this matter is still very much in the early stages. Pleadings have only
18  recently been closed in this case, with an amended answer filed on June 7, 2005. There has been
19  no certification of the class in this matter and no real discovery taken thus far.[5] Any delay on the
20  part of the Governor seeking to intervene was due to the Governor's belief that the Attorney General
21  would adequately represent his concerns to this Court. However, it is clear from the record in this
22  case that conflicting positions developed between the Attorney General and the Governor, thereby
23  necessitating the need for the Governor to intervene in this matter in order to have his voice heard.
24  This Court finds that the Governor has met the first prong and that the motion is timely.

25

26       [5]Moreover, the Court is aware of the fact that the Governor is further along in the
     settlement process in the related *Santos* case. This Court notes that many of the putative class
27  members may fare better under a structured settlement agreement. Should they proceed with a
     tax refund suit the relief sought for many of the tax years in question may be barred because of a
28  statute of limitations problem.

6

1    The next requirement for intervention as a matter of right, concerns whether the Governor
2  has a significant protectable interest relating to the property or transaction that is the subject of the
3  action. The Ninth Circuit has stated that "[a]n applicant for intervention has a significantly
4  protectable interest if the interest is protected by law and there is a relationship between the legally
5  protected interest and the plaintiff's claims." *Alisal Water,* 370 F.3d at 919.  Here, the Governor
6  has an interest protected by law in this matter. The Governor of Guam is charged with the execution
7  and administration of the GTIT. *See* 48 U.S.C. § 1421i.  For the orderly administration of
8  government, it is necessary that the Governor be able to set and administer tax policy on behalf of
9  the Government of Guam. Moreover, the Governor is currently trying to settle the *Santos* case and
10 may seek to assert the settlement as a defense in this matter. Additionally, there is a relationship
11 between his interest in administering the GTIT and the plaintiffs' claims to the EIC. Accordingly,
12 the Court finds the Governor has met the second requirement.

13    The third requirement for intervention concerns whether the disposition of the action may
14 impair or impede his ability to protect that interest. The Court is aware of the fact that the Governor
15 has entered into a settlement agreement in the *Santos* matter and that the disposition of this case may
16 impact that settlement.  For example, there are presently two requests for class certification, one in
17 this case and the second request in the *Santos* matter. The interests between the putative two classes
18 are so similar it is likely that there would be interference and a possible collapse of the settlement
19 agreement in *Santos* if the Court first certified the class in this action. Accordingly, the Court finds
20 that the Governor's interest in the administration and execution of the GTIT may be impaired or
21 impeded by the disposition of this case. Thus, the third requirement has been satisfied.

22    Lastly, in order to intervene in this action, the Governor needs to show that the existing
23 parties do not adequately represent his interests.  The Ninth Circuit considers three factors in
24 determining the adequacy of representation: "(1) whether the interest of a present party is such that
25 it will undoubtedly make all of a proposed intervenor's arguments; (2) whether the present party is
26 capable and willing to make such arguments; and (3) whether a proposed intervenor would offer any
27 necessary elements to the proceeding that other parties would neglect." *Araki v. Cayetano,* 324 F.3d
28 1078, 1086 (9th Cir. 2003).  "The most important factor in determining the adequacy of

7

1   representation is how the interest compares with the interests of existing parties. *Id.* "Where parties

2   share the same ultimate objective, differences in litigation strategy do not normally justify

3   intervention." *Id.*

4        Undoubtedly, the Governor should have input in this matter and his concerns considered

5   because of his role in the administration of the GTIT. Whether the case proceeds via litigation or

6   settlement, the Governor needs to be able to plan his budget in the event judgment is entered against

7   the Government of Guam, or the matter settles. It is inconceivable that this case can be resolved

8   without him. However, it appears that the Attorney General's representation of the Governor's

9   concerns in this matter may be lacking. For example, the Governor claims that at the hearing for

10  partial summary judgment on June 14, 2005, the Attorney General abandoned the arguments raised

11  in the opposition brief that had been prepared after consultation with the Governor's counsel, and

12  conceded key issues. *See* Reply in Support of the Governor of Guam's Motion to Intervene, at p.

13  2. And, the Attorney General did not disclose the *Santos* settlement agreement to this Court, despite

14  the Governor's request that he do so. *Id.* Under the circumstances, the record supports a finding

15  that the Governor of Guam is not being adequately represented in this matter. Accordingly, the

16  Governor has met the fourth requirement for intervention as of right.[6]

17                                  **CONCLUSION**

18       Based upon the foregoing, the Court hereby **GRANTS** the Motion to Intervene, finding that

19  the Governor has established a right to intervene.

20

21       SO ORDERED this 12th day of September 2005.

22

23                              /s/ Ricardo S. Martinez
                                UNITED STATES DISTRICT JUDGE

24

25

26       [6]Having concluded that the Governor has a right to intervene, the Court need not consider
     whether permissive intervention is warranted.

27

28       *The Honorable Ricardo S. Martinez, United States District Judge for the Western District of
     Washington, by designation.

                                         8