

**Office of the Attorney General**
**Douglas B. Moylan**
Attorney General of Guam
**Civil Division**
The Justice Building
287 West O'Brien Drive
Hagåtña, Guam 96910 ● USA
(671) 475-3324 ● (671) 472-2493 (Fax)
www.guamattorneygeneral.com ● guamattorneygeneral@hotmail

**Attorneys for the People of Guam (Government of Guam)**

**FILED**
DISTRICT COURT OF GUAM

MAR 1 4 2006

MARY L.M. MORAN
CLERK OF COURT

# IN THE DISTRICT COURT OF GUAM
# HAGÅTÑA, GUAM

| | |
|---|---|
| JULIE BABAUTA SANTOS, individually and on behalf of all those similarly situated, <br><br>             Petitioner, <br><br>             vs. <br><br> FELIX P. CAMACHO, Governor of Guam; ART ILAGAN, Director of Department of Revenue and Taxation; LOURDES M. PEREZ, Director of Department of Administration; DOUGLAS B. MOYLAN, Attorney General of Guam; and GOVERNMENT OF GUAM, <br><br>             Respondents. | Civil Case No. 04-00006 <br><br><br> **MOTION FOR RECONSIDERATION OF ORDER DISQUALIFYING THE PEOPLE'S ELECTED ATTORNEY GENERAL** |

Page i
*Motion for Reconsideration of Order Disqualifying the People's Elected Attorney General*
District Court of Guam Case Number 04-00006

Case 1:04-cv-00006    Document 295    Filed 03/14/2006    Page 1 of 27

# TABLE OF CONTENTS

**Page**

A. **Congressional & Legislative Intent for Autonomous & Independent Attorney General of Guam** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

B. **Attorney General Controls Civil & Criminal Taxation Litigation** . . . . . . . . . . . . . . . . . . . . . . . . . 9

C. **Governor *Not* Client of Attorney General, and Illegally Opposed the EITC Payments** . . . . . . . . . . . . 16

**Conclusion** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

**Addendum** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21-175

**Certificate of Service** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 176

Page ii
*Motion for Reconsideration of Order Disqualifying the People's Elected Attorney General*
District Court of Guam Case Number 04-00006

Case 1:04-cv-00006    Document 295    Filed 03/14/2006    Page 2 of 27

# TABLE OF AUTHORITIES

**Page**

**CASE LAWS:**

*Attorney General of Georgia v. The State Bar of
    Georgia,*
        Civ. Action No. 87-9032-2 Super. Ct. (1987) . . . . . . . . . . . . . . . . . . . . 4

*Attorney General of Guam vs. Y'Asela Pereira, Treasurer,
    Government of Guam,*
        SP32-03 (Super. Ct. Guam May 5, 2003) . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Connecticut Commission on Special Revenue v. Connecticut
    Freedom of Information Comm'n.,*
        174 Conn. 308, 318-319, 387 A.2d 533, 537 (1979) . . . . . . . . . . . . . . 5

*Ex Parte Weaver,*
        570 So.2d 675 (1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Feeney v. Commonwealth,*
        373 Mass. 359 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, passim

*Fergus v. Russel,*
        270 Ill. 304, 110 N.E. 120 (Ill. 1915) . . . . . . . . . . . . . . . . . . . . . . . . . 3, 19

*Gibson v. Johnson,*
        35 Or.App. 493, 582 P.2d 452 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Governor of Guam vs. Attorney General,*
        9th Circuit Court of Appeals Case Number 03-72836 . . . . . . . . . . . . . . . . 14

*Government of Guam v. Camacho,*
        CIV05-00038 . . . . . . . . . . . . . . . . . . . . . . . . . . . .. . . . . . . . . . . . . . . . . 14, passim

*Gutierrez v. Ada,*
        528 U.S. 250, 254, 120 S.Ct. 740, 744,
        145 L.Ed.2d 747 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~
Page iii
*Motion for Reconsideration of Order Disqualifying the People's Elected Attorney General*
District Court of Guam Case Number 04-00006

Case 1:04-cv-00006    Document 295    Filed 03/14/2006    Page 3 of 27

**Page**

**CASE LAWS:**

*Hauser v. Department of Law,*
  97 F.3d 1152, 1156 (9th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

*In Re Request of I Mina Bente Sing'ko Na Liheslaturan*
  *Guåhan Relative to the Application of the Earned Income*
  *Tax Credit Program to Guam Taxpayers*
  *("The EIC Question"),*
    2001 Guam 3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9, 15, 16

*Lyons v. Ryan,*
  201 Ill.2d 529, 780 N.E.2d 1098 (2002) . . . . . . . . . . . . . . . . . . . . . . . .  19

*Moylan v. Camacho,*
  SP230-03 (Super. Ct. Guam Nov. 10, 2003) . . . . . . . . . . . . . . . . . . . . .  4, passim

Newberg, Inc. v. The Illinois State Toll Highway
    *Authority,* 98 Ill.2d 58, 456 N.E.2d 50 (1983) . . . . . . . . . . . . . . . . . . .  19

*People v. ex rel. Hartigan v. E&E Hauling, Inc.*
    *1992, 180 Ill. Dec. 271, 153 Ill.2d 473,*
    *607 N.E.2d 165* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  5

*Simpao, et al. v. Government of Guam,*
  CIV04-00049 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  16

*Slovacek v. United States,* 40 Fed.Cl. 828, 830 (1998). . . . . . . . . . . . . . . . . . . . 10

*State of Florida ex rel.Shevin v. Exxon Corp.,*
  526 F.2d 266 (5th Cir. 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  18

*The Mayor of the City of New York v. The City Council*
  *of the City of New York,*
    6 Misc.3d 533, 536, 789 N.Y.S. 860, 863 (NY 2004) . . . . . . . . . . . . . . . . . .  3

*State ex rel. Condon v. Hodges,*
  349 S.C. 232, 562 S.E. 2d 63 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4

Page iv
*Motion for Reconsideration of Order Disqualifying the People's Elected Attorney General*
District Court of Guam Case Number 04-00006

Case 1:04-cv-00006    Document 295    Filed 03/14/2006    Page 4 of 27

**LOCAL STATUTES:**

5 G.C.A. § 30101(a) ................................................... 1,2

**FEDERAL STATUTES:**

28 U.S.C. § 1292(b) ..................................................... 1

48 U.S.C. § 1421g(a). ................................................... 12

48 U.S.C. § 1421g(c) ................................................... 7

48 U.S.C. § 1421(g)(d)(1) .............................................. 1,7

48 U.S.C. §§ 1421i(c) .................................................. 12

48 U.S.C. § 1422 ...................................................... 10

48 U.S.C. § 1423a ..................................................... 16

48 U.S.C. § 1424-4 .................................................... 11

1421i(d)(2) ........................................................... 12

Rule 5(a)(3) of the Federal Rules of Appellate
   Procedure to the Ninth Circuit Court of Appeals ....................... 1

L.R. 7.1(i) ............................................................ 1

HR2370 (U.S. P.L. No. 105-291 ......................................... 13

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~
Page v
*Motion for Reconsideration of Order Disqualifying the People's Elected Attorney General*
District Court of Guam Case Number 04-00006

Case 1:04-cv-00006     Document 295     Filed 03/14/2006     Page 5 of 27

**OTHERS:**

L.R. 7.1(i) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1

HR2370 (U.S. P.L. No. 105-291 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   13

HR2370 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   8

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

The Attorney General of Guam, by virtue of his *democratically* elected status as the People of Guam's (Government of Guam's) counsel, respectfully moves this Honorable Court to Reconsider its March 10, 2006 order reversing the Honorable Joaquin V.E. Manibusan, Jr's. decision, and dismissing the People of Guam's elected attorney from representing their legal interests in the above captioned case. Alternatively to certify this important question for interlocutory appeal pursuant to 28 U.S.C. § 1292(b) & Rule 5(a)(3) of the Federal Rules of Appellate Procedure to the Ninth Circuit Court of Appeals.

Pursuant to L.R. 7.1(i), the Attorney General of Guam respectfully moves this Honorable Court to reconsider its March 10, 2006 Order. This Court ordered that the Attorney General of Guam cannot represent the Government in this case because he is not adequately representing the Governor's interests. The Attorney General of Guam respectfully suggests that the Governor of Guam is *not* the client of the Attorney General of Guam, but that the People of Guam vis-à-vis the Government of Guam is that client, and that Congress intended the Attorney General to provide independent and autonomous representation for the People, free from *direct* Gubernatorial.

## A. Congressional & Legislative Intent for Autonomous & Independent Attorney General of Guam.

The Attorney General of Guam is a position which was recently (i) elevated, (ii) created and (iii) empowered by Congress in 1998 in U.S. Public Law Number 105-291, HR2370, codified as 48 U.S.C. § 1421(g)(d)(1). The Attorney General of Guam was created by Congress to be the *"chief legal officer of the Government of Guam." Id.* Congress permitted the Legislature of Guam to decide whether they wished the position to be democratically chosen by the People through an election, which it did in 1999 for the

Page 1
*Motion for Reconsideration of Order Disqualifying the People's Elected Attorney General*
District Court of Guam Case Number 04-00006
Case 1:04-cv-00006 Document 295 Filed 03/14/2006 Page 7 of 27

2002 election. 48 U.S.C. § 1421(g)(d)(1). Guam P.L. No. 25-44. 5 G.C.A. § 30101(a). This Office of Attorney General is the first elected term of the Attorney General.

The need for Congress to intervene into elevating the position from a locally created office to that of a Constitutional or Organic position, such as the Governor's, arose from a perception at the time that the Attorney General was not enforcing the law and needed to be isolated from local politics and control ("political interference"). **Addendum A.** <u>Note</u> *Hauser v. Department of Law*, 97 F.3d 1152, 1156 (9th Cir. 1996). Congress wanted to make the position autonomous and independent, free from control by the Governor. In creating the position in the Organic Act, Congress permitted the Guam Legislature to make it elected, which it immediately did so the following year, in 1999, to become effective for a four (4) year term starting in 2003. 5 G.C.A. § 30101(a). It appears that the position of Attorney General of Guam was probably created on Guam between 1946 and 1950 as part of the Naval Government administering Guam for Congress.

Whether the Office is appointed or elected, the Attorney General maintains an independent duty to enforce the law. Noteworthy is that the position of Attorney General of Guam is the only Federally-created Attorney General that is elected, and the only Attorney General created in Federal law for the U.S. Territories. All elected Attorneys General are in state Constitutions and statutes, and interpretation is left to local state courts. Recently, on January 6, 2005, during the confirmation process of the U.S. Attorney General, Congressman Patrick Leahy, the ranking member of the Senate Judiciary Committee, summarized the independent role of the U.S. Attorney General when the Congressman stated,

> As Justice James Iredell wrote in 1792, the person who serves as attorney general is, quote, "not called attorney general of the president, but attorney general of the United States."

Page 2
*Motion for Reconsideration of Order Disqualifying the People's Elected Attorney General*
District Court of Guam/Case Number 04-00006
Case 1:04-cv-00006   Document 295   Filed 03/14/2006   Page 8 of 27

Now, the post is quite distinct from the position. Judge Gonzales has performed for the president. There he acted as a spokesman for the administration and appeared as chief defense lawyer for the White House on a number of very important and, many times, politically sensitive issues.

So a key question for this hearing is whether the nominee shares this view of the crucial role of the attorney general.

When he was designated for this position by the president, Judge Gonzales said he was looking forward to continuing to work with friends and colleagues in the White House in a different capacity on behalf of our president.

But, you know, there are going to be times -- there may well be times when the attorney general of the United States has to enforce the law, and he can't be worried about friends or colleagues at the White House. His duty is to all Americans: Republicans, Democrats, independent, all Americans.

In a time when the Republican Party has control of all three branches of the federal government, my worry is that our system of checks and balances may become short-circuited by too few checks on assertions of executive branch authority.

*Source* http://judiciary.senate.gov/member_statement.cfm?id=1345&wit_id=2629.

*See also* **Addendum B.** Congressman Leahy succinctly summarized the duty of the Attorney General, a position which is over 700 years old, unlike that of the President or the Governor of Guam. National Association of Attorneys General, STATE ATTORNEYS GENERAL: POWERS AND RESPONSIBILITIES, Ross at 27-31. (*See Fergus v. Russel*, 270 Ill. 304, 110 N.E. 120 (Ill. 1915) for a history of the position of Attorney General). As stated during the hearings, and is part of the Official Congressional Record, *"The (U.S.) Attorney General should represent the interests of all Americans and is the nation's chief law enforcement officer."*

The People have a right to have the benefits of the service of that elected official, and that official need not have to share his statutory power with other officials. *The Mayor of the City of New York v. The City Council of the City of New York*, 6 Misc.3d 533, 536, 789 N.Y.S. 860, 863 (NY 2004).

Page 3
*Motion for Reconsideration of Order Disqualifying the People's Elected Attorney General*
District Court of Guam Case Number 04-00006
Case 1:14-cv-00006   Document 295   Filed 03/14/2006   Page 9 of 27

The primary function of the Attorney General is to Protect the Public Interest. *Feeney v. Commonwealth*, 373 Mass. 359, 366 N.E.2d 1262 (1977). The duty of the Attorney General is not to represent the legal policy which a particular government official desires the Attorney General to represent, such as might a private attorney. *Attorney General of Georgia v. The State Bar of Georgia*, Civ. Action No. 87-9032-2 Super. Ct. (1987). If that was the case, then why should the People pay for and exercise their right to a free election to choose an Attorney General. The Guam Courts have likewise held that Government officials are not the "client" of the Attorney General in the typical private Attorney-client relationship. *Moylan v. Camacho*, SP230-03 (Super. Ct. Guam Nov. 10, 2003). **Addendum C.** In fact it is the People of Guam collectively who are the client, and those same people have chosen the Attorney General during the last election, based upon the legal policy platform each Attorney General candidate presented before the electorate. Contrary to the Court's *Deukmejian* reference, and expressly citing and discounting its application, the Superior Court of Guam in *Moylan v. Camacho* held that the dual role of the public's attorney did not violate the ethics role when the Attorney General sued the Governor of Guam. *Moylan v. Camacho*, SP230-03 at 40-41. The Superior Court was quite cognizant of the checks and balance needed in the Government. Moreover, the Court in *Camacho* cited with approval *State ex rel. Condon v. Hodges*, 349 S.C. 232, 562 S.E. 2d 63 (2002) wherein the Attorney General was found to not violate any laws or ethics rules when the South Carolina Attorney General sued the South Carolina Governor. *Moylan v. Camacho*, SP230-03 at 30.

As other states have held, the Attorney General is in a unique position . . . this special status of the Attorney General where the people of the state are his clients

Page 4
*Motion for Reconsideration of Order Disqualifying the People's Elected Attorney General*
District Court of Guam Case Number 04-00006
Case 1:04-cv-00006 Document 295 Filed 03/14/2006 Page 10 of 27

cannot be disregarded in considering the application of the code of professional responsibility to the conduct of his office . . . if the AG is to have unqualified role of chief legal officer of the state, he or she must be able to direct the legal affairs of the state and its agencies. *Connecticut Commission on Special Revenue v. Connecticut Freedom of Information Comm'n.*, 174 Conn. 308, 318-319, 387 A.2d 533, 537 (1979). Noteworthy, is that a vast majority of states have an elected Attorney General, about forty-four (44) states. COMMON LAW POWERS OF THE ATTORNEY GENERAL, note 13 at 4. STATE ATTORNEYS GENERAL, Ross at 31.

Guam is the first in our area of the world, by virtue of Congress' action, to have an elected Attorney General. Not even Hawaii, Alaska nor the CNMI have an elected Attorney General, but represent a minority of jurisdictions still holding on to the appointed Attorney General system. However, whether the Attorney General is elected or not, does not obviate or change any Attorney General's primary duty to "Protect the Public Interest," regardless of whether the approach of the Attorney General conflicts with the Governor in litigation matters. STATE ATTORNEYS GENERAL, Ross at 38-39; *People ex rel. Hartigan v. E & E Hauling, Inc.*, 1992, 180 Ill.Dec. 271, 153 Ill.2d 473, 607 N.E.2d 165 (Attorney General has common-law duty to protect public purse as matter of general welfare). Practically though, if an appointed Attorney General tries to Protect the Public Interest, and that legal policy differs with the Governor's, like is the case herein, then the Attorney General would likely be removed. This probably accounts in part to the reason why most all the States in the Union have elected Attorneys General. The elected status makes the Attorney General directly accountable to the People, and more autonomous and independent from the control of any government official's control.

Page 5
*Motion for Reconsideration of Order Disqualifying the People's Elected Attorney General*
District Court of Guam Case Number: 02-00006
Case 1:04-cr-00006 Document 295    Filed 03/14/2006    Page 11 of 27

The Court's decision alluded to Hawaii[1] as having Attorneys General who have government officials as clients who control the Attorney General's legal policy. Further, the Court stated that Congress did not describe the powers of the Attorney General[2]. However, Congress' language was more like other jurisdictions which utilized the "chief legal officer"-type language, which Congress in 1998 was keenly aware of and the state court case decisions interpreting that type of Attorney General. Because Congress adopted the phrase *"chief legal officer,"* used by a select number of States[3], thereby creating and empowering the position of Attorney General, Guam's unique Congressional history warrants special attention. Note the comparison of jurisdictions and how their enabling legislation have effected their interpretive histories.

**Addendum D.** Guam's enabling language passed by Congress tracks a handful of state jurisdictions which use *"chief legal officer"* language supporting Mr. Troutman, Congressman Underwood and Congressman Young's desire that the office be autonomous and independent of Gubernatorial control and local Island politics. *Infra.*

When Congress suddenly created the position of Attorney General for Guam in 1998, it patterned the position after a select group of <u>state</u> Attorneys General, which had unique language. The language eventually utilized by Congress limited its interpretation of its powers to those like the Illinois Constitution's, *infra,* and was intended to address the reasons why the position was brought to Washington, D.C. to be elevated from local statute passed by the Legislature of Guam, to that of Constitutional / Organic Act significance. The law passed by Congress not only mandated that the position exist on Guam, but that it be infused with duties and powers associated with the language *"chief*

---

[1] Page 8, lines 16-17 of Court's March 10, 2006 order.
[2] Page 8, lines 6-8 of Court's March 10, 2006 order.
[3] Illinois, Mississippi, South Carolina, Florida, California, Georgia, Massachusetts and Montana.

Page 6
*Motion for Reconsideration of Order Disqualifying the People's Elected Attorney General*
District Court of Guam Case Number 04-00006
Case 1:04-cv-00006 Document 295 Filed 03/14/2006 Page 12 of 27

legal officer of Guam." 48 U.S.C. § 1421(g)(d)(1). Congress did not mean a meaningless act by passing the legislation with those particular words. *Gutierrez v. Ada*, 528 U.S. 250, 254, 120 S.Ct. 740, 744, 145 L.Ed.2d 747 (2000). Had Congress not intended such an effect, it could simply have stated, "there shall be an Attorney General whose powers shall be set by the Legislature of Guam." However, such was not the case. This was unlike the Public Auditor statute which Congress expressly left to the local government to regulate. 48 U.S.C. § 1421g(c).

Noteworthy is that between the time that Congressman Underwood, the author of the Constitutional Attorney General, introduced the bill (**Addendum E**), and the time the legislation was passed, several letters were submitted between then Guam Compiler of Laws Charles H. Troutman and Congressman Underwood, apparently causing the changing the wording of the legislation into its present language (**Addendum F**). On April 1, 1997 Mr. Troutman suggested a change in the language from its original language permitting the Guam Legislature to create the Office, to its current language stating that *"the Attorney General shall be the chief legal officer of the government of Guam."* 48 U.S.C. § 1421(g)(d)(1). **Addendum G.** That letter also referenced Illinois' Constitution to be "instructive" and the source of Mr. Troutman's recommended amendments. Congressman Underwood responded on July 10, 1997 requesting additional comments from Mr. Troutman, and focusing on the ability to make the office an elected position. **Addendum H.** In Mr. Troutman's July 16, 1997 response, he specifically referenced the ability of the Attorney General to be protected from removal *"at the will of the Governor."* **Addendum I.** Mr. Troutman further stated in the July 16, 1997 letter to advise that the Constitutional change had to empower the office with some "basic constitutional powers" in the enabling language, not subject to change by the

Page 7
*Motion for Reconsideration of Order Disqualifying the People's Elected Attorney General*
District Court of Guam Case Number 04-00006
Case 1:04-cv-00006 Document 295 Filed 03/14/2006 Page 13 of 27

Guam Legislature. He also again referenced the State of Illinois as the source of his recommended changes. By October 29, 1997 Mr. Troutman was again the Attorney General[4] and in his testimony he urged the Congressional oversight committee he made reference to the bill patterned the Guam Attorney General to that of the U.S. Attorney General. **Addendum J.** Interestingly, the U.S. Attorney General through the Department of Justice controls taxation decisions in litigation. It is clear from Mr. Troutman's testimony that the Attorney General be independent and autonomous to develop the Office, hence his request for an election process.

On September 24, 1998 the U.S. House of Representatives' Committee on Resources (Congressman Don Young) of the 105th Congress, 2nd Session, Report 105-742 issued its report on HR2370 recommending passage in the form it is today, and stated specifically as to the legislation:

> **BACKGROUND AND NEED FOR LEGISLATION. . .** Changes in the fundamental functions of any of the three branches of government in Guam can only occur by amendments to the Organic Act by Congress, as Guam is unable to make changes through local law. . . . However, these provisions are responsive to current specific requests of the Government of Guam and are expected to foster greater efficiency and equity.
> **ATTORNEY GENERAL OF GUAM.** . . . Controversies have arisen in the past because the appointment nature of the position of Attorney General. Public concerns revolve around political interference with investigations, inefficiency of case work and dismissal of the Attorney General without cause. . . . (Emphasis added).

**Addendum A.** Congress clearly did not intend to make the Attorney General either under the direct control of the Governor, or subject to removal by him. Had the Attorney General been the traditional, private counsel *of the Governor* he would have been removable at the will of his client, the Governor. But he was not made subject to

---

[4] Mr. Troutman had served as the Attorney General during different times in Guam's history, and was actively communicating with Delegate Robert Underwood towards the final drafting of the Attorney

Page 8
*Motion for Reconsideration of Order Disqualifying the People's Elected Attorney General*
District Court of Guam Case Number 04-00006
Case 1:04-cv-00006 Document 295 Filed 03/14/2006 Page 14 of 27

Governor's control, just the opposite . . . Congress transitioned the position of Attorney General into the Organic Act, like the Governor, and gave the Guam Legislature what it had sought to make the position elected, to give true autonomy and independence from the Governor.

## B. Attorney General Controls Civil & Criminal Taxation Litigation.

Like the United States Attorney General, the Attorney General of Guam directs and controls tax litigation, once litigation has been initiated. In this case the AG, like in all past cases for the past five (5) decades since the Organic Act was passed, represented the Government once it was sued in a tax matter. Here the Court in an unprecedented action has now divested the People of Guam of their democratically elected legal representative, just because that representative would not follow the orders of the Governor, who sought to unsettle the $60M settlement[5]. The Governors of Guam have for years refused to pay the Earned Income Tax Credit, and this Governor continued to refuse to pay it despite a Supreme Court of Guam decision in *In Re Request of I Mina Bente Sing'ko Na Liheslaturan Guåhan Relative to the Application of the Earned Income Tax Credit Program to Guam Taxpayers ("The EIC Question")*, 2001 Guam 3 finding it an obligation of the Governor, who administers the tax system. **Addendum K.** Further, that same Governor's administration and his chief of staff secretly attempted to pay one (1) EIC recipient without attempting to pay all others, including those who were entitled before that EIC recipient to receive the refund. **Addendum L.** Does the Attorney General's role in the Government of Guam protect a Governor's action therein? Who

General amendment to the Organic Act, changing it from its original as introduced bill version.
[5] This is the only settlement which was accepted by the Court, and was endorsed by the Acting Governor.

Page 9
*Motion for Reconsideration of Order Disqualifying the People's Elected Attorney General*
District Court of Guam CV06-00006
Case 1:06-cv-00006 Document 295 Filed 03/14/2006 Page 15 of 27

makes the decision that the Governor was not following the law? These are exactly the issues dealt with in *Moylan v. Camacho*, SP230-03.

The only reconcilable interpretation is that followed for centuries in American jurisprudence that the AG represents the People above all other government officials, when the government officials fail to follow the law. As the Congressionally mandated "*chief legal officer*" the Attorney General of Guam sets legal policy for the Government of Guam before the Courts, *not* the Governor of Guam. Moreover, Congress mandated that the Attorney General "*shall*" be the attorney for the Government of Guam, not the Governor in tax cases, and further not that the Governor of Guam be the legal representative for the Government of Guam.

Noteworthy is that since 1950 the Attorney General of Guam always handled tax litigation cases for the Government of Guam, and it was not until this instance that the Governor has attempted to intervene into tax litigation[6].

Although the Governor "controls" the administration and enforcement of taxation on Guam, as set forth in the Organic Act; like in the Federal Government, which is the same one which created the position of Attorney General of Guam, once litigation has begun, the Attorney General controls the direction of the litigation. *Ex Parte Weaver*, 570 So.2d 675 (1990). *Note Slovacek v. United States,* 40 Fed.Cl. 828, 830 (1998). If this were the case, then the Governor *also* controls the direction of criminal cases, since he is specifically tasked in the Organic Act with "faithful execution of the laws." 48 U.S.C. § 1422. This literally means that the Governor of Guam shall have the authority to direct all actions of the Attorney General of Guam, in civil and criminal prosecution, similar to the construction of the taxation laws by this Honorable Court in its March 10th order. Why

Page 10
*Motion for Reconsideration of Order Disqualifying the People's Elected Attorney General*
District Court of Guam Case Number 04-00006     Document 295     Filed 03/14/2006     Page 16 of 27

1  have an elected Attorney General if that person is simply going to represent the Governor

2  as his client? This scheme violates an elected AG's autonomy and independence. It also

3  would logically result in simply a Governor hiring his own Attorney General, and doing

4  away with the burdensome and unnecessary Democratic election process. The Governor

5  would be a super-official, who would be above the law in all respects since he could

6  "direct" the actions of the chief legal officer for Guam, and if he opposed the Governor he

7  would be disqualified and conflicted out from prosecuting or challenging the Governor[7].

8  This likewise runs afoul of the Congressional history behind Guam's quest for an

9  independent and autonomous elected Attorney General, protected from manipulation by

10  being placed in the Organic Act of Guam.

11      In *Moylan v. Camacho*, SP230-03 at 19, the court there stated that,

12
13              With regard to the federal enforcement of territorial income taxes
                in Guam, the Attorney General has been entrusted with its
14              enforcement. . . . (citing and listing 48 U.S.C. § 1424-4) . . . It can
                be seen from some of the statutes (local and federal) which have
15              made reference to the Attorney General that the Attorney General
                indeed is the primary figure, if not the chief figure, in the legal
16              affairs and enforcement of the affairs of the government of Guam.

17  The Attorney General on Guam and throughout the United States functions as a watchdog

18  for the People, a safety valve, like the Public Auditor. However, unlike the Public Auditor,

19  which is only permitted if the local legislature wishes, the Attorney General of Guam shall

20  exist and it shall have the authority conferred by "chief legal officer" status – by mandate

21  of Congress. The Attorney General in any jurisdiction plays a critical role in the balance of

22  powers principle which pervades American jurisprudence and our democratic system of

23  Government. The position is responsible for the enforcement of laws on Guam. If the

24

25

---

[6] Alluding to prior Guam practice for over 50 years and Federal practice illuminates the March 10, 2006 error in the statutory construction of the Organic Act.
[7] Due to the fact the Attorney General of Guam would be the Governor's client.

Page 11
*Motion for Reconsideration of Order Disqualifying the People's Elected Attorney General*
District Court of Guam Case Number 04-00006            Document 295     Filed 03/14/2006     Page 17 of 27

Governor controls the Attorney General, then who watches the Governor? This is what the Court in *Moylan v. Camacho*, SP230-03 was critically concerned about if it did not permit the AG to enforce the law against the Governor. Under the March 20, 2006 order herein, there now exists a hole in Attorney General of Guam's duty to enforce the tax laws on Guam, notwithstanding Congress not stating that the Attorney General of Guam shall be the Chief Legal Officer, *except* in the area of taxation. The People of Guam do not have a safety valve against the Governor violating the law in the area of taxation. We suggests that the only logical construction of Congress' action, consistent with the manner in which the Department of Justice and the U.S. Attorney General control taxation litigation decisions in the Federal system[8], is that the Attorney General of Guam control litigation decisions if the Government of Guam is sued in tax cases. The fact that the 1998 amendment creating the Constitutional position of Attorney General was passed later in time (after) to the Organic Act statutes referred to by this Honorable Court in its construction of 48 U.S.C. §§ 1421i(c) and 1421i(d)(2), yet did not except the purview of the Attorney General as chief legal officer for the government of Guam reveals Congress' intent that the Attorney General's duties *not* be limited to everything but taxation matters. This logic could likewise be extended to health care litigation cases as well due to the Governor having control thereof. 48 U.S.C. § 1421g(a).

This Honorable Court correctly makes a statement that Congress gave an option to either elect an Attorney General, or to have the Governor appoint one[9]. The Court uses

---

[8] The Attorney General previously extensively briefed the issue of how the Department of Justice, the sister agency to the Attorney General of Guam, controls taxation litigation decisions, even in the face of differing positions to that of the Department of the Treasury officials in the AG's October 28, 2006 legal brief and prior February 28, 2005 and July 19, 2005 oppositions to the Governor's Motion to Disqualify the Attorney General of Guam from representing the Government of Guam.

[9] Page 6, March 10, 2006 Order.

Page 12
*Motion for Reconsideration of Order Disqualifying the People's Elected Attorney General*
District Court of Guam Case Number 06-00006

1    this for the proposition that the Governor must control taxation decisions in litigation.

2    However, it is clear that the Attorney General's duty is the same regardless of whether the

3    Attorney General is elected or appointed. Even more, when an AG is elected, there is

4    greater selection and control by the People of Guam, the Attorney General's client. This

5    principle pervaded the Congressional record for HR2370 (U.S. P.L. No. 105-291). In an

6    elected Attorney General situation, Congressman Leahy stated the role of the U.S.

7    Attorney General quite eloquently. **Addendum B.** The U.S. Attorney General neither

8    blindly follows the orders of the President, nor does the Attorney General of Guam

9    mindlessly follow orders from the Governor of Guam. This is not the design of our system

10    of Government, which based upon the Congressional record for the Attorney General of

11    Guam was patterned after the Illinois Constitution, and states similar to the Illinois model

12    (language).

13        If the Governor's legal policy direction conflicts with what the Attorney General's,

14    either elected or appointed, then the Attorney General's opinion of what is the law and in

15    the best legal interests of the People shall be the direction of the Government in litigation.

16    That is the way the system has operated. There is absolutely no evidence that Congress

17    intended to change this direction, and in fact pushed it towards a more autonomous and

18    independent Attorney General when it gave the Guam Legislature the right to make the

19    position of Attorney General elected. **Addendum A.** 5 G.C.A. § 30101(a). The will of

20    the People prevails on Guam in a direct and tangible manner since the Attorney General is

21    elected by the People to represent their legal interests.

22        The consequences of this Honorable Court's construction of the tax laws include

23    the creation of a satellite-Attorney General's Office within the Office of the Governor of

24    Guam to administer tax litigation and criminal tax prosecution. If the ethics code is as

25

Page 13
*Motion for Reconsideration of Order Disqualifying the People's Elected Attorney General*
District Court of Guam Case Number 04-00006
Case 1:04-cv-00006 Document 295    Filed 03/14/2006    Page 19 of 27

this Honorable Court suggests, then the Attorney General is unable to represent any of the Governor of Guam's legal interests since he is being sued and the Governor of Guam is suing the Attorney General in various other adversarial cases, including the federal borrowing limit (bond) case, *Governor of Guam vs. Attorney General*, 9th Circuit Court of Appeals Case Number 03-72836; the Procurement Appeals Board Case (*Moylan v. Camacho*, SP230-03 (Super. Ct. Guam Nov. 10, 2003), and the Tax Appraisal Case, *Government of Guam v. Camacho*, CIV05-00038. Under a mechanical interpretation of the ethics code, the Attorney General of Guam is unable to represent the Governor in *any* matter. This is exactly the scenario which the Superior Court of Guam encountered when the Attorney General

The local courts have previously entertained issues as to whether the Attorney General's client is the Governor of Guam. In the lawsuit entitled, *Attorney General of Guam vs. Y'Asela Pereira, Treasurer, Government of Guam*, SP32-03 (Super. Ct. Guam May 5, 2003) the Superior Court of Guam found no ethics violation in the Attorney General suing the Governor to enforce the law. **Addendum M.** Moreover, on May 5, 2003 the Superior Court of Guam determined that the Attorney General's duty to enforce the law, as the Attorney General was elected to do so, included the authority to sue government officials and not blindly follow their instructions as a perfunctory attorney-client relationship would involve. *Id.* Most important is that the People of Guam selected their attorney to represent *their* legal interests, not that of the Governor or any other official in particular. Otherwise, there would be no necessity for an election. The Governor, Director of the Department of Revenue and Taxation, the Director of Administration and every other official could use that same taxpayer / voter money to hire their own attorneys to represent their respective legal positions in court. On the

Page 14
*Motion for Reconsideration of Order Disqualifying the People's Elected Attorney General*
District Court of Guam Case Number 04-00006 Document 295     Filed 03/14/2006     Page 20 of 27

contrary, the Attorney General runs for election based upon a unique legal policy platform which the voters evaluate and vote upon. Such is the case herein.

The questions facing this Honorable Court, although cases of first impression on Guam, are by no means new to American jurisprudence. It is a well-accepted principle that once litigation has begun, the Attorney General controls litigation, even over the objection of government officials. This not only ensures that a uniform legal policy is effectuated throughout all the various cases a jurisdiction may be involved in, but that

Taken to its logical conclusion, the Court's decision has serious and damaging consequences to the function of this Territorial Government and the protection of the Public Interest. Criminal cases reflect the independent and autonomous role which Attorneys General maintain in jurisdictions[10]. Under the Court's rationale, it would have the Governor of each state have the authority to interfere with the prosecution of cases, be that deciding which cases to prosecute, how to prosecute them and when to settle by plea or to take them to trial. This is not the method in which American jurisprudence has evolved as to the role of the Attorney General in Government.

---

[10] Like Deleware and Rhode Island which have Attorneys General which serve as criminal prosecutors as well.

*Motion for Reconsideration of Order Disqualifying the People's Elected Attorney General*
District Court of Guam Case Number 04-00006 Document 295   Filed 03/14/2006   Page 21 of 27

## C. Governor *Not* Client of Attorney General, and Illegally Opposed the EITC Payments.

The Governor is not the client of the Attorney General. Several years ago the appointed Attorney General of Guam, John Tarantino, opposed the EIC tax litigation before the Supreme Court of Guam in *In Re Request of I Mina Bente Sing'ko Na Liheslaturan Guåhan Relative to the Application of the Earned Income Tax Credit Program to Guam Taxpayers ("The EIC Question")*, 2001 Guam 3. Under this Honorable Court's logic, the Attorney General back then was the counsel to the Governor of Guam, and rightly opposed the EITC payments because that was the wish of the Governor of Guam. The Supreme Court of Guam ruled that the EITC payments were due and payable. Interestingly, both then Governor Gutierrez and this Governor of Guam, Felix Camacho, refused to pay the EITC payments, hence necessitating this Court having to order payment in the related *Simpao* case[11], *Simpao, et al. v. Government of Guam*, CIV04-00049. Although it is unclear whether the appointed Attorney General was following "orders" of the Governor in opposing the EITC payments in *In Re Request of I Mina Bente Sing'ko Na Liheslaturan Guåhan Relative to the Application of the Earned Income Tax Credit Program to Guam Taxpayers ("The EIC Question")*, 2001 Guam 3, it is clear that the Governors subsequent to that refused to make payments.

Contrary to the prior appointed Attorney General, this democratically elected Attorney General has taken positions in this case, and in other matters of great public importance to the community to further the People of Guam's legal interests, even against the wishes of the Governor of Guam. For example, in 2003 the Attorney General sued the Governor's cabinet member over the non-payment of past due

retirement contributions money due to government employees, resulting in part in an order that the Attorney General's duty was to protect the Public Interest above that of other Government officials when the Government officials did not follow the law **Addendum M**; in October, 2003 sued the Governor to empanel a procurement appeals board to protect the integrity of the procurement process, resulting in the decision by the Superior Court finding that the Governor was not the Attorney General's client, **Addendum C**; in July, 2003 was sued by the Governor of Guam to sign off on a Bond for government officials to borrow money without valuing the property to comply with the Federal borrowing ceiling limit, 48 U.S.C. § 1423a, *In Re: Request of Governor Felix P. Camacho Relative to the Interpretation and Application of Section 11 of the Organic Act of Guam*, 2003 Guam 16.

The Attorney General protects the Public Interest. **Addendum N.** Contrary to this Honorable Court's statement in the March 20th order, it was the Governor of Guam who changed positions, not the Attorney General of Guam, since the first settlement agreement was negotiated and agreed to with the input of the Acting Governor of Guam, and thereafter accepted by the Honorable Joaquin V.E. Manibusan, Jr. This settlement agreement for about $60M is the only settlement agreement accepted by the Court, specifically on June 17, 2004. It was Governor Camacho who later disavowed the $60M Settlement Agreement and is attempting to remove the Attorney General so he can have another agreement accepted for $90M. It is this point which highlights and underscores the duty of the Attorney General of Guam to act in the best legal interests of the People of Guam, who are going to be strapped with paying an additional $30M. The Governor actually agreed to the $60M settlement, and it was he who vacillated and changed his position, not the Attorney General. In fact

---

11 Order dated June 15, 2005 signed by the Honorable Ricardo S. Martinez, Designated Judge.
Page 17
*Motion for Reconsideration of Order Disqualifying the People's Elected Attorney General*
District Court of Guam Case Number

Document 295      Filed 03/14/2006      Page 23 of 27

settlement discussions were initiated at the behest of the Attorney General of Guam, not the Governor of Guam, who had separate counsel in the name of Shannon Taitano protecting and advancing his legal interests. Noteworthy is that the Government of Guam is already in dire straights, as explained by Governor Camacho himself at the February 2, 2006 leadership summit discussions at the Guam Legislature[12].

## Addendum O.

Interestingly, under this Court's interpretation of the normal attorney-client conflict rules, since the Attorney General and the Governor have sued one another several times over, the Attorney General would be disqualified to represent the Governor in any matter while the suits were (and are still) pending. Further, taken to its logical next step, since the Governor appoints and for practical purposes controls the Executive Branch vis-à-vis his appointed cabinet members, the Attorney General could not represent any Executive Branch agency due to the potential and actual conflicts of interest. This is not a new question in American jurisprudence. This also is not a new question on Guam, though the activity of the Attorney General in protecting the public interest has increased with the infusion of the democratic principle of an elected Attorney General now in Office.

In *Gibson v. Johnson*, 35 Or.App. 493, 582 P.2d 452 (1978) the Attorney General and his assistant Attorneys General assume functions of legal counsel only as authorized by statute, and thus are *not* in the same category as private lawyers, who may represent whom they choose, subject to the Code of Professional Responsibility. Further, the Attorney General represents the state, not simply the view of one agency or

---

[12] Governor Camacho explained that the Government cannot pay its debts and is surviving "*hand to mouth.*" The Government of Guam and the taxpaying People of Guam cannot afford the additional $30M settlement and was a key reason why the Attorney General of Guam would not agree to an

Page 18
*Motion for Reconsideration of Order Disqualifying the People's Elected Attorney General*
District Court of Guam CG06-0000bmeDocument 295     Filed 03/14/2006     Page 24 of 27

1  officer of the larger state entity. *Id.* The office of the Attorney General is a public trust;

2  it is a legal presumption that he will do his duty, that he will act with strict impartiality.

3  *State of Florida ex rel.Shevin v. Exxon Corp.*, 526 F.2d 266 (5th Cir. 1976).

4  In representing state officials, the Attorney General is empowered to decide legal

5  policy matters which would be reserved to the client in the ordinary attorney-client

6  relationship, at common law the Attorney General has the duty to represent the public

7  interest, as well as the Commonwealth and its officers, and the authority to assume

8  primary control over litigation involving the Commonwealth's interests . . . the

9  authority of the Attorney General as chief law officer, to assume primary control over

10  the conduct of litigation which involves the interests of the Commonwealth. *Feeney v.*

11  *Commonwealth*, 373 Mass. 359. This policy protects the interest of the state as a whole

12  as a <u>unitary client</u>, rather than any one of the <u>many potential agency manifestations of</u>

13  <u>the state</u>. *Id.* Only the Attorney General is empowered to represent the State in

14  litigation where the state is the real party in interest. *Lyons v. Ryan*, 201 Ill.2d 529,

15  780 N.E.2d 1098 (2002). The Attorney General is the only party to represent a state's

16  interest. *Fergus v. Russel*, 270 Ill. 304, 110 N.E. 120 (Ill. 1915). When the Attorney

17  General undertakes litigation, it is the Attorney General who controls the course of

18  representation, not an officer or agency. *Newberg, Inc. v. The Illinois State Toll*

19  *Highway Authority*, 98 Ill.2d 58, 456 N.E.2d 50 (1983).

20  In the final analysis, if the Court finds that the Attorney General of Guam is simply

21  the mouthpiece of the Governor of Guam, to further his legal agenda, then the People of

22  Guam should not vote for an Attorney General of Guam. The position should not be

23  elected, and the Governor should be given the right to hire a private attorney without

24  going through any appointment or confirmation process if the position of Attorney

25

---

amendment of the settlement figure. Also, Plaintiff's counsel is attempting to increase his class fee by about $3M (to $9M) from an estimated $6M he previously sought.

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

Page 19
*Motion for Reconsideration of Order Disqualifying the People's Elected Attorney General*
District Court of Guam Case Number 04-00006

Case 1:04-cv-00006    Document 295    Filed 03/14/2006    Page 25 of 27

General is simply that of a private attorney for the Governor. Further, that Congressman Leahy's testimony in the most recent confirmation of the present United States Attorney General, Alberto Gonzales, was wrong as to the duties and responsibilities of the U.S. Attorney General to the People of the United States of America. **Addendum P.**

## Conclusion.

For the foregoing reasons, the undersigned Attorney General of Guam respectfully requests that this Honorable Court reverse its March 10, 2006 order reversing the Honorable Joaquin V.E. Manibusan, Jr's. decision, and *not* disqualify the People's democratically elected choice of their attorney to represent their legal interests vis-à-vis the Government of Guam.

Alternatively, that this Honorable Court certify the issue of the Attorney General's disqualification to the Ninth Circuit Court of Appeals which as been separately filed.

Respectfully submitted this 14th day of March, 2006.

**OFFICE OF THE ATTORNEY GENERAL**
Douglas B. Moylan, Attorney General of Guam

**DOUGLAS B. MOYLAN**
Attorney General of Guam, Elected

Page 20
*Motion for Reconsideration of Order Disqualifying the People's Elected Attorney General*
District Court of Guam Case Number 04-00006
Case 1:04-cv-00006   Document 295   Filed 03/14/2006   Page 26 of 27

# Addendum Table of Contents

A        105th Congress Record of HR2370

B        January 6, 2005 Statement of Congressman Leahy

C        *Moylan v. Camacho*, SP230-03 (Super. Ct. Guam Nov. 10, 2003)

D        State by State Comparison of Enabling Language

E        Original *As Introduced* Version of Attorney General Bill

F        U.S. P.L. No. 105-291 (HR2370); 48 U.S.C. § 1421(g)(d)(1)

G        April 1, 1997 Charles Troutman Letter to Congressman

H        July 10, 1997 Response by Congressman Underwood

I        July 16, 1997 Reply by Charles Troutman

J        October 29, 1997 Testimony by Charles Troutman

K        *In Re Request of I Mina Bente Sing'ko Na Liheslaturan Guåhan Relative to the Application of the Earned Income Tax Credit Program to Guam Taxpayers ("The EIC Question")*, 2001 Guam 3

L        June 11, 2004 Article on Single EITC Payment

M        *Attorney General of Guam vs. Y'Asela Pereira, Treasurer, Government of Guam*, SP32-03 (Super. Ct. Guam May 5, 2003)

N        *Government of Guam v. Camacho*, CIV05-00038

O        February 2, 2006 Gov's. Statement of Financial Status

P        State of Utah Historical Account of Attorney General

*Motion for Reconsideration of Order Disqualifying the People's Elected Attorney General*
District Court of Guam Case Number 04-00006

# Addendum

# A

| 105TH CONGRESS 2d Session | HOUSE OF REPRESENTATIVES | REPORT 105–742 |

## GUAM ORGANIC ACT AMENDMENTS OF 1998

SEPTEMBER 24, 1998.—Committed to the Committee of the Whole House on the State of the Union and ordered to be printed

Mr. YOUNG of Alaska, from the Committee on Resources, submitted the following

## REPORT

together with

## ADDITIONAL VIEWS

[To accompany H.R. 2370]

[Including cost estimate of the Congressional Budget Office]

The Committee on Resources, to whom was referred the bill (H.R. 2370) to amend the Organic Act of Guam for the purposes of clarifying the local judicial structure and the office of Attorney General, having considered the same, report favorably thereon with amendments and recommend that the bill as amended do pass.

The amendments are as follows:

Strike out all after the enacting clause and insert in lieu thereof the following:

### SECTION 1. SHORT TITLE.

This Act may be cited as the "Guam Organic Act Amendments of 1998".

### SEC. 2. ATTORNEY GENERAL OF GUAM.

Section 29 of the Organic Act of Guam (48 U.S.C. 1421g) is amended by adding at the end the following new subsection:

"(d)(1) The Attorney General of Guam shall be the Chief Legal Officer of the Government of Guam. At such time as the Office of the Attorney General of Guam shall next become vacant, the Attorney General of Guam shall be appointed by the Governor of Guam with the advice and consent of the legislature, and shall serve at the pleasure of the Governor of Guam.

"(2) Instead of an appointed Attorney General, the legislature may, by law, provide for the election of the Attorney General of Guam by the qualified voters of Guam in general elections after 1998 in which the Governor of Guam is elected. The term of an elected Attorney General shall be 4 years. The Attorney General may be removed by the people of Guam according to the procedures specified in section

59–006

9–A of this Act or may be removed for cause in accordance with procedures established by the legislature in law. A vacancy in the office of an elected Attorney General shall be filled—

"(A) by appointment by the Governor of Guam if such vacancy occurs less than 6 months before a general election for the Office of Attorney General of Guam; or

"(B) by a special election held no sooner than 3 months after such vacancy occurs and no later than 6 months before a general election for Attorney General of Guam, and by appointment by the Governor of Guam pending a special election under this subparagraph.".

**SEC. 3. LEGISLATIVE QUORUM.**

Section 12 of the Organic Act of Guam (48 U.S.C. 1423b) is amended by striking "eleven" and inserting "a simple majority".

**SEC. 4. CLARIFICATION OF LEGISLATIVE POWER.**

The first sentence of section 11 of the Organic Act of Guam (48 U.S.C. 1423a) is amended—

(1) by inserting "rightful" before "subjects"; and
(2) by striking "legislation of local application" and inserting "legislation".

Amend the title so as to read:

A bill to amend the Organic Act of Guam to clarify local executive and legislative provisions in such Act, and for other purposes.

## PURPOSE OF THE BILL

As reported from the Committee on Resources, the purpose of H.R. 2370 is to amend the Organic Act of Guam to clarify local executive and legislative provisions in such Act.

## BACKGROUND AND NEED FOR LEGISLATION

The Organic Act of Guam was approved on August 1, 1950 (64 Stat. 384, 48 U.S.C. 1421 et seq.), to provide for Guam's governance. The executive, legislative, and judicial branches of the government of Guam exist based on the Organic Act. Changes to the fundamental functions of any of the three branches of government in Guam can only occur by amendments to the Organic Act by Congress, as Guam is unable to make changes through local law.

Although Congress has amended the Organic Act of Guam on occasion to make allowances for increased efficiency in the government of Guam or to correct inconsistencies, in 1976 Congress authorized Guam to adopt its own constitution to provide for a significant increase in self-government (Public Law 94–584). The proposed changes to the Organic Act in H.R. 2370 must be enacted by Congress as amendments to the Organic Act as Guam has not yet adopted a local constitution. However, these provisions are responsive to current specific requests of the Government of Guam and are expected to foster greater efficiency and equity.

*Attorney General of Guam*

Guam's Attorney General is currently appointed by the Governor of Guam with the advice and consent of the Guam Legislature. The appointment of the Attorney General is to a four year term or until the end of the term of the appointing Governor, whichever is sooner. The Governor may remove the Attorney General for cause.

Controversies have arisen in the past because of the appointment nature of the position of Attorney General. Public concerns revolve

around political interference with investigations, inefficiency of case work and dismissal of the Attorney General without cause.

In response to the growing number of complaints, a survey was conducted to determine an acceptable resolution. It was clear that respondents (69%) favored an elected position. The survey also asked whether the position should be mandated by Congress, or left to the Guam Legislature to create. A slight majority of citizens favored local legislation. An amendment to Guam's Organic Act is needed to allow for an elected Attorney General. This legislation provides a mechanism for elected legislators to act on this issue.

*Legislative quorum*

Since enactment of Guam's Organic Act, the Guam Legislature has been comprised of a 21 member body elected at-large. The Organic Act mandates that a legislative quorum shall consist of 11 members.

A referendum was held during the 1994 general election to reduce the number of seats in the Guam Legislature from 21 to 15. This change will take effect during the 1998 legislative elections.

H.R. 2370 will align the Organic Act with changes in local law and preferences of the electorate. It will replace a mandated legislative quorum to a simple majority rather than a specified number.

*Clarification of legislative powers*

Defined in Guam's Organic Act, the powers of the Guam Legislature currently extend to "subjects of legislation of local application." In Public Law 85-851, Congress amended the Virgin Island's Organic Act to read: "The legislative authority and power of the Virgin Islands shall extend to all rightful subjects of legislation not inconsistent with this Act or the laws of the United States made applicable to the Virgin Islands," in response to the Supreme Court case *Granville-Smith* v. *Granville-Smith* [349 U.S. 1, 75 S.Ct. 553 (1955)]. The Ninth Circuit Court of Appeals has referenced this discrepancy to support its decisions to the effect that Guam has less local government than other territories.

This legislation will provide Guam with a greater measure of self-government equal to that of the U.S. Virgin Islands.

## COMMITTEE ACTION

H.R. 2370 was introduced on July 31, 1997, by Delegate Robert Underwood (D-GU). The bill was referred to the Committee on Resources. On October 29, 1997, the Committee held a hearing on H.R. 2370 (Printed Hearing 105-78). Appearing before the Committee were officials of Guam's judicial, legislative, and executive branches, as well as the Administration. Witnesses supported self-government for Guam and there were no objections to any of the changes to the Organic Act which have been approved by the Committee.

On July 29, 1998, the Committee met to mark up H.R. 2370. An amendment in the nature of a substitute to focus the changes to the Organic Act of Guam to provisions about the election of the Attorney General of Guam, quorum size, and clarification of legislative powers was offered by Mr. Underwood and adopted by voice.

The bill was then ordered favorably reported to the House of Representatives by voice vote.

## COMMITTEE OVERSIGHT FINDINGS AND RECOMMENDATIONS

With respect to the requirements of clause 2(l)(3) of rule XI of the Rules of the House of Representatives, and clause 2(b)(1) of rule X of the Rules of the House of Representatives, the Committee on Resources' oversight findings and recommendations are reflected in the body of this report.

## CONSTITUTIONAL AUTHORITY STATEMENT

Article IV, section 3 of the Constitution of the United States grants Congress the authority to enact H.R. 2370.

## COST OF THE LEGISLATION

Clause 7(a) of rule XIII of the Rules of the House of Representatives requires an estimate and a comparison by the Committee of the costs which would be incurred in carrying out H.R. 2370. However, clause 7(d) of that Rule provides that this requirement does not apply when the Committee has included in its report a timely submitted cost estimate of the bill prepared by the Director of the Congressional Budget Office under section 403 of the Congressional Budget Act of 1974.

## COMPLIANCE WITH HOUSE RULE XI

1. With respect to the requirement of clause 2(l)(3)(B) of rule XI of the Rules of the House of Representatives and section 308(a) of the Congressional Budget Act of 1974, H.R. 2370 does not contain any new budget authority, spending authority, credit authority, or an increase or decrease in revenues or tax expenditures.

2. With respect to the requirement of clause 2(l)(3)(D) of rule XI of the Rules of the House of Representatives, the Committee has received no report of oversight findings and recommendations from the Committee on Government Reform and Oversight on the subject of H.R. 2370.

3. With respect to the requirement of clause 2(l)(3)(C) of rule XI of the Rules of the House of Representatives and section 403 of the Congressional Budget Act of 1974, the Committee has received the following cost estimate for H.R. 2370 from the Director of the Congressional Budget Office.

## CONGRESSIONAL BUDGET OFFICE COST ESTIMATE

U.S. CONGRESS,
CONGRESSIONAL BUDGET OFFICE,
*Washington, DC, August 6, 1998.*

Hon. DON YOUNG,
*Chairman, Committee on Resources,*
*House of Representatives, Washington, DC.*

DEAR MR. CHAIRMAN: The Congressional Budget Office has prepared the enclosed cost estimate for H.R. 2370, the Guam Organic Act Amendments of 1998.

If you wish further details on this estimate, we will be pleased to provide them. The CBO staff contact is John R. Righter.

Sincerely,

JUNE E. O'NEILL, *Director*.

Enclosure.

### H.R. 2370—*Guam Organic Act Amendments of 1998*

H.R. 2370 would amend the Organic Act of Guam to allow its legislature to enact a law providing for the election of the island's attorney general, specify that a simple majority of legislators qualifies as a quorum, and broaden the extent of the legislature's powers. CBO estimates that enacting this bill would have no impact on the federal budget. Because H.R. 2370 would not affect direct spending or receipts, pay-as-you-go procedures would not apply to the bill. H.R. 2370 contains no intergovernmental or private-sector mandates as defined in the Unfunded Mandates Reform Act and would impose no costs on state, local, or tribal governments.

The CBO staff contact is John R. Righter. This estimate was approved by Robert A. Sunshine, Deputy Assistant Director for Budget Analysis.

#### COMPLIANCE WITH PUBLIC LAW 104–4

H.R. 2370 contains no unfunded mandates.

#### CHANGES IN EXISTING LAW MADE BY THE BILL, AS REPORTED

In compliance with clause 3 of rule XIII of the Rules of the House of Representatives, changes in existing law made by the bill, as reported, are shown as follows (existing law proposed to be omitted is enclosed in black brackets, new matter is printed in italic, existing law in which no change is proposed is shown in roman):

## ORGANIC ACT OF GUAM

\*　　\*　　\*　　\*　　\*　　\*　　\*

SEC. 11. The legislative power of Guam shall extend to all *rightful* subjects of [legislation of local application] *legislation* not inconsistent with the provisions of this Act and the laws of the United States applicable to Guam. Taxes and assessments on property, internal revenues, sales, license fees, and royalties for franchises, privileges, and concessions may be imposed for purposes of the government of Guam as may be uniformly provided by the Legislature of Guam, and when necessary to anticipate taxes and revenues, bonds and other obligations may be issued by the government of Guam: *Provided, however,* That no public indebtedness of Guam shall be authorized or allowed in excess of 10 per centum of the aggregate tax valuation of the property in Guam. Bonds or other obligations of the government of Guam payable solely from revenues derived from any public improvement or undertaking shall not be considered public indebtedness of Guam within the meaning of this section. All bonds issued by the government of Guam or by its authority shall be exempt, as to principal and interest, from taxation by the Government of the United States or by the government of Guam, or by any State or Territory or any political subdivision thereof, or by the District of Columbia. The Secretary of the Inte-

rior (hereafter in this section referred to as "Secretary") is authorized to guarantee for purchase by the Federal Financing Bank bonds or other obligations of the Guam Power Authority maturing on or before December 31, 1978, which shall be issued in order to refinance short-term notes due or existing on June 1, 1976 and other indebtedness not evidenced by bonds or notes in an aggregate amount of not more than $36 million, and such bank, in addition to its other powers, is authorized to purchase, receive or otherwise acquire these same. The interest rate on obligations purchased by the Federal Financing Bank shall be not less than a rate determined by the Secretary of the Treasury taking into consideration the current average market yield on outstanding marketable obligations of the United States of comparable maturities, adjusted to the nearest one-eighth of 1 per centum, plus 1 per centum per annum. The Secretary, with the concurrence of the Secretary of the Treasury, may extend the guarantee provision of the previous sentence until December 31, 1980. The Secretary, upon determining that the Guam Power Authority is unable to refinance on reasonable terms the obligations purchased by the Federal Financing Bank under the fifth sentence of this section by December 31, 1980, may, with the concurrence of the Secretary of the Treasury, guarantee for purchase by the Federal Financing Bank; and such bank is authorized to purchase, obligations of the Guam Power Authority issued to refinance the principal amount of the obligations guaranteed under the fifth sentence of this section. The obligations that refinance such principal amount shall mature not later than December 31, 1990, and shall bear interest at a rate determined in accordance with section 6 of the Federal Financing Bank Act (12 U.S.C. 2285). At the request of the Board of Directors of the Guam Power Authority for a second refinancing agreement and conditioned on the approval of the Government of Guam pursuant to the law of Guam, and conditioned on the establishment of an independent rate-making authority by the Government of Guam, the Secretary may guarantee for purchase by the Federal Financing Bank, on or before December 31, 1984, according to an agreement that shall provide for—

(a) substantially equal semiannual installments of principal and interest;

\* \* \* \* \* \* \*

SEC. 12. The legislature shall be the judge of the selection and qualification of its own members. It shall choose from its members its own officers, determine its rules and procedure, not inconsistent with this Act, and keep a journal. The quorum of the legislature shall consist of [eleven] *a simple majority* of its members. No bill shall become a law unless it shall have been passed at a meeting, at which a quorum was present, by the affirmative vote of a majority of the members present and voting, which vote shall be by yeas and nays.

\* \* \* \* \* \* \*

SEC. 29. (a) \* \* \*

\* \* \* \* \* \* \*

*(d)(1) The Attorney General of Guam shall be the Chief Legal Officer of the Government of Guam. At such time as the Office of the Attorney General of Guam shall next become vacant, the Attorney General of Guam shall be appointed by the Governor of Guam with the advice and consent of the legislature, and shall serve at the pleasure of the Governor of Guam.*

*(2) Instead of an appointed Attorney General, the legislature may, by law, provide for the election of the Attorney General of Guam by the qualified voters of Guam in general elections after 1998 in which the Governor of Guam is elected. The term of an elected Attorney General shall be 4 years. The Attorney General may be removed by the people of Guam according to the procedures specified in section 9–A of this Act or may be removed for cause in accordance with procedures established by the legislature in law. A vacancy in the office of an elected Attorney General shall be filled—*

*(A) by appointment by the Governor of Guam if such vacancy occurs less than 6 months before a general election for the Office of Attorney General of Guam; or*

*(B) by a special election held no sooner than 3 months after such vacancy occurs and no later than 6 months before a general election for Attorney General of Guam, and by appointment by the Governor of Guam pending a special election under this subparagraph.*

\*        \*        \*        \*        \*        \*        \*

## ADDITIONAL VIEWS

The introduction of the original version of H.R. 2370, the Guam Judicial Empowerment Act, stemmed from a need to clarify and insulate the judicial branch of Guam's local government from interference by the executive or legislative branches of the Government of Guam. These Additional Views discuss "Section 2. Judicial Authority; Supreme Court of Guam" found in the original version of H.R. 2370.

A 1977 ruling by the U.S. Supreme Court—*Territory of Guam* v. *Olsen*, 431 U.S. 195—found Guam's Supreme Court (established in 1973 by the 12th Guam Legislature) to be inorganic. In this case, the Court held that Guam's Organic Act did not authorize the transfer of appellate jurisdiction from the appellate division of the District Court of Guam to a locally established appellate court.

The 1984 Omnibus Territories Act was passed by Congress in response to the *Guam* v. *Olsen* ruling. The Act authorized the Guam Legislature to create an appellate court and provided that once such a court is established, appellate jurisdiction would transfer from the appellate division of the District Court of Guam to the newly established appellate court. The Act, however, did not provide a structure for a newly created judicial system once an appellate court was established. Nor, did the Act mention that the responsibility should be left to the Guam Legislature.

In 1992 the 21st Guam Legislature passed Public Law 21–147, the Frank G. Lujan Memorial Court Reorganization Act. This Act re-created the Supreme Court of Guam to serve as the highest appellate court on the island. The author of the Frank G. Lujan Memorial Court Reorganization Act has stated that is was the intent of the 21st Guam Legislature to make the Supreme Court of Guam the highest local court and be vested with those powers traditionally held and exercised by the highest court of a jurisdiction.

However, the revival of the Supreme Court of Guam and the absence of administrative composition direction in the 1984 Omnibus Territories Act makes the court subject and subordinate to the shifts in the political power structure of the Guam Legislature. Public Law 23–86, enacted by the 23rd Guam Legislature in 1996, removed the Supreme Court's authority over personnel matters within the Judiciary and created two parallel court systems. On two other occasions, the 23rd Guam Legislature took into consideration two different pieces of legislation. Bill No. 494 would have completely removed the Supreme Court's authority over the Superior Court and Bill No. 776 would have rearranged the authority of the Supreme Court making it an appellate division of the Superior Court. Another example of the Supreme Court's susceptibility to the Guam Legislature came recently in February 1998.

During the course of debate over controversial comprehensive solid waste management legislation, a non-germane rider removing

Case 1:04-cv-00006    Document 295-2    Filed 03/14/2006    Page 9 of 28

the Supreme Court's authority was attached. Because the subject matter of the rider was also controversial, minority Members urged the leadership to allow for a public hearing on the issue before attachment. The request was denied, the rider was attached and the legislation passed. The Governor of Guam allowed a pocket veto of the solid waste management legislation and expressed his disapproval of the manner in which a controversial rider was attached to a crucial piece of legislation. He continued, in his message to the Speaker of the Guam Legislature, to reiterate his support for passage of H.R. 2370 by the U.S. Congress. The actions of the Guam Legislature clearly indicate that Guam's third branch of government is subordinate and subject to changes by the Guam Legislature. The Judiciary is not truly a co-equal, independent branch of government.

Chairman Don Young, Committee on Resources, has expressed in a May 11, 1998 letter to Mr. Underwood, that he cannot support the proposed measure (Sec. 2) regarding "Judicial Authority; Supreme Court of Guam," found in the original version of H.R. 2370. Chairman Young states that the change in judiciary "should be done with the support of the Government of Guam; or in a locally developed Constitution." Chairman Young notes that the Committee has, in the past, considered changes affecting local self-government of territories based on a consensus by the people and their leaders. The consensus is usually reflected in resolutions by the local legislature.

Mr. Allen P. Stayman, Director of the Office of Insular Affairs, stated in a May 5, 1998 letter that the Administration "has no objection to the passage of such a substitute amendment to H.R. 2370." The substitute amendment to which Mr. Stayman refers to is the improvement of language, as suggested by the Administration, for clarification. It is important to note that during the October 29, 1997 hearing on H.R. 2370, inclusive of Sec. 2 regarding "Judicial Authority; Supreme Court of Guam," Mr. Stayman testified that the Administration had no objection to the overall concept of H.R. 2370.

Section 2 of H.R. 2370, received endorsements and support from a number of local Guam organizations. The Guam Bar Association conducted a survey among its membership to determine the amount of support or opposition for H.R. 2370. Seventy-two percent (72%) or 27 of 37 attorneys, favored defining and affirming the authority of the Supreme Court in Guam's Organic Act. Guam's singular newspaper publication, the Pacific Daily News, also endorsed the passage of the Guam Judicial Empowerment Act in a February 10, 1998 editorial. They stated that H.R. 2370, "is emergency legislation and can't wait for routine handling. It must get prompt action in Washington before Guam's system of justice falls victim to arm-twisting from special interest groups."

A significant endorsement for the original version of H.R. 2370 came from a February 17, 1998 letter from the Conference of Chief Justices. The Conference of Chief Justices is comprised of members who hold the highest judicial officers of each state of the United States, the District of Columbia, Puerto Rico, Guam and other territories. In their letter, they express their strong support for H.R. 2370 "to assure by legislation the independence of its judiciary and

to maintain its judicial branch as a separate and co-equal branch of government."

Currently, Guam's judiciary is not a co-equal branch of government. It's court system does not reflect court systems existing in the United States. This predicament can only be corrected by amending the Organic Act of Guam to enact Sec. 2 of H.R. 2370 regarding the judicial authority of the Supreme Court of Guam. The Committee on Resources needs to address this important issue in the near future.

ROBERT A. UNDERWOOD.
GEORGE MILLER.

O

Union Calendar No. 427

105TH CONGRESS
2D SESSION

# H. R. 2370

[Report No. 105-742]

## A BILL

To amend the Organic Act of Guam for the purposes of clarifying the local judicial structure and the office of Attorney General.

SEPTEMBER 24, 1998

Reported with amendments, committed to the Committee of the Whole House on the State of the Union, and ordered to be printed

# Addendum

# B



Committee Information  Go

Statement of
**The Honorable Patrick Leahy**
United States Senator
Vermont

January 6, 2005

 PRINTABLE
VERSION

Members
Subcommittees
Hearings
Nominations
Business
Meetings
Press

STATEMENT OF SENATOR PATRICK LEAHY,
RANKING MEMBER, SENATE JUDICIARY COMMITTEE
CONFIRMATION HEARINGS ON THE NOMINATION
OF ALBERTO GONZALES
TO BE ATTORNEY GENERAL OF THE UNITED STATES
JANUARY 6, 2005

Judge Gonzales, welcome to the Senate Judiciary Committee. In the 109th
Congress we also welcome a very experienced member of the committee --
Senator Specter -- as our new chairman.

We are entrusted by the American people, the Senate and our Constitution to do
a thorough and fair job in considering nominations for the Executive Branch of
government.

At the outset, I want to make clear how inspiring your life story is. The recent
Washington Post profile of your life's journey in particular touched me as few
accounts of your life have. The road you have traveled from being a twelve-year-
old boy selling soft drinks at football games, all the way to the State House in
Texas and our White House, is a tribute to you and to your family.

I am sure today we will hear more about your life story. We are also here to learn
more about Alberto Gonzales as counsel to the President. And we are here to try
to glean a portrait of the kind of Attorney General you would become if
confirmed by the Senate.

The Role Of Attorney General

The Attorney General should represent the interests of all Americans and is the
nation's chief law enforcement officer. As Justice James Iredell wrote in 1792,
the person who serves as Attorney General, to quote him, "is not called Attorney
General of the President, but Attorney General of the United States."

This post is quite distinct from the position Judge Gonzales has performed for
the President in which he acted as a spokesman for the Administration and
appeared as chief defense lawyer for the White House on a range of important

and politically sensitive matters.

A key question before this hearing is whether the nominee shares this view of the crucial role of the U.S. Attorney General.

When he was designated for this position by the President, Judge Gonzales said that he was looking forward to, in his words, "continuing to work with friends and colleagues in the White House in a different capacity on behalf of our President."

But there may be times when the Attorney General of the United States has to enforce the law and cannot be worried about friends, colleagues and benefactors at the White House.

At a time when the Republican Party has taken control of all three branches of the Federal Government, my worry is that our system of checks and balances may become short-circuited by too few checks on assertions of Executive Branch authority.

My concern is that during several high-profile matters in your professional career you have appeared to serve as a facilitator, rather than an independent force in the policy-making process. The job of Attorney General is not about crafting rationalizations for ill-conceived ideas. It is a much more vital role than that. It is about being a forceful, independent voice in our continuing quest for justice and in defense of the constitutional rights of each and every American.

Need For A Fresh Start

We have now seen what happens when the rule of law plays second fiddle to a President's policy agenda. With John Ashcroft as Attorney General and with a White House Counsel's office that has impulsively facilitated rather than cautiously vetted serious constitutional issues, the Administration has taken one untenable legal position after another regarding the rule of law in the war against terror.

The few times that Attorney General Ashcroft consented to appear before this Senate oversight committee, he brandished intimidation as a weapon, sometimes going so far as to say that questioning the Administration's policies was giving aid and comfort to our enemies.

By contrast, Judge Gonzales' nomination seems to offer the possibility of a new era.

But as I told the nominee when we met within days of the announcement of his nomination, these hearings matter. We need to know more about his judgment and actions in connection with the tragic legal and policy changes formulated in secret by this Administration that are still hidden from proper congressional oversight and public scrutiny.

Policy Changes Leading to Torture

Those policies include this nominee's role in developing interpretations of the law to justify harsh treatment of prisoners tantamount to torture. America's troops and citizens are at greater risk because of those actions and the terrible repercussions throughout so much of the world. The searing photographs from Abu Ghraib have made it harder to create and maintain the alliances we need to prevail against the vicious terrorists who threaten us. Those abuses serve as recruiting posters for the terrorists.

The scandal of Abu Ghraib, allegations of mistreatment at Guantanamo, and charges from cases in Iraq and Afghanistan are serious matters with lingering questions and unresolved accountability. These hearings are about a nomination, but these hearings are also about accountability.

From the outset of public disclosure of the Abu Ghraib photographs, the Bush Administration maintained that any wrongdoing was the action of "a few bad apples."

As bits of information have been made public by the press over the last year, it has become clear to all that these incidents at U.S. facilities around the world are not just the actions of a few low-ranking members of the military. Rather, in the upper reaches of the Executive Branch a process was set in motion that rolled forward to produce scandalous results.

The Army Field Manual reflects our nation's long-held policies toward prisoners. It says: "The goal of any interrogation is to obtain reliable information in a lawful manner…. U.S. policy expressly prohibit[s] acts of violence or intimidation, including physical or mental torture, threats, insults, or exposure to inhumane treatment as a means of or to aid interrogation."

The policies are in place for good reason. The Field Manual continues: "The use of torture is a poor technique that yields unreliable results, may damage subsequent collection efforts, and can induce the source to say what he thinks the interrogator wants to hear. . . . It also may place U.S. and allied personnel in enemy hands at greater risk."

Yet senior officials in the Bush White House, Ashcroft Justice Department and Rumsfeld Pentagon set in motion a systematic effort to minimize, distort and even ignore our laws, policies and agreements on torture and the treatment of prisoners. Defense Secretary Rumsfeld and, later, Lt. Gen. Ricardo Sanchez, authorized the use of techniques that were contrary to both U.S. military manuals and international law. Former CIA Director Tenet requested and Secretary Rumsfeld approved the secret detention of "ghost detainees" in Iraq so that they could be hidden from the International Committee of the Red Cross. Still unexplained are instances where the U.S. Government delivered prisoners to other countries known to utilize torture. Where is the responsibility and accountability for these abuses?

We are the most powerful nation on earth, the most powerful nation the earth has ever known, a country that cherishes liberty and human rights, a nation that has

been a beacon of hope and freedom to the world. We face vicious enemies in the war on terrorism, but we can and will defeat them without sacrificing our values or stooping to their levels. I believe there are several people in the audience who are themselves survivors of torture committed by the armed forces and secret police of other countries who do not share our values. They continue to struggle to overcome those horrifying experiences, and they are very concerned that we not retreat from the high standards against torture that we have held up to the world in the past. I appreciate being made aware of their presence here today.

Opportunity For Accountability

These hearings are an opportunity at long last for some accountability for this meltdown of longstanding U.S. policy on torture. As White House Counsel, Judge Gonzales was at the center of discussions on the applicability of the Geneva Conventions to the wars in Afghanistan and Iraq, and the legality of detention and interrogation methods that have been seen as tantamount to torture. He oversaw the formulation of this Administration's extreme views of unfettered executive power and unprecedented government secrecy.

I hope things will be different if you are confirmed, Judge Gonzales. I hope that you will be accessible to Members of this Committee, and more responsive. Judge Gonzales, I welcome you and your family.

I know the President asked our incoming Chairman to proceed expeditiously with these hearings, and I have worked with him and other Members of the Committee to do just that.

- **TOP OF THIS PAGE**
- **RETURN TO HOME**

 **PRINTER FRIENDLY VERSION**

# Addendum

# C

# IN THE SUPERIOR COURT OF GUAM

DOUGLAS B. MOYLAN, as Attorney
General of Guam,

        Petitioner,

      v.

FELIX P. CAMACHO, as Governor
of Guam,

        Respondent.

SPECIAL PROCEEDING CASE
NO. SP230-03


*DISISIÓN YAN OTDEN[1]*

The Court heard this matter on November 4, 2003, pursuant to a briefing and hearing schedule to address the issues raised by the Supreme Court of Guam Order dated October 10, 2003 in Supreme Court Case No. WRP03-005. **J. Basil O'Mallan, III**, Esq., Deputy Attorney General, Civil Division, represented the Petitioner, *Douglas B. Moylan*, the Attorney General of Guam. **Douglas B. Moylan**, Esq., also appeared in his own behalf. **Shannon Taitano**, Esq., of the Office of the Governor, and **Michael A. Pangelinan**, Esq., and **Daniel Benjamin**, Esq., of Calvo and Clark, LLP, represented the Respondent, *Felix P. Camacho*, the Governor of Guam. The Court listened to the arguments and inquired into several issues raised by the parties. At the conclusion of the

---

[1]Decision and Order

hearing, the Court advised the parties that it reserved decision on the matter. After carefully considering the arguments of the parties, their legal memoranda, and after giving this matter much deliberation, the Court now issues this decision and order.

## *I MANMALLOFAN*[2]

On September 29, 2003, the Attorney General of Guam filed an ex parte petition for an alternative writ of mandate against Felix P. Camacho, the Governor (*I Maga'lahi*) of Guam to appoint members and alternate members for the purpose of empaneling a Procurement Appeals Board. An Order directing the issuance of the Alternative Writ of Mandate to empanel a Procurement Appeals Board was signed by the Honorable, Elizabeth Barrett Anderson. The Alternative Writ ordered *I Maga'lahi* to immediately appoint and transmit to the Guam Legislature members and alternates to fully comprise the Procurement Appeals Board. In the alternative, *I Maga'lahi* was ordered to answer and show cause on October 13, 2003 why he has not complied with the alternative writ.

On October 9, 2003, *I Maga'lahi* filed a Writ of Prohibition and/or Writ of Mandamus in the Supreme Court of Guam - WRP03-005. Therein, *I Maga'lahi* sought a writ "directing the Superior Court of Guam to cease and desist and refrain from presiding over and hearing any matters and taking further action" in the within case. At noon on October 10, 2003, *I Maga'lahi* filed an ex parte motion to stay this action pending resolution of the Writ of Prohibition filed in the Supreme Court. The ex parte motion was set for hearing at 4:00 p.m. Prior to the hearing, the Supreme Court issued its Order. It provided in part:

In issuing the Alternative Writ of Mandamus, the trial court implicitly found that it

---

[2]Background

Page 2 of 45

had jurisdiction. The Governor's petition raises the argument that the trial court erred because the Attorney General had no standing to sue, therefore the trial court acted without jurisdiction. In the face of this serious question and because we find no circumstances demanding exigency, the trial court should have thoroughly considered and required briefing on standing and jurisdiction before granting the Alternative Writ of Mandamus. We hereby order as follows:

1. this court will stay ruling on the Governor's petition for Writ of Prohibition and/or Writ of Mandamus for a period of thirty days.
2. the Superior Court shall address the issue of whether the Attorney General has standing to sue the Governor and whether the action was properly within the trial court's jurisdiction; and
3. the Alternative Writ of Mandamus issued by the Superior Court on September 29, 2003 is stayed pending the resolution of the jurisdictional issues.

The order was signed by F. Philip Carbullido, Chief Justice; Frances M. Tydingco-Gatewood, Associate Justice; and John A. Manglona[3], Justice Pro Tempore.

In accordance with the Supreme Court order, the parties agreed upon a scheduling order. The parties were ordered to file opening briefs on October 24 and respective replies on October 30. The parties have filed their opening as well as reply briefs.

### *DINISKUTA*[4]

On November 5, 2002, Respondent, Felix P. Camacho, was elected by the People of Guam as the seventh[5] Governor of Guam, succeeding to an office his father, Carlos G. Camacho, [Guam's last appointed and first elected Governor] had occupied before him. At the same time that Respondent was being elected Governor of Guam, the People of Guam were electing Petitioner, Douglas B. Moylan, as Guam's first elected Attorney General. Respondent Camacho was

---

[3]Manglona is an Associate Justice of the Supreme Court of the Commonwealth of the Northern Mariana Islands.

[4]Discussion

[5]Ricardo J. Bordallo was the second and fourth Governor of Guam.

Case 1:04-cv-00006    Document 295-2    Filed 03/14/2006    Page 21 of 28

inaugurated *I Maga'lahi* on January 6, 2003 and is and has been *I Maga'lahi* since then. Petitioner Moylan was inaugurated Attorney General likewise on January 6, 2003 and he is and has been the Attorney General since then.

Prior to the election of Petitioner, the Attorneys General before him were all appointed by *I Maga'lahi* with the advice and consent of the Guam Legislature. The Attorney General has filed this action seeking the aid of the Superior Court to order *I Maga'lahi* to appoint members and alternates to the Procurement Appeals Board. The Attorney General has chosen to proceed in this matter through a mandamus procedure and more particularly by means of an alternative writ of mandate. The alternative writ was issued by the Superior Court on September 29, 2003 and directs *I Maga'lahi* to appoint the remaining members and alternates to the Procurement Appeals Board or show cause before the Court why he has not done so. The alternative writ which has been issued has been stayed by the Supreme Court, pending compliance with its order referenced above.

## I. NATURE OF PETITION FOR ALTERNATIVE WRIT OF MANDAMUS

### A. *The Mandamus Process.*

Petitions for mandamus are provided for under 7 GCA §31201 et. seq. The relevant statutes provide:

§ 31202. **When and by What Court Issued.**
It may be issued by any court, [except a commissioner's court or police court,] to any inferior tribunal, corporation, board, or person to compel the performance of an act which the law specially enjoins, as a duty resulting from an office, trust, or station; or to compel the admission of a party to the use and enjoyment of a right or office to which he is entitled, and from which he is unlawfully precluded by such inferior tribunal, corporation, board, or person.

§ 31303. **Writ: Either Alternative or Peremptory.**
The writ must be either alternative or peremptory. The alternative writ must command the party to whom it is directed to desist or refrain from further proceedings in the action or matter specified therein, until the further order of the

Case 1:04-cv-00006    Document 295-2    Filed 03/14/2006    Page 22 of 28

court from which it is issued, and to show cause before such court, at a specified time and place, why such party should not be absolutely restrained from further proceedings in such action or matter. The peremptory writ must be in a similar form, except that the words requiring the party to show cause why he should not be absolutely restrained, etc., must be omitted, and a return day inserted.

### § 31204. Writ: Alternative or Peremptory.
The writ may be either alternative or peremptory. The alternative writ must command the party to whom it is directed, immediately after the receipt of the writ, or at some other specified time, to do the act required to be performed or to show cause before the court at a specified time and place why he has not done so. The peremptory writ must be in a similar form, except that the words requiring the party to show cause why he has not done as commanded must be omitted and a return day inserted.

### § 31205. When Application is Made Without Notice.
When the application is made to the court without notice to the adverse party, and the writ is allowed, the alternative must be first issued; but if the application is upon due notice and the writ is allowed, the peremptory may be issued in the first instance. With the alternative writ and also with any notice of an intention to apply for the writ, there must be served on each person against whom the writ is sought a copy of the petition. The notice of the application, when given, must be at least ten (10) days. The writ cannot be granted by default. The case must be heard by the court, whether the adverse party appears or not.

### § 31206. Adverse Party may Answer Under Oath.
On the return of the alternative, or the day on which the application for the writ is noticed, the party on whom the writ or notice has been served may answer the petition under oath, in the same manner as an answer to a complaint in a civil action.

A party seeking an alternative writ of mandate relief need not provide notice to the adverse party. See 7 G.C.A. §31205, supra. Moreover, the ex parte notice requirements of Rule 9 of the Rules of the Superior Court do not apply to such an application.

The purpose of the Attorney General's petition for an alternative writ was to order *I Maga'lahi* to appoint the remaining members and alternate members of the Procurement Appeals Board.

### B. The Procurement Appeals Board and its Appointment Process.

Page 5 of 45

The Procurement Appeals Board was created by Public Law 18-44. Its sponsors were then Senators C. T. C. Gutierrez and T. S. Nelson. It became law on November 14, 1986. The act added a new Chapter 12 to Title VII-A of the Government Code of Guam. It is now codified under 5 G.C.A. §5701, et seq. The purpose of the act was to provide a forum for procurement appeals. The relevant portions of the act are as follows:

**§ 5701. Creation of the Procurement Appeals Board.**
There is established an independent entity to be known as the Procurement Appeals Board to be composed of a chairperson and at least six (6) other members. **The chair person and members of the Board shall be appointed by the Governor** and confirmed with the advice and consent of the Legislature and shall serve part-time as necessary.

**§ 5702. Terms and Qualifications of Members of the Procurement Appeals Board.**
(a) Term. The term of office of the chairperson and each member of the Procurement Appeals Board shall be six (6) years except that in making the initial appointments, the Governor shall appoint one member for a term of four (4) years, and the chairperson for a term of six (6) years, so that a term of office shall expire every two (2) years. Thereafter, their successors shall be appointed for terms of six (6) years, or for the balance of any unexpired term, but members may continue to serve beyond their terms until their successors take office. Members may be reappointed for succeeding terms. If there is no chairperson, or if such officer is absent or unable to serve, the senior member in length of service shall be temporary chairperson.
(b) Authority of the Chairperson. The chairperson may adopt operational procedures and issue such orders, not inconsistent with this Chapter, as may be necessary in the execution of the Board's functions. The chairperson's authority may be delegated to the Board's members and employees, but only members of the Board may issue decisions on appeals.
©) Support. The Civil Service Commission is authorized to provide for the Board such services as the chairperson requests, on such basis, reimbursable or otherwise, as may be agreed upon between the Civil Service Commission and the chairperson. The Board is empowered to hire legal counsel, accountants, staff and other personnel, and to provide for training of its staff and members.

Case 1:04-cv-00006    Document 295-2    Filed 03/14/2006    Page 24 of 28

(d) Qualifications for Board Membership.

(1) One (1) member shall be a member in good standing of the Guam Bar Association who has been admitted to practice before the highest court of a state, territory or the District of Columbia for at least five (5) years prior to that person's appointment, one (1) member shall be a certified public accountant, one (1) member shall have demonstrated experience of at least five (5) years in procurement, one (1) businessperson and three (3) members from the community-at-large.

(2) No member shall be an employee of the government of Guam nor a member of any board or commission of the government of Guam.

(3) The appointment of any person to the Commission shall become void if at any time during his term of office he shall become an employee of the government or accept an annuity from the government.

(4) When a vacancy occurs, the Governor shall appoint a new member within sixty (60) days of the commencement of the vacancy.

(e) Removal of Members. Notwithstanding any other provision of this Chapter, the Governor or the Procurement Appeals Board by three (3) positive votes of its members may recuse a member of the Procurement Appeals Board from participation in a matter before the board due to:

(1) disability,

(2) conflict of interest with respect to service on the Board and engagement in any private business,

(3) for other good cause.

Any removal pursuant to items (2) and (3) of this Subsection shall be effective no sooner than ten (10) calendar days subsequent to the delivery of written notice of such removal by the Governor or the Board to the Legislative Secretary of the Legislature. Removal pursuant to item (1) of this Section shall be effective pursuant to the notice of the action taken.

A member of the Procurement Appeals Board may recuse himself.

For purposes of this Section, recuse means to disqualify from hearing the matter and taking any action on it.

(f) Appointment, Qualifications and Function of Alternates. At the same time as members of the Procurement Appeals Board are appointed by the Governor, **the Governor shall appoint three (3) alternate members to the Board**, all of whom shall serve for a term of six (6) years.

(1) Each alternate shall, at the time of his appointment, be designated either First Alternate, Second Alternate or Third Alternate. For the first year of his appointment each alternate shall serve in the order designated, and each year thereafter they shall rotate the order, so that during the second year, the First Alternate shall serve second, the Second Alternate third, and the Third first, and so on for each successive year until their terms expire.

(2) Each alternate shall fulfill the same requirements for membership on the Board as any of the regular board members fulfill and shall be subject to the same removal procedures as regular board members.

(3) The alternates shall fill in on matters before the Procurement Appeals Board when

a member is absent or recused pursuant to Subsection (e) of this Section and each alternate shall fill in for an absent or recused member in the order they are designated to serve, so that the alternate serving first fills in for the first absence or recusal, the alternate serving second fills in for the second absence or recusal, and so forth.

The Procurement Appeals Board has seven members, which includes a chairperson. The chairperson as well as the six remaining members are all appointed by *I Maga'lahi* with the advice and consent of the Guam Legislature. The Act also requires *I Maga'lahi* to appoint three alternates to the Board, all three likewise requiring legislative confirmation.

The Court is unclear whether this Board has ever been implemented. The Attorney General, however, advised the Court during oral arguments that this Board has never been empanelled since its creation. Thus, seventeen (17) years has passed since this Board was created and its office has still not been implemented. In his petition, the Attorney General alleges that *I Maga'lahi* has only appointed two members to the Board. Attorney David J. Highsmith was appointed by *I Maga'lahi* on June 24, 2003 and confirmed by the Guam Legislature on September 18, 2003. *I Maga'lahi* also appointed Carmen C. De Oro to the Board and she awaits confirmation by the Legislature. In addition to Highsmith, the Board has another existing member, Richard K. Lim, who was appointed by previous Governor Gutierrez on February 5, 2002 and confirmed on May 21, 2002. The Attorney General alleges that despite being in office for approximately ten months, *I Maga'lahi* has failed to appoint seven more individuals to the Board, four (4) regular members and three (3) alternates.

In the creation of the Procurement Appeals Board, the Legislature saw fit to qualify its membership. Thereunder, one (1) member must be an attorney [a member in good standing of the Guam Bar Association... who has been admitted .... to practice for at least five (5) years prior to his appointment]; one (1) member shall be a certified public accountant; one (1) member shall have

demonstrated experience of at least five (5) years in procurement, one (1) businessperson and three (3) members from the community-at-large. When initially passed, the Act required all its members [other than the attorney and certified public accountant members] to have demonstrated experience of at least five (5) years in procurement as a necessary qualification. In addition to the aforesaid qualifications, a member could not be a recipient of any annuity from the government of Guam nor a member of the immediate family of a government of Guam employee. It is apparent from the law as it now exists that subsequently enacted legislation has removed certain impediments in the nomination of members to the said Board.

In filing this action, the Attorney General seeks empaneling of a Procurement Appeals Board which prior hereto has never been empaneled since its creation in 1986.

## II. THE ATTORNEY GENERAL'S POSITION

In his opening brief, the Attorney General sets forth two basic arguments in support of his position. Petitioner first argues that an **elected Attorney General has standing to bring a mandamus action against *I Maga'lahi*.** In this regard, Petitioner points to the 1998 congressional amendments [48 U.S.C. §1421g(d)] made to the office of the Attorney General and the congressional testimony in support thereof from then Senators Elizabeth Barrett-Anderson and Vicente Pangelinan. The Attorney General uses that testimony as indicative of the legislative intent in the amendment with regard to the nature of the office in relation to the election of the Attorney General and his powers and authority. Letters from the Compiler of Laws, Charles Troutman[6], to Delegate Underwood was referenced to illustrate the purpose of the amendment and its interpretive effect [designation of the Attorney General as the Chief Legal Officer]. It is thus argued that being an

---

[6]Charles Troutman was a former Attorney General.

Case 1:04-cv-00006   Document 295-2   Filed 03/14/2006   Page 27 of 28

elected public official on the same executive level as the Governor [both created Organic Act positions] allows the Attorney General to bring this suit against *I Maga'lahi.*. More important, the Attorney General's designation as Chief Legal Officer of the government of Guam further cements his ability and provides statutory as well as common law authorization to bring the present action.

The Attorney General argues further that, in addition to the Congressional change in the position of the Attorney General, local law also permits him to sue *I Maga'lahi* to compel him to perform a ministerial act required by law. Petitioner refers the Court to his authority under Sections 30102 and 30109 of 5 G. C. A. Section 30102 grants the Attorney General "cognizance of all legal matters...involving the Executive Branch of the government of Guam, its agencies, instrumentalities, public corporations, autonomous agencies and the Mayors Council". Section 30109 authorizes the Attorney General to "conduct on behalf of the government of Guam all civil actions in which the government is an interested party". Petitioner cites the Court to various cases in support of his proposition.

In an effort to bolster his standing to bring this action, the Attorney General asserts that he is not the governor's attorney. Moreover, the Attorney General asserts that there is no attorney-client relationship with *I Maga'lahi.* This, for the purpose of countering claims by Respondent that the Attorney General is suing his own client, *I Maga'lahi.* The Attorney General is insistent that the government of Guam is his client and not *I Maga'lahi.* In this regard, Petitioner cites the Court to *State ex. Rel. Condon v. Hodges,* 562 S. E. 2d 623 (S.C. 2002) for the proposition that the Attorney General can sue the Governor if there is the possibility that the Governor is acting improperly.

The Attorney General next argues that the Superior Court has jurisdiction to entertain a mandamus action as the present one because such action is within the jurisdiction of this court, it

being a court of general jurisdiction.

## III. THE GOVERNOR'S POSITION

In his opening brief, *I Maga'lahi* argues that the faithful execution of the laws of Guam falls solely under his responsibility in accordance with the Organic Act of Guam [48 U.S.C. §1422]. The Organic Act grants the Governor supervision and control over the executive branch, which includes the Attorney General. In executing the laws of Guam, *I Maga'lahi* asserts that he has to prioritize among his many areas of responsibility, which include the appointment of members to vacant seats on numerous boards and commissions. The action by Respondent is an attempt to wrestle the executive power from the Governor.

*I Maga'lahi* sets forth three basic arguments in support of his position. He first argues that the Attorney General lacks standing to bring the present action because the Attorney General has no power to control the execution of the laws of Guam. *I Maga'lahi* emphatically points out that the entire executive power is vested in him. The Organic Act contains no provision granting any executive power to the Attorney General. Thus, the present action is merely an attempt to usurp the Governor's authority under the Organic Act. In support of this proposition, *I Maga'lahi* cites the Court to *People ex rel. Deukmejian v. Brown*, 29 Cal. 3d 150, (1981).

*I Maga'lahi* next argues that the Attorney General's authorities as set forth in his brief do not support his position that he has standing. In this regard, he advances several propositions:

1. An Attorney general's common law powers do not permit a civil action against a Chief Executive.

2. The Attorney General's enumerated statutory powers in the Guam Code do not permit the mandamus action.

Case 1:04-cv-00006    Document 295-3    Filed 03/14/2006    Page 1 of 35

3. The Attorney General's election is irrelevant to the maintenance of the present action.

.4. The Attorney General has no case authority to support for this Court's jurisdiction over an action brought by the Attorney General to compel the Governor to execute the law.

5. Restraining the Attorney General within his powers is not a "chilling" effect.

*I Maga'lahi* finally argues that the violation of ethical duties caused by this action reinforces the Attorney General's lack of standing. When the Attorney General filed this action, he brought suit against his own client. This is so because the Attorney General is the attorney for the government of Guam and has cognizance over all legal matters involving the executive branch. *I Maga'lahi* is the head of the executive branch. As head of the executive branch, *I Maga'lahi*, it is argued, is the client of the Attorney General.

Guam's Rule of Professional Conduct [1.7(a)] mandates that a lawyer shall not "be directly adverse to another client" absent a waiver. *I Maga'lahi* has never given the Attorney General a waiver. Yet, the Attorney general has filed this action against *I Maga'lahi.* The Attorney General has therefore violated rule 1.7(a) of Guam's Rule of Professional Conduct.

## IV. THE ATTORNEY GENERAL AND HIS POWERS

### A. The Historical Perspective

Congress passed the Organic Act of Guam in 1949 and in that process, it granted American citizenship for Guam's indigenous people; it provided greater self government for its inhabitants; it established a civilian government [rather than governance by the Naval Government] and it established the Organic Act as the "constitution" of Guam. Pursuant to the Organic Act, Guam elected its lawmakers and these lawmakers became members of the First Guam Legislature (1950-1952). Part of the first order of business of Guam's lawmakers was the establishment of the order

Case 1:04-cv-00006    Document 295-3    Filed 03/14/2006    Page 2 of 35

of the government's business. Part of that order required the establishment of the Department of Law, headed by the Attorney General. The lawmakers passed P.L. 1-88, which created the Office of the Attorney General and the Department of Law. It provided:

§7000. **Attorney General.** The Department of Law of the government of Guam shall be administered by the Attorney General, who shall be appointed by the Governor of Guam, withe the advice and consent of the Legislature, and shall be subject to removal by the Governor.

§7001. **Department of Law, cognizance.** The Department of Law shall have cognizance of all legal matters in which the government of Guam is in anywise interested. It shall have cognizance on all matters pertaining to public prosecution. For this purpose the Island Attorney, deputy Island Attorneys ...shall form the prosecution division of the Department of Law....

§7002. **Opinions.** The Attorney General shall give, when required or requested, and without fee, his opinion in writing to public officers on matters relating to the duties of their respective offices, and verbal or written instructions to commissioners or others, acting for the courts of Guam on all matters relating to service of writs and process.

§7003. **Defense of judges.** When requested by any judge of any court of Guam so to do, the Attorney General shall appear for and represent such court or judge in his official capacity is made a party defendant in his official capacity is made a party defendant in any action.
*(Included in Original Government Code of Guam enacted by P.L.88, 1st G.L., 1952.)*

In addition to the above statutes, §7004 of the Government Code authorized the Attorney General to make rules and regulations for the conduct of the department with said rules becoming effective only upon the approval of the Governor. Thus, the office of the Attorney General commenced its existence with humble beginnings. There were only four statutes[7] which defined its role and responsibility.

---

[7] The Island Attorney, however, had five provisions dealing with its authority. See §§7100 through 7104 of the Government Code.

Case 1:04-cv-00006  Document 295-3  Filed 03/14/2006  Page 3 of 35

P.L. 9-150 [effective February 23, 1968] amended §7001 to prohibit the Attorney General or Island Attorney from delegating to any attorney in private practice the collection of any account or other obligation owed to the government. On March 14, 1968, a new Section 7003.1 [ P.L. 9-175] was added to the Government Code to allow the Attorney General to come to the defense of officers and employees of the government of Guam sued in their individual capacities for the performance of an authorized act. Such action, however, was subject to the approval of the Governor. This provision has essentially remained the same.

P.L. 10-1, effective February 3, 1969, made clear that the Attorney General [§7101] was the public prosecutor. It authorized the Attorney general to conduct on behalf of the government of Guam "the prosecution of all crimes against the laws of Guam ... and to conduct on behalf of the government of Guam all civil actions in which the government is a party interested.

On December 27, 1975, P.L. 13-117 amended the Attorney General's authority to give him common law powers. It provided:

> §7002. Same. The Attorney General shall have, in addition to the powers expressly conferred upon him by this Act, **those common law powers which include, but are not limited to,** the right to bring suit to challenge laws which he believes to be unconstitutional and to bring action on behalf of the Territory representing the citizens as a whole for the redress of grievances which the citizens individually cannot achieve, **unless expressly limited by any law of Guam to the contrary.....**

The act which gave the Attorney General common law powers also limited the right of the Governor to remove the Attorney General. The Governor could only remove the Attorney General **for cause** (Section 7000, Government Code).

Indeed, the Office of the Attorney General has seen many amendments made to its governing statute since it was created by the First Guam Legislature and amendments continue up to the

present. Of all the amendments which have since been made, the most significant may be the amendment to the Organic Act to allow the government of Guam to legislate an elective Attorney General for Guam. That amendment to Guam's Organic Act and the subsequent resulting change in local law has lead to the election of Petitioner in the November, 2002 election and has ultimately lead that Petitioner to the present controversy which is presently before the Court.

### B. Current Laws which Define the Office and Powers of the Attorney General.

The Office of the Attorney General is now included in Guam's Organic Act. Specifically, 48 U.S.C.A. §1421g(d) provides:

> (1) The Attorney General of Guam shall be the **Chief Legal Officer of the Government of Guam.** At such time as the Office of the Attorney General of Guam shall next become vacant, the Attorney General of Guam shall be appointed by the Governor of Guam with the advice and consent of the legislature, and shall serve at the pleasure of the Governor of Guam.
> (2) Instead of an appointed Attorney General, **the legislature may, by law, provide for the election of the Attorney General of Guam by the qualified voters of Guam** in general elections after 1998 in which the Governor of Guam is elected. **The term of an elected Attorney General shall be 4 years. The Attorney General may be removed by the people of Guam according to the procedures specified in section 1422d of this title or may be removed for cause in accordance with procedures established by the legislature in law. A** vacancy in the office of an elected Attorney General shall be filled--
> (A) by appointment by the Governor of Guam if such vacancy occurs less than 6 months before a general election for the Office of Attorney General of Guam; or
> (B) by a special election held no sooner than 3 months after such vacancy occurs and no later than 6 months before a general election for Attorney General of Guam, and by appointment by the Governor of Guam pending a special election under this subparagraph.

In 1998, Congress made the Attorney General position an Organic Act position. The purpose for including the position in the Organic Act was to provide a mechanism for Guam's legislature to provide for an elected Attorney General position. In setting into motion the election of the Attorney General position, Congress understood that the Attorney General position was not novel to Guam's

government but was an existing position with responsibilities and powers derived from the Guam Legislature. However, in making the Office of the Attorney General an Organic Act position, Congress only mandated that "the Attorney General of Guam shall be the **Chief Legal Officer of the Government of Guam**". Was it necessary for Congress to define or delineate the powers, duties, or authority of the Attorney General? Was Guam's law sufficient in that regard? In any event, what appears clear was that Congress intended to expressly repeal [or repeal by implication] any local law inconsistent with the Attorney General being the Chief Legal Officer of the government of Guam.

Regardless of the Organic Act amendment to the office of the Attorney General, the Guam Legislature has defined and given the Office of the Attorney General certain powers, authority and responsibilities. The basic powers of the Attorney General are contained in 5 G.C.A. §30101 et. seq. There are other statutes which refer to or grant certain powers to the Attorney General. These statutes are referenced in other parts of the Code. The powers and responsibilities of the Office of the Attorney General are illustrated in the following statutes:

**5 GCA § 30101. Attorney General.**
(a) The Department of Law of the government of Guam shall be administered by the Attorney General of Guam, who shall be elected by the people of Guam for a term of four (4) years.
(b) A candidate for the position of Attorney General of Guam shall declare no political party affiliation. Candidates for Attorney General of Guam shall be subject to the same campaign and personal financial reporting requirements as apply to candidates for I Maga'lahen Guåhan [the Governor], as well as all laws pertaining to campaign contributions. No nominating petition shall be required of a candidate for Attorney General of Guam.

**5 GCA § 30102. Department of Law, Cognizance.**
(a) Notwithstanding any other provision of law, the **Attorney General shall have cognizance of all legal matters**, excluding the Legislative and Judicial Branches of the government of Guam, **involving the Executive Branch of the government of Guam, its agencies, instrumentalities, public corporations,**

autonomous agencies and the Mayors Council, all hereinafter referred to as "agency". Where any other law permits any agency or autonomous public corporation to retain counsel other than the Attorney General, this shall not preclude said agency or public corporation from requesting the services of the offices of the Attorney General, provided that said agency or autonomous public corporation shall reimburse the Office of the Attorney General for such services from funds of said agency or autonomous public corporation. Said reimbursement shall be deposited in the General Fund and credited to the Office of the Attorney General. In addition, and notwithstanding any other law to the contrary, any agency or autonomous public corporation of the government of Guam may advance funds to the office of the Attorney General for services and incidental travel to be rendered by said office on behalf of said agency or autonomous public corporation.

## 5 GCA § 30103. Common Law Powers of Attorney General.

**The Attorney General shall have,** in addition to the powers expressly conferred upon him by this Chapter, those common law powers which **include, but are not limited to,** the right to bring suit to challenge laws which he believes to be unconstitutional and to bring action on behalf of the Territory representing the citizens as a whole for redress of grievances which the citizens individually cannot achieve, unless expressly limited by any law of Guam to the contrary. The Attorney General may permit attorneys admitted to private practice in Guam or licensed collection agents to collect accounts or other obligations owing to the government of Guam, or to any agency or instrumentality thereof, if such procedure would be in the interest of the Government and expedite the collection of said account or obligation. Any agency or instrumentality not operating under yearly appropriations from the Legislature may retain counsel of its choice for the collection of obligations in the same manner as it may be permitted to retain counsel in other matters as permitted by its enabling legislation. Guam Memorial Hospital may permit the Attorney General or attorneys admitted to private practice in Guam and agents or licensed collection agents to collect accounts or other obligations owing to Guam Memorial Hospital.

## 5 GCA §30104. Attorney General as Public Prosecutor.

The Attorney General shall have cognizance of all matters pertaining to public prosecution., including the prosecution of any public officials.

## 5 GCA § 30109. Duties.

The Attorney General is the public prosecutor and, by himself, a deputy or assistant, shall:

(a) Conduct on behalf of the Government of Guam the prosecution of all offenses against the laws of Guam which are prosecuted in any of the courts of Guam, the District Court of Guam, and any appeals therefrom.

(b) Draw all informations, conduct grand jury proceedings, prosecute all recognizances forfeited in the courts and all actions for the recovery of debts, fines,

Case 1:04-cv-00006    Document 295-3    Filed 03/14/2006    Page 7 of 35

penalties and forfeitures accruing to the government of Guam, except as otherwise provided in this Act;

(c) **Conduct on behalf of the government of Guam all civil actions in which the government is an interested party;** provided that those branches, departments or agencies which are authorized to employ their own legal counsel may use them instead of the Attorney General.

(d) Deliver receipts of money or property received by him in his official capacity and file duplicates thereof with the Director of Administration;

(e) As soon as practical after the receipt of any money in his official capacity, turn the money over to the Director of Revenue and Taxation, and on the first Monday of each month file with the Director of Administration, an account, verified by his oath, of all monies received by him in his official capacity for the government of Guam during the preceding month;

(f) Be diligent in protecting the rights and properties of the government of Guam;

(g) Institute by any appropriate action proceedings on behalf of himself or any other public officer (not an employee) to have determined by the courts the validity of any law, rule or regulation of the government of Guam; and

(h) **Perform such other duties as are required by law.**

The statutes listed above enumerate some of the powers of the Attorney General existing within its basic statutory scheme. The Legislature has also enacted other laws which bear on the Attorney General's responsibilities. For instance, the Legislature has enacted Antitrust Laws and has made illegal any contract, combination, or conspiracy to restrain or monopolize trade (9 GCA §69.15). Criminal and civil penalties are established. 9 G.C.A. §69.45 authorizes the Attorney General to "bring an action for appropriate injunctive relief and civil penalties in the name of the people of Guam for a violation of this chapter." In authorizing the Attorney General to bring such action, the Legislature expressly recognized and provided that nothing in the chapter "shall limit any other statutory or common law rights of the Attorney General...".

The Guam Legislature has also enacted the Trade Practices and Consumer Protection Act. 5 G.C.A. §32101, et. seq. The Attorney General is authorized to maintain certain actions and may represent a consumer or consumers not in a class. Moreover, the Legislature has also provided that

nothing in this chapter shall limit any other statutory or "common law rights of the Attorney General". 5 G.C.A. §32105.

The Guam Legislature has clothed the Attorney General with the responsibility of collecting child support from non-custodial parents and absent fathers. It has also directed the Department of Public Health and Social Services to refer cases to the Attorney General for enforcement of support for public assistance rendered by the said department to families with dependent children. See 5 G.C.A. Section 34106.

The Attorney General has also been designated by the Legislature to play a vital role in the implementation and filing of claims against the government of Guam pursuant to the Government Claims Act. The Attorney General, subject to the approval of the Governor, may settle claims for damages to a motor vehicle under a certain sum. The Attorney General, along with the Governor, must also approve settlements entered into by autonomous boards and agencies for certain sums of money. See 5 G.C.A. Section 6206.

The Legislature has primarily entrusted to the Attorney General the responsibility for enforcing appropriate action against individuals who neglect or refuse to obey legislative subpoena or who refuse to testify or produce documents requested in legislative subpoenas. See 2 G.C.A. Section 3113.

With regard to the federal enforcement of territorial income taxes in Guam, the Attorney General has been entrusted with its enforcement. The appropriate federal statute provides:

§ 1424-4. Criminal offenses; procedure; definitions
Where appropriate, the provisions of part II of Title 18 and of Title 28, United States Code, and notwithstanding the provision in rule 54(a) Federal Rules of Criminal Procedure relating to the prosecution of criminal offenses on Guam by information, the rules of practice and procedure heretofore or hereafter promulgated and made effective by the Congress or the Supreme Court of the United States pursuant to

Titles 11, 18, and 28, United States Code, shall apply to the District Court of Guam and appeals therefrom; except that the terms, "Attorney for the government" and "United States attorney", as used in the Federal Rules of Criminal Procedure, shall, when applicable to cases arising under the laws of Guam, including the Guam Territorial income tax, mean the Attorney General of Guam or such other person or persons as may be authorized by the laws of Guam to act therein.

It can be seen from some of the statutes (local and federal) which have made reference to the Attorney General that the Attorney General indeed is a primary figure, if not the chief figure, in the legal affairs and enforcement of the affairs of the government of Guam.

## V. STANDING PURSUANT TO THE COMMON LAW POWERS OF AN ATTORNEY GENERAL AND THE CONFLICTS IN DUTIES IN THE EXERCISE THEREOF

It undisputed that an Attorney General possesses common law powers. It is in the very essence of these common law powers [and its recognition by the Courts] that Courts have given the Attorney General the requisite standing to bring legal actions against appropriate persons, bodies, and entities. The extent and nature of those common law powers are illustrated in the following cases. The cases further illustrate that in the exercise of his common law powers, the Attorney General, many times, is faced with a conflicting duty.

In *State of Fla. Ex rel. Shevin v. Exxon Corp.*, 526 F. 2d 266, 1976, the State of Florida, through its Attorney General, brought an antitrust action against seventeen (17) major oil companies. The United States District Court for the Northern District of Florida dismissed the action as one beyond the Attorney General's authority and the Attorney General appealed. The Court of Appeals, Thornberry, Circuit Judge, held that the Attorney General's powers extended to the institution of suit under federal law without specific authorization of the individual government entities which allegedly had sustained the legal injuries asserted. The trial court's dismissal was reversed. The Court stated:

Thus we conclude that (1) the Attorney General of Florida retains common law powers, (2) that those powers extend to institution of suits under federal law without specific authorization of the individual government entities who allegedly have sustained the legal injuries asserted, and (3) that neither the decisional nor statutory law of Florida negates such authority.

Commenting on the common law powers of the Attorney General, the Alabama Supreme Court in *Ex Parte Weaver*, 570 So. 2d 675, (1990) stated:

It is instructive to look at the history of the office of attorney general:
"The office of attorney general had its nascence in the *attornatus regis* of the thirteenth and fourteenth century England.

1 The *attornatus regis* served as the sovereign's primary legal representative, with considerable power subject to limitation only by the King. The office was carried over to colonial America, where it eventually became the office of attorney general. All fifty states have an office of attorney general created either by constitution or statute. The specific powers and duties vested in the office vary greatly among the states. Although some states restrict the attorney general's common-law powers by express statutory or constitutional language, the large majority of states have chosen to recognize the existence of these powers.

2 "The most far-reaching of the attorney general's common-law powers is the authority to control litigation involving state and public interests. It is generally accepted that the attorney general is authorized to bring actions on the state's behalf.

3 As the state's chief legal officer, 'the attorney- general has power, both under common law and by statute, to make any disposition of the state's litigation that he deems for its best interest.... [H]e may abandon, discontinue, dismiss or compromise it.'

4 In addition to having authority to initiate and manage an action, the attorney general may elect not to pursue a claim or to compromise or settle a suit when he determines that continued litigation would be adverse to the public interest.

5 "Most courts have given the attorney general 'a broad discretion ... in determining what matters may, or may not, be of interest to the people generally.'

6 The investment of such discretion is based on the premise that the attorney general should act on behalf of the public interest, or as the 'people's attorney.' In an early North Carolina Supreme Court decision, the court refused to interfere with the attorney general's use of his discretionary power to enter a nolle prosequi on grounds that the authority had not been used 'oppressively.'

7 Other courts have left undisturbed the use of the power to control litigation as long

as the attorney general's actions are not arbitrary, capricious, or in bad faith.

In *Com. Ex rel. Hancock v. Paxton*, 516 S.W. 2d 865, 1974, the court held that the Attorney General's constitutional, statutory and common law powers included power to initiate suit against State Department of Transportation and its commissioner to challenge constitutionality of two laws which made provisions for special automobile license plates for ham radio operators and for members of the General Assembly. The Kentucky Court of Appeals stated:

> As concerns the constitutional duties of the office, the only express one is that in the prescribed oath of office--to support the Constitution. The statutory powers and duties of the office are set forth in KRS 15.020. The most significant provisions of that statute, as concern the question here in issue, are that the Attorney General is 'the chief law officer of the commonwealth' and 'shall commence all actions or enter his appearance in all cases * * * in which the Commonwealth has an interest * * *.' At common law, he had the power to institute, conduct and maintain suits and proceedings for the enforcement of the laws of the state, the preservation of order, and the protection of public rights.

While the Kentucky Appeals Court upheld the power and authority of the Attorney General to file an action against the State Department of Transportation and its commissioner, it was not insensitive to the problems faced by the Attorney General when there are conflicts in duties. The Court commented:

> While KRS 15.020 imposes on the Attorney General the duty to 'attend to * * * any litigation or legal business that any state officer, department, commissioner, or agency may have in connection with, or growing out of, his or its official duties,' we believe the statute, in stating at the outset that the Attorney General is 'the chief law officer of the Commonwealth,' intends that in case of a conflict of duties the Attorney General's primary obligation is to the Commonwealth, the body politic, rather than to its officers, departments, commissions, or agencies. We do not conceive that a suit brought by the Attorney General against a state officer, department or agency, seeking to uphold the Constitution, is a suit against the Commonwealth in the sense of a being a breach of the Attorney General's duty to represent the Commonwealth.

Page 22 of 45

In *Hansen v. Barlow*, 456 P. 2d 177, the Utah Supreme Court held that Attorney General, by virtue of inherent authority of his office, had the power to commence an action to determine whether a legislative amendment, providing for payment of per diem and expenses to members of legislative council, and authorizing council to employ staff and fix their salaries, was constitutional. The Court discussed the inherent common law powers of the Attorney General and stated:

> However, this court has repeatedly held that the attorney general has common-law powers and duties. The office of Attorney General is of ancient origin. The powers and duties appertaining to it were recognized by the common law, and the common law has been a part of our system of jurisprudence from the organization of Montana territory to the present day
> In this state the office of Attorney General is created by our state Constitution (sec. 1, Art. VII), which also provides that the incumbent of the office 'shall perform such duties as are prescribed in this Constitution and by the laws of the State,' The Constitution enumerates certain duties, * * * and then concludes by imposing upon the Attorney General 'other duties prescribed by law.' It is the general consensus of opinion that in practically every state of this Union whose basis of jurisprudence is the common law, the office of Attorney General, as it existed in England, was adopted as a part of the governmental machinery, and that in the absence of express restrictions, the common-law duties attach themselves to the office so far as they are applicable and in harmony with our system of government * * *.
> ..............................
> In discussing the powers of the attorney general the court in <u>Darling Apartment Co. v. Springer,</u> 25 Del. Ch. 420, 22 A. 2d 397, 403, 137 A.L.R. 803, 811, had this to say:

> 'The authorities substantially agree that, in addition to those conferred on it by statute, the office is clothed with all of the powers and duties pertaining thereto at common law; and, as the chief law officer of the State, the Attorney General, in the absence of express legislative restriction to the contrary, may exercise all such power and authority as the public interests may from time to time require. In short, the Attorney General's powers are as broad as the common law unless restricted or modified by statute.'

In *People ex rel. Hartigan v. E & E Hauling, Inc.*, 153 Ill. 2d 473, 607 N.E. 2d 165, (1991), the Supreme Court of Illinois dealt with the issue whether the Attorney General had standing to file a suit against various contractors which had participated in various state highway projects with the

Page 23 of 45

Metropolitan Fair and Exposition Authority. The Supreme Court held that the Attorney General had standing under common powers to assert on behalf of the state claims relating to Metropolitan Fair and Exposition Authority's contracts based upon common law fraud and the state's Consumer Fraud and Deceptive Business Practices Act. The Court stated:

> Before discussing the sufficiency of the complaint, we must first consider defendants' contention that the Attorney General has no standing to assert claims relating to the Authority's contracts. The standing doctrine assures that issues are presented to a court only by parties who have a sufficient stake in the outcome of the controversy. *(Harris Trust & Savings Bank v. Duggan* (1983), 95 Ill.2d 516, 527, 70 Ill.Dec. 195, 449 N.E.2d 69, citing *Sierra Club v. Morton* (1972), 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636.) Absent the necessary allegations of interest in the controversy, a party lacks standing to sue.
>
> The Authority is a public corporation established by the Metropolitan Fair and Exposition Authority Act (Ill.Rev.Stat.1985, ch. 85, par. 1223) to promote, operate and maintain conventions and to construct, equip and maintain buildings for these conventions (Ill.Rev.Stat.1985, ch. 85, par. 1224). Under its enabling statute, the Authority has the power to enter into contracts (Ill.Rev.Stat.1987, ch. 85, par. 1225(d)) and may sue and be sued in its own name (Ill.Rev.Stat.1987, ch. 85, par. 1223). Defendants argue that because the Authority has not filed suit itself, nor has it authorized the Attorney General to do so, the Attorney General lacks standing to bring claims arising out of the Authority's contracts.
>
> The Attorney General brings this action "on behalf of the people and taxpayers of Illinois," and he asserts three bases for his standing to bring this suit. First, he argues that he has standing under the common law powers delegated to him by the Illinois Constitution. Second, he argues the legislature has provided standing under the statutory powers of his office. Third, he argues that a taxpayer would have standing to bring this suit and, therefore, he has standing as the representative of all the taxpayers of this State. Because we believe the Attorney General has standing under his common law powers, we need not address the latter two arguments.
>
> Article V, section 15, of the Illinois Constitution of 1970 provides:
> "The Attorney General shall be the legal officer of the State, and shall have the duties and powers that may be prescribed by law."
> In *Fergus v. Russel* (1915), 270 Ill. 304, 110 N.E. 130, this court held that the Attorney General has all the common law powers incident to that office. In *Fergus,* this court stated:
> "[T]he Attorney General is the chief law officer of the State, and the only officer empowered to represent the people in any suit or proceeding in which the State is the real party in interest, except where the constitution or a constitutional statute may

Case 1:04-cv-00006     Document 295-3     Filed 03/14/2006     Page 14 of 35

provide otherwise." (*Fergus*, 270 Ill. at 342, 110 N.E. 130.)

In addition to representing the State and its agencies, the Attorney General is responsible for representing the broader interests of the State. (*Environmental Protection Agency v. Pollution Control Board* (1977), 69 Ill.2d 394, 401, 14 Ill.Dec. 245, 372 N.E.2d 50.) Further, although the legislature may add to the Attorney General's common law powers, it may not detract from them. The holding of *Fergus* was incorporated into the Illinois Constitution of 1970. *People ex rel. Scott v. Briceland* (1976), 65 Ill.2d 485, 3 Ill.Dec. 739, 359 N.E.2d 149; *Stein v. Howlett* (1971), 52 Ill.2d 570, 289 N.E.2d 409.

In *Wade v. Mississippi Co-op. Extension Service*, 392 F. Supp. 229, N.D. Miss., (1975), the Court examined "whether in a case of undeniable statewide interest the Attorney General of the State of Mississippi has authority to assume defense of an action against the Board of Trustees of State Institutions of Higher Learning (the Board), an autonomous and constitutional state agency which wishes instead to retain private counsel to represent its official interests". The Board had been involved in a suit in which mammoth racial discrimination was alleged. The Board retained its own attorney during the course of the civil litigation. Several years after the case had been pending, the Attorney General advised the Court and the parties that he was now moving in to represent the interest of the Board and all affected state agencies. When the United Stated, as plaintiff-intervenor, moved to amend its complaint, the Board, through its retained counsel, filed an objection. The Attorney General moved to strike the opposition. The court stated:

> The Attorney General of Mississippi is a constitutional officer ordained by the State's original charter of 1817 and continued in every state constitution since.
>
> Although § 173, the provision of Mississippi's present constitution which establishes the office, is facially silent as to its powers and duties, specific legislative authorization for the power now claimed by the Attorney General is not wanting. Indeed, statutory designation of the Attorney General as legal counsel for the State in all civil cases stretches forward in unbroken succession since territorial times. If the present statutory language of § 7-5-1, granting the Attorney General 'the powers of the attorney general at common law and . . . the sole power to bring or defend a lawsuit on behalf of a state agency, the subject matter of which is of statewide

Case 1:04-cv-00006    Document 295-3    Filed 03/14/2006    Page 15 of 35

interest,' were the sole guide, it would be clear that the Attorney General is empowered to defend the Board against the comprehensive complaint of racial discrimination in the operation of statewide interest,' were the sole guide, its charge. The authority of the Attorney General to act on behalf of the Board, however, is more than statutory; it is of constitutional dimension.

Though § 173 makes no delineation of the nature and scope of the Attorney General's power, the Supreme Court of Mississippi has consistently ruled that the constitutional creation of the office, even without further statutory enactment, vested in the Attorney General all powers which that officer possessed at common law and incorporated that common-law authority into the constitution itself.

The duties of the Attorney General were not prescribed by the Constitution, nor did it provide that they would necessarily have to be prescribed by the legislature. They existed at common law . . .. The creation of the office of Attorney General by the Constitution vested him with these common law duties, which he had previously exercised as chief law officer of the realm. Kennington-Saenger Theatres v. State, 196 Miss. 841, 18 So.2d 48o, 486 (Miss.1944).

See also Gandy v. Reserve Life Ins. Co., 279 So.2d 648, 649 (Miss.1973); State v. Warren, 254 Miss. 293, 180 So.2d 293, 299 (1965); *233 Dunn Const. Co. v. Craig, 191 Miss. 682, 2 So.2d 166, 174-75 (1941); Capitol Stages v. State, 157 Miss. 576, 128 So. 759, 763 (1930).


The Board's final, and most serious, contention is that § 213-A of Mississippi's Constitution, inserted in 1944, created the Board as an autonomous agency entrusted with the management and control of Mississippi's senior colleges and universities, and thus invested the Board with the power to employ legal counsel in all cases to which it is a party, independently of the Attorney General. Mississippi has no judicial precedents interpreting the scope of § 213-A or the statutes passed thereunder. Hence, this case is one of first impression. Since § 213-A nowhere expressly grants to the Board authority to engage counsel for the purpose of conducting litigation of state-wide interest, the Board's assertion that § 213-A bestows such authority can only be based upon a claim that § 213-A impliedly effects a pro tanto repeal of the plenary authority conferred on the Attorney General by § 173

to represent the State in all litigation of such character. This contention is bottomed upon the proposition that the Board has inherent power as a constitutionally-created autonomous entity, particularly in view of certain language found in Miss. Code Ann. § 37-101-7 (1972):

The board shall also have the authority to employ on a fee basis such technical and professional assistance as may be necessary to carry out the powers, duties and purposes of the board.

It is easily perceptible that even if the foregoing statute purports to give the Board authority to retain private legal counsel as professional advisors, no statutory enactment can override the well-established constitutional authority of the Attorney General in this area of strong State concern.

Case 1:04-cv-00006     Document 295-3     Filed 03/14/2006     Page 16 of 35

But we do not read either §37-101-7 or § 213-A of the State's constitution as conferring such authority upon the Board. Mississippi jurisprudence places high priority on harmonizing, wherever possible, separate constitutional provisions so as to give effect to all; and repeal of a specific constitutional provision by implication is never favored. State v. Jackson, 119 Miss. 727, 81 So. 1 (1919). The Board's purpose, as prominently expressed in its constitutional charter and complementary legislation, is to manage and control the educational institutions under its charge 'to the greatest advantage of the people of the State', uninfluenced by political considerations and free of domination by the Chief Executive of the State. The statutory powers and duties of the Board, enumerated at length in Miss. Code Ann. § 37-101-15, are clearly directed toward this concept of the Board as a nonpolitical and independent agency autonomous within its sphere of operations in all fields of higher education. But the autonomy of the Board, and hence its ability to act independently of the Attorney General and other governmental officers, extends only to those highly important functions for which it was created. Just as the Board could not, independently of the legislature, levy and collect taxes for the support of state universities, so too it cannot, without a specific constitutional grant, act in those areas expressly and constitutionally entrusted to the authority of the Attorney General. Proper functioning of the Board as an educational agency is not dependent on its ability to retain private counsel in cases of this sort, which are of state-wide interest. Thus, the power so to act may not be implied from the terms of § 213-A.

We emphasize that this case does not concern the authority which the Board may legally exercise in employing counsel in the discharge of many activities, which may be of a purely local, administrative, or proprietary nature. For example, the Board may need legal assistance in purchasing real estate, collecting debts from others, preparing and reviewing employment contracts with professional staff, and other matters similarly related to the Board's ordinary functions. Whether the Board may engage counsel, independently of the Attorney General's office, to assist in matters of this kind is not presented by this case, and we express no opinion thereon.

But in actions of indisputable statewide interest, where the Attorney General is specifically empowered to act for state agencies by long-established constitutional doctrine, due regard for Mississippi's Constitution by applying the familiar rule of pari materia interpretation mandates that the Board not be allowed to usurp his constitutional prerogative. See St. Louis & San Francisco R. Co. v. Benton County, 132 Miss. 325, 96 So. 689 (Miss.1923); State v. Jackson, supra.

Moreover, in the eventuality of a conflict of interest between state agencies-- for example, between the Board and one or more junior colleges or other educational entities joined as defendants in this cause-- the Attorney General has given his personal assurance to this court to take whatever steps may be necessary to protect all interests, including compliance with such orders as this court may see fit to enter. **We hold that the Board is without power to engage counsel in this cause to represent its official interests independently, and over the objection of the State's Attorney General, and the Attorney General's motion to strike is hereby**

**sustained.**

The Attorney General's ability to maintain actions depends on the public interest nature of the litigation. The Courts have been the final arbiters of the public interest nature asserted by the Attorney General. In *Blumenthal v. Barnes*, 261 Conn. 434, 804 A. 2d 152, (2002), the Connecticut Supreme Court held that the Attorney General had no common law authority to sue the president of a non profit corporation in relation to private gifts which had been made to the corporation, although the common law authority to sue extended to charitable and public gifts made to the corporation.

In *State v. City of Oak Creek*, 232 Wis. 2d 612, 605 N. W. 2d 526, (2000), the Wisconsin Supreme Court held that the Attorney general had no standing to sue to challenge the validity of a statute. Rather, the Attorney General had a duty to defend the statute. The Court acknowledged, however, that the Attorney general may have standing if directed by the governor to challenge the statute or if there if the case results in the granting of a petition for original jurisdiction.

## VI. ATTORNEY GENERAL ACTIONS IN RELATION TO THE GOVERNOR AND IN ITS RELATIONSHIP TO THE EXECUTIVE FUNCTION.

Existing cases provide guidance as to the appropriateness of actions by an Attorney General against the Governor, in relation to the Governor's authority, his executive functions, in particular, his faithful execution of the laws. The following cases are illustrative:

In *Perdue v. Baker*, 586 S. E. 2d 606, (Sept. 4, 2003), the Georgia Supreme Court was faced with the issue whether the Attorney General had the authority under state law to appeal a court decision invalidating a state redistricting statute despite the Governor's order to dismiss the appeal. Because there was constitutional authority for the General Assembly to vest the Attorney General with specific duties and a state statute vested the Attorney General with the authority to litigate in

the voting rights action, the Supreme Court held that the Attorney General had the power to seek a final determination on the validity of the State Senate redistricting statute under the federal Voting Rights Act. The Court affirmed the trial court's ruling that the Governor had no clear legal right to order the Attorney General to dismiss the appeal filed on behalf of the State of Georgia in the United States Supreme Court. Thus, the Governor's application for a writ of mandamus was denied. In this case, both the Governor and the Attorney General argued that each had the sole right to determine the public interest. The Court stated:

> ...we reject the broader claim by each officer that he has the ultimate authority to decide what is in the best interest of the people of the State in every lawsuit involving the State of Georgia. By giving both the Governor and Attorney General the responsibility for enforcing state law, the drafters of our constitutions and the General Assembly have made it less likely that the State will fail to forcefully prosecute or defend its interests in a court of law or other legal proceeding. This overlapping responsibility is also consistent with the existing practice in state government. Most important, it provides a system of checks and balances within the executive branch so that no single official has unrestrained power to decide what laws to enforce and when to enforce them.
> We also reject the dissent's narrow characterization of the Attorney General's role as merely that of legal counsel to the Governor. To imply that the Georgia Rules of Professional Conduct control the Attorney General's relationship to the Governor ignores the important and independent role assigned to the Attorney General under our constitution. Accepting the dissent's argument would eviscerate the Attorney General's separate constitutional role.
> The State of Georgia is not one branch of government, one office, or one officer. The State's authority resides with the people who elect many officers with different responsibilities under valid law.
> 2. Our conclusion that both officers have the duty to enforce state laws is consistent with the language and legislative history of article V of the 1983 Georgia Constitution. The first paragraph on the Governor's duties and powers in the Executive Article states the following: "The chief executive powers shall be vested in the Governor. The other executive officers shall have such powers as may be prescribed by this Constitution and by law."
>
> This provision made two changes from previous constitutions. It added the word "chief" to the first sentence and added the second sentence referring to the relationship between the Governor and other executive officers.

.................................................................

Case 1:04-cv-00006   Document 295-3   Filed 03/14/2006   Page 19 of 35

On the other hand, the executive branch generally has the power and authority to control litigation as part of its power to execute the laws, and a law that removes from the executive branch sufficient control of litigation may well violate separation of powers. **However, the executive branch does not have the authority to decline to execute a law under the guise of executing the laws: "To contend that the obligation imposed ... to see the laws faithfully executed, implies a power to forbid their execution, is a novel construction of the Constitution and entirely inadmissible."** The power to forbid the execution of the laws would enable the executive branch to nullify validly enacted statutes. In that situation, the executive branch would encroach upon the legislative power to repeal statutes or upon the judicial branch's power of judicial review. What the executive branch cannot do directly, it cannot do indirectly. Thus, even though the executive branch generally has the power and authority to control litigation, it cannot exercise this power in order to prevent the execution of a law.

In *State ex rel. Condon v. Hodges,* 349 S.C. 232, 562 S. E. 2d 623, (2002), the Supreme Court of South Carolina exercised its original jurisdiction to address the issue whether the Attorney General had the authority to bring suit against the Governor. Defendants argued that the Attorney General was violating the South Carolina Constitution and the South Carolina Code by suing the Governor in his official capacity. The Constitution provides:

> The Governor shall take care that the laws be faithfully executed. To this end, the *Attorney General shall assist and represent the Governor, but such power shall not be construed to authorize any action or proceeding against the General Assembly or the Supreme Court*

In *Condon v. Hodges,* the Supreme Court determined that the Attorney General had the authority to sue the Governor and in the process of doing so, he was not prohibited by Rules of Ethics from doing so. The Court stated:

> There is no provision in the South Carolina Code or Constitution that explicitly prevents the Attorney General from bringing a civil action against the Governor. Further, "[a]s the chief law officer of the State, [the Attorney General] may, in the absence of some express legislative restriction to the contrary, exercise all such *power* and *authority as public interests may from time to time require,* and may institute, conduct and maintain all such suits and *proceedings as he deems* necessary

Case 1:04-cv-00006   Document 295-3   Filed 03/14/2006   Page 20 of 35

for *the enforcement of the laws of the State,* the *preservation of order,* and the *protection* of *public rights.*"

*State ex rel. Daniel v. Broad River Power Co., 157 S.C. 1, 68, 153 S.E. 537, 560 (1929), aff'd* 282 U.S. 187, 51 S.Ct. 94, 75 L.Ed. 287 (1930) (citation omitted and italics added by *Daniel* court). *Cf. State v. Beach Co.,* 271 S.C. 425, 248 S.E.2d 115 (1978) (while Attorney General has broad statutory authority, and arguably common law authority, to institute actions involving welfare of State, that authority is not unlimited). The Attorney General has a dual role. He is an attorney for the Governor and he is an attorney for vindicating wrongs against the collective citizens of the State. *See Porcher v. Cappelmann,* 187 S.C. 491, 198 S.E. 8 (1938) (Attorney General represents sovereign power and general public). Allowing the Attorney General to bring an action against the Governor when there is the possibility the Governor is acting illegally is consistent with the duties of this dual role. Further, because the office of attorney general exists to properly ensure the administration of the laws of this State, the Attorney General is merely ensuring that Proviso 72.109 is being administered the way in which the General Assembly intended. *See Langford v. McLeod,* 269 S.C. 466, 238 S.E.2d 161 (1977) (office of attorney general exists to properly ensure administration of laws of this State).
The above precepts lead to the conclusion that the Attorney General can and should bring an action against the Governor if there is the possibility the Governor is acting improperly...

From this language and the fact there is no statutory or constitutional prohibition against the Attorney General suing the Governor, we find the Attorney General has the authority to sue the Governor when he is bringing the action in the name of the State for the purpose of asserting that a separation of powers violation has occurred. Moreover, as stated previously, the Attorney General can bring an action against the Governor when it is necessary for the enforcement of the laws of the State, the preservation of order, and the protection of public rights.

..........................................

Defendants query whether the Attorney General's action of bringing suit against the Governor violates the Rules of Professional Responsibility. Defendants state the Attorney General and the Governor have an attorney-client relationship, and that the Attorney General has violated Rule 1.7(a) of Rule 407 of the Rules of Professional Responsibility, which states "[a] lawyer shall not represent a client if the representation of that client will be directly adverse to another client, unless: ... (2) Each client consents after consultation."
Defendants contend if the Governor had requested the Attorney General represent him in this matter, the Attorney General would be required to do so. *See* S.C.Code Ann. § 1-7-50. In that event, the Attorney General would be on both sides of the action which Defendants assert is impermissible. Defendants also assert that because the Attorney General is currently representing the Governor in other legal matters, the Attorney General cannot ethically bring the instant action against the Governor.

Case 1:04-cv-00006     Document 295-3     Filed 03/14/2006     Page 21 of 35

We have previously found that an analogous situation did not create a conflict of interest. *Cf. Langford v. McLeod, supra* **629 (original proceeding brought for declaratory judgment as to status, responsibility, and duty of Attorney General in representing municipal employees in civil actions; Court held Attorney General may represent public officials in civil suits as well as criminal ones without being subject to imposition of conflicting or unethical duties); *State ex rel. McLeod v. Snipes,* 266 S.C. 415, 223 S.E.2d 853 (1976) (Attorney General sought declaratory judgment that statute requiring him to represent officers of State in criminal proceedings was in conflict with constitutional provision designating Attorney General as chief prosecutor of State; Court held no conflict of interest arose from two duties of Attorney General as he could appoint members of his staff or solicitors or assistant solicitors to participate in prosecution and defense).

**Furthermore, the Attorney General, as noted above, has a dual role of serving the sovereign of the State and the general public. Thus, the Attorney General is not violating the ethical rule against conflicts of interest by bringing an action against the Governor.**

While the Attorney General is required by the Constitution to "assist and represent" the Governor, the Attorney General also has other duties given to him by the General Assembly, and elaborated on by the Court, which indicate the Attorney General can bring an action against the Governor.

In *People ex. Rel. Deukmejian v. Brown*, 172 Cal. Rptr. 478, (1981), the Attorney General of California sought a peremptory writ of mandate to compel the Governor, the Controller, the State Personnel Board, and the Public Employment Relations Board to perform their statutory and constitutional duties with regard to the recently enacted State Employer-Employee Relations Act. The Supreme Court of California held that the Attorney General could not maintain the action where the Attorney General had represented certain state clients, given them legal advise with regard to the pending litigation, and then withdrawn and sued the same clients on the next day on the cause of action arising out of the identical controversy.

The Attorney General argued, however, that his common law powers authorized him to commence such an action. The Supreme Court responded:

2. *Article V, section 1, of the California Constitution* provides that "The supreme executive power of this State is vested in the Governor. The Governor shall see that

Page 32 of 45

the law is faithfully executed."

Article V; section 13, defines the powers of the Attorney General inter alia in this manner: "Subject to the powers and duties of the Governor, the Attorney General shall be the chief law officer of the State." The constitutional pattern is crystal clear: if a conflict between the Governor and the Attorney General develops over the faithful execution of the laws of this state, the Governor retains the "supreme executive power" to determine the public interest; the Attorney General may act only "subject to the powers" of the Governor.

Consistent with the Constitution, Government Code section 12010 provides: "The Governor shall supervise the official conduct of all executive and ministerial officers." (Spear v. Reeves (1906) 148 Cal. 501, 504, 83 P. 432.) The Attorney General is an executive officer who "shall report to the Governor the condition of the affairs of his office" (Gov. Code, s 12522).

We recognize there are cases in other jurisdictions that permit their attorneys general to sue any state officer or agency, presumably without restriction. Such opinions arise, however, under the peculiarities of the prevailing law in those several states, and are not persuasive here. (See, e. g., Conn. Com'n. v. Conn. Freedom of Information ( 1978) 174 Conn. 308, 387 A.2d 533); Feeney v. Commonwealth (1977) 373 Mass. 359, 366 N.E.2d 1262; E.P.A. v. Pollution Control Bd. (1977) 69 Ill.2d 394, 14 Ill.Dec. 245, 372 N.E.2d 50; Commonwealth ex rel. Hancock v. Paxton (Ky.1974) 516 S.W.2d 865.)

On the other hand, several jurisdictions have prevented the attorney general from acting without constitutional or statutory authority. A federal court found it incongruous for an attorney general, purporting to act for the people, to mount "an attack by the State upon the validity of an enactment of its own legislature." (Baxley v. Rutland (D.Ala.1976) 409 F.Supp. 1249, 1257; see also Hill v. Texas Water Quality Bd. (Tex.Civ.App.1978) 568 S.W.2d 738; Motor Club of Iowa v. Dept. of Transp. (Iowa 1977) 251 N.W.2d 510, 515; People ex rel. Witcher v. District Court, etc. (1976) 190 Colo. 483, 549 P.2d 778; Garcia v. Laughlin (1955) 155 Tex. 261, 285 S.W.2d 191, 194; State v. Hagan (1919) 44 N.D. 306, 175 N.W. 372, 374; State v. Huston (1908) 21 Okl. 782, 97 P. 982, 989.)

Arizona, the constitution of which, like ours, declares that its governor "shall take care that the laws be faithfully executed" (*159 Ariz.Const., art. V, s 4), reached the same conclusion as we do herein. In Arizona State Land Department v. McFate (1960) 87 Ariz. 139, 348 P.2d 912, 918, the supreme court of that state declared in an unanimous opinion, "Significantly, these powers are not vested in the Attorney General. Thus, the Governor alone, and not the Attorney General, is responsible for the supervision of the executive department and is obligated and empowered to protect the interests of the people and the State by taking care that the laws are faithfully executed."

VII. APPLICATION OF ORGANIC ACT AMENDMENTS, LOCAL LAWS

Page 33 of 45

## AND CASE LAW TO PRESENT CONTROVERSY

## A. REQUIREMENTS OF THE PROCUREMENT APPEALS BOARD

The Attorney General has brought this action [alternative writ of mandamus] to compel *I Maga'lahi* to appoint members of the Guam Procurement Appeals Board. This Board has been created by the Legislature to provide a form for appeals from procurement practices. This is a Board that has never been empaneled since its creation in 1986. The enabling statute has gone through amendments for the most part to allow greater eligibility for membership. Prior to the amendments, a member was required to have five years of procurement experience for eligibility. To date, only two members have ever been confirmed to this Board.

The Board serves an important governmental function because this Board is the final administrative body where challenges to awards of government bids and contracts can be made. The absence of such a Board has required aggrieved parties to file court actions and seek judicial remedies even though Guam law provides an administrative appeal level where the challenges could be resolved. Instead, the courts of Guam have been substituted as the body where challenges can be brought forth. Incumbent governors have been criticized in the past for their failure to empanel such Board. Criticism in the past has come from the legislative branch. The legislature has also seen fit to amend the act to allow for flexibility in the composition of its membership.

In bringing this action, the Attorney General has alleged that while *I Maga'lahi* has been in office for approximately ten (10) months, he has yet to make the required appointments to the Procurement Appeals Board. 5 G.C.A. §5710 provides that the "members of the Board shall be appointed by the Governor". 5 G.C.A. §5702(f) further provides that "the Governor shall appoint three (3) alternate members to the Board". It is apparent that among the countless and innumerable

Case 1:04-cv-00006    Document 295-3    Filed 03/14/2006    Page 24 of 35

tasks within the Governor's responsibilities with regard to his faithful execution of the laws, he is no less required to make the said appointments to the Procurement Appeals Board. This is a responsibility provided by local law that *I Maga'lahi* must also faithfully execute.

## B. DOES THE ATTORNEY GENERAL HAVE AUTHORITY TO SUE THE GOVERNOR?

In determining whether the Attorney General has authority or the requisite standing to bring the mandamus action, the Court must extensively review the Attorney General's powers and ascertain whether such powers authorize him to bring the present action or whether he is expressly excluded by a statute from filing the present action. Thus, unless there is a specific statute that prevents the filing of this mandamus action, at a minimum, the Attorney General's common law powers authorize the filing of this action.

Generally, the powers of an Attorney General are found in the respective state constitution or in the enactments of the various state legislatures. These are the enumerated or express powers. It is also not disputed that the Attorney General has common law powers which has its roots in the English system. The extent of the Attorney General's enumerated powers as well as his common law powers have been the subject of many state court decisions. These decisions are not uniformed and are conflicting to some degree.

Petitioner, the present Attorney General, advocates his position to be a constitutional office, i.e., he exercises authority pursuant to a congressional mandate as expressed in the Organic Act of Guam. Since his position was created by Congress, he wields authority under an analogous "supremacy clause" because of his designation as the "Chief Legal Officer of the Government of Guam" in the Organic Act. The Attorney General boldly asserts that he needs no other authority other than this designation to represent the government of Guam in all matter in which it is

Case 1:04-cv-00006     Document 295-3     Filed 03/14/2006     Page 25 of 35

interested, to undertake all actions for the public benefit and to prosecute individuals for the commission of crimes. The Attorney General also asserts that the local legislature has no authority to diminish his present powers but it may augment such powers. Furthermore, the Attorney General argues that the nature of his office inherently provides him common law powers associated with every Attorney General. Thus, in addition to his designation as the Chief Legal Officer of the government of Guam, he also possesses common law powers similarly possessed by other Attorneys General. It is this designation as the Chief Legal Officer in the Organic Act of Guam, it is argued, as well as his common law powers inherent in that office that authorize him to bring this action against *I Maga'lahi.*

Respondent, *I Maga'lahi,* argues on the contrary that there is no statute which expressly authorizes the Attorney General to bring a mandamus action against him. Furthermore, since the Organic Act designates *I Maga'lahi* as the chief executive officer in the executive branch, he alone is entrusted with the faithful execution of the laws, not the Attorney General. The present action is an attempt to wrestle away from him his responsibilities in the execution of the laws. *I Maga'lahi* further argues that the Attorney General has no common laws powers under the Organic Act nor does he have such powers under local law. Furthermore, even if he had statutory common law powers, the Governor's designation as the chief executive officer under the Organic Act of Guam negates any common law authority that the Attorney General may have in bringing the present action.

Does the Organic Act's designation of the Attorney General as Chief Legal Officer supply him with inherent common law powers? Does the Attorney General possess common law powers? Even if the Court were to conclude that the Attorney General has no common law powers which emanate from his Organic Act position, a review of Guam's laws shows that the Attorney General

Case 1:04-cv-00006    Document 295-3    Filed 03/14/2006    Page 26 of 35

has been granted common law powers by the Guam Legislature. This grant of common law powers is contained in §30103 of 5 G.C.A. The Attorney General possesses common law powers which are not defined. The common law powers include those undertakings specifically mentioned in Section 30103 but are not limited to them. Thus, he has powers to bring actions which affect the public interest **unless expressly limited by any law of Guam to the contrary.**

Under his common law powers, an Attorney General has the power to maintain suits and proceedings for the enforcement of the laws of the state, the preservation of order, and the protection of public rights. It is in the furtherance of these stated purposes that he has been held to have had authority to sue state officers, departments and agencies.

In the pursuit of these stated purposes, can the Attorney General sue the Governor? It would appear that under his common law powers, the Attorney General would have authority to sue the Governor unless there is a specific statute which expressly limits this power to do so. This is so because case law has upheld the right of the Attorney General to sue state officers for enforcement of state laws. The right to sue the Governor under the Attorney General's common law power was recognized and upheld in *State ex rel. Condon v. Hodges*, supra. Since the Attorney General's authority to sue has been answered in the affirmative, the Court must proceed to ask the next question.

Does the Governor's executive powers expressly limit the Attorney General's power to bring this action. The Governor's executive powers stand on the same level as the Attorney General. The Governor also occupies a constitutional office under the creation of Congress in the Organic Act of Guam. The Governor is the executive branch's chief executive officer. The Attorney General is the head of the Department of Law and the Department of Law is within the Executive Branch. The

Case 1:04-cv-00006    Document 295-3    Filed 03/14/2006    Page 27 of 35

Governor is entrusted with the faithful performance of the laws. The Governor is entrusted with appointment powers. He and not the Attorney General appoints members of boards and commissions. It is in this context of the separation of powers [the Attorney General's office is in the executive branch and the Governor is the head of the said branch] that the Governor argues that he cannot be sued by the Attorney General. He is the head of the executive branch, charged with the faithful execution of the laws, and the sole determinant of the public interest.

The Organic Act makes the Governor the chief executive officer charged with the general supervision and control over the executive branch of the government of Guam and charged with the faithful execution of the laws. The Organic Act makes the Attorney General the Chief legal Officer of the government of Guam. The Governor is head of the executive branch but the Attorney General is the chief legal officer of the government of Guam, which includes not only the executive branch but also the legislative and judicial branches. Thus, the sphere of the Attorney General's legal cognizance is within the entire government of Guam, legislative and judicial, not just the executive branch.

With regard solely to the executive branch, does the Governor's control over the executive branch expressly include control over the Attorney General such that the present action cannot be maintained?

Assuming that there were some conflict in the roles within the executive between the Governor and the Attorney General, the statutory authority of the Attorney General should prevail because his statute was enacted subsequent in time by congress and it is specific to an office and not general as the Governor's supervisory and control power over the executive branch. The Court notes that the Attorney General no longer is subject to the removal authority of the Governor. Thus, the

Governor's appointive control over this part of the executive has been removed from his immediate control. The Attorney General is now elective and he may be removed not by the Governor but through procedures specified in Section 1422 of the Organic Act. The Attorney General may also be removed for cause in accordance with procedures established by the Legislature in law. The whole legislative intent behind the elective Attorney General was to remove the Attorney General from the control of the Governor and make the office independent. Therefore, it does not appear that the Governor's supervision and control over the executive branch renders the Attorney General hapless in bringing suits against the Governor. In similar fashion, the existence of the Department of Education within the executive branch does not render invalid the present school board merely because the Governor has general supervision over the executive branch. The placement of the education system within the control of the government of Guam has similar effect to the creation of the office of the Attorney General as the chief legal officer of the government of Guam and its resulting placement outside the reach of the executive head.

In ascertaining whether the Attorney General can file this action against the Governor, the final question the Court must ask is whether the Rules of Professional Conduct prevent the Attorney General from bringing the mandamus suit. Is the Attorney General so prevented?

*I Maga'lahi* argues that there was a violation of ethical duties when the Attorney General filed this mandamus action against him because in doing so the Attorney General brought suit against his own client. This is necessarily so because the Attorney General is the attorney for the government of Guam and has cognizance over all legal matters involving the executive branch. *I Maga'lahi* is the head of the executive branch. As head of the executive branch, *I Maga'lahi* is the client of the Attorney General.

Case 1:04-cv-00006    Document 295-3    Filed 03/14/2006    Page 29 of 35

Guam's Rule of Professional Conduct [1.7(a)] mandates that a lawyer shall not "be directly adverse to another client" absent a waiver. *I Maga'lahi* has never given the Attorney General a waiver, but the Attorney General has filed this action against *I Maga'lahi.* The Attorney General has therefore violated his ethical duties and should be enjoined from doing so.

*I Maga'lahi* argues that in *People ex. Rel. Deukmejian v. Brown*, the California Supreme Court held that it was not ethical for the Attorney general to file suit against the Governor, the very person he was supposed to represent. The *Deukmejian v. Brown* case, however, was one where the Attorney General had represented state clients, given them legal advice with regard to the pending litigation, then withdrew from their representation and sued the same clients the next day on a cause of action arising out of the identical controversy. The Court held this was improper conduct by the Attorney General and it was a violation of the rules of professional conduct. The decision in *Deukmejian v. Brown* was narrow, however. The Supreme Court, while acknowledging the dual role of the Attorney General, [as the representative of state agencies and the guardian of the public interest] determined that his common law powers did not authorize the Attorney General to sue the Governor because the California state constitution designated the Attorney General the chief legal officer **subject to the powers and duties of the Governor.** If there was a conflict between the two offices, the Governor retained the supreme power to determine the public interest because the Attorney General's common law power was subject to the express powers and duties of the Governor.

Most jurisdictions recognize a dual role with the Office of the Attorney General. Some of these jurisdictions have recognized and upheld the common law powers of an Attorney General to bring an action against state officers in the enforcement of the laws, the preservation of the public

order and the protection of the public interest. It was the public interest in *Condon v. Hodges* that lead the South Carolina Supreme Court to conclude that the Attorney General could and should bring an action against the Governor if there is the possibility he may be acting improperly. Moreover, the Court held that any existing attorney-client relationship between the Attorney General and the Governor would not prevent the bringing of the action. Moreover, it did not represent a conflict of interest. Because of the Attorney General's dual role, he is not violating the rules of ethics against conflicts of interest by bringing an action against the Governor.

The Attorney General has also cited the court to two Superior Court decisions in which dual representation was not a disqualifying factor. In *People v. Castro*, CF 324-98, then Judge Frances Tydingco-Gatewood ruled that Guam's Rules of Professional Responsibility could not be mechanically applied to the Attorney General's office and did not disqualify the Attorney General from prosecuting the Defendant even though it was representing the Defendant in a civil matter with regards to the claim filed against the Defendant under the Government Claims Act. The Court held that the "mechanical application of the Guam Rules of Professional Conduct to the Attorney general's Office is disfavored because the Attorney General is 'the only one of its kind' and is entitled to a presumption of impartiality".

In *Attorney General of Guam v. Y'Asela Pereira*, Super. Ct. No.SP32-03, this Court recognized the special statues of the Attorney General as the chief legal officer of the government of Guam and his dual role in serving the government of Guam and the public interest.

If the Court were to agree with the Governor and disable the Attorney General from bringing suit against him which the Attorney General has filed in the name of the public interest, [enforcing the laws of Guam by requiring the Governor to perform an act required by law - the appointment

of members to the Procurement Appeals Board], would there be any other protector or guardian of the public interest who would be able to do so? It would appear that a person aggrieved with a procurement process might forego filing a suit to require the governor to make an appointment because there might not be standing to commence such a suit. An aggrieved person may not have standing to allege injury or harm because his appeal may be brought directly to the courts. Thus, he may not be injured in that sense to have the requisite standing to sue the Governor to make appointments to the Board.

Moreover, a ruling by this Court that the Governor cannot be sued by the Attorney General because he is the Attorney General's client may very well result in a type of judicial grant of immunity from suits. Officers of the executive branch may avoid suit when they act improperly or in violation of the law because they derive legal representation from the Attorney General. This cannot be the case nor can this be sound public policy because no one is above the law. It would be unreasonable for this Court to hold that the Attorney General cannot sue the Governor because the faithful execution of the laws rests solely with the Governor. Whether the Governor may be sued to answer why he has not made appointments to the Procurement Appeals Board is the issue herein, not when he should make appointments. The Governor states that in the prioritization of his many areas of responsibility in the execution of the laws, he is in the process and is still interviewing individuals for membership in the said Board. These are issues, however, that relate to the merits of the petition. The Court, upon a return on the alternative writ may very well agree with the Governor's position - that in the execution of the laws, he may need and should be afforded additional time to make his appointments. But, as the Court *in Purdue v. Baker,* supra, acknowledged: the Governor's executive power [his faithful execution of the laws of Guam] cannot

Page 42 of 45

be used to prevent the execution of another law, i.e., his duty under Guam law to make appointments to the Procurement Appeals Board.

The Court also finds that the better view regarding the Attorney General's dual role is one where the public interest supercedes any conflict in the duties of the Attorney General in favor of the public interest. The general public interest should not be subservient to the Governor's interest as it relates to the faithful execution of the laws. The Governor, like the Attorney General, represents the people, and the public's interest should or must prevail over the individual interests of the governor as well as the Attorney General. In coming to this conclusion, the Court does not intimate that the Attorney General has the final determination of what is in the public interest. The Governor may very well have a different view of what is the public interest. When their positions conflict as to the public interest, as in the controversy before the court, it is appropriate that the Courts determine what the public interest calls for.

## DITETMINASION[8]

For the reasons stated above, the Court hereby finds that in the issuance of the alternative writ of mandate herein, the Superior Court of Guam had jurisdiction to entertain the petition filed by the Attorney General against the Governor of Guam, a mandamus action seeking the Governor to empanel the Procurement Appeals Board. The Attorney General of Guam, like the Governor, is a constitutional officer, and he is designated in the Organic Act of Guam as the Chief Legal Officer of the Government of Guam. As Chief Legal Officer of the government of Guam, the Attorney General inherently possesses common law powers. The Guam Legislature has also bestowed common law powers to the Attorney General - powers which are broad but undefined, emerging and

---

[8]Conclusion

Case 1:04-cv-00006    Document 295-3    Filed 03/14/2006    Page 33 of 35

not limited to – unless expressly limited by any law of Guam to the contrary. The common law powers of an Attorney General trace its origin to the English legal system. Petitioner, as Attorney General, has the dual responsibility of (1) representing the Governor, his directors, agencies and other entities in all matters in which the said officials or the government is in anywise involved and (2) being the protector and the guardian of the public interest [a generally accorded common law power]. The public interest arises when there is a need to bring an action for the enforcement of the laws of Guam, the preservation of the order, and the protection of public rights.

In protecting the public interest, the Attorney General has authority to bring an action against the Governor for the enforcement of the laws of Guam. As part of his constitutional [Organic Act] duties in relation to his faithful execution of the laws, the Governor is mandated by law to appoint members to the Procurement Appeals Board. The Court finds no federal or local law exists which expressly prevents the Attorney General from filing an action against the Governor of Guam. Its absence accords common law authority for the Attorney General to proceed with the present action. While the Attorney General has a duty to represent the Governor, there is no conflict with that representation whenever he brings an action against the Governor in the name of the government or in his name, when brought in the name of the public interest. Moreover, there is no violation of the rules of professional responsibility whenever he brings such an action.

The Court also finds and agrees with the Governor's position that he alone is charged with the faithful execution of the laws of Guam. The Court finds that *I Maga'lahi* alone should determine who to appoint as members to vacant positions on boards and commissions of the government of Guam. He alone has discretion in prioritizing among his many areas of responsibilities in the execution of the laws of Guam. But, in bringing this action, the Attorney

General is not usurping nor is he attempting to wrestle the executive power from the Governor. *I Maga'lahi* remains the appointing authority. He alone appoints, no one else. Whether *I Maga'lahi* should make appointments to the Procurement Appeals Board at this juncture, or whether he should be given more time to make the remaining appointments, taking into consideration the prioritization that may be necessary in the execution of the laws [the competing public interest claims before the Court], these questions do not concern the jurisdiction of the Court or Petitioner's standing, but relate solely to Petitioner's request whether the Attorney General's prayer for relief should be granted on the merits of his application. The Court, however, expresses no opinion on the merits of the Attorney General's mandamus request. It has only been directed by the Supreme Court to determine whether it has jurisdiction to entertain Petitioner's action and in that regard whether the Attorney General has standing to bring the mandamus action. This Court thus concludes that it has jurisdiction to hear the alternative writ filed by the Attorney General. The Attorney General, under his constitutional and common law powers, has authority and standing to file the present action [brought in the public interest] against the Governor

  *Este i sinneda i Kotte*[9].

  SO ORDERED this 10th day of November, 2003.


Joaquin V. E. Manibusan, Jr.
Judge, Superior Court of Guam

---

[9]These are the findings of the Court.

Page 45 of 45

I hereby certify that the foregoing is a full, true and correct copy of the original on file in the office of the clerk of the Superior Court of Guam Dated at Hagatna, Guam

NOV 1 0 2003

Ann D.L. Rivera
Deputy Clerk, Superior Court of Guam

# Addendum

# D

# ARIZONA

## ARIZONA REVISED STATUTES ANNOTATED
## CONSTITUTION OF THE STATE OF ARIZONA
## ARTICLE V. EXECUTIVE DEPARTMENT

§ 9. Powers and duties of state officers:

"Section 9. The powers and duties of Secretary of State, State Treasurer, Attorney-General, and Superintendent of Public Instruction shall be as prescribed by law."

vs.

*"The Attorney General of Guam shall be the Chief Legal Officer of the Government of Guam."*
48 U.S.C. § 4121(g)(d)(1).

# KENTUCKY

## BALDWIN'S KENTUCKY REVISED STATUTES ANNOTATED
## CONSTITUTION OF KENTUCKY
## THE EXECUTIVE DEPARTMENT
## OFFICERS FOR THE STATE AT LARGE

KY CONST § 93 SUCCESSION OF ELECTED CONSTITUTIONAL STATE OFFICERS; DUTIES; INFERIOR OFFICERS AND MEMBERS OF BOARDS AND COMMISSIONS

The Treasurer, Auditor of Public Accounts, Secretary of State, Commissioner of Agriculture, Labor and Statistics, and Attorney General shall be ineligible to reelection for the succeeding four years after the expiration of any second consecutive term for which they shall have been elected. The duties and responsibilities of these officers shall be prescribed by law, and all fees collected by any of said officers shall be covered into the treasury. Inferior State officers and members of boards and commissions, not specifically provided for in this Constitution, may be appointed or elected, in such manner as may be prescribed by law, which may include a requirement of consent by the Senate, for a term not exceeding four years, and until their successors are appointed or elected and qualified.

vs.

*"The Attorney General of Guam shall be the Chief Legal Officer*
*of the Government of Guam."*
48 U.S.C. § 4121(g)(d)(1).

# WISCONSIN

## WEST'S WISCONSIN STATUTES ANNOTATED
## CONSTITUTION OF THE STATE OF WISCONSIN
## ARTICLE VI. ADMINISTRATIVE

§ 3. Treasurer and attorney general; duties, compensation

Section 3. The powers, duties and compensation of the treasurer and attorney general shall be prescribed by law.

vs.

*"The Attorney General of Guam shall be the Chief Legal Officer of the Government of Guam."*
48 U.S.C. § 4121(g)(d)(1).

# OKLAHOMA

## OKLAHOMA STATUTES ANNOTATED
## CONSTITUTION OF THE STATE OF OKLAHOMA [ANNOTATED]
## ARTICLE VI.--EXECUTIVE DEPARTMENT
## IN GENERAL

§ 1. Executive officers enumerated--Offices and records--Duties

A. The Executive authority of the state shall be vested in a Governor, Lieutenant Governor, Secretary of State, State Auditor and Inspector, Attorney General, State Treasurer, Superintendent of Public Instruction, Commissioner of Labor, Commissioner of Insurance and other officers provided by law and this Constitution, each of whom shall keep his office and public records, books and papers at the seat of government, and shall perform such duties as may be designated in this Constitution or prescribed by law.

## OKLAHOMA STATUTES ANNOTATED
## TITLE 74. STATE GOVERNMENT
## CHAPTER 2. ATTORNEY GENERAL
## GENERAL PROVISIONS

§ 18. Attorney General as chief law officer

The Attorney General shall be the chief law officer of the state.

\*      Legislature Set Powers of AG

vs.

*"The Attorney General of Guam shall be the Chief Legal Officer of the Government of Guam."*
48 U.S.C. § 4121(g)(d)(1).

# MISSOURI

§ 12. Executive department, composition of--elective officials--departments and offices enumerated

The executive department shall consist of all state elective and appointive officials and employees except officials and employees of the legislative and judicial departments. In addition to the governor and lieutenant governor there shall be a state auditor, secretary of state, attorney general, a state treasurer, and office of administration, a department of agriculture, a department of conservation, a department of natural resources, a department of elementary and secondary education, a department of higher education, a department of highways and transportation, a department of insurance, a department of labor and industrial relations, a department of economic development, a department of public safety, a department of revenue, a department of social services, and a department of mental health. In addition to the elected officers, there shall not be more than fifteen departments and the office of administration. The general assembly may create by law two departments, in addition to those named, provided that the departments shall be headed by a director or commission appointed by the governor on the advice and consent of the senate. The director or commission shall have administrative responsibility and authority for the department created by law. Unless discontinued all present or future boards, bureaus, commissions and other agencies of the state exercising administrative or executive authority shall be assigned by law or by the governor as provided by law to the office of administration or to one of the fifteen administrative departments to which their respective powers and duties are germane.

(Title IV, Chapter 27 – Describes Duties)

vs.

*"The Attorney General of Guam shall be the Chief Legal Officer*
*of the Government of Guam."*
48 U.S.C. § 4121(g)(d)(1).

# NORTH DAKOTA

## NORTH DAKOTA CENTURY CODE
## CONSTITUTION OF NORTH DAKOTA
## ARTICLE V EXECUTIVE BRANCH

### Section 2

The qualified electors of the state at the times and places of choosing members of the legislative assembly shall choose a governor, lieutenant governor, agriculture commissioner, attorney general, auditor, insurance commissioner, three public service commissioners, secretary of state, superintendent of public instruction, tax commissioner, and treasurer. The legislative assembly may by law provide for a department of labor to be administered by a public official who may be either elected or appointed.

The powers and duties of the agriculture commissioner, attorney general, auditor, insurance commissioner, public service commissioners, secretary of state, superintendent of public instruction, tax commissioner, and treasurer must be prescribed by law. If the legislative assembly establishes a labor department, the powers and duties of the officer administering that department must be prescribed by law.

vs.

*"The Attorney General of Guam shall be the Chief Legal Officer of the Government of Guam."*
48 U.S.C. § 4121(g)(d)(1).

# UTAH

## UTAH CODE, 1953
## CONSTITUTION OF UTAH
## ARTICLE VII. EXECUTIVE DEPARTMENT

§ 16 [Duties of Attorney General.]

The Attorney General shall be the legal adviser of the State officers, except as otherwise provided by this Constitution, and shall perform such other duties as provided by law.

vs.

*"The Attorney General of Guam shall be the Chief Legal Officer of the Government of Guam."*
48 U.S.C. § 4121(g)(d)(1).

# NEW JERSEY

52:17A-2. Department established; appointment and term of Attorney-General

There is hereby established a Department of Law in the State Government. The Attorney-General shall be the head of said department and the Attorney-General shall be nominated by the Governor and appointed by him with the advice and consent of the Senate and shall hold his office for the term of five years.

52:17A-1. Purpose of act

The purpose of this act is to accomplish economy and efficiency by centralizing, in one department, the facilities afforded by the State for the rendering of legal services to the Governor and to all officers, departments, boards, bodies, commissions and instrumentalities of the State Government and to provide for the enforcement of the criminal law of the State by such department where the ends of justice so require.

52:17A-4. Powers and duties of Division of Law

The powers and duties of the Division of Law shall be the powers and duties now or hereafter conferred upon or required of the Attorney General, either by the Constitution or by the common and statutory law of the State, and as specifically but not exclusively as detailed herein, to wit:

a. Be present at the seat of the government during the sessions of the Legislature;

b. Give to the Governor, to the members of the Senate and the General Assembly, and to all other officers, departments, boards, bodies, commissions and instrumentalities of the State Government, legal advice on such matters as they may from time to time require;

c. Examine and decide all legal matters submitted to him by the Governor or the Legislature and act for them in any matter in which they may be interested, and shall exclusively attend to and control all litigation and controversies to which the State is a party or in which its rights and interests are involved;

d. Carry out and enforce the provisions of the New Jersey Securities Law; [FN1] also the Civil Rights Law [FN2];

e. Act as the sole legal adviser, attorney or counsel, notwithstanding the provisions of any other law, for all officers, departments, boards, bodies, commissions and instrumentalities of the State Government in all matters other than those requiring the performance of administrative functions entailing the enforcement, prosecution and hearing of issues as imposed by law upon them; and represent them in all proceedings or actions of any kind which may be brought for or against them in any court of this State; and shall likewise interpret all statutes and legal documents, inspect and approve contracts and titles and otherwise control their legal activities;

f. (Deleted by amendment.);

g. Attend generally to all legal matters in which the State or any officer, department, board, body, commission or instrumentality of the State Government is a party or in which its rights or interests are involved;

h. Enforce the provisions of the Constitution and all other laws of the State, as well as perform all of the duties conferred and imposed by law upon the Attorney General.

vs.

# *"The Attorney General of Guam shall be the Chief Legal Officer of the Government of Guam."*
48 U.S.C. § 4121(g)(d)(1).

# NEW YORK

## MCKINNEY'S CONSOLIDATED LAWS OF NEW YORK ANNOTATED
## CONSTITUTION OF THE STATE OF NEW YORK
## ARTICLE V--OFFICERS AND CIVIL DEPARTMENTS

### § 1. [Comptroller and attorney-general, election, qualifications and duties; payment of state moneys without audit void]

The comptroller and attorney-general shall be chosen at the same general election as the governor and hold office for the same term, and shall possess the qualifications provided in section 2 of article IV. The legislature shall provide for filling vacancies in the office of comptroller and of attorney- general. No election of a comptroller or an attorney-general shall be had except at the time of electing a governor. The comptroller shall be required: (1) to audit all vouchers before payment and all official accounts; (2) to audit the accrual and collection of all revenues and receipts; and (3) to prescribe such methods of accounting as are necessary for the performance of the foregoing duties. The payment of any money of the state, or of any money under its control, or the refund of any money paid to the state, except upon audit by the comptroller, shall be void, and may be restrained upon the suit of any taxpayer with the consent of the supreme court in appellate division on notice to the attorney-general. In such respect the legislature shall define the powers and duties and may also assign to him or her: (1) supervision of the accounts of any political subdivision of the state; and (2) powers and duties pertaining to or connected with the assessment and taxation of real estate, including determination of ratios which the assessed valuation of taxable real property bears to the full valuation thereof, but not including any of those powers and duties reserved to officers of a county, city, town or village by virtue of sections seven and eight of article nine of this constitution. The legislature shall assign to him or her no administrative duties, excepting such as may be incidental to the performance of these functions, any other provision of this constitution to the contrary notwithstanding.

## MCKINNEY'S CONSOLIDATED LAWS OF NEW YORK ANNOTATED
## CONSTITUTION OF THE STATE OF NEW YORK
## ARTICLE V--OFFICERS AND CIVIL DEPARTMENTS

### § 3. [Assignment of functions; temporary commissions; reducing number of departments]

Subject to the limitations contained in this constitution, the legislature may from time to time assign by law new powers and functions to departments, officers, boards, commissions or executive offices of the governor, and increase, modify or diminish their powers and functions. Nothing contained in this article shall prevent the legislature from creating temporary commissions for special purposes or executive offices of the governor and from reducing the number of departments as provided for in this article, by consolidation or otherwise.

vs.

## *"The Attorney General of Guam shall be the Chief Legal Officer of the Government of Guam."*

48 U.S.C. § 4121(g)(d)(1).

# ILLINOIS

## WEST'S SMITH-HURD ILLINOIS COMPILED STATUTES ANNOTATED
## CONSTITUTION OF THE STATE OF ILLINOIS
## ARTICLE V. THE EXECUTIVE

§ 15. Attorney General--Duties

The Attorney General shall be the legal officer of the State, *and shall have the duties and powers that may be prescribed by law.*

vs.

*"The Attorney General of Guam shall be the Chief Legal Officer of the Government of Guam."*
48 U.S.C. § 4121(g)(d)(1).

# GEORGIA

Paragraph IV. Attorney General; duties

The Attorney General shall act as the legal advisor of the executive department, shall represent the state in the Supreme Court in all capital felonies and in all civil and criminal cases in any court when required by the Governor, and shall perform such other duties as shall be required by law.

vs.

*"The Attorney General of Guam shall be the Chief Legal Officer of the Government of Guam."*
48 U.S.C. § 4121(g)(d)(1).

# WASHINGTON STATE

WEST'S REVISED CODE OF WASHINGTON ANNOTATED
CONSTITUTION OF THE STATE OF WASHINGTON
ARTICLE 3. THE EXECUTIVE

§ 21. Attorney General, Duties and Salary

The attorney general shall be the legal adviser of the state officers, and shall perform such other duties as may be prescribed by law. He shall receive an annual salary of two thousand dollars, which may be increased by the legislature, but shall never exceed thirty-five hundred dollars per annum.

vs.

*"The Attorney General of Guam shall be the Chief Legal Officer of the Government of Guam."*
48 U.S.C. § 4121(g)(d)(1).

# Addendum

# E

|

10 **SEC. 3. ESTABLISHMENT OF OFFICE OF ATTORNEY GEN-**

11           **ERAL.**

12      Section 29 of the Organic Act of Guam (48 U.S.C.

13 1421) is amended by adding at the end the following new

14 subsection:

15      "(d) The Government of Guam may establish by law

16 an Office of the Attorney General of Guam within the ex-

17 ecutive branch of the Government of Guam. Such law

18 shall—

19           "(1) provide for the Attorney General of Guam

20      to be—

21                "(A) appointed by the Governor, with the

22           advice and consent of the legislature, for a term

23           ending when a successor is appointed and quali-

24           fied; or

3

1        "(B) elected by the people of Guam at the

2     same time, for the same term, and subject to

3     removal in the same manner as provided for the

4     Office of Governor of Guam; and

5        "(2) set forth the duties and compensation of

6     the Attorney General of Guam.".

# Addendum

# F

# Union Calendar No. 427

105TH CONGRESS
2D SESSION

# H. R. 2370

[Report No. 105–742]

To amend the Organic Act of Guam for the purposes of clarifying the
local judicial structure and the office of Attorney General.

---

## IN THE HOUSE OF REPRESENTATIVES

JULY 31, 1997

Mr. UNDERWOOD (for himself, Mr. MILLER of California, and Mr. ABER-
CROMBIE) introduced the following bill; which was referred to the Com-
mittee on Resources

SEPTEMBER 24, 1998

Additional sponsors: Ms. CHRISTIAN-GREEN and Mr. ROMERO-BARCELÓ

SEPTEMBER 24, 1998

Reported with amendments, committed to the Committee of the Whole House
on the State of the Union, and ordered to be printed

[Strike out all after the enacting clause and insert the part printed in italic]

[For text of introduced bill, see copy of bill as introduced on July 31, 1997]

---

# A BILL

To amend the Organic Act of Guam for the purposes of
clarifying the local judicial structure and the office of
Attorney General.

1    *Be it enacted by the Senate and House of Representa-*

2  *tives of the United States of America in Congress assembled,*

1 **SECTION 1. SHORT TITLE.**

2     *This Act may be cited as the "Guam Organic Act*

3 *Amendments of 1998".*

4 **SEC. 2. ATTORNEY GENERAL OF GUAM.**

5     *Section 29 of the Organic Act of Guam (48 U.S.C.*

6 *1421g) is amended by adding at the end the following new*

7 *subsection:*

8     *"(d)(1) The Attorney General of Guam shall be the*

9 *Chief Legal Officer of the Government of Guam. At such*

10 *time as the Office of the Attorney General of Guam shall*

11 *next become vacant, the Attorney General of Guam shall*

12 *be appointed by the Governor of Guam with the advice and*

13 *consent of the legislature, and shall serve at the pleasure*

14 *of the Governor of Guam.*

15     *"(2) Instead of an appointed Attorney General, the leg-*

16 *islature may, by law, provide for the election of the Attorney*

17 *General of Guam by the qualified voters of Guam in general*

18 *elections after 1998 in which the Governor of Guam is elect-*

19 *ed. The term of an elected Attorney General shall be 4 years.*

20 *The Attorney General may be removed by the people of*

21 *Guam according to the procedures specified in section 9–*

22 *A of this Act or may be removed for cause in accordance*

23 *with procedures established by the legislature in law. A va-*

24 *cancy in the office of an elected Attorney General shall be*

25 *filled—*

Case 1:04-cv-00006    Document 295-4    Filed 03/14/2006    Page 21 of 34

1         *"(A) by appointment by the Governor of Guam*

2     *if such vacancy occurs less than 6 months before a*

3     *general election for the Office of Attorney General of*

4     *Guam; or*

5         *"(B) by a special election held no sooner than 3*

6     *months after such vacancy occurs and no later than*

7     *6 months before a general election for Attorney Gen-*

8     *eral of Guam, and by appointment by the Governor*

9     *of Guam pending a special election under this sub-*

10     *paragraph.".*

11 **SEC. 3. LEGISLATIVE QUORUM.**

12     *Section 12 of the Organic Act of Guam (48 U.S.C.*

13 *1423b) is amended by striking "eleven" and inserting "a*

14 *simple majority".*

15 **SEC. 4. CLARIFICATION OF LEGISLATIVE POWER.**

16     *The first sentence of section 11 of the Organic Act of*

17 *Guam (48 U.S.C. 1423a) is amended—*

18         *(1) by inserting "rightful" before "subjects"; and*

19         *(2) by striking "legislation of local application"*

20     *and inserting "legislation".*

    Amend the title so as to read: "A bill to amend the Organic Act of Guam to clarify local executive and legis-lative provisions in such Act, and for other purposes.".

Case 1:04-cv-00006    Document 295-4    Filed 03/14/2006    Page 22 of 34

# Addendum

# G

CARL T. C. GUTIERREZ
GOVERNOR OF GUAM

MADELEINE Z. BORDALLO
LIEUTENANT GOVERNOR OF GUAM

CHARLES H. TROUTMAN
COMPILER OF LAWS



# OFFICE OF THE ATTORNEY GENERAL
# TERRITORY OF GUAM

Compiler of Laws Division
238 F.C. Flores Street, Suite 701
Agaña, Guam 96910-5185

PHONE: +671 475 3309
FAX: +671 472 6992
E-MAIL: troutman@ns.gu

April 1, 1997

Honorable Robert Underwood, MC.
House of Representatives

FAX: Guam 477-2587
Washington, DC 202-226-0314

Dear Congressman Underwood,

Here are my comments on your proposed amendments to the Organic Act:

1.  Unfortunately your proposal with respect to education will not solve the present
    lawsuit. The issue being litigated now is that other provisions of the Organic Act
    establish three branches of government, the general (not specific) supervision of the
    Governor over the Executive Branch and the power of the Legislature to appropriate
    funds. DOE is arguing that the existing language overrides these basic structures f
    government, enabling a fourth branch, totally separate and apart from the executive, to
    exist and to be funded without any input from the Executive. Some recent proposals,
    one of which was declared unconstitutional at the trial level, would have automatic
    appropriations if the Legislature did not object within 45 days. Unless the education
    sections are specific, I see no end to suits and disputes.

    Therefore, I suggest that your amendment specify whatever structure you wish to
    propose, en elected board; an state-level board under the Governor with elected
    district boards (like in the US) to be created by the Legislature; or whatever. You need
    to be specific if you are to avoid more litigation. Indeed, your proposal would seem to
    indicate that public education could be created totally separate and apart fro the
    government. Is that your intent?

2. Your amendment regarding the Attorney General is very welcome. However, it goes only one-third of the way. Section 1421g(c) (Organic Act) provides for a Public Prosecutor:

(c) Office of Public Prosecutor; Office of Public Auditor. The Government of Guam may by law establish an Office of Public Prosecutor and an Office of Public Auditor. The Public Prosecutor and Public Auditor may be removed as provided by the laws of Guam.

One reason why the law was never implemented was that it would, *de facto* require a split of the Attorney General's Office. Our experience under the 16th Legislature (before it was declared inorganic) was not all good. Political was not removed from the office and never will be. Another reason for ignoring this law is that it does not provide any specific powers, nor means for appointment, and hence no local consensus.

I have always been of the opinion that the means of appointment is far less important than the tenure of office. We do not elect federal judges, but their independence is assured through other mechanisms. Yet an elected Attorney General would not necessarily be bad, though by no means would anything get solved by such a change. Now that person would have a personal agenda to pursue, as well as that of the general government. I saw this shift when I was representing both the appointed and, later, the first elected Board of Education. Also, the position, if you mention it at all, must be created by the Organic Act, not just permitted. Permission would permit the creation of another office with lesser powers to get around the fact that the Attorney General is the legal officer for the Government of Guam — and there are many who would do just that! The Organic Act should stop games playing as much as possible, not increase it.

The Constitution of Illinois is an excellent example of a very good Attorney General. Modifying the concepts found there for Guam (unicameral legislature, etc.), I suggest the following changes to your proposed bill:

"(d)(1) There shall be with the Executive Branch of the Government of Guam an Attorney General, who shall be [elected by the voters of Guam] [appointed by the Governor with the advice and consent of the Legislature]. The Attorney General shall server for a term [{if elected} commencing at the same time as the term of the Governor of Guam and ending at the same time] [{if appointed} ending at the same time as the term of office of the appointing Governor, but the Attorney General and until a successor is appointed and qualified.] [{If elected} The Attorney General may be removed from office in the same manner as may be the Governor of Guam.] [{If appointed} The Governor may remove the Attorney General, but only for cause provided in law, or if he be convicted of a felony or a misdemeanor involving moral turpitude. However, the Attorney General may appeal such removal to the Supreme Court of Guam.]

(2) The Attorney General shall be the legal officer of Guam, and shall be the Public Prosecutor of Guam, and shall have the duties and powers that may be prescribed by law."

The material in brackets [...] are alternatives depending upon the choice as to method of appointment. I am concerned about your draft because, in leaving it solely up to the Legislature, you are not creating a strong office, but rather a weak one having no improvements over the present situation. You should also repeal the current section permitting a Public Prosecutor and regulating that officer's removal.

3. With modern communications, it is high time that we do not require an acting Governor whenever the Governor leaves island.

4. Supreme Court. This is an excellent proposal, and will solve many problems. However, I do have some suggestions. I do not think § (a)(3) will work. While it may good to provide for some inherent powers, I think you have done it as much as can be done by providing that the Supreme Court is the highest court of Guam. Each state has its own history and doctrine as to what are its inherent powers. It really is not possible to apply the doctrine of 50 states to one jurisdiction. There are too many contradictions. There are too many different state constitutional provisions on the subject.

In the same way as my suggestions in for the other amendments, I suggest that you provide for the appointment and removal of the judges and justices. In the past, there have been amendments to such provisions to ensure that certain individuals are made judges, even where they were not qualified under the prior law. {Some have turned out to be good judges, but that does not mean we should pass laws for particular persons.)

Again, the Illinois Constitution can be instructive, but here the complex structure of the State judiciary makes copying not practical. However, as a replacement for item (3), I suggest the following:

> General administrative and supervisory authority over all courts is vested in the Supreme Court and shall be exercised by the Chief Justice in accordance with its rules. The Supreme Court shall appoint an administrative director and staff to assist the Chief Justice in his duties. The administrative director shall serve at the pleasure of the Court. Subject to the overall direction of the Supreme Court, the Legislature may provide for the staff structure and employment in the lower court(s) of Guam.

Assuming that you do not want to change the appointment and tenure of the justices and judges, I suggest the following changes to subsection (c):

> (c) The qualification and duties of the justices and judges of the local courts of Guam, and the practice and procedure of these courts, shall be governed by the laws of Guam.

I have trouble in finding the reference to your amendment to 22C relative to appeals. Are the citations correct (or my sources incorrect)?

Thank you for the opportunity to express my observations on this proposal.

Sincerely yours,

*Charles H. Troutman*

CHARLES H. TROUTMAN

# Addendum

# H

ROBERT A. UNDERWOOD
Guam

NATIONAL SECURITY COMMITTEE
SUBCOMMITTEES
Military Readiness
Military Personnel
Military Installations and Facilities

RESOURCES COMMITTEE
SUBCOMMITTEE:
National Parks and Public Lands



# Congress of the United States
## House of Representatives
### Washington, DC 20515–5301
July 10, 1997

WASHINGTON OFFICE:
424 Cannon House Office Building
Washington, DC 20515–5301
Ph: (202) 225–1188
Fax: (202) 226–0341
e-mail: guamdc@hr.house.gov

GUAM OFFICE:
Suite 107
120 Father Duenas Avenue
Agana, GU 96910
Ph: (671) 477–4272/73/74
Fax: (671) 477–2587

Mr. Charles H. Troutman
Guam Compiler of Laws
Office of the Attorney General
238 Archbishop F.C. Flores Street, Ste. 701
Agana, Guam 96910-5185

Dear Attorney Troutman:

Thank you for your continued input on my proposals to amend the Organic Act of Guam. I recently sponsored a questionnaire designed to obtain the input of Guam's people on three proposed amendments. These are (a) an amendment that would confirm the Supreme Court's authority over the judicial branch of our government; (b) an amendment that would provide for an elected Attorney General; and (c) an amendment concerning the powers of the Governor and Lt. Governor when they are off-island and on official business. The results were encouraging and I am prepared to advance the amendments concerning the Supreme Court and the Attorney General.

In your correspondence of April 1, you recommended that the office of Attorney General be provided for by the Organic Act of Guam regardless of whether it is an elected or appointed position. The Twenty-third Guam Legislature passed a unanimous resolution last session, in favor of an elected Attorney General. Nearly 70% of the respondents to my questionnaire were in favor of an elected Attorney General. Some 53% of those who favored an elected Attorney General preferred to give the Guam Legislature the authority to create such an office.

I have attached draft language that would enable the legislature to provide for an elected Attorney General. The language establishes the office of Attorney General in the Organic Act and specifically provides the means for appointment and removal. Should the legislature choose to exercise this authority, are there any provisions you wish to see included in this legislation?

Please review the draft language and provide me with your input as soon as possible. Once again, thank you for your assistance.

Sincerely,

ROBERT A. UNDERWOOD
Member of Congress

10  SEC. 3. ESTABLISHMENT OF OFFICE OF ATTORNEY GEN-

11        ERAL.

12        Section 29 of the Organic Act of Guam (48 U.S.C.

13  1421) is amended by adding at the end the following new

14  subsection:

15        "(d) The Government of Guam may establish by law

16  an Office of the Attorney General of Guam within the ex-

17  ecutive branch of the Government of Guam. Such law

18  shall—

19        "(1) provide for the Attorney General of Guam

20        to be—

21              "(A) appointed by the Governor, with the

22              advice and consent of the legislature, for a term

23              ending when a successor is appointed and quali-

24              fied; or

3

1         "(B) elected by the people of Guam at the

2    same time, for the same term, and subject to

3    removal in the same manner as provided for the

4    Office of Governor of Guam; and

5        "(2) set forth the duties and compensation of

6    the Attorney General of Guam.".

# Addendum

# I

# DEPARTMENT OF LAW



**CARL T.C. GUTIERREZ**
Maga'låhi
Governor

**MADELEINE Z. BORDALLO**
Tiñiente Gubetnadora
Lieutenant Governor

Ufisinan Hiniråt Abugao
Tiritorian Guåhan

## OFFICE OF THE ATTORNEY GENERAL
### Territory of Guam

**CALVIN E. HOLLOWAY, SR.**
Hiniråt Abugao
Attorney General

**CHARLES H. TROUTMAN**
Rikobidot i Lai Guåhan Siha
Compiler of Laws

July 16, 1997

Hon. Robert A. Underwood, M.C.
170 Father Duenas Avenue, Suite 107
Agana, GU 96910

Dear Congressman Underwood,

Thank you for sending me the draft amendment to the Organic Act on the Attorney General. I do have a few comments.

First, if the position is to be appointed, I believe that the Organic Act should make it a true "constitutional position" by providing not only a method of removal (other than at the will of the Governor) but also provide for the basic functions of the position, as I mentioned in my earlier letter. The first, regarding removal, is required to overcome the judicial decisions that invalidated the former Public Prosecutor — that the Organic Act as written did not permit the Legislature to protect the office from removal for any reason if the Governor so desired. The Organic Act has been amended with respect to the "public prosecutor" to permit the Legislature to regulate the manner of removal of the officer. To make a meaningful amendment, such must be added here, or we will revert to pre-1984 law.

Second, if there is any substantive meaning to your amendment, the Attorney General needs to have some basic constitutional powers that are not subject to the Legislature's total will. Once before, the Legislature removed from the Attorney General the power to challenge unconstitutional laws because it did not like one challenge he brought. That limitation was removed when the Public Prosecutor law was invalidated. I do not want to see that kind of skirmishing reinvented.

Therefore, I suggest the following changes to your proposal:

Compiler of Laws Division (Dibision Fanrikohiyan i Lai Guåhan Siha)
238 Archbishop Flores Street, Suite 701 • Agaña, Guam 96910-5185 USA
Phone: (671)-475-3252 • Fax: (671-472-6992 • E-mail: troutman@ns.gu

beginning on line 22, page 2:

"(A) appointed by the Governor, with the advice and consent of the legislature, for a term ending when a successor is appointed and qualified, and subject to removal only for causes stated in law; or"

change item (d)(1)(A)(2) to (d)(1)(A)(3) on line 5 of page 3.

"(2) set forth the duties and compensation of the Attorney General, who, in addition, shall be the chief legal officer of the Government of Guam having cognizance over all legal matters in which the government is in anywise interested."

The broad language comes from the existing law on the jurisdiction of the Attorney General, but haw been modified with reference to other agencies. I do not see this language as eliminating the use of outside counsel for various agencies, but would keep a check on having many and diverse legal "empires" within the government of Guam. This is the same idea as expressed in the 1970 Illinois Constitution.

Thank you for your consideration.

Sincerely yours,

*Charles H. Troutman*

CHARLES H. TROUTMAN
Compiler of Laws

Case 1:04-cv-00006    Document 295-4    Filed 03/14/2006    Page 34 of 34

# Addendum

# J

# Committee on Resources

## Witness Testimony

### Attorney General Charles Troutman
Statement - Guam Commonwealth Act
October 29, 1997

Dear Mr. Chairman,

Thank you for holding hearings on H.R. 2370, "A Bill to amend the Organic Act of Guam for the purpose of clarifying the local judicial structure and the Office of the Attorney General." A Bill such as this is sorely needed on Guam and will finally create a genuine three-branch form of government for Guam. I would appreciate it if you would enter this testimony into the record of the Hearing.

TESTIMONY OF

CHARLES H. TROUTMAN

ACTING ATTORNEY GENERAL OF GUAM

IN FAVOR OF H.R. 2370

Mr. Chairman and members of the Committee on Resources,

Perhaps it may seem strange to be testifying on an amendment to the Organic Act at the same hearing as we are testifying for a Bill which would completely replace that Act. I believe that Congress should pass both Bills, but with changes. To be realistic, a Guam constitution is several years in the future. The federal law authorizing a Guam Constitutional convention now has a sufficient number of problems so that trying to use it to create a constitution is not a practical possibility. In the past, Congress has amended the Organic Act to supposedly permit the people of Guam to do one thing or another, but, since 1984, the effects have been definitely mixed. The amendment regarding the educational system has caused lawsuits and is still the subject of much confusion simply because it is so vague and unclear, especially when dealing with such an important subject. Likewise, and contrary to the provisions of most state constitutions, reference to creating a "public prosecutor" continues to cause severe doubts as to whether that position can be elected, or must be appointed, and what can be the true scope of that office. The amendment permitting the creation of the Supreme Court has been partially successful, in that we have a Supreme Court of Guam now, and it has issued its first decisions -- very good ones, by the way.

But still Guam does not have a true government consisting of three branches of local government. The very existence of **all** of our local courts are subject to the will of the Legislature. Indeed, one person in 1977, now nominated to be a part-time Justice of the Supreme Court, advocated the abolition of the entire local court system, relying instead on a federal District Court of Guam having multiple judges. Fundamentally, the structure of the courts has not changed since 1977. They are still not a separate, fundamental branch of the government. Further, the District Court of Guam remains, even in HR 2370, the court of general jurisdiction for Guam, whatever that now means -- -- just one more ambiguity that we do not need.

A similar problem exists with respect to the Attorney General. Most of the states have created the Attorney General as a constitutional officer. We now feel that the people of Guam should have that opportunity as well. The Attorney General is patterned after that of the United States Attorney General, appointed by the Governor with the consent of the Legislature. The term of office is indefinite, at the will of the Governor.

Because Guam needs the stability of a firm three-branch system of government, I believe these issues should be addressed forthrightly now. The Congress should not, as it did in the past amendments, make them vague in the extreme, with the explanation that the Congress did not wish to dictate how the people of Guam are to conduct its government. As long as we have an Organic Act, Congress does dictate, and the people require a better system as soon as possible.

I first testified on the need for a "constitutional" judiciary back in late 1976 when the late Delegate from Guam, Antonio Won Pat, had introduced a bill creating and establishing a Supreme Court for Guam. That Bill died in committee largely because the U.S. Supreme Court was considering the ability of Guam to create its own Supreme Court under the Organic Act as it then existed. Further hearings were held on Guam by the Pacific Territories Committee of the Administrative Office of the U.S. Courts. Those hearings resulted, in 1984, in the current Organic Act provisions permitting the Legislature to create an "appellate court" locally. That court was created and began operations in the middle of 1996. It has issued about a dozen decisions since then.

Since the Guam Supreme Court's creation, there has been skirmishing between it and the superior Court of Guam, and the Legislature, over whether the Supreme Court will really be the highest court of the Territory. For so long, the local courts consisted only of the Superior Court of Guam that giving up power is a very hard thing to do. Further the past history of the Superior Court and the Legislature will show that there is a need to make "constitutional" such things as the powers of the courts, their respective jurisdictions and, perhaps, terms of office.

I do have some concerns with Bill HR 2370. First, Section 2 appears ambiguous. What is intended by making the District Court of Guam, now a federal court with no local appellate functions, part of a "unified judicial system" of Guam? Does this imply some form of review by the District Court over the court system of Guam? Does this section imply that the District Court judge has some form of management power over the Guam courts?. I sincerely hope not. Congress already has imposed a fifteen-year period of review of the Supreme Court's decisions by the Ninth Circuit (by certiorari), though no such review has yet been sought by any party.. Rather, I believe that the District Court should be made more like an Article III court rather than part of the Guam judiciary system. Just what does this section mean?

Actually, I would like to see the United States constitutional standard for federal judges applied to the District Court of Guam. If this method of appointment is so important to the American system, why are the U.S. citizens of Guam not entitled to a similar federal judiciary rather than one which is appointed and reappointed every 10 years?

There seems to be one missing piece to this Bill -- no mention of a term or qualifications for the Supreme Court or Superior Court justices and judges. This is one area where the Legislature has, in the past, acted to insure the appointment of judges it desired. On one occasion, a law was passed extending the terms of all the judges so that one judge would not have to go through re-appointment by the then-Governor -- thus insuring his continuation in office. On a more recent occasion, the Legislature lowered the age and practice qualifications for the Superior Court so that a younger attorney could be appointed to a vacancy in the Superior Court. It is here that I believe more protection is needed rather than in some of the details contained in the present Bill.

Nevertheless, I support the provisions of this Bill concerning the Guam courts. I would urge your consideration of those items I have mentioned and make the necessary changes to this measure.

Concerning Section 3 of HR 2370 -- affecting the position of Attorney General, I support Congressional action on this subject, but the present proposal is seriously deficient. I served as Attorney General from 1975 through 1977, and for extended periods as Acting Attorney General in 1987 and again presently. I have worked in the Attorney General's Office of Guam since 1970 with about two years out in private practice. There have been great changes in the Office during the past 27 years, but one thing remains the same -- the Attorney General is appointed, as is the United States Attorney General, to serve at the pleasure of the chief executive. This has hindered the development of the Office, but in general not because of improper interference by the Governor, any Governor, but because the Office has been unable to develop a vision of its own. I have been told by some state Attorneys General that they could not serve under such conditions.

In addition, the present Organic Act provides only that a "public prosecutor" may be created by the Legislature and that the Legislature may by law regulate that officer's "removal". There is no mention of how that officer is to e appointed. This has caused considerable confusion and controversy as the Legislature has tried to create an elected position, which I do not believe is presently permitted. Likewise, the Legislature has tried, but not yet passed, a bill which would make the Attorney General, now having both criminal and civil responsibility, the "Public Prosecutor", and then be an elected official.

Right now, I express no preference for an appointed or elected Attorney General, **so long as the position is defined as "constitutional" (in the Organic Act) and the overall duties and functions provided in the Organic Act,** much as is found in the Constitution of the State of Illinois. Thus, I believe that three amendments are required to Section 3 of this Bill in order to make a serious difference in the Attorney General's functions:

First, repeal the reference in the Organic Act to the "public prosecutor". This office has never been created and the ambiguities in the present law will only be compounded if it is permitted to stand alongside the amendments proposed here. If it is desirable to keep a reference to a "public prosecutor" in the Organic Act, then it should be mentioned in Section 3 of this Bill, but only in such a way so as not to subordinate the Attorney General in that position's overall duties as Chief legal officer of Guam. The Public Prosecutor could contain similar provisions as are given to the Attorney General, permitting the Legislature to create and appointed or elective office. The point is, we do not need two "Attorney General" positions for Guam.

Second, On page 6, lines 24-25, the duties of the Attorney General should be changed by deleting item (d)(2) and adding the following below subsection (d) so that it is of equal standing and not subordinate to subsection (d):

"The Attorney General shall be the chief legal officer of the territory of Guam and shall have such other duties and such compensation as the Legislature may provide by law."

Third, a provision needs to be made to insure the viability of the office by providing some stability of the term. This is actually far more important than the method by which the Attorney General is to be selected. Therefore, I strongly urge another amendment, probably just following my second suggestion, which would read:

"Whether the Attorney General be appointed, as provided in subsection (d)(1)(A), or elected, as

provided in subjection (d)(1)(B), the term and method of removal of the Attorney General shall be the same as is provided for an elected Attorney General."

These last amendments would provide what is really needed by the Attorney General -- a basic statement of duties and a term that was not at the pleasure of any official. Of course, the Legislature could provide for vacancies as it does now. I believe that my amendments will do more for the Office than will a mere providing for Legislative choice of appointment or election. I recognize that the people of Guam seem not to be decided upon the method of choosing the Attorney General. This does not matter that much. What does matter, is that the Attorney General have the independence once he or she is in office, to accomplish the duties of the Office and to develop that office to the degree it deserves.

While Section 3 clears up one glaring ambiguity in the present Organic Act, it does little to address the real, substantive problems of the Attorney General. I urge this Committee to amend Section 3 of H.R. 2370 to address the concerns I have with regard to the Office of Attorney General on Guam.

Thank you for your kind attention.

CHARLES H. TROUTMAN

Attorney General of Guam (Acting)

###

# Addendum

# K

# IN THE SUPREME COURT OF GUAM

## IN *RE* REQUEST OF *I MINA' BENTE SING'KO NA LIHESLATURAN GUÅHAN* RELATIVE TO THE APPLICATION OF THE EARNED INCOME TAX CREDIT PROGRAM TO GUAM TAXPAYERS ("The EIC question")

## OPINION

### Filed:   February 9, 2001

### Cite as 2001 Guam 3

Supreme Court Case Number: CRQ00-001

Request for Declaratory Judgment pursuant to
section 4104 of Title 7 of the Guam Code Annotated
Argued and submitted September 7, 2000
Hagåtña, Guam

Appearing for the Legislature:
Therese M. Terlaje, Esq.
Barcinas & Terlaje, P.C.
Suite 216, Union Bank Building
194 Hernan Cortes Avenue
Hagåtña, Guam 96910

Appearing for the Governor and his
Designee, the Director of the Department of
Revenue and Taxation:
David C. Sullivan, Esq.
Assistant Attorney General
Office of the Attorney General
Suite 2-200E, Judicial Center Building
Hagåtña, Guam 96910

BEFORE: BENJAMIN J.F. CRUZ, Chief Justice; PETER C. SIGUENZA, JR., Associate Justice; and JOHN A. MANGLONA, Designated Justice.

**MANGLONA, J.:**

**[1]**     The Legislature submits to this court a request for a declaratory judgment pursuant to 7 GCA § 4104. The Legislature specifically seeks this court's opinion as to whether Guam's taxpayers, otherwise eligible, are entitled to the Earned Income Tax Credit, pursuant to a provision in Subtitle A of the Internal Revenue Code and applied to Guam by operation of the Organic Act, 48 U.S.C. § 1421 et seq. The Legislature also asks whether the Director of the Department of Revenue and Taxation is required to pay the credit to eligible taxpayers. We find that this court has jurisdiction over this matter notwithstanding the District Court of Guam's exclusive original jurisdiction over taxpayer suits involving the Guam Territorial Income Tax. We hold that eligible taxpayers are entitled to credit and that the Executive Branch must enforce it. Accordingly, we answer both of the Legislature's questions in the affirmative.

**I.**

**[2]**     Although permitted by Congress, Guam has not promulgated its own income tax code. Instead, the Organic Act imposes certain provision of the Internal Revenue Code of the United States ("I.R.C.") as the income tax applicable to Guam taxpayers. This tax, designated the Guam Territorial Income Tax ("GTIT"), mirrors certain provisions of the I.R.C. Such mirroring includes any modification or repeal of I.R.C. sections that the United States may from time-to-time make effective for a given tax year, as well as enactments of new provisions.

**[3]**     Section 31 of the Organic Act, as amended, specifically lists the mirroring provisions, including

*inter alia* Subtitle A of the I.R.C., which contains the Earned Income Tax Credit ("EIC"). *See* 48 U.S.C.

§ 1421i(d) ("section 1421i(d)") and 26 U.S.C. § 32 ("section 32"). The EIC, which is still in force, only

became effective in tax year 1975, and was not part of the I.R.C. when the Organic Act was passed in

1950, nor was it applicable when the United States modified the Organic Act in 1954. The EIC was

enacted, among other things, to provide special tax benefits to low-income workers by reducing tax

burdens and making employment more attractive than welfare. *See Sorenson v. Secretary of Treasury*

*of the United States*, 475 U.S. 851, 106 S. Ct. 1600, 89 L. Ed. 2d 855 (1986).

**[4]**     Under the mirror code, Guam taxpayers have been eligible for the EIC since its effective date. In

1989, EIC applicability was questioned for the first time. In response to a request from the Department

of Administration ("DOA"), on or about June 23, 1989, the Attorney General's office ("AG's office")

issued Memorandum Opinion No. DOA 89-0750, concluding that the Government of Guam

("government") is obligated to pay EIC in excess of tax owing ("refundable EIC"). The AG's office

reasoned that, because the Organic Act mandates that Guam mirror the I.R.C. in implementing the GTIT,

the EIC applies to Guam taxpayers unless Guam de-links from the I.R.C. and enacts its own tax code. The

AG's office also opined that the refundable EIC be paid from the General Fund, in the same manner as

ordinary refunds, consistent with the practice in the United States, where the refundable EIC are classified

as tax outlay and paid out of the U.S. Treasury.[1] *See* Mem. Op. No. DOA 89-0750.

**[5]**     On or about January 4, 1996, the AG's office issued Memorandum Opinion No. DRT/DOA 96-

001, which revoked Memorandum Opinion No. DOA 89-0750 and adopted instead, the Department of

---

[1]The United States reimbursed Guam for paying the refundable EIC for several years before the reimbursement was halted during the Carter Administration. *See* Mem. Op. No. DOA 89-0750.

Revenue and Taxation's ("Rev & Tax's") Revenue Ruling 96-001. Without legal analysis, the AG's office ruled that: (1) the EIC does not apply to Guam and that Rev & Tax should not administer the EIC, and (2) Rev & Tax should not certify to DOA any amounts owing as refundable EIC. The ruling further declared that, even if the EIC applied to Guam, Rev & Tax could not certify the amount each eligible taxpayer was to receive because the Legislature made no appropriations to fund the refundable EIC. The ruling was retroactively applied to tax year 1994, but under the discretion of the Director of Rev & Tax ("Director"), tax returns would not be audited. As indicated, the AG's opinion simply deferred to Revenue Ruling 96-001 and also to the Director's exclusive administrative responsibility to determine what tax shall apply in mirroring the I.R.C.

[6]     In response to the Executive Branch's reversal of this tax policy, the Legislature enacted statutes to ensure that Guam taxpayers could receive the refundable EIC. Public Law 23-74 contains continuing appropriations to finance the refundable EIC. Section 4108, Title 11 of the GCA institutes the Guam Earned Income Program ("Guam EIC"), mirroring 26 U.S.C. § 32. Section 4104, Title 11 of the GCA authorizes the expenditure of funds to pay refundable credits under the Guam EIC. Section 50103, Title 11 of the GCA requires the establishment of a formula for reserving income tax receipts to pay the refundable EIC in a timely manner. Section 50103, Title 11 of the GCA provides for the deposit of amounts reserved for the refundable EIC, thereby ensuring the availability of funds. Although these measures have become law, the Executive Branch has ignored their policy mandate and refused to implement the EIC.

[7]     Due to the Executive Branch's intransigent position, on May 30, 2000, the Legislature filed its Complaint for Declaratory Judgment seeking this court's opinion on the applicability of and the Executive

Branch's obligation to enforce the EIC. The Legislature presents for our review the following questions:

(1) whether Guam taxpayers are entitled to the EIC; and (2) whether the Director is required to pay

refundable credits. The Governor and the Director (collectively "Governor") have joined in the action

opposing the Legislature's position on both issues.

## II.

[8]     The court is confronted, as a threshold matter, with the Governor's initial question of whether we

lack jurisdiction over this request. The Legislature defends by asserting that 7 GCA § 4104 grants this

court jurisdiction to address the questions posed by the request for a declaratory judgment.

[9]     The Governor argues that any matter dealing with the GTIT lies within the exclusive and original

jurisdiction of the District Court of Guam, as provided under section 1421i(h) of the Organic Act. The

Governor further contends that *Government of Guam v. Superior Court of Guam (Guam Dai-Ichi*

*Hotel, Inc., Real Party in Interest)* held that legislation, which can be construed to be a tax measure,

would be properly brought to the District Court when a controversy arises with respect to such legislation.

*See* 998 F.2d 754 (9th Cir. 1993) (disputing whether GEDA qualifying certificates may be filed in district

court). Thus, the dispositive inquiry concerning jurisdiction is whether the action here falls within the ambit

of the District Court's exclusive original jurisdiction. In examining this question, we turn to 48 U.S.C. §

1421i(h), which provides:

> 1421i. Income Tax.
>
> (h) Jurisdiction of District Court; suits for recovery or collection of taxes; payment of
> judgment. (1) Notwithstanding any provision of Section 22 of this Act [section 1424 of
> Title 48] or any other provisions of law to the contrary, the District Court of Guam shall
> have exclusive original jurisdiction over all judicial proceedings in Guam, both criminal and

civil, regardless of the degree of the offense or of the amount involved, with respect to the Guam Territorial Income Tax.

48 U.S.C. § 1421i(h)(1) (1954). Section 1421i(h) plainly states that the District Court has exclusive original jurisdiction over all civil and criminal judicial proceedings for any offense and any amount when the GTIT is the subject matter of the litigation.

**[10]** As we review section 1421i, we observe illustrations in its language that the District Court's jurisdiction extends to taxpayer suits involving to specific tax controversies. Subsection (h)(2) specifically permits aggrieved individuals to sue for taxes, penalties or any sum erroneously assessed or collected; subsection (h)(3) provides certain protections to the Governor and government employees who carry out their duties in enforcing the GTIT. *See* 48 U.S.C. § 1421li(h)(2)-(h)(3); *see also* 48 U.S.C. §1421i(a) (permitting the legislature to levy additional ten percent on top of taxpayers' liabilities); 48 U.S.C. § 1421i(c) and (d)(2) (authorizing the Governor to administer and enforce GTIT similar to power granted to the Secretary of the Treasury); 48 U.S.C. § 1421i(f) (extending I.R.C. penalty provisions to Guam); 48 U.S.C. § 1421i(g) (providing that the government may attach property of individual in violation of mirror code). These provisions signal that the District Court's jurisdiction encompasses only taxpayer suits involving a specific tax controversy.

**[11]** Case law bolsters our interpretation of section 1421i(h). In *Guam Dai Ichi Hotel*, the hotel sued for a rebate under the GEDA qualifying certification. *See* 998 F.2d 754. The District Court's jurisdiction was found pursuant to subsection (h). *See* 998 F.2d at 755. The court in that case held:

> The language of the statute outlining the Federal District Court's jurisdiction also compels the conclusion that Federal District Court is where *disputes over rebate amounts should be litigated.* Congress provided that the District Court should exercise jurisdiction over any judicial proceeding "with respect" to the territorial tax, expressly stating that any *suits alleging recovery or rebates of the Territorial tax* are to be heard

in the district court. 48 U.S.C. § 1421i(h)(2). As the Appellate Division correctly concluded, the "plain reading" of both provisions of the jurisdictional statute "compels the conclusion that [Congress] contemplated that all suits for a refund of income taxes, whatever the basis for the suit, be brought in the District court."

*Id.* (emphasis added). Other cases provide examples of how section 1421i(h) has been invoked to confer jurisdiction over specific tax controversies. In *Government of Guam v. Kaanehe*, the dispute centered on the collection of withholding taxes from a bar. *See* 124 F. Supp. 15 (D. Guam 1954). The District Court examined the legality of assessments under GTIT involving an individual taxpayer in *Wilson v. Kennedy*, 123 F. Supp. 156 (D. Guam 1954). The Ninth Circuit also ruled on a taxpayer's challenge to tax on income earned while on Guam in *Phelan v. Taitano*, 233 F.2d 117 (9th Cir. 1956), on the recovery of GTIT paid in *Government of Guam v. Koster*, 362 F.2d 248 (9th Cir. 1966), a refund sought of GTIT in *Sayre & Co. v. Riddell*, 395 F.2d 407 (9th Cir. 1986) (en banc) ("*Sayre*"), and refund of the business privilege tax in *Bank of America, Nat'l Trust and Sav. Ass'n v. Chaco*, 539 F.2d 1226 (9th Cir. 1976) (per curiam) ("*Chaco I*"). In each of these cases, we find that the action involved a taxpayer and a specific tax controversy.

**[12]**    Such a finding is consistent with federal constitutional and prudential limitations restraining district

courts from assuming jurisdiction over various disputes. The "case or controversy" limitation of the United

States Constitution prohibits federal courts from rendering advisory opinions. *See Aetna Life Ins. Co. v.*

*Haworth*, 300 U.S. 227, 57 S. Ct. 461 (1937); U.S. CONST. amend. X. *Aetna* announced the meaning

of "controversy" in the constitutional sense as follows:

> A "controversy" in this sense must be one that is appropriate for judicial
> determination. A justiciable controversy is thus distinguished from a difference or dispute
> of a hypothetical or abstract character; from one that is academic or moot. The
> controversy must be definite and concrete, touching the legal relations of parties having
> adverse legal interests. It must be a real and substantial controversy admitting of specific
> relief through a decree of a conclusive character, as distinguished from an opinion advising
> what the law would be upon a hypothetical state of facts . . . .

300 U.S. at 240-41, 57 S. Ct. at 464 (citations omitted). In *Aetna*, the controversy concerned a specific

insured, four specific life insurance policies, and a complaint that the policies be declared null and void by

reason of lapse for nonpayment of premiums. *Id*. at 237, 239, 57 S. Ct. at 462-63. Such facts constituted

a controversy in the constitutional sense. *Id*. at 244, 57 S. Ct. at 465.

**[13]**    In contrast here, we are asked by the Legislature to render an advisory opinion on the applicability

of the EIC to Guam taxpayers and whether the Director is required to pay the refundable EIC. Unlike

*Guam Dai Ichi Hotel* and the other tax cases, no aggrieved taxpayer, no penalty nor contested assessment

is involved in the instant case. No question arises here over whether the government owes any specific

individual, or individuals, the refundable EIC. Neither is there a controversy in the constitutional sense.[2]

---

[2]It might be argued that the District Court of Guam, not being a court created under Article III of the United
States Constitution but a court created by Congress in exercise of its authority over the United States possessions, might
not have the same constitutional and prudential limitations as an Article III court. However, the Organic Act appears
to set out these limitations on the District Court of Guam. Under the Organic Act, "[t]he District Court of Guam *shall*
*have the jurisdiction of a district court of the United States*, including, but not limited to, the diversity jurisdiction
provided for in § 1332 of title 28, United States Code, and that of a bankruptcy court of the United States." 48 U.S.C. §

No specific legal relationship is at stake, no specific relief is sought, nor do the parties have direct adverse legal interests in this controversy. Instead, the questions here, presented in the form of a request for declaratory judgment, involve only hypothetical taxpayers, otherwise eligible for EIC, and whether they are entitled to the tax credit. Thus, it is the position of this court that the Legislature's request for declaratory judgment falls outside the District Court's jurisdiction as defined by the Organic Act.

**[14]** We turn to the next inquiry of whether the instant case falls within our jurisdiction. Congress granted the Legislature authority to create local courts and define their jurisdiction over certain proceedings. Under the Organic Act,

> The legislature may vest in the local courts jurisdiction over all causes in Guam over which any court established by the Constitution and laws of the United States does not have exclusive jurisdiction. Such jurisdiction shall be subject to the exclusive or concurrent jurisdiction conferred on the District Court of Guam by section 1424(b) of this title.

48 U.S.C. § 1424-1. Having determined that the District Court does not have exclusive original jurisdiction over this request for declaratory judgment, we review the pertinent statute to determine if the Legislature has conferred on this court jurisdiction to hear such requests.

**[15]** Under 7 GCA § 4104,

> The Governor, in writing, or the Guam Legislature, by resolution, *may request declaratory judgments from the Supreme Court as to the interpretation of any law, federal or local lying within the jurisdiction of the courts of Guam to decide, and upon any question affecting the powers and duties of the Governor and the operation of the Executive Branch, or the Guam Legislature, respectively.* The declaratory judgments may be issued only where it is a matter of great public interest and the normal process of law would cause undue delay. Such declaratory judgments shall not be available to private parties. The Supreme Court shall, pursuant to its rules and procedure, permit interested parties to be heard on the questions presented and shall

---

1424(b) (1954) (emphasis added). Thus, while not an Article III court, the District Court of Guam appears bound by similar constitutional and prudential limitations.

render its written judgment hereon. Upon a writing, or resolution in the case of the Guam
Legislature, by the party submitting the request for the declaratory judgment that the party
wishes the Supreme Court to dismiss its petition for declaratory judgment, the Supreme
Court shall no longer have jurisdiction and shall dismiss without prejudice the declaratory
judgment case, provided that the request is filed with the Supreme Court at any time before
the court renders its written decision.

7 GCA § 4104 (1994) (emphasis added). Thus, through the power given the Legislature from Congress,

this court has been granted the authority to issue advisory opinions interpreting any federal or local law and

deciding any question affecting the powers and duties of the Governor and the operation of the Executive

Branch.

[16]     The questions presented by the Legislature involve interpretation of federal law, specifically the

Organic Act, as it relates to the Governor's enforcement duty and the applicability of the EIC, which is

contained in the I.R.C. The Legislature alleges that eligible taxpayers are deprived of the refundable EIC

because of the Executive Branch's refusal to mirror the I.R.C. with regard to the EIC. Furthermore, the

court is concerned about the potential for undue delay in adjudicating these questions if the Legislature

waited until a taxpayer pursued litigation on the EIC. Because eligible taxpayers are generally indigent and

without the financial means to challenge the Governor's decision not to pay out any refundable EIC, there

is the possibility that such an action may never be filed. These considerations compel a finding that the

Legislature's request for declaratory judgment, pursuant to 7 GCA § 4104, is properly before this court.

### III.

**[17]**     Having decided that we have jurisdiction, we turn to the substance of the Legislature's request for declaratory judgment and the first question presented for our review. In asserting that Guam taxpayers are entitled to the EIC, the Legislature argues that, until section 32 of the I.R.C. is expressly excluded from the GTIT, or until Guam enacts its own tax code in lieu of the mirror code, Guam must follow the EIC. The Legislature contends that, according to *Sayre* and *Kaaneche*, section 1421i requires Guam to apply the I.R.C. to persons and incomes within the territory's boundaries. *See also* I.R.C. § 7651(2)(B) (extending the administration, collection and enforcement provisions of I.R.C. to U.S. possessions). The Legislature also emphasizes that, after Revenue Ruling 96-001 halted EIC payments to eligible taxpayers, it enacted a series of statutes making the EIC applicable to Guam taxpayers "to the full extent permitted by federal law" and approved continuing appropriations from the general fund to pay for the EIC. *See* Public Law Nos. 23-74, 24-61, 25-03, 25-43. According to the Legislature, the Governor is bound by both federal and Guam law to pay the refundable EIC to eligible taxpayers. Because section 1421i imposes the enlisted provisions of the I.R.C. as the tax code of Guam, because section 32 is specifically included in the enlisted applicable chapters of the I.R.C., and because Guam law has made section 32 applicable to Guam taxpayers, the Legislature urges this court to hold that Guam taxpayers are entitled to receive the refundable EIC.

**[18]**     The Governor counters by acknowledging that while, "it is undeniably true that section 32 is part of Subtitle A of the [I.R.C.] . . . which applies to Guam . . .", when viewed through the lens of the Organic Act, particularly those sections establishing the GTIT, Congress did not intend to make section 32 applicable to Guam. Governor's Opening Brief at 13-14. In support of this argument, the Governor points

to Congress's omission of Social Security taxes from the Organic Act in order to shield Guam from Social Security's fiscal impacts. The Governor argues that likewise the EIC does not apply to Guam since its funding in the United States is paid by Social Security taxes and Congress has not appropriated such funding to pay for the EIC on Guam. Instead, the EIC requires the government to use its own funds to pay the EIC. Labeling the EIC as a social welfare program disguised as a tax credit, the Governor asserts that nowhere in its legislative history is there an allusion that Congress expected the EIC apply to Guam. The Governor suggests that the absence of any mention of the EIC's applicability to Guam indicates that "Guam never crossed any one's mind." Governor's Opening Brief at 17.

[19] We disagree. Nothing in section 32 of the I.R.C., nor its legislative history indicates that Congress's failure to address Guam and the other mirror code jurisdictions, when enacting the EIC, was an oversight. In fact, while the Governor seizes on just one of the objectives in establishing the EIC, we note that not only did Congress intend to reduce the disincentive to work caused by the imposition of Social Security taxes on earned income, but it also sought to provide relief for low-income families hurt by rising food and energy prices and to stimulate the economy by funneling funds to persons likely to spend money immediately. *See Sorenson*, 475 U.S. at 864, 106 S. Ct. at 1608-09 (citing congressional committee reports, hearings and other legislative materials). The fact that Guam does not pay certain Social Security taxes should not prevent low-income families, who reside on Guam, from being paid the refundable EIC when there is no indication from Congress that, in designating the beneficiaries of this tax program, Guam low-income families were to be excluded.

[20] Moreover, there is ample evidence contradicting the Governor's argument, in light of the numerous opportunities that Congress has dealt with the EIC as it relates to Guam. Congress could have addressed

this issue when it passed the Omnibus Territories Act in 1986, or very recently, when it passed the Guam Omnibus Opportunities Act. Likewise, Congress could have provided for the non-applicability of EIC by modifying the I.R.C. directly, as it did when providing the governors of the possessions of the United States the power to alter ceilings for qualified mortgage bonds. *See* 48 GCA § 1421i(h) (adding authority under the I.R.C. in Section 204 of the Act of October 5, 1984, P.L. 98-454). We must assume that Congress knew what it was doing when it implemented the EIC without making it specifically inapplicable to Guam. The Governor's contention that Congress's failure to address the EIC's effects on Guam was mere inadvertence is pure speculation and is not grounded on sound solid evidence either in the language of section 32 itself or its legislative history.

[21]     The instant case stands in contrast to *Flores v. Guam*, where the Ninth Circuit examined the legislative history of the 1958 amendments to the Organic Act and found in a Senate Report a statement that section 932 of the I.R.C. is to be excluded from the GTIT. *See* 444 F.2d 284, 287-88 (9th Cir. 1971). Accordingly, the Ninth Circuit held that "section [932] is simply not a part of the tax law of Guam." *See id.* at 288. The Governor offers no such specific evidence to buttress his claim. Absent any clear indication from Congress, we will not impute to its complete silence on the EIC's applicability to Guam an intent to exclude our lower-income taxpayers from receiving the benefits of this tax program.

[22]     Nor do we agree with the Governor's second argument that section 32 is inorganic because it undermines the government's ability to attain self-sufficiency and to control expenditures in financing other government programs and services, pursuant to section 1423j of the Organic Act.[3] Admittedly, the mirror

---

[3]Section 1423j provides:

Appropriations by the Legislature Authorized.  (a) Appropriations, except as otherwise provided in this chapter, and except such appropriations as shall be made from time to time by the congress of the

code was implemented with the immediate purpose of relieving the United States Treasury from making

direct appropriations to Guam and of making Guam financially self-sufficient.[4]  *See Laguana v. Ansell,*

102 F. Supp. 919, 920-21 (D. Guam 1952); *Chaco I,* 539 F.2d at 1227-28.  But Congress established

the means in which Guam was to achieve financial self-sufficiency by creating, in section 1421i, "a separate

integral taxing structure for Guam 'mirroring' the provisions of the federal tax code, except for those

provision which were incompatible with such a 'separate tax' structure."[5]  *Sayre,* 395 F.2d at 410.  In

*Flores,* the Ninth Circuit found the following excerpt of legislative history to be the most authoritative

source on congressional intent in enacting section 1421i(d)(1):

> The specific mention of chapter 2 and section 931 of the 1954 code and
> of corresponding provisions of the 1939 code from the income-tax laws
> in force in Guam is not intended to exclude other provisions of the 1954
> or 1939 codes from the category of provisions which are manifestly
> inapplicable or incompatible with the intent of Congress in making the
> income-tax law of the United States applicable in Guam. Other provisions
> of the 1954 and 1939 codes which are manifestly inapplicable or
> incompatible with that intent (for instance, section 932 of the 1954 code
> and section 252 of the 1939 code) are also excluded even though not

---

United States, shall be made by the legislature.

(b) If at the termination of any fiscal year the legislature shall have failed to pass appropriation bills
providing for payments of the necessary current expenses of the government and meeting its legal
obligations for the ensuing fiscal year, then the several sums appropriated in the last appropriation
bills for the objects and purposes therein specified, so far as the same may be applicable, shall be
deemed to be re-appropriated, item by item.

(c) All appropriations made prior to August 1, 1950 shall be available to the government of Guam.
Organic Act § 1423j.

[4]In fact, by not appropriating the needed funding to pay for the EIC, Congress remains consistent with its
original intent not to make direct appropriations to Guam.

[5]In reviewing the legislative history of the 1958 amendments to the Organic Act, the Court noted that the
Department of Interior's materials to the Congress make it clear "that the purpose of the amended statute was to give
Guam a separate, integral tax system, which would duplicate the United States' tax system in all substantive particulars."
*See* 395 F.2d at 412. Thus it found that Congress intended that Guam apply the I.R.C., subject to section 1421i(d)(1) "to
persons and income within its territory just as the United States applies the [I.R.C.] . . . to persons and income within its
territory." *See id.* at 412.

specifically singled out for mention.

*See* 444 F.2d at 287. It follows that, unless an I.R.C. provision is "manifestly inapplicable or incompatible" with the GTIT, it applies to Guam taxpayers.[6] *See id*; 48 U.S.C. § 1421i(d). What is deemed "manifestly inapplicable or incompatible" must be strictly construed within congressional intent of making the income tax laws of the United States applicable in Guam.[7] *See* 539 F.2d at 1227. The District Court of Guam had occasion to apply this test in *Bank of America, Nat'l Trust and Sav. Ass'n v. Chaco* ("*Chaco II*"), where it held that the Foreign Investors Tax Act of 1964 ("FITA"), was inapplicable to corporations incorporated in the United States but doing business in Guam. *See* 423 F.Supp 409, 412 (D. Guam 1976). The District Court examined the legislative history of FITA and found that "the very purpose of the Act, i.e., to increase tax revenues, could be severely frustrated" if the tax were imposed on the corporate taxpayer. *Id.* at 413. It reasoned that Congress could not have intended to indirectly benefit Guam at the expense of the United States. *See id.*

[23]     Unlike *Chaco II* and the FITA, there is no evidence in the record supporting the Governor's contention that the application of the EIC in Guam would "severely frustrate" congressional intent in applying the federal income-tax laws to Guam. In fact, we find it especially difficult to accept the

---

[6]The Ninth Circuit's recent decision in *Gumataotao v. JSU, Dir. of Dep't of Revenue and Taxation*, 2001 WL 21012 (9th Cir. Jan. 10, 2001), reinforces our position. Citing, *Sayre*, 395 F.2d at 412 and the Third Circuit's decision in *Vitco*, 560 F.2d 180, 184-85 (3d Cir. 1977), the Court reiterated Congress's intent to provide uniform tax treatment for U.S. and Guam taxpayers. *See* 2001 WL 21012, at *5. Thus, it rejected the taxpayer's argument that Guam was not authorized to tax U.S. bonds. *See id.* "[A]llowing Guam to tax the interest from federal bonds would provide uniformity, whereas disallowing Guam from taxing them would create 'disparate tax treatment.'" *See id.* It should similarly follow in the instant case that allowing Guam to apply the EIC would provide uniformity, whereas disallowing the EIC would invariably create disparate tax treatment between Guam and U.S. taxpayers. Accordingly, unless Congress expressly indicates otherwise, the general rule that Guam and U.S. taxpayers are to be afforded uniform tax treatment applies to the refundable EIC.

[7]*Gumataotao* also notes that the Ninth Circuit has never held a provision of the I.R.C. "manifestly inapplicable or incompatible" with the intent of the Income Tax Section, while acknowledging that only one district court has done so, *see Bank of Guam v. Chaco*, 423 F.Supp. 409, 413 (D. Guam 1976). *Gumataotao*, 2001 WL 21012, at *5.

Governor's position when the government, from 1990 to 1994, paid the EIC and the Legislature has approved continuing appropriations from the general fund to pay for this refundable credit. According to Ninth Circuit, when determining which I.R.C. provision is "manifestly inapplicable or incompatible" we must strictly construe the provision within congressional intent to establish a tax system for Guam mirroring the I.R.C. *See* 539 F.2d at 1227. We hold therefore that, given the absence of any evidence demonstrating the EIC's manifest inapplicability or incompatibility to Congress's intent in creating the mirror tax structure of the GTIT, Guam taxpayers are entitled to the EIC as provided in 26 U.S.C. § 32.

[24]     Following our conclusion that Guam taxpayers are entitled to EIC, we likewise hold that the Director is bound by section 1421i to pay the EIC to eligible Guam taxpayers. We agree with the Legislature that, unless Guam de-links from the I.R.C., in accordance with the Tax Reform Act of 1986, or unless an I.R.C. provision is deemed "manifestly incompatible or inapplicable" with congressional intent, Guam tax officials are limited by section 1421i to rule-making authority affecting GTIT collection and enforcement, but may not substantively modify any tax law set forth in the I.R.C. *See Koster*, 362 F.2d at 251; *see also* 539 F.2d at 1227-28 ("Government of Guam is powerless to vary the terms of the federal income tax laws as applied to Guam, except as permitted by Congress").

[25]     The extent of Guam tax official's rule-making authority was initially examined in *Koster*. In 1952, Guam tax officials promulgated the following two regulations which deviated from the corresponding provisions in the I.R.C.: (1) defining gross income to exclude income not derived from Guam and that gross income under the I.R.C. includes income from whatever source derived, and (2) allowing only deductions which could be attributed to income derived from Guam. The government disallowed Koster's deductions for business losses in the U.S., and Koster brought suit claiming that the regulations were in violation of the

Organic Act's mirror code provisions. The Ninth Circuit agreed with Koster and opined that, although under section 1421i(d)(2), tax officials could promulgate rules and regulations, consistent with IRS regulations, but only for GTIT administration or collection of taxes. *Koster*, 362 F.2d at 250-51. The Court rejected the government's argument, premised on the explanatory note in the legislative history of the 1958 amendments to the Organic Act, that it was allowed to "adapt" the I.R.C., which was "designed for a huge and fully developed economy" to suit a "small and as yet underdeveloped island territory." *Id.* The Ninth Circuit reasoned that the excerpt from the legislative history must be construed as follows:

> The word 'adapt' must be read in conjunction with the closing words of the sentence in which it appears, viz., '* * * in accordance with the intent and under the terms of section 31.' Section 31, read as a whole, exhibits an intent to apply to Guam the substantive provisions of the income-tax laws of the United States (with specified exceptions), except where manifestly inapplicable or incompatible with the intent of that section. Any adaptation which cannot be so justified is not authorized.

*Id.*

[26] We read *Koster* and the subsequent Ninth Circuit decisions to mean that the enlisted substantive provisions of the I.R.C. in section 1421i are to be applied to Guam without deviation "except where manifestly inapplicable or incompatible" with the intent of section 1421i. Thus, tax officials may modify the mirror code only where such modification concerns tax administration or collection, or where an enlisted I.R.C. substantive provision is "manifestly inapplicable or incompatible" with the intent of section 1421i. Our reading of *Koster*, in particular, suggests that Guam tax officials are powerless to tailor the GTIT to suit the island's economic situation, thereby rendering indefensible the Governor's position that tax officials may adapt the I.R.C. to meet Guam's fiscal constraints.

[27] Like *Koster*, where tax officials sought to exclude extra-jurisdictional income and deductions from the meaning of gross income by omitting en entire section of the I.R.C., the Director's refusal, through

Revenue Ruling 96-001, to pay the refundable EIC to otherwise eligible taxpayers, does not involve the mere administration of the GTIT, but substantively modifies an I.R.C. provision. We therefore hold that Revenue Ruling 96-001 is invalid as a matter of law and tax officials may not continue to rely on it as authority in denying the refundable EIC to otherwise eligible low-income taxpayers. Accordingly, the Director, pursuant to section 32 of the I.R.C. which applies to Guam through section 1421i, is required to pay the EIC to eligible Guam taxpayers.

[28]     Having concluded that the EIC applies in Guam and that the Director is obligated to pay the EIC to eligible taxpayers, we do not reach the Governor's alternative argument that, if in fact section 32 is inapplicable in Guam, then the Guam EIC, which incorporates section 32 of the I.R.C. as its operative provisions, is inorganic. We note nevertheless that the Legislature's attempts to implement the Guam EIC is consistent with Congress's intent in enacting section 1421i because the U.S. treasury does not make direct appropriations to fund the refundable EIC.

## IV.

[29]     We hold that the District Court of Guam does not have exclusive original jurisdiction over this case because it is not a taxpayer suit. This court has jurisdiction over the Legislature's request for a declaratory judgment pursuant to 7 GCA § 4104.

[30]     We also hold that the substantive provisions of the I.R.C. enlisted in the Organic Act, including the EIC, must be applied in mirrored fashion to Guam. Revenue Ruling 96-001 which purportedly removed the EIC from the GTIT is inorganic as a matter of law because it seeks to modify the substance of the I.R.C. The Governor, to whom Congress has delegated the functions of collecting and enforcing the GTIT,

is likewise required to enforce and administer the EIC.


_____
PETER C. SIGUENZA, JR.
Associate Justice

_____
JOHN A. MANGLONA
Designated Justice


_____
BENJAMIN J.F. CRUZ
Chief Justice

# Addendum

# L

Print this story

# EITC recipient says he was told to keep quiet about payment

by **Ken Wetmore**, **KUAM News**
**Friday, June 11, 2004**

In March of this year, Governor's chief of staff Tony Sanchez told Department of Revenue and Taxation acting director John Camacho to pay the Earned Income Tax Credit to a single taxpayer. Yesterday, Sanchez told KUAM News he ordered the payout because the taxpayer was in a financial tight spot and desperately needed the money.

Sanchez said it has always been the Camacho Administration's position that the EITC should be paid and said others who are owed the EITC can go to Revenue & Taxation and fill out a hardship request, and if it is granted, receive the EITC.

The decision to start paying out the tax credit by the Administration comes at the same time that the Guam Attorney General is in the District Court fighting a class action lawsuit trying to legally force the payout of more than $100,000,000 to thousands of local taxpayers eligible for the Earned Income Tax Credit. However as of today only one taxpayer has received the tax credit.

If you've been wondering who the first taxpayer in six years to receive the EITC is, KUAM News discovered the answer in an exclusive interview.

Joe Budomo has been fighting for the last six years to receive what he believes he is owed, namely the Earned Income Tax Credit. He said, "I followed it ever since [Speaker Ben] Pangelinan took our government to court when the former governor [Carl] Gutierrez was in office, and pretty much I kept following it because one is the Director of Revenue is bound by a law to pay it to eligible taxpayers that have a low income."

Armed with the court decision and documents from the Legislature proving that Guam's law making body had made provisions so the Earned Income Tax Credit could be paid, Budomo visited everyone from the director of the Revenue & Tax to the Speaker of the Legislature, lobbying to receive the tax credit. And finally, this past March after the death of his mother-in-law, Budomo says he visited Governor's chief of staff Tony Sanchez, who then ordered the payment of the Earned Income Tax Credit to Budomo.

There is an interesting twist however. While the Administration is claiming they made a policy call to start paying the Earned Income Tax Credit - especially in hardship cases - it appears they didn't want it publicized. KUAM News reminded Budomo that during the initial stages of our investigation we called him and inquired if he indeed had received the Earned Income Tax Credit, further reminding him that he had first said he had not, essentially contradicting the now-revealed facts. We then asked why he acted in such a way. He responded by saying, "I was in a kind of busy situation that day you called, and I was doing a lot of things and I had a lot

of stuff in my mind, so I wasn't really concentrating on what you were talking about."

Again, we alluded to the fact that several times during the same phone conversation, we asked for confirmation if he had received EITC, to which he implied that he was told to keep the matter under wraps. He confirmed this latter point, saying, "Yeah, its true. But I know I haven't leaked anything out, I know you guys are the ones who found out; you guys are the one that contacted me."

Further prodding on the point of keeping the matter hush-hush, Budomo admitted, "They just said, 'Just don't, you know, advertise it.' You know what I mean by advertise? Like go out and have other people like me giving them documents; that's for them to go and get it themself, *[sic]* like I did." He further confessed, "I had a problem - if you need to get documents from your senators and any place else, just go down and ask your senator for it."

We then asked if the caveat to remain silent was the real motivation behind him not telling us up front that he had received, citing the fact that he had been told not to tell. Budomo's response? "Yeah, just to keep it on the down low, nai."

Budomo says he was told to keep it on the down low by an employee at the Department of Revenue and Taxation, who he refused to identify, although he said it was neither the director or deputy director. However upon further questioning, Budomo said it wasn't just an employee at Rev & Tax who was interested in the payout not being made public.

He recalled his conversation with Governor's chief of staff Sanchez, saying, "Well, he just said, 'You know, just don't, you know, announce to the public', so I just kept it to myself. He also said Sanchez didn't mention why he didn't want Budomo announcing the granting of the creadit to the public.

Speaker Pangelinan says he is upset by what Budomo is saying he was told. He told KUAM News, "This Administration, who Mr. Budomo came in contact with, is just outright lying to the public and I think this is just a way to cover it up. First they say it's their policy and then when they do it they say 'Don't tell anyone it's our policy'? I mean this kind of stuff has to be cleared up and I hope the Governor takes some strong action with his people in that office that are just lying to the people of Guam."

The Speaker says the Legislature believes the Earned Income Tax Credit should be paid to all eligible taxpayers and has provided the Executive Branch with the mechanism to fund the payment of the tax credit.

While KUAM News contacted the Governor's Office for comment immediately following our interview with Mr. Budomo early this afternoon, the Administration did not immediately respond. Just before 5pm today Jadeen Tuncap, the special assistant to the Governor's chief of staff, called.

Tuncap has served as secretary to Tony Sanchez for the last two years, both at the Superior Court and in the Governor's Office. She says she was in the room with

Sanchez when he met with Budomo and claims Sanchez never made any statements to the effect that Budomo should not make it publicly known that he had received the EITC.

Just before 5:30, Sanchez himself called KUAM News. After we read Budomo's quote to him, he denies ever making any such comment. Sanchez pointed out his special assistant was a witness that can attest that he didn't say anything to that effect. He would call again before 6pm, saying that perhaps Budomo misinterpreted what has been originally said, and said he is unashamed of granting the tax credit, reaffirming that it's the purpose of the local government to help, not hurt.

Rev & Tax director Art Ilagan meanwhile told KUAM News he will be checking to see if any of his employees said what Budomo alleges. Ilagan says he doesn't believe an employee from his agency would have had the opportunity to say that - as they shouldn't have come in contact with Budomo - but adds he was off-island at the time of the incident. The Rev & Tax director says the EITC check was issued to Budomo through the Department of Administration.

**Copyright © 2000-2006 by Pacific Telestations, Inc.**

Print this story

# Addendum

# M



Office of the Attorney General
Douglas B. Moylan
Attorney General of Guam
Civil Division
Guam Judicial Center, Suite 2-200E
120 West O'Brien Drive
Hagåtña, Guam 96910 ● USA
(671) 475-3324 ● (671) 472-2493 (Fax)
www.guamattorneygeneral.com ● law@mail.justice.gov.gu

Attorneys for the Government of Guam

# IN THE SUPERIOR COURT OF GUAM
# HAGÅTÑA, GUAM

ATTORNEY GENERAL OF GUAM,       )        Special Proceedings Case 32-03
                                )
            Petitioner,         )
                                )
        vs.                     )   **ORDER GRANTING AG'S MOTION TO**
                                )   **REPRESENT GOVERNMENT OF GUAM**
Y'ASELA PEREIRA, TREASURER,     )
GOVERNMENT OF GUAM,             )
                                )
            Respondent.         )
                                )

Whereas this matter came before the Court on the Attorney General of Guam's Motion to

Represent the Government of Guam, notwithstanding this instant lawsuit suing the Government of

Guam, on this 5th day of May, 2003. Representing Petitioner is Deputy Attorney General J. Basil

O'Mallen, and representing Respondent is Attorney Arthur Barcinas. The Court hereby Grants the

motion for the foregoing reasons.

In granting the Attorney General of Guam's motion, the Court recognizes the special status

of the Attorney General as the *"Chief Legal Officer of the Government of Guam,"* (48 U.S.C. §

1421g(d)(1)) which language carries with it certain inherent common law powers and duties,

Page 1
*Order Granting AG's Motion to Represent Government of Guam*
Superior Court of Guam Special Proceedings Case No. SP32-03

Case 1:04-cv-00006     Document 295-6     Filed 03/14/2006     Page 6 of 33

granted by Congress in 1998. _Feeney v. Commonwealth_, 373 Mass. 359, 366 N.E.2d 1262 (Mass. 1977). The Attorney General in his *parens patriae* role represents both the Government of Guam and the Public Interest, and when the Government of Guam injures the Public Interest, the Attorney General must protect the Public Interest above all other interests, including the Government of Guam. *However*, the Attorney General's action in protecting the Public Interest does *not* automatically disqualify the Attorney General from representing the Government of Guam, including under the conflict of interest and imputed disqualification rules contained within the Guam Rules of Professional Conduct for Lawyers (7 G.C.A. Appendix F).

This Court incorporates the reasoning and rationale of the Attorney General's dual role in protecting the Public Interest as set forth in _State of South Carolina ex rel. Condon v. Hodges_, 349 S.C. 232, 562 S.E.2d 623 (S.C. 2002) wherein the Supreme Court of South Carolina found that the Attorney General did *not* violate the ethical rule against conflicts of interest by bringing an action against a government official, since the Attorney General has a dual role of serving the sovereign of the State and the general public (*parens patriae*). See also, _Connecticut Commission on Special Revenue v. Connecticut Freedom of Information Comm'n._, 174 Conn. 308, 318-319, 387 A.2d 533 (Conn. 1979); _Gray v. Rhode Island Dept. of Children, Youth and Families_, 937 F.Supp. 153 (D.R.I. 1996).

In _Attorney General v. Michigan Public Service Commission_, 625 N.W.2d 16 (Mich. 2000) the Michigan appellate courts stated,

> "... the rules of professional conduct do apply to the office of attorney general; while mechanical application of these rules is not possible because of the unique nature of that office, thus allowing dual representation in certain circumstances not otherwise permitted in the arena of private practice, the rules do recognize a clear conflict of interest when the AG acts as a party litigant in opposition to an agency or department that she also represents in the same cause of action ... a conflict is not necessarily automatic disqualification of the Attorney General as counsel for the state agency or,

conversely, a bar to the ability of the Attorney General to pursue an action as a active party ... "

The majority rule is that the Attorney General may represent adverse state agencies in intragovernmental disputes. State ex rel Allain v. Mississippi Public Service Comm., 418 So.2d 779, 783 (Miss. 1982). See also, Superintendent of Ins. v. Attorney General, 558 A.2d 1197 (Me. 1989); Gust K. Newberg, Inc. v. Illinois State Toll Highway Authority, 98 Ill.2d 58, 456 N.E.2d 50 (Ill. 1983); Gibson v. Johnson, 35 Or.App. 493, 582 P.2d 452 (1978).

In granting the Attorney General's motion, the Court recognizes the crucial and dual role which the Attorney General provides in providing the Government of Guam economical legal services and in exercising his sworn duty to protect the Public Interest.

For the foregoing reasons, the Court hereby GRANTS the Attorney General of Guam's Motion to Represent the Government of Guam.

SO ORDERED this _____ day of May, 2003.

Original Signed By:
HON. JOAQUIN V.E. MANIBUSAN, JR.

_____

**HONORABLE JOAQUIN V.E. MANIBUSAN**
Judge, Superior Court of Guam

I do hereby certify that the foregoing
is a full, true and correct copy of the
original on file in the office of the
clerk of the Superior Court of Guam
Dated at Hagatna, Guam

MAY 0 5 2003

Ann D.L. Rivera
Deputy Clerk, Superior Court of Guam

Page 3
*Order Granting AG's Motion to Represent Government of Guam*
Superior Court of Guam Special Proceedings Case No. SP32-03

# Addendum

# N



State Online Services | Agency List | Business.utah.gov

Search Utah.gov

*State of Utah*
# OFFICE OF THE ATTORNEY GENERAL

About the Office

AG Publications

Children's Issues

Consumer Assistance

Crime and Violence Prevention

Environment and Natural Resources

Opinions and Legal Research Tools

News

Kids' Page

## The Attorney General as Champion of the Public Interest

Home/About/Office History/The Attorney General as Champion of the Public Interest

The office of the Attorney General has its roots in fifteenth century England, where the Attorney General, as the king's attorney, was considered not only the legal representative of the crown but also the guardian of the public interest. [1] The office of Attorney General as established by the colonies and later the States, no longer drew its authority from the king which made it even more clearly an office dedicated to the people. The highest court of Kentucky characterized the modern office in this way:

> When this country promulgated its Declaration of Independence, the writers of that instrument in discussing the inalienable rights of man stated: That to secure these rights, Governments are instituted among Men, deriving their just powers from the consent of the governed....Thus, the source of authority of the Attorney General is the people who establish the government, and his primary obligation is to the people. Hancock v. Terry Elkhorn Mining Co., 503 S.W.2d 710, 715 (Ky. 1973).

Following the establishment of Utah as a territory in 1850 through the Organic Act, [2] the office of Attorney General was created in one of the first enactments by the legislative assembly of 1851-2. [3] The Attorney General was elected by the joint vote of the Legislative Assembly to a term of four years. The duties of the office were set forth as follows:

> It shall be the duty of the Attorney General to keep his office at the seat of government, to attend to all legal business on the part of the Territory, before the courts, where the Territory is a party, and prosecute individuals accused of crimes in the judicial district in which he keeps his office, in cases arising under the laws of the Territory, and such other duties as pertain to his office. [4]

The territorial office of Attorney General existed for 22 years. In 1874, Congress passed the Poland Law [5] which abolished the civil and criminal jurisdiction of the Utah Territory's "probate court" system and the territorial offices of Attorney General and Marshall.

In 1895 the people of Utah again created the office of Attorney General, this time in the Constitution of Utah. 1896 Utah Const. art. VII, §§ 1, 18 (now art. VII, §§ 1, 16). Since the admission of Utah as a state on January 4, 1896, the Attorney General has been an independently elected constitutional officer of the

executive department.

The constitutions of 44 states establish an office of Attorney General. In 43 of those states, the Attorney General is popularly elected. [6]

Numerous courts across the country have recognized the right of state attorneys general to represent the public interest as they have throughout history. [7] The Utah Supreme Court recognized such implicit authority in the office of Utah Attorney General. In Hansen v. Barlow, 456 P.2d 177 (Utah 1969), the Utah Attorney General brought an action against members of the state legislature to declare unconstitutional a state statute that provided for payment of per diem and expenses to the Legislative Council and authorized it to employ staff. Noting that the Attorney General "is in a much more informed, duty-entrusted, and advantageous position to [bring such a suit] than the individual citizen," the Court held that it is "within the right of the Attorney General, if not his duty," to challenge the constitutionality of a state statute "if he deems it appropriate." Id. at 181. Absent this independent authority to act in the public interest, suits such as the one brought by the Utah Attorney General in January 2001 challenging the U.S. Census results could only have been brought if another executive branch officer, as client, had directed the filing of the suit.

---

1. See Generally National Association of Attorneys General, State Attorneys General: Powers and Responsibilities, 27-31 (Lynne M. Ross ed. 1990). (hereafter State Attorneys General)

2. Act Cong. 1850, 9 Statutes at Large 453.

3. Utah Acts 1855, ch. VII, sections 1-8 (approved March 3, 1852), B.H. Roberts, A Comprehensive History of The Church of Jesus Christ of Latter-day Saints, Vol. IV, 192 (Deseret News Press 1930).

4. Id. at section 5.

5. Act Cong. June 23, 1874, 1 Supp. Rev. Statutes 105, ch. 469 (reprinted in 1 Comp. Laws Utah 1888, at 105). See generally B.H. Roberts, A Comprehensive History of The Church of Jesus Christ of Latter-day Saints, Vol. V, 439-40 (Deseret News Press 1930).

6. State Attorneys General 31.

7. E.g., Connecticut Comm'n on Spec. Revenue v. Connecticut Freedom of Information Comm'n, 387 A.2d 533 (Conn. 1978) (real client of the Attorney General is people of the state); Commonwealth v. Paxton, 516 S.W.2d 865 (Ky. 1974) (Attorney General represents the people, not merely the "machinery" of the state bureaucracy); Superintendent of Ins. v. Attorney General, 558 A.2d 1197 (Me. 1989) (recognizing that Attorney General is the chief legal officer and may institute any action for the

enforcement of laws and protection of public rights); Humphrey v. McLaren, 402 N.W.2d 535, 543 (Minn. 1987) ([The Attorney General] "has for a client the public, a client that includes the general populace even though this client assumes its immediate identity through its various governmental agencies"); State v. Public Service Comm'n, 283 P.2d 594, 599 (Mont. 1955) (Attorney General represents the public and may bring all proper suits to protect its rights); State ex rel. Igoe v. Bradford, 611 S.W.2d 343, 347 (Mo. App. 1980) ("[i]t is for the Attorney General to decide where and how to litigate issues involving public rights and duties and to prevent injury to the public welfare") (citing State ex rel. Taylor v. Wade, 231 S.W.2d 179 (Mo. 1950)); Reiter v. Wallgren, 184 P.2d 571 (Wash. 1947) ("It has always been a paramount duty of the Attorney General to protect the interests of the people of the state").

| State of Utah Attorney General- HOME | Utah Youth Courts | ICAC | Site Map | Links | To Contact Us |

# Addendum

# O



# Office of the Governor of Guam

P.O. Box 2950  Hagåtña, Guam 96932
TEL: (671) 472-8931 • FAX: (671) 477-4826 • EMAIL: governor@mail.gov.gu

**Felix Perez Camacho**
*Governor*

**Kaleo Scott Moylan**
*Lieutenant Governor*

FEB 0 2 2006

The Honorable Mark Forbes
Speaker
*I Mina' Bente Ocho na Liheslaturan Guåhan*
155 Helser Street
Hagåtña, Guam 96910

Speaker Forbes:

*Hafa Adai!* I would like to thank you for expressing your interest in addressing several of the challenges that face our people, and seeking the input and assistance of members of our community in this process; this is a policy my administration has practiced since entering office in 2003.

Over the past three years, this Administration has added 105 classrooms, repaired and replaced air-conditioners, repaired cafeterias and equipment in Guam's public schools – providing a better learning environment for Guam's children. We refurbished, upgraded and opened the Tumon Police Substation. We purchased the Latte Therapeutic Home for Severe Emotional Children and built the Dementia Center in Dededo.

Today, our school children can look forward to five new public schools. Construction of the UOG College of Public and Business Administration is nearly completed. We are working with the Guam Community College to fund the construction and upgrade of its Technology Center, Allied Health building, and other campus facilities to better serve its students. Of course the Gate Theater, Southern High's air-conditioning and gym, and many of the schools perennial equipment problems have been resolved; some via the Adopt-a-School volunteers, private businesses, government agencies, parent teacher organizations, Mayors, Senators, the Superintendent and my office.

The project to repave and upgrade of 157 of tertiary roads in Guam's villages is ready to be awarded and will ease our people's transportation woes and make village streets safer. The $100 million GWA bond will overhaul our water system, and we are ensuring that efforts are coordinated with Department of Public Works road projects to avoid breaking up the pavement in the ensuing years. The new Northern Public Health Facility, the new Veteran's Affairs office; Land Management Facility, the Port dredging and dock repairs, the Airport runway expansion and the Emergency Operation Center are all ongoing and will result in improved government services to our people.

Asan and Talafofo seawall projects are currently in the planning phase. In addition, the A&E for the Guam Museum, Hagåtña Redevelopment and repairs of Mental Health's third floor are ongoing. These have had the input from our community, the various elected and appointed boards, the Mayors, the Guam Public Schools, the Parent Teacher Organization's, the military command, Chamber of Commerce members, Guam Hotel Restaurant Association and more.

However, several of the items on your agenda address outstanding debts incurred by this government long before I became Governor or you Speaker. In fact, the debt that we face due to the unwillingness of past leadership to pay its bills has nearly crippled this government's ability to meet even the basic needs of our island community.

As you will recall, at the start of my administration, the government of Guam faced a more than $209 million deficit, operational expenditures running nearly $100 million above actual revenues, unpaid tax refunds as far back as tax year 2000 and an unfunded retirement fund liability of more than $1.3 billion. We also are contending with outstanding payments to the retirement fund from the Guam Public School System and the Guam Memorial Hospital Authority of some $33 million, obligations that were incurred prior to my administration. It was common practice prior to my administration for government agencies to ignore or defer utility payments. This has caused a debt of more than $13.7 million in outstanding prior year streetlight payments, which today threatens our ability to keep the lights on and our streets safe.

We also face federal court orders to address critical environmental and public health issues that stemmed from the aging water and wastewater systems and the Ordot landfill. These two projects alone will cost upwards of $500 million.

Since entering office, we have acknowledged the obligation to the most-needy in our community who have been denied their Earned Income Tax Credit payments since 1995, adding anywhere between $60 million and $90 million to the prior years' debts that this government is obligated to pay and an estimated $20 million annually to ensure that they are paid for each year moving forward.

Mr. Speaker, no one can deny that all of these obligations must be addressed and that the government of Guam is fully responsible for ensuring that they are met. To this end, we have worked on several fronts to address these issues and while there is still so much that must be done, I would like to take this opportunity to highlight the progress the government agencies have made to resolve many of the issues that you have listed as agenda items for the summit.

In terms of overall operational stability within this government, we have made tremendous progress in holding down actual costs. We reduced actual expenditures of this government by nearly $100 million. We lowered line agency General Fund payroll by $1 million per pay period. We have seen a reduction in government workforce by more than 1,000 employees, without having to resort to layoffs.

We have partnered with the Department of Interior to upgrade the government of Guam's Financial Management System to ensure that all financial information is tracked and accounted for and to ensure that the Oracle debacle never occurs again. We also have worked to improve the reporting capacity of this government to ensure that timely audits can be made to account for the way this government spends tax dollars. As of FY2004, this government has reduced its audit findings from as high as 109 to 30, in the government of Guam's single audit, enabling us to increase federal funds from the Department of Interior's CIP grants from $1.3 million to $3.3 million annually. We continue to address audit findings to improve our accountability.

## Tax Refunds

Since January 2003, my administration has paid out more than $156 million in tax refunds to the people of Guam. We have paid out undisputed tax claims from 2000 through 2003 and have already begun to pay down 2004 refunds.

## Earned Income Tax Credits

An agreement has been reached between my administration and the representatives of the plaintiffs in the Earned Income Tax Credit case. Upon approval of the agreement by the courts, we continue monies, per the agreement, to begin the payment of Earned Income Credit payments. The Department of Administration also is prepared to factor the annual EITC payments into the tax refund set aside account to address future payments.

## Retirement Fund Debt

Working closely with you and the Retirement Fund, we are paying the interest on prior year retirement contributions in order to allow employees from the Guam Memorial Hospital and the Guam Public School System to retire as we work through the financing plan for the entire outstanding debt.

Since entering office, we have ensured timely payment of all current year line agency Retirement Fund obligations. These contributions have resulted in a reduction of the unfunded liability to the Retirement Fund from $1.407 billion to $1.354 billion. Our responsible, timely payments have had a $50 million impact on the debt owed to the Fund. In addition, these payments have allowed the fund to achieve a return on investment of 9.3% in FY04, as compared to a negative return prior to this Administration.

## Utility Debt

With regard to line agency utility payments, my administration is current on its billings.

However, we face three challenges in this area. The first is the outstanding prior obligations that we face for streetlights and the affect it is having on the Guam Power Authority's credit rating and their capacity to make improvements to the system or to

offset rising fuel costs. The second challenge is making payments on current utility payments due to the structural changes within the FY06 budget and the constraints placed on this administration to maintain full cash management of all revenue sources. Finally, difficulties in paying current year streetlight billings have become critical due to the under-funding of the Abandon Vehicle/Streetlight Fund. While the annual cost for streetlight billings is $4.8 million, the Fund is on track to collect $3.7 million, with 10% of these revenues dedicated, by law, to the abandon vehicle program.

## GPSS funding

GPSS is currently receiving 83.2% in withholding taxes, as stipulated within the budget law for FY06 and we will continue to fund them at this rate.

## GPD funding

While the Guam Police Department is fully funded for all operational areas to maintain current levels of service, my administration has also augmented their funding needs with more than $5.4 million in Compact Impact funds, DOI CIP grant funding and Community Development Block Grant funding for the repair and improvement of their buildings, the purchase of police cars and motorcycles, and the purchase of critical equipment for police officers. Since entering office, we have increased the police force by 25% and the fleet of police vehicles has gone up by 33%.

## GMH funding

In FY06 the Guam Memorial Hospital received $25.4 million in subsidies from the government of Guam, an increase from $9 million in FY05. In FY07, through the proposed budget appropriation as well as other funding sources within my authority, my administration is committed to increase the subsidy to the hospital's operating budget.

## Fixing roads

The Department of Public Works currently is in the process of awarding the contract to begin the Island-wide Village Street Restoration Program that my administration developed in cooperation with the Mayors of all 19 villages. In total, $23 million that this Administration identified in unexpended highway bond funds will be used to repair 157 village roads that the Mayors have helped us identify as the most critical. This is the first time in the history of our government that such a major undertaking has been taken to repair village roads. In addition, this Administration has used $91 million in federal highway funds to expand, repair and resurface our main thoroughfares.

## Solid waste facilities

The Department of Public Works and the Guam Environmental Protection Agency have made significant progress toward the construction of the long-awaited new landfill. A site has been chosen, a financial plan is in place to explore all available funding options to

fund the estimated $100 million cost, and both agencies continue to work with federal and local partners to make this facility a reality. In addition, plans for a special facility to handle household hazardous waste are in development, so families will be able to safely dispose of special waste. These facilities are critical to protecting the health of our families and the environment we rely on.

## Water & Wastewater facilities

The Consolidated Commission on Utilities (CCU) has already floated a $100 million dollar bond to upgrade Guam's 50-year-old system, with plans to seek another $100 million for further improvements. The Guam Waterworks Authority has already created its priority listing to ensure that the most immediate needs are met as soon as possible. Long-standing problems with the wastewater treatment plants, as well as repairs to critical water and sewer lines, are among the first projects that will be completed with the bond proceeds. To ensure that we safeguard public health and the source of the island's water, GWA and Guam EPA are working together to correct longstanding problems and prevent new ones from occurring.

Mr. Speaker, there are many challenges that we as a government continue to face. But, as you can see, we have made progress in many areas. As this summit progresses, I am anxious to see the suggested solutions that come from healthy discussion and debate from the broad collection of community members invited to participate. However, I expect that your discussions will be held in the context of the progress we have already made and in line with the positive direction our government is heading.

It is clear from many of the issues outlined in your invitation letter, that an overriding concern is the outstanding debt we face as a result of previous misspending. My fiscal team is in the process of finalizing a 5-year financial recovery plan to propose refinancing the current debt.

I want to be clear that this refinancing plan is not intended to increase the government's debt. Our goal is to pay the people of Guam what has been held from them for far too long, in the form of tax refunds, Earned Income Tax Credits, GPSS and GMH outstanding Retirement Fund Payments, prior years' utility payments and other critical debt requirements. Based on market conditions, we anticipate that the government will be able to realize a savings in the interest rate as compared with the rates currently being paid, especially for past due tax refunds, Retirement Fund debt and utility back payments.

I look forward to working with you and the other members of the 28th Guam legislature to find ways to overcome the obstacles we currently face in seeking bond financing to restore to the people what is rightfully theirs. I am sure that you will agree that the obstacles - political and otherwise - have caused harm to our people and must be addressed immediately so that we can move forward with this sound financing policy. As you know, the Guam Legislature approved bond refinancing, this Administration signed off on it and the Supreme Court of Guam concurred with both of our assessments that the bond is responsible, sound and well within the capacity of this government is achieve.

# OFFICE OF THE GOVERNOR OF GUAM



# General Fund 5-year Preliminary Presentation

*February 16, 2006*



# Current Debt Outstanding – Limited and General Obligation

| Bond Issue | Dedicated Purpose | Original Par Amount | Remaining Par Amount (12/31/05) | Payment Source |
|---|---|---|---|---|
| GovGuam General Obligation, 1993 Series | New money for DOE and UOG Capital Improvements | $175.0 MM | $117.5 MM | GovGuam Full Faith & Credit |
| GovGuam General Obligation, 1995 Series | New Money (Deficit Financing Bond – Tax Refunds) | $115.0 MM | $2.1 MM | GovGuam Full Faith & Credit |
| GovGuam Loan as per Public Law 26-84 | $5 MM for public assistance programs, $5 MM for DOE | $10.0 MM | $7.5 MM | Section 30 Annual Receipts |
| *TOTAL GENERAL OBLIGATION* | | *$300.0 MM* | *$127.1 MM* | |
| 1997 Infrastructure Improvement Bonds | Tumon Infrastructure Improvement Project | $76.3 MM | $51.3 MM | Hotel Taxes |
| 2001 Highway Refunding Bonds | Advance refunded GovGuam Highway bonds 1992 Series | $51.7 MM | $35.5 MM | Liquid Fuel Taxes, Vehicle Regs., License fees |
| 2001 Section 30 Bonds | Refunded Water Bonds, prepaid GMH and Early retirement Loan, funded $6 MM for GWA (new money) | $76.9 MM | $50.5 MM | Section 30 Annual Receipts |
| 2003 University of Guam Loan | Construction of the UOG College of Business School | $13.5 MM | $13.5 MM | A portion of Mass Transit surcharge |
| *TOTAL LIMITED OBLIGATION* | | *$218.4 MM* | *$150.8 MM* | |
| *TOTAL GOVGUAM DEBT* | | *$518.4 MM* | *$277.9 MM* | |



# Other Debt Outstanding

| PAYABLES | Amount as of 2/01/2006 | Payment Source |
|---|---|---|
| Past Due Tax Refunds | $139.3 MM | General Fund |
| 2005 Estimated Tax Refunds | $ 82.0 MM | General Fund |
| Earned Income Tax Payable | $ 90.0 MM | General Fund |
| Retirement Fund Payables (GPSS - $16.9M, GMH-$17.7M) | $ 34.6 MM | General Fund / GMH |
| GPA Payables (GPSS - $13.8 M, DPW - $14.1 M) | $ 27.9 MM | General Fund/Territorial Highway Bond Revenues |
| Vendor Payables (Autonomous Agencies-$15.0m, Vendors-$10.9m, MIP/Medicaid - $5.4M | $ 31.3 MM | General Fund |
| *TOTAL GOVGUAM PAYABLES* | *$405.1 MM* | |
| Supplemental Annuities and COLA payments ($103.7M as of 9/30/2003)[1] | $ 99.3 MM | Debt pledged by 1.20116% of covered payroll |
| *TOTAL GOVGUAM DEBT* | *$782.3 MM* | |

*Sources:*
*1. Retirement Fund Audit, FY2004*



# Revenue Projections

|  | FY 2005 | FY 2006 | FY 2007 | Var% |
|---|---|---|---|---|
| Budgeted | $410.0 | $435.0 | $457.0 | 5.06% |
| Actual/Tracking | $403.0 | $430.0 | | |
| Variance | -1.71% | -1.15% | | |
| **Revenue Adjustments** | | | | |
| 2.0% below budget | | $426.3 | $447.9 | |
| $ Variance from budget | | $8.7 | $9.1 | |
| 1.5% below budget | | $428.5 | $450.1 | |
| $ Variance from budget | | $6.5 | $6.9 | |
| 1.0% below budget | | $430.7 | $452.4 | |
| $ Variance from budget | | $4.4 | $4.6 | |

Sources:
1. Retirement Fund Audit, FY2004

4

# I. Financing Summary



# Financing Summary

- Three scenarios are included:

    - $300mm new money financing to pay the following:

        - Prior years' tax refunds

        - EITC settlement

        - Retirement fund payables for GPSS & GMH

        - GPSS past due payable to GPA

        - Past due vendor payables

        - Past due MIP and Medicaid bills

    - $350mm new money financing to pay for the above plus $50mm in permanent working capital

    - $425mm new money financing and refunding of the 1993 GO bonds

- A refunding of the 1993 GO bonds currently produces $3.4mm in negative present value savings, however a refunding can be authorized should it yield a certain savings target under market conditions at time of issuance

- A refunding of the 1993 GO bonds is not necessary in order to release the pledge of property taxes to the 1993 GO bonds (Territorial Education Fund). This can be done via a legislative amendment.



# I. $300 Million in Proceeds Debt Service Schedule

| Term | Par Amount ($ million) | Annual Debt Service ($ million) |
|------|------------------------|--------------------------------|
| 30-Years | $313.04 | $23.6 |
| 25-Years | $312.87 | $25.0 |



■ 30-Year Bonds ■ 25-Year Bonds

Fiscal Year

# II. $350 Million in Proceeds Debt Service Schedule



| Term | Par Amount ($ million) | Annual Debt Service ($ million) |
|---|---|---|
| 30-Years | $365.1 | $27.5 |
| 25-Years | $364.9 | $29.2 |



Fiscal Year

■ 30-Year Bonds    ■ 25-Year Bonds



# III. $424.91 Million 30-year Financing Including 1993 GO Refunding Summary

| Sources | |
|---|---|
| Par Amount | $ 424,910,000.00 |
| **Total Uses** | **$ 424,910,000.00** |

| Uses | |
|---|---|
| Project Fund Deposit | $ 300,000,000.00 |
| Refunding Escrow Deposit | 110,975,000.00 |
| Capitalized Interest Fund | 9,782,000.00 |
| Underwriter's Discount | 3,399,280.00 |
| Cost of Issuance | 750,000.00 |
| Additional Proceeds | 2,876.00 |
| **Total Uses** | **$ 424,910,000.00** |

| Refunding Bonds Scale | |
|---|---|
| Serials 2007 - 2011 | 5.20% - 5.46% |
| Term 2016 | 5.81% |
| Term 2018 | 5.90% |
| Term 2026 | 6.24% |
| Term 2036 | 6.45% |

| General Obligation Bonds, 1993 Series A Refunding Statistics | | |
|---|---|---|
| Net PV Savings | | ($3,437,695.58) |
| Percentage Savings of Refunded Bonds | | -3.097631% |

| Refunded Bonds | | |
|---|---|---|
| 11/15/2007 | 5.150% | $ 6,845,000 |
| 11/15/2008 | 5.200% | 7,195,000 |
| 11/15/2013 | 5.375% | 42,150,000 |
| 11/15/2018 | 5.400% | 54,785,000 |
| | **Total** | **$ 110,975,000** |

| Payables | Amount ($ million) |
|---|---|
| 2004 and prior year individual and corporate tax refunds | $ 139.3 |
| EITC settlement payment | 90.0 |
| Retirement fund payables for GPSS and GMH | 34.0 |
| GPSS past due payable to GPA | 13.8 |
| Vendor payables | 10.9 |
| Past due MIP & Medicaid bills | 5.4 |
| Other working capital | 6.6 |
| **Total** | **$ 300.0** |

9



# III. $424.91 Million 30-year Financing Including 1993 GO Refundi Debt Service Schedule



| Term | Annual Debt Service ($ million) |
|------|--------------------------------|
| 30-Years | $36.8 |

Fiscal Year

■ New Money   ■ 1993 GO Refunding

# Addendum

# P

Print this story

# EITC recipient says he was told to keep quiet about payment

by **Ken Wetmore**, **KUAM News**
**Friday, June 11, 2004**

In March of this year, Governor's chief of staff Tony Sanchez told Department of Revenue and Taxation acting director John Camacho to pay the Earned Income Tax Credit to a single taxpayer. Yesterday, Sanchez told KUAM News he ordered the payout because the taxpayer was in a financial tight spot and desperately needed the money.

Sanchez said it has always been the Camacho Administration's position that the EITC should be paid and said others who are owed the EITC can go to Revenue & Taxation and fill out a hardship request, and if it is granted, receive the EITC.

The decision to start paying out the tax credit by the Administration comes at the same time that the Guam Attorney General is in the District Court fighting a class action lawsuit trying to legally force the payout of more than $100,000,000 to thousands of local taxpayers eligible for the Earned Income Tax Credit. However as of today only one taxpayer has received the tax credit.

If you've been wondering who the first taxpayer in six years to receive the EITC is, KUAM News discovered the answer in an exclusive interview.

Joe Budomo has been fighting for the last six years to receive what he believes he is owed, namely the Earned Income Tax Credit. He said, "I followed it ever since [Speaker Ben] Pangelinan took our government to court when the former governor [Carl] Gutierrez was in office, and pretty much I kept following it because one is the Director of Revenue is bound by a law to pay it to eligible taxpayers that have a low income."

Armed with the court decision and documents from the Legislature proving that Guam's law making body had made provisions so the Earned Income Tax Credit could be paid, Budomo visited everyone from the director of the Revenue & Tax to the Speaker of the Legislature, lobbying to receive the tax credit. And finally, this past March after the death of his mother-in-law, Budomo says he visited Governor's chief of staff Tony Sanchez, who then ordered the payment of the Earned Income Tax Credit to Budomo.

There is an interesting twist however. While the Administration is claiming they made a policy call to start paying the Earned Income Tax Credit - especially in hardship cases - it appears they didn't want it publicized. KUAM News reminded Budomo that during the initial stages of our investigation we called him and inquired if he indeed had received the Earned Income Tax Credit, further reminding him that he had first said he had not, essentially contradicting the now-revealed facts. We then asked why he acted in such a way. He responded by saying, "I was in a kind of busy situation that day you called, and I was doing a lot of things and I had a lot

of stuff in my mind, so I wasn't really concentrating on what you were talking about."

Again, we alluded to the fact that several times during the same phone conversation, we asked for confirmation if he had received EITC, to which he implied that he was told to keep the matter under wraps. He confirmed this latter point, saying, "Yeah, its true. But I know I haven't leaked anything out, I know you guys are the ones who found out; you guys are the one that contacted me."

Further prodding on the point of keeping the matter hush-hush, Budomo admitted, "They just said, 'Just don't, you know, advertise it.' You know what I mean by advertise? Like go out and have other people like me giving them documents; that's for them to go and get it themself, [sic] like I did." He further confessed, "I had a problem - if you need to get documents from your senators and any place else, just go down and ask your senator for it."

We then asked if the caveat to remain silent was the real motivation behind him not telling us up front that he had received, citing the fact that he had been told not to tell. Budomo's response? "Yeah, just to keep it on the down low, nai."

Budomo says he was told to keep it on the down low by an employee at the Department of Revenue and Taxation, who he refused to identify, although he said it was neither the director or deputy director. However upon further questioning, Budomo said it wasn't just an employee at Rev & Tax who was interested in the payout not being made public.

He recalled his conversation with Governor's chief of staff Sanchez, saying, "Well, he just said, 'You know, just don't, you know, announce to the public', so I just kept it to myself. He also said Sanchez didn't mention why he didn't want Budomo announcing the granting of the creadit to the public.

Speaker Pangelinan says he is upset by what Budomo is saying he was told. He told KUAM News, "This Administration, who Mr. Budomo came in contact with, is just outright lying to the public and I think this is just a way to cover it up. First they say it's their policy and then when they do it they say 'Don't tell anyone it's our policy'? I mean this kind of stuff has to be cleared up and I hope the Governor takes some strong action with his people in that office that are just lying to the people of Guam."

The Speaker says the Legislature believes the Earned Income Tax Credit should be paid to all eligible taxpayers and has provided the Executive Branch with the mechanism to fund the payment of the tax credit.

While KUAM News contacted the Governor's Office for comment immediately following our interview with Mr. Budomo early this afternoon, the Administration did not immediately respond. Just before 5pm today Jadeen Tuncap, the special assistant to the Governor's chief of staff, called.

Tuncap has served as secretary to Tony Sanchez for the last two years, both at the Superior Court and in the Governor's Office. She says she was in the room with

Sanchez when he met with Budomo and claims Sanchez never made any statements to the effect that Budomo should not make it publicly known that he had received the EITC.

Just before 5:30, Sanchez himself called KUAM News. After we read Budomo's quote to him, he denies ever making any such comment. Sanchez pointed out his special assistant was a witness that can attest that he didn't say anything to that effect. He would call again before 6pm, saying that perhaps Budomo misinterpreted what has been originally said, and said he is unashamed of granting the tax credit, reaffirming that it's the purpose of the local government to help, not hurt.

Rev & Tax director Art Ilagan meanwhile told KUAM News he will be checking to see if any of his employees said what Budomo alleges. Ilagan says he doesn't believe an employee from his agency would have had the opportunity to say that - as they shouldn't have come in contact with Budomo - but adds he was off-Island at the time of the incident. The Rev & Tax director says the EITC check was issued to Budomo through the Department of Administration.

**Copyright © 2000-2006 by Pacific Telestations, Inc.**



# CERTIFICATE OF SERVICE

This is to certify that I have this day caused to be served counsel for the opposing party(ies) with a copy of the foregoing by hand delivery, or by first class properly addressed, to:

Michael Phillips, Esq.
Phillips & Bordallo, P.C.
410 West O'Brien Dr.
Hagåtña, Guam 96910

Rawlen MT Mantanona, Esq.
Mantanona Law Office
GCIC Bldg., Suite 601B
414 West Soledad Ave.
Hagåtña, Guam 96910

Rodney J. Jacob, Esq.
Daniel Benjamin, Esq.
Calvo and Clark, LLP
655 South Marine Drive, Suite 202
Tamuning, Guam 96913

Shannon J. Taitano, Esq.
Legal Counsel
Office of the Governor of Guam
P.O. Box 2950
Hagåtña, Guam 96932

Respectfully submitted this 14th day of March, 2006.

OFFICE OF THE ATTORNEY GENERAL
Douglas B. Moylan, Attorney General of Guam

_____
DOUGLAS B. MOYLAN
Attorney General of Guam, Elected