Counsel appearing on following page

# FILED
DISTRICT COURT OF GUAM
AUG 1 1 2006 nº

## MARY L.M. MORAN
## CLERK OF COURT

DISTRICT COURT OF GUAM

TERRITORY OF GUAM

JULIE BABAUTA SANTOS, *et.al*

        Petitioners,

v.

FELIX P. CAMACHO, et al.

        Respondents

---

CHARMAINE R. TORRES, *et al.*

        Plaintiffs

v.

GOVERNMENT OF GUAM, et al.

        Respondents

---

MARY GRACE SIMPAO, *et al*,

        Plaintiffs,

v.

GOVERNMENT OF GUAM

        Defendant.

v.

FELIX P. CAMACHO, Governor of Guam

        Intervenor-Defendant

Civil Case No. 04-00006

Civil Case No. 04-00038

Civil Case No. 04-00049

**DECLARATION OF THOMAS J. FISHER IN SUPPORT OF SUPPLEMENTAL FILING IN OPPOSITION TO PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT**

VAN DE VELD SHIMIZU CANTO & FISHER
Suite 101 Dela Corte Bldg.
167 East Marine Corps Drive
Hagatna, Guam 96910
671.472.1131

TOUSLEY BRAIN STEPHENS PLLC
Kim D. Stephens, P.S., WSBA #11984
Nancy A. Pacharzina, WSBA #25946
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101-7332
206.682.5600

I, THOMAS J. FISHER, declare and state as follows;

1. I am a partner in the law firm of Van de veld Shimizu Canto & Fisher;

2. This firm, together with the law Firm of Tousley Brain Stephens PLLC, represent Plaintiffs Simpao et al. in this matter;

3. If I called to testify in this matter, I will declare and state that the following is true and correct to the best of my knowledge;

4. "Exhibit A" appended hereto is a true and accurate copy of a letter from Ms. Lourdes Perez, Director of the Department of Administration, Government of Guam, to the undersigned, Mr. Thomas J. Fisher, dated January 18, 2005;

5. "Exhibit B" appended hereto is a true and accurate copy of a letter from Mr. Artemio Ilagan, Director of the Department of Revenue and Taxation, Government of Guam, to the undersigned, Mr. Thomas J. Fisher, dated February 8, 2005;

6. "Exhibit C" appended hereto is a true and accurate copy of the "Independent Accountant's Report on Applying Agreed Upon Procedures," prepared by the Certified Public Accounting firm J. Scott Magliari & Company and forwarded to this law firm on September 7, 2005;

7. "Exhibit D" appended hereto is a true and accurate copy of the "Amended Menorandum Of Points And Authorities In Support Of Opposition To Petitioner's Motion For Approval Of The Administrative Plan," filed on behalf of the Governor of Guam by Rodney J. Jacob, Esq. on November 29, 2004 in District Court of Guam Civil Case No. CV04-00006, *Santos et al., v. Camacho, et al.*;

8.    "Exhibit E" appended hereto is a true and accurate copy of a partial summary judgment order entitled "Order," issued by Judge Ricardo S. Martinez in District Court of Guam Civil Case No. CV04-00049 on June 15, 2005;

9.    "Exhibit F" appended hereto is a true and accurate copy of a legal memorandum prepared by Government of Guam Assistant Attorney General Charles Troutman for the Attorney General of Guam on October 13, 2004, which incidentally was also included as Exhibit C to the "Declaration Of Daniel J. Benjamin In Support Of The Governor Of Guam's Objection To (1) Petitioner's Motion For Orders Approving The Administration Plan And Amended Notice; And (2) The Attorney General Of Guam's MPA In Response To Motion For Orders Approving Administration Plan," filed by Daniel J. Benjamin Esq. on behalf of the Governor of Guam on November 9, 2004 in District Court of Guam Civil Case No. CV04-00006, *Santos, et al., v. Camacho, et al.*

**FURTHER** Declarant sayeth naught.

_____    11 Aug. 06
Thomas J. Fisher

# EXHIBIT A





**GOVERNMENT OF GUAM**
(GUBETNOMENTON GUAHAN)
**DEPARTMENT OF ADMINISTRATION**
(DIPATTAMENTON ATMENESTRASION)
**DIRECTOR'S OFFICE**
(Ufisinan Direktot)
Post Office Box 884 • Hagåtña, Guam 96932
Tel: (671) 475-1101/1221 • Fax (671) 477-6788

*Felix P. Camacho*
*Governor*
*Kaleo S. Moylan*
*Lieutenant Governor*

*Lourdes M. Perez*
*Director*
*Joseph C. Manibusan*
*Deputy Director*

January 18, 2005

Thomas J. Fisher, Esq.
Attorney at Law
Ven De Veld Shimizu Canto Fisher
Attorneys at Law
Suite 101 De La Corte Building
167 East Marine Corps Drive
Hagatna, Guam 96910

Re: Requests for Information under the "Sunshine Law"

Dear Attorney Fisher:

In reference to your request for copies, or to make available for your inspection, all reports submitted to the Guam Legislature by the Department of Administration pursuant to 11 Guam Code Ann. Section 50107, please be advised that we have not been able to locate files or copies of monthly correspondence or transmittals indicating compliance with the public law since its enactment.

In reference to your inquiry as to the location of the Income Tax Reserve Fund, the Government of Guam has an account with the Bank of Guam called "Income Tax (Reserve)/Refund" account with the Bank of Guam. Because of the manner in which our banking system is designed, all income tax refund checks (payments) written against this account are "swept" directly against the Government of Guam's General Fund Account. Bank records showing deposits/disbursements against those accounts are available for inspection at my office. Please call my office when you are ready to inspect these records. However, should you request for copies of specific information, I will have to first clear through legal counsel because of the very sensitive nature of taxpayer information.

Sincerely,

Lourdes M. Perez
Director

RECEIVED

# EXHIBIT B

**Dipåttamenton Kontribusion yan Adu'ånå**

**DEPARTMENT OF**

# REVENUE AND TAXATION

**GOVERNMENT OF GUAM**     **Gubetnamenton Guåhan**

FELIX P. CAMACHO, Governor Maga'låhi
KALEO S. MOYLAN, Lt. Governor Tiñente Gubetnadot

ARTEMIO B. ILAGAN, Director
Direktot
JOHN P. CAMACHO,,Deputy Director
Segundo Direktot

February 8, 2005

Thomas J. Fisher
Attorney At Law
Van De Veld, Shimizu, Canto & Fisher
Suite 101 De La Corte Building
167 East Marine Corps Drive
Hagatna, Guam 96910
Phone (671) 472-1131
Fax (671) 472-2886

In reply to: Sunshine Law Request Concerning Income Tax Refund Efficient Payment Trust Fund

Dear Mr. Fisher:

Thank you for allowing the Department of Revenue & Taxation (DRT) additional time to formally respond to your above request. As we discussed via our telephone conversation, DRT has been unable to formulate a workable plan to ensure deposits into this Fund. As you may already know, the Government's tax revenues have been declining due to special interest legislations that have exempted many from the payment of Business Privilege Taxes (GRT) and the Bush Tax Cuts have also impacted income taxes by lessening tax rates and the increasing deductions and credits such as the Child Tax Credits, Additional Child Tax Credit, etc.

Presently, to my knowledge, DRT does not maintain any reports or correspondence relating to the items requested on your January 21, 2005 letter.

Sincerely,

Artemio B. Ilagan
Director

Post Office Box 23607, Guam Main Facility, Guam 96921 • Tél. / Telifon: (671) 475-1801/1785-89 • Fax / Faks: (671) 472-2643

# EXHIBIT C

# J. Scott Magliari & COMPANY

## CERTIFIED PUBLIC ACCOUNTANT

**GUAM**
P.O. BOX 12734 • TAMUNING, GUAM 96931
TEL: (671) 472-2680 • FAX: (671) 472-2686

**SAIPAN**
PMB 297 PPP BOX 10000 • SAIPAN, MP 96950
TEL: (670) 233-1837 • FAX: (670) 233-8214

## Independent Accountant's Report
## on Applying Agreed Upon Procedures

Van De Veld, Shimizu, Canto & Fisher
Attorneys At Law
Suite 101 De La Corte Building
167 East Marine Corps Drive
Hagatna, Guam 96910

At your request, we have performed the procedures enumerated below, which were agreed to by Van De Veld, Shimizu, Canto & Fisher, Attorneys at Law, solely to assist you with respect to the calculation of accumulated interest for various taxpayers for the period covering from April 15, 1996 through September 30, 2005. This engagement to apply agreed-upon procedures was performed in accordance with standards established by the American Institute of Certified Public Accountants. The sufficiency of these procedures is solely the responsibility of the specified users of the report. Consequently, we make no representation regarding the sufficiency of the procedures described below either for the purpose for which this report has been requested or for any other purpose.

Our procedures and findings are as follows:

1. Procedure:

   Calculate the number of days in each period in which the interest rate was unchanged for the period covering from April 15, 1996 through September 30, 2005.

   Finding:

   No exceptions were noted as a result of this procedure.

2. Procedure:

   Create excel spreadsheet to calculate interest compounded daily per Internal Revenue Code (IRC) Section 6621 for each taxpayer sample. The period calculated covered April 15, 1996 through September 30, 2005.

Finding:

No exceptions were noted as a result of this procedure. See the accompanying attachments listed by taxpayer as *Schedules A and B*. Based on the results of this procedure, we calculated total accumulated interest as follows:

| | |
|---|---|
| Low - $15,000,000: | $58,907,306.76 |
| Medium - $17,000,000: | $66,761,614.33 |
| High - $20,000,000: | $78,543,075.68 |

\* \* \* \* \* \* \* \*

We were not engaged to, and did not perform an audit, the objective of which would be the statement of an opinion on the specified elements, accounts or items. Accordingly, we do not express an opinion. Had we performed additional procedures, other matters might have come to our attention that would have been reported to you. We have no responsibility to update this report for events and circumstances occurring after the date of this report.

This report is intended solely for the information and use of Van De Veld, Shimizu, Canto & Fisher and should not be used by those who have not agreed to the procedures and taken responsibility for the sufficiency of the procedures for their purposes. This report relates only to the information specified above and does not extend to any financial statements as a whole.

*J. Scott Maglian & Company*

Hagåtña, Guam
September 7, 2005

# Van De Veld, Shimizu, Canto and Fisher
## Attorneys At Law
### Summary Schedule of Accumulated Interest
### As of September 30, 2005

*Schedule A*

|  | Period Covered | Low- $15,000,000 | Medium- $17,000,000 | High- $20,000,000 |
|---|---|---|---|---|
| Taxpayer "A" | 4/15/96 - 9/30/05 | $ 13,596,226.52 | $ 15,409,056.72 | $ 18,128,302.03 |
| Taxpayer "B" | 4/15/97 - 9/30/05 | 11,453,611.53 | 12,980,759.73 | 15,271,482.04 |
| Taxpayer "C" | 4/15/98 - 9/30/05 | 9,429,341.72 | 10,686,587.28 | 12,572,455.63 |
| Taxpayer "D" | 4/15/99 - 9/30/05 | 7,769,186.85 | 8,805,078.43 | 10,358,915.80 |
| Taxpayer "E" | 4/15/00 - 9/30/05 | 6,006,130.16 | 6,806,947.51 | 8,008,173.55 |
| Taxpayer "F" | 4/15/01 - 9/30/05 | 4,205,733.88 | 4,766,498.39 | 5,607,645.17 |
| Taxpayer "G" | 4/15/02 - 9/30/05 | 2,920,677.92 | 3,310,101.65 | 3,894,237.23 |
| Taxpayer "H" | 4/15/03 - 9/30/05 | 1,925,291.71 | 2,181,997.27 | 2,567,055.62 |
| Taxpayer "I" | 4/15/04 - 9/30/05 | 1,178,587.07 | 1,335,732.01 | 1,571,449.43 |
| Taxpayer "J" | 4/15/05 - 9/30/05 | 422,519.40 | 478,855.32 | 563,359.20 |
| **Total Accumulated Interest** | | 58,907,306.76 | 66,761,614.33 | 78,543,075.68 |
| **Total Principal** *(Note 1)* | | 150,000,000.00 | 170,000,000.00 | 200,000,000.00 |
| **Total Principal and Accumulated Interest** | | $ 208,907,306.76 | $ 236,761,614.33 | $ 278,543,075.68 |

*Note 1:* Principal amounts for Low, Medium and High are $15,000,000, $17,000,000, and $20,000,000 respectively.

Schedule B

*Note 1*

| Beginning Balance | Period | Number of days | Interest Rate | Daily Interest Rate | Value | Accumulated Interest |
|---|---|---|---|---|---|---|
| $ 15,000,000.00 | 04/15/1996 - 06/30/1996 | 77 | 7.00% | 0.000191781 | $ 15,223,128.89 | $ 223,128.89 |
| $ 15,223,128.89 | 07/01/1996 - 03/31/1998 | 639 | 8.00% | 0.000219178 | $ 17,511,457.08 | $ 2,288,328.19 |
| $ 17,511,457.08 | 04/01/1998 - 03/31/1999 | 365 | 7.00% | 0.000191781 | $ 18,781,054.93 | $ 1,269,597.85 |
| $ 18,781,054.93 | 04/01/1999 - 03/31/2000 | 366 | 8.00% | 0.000219178 | $ 20,349,554.78 | $ 1,568,499.85 |
| $ 20,349,554.78 | 04/01/2000 - 03/31/2001 | 365 | 9.00% | 0.000246575 | $ 22,265,712.51 | $ 1,916,157.73 |
| $ 22,265,712.51 | 04/01/2001 - 06/30/2001 | 91 | 8.00% | 0.000219178 | $ 22,714,215.45 | $ 448,502.94 |
| $ 22,714,215.45 | 07/01/2001 - 12/31/2001 | 184 | 7.00% | 0.000191781 | $ 23,529,977.52 | $ 815,762.08 |
| $ 23,529,977.52 | 01/01/2002 - 12/31/2002 | 365 | 6.00% | 0.000164384 | $ 24,984,866.87 | $ 1,454,889.35 |
| $ 24,984,866.87 | 01/01/2003 - 09/30/2003 | 273 | 5.00% | 0.000136986 | $ 25,936,857.21 | $ 951,990.34 |
| $ 25,936,857.21 | 10/01/2003 - 03/31/2004 | 183 | 4.00% | 0.000109589 | $ 26,462,237.36 | $ 525,380.14 |
| $ 26,462,237.36 | 04/01/2004 - 06/30/2004 | 91 | 5.00% | 0.000136986 | $ 26,794,150.83 | $ 331,913.47 |
| $ 26,794,150.83 | 07/01/2004 - 09/30/2004 | 92 | 4.00% | 0.000109589 | $ 27,065,646.05 | $ 271,495.22 |
| $ 27,065,646.05 | 10/01/2004 - 03/31/2005 | 182 | 5.00% | 0.000136986 | $ 27,748,868.09 | $ 683,222.04 |
| $ 27,748,868.09 | 04/01/2005 - 09/30/2005 | 183 | 6.00% | 0.000164384 | $ 28,596,226.52 | $ 847,358.43 |

Total accumulated interest April 15, 1996 through September 30, 2005:    $ 13,596,226.52

*Note 1:* Interest rate equals the Federal Short-term rate plus 3% and is subject to daily compounding per IRC Section 6621.

*Note 1*

| Beginning Balance | Period | Number of days | Interest Rate | Daily Interest Rate | Value | Accumulated Interest |
|---|---|---|---|---|---|---|
| $ 17,000,000.00 | 04/15/1996 - 06/30/1996 | 77 | 7.00% | 0.000191781 | $ 17,252,879.40 | $ 252,879.40 |
| $ 17,252,879.40 | 07/01/1996 - 03/31/1998 | 639 | 8.00% | 0.000219178 | $ 19,846,318.02 | $ 2,593,438.62 |
| $ 19,846,318.02 | 04/01/1998 - 03/31/1999 | 365 | 7.00% | 0.000191781 | $ 21,285,195.59 | $ 1,438,877.57 |
| $ 21,285,195.59 | 04/01/1999 - 03/31/2000 | 366 | 8.00% | 0.000219178 | $ 23,062,828.75 | $ 1,777,633.16 |
| $ 23,062,828.75 | 04/01/2000 - 03/31/2001 | 365 | 9.00% | 0.000246575 | $ 25,234,474.18 | $ 2,171,645.42 |
| $ 25,234,474.18 | 04/01/2001 - 06/30/2001 | 91 | 8.00% | 0.000219178 | $ 25,742,777.50 | $ 508,303.33 |
| $ 25,742,777.50 | 07/01/2001 - 12/31/2001 | 184 | 7.00% | 0.000191781 | $ 26,667,307.86 | $ 924,530.35 |
| $ 26,667,307.86 | 01/01/2002 - 12/31/2002 | 365 | 6.00% | 0.000164384 | $ 28,316,182.46 | $ 1,648,874.60 |
| $ 28,316,182.46 | 01/01/2003 - 09/30/2003 | 273 | 5.00% | 0.000136986 | $ 29,395,104.84 | $ 1,078,922.39 |
| $ 29,395,104.84 | 10/01/2003 - 03/31/2004 | 183 | 4.00% | 0.000109589 | $ 29,990,535.67 | $ 595,430.83 |
| $ 29,990,535.67 | 04/01/2004 - 06/30/2004 | 91 | 5.00% | 0.000136986 | $ 30,366,704.27 | $ 376,168.60 |
| $ 30,366,704.27 | 07/01/2004 - 09/30/2004 | 92 | 4.00% | 0.000109589 | $ 30,674,398.86 | $ 307,694.59 |
| $ 30,674,398.86 | 10/01/2004 - 03/31/2005 | 182 | 5.00% | 0.000136986 | $ 31,448,717.16 | $ 774,318.31 |
| $ 31,448,717.16 | 04/01/2005 - 09/30/2005 | 183 | 6.00% | 0.000164384 | $ 32,409,056.72 | $ 960,339.56 |

Total accumulated interest April 15, 1996 through September 30, 2005:    $ 15,409,056.72

*Note 1:* Interest rate equals the Federal Short-term rate plus 3% and is subject to daily compounding per IRC Section 6621.

*Note 1*

| Beginning Balance | Period | Number of days | Interest Rate | Daily Interest Rate | Value | Accumulated Interest |
|---|---|---|---|---|---|---|
| $ 20,000,000.00 | 04/15/1996 - 06/30/1996 | 77 | 7.00% | 0.000191781 | $ 20,297,505.18 | $ 297,505.18 |
| $ 20,297,505.18 | 07/01/1996 - 03/31/1998 | 639 | 8.00% | 0.000219178 | $ 23,348,609.44 | $ 3,051,104.26 |
| $ 23,348,609.44 | 04/01/1998 - 03/31/1999 | 365 | 7.00% | 0.000191781 | $ 25,041,406.58 | $ 1,692,797.14 |
| $ 25,041,406.58 | 04/01/1999 - 03/31/2000 | 366 | 8.00% | 0.000219178 | $ 27,132,739.71 | $ 2,091,333.13 |
| $ 27,132,739.71 | 04/01/2000 - 03/31/2001 | 365 | 9.00% | 0.000246575 | $ 29,687,616.68 | $ 2,554,876.97 |
| $ 29,687,616.68 | 04/01/2001 - 06/30/2001 | 91 | 8.00% | 0.000219178 | $ 30,285,620.59 | $ 598,003.92 |
| $ 30,285,620.59 | 07/01/2001 - 12/31/2001 | 184 | 7.00% | 0.000191781 | $ 31,373,303.36 | $ 1,087,682.77 |
| $ 31,373,303.36 | 01/01/2002 - 12/31/2002 | 365 | 6.00% | 0.000164384 | $ 33,313,155.83 | $ 1,939,852.47 |
| $ 33,313,155.83 | 01/01/2003 - 09/30/2003 | 273 | 5.00% | 0.000136986 | $ 34,582,476.28 | $ 1,269,320.45 |
| $ 34,582,476.28 | 10/01/2003 - 03/31/2004 | 183 | 4.00% | 0.000109589 | $ 35,282,983.14 | $ 700,506.86 |
| $ 35,282,983.14 | 04/01/2004 - 06/30/2004 | 91 | 5.00% | 0.000136986 | $ 35,725,534.43 | $ 442,551.29 |
| $ 35,725,534.43 | 07/01/2004 - 09/30/2004 | 92 | 4.00% | 0.000109589 | $ 36,087,528.07 | $ 361,993.63 |
| $ 36,087,528.07 | 10/01/2004 - 03/31/2005 | 182 | 5.00% | 0.000136986 | $ 36,998,490.78 | $ 910,962.71 |
| $ 36,998,490.78 | 04/01/2005 - 09/30/2005 | 183 | 6.00% | 0.000164384 | $ 38,128,302.03 | $ 1,129,811.24 |

Total accumulated interest April 15, 1996 through September 30, 2005:    $ 18,128,302.03

*Note 1:* Interest rate equals the Federal Short-term rate plus 3% and is subject to daily compounding per IRC Section 6621.

Note 1

| Beginning Balance | Period | Number of days | Interest Rate | Daily Interest Rate | Value | Accumulated Interest |
|---|---|---|---|---|---|---|
| $ 15,000,000.00 | 04/15/1997 - 03/31/1998 | 351 | 8.00% | 0.000219178 | $ 16,199,385.00 | $ 1,199,385.00 |
| $ 16,199,385.00 | 04/01/1998 - 03/31/1999 | 365 | 7.00% | 0.000191781 | $ 17,373,856.34 | $ 1,174,471.34 |
| $ 17,373,856.34 | 04/01/1999 - 03/31/2000 | 366 | 8.00% | 0.000219178 | $ 18,824,833.99 | $ 1,450,977.66 |
| $ 18,824,833.99 | 04/01/2000 - 03/31/2001 | 365 | 9.00% | 0.000246575 | $ 20,597,420.74 | $ 1,772,586.75 |
| $ 20,597,420.74 | 04/01/2001 - 06/30/2001 | 91 | 8.00% | 0.000219178 | $ 21,012,318.92 | $ 414,898.18 |
| $ 21,012,318.92 | 07/01/2001 - 12/31/2001 | 184 | 7.00% | 0.000191781 | $ 21,766,958.81 | $ 754,639.89 |
| $ 21,766,958.81 | 01/01/2002 - 12/31/2002 | 365 | 6.00% | 0.000164384 | $ 23,112,838.40 | $ 1,345,879.59 |
| $ 23,112,838.40 | 01/01/2003 - 09/30/2003 | 273 | 5.00% | 0.000136986 | $ 23,993,499.44 | $ 880,661.04 |
| $ 23,993,499.44 | 10/01/2003 - 12/31/2003 | 183 | 4.00% | 0.000109589 | $ 24,479,514.69 | $ 486,015.25 |
| $ 24,479,514.69 | 04/01/2004 - 06/30/2004 | 91 | 5.00% | 0.000136986 | $ 24,786,559.05 | $ 307,044.36 |
| $ 24,786,559.05 | 07/01/2004 - 09/30/2004 | 92 | 4.00% | 0.000109589 | $ 25,037,712.09 | $ 251,153.04 |
| $ 25,037,712.09 | 10/01/2004 - 03/31/2005 | 182 | 5.00% | 0.000136986 | $ 25,669,742.69 | $ 632,030.60 |
| $ 25,669,742.69 | 04/01/2005 - 09/30/2005 | 183 | 6.00% | 0.000164384 | $ 26,453,611.53 | $ 783,868.84 |

**Total accumulated interest April 15, 1997 through September 30, 2005:** $ 11,453,611.53

Note 1: Interest rate equals the Federal Short-term rate plus 3% and is subject to daily compounding per IRC Section 6621.

Note 1

| Beginning Balance | Period | Number of days | Interest Rate | Daily Interest Rate | Value | Accumulated Interest |
|---|---|---|---|---|---|---|
| $ 17,000,000.00 | 04/15/1997 - 03/31/1998 | 351 | 8.00% | 0.000219178 | $ 18,359,303.00 | $ 1,359,303.00 |
| $ 18,359,303.00 | 04/01/1998 - 03/31/1999 | 365 | 7.00% | 0.000191781 | $ 19,690,370.51 | $ 1,331,067.52 |
| $ 19,690,370.51 | 04/01/1999 - 03/31/2000 | 366 | 8.00% | 0.000219178 | $ 21,334,811.86 | $ 1,644,441.34 |
| $ 21,334,811.86 | 04/01/2000 - 03/31/2001 | 365 | 9.00% | 0.000246575 | $ 23,343,743.50 | $ 2,008,931.65 |
| $ 23,343,743.50 | 04/01/2001 - 06/30/2001 | 91 | 8.00% | 0.000219178 | $ 23,813,961.44 | $ 470,217.94 |
| $ 23,813,961.44 | 07/01/2001 - 12/31/2001 | 184 | 7.00% | 0.000191781 | $ 24,669,219.98 | $ 855,258.54 |
| $ 24,669,219.98 | 01/01/2002 - 12/31/2002 | 365 | 6.00% | 0.000164384 | $ 26,194,550.19 | $ 1,525,330.20 |
| $ 26,194,550.19 | 01/01/2003 - 09/30/2003 | 273 | 5.00% | 0.000136986 | $ 27,192,632.70 | $ 998,082.51 |
| $ 27,192,632.70 | 10/01/2003 - 03/31/2004 | 183 | 4.00% | 0.000109589 | $ 27,743,449.98 | $ 550,817.28 |
| $ 27,743,449.98 | 04/01/2004 - 06/30/2004 | 91 | 5.00% | 0.000136986 | $ 28,091,433.59 | $ 347,983.61 |
| $ 28,091,433.59 | 07/01/2004 - 09/30/2004 | 92 | 4.00% | 0.000109589 | $ 28,376,073.70 | $ 284,640.11 |
| $ 28,376,073.70 | 10/01/2004 - 03/31/2005 | 182 | 5.00% | 0.000136986 | $ 29,092,375.05 | $ 716,301.35 |
| $ 29,092,375.05 | 04/01/2005 - 09/30/2005 | 183 | 6.00% | 0.000164384 | $ 29,980,759.73 | $ 888,384.68 |

**Total accumulated interest April 15, 1997 through September 30, 2005:** $ 12,980,759.73

Note 1: Interest rate equals the Federal Short-term rate plus 3% and is subject to daily compounding per IRC Section 6621.

Note 1

| Beginning Balance | Period | Number of days | Interest Rate | Daily Interest Rate | Value | Accumulated Interest |
|---|---|---|---|---|---|---|
| $ 20,000,000.00 | 04/15/1997 - 03/31/1998 | 351 | 8.00% | 0.000219178 | $ 21,599,180.00 | $ 1,599,180.00 |
| $ 21,599,180.00 | 04/01/1998 - 03/31/1999 | 365 | 7.00% | 0.000191781 | $ 23,165,141.78 | $ 1,565,961.79 |
| $ 23,165,141.78 | 04/01/1999 - 03/31/2000 | 366 | 8.00% | 0.000219178 | $ 25,099,778.65 | $ 1,934,636.87 |
| $ 25,099,778.65 | 04/01/2000 - 03/31/2001 | 365 | 9.00% | 0.000246575 | $ 27,463,227.65 | $ 2,363,449.00 |
| $ 27,463,227.65 | 04/01/2001 - 06/30/2001 | 91 | 8.00% | 0.000219178 | $ 28,016,425.23 | $ 553,197.58 |
| $ 28,016,425.23 | 07/01/2001 - 12/31/2001 | 184 | 7.00% | 0.000191781 | $ 29,022,611.74 | $ 1,006,186.51 |
| $ 29,022,611.74 | 01/01/2002 - 12/31/2002 | 365 | 6.00% | 0.000164384 | $ 30,817,117.87 | $ 1,794,506.12 |
| $ 30,817,117.87 | 01/01/2003 - 09/30/2003 | 273 | 5.00% | 0.000136986 | $ 31,991,332.59 | $ 1,174,214.72 |
| $ 31,991,332.59 | 10/01/2003 - 03/31/2004 | 183 | 4.00% | 0.000109589 | $ 32,639,352.92 | $ 648,020.33 |
| $ 32,639,352.92 | 04/01/2004 - 06/30/2004 | 91 | 5.00% | 0.000136986 | $ 33,048,745.40 | $ 409,392.48 |
| $ 33,048,745.40 | 07/01/2004 - 09/30/2004 | 92 | 4.00% | 0.000109589 | $ 33,383,616.12 | $ 334,870.72 |
| $ 33,383,616.12 | 10/01/2004 - 03/31/2005 | 182 | 5.00% | 0.000136986 | $ 34,226,323.59 | $ 842,707.47 |
| $ 34,226,323.59 | 04/01/2005 - 09/30/2005 | 183 | 6.00% | 0.000164384 | $ 35,271,482.04 | $ 1,045,158.45 |

**Total accumulated interest April 15, 1997 through September 30, 2005:** $ 15,271,482.04

Note 1: Interest rate equals the Federal Short-term rate plus 3% and is subject to daily compounding per IRC Section 6621.

*Schedule B, Continued*

#### Note 1

| Beginning Balance | Period | Number of days | Interest Rate | Daily Interest Rate | Value | Accumulated Interest |
|---|---|---|---|---|---|---|
| $ 15,000,000.00 | 04/15/1998 - 03/31/1999 | 351 | 7.00% | 0.000191781 | $ 16,044,382.94 | $ 1,044,382.94 |
| $ 16,044,382.94 | 04/01/1999 - 03/31/2000 | 366 | 8.00% | 0.000219178 | $ 17,384,329.62 | $ 1,339,946.68 |
| $ 17,384,329.62 | 04/01/2000 - 03/31/2001 | 365 | 9.00% | 0.000246575 | $ 19,021,275.38 | $ 1,636,945.77 |
| $ 19,021,275.38 | 04/01/2001 - 06/30/2001 | 91 | 8.00% | 0.000219178 | $ 19,404,424.94 | $ 383,149.56 |
| $ 19,404,424.94 | 07/01/2001 - 12/31/2001 | 184 | 7.00% | 0.000191781 | $ 20,101,318.66 | $ 696,893.72 |
| $ 20,101,318.66 | 01/01/2002 - 12/31/2002 | 365 | 6.00% | 0.000164384 | $ 21,344,209.53 | $ 1,242,890.88 |
| $ 21,344,209.53 | 01/01/2003 - 09/30/2003 | 273 | 5.00% | 0.000136986 | $ 22,157,481.08 | $ 813,271.55 |
| $ 22,157,481.08 | 10/01/2003 - 03/31/2004 | 183 | 4.00% | 0.000109589 | $ 22,606,305.72 | $ 448,824.64 |
| $ 22,606,305.72 | 04/01/2004 - 06/30/2004 | 91 | 5.00% | 0.000136986 | $ 22,889,854.58 | $ 283,548.87 |
| $ 22,889,854.58 | 04/01/2004 - 09/30/2004 | 92 | 4.00% | 0.000109589 | $ 23,121,789.02 | $ 231,934.43 |
| $ 23,121,789.02 | 10/01/2004 - 03/31/2005 | 182 | 5.00% | 0.000136986 | $ 23,705,455.70 | $ 583,666.68 |
| $ 23,705,455.70 | 04/01/2005 - 09/30/2005 | 183 | 6.00% | 0.000164384 | $ 24,429,341.72 | $ 723,886.02 |

**Total accumulated interest April 15, 1998 through September 30, 2005:**     **$ 9,429,341.72**

*Note 1:* Interest rate equals the Federal Short-term rate plus 3% and is subject to daily compounding per IRC Section 6621.

#### Note 1

| Beginning Balance | Period | Number of days | Interest Rate | Daily Interest Rate | Value | Accumulated Interest |
|---|---|---|---|---|---|---|
| $ 17,000,000.00 | 04/15/1998 - 03/31/1999 | 351 | 7.00% | 0.000191781 | $ 18,183,634.00 | $ 1,183,634.00 |
| $ 18,183,634.00 | 04/01/1999 - 03/31/2000 | 366 | 8.00% | 0.000219178 | $ 19,702,240.23 | $ 1,518,606.24 |
| $ 19,702,240.23 | 04/01/2000 - 03/31/2001 | 365 | 9.00% | 0.000246575 | $ 21,557,445.43 | $ 1,855,205.20 |
| $ 21,557,445.43 | 04/01/2001 - 06/30/2001 | 91 | 8.00% | 0.000219178 | $ 21,991,681.60 | $ 434,236.16 |
| $ 21,991,681.60 | 07/01/2001 - 12/31/2001 | 184 | 7.00% | 0.000191781 | $ 22,781,494.48 | $ 789,812.88 |
| $ 22,781,494.48 | 01/01/2002 - 12/31/2002 | 365 | 6.00% | 0.000164384 | $ 24,190,104.14 | $ 1,408,609.66 |
| $ 24,190,104.14 | 01/01/2003 - 09/30/2003 | 273 | 5.00% | 0.000136986 | $ 25,111,811.89 | $ 921,707.75 |
| $ 25,111,811.89 | 10/01/2003 - 03/31/2004 | 183 | 4.00% | 0.000109589 | $ 25,620,479.81 | $ 508,667.92 |
| $ 25,620,479.81 | 04/01/2004 - 06/30/2004 | 91 | 5.00% | 0.000136986 | $ 25,941,835.20 | $ 321,355.38 |
| $ 25,941,835.20 | 07/01/2004 - 09/30/2004 | 92 | 4.00% | 0.000109589 | $ 26,204,694.22 | $ 262,859.03 |
| $ 26,204,694.22 | 10/01/2004 - 03/31/2005 | 182 | 5.00% | 0.000136986 | $ 26,866,183.12 | $ 661,488.90 |
| $ 26,866,183.12 | 04/01/2005 - 09/30/2005 | 183 | 6.00% | 0.000164384 | $ 27,686,587.28 | $ 820,404.16 |

**Total accumulated interest April 15, 1998 through September 30, 2005:**     **$ 10,686,587.28**

*Note 1:* Interest rate equals the Federal Short-term rate plus 3% and is subject to daily compounding per IRC Section 6621.

#### Note 1

| Beginning Balance | Period | Number of days | Interest Rate | Daily Interest Rate | Value | Accumulated Interest |
|---|---|---|---|---|---|---|
| $ 20,000,000.00 | 04/15/1998 - 03/31/1999 | 351 | 7.00% | 0.000191781 | $ 21,392,510.58 | $ 1,392,510.58 |
| $ 21,392,510.58 | 04/01/1999 - 03/31/2000 | 366 | 8.00% | 0.000219178 | $ 23,179,106.16 | $ 1,786,595.57 |
| $ 23,179,106.16 | 04/01/2000 - 03/31/2001 | 365 | 9.00% | 0.000246575 | $ 25,361,700.51 | $ 2,182,594.35 |
| $ 25,361,700.51 | 04/01/2001 - 06/30/2001 | 91 | 8.00% | 0.000219178 | $ 25,872,566.59 | $ 510,866.08 |
| $ 25,872,566.59 | 07/01/2001 - 12/31/2001 | 184 | 7.00% | 0.000191781 | $ 26,801,758.21 | $ 929,191.62 |
| $ 26,801,758.21 | 01/01/2002 - 12/31/2002 | 365 | 6.00% | 0.000164384 | $ 28,458,946.05 | $ 1,657,187.84 |
| $ 28,458,946.05 | 01/01/2003 - 09/30/2003 | 273 | 5.00% | 0.000136986 | $ 29,543,308.11 | $ 1,084,362.06 |
| $ 29,543,308.11 | 10/01/2003 - 03/31/2004 | 183 | 4.00% | 0.000109589 | $ 30,141,740.96 | $ 598,432.85 |
| $ 30,141,740.96 | 04/01/2004 - 06/30/2004 | 91 | 5.00% | 0.000136986 | $ 30,519,806.11 | $ 378,065.15 |
| $ 30,519,806.11 | 07/01/2004 - 09/30/2004 | 92 | 4.00% | 0.000109589 | $ 30,829,052.02 | $ 309,245.91 |
| $ 30,829,052.02 | 10/01/2004 - 03/31/2005 | 182 | 5.00% | 0.000136986 | $ 31,607,274.26 | $ 778,222.24 |
| $ 31,607,274.26 | 04/01/2005 - 09/30/2005 | 183 | 6.00% | 0.000164384 | $ 32,572,455.63 | $ 965,181.37 |

**Total accumulated interest April 15, 1998 through September 30, 2005:**     **$ 12,572,455.63**

*Note 1:* Interest rate equals the Federal Short-term rate plus 3% and is subject to daily compounding per IRC Section 6621.

Schedule B, Continued

Note 1

| Beginning Balance | Period | Number of days | Interest Rate | Daily Interest Rate | Value | Accumulated Interest |
|---|---|---|---|---|---|---|
| $ 15,000,000.00 | 04/15/1999 - 03/31/2000 | 352 | 8.00% | 0.000219178 | $ 16,202,935.55 | $ 1,202,935.55 |
| $ 16,202,935.55 | 04/01/2000 - 03/31/2001 | 365 | 9.00% | 0.000246575 | $ 17,728,638.71 | $ 1,525,703.17 |
| $ 17,728,638.71 | 04/01/2001 - 06/30/2001 | 91 | 8.00% | 0.000219178 | $ 18,085,750.42 | $ 357,111.70 |
| $ 18,085,750.42 | 07/01/2001 - 12/31/2001 | 184 | 7.00% | 0.000191781 | $ 18,735,285.04 | $ 649,534.62 |
| $ 18,735,285.04 | 01/01/2002 - 12/31/2002 | 365 | 6.00% | 0.000164384 | $ 19,893,712.27 | $ 1,158,427.23 |
| $ 19,893,712.27 | 01/01/2003 - 09/30/2003 | 273 | 5.00% | 0.000136986 | $ 20,651,715.98 | $ 758,003.72 |
| $ 20,651,715.98 | 10/01/2003 - 03/31/2004 | 183 | 4.00% | 0.000109589 | $ 21,070,039.66 | $ 418,323.68 |
| $ 21,070,039.66 | 04/01/2004 - 06/30/2004 | 91 | 5.00% | 0.000136986 | $ 21,334,319.28 | $ 264,279.62 |
| $ 21,334,319.28 | 07/01/2004 - 09/30/2004 | 92 | 4.00% | 0.000109589 | $ 21,550,492.05 | $ 216,172.77 |
| $ 21,550,492.05 | 10/01/2004 - 03/31/2005 | 182 | 5.00% | 0.000136986 | $ 22,094,494.25 | $ 544,002.20 |
| $ 22,094,494.25 | 04/01/2005 - 09/30/2005 | 183 | 6.00% | 0.000164384 | $ 22,769,186.85 | $ 674,692.60 |

Total accumulated interest April 15, 1999 through September 30, 2005: $ 7,769,186.85

Note 1: Interest rate equals the Federal Short-term rate plus 3% and is subject to daily compounding per IRC Section 6621.

Note 1

| Beginning Balance | Period | Number of days | Interest Rate | Daily Interest Rate | Value | Accumulated Interest |
|---|---|---|---|---|---|---|
| $ 17,000,000.00 | 04/15/1999 - 03/31/2000 | 352 | 8.00% | 0.000219178 | $ 18,363,326.95 | $ 1,363,326.95 |
| $ 18,363,326.95 | 04/01/2000 - 03/31/2001 | 365 | 9.00% | 0.000246575 | $ 20,092,457.21 | $ 1,729,130.25 |
| $ 20,092,457.21 | 04/01/2001 - 06/30/2001 | 91 | 8.00% | 0.000219178 | $ 20,497,183.80 | $ 404,726.60 |
| $ 20,497,183.80 | 07/01/2001 - 12/31/2001 | 184 | 7.00% | 0.000191781 | $ 21,233,323.04 | $ 736,139.24 |
| $ 21,233,323.04 | 01/01/2002 - 12/31/2002 | 365 | 6.00% | 0.000164384 | $ 22,546,207.24 | $ 1,312,884.19 |
| $ 22,546,207.24 | 01/01/2003 - 09/30/2003 | 273 | 5.00% | 0.000136986 | $ 23,405,278.11 | $ 859,070.88 |
| $ 23,405,278.11 | 10/01/2003 - 03/31/2004 | 183 | 4.00% | 0.000109589 | $ 23,879,378.28 | $ 474,100.17 |
| $ 23,879,378.28 | 04/01/2004 - 06/30/2004 | 91 | 5.00% | 0.000136986 | $ 24,178,895.18 | $ 299,516.90 |
| $ 24,178,895.18 | 07/01/2004 - 09/30/2004 | 92 | 4.00% | 0.000109589 | $ 24,423,890.99 | $ 244,995.81 |
| $ 24,423,890.99 | 10/01/2004 - 03/31/2005 | 182 | 5.00% | 0.000136986 | $ 25,040,426.82 | $ 616,535.83 |
| $ 25,040,426.82 | 04/01/2005 - 09/30/2005 | 183 | 6.00% | 0.000164384 | $ 25,805,078.43 | $ 764,651.62 |

Total accumulated interest April 15, 1999 through September 30, 2005: $ 8,805,078.43

Note 1: Interest rate equals the Federal Short-term rate plus 3% and is subject to daily compounding per IRC Section 6621.

Note 1

| Beginning Balance | Period | Number of days | Interest Rate | Daily Interest Rate | Value | Accumulated Interest |
|---|---|---|---|---|---|---|
| $ 20,000,000.00 | 04/15/1999 - 03/31/2000 | 352 | 8.00% | 0.000219178 | $ 21,603,914.06 | $ 1,603,914.06 |
| $ 21,603,914.06 | 04/01/2000 - 03/31/2001 | 365 | 9.00% | 0.000246575 | $ 23,638,184.95 | $ 2,034,270.89 |
| $ 23,638,184.95 | 04/01/2001 - 06/30/2001 | 91 | 8.00% | 0.000219178 | $ 24,114,333.89 | $ 476,148.94 |
| $ 24,114,333.89 | 07/01/2001 - 12/31/2001 | 184 | 7.00% | 0.000191781 | $ 24,980,380.05 | $ 866,046.16 |
| $ 24,980,380.05 | 01/01/2002 - 12/31/2002 | 365 | 6.00% | 0.000164384 | $ 26,524,949.69 | $ 1,544,569.64 |
| $ 26,524,949.69 | 01/01/2003 - 09/30/2003 | 273 | 5.00% | 0.000136986 | $ 27,535,621.31 | $ 1,010,671.62 |
| $ 27,535,621.31 | 10/01/2003 - 03/31/2004 | 183 | 4.00% | 0.000109589 | $ 28,093,386.21 | $ 557,764.90 |
| $ 28,093,386.21 | 04/01/2004 - 06/30/2004 | 91 | 5.00% | 0.000136986 | $ 28,445,759.04 | $ 352,372.82 |
| $ 28,445,759.04 | 07/01/2004 - 09/30/2004 | 92 | 4.00% | 0.000109589 | $ 28,733,989.40 | $ 288,230.36 |
| $ 28,733,989.40 | 10/01/2004 - 03/31/2005 | 182 | 5.00% | 0.000136986 | $ 29,459,325.67 | $ 725,336.27 |
| $ 29,459,325.67 | 04/01/2005 - 09/30/2005 | 183 | 6.00% | 0.000164384 | $ 30,358,915.80 | $ 899,590.14 |

Total accumulated interest April 15, 1999 through September 30, 2005: $ 10,358,915.80

Note 1: Interest rate equals the Federal Short-term rate plus 3% and is subject to daily compounding per IRC Section 6621.

*Schedule B, Continued*

*Note 1*

| Beginning Balance | Period | Number of days | Interest Rate | Daily Interest Rate | Value | Accumulated Interest |
|---|---|---|---|---|---|---|
| $ 15,000,000.00 | 04/15/2000 - 03/31/2001 | 351 | 9.00% | 0.000246575 | $ 16,355,880.20 | $ 1,355,880.20 |
| $ 16,355,880.20 | 04/01/2001 - 06/30/2001 | 91 | 8.00% | 0.000219178 | $ 16,685,340.14 | $ 329,459.94 |
| $ 16,685,340.14 | 07/01/2001 - 12/31/2001 | 184 | 7.00% | 0.000191781 | $ 17,284,580.19 | $ 599,240.06 |
| $ 17,284,580.19 | 01/01/2002 - 12/31/2002 | 365 | 6.00% | 0.000164384 | $ 18,353,308.44 | $ 1,068,728.25 |
| $ 18,353,308.44 | 01/01/2003 - 09/30/2003 | 273 | 5.00% | 0.000136986 | $ 19,052,618.64 | $ 699,310.20 |
| $ 19,052,618.64 | 10/01/2003 - 03/31/2004 | 183 | 4.00% | 0.000109589 | $ 19,438,550.81 | $ 385,932.17 |
| $ 19,438,550.81 | 04/01/2004 - 06/30/2004 | 91 | 5.00% | 0.000136986 | $ 19,682,366.81 | $ 243,816.00 |
| $ 19,682,366.81 | 07/01/2004 - 09/30/2004 | 92 | 4.00% | 0.000109589 | $ 19,881,800.96 | $ 199,434.15 |
| $ 19,881,800.96 | 10/01/2004 - 03/31/2005 | 182 | 5.00% | 0.000136986 | $ 20,383,680.15 | $ 501,879.19 |
| $ 20,383,680.15 | 04/01/2005 - 09/30/2005 | 183 | 6.00% | 0.000164384 | $ 21,006,130.16 | $ 622,450.01 |

Total accumulated Interest April 15, 2000 through September 30, 2005:  $ 6,006,130.16

*Note 1:* Interest rate equals the Federal Short-term rate plus 3% and is subject to daily compounding per IRC Section 6621.

*Note 1*

| Beginning Balance | Period | Number of days | Interest Rate | Daily Interest Rate | Value | Accumulated Interest |
|---|---|---|---|---|---|---|
| $ 17,000,000.00 | 04/15/2000 - 03/31/2001 | 351 | 9.00% | 0.000246575 | $ 18,536,664.22 | $ 1,536,664.22 |
| $ 18,536,664.22 | 04/01/2001 - 06/30/2001 | 91 | 8.00% | 0.000219178 | $ 18,910,052.16 | $ 373,387.93 |
| $ 18,910,052.16 | 07/01/2001 - 12/31/2001 | 184 | 7.00% | 0.000191781 | $ 19,589,190.89 | $ 679,138.73 |
| $ 19,589,190.89 | 01/01/2002 - 12/31/2002 | 365 | 6.00% | 0.000164384 | $ 20,800,416.23 | $ 1,211,225.35 |
| $ 20,800,416.23 | 01/01/2003 - 09/30/2003 | 273 | 5.00% | 0.000136986 | $ 21,592,967.80 | $ 792,551.56 |
| $ 21,592,967.80 | 10/01/2003 - 03/31/2004 | 183 | 4.00% | 0.000109589 | $ 22,030,357.59 | $ 437,389.79 |
| $ 22,030,357.59 | 04/01/2004 - 06/30/2004 | 91 | 5.00% | 0.000136986 | $ 22,306,682.39 | $ 276,324.80 |
| $ 22,306,682.39 | 07/01/2004 - 09/30/2004 | 92 | 4.00% | 0.000109589 | $ 22,532,707.75 | $ 226,025.37 |
| $ 22,532,707.75 | 10/01/2004 - 03/31/2005 | 182 | 5.00% | 0.000136986 | $ 23,101,504.17 | $ 568,796.42 |
| $ 23,101,504.17 | 04/01/2005 - 09/30/2005 | 183 | 6.00% | 0.000164384 | $ 23,806,947.51 | $ 705,443.35 |

Total accumulated Interest April 15, 2000 through September 30, 2005:  $ 6,806,947.51

*Note 1:* Interest rate equals the Federal Short-term rate plus 3% and is subject to daily compounding per IRC Section 6621.

*Note 1*

| Beginning Balance | Period | Number of days | Interest Rate | Daily Interest Rate | Value | Accumulated Interest |
|---|---|---|---|---|---|---|
| $ 20,000,000.00 | 04/15/2000 - 03/31/2001 | 351 | 9.00% | 0.000246575 | $ 21,807,840.26 | $ 1,807,840.26 |
| $ 21,807,840.26 | 04/01/2001 - 06/30/2001 | 91 | 8.00% | 0.000219178 | $ 22,247,120.18 | $ 439,279.92 |
| $ 22,247,120.18 | 07/01/2001 - 12/31/2001 | 184 | 7.00% | 0.000191781 | $ 23,046,106.92 | $ 798,986.74 |
| $ 23,046,106.92 | 01/01/2002 - 12/31/2002 | 365 | 6.00% | 0.000164384 | $ 24,471,077.92 | $ 1,424,971.00 |
| $ 24,471,077.92 | 01/01/2003 - 09/30/2003 | 273 | 5.00% | 0.000136986 | $ 25,403,491.53 | $ 932,413.61 |
| $ 25,403,491.53 | 10/01/2003 - 03/31/2004 | 183 | 4.00% | 0.000109589 | $ 25,918,067.75 | $ 514,576.22 |
| $ 25,918,067.75 | 04/01/2004 - 06/30/2004 | 91 | 5.00% | 0.000136986 | $ 26,243,155.75 | $ 325,088.00 |
| $ 26,243,155.75 | 07/01/2004 - 09/30/2004 | 92 | 4.00% | 0.000109589 | $ 26,509,067.94 | $ 265,912.20 |
| $ 26,509,067.94 | 10/01/2004 - 03/31/2005 | 182 | 5.00% | 0.000136986 | $ 27,178,240.20 | $ 669,172.25 |
| $ 27,178,240.20 | 04/01/2005 - 09/30/2005 | 183 | 6.00% | 0.000164384 | $ 28,008,173.55 | $ 829,933.35 |

Total accumulated Interest April 15, 2000 through September 30, 2005:  $ 8,008,173.55

*Note 1:* Interest rate equals the Federal Short-term rate plus 3% and is subject to daily compounding per IRC Section 6621.

Van De Veld, Shimizu, Canto and Fisher
**Schedule of Accumulated Interest**
**Taxpayer "F"**
**As of September 30, 2005**

*Schedule B, Continued*

*Note 1*

| Beginning Balance | Period | Number of days | Interest Rate | Daily Interest Rate | Value | Accumulated Interest |
|---|---|---|---|---|---|---|
| $ 15,000,000.00 | 04/15/2001 - 06/30/2001 | 77 | 8.00% | 0.000219178 | $ 15,255,270.72 | $ 255,270.72 |
| $ 15,255,270.72 | 07/01/2001 - 12/31/2001 | 184 | 7.00% | 0.000191781 | $ 15,803,151.03 | $ 547,880.31 |
| $ 15,803,151.03 | 01/01/2002 - 12/31/2002 | 365 | 6.00% | 0.000164384 | $ 16,780,280.57 | $ 977,129.54 |
| $ 16,780,280.57 | 01/01/2003 - 09/30/2003 | 273 | 5.00% | 0.000136986 | $ 17,419,654.20 | $ 639,373.63 |
| $ 17,419,654.20 | 10/01/2003 - 03/31/2004 | 183 | 4.00% | 0.000109589 | $ 17,772,508.83 | $ 352,054.04 |
| $ 17,772,508.83 | 04/01/2004 - 06/30/2004 | 91 | 5.00% | 0.000136986 | $ 17,995,427.82 | $ 222,918.98 |
| $ 17,995,427.82 | 07/01/2004 - 09/30/2004 | 92 | 4.00% | 0.000109589 | $ 18,177,768.84 | $ 182,341.02 |
| $ 18,177,768.84 | 10/01/2004 - 03/31/2005 | 182 | 5.00% | 0.000136986 | $ 18,636,632.90 | $ 458,864.06 |
| $ 18,636,632.90 | 04/01/2005 - 09/30/2005 | 183 | 6.00% | 0.000164384 | $ 19,205,733.88 | $ 569,100.98 |

Total accumulated interest April 15, 2001 through September 30, 2005: **$ 4,205,733.88**

*Note 1:* Interest rate equals the Federal Short-term rate plus 3% and is subject to daily compounding per IRC Section 6621.

*Note 1*

| Beginning Balance | Period | Number of days | Interest Rate | Daily Interest Rate | Value | Accumulated Interest |
|---|---|---|---|---|---|---|
| $ 17,000,000.00 | 04/15/2001 - 06/30/2001 | 77 | 8.00% | 0.000219178 | $ 17,289,306.81 | $ 289,306.81 |
| $ 17,289,306.81 | 07/01/2001 - 12/31/2001 | 184 | 7.00% | 0.000191781 | $ 17,910,237.83 | $ 620,931.01 |
| $ 17,910,237.83 | 01/01/2002 - 12/31/2002 | 365 | 6.00% | 0.000164384 | $ 19,017,651.31 | $ 1,107,413.48 |
| $ 19,017,651.31 | 01/01/2003 - 09/30/2003 | 273 | 5.00% | 0.000136986 | $ 19,742,274.75 | $ 724,623.45 |
| $ 19,742,274.75 | 10/01/2003 - 03/31/2004 | 183 | 4.00% | 0.000109589 | $ 20,142,176.68 | $ 399,901.92 |
| $ 20,142,176.68 | 04/01/2004 - 06/30/2004 | 91 | 5.00% | 0.000136986 | $ 20,394,818.20 | $ 252,641.52 |
| $ 20,394,818.20 | 07/01/2004 - 09/30/2004 | 92 | 4.00% | 0.000109589 | $ 20,601,471.35 | $ 206,653.15 |
| $ 20,601,471.35 | 10/01/2004 - 03/31/2005 | 182 | 5.00% | 0.000136986 | $ 21,121,517.28 | $ 520,045.93 |
| $ 21,121,517.28 | 04/01/2005 - 09/30/2005 | 183 | 6.00% | 0.000164384 | $ 21,766,498.39 | $ 644,981.11 |

Total accumulated interest April 15, 2001 through September 30, 2005: **$ 4,766,498.39**

*Note 1:* Interest rate equals the Federal Short-term rate plus 3% and is subject to daily compounding per IRC Section 6621.

*Note 1*

| Beginning Balance | Period | Number of days | Interest Rate | Daily Interest Rate | Value | Accumulated Interest |
|---|---|---|---|---|---|---|
| $ 20,000,000.00 | 04/15/2001 - 06/30/2001 | 77 | 8.00% | 0.000219178 | $ 20,340,360.96 | $ 340,360.96 |
| $ 20,340,360.96 | 07/01/2001 - 12/31/2001 | 184 | 7.00% | 0.000191781 | $ 21,070,868.03 | $ 730,507.08 |
| $ 21,070,868.03 | 01/01/2002 - 12/31/2002 | 365 | 6.00% | 0.000164384 | $ 22,373,707.42 | $ 1,302,839.39 |
| $ 22,373,707.42 | 01/01/2003 - 09/30/2003 | 273 | 5.00% | 0.000136986 | $ 23,226,205.59 | $ 852,498.17 |
| $ 23,226,205.59 | 10/01/2003 - 03/31/2004 | 183 | 4.00% | 0.000109589 | $ 23,696,678.45 | $ 470,472.85 |
| $ 23,696,678.45 | 04/01/2004 - 06/30/2004 | 91 | 5.00% | 0.000136986 | $ 23,993,903.76 | $ 297,225.31 |
| $ 23,993,903.76 | 07/01/2004 - 09/30/2004 | 92 | 4.00% | 0.000109589 | $ 24,237,025.12 | $ 243,121.36 |
| $ 24,237,025.12 | 10/01/2004 - 03/31/2005 | 182 | 5.00% | 0.000136986 | $ 24,848,843.86 | $ 611,818.75 |
| $ 24,848,843.86 | 04/01/2005 - 09/30/2005 | 183 | 6.00% | 0.000164384 | $ 25,607,645.17 | $ 758,801.31 |

Total accumulated interest April 15, 2001 through September 30, 2005: **$ 5,607,645.17**

*Note 1:* Interest rate equals the Federal Short-term rate plus 3% and is subject to daily compounding per IRC Section 6621.

Case 1:04-cv-00006    Document 346    Filed 08/11/2006    Page 18 of 22

*Schedule B, Continued*

*Note 1*

| Beginning Balance | Period | Number of days | Interest Rate | Daily Interest Rate | Value | Accumulated Interest |
|---|---|---|---|---|---|---|
| $ 15,000,000.00 | 04/15/2002 - 12/31/2002 | 261 | 6.00% | 0.000164384 | $ 15,657,511.73 | $ 657,511.73 |
| $ 15,657,511.73 | 01/01/2003 - 09/30/2003 | 273 | 5.00% | 0.000136986 | $ 16,254,104.86 | $ 596,593.13 |
| $ 16,254,104.86 | 10/01/2003 - 03/31/2004 | 183 | 4.00% | 0.000109589 | $ 16,583,349.99 | $ 329,245.13 |
| $ 16,583,349.99 | 04/01/2004 - 06/30/2004 | 91 | 5.00% | 0.000136986 | $ 16,791,353.46 | $ 208,003.47 |
| $ 16,791,353.46 | 07/01/2004 - 09/30/2004 | 92 | 4.00% | 0.000109589 | $ 16,961,494.04 | $ 170,140.58 |
| $ 16,961,494.04 | 10/01/2004 - 03/31/2005 | 182 | 5.00% | 0.000136986 | $ 17,389,655.50 | $ 428,161.46 |
| $ 17,389,655.50 | 04/01/2005 - 09/30/2005 | 183 | 6.00% | 0.000164384 | $ 17,920,677.92 | $ 531,022.43 |

Total accumulated interest April 15, 2002 through September 30, 2005:  **$ 2,920,677.92**

*Note 1:* Interest rate equals the Federal Short-term rate plus 3% and is subject to daily compounding per IRC Section 6621.

*Note 1*

| Beginning Balance | Period | Number of days | Interest Rate | Daily Interest Rate | Value | Accumulated Interest |
|---|---|---|---|---|---|---|
| $ 17,000,000.00 | 04/15/2002 - 12/31/2002 | 261 | 6.00% | 0.000164384 | $ 17,745,179.96 | $ 745,179.96 |
| $ 17,745,179.96 | 01/01/2003 - 09/30/2003 | 273 | 5.00% | 0.000136986 | $ 18,421,318.84 | $ 676,138.88 |
| $ 18,421,318.84 | 10/01/2003 - 03/31/2004 | 183 | 4.00% | 0.000109589 | $ 18,794,463.32 | $ 373,144.48 |
| $ 18,794,463.32 | 04/01/2004 - 06/30/2004 | 91 | 5.00% | 0.000136986 | $ 19,030,200.59 | $ 235,737.27 |
| $ 19,030,200.59 | 07/01/2004 - 09/30/2004 | 92 | 4.00% | 0.000109589 | $ 19,223,026.58 | $ 192,825.99 |
| $ 19,223,026.58 | 10/01/2004 - 03/31/2005 | 182 | 5.00% | 0.000136986 | $ 19,708,276.23 | $ 485,249.65 |
| $ 19,708,276.23 | 04/01/2005 - 09/30/2005 | 183 | 6.00% | 0.000164384 | $ 20,310,101.65 | $ 601,825.42 |

Total accumulated interest April 15, 2002 through September 30, 2005:  **$ 3,310,101.65**

*Note 1:* Interest rate equals the Federal Short-term rate plus 3% and is subject to daily compounding per IRC Section 6621.

*Note 1*

| Beginning Balance | Period | Number of days | Interest Rate | Daily Interest Rate | Value | Accumulated Interest |
|---|---|---|---|---|---|---|
| $ 20,000,000.00 | 04/15/2002 - 12/31/2002 | 261 | 6.00% | 0.000164384 | $ 20,876,682.31 | $ 876,682.31 |
| $ 20,876,682.31 | 01/01/2003 - 09/30/2003 | 273 | 5.00% | 0.000136986 | $ 21,672,139.82 | $ 795,457.51 |
| $ 21,672,139.82 | 10/01/2003 - 03/31/2004 | 183 | 4.00% | 0.000109589 | $ 22,111,133.32 | $ 438,993.51 |
| $ 22,111,133.32 | 04/01/2004 - 06/30/2004 | 91 | 5.00% | 0.000136986 | $ 22,388,471.29 | $ 277,337.96 |
| $ 22,388,471.29 | 07/01/2004 - 09/30/2004 | 92 | 4.00% | 0.000109589 | $ 22,615,325.39 | $ 226,854.10 |
| $ 22,615,325.39 | 10/01/2004 - 03/31/2005 | 182 | 5.00% | 0.000136986 | $ 23,186,207.33 | $ 570,881.94 |
| $ 23,186,207.33 | 04/01/2005 - 09/30/2005 | 183 | 6.00% | 0.000164384 | $ 23,894,237.23 | $ 708,029.90 |

Total accumulated interest April 15, 2002 through September 30, 2005:  **$ 3,894,237.23**

*Note 1:* Interest rate equals the Federal Short-term rate plus 3% and is subject to daily compounding per IRC Section 6621.

*Schedule B, Continued*

*Note 1*

| Beginning Balance | Period | Number of days | Interest Rate | Daily Interest Rate | Value | Accumulated Interest |
|---|---|---|---|---|---|---|
| $ 15,000,000.00 | 04/15/2003 - 09/30/2003 | 169 | 5.00% | 0.000136986 | $ 15,351,286.79 | $    351,286.79 |
| $ 15,351,286.79 | 10/01/2003 - 03/31/2004 | 183 | 4.00% | 0.000109589 | $ 15,662,244.33 | $    310,957.54 |
| $ 15,662,244.33 | 04/01/2004 - 06/30/2004 | 91 | 5.00% | 0.000136986 | $ 15,858,694.45 | $    196,450.13 |
| $ 15,858,694.45 | 07/01/2004 - 09/30/2004 | 92 | 4.00% | 0.000109589 | $ 16,019,384.74 | $    160,690.29 |
| $ 16,019,384.74 | 10/01/2004 - 03/31/2005 | 182 | 5.00% | 0.000136986 | $ 16,423,764.40 | $    404,379.66 |
| $ 16,423,764.40 | 04/01/2005 - 09/30/2005 | 183 | 6.00% | 0.000164384 | $ 16,925,291.71 | $    501,527.31 |

Total accumulated interest April 15, 2003 through September 30, 2005:      $   1,925,291.71

*Note 1:* Interest rate equals the Federal Short-term rate plus 3% and is subject to daily compounding per IRC Section 6621.

*Note 1*

| Beginning Balance | Period | Number of days | Interest Rate | Daily Interest Rate | Value | Accumulated Interest |
|---|---|---|---|---|---|---|
| $ 17,000,000.00 | 04/15/2003 - 09/30/2003 | 169 | 5.00% | 0.000136986 | $ 17,398,125.03 | $    398,125.03 |
| $ 17,398,125.03 | 10/01/2003 - 03/31/2004 | 183 | 4.00% | 0.000109589 | $ 17,750,543.57 | $    352,418.54 |
| $ 17,750,543.57 | 04/01/2004 - 06/30/2004 | 91 | 5.00% | 0.000136986 | $ 17,973,187.05 | $    222,643.48 |
| $ 17,973,187.05 | 07/01/2004 - 09/30/2004 | 92 | 4.00% | 0.000109589 | $ 18,155,302.71 | $    182,115.66 |
| $ 18,155,302.71 | 10/01/2004 - 03/31/2005 | 182 | 5.00% | 0.000136986 | $ 18,613,599.65 | $    458,296.94 |
| $ 18,613,599.65 | 04/01/2005 - 09/30/2005 | 183 | 6.00% | 0.000164384 | $ 19,181,997.27 | $    568,397.62 |

Total accumulated interest April 15, 2003 through September 30, 2005:      $   2,181,997.27

*Note 1:* Interest rate equals the Federal Short-term rate plus 3% and is subject to daily compounding per IRC Section 6621.

*Note 1*

| Beginning Balance | Period | Number of days | Interest Rate | Daily Interest Rate | Value | Accumulated Interest |
|---|---|---|---|---|---|---|
| $ 20,000,000.00 | 04/15/2003 - 09/30/2003 | 169 | 5.00% | 0.000136986 | $ 20,468,382.39 | $    468,382.39 |
| $ 20,468,382.39 | 10/01/2003 - 03/31/2004 | 183 | 4.00% | 0.000109589 | $ 20,882,992.44 | $    414,610.05 |
| $ 20,882,992.44 | 04/01/2004 - 06/30/2004 | 91 | 5.00% | 0.000136986 | $ 21,144,925.94 | $    261,933.50 |
| $ 21,144,925.94 | 07/01/2004 - 09/30/2004 | 92 | 4.00% | 0.000109589 | $ 21,359,179.66 | $    214,253.72 |
| $ 21,359,179.66 | 10/01/2004 - 03/31/2005 | 182 | 5.00% | 0.000136986 | $ 21,898,352.53 | $    539,172.88 |
| $ 21,898,352.53 | 04/01/2005 - 09/30/2005 | 183 | 6.00% | 0.000164384 | $ 22,567,055.62 | $    668,703.08 |

Total accumulated interest April 15, 2003 through September 30, 2005:      $   2,567,055.62

*Note 1:* Interest rate equals the Federal Short-term rate plus 3% and is subject to daily compounding per IRC Section 6621.

*Schedule B, Continued*

*Note 1*

| Beginning Balance | Period | Number of days | Interest Rate | Daily Interest Rate | Value | Accumulated Interest |
|---|---|---|---|---|---|---|
| $ 15,000,000.00 | 04/15/2004 - 06/30/2004 | 77 | 5.00% | 0.000136986 | $ 15,159,045.61 | $ 159,045.61 |
| $ 15,159,045.61 | 07/01/2004 - 09/30/2004 | 92 | 4.00% | 0.000109589 | $ 15,312,646.62 | $ 153,601.01 |
| $ 15,312,646.62 | 10/01/2004 - 03/31/2005 | 182 | 5.00% | 0.000136986 | $ 15,699,185.98 | $ 386,539.36 |
| $ 15,699,185.98 | 04/01/2005 - 09/30/2005 | 183 | 6.00% | 0.000164384 | $ 16,178,587.07 | $ 479,401.09 |

Total accumulated interest April 15, 2004 through September 30, 2005:    **$ 1,178,587.07**

*Note 1:* Interest rate equals the Federal Short-term rate plus 3% and is subject to daily compounding per IRC Section 6621.

*Note 1*

| Beginning Balance | Period | Number of days | Interest Rate | Daily Interest Rate | Value | Accumulated Interest |
|---|---|---|---|---|---|---|
| $ 17,000,000.00 | 04/15/2004 - 06/30/2004 | 77 | 5.00% | 0.000136986 | $ 17,180,251.69 | $ 180,251.69 |
| $ 17,180,251.69 | 07/01/2004 - 09/30/2004 | 92 | 4.00% | 0.000109589 | $ 17,354,332.83 | $ 174,081.14 |
| $ 17,354,332.83 | 10/01/2004 - 03/31/2005 | 182 | 5.00% | 0.000136986 | $ 17,792,410.78 | $ 438,077.94 |
| $ 17,792,410.78 | 04/01/2005 - 09/30/2005 | 183 | 6.00% | 0.000164384 | $ 18,335,732.01 | $ 543,321.24 |

Total accumulated interest April 15, 2004 through September 30, 2005:    **$ 1,335,732.01**

*Note 1:* Interest rate equals the Federal Short-term rate plus 3% and is subject to daily compounding per IRC Section 6621.

*Note 1*

| Beginning Balance | Period | Number of days | Interest Rate | Daily Interest Rate | Value | Accumulated Interest |
|---|---|---|---|---|---|---|
| $ 20,000,000.00 | 04/15/2004 - 06/30/2004 | 77 | 5.00% | 0.000136986 | $ 20,212,060.82 | $ 212,060.82 |
| $ 20,212,060.82 | 07/01/2004 - 09/30/2004 | 92 | 4.00% | 0.000109589 | $ 20,416,862.16 | $ 204,801.34 |
| $ 20,416,862.16 | 10/01/2004 - 03/31/2005 | 182 | 5.00% | 0.000136986 | $ 20,932,247.97 | $ 515,385.82 |
| $ 20,932,247.97 | 04/01/2005 - 09/30/2005 | 183 | 6.00% | 0.000164384 | $ 21,571,449.43 | $ 639,201.45 |

Total accumulated interest April 15, 2004 through September 30, 2005:    **$ 1,571,449.43**

*Note 1:* Interest rate equals the Federal Short-term rate plus 3% and is subject to daily compounding per IRC Section 6621.

*Schedule B, Continued*

*Note 1*

| Beginning Balance | Period | Number of days | Interest Rate | Daily Interest Rate | Value | Accumulated Interest |
|---|---|---|---|---|---|---|
| $ 15,000,000.00 | 04/15/2005 - 09/30/2005 | 169 | 6.00% | 0.000164384 | $ 15,422,519.40 | $ 422,519.40 |
| | Total accumulated interest April 15, 2005 through September 30, 2005: | | | | | $ 422,519.40 |

*Note 1:* Interest rate equals the Federal Short-term rate plus 3% and is subject to daily compounding per IRC Section 6621.

*Note 1*

| Beginning Balance | Period | Number of days | Interest Rate | Daily Interest Rate | Value | Accumulated Interest |
|---|---|---|---|---|---|---|
| $ 17,000,000.00 | 04/15/2005 - 09/30/2005 | 169 | 6.00% | 0.000164384 | $ 17,478,855.32 | $ 478,855.32 |
| | Total accumulated interest April 15, 2005 through September 30, 2005: | | | | | $ 478,855.32 |

*Note 1:* Interest rate equals the Federal Short-term rate plus 3% and is subject to daily compounding per IRC Section 6621.

*Note 1*

| Beginning Balance | Period | Number of days | Interest Rate | Daily Interest Rate | Value | Accumulated Interest |
|---|---|---|---|---|---|---|
| $ 20,000,000.00 | 04/15/2005 - 09/30/2005 | 169 | 6.00% | 0.000164384 | $ 20,563,359.20 | $ 563,359.20 |
| | Total accumulated interest April 15, 2005 through September 30, 2005: | | | | | $ 563,359.20 |

*Note 1:* Interest rate equals the Federal Short-term rate plus 3% and is subject to daily compounding per IRC Section 6621.

# EXHIBIT D

1   SHANNON TAITANO, ESQ.
    OFFICE OF THE GOVERNOR OF GUAM
2   Ricardo J. Bordallo Governor's Complex
3   Adelup, Guam  96910
    Telephone:    (671) 472-8931
4   Facsimile:    (671) 477-4826

5   RODNEY J. JACOB, ESQ.
    DANIEL M. BENJAMIN, ESQ.
6   CALVO AND CLARK, LLP
7   Attorneys at Law
    655 South Marine Drive, Suite 202
8   Tamuning, Guam  96913
    Telephone:    (671) 646-9355
9   Facsimile:    (671) 646-9403

10  Attorneys for *Felix P. Camacho, Governor of Guam*

11

12          IN THE UNITED STATES DISTRICT COURT
                    DISTRICT OF GUAM
13

14  JULIE BABAUTA SANTOS, et. al.,          CIVIL CASE NO. 04-00006

15                      Petitioners,

16              -v-                         **AMENDED MEMORANDUM OF
                                            POINTS AND AUTHORITIES IN
                                            SUPPORT OF OPPOSITION TO
17  FELIX P. CAMACHO, etc., et. al.         PETITIONER'S MOTION FOR
                                            APPROVAL OF THE
18                      Respondents.        ADMINISTRATIVE PLAN**

19

20

21

22

23

24

25

26

27

28              ORIGINAL

FILED
DISTRICT COURT OF GUAM
NOV 29 2004
MARY L. M. MORAN
CLERK OF COURT

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................. 1

STATEMENT OF FACTS ............................................................................................... 2

    A.   This Action and the EITC ............................................................................ 2
    B.   The Settlement Agreement.......................................................................... 3
    C.   The Governor's Investigation into the Legality of the Settlement.................... 4
    D.   The Efforts to Bind the Governor to an Illegal Agreement ............................ 5

ARGUMENT ................................................................................................................... 6

I.    SUBJECT MATTER JURISDICTION MUST BE ADDRESSED BEFORE THERE ARE
     FURTHER PROCEEDINGS IN THIS CASE ................................................................ 6

II.   THE SETTLEMENT AGREEMENT IS ILLEGAL .......................................................... 9

    A.   The Governor's Organic Act Authority Over Unencumbered Funds............... 10
    B.   The Guam Earned Income Program.............................................................. 12
    C.   The Income Tax Reserve Funds.................................................................... 12
    D.   Other Laws ................................................................................................. 14

III.  DISCOVERY AND A PROPERLY NOTICED FAIRNESS HEARING MUST
      PROCEED ANY ADMINISTRATIVE PLAN ................................................................ 14

    A.   Procedural Issues......................................................................................... 16
    B.   Lack of Adversarial Proceedings ................................................................ 18
    C.   Conflicts of Interest..................................................................................... 18
    D.   Lack of Discovery ....................................................................................... 19
    E.   Attorney's Fees ........................................................................................... 20
    F.   Substantive Fairness.................................................................................... 20

CONCLUSION................................................................................................................ 20

1

# TABLE OF AUTHORITIES

2

**Cases**

3

*Ace Heating & Plumbing Co. v. Crane Co.*, 453 F.2d 30 (3d Cir. 1971) ...................................... 16

4

*Allied Chem. Corp. v. Daiflon, Inc.*, 449 U.S. 33 (1980)................................................................ 8,9

5

*Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997) ................................................................. 15

6

7

*Ashoff v. City of Ukiah*, 130 F.3d 409 (9th Cir. 1997) ..................................................................... 8

8

*Bear Valley Mutual Water Co. v. Riddell*, 493 F.2d 948 (9th Cir. 1974) ........................................ 7

9

*Boyd v. United States*, 762 F.2d 1369 (9th Cir. 1985) ..................................................................... 7

10

*Blackhawk Heating & Plumbing Co. v. United States*, 622 F.2d 539 (Claims Ct. 1980).............. 11

11

*Class Plaintiffs v. City of Seattle*, 955 F.2d 1268 (9th Cir. 1992).................................................. 15

12

13

*Ficalora v. Lockheed Cal. Co.*, 751 F.2d 955 (9th Cir. 1985) ........................................................ 15

14

*Hanlon v. Chrysler Corp.*, 150 F.3d 1011 (9th Cir. 1998)........................................................... 6,16

15

*Heyl & Patterson Int'l v. Rich Housing of Virgin Islands, Inc.*, 663 F.2d 419 (3d Cir. 1981) ...... 10

16

*In Re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 738 (3d Cir.
1995) ........................................................................................................................................ 16,19

17

18

*In Re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454 (9th Cir. 2000) .................................................. 16

19

*Israel v. United States*, 356 F.3d 221 (2d Cir. 2004) .................................................................... 14

20

*Jeff D. v. Andrus*, 889 F.2d 753 (9th Cir. 1989)............................................................................. 11

21

*Lewis & Queen v. N.M. Ball Sons*, 48 Cal. 2d 141 (1957).............................................................. 6

22

*Local No. 93 v. City of Cleveland*, 478 U.S. 501 (1986) ................................................................. 6

23

24

*Martinez v. United States*, 595 F.2d 1147 (9th Cir. 1979) .............................................................. 7

25

*Molski v. Gleich*, 318 F.3d 937 (9th Cir. 2003) ............................................................................. 16

26

*Morongo Band of Mission Indians v. Cal. State Bd. of Equalization*, 858 F.2d 1376 (9th Cir.
1988) ............................................................................................................................................... 6

27

28

*Oatman v. Dept. of Treasury*, 34 F.3d 787 (9th Cir. 1994)........................................................... 7,8

1    *Ortiz v. Fiberboard Corp.*, 527 U.S. 815 (1999) ....................................................... 15,19

2    *Pangelinan v. Gutierrez*, 2003 Guam 13 (2003)....................................................... 9,10,12

3
4    *Quarty v. United States*, 170 F.3d 961 (9th Cir. 1999) ................................................ 7,8

5    *Rand v. United States*, 249 U.S. 503 (1918) ................................................................. 8

6    *Robert F. Simmons and Assocs. v. United States*, 360 F.2d 962 (Ct. Cl. 1966) ............ 10

7    *Rock Island R.R. Co. v. United States*, 254 U.S. 141 (1920) ....................................... 7

8    *Saunooke v. United States*, 8 Cl. Ct. 327 (1985)........................................................... 8

9    *Sorenson v. Sec'y of Treasury*, 475 U.S. 851 (1986) ............................................... 7,14,17

10   *Thompson v. Gaskill*, 315 U.S. 552 (1942)................................................................... 8

11   *Thompson v. McCombe*, 99 F.3d 352 (9th Cir. 1996) ................................................ 8

12
13   *Tucker v. Alexander*, 275 U.S. 228 (1927).................................................................. 7,8

14   *United Investors Life Ins. V. Waddell & Reed, Inc.*, 360 F.3d 960 (9th Cir. 2004)....................... 6

15   *United States ex rel. Girard Trust Co. v. Helvering*, 301 U.S. 540 (1937) ............... 9

16   *United States v. Boe*, 543 F.2d 151 (C.C.P.A. 1976) ................................................ 7

17   *United States v. Felt & Tarrant Mfg. Co.*, 283 U.S. 269 (1931)................................ 8

18   *Zucker v. Occidental Petroleum Corp.*, 192 F.3d 1323 (9th Cir. 1999) ...................... 15
19

## Statutes

21   11 G.C.A. § 4105 ..................................................................................................... 2,15

22   11 G.C.A. § 42103 .............................................................................................. 12,14,17

23   11 G.C.A. § 42104 .................................................................................................. 3,12,15

24   11 G.C.A. § 50105 .................................................................................................. 13,16

25   11 G.C.A. §§ 42101-04 ............................................................................................ 2,12

26   11 G.C.A. §§ 50103-05 .......................................................................................... 13,16

27   26 U.S.C. § 7422 ...................................................................................................... 7,8
28

26 U.S.C. § 6532 .......................................................................................................... 7,8,10

26 U.S.C. § 7422 .......................................................................................................... 7,8,10

48 U.S.C. § 1421i ................................................................................................... 2,7,8,13

48 U.S.C. § 1423j ............................................................................................................ 9,11

5 G.C.A. § 22401 ........................................................................................................ *en passim*

**Other Authorities**

1 *Civ. Actions Against the U.S.* § 1:15 ...................................................................... 9,11

15 C. Wright, A. Miller & E. Cooper, *Fed. Practice and Proc.* § 3844 ........................................... 7

7B Wright & Miller, *Fed. Practice & Proc.* § 1786 ....................................................... 21

7B Wright & Miller, *Fed. Practice & Proc.* § 1797 ............................................... 16,19,20

John C. Coffee, Jr., *Class Wars: The Dilemma of the Mass Tort Class Action*, 95 Colum. L. Rev.
    1343, 1367-82 (1995).................................................................................................. 15

Guam Public Law 23-74 ..................................................................................................... 2

Guam Public Law 24-59 ................................................................................................ 2,3,12,15

Guam Public Law 24-61 ..................................................................................................... 2

Guam Public Law 25-43 ................................................................................................... 13

Guam Public Law 25-176 ................................................................................................... 2

**Rules**

57 A.L.R. 3d 475.............................................................................................................. 18

Fed. R. Civ. P. 23 ................................................................................................... *en passim*

1

## INTRODUCTION

2    The Governor long has championed the EITC. But he cannot champion settlement

3 of this case at the expense of the laws of Guam and the public interest. The settlement here is

4 illegal because there is no appropriation or fund supporting its payment. The administrative plan

5 springs from this settlement, and the Governor has no choice but to oppose it as well.

6    The settlement occurred while the Governor was off-island. A subsequent inquiry

7 (and an opinion letter by the Attorney General) have revealed that the settlement violates Guam's

8 Illegal Expenditures Act. No officer of Guam may authorize expenditure before the Legislature

9 appropriates the money or where there is insufficient money in the fund that is intended to

10 support the expenditure. The settlement here contravenes this law. It would bind the

11 Government to pay $6 million to counsel, $54 million to a settlement fund, and tens of millions of

12 dollars more in future claims, without an appropriation and without adequate money in any

13 available fund. As the Guam Supreme Court held last year, such a contract is void and unlawful.

14    Even before this issue can be heard, there is a fundamental need to resolve subject

15 matter jurisdiction in this case. Petitioner's complaint does not allege that she exhausted her

16 administrative remedies. The Ninth Circuit repeatedly has held that a court cannot act in a tax

17 refund case without exhaustion. Similarly, no settlement that must be administered by the courts

18 (such as the settlement of a purported class action here) can be enforced absent subject matter

19 jurisdiction over the underlying action. Therefore, even before deciding the other issues, there

20 must be briefing to determine whether the Court has jurisdiction over this proceeding.

21    And even without the other issues, any attempt to obtain an administrative plan is

22 premature. Before a court may adopt an administrative plan in a class action settlement, it must

23 give final approval to the settlement itself. In class actions, courts safeguard the public interest by

24 ensuring that the terms of a settlement are fair to the parties and public. This requires scrutinizing

25 all circumstances surrounding the settlement to determine whether it is substantively fair and

26 reasonable. These issues must be explored in open court before the settlement (or any

27 administrative plan) may be approved.

28

MR041129-382-00010[Amended MP&A re Opp.toAdmin.Plan]                    1

**STATEMENT OF FACTS**

**A.    This Action and the EITC**

In February 2004, Julie Babauta Santos filed this action against the Governor of Guam, the Director of the Department of Revenue and Taxation, the Director of Department of Administration, the Attorney General, and the Government of Guam. The lawsuit seeks to recover the Earned Income Tax Credit ("EITC") on behalf of all eligible taxpayers.

Petitioner's lawsuit stems from a 1996 revenue ruling by Guam's Department of Revenue and Taxation, Revenue Ruling 96-001, which took the position that the EITC did not apply to Guam. This ruling purported to be based on 48 U.S.C. § 1421i(d), which states that the Territorial Income Tax mirrors the federal income tax law except where federal law is "manifestly inapplicable or incompatible."

After this ruling, then-Senator (now Governor) Camacho and others insisted that a means be found to fund the EITC. A series of legislation was passed to try to appropriate funds to pay the EITC. This began with Public Law 23-74, which added 11 G.C.A. § 4105 to the G.C.A. That section stated that the EITC would apply on Guam and that: "There is hereby appropriated from the General Fund, on a continuing basis, such funds as are necessary to give this statute its full force and effect." However, 11 G.C.A. § 4105 (and therefore its appropriation) was subsequently repealed by Public Law 25-176, § 24 ("Chapter 4 of Division 1 of Title 11 of the Guam Code Annotated is hereby *repealed* in its entirety.") (italics in original).

The effort to appropriate funds to pay the EITC was continued in Public Law 24-61 in 1997. That law created the Earned Income Program, which mirrored the federal EITC and identified a source of funds for this payment of the EITC. *See* 11 G.C.A. §§ 42101-04. As amended in 1999, the appropriation provision states:

> Authorization to Spend. For Fiscal Year 1998 and each year thereafter, the Department of Revenue and Taxation is authorized on a continuing basis to spend funds from the Provisions of Refunds as set out in "Exhibit A" of Public Law Number 24-59 for Fiscal Years 1998 and 1999 in such amounts as are necessary to pay the Earned Income program subsidies under this Chapter.

11 G.C.A. § 42104 (current through 2004).

MR041129-382-00010[Amended MP&A re Opp.toAdmin.Plan]    2

1

2          The "Provisions of Refunds as set out in 'Exhibit A' of Public Law Number 24-59

3    for Fiscal Years 1998 and 1999" referenced in 11 G.C.A. § 42104 was a general provision in the

4    1998/1999 budget for tax refunds of $50.2 million.  Unfortunately, the Provisions for Refunds for

5    the 1998 and 1999 Fiscal Years has been exhausted.  (Decl. of Jose S. Calvo ("Calvo Decl.") at ¶

6    3.)  Since that time, the Legislature has failed to make any new appropriation or reserve to pay the

7    previously unpaid EITC amounts.  The most that has occurred is the passage of two laws directed

8    at future budgeting for the payment of the EITC in *future* tax years (Chapters 50 of Title 11, as

9    amended in 1999, and Chapter 51 of Title 11, as enacted in 2002).  But no appropriation has been

10    made to cover the non-payment of the EITC for all the previous years (1996-1999), and the funds

11    are, in any case, depleted such that they cannot cover the subsequent years (2000-2003).

         B.      The Settlement Agreement

12          In June 2004, while the Governor was off-island, Acting Governor Moylan and

13    Attorney General Moylan entered into a settlement agreement with petitioner's counsel.  The

14    settlement agreement provided that the Government of Guam would pay $60 million as the

15    Settlement Amount and that the Government would pay the EITC tax credit in future tax years.

16    The agreement did not identify any source of appropriation.  The agreement was not contingent

17    on the Legislature appropriating funds to make these payments.  Yet, it called for a payment of

18    $17 million in the first year alone.

19          After reaching this agreement, the Attorney General and petitioner's counsel

20    submitted a stipulated order preliminarily approving the settlement that was signed on June 17,

21    2004.  They subsequently submitted a stipulated order for approval of attorney's fees that was

22    signed on June 24, 2004.  That stipulation stated that petitioner's counsel was to receive "ten

23    percent (10%) of the Settlement Amount," *i.e.* $6 million.

24          The settlement agreement contained a stipulation that this case was a class action

25    and that the "class" included individuals who "were and are entitled to be paid refundable earned

26    income tax credits ... for any of the following tax years:  1996, 1998, 1999, 2000, 2001, 2002,

27

28

and 2003." Prior to that time, the issue of class certification had not been briefed and no discovery occurred. Tax year 1996 was not even included in petitioner's complaint.

On June 24, 2004, a stipulated order that established the "class notice" was signed. The notice published pursuant to the order stated that there had been a settlement and that class members could opt out. It did not state that they could appear represented by counsel to object. It did not identify the dangers of opting out or in. It did not mention an administrative plan, who would pay for it, or what the plan would be. The Attorney General and petitioner later stipulated that the notice was not adequately published: "The parties agree that the original notice approved by this Court was not published for three full weeks in the local newspapers in accordance with the parties' agreement...Notwithstanding the failure to fully publish the original notice as agreed, the parties agree that individual notices to members of the class regarding the class action and proposed settlement would be best for all parties involved." A revised notice was attached to this stipulation, but it never was sent out to putative class members.

On July 14, 2004, petitioner filed a motion to appoint petitioner's counsel as "class counsel." Two days later, he was appointed "interim class counsel."

C.    **The Governor's Investigation into the Legality of the Settlement**

In August 2004, an individual filed a lawsuit similar to this one seeking refunds of the EITC. The Governor and the Attorney General, among others, were named as defendants. Because he perceived a conflict, the Governor retained independent legal counsel.

After conducting legal research in connection with the other lawsuit, the Governor's legal counsel became concerned regarding the legality of the settlement in this case and wrote to the Attorney General's office to inquire as to these concerns. (Decl. of Rodney J. Jacob submitted concurrently herewith ("Jacob Decl.") at Exh. A.) Principal among the concerns was the issue of how the settlement would be funded. (*Id.*)

In response, the Attorney General's office sent a letter to the Governor advising him that the settlement was illegal with regard to the payment of future EITC tax credits, but that it was legal with regard to the payment of the $60 million. (Jacob Decl. Exh. C.) It further stated

1    that the term regarding future payments could expose the Governor and other Government

2    defendants to criminal prosecution if they proceeded. (*Id.*)

3         The Governor made multiple oral and written requests for information regarding

4    the negotiation of settlement and the advice that the Attorney General had provided to the

5    government defendants at the time that the settlement was signed. (Jacob Decl. A, E.) He

6    received nothing from the Attorney General for almost two months. On November 8, 2004, the

7    Governor finally received a letter from the Attorney General. It offered no explanation of the

8    negotiations and stated that "there is no written documentation regarding the history of the

9    negotiations leading up to the Settlement Agreement." (Jacob Decl. Exh. F.)

10        **D.    The Efforts to Bind the Governor to an Illegal Agreement**

11        Given the concerns about the legality of the settlement, the Governor asked the

12   Attorney General to consult him before taking any further steps in this case. On October 25,

13   2004, petitioner filed the proposed administrative plan. Two days later, the Attorney General's

14   office informed the Governor that it would obtain an extension until November 29 to respond to

15   the plan. (Jacob Decl. Exh. D.) Instead, the Attorney General filed a response to the Plan without

16   consulting his client, the Governor. The Attorney General sent a letter alerting the Governor to

17   this intent that was received by the Governor's central files less than *one hour* before the filing

18   was due on Monday, November 8. (Jacob Decl. Exh. F.)

19        The Attorney General's response sought to continue to enforce the settlement, but

20   also to impose new terms that were not agreed to by the parties. First, it seeks to have the

21   Department of Administration administer the settlement, rather than the Department of Revenue

22   and Taxation, as the settlement agreement states. Second, it proposes conducting a series of

23   setoffs against any money paid out through the settlement for any money owed to "the Guam

24   Memorial Hospital Authority, the Child Support Collection Division of the Attorney General's

25   Office and the Guam Housing and Urban Renewal Authority." (AG Br. at 4:24-5:2.)[1]

26

27   _____

28   [1] The response also attempts to prevent the Governor from asserting his interests through independent counsel. That issue is addressed in a separate concurrent filing.

1

2       Because the Attorney General's response did not reflect the Governor's position or

3   disclose the illegality of the contract, the Governor filed a request to be heard by this Court. In

4   response, petitioner's counsel drafted a letter threatening to move for contempt if the Governor

5   did not immediately commences payments under the settlement. (Jacob Decl. H.) On November

6   12, 2004, the Court issued an Order setting a briefing schedule and explaining that "the Court

7   believes the Defendant should be heard."

## ARGUMENT

8       Before the Court may enforce the settlement agreement, it must determine: (1)

9   whether the Court has jurisdiction over this case; (2) whether the settlement is legal; and (3)

10  whether it is fair and reasonable. *United Investors Life Ins. V. Waddell & Reed, Inc.*, 360 F.3d

11  960, 966-67 (9th Cir. 2004) (quotations omitted) ("a district court's duty to establish subject

12  matter jurisdiction is not contingent upon the parties' arguments. It is well established that lack

13  of federal jurisdiction cannot be waived or be overcome by an agreement of the parties."); *Lewis*

14  *& Queen v. N.M. Ball Sons*, 48 Cal. 2d 141, 147-48 (1957) ("when the evidence shows that the

15  plaintiff in substance seeks to enforce an illegal contract … the court has both the power and duty

16  to ascertain the true facts in order that it may not unwittingly lend its assistance"); *Hanlon v.*

17  *Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998) (in class actions, court must determine

18  "whether a proposed settlement is fundamentally fair, adequate, and reasonable").

19.

20  **I.    SUBJECT MATTER JURISDICTION MUST BE ADDRESSED BEFORE
        THERE ARE FURTHER PROCEEDINGS IN THIS CASE**

21      Federal subject-matter jurisdiction must exist before the Court can enter a consent

22  decree such as that proposed in this case. "[A] federal court is more than 'a recorder of contracts'

23  from whom parties can purchase injunctions; it is 'an organ of government constituted to make

24  judicial decisions....' Accordingly, a consent decree must spring from and serve to resolve a

25  dispute within the court's subject-matter jurisdiction." *Local No. 93 v. City of Cleveland*, 478

26  U.S. 501, 525 (1986) (internal citation omitted, ellipses in original). The parties cannot evade

27  jurisdictional requirements by stipulation. *Morongo Band of Mission Indians v. Cal. State Bd. of*

28  *Equalization*, 858 F.2d 1376, 1380 (9th Cir. 1988) ("The parties have no power to confer

jurisdiction on the district court by agreement or consent."). "If jurisdiction is lacking at the outset, the district court has no power to do anything with the case except dismiss ... and any order other than to dismiss is a nullity." *Id.* at 1380-81 (citing 15 C. Wright, A. Miller & E. Cooper, *Fed. Practice and Proc.* § 3844 at 332 and *United States v. Boe*, 543 F.2d 151, 159 (C.C.P.A. 1976)) (brackets and quotations omitted).

Here, it appears that no subject matter jurisdiction exists. Petitioner states claims for tax refunds and mandamus. Where a petitioner seeks a tax refund, administrative exhaustion is required before a suit to recover the refund may be filed:

> No suit or proceeding shall be maintained in any court for the recovery of any internal revenue tax alleged to have been erroneously or illegally assessed or collected, or of any penalty claimed to have been collected without authority, or of any sum alleged to have been excessive or in any manner wrongfully collected, until a claim for refund or credit has been duly filed....

26 U.S.C. § 7422(a).[2] The Ninth Circuit repeatedly has recognized that a plaintiff's failure to exhaust a tax-refund claim deprives a court of subject-matter jurisdiction. *Quarty v. United States*, 170 F.3d 961, 972 (9th Cir. 1999); *Boyd v. United States*, 762 F.2d 1369, 1372 (9th Cir. 1985); *Martinez v. United States*, 595 F.2d 1147, 1148 (9th Cir. 1979) (per curiam)); *Bear Valley Mut. Water Co. v. Riddell*, 493 F.2d 948, 951 (9th Cir. 1974). Each plaintiff must individually prove exhaustion. *Oatman v. Dept. of Treasury*, 34 F.3d 787, 789 (9th Cir. 1994) ("The district court lacks jurisdiction over claims for refunds pressed by any potential class members who have not satisfied the procedural requirements of 26 U.S.C. §§ 6532 and 7422.") (citing *Sorenson v. Sec'y of Treasury*, 752 F.2d 1433, 1440 (9th Cir. 1985)). Further, the exhaustion requirement cannot be excused based upon futility. As the Ninth Circuit recently reaffirmed:

> An anticipated rejection of the claim, which the statute contemplates, is not a ground for suspending its operation. Even though formal, the condition upon which the consent to suit is given is defined by the words of the statute, and "they mark the conditions of the claimant's right.' *Rock Island R.R. Co. v. United States*, 254 U.S. 141, 143 [(1920)]. Compliance may be dispensed with by waiver, as an administrative act, *Tucker v. Alexander, supra* [275

---

[2] The Organic Act provides that the income tax laws in force in the United States of America "shall be held to be likewise in force in Guam." 48 U.S.C. § 1421i(a). Terminology in those tax laws is changed to make their application to Guam clear. 48 U.S.C. § 1421i(e).

1    U.S. 228 (1927)]; but it is not within the judicial province to read
2    out of the statute the requirement of its words, *Rand v. United States*, 249 U.S. 503, 510 [(1918)].

3    *Quarty*, 170 F.3d at 973 (quoting *United States v. Felt & Tarrant Mfg.*, 283 U.S. 269, 273 (1931)).

4    Because petitioner bears the burden of proving subject-matter jurisdiction and has

5    not alleged or provided any evidence that the exhaustion requirement has been satisfied, the Court

6    lacks jurisdiction. *E.g.*, *Thompson v. Gaskill*, 315 U.S. 442, 447 (1942) ("The record contains no

7    showing of the requisite jurisdictional amount, and the district court was therefore without

8    jurisdiction"); *Ashoff v. City of Ukiah*, 130 F.3d 409, 410 (9th Cir. 1997) ("The plaintiff (here the

9    appellant) bears the burden of establishing subject matter jurisdiction."); *Thompson v. McCombe*,

10   99 F.3d 352, 353 (9th Cir. 1996) ("A party invoking the federal court's jurisdiction has the burden

11   of proving the actual existence of subject matter jurisdiction.").

12   None of this can surprise the Attorney General. He has joined in the Governor's

13   motion to dismiss a similar class action precisely because exhaustion and other issues prevent the

14   assertion of jurisdiction over tax refund class actions—which is why almost every court to

15   consider the issue has rejected such class actions. (Jacob Decl. Exh. J at 15-18 (brief of the

16   Governor collecting authorities); Exh. K at 2 (Attorney General's brief joining this argument).)

17   *See Oatman v. Dept. of Treasury*, 34 F.3d 787, 789 (9th Cir. 1994) ("court lacks jurisdiction over

18   claims for refunds pressed by any potential class members who have not satisfied the procedural

19   requirements of 26 U.S.C. §§ 6532 and 7422.") (citation omitted); *Saunooke v. United States*, 8

20   Cl. Ct. 327, 330-31 (1985) (rejecting class certification in tax refund cases because court had to

21   be able to individually determine that each class member met the jurisdictional prerequisites).

22   It also appears that petitioner cannot cure the jurisdictional deficiencies by asking

23   for "a writ in the nature of mandamus" in lieu of a tax refund. (*See* Compl. ¶ 27.) Mandamus is a

24   drastic remedy "only to be invoked in extraordinary situations." *Allied Chem. Corp. v. Daiflon,

25   Inc.*, 449 U.S. 33, 34 (1980). "In order to insure that the writ will issue only in extraordinary

26   circumstances, this Court has required that a party seeking issuance have no other adequate means

27   to attain the relief he desires, and that he satisfy the burden of showing that his right to issuance

28   of the writ is clear and indisputable." *Id.* at 35 (citations, quotations and brackets omitted).

1    Here, the government has provided administrative remedies for obtaining the relief

2    petitioner seeks and the ability to sue for a refund in district court once the remedy is exhausted.

3    That petitioner has chosen not to avail herself of these remedies does not entitle her to

4    extraordinary relief. *United States ex rel. Girard Trust Co. v. Helvering*, 301 U.S. 540, 542-44

5    (1937) (mandamus for tax refund unavailable where party could pursue administrative remedy

6    and then maintain suit in district court because "mandamus may not be employed to secure the

7    adjudication of a disputed right for which an ordinary suit affords a remedy equally adequate and

8    complete"); 1 *Civ. Actions Against the U.S.* § 1:15 (collecting authorities) ("Because mandamus

9    is not available when other remedies are adequate to afford full relief, a party must first exhaust

10    administrative remedies."). Moreover, neither petitioner nor any putative class members have

11    satisfied "their burden of showing that [their] right to issuance of the writ is clear and

12    indisputable" given their failure to allege or prove exhaustion. *Allied Chem.*, 449 U.S. at 35. For

13    these reasons, briefing and a hearing on jurisdiction should be conducted.

14    II.        **THE SETTLEMENT AGREEMENT IS ILLEGAL**

15    The Organic Act of Guam expressly reserves the power to appropriate money to

16    the Legislature. *Pangelinan v. Gutierrez*, 2003 Guam 13, at ¶15 (2003), *reconsidered in part on*

17    *other grounds* 2004 Guam 16 (citing 48 U.S.C. § 1423j(a)). Consequently, the Illegal

18    Expenditures Act, 5 G.C.A. § 22401, forbids officers from binding the Government to contracts

19    that spend unappropriated monies or in excess of the amount of money in a fund:

20            No officer or employee of the government of Guam, including the
21            Governor of Guam, shall:

22            (1) Make or authorize any expenditure from, or create or authorize
              any obligation under, any appropriation or fund in excess of the
23            amount available therein, or for other than an authorized purpose;

24            (2) Commence, continue, or proceed with any operational activity,
              construction, improvement, contract, or obligation without an
25            appropriation or fund for the payment thereof; or after any such
              appropriation or fund is exhausted;

26
              (3) Involve the government of Guam in any contract or other
27            obligation, for the payment of money for any purpose, in advance
              of the appropriation made for such purpose.

28

MR041129-382-00010[Amended MP&A re Opp.toAdmin.Plan]                    9

5 G.C.A. § 22401(a).

A violation of this Act voids a contract and makes it unenforceable under Guam law. *Pangelinan*, 2003 Guam 13, at ¶25 ("If contracts violative of statutory prohibitions may be executed by government agencies and subsequently enforced, the power of the legislature and the processes of government itself would be undermined.") (quoting *Heyl & Patterson Int'l v. Rich Housing of Virgin Islands, Inc.*, 663 F.2d 419, 432 (3d Cir. 1981)); *Robert F. Simmons and Assocs. v. United States*, 360 F.2d 962, 965 (Ct. Cl. 1966) ("It is settled law that an agency of the Government cannot create a binding contract without the authority of an appropriation of funds from the Congress to cover the contract. If such an unauthorized contract is entered into, it is a nullity."). As the Attorney General himself explained to the Guam Supreme Court just last year, a contract that violates 5 G.C.A. § 22401 must be declared "Null and Void." (Jacob Decl. Exh. I at 8 (Brief of the Attorney General in *Pangelinan v. Gutierrez*).)

The settlement contract here requires three different expenditures that violate the Illegal Expenditures Act. Without an appropriation, it requires (1) the payment of $6 million in attorney's fees to class counsel; (2) the payment of $54 million in alleged tax refund claims, including $17 million in the first year alone; and (3) the Government to pay the Earned Income Tax Credit in all future tax years, which could cost the Government tens of millions more. Because the Attorney General was his counsel, the Governor requested an opinion regarding these expenditures pursuant to 5 G.C.A. § 30107. The Attorney General opined that any obligation to make future payments violated the Illegal Expenditures Act. He stated that the $60 million provision was legal based upon the Governor's power to spend unencumbered funds under 48 U.S.C. section 1421i(h)(3). (*See* Jacob Decl. Exh. C.) As explained below, the Governor believes that advice to be incorrect.

A.    **The Governor's Organic Act Authority Over Unencumbered Funds**

The Attorney General has rationalized that the Governor can use the following Organic Act power to make the $6 million attorneys' fees and $54 million settlement payments:

> Suits for the recovery of any Guam Territorial income tax alleged to
> have been erroneously or illegally assessed or collected, or of any

1
2
3
4
5
6

penalty claimed to have been collected without authority, or of any sum alleged to have been excessive or in any manner wrongfully collected, under the income-tax laws in force in Guam, pursuant to subsection (a) of this section, may, regardless of the amount of claim, be maintained against the government of Guam subject to the same statutory requirements as are applicable to suits for the recovery of such amounts maintained against the United States in the United States district courts with respect to the United States income tax. **When any judgment against the government of Guam under this paragraph has become final, the Governor shall order the payment of such judgments out of any unencumbered funds in the treasury of Guam.**

7

48 U.S.C. § 1421i(h)(2) (emphasis added).

8
9
10
11
12
13
14
15
16
17
18

This power does not authorize the $60 million settlement payment in this case. It states the Governor can pay "final judgments" from "unencumbered funds." But nowhere is it stated that the Governor can contract for such "final judgments." Such a reading of this statute would permit the Governor (or Lt. Governor when the Governor was gone) to circumvent the appropriations process for any expenditure. A settlement agreement is a contract. *Jeff D. v. Andrus*, 889 F.2d 753, 759 (9th Cir. 1989) ("An agreement to settle a legal dispute is a contract and its enforceability is governed by familiar principles of contract law."). It is subject to restrictions on the expenditures of unappropriated funds. *Cf. Blackhawk Heating & Plumbing Co. v. United States*, 622 F.2d 539, 542, 553 (Claims Ct. 1980) (enforcing provision of settlement contract that was contingent on funding pursuant to comparable federal Anti-Deficiency Act).

19
20
21
22

Moreover, the "final judgment" exception does not apply because there has been no final judgment, yet the contract requires payments starting 30 days after preliminary approval was given. Requiring payments before any final judgment is entered further demonstrates that this contract was unlawfully designed to obligate the Government in advance of an appropriation being made (as opposed to in contemplation of this power over unencumbered funds).

23
24
25
26
27
28

The Governor does not have access to anything close to the amount of the monthly payments in unencumbered funds each month that are required by the settlement contract. Under the contract, the Governor is supposed to make payments totaling $17 million in the first year alone. Without violating a Legislative appropriation to fund other projects, the Governor does not have access to $17 million in unencumbered funds in a single year. The only way in which this

1    contract can be funded is if it forces the Legislature to make an appropriation to meet the contract

2    and avoid having the Government held in contempt[3]—which is exactly the type of forced

3    appropriation that the Illegal Expenditures Act exists to prevent. *See* 5 G.C.A. § 22401(a)(1)-(2)

4    (forbidding obligations in excess of any appropriation or fund).

5            Finally, as the Attorney General concedes (Jacob Decl. Exh. C), the power to pay

6    final tax judgments cannot authorize the payment of the EITC in the future. By its plain terms, it

7    only applies to final tax judgments; future EITC payments do not fall within authority.

8            **B.    The Guam Earned Income Program**

9            Under existing law, the settlement also cannot be funded by Guam's Earned

10   Income Program. As explained previously, 11 G.C.A. § 4105 contained an express appropriation

11   to pay the EITC indefinitely, but this was repealed in Public Law 25-176, § 24. As amended in

12   1999, 11 G.C.A. § 42104 states: "For Fiscal Year 1998 and each year thereafter, the Department

13   of Revenue and Taxation is authorized on a continuing basis to spend funds **from the Provisions**

14   **of Refunds as set out in "Exhibit A" of Public Law Number 24-59 for Fiscal Years 1998 and**

15   **1999** in such amounts as are necessary to pay the Earned Income program subsidies under this

16   Chapter." (emphasis added). However, the bolded text was a reference to a specific set-aside of

17   $50.2 million in Exhibit A to the budget bill for fiscal years 1998 and 1999 (which was P.L. 24-

18   59). This set-aside for tax returns has been spent. (Calvo Decl. ¶ 3.) Guam's Earned Income

19   Program contains no other appropriation. *See* 11 G.C.A. §§ 42101-04 (containing the Program in

20   its entirety). Consequently, this Program has no appropriation to  pay the $60 million settlement

21   payment or the EITC in future years. *See* 5 G.C.A. § 22401(2) (prohibition against expenditures

22   of exhausted appropriations or funds).[4]

23           **C.    The Income Tax Reserve Funds**

24           Another issue not addressed by the Attorney General is funding the settlement

25   from the Income Tax Reserve Funds created by Chapters 50 and 51 of Title 11 of the G.C.A. In

26   _____

27   [3] Petitioner's counsel recently threatened the Government with a contempt motion if it
     does not start to make the unlawful payments. (*See* Jacob Decl. Exh. H.)

28   [4] It also never authorized expenditure of $6 million on attorneys' fees or $7 million in
     additional administrative costs even when funded.

June of 1999, the Legislature amended the Income Tax Reserve Fund to require that a formula be devised for reserving for EITC payments as well as tax refunds. Under the law, there are yearly reservations to pay each *future* year's income tax refunds, EITC payments, and child tax credits based on the average of such payments over the last three years. 11 G.C.A. §§ 50103-05. This reservation for *future* payments was extended effective October 1, 2002 to require deposits on a monthly and quarterly basis, and transfer to the reserve fund at the end of each year. *Id.* § 51102.

Obviously, these laws only authorize expenditures for tax refunds, the EITC, or the child tax credit. 11 G.C.A. § 50105. They therefore can authorize neither the diversion of $6 million in attorneys' fees, nor $1 million in administrative costs.

However, even as to the $54 million, the settlement fails to comply with the Illegal Expenditures Act. The settlement attempts to pay claims from tax years 1996, 1998, and 1999 (as well as 2000-2003). No reserves for the EITC were occurring at that time because there was no EITC reserves provision until June 1999. *See* P.L. 25-43. The Illegal Expenditures Act states that no officer can "[m]ake or authorize any expenditure from, or create or authorize any obligation under, <u>any appropriation or *fund* in excess of the amount available therein, or for other than an authorized purpose</u>" or to continue such expenditures. 5 G.C.A. § 22401(a)(1)-(2) (emphasis added). If the Governor tried to use the reserve fund to pay for tax years 1996-1999 he would therefore by violating the Act. Yet, this is exactly what the Settlement Agreement requires in Section V(A)(4) of that contract, which states that claims for tax year 1996 and then 1998 must be paid first.

Further, the reserves are done on a year-by-year basis reflecting the present year's need for reserves. This means that the government cannot reserve, for example, more in 2004 than is needed to pay 2004 tax refunds and EITC and child tax credits. *See* 11 G.C.A. §§ 50103-05. Consequently, there cannot be enough in the reserves to both honor the present obligations of the Government going forward (as is required by the reserves law) and pay this settlement as to tax years 1996, 1998, and 1999.

MR041129-382-00010[Amended MP&A re Opp.toAdmin.Plan]                    13

1    Next, as everyone who lives on Guam knows, Guam does not have *any* income tax

2    reserves at present. The "reserve funds" are exhausted because Guam is trying to pay off a multi-

3    year backlog of refunds developed during the previous administration. Therefore, the settlement

4    could not have been based on these non-existent reserve funds. 5 G.C.A. § 22401(a) (contract is

5    illegal if funds are inadequate or exhausted).

6    Finally, although sometimes called a "refund" because it is *administered* as though

7    it was a refund, the EITC is actually a social subsidy, and not a true refund at all. *See* 11 G.C.A.

8    § 42103 (explaining that the EITC is a "subsidy"). It "was enacted to reduce the disincentive to

9    work caused by the imposition of Social Security taxes on earned income (welfare payments are

10   not similarly taxed), to stimulate the economy by funneling funds to persons likely to spend the

11   money immediately, and to provide relief for low-income families hurt by rising food and energy

12   prices." *Sorenson v. Sec'y of Treasury*, 475 U.S. 851, 864 (1986) (citations omitted). Thus, "the

13   EIC does permit taxpayers to receive more from the government than they pay in taxes." *Israel v.*

14   *United States*, 356 F.3d 221, 223 (2d Cir. 2004). It "is a credit unlike other credits in the tax

15   code--not only can it be used 'to off-set tax that would otherwise be owed,' it is 'refundable' even

16   if the taxpayer had no tax liability." *Id.* (quoting *Sorenson*, 475 U.S. at 854). Because it is a

17   subsidy, the only proper source for paying back EITC payments has to be an appropriation.

18   **D.    Other Laws**

19   Although the Attorney General did not explain this in his opinion letter to the

20   Governor, it appears from his brief that the settlement is illegal because it does not mandate the

21   setoffs required by the Internal Revenue Code. (AG MPA at 4-5.) This defect cannot be cured

22   through the administrative plan because that would require the Court to rewrite the settlement in a

23   manner that was not agreed upon by the parties or disclosed to the putative class members.

24   **III.    DISCOVERY AND A PROPERLY NOTICED FAIRNESS HEARING**

25   **MUST PROCEED ANY ADMINISTRATIVE PLAN**

26   Before the Court may issue an order approving the administrative plan, it first

27   must finally approve the settlement. In addition to its independent duties to assess the legality of

28   the agreement and inquire into its own jurisdiction to act, Rule 23(e) requires a court to protect

MR041129-3K2-00010[Amended MP&A re Opp.toAdmin.Plan]                    14

the public interest by ensuring that the settlement is fair and reasonable, paying "undiluted, even heightened attention in the settlement context." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997); *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1290 (9th Cir. 1992) (quoting *Ficalora v. Lockheed Cal. Co.*, 751 F.2d 955, 997 (9th Cir. 1985)) ("Before approving a class settlement, the district court must reach a reasoned judgment that the proposed agreement is not the product of fraud or overreaching by, or collusion among, the negotiating parties.").

"Some courts have described their duty under Rule 23(e) as a 'fiduciary responsibility' of ensuring that the settlement is fair and not the product of collusion." *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 738, 805 (3d Cir. 1995) (citations omitted). Class actions differ from regular cases in that they affect the rights of members of the public who are not before the Court, who have not had the opportunity to consult with counsel, and who have not had an opportunity to be heard. *See Ortiz v. Fiberboard Corp.*, 527 U.S. 815, 847 (1999) ("The legal rights of absent class members ... are resolved regardless of either their consent, or, in a class with objectors, their express wish to the contrary"). Further, in class actions, special incentives and opportunities for collusion exist. *E.g.*, *Zucker v. Occidental Petroleum Corp.*, 192 F.3d 1323, 1327 (9th Cir. 1999) ("absence of individual clients controlling the litigation for their own benefit creates opportunities for collusive arrangements in which defendants can pay the attorneys for the plaintiff class enough money to induce them to settle the class action for too little benefit to the class or too much benefit to the attorneys....") (bracket omitted); John C. Coffee, Jr., *Class Wars: The Dilemma of the Mass Tort Class Action*, 95 Colum. L. Rev. 1343, 1367-84 (1995) (giving reasons and collecting cases on collusion).

The settlement here bears numerous worrisome indicia, all of which require discovery and evidentiary hearings before the Court can make an informed determination regarding the fairness of the settlement. Until a fairness determination has been made, no part of the proposed settlement, including the administrative plan, may be approved or enforced.

1          **A.    Procedural Issues**

2                  One requirement a court examines in determining whether a settlement is fair and

3          reasonable is whether the proper procedures have been followed. 7B Wright & Miller, *Fed.*

4          *Practice & Proc.* § 1797.1. Many important procedural protections are not present here:

5                  (1)    Class Certification: "Settlements that take place prior to formal class

6          certification require a higher standard of fairness." *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d

7          454, 458 (9th Cir. 2000); *see also Hanlon*, 150 F.3d at 1026 ("The dangers of collusion between

8          class counsel and the defendant, as well as the need for additional protections when the settlement

9          is not negotiated by a court designated class representative, weigh in favor of a more probing

10         inquiry than may normally be required under Rule 23(e)."). Lack of certification also creates

11         additional problems in evaluating fairness that will have to be resolved through factual

12         development. *See* 7B Wright & Miller, *Fed. Practice & Proc.* § 1797 ("Another problem posed

13         by settlements prior to class certification is how the court properly can assess the fairness of the

14         proposed compromise before it determines, at least, the scope of the class.").

15                 (2)    Class Counsel: Where, as here, settlement occurs prior to the appointment

16         of class counsel, courts are vigilant to protect against collusion. *Ace Heating & Plumbing Co. v.*

17         *Crane Co.*, 453 F.2d 30, 33 (3d Cir. 1971) ("when the settlement is not negotiated by a court

18         designated class representative the court must be doubly careful in evaluating the fairness of the

19         settlement ... if it is feasible in the first instance for the court to designate a class representative to

20         conduct settlement negotiations, such a course is highly desirable").

21                 (3)    Notice: Lack of proper notice alone is reason to reject a proposed class

22         action settlement. *E.g.*, *Molski v. Gleich*, 318 F.3d 937, 952 (9th Cir. 2003) (notice failing to

23         clearly explain which claims were released violates due process). "Without the notice

24         requirement it would be constitutionally impermissible to give the judgment binding effect

25         against the absentee members of the class. The notice serves to inform the absentees who

26         otherwise might not be aware of the proceeding that their rights are in litigation so that they can

27         take whatever steps they deem appropriate to make certain that their interests are protected." 7B

28         Wright & Miller, Fed. Practice & Proc. § 1786 (collecting authorities).

MR041129-382-00010[Amended MP&A re Opp.toAdmin.Plan]          16

1

2          Here, the parties already stipulated that the only notice that was given thus far was

3   not published according to the terms of the settlement. It was also deficient in several other

4   material respects. FRCP 23(c)(2)(B) requires that class notice at least include: (1) "the class

5   claims, issues or defenses," (2) "that a class member may enter an appearance through counsel if

6   the member so desires," and (3) "the binding effect of a class judgment on class members." Fed.

7   R. Civ. P. 23(c)(2)(B). This notice failed to describe all of the claims, issues or defenses in this

8   case (including exhaustion), did not explain the risks and benefits of opting out, or disclose that

9   class members could appear through counsel to object. It also misstated that class certification

10  was final and that petitioner's counsel was class counsel. The proposed new notice still omits any

11  concrete explanation as to claims, issues, and defenses, or any explanation as to the advantages or

12  disadvantages or opting in or out. And it does not explain to potential class members that it

    supplants the previous notice, which can only lead to confusion.

13          Furthermore, the proposed administrative plan adds new material provisions to the

14  settlement agreement that are not disclosed in the actual or proposed "class notices." For

15  example, the proposed administrative plan would allow petitioner's counsel to receive fees before

16  amounts were actually disbursed to class members. This term, which would not be in the interest

17  of the alleged class, was not disclosed in any of the "class notices" (not to mention that it is a new

18  and material term that was not part of the settlement agreement).

19          Additionally, none of the class notices discussed the $1 million dollars in

20  "administrative fees" called for by the proposed administrative plan. Not only is this a material

21  change to the settlement that would require the Court to rewrite the settlement agreement, it

22  would bind class members to this term without notice and without due process of the law.

23          Finally, the Attorney General proposes a previously undisclosed procedure to off-

24  set claims that will take significant amounts of money from class members. The new notice gives

25  no warning of this. Although the Governor's counsel is still investigating this matter and will

26  provide supplemental information to the Court, it appears possible that the off-sets could consume

27  a very significant amount of the class's recovery (which already is only 50% of their claims).

28

MR041129-382-00010[Amended MP&A re Opp.toAdmin.Plan]          17

(4)    Attorney's Fees: Rule 23(h)(1) requires that "a claim for attorney's fees **must** be made by motion." (emphasis added). The rules further provide: "A class member ... may object to the motion." Fed. R. Civ. P. 23(h)(2). Here, this issue was resolved by stipulation before the class members even received a notice. No motion was filed; no class member was given the opportunity to object. Moreover, attorney's fees were decided before any determination had been made as to who was class counsel. Thus, it was impossible to consider factors such as the experience of counsel in setting the amount. 57 ALR 3d 475 § 11 (collecting authorities) ("The attorney's standing in the profession with respect to his ability, skill, and integrity appears to be one of the factors most generally recognized as a proper matter for consideration in assessing the value of his services ...").

**B.    Lack of Adversarial Proceedings**

There has been a marked absence of any adversarial proceedings between the parties in this case. Almost everything that has occurred to date has been accomplished by stipulations that evade the scrutiny of the adversarial process. Issues that are normally hotly contested in class actions were not briefed or argued, including: (1) Class certification; (2) Class counsel; (3) Class notice; and (4) Attorney's fees. The Attorney General did not litigate exhaustion, which is a fundamental predicate in any tax refund case. The lack of any motions as to any of these issues is doubly problematic because there are no transcripts for the Court or objectors to review in assessing whether the settlement is fair and reasonable. Additionally, according to the Attorney General, there is no written documentation of the negotiations.

Most critically, despite being aware of the illegality of the settlement agreement, the Attorney General has not raised this issue or disclosed his opinion letter to this Court. Instead, the Attorney General has taken the position that the administrative plan should go forward. Where counsel exposes his or her client to criminal liability and consistently sides with the opposing party, all possible red flag are raised.

**C.    Conflicts of Interest**

The settlement also creates troubling conflicts. For example, the interests of the class members conflict. The class is comprised of individuals who have time-barred claims, and

those who do not. The settlement actually gives preference to the untimely claims and pays them equally. Thus, a serious question arises as to whether the interests of those with timely claims (who would have a better chance of prevailing were the case to go to trial) have been represented adequately. *See Ortiz*, 527 U.S. at 857 (noting conflict of interest between class members whose claims accrued when defendant was insured and those whose claims accrued afterward because "Pre-1959 claimants accordingly had more valuable claims than post-1959 claimants").

The settlement also has a prejudicial effect on the settling parties. As discussed above, the settlement would put the Governor and many government employees in the untenable position of having to choose between following a law passed by the Legislature or complying with an order of the Court. This creates serious questions as to why the government was advised to enter into this contract.

**D.    Lack of Discovery**

No discovery occurred in this case. Without discovery, it is difficult to evaluate whether the amount of the settlement is proportional to the actual exposure. One must wonder how the Attorney General could have agreed to pay tens of millions of dollars without discovery, when his answer to the petition (1) denied that this case was a class action, (2) stated that he lacked information to form a belief as to the truth of the class allegations, and (3) explicitly averred: "Petitioner has not met the class certification requirements set forth in Rule 23(a) and (b) of the Federal Rules of Civil Procedure." (Opp to Pet. ¶¶ 3, 6, Aff. Defense ¶ 6.)

Equally importantly, no discovery has occurred regarding the fairness of the settlement, how it was negotiated, and the advice provided before it was signed. The Governor has requested this information, including his client files, from the Attorney General. The Attorney General has not provided any of it and claims that there is none. Under these circumstances, discovery on fairness must be permitted. *See, e.g., In re Gen. Motors Corp. Engine Interchange Litig.*, 594 F.2d 1106, 1124 (7th Cir. 1979) ("We think that the conduct of the negotiations was relevant to the fairness of the settlement and that the trial court's refusal to permit discovery or examination of the negotiations constituted an abuse of discretion.").

E.   **Attorney's Fees**

The Attorney General stipulated to pay petitioner's counsel the entire amount of fees he requested in the petition. This amounts to $6 million. Yet, counsel had done nothing beyond file a complaint and "negotiate" the settlement for what appears to have been less than a day. He did not file a single interrogatory, take any depositions, or even ask for one document. Moreover, the proposed administrative plan secures payments of attorney's fees as each payment is made into the settlement fund. This would permit counsel to receive fees before amounts were actually disbursed to class members, which is contrary to the interest of the class. All of these facts raise questions regarding fairness and the public interest that require a public hearing.

F.   **Substantive Fairness**

Significant questions as to the fairness of the settlement exist. The Government pays $60 million dollars, $6 million of which would go to petitioner's counsel irregardless of how many class members opt in. As a result, all the class members could opt out and separately sue the Government leaving the Government in the same position it was in prior to this litigation, except that petitioner's counsel would be $6 million wealthier. At the same time, the settlement does little for those persons who opt-in. It only provides 50% of their refunds — if they are allowed to keep their refunds at all. Given the setoffs, many opt-ins could receive nothing. This virtually ensures that those with invalid claims will opt-in, while those with valid claims will not. This is not a fair and reasonable substitute for solving this problem through the political process with a proper expenditure of public funds.

**CONCLUSION**

For the foregoing reasons, the Governor respectfully asks that the Court deny the motion to approve the administrative plan, vacate the previous order preliminarily approving the settlement, and conduct briefing to determine whether it has subject matter jurisdiction.

Dated this 29thday of November, 2004.

OFFICE OF THE GOVERNOR OF GUAM
CALVO AND CLARK, LLP
Attorneys at Law

By: _____
RODNEY J. JACOB

MR041129-382-00010[Amended MP&A re Opp.toAdmin.Plan]                    20

# EXHIBIT E

DISTRICT COURT OF GUAM

TERRITORY OF GUAM

MARY GRACE SIMPAO, CHRISTINA )     Civil Case No. 04-00049
NAPUTI and JANICE CRUZ, on behalf of )
themselves and a class of others similarly )
situated, )
)
        Plaintiffs, )
)
        vs. )     ORDER
)
GOVERNMENT OF GUAM, )
)
        Defendant. )
)

This matter is before the Court on the Plaintiffs' Partial Summary Judgment motion. *See* Docket No. 59. After hearing argument from counsel and reviewing the parties' submissions, as well as relevant caselaw and authority, the Court hereby memorializes the bases for its rulings herein.

**BACKGROUND**

In the tax years prior to 1995, Guam taxpayers claimed the Earned Income Tax Credit ("EIC") and the Government of Guam paid it.[1] However, in the years 1995 and 1996, the Government of Guam stopped paying the EIC. In 1996 the Department of Revenue and Taxation

---

[1] The EIC also referred to as the EITC was first enacted by the United States Congress in 1975 and codified as Section 43 of the U.S. Internal Revenue Code of 1954. *See* U.S. Public Law 94-12, § 204. The EIC is a refundable Federal income tax credit for low-income working individuals and families. It allows an eligible individual to claim a tax credit against the amount of income tax liability, if any, on his or her annual income tax return.

("DRT") issued a ruling ("Revenue Ruling No. 96-001") regarding whether the EIC applied in Guam under the Guam Territorial Income Tax ("GTIT"). *See* Canto Decl., at Exhibit C, attached thereto. It concluded that it did not. The Attorney General of Guam issued his own opinion on the matter and agreed with the DRT's ruling. *Id.*, Exhibit B ("Attorney General of Guam Memorandum Opinion DRT/DOA 96-001 ('1996 AG Opinion')), attached thereto.

In light of the DRT's ruling and Attorney General's opinion, the Government of Guam published that EIC was inapplicable in Guam on its tax return forms for the years 1995 and 1996 and 1999 through 2003.[2] *See* Answer at ¶ 3. For example, the 1999 1040A tax form contained the language "**Not Applicable**" where Earned Income Credit was listed. *See* Canto Decl., Exhibit L, attached thereto.[3] For the years 1997 and 1998, such prohibitory language was not on the Government of Guam's tax forms. *See Id.*, Exhibit E, attached thereto.

For tax years 1995 and 1996, the Government of Guam did not pay refunds associated with EICs. *See* Answer at ¶ 18. In the years 1997 and 1998, qualified Guam taxpayers could claim EIC on their tax returns. However, only some of the EIC claims were paid for the tax year 1997 and with the exception of one individual taxpayer, no EICs were paid for the tax year 1998. *Id.* at ¶s 7, 21 and 23. No EICs were paid for the tax years of 1999 through 2003.

On January 12, 2005, the Governor of Guam issued an Executive Order indicating the Government would establish a procedure whereby EIC claims would become a part of a qualified taxpayer's tax return. *See* Canto Decl., Exhibit F, attached thereto. Shortly after the Governor issued this order, the DRT published forms with which to make claims for the relevant tax years of 1995 though 2004. *Id.*, at Exhibit G, attached thereto.

The plaintiffs have collectively filed individual income tax returns with the Government of Guam during the tax years 1995 through 2003. *See* Canto Decl., at Exhibit L, attached thereto. None of the plaintiffs received an EIC offsetting the taxes paid during those years. Additionally,

---

[2] Guam issues it own 1040 forms.

[3] The plaintiffs in some of the years in question actually used the federal form 1040 which did not black out the EIC portion.

2

none of the plaintiffs filed an administrative claim for a refund of overpaid taxes. The plaintiffs, Mary Grace Simpoa, Christiana Naputi and Janice Cruz,[4] on behalf of themselves and a class of other similarly situated, ("plaintiffs") brought this action against the Government of Guam seeking declaratory relief regarding the applicability of the EIC to Guam taxpayers and refunds from tax overpayments.

## DISCUSSION

The plaintiffs now move for partial summary judgment and seek the following relief: (1) A declaration that, under the GTIT, the EIC applies to Guam and requires refunds of properly claimed EIC claims; (2) A declaration that, by filing income tax returns that contain no claim for the EIC, the plaintiffs have nonetheless exhausted their administrative remedies as required by the GTIT as a condition precedent to bringing suit; (3) A declaration and injunctive relief requiring the Government of Guam to provide notice to plaintiffs of their right to file EIC claims and creating procedures for filing such claims under the GTIT, or alternatively, a declaration that the Government of Guam must refund EIC claims to plaintiffs upon filing proper amended tax returns containing an EIC claim under the GTIT; and (4) A declaration and injunctive relief that the Government of Guam must enforce certain local Guam laws concerning amounts that are alleged to be required to be set aside to pay the EIC.

Summary judgment is appropriate when the evidence, read in the light most favorable to the nonmoving party, demonstrates that there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The party opposing summary judgment cannot rest on conclusory allegations, but must set forth specific facts showing that there is a genuine issue for trial. *Leer v. Murphy*, 844 F.2d 628, 631 (9th Cir. 1988). Moreover, to defeat a summary judgment motion, the nonmoving party must come forward with evidence sufficient to establish the existence of any disputed element essential to that party's case, and for which that party will bear the burden of proof at trial. *Celotex Corp. v.*

---

[4]On April 14, 2005, when the summary judgment motion was filed, Janice Cruz, was not a named plaintiff. However, on April 18, 2005, plaintiffs filed a Second Amended Complaint wherein, plaintiff Cruz was added.

3

*Catrett,* 477 U.S. 317, 322, 102 S.Ct. 2548 (1986).

Before addressing the merits of the motion, the defendant makes a number of objections. The defendant first contends that the plaintiffs' motion is premature. The motion is based on the Second Amended Complaint. However, the motion was filed on April 14, 2005 and the Second Amended Complaint was filed on April 18, 2005, four days after the motion. The defendant claims that in filing the motion, the plaintiffs misrepresented that the Second Amended Complaint contained no new facts, "apart from the addition of the plaintiff. All of the defendant's answers therefore to the Second Amended Complaint are required to be identical to its answers to the First Amended Complaint, save for those referring to the newly added Plaintiff Janice Cruz." *See* Motion, p.2. The defendant claims that this is not true. This Court agrees. In comparing the First Amended Complaint with the Second Amended Complaint, the Court notes that there are changes in the Second Amended Complaint that pertain to the original plaintiffs, Ms. Simpao and Ms. Naputi.[5] Notwithstanding the changes to the Second Amended Complaint, the substance of the complaint remains the same. Moreover, the changes have no bearing on the relief sought in the motion requiring this Court to hold the motion in abeyance.

The defendant also argues that the Declaratory Judgment Act and Anti-Injunctive Relief Act prohibit the relief sought. The Declaratory Judgment Act states that:

> [i]n a case of actual controversy within its jurisdiction, except with respect to Federal taxes other than actions brought under section 7428 of the Internal Revenue Code of 1986 . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking declaration, whether or not further relief is or could be sought.

28 U.S.C. § 2201(a).

The defendant argues that the Declaratory Judgment Act prohibits declaratory relief with respect to *federal taxes*. (Emphasis added.) However, in this instance, the plaintiffs argue that GTIT is not a federal tax so therefore the Declaratory Judgment Act does not bar the relief

---

[5]The plaintiffs are admonished that they are to exercise care in making representations to the Court and are cautioned that any further misrepresentations may result in the imposition of sanctions and/or other action deemed appropriate.

4

sought. This Court notes that this issue was discussed and ruled upon in the Court's prior Order concerning the defendant's motion to dismiss.[6] Honorable Ronald S.W. Lew agreed with the plaintiffs and found that the Declaratory Judgment Act did apply. Likewise, the Court addressed the applicability of the Anti-Injunction Act in its prior Order. The Anti-Injunction Act generally prohibits suits "for the purpose of restraining the assessment or collection of any tax." 26 U.S.C. § 7421(a). Judge Lew held that the Anti-Injunction Act did not bar the plaintiffs' claims because the suit was not brought for the purpose of restraining the assessment or collection of taxes, but was instead brought for the applicability and enforcement of the EIC. This Court finds Judge Lew's rulings to be the law of the case and will not otherwise disturb them. *See United States v. Lummi Indian Tribe*, 235 F.3d 443, 452 (9th Cir.2000) ("Under the law of the case doctrine, 'a court is generally precluded from reconsidering an issue previously decided by the same court, or a higher court in the identical case.'").

Turning now to the real issue before the Court, does the EIC apply to Guam and if so, what actions must the Government of Guam take in order to administer it. At the outset of its discussion, the Court notes that this issue has been unsettled for years.

Apparently, the issue was first raised in 1989. The Attorney General concluded in Memorandum Opinion No. DOA 89-0750 to the Director of Administration ("DOA"), that Guam was obligated to pay the EIC in excess of the tax owing. *See Canto Decl.*, at Exhibit A, attached thereto. The Attorney General stated that:

> Guam currently uses a mirror image of the Internal Revenue Codes as its basis for collecting income taxes. Some time ago, the Territory received the permission of Congress to enact its own tax code in the 1986 Tax Reform Act.[7] By Executive Order, we have established the Guam Tax Reform Commission to determine and recommend how we will delink from IRC. The Earned Income Credit (EIC) and its applicability to Guam is one of the issues currently before the Commission. We have been informed that Guam had previously received an annual reimbursement from the

---

[6]*See* Order, Docket No. 53.

[7]In 1986, Congress authorized Guam to "de-link" from the I.R.C. and pass its own tax laws that would go into effect "upon an exchange of notes" by the governments of Guam and the United States. Tax Reform Act of 1986, §§ 1271, 1277(b), Pub.L. No. 99-514, 100 Stat.2085.

5

federal government amounting to several million dollars, but that the practice was halted during the administration of President Carter.

It appears that because we have the authority to delink from IRC, and yet choose not to do so (if only by our inaction), that we are in a position of being responsible for any shortfall resulting from following federal tax policies which are entirely discretionary upon us. We might be able to attempt to seek reimbursement for the estimated or actual shortfall caused by Earned Income Credit. However, the response of Congress is likely to be that we merely have to rewrite our local tax code to remove this burden.

A few years later, on or about January 4, 1996, the Attorney General revoked its earlier Memorandum Opinion DOA 89-0750 and adopted the DRT's Revenue Ruling 96-001. *See* Canto Decl., at Exhibit B, attached thereto. The Attorney General decided that: (1) EIC was not applicable in Guam and should not be administered by DRT, and (2) DRT should not certify to the DOA for the payment of any amounts owing as refundable EIC. *Id.*

In response to the change in tax policy the Legislature enacted its own program (Guam Earned Income Program) to ensure that Guam's taxpayers would receive the EIC. *See* 11 Guam Code Ann. § 4108. The program mirrored the federal program under 26 U.S.C. § 32. However, the program was never implemented and in 2000, the Legislature filed a declaratory judgment action with Guam's Supreme Court asking for its opinion as to whether Guam's taxpayers were entitled to the EIC, pursuant to Subtitle A of the IRC and applied to Guam by the operation of the Organic Act, 48 U.S.C. § 1421 et seq. *See In re Request of I Mina 'Bente Sing'Kona Liheslaturan Guahan Relative to the Application of the Earned Income Tax Credit Program to Guam Taxpayers ("The EIC question"),* 2001 Guam 3, 2001 WL 113985 (Sup. Ct. Guam 2001). After providing a thorough description of the history of the EIC, the Guam Supreme Court held that the EIC must be applied in mirrored fashion to Guam. This Court agrees.

Guam's tax code is based on the Internal Revenue Code. It is made applicable to Guam by the Organic Act and by the provisions of the Code itself. Organic Act §1421i(k); Internal Revenue Code § 7651. In effect, the Congress established a mirror system of taxation.

The Organic Act of Guam states:

(a) Applicability of Federal laws; separate tax

6

1    The income tax laws in force in the United States of America and
     those which may hereafter be enacted shall be held to be likewise
2    in force in Guam: *Provided*, That notwithstanding any other
     provision of law, the Legislature of Guam may levy a separate tax
3    on all taxpayers in an amount not to exceed 10 per centum of their
     annual income tax obligation to the Government of Guam.

4
     (b) Guam Territorial income tax
5
     The income-tax laws in force in Guam pursuant to subsection (a)
6    of this section shall be deemed to impose separate Territorial
     income tax, payable to the government of Guam, which tax is
7    designated the "Guam Territorial income tax."

8    48 U.S.C. § 1421i(a) and (b).

9    Title 48 U.S.C. § 1421i(d) adds:

10        (1) The income tax laws in force in Guam pursuant to subsection
          (a) of this section include but are not limited to the following
11        provisions of the Internal Revenue Code of 1986, where not
          manifestly inapplicable or incompatible with the intent of this
12        section: Subtitle A [26 U.S.C.A. § 1 et seq.] . . . and all provisions
          of subtitle F [26 U.S.C.A. § 6001 et. seq.] . . .

13   Section 31 of the Organic Act specifically lists the mirroring provisions, including

14   Subtitle A of the I.R.C. which creates and defines the EIC.[8]  The EIC was enacted in 1975 to

15   provide tax benefits to low-income workers in the hopes that these benefits would make working

16   more attractive than welfare.  Since that time, Guam taxpayers applied for and received EICs

17   until 1995 when the Government of Guam had a shift in tax policy and decided that it was not

18   responsible for the payment of the EIC.

19        However, it would appear that the shift in policy was more attributable to a shortfall in

20   the public coffers than one in legal reasoning.  In DRT's Revenue Ruling No. 96-001, the

21   director stated that "[a] definitive ruling by the Director of DRT is necessary at this time because

22   GovGuam has experienced large amounts of lost revenue and cash outlays under the EITC."

23   *See* Canto Decl., at Exhibit C, attached thereto.  Guam's taxpayers should not be made to pay for

24   the financial woes of its sovereign.  If Guam is unable to pay for the EIC, it alone, has the power

25   to change its tax code by delinking from the IRC in accordance with the Tax Reform Act of

26

27
          [8]Section 6401(a) of Subtitle F directs the taxing authority to refund the EIC to the
28   taxpayer or credit the EIC overpayment against the taxpayer's liabilities.

7

1986, or by enacting an additional tax to cover its expenses. *See* 48 U.S.C. § 1421i(a). Short of
those options, the Court finds that as a matter of law, Guam must pay the EIC.

Moreover, the Court notes that the defendant seemingly has conceded that the EIC applies
to Guam. The defendant stated in its Clarification of Defendant's Opposition to Plaintiff's
Motion for Partial Summary Judgment that "[t]he position of the Office of the Attorney General,
on behalf of the Government of Guam, with respect to the Earned Income Tax Credit ("EIC") is
set forth in the Settlement Agreement entered into on June 14, 2004 . . ."[9] That Settlement
Agreement was attached as Exhibit A to a Stipulated Order Granting Preliminary Approval of
Class Action Settlement. Some of the positions set forth in the Stipulated Order were as follows:

> 2. "EIC Class" means all persons who (a) filed Guam tax returns
> and (b) were and are entitled to be paid refundable earned income
> tax credits under the Guam Territorial Income Tax and the Earned
> Income Program for any or all of the following tax years: 1996,
> 1998, 1999, 2000, 2001, 2002 and 2003.

> 3. The EIC Class members, otherwise eligible, are entitled to the
> Earned Income Tax Credit, pursuant to a provision in Subtitle A of
> the Internal Revenue Code and applied to Guam by operation of
> the Organic Act, 48 U.S.C. § 1421 et seq.

> 4. The Government of Guam is required to pay the Earned Income
> Tax Credit to eligible taxpayers.[10]

Additionally, the Government of Guam further stated "[t]he Government of Guam does not
oppose the Motion for Partial Summary Judgment to the extent it will determine whether the EIC
applies to the People of Guam as a matter of law."

Having decided that the EIC applies to Guam, the next question is whether the taxpayers
exhausted their administrative remedies in claiming the EIC. According to 26 U.S.C. § 7422(a) a
taxpayer is required to file a claim for a tax refund before filing suit.[11] However, in this instance,

---

[9]*See* Clarification of Defendant's Opposition to Plaintiff's Motion for Partial Summary
Judgment. Docket No. 81.

[10]*See* Certified Copy of Stipulated Order Granting Preliminary Approval of Class Action
Settlement With Attached Settlement Agreement in Santos Case, CIV04-00006, Docket No. 82,
page 2.

[11]26 U.S.C. § 7422 states:

8

the plaintiffs argue that the filing of an income tax return acts as a claim for the EIC, since the Government of Guam affirmatively took steps to prohibit a taxpayer from actually filing an EIC claim. The Government of Guam represented to the taxpayers that the EIC was inapplicable or not available on Guam. *See* Canto Decl., Exhibit L, attached thereto. The DRT's policy was to reject claims where individual taxpayers attempted to write EIC claims on their Guam tax forms, submit the U.S. versions of the forms (which did not block out the EIC box), submit the Form 1040 X[12] or submit letters or informal claims. *See* Camacho Decl., at ¶ 9. It was DRT's policy to return such forms to the taxpayer and (sometimes) provide the taxpayer with a copy of the Revenue Ruling stating the EIC did not apply in Guam. This Court is concerned that the Government took actions that discouraged if not actually affirmatively prohibited the filing of a return with the request for the EIC. The Court therefore finds under the circumstances, the filing of the tax returns should be considered a claim satisfying the jurisdictional requirement under 26 U.S.C. § 6511.[13]

The plaintiffs next seek declaratory and injunctive relief requiring the Government of Guam to provide notice to plaintiffs of their right to file EIC claims and creating procedures for filing such claims under the GTIT, or alternatively, a declaration that the Government of Guam must refund EIC claims to plaintiffs upon filing proper amended tax returns containing an EIC

---

(a) No suit prior to filing claim for refund.

> No suit or proceeding shall be maintained in any court for the recovery of any internal revenue tax alleged to have been erroneously or illegally assessed or collected, or of any penalty claimed to have been collected without authority, or of any sum alleged to have been excessive or in any manner wrongfully collected, until a claim for refund or credit has been duly filed with the Secretary, according to the provisions of law in that regard, and the regulations of the Secretary established pursuance thereof.

[12]As used in the federal system, Form 1040 X is used for amended tax claims.

[13]Although the Court has jurisdiction based on the filing of the claims, the Court will refrain at this time from addressing whether the statute of limitations would act as a bar to many of the claims pursued in a refund suit. *See* 26 U.S.C. § 6532(a)(1).

9

1  claim under the GTIT. The Government of Guam claims that this issue is moot and the request

2  unnecessary as the Government of Guam is already accepting EIC claims and permitting the

3  amendment of tax returns to facilitate such claims, to the extent permitted by federal and

4  territorial law. *See* Camacho Decl., at Exhibit 2, attached thereto.

5       In January 2005, the Governor of Guam issued Executive Order 2005-001, requiring DRT

6  to create supplemental EIC forms ("Guam Earned Income Credit Application") and to accept the

7  submission of the EIC claims under territorial and, to the extent applicable, federal law.

8  *See* Camacho Decl., at Exhibit 1, attached thereto. It applies to tax years 1995-1996 and 1999-

9  2004, and into the future. *Id.* There are no forms for the years 1997-1998 because DRT had

10 already created a form for the those years and had accepted claims. The Order expressly states

11 that tax returns may be amended as part of such a submission, although amendments are limited

12 to three years as provided under federal law. *Id.* Accompanying the forms is an EIC brochure

13 prepared by DRT. *Id.* at Exhibit 4. Pursuant to the Executive Order, the EIC claims submitted

14 under this procedure shall constitute sufficient claims for the EIC under the GTIT if the EIC is

15 held to apply to Guam. *Id.* at Exhibit 1, ¶ 2. As of April 26, 2005, DRT has received 15,475

16 claims for the EIC under the Executive Order. *Id.* at ¶ 14 and Exhibit 5.

17      The plaintiffs state that they are concerned that the forms contain qualifying language that

18 would allow the Government of Guam to ignore its obligation to pay the EIC. The offending

19 language is as follows:

20      By providing this form neither the Department of Revenue & Taxation nor any
        other part of the Government of Guam or its officers are agreeing to make any
21      payment to any taxpayer or any offset in favor of any taxpayer or waiving any
        applicable law regarding submission of claims.
22
        *See* Camacho Decl., at Exhibit 2.
23
        The plaintiffs claim that since the Government of Guam is claiming there is no obligation
24
   to pay the EIC on the forms, the request for declaratory relief is not moot. This Court has
25
   reviewed the forms and notes that at the time they were created, the issue of the EIC had not been
26
   decided. It seems to reason that in drafting the documents, the Government wanted to preserve
27
   its rights should a Court subsequently rule that it had no legal obligation to pay the EIC. Despite
28

10

1    a history of non-payment by the Government, the Court finds the Government of Guam has taken

2    efforts to create forms that would allow it to process the claims in the event it is found

3    responsible for paying the claims.

4    Under the circumstances, the Court does not find the need to grant declaratory relief.

5    Should the Government of Guam refuse to pay the claims after they have been found owing, the

6    plaintiffs are free to take steps to enforce the payments. The Court is reluctant to grant

7    declaratory relief where there is only the possibility of future harm. *Hodgers-Durgin v. de la*

8    *Vina* 199 F.3d 1037, 1042 (9th Cir.,1999) ("The Supreme Court has repeatedly cautioned that,

9    absent a threat of immediate and irreparable harm, the federal courts should not enjoin a state to

10   conduct its business in a particular way."). The Court notes that the plaintiffs' complaint is also

11   one for a refund. There is nothing preventing the plaintiffs from proceeding with this action.

12   Accordingly, the Court denies the declaratory and injunctive relief as requested.

13   Lastly, the plaintiffs ask for injunctive relief requiring the Government of Guam to

14   enforce certain local Guam law (11 Guam Code Ann. § 50101 et seq. and 11 Guam Code Ann. §

15   51101 et seq.) concerning amounts that are alleged to be required to be set aside to pay the EIC.

16   In 1999, the Legislature amended the Income Tax Reserve Fund law (the "Reserve Fund"), to

17   create a yearly reserve fund to reserve tax receipts for the payment of income tax refunds, the

18   child tax credit, and the EIC. 11 Guam Code Ann. § 50103. It also requires the DOA, DRT and

19   the Bureau of Budget & Management Research to establish a yearly formula for how much

20   money should be reserved from income tax receipts. *Id.* This formula is to be used by DOA to

21   pay projected income tax refunds, child tax credits, and EIC. 11 Guam Code Ann. § 50104.

22   In addition to the Reserve Fund, the Legislature enacted the Income Tax Refund Efficient

23   Payment Trust Fund Act of 2002 (the "Trust Fund"). The Trust Fund is supposed to receive

24   weekly, quarterly, and monthly deposits (depending on the source) of payroll and other income

25   taxes. 11 Guam Code Ann. § 50102. The formula for such deposits is supposed to be the same

26   formula as the yearly account under the Reserve Fund, except that the money in the Trust Fund

27   account is being reserved for the coming year and is supposed to be earning interest. *Id.* When

28   DOA is ready to release tax refunds, child tax credits, or the EIC, the money is to be transferred

11

from the Trust Fund into the Reserve Fund, and to the taxpayers. *Id.*

The Government of Guam argues that the plaintiffs have no right to sue for the enforcement of the Reserve and Trust Fund laws. The Government of Guam states that these laws are local budget laws designed to benefit the Legislature with regard to expenditures of public funds. There is nothing in the laws themselves that create a generalized private cause of action, much less a right to seek injunctive relief. The plaintiffs therefore should be denied injunctive relief. *See Touche Ross & Co. v. Readington,* 442 U.S. 560, 568 (1979) (an implied cause of action can only be created under a statute if it is consistent with the intent of the legislature.)

The Government of Guam also states that it is complying with the laws to the degree permitted by the intervening budget laws. In 2004, the Guam Legislature passed its budget for fiscal year 2005, P.L. 27-106 (Bill 363), creating a tax refund reserve of $72 million. There was no provision therein for the EIC or other reserves. *See* Guam P.L. 27-106. Based upon the current financial figures available to the Government, $72 million is not sufficient to pay this year's estimated tax refunds and EIC. Decl. of Lourdes Perez, at ¶ 4.

According to the Director of the DOA, an injunction that requires the Government of Guam to immediately begin to set aside money for the EIC could cause a financial crisis. Decl. of Lourdes Perez, at ¶ 8. The Court is concerned about the consequences of ordering the Government of Guam to comply with these laws without a showing of actually how much money would be required and the effects that would have on the operations of the Government. Under the circumstances, the Court finds the request premature in light of the fact that the class has not been certified. There simply are not enough facts to indicate what sum of monies should actually be set aside. In addition, when the plaintiffs proceed with their refund suit, the Court can revisit the issue of how refunds are to be paid if found owing. Should the Government of Guam choose not to take action in paying its obligation, the Court can then take the appropriate action. Accordingly, the Court denies summary judgment as to this request.

///

///

CONCLUSION

In light of the foregoing, the Court grants partial summary judgment as to the issue of whether EIC applies to Guam and that, by filing income tax returns that contain no claim for the EIC, the plaintiffs have nonetheless exhausted their administrative remedies as required by the GTIT as a condition precedent to bringing suit. As to the other requests, the Court denies the relief sought. The plaintiffs are to take action to certify the class and proceed with this matter as a refund suit.[14]

SO ORDERED this _15_ day of June, 2005.

RICARDO S. MARTINEZ*
Designated Judge

Notice is hereby given that this document was
entered on the docket on __JUN 15 2005__.
No separate notice of entry on the docket will
be issued by this Court.
        Mary L. M. Moran
    Clerk, District Court of Guam
By: /s/ Shirlene A. Ishizu    JUN 15 2005
    Deputy Clerk        Date

---

[14]The Court notes the conspicuous absence of the United States as a party in this action. The Court questions whether there may be an equal protection argument in light of the fact that Guam taxpayers are not entitled to the Advance EIC and an offset of their social security taxes paid to the federal government.

*The Honorable Ricardo S. Martinez, United States District Judge for the Western District of Washington, by designation.

13

# EXHIBIT F



# GOVERNMENT OF GUAM
## CONSUMER COUNSEL
### OFFICE OF THE ATTORNEY GENERAL
HAGÅTÑA, GUAM



October 13, 2004

**MEMORANDUM**

To:     Attorney General

From:   Charles Troutman

Subject:     Santos EITC Settlement — Need for Legislative appropriation of "Refunds"

## CONFIDENTIAL ATTORNEY- CLIENT & WORK PRODUCT COMMUNICATION

You have asked me to advise you on certain questions raised by the Governor and other of our clients with regards to implementing the EITC settlement in the Santos case. In this memo I will examine only the question whether the Governor must seek a legislative appropriation before paying the settlement.

The EITC settlement consists of several elements to be performed by the government of Guam: (1) funding and payment of $60 million in delinquent EITC refunds to qualified taxpayers for tax years 1996 and 1998 through 2003 in accordance with the multi-year schedule established in the settlement agreement; (2) payment of $6 million in attorney fees to class counsel on a pay-as-you-go basis from the $60 million in EITC refunds to occur over the life of the settlement schedule; (3) commitment to apply, and to pay, EITC refunds to qualified taxpayers for all future tax years, commencing with 2004; and (4) payment of approximately $1 million in administrative costs by the Department of Revenue and Taxation to implement the settlement, which amount appears to be in addition to and separate from the $60 million for EITC refunds and attorneys fees.

My opinion is that the Governor does not have to seek an appropriation for items 1 and 2. On the on other hand, he must have appropriations for items 3 and 4. In reaching these conclusions, I am assuming that the EITC validly applies to Guam, a matter of doubt to some, but rendered moot by the settlement.

Any answer must stem, first, from the Organic Act of Guam. This settlement will result, *inter alia*, in a judgment for money due against the government of Guam. The Organic Act states that, in such cases:

> When any judgment against the government of Guam under this paragraph [for an unpaid income tax refund] has become final, the Governor shall order the payment of such judgment out of any unencumbered funds in the treasury of Guam. 48 U.S.C.A. §1421i(h)(3).

Courts have long held that Congress has the power to legislate directly for a territory as if Congress were a state legislature. This was recently reaffirmed by the 9th Circuit in *People v. Guerrero*, 290 F.3d 1210 (2002):

> *See, e.g., First Nat'l Bank v. County of Yankton*, 101 U.S. 129, 133, 25 L.Ed. 1046 (1879) ( "[Congress] may make a void act of the territorial legislature valid, and a valid act void. In other words, it has full and complete legislative authority over the people of the Territories and all the departments of the territorial governments."); at 1221-2.

The Organic Act completely occupies the authority Guam has over the Territorial Income Tax, restricting the Legislature to those matters not covered (very few) by the Act. A good example is in Section 11 of the Organic Act where Congress has permitted the Legislature to adopt surcharge on the Territorial Income Tax of up to 10%. While Guam may adopt its own income tax structure pursuant to another federal law, it has not yet done so and, therefore, is still subject to the existing mirror-image income tax imposed by the Organic Act.

It is my opinion, that in the case of paying a judgment obtained against the government for the matters stated in the Organic Act, including refund of taxes (item 1 above), Congress has legislated the authority to pay notwithstanding the absence of a legislative appropriation. In fact, the language is mandatory – "the Governor shall order . . .". If he does not order the payment of a judgment for an unpaid income tax refund from any unencumbered funds, he would be subject to a writ of mandate from the District Court ordering him to do so.

2

EITC payments are treated as refunds of income tax overpayments under the U.S. Internal Revenue Code mirrored in Guam, and are subject to the same rules as ordinary income tax refunds. *Sorenson v. Secretary of the Treasury of the United States*, 475 U.S. 851, 106 S.Ct. 1600, 89 L.Ed. 2d 855 (1986); *Israel v. United States*, 356 F.3d 221 (2nd Cir. 2004). Accordingly, payment of the judgment to be entered by the District Court of Guam for unpaid EITC refunds covering tax years 1986 and 1988 through 2003 will be subject to the provisions of the Organic Act, 48 U.S.C.A. §1421i(h)(3), requiring the Governor to pay the judgment "out of any unencumbered funds in the treasury of Guam" without regard to appropriation by the Legislature.

There have been no decided cases defining the term "unencumbered funds in the treasury of Guam", although definitions of "unencumbered funds" are found in other contexts. See *United States v. Kim* 111 F. 3d 1351 (7th Cir. 1997)(defining "unencumbered funds" for purposes of the trust fund penalty of Section 6672 of the Internal Revenue Code). However, the common understanding of this term in Guam is that it means any funds not obligated by contract or other order, for example, wages. When it comes to judgments for delinquent income tax refunds, the Organic Act requires that payment be from any unencumbered funds within the treasury of Guam, not just from funds allocated for the purpose of tax refunds by the Legislature. Therefore, the Governor may, and indeed must, pay the judgment for refunds of the EITC from any unencumbered funds in the treasury of Guam.

Moreover, no legislative appropriation will be needed regarding payment of attorney fees to class counsel under the judgment (item 2 above). The attorneys fees to be paid to class counsel are not a separate amount awarded by the court against the government. Rather, the attorney fees are an obligation imposed on the taxpayers and will be paid by them to class counsel from their EITC refunds, which is their property. Because the Governor does not have to obtain an appropriation from the Legislature to pay the judgment for the delinquent EITC refunds covering tax years 1996 and 1998 through 2003, which is the source of the attorneys fees, he does not have to obtain an appropriation for the attorneys fees (I make no opinion as to the reasonableness of the amount of attorneys fees sought by class counsel in the settlement, which is a different issue).

On the other hand, the obligation undertaken by the government in the settlement to pay future EITC refunds on annual basis hereafter to qualified taxpayers (item 3 above), commencing with tax year 2004, is not a money judgment for refunds and, therefore, is not subject to the provisions of the Organic Act, 48 I U.S.C.A. §1421i(h)(3), requiring the

3

Governor to pay a judgment for unpaid refunds "out of any unencumbered funds in the treasury of Guam". Consequently, it is proper and necessary for the Legislature to annually appropriate funds for the payment of such refunds, which the Legislature did for fiscal years 1998 and 1999 in the Guam Earned Income Program, 11 G.C.A. §42104.

Although the U.S. Congress in 31 U.S.C. §1324 has made a continuing appropriation to the Department of Treasury to pay U.S. tax refunds, this appropriation is not mirrored in Guam. The Organic Act provides for mirroring of the Internal Revenue Code which is found in Article 26 of U.S.C., but not Title 31 of U.S.C.

The settlement also provides for a $1 million "pot" to be used as administration costs by the Department of Revenue and Taxation to implement the settlement and the payout under it (item 4 above). As these funds appear to come from the General Fund and are separate from and in addition to the $60 million EITC settlement amount, then there is an absolute requirement that the moneys be appropriated by the Legislature, since these are for the general operations of the Department of Revenue & Taxation. They would not be part of a judgment for delinquent income tax refunds. I assume that the $1 million will be payable over several years and need not be appropriated all at once.

The Governor and our other clients would not be subject to the provisions and penalties set forth in 5 G.C.A. §22401 regarding the expenditure of unappropriated funds to the extent that funds under the EITC settlement (items 1 and 2 above) are paid pursuant to the Organic Act, 48 U.S.C.A. §1421i(h)(3), requiring judgments for unpaid income tax refunds to be paid "out of any unencumbered funds in the treasury of Guam". However, the expenditure of unappropriated funds for other parts of the settlement that do not come within the scope of this Organic Act provision regarding payment of judgments for unpaid income tax refunds (items 3 and 4 above) would expose the Governor and our other clients to possible liability under 5 G.C.A. §22401.

I trust that this memorandum fully answers your questions. I would be pleased to answer any further questions you may have regarding this matter.

*Charles H. Troutman*
CHARLES H. TROUTMAN

4