*Counsel appearing on following page*



FILED
DISTRICT COURT OF GUAM
JUN 2 2 2007
MARY L.M. MORAN
CLERK OF COURT

DISTRICT COURT OF GUAM

TERRITORY OF GUAM

| | |
|---|---|
| JULIE BABAUTA SANTOS, *et.al* | Civil Case No. 04-0006 |
| Petitioners, | |
| v. | |
| FELIX P. CAMACHO, et al. | |
| Respondents | |

Civil Case No. 04-00048

CHARMAINE R. TORRES, *et al.*

Plaintiffs

v.

GOVERNMENT OF GUAM, et al.

Respondents

MARY GRACE SIMPAO, *et al*,

Plaintiffs,

v.

GOVERNMENT OF GUAM

Defendant.

v.

FELIX P. CAMACHO, Governor of Guam

Intervenor-Defendant

Civil Case No. 04-00049

**OBJECTION OF JANICE CRUZ AND MARY GRACE SIMPAO TO FINAL APPROVAL OF CLASS ACTION SETTLEMENT AGREEMENT AND MEMORANDUM OF POINTS AND AUTHORITY**

# ORIGINAL

**Shimizu Canto & Fisher**
Suite 101 De La Corte Bldg.
167 East Marine Corps Drive
Hagatna Guam 96910
671.472.1131

**Tousley Brain Stephens PLLC**
Kim D. Stephens, P.S., WSBA #11984
Nancy A. Pacharzina, WSBA #25946
700 Fifth Avenue, Suite 5600
Seattle, Washington 98104-5056
206.682.5600

Counsel for Objectors Simpao and Cruz

# I.    INTRODUCTION

Class members, Mary Grace Simpao and Janice Cruz (also Plaintiffs in *Simpao et al v. Government of Guam, Civil case No. 04-00049*) (hereinafter referred to as *Simpao*), appear before the court to (1) provide their comments on, and objections to Plaintiffs and Respondents *Joint Motion for Final Approval of Class Action Settlement Agreement*; and (2) to notify the Court they would like to be heard at the final approval hearing.[1]

At issue is whether this Court, in it role as fiduciary, can find that the proposed Santos III Settlement Agreement fairly and adequately settles Class Members' EIC claims:

(1)     Where there is no dispute that the administrative branch of Guam's government, in a calculated manner designed to increase the money in it coffers, wrongly and persistently retained the EIC credits due its working poor and used those funds for purposes of its own design.

(2)     Where that same government pleads poverty forces it to short change this particularly vulnerable group by offering only a promise of a belated and uncertain payment of a small fraction of what the government owes to

---

[1] Over time, litigation regarding the Government of Guam's failure to pay the Earned Income Tax Credit (EITC) has consisted of three parallel class actions each seeking to recover some portion of EICs wrongfully deprived Guam's' poorest tax payers since 1995. Those actions have included: Santos, CV 04-00006  (hereinafter Santos), Simpao , CV 04-00049 (hereinafter Simpao)and Torres. CV 04-000038 (hereinafter Torres)

The Santos and Torres Actions have now been combined and those parties seek final approval of the settlement currently before the Court. The proposed settlement represents the third attempt at settlement made by Santos counsel and is referred to herein as Santos III. The Simpao Action is stayed pending resolution of Santos III. Final approval of Santos III will moot the class EIC claims brought in the Simpao Action.

---

extinguish their claims - even though its liability for all EIC payments has
been firmly established in summary judgment rulings;

(3)     Where the record before the Court shows minimal advocacy by settling class
        counsel, inadequate notice to the class and a cumbersome claims making
        procedure that has minimized claims; and

(4)     Where the record is barren of any estimate of how this class would fair should
        it prevail at trial.

Simpao respectfully asserts that under these circumstances and on this record, the Court cannot
find the terms of this settlement are fair and adequate.

    Simpao objects to the proposed settlement first and foremost, on the basis the settling
parties have simply not provided class members or this Court enough information on which to
evaluate the effectiveness of class notice or the fairness of the settlement.

    Simpao also objects to the settlement on the grounds it is procedurally unfair because the
notice was inadequate and the claims procedure burdensome. As a result substantial numbers of
class members have been deprived of their right to recover even the fraction of their EIC
damages the settlement purports to offer.

    In addition, the settlement is substantively unfair because of the disparity in recovery
between class years, the manner in which the government's offsets are handled; the delay
associated with payment pf claims; and the amount to which the claims have been compromised
in light of the strength of plaintiffs' case.

    Finally, Simpao objects to the settlement because as currently structured its funding
mechanism is unlikely to survive a challenge that it is in violation of Guam law.

## II.    STATEMENT OF FACTS

### A. The Governments Malfeasance

The Government of Guam, after properly paying the EITC since at least the 1970s, abruptly stopped paying the refund and affirmatively prevented its poorest citizens from filing claims. It did so to keep from having to pay this money. The government continued to wrongfully deny its citizens EITC's even after Guam's Supreme Court ruled it had a duty to pay the credit. See Order [for partial summary judgment], J. Martinez, Dist. Ct. of Guam, CV04-00049, June 15, 2005, Docket No. 99, at p. 6. It continues to deny the credit to this day and it refuses to admit its lawful obligation to do so. See Santos III, p. 39 at ¶ IX.d.

### 1. *The Government's Failure to Maintain the Tax Refund Reserve Fund* [2]

This same Government ignores legislative mandates passed to create and maintain reserve funds designed to cure its chronic failure to pay any tax refund in a timely manner. The Guam Legislature created two tools by which the government would be forced to set aside portions of tax receipts and devote the amounts to tax refunds and, since 1999, the EITC. These enactments are known as the Income Tax Refund Reserve Fund and the Income Tax Refund Efficient Payment Trust Fund) *See 11 Guam Code Ann. Chapters 50 and 51*. If the Government had abided by the law, it would have devised a formula for setting aside a portion of each dollar received in proportion to projected refund amounts. As a result it would have sufficient reserves available to return to the taxpayer the money owed him or her.

Yet the Government does not abide by the law. Simpao plaintiffs' counsel have made inquiry to both the Guam Department of Administration and the Department of Revenue and

---

[2] While the current settlement does not purport to resolve claims related to this misconduct, the history of these funds is relevant to the adequacy of the proposed settlement.

Taxation concerning compliance with the law. Director Perez of the Department of Administration candidly admits that "we have not been able to locate files or copies of monthly correspondence or transmittals indicating compliance with the public law since its enactment." Further, the Director of the Department of Revenue and Taxation admits, "As we discussed via our telephone conversation, DRT has been unable to formulate a workable plan to ensure deposits into this fund. As you may already know, the Government's tax revenues have been declining due to special interest legislations that have exempted many from payment of the Business Privilege Tax (GRT) and the Bush Tax Cuts have also impacted income taxes by lessening tax rates and the increasing deductions and credits such as the Child tax Credits, Additional Child Tax Credit, etc."

Now in *Santos III*, the class is assured that the Government will pay the settlement by setting aside 15% of the money placed into the Reserve. *See Settlement* at p. 18. However, 15% of zero is zero.

**B. History of This Litigation**

**1.      The Origins of the Santos Settlement and the Parallel Actions**

On February 12th, 2004, Julie Santos filed a class action petition seeking refund of the Earned Income Tax Credit (EITC). *See Santos v. Camacho, CV 04-0006.* Four months later, the parties to that suit sought Court approval of a proposed settlement (Santos I). *Id at docket entry 14.* Santos I compromised class EITC claims at approximately 28% or less of the actual value of the claims[3], waived all interest, ignored tax years 1995 and 2004, attempted to convey

---

[3] $60,000,000.00 (the settlement amount) divided by $208,000,000.00 (Respondent liability where it is assumed actual EITCs total $15,000,000.00 per year, plus interest).

subject matter jurisdiction by stipulation and proposed class notice be limited to publication only.

Christine Naputi, (a *Simpao* Plaintiff), citing serious deficiencies in the settlement, attempted to intervene. *Id at docket entry 18.* So did Plaintiff Charmaine Torres (the *Torres* Plaintiff). *Id at docket entry 21.* Both their motions were denied. *Id at docket entry 76.* Both filed their own class actions. Torres sought to represent an "opt-out class," i.e., potential members of the Santos I class who wanted a greater recovery than the Santos settlement offered. *See Torres v. Government of Guam, CV 04-0038 at docket entry 1.* Naputi's sought to represent all taxpayers deprived EITCs and retained additional counsel experienced in class actions.

## 2. The Demise of Santos I

The Governor of Guam opposed Santos I and outlined its deficiencies for this Court in his November 24th, 2004, opposition to *Santos'* motion to approve the administration plan Santos I: . The Governor noted all of the following:

a. the Court's lack of subject matter jurisdiction (the Plaintiffs had not exhausted administrative remedies pursuant to 26 U.S.C. §7422),

b. illegality of the settlement under the Organic Act of Guam, 48 U.S.C. §1421 et seq., and the Illegal Expenditures act of 5 Guam Code Ann. § 22401,

c. failure of the parties to conduct any discovery as to several "worrisome indicia" including certification of the class upon settlement, adequacy of class counsel, and notice to the class,

d. failure of the parties to conduct any discovery as to the government's actual liability,

e. lack of an adversarial relationship between the parties,

f. a conflict of interest within the class between those whose claims are potentially untimely and those whose are not, and

g. the amount and payment of attorney fees.

Importantly the Governor also questioned the substantive fairness of an EIC settlement where class members received only a fraction of the money owed them. See Amended Memorandum of Points and Authority in Support of Opposition to Petitioner's Motion for Approval of the Administrative Plan at docket entry 102.

Around this same time, on December 3rd, 2004 Naputi filed her class action complaint for recovery of the EITC, now referred to as the Simpao action.[4] The Simpao complaint properly pleads jurisdiction, includes all Guam taxpayers wrongly denied EITCs and seeks relief in the form of both a claims filing process and actual refund of past and future EITCs, as well as other forms of necessary relief not contemplated by the *Santos* petition. *See Simpao v. Government of Guam, CV 04-0049 at docket entry 1.*[5]

In response the Governor issued an executive order providing an EIC claims mechanism that would allow tax payers to preserve their claims.

### 3. Simpao Litigates while Santos Negotiates Santos II

Simpao actively litigated the class EIC claims. She conducted discovery through Sunshine Act requests and direct service on the Government. On February 11th, 2005 the Government filed a motion to dismiss the *Simpao* action. *See Simpao, CV 04-0049 at docket entry 17.* In that motion the Government argued lack of subject matter jurisdiction and a variety

---

[4] Simpao and Cruz were added later.

[5] In particular , compliance with trust and reserve fund statutes.

of procedural and jurisdictional defenses. Simpao opposed the motion and ultimately prevailed[6].
*See Simpao, CV 04-0049, Order, 17 March 2005 (J. Lew).*

On April 14th, 2005 Simpao filed a Motion for Partial Summary Judgment. *See Simpao, CV 04-0049 at docket entry 59.* This motion was opposed by the Government. On June 15th, 2005 the Court granted Simpao's motion in part and held:

> (1) "***as a matter of law, Guam must pay the EIC***," Summ. J. Order at 7-8; and

> (2) "***under the circumstances, the filing of the tax returns should be considered a claim satisfying the jurisdiction requirement under 26 U.S.C. § 6511*** [7][*i.e.,* the provision prescribing time limits for filing an administrative claim].

> Summ.J. Order at 9.

*See Fisher Decl. at Exhibit A.*

In addition to litigating the class' claims, Simpao also made efforts to participate in settlement negotiations. Specifically, *Simpao* Plaintiffs asked the parties in *Santos* to include them in a mediation held with the Governor and the AG in March 2005. The parties refused. As a result of that mediation Santos entered into a new settlement with the Governor (*Santos II*). The AG objected to this settlement.

---

[6] Although that motion to dismiss would in effect have determine the fate of the *Santos* and *Torres* actions as well, neither counsel for these two Plaintiffs asked to be heard.

[7] In that order, the Court expressed (and Plaintiffs do not dispute) that it made no determination as to whether class members' claims are time barred pursuant to 26 U.S.C. § 6532. However, it should be noted that both the Governor and the Government of Guam admit that plaintiffs did not receive any formal notice of disallowance of their EIC claims from the Government. Because no formal disallowance notices were issued, the limitation provision of 26 U.S.C. §6532 do not apply. Also see Court's order granting preliminary approval of the settlement.

Objection to Final Approval of a Class Action Settlement

*Santos II*, like *Santos I*, did not include all taxpayers denied EITCs (it excluded tax year 1997 in which some but not all EITC claims were paid). It also failed to allege, or require the conditions precedent to establish the Court's subject matter jurisdiction.

The EIC litigation then became sidetracked until the Court decided whether the Governor or the AG controlled this litigation.

### 4. The Origins of Santos III

Despite the existence of Santos II, on March 14th, 2006 this Court ordered the *Santos*, *Simpao* and *Torres* suits consolidated, *see Santos at docket entry 299*, and, requested briefing on appointment of lead counsel. Before that briefing occurred however, the court entered a stay to allow the parties to enter into "global" settlement negotiations. Negotiations occurred on Guam between April 6th and 8th, 2006. The Governor informed the *Simpao* group during the morning of the second day that it would not negotiate with them and that their further presence was unnecessary. *See Santos v. Camacho, status report filed by Simpao, docket entry 312.*

The outcome of that mediation was Santos III . Santos III differed little from Santos II except that it included class year 1997, thus fully encompassing the Simpao class. It also provided for early payment of some claims before final approval of the settlement.

Notably counsel for Torres joined in Santos III. To do so, Torres abandoned the class she originally sought to represent (i.e., Santos class members who wanted a greater recovery). In return Torres negotiated for a share of attorney fees in excess of $1 million dollars.

### C. The Santos III Settlement Agreement

#### 1. The Value of the Claims

The settlement seeks to compensate class members for all unpaid claims for EIC from tax years 1995-2004 and provide for future payment of EIC claims for tax years 2005 and beyond.

Neither the Settlement nor the Motion for Final Approval identify the value of the claims at issue. In prior pleadings the government has indicated that EIC claims each year total approximately 20 million. Cite.

Simpao hired the accounting firm of J. Scott Magliari & Company to produce an analysis of Respondent's probable liability. Three analyses were prepared based on the assumption that EITCs total $15,000,000.00 per year, $17,000,000.00 per year or $20,000,000.00 per year respectively. The analysis includes tax year 1997, and represents liability as of 30 September 2005.

At $15,000,000.00 per annum, total liability is $208,907,306.76

At $17,000,000.00 per annum, total liability is $236,761,614.33

At $20,000,000.00 per annum, total liability is $278,543,075.68

*See Fisher Decl. at Exhibit B.*

### 2. The Value of the Settlement

Under the terms of Santos III, interest on all EIC claims is waived and the government pledges to eventually provide up to $90 million to pay EITC claim. Thus collectively the value of all the EIC claims at issue are compromised to 43% of their value or less. [8]

But claims for different tax years are funded differently. A common fund is "created" for each tax year at issue out of which all EIC claims for that tax year (or some fraction thereof) will be paid, if and when the funding becomes available. The government pledges to eventually fund claims for tax years 1998 and 2001-2004 at a rate of $15 million for each year and pledges only

---

[8] $90,000,000.00 divided by $208,000,000.00 (the projected value of all claims as of September 2005). N.b., this is a conservative estimate assuming principal amount of $15,000,000.00 per year. The actual value of the claims may be much higher but is unknown. Under *Santos-Torres* it is impossible for any class member to project or calculate the actual value of the claim.

$15 million to collectively fund claims for tax years 1995, 1996, 1999 and 2000 million. Based on the value of the claims described above and the amount of settlement funds offered the percentage recovery for each tax years is as follows:

| Class Year | Settlement compensation | Projected actual value including interest[9] | Settlement recovery as a percent of actual projected value |
|------------|------------------------|-------------------------------|-------------------------------------------|
| 1995 | $3,500,000.00[10] | $28,596,226.52 | 12% |
| 1996 | $3,500,000.00 | $26,453,611.53 | 13% |
| 1997 | Total | n/a | n/a |
| 1998 | $15,000,000.00 | $22,769,186.85 | 66% |
| 1999 | $3,500,000.00 | $21,006,130.16 | 16% |
| 2000 | $3,500,000.00 | $19,205,733.88 | 18% |
| 2001 | $15,000,000.00 | $17,920,677.92 | 83% |
| 2002 | $15,000,000.00 | $16,925,291,71 | 88% |
| 2003 | $15,000,000.00 | $16,178,587.07 | 93% |
| 2004 | $15,000,000.00 | $15,422,519.40 | 97% |

The Parties more heavily discount the early tax years on the basis they are potentially time barred.[11]

### 3. Funding for the Settlement

To fund the settlement the Government has committed to start complying with the Tax Refund Reserve Fund statute (a legislative device crated to ensure the government reserved sufficient funds to pay tax refunds), and pledges to allocate 15% of all monies placed into the

---

[9]  Simpao plaintiffs' counsel had the accounting firm compute three calculations for each class year based on an assumption of total EITC claims of $15, $17 and $20 million. For purposes of this table we choose the more conservative number, $15 million.

[10] Tax years 1995, 1996, 1999 and 2000 each share a $15 million dollar award.

[11] Settling parties reject *American Pipe*. A separate fund of $500,000 is established to pay claims for 1997 and the government has warranted that amount as sufficient to pay those claims.

Tax Refund Reserve Account for payment of claims made pursuant to the settlement. The Department of Administration and Department of Revenues and Taxation candidly admit, however, that as of January 2005 the government had never complied with the tax refund reserve statutes. *See Fisher Decl. at C.*

### 4. Other Settlement Terms

Santos III also provided for payment of class years 1997 and 1998 upon preliminary approval. Payment is to come from an amount of approximately $10 million dollars accumulated in the Reserve.

### D. Preliminary Approval of Santos III

On May 26th, 2006 *Santos* and *Torres*, filed a motion for preliminary approval of Santos III. *See Santos at docket entry 320.* On August 11th, 2006 *Simpao* filed an Opposition to Preliminary Approval of the Class Action Settlement, *see Fisher Decl. at attachment D,* and to Santos' counsel's Motion for Appointment as Lead Counsel. *See Fisher Decl. at E..* At the request of the Court Simpao filed Supplemental Briefing on her opposition to Santos III primarily focused on jurisdictional issues. Finally, on January 4th, 2007 Simpao appeared in Court to comment on and oppose preliminary approval of Santos III..

At that hearing the Court noted a problem with jurisdiction raised by Simpao, i.e. the class definition didn't require administrative exhaustion. In response settling parties changed the class definition to require a class member to have filed a tax return.

On January 9th, 2007 the Court granted preliminary approval to *Santos III* The Court noted that many of the issues identified by Simpao would be better addressed at a hearing on final approval. Order, J. Tydingco-Gatewood, Jan. 9, 2007, at Docket No. 384.

The Court also ordered notice be made to the class members pursuant to the notice plan in the Settlement Agreement. Notice to the class consisted of publication in two newspapers of local circulation on four separate occasions and mailing of the notice to prospective class members. On March 8th, 2007 Respondent and class representative realized that as to a significant number of class members a mistake had been made in notice (they failed to notify thousands of taxpayers as to the off set provisions of the tax laws) and moved the Court to allow revised notice. This Court allowed them to do so on March 12th, 2007.

## E.     Santos III Notice, Claims Period and Motion for Final Approval

After preliminary approval the parties were required to complete class notice; pay claims for 1997 and 1998 and start reserving funds from the Tax Reserve Fund for payment of the settlement. The settlement agreement provides that if the Government fails "to reserve and/or pay at least $15 million for the payment of claims funded under the Settlement Agreement by the time the Agreement is subject to the Fairness Hearing, Santos and Torres shall have the right to terminate the Settlement Agreement . . . . " *Settlement Agreement A at 36*. The Government made $10 million immediately available for payment of 1998 claims. Thus, it was required to reserve $5 million more to avoid the escape clause.

The Department of Administration has filed monthly reports with the Court indicating the amount of funds reserved from the Tax refund reserve funds for payment of this settlement paid the amounts paid out for EITC claims as follows:

| Month in 2007 | Monies reserved from Tax Reserve Fund for Payment of the Settlement | Monies Paid Out for EIC Claims |
|---|---|---|

| | | |
|---|---|---|
| January | 717,450 | 0 |
| February | 649,592 | 0 |
| March | 642,371 | 8,233,851 in 1998 claims |
| April | 654,030 | 0 |
| May | 770, 060 | 3,252 |
| | | |
| TOTAL | 3,444,503 | 8,237,103 |

Thus, only $11.7 million have been reserved or paid out for this settlement, approximately 80% of the $15 million required.

In their motion for final approval, the Settling Parties indicate notice was affected as required by the Notice Plan but no proof or documentation of notice has been filed of which Simpao is aware. Thus, no information is available as to the number of notices actually mailed; the number of mailed notices returned as undeliverable or the procedure followed, if any, to resend notices returned as undeliverable.

Similarly, regarding the early payment of 1997 and 1998 claims, no information has been provided as to the number of checks or offset notices that were mailed, the total value in claims those checks and notices represented; the number of mailings returned as undeliverable, or the number of checks cashed and offset notices returned.

The Parties Motion states that 54,000 EIC claims have been filed following notice but the statement is unsupported by evidence or declaration and it is unclear if this number includes the 20,000 claims previously filed pursuant to Exec Order. No information is provided as to the value of the claims filed; the number of claimants who filed the claims; the distribution of the

claims over the various tax years at issue; or the amount of offsets that will be applied against those claims.

The Settling parties have also failed to provide any estimate of the value of the claims Class Counsel has compromised so the Court can determine the extent to which these claims have been discounted.

**F. Simpao' and Cruz' Status to Object in this litigation**

Class members Mary Grace Simpao and Janice Cruz are members of the proposed settlement class. Mary Grace Simpao was, at all relevant times, a resident of Guam who paid income taxes. She filed income tax returns for tax years 1996 through 2004 and was eligible for the EITC for years 1996 through 1998, 2002 and 2004. She filed EIC claims for in tax years 1997 and 1998. Janice Cruz is a resident of Guam who paid income taxes and filed tax returns for 1995 through 2004. Additionally she qualified for an EITC for tax years 1996 through 2004.

Simpao and Cruz are also Plaintiffs in the Simpao Action. They actively litigated their EIC claims surviving a motion to dismiss and prevailing on summary judgment before their case was consolidated with this one and stayed to facilitate this settlement. Approval of the settlement proposed here will moot their claims brought in Simpao. Both Simpao and Cruz have filed claims pursuant to the Santos III settlement. [12] Both Simpao and Cruz ask this Court to deny final approval of this settlement on the basis it is not fair adequate or reasonable in light of the egregiousness of the government malfeasance at issue and the strength of the class' claims.

### III. OBJECTIONS TO THE PROPOSED SETTLEMENT

**A. The Standard for Final Approval**

---

[12] The third plaintiff in Simpao, Chrstine Naputi, has opted out of Santos III.

Before the Court may approve a class settlement, it must find it fair, reasonable and adequate. Fed. R. Civ. Pro. 23(e). *See also Torrisi v. Tucson Electric, 8 F.3d 1370, 1375 (9th Cir. 1993)*. While settlements are favored, this judicial inclination has it limits. In particular, courts are mindful that "[u]nder Rule 23(e) the district court acts as a fiduciary who must serve as a guardian of the rights of absent class members. The court cannot accept a settlement that the proponents have not shown to be fair, reasonable, and adequate." *Grunin v. International House of Pancakes, 513 F.2d 114, 123 (8th Cir. 1975)* See also *Synfuel Technologies Inc. v. DHL, 463 F.3d 646, 652-53 (internal citations, quotations omitted) (7th Cir. 2006)* (we insist that district courts exercise the highest degree of vigilance in scrutinizing proposed settlements of class actions. In the past, we have gone so far as to characterize the court's role as akin to the high duty of care that the law requires of fiduciaries.")

Where as here, a settlement is presented to the Court prior to certification of the class, the Court must exercise heightened scrutiny. *Stanton v. Boeing Co., 327 F.3d 938, 952 (9th Cir. 2003). See also In re General Motors Corporation Pick-Up Truck Fuel Tank Products Liability Litigation, 55 F.3d 768, 805 (3rd Cir. 1995)* ("We affirm the need for courts to be even more scrupulous than usual in approving settlements where no class has yet been formally certified."); *see also Weinberger v. Kendrick, 698 F.2d 61, 73 (2nd Cir. 1982)* (higher showing of fairness required in pre-certification settlements, and special focus on assuring adequate representation and the absence of collusion); *and Ace Heating & Plumbing Co. v. Crane Co., 453 F2d 30, 33 (3rd Cir. 1971)* ("[W]hen the settlement is not negotiated by a court designated class representative the court must be doubly careful in evaluating the fairness of the settlement to the plaintiff's class.")

The Court's preliminary approval of the settlement "in no way limits this Court's ability to deny final approval of the settlement at the final hearing on the matter." *Buchet v. ITT Consumer Financial Corp.*, 845 F.Supp. 684, 688 (D.Minn. 1994) (denying final approval because value of settlement to class was simply "too tenuous and speculative in nature"). The Court's rejection may result from the more rigorous review required on final approval than on preliminary approval, which only requires a determination that the proposed settlement is within the "range of possible approval." *See In re Microsoft Corp. Antitrust Litigation*, 185 F.Supp.2d 519 (D.Md.2002) (finding a proposed settlement so under-funded that it was not even within the "range of possible approval" and denying preliminary approval).

In order to approve the settlement, the Court must comprehensively explore and make factual findings balancing a number of factors: the risk, expense, complexity and likely duration of further litigation; the risk of maintaining a class action status throughout the trial; the amount offered in settlement; the extent of discovery completed and the stage of the proceedings; the experience and views of counsel and the reaction of class members' reaction to the settlement. *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 458 (9th Cir. 2000) (noting "the district court must show it has explored these factors comprehensively to survive appellate review"); See also *Churchill Village, LLC v. General Electric, 361 F.3d 566, 575 (9th Cir. 2004)*; *Officers for Justice v. Civil Serv. Comm'n of San Francisco*, 688 F.2d 615, 625 (9th Cir. 1982) (noting this list is not an exhaustive list of relevant considerations). "The proponents of the settlement bear the burden of proving that these factors weigh in favor of approval." . *Grunin v. International House of Pancakes, 513 F.2d 114, 785???? (8th Cir. 1975).*

The Court may not approve a settlement if the record presented by the settling parties does not show the court gave (or was able to give) due consideration to relevant facts. *Mandujano v. Basic Vegetable Products, Inc.* 541 F.2d 832, 836-847 (9th Cir. 1976) (reversing court's final approval of class action settlement on basis that record was inadequate to demonstrate Court adequately considered valid objections). *In re General Motors Corporation Pick-Up at 805.(* "to survive appellate review, the district court must show it has explored comprehensively all relevant factors.") In fact failure to present an adequate record is reason enough to deny final approval. *See Synfuel at 654* ("concluding that the district court abused its discretion by approving the settlement without adequately evaluating its fairness we need not reach the other arguments raised by objectors . . ." ). "At all events, where the court fails to comply with this duty, absentees have an action to enjoin the settlement." *Id, quoting Newberg, 2 Newberg & Conte § 11.2*

In sum " . . . the district court judge must "undertake an analysis of the facts and the law relevant to the proposed compromise," and he must "support his conclusions by memorandum." *Cotton v. Hinton, 559 F.2d 1326 at 1330 (5th Cir. 1977).* "A 'mere boiler-plate approval phrased in appropriate language but unsupported by evaluation of the facts or analysis of the law' will not suffice." *Id.* (quoting *Protective Committee v. Anderson, 390 U.S. 414, 434, 8 S.Ct. 1157, 1168, 20 L.Ed.2d 1 (1968).* This is because "(a)n appellate court ... must have a basis for judging the exercise of the trial judge's discretion." *Corrugated Container Anti-Trust Litigation v. Pleasure Hours Inc., 643 F.2d 195, 212 (5th Cir. 1981)*

**B.    The Record Before the Court Is Inadequate To Support a Fairness Finding**

     **1.    The record on substantive Fairness is Inadequate**

The court may not approval a settlement if the information necessary to assess the value of the settlement and the value of the claims is not fully developed in the record. *See In re Microsoft Corp. Antitrust Litigation,* 185 F.Supp.2d at 526-527. (denying approval because the record was insufficient to make a determination of the value of the class claims even where some expert testimony on the issue was presented). *See also Reynolds* where the Court refused to approve a $25 million settlement because counsel for the settlement plaintiffs failed to provide serious analysis of the chances of recovery or value of aspects of the case, and in fact never attempted necessary discovery to do so. 260 F.Supp at 695. *See also Mirfasihi v. Fleet Mort. Corp.,* (reversing final approval with instructions for the trial court to "arrive at a clearer estimate of the potential value of [the claims of a subclass] to allow proper evaluation of the reasonableness of the proposed settlement." 450 F.3d 745 (7th Cir. 2006). ; *see also Carnegie v. Household Intern., Inc.,* 371 F.Supp.2d 954, 957 (N.D. Ill. 2005) (denying preliminary approval of settlement where class counsel could not tell court number of people that would actually get notice and how much the settlement was worth to any individual).

The record must also show the extent to which class members actually made claims and will benefit . See *Sylvester v. Cigna Corp.,* ( refusing to finally approve a settlement the trial court had preliminarily approved finding it could not be fair, reasonable or adequate where less than 20% of the class actually made claims and the largest portion of the settlement fund was going to revert to the defendants. 369 F.Supp.2d 34, 52-53 (D. Me. 2005)).

> In considering the fairness of the settlement, the court did not attempt to quantify the value of plaintiffs' case or even the overall value of the settlement offer to class members. Nor did it estimate how many class members' claims would be barred by the statute of limitations or the voluntary payment doctrine . . . . and . . . . Since we conclude that the district court abused its discretion by approving the settlement without adequately evaluating its fairness we need not reach the other arguments raised by objectors . .

*Synfuel Technologies Inc.,* at 653, 654 (internal citations, quotations omitted) (7th Cir. 2006).

1   "At all events, where the court fails to comply with this duty, absentees have an action to

2   enjoin the settlement." *Id, quoting Newberg, 2 Newberg & Conte § 11.2.*

3   Here, the settling Parties Motion for Final Approval is completely devoid of any of the

4   facts necessary for the Court to asses the fairness of this settlement. Thus as threshold matter the

5   settlement should be rejected. Most important, and inexplicable, is the fact that there is no

6   presentation of the uncompromised value of the class claims or the portion of the value that

7   represents principal versus interest.

8       The most important factor relevant to the fairness of a class action settlement is the
9       strength of plaintiff's case on the merits balanced against the amount offered in the
        settlement. Manual for Complex Litigation s 1.46 at 56. Conceptually, this requires a
10      comparison of the amount offered with the product of (1) the probability of plaintiff's
        prevailing on the merits times (2) *the present value of probable damages plaintiff would*
11      *recover if he did prevail.*
    *In re General Motors Corporation Engine Interchange Litigation, 594 F.2d 1106, 1132(7th Cir.*
12  *1979)*

13   Thus, the court cannot even begin to conduct its analysis

14       In conducting this analysis, the district court should begin by quantifying the net
         expected value of continued litigation to the class. To do so, the court should
15       estimate the range of possible outcomes and ascribe a probability to each point on the
         range. Although we have recognized that a high degree of precision cannot be
16       expected in valuing a litigation, *the court should nevertheless insist that the parties*
         *present evidence that would enable possible outcomes to be estimated,* so that the court
17       can at least come up with a ballpark valuation.

18

19   *Synfuel Technologies Inc. v. DHL, 463 F.3d 646, 653 (internal citations, quotations omitted) (7th*

20   *Cir. 2006).*

21   As such the court does not even know to what degree the Class claims have been

22   discounted for settlement. Nor can the court evaluate the effect the proposed blanket waiver of

23   interest has on the recovery for each tax year at issue.

24

25

---

Equally important, the parties have also failed to provide the Court any information on the amount of money the government will actually pay out under the proposed settlement. This information should be known, or at least capable of estimate, given the deadline for filing claims was months ago.

All the parties have provided the court is the statement that "54,000 claims have been filed following Notice ." *Motion at 11*. And it is even unclear whether that number includes the 20,000 claims filed before notice under the procedure provided by the Governor in his Executive order.

The Parties have not identified:

The value of the claims class members have filed;

The value of offsets the government will apply to those claims;

How many claimants filed the claims versus the number of claimants estimated to be in the class; or

The distribution of the claims filed over the various tax years at issue.

All of this information is needed for the court to asses the adequacy of this settlement. For example, if the government offsets represent a significant fraction of the claims actually made that will indicate the Class claims have likely been too severely discounted –especially since Guam's' inability to pay has been cited as a factor justifying this settlement.

The settling parties also fail to provide any meaningful assessment of the strengths of the Class' case and the risks of continued litigation. Instead they offer only the unsupported conclusory statements that:

-continued litigation of issues of first impression could have unspecified "staggering consequences," *Motion at 9-10*.

-the government has substantial obligations and is in poor financial condition, Motion at 10-11; and

- a judgment obtained through trial "might be of no greater utility to class members." *Motion at 11.*

No where do the parties identify the staggering consequences that could result from obtaining clarity on Guam's tax law through judicial review. No where do the parties present any substantive information on Guam's ability to fund a settlement. And no where do the Parties explain why a judgment for the full value of the class claims would be of less utility to Class Members given the proposed settlement provides for payment only as the government periodically makes fund available.

Finally, no evidence is provided as to the government's ability to pay.

The settling Parties have not met their burden to create a record that demonstrates this settlement is fair reasonable and adequate. As the Motion for Final Approval of the settlement should be denied. The Court does not have discretion to approve a settlement on a patently inadequate record. Cite Case.

## 2.    The Record on the Effectiveness of Notice Is Inadequate

Even if the basic terms of this agreement could be found substantively fair (and they cannot) the Parties are also required to demonstrate that class notice was effective and that meaningful recoveries will actually reach class members. Thus the court may not approve the settlement unless it can find class notice procedures adequately protected absent class members due process rights. *Parker v. Time Warner Entertainment Co.,* 239 F.R.D. 318, 336 (E.D.N.Y. 2007) (refusing to approve final settlement in part because of court's inability to determine from

record whether an old data base could be updated, which in turn prevented the court from making a finding that best practicable notice had been provided).

The importance of effective class notice cannot be overstated. Notice and opportunity to be heard are fundamental requisites of the constitutional guarantee of due process. *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314, 70 S.Ct. 652, 657 (1950). When notice is a person's due, process which is a mere gesture is not due process. *Id.* at 315, 657. Thus, individual notice to identifiable class members is not a discretionary consideration, it is an "unambiguous requirement of Rule 23." *Eisen v. Carlisle & Jacquelin, et al.*, 417 U.S. 156, 174, 94 S.Ct. 2140, 2151 (1974) (requiring individual notice to over 2 million class members where there was "nothing to show that individual notice cannot be mailed to each.").

To demonstrate class notice has been adequate settling parties typically provide the court extensive information abut the notice program. Such information includes:

The anticipated effectiveness of the media selected for publication notice including the reader demographics, circulation, audience and an analysis as to the reach they provide to class members, *See Fisher at F. declaration of Intrepido at 42.*

Details about the mailing including" the actual number of mailings that would be sent, information on whether or not they believed that the mailing lists were comprehensive, the date on which mailings would be distributed, the method for handling mailings returned as undeliverable, a sample or description of how the mailer would actually look, a sample or description of how the outside of the mailer would actually look in order to overcome the perception of junk mail and attract Class members' attention. It is common practice for a notice program to provide the detailed components of a mailing effort prior to court approval and implementation." *Id., Intrepido at 43*;

And a rigorous analysis of the actual percentage of class members the notice plan was expected to reach. As Ms Interpido notes: it is routine practice in notice planning to do so calculate the percentage of potential Class members the plan is intended to reach. Courts have recognized the merits of reach quantification—even when challenged—and leading notice professionals have adopted this model since our introduction of it to the class action notice field 15 years ago. *Id., Intrepido Decl. at 44*

It is extremely important to provide courts with reach statistics, because a notice program can appear to provide effective notice when readily available statistics show that it is actually reaching a small percentage of the class. State and federal courts have embraced and cited notice programs reaching an overwhelming majority (75%-90% or more) of a given class. *Id* at 45

It is reasonable to undertake reach calculations and provide them to the Court, because advertising media professionals do this work as part of routine media planning, and because courts need, expect, and are regularly provided with this information in notice planning situations. *Id* at 44.

"Prior to approving a settlement, the court should also be informed as to the number of mailings sent successfully, the number returned as undeliverable, and how undeliverable addresses were updated and resent, and on what date mailings and remailings were sent. The Court should also be provided with samples of the mailings as actually printed and distributed to ensure that they too were not negatively altered." *Id. at* 50.

None of this information has been provided the Court by settling parties here. In fact, these parties have not even provided the court affidavits demonstrating the notice was even made. Thus the Court can make no assessment of class participation in the settlement. Absent a

better record this Court should follow the same path as the district court in *Carnegie v. Household Intern, Inc., 371 F.Supp.2d 954, 957 ( N.D. Ill. 2005)* did to fulfill its role as fiduciary to a particularly vulnerable class. That court denied even preliminary approval noting:

> "What is troubling is that although class counsel represent a certified class of mainly low income individuals going back as far as 15 years, and ending in 1996, they have done no research and have not even attempted to present the court with information as to what type of notice would be reasonably likely to reach the most individual class members at a cost commensurate with the benefit to be gained by the settlement. Under the only notice provided in the proposed settlement presented to me, counsel are unable to tell me at this time how many people may actually get notice. Thus they are unable to articulate how much the settlement is worth to any individual. There is no basis therefore for me to give preliminary approval to the settlement without a better idea of what a claimant is likely to receive and without assurance that notice will be given that is likely to reach the greatest number of class members."

*Carnegie v. Household Intern, Inc., 371 F.Supp.2d 954, 957 ( N.D. Ill. 2005).*

## C. Santos III is Procedurally Inadequate and Unfair

### 1. Notice to the Class Was Constitutionally Inadequate

To assist the Court in determining whether the Santos III notice plan was sufficient Simpao asked Gina Intrepido, Vice president and Media Director of Hilsoft Notifications to review the plan and provide an expert opinion. Hilsoft Notifications has extensive experience in designing and effectuating class notice. Its president, Todd Hilsie was the first notice expert recognized in published court decisions in the United States and Canada. *Intrepido Decl. at* 10. He has frequently evaluated notice programs for the Court and opined as to whether they represent the best notice practicable under the circumstances. *Id. at* 12. The company collaborated with the Federal Judicial Center to write and design the "model" forms of class notice the FTC has published to assist judges and attorneys. [13] *Id. at* 9. Ms. Intrepido has

---

[13] A further discussion of the qualifications of Ms Intrepido and Hilsoft Notifications, Inc. is presented in the Declaration of Gina Intrepido.

1

2

worked on many of the most significant class action lawsuits in the United States and Canada involving all aspects of notice dissemination. *Id at* 2.

3

4

5

6

7

8

Ms. Intrepido concludes the Santos III Notice Plan "was not the best practicable, and was not reasonably calculated to actually inform those affected by the Class Notice. The Notice Program was defective and insufficient to effectively notify Class members. *Id at* 4. She also states the Notice Program was "woefully inadequate and did not satisfy due process obligations . . ." *Id at* 54. Her attached declaration enumerates the many defects in the dissemination; physical design and content of the notices used here.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Regarding dissemination; Ms. Intrepido notes that the decision to use the last known address of class members contained in the DRT database falls below accepted class notice standards especially where as here social security numbers of class members are known. As Ms. Intrepido explains, where social security numbers are known, there are many ways to quickly and cheaply obtain updated addresses for class members. *Id at* 19-21. The failure to update addresses is exacerbated here because of factors unique to this class, i.e., general mobility concerns (nearly half of Guam's population changed addresses in a five year period) and heightened mobility concerns for a lower income Class that includes members associated with the military. *Id at* 22-24. In addition, Ms. Intrepido opines that is would have been reasonable and practicable to provide individualized notice to class members whose tax filings had not yet been entered into DRTs data base. *Id at* 25 Yet the notice plan here did not provide individualized notice to these class members. *See Santos III at p.* 13. This is contrary to the established legal standard that individualized notice is required where practicable. See *Eisen v. Carlisle & Jacquelin, et al.*, 417 U.S. 156, 174, 94 S.Ct. 2140, 2151 (1974)( holding individual notice to identifiable class members is not a discretionary consideration, it is an "unambiguous

requirement of Rule 23." )

Ms. Intrepido is even more critical of the design of the actual mailing and published notice concluding: "This Class Notice, even if received by any substantial percentage of Class members, is unlikely to have been noticed or understood." *Id at* 31 The Class Notice does not in any way follow the model notices that we designed in collaboration with the FJC: it contains no callout or headline to capture attention; it is difficult to read with its lengthy, small text; it does not invite response; and in fact, it does not incorporate any design features that are standard practice in the legal notification field, for class actions big or small. *Id at* 31. *See also id at* 32-35 (enumerating defects). She explains that the Parties failure to use accepted design increases the likelihood the class notice will be discarded as junk mail and even if read that it will not be understood. *Id at* 36-42

The notice used here also falls below accepted design standards for content. *See Id at* 43. ("The Class Notice does not follow accepted standards for effectively written notices.") As Ms Intrepido notes. It "is not written in plain language nor is it designed to be readable and understandable. Many Class members would have a difficult if not impossible time understanding their rights and options in the lawsuit. From a communications perspective, the language used to inform Class members of their rights and options—both the words and the way in which they were written—is inadequate.' *Id.* The notice also failed to address the fact that only 38.3% of Guam's population of five years of age and older speak only English at home, with 61.7% speaking a language other than English.[14] Of those who speak another language at home, 22.2% speak Chamorro and 22.2% speak Philippine languages. It is common practice to

---

[14] *See* U.S. Census Bureau's *2000 Population and Housing Profile: 2000 for Geography: Guam*, available online at www.census.gov/Press-Release/www/2002/guamstatelevel.pdf (last visited June 20, 2007).

have notices translated into other languages and made readily available to Class members by either calling a toll free phone number and requesting it or visiting a website with a link to translated notice documents. *Id at* 43

## 2.    The Claims Filing Procedure Was Unduly Burdensome

To make a claim under the settlement a taxpayer must file a form for each year in which they were eligible for an EIC within sixty days of the completion of the class notice period. *Settlement, pp.21-22, ¶ b.i., How EIC Class Members Will File Their Claims for Tax Years 1995-1996 and 1998-2004* See *Id., p. 23 c.i. When Members of the Class Must File Their Claims.* Within this sixty day period, a taxpayer had to find each of his or her tax returns and, inevitably for most, request copies of old returns from the Department of Revenue and Taxation (at his or her expense). While the clock ticks, the taxpayer then waits for the arrival of the old return. Notably, the Department of Revenue and Taxation charges $35 dollars for a copy of each return and the settlement did not waive this payment for claimants. *See Fisher declaration at* G. Thus, it is likely many class members had to pay a fee in order to file a claim to receive a tax credit wrongly withheld by the government in the first place.

Class members must then uncover and *carefully* analyze the various changes of the EIC program over the last 11 years. Next the taxpayer must determine his or her eligibility for each year and, for each year, make a separate claim [15] [16]

Very few of these class members can be expected to work their way through this thicket.[17] Notably, before the Government stopped allowing tax payers to file EIC claims, a

---

[15]  Attention in this matter is crucial. A mistake by the taxpayer in just one year could forfeit all refunds for all years. *See Settlement, Exhibit C, Notice, III g., Processing of Claims and Governing Laws.*

[16]  An interesting anomaly arising in the settlement is that a person who never filed a return is in a better position than one who did file, yet needs to amend. The parties strictly apply 26 USC §6511. *See settlement p.22-23, ¶ 7.*

claimant could simply write EIC on their tax return form and the government would calculate the credit due for them.

### 3. The Claims Experience Data Provided By the Settling Parties Does Not Demonstrate the Adequacy of Class Notice or Significant Class Participation

Given the defects in the notice plan and the burdensome nature of the claims filing procedure, the Parties bear a heavy burden to demonstrate this settlement will actually reach significant numbers of class members. Yet, as noted above, they provide no evidence of class reaction to the settlement other than an assertion that "over 54,000 claims have been filed following notice." *Joint Motion of Petitioners and Respondents in Santos and Torres for Final Approval of Class Action Settlement Agreement at p. 11, filed June 8th, 2007, at docket entry417.*

This representation tells the Court nothing. The parties have not identified what 54000 represents in terms of a percentage of all possible claims. In their class certification motion, the Parties estimates there may be as many as 20,000 claimants. If that number holds for each tax year at issue that represents 200,000 claims . Thus the 54,000 represents only 25% of possible claims. And it remains unclear if the 54,000 number includes claims filed pursuant to the governor's exec order. Thus the Parties unsupported assertion that this settlement has received "overwhelming support" is simply not credible.

The lack of opt outs and objectors in this case cannot be viewed as evidence of class support given the defects in class notice. Courts recognize the a class' silence means nothing. "[S]upport cannot necessarily be inferred from silence; acquiescence to a bad deal is something quite different than affirmative support." *In re General Motors Corporation Engine Interchange*

---

[17] According to one study, 45% of recipients are single with children. Of these, 23 % are high school dropouts, 40% graduated high school only and 6% graduated college. *See Making Work Pay; The Earned Income Tax Credit and Its Impact on America's Families, Meyer and Holtz-Eakin, Russell Sage Foundation, New York, 2001, p.4.*

*Litigation,594 F.2d  at 1137 .*  To the extent this class is silent, it may well be a product of the impenetrable or un-received notice.

Absent a convincing showing that a high percentage of class members will receive the benefits the court should not approve the settlement.

### D. *Santos-Torres* is Substantively Unfair

1.    **Santos III Unnecessarily and Unfairly Creates Conflicts Between and Among Class members**

Santos III's wholesale abandonment of interest unfairly disadvantages certain class members.   Pursuant to law, unpaid tax refunds accumulate interest at the Federal short term interest rate plus 3%. *See 26 U.S.C. §6621.*  The settlement however abandons all interest for all class years. *See Settlement p. 17,¶ 3.b., No Interest, Settlement Agreement.*   This waiver, because of the passage of time and the compounding of interest, hurts earlier years more than later. A claim from 1995 has accumulated more interest than 2004 claims for example. This is especially unfair given the older claims have already been more severely discounted than the more recent tax years. As shown in Table at pp. 8 and 9 , the overall result is that class members will recover only 12% of 1995 claims; while class members with claims for 2003 and 2004 will recover over 90% of those claims' value.[18]

The abandonment of interest without a corresponding abandonment of interest on the governments offset claims also disadvantages class members who owe a debt to the government. Under the zero netting rule of 26 USC §6621(d), the interest on the debt a taxpayer owes the government can be offset to zero by the interest the government owes the tax payer on an unpaid

---

[18] In addition, under the proposed settlement claims for tax year 1997 are paid with interest where all other tax years (including the similarly situated claims for 1998) are not. The government allowed taxpayers to file EIC claims in 1997 and 1998.  It paid some 1997 claims including interest but not all, and it never paid 1998 claims.  The decision to pay interest on the unpaid 1997 claims and not on the unpaid 1998 claims is inexplicable.

tax refund. Here, class members who owed the government money while their EIC refund was owed them have lost that benefit. The net result is a windfall to the Defendant. It is irrational to award interest to the wrongdoer and deny it to the victim.

'This injury is compounded by the fact that the notice does not include information on the provisions of CFR 301.6402-6(i)(1) regarding how innocent spouses can protect their share of the EIC claim from the off set. The failure to do so amounts to a violation of the spouse class members' right to due process. *See Nelson v. Regan, 560 F.Supp 1101, 1107(D.C. Conn. 1983)* "Both the pre-intercept notice sent by the DHR and the post-intercept notice sent by the IRS fail to meet the due process requirements for notice." Neither does it mention the possible defenses an individual might have to the interception of tax refunds or the availability of regular procedures in which to challenge the offset. Some people, in particular non-obligated spouses filing joint tax returns, never received individual notice." Whether this is a product of negligence or ignorance, it is class members who suffer.

The waiver of interest also disadvantages claims later in the queue for payment. Under the structure, class years must queue for payment and wait for each precedent year to be satisfied. *See Settlement p. 25, ¶ e, When EIC Claims for Tax years 1995-1996 and 1998-2004 Will be Paid* . Naturally, because a class year suffers additional damage as each day elapses (they get no interest while waiting in line), each year would prefer to be at the head of the line. The government has not provided any estimate of how long it will take to pay these claims but based on the reservation rates reported by the department it will take almost 10 years to accumulate the $80 million pledged to pay these claims.[19] Additionally, each year would prefer to displace 1998 from its preferred position and share in the initial immediate distribution of $10,000,000.00. This is particularly true when one considers the indefinite nature of the funding.

---

[19] Assumes $700,000 is reserved per month.

The Guam Legislature could simply abolish the Reserve Fund and cut short all settlement payments[20]. In contrast to the years at the end of the queue, class year 1998 prefers the structured payout since it reduces the number of participants in the initial payout.

### 2. Santos III's Funding Mechanism Is Illusory

Under the settlement, payment to class members is predicated on two contingencies: money must be placed in the Guam's Income Tax Reserve or Trust Fund, and the legislature must not repeal the statutes which created those funds. *See Settlement* at p. 18, ¶ V.a.i, *Funding Source for the $90 Million.* (*emphasis in the original*). The Legislature can stop the payments, not just by the deliberate de-linking of Guam from the federal tax code and public abolishment of the EITC, but also by simply eliminating the tax reserve and trust funds, mechanisms heretofore not used by the government anyway. *See Fisher Decl.*, at Exhibit B. (The Director of Revenue and Taxation admits that Guam "has been unable to formulate a workable plan to ensure deposits into this Fund."). Thus this settlement amounts to a promise to pay only if money is collected into a specific pot <u>and</u> if the Government continues to allow the pot to exist.

### 2. The pre-approval "payout" of 1997 and 1998 claims is coercive

Under this settlement the government issued checks or notice of offsets to 1997 and 1998 claimants (by and large to the poor and needy) immediately upon preliminary approval. Class members who cash the check or return the offset form lose the right to opt out of the settlement for other class years which are not treated the same. Thus before these class members may properly consider the settlement, determine their own anticipated compensation, or receive their old returns from the Department, they out of necessity will bind themselves to this inadequate settlement. *See settlement at* 25-27.

---

[20] This scenario is not farfetched; this court has noted that Guam's decision to stop paying the EITC was "more attributable to the shortfall in the public coffers than one in legal reasoning." *See Order, 15 June 2006, Simpao et al v. Government of Guam, CV 04-00049,p.7 (J. Martinez).*

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

Objection to Final Approval of a Class Action Settlement

### 3. The settlement inadequately compensates class members

#### a. The Settlement Amount is Inadequate for All Class Years

A factor courts consider when passing on a settlement is the adequacy of compensation in light of the risks of litigation. *See e.g., Staton v. Boeing Co.*, 327 F.3d 938, 959-60 (9th Cir. 2003). Here, in a fundamental sense, this case has already been won for plaintiffs. In the Simpao Action this Court held the EITC applies on Guam and claimants have met the jurisdictional requirements of 26 U.S.C. §6511 on a class wide basis. Against this victory stands a settlement that discounts the class as a whole to 43% of the claims' worth, and for some years to 12%. The settlement amount, in light of Plaintiffs' great strength amounts to a fire sale. Further, the Government can immediately credit itself for the debt it will recover from offsets. Thus the government enjoys a windfall while class members continue to wait for their return..

The flaccidness of this settlement condemns its viability especially in light of the nature of the class that has been so egregiously wronged. "[T]he EITC goes primarily to very low income single parents, and it amounts to a large share of the resources this group has available to consume." *See Making Work Pay; The Earned Income Tax Credit and Its Impact on America's Families,* Meyer and Holtz-Eakin, Russell Sage Foundation, New York, 2001. Concern for this working poor is not much in evidence in this settlement, though. Assuming a taxpayer makes it safely through the claims-making forest, she will emerge to find dramatically discounted, and dramatically deferred, compensation.

"America's families" in this law suit is not an abstraction; it is a real group of neighbors, fellow villagers, family members and co-workers, on Guam. It is a group deserving the highest attention from the litigants.

The impact of the EITC upon the country has been well observed. One study found that:

• Two thirds of the recipients used the EITC payment on children as a priority

• Many families hope to save a portion of the EITC check

• Furniture is the most common post check purchase

• Some families save for down payments on homes

• Some use the check for transportation

• Just as significantly, people take joy in being able to finally give their kids money

*See How Families View and Use the Earned Income Tax Credit: Advance Payment Versus Lump-Sum Delivery, Romer and Weisner, in Making Work Pay; The Earned Income Tax Credit and Its Impact on America's Families, Id. at passim, pp.366-91.*

The EITC is no government giveaway; it is a well thought out program designed to raise people out of poverty. It is an expression of a mature society's mindfulness of those among us in need. Settlement of this dispute then cannot tolerate the presence of cynicism in the structure and miserliness in the amount. The Court should reject the settlement as inadequate.

**b. The Settlement is Especially Inadequate for the Potentially-Time Barred Tax Years**

The settlement heavily discounts claims for tax years 1995, 1996, and 1999 because they are potentially time barred by operation of 26 U.S.C.A. §6511. But this threshold issue was resolved in the Simpoa Action when the Court found that all the class years had met the jurisdictional bar of *§6511. See Summ. J. Order.*[21] Despite this, the parties treat them as years "for which there is an arguable risk of a time bar if litigated" and compromise all the claims at approximately twenty five per centum (25%) of the other years. *See Joint Motion for Preliminary Approval at 8.* While these claims still bear some added risk in the event of an

---

[21] Judge Martinez did note the potential existence of a time bar pursuant to 26 U.S.C. §6532, see fn. 6, *supra.*

appeal the heavy discount applied here is unwarranted. And it is notable that this same discount was applied in Santos II before the Simpao summary judgment ruling. Thus the Parties have not reflected this significant victory in the settlement. The Court should reject the settlement as inadequate for these class years.

### c. Tax year 2000 claims are unfairly and inadequately compensated

The settlement wrongly treat class year 2000 as a potentially time barred year. By statute class year 2000 was required to file a claim no later than April 15th, 2004. The filing of the *Santos* action on February 12th, 2004, however, stopped the clock for this class year. *See Devlin v. Scardelletti*, 536 U.S. 1, 122 S.Ct. 2005 (2002) (Nonnamed class members are, for instance, parties in the sense that the filing of an action on behalf of the class tolls a statute of limitations against them) *citing American Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 94 S.Ct. 756 (1974). Thus, tax year 2000 claims are as timely as claims for tax years 2001-2004 and should not be so severely discounted.

## E. Santos III Violates the Organic Act and Guam Law

This Court cannot lend its support to a settlement which violates the law. *See Grunin v. International House of Pancakes, 513 F.2d at 123* ("We agree with appellant's statement that a court cannot lend its approval to any contract or agreement that violates the antitrust laws".) *See also Isby v. Bayh, 75 F.3d 1191, 1197 (7th Cir. 1996), and Tennessee Ass'n of Health Maintenance Organizations, Inc. v. Grier, 262 F.3d 559, 565 (6th Cir. 2001).*

*Santos-Torres* is funded through a prohibited source and violates the Guam illegal expenditures act, because of this, the Court cannot grant final approval.

*A.   Santos-Torres violates 48 USC §1422i and is inorganic*

Guam's Organic Act requires that judgments from settlement of tax suits be paid from unencumbered funds of the government. "When any judgment against the government of Guam under this paragraph has become final, the Governor shall order the payment of such judgments out of any unencumbered funds in the treasury of Guam." *48 U.S.C. § 1422i.* This language is mandatory.

Contrary to the Organic Act, *Santos-Torres* is funded through two Guam statutory creations, the Income Tax Refund Reserve Fund of 11 GCA Chapter 50 (the Reserve) and the Income Tax Refund Efficient Payment Trust Fund of 11 GCA Chapter 51 (the Trust)[22], both of which are encumbered.

The Reserve and Trust are established " . . . in order to accumulate sufficient cash reserves to pay <u>projected</u> income tax refunds, earned income tax credits, and child tax credits in a timely manner."*11 GCA §50103(emphasis added).* In order to determine how much money is to be placed in the Reserve and Trust, a statistical average of the previous three years' returns is made and this amount, as a percentage of government receipts, is set aside. See 11 GCA §50103. There is no provision (nor room) for funding anything other than current need, tax suit settlements included. This is a principle with which the Respondent once agreed. The Governor in his *Memorandum of Points and Authorities in Support of Opposition to Petitioner's Motion for Approval of the Administrative Plan filed 29 November 2004at docket entry 102*, ". . . the reserves are done on a year-by-year basis reflecting the present year's need for reserves. This means that the government cannot reserve, for example, more in 2004 than is needed to pay 2004 tax refunds and EITC and child tax credits. *See* 11 GCA §50103-05. Consequently there cannot be enough in the reserves to both honor the present obligations of the Government going forward

---

[22] The settlement makes no provision for funding in the event the Legislature repeals the Trust and Reserve.

(as is required by the reserves law) and pay this settlement as to 1996, 1998, and 1999." *Id at p.13.* Each dollar which flows through the Trust and Reserve is already earmarked for return to a taxpayer and is not, therefore, unencumbered. *See 11 GCA 50105,* "Any and all expenditures from the Fund shall be for the payment of income tax refunds, earned income tax credits, child tax credits, tax rebate relief and for no other purpose. The fund is not subject to the provisions of 5 GCA §22414, which provisions would otherwise permit I Maga'lahen Guåhan [Governor of Guam] to pledge the Fund."

A tax refund is a return to the citizen of an overpayment of taxes. *See Nichols v. Birdsell, --F.3d--, 2007 WL 1344219 (9th Cir. 2007).* The money is not, nor is it ever, the property of the government. *See In re Lyle, 324 B.R. 128, 131 (Bkrtcy N.D. Calif. 2005)* ("Generally, courts have recognized that a taxpayer holds a property interest in a federal income tax refund as of the end of the tax year to which the refund relates.") *and see* **legislative intent for the Reserve**. The money is simply held by the government pending return to the taxpayer. The government, having no ownership interest in the refunds, has no ability to direct the money anywhere other than to the rightful owner. In spite of this, *Santos-Torres* "transfers" 15 cents of each over-collected dollar and reappropriates it to a settlement of a lawsuit.

It is clear that a final judgment in this case must be paid from unencumbered funds. Assuming the Trust and Reserve are unencumbered, the settlement is still illegal. As has been seen, the Organic Act requires payments of final judgments, but does not authorize the Governor to enter contracts for such final judgments. A settlement is a contract. *See Jeff D. v. Andrus, 889 F.2d 753, 759 (9th Cir. 1989).*

*B. Santos-Torres Violates 48 USC §1423j and is Inorganic*

The Guam Legislature determines how public funds are to be spent. *See 48 USC §1423j* "Appropriations, except as otherwise provided in this chapter, and except such appropriations as shall be made from time to time by the Congress of the United States, shall be made by the legislature." *And see In Re Request of Gutierrez, 2002 Guam 1 at ¶ 38 (internal citations and quotations omitted)*

> Thus, pursuant to the Organic Act, the Legislature has plenary or absolute power over appropriations . . . . The legislative power of appropriation is defined as the authority to set apart from the public revenue a certain sum of money for a specified object . . . . The power of appropriation encompasses the principle . . . . That it is for the Legislature, and not the executive branch, to determine finally which social objectives or programs are worthy of pursuit. In exercise of this power the legislature may designate specific use of money. The Legislature's plenary power of appropriation includes the power to impose conditions upon the expenditure of appropriated funds. [T]he appropriation of money and the setting of limitations on expenditures by state executive agencies constitutes an exercise of legislative power.

The executive branch's duty is to execute the legislature's enactments. *See 48 USC §1422* "[The Governor] shall be responsible for the faithful execution of the laws of Guam and the laws of the United States applicable in Guam." *And Request of Gutierrez at ¶ 39* "Thus, under the Organic Act, it is the duty of the Governor to enforce the laws as enacted by the Legislature and Congress . . ."

The Guam legislature said the Trust and Reserve funds were to be used for specific outlays; projected tax refunds, earned income tax credits, child tax credits and rebates. The Legislature was specific in this regard and left no room for executive discretion. Pointedly, the Legislature incorporated a "hands off" provision in both Chapter 50 and 51 which forbids the transfer or encumbering of the funds by the Governor. See 11 GCA §§ 50106, 51105, and 51107.

The *Santos-Torres* settlement diverts the disbursements from these funds to pay 90 million dollars which include a 10 million dollar initial, pre-final approval, unappropriated outlay from the Reserve and Trust. Furthermore, the settlement binds Guam to untold millions in future EITC payments also without Legislative appropriation.

By diverting 15% of each dollar designated for a current year tax return, the settlement improperly "set[s] apart from the public revenue a certain sum of money for a specified object, which is in effect, an appropriation." *Pangelinan v. Gutierrez, 2003 WL 21488687, ¶22 (Guam 2003) reconsidered on other grounds 2004 Guam 16 (internal citation and quotation omitted).* Accordingly, this Court should determine that the settlement is in violation of 48 USC §1423j "which reserves for the Legislature the plenary authority to appropriate funds." *Id.*

There was a time when the Governor himself shared these concerns. In his *Memorandum of Points and Authorities in Support of Opposition to Petitioner's Motion for Approval of the Administrative Plan* he noted the Guam Supreme Court's iteration that the spending power is reserved to the Legislature and further noted that the structure of the settlement placed him in violation of the Guam Illegal Expenditures Act. *Id at p. 9.* He was correct.

### C. *Santos-Torres violates Guam's illegal expenditures act.*

Despite the Organic Act requirement that the settlement be paid from unencumbered funds, the Governor has entered a contract to pay it in another way. Assuming he has the power to do so, it must still be done in accord with Guam law.

Guam law prohibits a government official, including the Governor, from "[Involving] the government of Guam in any contract or other obligation, for the payment of money for any purpose, in advance of the appropriation made for such purpose." *5 GCA §22401, Illegal Expenditures, at (a)(3).* Neither can the Governor "make or authorize any expenditure from, or

create or authorize any obligation under, any appropriation or fund in excess of the amount available therein, or for other than an authorized purpose." *Id, (a)(1)*. Parties to the proposed settlement recognize this prohibition. *See Settlement, p. 19, Concerns Regarding the Illegal Expenditures Act.*

It bears repeating how *Santos-Torres* is funded; 15 cents of each dollar designated to pay current refunds and credits is diverted to pay the settlement. That is to say the Legislature said use the money to pay "A" and the Governor decides instead to pay "B". Under the Illegal Expenditures Act, an appropriation "means the funds allocated by the Legislature which directs how the amount, manner and purpose of the funds are to be used." *5 GCA §22401(6)(i)*. There is no question that the purpose of the Reserve and Trust is to pay projected refunds and credits; the statute says so, the Legislature said so, and the intent is evidenced by the formula for accumulating the reserves. The parties may not take these funds to satisfy their settlement, particularly where the settlement outlays are not tax credits, rather part of a resolution of a dispute. *See Santos-Torres at IX. d, p. 39.*

       i. *The Governor has involved Guam in a contract prior to an appropriation.*

A settlement agreement is a contract. *Jeff D. v. Andrus, 889 F.2d 753, 759 (9th Cir. 1989)* ("An agreement to settle a legal dispute is a contract and its enforceability is governed by familiar principles of contract law.") Settlement agreements, as contracts, are also subject to restrictions on expenditure of unappropriated funds. *See Pangelinan v. Gutierrez, 2003 WL 21488687 (Guam 2003)*(finding a government contract void under the Illegal Expenditures Act) *and Blackhawk Heating & Plumbing Co. v. United States, 622 F.2d 539, 542, 553 (Claims Ct. 1980)*(enforcing a provision of a settlement agreement that was contingent upon funding pursuant to federal Anti-Deficiency Act).

Under the terms of the settlement, Guam must pay 10 million dollars prior to final approval of the settlement, a total of 90 million upon final approval and, in consideration of the settlement, pay future EITC. Although there has been no Legislative appropriation, the Governor entered into the settlement and thereby "involv[ed] the government of Guam in a contract or obligation for the payment of money." *See Pangelinan v. Gutierrez at ¶ 23* (discussing the consequence of a contract entailing the government prior to an appropriation). "Such an action constitutes an illegal expenditure." *Id, internal quotations omitted.*

> *ii. The Governor has authorized an expenditure from a fund in excess of the amount available therein, and for other than an authorized purpose*

The Reserve and Trust accumulate enough money to refund the overpayments made in the current tax year. The amount set aside is determined by establishing the statistical average of the prior three year.

In theory, money has been set aside to return the overpayment of income taxes, but Guam has not paid EITC in the prior three years. No money therefore has been set aside to pay those credits. To meet the requirements of the settlement, Guam must expend all existing funds to meet obligations of the current tax year and then somehow reach beyond to meet the settlement. This is illegal. The Illegal Expenditures Act states that no officer may "Make or authorize any expenditure from, or create or authorize any obligation under, any appropriation or fund in excess of the amount available therein, or for other than an authorized purpose." 5 GCA §22401 (a) (1). That is precisely what the settlement does.

A settlement which violates the Act is a nullity. "If contracts violative of statutory prohibitions may be executed by government agencies and subsequently enforced, the power of the legislature and the processes of government itself would be undermined" *Pangelinan 2003*

*Guam 13 at ¶ 25.* This court must not therefore grant *Santos-Torres* final approval.

### Conclusion

This Court should not grant final approval to the settlement. Objectors ask this Court to consider that "[T]he EITC goes primarily to very low income single parents, and it amounts to a large share of the resources this group has available to consume." *See Making Work Pay; The Earned Income Tax Credit and Its Impact on America's Families, Meyer and Holtz-Eakin, Russell Sage Foundation, New York, 2001.*

The EITC is no government giveaway, it is a well thought out program designed to raise people from poverty. It is an expression of a mature society's regard for those among us in need. In spite of this, settling parties create a scheme with both barriers to participation and entry. They have developed an ineffective and unconstitutional notice scheme that is unconscionably short and confounding in its design.

Settling Parties present the Court with and agreement of convenience that harms the class, is illegal in its funding and gives Respondent a windfall. In fact, there is no indication that either the Torres or Santos parties have attempted an analysis of the amounts the class is owed at all.

Settling parties have provided the Court with no information from which it can make a reasoned analysis of its fairness and adequacy. Without this the Court simply can't approve the settlement.

Finally, this is Santos third failed attempt at reaching a settlement. Objectors note that this is a sufficient number of "at bats" for them. Objectors respectfully request that counsel for Simpao be appointed lead counsel.

.

Objectors: JANICE CRUZ and MARY GRACE SIMPAO

**SHIMIZU CANTO & FISHER**

**TOUSLEY BRAIN & STEPHENS, PLLC**

By: _____

Nancy Pacharzina, Esq.
Tousley Brain Stephens, PLLC
Attorney for Objector