1  **SHANNON TAITANO, ESQ.**
   **OFFICE OF THE GOVERNOR OF GUAM**
2  Ricardo J. Bordallo Governor's Complex
   Adelup, Guam 96910
3  Telephone:    (671) 472-8931
   Facsimile:    (671) 477-6666
4
   **EDUARDO A. CALVO, ESQ.**
5  **KATHLEEN V. FISHER, ESQ.**
   **RODNEY J. JACOB, ESQ.**
6  **DANIEL M. BENJAMIN, ESQ.**
   **CALVO & CLARK, LLP**
7  Attorneys at Law
   655 South Marine Corps Drive, Suite 202
8  Tamuning, Guam 96913
   Telephone:    (671) 646-9355
9  Facsimile:    (671) 646-9403

10 *Attorneys for the Government of Guam*
   *and Felix P. Camacho, Governor of Guam*
11

**FILED**
DISTRICT COURT OF GUAM
JUL 26 2007 *mbs*
**MARY L.M. MORAN**
**CLERK OF COURT**

12
                 IN THE UNITED STATES DISTRICT COURT
13
                         DISTRICT OF GUAM
14

15 JULIE BABAUTA SANTOS, et. al.,          | CIVIL CASE NO. 04-00006
16                                         | (Consolidated with Civil Case Nos.
                          Petitioners,     |  04-00038 and 04-00049)
17
                                           | **THE GOVERNOR'S AND**
18           -v-                           | **GOVERNMENT OF GUAM'S REPLY**
                                           | **IN SUPPORT OF MOTION FOR**
19                                         | **FINAL APPROVAL OF**
   FELIX P. CAMACHO, etc., et. al.         | **SETTLEMENT AND RESPONSE TO**
20                                         | *SIMPAO* **PLAINTIFFS' OBJECTIONS**
                          Respondents.
21

22
23
24
25
26
27
28

# ORIGINAL

1

# **TABLE OF CONTENTS**

2

3    TABLE OF CONTENTS ............................................................................................................. i

4    TABLE OF AUTHORITIES .................................................................................................... iii

     INTRODUCTION ...................................................................................................................... 1
5
     ARGUMENT .............................................................................................................................. 1

6    I.      THE GOVERNING STANDARD ................................................................................. 1

7    II.     NOTICE AND THE CLAIMS PROCEDURE WERE ADEQUATE AND FAIR ............ 3

8            A.     The Notice Given Was Proper ........................................................................... 3

9                   1.     The Notice Procedures, Which Relied on Notice by Mail and Publication,
                           Were Reasonable and Practicable .......................................................... 4
10
                    2.     The Notice Itself, Which the Court Already Approved, Was Proper .......... 5
11
             B.     The Claims Filing Procedures – Which the Court Already Approved over
                    Objectors' Challenge in *Simpao* – Tracked Normal Tax Filing Procedures ............ 7
12
     III.    THE COURT HAS THE NECESSARY INFORMATION TO APPROVE THE
13           SETTLEMENT ............................................................................................................... 8

14           A.     "The Value of the Claims Members Have Filed" Is Contained in the Camacho
                    Declaration ........................................................................................................ 9
15
             B.     "The Value of Offsets the Government Will Apply to the Claims" Is Irrelevant
16                  Because Offsets Apply as a Matter of Law and Class Members Are Still Receiving
                    the Same Monetary Benefit ............................................................................... 10
17
             C.     The Government has Supplied the Needed Claims Experience Data .................... 12

             D.     "The Distribution of the Claims Filed over the Various Tax Years" .................... 14
18
     IV.     THE SETTLEMENT IS SUBSTANTIVELY FAIR ......................................................... 15
19
             A.     The Settlement Does Not Create Conflicts Between Class Members .................... 16
20
             B.     The Funding Mechanism Is Effective and Has Already Generated a $10 Million
21                  Payment and Placed Millions More in Reserve Pending Final Approval ............. 18

22           C.     The Early Payment Was Not Coercive ................................................................ 19

             D.     Objectors Are Failing To Account For Value of the Agreement to Pay the EIC .. 20
23
             E.     The Settlement Fairly Compensates 1995-1996 and 1999-2000 ........................... 21
24
                    1.     The $15 Million Payment Accounts for the Risk to Time-Barred Years .. 21
25
                    2.     Inclusion of 2000 as a Potentially Time-Barred Year Is Justified by the
26                         Governing Law .................................................................................... 23

                    3.     Time-Barred Claims Are Being Paid at a High Rate .............................. 24
27
             F.     Objectors Are Failing to Consider the Value of the Government's Agreement to
28                  Proceed as a Class Action .................................................................................. 25

             G.     Objectors Are Failing to Consider the Value of the Government's Agreement to
                    Desist From Continued Litigation on Jurisdiction ............................................... 26

             H.     The Very Low Number of Opt-outs Further Supports Approval ........................... 27

V.   THE SETTLEMENT COMPLIES WITH THE ORGANIC ACT AND GUAM LAW ... 27

    A.   The Settlement Does Not Violate the Provision of 48 U.S.C. § 1421i for Payments from Unencumbered Funds.................................................................................. 27

    B.   The Settlement Complies with Chapters 50 and 51 of the G.C.A. ........................ 28

    C.   The Settlement Complies with 48 U.S.C. § 1423j.................................................. 29

    D.   The Governor's Past Concern Regarding the Illegal Expenditures Act Was Resolved and the Present Settlement Complies with the Act ................................. 29

CONCLUSION ........................................................................................................................... 30

# TABLE OF AUTHORITIES

**Cases**

*7-Eleven Owners for Fair Franchising v. Southland Corp.*, 85 Cal. App. 4th 1135 (2000) ......... 16

*A. G. Reeves Steel Const. Co. v. Weiss*, 119 F.2d 472 (6th Cir. 1941) .......................................... 22

*Agron v. Ill. Bell Tel. Co.*, 325 F. Supp. 487 (N.D. Ill. 1970) ........................................................ 25

*Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997) ......................................................... 3, 26

*American Pipe & Const. Co. v. Utah*, 414 U.S. 538 (1974) ........................................................... 24

*Appoloni v. United States*, 218 F.R.D. 556 (W.D. Mich. 2003) ..................................................... 26

*Balkissoon v. Comm'r of Internal Revenue*, 995 F.2d 525, 528 (4th Cir. 1993) ........................... 22

*Berger v. Comm'r of Internal Revenue*, 404 F.2d 668, 673 (3d Cir. 1968) ................................... 22

*Boyd v. Bechtel Corp.*, 485 F. Supp. 610 (N.D. Cal. 1979) ........................................................... 15

*Bussie v. Allmerica Financial Corp.*, 50 F. Supp. 2d 59 (D. Mass. 1999) .................................... 16

*Carnegie v. Household Intern., Inc.*, 371 F. Supp. 2d 954 (N.D. Ill. 2005) .................................... 3

*Class Plaintiffs v. City of Seattle*, 955 F.2d 1268 (9th Cir. 1992) ............................................... 1, 2

*Cohen v. RTC*, 61 F.3d 725 (9th Cir. 1995) ............................................................................. 16, 18

*Danoff v. United States*, 324 F. Supp. 2d 1086 (C.D. Cal. 2004) ................................................. 24

*Einson-Freeman Co. v. Corwin*, 112 F.2d 683 (2d Cir. 1940) ...................................................... 22

*Finkelstein v. United States*, 943 F. Supp. 425 (D.N.J. 1996) ...................................................... 22

*Green v. Walters*, 73-2 U.S.T.C. ¶ 9729, 32 A.F.T.R. 2d 73-5963 (E.D. Cal. 1973) ..................... 25

*Hanlon v. Chrysler Corp.* 150 F.3d 1011 (9th Cir. 1998) ............................................................... 2

*Heisler v. United States*, 463 F.2d 375 (9th Cir 1972) ................................................................. 25

*Holmes v. Continental Can Co.*, 706 F.2d 1144 (11th Cir. 1983) ................................................. 16

*In re Cendant Corp. Litig.*, 264 F.3d 201, 230, 242 (3d Cir. 2001) ............................................... 24

*In re Gypsum Antitrust Cases*, 565 F.2d 1123 (9th Cir. 1977) ................................................... 5, 6

*In re Ikon Office Solutions, Inc., Securities Litigation*, 194 F.R.D. 166 (E.D. Pa. 2000) .............. 15

*In re Microsoft Corp. Antitrust Litigation*, 185 F. Supp. 2d 519 (D. Md. 2002) ............................. 3

*In re Remeron Direct Purchaser Antitrust Litigation*, 2005 WL 3008808 (D.N.J. November 9, 2005) ......................................................................................................................................... 24

*Jones v. Amalgamated Warbasse Houses, Inc.*, 97 F.R.D. 355 (E.D.N.Y. 1982) ........................... 3

*Klender v. United States*, 218 F.R.D. 161 (E.D. Mich. 2003) ...................................................... 26

*Lewis v. Reynolds*, 284 U.S. 281 (1932) ...................................................................................... 25

*Linney v. Cellular Alaska P'ship*, 151 F.3d 1234 (9th Cir. 1998) ...................................... 2, 15, 25

*Lipsett v. United States*, 37 F.R.D. 549 (S.D.N.Y. 1965) ............................................................. 25

*Looney v. United States*, 228 Ct.Cl. 807, 1981 WL 11173 (1981) ............................................... 22

*M. Berenson Co. v. Faneuil Hall Marketplace, Inc.*, 671 F. Supp. 819 (D. Mass. 1987) .............. 16

*Maiman v. I.R.S.*, 1998 WL 161003 (E.D.N.Y. 1998) .................................................................... 22

*McCarthy v. Paine Webber Group, Inc.*, 164 F.R.D. 309 (D. Conn. 1995) ...................................... 6

*McConnell v. United States*, 295 F. Supp. 605 (D. Tenn. 1969 .................................................... 25

*Mirfasihi v. Fleet Mortg. Corp.*, 450 F.3d 745 (7th Cir. 2006)..................................................... 3

*Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523 (C.D. Cal. 2004).................... 2

*Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 615 (9th Cir. 1982)............................. 1, 2, 16

*Officers for Justice*, 688 F.2d at 625 ............................................................................................ 8, 15

*Petruzzi's, Inc. v. Darling-Delaware Co., Inc.*, 880 F. Supp. 292 (M.D. Pa. 1995) ...................... 15

*Pigford v. Glickman*, 185 F.R.D. 82 (D.D.C. 1999) ...................................................................... 27

*Rosser v. United States*, 9 F.3d 1519 (11th Cir. 1993) .................................................................. 22

*San Francisco NAACP v. San Francisco Unified School Dist.*, 2001 WL 1922333 (N.D. Cal. 2001) ........................................................................................................................................ 2, 3

*Saunooke v. United States*, 8 Cl. Ct. 327 (1985)........................................................................... 25

*Smith v. United States*, 478 F.2d 398 (5th Cir. 1973) .................................................................. 22

*Stoetzner v. U.S. Steel Corp.*, 897 F.2d 115 (3d Cir. 1990) ......................................................... 27

*Stop & Shop Supermarket Co. v. SmithKline Beecham Corp.*, 2005 WL 1213926 (E.D. Pa. May 19, 2005) ...................................................................................................................................... 24

*Synfuel Technologies Inc. v. DHL Express*, 463 F.3d 646 (7th Cir. 2006) ...................................... 8

*Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370 (9th Cir. 1993).................................................. 1, 2

*United States v. Brockamp*, 519 U.S. 347 (1997) ......................................................................... 24

*United States v. New Jersey*, 1995 WL 1943013 (D.N.J. 1995);.................................................... 3

*United States v. Ray*, 375 F.3d 980 (9th Cir. 2004) ...................................................................... 21

*United States v. Truckee-Carson Irrigation Dist.*, 71 F.R.D. 10 (D. Nev. 1975 .............................. 6

*Whittington v. United States*, 240 F.R.D. 344 (S.D. Tex. 2006)................................................... 25

**Statutes**

11 G.C.A. § 50101 ............................................................................................................................ 28

11 G.C.A. § 51101 ............................................................................................................................ 28

26 U.S.C. § 32.............................................................................................................................. 8, 14

26 U.S.C. § 6103 ................................................................................................................................ 5

26 U.S.C. § 6402 .............................................................................................................................. 10

26 U.S.C. § 6511 .............................................................................................................................. 26

26 U.S.C. § 6532 .............................................................................................................................. 21

26 U.S.C. § 7422 ........................................................................................................................ 23, 26

48 U.S.C. § 1423j............................................................................................................................. 29

**Rules**

Fed. R. Civ. P. 23 .................................................................................................................... 1, 3, 26

1    Governor of Guam Felix P. Camacho and the Government of Guam hereby respectfully
2  submit their reply in support of the joint motion for final and their response to the Objections filed
3  by the *Simpao* plaintiffs and their counsel (hereinafter "Objectors").

## INTRODUCTION

The Governor and Government respectfully ask that this Court approve the Settling
Parties' Settlement Agreement. The Objectors (or really, their attorneys) have thrown literally
dozens of issues at the wall hoping one of them sticks and disrupts this Settlement Agreement.
But a settlement is viewed as a whole. This settlement pays $90 million to the class, guarantees
the future payment of the EIC, pays many claims at 100% of value (less only interest), and is the
result of a fully mediated negotiation process. The notice procedures were reasonable and
practicable, providing individual notice to all persons who could be identified by DRT, and notice
by publication in Guam's two main newspapers. The data regarding the value of the
compromised claims demonstrates an extraordinarily high level of payment, up to 100% of claim
value. The class understood and was capable of utilizing the claims-making process as shown by
participation of at least 90% of the theoretical class identified by DRT for tax year 2004.
Ultimately, Objectors are left only to raise issues they know cannot succeed, such as the alleged
"illegality" of the Settlement when it was structured to address just that concern regarding Guam
and federal law. The Settlement is a fair and reasonable bargain between the Government and the
Class deserving of this Court's final approval.

## ARGUMENT

## I.    THE GOVERNING STANDARD

As indicated by Rule 23 of the Federal Rules of Civil Procedure, a class action settlement
"should be approved if it is fundamentally fair, adequate and reasonable." *Torrisi v. Tucson Elec.
Power Co.*, 8 F.3d 1370, 1375 (9th Cir. 1993) (citation and quotation marks omitted); *see also*
Fed. R. Civ. P. 23(e)(1)(C). There is a "strong judicial policy that favors settlements, particularly
where complex class action litigation is concerned." *Class Plaintiffs v. City of Seattle*, 955 F.2d
1268, 1276 (9th Cir. 1992) (citing *Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 615, 625
(9th Cir. 1982) ("[V]oluntary conciliation and settlement are the preferred means of dispute

resolution. This is especially true in complex class action litigation...")); *see also San Francisco NAACP v. San Francisco Unified School Dist.*, 2001 WL 1922333, *5 (N.D. Cal. 2001) (Orrick, J.).

"The initial decision to approve or reject a settlement proposal is committed to the sound discretion of the trial judge." *Officers for Justice*, 688 F.2d at 625. A district judge's views are afforded "[g]reat weight" in evaluating the fairness of a proposed class action settlement because he or she "is exposed to the litigants, and their strategies, positions and proofs" and "is aware of the expense and possible legal bars to success." *Class Plaintiffs*, 955 F.2d at 1291-92 (court of appeal will not "substitute [its] notions of fairness for those of the district judge and the parties to the agreement" and "will reverse 'only upon a strong showing that the district court's decision was a clear abuse of discretion'") (quoting *Officers for Justice*, 688 F.2d at 626).

Although here, as is a frequent tactic of objecting attorneys, the Objectors have tried to divide the Settlement into component parts as though to suggest that a single defect is fatal, in actuality a settlement is evaluated as a whole: **"It is the settlement taken as a whole, rather than the individual component parts, that must be examined for overall fairness."** *Hanlon v. Chrysler Corp.* 150 F.3d 1011, 1026 (9th Cir. 1998) (citations omitted and emphasis added). In determining whether a proposed class action settlement is fair, reasonable, and adequate, the Ninth Circuit has considered the following factors:

(1) the strength of the plaintiff's case;
(2) the risk, expense, complexity, and likely duration of further litigation;
(3) the risk of maintaining class action status throughout the trial;
(4) the amount offered in settlement;
(5) the extent of discovery completed and the stage of the proceedings;
(6) the experience and views of counsel;
(7) the presence of a governmental participant; and
(8) the reaction of the class members to the proposed settlement.

*See, e.g., Linney v. Cellular Alaska P'ship,* 151 F.3d 1234, 1242 (9th Cir. 1998); *Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 525-526 (C.D. Cal. 2004). Not all factors will apply to every class action settlement. *See Torrisi,* 8 F.3d at 1376. And "[d]istrict courts have wide discretion in assessing the weight and applicability of each factor." *Nat'l Rural Telecomms. Coop.*, 221 F.R.D. at 525-526 (quoting 5 *Moore's Federal Practice,* § 23.85[2][a] (Matthew Bender 3d ed.)).

1    Further, the presence of a governmental entity in the settlement negotiations is a factor

2    "weighing heavily" in favor of a finding of fairness. *See Jones v. Amalgamated Warbasse*

3    *Houses, Inc.*, 97 F.R.D. 355, 360 (E.D.N.Y. 1982); *see also United States v. New Jersey*, 1995

4    WL 1943013, \*14 (D.N.J. 1995); *San Francisco*, 2001 WL 1922333 at \*8.[1]

5    **II.    NOTICE AND THE CLAIMS PROCEDURE WERE ADEQUATE AND FAIR**

6          **A.    The Notice Given Was Proper**

7          Before certifying a class or approving a class settlement, the court must direct that notice

8    of the proposed settlement be disseminated to class members. Fed. R. Civ. P. 23(c)(2) & 23(e).

9    "To alert class members to their right to 'opt out' of a(b)(3) class, [ Rule 23(c)(2) ] instructs the

10   court to 'direct to the members of the class **the best notice practicable under the**

11   **circumstances,** including individual notice to all members who can be identified through

12   reasonable effort.'" *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 617 (1997) (quoting Fed.

13   R. Civ. P. 23(c)(2) (emphasis added)). As will be discussed, the form of notice in this case,

14   which was already approved by the Court in granting preliminary approval, was more than

15   adequate.

16

17

18   [1] The cases cited by the Objectors in their discussion of approval of a settlement are distinguishable. Those case address settlements containing intimations of collusive conduct, plain

19   mistakes in assessing the value of the class claims, and substantively dubious settlements.

20         For example, in *In re Microsoft Corp. Antitrust Litigation*, 185 F. Supp. 2d 519, 527 (D. Md. 2002), the court refused to approve a proposed settlement because, inter alia, during the

21   approval process the court learned for the first time that most of the claim holders were businesses, not individuals, which raised questions as to the propriety of the parties' attempt to

22   use retail prices as the basis for damage calculations. No such surprises exist here.

23         In *Mirfasihi v. Fleet Mortg. Corp.*, 450 F.3d 745, 748 (7th Cir. 2006), the appellate court reversed approval of a settlement because the district court mistakenly evaluated a subclass's

24   claims based on the laws of only a handful of states, even though the value of the claims potentially turned on the applicability of all 50 state laws. Here the applicable law is clear, and

25   permits the Court to make a reasonable evaluation of the claims.

26         Finally, in *Carnegie v. Household Intern., Inc.*, 371 F. Supp. 2d 954, 957-59 (N.D. Ill.

27   2005), the court refused to approve a settlement where both the effectiveness of the notice and the adequacy of the settlement were not only too uncertain, but appeared dubious at best (*e.g.*, the

28   settlement called for payment of $68,750,000 to a class of potentially 28,000,000 persons). Here, as will be discussed, (1) the notice procedures complied with the law and are consistent with the general procedures governing tax claim; and (2) the Settlement is paying $90 million at a rate of up to 100% of the value of the claim (excluding interest, and depending upon the tax year).

*CIVIL CASE NO. 04-00006*                    3
*(Consolidated with Civil Case Nos. 04-00038 and 04-00049)*

### 1. The Notice Procedures, Which Relied on Notice by Mail and Publication, Were Reasonable and Practicable

Relying exclusively on the "expert" opinion on Ms. Interpido, Objectors attack the methods by which notice was given to the Class. (Objections at 22-27).

First, citing solely Ms. Interpido, Objectors first claim that, as to "publication notice," the Settling Parties were to provide reader demographics, circulation, audience, and an analysis as to the reach" of the publication. (Objection at 22). In this case, the Government gave notice by publication in the Pacific Daily News and Marianas Variety that was repeated twice a week for four weeks. (Settlement Agreement § III(b)). A challenge to this notice might make sense to Ms. Interpido based on her knowledge of class actions in the U.S. mainland, but it makes no sense to anyone who has ever lived on Guam. Guam is an island. It has only two newspapers of any significant general circulation – the Pacific Daily News and Marianas Variety. The Court can take judicial notice of these basic facts and does not need a "demographic analysis" as to what daily newspapers the people of Guam read.

Second, again citing solely Ms. Interpido, Objectors also complain that a study was not commissioned to analyze the reach of the mailing of the notice. (Objections at 23). Again, this might makes sense in a very different case, but here it makes no sense at all. DRT has the tax returns it has on file; if someone was possibly eligible, they were sent a notice at their last known address in DRT's computer system. (Settlement Agreement § III(c); Docket No. 424 at ¶ 5). If they had no such tax return on file, they were still receiving notice by publication. (Settlement Agreement § III(b)).

Third, Objectors' entire argument regarding mailing and publication notice, and Ms. Interpido's declaration, is not taking into account other facts of which the Court can take judicial notice. This has been a high profile case on the Territory of Guam from day one. The Settlement has received extensive coverage not only in the Pacific Daily News and Marianas Variety, but also on KUAM (both TV and radio), ABC-7 (at least since that station started carrying news), K57 radio, and several other radio stations. This case is not a consumer class action in the U.S. that might receive little or no media coverage and where a published notice was the only likely way a class member would hear about the case. This case is highly publicized, and it is in a small, tightly knit island community that is extremely aware of the Settlement. Spending tens or

*CIVIL CASE NO. 04-00006*      4
*(Consolidated with Civil Case Nos. 04-00038 and 04-00049)*

1    hundreds of thousands of dollars commissioning off-island experts to create some form of "study"
2    on notice-effectiveness on Guam regarding this case makes no practical sense based on facts
3    known to any resident of Guam.

4        Fourth, Objectors write that that their chosen expert, Ms. Interpido "opines that it would
5    have been reasonable and practicable to provide individualized notice to class members whose tax
6    filings had not yet been entered into [sic] DRTs data base." (Objection at 25). This "opinion" is
7    based upon a failure to understand how DRT works. The list of most recent addresses in its
8    computer system is not static. DRT receives new tax returns and/or change of address forms
9    every day of the week it is open. (Camacho Dec. ¶ 3). These are entered into the system as soon
10   as is possible. (*Id.*) But this process never stops; new tax returns and/or change of address forms
11   will continue to be submitted. (*Id.*) Thus, there has to be a cut-off at some point if a list is to be
12   generated and mailing sent, even though a few new addresses may have been submitted that are
13   not yet in the system. (*Id.*) But using the most up-to-date address in the computer system as of
14   the date the mailing list is generated is all that is reasonable and practicable.

15       Fifth, Objectors complain that "especially" using social security numbers, DRT could
16   have conducted searches for other possible addresses of taxpayers. (Objections at ¶ 25). Again,
17   this shows a complete lack of knowledge regarding DRT and tax procedures and laws. Taxpayer
18   information such as their social security number is confidential under 26 U.S.C. § 6103(a)
19   (taxpayer information, including taxpayer identification number, cannot be disclosed). (*See*
20   Camacho Dec. ¶ 4). DRT could not give that information to a third party to search random
21   databases for other possible addresses. (*Id.*) Nor could DRT send taxpayer information to
22   addresses of dubious accuracy; taxpayer information must be kept confidential. (*Id.*) That is why
23   only taxpayers or their authorized representatives can change their address on file with DRT.
24   (*Id.*)

25                    **2.    The Notice Itself, Which the Court Already Approved, Was Proper**

26       Objectors attempt to challenge the contents of the notice of the class action itself (even
27   though the Court already approved the notice). (Objection at 26-27). Notably, the primary issue
28   with a notice is whether it accurately informs Class Members of their rights and ability to be
     heard. *In re Gypsum Antitrust Cases*, 565 F.2d 1123, 1125 (9th Cir. 1977) ("The purpose of this

*CIVIL CASE NO. 04-00006*                                 5
*(Consolidated with Civil Case Nos. 04-00038 and 04-00049)*

notice requirement ... is to present a fair recital of the subject matter of the suit and to inform all class members of their opportunity to be heard.") (citations omitted and emphasis added). As such, "[a] class certification notice should advise the class members of their rights and obligations if they elect to remain class members." *McCarthy v. Paine Webber Group, Inc.*, 164 F.R.D. 309, 312 (D. Conn. 1995). Objectors do not claim this notice failed to accomplish this central purpose. (*See* Objections at 26-27).

Instead, Objectors suggest that the notice was not clear enough because it does not follow the "model" Ms. Interpido created and use a "callout or headline," it is "lengthy," the type is too small, and does not invite responses. (Objections at 26). Actually, the notice as approved by the Court does have bolded headings, it does tell Class Members how to respond (and indeed, tens of thousands responded by filing claims, while a very few responded with opt-out notices), and it also includes final bolded reminders at the end. (*See* Docket No. 390, 392 (the notice and the Order approving it)).

About the only criticism that is correct is that it is lengthy. But it must be remembered that this is a settlement of a tax case. Anyone who has ever done their own taxes, and attempted to follow the hundred page instruction booklets that come with each tax form, knows that the issues are not simple. By necessity here, there are simply a lot more issues to include in the notice than might apply in an ordinary case (*e.g.*, the requirement of tax returns, the application of offsets, the federal statute governing false EIC claims, etc.).

Thus, the Settling Parties properly did what the law requires, which is design a notice that informs the Class of everything they need to know about joining the Settlement or opting-out. Having accomplished that, there was no additional requirement of "callout" or the like also be required. As the Ninth Circuit has stated: "Rule 23(d)(2), of course, does not provide for a specific manner of notice or the form of the notice. These are matters left to the court's discretion to be dictated by the circumstances of each case." *In re Gypsum Antitrust Cases*, 565 F.2d at 1127 (quoting with approval *United States v. Truckee-Carson Irrigation Dist.*, 71 F.R.D. 10, 18 (D. Nev. 1975)). So while the notice may not be in the exact form Objectors would have done it, it is nonetheless adequate. *See id.*

**B.    The Claims Filing Procedures – Which the Court Already Approved over Objectors' Challenge in *Simpao* – Tracked Normal Tax Filing Procedures**

Objectors challenge the requirement that Class Members submit a claim form for each year in which they believe they are owed the EIC as "unduly burdensome." (Objections at 27).

The claims form procedure actually predates the Settlement, and is based upon Executive Order No. 2005-01. Objectors already tried to challenge that procedure in the *Simpao* case and lost. As Judge Martinez explained:

> In January 2005, the Governor of Guam issued Executive Order 2005-001, requiring DRT to create supplemental EIC forms ("Guam Earned Income Credit Application") and to accept the submission of the EIC claims under territorial and, to the extent applicable, federal law. *See* Camacho Decl., at Exhibit 1, attached thereto. It applies to tax years 1995-1996 and 1999-2004, into the future. *Id.* There are no forms for the years 1997-1998 because DRT had already created a form for the those years and had accepted claims. The Order expressly states that tax returns may be amended as part of such a submission, although amendments are limited to three years as provided under federal law. *Id.* Accompanying the forms is an EIC brochure prepared by DRT. *Id.* at Exhibit 4. Pursuant to the Executive Order, the EIC claims submitted under this procedure shall constitute sufficient claims for the EIC under the GTIT if the EIC is held to apply to Guam. *Id.*, at Exhibit 1, ¶ 2.

(*Simpao* Dock. No. 99-2 at 10). He then held: "the Court finds that the Government of Guam has taken efforts to create forms that would allow it to process the claims in the event it is found responsible for paying the claims." (*Id.* at 11). Consequently, he denied the Objectors motion on this issue. (*Id.*)

Moreover, even if re-litigated, Objectors' arguments are without merit:

Objectors complain the Class Members must obtain their previous years' tax returns to determine their eligibility, and that this caused delay and expense. (Objections at 27). That is false. The EIC-GU claim forms are designed to *avoid* requiring the previous years' tax return. They were filed with the Court as Exhibit 2 to *Simpao* Docket No. 77, and as the Court can see there is no such requirement. Indeed, the fact that DRT was to perform all calculations for the taxpayer (so that the tax returns were not needed) was also an express requirement of Executive Order No. 2005-0001. (*See* Simpao Docket No. 77 at Ex. 1 (the Executive Order) at ¶¶ 2-3). Moreover, the claim forms are not that different from the requirements of federal law, including submission of a schedule EIC to claim a "qualified child," and the general requirement of claiming the EIC to ensure compliance with other requirements not found on an individual's tax

return. *(See* Simpao Docket No. 77 at ¶¶ 5-6 (previous declaration by John Camacho, Deputy Director of DRT, setting out these facts)).

Objectors complain that Class Members must make a separate claim each year. (Objections at 27). But that is because the requirements of the EIC program have changed from year to year, and because members' own status and eligibility will have changed from year (*e.g.*, as the number of dependents or income changes). *See* 26 U.S.C. § 32 (setting forth the EIC requirements and showing multiple amendments and changes from 1995-2004).

Lastly, Objectors complain that a taxpayer who submitted a false claim could forfeit eligibility. (Objections at 27 n.15). That provision is based upon federal law. *See* 26 U.S.C. § 32(k) (*See also* Settlement Agreement § VI(d)(4), referencing this law and applying it to tax years as of its effective date only).

In sum, Objectors challenges to the claims filing procedures are completely unwarranted. The procedures are fair and consistent with governing law.

## III. THE COURT HAS THE NECESSARY INFORMATION TO APPROVE THE SETTLEMENT

Objectors argue that the Settling Parties need to provide the following date to the Court: (1) "The value of the claims class members have filed"; (2) "The value of offsets the government will apply to the claims"; (3) "How many claimants filed claims versus the number estimate to be in the class"; and (4) "The distribution of the claims filed over the various tax years." (Objections at 20).

Before approving a settlement, courts need not (and, indeed, cannot) make exact determinations as to the potential value of a class's claims or the risks of litigation. *See, e.g., Synfuel Technologies Inc. v. DHL Express*, 463 F.3d 646, 653 (7th Cir. 2006). And so, "[u]ltimately, the district court's determination is nothing more than an amalgam of delicate balancing, gross approximations and rough justice." *Officers for Justice*, 688 F.2d at 625 (citation and quotation marks omitted).

However, all of the truly required data is now available. Some of this data could not be presented while claims were still being accepted and processed; however, claim processing is now complete for all years except 2004 (which is almost complete), and each of these issues (to

the degree they are valid) can be addressed in turn and resolved as discussed below.[2] Of course, some of the information is hard, concrete results, while by necessity other information must be estimated. However, overall, the information provided meets the necessary standards.

### A. "The Value of the Claims Members Have Filed" Is Contained in the Camacho Declaration

The following information is available as to the value of the claims filed in each tax year and is included as Exhibit A to the Camacho Declaration.

For tax years 1995-96, and 1999-2000, which are being paid a total of $15 million, the figures are as follows:

| Tax Year | Qty | "A" Status | "S" Status[3] |
|---|---|---|---|
| 1995 | 1693 | $ 2,504,665.00 | $ 5,691.00 |
| 1996 | 1880 | $ 3,059,889.00 | $ 3,556.00 |
| 1999 | 3185 | $ 5,788,613.00 | $ 4,496.00 |
| 2000 | 3347 | $ 6,134,7610.00 | $ 18,342.00 |
| | | | |
| Total | 10105 | $17,487,877.00 | $ 32,085.00 |

Thus, for those tax years, Class Members have stated claims valued (without interest) at $17.5 million and will receive 86% of the value of those claims.

For tax year 1997, which is being paid at 100% plus interest (which was agreed to simply to ensure parity throughout tax year 1997 as almost all 1997 tax year claims already were paid in the past), the figures are that there were 237 valid claims, worth $551,589.06 (of which $106,946.80 was subject to offsets. (Camacho Dec. Ex. A).

For tax year 1998, which is receiving $15 million total, there were 11,534 accepted claims with a face value of $20,607,153.00 (without interest). Class Members will receive $15 million

---

[2] Further, although the Government believes all of this data is sufficient, in the event it were not, the correct procedure would not to be to refuse approval overall, but rather to instruct the parties as to what data was needed to assist the Court.

[3] Claims with an "S" status (Suspended) are pending additional information from the taxpayers; processing cannot be completed without it. The Government is treating them as though they may be accepted in terms of presenting the total potential liability.

*CIVIL CASE NO. 04-00006*                    9
*(Consolidated with Civil Case Nos. 04-00038 and 04-00049)*

1  for those claims or about 73% of the value of those claims (but also the early payout that, as
2  Objectors point out places 1998 in a favored position, *see* Objections at 31).

3  Finally, for tax years 2001-2004, which are being paid at up to $15 million per year, with
4  any unpaid amounts from the preceding year flowing into the next, the data is as follows:

| Tax Year | Qty | "A" Status | "S" Status |
|----------|-------|------------------|-----------------|
| 2001 | 3617 | $ 6,782,097.00 | $ 32,835.00 |
| 2002 | 4124 | $ 8,522,100.00 | $ 21,650.00 |
| 2003 | 4185 | $ 8,803,171.00 | $ 36,262.00 |
| 2004 | 7406 | $15,528,703.00 | $ 46,883.00 |
| | | | |
| Total EIC | 19332 | $39,636,071.00 | $137,630.00 |

12  Thus, each of these tax years except 2004 has totaled less than the $15 million allocated for it and
13  will end up receiving 100% of their value (without interest).  Further, accounting for the fact that
14  tax year 2004 will receive the unused portion of the monies from the prior years (*see* Settlement
15  Agreement § IV(a)(iv)), 2004 also will end up being fully funded at 100% of the value of the
16  claims (without interest).

17  In sum, the Court has before it the necessary information regarding the value of the
18  claims.  This data shows that they are being paid at a rate of anywhere from 73% to 100% of their
19  value, other than that interest is not being paid.  This information is more than adequate to permit
20  fairness to be evaluated.

21         **B.    "The Value of Offsets the Government Will Apply to the Claims" Is
22                Irrelevant Because Offsets Apply as a Matter of Law and Class Members Are
                 Still Receiving the Same Monetary Benefit**

23  Objectors next demand to know  "the value of offsets the government will apply to the
24  claims."  (Objections at 20).  On this issue, however, Objectors do not have any argument
25  because the value of the offsets is irrelevant to determining the fairness of the Settlement.

26  This is because Federal law provides that all tax refunds are subject to offsets for unpaid
27  taxes, back child support, and certain other obligations to the Government.  26 U.S.C. § 6402.
28  The EIC is treated as a tax refund for this purpose.  Since the Government is agreeing to pay back

1  EIC in the Settlement, it is obligated by federal law to apply the offsets owed for back taxes, child
2  support, etc., whatever their amount may be. *Id.*

3      In any case, a Class Member cannot complain that they are somehow receiving less of a
4  benefit because their particular claim is subject to offset. They are still receiving, dollar-for-
5  dollar the same value as every other Class Member—it is just that here federal law requires that
6  the value first be applied to back taxes, child support, and other obligations owing.

7      It also is not practical to supply this information because the exact amount of offsets
8  cannot be known until claims are being paid out. (Camacho Dec. ¶ 5). The way that offsets work
9  is that, when the Government is ready to issue a tax refund, it performs a check for offsets owing.
10 So until a particular EIC "refund" is ready to be paid under the Settlement, no check is made.
11 Further, it would be an idle act to even attempt an estimate. Assuming that a taxpayer owed a
12 $100 offset as of the date of this filing on July 26, that does not mean they will still owe that
13 offset on, say, October 1 when their check issues. They might well pay the back obligation in the
14 interim. Or an ordinary tax refund for say, 2004, might be processed first and completely satisfy
15 the offset, such that by the time the EIC payment is ready, no offset is left owing. That is why
16 DRT has not attempted any such calculation. *(See id.)*

17     Finally, a limited understanding of the likely outcome in each year can be seen as to tax
18 years 1997 and 1998, where payments already were made under the "early payment" provision
19 and offsets applied:

| CLAIMS REFUNDED | | | | |
|---|---|---|---|---|
| Tax Year | Qty | Checks Written | Offsets | Totals |
| 1997 | 237 | $   444,642.26 | $106,946.80 | $    551,589.06 |
| 1998 | 11534 | $ 8,246,208.04 | 1765521.24 | $10,011,729.28 |
| TOTALS | 11771 | $ 8,690,850.30 | $1,872,468.04 | $10,563,318.34 |

1  (Camacho Dec. Ex. A). As the Court can see, claims in 1997 were subject to offsets equaling
2  about 20% of their value, and claims in 1998 were subject to offsets equally about 18% of their
3  value.

4      Thus, although the Government does not agree with Objectors that this information is
5  relevant to approval of the Settlement, the Court does have a sample indicating that offsets are
6  likely to fall in the range of around 20% of the value of the total claims paid.

7      ## C.      The Government has Supplied the Needed Claims Experience Data

8      Objectors challenge the lack of "claims experience" data, *i.e.* the figures on how many
9  person submitted claims and how many persons were expected to file claims. (Objections at 20,
10 28). The data regarding the number of claim submitted, and number of claims per year, is now on
11 file. (Camacho Decl. Ex. A). It shows the following numbers of claims per year:[4]

| Year | Number of Claims Filed |
|------|------------------------|
| 1995 | 2698 |
| 1996 | 2931 |
| 1997 | $902^5$ |
| 1998 | 13140 |
| 1999 | 4437 |
| 2000 | 4677 |
| 2001 | 5025 |
| 2002 | 5326 |
| 2003 | 5755 |
| 2004 | 9351 |
| **Total**: | **53,968** |

24 So the necessary information on the number of claims filed has been provided.

---

27      [4] Of course, not all claims turned out to be valid. Those that were denied are denoted with
a "D" on the chart that is Exhibit A to the Camacho Declaration. Most commonly, they are
28 denied because the earned income exceeds the limit or no tax return was filed.

      [5] This is only the number of 1997 claims covered by the Settlement, since most 1997
claims were already processed and paid years ago.

1    Objectors, however, are also inquiring regarding how many claims *could have been* filed
2    as opposed to how many claims *actually were* filed. (Objections at 20, 28). This is not a number
3    that can be answered with certainty. First, not every person who could qualify for the EIC
4    necessarily claims it on their tax return. Second, a tax return alone does not definitely tell DRT
5    whether a taxpayer would qualify for the EIC—rather, taxpayers must complete the "Schedule
6    EIC" if they have qualifying children (DRT has substituted the EIC-GU form for that same
7    purpose). (*Simpao* Docket No. 77 (Declaration by Deputy DRT Director) at ¶ 5-6). And even if
8    that form is not needed, examining a tax return alone will not necessarily tell DRT if an
9    individual is qualified; that is why an affirmative claim must be paid. (*Id.* ¶ 6). Third, during the
10   years the EIC was not being applied, some taxpayers who otherwise could have qualified filed as
11   married filing separately, which disqualified them from the EIC. *See* 26 U.S.C. § 32(d) (married
12   persons must file jointly to qualify for EIC). Thus, the exact number of claims that would have
13   been submitted in each year if taxpayers were able to file for the EIC at that time is simply not a
14   number that can be known. (*Id.*)

15          That stated, as part of the settlement negotiations, DRT did determine the theoretical
16   maximum potential number of claims that could exist *solely based on the information of a*
17   *taxpayer's tax return.* The calculations are as follows:

18          1995:  Theoretical possibility of 13,212 claims

19          1996:  Theoretical possibility of 14,518 claims

20          1999:  Theoretical possibility of 14,828 claims

21          2000   Theoretical possibility of 13,881 claims

22          2001:  Theoretical possibility of 13,816 claims

23          2002:  Theoretical possibility of 13,542 claims

24          2003   Theoretical possibility of 13,084 claims

25          2004:  Theoretical possibility of 10,091 claims

26   (Camacho Decl. ¶ 7).[6]

27

28
          [6] There are three basic factors that may affect how many valid claims and the dollar value
     of claims that could be filed each year – what the current EIC thresholds for qualifications were
     *CIVIL CASE NO. 04-00006*                    13
     *(Consolidated with Civil Case Nos. 04-00038 and 04-00049)*

1    As the Court can see, what this data shows is that DRT was very successful in obtaining

2    filed claims for 2004, the most recent tax year covered, with 9,351 made out of a theoretical

3    possibility of 10,091 claims. After that year, not surprisingly, the rate of claims filed drops to

4    about half as many in 2003, and then progressively drops in each of the following years

5    thereafter.

6        Of course, Objectors will seize on this data to try to suggest that the claims process was

7    unfair because of the drop in older years. But the very success of 2004 shows that the main factor

8    in whether a claim was submitted is not the ease of the filing system or a lack of notice to the

9    taxpayer (2004 used the same system as all of those years), but rather whether or not taxpayers

10   had to go back in time to file new claims for old years. Ten of thousands of taxpayers took that

11   opportunity, but some thousands of others did not. But the requirement that they file a claim

12   could not have been avoided. As previously discussed in Part II(B), there had to be a claims

13   filing process because the rules changed from year to year and because the information was

14   required by 26 U.S.C. § 32. Indeed, 26 U.S.C. § 32(c)(1)(G) actually forbids granting the EIC if

15   a taxpayer has not provided a qualifying child's taxpayer identification number. And 26 U.S.C. §

16   32(k) regulates false EIC claims, thus requiring an express claim be made.

17       In sum, the available data showing that almost 93% of potential 2004 claims were filed

18   demonstrates the Class members were aware of the Settlement and understood how to file claims.

19   Therefore, it substantiates the procedures used and supports a finding that the Settlement was fair

20   reasonable to the Class.

21       **D.    "The Distribution of the Claims Filed over the Various Tax Years"**

22       Lastly, Objectors request the "[t]he distribution of the claims filed over the various tax

23   years." (Objections at 20). This information is listed in the immediately preceding subsection,

24   Part III(C) hereto.

25

26

27

28   each year, what the maximum EIC and rates were for each year, and how many tax filers there
     were each year. (Camacho Dec. ¶ 6). *See also* 26 U.S.C.A. § 32 (annotated code showing the
     many amendments made over the years).
     *CIVIL CASE NO. 04-00006*                                         14
     *(Consolidated with Civil Case Nos. 04-00038 and 04-00049)*

## IV.    THE SETTLEMENT IS SUBSTANTIVELY FAIR

To determine if a settlement is substantively fair, the Court must "determine whether the settlement was within the range of reasonableness in light of the best possible recovery and the risks of litigation." *Petruzzi's, Inc. v. Darling-Delaware Co., Inc.*, 880 F. Supp. 292, 297 (M.D. Pa. 1995). But "[u]ltimately, the district court's determination is nothing more than an amalgam of delicate balancing, gross approximations and rough justice." *Officers for Justice*, 688 F.2d at 625 (citation and quotation marks omitted).

The Governor and Government will respond to each of Plaintiffs' specific objections in turn. But it bears pointing out at the start of this discussion that the Government agreed to make up to $90 million available for claims at a rate of $15 million per year for each timely year and with another $15 million included. By any measure, it is a substantial settlement.

Indeed, as shown in Exhibit A to the declaration of John Camacho, the EIC Class is receiving somewhere between 72% to 100% of the value of their claim per year (not including interest). Indeed, even using the Objectors' speculative numbers of 12% for 1995 (the most stale year) to 90% for 2003 and 2004 (the most timely claims) (*see* Objections at 29), the value of the settlement falls within the reasonable range of the value of the class claims. As has been explained: "[T]he fact that a proposed settlement constitutes a relatively small percentage of the most optimistic estimate does not, in itself, weigh against the settlement: rather, the percentage should be considered in light of the strength of the claims." *In re Ikon Office Solutions, Inc., Securities Litigation*, 194 F.R.D. 166, 184 (E.D. Pa. 2000); *Linney*, 151 F.3d at 1242 ("The fact that a proposed settlement may only amount to a fraction of the potential recovery does not, in and of itself, mean that the proposed settlement is grossly inadequate and should be disapproved.") (citation omitted); *see also Boyd v. Bechtel Corp.*, 485 F. Supp. 610, 617-618 (N.D. Cal. 1979) ("simply because a settlement may amount to only a fraction of the potential recovery does not in itself render it unfair or inadequate. Compromise is the very nature of settlement.").

In fact, "it is well-settled law that a proposed settlement may be acceptable even though it amounts to only a fraction of the potential recovery that might be available to the class members at trial." *Nat'l Rural Telecomms. Coop.*, 221 F.R.D. at 527 (citations omitted). This is because

1  "the very essence of a settlement is compromise, a yielding of absolutes and an abandoning of
2  highest hopes.'" *Linney*, 151 F.3d at 1242 (citation and quotation marks omitted).

3           **A.    The Settlement Does Not Create Conflicts Between Class Members**

4           Objectors assert that the Settlement "unnecessarily and unfairly creates conflicts between
5  and among class members" because not every tax payer will fare as well as another depending on
6  the years of their claims. (*See* Objections at 29). But, the provision of different benefits to
7  different class members is permissible where settlement terms are "rationally based on legitimate
8  considerations." *Cohen v. RTC*, 61 F.3d 725, 728 (9th Cir. 1995) (citation omitted), *vacated on
9  other grounds*, 72 F.3d 686 (9th Cir. 1996); see *also Officers for Justice*, 688 F.2d at 629
10 (affirming approval of settlement providing different relief to differently situated class members);
11 *M. Berenson Co. v. Faneuil Hall Marketplace, Inc.*, 671 F. Supp. 819, 824 (D. Mass. 1987)
12 (approving settlement which treated Class members differently where such treatment was
13 "reasonable and appropriate, and fairly reflect[ed] the reality of the business situation presented
14 by [the] lawsuit"); *7-Eleven Owners for Fair Franchising v. Southland Corp.*, 85 Cal. App. 4th
15 1135, 1162-1163 (2000) ("While intraclass disparities may be a signal of unfairness, the inference
16 is rebuttable by a showing that differences in treatment "are rationally based on legitimate
17 considerations.") (citing *Holmes v. Continental Can Co.*, 706 F.2d 1144, 1148 (11th Cir. 1983)).

18          Objectors make four arguments, each of which is addressed in turn:

19          First, they argue that the non-payment of interest is unfair because it falls
20 disproportionately on those who have the oldest claims. (Objections at 29). But, as discussed
21 below, those claims are disproportionately less valuable because they are the least likely to
22 succeed due to statute of limitations problems. Indeed, these are the claims that are receiving the
23 benefit of the Governor's voluntary waiver, for settlement, of 26 U.S.C. § 6402 that might
24 otherwise bar those claims. (*See infra* Part III(A)). Further, the older years are receiving
25 payment first, so their greater loss of interest is in partially offset by their earlier receipt of the
26 monetary benefit of the Settlement. These, then, are rational distinctions based upon legitimate
27 considerations. *Cf. Bussie v. Allmerica Financial Corp.*, 50 F. Supp. 2d 59, 75-76 (D. Mass.
28 1999) ("any differences in the nature and value of the benefits received by Class members reflect
   the Settlement's fairness insofar as they are rationally based on objective differences in the

positions of the Class members, such as the kind and size of their insurance policy, their status as a current or terminated policyowner, and, with respect to those participating in the ADR Process, the nature and relative strength of their claim") (citations omitted) (collecting cases).

Second, Objectors argue that the loss of interest is "disproportionately unfair" to those who owe debts to the government because they cannot offset interest owed against interest owing. (Objections at 29). Actually, the effect of the loss of interest is the same for all class members – they are receiving less monetary value than if they were paid interest. For example, someone who does not owe interest to the government might owe an interest bearing obligation to a credit card company. They are equally as affected by the non-payment of interest. Or, for that matter, someone might have no debts, but if they received interest they could use the additional money to purchase things he or she otherwise could not afford, or to place money in a savings account he or she otherwise could not fund. The monetary loss in compromising interest is always the same; not being paid say 5% interest on $100 is a loss of $5.00 to all class members equally, whether that money otherwise would have offset interest to the government, interest owed on other debts, or to make purchases. But that is the nature of settlement – some level of compromise of a claim at less than 100% of value must occur or no defendant would ever settle. Here, that interest has been compromised.

Third, almost as a non-sequitor, Objectors claim the Settlement violates the rights of how innocent spouses can protect themselves from offsets. (Objections at 30). Actually, the Settlement plainly provides that the payments and offsets are administered just like ordinary tax refunds except where the Agreement provides otherwise. (Settlement Agreement § VI(a)). Nowhere in the Agreement is there any provision stripping spouses of their protections. Hence, a spouse who wants to protect their EIC claim under the Settlement from offset has the same rights as one who wants to protect an ordinary tax refund from an offset and is afforded the same rights by DRT. (See id.)

Fourth, Objectors argue that not paying interest is unfair to the most recent tax years because they must wait the longest for payment. (Objections at 30-31). That is simply the flip-side of the first supposed conflict: It is the oldest years that are giving up the most interest, but the most recent years that are waiting in line the longest. This type of balancing is a rational

distinction caused by the fact that the Government is paying over time. Someone thus has to be first in line; someone has to be last. Thus, the settling parties addressed this as rationally as possible: Tax years 1988 and 1997 were placed first because all of those claims were already on file. Thus, those years received the benefit of the "early payment," as all of the other years were opened for claim submission.

After 1997 and 1998 came the oldest years, the ones that did give up the most interest and were paid at a lower rate. It makes sense that they be paid next because those years have waited the longest, and have also compromised more value for payment. And those oldest years are then followed in turn by each most recent year, such that the years that waited the longest and waived the most interest got paid the soonest, and those that are the most recent and waived the least interest get paid last. It is, then, a compromise plan based on rational distinctions and legitimate considerations. *Cohen*, 61 F.3d at 728.

## B. The Funding Mechanism Is Effective and Has Already Generated a $10 Million Payment and Placed Millions More in Reserve Pending Final Approval

Objectors argue that the Government's funding mechanism is "illusory" because (1) payments could stop being made into Guam's Income Tax Reserve or Trust Fund (which are where settlement funds are sourced from); or (2) the Legislature could abolish the funds.

First, it is true that the Government could, in any given month, pay no money towards the Settlement if it places no money into the Reserve and Trust Funds. The Government's promise is simply to place 15% of whatever goes into those funds for tax refunds and the EIC, and to use it to fund EIC payments under the Settlement. (Settlement Agreement § V(a)).

So far, however, this system already has led to $13.4 million being placed into the Funds or paid to the class. (*See* Perez Dec. ¶ 3). Further, under the Settlement, the Government has pledged to only pay tax refunds out of the Reserve and Trust Funds. (Settlement Agreement § V(b)). And it has pledged in the Settlement (which will be enforceable by the Court) to provide reports regarding its compliance, which have been filed as required since preliminary approval was granted. (*Id.*; *see* Dock. Nos. 393 (January Report), 401 (February Report), 404 (March Report), 411 (April Report), 419 (May Report), 445 (June Report)).

1    The result is that the Settlement is not without binding power that ensures payment over
2    time. Specifically, for the Government to not pay anything at all over time, it either would have
3    to breach the Settlement by paying tax refunds through other means than the Reserve or Trust
4    Funds, or to stop paying all tax returns indefinitely – which would pretty much assure a citizen
5    revolt at the next election. Neither situation seems likely, and notably the first could be
6    immediately addressed by the Court, while the second is guaranteed to be corrected by the
7    electoral process. Thus, under the circumstances, it is hard to see how the Government's funding
8    is illusory – especially when it has thus already reserved approximately $13.4 million of the $90
9    million. (*See* Perez Decl. ¶ 3).

10    Second, Objectors' suggestion that the Legislature might abolish the Reserve and Trust
11    Funds is complete speculation. (Objections at 31). An objection needs to have some concrete
12    fact behind it; this one does not. It is just as well to suggest that Congress might abolish the EIC,
13    and so the Settlement is illusory on that ground too. Settlements have to be based on laws, and
14    there always is a danger that laws can change. But if that were a ground to challenge a
15    settlement's approval, none would ever receive approval.

16                    **C.    The Early Payment Was Not Coercive**

17    Recycling an argument from their objections to preliminary approval, Objectors assert
18    again that the early payment was "coercive." (Objections at 31). That argument remains as false
19    as it was on the hearing for preliminary approval.

20    Given that most 1997 claims already were paid, and all 1997 and 1998 claims already are
21    on file, and with in excess of $10 million already set aside for the Settlement, it was the
22    Governor's judgment that proceeding with the payment of the 1997 and 1998 claims was in the
23    interest of the Government. (*See also Santos* Docket No. 285 (Order re: Objections to Magistrate
24    Order of September 19 2005) (establishing the Governor's power and responsibility over all
25    executive matters concerning the GTIT)). The early payment benefits the Government by
26    providing an incentive for persons with 1997 and 1998 EIC claims to join the Settlement.

27    But this incentive is non-coercive. Claimants remained free to refuse the early partial
28    payment and instead await full payment after final approval, as claimants were expressly
     informed. (*See* Settlement Agreement § VI(e)(i)-(ii)). Indeed, the Government subsequently

*CIVIL CASE NO. 04-00006*                                                      19
*(Consolidated with Civil Case Nos. 04-00038 and 04-00049)*

1   obtained Court permission to engage in additional notice to persons subject to offsets to ensure
2   fair implementation of the "early payment." (Docket Nos. 395, 400).

3       The Governor and Government took a substantial risk—as the Court's December 7, 2006
4   Order appeared to be taking note of—by paying the $10 million upon preliminary approval with
5   no guarantee that the Court will give the Settlement Agreement final approval. The Governor
6   does see a benefit to this. But it is a risk. The EIC Class, meanwhile, received an immediate
7   benefit of $10 million, but will only be bound by the Settlement if it is found to be fair at the final
8   fairness hearing. That is hardly "coercive."

9       **D.    Objectors Are Failing To Account For Value of the Agreement to Pay the EIC**
10      In the Settlement Agreement, the Government has agreed to pay $90 million in back EIC
11  claims and to pay the complete EIC going forward. (Settlement Agreement §§ IV(a), IV(e)).
12  This will result in 100% payment (other than interest) in many recent tax years, and substantial
13  payments in back years. (*See supra* Part II(A)).   And, of course, it will mean complete
14  satisfaction of all EIC claims in the future.

15      Yet, Objectors attempt to dismiss the value of this to the Class by asserting that, "in a
16  fundamental sense, this case had already been won for plaintiffs" because of the holding in
17  *Simpao* that the EIC applies in Guam. (Objections at 32). However, the judge who issued that
18  decision, Judge Martinez, took a very different view. As he found, following that decision, the
19  case was "still very much in the early stages." (*Simpao* Dock. No. 148 at 6). As he noted, the
20  statute of limitations in particular posed a substantial risk to the Class, and "many of the putative
21  class members may fare better under a structured settlement agreement." (*Id*. at 6 n.7)

22      Indeed, with regard to the "applicability" of the EIC to Guam, the issue was not finally
23  decided at all. Following a prior Guam Supreme Court decision, Judge Martinez had ruled that it
24  applied to Guam in part, he wrote, because the Attorney General had conceded the issue (*id*. at
25  3:16-17), which it later became clear the Attorney General was not empowered to do because the
26  Governor controlled tax refund litigation. (Dock. No. 285). Thus, the door was open at minimum
27  for a renewed challenge in the District Court in all three EIC cases on the ground that the *Simpao*
28  decision was not binding on the Governor.

*CIVIL CASE NO. 04-00006*                                    20
*(Consolidated with Civil Case Nos. 04-00038 and 04-00049)*

1       Moreover, Objectors cannot simply take for granted that the decision by the district court

2  would have been affirmed by the Ninth Circuit. Had the Governor chosen to press the issue and

3  appeal, the applicability of the EIC to Guam would have been a question of statutory

4  interpretation that the Ninth Circuit would have reviewed *de novo*. *United States v. Ray*, 375 F.3d

5  980, 988 (9th Cir. 2004) ("We review de novo the district court's resolution of legal issues, such

6  as questions of statutory interpretation") (citation omitted). It is thus quite possible that, absent a

7  settlement, the Class would have received nothing. Instead, through the Settlement, the Class

8  received a secure judgment of $90 million for past years and full implementation of the EIC in

9  future years.

10       **E.  The Settlement Fairly Compensates 1995-1996 and 1999-2000**

11       Objectors argue that the Settlement Agreement unfairly compromises the claims for the

12  time-barred years of 1995-1996 and 1999-2000 by paying them $15 million total, instead of the

13  $15 million per year paid to "timely" years. (Objections at 33). They also separately argue that it

14  is unfair to include year 2000 as they assert it is not a potentially time-barred year. (*Id.* at 34).

15  However, the rationale behind this payment is adequate and fair.

16       **1.  The $15 Million Payment Accounts for the Risk to Time-Barred Years**

17       Objectors first argue that it is unfair to discount these claims based on the potential statute

18  of limitations created by 26 U.S.C. § 6511 given Judge Martinez's ruling. (Objections at 33).

19       First, Objectors are not focusing upon the more important statute of limitations at that

20  juncture: 26 U.S.C. § 6532. As they admit only in footnotes, prior to the most recent Settlement

21  in March 2006, Judge Martinez in *Simpao* had expressed the view that some years were possibly

22  untimely under 26 U.S.C. § 6532. (*E.g. Simpao* Docket No. 148-1 (Sept. 14, 2005 Order) at 6 n.5

23  ("This Court notes that many of the putative class members may fare better under a structured

24  settlement agreement. Should they proceed with a tax refund suit the relief sought for many of

25  the tax years in question may be barred because of a statute of limitations problem."). And,

26  indeed, there is substantial support for the view.

27       If, in fact, the filing of a tax return constituted the filing of an EIC claim under section

28  6511, the fact that a claim was filed could trigger the statute of limitations in § 6532(a)(1). That

statute bars any claim for a tax refund more than two years after notice of disallowance. The tax

*CIVIL CASE NO. 04-00006*     21
*(Consolidated with Civil Case Nos. 04-00038 and 04-00049)*

return forms for tax years 1995-1996 and 1999-2003 stated on their face that the EIC would not be applied. Arguably this gave taxpayers actual notice that their claim was denied and thereby triggered § 6532(a)(1).

The issue in essence would come down to whether the notice of disallowance had to be sent by certified mail. There is a strong line of authority suggesting that is not required. *E.g. Smith v. United States*, 478 F.2d 398, 399 (5th Cir. 1973) ("the purpose of a notice of disallowance is to provide the taxpayer with official notification of the Commissioner's adverse action. So long as the taxpayer receives adequate notice of the Commissioner's disallowance, no particular form of notice is necessary to start the running of the period of limitations.") (citing *A. G. Reeves Steel Const. Co. v. Weiss*, 119 F.2d 472 (6th Cir.), *cert. denied* 314 U.S. 677 (1941)); *accord Finkelstein v. United States*, 943 F. Supp. 425, 430-31 (D.N.J. 1996) (collecting additional authorities). Similar law exists as to the similar requirement of mailing notices of deficiency. *Balkissoon v. Comm'r of Internal Revenue*, 995 F.2d 525, 528 (4th Cir.), *cert. denied* 510 U.S. 978 (1993) ("[I.R.S.] Commissioner's failure to comply with the authorization in section 6212(a) inviting the use of registered or certified mail proves to be a technical, but harmless violation"); *Berger v. Comm'r of Internal Revenue*, 404 F.2d 668, 673 (3d Cir. 1968), *cert. denied* 395 U.S. 905 (1969) (section 6212(a) authorization that notice of deficiency be sent by registered or certified mail does not forbid any other method of notice). Admittedly, Objectors have attempted to cite contrary authority, but it is not very persuasive,[7] and even if on point, none of these cases

---

[7] Objectors gave it their best shot in the briefing regarding preliminary approval, citing a line of cases that they claimed held that 26 U.S.C. § 6532(a) requires notice by mail and that other forms of notice are not satisfactory. (*See* Docket No. 367 at 6-9). That authority is not very persuasive. *Rosser v. United States*, 9 F.3d 1519, 1522 (11th Cir. 1993), held that the statute of limitations began to run upon mailing of the notice of disallowance even where the taxpayer alleged they never received the actual notice; it was not addressing the question of whether alternative forms of actual notice were sufficient. *Maiman v. I.R.S.*, 1998 WL 161003 (E.D.N.Y. 1998), simply followed *Rosser* and again has no on-point holding. *Einson-Freeman Co. v. Corwin*, 112 F.2d 683, 684 (2d Cir. 1940), is even further off-point; its holding was that the mailing of a notice of disallowance started the statute of limitations even where a second, identical refund claim was filed. Objectors also completely misstated *Looney v. United States*, 228 Ct.Cl. 807, 1981 WL 11173 (1981), which held that a mailed notice of disallowance had started the statute of limitations and that a telephone call by an IRS employee to the contrary could not give rise to estoppel as that employee had no authority to alter the statute through a phone call.

1  addressing § 6532 are from the U.S. Supreme Court or Ninth Circuit; *i.e.*, none could be
2  controlling. Thus, there was substantial justification for a substantial discount on the value of the
3  claims based on section 6532 and the fact that the Governor was voluntarily waiving section 6532
4  (for settlement purposes only) as to persons who chose to remain class members.

5          Second, section 6511 remained a substantial threat to the Class' recovery.    Judge
6  Manibusan had indicated skepticism as to whether section 6511 was satisfied. (*See Torres* Docket
7  No. 64 (Sept. 29, 2005 Report and Recommendations of Magistrate Judge) at 9:24-27 (While the
8  Court "concluded *supra* that the Plaintiff's mere filing of a tax return suffices for the requirement
9  of filing an administrative refund claim under 26 U.S.C. § 7422(a), such limited action by the
10 Plaintiff is insufficient to satisfy the requirement under 26 U.S.C. § 6511(a) that refund suits be
11 brought in the district court within the applicable statute of limitations.")). Further, there were the
12 pending concerns noted above with the Attorney General's role in conceding issues that opened
13 the door to a renewed challenge. (*See Simpao* Dock. No. 148 at 3:16-17; *see also id.* at 8:8-15
14 (concluding Governor was not being adequately represented)).

15                        **2.      Inclusion of 2000 as a Potentially Time-Barred Year Is Justified by the**
                                 **Governing Law**
16
                 Objectors complain that the year 2000 should not have been treated as a time-barred year
17
        because tax returns could have been filed up until April 15, 2004 and the *Santos* suit was filed in
18
        February 2004, thus (they argue) tolling the statute of limitations as to the putative class.
19
        (Objections at 34).
20
                 First, Objectors' analysis is only considering the three year statute of limitations to file a
21
        tax return under section 6511. But, as discussed, the statute of limitations in section 6532(a)(1) is
22
        of greater immediate concern at this juncture. That statute only gives taxpayers two years in
23
        which to file suit following a notice of disallowance of their claim. As to most taxpayers who
24
        filed timely 2000 tax returns on or before April 15, 2001, their refund suit thus became potentially
25
        untimely as on April 15, 2003 – ten  months *before Santos* was filed. This then supports treating
26
        2000 like the other time-barred claims.
27
                 Second, Objectors' argument that year 2000 could be timely under the three year statute
28
        hinges on their position that the filing of a putative class action tolls the statute of limitations as to

1  putative class members under *American Pipe & Const. Co. v. Utah*, 414 U.S. 538 (1974). The
2  problem with this argument is that the U.S. Supreme Court has announced a blanket rule against
3  any non-statutory, equitable tolling of the statute of limitations in tax refund case. *United States*
4  *v. Brockamp*, 519 U.S. 347, 352-53 (1997). Certainly, were the case litigated, Objectors could try
5  to argue that *Brockamp* does not apply to bar this type of equitable tolling, but any fair
6  characterization of *Brockamp* would have to admit that this argument would be uphill all the way
7  given its sweeping language and broad application it has received by subsequent courts. *See id.*;
8  *Danoff v. United States*, 324 F. Supp. 2d 1086, 1099-1100 (C.D. Cal. 2004) (collecting cases).

9  ### 3. Time-Barred Claims Are Being Paid at a High Rate

10  Finally, in assessing the fairness to the time-barred years, the Court can take note of the
11  fact that substantially fewer claims were filed for older years than more recent years. (Camacho
12  Dec. at Ex. A). Indeed, this was a known fact going into the Settlement; ever since the Governor
13  authorized the filing of EIC-GU forms under Executive Order 2005-001, the most claims have
14  been filed for the most recent tax year covered, 2004, with participation dropping off every year
15  thereafter (not including 1998) at a gradual rate until the lowest number is reached as to the oldest
16  year, 1995. (Camacho Dec. ¶ 3). This pattern is evidenced in the final tally as well. (*Id.* Ex. A).

17  As a result of the predictable fact that there are fewer claims as to the older, potentially
18  time-barred years, the actual payout (exclusive of interest) is actually quite close to 100% for
19  these potentially time-barred years. Specifically, $17.5 million in claims were filed for 1996-96
20  and 1999-2000. (Camacho Dec. Ex. A). Given that $15 million is available to pay those claims,
21  the actual pay out rate is approximately 87% of the value of each time-barred year's claim. This
22  level of pay-out far exceeds any definition of reasonableness. *See, e.g., Stop & Shop Supermarket*
23  *Co. v. SmithKline Beecham Corp.*, 2005 WL 1213926 (E.D. Pa. May 19, 2005) (recovery of
24  11.4% of estimated damages "compares favorably with the settlements reached in other complex
25  class action lawsuits"); *In re Remeron Direct Purchaser Antitrust Litigation*, 2005 WL 3008808,
26  *9 (D.N.J. November 9, 2005) (settlement representing 56% to 69% of the maximum damages
27  plaintiffs could hope to recover was "above the range of settlements routinely granted final
28  approval"); *In re Cendant Corp. Litig.*, 264 F.3d 201, 230, 242 (3d Cir. 2001) (approving

settlement of 36% of total damages and noting that typical recoveries in some types of complex securities class actions range from 1.6%-14% of estimated damages).

### F. Objectors Are Failing to Consider the Value of the Government's Agreement to Proceed as a Class Action

Although the approval of a settlement is supposed to consider all of the factors that would affect the litigation, *Linney*, 151 F.3d at 1242, Objectors completely brush by one of the most important ones: The fact the Government agreed to proceed as a class action for settlement purposes.

This voluntary agreement was of tremendous value to the class because the odds against class certification absent government cooperation were extraordinarily high, meaning that the class was facing substantially higher cost of attempting the individual adjudication of their claims (which might have meant some would never have been heard at all). Specifically, under most circumstances courts confronted with the question have held that a tax refund action cannot be handled as a class action because of individualized issues.

Thus, in the cases of *Saunooke v. United States*, 8 Cl. Ct. 327, 330-31 (1985); *Heisler v. United States*, 463 F.2d 375, 375 (9th Cir 1972) (per curiam); *Whittington v. United States*, 240 F.R.D. 344 (S.D. Tex. 2006); *McConnell v. United States*, 295 F. Supp. 605, 606 (D. Tenn. 1969); *Green v. Walters*, 73-2 U.S.T.C. ¶ 9729, 32 A.F.T.R. 2d 73-5963 (E.D. Cal. 1973); *Agron v. Ill. Bell Tel. Co.*, 325 F. Supp. 487, 488 (N.D. Ill. 1970), the courts all refused to allow tax refund cases to proceed as class actions because individualized issues predominated.

As one court explained in holding that it would be impossible to consolidate a mere fourteen tax refund cases into one (which is substantially less than the 50,000 at issue here): "Since a tax refund action involves in effect a reaudit of the individual taxpayer's return for the time period in question ..., and not merely the ground on which the refund is sought, what would be tried were the relief granted, would be a composite action adjudicating the validity of each item on fourteen different returns. **It is difficult to conceive of a situation where the original action would be more hindered than in such a chaotic suit.**" *Lipsett v. United States*, 37 F.R.D. 549, 552 (S.D.N.Y. 1965) (citing *Lewis v. Reynolds*, 284 U.S. 281 (1932)) (emphasis added).

1    The only cases ever to conclude that class certification of a tax refund case was possible is

2    a decision from Michigan, *Appoloni v. United States*, 218 F.R.D. 556 (W.D. Mich. 2003), and a

3    case called *Klender v. United States*, 218 F.R.D. 161 (E.D. Mich. 2003), that involved the same

4    facts applied in a different district court in Michigan. In *Appoloni*, the court certified a class of

5    less than 200 claimants (as opposed to the tens of thousands here). *Appoloni*, 218 F.R.D. at 560.

6    And that court was never forced to deal with the procedural nightmare this would have created

7    because it subsequently found no government liability. *See Appoloni v. United States*, 333 F.

8    Supp. 2d 624 (W.D. Mich. 2003). *Appoloni* thus is not much in the way of precedent to suggest

9    that this case could have been successfully adjudicated at a contested trial resolving the individual

10   validity of over 50,000 tax refund claims.

11   Yet, while Rule 23 may pose an insurmountable barrier to *litigating* these claims on a

12   class-wide basis, it does not preclude a *settlement* on behalf of a class. This is because the same

13   case management issues that foreclose litigating a tax refund class action do not prevent

14   settlement of a tax refund class action. *See Amchem Prods. Inc.*, 521 U.S. at 620 ("Confronted

15   with a request for settlement-only class certification, a district court need not inquire whether the

16   case, if tried, would present intractable management problems, *see* Fed. Rule Civ. Proc.

17   23(b)(3)(D), for the proposal is that there be no trial."). The Government has agreed in this case

18   to administer the Settlement as it would ordinary tax claims. (Settlement Agreement § VI(a)).

19   Accordingly, this has cleared the otherwise likely fatal defect to class certification that 50,000 tax

20   claims cannot be processed through a federal court where the Government right to challenge each

21   and every one and to re-audit each and every return. That alone makes this Settlement of

22   tremendous value to the Class.

### G. Objectors Are Failing to Consider the Value of the Government's Agreement to Desist From Continued Litigation on Jurisdiction

Before the present Settlement, the Government had hotly contested the question of

jurisdiction based upon the requirement of exhaustion under 26 U.S.C. § 7422(a) and the statute

of limitations under 26 U.S.C. § 6511. Of course, parties may not stipulate to jurisdiction, and

with or without a concession on subject matter jurisdiction the Court has an independent duty to

review the issue for itself. Nonetheless, the Court need not ignore the practical reality that, in the vast majority of situations where subject matter jurisdiction is found wanting, it is because a party raised that challenge. Thus, the fact that the Government has agreed not to further challenge the issue is of substantial benefit to the Class, since it decreases the risk of dismissal substantially.

## H. The Very Low Number of Opt-outs Further Supports Approval

Objectors make only the briefest, dismissing reference to the fact that there were barely even a handful of opt-out notices received in this case. (Objections at 28). However, the lack of a substantial number of opts is, to the contrary, a factor the Court can and should consider in making its determination as to the overall fairness of the Settlement. *Stoetzner v. U.S. Steel Corp.*, 897 F.2d 115, 118-19 (3d Cir. 1990) (29 objections out of 281 class members "strongly favors settlement"); *see also Pigford v. Glickman*, 185 F.R.D. 82, 102 (D.D.C. 1999) (finding 5% to be a "low rate of opt-outs" when 85 farmer class members elected to opt out of the class after 1686 completed claim packages).

## V. THE SETTLEMENT COMPLIES WITH THE ORGANIC ACT AND GUAM LAW

In a final bid to destroy the Settlement, Objectors argue that its terms violate the Organic Act and Guam law, claiming the Court "must" not approve the Settlement because it is allegedly illegal. (Objection at 34-41). The basic premise of these arguments is that the Organic Act and current Guam law only allow the Government to pay for judgments, not to contract for judgments. (*See* Objections at 18-21). If these arguments were correct, it would mean that it would be impossible for the Government ever to settle this case and instead the Class must bear all risks of fully litigating the case or the Government must confess to immediately pay a judgment (which it will not do). It is hard – impossible, actually – to see how making this argument benefits the Class; to the contrary, it would appear to put the Class at risk. But, in actuality, no such risk exists because Objectors are simply getting the law wrong.

### A. The Settlement Does Not Violate the Provision of 48 U.S.C. § 1421i for Payments from Unencumbered Funds

Objectors first argue that the Settlement violates 48 USC § 1421i. That section provides that judgments for back tax refunds are to be funded from "unencumbered" funds. 48 USC § 1421i. Objectors are correct that 48 USC § 1421i provides *a* means of paying for a tax refund

1    judgment. Thus, in theory the Government could simply confess to the judgment under 48 USC §
2    1421i and wait for sufficient unencumbered funds to be available.

3         But, simply because 48 USC § 1421i provides *a* means of paying for a tax refund
4    judgment does not mean that it provides *the only* means of paying for a tax refund judgment.
5    Barring a windfall of historic proportions, it will take years for there to be $90 million in
6    unencumbered funds given a current deficit of $524 million. (Perez Decl. ¶ 2). Thus, given that
7    nothing in 48 USC § 1421i creates a prohibition on the Government satisfying judgments through
8    other, authorized means, the Governor has instead looked to Chapters 50 and 51 of Title 11 of the
9    G.C.A., which as discussed below provide alternative sources of funding.

10        **B.    The Settlement Complies with Chapters 50 and 51 of the G.C.A.**

11        Chapters 50 and 51 of the 11 G.C.A. create reserve and trust funds that both state they can
12   be used to pay tax refunds, "earned income tax credits," and the child tax credit. 11 G.C.A. §
13   50101, *et seq.* and 51101, *et seq.* Given that these statutes thus expressly permit expenditures
14   from the trust and reserve funds to pay the EIC, the Governor has utilized these to support the
15   Settlement Agreement.

16        Objectors make an issue of the fact that these reserve and trusts funds hold "projected"
17   amounts necessary to pay refunds and the EIC based on a three-year average. (Objections at 35).
18   However, what Objectors fail to note is that the three-year average is not based on refunds or
19   claims filed in the last three years – it is based on refunds and credits "issued." 11 G.C.A. §
20   50103.  Further, because obviously this might prove inadequate as the amount issued may
21   increase year to year, the amount to be reserved can then be *increased* because the ultimate
22   calculation "**shall <u>further</u> provide for reserving income tax receipts, on a percentage basis, in**
23   **order to accumulate sufficient cash reserves to pay <u>projected</u> income tax refunds, earned**
24   **income tax credits, and child tax credits in a timely manner.**" *Id.* (emphasis added).

25        Thus, the ultimate result is that the fund holds the amount **projected** to be required to pay
26   tax refunds, the EIC, and the child tax credit. It therefore is possible to account for the additional
27   amount needed to satisfy prior years' EIC under the Settlement based on such projections.
28   Section 50103 thus does permit the Governor the flexibility, based upon projections, to pay the

1  previous years EIC, and he is not obligated to simply wait until there are sufficient unencumbered
2  funds to pay a judgment as suggested by Objectors.[8]

3  ### C. The Settlement Complies with 48 U.S.C. § 1423j

4  Objectors spend two pages of their brief arguing that the Settlement violates the
5  Legislature's power over appropriations under 48 U.S.C. § 1423j. However, as Objectors must
6  admit, Chapters 50 and 51 of 11 G.C.A. state that funds therein can be spent on "projected tax
7  refunds, earned income tax credits, child tax credits and rebates." (Objection at 37:19). Nowhere
8  in the statutes does it state that the "projected" EIC that can be paid is only for future years –
9  "projected EIC payments" are still "projected EIC payments," whether they are payments for
10  1995 or 2005. Accordingly, the Governor's pledging of 15% of the amount that goes into those
11  funds is consistent with the Legislature's appropriation of monies that go into the Chapter 50 and
12  51 trust and reserve funds for "projected . . . earned income tax credits." 11 G.C.A. § 50103.

13  ### D. The Governor's Past Concern Regarding the Illegal Expenditures Act Was Resolved and the Present Settlement Complies with the Act
14
15  Finally, Objectors argue that the Settlement Agreement violates the Illegal Expenditures
16  Act, 5 G.C.A. § 22401. (Objections at 38-40).

17  First, they argue that the Governor entered into the contract "prior to an appropriation."
18  (Objection at 39-40). Actually, there is an appropriation – Chapters 50 and 51 of 11 G.C.A.
19  authorize expenditures on the EIC. The Settlement is paying the EIC. It complies with that
20  aspect of the law.

21  Second, they argue that the Settlement authorizes an expenditure "from a fund in excess of
22  the amount available therein." (Objections at 40). That, indeed, was the problem with the first
23  *Santos* settlement, which guaranteed $15 million a year, whether or not that amount was in the tax
24  refund reserve and trust funds. But the present Settlement only guarantees 15% of whatever is

25
26  [8] Objectors' argument that the money in the Fund is "property" belonging to taxpayers
27  (Objection at 36) is wrong for two reasons. First of all, Objectors are relying on precedent
    concerning true tax *refunds* of over paid taxes; the EIC is administered as a tax "refund," but it is
28  actually a social subsidy payment to the working poor *from the Government's funds*. Moreover,
    the precedent cited is in regard to the taxpayers' property interest in eventually receiving their
    refund; it says nothing about giving them a personal property interest in any particular funds held
    by the Government, however the Government may denote them.

placed in those funds[9] – whether that is 15% of $10 million or $100 million. No promise is made that any particular amount will be in the funds at any time or paid at any time, and therefore nowhere has the Governor authorized an expenditure "from a fund in excess of the amount available therein."

Third, Objectors point to the promise to pay the EIC in future tax years as violating the Illegal Expenditures Act. (Objections at 38). The promise made in the Settlement is that "EIC claims for tax years 2005 and future tax years shall be funded in compliance with Chapters 50 and 51 of Title 11 of the G.C.A." (Settlement Agreement § V(g)). Again, thus, there is no promised expenditure "from a fund in excess of the amount available therein" as future EIC will only be paid as, in the ordinary course, funds become available for tax refunds and the EIC.

## CONCLUSION

For the forgoing reasons, the Governor and Government respectfully request that the Court approve the Settlement Agreement.

Dated this 26th day of July, 2007.

OFFICE OF THE GOVERNOR OF GUAM
CALVO & CLARK, LLP
Attorneys at Law
*Attorneys for the Government of Guam
and Felix P. Camacho, Governor of Guam*

By: _____

**DANIEL M. BENJAMIN**

---

[9] And, as previously stated, it also guarantees (as required by Guam law) that all tax refunds will be paid from these funds.

*CIVIL CASE NO. 04-00006*
*(Consolidated with Civil Case Nos. 04-00038 and 04-00049)*

30