SHANNON TAITANO, ESQ.
OFFICE OF THE GOVERNOR OF GUAM
Ricardo J. Bordallo Governor's Complex
Adelup, Guam 96910
Telephone: (671) 472-8931
Facsimile: (671) 477-6666

EDUARDO A. CALVO, ESQ.
KATHLEEN V. FISHER, ESQ.
RODNEY J. JACOB, ESQ.
DANIEL M. BENJAMIN, ESQ.
CALVO & CLARK, LLP
Attorneys at Law
655 South Marine Corps Drive, Suite 202
Tamuning, Guam 96913
Telephone: (671) 646-9355
Facsimile: (671) 646-9403

*Attorneys for the Government of Guam
and Felix P. Camacho, Governor of Guam*

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF GUAM

| | |
|---|---|
| JULIE BABAUTA SANTOS, et. al., <br><br> Petitioners, <br><br> -v- <br><br> FELIX P. CAMACHO, etc., et. al. <br><br> Respondents. | CIVIL CASE NO. 04-00006 <br> (Consolidated with Civil Case Nos. 04-00038 and 04-00049) <br><br> **THE GOVERNOR'S AND GOVERNMENT OF GUAM'S SUR-REPLY PURSUANT TO THE COURT'S ORDER OF AUGUST 31, 2007 IN SUPPORT OF THE JOINT MOTION FOR FINAL APPROVAL** |

{G0025133.DOC;2}

ORIGINAL

Pursuant to the Court's August 31, 2007 Order, Governor of Guam Felix P. Camacho and the Government of Guam hereby respectfully submit their sur-reply in support of the joint motion for final approval of the Settlement Agreement.

## INTRODUCTION

Objectors appear to view the Settlement as a sweater, where they can keep on pulling each individual string in hope that one might make the whole compromise unravel. But, that is not how it works. "**It is the settlement taken as a <u>whole</u>, rather than the individual component parts, that must be examined for overall fairness.**" *Hanlon v. Chrysler Corp.* 150 F.3d 1011, 1026 (9th Cir. 1998) (citations omitted and emphasis added). By that Ninth Circuit standard, the Settlement is deserving of final approval – indeed, it would deserve such approval even if judged by its individual parts, because, as will discussed, Objectors still have yet to find any string that will unravel what is a tightly-knit legal compromise.

## ARGUMENT

### I. THE NOTICE AND THE CLAIMS PROCEDURES ARE FAIR AND ADEQUATE

#### A. The Notice Given Was the Best Notice Practicable Under the Circumstances

##### 1. The Government Has Given the Best Individual Notice Practicable that Complied with Mandatory Federal Privacy Laws

Objectors' Response continues to beat the drum that individualized notice was inadequate because the Government has not used alternative means of obtaining mailing addresses or commissioned a study as to the effectiveness of such mailing. (Response at 3-6). As was the case last time, the only real authority given is the testimony of Objector's "expert" witness, Ms. Interpido, who Objectors argue can somehow testify that "there are numerous reputable SSN look up services <u>that do not implicate privacy concerns</u>." (Response at 4 (emphasis added)).

Objectors (and Ms. Intrepido) just do not get it. DRT cannot give taxpayers' social security numbers and other confidential tax information (*e.g.*, income information on who qualifies for the EIC) to third parties without violating the law, especially where they would be giving it to a corporation that specializes in selling such information to others. And even if it could, DRT still could not use the results without further violating the law. Because what would

happen would be that the so-called "SSN look up service" would give DRT a list of other possible addresses for taxpayers based upon possible matches. And then DRT would send a notice of the settlement – and possibly an early payment check – to those "new" addresses, some of which would assuredly be wrong. And by having mailed to those incorrect addresses, DRT would have (without any consent from the taxpayer) disclosed to the recipient the identity of a taxpayer and the fact that this person fell within income brackets making them eligible for the EIC (and possibly additional confidential information as well). The Government thus respectfully suggests that Ms. Interpido and Objectors take a very careful look at 26 U.S.C. § 6103, because there is simply no way that the above-described sequence could avoid violating § 6103.[1]

Objectors' only effort to address section 6103 is to point out that confidential information can be disclosed under 26 U.S.C. § 6103(k)(6). (Response at 4). But Objectors do not bother to quote the whole section. That is because it is abundantly clear it has no application here; it states:

> **(6) Disclosure by certain officers and employees for investigative purposes.**-- An internal revenue officer or employee and an officer or employee of the Office of Treasury Inspector General for Tax Administration may, **in connection with his official duties relating to any audit, collection activity, or civil or criminal tax investigation or any other offense under the internal revenue laws**, disclose return information to the extent that such disclosure is necessary in obtaining information, which is not otherwise reasonably available, with respect to the correct determination of tax, liability for tax, or the amount to be collected or with respect to the enforcement of any other provision of this title.

(Emphasis added). Thus, under this section, confidential information can be disclosed in connection with a civil or criminal enforcement action. But that is not this case and a citation to this section is about as on-point as Ms. Intrepido's declaration.

In this context, as already laid out in the Camacho declaration, it is very clear what DRT could do to give individualized notice – it could mail that notice to a taxpayers' last known address based upon DRT records. Those last known addresses are determined based on DRT's most recent records, as updated by the filings of the taxpayer or their authorized representative. (*See* Dock. No. 450 (Camacho Declaration)). Given these points, the individual notice given was

---

[1] Violating §6103 subjects DRT to civil penalties under 26 U.S.C. § 7431, with a minimum of $1,000 per violation (and with the possibility of actual damages being tacked on).

*CIVIL CASE NO. 04-00006* 2
*(Consolidated with Civil Case Nos. 04-00038 and 04-00049)*

by the best means possible, and the demand for some type of post-notice study is far off-point as no alternative means of individualized notice by mail was possible (putting aside the fact that Objectors have not cited <u>one</u> case where such a post-notice study was required – the argument is entirely based on Ms. Intrepido's declaration on their behalf).[2]

### 2. Publication in Newspapers of General Circulation Was Also Proper

Again relying solely on the Intrepido declaration, Objectors argue that notice by publication in the form of publishing the notice for four straight weeks in the PDN and Marianas Variety, combined with the individual notice given, was not adequate, and that a study had to be conducted on the effectiveness of such publication. (Response at 6-7).

Yet, Objectors are not citing a single case to that effect. Or, more to the point, a single case holding that notice through mailing to last known addresses and publication in a newspaper of general circulation to the class is inadequate. And there is a reason for that: Notwithstanding Ms. Intrepido's declaration, an awful lot of courts have concluded that just this formula is the correct one – especially in cases (such as this one) that have also included extensive news coverage. *E.g. Pigford v. Veneman*, 355 F. Supp. 2d 148, 162 (D.D.C. 2005) (citing with approval 3 Newberg on Class Actions § 22:85 (4th ed.) (noting that "courts have usually required a combination of first-class mailed notice to the identifiable members and publication in one or more newspapers" when difficulties arise locating all putative class members); *In re Cherry's Petition to Intervene*, 164 F.R.D. 630, 638 (E.D. Mich. 1996) (notice adequate where sent to last known address, published in employee publications, and case covered in newspaper stories); *White v. National Football League*, 822 F. Supp. 1389, 1401 (D. Minn. 1993) (in case involving nation-wide class, publication in national newspaper, individual notice by mail to last known address, and news coverage ensured adequate notice); *Burns v. Elrod*, 757 F.2d 151, 153-54 (7th Cir. 1985) (notice via last known address and publication in Chicago's two daily newspapers

---

[2] The only case cited is *Parker v. Time Warner Enter. Co., L.P.*, 239 F.R.D. 318, 335 (E.D.N.Y. 2007). That case involved updating addresses, but did not involve a government entity that was handling confidential information it was legally bound not to disclose. And even that case did not demand a "post-notice" study on the effectiveness of notice.

adequate even when 500 of 700 notices were returned undelivered); *Herm v. Stafford*, 461 F. Supp. 502, 507 (D. Ky. 1978) (notice adequate where accomplished by last known address and publication in local newspapers of general circulation).

Beyond making an argument without legal authority, Objectors' position is obviously relying upon suspect math and figures. For example, they argue that the PDN only has a circulation of 20,116, and thus only reaches 13% of the island. But, anyone who lives on Guam and knows its population knows that most of those newspapers are going to households with more than one person, and to workplaces where they are read by everyone in the office. It is quite true that the Government has not undergone the expense to figure out exactly how many people actually read the PDN, or the demographics of such persons (which Objectors appear to suggest is required). But that information is available from the PDN's ratecard, available at http://www.guampdn.com/guampublishing/customerservice/retail_ratecard.pdf (a courtesy copy of the relevant page is attached hereto). It states that the PDN reaches: 78% of women; 77% of men; 74-80% of persons 18-80 depending on age; 78% of households with children, etc. (*See* Attachment A hereto). Thus, it is a newspaper of general circulation, and it is reaching over 75% of the island (not the 13% claimed by Objectors).

The Government admits that there are still other means of reaching people. But, what is required here is what is reasonably practicable. The Government mailed notices to persons' last known addresses as recorded with DRT. It published the notice for four straight weeks in the two newspapers of general circulation in Guam, one of which reaches over 75% of the population (who presumably may well inform at least some of the people who do not read the newspaper). The earned income tax credit litigation generally, and this Settlement in particular, have been the subject of dozens and dozens of news stories on TV, on the radio, in print, and on the internet. No case has been cited to the Court holding notice inadequate given such facts.

### B. The Contents of the Notice Are Adequate

Objectors once again argue that the contents of the notice are inadequate, again relying solely on Ms. Intrepido's declaration instead of any citation to cases regarding inadequate notices. (*See* Response at 7-8). The Government already answered these objections, so it will not repeat

that discussion here. But, since Objectors are still failing to cite any law, it is perhaps worth pointing out what the Ninth Circuit, as opposed to Ms. Intrepido, thinks is an inadequate notice. In the case of *Molski v. Gleich*, 318 F.3d 937, 951-52 (9th Cir. 2003), the court rejected a class action notice. It did not do so because the notice failed to contain "call out" headings or a "1-800" number. It did so because the notice "fail[ed] to explain that only claims involving literally physical injuries were not released under the proposed consent decree" and thus "<u>the notice misled the putative class members</u>." *Id.* at 952 (emphasis added).

That, in essence, is the real concern here – did the Settling Parties correctly and fully inform the Class of the material facts they need to know to make the decision to opt-out or remain in the Class? Despite at least three chances to brief the issue (once on preliminary approval, and now twice on final approval), Objectors still have yet to identify any material statement that is inaccurate, misleading, or omitted from the class action notice in this case. Yet, that is what Objectors need to show to be able to object successfully – an argument that the notice as drafted "misled the putative class members." *Molski*, 318 F.3d at 952. But Objectors do not have such a ground here because the notice does not mislead class members.

### C. The Claims Filing Procedures Is Fair and Reasonable

With regard to the claims filing procedure, other than vague assertions that it is "burdensome" (which are already addressed in the Government's prior brief), Objectors offer argument on only two points: (1) that the number of claims denied somehow raises questions as to the procedures used; and (2) that the Court should somehow ignore Judge Martinez's prior ruling approving the claims filing procedure. They are wrong on both points.

#### 1. Objectors' Only "New" Objection to the Claims Filing Procedure– that too Many Claims Are Denied – Fails to Understand How The Settlement and Executive Order Work: To Account for the Passage of Time and the Difficulty of Obtaining Back Tax Returns, They Permit the Filing of Claims by Persons Unsure of Their EIC Eligibility So Long as All Information Submitted Is Truthful

Although much of Objectors' arguments are a rehash, they do make two new points: (a) They argue that the rate at which claims were denied is higher than in years where EIC was accepted; and (b) they argue the Government or Class Counsel should be auditing those claims

that are denied. (Objectors' Response at 2, 10-12). As is so frequently the case, Objectors are not acknowledging or understanding all of the terms of the Settlement and Executive Order 2005-001, which fully address those issues.

First, the rate of denials is a result of the liberal claim filing procedure adopted in the Executive Order, which is in turn adopted in the Settlement Agreement. Specifically, Objectors continue to labor under the false impression that claimants had to obtain their past tax forms to file claims because they had to know whether or not they qualified under the income thresholds for the EIC. (Response at 11). However, the Executive Order addressed that potential problem years ago by providing that, although EIC claimants had to be truthful (*e.g.*, they had to accurately report the number of qualifying children, etc.), precisely because they might not remember the contents of their tax return, the Government was waiving the requirement that they determine for themselves whether or not they qualified for the EIC. As the Order states in the relevant provisions of its recital:

> **WHEREAS, <u>taxpayers should not have to bear the primary burden of determining whether they are eligible for the EITC in past tax years, or in what amounts, and to expect them to do so could at a minimum require them to obtain copies of all relevant back years' tax returns, at substantial cost and burden to both taxpayers and DRT</u>**; and
>
> **WHEREAS, <u>the use of a new simplified claim form for EITC claims</u>**, which requires only information not already known to DRT from taxpayers' previously submitted tax returns, **<u>would minimize the burden on taxpayers of making EITC claims</u>** *and would allow DRT to determine the eligibility* **and calculate the amount of the legitimate claims of each taxpayer** submitting the simplified form in the fastest possible time; ...

(*Simpao* Dock. No. 77 at Ex. 1 (emphasis added)). And as the Executive Order then goes on to order in paragraphs 2 and 3 of the Order:

> 2. Pursuant to the authority vested in it by 11 G.C.A.§§ 42102 and 42103, DRT shall prepare simplified forms to permit submission of EITC claims for tax years 1995-1996 and 1999-2004, together with explanatory materials as necessary to inform taxpayers about the procedures and plans for administration of such claims. **<u>The simplified forms shall require only information not already provided to DRT in tax returns and necessary for DRT to determine taxpayers' eligibility, calculate the amount of taxpayers' legitimate claims, and detect duplicative, mutually inconsistent, and fraudulent claims</u>**. Submission of a claim under the Guam Earned Income Program shall constitute submission of a claim for the federal EITC to the extent the federal EITC applies to Guam. However, any taxpayer who has not yet filed a tax return as to a given

tax year shall be required to file that tax return for that tax year along with the simplified EITC claim form in order to be eligible for the EITC under the Guam Earned Income Program for that tax year.

3. **DRT shall use the information submitted by taxpayers on the form described in paragraph 2, together with information already in DRT's possession, to determine taxpayers' eligibility, calculate the amount of taxpayers' legitimate claims, and promptly communicate that information to taxpayers submitting the form. Submitted information must be truthful, and the form shall require that its contents be submitted under penalty of perjury. The provisions of 26 U.S.C. § 32(k) will *in all other respects* apply to claims under the Guam Earned Income Program pursuant to 11 G.C. A. § 42102.**

(*Id.* (emphasis added)). In other words: All that taxpayers had to submit in their claim form was the information that permitted the Government to determine their potential eligibility; *they did not need to determine their eligibility.* Instead, the Government took upon itself the burden of determining eligibility, reasoning that this was both more fair and cost efficient than requiring taxpayers to dig up their returns from years ago and determine whether they fell within the EIC threshold for each year. (*See also Simpao* Dock. No. 77 at Ex. 4 (informational pamphlet that was distributed to taxpayers explaining that their eligibility for the EIC would be determined for them and that their only obligation was to submit truthful information)).

It is this policy decision that accounts for the higher rate of rejection of claims. If taxpayers are not required to go back to their old tax returns to determine their eligibility, it is fairly predictable that more non-qualifying claims will be filed that exceed the income limitation or other requirements, hence resulting in a higher denial rate.[3]

Second, because there is a perfectly rational explanation for the higher denial rate (that the claims procedure was deliberately over-inclusive), the suggestion that Class Counsel "audit" the rejected claims is not well-taken. (Response at 11). Indeed, an auditing process would require giving Class Counsel access to individual's private tax information without their consent in

---

[3] However, taxpayers are not penalized for such a denial and, in this regard, Objectors' suggestion that filing an unsuccessful EIC claim forfeited future rights (*see* Response at 11) is simply incorrect. Objectors are referring to 26 U.S.C. § 32(k), which creates penalties for submitting false EIC claims. But, as recited in paragraph 3 of the Executive Order, the Government has not enforced that provision as to submission of a non-qualifying claims, stating that it will only enforce the provision "in all other respects" (*i.e.*, only enforcing it as to false statements, not as to the submission of a claim by someone who turns out not to qualify).

*CIVIL CASE NO. 04-00006*             7
*(Consolidated with Civil Case Nos. 04-00038 and 04-00049)*

violation of federal law. *See* 26 U.S.C. § 6103. That is why the Settlement is drafted to precisely exclude that possibility. (Settlement Agreement § III(c)(vi) ("The Parties acknowledge that it is unlawful under federal law and territorial to disclose individual taxpayer information to any third party except for as authorized by law. None of the forgoing provisions regarding individual notice shall be construed to require such unauthorized disclosures....").

In any case, Objectors are again deliberately or accidentally failing to recognize that the Settlement contains safeguards against the improper rejection of claims. Initially, it expressly protects taxpayers' rights' to challenge any eligibility decision. (*See* Settlement Agreement § VI(d)(v) ("<u>With regard to any denial of an EIC claim or any assessment of any civil or criminal penalties, a member of the EIC Class shall maintain the right to challenge such a determination through all administrative and judicial processes afforded under federal or territorial law to a taxpayer as to any tax refund claim.</u>") (emphasis added)).

But the Agreement then goes farther. In Section VI(e)(viii), entitled "Procedure Governing Claims Approved After Claims For That Tax Year Have Been Paid," the Settlement Agreement provides that, if a taxpayer challenges a determination as to the amount of EIC he or she is owed, and if the amount owed to the other members of the Class has already been calculated, then that taxpayer receives a proportionate amount equaling their rightful share *in addition to the $90 million already guaranteed to the Class.* (Settlement Agreement § VI(e)(viii)(2)(B)). In other words, if DRT refuses to pay an EIC claim under the Settlement, and the taxpayer is later found eligible, it will actually *increase* the liability of the Government above the existing, capped settlement amount. Thus, the Government has every incentive to ensure that all claims are accurately processed.

### 2. Objectors Cannot Simply Ignore or Wish Away Judge Martinez's Prior Ruling Approving the Procedures Over Their Objections

Objectors also make a weak effort to distinguish away Judge Martinez's prior ruling (*see Simpao* Dock. No. 99-2 at 10) that the claims procedures established in Executive Order 2005-001 are valid because, they claim, "[t]he context here entirely different." (Response at 12). But while the legal context here is different (a motion for approval of a settlement versus a motion for

summary judgment), the factual context is not – it is still simply a question of whether or not the claims forms are an adequate method to process claims. And Judge Martinez squarely addressed that issue, holding: "<u>the Court finds that the Government of Guam has taken efforts to create forms that would allow it to process the claims in the event it is found responsible for paying the claims.</u>" (*Simpao* Dock. No. 99-2 at 11 (emphasis added)). The holding is clear, and Objectors' sophistry cannot disguise that plain conclusion (which conclusion is also correct for the other reasons given in the Governor's prior filings – namely the claims forms are a fair and reasonable means of determining who is filing an EIC claim and whether the claim is valid).

## II. THE SETTLEMENT IS SUBSTANTIVELY FAIR

### A. The Payments Are Fair to Each Tax Year

On pages 12-15 of their Response, Objectors revisit their arguments that the Settlement is treating different tax years unfairly. To begin with, they misstate the law. Although Objectors cite *Holmes*, an Eleventh Circuit case, to suggest that any difference between the treatment of class members is prima facie evidence of unfairness creating a "heavy burden" on the Settling Parties, the Ninth Circuit has made it clear that the heavier *Holmes* standard only applies where there is unequal treatment of the <u>named plaintiff versus the unnamed class members</u>:

> **The problem faced in Holmes, however, is different than the problem here. In Holmes, the eight named plaintiffs were to receive half of the total fund, [citation omitted], resulting in the differential treatment of the named plaintiffs vis a vis the unnamed plaintiffs.** ***In such a situation*, heightened judicial review of the fairness of the settlement by the trial court is necessary**.

*Cohen v. RTC*, 61 F.3d 725, 728 (9th Cir. 1995) (citation omitted and emphasis added), *vacated on other grounds*, 72 F.3d 686 (9th Cir. 1996). As the Ninth Circuit held, where the different treatment is simply as between different class members, the standard is lower and simply focused on whether the distinctions drawn are "<u>rationally based on legitimate considerations</u>," explaining that in such cases "there is less concern because the named plaintiffs are not receiving preferential treatment vis a vis the unnamed plaintiffs." *Id.* (emphasis added).

Here, the Government has already stated the reasons for different treatment in prior briefing and will not burden the Court with repetition. A few points are in order, however, in response to Objectors' latest attempts to attack the difference in treatment of particular tax years:

Case 1:04-cv-00006   Document 473-2   Filed 09/05/2007   Page 10 of 18

First, Objectors assert that the *American Pipe* analysis (which is one reason tax year 2000 is treated differently) would be the same for tax year 2000 as for 2001-04. This simply ignores, however, that the principle reason for treating 2000 different is because it is more vulnerable to the two-year statute of limitation than any subsequent year as that statute expired in April 2003, months before suit was brought (assuming *American Pipe* tolls the statute once suit is brought, which the Government does not concede). In comparison, tax years 2001-04 were timely under the two-year statute of limitations when the *Santos* action was filed in February 2004.

Second, Objectors' argument that "Tax year 1995, 1996, and 1999 are treated unfairly" (which argument in the middle switches to arguing that the unfairness is as "to tax years 2001-04") (*see* Response at 14) is just repeating prior arguments. As already addressed in the Government's prior briefing, older years are receiving less, but also are receiving prompter payment; more recent years receive more, but also must wait longer for payment. This is a rational compromise based upon the Government's limited funds and inability to pay all years simultaneously, as well as accounting for the lower number of claims in stale years and their lower likelihood of success. Indeed, the fact that Objectors' own brief manages to switch mid-paragraph between arguing that the Settlement is unfair to the old years to then arguing it is unfair to the new years (*see* Response at 14) is telling in revealing that in fact the Settlement is just about equally fair to all years – no year receives a perfect deal, but each is receives a fair deal.

Third, Objectors argue that it is unfair that each year is individually capped as all years should supposedly be paid out in one total amount. (Response at 15). But there is a quite legitimate reason for rejecting this approach. The Settlement is designed to fix the Government's liability for each year,[4] and then to have the years paid out sequentially as funds become available. Had the Settling Parties followed the Objectors' idea, the entire class would have to

---

[4] Objectors argue that capping the liability for each year benefits the Government. (Response at 15). Well, yes. If there was nothing at all in the Settlement to provide the Government a measure of certainty in dealing with this $90 million liability, it never would have entered this Agreement as there would be no advantage over litigation. It is at some point ridiculous to be suggesting that a settlement should be rejected simply because some portions benefit a defendant; by that standard, no class action settlement would ever receive approval.

wait until all claims were processed and all $90 million was collected before any could be paid out. By breaking into years, it became possible to begin payments now (as already occurred) and to pay each year as the applicable $15 million becomes available. That is fair and rational.

### B. Objectors Still Have Not Shown That the Early Payment Was Coercive (Because It Is Not)

Even though the Court already rejected the argument (*see* Dock. 384 at 4), Objectors once again try to argue that the early payment is coercive. (Response at 15-16). Again, Class Members were told of the consequences of cashing their check and were told they will not be bound by the Settlement unless the Agreement receives final approval. Objectors' only new spin is to cite *In re Educational Testing Service*, 447 F. Supp. 2d 612, 627 (E.D. La. 2006). Objectors' citation of that case is misleading, to say the least. The issue addressed there was that an objector was suggesting that class members should have been sent a check instead of a claim form; the court overruled the objection (and approved the settlement) because use of a claim form was standard and because class members under the settlement had the right to either an expedited payment or individualized damages. *Id*. It is unclear how that case bears on this case (except that it shows that using a claim form is normal). Certainly, class members here are not choosing between expedited payment or individualized assessment; they were simply being offered an earlier payment in the event they had already decided not to opt-out – a payment made at risk to the Government as final approval could ultimately be denied. Objectors citing an irrelevant case for a proposition it does not stand for does not help their "coercion" argument.

### C. The Benefit of the Payment to Class Members Is Shown Sufficient for Purposes of Approving the Settlement

Objectors argue that the Government has to show the "undiscounted value of the Class' claims." (Response at 16). Of course, were that the standard – that the Government had to show exactly what the total possible claims would be worth – it would be impossible in this case as the total number of possible claims that could have been filed can never be determined as explained in the Government's prior briefing, which Objectors fail to address. (*See* Docket No. 448 at 13). But, this is not the law. *E.g., In re Michael Milken and Assocs. Securities Litig.*, 150 F.R.D. 57, 66 (S.D.N.Y. 1993) ("The Milken Global Settlement may be found reasonable <u>even though the</u>

total value to be allocated to and recovered by the Class cannot presently be determined) (citing, inter alia, *Cotton v. Hinton*, 559 F.2d 1326, 1334 (5th Cir. 1977)) (emphasis added). Rather, "[t]he determination of what constitutes a "reasonable" settlement is not susceptible of a mathematical equation yielding a particularized sum. ... [A]s Judge Friendly has explained, "in any case there is a range of reasonableness with respect to a settlement." *Id.* (citing *Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972); *Zerkle v. Cleveland-Cliffs Iron Co.*, 52 F.R.D. 151, 159 (S.D.N.Y. 1971); *Glicken v. Bradford*, 35 F.R.D. 144, 152 (S.D.N.Y. 1964)).

In any case, substantial information has been provided based upon what can be shown in the Camacho Declaration filed on July 26, 2007, and this is more than adequate. It shows that the Class is receiving from 73%-100% of the value of their claims, less interest. (*See* Docket No. 450). Thus, although Objectors also cite *Carnegie v. Household Intern Inc.*, 371 F. Supp. 2d 954 (N.D. Ill. 2005), for the proposition that the value of the Settlement must be shown as to each individual (*see* Response at 16), this information has been shown. There is sufficient information as to the amount received by the Class versus the amount they could have received if completely successful on their claims, and that information shows the Settlement is reasonable and fair.

**D.    The Benefit of the Government's Concessions in the Settlement Agreement**

Objectors predictably try to dismiss the value of the Government's agreements in the Settlement Agreement to: (1) waive the statute of limitation in 26 U.S.C. § 6532; (2) agree to proceed as a class action; (3) agree not to further contest the application of the EIC; and (4) agree not to further contest jurisdiction. (Response at 13, 16-18). They are wrong on all fronts.

First, with regard to section 6532, because they wish to deny the value of such a waiver, Objectors now claim they never agreed that the Government could waiver section 6532. (Response at 13 n.5). Actually, they did. (*See* Docket No. 374 at 12 ("*Simpao* does not dispute [that] the Governor can extend the §6532 limitations period")). And, in any case, it is quiet clear the Government can manage such a waiver as it is expressly permitted in the plain language of section 6532(b). (*See also* Dock. No. 369 at 4). Further, given that this Court had recognized the danger that § 6532 created for the Class' claims absent a waiver, it is equally clear that the waiver is of benefit to the Class. (*E.g. Simpao* Docket No. 148-1 (Sept. 14, 2005 Order) at 6 n.5

("Should [the class] proceed with a tax refund suit the relief sought for many of the tax years in question may be barred because of a statute of limitations problem.")).

Second, Objectors' response regarding the Government's agreement to have this action proceed as a class action does not respond to the issue. (*See* Response at 18). Of course, as Objectors state, the Court must still undertake an analysis under Rule 23. (*Id.*) But it equally true, as discussed in detail in the Government's prior brief, that case management has been a critical issue that has defeated past tax refund class actions. And it also is equally true that under *Amchem Products* (cited in the prior briefing) this one, crucial factor can be and has been resolved by the Government in the Settlement. It thus cannot be said that the Government's concession of class certification for settlement purposes is of "little value" to the Class as Objectors claim.

Third, Objectors also (deliberately) miss the point regarding the Governments' agreement to apply the EIC. The fact is that this issue was not and could not be conclusively decided absent decision by the Ninth Circuit (or Supreme Court).[5] Risks on appeal are real, and cannot be discarded.

Fourth, Objectors' only response regarding the Government's decision regarding jurisdiction is to point out that the Court will always examine jurisdiction. (Response at 17). The Government admitted as much in its previous brief. But as stated in that brief, the Court need not ignore the practical reality that, in the majority of situations where jurisdiction is found wanting, it is because a party raised that challenge. Thus, this issue also cannot be ignored.

E.   The Very Low Number of Opt-outs Further Supports Approval

Objectors' only argument that the Court should disregard the low number of opt-outs is because of their assertion that there are "relatively few claims." (Response at 18). But that is not the evidence The evidence is that over 90% of the possible claims for 2004 were filed; the lower amount of claims only occurred as to older tax years, which shows only a lower amount of

---

[5] This is without even considering whether the Attorney General's improper concession of the issue had opened the door to subsequent challenge in the District Court.

*CIVIL CASE NO. 04-00006*                    13
*(Consolidated with Civil Case Nos. 04-00038 and 04-00049)*

participation in older years, not a lower level of participation overall. And, even as to the older years, class participation was hardly insignificant, constituting tens of thousands of claims. Indeed, there were almost 54,000 claims in total. By any measure, that is hardly just a "few." claims. Thus, the evidence more than supports the Court's consideration of the low number of opt-outs as supporting a grant of final approval. *See In re Am. Bank Note Holographics*, Inc.,127 F.Supp.2d 418, 425 (S.D.N.Y. 2001) ("the lack of objections may well evidence the fairness of the Settlement") (citing, *inter alia, Marshall v. Holiday Magic, Inc.*, 550 F.2d 1173, 1178 (9th Cir. 1977) (affirming approval of settlement where small number of class members indicating their disapproval of the settlement indicates its acceptability)).

### III. COMPLIANCE WITH THE ORGANIC ACT AND GUAM LAW

Objectors claim that they are not arguing that the case cannot be settled, simply that the Settlement must comply with the Organic Act and Illegal Expenditures Act. (Response at 21). That is a nice sentiment in theory, but in practice, their reading of those laws leaves no means of constructing a settlement – even though that is not required in the plain language of those laws.

For example, Objectors repeat their argument that 48 U.S.C. § 1421i(h)(2) requires that the Settlement be funded from unencumbered funds. (Response at 19-20). The basis for this is the assertion that subsection (h)(2) states tax refund judgments "shall" be paid from unencumbered fund. (*Id.*) This certainly suggests that unencumbered funds "shall" be used, if available, to satisfy a judgment. But, it is undisputed that the Government has no unencumbered funds (and has not had any for years). And, there is nothing in the mandatory nature of using unencumbered funds (where available) that forecloses using other, alternative funding sources, which is what the Settlement does. To give 48 U.S.C. § 1421i(h)(2) Objectors' reading would be to functionally (due to the lack of any unencumbered funds) make any meaningful settlement impossible. That is not dictated by the statute, and it is an irrational argument on "behalf" of the Class. The use of alternative funding does not violate 48 U.S.C. § 1421i.

Similarly, Objectors argue that only the Legislature can authorize alternative funding, notwithstanding that Chapters 50 and 51 of 11 G.C.A. state that the Income Tax Reserve and Trust Funds can be used for the EIC. (Response at 21). But Objectors' conclusion is not dictated

by the plain language of those statutes, and leaves the Class dependent upon either unencumbered funds or future legislative action before any settlement can occur. It makes no sense to adopt such an unreasonable reading of the statutes.

Finally, it is unclear how Objectors allege there is a violation of the Illegal Expenditures Act. The Government has agreed to make payments from the Income Trust and Reserve Funds as money is available, and has promised that 15% of all funds reserved for income tax refunds will be applied to this purpose. (Settlement Agreement § V(a)-(b)). Nowhere do Objectors in their Response point out how this violates any specific provision of the Illegal Expenditures Act. (*See* Response at 22). Indeed, they resort to arguing it is an illusory promise (*see id.*), which it plainly is not as millions of dollars already have been reserved.

## **CONCLUSION**

For the forgoing reasons, the Governor and Government respectfully request that the Court approve the Settlement Agreement.

Dated this 5th day of September, 2007.

                        OFFICE OF THE GOVERNOR OF GUAM
                        CALVO & CLARK, LLP
                        Attorneys at Law
                        *Attorneys for the Government of Guam*
                        *and Felix P. Camacho, Governor of Guam*

By: _____
     **DANIEL M. BENJAMIN**

# ATTACHMENT "A"

# Hit Your Target Market

## with the Pacific Daily News



The PDN reaches the vast majority of adults in every major demographic target group, from young adults to two income households to adults with children. Maximize the return on your ad dollar by choosing the source that delivers your market.

— the Pacific Daily News

The PDN reaches customers...

| ...in All Adult Ages | PDN's reach |
|---|---|
| 18-24 years | 72% |
| 25-34 years | 84% |
| 35-49 years | 80% |
| 50 years plus | 80% |
| ...by Gender | PDN's reach |
| Women | 78% |
| Men | 77% |
| ...by Marital Status | PDN's reach |
| Married | 77% |
| Single | 78% |
| ...with Buying Power | PDN's reach |
| Annual household income of more than $35,000 | 80% |
| Two income households | 82% |
| ...with Children at Home | PDN's reach |
| Households with children | 79% |
| ...by Residence Status | PDN's reach |
| Homeowners | 80% |
| Renters | 73% |
| ...by Education | PDN's reach |
| HS Graduate | 79% |
| Some College | 79% |
| College Graduate | 82% |
| ...by Ethnic Background | PDN's reach |
| Chamorro | 80% |
| Filipino | 75% |
| Caucasian | 78% |
| Other | 70% |

**CALL 472-1PDN**

Pacific Daily News
GUAM'S *complete* SOURCE
www.guampdn.com