1   [Appearing Counsel on next page]



**FILED**
DISTRICT COURT OF GUAM

OCT 1 9 2007

**JEANNE G. QUINATA**
**Clerk of Court**

5                    **DISTRICT COURT OF GUAM**

6                    **TERRITORY OF GUAM**

7   JULIE BABAUTA SANTOS, *et. al.*,          Civil Case No. 04-00006

8
                              Petitioners,
9                                                 **NOTICE OF SUBMISSION OF**
            -v-                                   **PROPOSED FINDINGS OF FACT**
10                                                **AND CONCLUSIONS OF LAW**
    FELIX P. CAMACHO, *et. al.*
11
                              Respondents.
12                                                Civil Case No. 04-00038

13  CHARMAINE R. TORRES, *et al.*,

14
                              Plaintiffs,
15          -v-

16  GOVERNMENT OF GUAM, *et al.*,

17
                              Defendants.
18                                                Civil Case No. 04-00049

19  MARY GRACE SIMPAO, *et al.*,

20
                              Plaintiffs,
21          -v-

22  GOVERNMENT OF GUAM,

23
                              Defendant.
24          -v-

25  FELIX P. CAMACHO, Governor of Guam,

26                            Intervenor-Defendant.

27

28  {G0026303.DOC;1}

**ORIGINAL**

**SHANNON TAITANO, ESQ.**
**OFFICE OF THE GOVERNOR OF GUAM**
Ricardo J. Bordallo Governor's Complex
Adelup, Guam 96910
Telephone:    (671) 472-8931
Facsimile:    (671) 477-6666

**EDUARDO A. CALVO, ESQ.**
**KATHLEEN V. FISHER, ESQ.**
**RODNEY J. JACOB, ESQ.**
**DANIEL M. BENJAMIN, ESQ.**
**CALVO & CLARK, LLP**
Attorneys at Law
655 South Marine Drive, Suite 202
Tamuning, Guam 96913
Telephone:    (671) 646-9355
Facsimile:    (671) 646-9403
Attorneys for *Felix P. Camacho, Governor of Guam*

**RAWLEN M.T. MANTANONA**
**CABOT MANTANONA LLP**
BankPacific Building, 2nd Floor
825 S. Marine Corps Drive
Telephone:    (671) 646-2001
Facsimile:    (671) 646-0777
Attorneys for Respondents *Lourdes M. Perez and Artemio B. Ilagan*

**MICHAEL F. PHILLIPS**
**PHILLIPS & BORDALLO, P.C.**
410 West O'Brien Drive
Hagåtña, Guam 96910
Telephone:    (671) 477-2223
Facsimile:    (671) 477-2329
Class Counsel and Attorneys for Petitioner *Julie Babauta Santos*

**IGNACIO C. AGUIGUI**
**PETER C. PEREZ**
**LUJAN AGUIGUI & PEREZ LLP**
300 Pacific News Building
Hagåtña, Guam 96910
Telephone:    (671) 477-8064
Facsimile:    (671) 477-5297
Attorneys for Plaintiff *Charmaine R. Torres*

{G0026303.DOC;1}

Consistent with the Court's instructions at the fairness hearing, the undersigned parties hereby respectfully submit proposed findings of fact and conclusions of law, attached hereto as Attachment "A."

Respectfully submitted this 19th day of October, 2007.

OFFICE OF THE GOVERNOR OF GUAM
CALVO & CLARK, LLP
Attorneys for Respondent Felix P. Camacho,
Governor of Guam


By: _____
        DANIEL M. BENJAMIN


CABOT MANTANONA LLP
Attorneys for Respondents Lourdes M. Perez
and Artemio B. Ilagan


By: _____
        RAWLEN M.T. MANTANONA


PHILLIPS & BORDALLO, P.C.
Class Counsel & Attorneys for Petitioner
Julie Babauta Santos


By: _____
        MICHAEL F. PHILLIPS


LUJAN AGUIGUI & PEREZ LLP
Attorneys for Plaintiff Charmaine R. Torres


By: _____
        PETER C. PEREZ

1

# ATTACHMENT "A"

1 | [Appearing Counsel on next page]
2

3

4

5

6 **DISTRICT COURT OF GUAM**

7 **TERRITORY OF GUAM**

8 | JULIE BABAUTA SANTOS, *et. al.,*      Civil Case No. 04-00006

9 |       Petitioners,

10 |      -v-       **[PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW GRANTING FINAL CLASS CERTIFICATION AND SETTLEMENT APPROVAL**

11 | FELIX P. CAMACHO, *et. al.*

12 |       Respondents.

13

14 | CHARMAINE R. TORRES, *et al.,*      Civil Case No. 04-00038

15 |       Plaintiffs,

16 |      -v-

17 | GOVERNMENT OF GUAM, *et al.,*

18 |       Defendants.

19 | MARY GRACE SIMPAO, *et al.,*

20 |       Plaintiffs,      Civil Case No. 04-00049

21 |      -v-

22 | GOVERNMENT OF GUAM,

23 |       Defendant.

24 |      -v-

25 | FELIX P. CAMACHO, Governor of Guam,

26 |       Intervenor-Defendant.

27

28

{G0026303.DOC;1}

**SHANNON TAITANO, ESQ.**
**OFFICE OF THE GOVERNOR OF GUAM**
Ricardo J. Bordallo Governor's Complex
Adelup, Guam 96910
Telephone:    (671) 472-8931
Facsimile:    (671) 477-6666

**EDUARDO A. CALVO, ESQ.**
**KATHLEEN V. FISHER, ESQ.**
**RODNEY J. JACOB, ESQ.**
**DANIEL M. BENJAMIN, ESQ.**
**CALVO & CLARK, LLP**
Attorneys at Law
655 South Marine Drive, Suite 202
Tamuning, Guam 96913
Telephone:    (671) 646-9355
Facsimile:    (671) 646-9403
Attorneys for *Felix P. Camacho, Governor of Guam*

**RAWLEN M.T. MANTANONA**
**CABOT MANTANONA LLP**
BankPacific Building, 2nd Floor
825 S. Marine Corps Drive
Telephone:    (671) 646-2001
Facsimile:    (671) 646-0777
Attorneys for Respondents *Lourdes M. Perez and Artemio B. Ilagan*

**MICHAEL F. PHILLIPS**
**PHILLIPS & BORDALLO, P.C.**
410 West O'Brien Drive
Hagåtña, Guam 96910
Telephone:    (671) 477-2223
Facsimile:    (671) 477-2329
Class Counsel and Attorneys for Petitioner *Julie Babauta Santos*

**IGNACIO C. AGUIGUI**
**PETER C. PEREZ**
**LUJAN AGUIGUI & PEREZ LLP**
300 Pacific News Building
Hagåtña, Guam 96910
Telephone:    (671) 477-8064
Facsimile:    (671) 477-5297
Attorneys for Plaintiff *Charmaine R. Torres*

{G0026303.DOC;1}

This is an action by Plaintiff Julie B. Santos, on behalf of herself and those similarly situated, to recover allegedly owed refunds of the Earned Income Tax Credit (the "EIC") from the Government of Guam, the Governor of Guam, and the Directors of the Departments of Administration and Revenue & Taxation (referred to herein collectively as "Respondents"). This action, Civil Action No. 04-00006, has been consolidated for pretrial purposes with two other actions, and it is referred to herein as the "*Santos* action." The two other actions that have been consolidated with the *Santos* action are Civil Action No. 04-00038 (the "*Torres* action") and Civil Action No. 04-00049 (the "*Simpao* action").

Presently before the Court are motions: (1) By the plaintiffs in *Santos* and *Torres* for final class certification, and (2) By the plaintiffs in *Santos* and *Torres*, together with the Respondents (collectively referred to herein as the "Settling Parties") for final approval of a settlement agreement they have reached (*see* Dock. No. 383,[1] referred to herein as the "Settlement"). The only objections filed were by two of the three plaintiffs in the *Simpao* action, Mary G. Simpao and Janice Cruz (referred to herein as "Objectors").[2] For the reasons that will be stated, having considered the briefing of the parties, the pleadings on file, and the arguments of counsel, the Court hereby grants the motions and overrules the objections.

## FACTUAL BACKGROUND

### A.    Procedural History

The *Santos* action was first brought in February 2004 by attorney Michael F. Phillips as a putative class action seeking tax refunds, or in the alternative a writ of mandamus. (Dock. No. 1). The essential allegation of the complaint was that the Guam Department of Revenue and Taxation ("DRT") and other Respondents had unlawfully refused to pay the EIC to Guam taxpayers in certain years,[3] and that such taxpayers accordingly were owed such EIC as tax refunds. (*Id.*)

After the defendants answered, the parties agreed to a trial in November 2004. (Dock. No. 11). On May 27, 2004, the Court instructed Mr. Phillips to hold off on his planned summary

---

[1] All docket references are to this proceeding except where noted.

[2] The third *Simpao* plaintiff, requested exclusion from the Settlement.

[3] The complaint has been amended to include tax years 1995 through 2004 in what is now a joint complaint by the *Santos* and *Torres* parties. (Dock. 326)

*CIVIL CASE NO. 04-00006*                                        1
*(Consolidated with Civil Case Nos. 04-00038 and 04-00049)*

judgment motion, and to instead seek class certification. (Dock. No. 12). On June 17, 2004, however, Santos reached a settlement with the Government and the Attorney General of Guam, with the Lieutenant Governor signing the agreement as Acting Governor because the Governor was off-island. (Dock. No. 14).

Soon thereafter, the attorneys now representing the plaintiffs in *Torres* and *Simpao* sought to intervene, which intervention was denied on August 5, 2004. (Dock. No. 76). The *Torres* plaintiff initiated her own action on August 9, 2007. (*Torres* Dock. No. 1). The *Simpao* attorneys first sought to appeal the denial of intervention, but subsequently dismissed the appeal without prejudice and initiated a third competing action on December 3, 2004. (*Simpao* Dock. No. 1). Although there are some differences in the exact class definitions and parties named, and although the *Torres* complaint expanded the tax years covered, at heart both new actions duplicated the *Santos* complaint by seeking back tax refunds of the EIC from Respondents.

Meanwhile, a dispute had arisen between the Attorney General and Governor of Guam as to the legality of the first settlement. On November 9, 2004, the Governor objected to proceeding with that settlement, and subsequently filed a motion to disqualify the Attorney General as counsel for the government of Guam. (Dock. Nos. 87, 163).

After briefing regarding the legality of the settlement, the parties consented to a mediation before JAMS Mediator Catherin Yanni, Esq. (Dock. Nos. 188, 207). In May 2005, they reached a term sheet and began drafting a settlement agreement while they waited to see if the Attorney General would join the settlement. (Dock. Nos. 188, 207; *Simpao* Dock No. 96). In June 2005, Respondents (other than the Government, which was represented by the Attorney General) and the *Santos* plaintiff formalized their settlement in a written settlement agreement and moved for preliminary approval and certification. (Dock No. 211, 212).

Meanwhile, however, the Governor was not at that time a party in *Simpao*, and the Attorney General was directing the defense of the action on behalf of the Government. On June 15, 2006, the Court granted in part and denied in part a motion for partial summary judgment by the *Simpao* plaintiffs in that action. (*Simpao* Dock. 99). Judge Martinez, who issued that decision, later stated that the relief that was granted was in part a result of the Attorney General's concession of certain issues, contrary to the Governor's position. (*Simpao* Dock. No. 148-1). In

*CIVIL CASE NO. 04-00006*      2
*(Consolidated with Civil Case Nos. 04-00038 and 04-00049)*

the same Order, Judge Martinez granted the Governor's motion to intervene in *Simpao* because his interests had not been adequately represented. (*Id.*)

On March 10, 2006, the Court disqualified the Attorney General as counsel for the Government of Guam and held that the Governor had the power to control tax litigation and to settle such cases. (Dock. No. 285). It also consolidated the three cases for pretrial purposes. The Attorney General obtained permission to file an interlocutory appeal, and the cases were stayed pending this appeal. (Dock No. 300).

Following an unopposed motion by the Governor, on March 21, 2006, the Court ordered the parties to hold a global mediation. (Dock. No. 309). The parties thereafter conducted a multi-day mediation before The Honorable William Cahill (Ret.), a JAMS mediator. (Dock No. 314). With the parties' consent, the Court subsequently contacted the mediator and ascertained that all parties had a meaningful opportunity to participate at the mediation. (*See* Dock. No. 384 at 3).

Following the mediation, the *Santos* and *Torres* plaintiffs reached a settlement with the Respondents, but the *Simpao* plaintiffs did not. On May 26, 2006, the Settling Parties moved for preliminary approval of the Settlement, and soon thereafter, pursuant to the terms of the Settlement, the *Santos* and *Torres* parties moved for preliminary class certification and appointment of *Santos* counsel (Mr. Phillips) as lead counsel. (Dock. Nos. 320, 329).

The Court, however, maintained the stay pending the Attorney General's appeal. (Dock No. 333). After that appeal was denied, the present Judge was assigned to this case on November 28, 2006. (Dock. 356). After further briefing and argument, in which the Court permitted the *Simpao* plaintiffs to participate, on January 9, 2007, the Court granted preliminary certification and approval. (Dock. No. 384).

On January 29, the class notice was approved. (Dock. No. 392). It was thereafter published twice a week for four weeks in the Pacific Daily News and Marianas Variety, and also was mailed to 49,378 individual taxpayers who had been identified, based on their tax records, as being potentially qualified for an EIC claim in tax years 1995-96 and/or 1999-2004, or who had actually filed a claim in 1997 or 1998 that had yet to be paid. (Dock. Nos. 424, 493 at ¶ 2).[4] The

---

[4] Of those, 47,351 were sent to Guam addresses and 2,027 were sent off-island. (*Id.*)

reason for the different treatment of different tax years is that, in 1997 and 1998, it was possible to file a EIC claim, whereas for all other years DRT had asserted such claims would not be accepted (except that they were accepted in 2004 as well, but the time to file a 2004 claim was still open). (Settlement Agreement III(c), VI(b); *see also Simpao* Dock. No. 99 at 1-2).

From the date of publication of the notice until the expiration of the time to file a request for exclusion on May 8, 2007, the Court received four requests to opt-out. (*See* Dock. Nos. 403, 406, 408, 409). One of the requests was by one of the *Simpao* plaintiffs. (Dock. No. 409).

On June 8, 2007, the *Santos* and *Torres* parties moved for final class certification, and the Settling Parties moved for final approval of the Settlement Agreement. (Dock. Nos. 416, 417, 421). The only objections filed were by the two remaining *Simpao* plaintiffs. (*see* Dock. Nos. 426, 462). On September 20 and 21, 2007, the Court heard argument on these motions and objections. (Dock. No. 491, 494).

## B.    The Terms of the Settlement

The Court will briefly summarize the relevant terms of the Settlement.[5]    The Settlement begins by defining the EIC class as follows:

> All persons who do not elect to request exclusion from the class under the procedures described below and: (1) were subject to the Guam Territorial Income Tax ("GTIT") established in 48 U.S.C. § 1421i for tax years 1995-1996 and/or 1999-2004 and would have been eligible to file for the EIC established in 26 U.S.C. § 32 (as it applied in each respective tax year) if that program were applied in the Territory of Guam, and filed a timely tax return for the applicable tax year or year(s) in which the credit is sought; and/or (2) were eligible to receive an EIC credit under certain Guam territorial laws for tax years 1995-1996 and/or 1999-2004 that mirrored the federal EIC law (26 U.S.C. § 32), including the Guam Earned Income Program (Chapter 42 of 11 G.C.A.), and filed a timely tax return for the applicable tax year or year(s) in which the credit is sought; and/or (3) actually filed a claim for the EIC with DRT for tax year 1998 under the GTIT or Guam Earned Income Program (Chapter 42 of 11 G.C.A.) on or before April 15, 2002, and have not yet received full payment for that claim; and/or (4) actually filed a claim for the EIC with DRT for tax year 1997 under the GTIT or Guam Earned Income Program (Chapter 42 of 11 G.C.A.) on or before April 16, 2001 and have not yet received full payment for that claim.

(Settlement Agreement § I(b)).

---

[5] The Court notes at the outset that, in the Settlement, the Parties agreed to supersede the prior settlements of this case. (Settlement Agreement § II(a)(vi)-(vii)).

In the Settlement, the Government agreed to pay a total of $90 million for tax years 1995-1996 and 1998-2004, with $15 million per year devoted to all "timely" years, where claims were or still could have been allegedly asserted within the statute of limitations (1998, and 2001-2004); another $15 million total was devoted to the "stale" years (1995-1996, and 1999-2000), where the potential statute of limitations defense was stronger. (Settlement Agreement § IV(a)).[6] The Class waived all right to interest, however. (*Id.* § IV(b)). The one exception was as to 1997, where the Government had already paid 100% of most claims with interest pursuant to a specific appropriation, and agreed to pay those few remaining claims at 100% plus interest to ensure parity. (*Id.* § IV(d)). The Government also agreed to pay the EIC in future years. (*Id.* § IV(e)).

As an additional benefit to the Class, the Government agreed to make an initial, early payment to the EIC Class of $10 million it had already reserved under the prior settlements for tax year 1998 claims (and also to pay the few 1997 claims) upon preliminary approval of the Settlement. (Settlement Agreement § VI(e)(i)-(ii)). Class members receiving such payments received additional notice informing them that accepting the check would bind them to the Settlement *if* it received final approval, but they were also told that they could wait and still receive the check upon final approval if they preferred, and they were not bound to the Settlement unless it received final approval. (*Id.* § VI(e)(i)-(ii) & Ex. D).

The Settlement Agreement contained very specific funding mechanisms. (Settlement Agreement § V). Funding for the $90 million was obtained by devoting at least 15% of any amounts that are placed into the Government of Guam's tax refund reserve funds to the Settlement. (Settlement Agreement § V(a)). The tax refund reserve funds are the funds used to hold all of Guam's tax refunds before they are paid out, and the Government pledged not to pay tax refunds out of any other source during the life of the Settlement and to provide monthly reports to ensure compliance (which it has now done since February of 2007). (*Id.* § V(a)-(b)).

Despite creating a class action, the Settlement Agreement avoids imposing an undue burden on the Court, and any management difficulties that might otherwise arise, by utilizing

---

[6] The Settlement Agreement also contains "roll-over" provisions in which any remaining amounts in a particular year will be rolled-over to fund payments for certain other years. (*See id.*)

existing DRT structures to process tax claims. (*See* Settlement Agreement § VI(a)). The Settlement Agreement uses the EIC claim forms created pursuant to Executive Order 2005-001 and otherwise tracks Executive Order 2005-001 in terms of claims procedures (see Settlement Agreement § VI(b))—the same forms and procedures that were upheld by the Court in *Simpao* over the objections of the Objectors in this case. (*See* Simpao Dock. No. 99 at 9-11).[7]

## DISCUSSION

### I. Class Certification

The plaintiffs in *Santos* and *Torres* have moved for final class certification. The Respondents have stated they do not oppose certification for settlement purposes. The Objectors have stated that they do not contest that class certification is possible in this case, but rather are objecting to class certification in the context of the Settlement, as well as objecting to the form of notice given and the adequacy of representation.

A party seeking final class certification bears the burden of: (1) establishing a prima facie showing of each prerequisite set forth under Rule 23(a) of the Federal Rules of Civil Procedure; and (2) demonstrating appropriate grounds for class action status under Rule 23(b). *Dukes v. Wal-Mart, Inc.*, 474 F.3d 1214, 1224 (9th Cir. 2007); *see also Zinser v. Accufix Research Inst.*, 253 F.3d 1180, 1186 (9th Cir. 2001) ("[petitioner] bears the burden of demonstrating that she has met each of the four requirements of Rule 23(a) and at least one of the requirements of Rule 23(b)" (citing *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992)).

### A. Rule 23(a) Requirements

The first issue is whether Fed. R. Civ. Proc. 23(a) is satisfied. The requirements of Rule 23(a) are commonly referred to as the requirements of numerosity, commonality, typicality, and adequate representation. *E.g., Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir.1998). Each of these factors is satisfied as set forth below.

---

[7] The Executive Order is further described in that Order, and provides much of the administrative structure for the Settlement.

*CIVIL CASE NO. 04-00006*       6
*(Consolidated with Civil Case Nos. 04-00038 and 04-00049)*

## 1. Numerosity

A class meets the numerosity requirement where the class is of such a size that joinder of all members would be impractical. Fed. R. Civ. Proc. 23 (a)(1). This number need not be alleged with mathematical precision. Instead, a finding of numerosity can be demonstrated through common sense assumptions. *In re Playmobil Antitrust Litigation*, 35 F.Supp.2d, 231, 239 (E.D.N.Y 1998). Further, a court will examine the specific facts of each case to determine whether joinder is impractical. *General Tel. Co. v. EEOC*, 446 U.S. 318, 330 (1980).

In the present case, DRT identified a class of persons *potentially* eligible for the EIC of 49,378 persons, (Dock. 493 at ¶ 2), of which 24,108 filed claims. (Dock. No. 495 at ¶ 2). Although not all persons *potentially* eligible necessarily in fact qualified for the EIC, many did and there were indeed 41,696 successful claims. These numbers far exceed that of cases in which other courts have found sufficient numerosity to certify a class. *E.g., Paper Systems, Inc. v. Mitsubishi Corp.*, 193 F.R.D. 601, 604 (E.D. Wis. 2000) (would-be class of greater than forty members held sufficient); *In re Flat Glass Antitrust Litigation*, 191 F.R.D. 472 (E.D. Pa. 1999) (holding that "classes consisting of hundreds (and potentially thousands) of putative plaintiffs have routinely satisfied the numerosity requirement.") (citations omitted).

## 2. Commonality

The second factor, commonality, refers to a situation in which there are questions of law or fact common to the class. Fed. R. Civ. Proc. 23(a)(2). This has been interpreted by courts to mean that the case must involve an issue "common to the class as a whole," and that relief must "turn on questions of law applicable in the same manner to each member of the class." *See General Tel. Co. v. Falcon*, 457 U.S. 147, 155 (1982). This requirement is satisfied if the named plaintiffs share at least one question of fact or law with the grievances of the class generally. *In re Flat Glass Antitrust Litig.*, 191 F.R.D. 472 (E.D. Pa. 1999)

Here, as the Court previously observed in granting preliminary certification, the fact that "Petitioners and class members have been denied both the opportunity to file for the earned income tax credit ("EIC") for several years and the recovery of the same" satisfies the commonality requirement. (Dock. No. 384 at 5-6). This factor has not changed since the Court issued its previous Order, and the Court again concludes that this requirement has been met.

### 3.  Typicality

The typicality requirement examines whether the individual claim of the class has the essential characteristics common to that of the class. Fed. R. Civ. Proc. 23 (a)(3); *Hassine v. Jeffes*, 846 F.2d 169, 177 (3d Cir.1988). Stated differently, a "plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and, her or his claims are based on the same legal theory." 4 Herbert Newberg & Alba Conte, Newberg on Class Actions § 18.08, at 18-26 (3d ed.1992); *see also Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992). The purpose of the typicality requirement is to assure alignment of interests between the named class representative and the rest of the class. *General Tel. Co. v. Falcon*, 457 U.S. 147, 156 (1982).

With respect to typicality, the Court's prior Order granting preliminary class certification found that "the Respondent's 'course of conduct' with respect to the various plaintiffs, *i.e.*, its failure to allow EIC claims and subsequent payment thereof is exactly the same." (Dock. 384 at 6). On that basis, the Court held that "Petitioners' claims are 'typical' of those of the rest of the class." (*Id.*) No new facts have been introduced contradicting this prior holding, and the Court thus once again concludes that typicality is satisfied here on this same ground.

### 4.  Adequate Representation

The final requirement is that the representative party will fairly and adequately represent the class. Fed. R. Civ. Proc. 23 (a)(4). Representation is "adequate" if (1) the attorney representing the class is qualified and competent; and (2) the class representatives do not have interests antagonistic to the remainder of the class. *Lerwill v. Inflight Motion Pictures, Inc.*, 582 F.2d 507, 512 (9th Cir. 1978). As to the second factor, as the Court found in its prior Order granting preliminary certification, "the Petitioners and class members possess the same interest in recovering the EIC and in the implementation of the earned income tax credit program. The Petitioners have vigorously pursued this action." (Dock. 384 at 6).

Indeed, Objectors do not dispute the adequacy of the class representatives; but, Objectors do dispute the adequacy of class counsel, Mr. Phillips. In large part, their objection is that he is inadequate because of the alleged inadequacy of the Settlement he entered into. The Court addresses and overrules the objections to the Settlement *infra*. Further, the Court notes that it has

already found over Objectors' prior objections that "[i]t is evident to this court that [Mr. Phillips] has the requisite experience in handling class actions to be able to advocate on behalf of the class in this instance." (Dock. 384 at 10). The Court once again confirms that finding.[8]

## B. Rule 23(b) Criteria

The second requirement for class certification is that certification be proper under one or more of the possible grounds under Fed. R. Civ. Proc. 23(b). In the present case, the Court finds that certification is proper under Rule 23(b)(3).

To qualify for certification under Rule 23(b)(3), (1) "[c]ommon questions must 'predominate over any questions affecting only individual members,'" and (2) "class resolution must be 'superior to other available methods for the fair and efficient adjudication of the controversy.'" Fed R. Civ. Proc. 23 (b)(3); *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 613-14 (1997).

Having already found that common questions of law and fact exist in the instant action, the Court must now go one step further and find that such common questions 'predominate' the action, or else class certification is inappropriate. *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996). Here, the Court does find that the common questions do predominate because Respondents' conduct with regard to implementation of the EIC is at the heart of all the Plaintiffs' cases. Accordingly, this criteria is met.

As to the second consideration under Rule 23(b)(3), the Court considers four factors to determine whether a class action would be the superior form of resolution in this case. First is the interest of each member in "individually controlling the prosecution or defense of separate actions." Fed. R. Civ. Proc. 23(b)(3)(A). Here, the Court notes that in cases where monetary damages to each plaintiff are relatively small, certifying a class action is favored. *In re Northern Dist. of Cal., Dalkon Shield, Etc.*, 693 F.2d 847, 856 (9th Cir. 1982). Such is the case here.

---

[8] The Court notes that similar objections to Mr. Phillips and the adequacy of his representation were raised by Objectors when they and their counsel sought to intervene in this action in 2004; the judge then sitting on this case (Judge Coughenour) denied intervention in part because he found that representation was adequate. (*See* Dock. No 76 at 4-8). This Court sees no reason to revisit those findings by a previous District Judge sitting on this case, and Objectors have not provided any such reasons. Accordingly, the Court also adopts those findings as an addition ground for overruling Objectors' challenge to the adequacy of counsel.

There have been 41,696 claims made with a total value of $79,572,873, which works out to a total of approximately $1,908 per claim. (*See* Dock. No. 490 at Ex. A). Further, as the Court has previously found, "the EIC plaintiffs are lower income individuals who may not have the ability or inclination to retain counsel." (Dock. No. 384 at 7). In light of these considerations, the first factor is satisfied.

The second factor is "the extent and nature of any litigation concerning the controversy already commenced by or against members of the class." Fed. R. Civ. Proc. 23(b)(3)(B). Here, as has been previously found, there are two other pending lawsuits involving essentially the same theories and claims, and it thus is worthwhile to join together as many plaintiffs as possible to settle the matters. (Dock. No. 384 at 8). Indeed, the Court notes that only a handful of persons have opted out, and that of the *Torres* and *Simpao* plaintiffs, three out of four of them have remained in this action, thus helping to consolidate and resolve almost all outstanding claims.

The third factor is "the desirability or undesirability of concentrating the litigation of the claims in the particular forum." Fed. R. Civ. Proc. 23(b)(3)(C). In this case, Guam is the natural location for this litigation given the concentration of the plaintiffs, witnesses and evidence on Guam. Indeed, the last known address for 47,351 out of the 49,378 potential class members identified was on Guam. (Dock. No. 493 at ¶ 2). Thus, this is the desirable forum for resolution of this litigation.

The fourth and final factor is "the difficulties likely to be encountered in the management of a class action." Fed. R. Civ. Proc. 23(b)(3)(D). The Court need not address this factor because a court presented with a request for settlement only class certification "need not inquire whether the case, if tried, would present intractable management problems." *Amchem*, 521 U.S. at 620.

In sum, the Court finds that the requirements for class certification in the context of the present settlement are met, and thus next turns its attention to the issues of notice and final approval.

## II.     Notice to the Class

The next issue that the Court turns to is notice to the Class. Before certifying a class or approving a class settlement, the court must direct that notice of the proposed settlement be disseminated to class members. Fed. R. Civ. P. 23(c)(2) & 23(e). "To alert class members to their

right to 'opt out' of a (b)(3) class, [Rule 23(c)(2)] instructs the court to 'direct to the members of the class the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort.'" *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 617 (1997) (quoting Fed. R. Civ. P. 23(c)(2)). As will be discussed, the form of notice in this case met that standard.

## A. The Notice Procedures Employed the Best Procedures Practicable under the Circumstances

The Settling Parties accomplished notice in this case by two means. First, they sent individual copies of the notice to all potential class members who could be identified based upon DRT's records as having filed tax returns in one or more tax years between 1995-1996 or 1999-2004 that indicated they might qualify for the EIC, or who had actually filed EIC claims in 1997 or 1998. (Settlement Agreement § III(c)). Second, they supplemented such individual notice with notice by publication twice a week for four weeks in Guam's two primary newspapers of general circulation, the Pacific Daily News and the Marianas Variety. (*Id.* § III(b)).

Moreover, the Court takes judicial notice of the fact (which all parties at argument conceded) that the EIC litigation, the Governor's Executive Order permitting the filing of claims, and the Settlement, have been the subject of dozens and dozens of news stories on TV, on the radio, in print, and on the internet on Guam news outlets. This includes stories on both television stations that cover Guam local news (KUAM and ABC-7 TV (both of which also repeat their broadcasts on sister stations)), both newspapers of general circulation (the Pacific Daily News and Marianas Variety), both local am radio stations that offer "talk radio" (K57 and Isla 630), and websites covering local news (*e.g.*, http://kuam.com, http://guampdn.com, http://www.mvariety.com, and http://pacificnewscenter.com).

This combination of individual notice and notice by publication in an applicable newspaper, especially in high publicity cases, has been widely approved as satisfactory by the federal courts. *E.g. Pigford v. Veneman*, 355 F. Supp. 2d 148, 162 (D.D.C. 2005) (citing with approval 3 Newberg on Class Actions § 22:85 (4th ed.) (noting that "courts have usually required a combination of first-class mailed notice to the identifiable members and publication in one or more newspapers" when difficulties arise locating all putative class members); *In re Cherry's*

*Petition to Intervene*, 164 F.R.D. 630, 638 (E.D. Mich. 1996) (notice adequate where sent to last known address, published in employee publications, and case covered in newspaper stories); *White v. National Football League*, 822 F. Supp. 1389, 1401 (D. Minn. 1993) (in case involving nation-wide class, publication in national newspaper and individual notice by mail to last known address, and news coverage ensured adequate notice); *Burns v. Elrod*, 757 F.2d 151, 153-54 (7th Cir. 1985) (notice via last known address and publication in Chicago's two daily newspapers adequate even when 500 of 700 notices were returned undelivered); *Herm v. Stafford*, 461 F. Supp. 502, 507 (D. Ky. 1978) (notice adequate where accomplished by last known address and publication in local newspapers of general circulation).

Indeed, the Court notes that the rate of publication – a total of sixteen separate instances of publication over a four week period – exceeds the rate of publication in many other cases. *E.g. White*, 822 F. Supp. at 1400 (publication only occurred once, on March 12, 1993); *see also Bynum v. Govt. of Dist. of Columbia*, 384 F. Supp. 2d 342, 353-54 (D.D.C. 2005) (ordering notice twice a week for two weeks). It also notes that, with the agreement of the other Settling Parties, the Government went back to this Court and secured permission to give an additional form of notice in March 2007 when there was a question regarding notice of early payments to persons subject to offsets, demonstrating a commitment by the Settling Parties to ensuring the best notice practicable in the case. (*See* Docket No. 400).

Nonetheless, relying almost exclusively on a declaration by their expert, Ms. Interpido, and not on any applicable Ninth Circuit or even federal authorities, Objectors attack the Settling Parties' methods of giving individual notice and the notice by publication. At the outset, the Court notes that while it appreciates the qualifications and expertise of Ms. Interpido regarding notice generally, her two declarations do not demonstrate any experience or familiarity with Guam (it appears she has never even visited), nor does it demonstrate familiarity with tax law (for reasons that will be discussed).

In any case, the first and most crucial aspect of Ms. Interpido's expert testimony is that it actually strongly *supports* the adequacy of the form of notice in this case. In her first declaration, Ms. Interpido opines that a notice program is adequate if it reaches between 75%-90% of the class. (Dock. No. 429 at Ex. F (at ¶ 29)).

1

2      Here, 49,378 notices were mailed; only 9,351 were returned. (Dock No. 493 at ¶¶ 2-3).

3 Thus, the individual notices in this case reached their intended recipients approximately 81% of

4 the time. Further, the Pacific Daily News has a "ratecard" containing its basic demographics, *see*

5 http://www.guampdn.com/guampublishing/customerservice/retail_ratecard.pdf, a copy of the

6 relevant page of which is attached to Docket No. 473. It states that the PDN reaches: 78% of

7 women; 77% of men; 74-80% of persons 18-80 depending on age; 78% of households with

children, etc. The PDN therefore is reaching over 75% of the island.[9] In sum, this means that

8 both forms of notice chosen (individual notice and notice by publication), *on their own*, are

9 already reaching in excess of the 75% of the Class that Objector's expert testified was the

10 necessary standard.

11      Further, common sense dictates that some of the persons who received individual notice

12 will not have received notice by publication, and some of the persons who received notice by

13 publication will not have received individual notice. Thus, the actual success rate in this case

14 would be somewhere north of the 81% for individual notice, and the Court has adequate grounds

15 (based on the testimony of Objectors' own expert) for concluding that notice here was the best

16 notice practicable under the circumstances.

17      That stated, the Court will briefly respond to Objectors' other primary arguments

18 regarding the means of notice:

19      First, citing solely Ms. Interpido, Objectors claim that, as to "publication notice," the

20 Settling Parties were to provide reader demographics, circulation, audience, and an analysis as to

21 the reach of the publication. They have cited no case for this proposition, and while a challenge

22 to this notice might make sense to Ms. Interpido based on her knowledge of class actions in the

23 U.S. mainland, but it makes no sense to anyone who has ever lived on Guam. Guam is an island.

24 It has only two newspapers of general circulation – the Pacific Daily News and Marianas Variety.

25 The Court can take judicial notice of these basic facts.

26

27

28
_____

[9] Exact figures for Marianas Variety were not available, but it is of course supplementing publication in the PDN.

*CIVIL CASE NO. 04-00006*                                    13
*(Consolidated with Civil Case Nos. 04-00038 and 04-00049)*

Second, again citing solely Ms. Interpido, Objectors complain that a study was not commissioned to analyze the reach of the mailing of the notice. (Objections at 23). Again, this might makes sense in a different case, but here it makes no sense at all. DRT has the tax returns it has on file; if someone was possibly eligible, they were sent a notice at their last known address in DRT's computer system. (Settlement Agreement § III(c); Docket No. 424 at ¶ 5). If they had no such tax return on file, they were still receiving notice by publication. (Settlement Agreement § III(b)).

Third, Objectors write that that their chosen expert, Ms. Interpido "opines that it would have been reasonable and practicable to provide individualized notice to class members whose tax filings had not yet been entered into [sic] DRTs data base." The Declaration of the Deputy Director of DRT demonstrates that Ms. Interpido's testimony fails to consider how DRT works. The list of most recent addresses in its computer system is not static. DRT receives new tax returns and/or change of address forms every day of the week it is open. (Dock. No. 450 at ¶ 3). These are entered into the system as soon as is possible. (*Id.*) But this process never stops; new tax returns and/or change of address forms will continue to be submitted. (*Id.*) Thus, there has to be a cut-off at some point if a list is to be generated and mailing sent, even though a few new addresses may have been submitted that are not yet in the system. (*Id.*) Using the most up-to-date address in the computer system thus is the best notice practicable.

Finally, in their briefing and at argument, Objectors devoted considerable time to arguing that "especially" using social security numbers, DRT could have conducted searches for other possible addresses of taxpayers, suggesting that DRT should have retained a social security "look up service." However, taxpayer information, such as their social security number, is confidential under 26 U.S.C. § 6103(a) (taxpayer information, including taxpayer identification number, cannot be disclosed). *See Aronson v. IRS*, 973 F.2d 962, 967 (1st Cir. 1992) ("Congress has decided that, with respect to tax returns, confidentiality, not sunlight is the aim"). (*See also* Dock No. 450 ¶ 4 (Declaration of DRT Deputy Director regarding compliance with the statute)). Accordingly, DRT cannot give taxpayers' social security numbers and other confidential tax information (*e.g.*, income information on who qualifies for the EIC) to third parties without violating the law, especially where they would be giving it to a corporation that specializes in

*CIVIL CASE NO. 04-00006*        14
*(Consolidated with Civil Case Nos. 04-00038 and 04-00049)*

selling such information to others. And, even if it could, DRT still could not use the results without further violating the law. A "SSN look up service" would give DRT a list of other possible addresses for taxpayers based upon possible matches. Then DRT would send a notice of the settlement – and possibly an early payment check – to those "new" addresses, some of which might well be wrong. By having mailed to those incorrect addresses, DRT would have (without any consent from the taxpayer) disclosed to the recipient the identity of a taxpayer and the fact that this person fell within income brackets making them eligible for the EIC (and possibly additional confidential information as well).

After the Government raised this issue, in their reply briefing, Objectors argued that confidential information can be disclosed under 26 U.S.C. § 6103(k)(6). But, when quoted in full, that section has no application here. It states:

> (6) Disclosure by certain officers and employees for investigative purposes.-- An internal revenue officer or employee and an officer or employee of the Office of Treasury Inspector General for Tax Administration may, in connection with his official duties relating to any audit, collection activity, or civil or criminal tax investigation or any other offense under the internal revenue laws, disclose return information to the extent that such disclosure is necessary in obtaining information, which is not otherwise reasonably available, with respect to the correct determination of tax, liability for tax, or the amount to be collected or with respect to the enforcement of any other provision of this title.

Thus, under this section, confidential information can be disclosed in connection with a civil or criminal enforcement action. But that is not this case.

During argument, Objectors then submitted "supplementary" authority, arguing that disclosure was permitted under 26 U.S.C. § 6103(m)(1). That section provides that the government "may" disclose "taxpayer identity information to the press and other media for the purpose of notifying persons entitled to tax refunds when the Secretary, after reasonable effort and lapse of time, has been unable to locate such person." 26 U.S.C. § 6103(m)(1). To begin with, the statute is permissive, not mandatory (*i.e.*, it says "may," not "shall"), and thus a third party (for example, the plaintiffs in this case) cannot compel the government to release such information. *See Aronson*, 973 F.2d at 967. Next, the disclosure is "to the press or other media," and a social security "look up" service is not the press or other media. *See id.* (improper to order release of information to non-media). Further, the disclosure permitted is of "taxpayer identity

information," which under section 6103 is a taxpayer's name, address, and social security number. 26 U.S.C. § 6103(b)(6). Publication of a list of persons owed the EIC implicitly discloses more than that – it discloses what is defined in 26 U.S.C. § 6103(b)(2) as "return information" (*e.g.*, that the amount of income falls within the EIC thresholds) – and that is not permitted by section 6103(m)(1). Finally, publication under section 6103(m)(1) requires that a taxpayer be owed a refund – but at the time of the notice of the Settlement, it is not known whether a taxpayer will necessarily qualify for a refund or whether they will stay in the Settlement and thus be entitled to a refund. The statute is inapposite.

In sum, all objections regarding the means by which notice was given are hereby overruled, and the Court concludes that the notice given was the best notice practicable.

## B. The Form of the Notice Was Proper

The next issue is whether the substance of the notice itself was proper. Notably, the primary issue with a notice is whether it accurately informs Class Members of their rights and ability to be heard. As the Ninth Circuit has held, "[n]otice is satisfactory if it 'generally describes the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be heard.'" *Churchill Village, L.L.C. v. General Elec.*, 361 F.3d 566, 575 (9th Cir. 2004) (quoting *Mendoza v. Tucson Sch. Dist. No. 1*, 623 F.2d 1338, 1352 (9th Cir.1980)); *In re Gypsum Antitrust Cases*, 565 F.2d 1123, 1125 (9th Cir. 1977) ("The purpose of this notice requirement ... is to present a fair recital of the subject matter of the suit and to inform all class members of their opportunity to be heard.") (citations omitted). As such, "[a] class certification notice should advise the class members of their rights and obligations if they elect to remain class members." *McCarthy v. Paine Webber Group, Inc.*, 164 F.R.D. 309, 312 (D. Conn. 1995). Specifically, under Rule 23, a notice must state in clear, precise language nature of action the: (1) definition of the class, (2) class claims, issues, and defenses, (3) that the class member can appear through counsel, and (4) that the court can and will exclude the class member if requested, and how this can be accomplished. Fed. R. Civ. Proc 23(c)(2)(A).

The class notice contains all of these elements and Objectors have not asserted otherwise. Indeed, the notice also includes other relevant information that has been deemed of importance to include; for example, it gives the class notice of the competing *Simpao* action and that they might

fare better, worse, or the same by opting-out and joining that action. *See Churchill Village,* 361 F.3d at 575 (approving of inclusion of such information to ensure class members knew of option of opting out so as to be able to join competing litigation).

Objectors ask that the Court focus its attention, however, not on what the substance of the notice stated, but instead (relying again solely upon the declarations of their expert and not any citation to case law) on the words chosen and the graphical design used. To begin with, while not wholly irrelevant, the cases reviewed by the Court suggest that an objection as to the particular design of a notice is much weaker than an objection that actually suggests a notice misled class members. The Ninth Circuit has recognized this, holding "Rule 23(d)(2), of course, does not provide for a specific manner of notice or the form of the notice. These are matters left to the court's discretion to be dictated by the circumstances of each case." *In re Gypsum Antitrust Cases,* 565 F.2d at 1127 (quoting with approval *United States v. Truckee-Carson Irrigation Dist.,* 71 F.R.D. 10, 18 (D. Nev. 1975)). Rather, cases rejecting notices are cases such as *Molski v. Gleich,* 318 F.3d 937, 951-52 (9th Cir. 2003), where the court did not reject the notice because it failed to contain ideal wording or graphical design, but rather because the notice "fail[ed] to explain that only claims involving literally physical injuries were not released under the proposed consent decree" and thus "the notice misled the putative class members." *Id.* at 952 (emphasis added).

However, even considering Objectors' arguments, they do not have much merit. For example, citing Ms. Interpido's declaration, they argue that the notice should use a "callout or headline," that the type is too small, and that it does not invite responses. Actually, the notice as approved by the Court does have bolded headings, it does tell class members how to respond, and it also includes final bolded reminders at the end. (*See* Docket No. 390, 392 (the notice and the Order approving it)). As for the type size, it is never smaller to 10 pt. font, which is precisely what is recommend in one of the articles attached as an exhibit to Ms. Interpido's second declaration as an example of possible guidelines in drafting a notice. (Dock No. 463 at Ex. A (at

Ex. 1 (second article, p. 690))).[10] Moreover, in many cases, the notice follows the recommended language choices from that same article; for example, using short, direct sentences, and avoiding lawyerly phrases such as "null and avoid" and instead using words such as "void." (*Id.*)

Further, the Court takes notice of the fact that this is a settlement of a tax case. Anyone who has ever done their own taxes, and attempted to follow the hundred page instruction booklets that come with each tax form, knows that the issues are not simple. By necessity here, there are simply a lot more issues to include in the notice than might apply in an ordinary case (*e.g.*, the requirement of tax returns, the application of offsets, the federal statute governing false EIC claims, etc.). In sum, while the notice may not be in the exact form Objectors would propose, it is nonetheless satisfactory, and their objections are overruled. *Churchill Village,* 361 F.3d at 575.

## C. The Notice Was Effective

When the parties entered the Settlement, although there were estimates, it was impossible to know exactly how many class members existed because it was impossible to know exactly how many valid claims could or would be submitted. There were several reasons for this. First, not every person who could qualify for the EIC necessarily claims it on their tax return. Second, a tax return alone does not definitely tell DRT whether a taxpayer would qualify for the EIC— rather, taxpayers must complete the "Schedule EIC" if they have qualifying children (DRT has substituted the EIC-GU form for that same purpose). (*Simpao* Docket No. 77 (Declaration by Deputy DRT Director) at ¶ 5-6). And even if that form is not needed, examining a tax return alone will not necessarily tell DRT if an individual is qualified; that is why an affirmative claim must be made. (*Id.* ¶ 6). Third, during the years the EIC was not being applied, some taxpayers who otherwise could have qualified filed as married filing separately, which disqualified them from the EIC. *See* 26 U.S.C. § 32(d) (married persons must file jointly to qualify for EIC). Thus, the exact number of claims that would have been submitted in each year if taxpayers were able to file for the EIC at that time is simply not a number that can be known.

---

[10] Indeed, it was noted at argument that the Government actually published the notice on two pages of the newspaper (instead of just one as required by the Settlement) when this proved necessary to ensure that the type was easy to read.

*CIVIL CASE NO. 04-00006*  18
*(Consolidated with Civil Case Nos. 04-00038 and 04-00049)*

That stated, as part of the settlement negotiations, DRT did determine the theoretical maximum potential number of claims that could exist *solely based on the information of a taxpayer's tax return*. The calculations are as follows:

1995: Theoretical possibility of 13,212 claims

1996: Theoretical possibility of 14,518 claims

1999: Theoretical possibility of 14,828 claims

2000  Theoretical possibility of 13,881 claims

2001: Theoretical possibility of 13,816 claims

2002: Theoretical possibility of 13,542 claims

2003  Theoretical possibility of 13,084 claims

2004: Theoretical possibility of 10,091 claims

(Dock. No. 450 at ¶ 7).[11]  Of course, not all of these persons necessarily would ultimately qualify for the EIC, but it is a useful starting point.

Now that the notice is completed, the Court can compare the number of theoretical claims to the number of actual claims filed.  The final data shows the following numbers of claims per were submitted in each tax year:

| Year | Number of Claims Filed |
|------|------------------------|
| 1995 | 2699 |
| 1996 | 2932 |
| 1997 | 904[12] |
| 1998 | 13143 |
| 1999 | 4438 |
| 2000 | 4678 |

[11] There are three basic factors that may affect how many valid claims and the dollar value of claims that could be filed each year – what the current EIC thresholds for qualifications were each year, what the maximum EIC and rates were for each year, and how many tax filers there were each year. (Docket No. 450 at ¶ 6). *See also* 26 U.S.C.A. § 32 (annotated code showing the many amendments made to the EIC law made over the years).

[12] This is only the number of 1997 claims covered by the Settlement, since most 1997 claims were already processed and paid years ago.

| | |
|---|---|
| 2001 | 5028 |
| 2002 | 5331 |
| 2003 | 5761 |
| 2004 | 9355 |
| **Total**: | **53,995** |

(Dock. No. 490 at Ex. A).

This data shows that DRT was very successful in obtaining filed claims for 2004, the most recent tax year covered, with 9,355 made out of a theoretical possibility of 10,091 claims – or about a 93% success rate. After that year, the rate of claims filed drops to about half as many in 2003, and then progressively drops in each of the following years thereafter. Objectors have seized on this data to try to suggest that the claims process was unfair because of the drop in older years. But the very success of 2004 shows that the main factor in whether a claim was submitted is not the filing system or a lack of notice to the taxpayer (2004 used the same system as all of those years), but whether or not taxpayers had to go back in time to file new claims for old years. Thousands of taxpayers took that opportunity, but some thousands of others did not.

Indeed, additional data further shows a substantially high percentage of class participation. As noted, DRT sent out 49,378 notices to unique individuals. (Dock. 493 ¶ 2). The total number of unique individuals who actually filed claims is 24,108. (*See* Docket 495 at ¶ 2). Thus, just under half (approximately 48.8%) of the theoretical maximum number of persons in the class filed claims. This compares extremely favorably to most other class actions. *E.g. Cullen v. Whitman Medical Corp.*, 197 F.R.D. 136, 148 (E.D. Pa. 2000) (approving settlement where 2,000 out of 5,300, or 37.7%, of possible class members returned claim forms); *In re Educational Testing Serv. Praxis Principles of Learning and Teaching, Grades 7-12 Litig.*, 447 F. Supp. 2d 612, 625-26 (E.D. La. 2006) (approving settlement where overall participation rate was 16%, and especially noting that one subset of class had participated at 49.5% rate); *Hughes v. Microsoft Corp.*, 2001 WL 34089697, *8 (W.D. Wash. 2001) (approving settlement where "[o]ver 37,000 notices were sent and over 3,600 class members contacted class counsel wanting to participate. After the settlement was announced, 2,745 class members (some of whom had previously contacted class counsel) wrote to class counsel wanting the benefits of the settlement.").

Lastly, at the conclusion of the fairness hearing, Objectors asked for a calculation of how many claims were filed before notice was issued, and how many after. This issue arises because of the unique circumstances of this case, where the Government started accepting claims almost two years before the Settlement notice was published because of the Governor's issuance of Executive Order 2005-001. The requested data shows that, of the 24,108 individual taxpayers who filed claims, 20,567 filed claims solely before the first date of publication; and 3,578 filed claims after the date of publication (of which 2,181 had already filed claims before the date of publication, and then filed additional claims after notice was published). (Camacho Dec., filed 10/19/2007, at ¶ 2). The fact that over 20,567 of the claims were filed before notice, and 3,578 after notice, however, does not point to any failure of the notice program. But for the Executive Order already permitting claims to be filed pre-notice, it has to be assumed that all 24,108 claims would have come in during the notice period. Indeed, the amount of pre-notice claims simply confirms the Court's conclusion as to the high degree of publicity and public awareness this class action experienced, which helps confirm the adequacy of notice. In any case, it would be unfair to draw an adverse inference against the notice program simply because prior actions already had obtained most of the claims that were likely to be filed. The fact remains that anything approaching a 50% success rate is quite substantial, and points to a successful notice (and in this case, pre-notice) program. *See In re Educational Testing Serv.*, 447 F. Supp. 2d at 625-26 (49.5% rate of claims being filed for subset of class is "unusually high" and strongly supports settlement).

### III. Final Approval of the Settlement

The next issue is whether the Court should grant final approval to the Settlement. As indicated by Rule 23 of the Federal Rules of Civil Procedure, a class action settlement "should be approved if it is fundamentally fair, adequate and reasonable." *Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370, 1375 (9th Cir. 1993) (citation and quotation marks omitted); *see also* Fed. R. Civ. P. 23(e)(1)(C). There is a "strong judicial policy that favors settlements, particularly where complex class action litigation is concerned." *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992) (citing *Officers for Justice v. Civil Serv. Comm'n,* 688 F.2d 615, 625 (9th Cir. 1982) ("[V]oluntary conciliation and settlement are the preferred means of dispute resolution. This is especially true in complex class action litigation...")).

"The initial decision to approve or reject a settlement proposal is committed to the sound discretion of the trial judge." *Officers for Justice*, 688 F.2d at 625. The Court will not rule on the merits in determining whether to approve or deny the settlement. *Id.* at 625. "It is the settlement taken as a whole, rather than the individual component parts, that must be examined for overall fairness." *Hanlon v. Chrysler Corp.* 150 F.3d 1011, 1026 (9th Cir. 1998) (citations omitted).

In determining whether a proposed class action settlement is fair, reasonable, and adequate, the Ninth Circuit has considered the following factors:

    (1) the strength of the plaintiff's case;
    (2) the risk, expense, complexity, and likely duration of further litigation;
    (3) the risk of maintaining class action status throughout the trial;
    (4) the amount offered in settlement;
    (5) the extent of discovery completed and the stage of the proceedings;
    (6) the experience and views of counsel;
    (7) the presence of a governmental participant; and
    (8) the reaction of the class members to the proposed settlement.

*See, e.g., Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1242 (9th Cir. 1998); *Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 525-526 (C.D. Cal. 2004). Not all factors will apply to every class action settlement. *See Torrisi*, 8 F.3d at 1376. And "[d]istrict courts have wide discretion in assessing the weight and applicability of each factor." *Nat'l Rural Telecomms. Coop.*, 221 F.R.D. at 525-526 (quoting 5 *Moore's Federal Practice*, § 23.85[2][a] (Matthew Bender 3d ed.)).

Further, the presence of a governmental entity in the settlement negotiations is a factor "weighing heavily" in favor of a finding of fairness. *See Jones v. Amalgamated Warbasse Houses, Inc.*, 97 F.R.D. 355, 360 (E.D.N.Y. 1982); *see also United States v. New Jersey*, 1995 WL 1943013, *14 (D.N.J. 1995); *San Francisco*, 2001 WL 1922333 at *8.

Before approving a settlement, courts need not (and, indeed, cannot) make exact determinations as to the potential value of a class's claims or the risks of litigation. *See, e.g., Synfuel Technologies Inc. v. DHL Express*, 463 F.3d 646, 653 (7th Cir. 2006). That stated, in this case the Court believes that it has the specific data necessary to confidently conclude that the settlement here is both fair and of quite substantial value to the Class.

## A. The Settlement Payments Are Fair

To determine if a settlement is substantively fair, the Court must "determine whether the settlement was within the range of reasonableness in light of the best possible recovery and the risks of litigation." *Petruzzi's, Inc. v. Darling-Delaware Co., Inc.*, 880 F. Supp. 292, 297 (M.D. Pa. 1995). But "[u]ltimately, the district court's determination is nothing more than an amalgam of delicate balancing, gross approximations and rough justice." *Officers for Justice*, 688 F.2d at 625 (citation and quotation marks omitted).

Overall, along with agreeing to pay the EIC in future years, the Government has agreed to make up to $90 million available for claims at a rate of $15 million per year for each "timely" year (1998 and 2001-2004) and with another $15 million for the "stale" years included (1995-96 and 1999-2000). By any measure, it is a substantial settlement; once the data is examined, it also is clear that it a fair settlement.

For tax years 1995-96, and 1999-2000, which are being paid a total of $15 million, the figures are as follows:

| Tax Year | Qty | | "A" Status | "S" Status[13] | |
|---|---|---|---|---|---|
| 1995 | 1693 | | $ 2,506,700.00 | | |
| 1996 | 1879 | | $ 3,068,007.00 | | |
| 1999 | 3185 | | $ 5,809,403.00 | | |
| 2000 | 3344 | | $ 6,162,0780.00 | | $ 4,532.00 |
| | | | | | |
| Total | 10101 | | $17,546,188.00 | | $ 4,532.00 |

Thus, for those tax years, Class Members have stated claims valued (without interest) at $17.5 million and will receive 86% of the value of those claims. (*See* Dock. No. 490 at Ex. A).

For tax year 1997, which is being paid at 100% plus interest (which was agreed to ensure parity throughout tax year 1997 as almost all 1997 tax year claims already were paid in the past), the figures are that there were 237 valid claims, worth $551,589.06. (*See id.*)

For tax year 1998, which is receiving $15 million total, there were 11,540 accepted claims with a face value of $20,607,153.00 (without interest). Class Members will receive $15 million

---

[13] Claims with an "S" status (Suspended) are pending additional information from the taxpayers; processing cannot be completed without it. The Government treated them as though they might be accepted in terms of presenting the total potential liability.

for those claims or about 73% of the value of those claims (but also the early payout that, as Objectors point out, places 1998 in a favored position, *see infra*). (*See* Dock. No. 490 at Ex. A).

Finally, for tax years 2001-2004, which are being paid at up to $15 million per year, with any unpaid amounts from the preceding year flowing into the next, the data is as follows:

| Tax Year | Qty | | "A" Status | | "S" Status |
|---|---|---|---|---|---|
| 2001 | 3735 | | $ 7,219,610.00 | | $ 7,352.00 |
| 2002 | 4166 | | $ 8,784,431.00 | | $ 21,650.00 |
| 2003 | 4465 | | $ 9,576,827.00 | | $ 7,314.00 |
| 2004 | 7452 | | $15,838,664.00 | | $ 33,304.00 |
| | | | | | |
| Total EIC | 19332 | | $41,419,532.00 | | $74,152.00 |

Each of these tax years except 2004 has totaled less than the $15 million allocated for it and will end up receiving 100% of their value (without interest). Further, accounting for the fact that tax year 2004 will receive the unused portion of the monies from the prior years (*see* Settlement Agreement § IV(a)(iv)), 2004 also will end up being fully funded at 100% of the value of the claims (without interest). (*See* Dock. No. 490 at Ex. A).

In sum, the final data shows that the EIC Class is receiving somewhere between 73% and 100% of the value of their claim per year (not including interest). (*See* Docket No. 490 at Ex. A). This amount of recovery is more than reasonable (especially given the risks of litigation for the class, discussed *infra*). Indeed, even had the percentages been substantially lower, the value of a settlement can fall within the reasonable range of the value of the class claims. As has been explained: "[T]he fact that a proposed settlement constitutes a relatively small percentage of the most optimistic estimate does not, in itself, weigh against the settlement: rather, the percentage should be considered in light of the strength of the claims." *In re Ikon Office Solutions, Inc., Securities Litigation*, 194 F.R.D. 166, 184 (E.D. Pa. 2000); *Linney*, 151 F.3d at 1242 ("The fact that a proposed settlement may only amount to a fraction of the potential recovery does not, in and of itself, mean that the proposed settlement is grossly inadequate and should be disapproved.") (citation omitted); *see also Boyd v. Bechtel Corp.*, 485 F. Supp. 610, 617-618 (N.D. Cal. 1979) ("simply because a settlement may amount to only a fraction of the potential recovery does not in itself render it unfair or inadequate. Compromise is the very nature of settlement."). This is because "the very essence of a settlement is compromise, a yielding of

absolutes and an abandoning of highest hopes.'" *Linney*, 151 F.3d at 1242 (citation and quotation marks omitted).

## B. The Settlement Does Not Create Conflicts Between Class Members

Objectors assert that the Settlement "unnecessarily and unfairly creates conflicts between and among class members" because not every tax payer will fare as well as another depending on the years of their claims. However, the provision of different benefits to different class members is permissible where settlement terms are "rationally based on legitimate considerations." *Cohen v. RTC,* 61 F.3d 725, 728 (9th Cir. 1995) (citation omitted), *vacated on other grounds,* 72 F.3d 686 (9th Cir. 1996); *see also Officers for Justice,* 688 F.2d at 629 (affirming approval of settlement providing different relief to differently situated class members); *M. Berenson Co. v. Faneuil Hall Marketplace, Inc.*, 671 F. Supp. 819, 824 (D. Mass. 1987) (approving settlement which treated Class members differently where such treatment was "reasonable and appropriate, and fairly reflect[ed] the reality of the business situation presented by [the] lawsuit"); *7-Eleven Owners for Fair Franchising v. Southland Corp.*, 85 Cal. App. 4th 1135, 1162-1163 (2000) ("While intraclass disparities may be a signal of unfairness, the inference is rebuttable by a showing that differences in treatment "are rationally based on legitimate considerations.") (citing *Holmes v. Continental Can Co.*, 706 F.2d 1144, 1148 (11th Cir. 1983)).[14] Objectors make a number of arguments, each of which is addressed in turn.

### 1. Interest

Objectors argue that the non-payment of interest is unfair because it falls disproportionately on those who have the oldest claims. But, as discussed below, those claims are disproportionately less valuable because they are the least likely to succeed due to statute of

---

[14] Objectors cite *Holmes* to suggest that any difference between the treatment of class members is prima facie evidence of unfairness creating a "heavy burden" on the Settling Parties, but the Ninth Circuit has made it clear that the heavier *Holmes* standard only applies where there is unequal treatment of the named plaintiff versus the unnamed class members. *Cohen,* 61 F.3d at 728. Where the different treatment is simply as between different class members, the standard is lower and simply focused on whether the distinctions drawn are "rationally based on legitimate considerations," because in such cases "there is less concern because the named plaintiffs are not receiving preferential treatment vis a vis the unnamed plaintiffs." *Id.*

limitations problems. Indeed, these are the claims that are receiving the benefit of the Governor's voluntary waiver, for settlement, of a statute of limitation (26 U.S.C. § 6402) that might otherwise bar those claims. (*See infra*). Further, the older years are receiving payment first, so their greater loss of interest is partially offset by their earlier receipt of the monetary benefit of the Settlement. These, then, are rational distinctions based upon legitimate considerations. *Cf. Bussie v. Allmerica Financial Corp.*, 50 F. Supp. 2d 59, 75-76 (D. Mass. 1999) ("any differences in the nature and value of the benefits received by Class members reflect the Settlement's fairness insofar as they are rationally based on objective differences in the positions of the Class members, such as the kind and size of their insurance policy, their status as a current or terminated policyowner, and, with respect to those participating in the ADR Process, the nature and relative strength of their claim") (citations omitted) (collecting cases).

## 2. The Most Recent Years

Objectors argue that not paying interest is unfair to the most recent tax years because they must wait the longest for payment. That is simply the flip-side of the first supposed conflict: It is the oldest years that are giving up the most interest, but the most recent years that are waiting in line the longest. This type of balancing is a rational distinction caused by the fact that the Government is paying over time. Someone thus has to be first in line; someone has to be last. Thus, the settling parties addressed this as rationally as possible: Tax years 1988 and 1997 were placed first because all of those claims were already on file. Thus, those years received the benefit of the "early payment," as all of the other years were opened for claim submission. After 1997 and 1998 came the oldest years, the ones that did give up the most interest. It makes sense that they be paid next because those years have waited the longest, and have also compromised more value for payment. And those oldest years are then followed in turn by each most recent year, such that the years that waited the longest and waived the most interest got paid the soonest, and those that are the most recent and waived the least interest get paid last. It is, then, a compromise plan based on rational distinctions and legitimate considerations. *Cohen*, 61 F.3d at 728.

### 3. Compensation of Tax Years 1995-1996 and 1999-2000

Objectors argue that the Settlement Agreement unfairly compromises the claims for the time-barred years of 1995-1996 and 1999-2000 by paying them $15 million total, instead of the $15 million per year paid to "timely" years. They also separately argue that it is unfair to include year 2000 as they assert it is not a potentially time-barred year. However, the rationale behind this payment is adequate and fair as discussed below.

#### i. The Risk to Time-Barred Years

Objectors argue that it is unfair to discount these claims based on the potential statute of limitations created by 26 U.S.C. § 6511 given Judge Martinez's ruling on the partial summary judgment. First, Objectors are not focusing upon the more important statute of limitations at that juncture: 26 U.S.C. § 6532. As they admit only in footnotes, prior to the most recent Settlement in March 2006, Judge Martinez in *Simpao* had expressed the view that some years were possibly untimely under 26 U.S.C. § 6532. (*E.g. Simpao* Dock. No. 148-1 at 6 n.5 ("This Court notes that many of the putative class members may fare better under a structured settlement agreement. Should they proceed with a tax refund suit the relief sought for many of the tax years in question may be barred because of a statute of limitations problem.")).

Indeed, there is substantial support for the view. Section 6532(a)(1) bars any claim for a tax refund more than two years after notice of disallowance. The Guam tax return forms for tax years 1995-1996 and 1999-2003 stated on their face that the EIC would not be applied. Arguably, this gave taxpayers actual notice that their claim was denied and thereby triggered § 6532(a)(1). The issue in essence would come down to whether the notice of disallowance had to be sent by certified mail. Objectors and the Government briefed this issue in regard to preliminary approval, and without deciding the merits, none of these cases addressing § 6532 are from the U.S. Supreme Court or Ninth Circuit; *i.e.*, none could be controlling. Thus, there was justification for a discount on the value of the claims based on section 6532 and the fact that the Governor was voluntarily waiving section 6532 (for settlement purposes only) as to persons who chose to remain class members.[15]

---

[15] Objectors have claimed they never agreed that the Government could waive section 6532. Actually, they did. (*See* Docket No. 374 at 12 ("*Simpao* does not dispute [that] the

*CIVIL CASE NO. 04-00006*     27
*(Consolidated with Civil Case Nos. 04-00038 and 04-00049)*

Second, section 6511 remained a threat to the Class' recovery. Judge Manibusan had indicated skepticism as to whether section 6511 was satisfied. (*See Torres* Docket No. 64 (Sept. 29, 2005 Report and Recommendations of Magistrate Judge) at 9:24-27). Further, there were the pending concerns noted above with the Attorney General's role in conceding issues that opened the door to a renewed challenge. (*See Simpao* Dock. No. 148-1 at 3:16-17; *see also id.* at 8:8-15 (concluding Governor was not being adequately represented)).

### ii. Inclusion of 2000 as a Potentially Time-Barred Year

Objectors complain that the year 2000 should not have been treated as a time-barred year because tax returns could have been filed up until April 15, 2004 and the *Santos* suit was filed in February 2004, thus (they argue) tolling the statute of limitations as to the putative class.

First, Objectors' analysis is only considering the three year statute of limitations to file a tax return under section 6511. But, as discussed, the statute of limitations in section 6532(a)(1) is of greater immediate concern at this juncture. That statute only gives taxpayers two years in which to file suit following a notice of disallowance of their claim. As to most taxpayers who filed timely 2000 tax returns on or before April 15, 2001, their refund suit thus became potentially untimely as on April 15, 2003 – ten months *before Santos* was filed. This supports treating 2000 like the other potentially time-barred claims.

Second, Objectors' argument that year 2000 could be timely under the three year statute hinges on their position that the filing of a putative class action tolls the statute of limitations as to putative class members under *American Pipe & Const. Co. v. Utah*, 414 U.S. 538 (1974). The argument against this is that the U.S. Supreme Court has announced a blanket rule against any non-statutory, equitable tolling of the statute of limitations in tax refund case. *United States v. Brockamp*, 519 U.S. 347, 352-53 (1997). Certainly, were the case litigated, Objectors could try to argue that *Brockamp* does not apply to bar this type of equitable tolling, but *Brockamp* did present a risk, making settlement with a waiver and a guarantee to pay (albeit, at less than 100%) beneficial to the class.

---

Governor can extend the §6532 limitations period")). In any case, such a waiver is permitted in the plain language of the statute.

Finally, in assessing the fairness to the time-barred years, the Court can take note of the fact that substantially fewer claims were filed for older years than more recent years. Indeed, this was a known fact going into the Settlement; ever since the Governor authorized the filing of EIC-GU forms under Executive Order 2005-001, the most claims have been filed for the most recent tax year covered, 2004, with participation dropping off every year thereafter (not including 1998) at a gradual rate until the lowest number is reached as to the oldest year, 1995. (Dock. No. 450 ¶ 3). This pattern is evidenced in the final tally as well. (Dock. No. 490 at Ex. A).

As a result of the predictable fact that there are fewer claims as to the older, potentially time-barred years, the actual payout (exclusive of interest) is actually quite close to 100% for these potentially time-barred years. Approximately $17.5 million in claims were filed for 1996-96 and 1999-2000. (Dock. No. 490 at Ex. A). Given that $15 million is available to pay those claims, the actual pay out rate is approximately 86% of the value of each time-barred year's claim. This level of pay-out far exceeds any definition of reasonableness. *See, e.g., Stop & Shop Supermarket Co. v. SmithKline Beecham Corp.,* 2005 WL 1213926 (E.D. Pa. May 19, 2005) (recovery of 11.4% of estimated damages "compares favorably with the settlements reached in other complex class action lawsuits"); *In re Remeron Direct Purchaser Antitrust Litig.*, 2005 WL 3008808, *9 (D.N.J. November 9, 2005) (settlement representing 56% to 69% of the maximum damages plaintiffs could hope to recover was "above the range of settlements routinely granted final approval"); *In re Cendant Corp. Litig.,* 264 F.3d 201, 230, 242 (3d Cir. 2001) (approving settlement of 36% of total damages and noting that typical recoveries in some types of complex securities class actions range from 1.6%-14% of estimated damages).

## 4. Offsets

Objectors argue that the loss of interest is "disproportionately unfair" to those who owe debts to the government because they cannot offset interest owed against interest owing. But the value of the offsets is irrelevant to determining the fairness of the Settlement. Federal law provides that tax refunds are subject to offsets for unpaid taxes, back child support, and certain other obligations. 26 U.S.C. § 6402. The EIC is treated as a tax refund for this purpose. Since

the Government is agreeing to pay EIC in the Settlement, it is obligated by federal law to apply the offsets owed for back taxes, child support, etc., whatever that amount may be. *Id.*

Further, the effect of the loss of interest is the same for all class members – they are receiving less monetary value than if they were paid interest. For example, someone who does not owe interest to the Government might owe an interest bearing obligation to a credit card company. They are equally as affected by the non-payment of interest. Or, for that matter, someone might have no debts, but if they received interest, they could use the additional money to purchase things he or she otherwise could not afford, or to place money in a savings account he or she otherwise could not fund. The monetary loss in compromising interest is always the same; not being paid 5% interest on $100 is a loss of $5.00 to all class members equally, whether that money otherwise would have offset interest to the government, interest owed on other debts, or to make purchases. But that is the nature of settlement – some level of compromise of a claim at less than 100% of value must occur or no defendant would ever settle.[16]

## C. The Value of the Government's Concessions Is Substantial

Approval of a settlement requires consideration of all of the factors that would affect the litigation. *Linney*, 151 F.3d at 1242. Here, along with the general benefit that a prompt settlement brings as compared to the indefinite nature of protracted litigation, a few of the Government's concessions bear particular emphasis. These are the value of the Government's agreements in the Settlement Agreement to: (1) to pay $90 million and to pay the EIC in future years; (2) waive the statute of limitation in 26 U.S.C. § 6532; (3) agree to proceed as a class action; and (4) agree not to further contest jurisdiction.

### 1. Payment of Past and Future EIC

In the Settlement Agreement, the Government has agreed to pay $90 million in back EIC claims and to pay the complete EIC going forward. (Settlement Agreement §§ IV(a), IV(e)).

---

[16] Objectors also claim the Settlement violates the rights of spouses to protect themselves from offsets. But the Settlement provides that the payments and offsets are administered just like ordinary tax refunds except if the Agreement provides otherwise. (Settlement Agreement § VI(a)). Nowhere in the Agreement are such protections stripped from spouses.

This will result in 100% payment (other than interest) in many recent tax years, and substantial payments in back years. And, of course, it will mean payment of all EIC claims in the future.

. Objectors attempt to dismiss the value of this to the Class by asserting that, "in a fundamental sense, this case had already been won for plaintiffs" because of the holding in *Simpao* that the EIC applies in Guam. However, the judge who issued that decision, Judge Martinez, took a very different view. As he found, following that decision, the case was "still very much in the early stages." (*Simpao* Dock. No. 148-1 at 6). As he noted, the statute of limitations in particular posed a substantial risk to the Class, and "many of the putative class members may fare better under a structured settlement agreement." (*Id.* at 6 n.5).

Indeed, with regard to the "applicability" of the EIC to Guam, the issue was not finally decided at all. Following a prior Guam Supreme Court decision, Judge Martinez had ruled that it applied to Guam in part, he wrote, because the Attorney General had conceded the issue (*id.* at 3:16-17), which it later became clear the Attorney General was not empowered to do because the Governor controlled tax refund litigation. (Dock. No. 285). Thus, at minimum, the door was open for a renewed challenge in this Court in all three EIC cases on the ground that the *Simpao* decision was not binding on the Governor.

Moreover, Objectors cannot take for granted that the decision by this Court would have been affirmed by the Ninth Circuit. Had the Governor chosen to press the issue and appeal, the applicability of the EIC to Guam would have been a question of statutory interpretation that the Ninth Circuit would have reviewed *de novo*. *United States v. Ray*, 375 F.3d 980, 988 (9th Cir. 2004) ("We review de novo the district court's resolution of legal issues, such as questions of statutory interpretation") (citation omitted). It thus remained possible that, absent a settlement, the Class would have received nothing. Instead, through the Settlement, the Class received a secure judgment of $90 million for past years and full implementation of the EIC in future years.

## 2. Waiver of the Statute of Limitations

The Court has already discussed the danger posed by section 6532 to the Class' recovery. *See supra*. Thus, the fact that the statute was waived is of great benefit to the Class.

### 3. Proceeding as a Class Action

The Settlement also was of substantial value to the class because the Government makes a strong case (which the plaintiffs, of course, contest) that class certification absent government cooperation would have been difficult to achieve, meaning that the class was facing substantially higher cost of attempting the individual adjudication of their claims (which might have meant some would never have been heard at all). The Government rests its argument on the fact that most courts confronted with the question have held that a tax refund action cannot be handled as a class action. Thus, in the cases of *Saunooke v. United States*, 8 Cl. Ct. 327, 330-31 (1985); *Heisler v. United States*, 463 F.2d 375, 375 (9th Cir 1972) (per curiam); *Whittington v. United States*, 240 F.R.D. 344 (S.D. Tex. 2006); *McConnell v. United States*, 295 F. Supp. 605, 606 (D. Tenn. 1969); *Green v. Walters*, 73-2 U.S.T.C. ¶ 9729, 32 A.F.T.R. 2d 73-5963 (E.D. Cal. 1973); *Agron v. Ill. Bell Tel. Co.*, 325 F. Supp. 487, 488 (N.D. Ill. 1970), the courts refused to allow tax refund cases to proceed as class actions.[17]

The only cases any of the parties to this litigation (including Objectors) ever located that concluded that class certification of a tax refund case was possible is *Appoloni v. United States*, 218 F.R.D. 556 (W.D. Mich. 2003), and a case called *Klender v. United States*, 218 F.R.D. 161 (E.D. Mich. 2003), that involved the same facts applied in a different district court in Michigan. In *Appoloni*, the court certified a class of less than 200 claimants (as opposed to the tens of thousands here). *Appoloni*, 218 F.R.D. at 560. And that court was never forced to deal with the procedural difficulties this would have created because it subsequently found no government liability. *See Appoloni v. United States*, 333 F. Supp. 2d 624 (W.D. Mich. 2003).

Yet, while Rule 23 may pose an potential barrier to *litigating* these claims on a class-wide basis, it does not preclude a *settlement* on behalf of a class. This is because the same case management issues that may foreclose litigating a tax refund class action do not prevent

---

[17] As one court explained in holding that it would be impossible to consolidate a mere fourteen tax refund cases into one (which is substantially less than the 50,000 at issue here): "Since a tax refund action involves in effect a reaudit of the individual taxpayer's return for the time period in question ..., and not merely the ground on which the refund is sought, what would be tried were the relief granted, would be a composite action adjudicating the validity of each item on fourteen different returns. It is difficult to conceive of a situation where the original action would be more hindered than in such a chaotic suit." *Lipsett v. United States*, 37 F.R.D. 549, 552 (S.D.N.Y. 1965) (citing *Lewis v. Reynolds*, 284 U.S. 281 (1932)) (emphasis added).

settlement of a tax refund class action. *See Amchem Prods. Inc.*, 521 U.S. at 620 ("Confronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems, *see* Fed. Rule Civ. Proc. 23(b)(3)(D), for the proposal is that there be no trial."). The Government has agreed in this case to administer the Settlement as it would ordinary tax claims. (Settlement Agreement § VI(a)). Accordingly, settlement has cleared the path for class certification, to the benefit of the Class.

### 4. Jurisdiction

Before the present Settlement, the Government had hotly contested the question of jurisdiction based upon the requirement of exhaustion under 26 U.S.C. § 7422(a) and the statute of limitations under 26 U.S.C. § 6511. Of course, parties may not stipulate to jurisdiction, and with or without a concession on subject matter jurisdiction, the Court has an independent duty to review the issue for itself. Nonetheless, the Court need not ignore the practical reality that, in the many situations where subject matter jurisdiction is found wanting, it is because a party raised that challenge. Thus, the fact that the Government has agreed not to further challenge the issue is of substantial benefit to the Class, since it decreases the risk of dismissal.

### D. The Claims Filing Procedures Is Substantively Fair

Under the terms of the Settlement, except as to tax years 1997 and 1998 where claims were already on file, taxpayers were required to file a tax form for each year in which they claimed the EIC. Objectors challenge this requirement as "unduly burdensome."

But there had to be a claims filing process because the rules changed from year to year and because the information was required by 26 U.S.C. § 32. Indeed, 26 U.S.C. § 32(c)(1)(G) actually forbids granting the EIC if a taxpayer has not provided a qualifying child's taxpayer identification number. And 26 U.S.C. § 32(k) regulates false EIC claims, thus requiring an express claim be made. Indeed, the claims form procedure actually predates the Settlement, and is based upon the Governor of Guam's Executive Order No. 2005-01. Objectors already tried to challenge that procedure in the *Simpao* case and lost. As Judge Martinez explained:

> In January 2005, the Governor of Guam issued Executive Order 2005-001, requiring DRT to create supplemental EIC forms ("Guam Earned Income Credit Application") and to accept the submission of the EIC claims under territorial and, to the extent applicable, federal law. *See* Camacho Decl., at Exhibit 1, attached

thereto. It applies to tax years 1995-1996 and 1999-2004, and into the future. *Id.* There are no forms for the years 1997-1998 because DRT had already created a form for the those years and had accepted claims. The Order expressly states that tax returns may be amended as part of such a submission, although amendments are limited to three years as provided under federal law. *Id.* Accompanying the forms is an EIC brochure prepared by DRT. *Id.* at Exhibit 4. Pursuant to the Executive Order, the EIC claims submitted under this procedure shall constitute sufficient claims for the EIC under the GTIT if the EIC is held to apply to Guam. *Id.*, at Exhibit 1, ¶ 2.

(*Simpao* Dock. No. 99-2 at 10). He then held: "the Court finds that the Government of Guam has taken efforts to create forms that would allow it to process the claims in the event it is found responsible for paying the claims." (*Id.* at 11). Consequently, he denied the Objectors' motion on this issue. (*Id.*)

The Court agrees with these conclusions and considers them to be law of the case. However, even if re-litigated, Objectors' arguments are without merit.

First, Objectors complain the Class Members must obtain their previous years' tax returns to determine their eligibility, and that this caused delay and expense. That is incorrect. The EIC-GU claim forms are designed to *avoid* requiring the previous years' tax return. They were filed with the Court as Exhibit 2 to *Simpao* Docket No. 77, and an examination of them shows that there is no such requirement. Indeed, the fact that DRT was to perform all calculations for the taxpayer (so that the tax returns were not needed) was also an express requirement of Executive Order No. 2005-0001. (*See* Simpao Docket No. 77 at Ex. 1 (the Executive Order) at ¶¶ 2-3). Moreover, the claim forms are not that different from the requirements of federal law, including submission of a schedule EIC to claim a "qualified child," and the general requirement of claiming the EIC to ensure compliance with other requirements not found on an individual's tax return. (*See* Simpao Docket No. 77 at ¶¶ 5-6 (previous declaration by John Camacho, Deputy Director of DRT, setting out these facts)).

Second, Objectors complain that Class Members must make a separate claim each year. But that is because the requirements of the EIC program have changed from year to year, and because members' own status and eligibility will have changed from year (*e.g.*, as the number of dependents or income changes). *See* 26 U.S.C. § 32 (setting forth the EIC requirements and showing multiple amendments and changes from 1995-2004).

Third, Objectors complain that a taxpayer who submitted a false claim could forfeit eligibility. That provision is based upon federal law. *See* 26 U.S.C. § 32(k).

Fourth, Objectors assert that a defect in the procedure is evidenced because claims for tax years 1995-1996 and 1999-2004 (where new claims were required) were experiencing a higher denial rate then for tax years 1997-1998 (where claims were already on file). However, the rate of denials is more obviously a result of the liberal claim filing procedure adopted in the Executive Order. As noted, the Executive Order addressed the potential problem of taxpayers not having their old tax returns by providing that, although EIC claimants had to be truthful (*e.g.*, they had to accurately report the number of qualifying children, etc.), precisely because they might not remember the contents of their tax return, the Government was waiving the requirement that they determine for themselves whether or not they qualified for the EIC. (*Simpao* Dock. No. 77 at Ex. 1 (at Recitals and ¶¶ 1-2)). In other words: All that taxpayers had to submit in their claim form was the information that permitted the Government to determine their potential eligibility; *they did not need to determine their eligibility.* Instead, the Government took upon itself the burden of determining eligibility, reasoning that this was both more fair and cost efficient than requiring taxpayers to dig up their returns from years ago and determine whether they fell within the EIC threshold for each year. (*See also Simpao* Dock. No. 77 at Ex. 4 (informational pamphlet that was distributed to taxpayers explaining that their eligibility for the EIC would be determined for them and that their only obligation was to submit truthful information)). The Court thus finds that it reasonable to conclude that it is this policy decision that accounts for the higher rate of rejection of claims. If taxpayers are not required to go back to their old tax returns to determine their eligibility, it is fairly predictable that more non-qualifying claims will be filed that exceed the income limitation or other requirements, hence resulting in a higher denial rate.[18]

---

[18] However, taxpayers are not penalized for such a denial and, in this regard, Objectors' suggestion that filing an unsuccessful EIC claim forfeited future rights is simply incorrect. Objectors are referring to 26 U.S.C. § 32(k), which creates penalties for submitting false EIC claims. But, as recited in paragraph 3 of the Executive Order, the Government has not enforced that provision as to submission of a non-qualifying claims, stating that it will only enforce the provision "in all other respects" (*i.e.*, only enforcing it as to false statements, not as to the submission of a claim by someone who turns out not to qualify).

Finally, the suggestion by Objectors that Class Counsel must "audit" the rejected claims is not well taken because there is a perfectly rational explanation for the higher denial rate (that the claims procedure was deliberately over-inclusive). Moreover, an audit by Class Counsel is not possible. An auditing process would require giving Class Counsel access to individual's private tax information without their consent in violation of federal law. *See* 26 U.S.C. § 6103. That is why the Settlement is drafted to precisely exclude that possibility. (Settlement Agreement § III(c)(vi) ("The Parties acknowledge that it is unlawful under federal law and territorial to disclose individual taxpayer information to any third party except for as authorized by law. None of the forgoing provisions regarding individual notice shall be construed to require such unauthorized disclosures....").

Rather than an audit process, the Settlement contains safeguards against the improper rejection of claims. Initially, it expressly protects taxpayers' rights' to challenge any eligibility decision. (*See* Settlement Agreement § VI(d)(v) ("With regard to any denial of an EIC claim or any assessment of any civil or criminal penalties, a member of the EIC Class shall maintain the right to challenge such a determination through all administrative and judicial processes afforded under federal or territorial law to a taxpayer as to any tax refund claim.")). But the Agreement then goes farther. In Section VI(e)(viii), entitled "Procedure Governing Claims Approved After Claims For That Tax Year Have Been Paid," the Settlement Agreement provides that, if a taxpayer challenges a determination as to the amount of EIC he or she is owed, and if the amount owed to the other members of the Class has already been calculated, then that taxpayer receives a proportionate amount equaling their rightful share *in addition to the $90 million already guaranteed to the Class*. (Settlement Agreement § VI(e)(viii)(2)(B)). In other words, if DRT refuses to pay an EIC claim under the Settlement, and the taxpayer is later found eligible, it will actually *increase* the liability of the Government above the existing, capped settlement amount. Thus, the Government has every incentive to ensure that all claims are accurately processed.

In sum, Objectors' challenges to the claims filing procedures are unwarranted. The procedures are fair and consistent with governing law, and the objections are thus overruled.

## E.     The Opt-Out Rate Supports Approval

In determining whether the Settlement was fair, the Court also notes that there were only four requests to be excluded from the Settlement filed. The lack of a substantial number of opt-out is a factor the Court can and should consider in making its determination as to the overall fairness of the Settlement. *See In re Am. Bank Note Holographics*, Inc.,127 F.Supp.2d 418, 425 (S.D.N.Y. 2001) ("the lack of objections may well evidence the fairness of the Settlement") (citing, *inter alia, Marshall v. Holiday Magic, Inc.*, 550 F.2d 1173, 1178 (9th Cir. 1977) (affirming approval of settlement where small number of class members indicating their disapproval of the settlement indicates its acceptability)); *Stoetzner v. U.S. Steel Corp.*, 897 F.2d 115, 118-19 (3d Cir. 1990) (29 objections out of 281 class members "strongly favors settlement"); *see also Pigford v. Glickman*, 185 F.R.D. 82, 102 (D.D.C. 1999) (finding 5% to be a "low rate of opt-outs" when 85 farmer class members elected to opt out of the class after 1686 completed claim packages). Thus, the low number of opt-outs supports final approval.

Objectors argue that the Court should disregard the low number of opt-outs because of their assertion that there are "relatively few claims." But that is not the evidence. The evidence is that over 90% of the possible claims for 2004 were filed; the lower amount of claims only occurred as to older tax years, which shows only a lower amount of participation in older years, not a lower level of participation overall. And, even as to the older years, class participation was hardly insignificant, constituting tens of thousands of claims. Indeed, there were approximately 54,000 claims in total. By any measure, that is hardly just a "few" claims. *See In re Educational Testing Serv.*, 447 F. Supp. 2d at 626 (where overall participation rate was 16%, with one subset participating at a 49.5% rate, existence of only four opt-out of 37,0000 claims was factor supporting approval of settlement).

## F.     The Other Objections Lack Merit

Objectors raise a number of additional issues, none of which have merit.

### 1.     The Funding Mechanism

Objectors argue that the Government's funding mechanism is "illusory" because (1) payments could stop being made into Guam's Income Tax Reserve or Trust Fund (which are where settlement funds are sourced from); or (2) the Legislature could abolish the Funds. It is

true that the Government could, in any given month, pay no money towards the Settlement if it places no money into the Reserve and Trust Funds. The Government's promise is simply to place 15% of whatever goes into those funds for tax refunds and the EIC, and to use it to fund EIC payments under the Settlement. (Settlement Agreement § V(a)). *However*, so far, this system already has led to approximately $16 million being placed into the Funds or paid to the class. (*See* Dock. No. 449 at ¶ 3 (stating total through June 2007); Docket Nos. 459, 484, 498 (subsequent months' reports)). Further, under the Settlement, the Government has pledged to only pay tax refunds out of the Reserve and Trust Funds. (Settlement Agreement § V(b)). And it has pledged in the Settlement (which will be enforceable by the Court) to provide reports regarding its compliance, which have been filed as required since preliminary approval was granted. (*Id.*) The result is that the Settlement is not without binding power that ensures payment over time. Specifically, for the Government to not pay anything at all over time, it either would have to breach the Settlement by paying tax refunds through other means than the Reserve or Trust Funds, or to stop paying all tax returns indefinitely. Neither situation seems likely, and notably the first could be immediately addressed by the Court, while the second would assuredly be corrected rapidly by the electoral process. Thus, under the circumstances, it is hard to see how the Government's funding is illusory – especially when it has already reserved approximately $16 million of the $90 million.

Further, Objectors' suggestion that the Legislature might abolish the Reserve and Trust Funds is complete speculation. An objection needs to have some concrete fact behind it; this one does not. It is just as well to suggest that Congress might abolish the EIC, and so the Settlement is illusory on that ground too. Settlements are based on laws as they then-exist, and there always is a danger that laws can change. But if that were a ground to challenge a settlement's approval, none would ever receive approval.

### 2. The Early Payment

Objectors argue that the early payment of 1997 and 1998 was "coercive." The Court disagrees. Claimants remained free to refuse the early partial payment and instead await full payment after final approval, as claimants were expressly informed. (*See* Settlement Agreement § VI(e)(i)-(ii)). Indeed, the Government subsequently obtained Court permission to engage in

additional notice to persons subject to offsets to ensure fair implementation of the "early payment." (Docket Nos. 395, 400).

Instead of being coercive, the early payment was a unique approach to addressing the delays in this litigation that was of benefit to the class. Given that most 1997 claims already were paid, and all 1997 and 1998 claims already are on file, and with in excess of $10 million already set aside for the Settlement, it was the Governor's judgment that proceeding with the payment of the 1997 and 1998 claims was in the interest of the Government. (*See also Santos* Docket No. 285 (establishing the Governor's power and responsibility over all executive matters concerning the GTIT)). The early payment benefited the Government by providing an incentive for persons with 1997 and 1998 EIC claims to join the Settlement. However, the Governor and Government took a substantial risk by paying the $10 million upon preliminary approval with no guarantee that the Court will give the Settlement Agreement final approval. The EIC Class, meanwhile, received an immediate benefit of $10 million, but will only be bound by the Settlement if was found to be fair by this Court. That is not coercive.

Objectors cite *In re Educational Testing Serv.*, 447 F. Supp. 2d at 627, as being to the contrary. It is not; it is simply off-point. The issue addressed there was that an objector was suggesting that class members should have been sent a check instead of a claim form; the court overruled the objection (and approved the settlement) because use of a claim form was standard and because class members under the settlement had the right to either an expedited payment or individualized damages. *Id*. It is unclear how that case bears on this "coerciveness" allegation in this case. Class members here are not choosing between expedited payment or individualized assessment; they were being offered an earlier payment in the event they had already decided not to opt-out – a payment made at risk to the Government as final approval could ultimately be denied. The objection is overruled.

### 3.    The Value of the Claims

Objectors argue that the Government has to show the "undiscounted value of the Class' claims." Of course, were that the standard – that the Government had to show exactly what the total possible claims would be worth – it would be impossible in this case as the total number of possible claims that could have been filed can never be determined as explained in the

*CIVIL CASE NO. 04-00006*                                       39
*(Consolidated with Civil Case Nos. 04-00038 and 04-00049)*

Government's prior briefing, which Objectors fail to address. (*See* Docket No. 448 at 13). But, this is not the law. *E.g., In re Michael Milken and Assocs. Securities Litig.*, 150 F.R.D. 57, 66 (S.D.N.Y. 1993) ("The Milken Global Settlement may be found reasonable <u>even though the total value to be allocated to and recovered by the Class cannot presently be determined</u>) (citing, *inter alia, Cotton v. Hinton*, 559 F.2d 1326, 1334 (5th Cir. 1977)) (emphasis added). Rather, "[t]he determination of what constitutes a "reasonable" settlement is not susceptible of a mathematical equation yielding a particularized sum. ... [A]s Judge Friendly has explained, "in any case there is a range of reasonableness with respect to a settlement." *Id.* (citing *Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972); *Zerkle v. Cleveland-Cliffs Iron Co.*, 52 F.R.D. 151, 159 (S.D.N.Y. 1971); *Glicken v. Bradford*, 35 F.R.D. 144, 152 (S.D.N.Y. 1964)).

In any case, substantial information has been provided based upon what can be shown in the Camacho Declaration filed on July 26, 2007, and this is more than adequate. It shows that the Class is receiving from 73%-100% of the value of their claims, less interest. (*See* Docket No. 450). Thus, although Objectors also cite *Carnegie v. Household Intern Inc.*, 371 F. Supp. 2d 954 (N.D. Ill. 2005), for the proposition that the value of the Settlement must be shown as to each individual, this information has been shown. There is sufficient information as to the amount received by the Class versus the amount they could have received if completely successful, and that information shows the Settlement is reasonable and fair. The objection is overruled.

### 4. Compliance with the Organic Act and Guam Law

Objectors argue that the Settlement violate the Organic Act and Guam law. The Court disagrees.

### i. 48 U.S.C. § 1421i

Objectors argue that the Settlement violates 48 USC § 1421i. That section provides that judgments for back tax refunds are to be funded from "unencumbered" funds. 48 USC § 1421i.[19]

---

[19] The term unencumbered funds is not defined in the Organic Act, and at argument Objectors suggested that it was not synonymous with unappropriated funds, but rather referred to funds that are not pledged to support bonds or that are not federal grant money that can only be used for designated purposes. Assuming *arguendo* this were true, and a $90 million or higher judgment was entered against the Government of Guam, it would either bankrupt the Government if it had to pay all at once (it has a yearly budget of less than $500 million, *see* Guam P.L. 29-19, and a deficit that already exceeds that amount), or place the Court in the position of supervising

Objectors are correct that 48 USC § 1421i provides *a* means of paying for a tax refund judgment. Thus, in theory the Government could, in a settlement, confess to a judgment under 48 USC § 1421i and wait for sufficient unencumbered funds to be available to pay the settlement. But, simply because 48 USC § 1421i provides *a* means of paying for a tax refund judgment does not mean that it provides *the only* means of paying for a tax refund judgment. Barring a windfall of historic proportions, it will take years for there to be $90 million in unencumbered funds given a current Government of Guam deficit of $524 million. (Dock. No. 449 ¶ 2). Thus, given that nothing in 48 USC § 1421i creates a prohibition on the Government satisfying judgments through other, authorized means, the Settling Parties instead looked to Chapters 50 and 51 of Title 11 of the G.C.A., which as discussed below provide alternative sources of funding. The Court finds that this was lawful.

### ii. Chapters 50 and 51 of the G.C.A.

Chapters 50 and 51 of the 11 G.C.A. create reserve and trust funds that both state they can be used to pay tax refunds, "earned income tax credits," and the child tax credit. 11 G.C.A. § 50101, *et seq.* and 51101, *et seq.* Given that these statutes thus expressly permit expenditures from the trust and reserve funds to pay the EIC, the Settling Parties utilized these to support the Settlement Agreement.

Objectors make an issue of the fact that these reserve and trusts funds hold "projected" amounts necessary to pay refunds and the EIC based on a three-year average. But the three-year average is not based on refunds or claims "filed" in the last three years – it is based on refunds and credits "issued." 11 G.C.A. § 50103. Further, because this might prove inadequate, the amount to be reserved can then be *increased* because the ultimate calculation "shall further provide for reserving income tax receipts, on a percentage basis, in order to accumulate sufficient cash reserves to pay projected income tax refunds, earned income tax credits, and child tax credits in a timely manner." *Id.* Thus, the ultimate result is that the fund holds the amount projected to

---

every expenditure by the Government for years to determine whether it should proceed or such money should instead be used to satisfy the judgment. The Court sees little value to the Class in insisting on a construction of a statute that would either bankrupt the defendant, or leave the Class in a position where it must constantly come back to this Court in an effort to be paid.

*CIVIL CASE NO. 04-00006*
*(Consolidated with Civil Case Nos. 04-00038 and 04-00049)*

41

be required to pay tax refunds, the EIC, and the child tax credit. It therefore is possible to account for the additional amount needed to satisfy prior years' EIC under the Settlement based on such projections. Section 50103 thus does permit the Governor the flexibility, based upon projections, to pay the previous years EIC, and he is not obligated to simply wait until there are sufficient unencumbered funds to pay a judgment as suggested by Objectors.[20]

### iii. 48 U.S.C. § 1423j

Objectors argue that the Settlement violates the Legislature's power over appropriations under 48 U.S.C. § 1423j. Chapters 50 and 51 of 11 G.C.A. state that funds therein can be spent on "projected tax refunds, earned income tax credits, child tax credits and rebates." Nowhere in the statutes does it state that the "projected" EIC that can be paid is only for future years – "projected EIC payments" are still "projected EIC payments," whether they are payments for 1995 or 2005. Accordingly, the Government's pledge of 15% of the amount that goes into those funds is consistent with the Legislature's appropriation of monies that go into the Chapter 50 and 51 trust and reserve funds for "projected . . . earned income tax credits." 11 G.C.A. § 50103.

### iv. The Illegal Expenditures Act

Objectors lastly argue that the Settlement Agreement violates the Illegal Expenditures Act, 5 G.C.A. § 22401. First, they argue that the Governor entered into the contract "prior to an appropriation." But there is an appropriation – Chapters 50 and 51 of 11 G.C.A. authorize expenditures on the EIC. The Settlement is paying the EIC. It complies with that requirement.

Second, Objectors argue that the Settlement authorizes an expenditure "from a fund in excess of the amount available therein." But the Settlement only guarantees 15% of whatever is placed in those funds[21] – whether that is 15% of $10 million or $100 million. No promise is

---

[20] Objectors' argument that the money in the Fund is "property" belonging to taxpayers (Objection at 36) is wrong for two reasons. First of all, Objectors are relying on precedent concerning true tax *refunds* of overpaid taxes; the EIC is administered as a tax "refund," but it is actually a social subsidy payment to the working poor *from the Government's funds*. Moreover, the precedent cited is in regard to the taxpayers' property interest in eventually receiving their refund; it says nothing about giving them a personal property interest in any particular funds held by the Government, however the Government may denote them.

[21] And, as previously stated, it also guarantees (as required by Guam law) that all tax refunds will be paid from these funds.

*CIVIL CASE NO. 04-00006* 42
*(Consolidated with Civil Case Nos. 04-00038 and 04-00049)*

made that any particular amount will be in the funds at any time or paid at any time, and therefore nowhere has the Governor authorized an expenditure "from a fund in excess of the amount available therein."

Third, Objectors point to the promise to pay the EIC in future tax years as violating the Illegal Expenditures Act. The promise made in the Settlement is that "EIC claims for tax years 2005 and future tax years shall be funded in compliance with Chapters 50 and 51 of Title 11 of the G.C.A." (Settlement Agreement § V(g)). Again, thus, there is no promised expenditure "from a fund in excess of the amount available therein"; future EIC will only be paid as, in the ordinary course, funds become available for tax refunds and the EIC. This is lawful.

## CONCLUSION

The Court hereby GRANTS the motions for final class certification and final approval, and denies all objections submitted. The Court shall issue a judgment consistent herewith, and which shall expressly retain jurisdiction to enforce the Settlement Agreement.

SO ORDERED this ___ day of _____, 2007.

_____
**FRANCES TYDINGCO-GATEWOOD**
Chief Judge, District Court of Guam