# DISTRICT COURT OF GUAM

## TERRITORY OF GUAM

JULIE BABAUTA SANTOS, *et al.*,

        Petitioners,

        vs.

FELIX P. CAMACHO, *et al.*,

        Respondents.

---

CHARMAINE R. TORRES, *et al.*,

        Plaintiffs,

        vs.

GOVERNMENT OF GUAM, *et al.*,

        Defendants.

---

MARY GRACE SIMPAO, *et al.*,

        Plaintiffs,

        vs.

GOVERNMENT OF GUAM,

        Defendant,

        vs.

FELIX P. CAMACHO, Governor of Guam,

        Intervenor-Defendant.

Civil Case No. 04-00006
Civil Case No. 04-00038
Civil Case No. 04-00049

**SUPERSEDING FINAL EIC CLASS ACTION ORDER**

CERTIFICATION OF EIC CLASS
APPOINTMENT OF CLASS REPRESENTATIVE
APPOINTMENT OF CLASS COUNSEL
APPROVAL OF SETTLEMENT AGREEMENT
AWARD OF ATTORNEYS' FEES

This Order supersedes and vacates the Final EIC Order issued on April 10, 2008.[1]  *See* Docket No. 583.

The Petitioner Julie Babauta Santos  ("Santos"), on behalf of herself and a putative class of taxpayers, Plaintiff Charmaine R. Torres[2] ("Torres") and Respondents Governor of Guam Felix P. Camacho, Director of the Department of Administration Lourdes M. Perez and Director of the Department of Revenue and Taxation Artemio R. Ilagan and Government of Guam, (collectively the "Respondents") entered into an amended class action settlement agreement (the "Settlement Agreement").[3]  Previously, on January 9, 2007, this court entered an Order granting Preliminary Approval of Class Action Settlement Agreement and granting Conditional Certification of the EIC Class for Settlement Purposes ("Preliminary Approval Order").  *See* Docket No. 384.

On June 21, 2007, Respondents submitted a declaration by Deputy Director of the Department of Revenue and Taxation John P. Camacho, confirming the timely distribution of the class Mailed Settlement Notice and Publication Notice required by the Preliminary Approval Order.  On September 20, 2007, this matter came before the court for a Fairness Hearing and final approval of the Settlement Agreement.  The only objections filed were by Janice Cruz and Mary Grace Simpao, two of the three plaintiffs in the companion *Simpao* action (hereinafter referred to as the "Objectors").[4]  The objectors were permitted to participate in the hearing through retained counsel, the firms of Shimizu Canto & Fisher and Tousley Brain Stephens PLLC.  On January 9, 2008, the matter came before the court for the Approval of Attorneys' Fees.  Having considered

---

[1]  On April 14, 2008, *Torres* counsel filed a motion to amend the previous Order as it pertained to the award of their attorney fees.  Because of the significance of the issues presented in this case, the court performed a thorough accounting review of the prior Order and the voluminous record herein.  The court notes, upon further review of the sizable pleadings, that there were underlying mistakes made in counsels' submitted billing statements.  Accordingly, the court issues this Superseding Final Order to address the concerns raised by *Torres* counsel and other errors found by the court.

[2]  *Torres v. Gov't of Guam, et. al.*, Guam Dist. Ct. Civil Case No. CV04-00038.

[3]  *See* Docket No. 383.

[4]  *Simpao v. Gov't of Guam*, Guam Dist. Ct. Civil Case No. CV04-00049.

2

the evidence presented at the hearings, the objections, the arguments of counsel, and the full record of the case, the court hereby **GRANTS** the Motion for Final Certification of the EIC Class; confirms appointment of Class Representative and Class Counsel; and **APPROVES** the Settlement Agreement. In addition, it awards attorneys' fees as set forth herein.

## I. JURISDICTION OF THE COURT

Santos, Torres, and Respondents (collectively "the settling parties") and the Settlement Class Members ("the Class") have submitted to the jurisdiction of the court for purposes of the settlement. The court finds it has jurisdiction over the parties and this matter pursuant to 48 U.S.C. § 1421i(h) and 28 U.S.C. § 1361 and has authority to approve the Settlement Agreement.

## II. BACKGROUND

This matter concerns the Government of Guam's (the "Government") failure to pay taxpayers the Earned Income Tax Credit ("EIC"). Prior to tax year 1995, Guam taxpayers claimed the EIC and the Government paid the credit.[5] However, in 1996, the Department of Revenue and Taxation ("DRT") issued Revenue Ruling No. 96-001 regarding whether the EIC applied in Guam under the Guam Territorial Income Tax ("GTIT"). In its ruling DRT concluded that it did not. The Attorney General of Guam[6] issued his own opinion on the matter and agreed with DRT's conclusion.

In light of DRT's ruling and the Attorney General's Opinion, the Government decided that the EIC was inapplicable in Guam on its tax return forms for the years 1995 and 1996 and 1999 through 2003.[7] For example, the 1999 1040A tax form contained the language "**Not Applicable**"

---

[5] The EIC, also referred to as the EITC, was first enacted by the United States Congress in 1975 and codified as Section 43 of the U.S. Internal Revenue Code of 1954. *See* U.S. Public Law 94-12 § 204. The EIC is a refundable Federal income tax credit for low-income working individuals and families. It allows an eligible individual to claim a tax credit against the amount of income tax liability, if any, on his or her annual income tax return. Because the EIC is a refundable credit, even individuals who owe no income taxes can receive it if they file their tax returns.

[6] At that time Calvin Holloway Jr. served as that Attorney General of Guam.

[7] Guam issues it own 1040 tax forms.

3

where Earned Income Credit was listed.[8]  For the years 1997 and 1998, such prohibitory language was not on the Government's tax forms.

For tax years 1995 and 1996, the Government did not pay refunds associated with the EIC. In the years 1997 and 1998, qualified Guam taxpayers could claim EIC on their tax returns. However, only some of the EIC claims were paid for the tax year 1997 and with the exception of one individual taxpayer, no EICs were paid for the tax year 1998.  No EICs were paid for the tax years 1999 through 2003.

On January 12, 2005, then Governor of Guam, Felix P. Camacho, (the "Governor") issued Executive Order 2005-01 which established a procedure whereby EIC claims would become a part of a qualified taxpayer's tax return.  Shortly after the Governor issued this order, DRT published forms with which taxpayers could make claims for the relevant tax years of 1995 though 2004.

Taxpayers who make up the settlement class filed individual income tax returns with the Government during the tax years 1995 through 2003.  None of them received an EIC offsetting the taxes paid during those years.  Additionally, none of them filed an administrative claim for a refund of overpaid taxes.

The Government's failure to pay the EIC led to the filing of three class actions.  On February 12, 2004, the lead case of *Santos v. Camacho,* Guam Dist. Ct. Civil Case No. CV04-0006 (the "*Santos* action"), was filed by Attorney Michael F. Phillips.  Santos alleged that DRT and the other Respondents had unlawfully refused to pay the EIC to Guam taxpayers in certain years,[9] and that those taxpayers accordingly were owed the EIC as tax refunds.  *See* Docket No. 1.  The second putative EIC class action, *Torres v. Government of Guam, et. al.,* Guam Dist. Ct. Civil Case No.04-00038 (the "*Torres* action") was filed on August 9, 2004 by Ms. Charmaine R. Torres, represented by attorney Peter C. Perez.  *See Torres* Docket No. 1.  The third class action, *Simpao v. Government of Guam*, Guam Dist. Ct. Civil Case No.CV04-00049 (the *Simpao* action") was

---

[8]  The plaintiffs in some of the years in question actually used the federal 1040 tax form which did not black out the EIC portion.

[9]  The complaint has subsequently been amended to include additional tax years, 1995 through 2004.  *See* Docket No. 296.

4

subsequently filed in December 2004 by Mary Grace Simpao and Christina Naputi, represented by attorney Thomas J. Fisher. *See Simpao* Docket No. 1. Although there are some differences in the exact class definitions and parties named, all three complaints sought the recovery of back tax refunds of the EIC from Respondents.[10]

After the Respondents answered the complaint, the parties agreed to a trial set to begin in November 2004. *See Santos* Docket No. 11. On May 26, 2004, U.S. Magistrate Judge, Joaquin V.E. Manibusan, Jr., instructed Attorney Phillips to seek class certification before moving forward with his planned summary judgment motion. *See id.*, Docket No. 12. On June 17, 2004, however, Santos reached a settlement (the "first settlement") with the Government and then Attorney General of Guam, Douglas B. Moylan, with then Lieutenant Governor, Kaleo S. Moylan, signing the agreement as Acting Governor because the Governor, Felix P. Camacho, was off-island. *See id.*, Docket No. 14.

Soon thereafter, the parties in the *Torres* and *Simpao* actions sought to intervene. The intervention was denied on August 5, 2004. *See Santos* Docket No. 76. The attorneys in *Simpao* had first sought to appeal the denial of intervention, but subsequently dismissed the appeal without prejudice and then initiated the third competing action. *Id.*

Meanwhile, a dispute arose between the Attorney General and the Governor concerning the legality of the first settlement. On November 9, 2004, the Governor filed his objections to proceeding with the first settlement. *See Santos* Docket No. 87. After the filing of the briefs regarding the legality of the settlement, the parties consented to mediation before Judicial Arbitration and Mediation Services, Inc. ("JAMS")[11] Mediator Catherine Yanni, Esq. *See id.*, Docket Nos. 188 and 207. In May 2005, the parties reached a term sheet and began drafting a

---

[10] The *Santos* action was eventually consolidated for pretrial purposes with the *Torres* and *Simpao* actions. *See* Docket No. 299.

[11] JAMS mediators and arbitrators are resolution experts who resolve some of the nation's largest, most complex and contentious disputes. JAMS neutrals are skilled in alternative dispute resolution (ADR) processes including discovery referee, private judging, in addition to arbitration and mediation. *See* www.jamsadr.com.

5

1 settlement agreement while they waited to see if then Attorney General Douglas B. Moylan, would

2 join the settlement. *See id.*, Docket Nos. 188 and 207; *Simpao* Docket No. 96. In June 2005,

3 Respondents (other than the Government, which was represented by the Attorney General) and

4 *Santos* formalized their settlement in a written settlement agreement (the "second settlement") and

5 moved for preliminary approval and certification. *See* Docket Nos. 211 and 212.

6     After having entered into the second settlement, the *Simpao* plaintiffs' Motion for Summary

7 Judgment came before this court. The *Simpao* plaintiffs moved the court to make a determination

8 that the EIC was applicable to Guam. In June 2005, designated federal Judge Ricardo Martinez

9 found that the EIC was applicable to Guam. On the day of the hearing the Attorney General filed

10 a pleading wherein he conceded the issue concerning the applicability of the EIC to Guam.[12] In

11 light of the concession and the advisory opinion by the Supreme Court of Guam on the matter,

12 Judge Martinez agreed that it should apply. *See Simpao* Docket No. 99.

13     The relationship between Governor Felix P. Camacho and then Attorney General Douglas

14 B. Moylan became increasingly more strained. It eventually deteriorated to the point where the

15 Governor moved to disqualify the Attorney General from further representation of the Government

16 in the *Santos* action. *See Santos* Docket No. 163. On September 19, 2005, the U.S. Magistrate

17 Judge denied the Governor's Motion to Disqualify the Attorney General from this action. The

18 Governor then filed objections to the Magistrate Judge's order which this court sustained in its

19 March 10, 2006 Order. *See id.* Docket No. 285. Thereafter, the Attorney General moved the court

20 to reconsider its order. *See id.* Docket No. 295.

21     The Attorney General insisted that as the "chief legal officer" of Guam, he was the only

22 one entitled to represent the Government; however, in an order filed on March 10, 2006,

23 designated federal Judge James L. Robart found otherwise. *See Santos* Docket No. 285. The court

24 determined that the Governor had authority over the enforcement of tax matters, and thus, could

25 dictate the course of litigation in this matter. However, the court recognized that the issue was one

26 ───────────────────

27     [12] It was later revealed that the concession was contrary to the Governor's position. In his
June 15, 2005 Order, Judge Martinez granted the Governor's motion to intervene in

28 *Simpao* because his interests had not been adequately represented. *See Simpao* Docket No. 99.

of first impression on Guam. Accordingly, the court granted the Attorney General's Motion to Certify the Question for Interlocutory Appeal and certified the issue of the Attorney General's disqualification in the case to the Ninth Circuit. *See id.* Docket No. 300. All matters were then stayed. *Id.* Judge Robart permitted the parties to meet and try to work out a settlement while the stay was in effect. *See id.* Docket No. 309. On April 6-8, 2006, a global mediation was held on Guam before the Honorable William J. Cahill (Ret. Judge).[13] While the *Torres* and *Santos* plaintiffs successfully reached a settlement, which is the one before the court, the *Simpao* plaintiffs did not become a signatory party to the settlement.

On June 19, 2006, the Ninth Circuit denied the Attorney General's petition for permission to appeal the matter. *See* Docket No. 335. On November 28, 2006, the undersigned judge was assigned this case. On December 1, 2006, a status hearing was held. At that time, it became clear that the next step was to determine whether preliminary approval should be given to the proposed settlement agreement. Accordingly, on January 4, 2007, the court heard the Motion for Preliminary Approval of Class Action Settlement Agreement ("proposed Settlement Agreement"). After the parties made their arguments at the hearing, the court found and concluded that the settlement class as defined by the settling parties satisfied all the requirements of due process. It also appointed Santos as class representative and Santos' attorney, Michael F. Phillips, as lead counsel for the Class ("Class Counsel"). *See* Docket No. 384.

On January 29, 2007, the class notice was approved. *See* Docket No. 392. It was thereafter published twice a week for four weeks in the *Pacific Daily News* and the *Marianas Variety*. The notice was also mailed to 49,378[14] individual taxpayers. Based on their tax records, these individuals were identified as being potentially qualified for an EIC claim in tax years 1995-96

---

[13] Judge Cahill served as a San Francisco Superior Court Law & Motion and Writs & Receivers Judge for four years, and Settlement and Trial Judge for eight years prior to joining JAMS. He has a reputation of ensuring the resolution of all types of disputes, including cases involving class action, business disputes, employment, real estate, securities, toxic tort, and insurance coverage. *See* www.jamsadr.com.

[14] Of those, 47,351 were sent to Guam addresses and 2,027 were sent off-island. *See* Docket No 493 at ¶ 2.

and/or 1999-2004, or who had actually filed a claim in 1997 or 1998 that had yet to be paid. *See* Docket Nos. 424 and 493 at ¶ 2.[15]

From the date of publication of the notice until the expiration of the time to file a request for exclusion on May 8, 2007, the court received four requests to opt-out. *See* Docket Nos. 403, 406, 408, 409. One of the requests was by one of the *Simpao* plaintiffs. *See* Docket No. 409. On June 8, 2007, the *Santos* and *Torres* parties moved for final class certification, and the settling parties moved for final approval of the Settlement Agreement. *See* Docket Nos. 416, 417, 421. The only objections filed were by the two remaining *Simpao* plaintiffs. *See* Docket Nos. 426, 462. On September 20 and 21, 2007, the court heard argument on these motions and objections. *See* Docket Nos. 491 and 494. The court now concludes that its prior preliminary rulings concerning class certification, appointment of class representative and Class Counsel are still applicable.

## III. TERMS OF THE SETTLEMENT AGREEMENT

In the Settlement Agreement, the Government agreed to pay a total of $90 million for tax years 1995-1996 and 1998-2004, with $15 million per year devoted to all "timely" years, where claims were or still could have been allegedly asserted within the statute of limitations (1998, and 2001-2004); another $15 million was devoted to the "stale" years (1995-1996, and 1999-2000), where the potential statute of limitations defense was stronger. *See* Settlement Agreement § IV(a) Docket No. 383.[16] The Class, however, waived all right to interest. *Id.* at § IV(b). The one exception was as to tax year 1997, where the Government had already paid 100% of most claims with interest pursuant to a specific appropriation, and agreed to pay those few remaining claims at 100% plus interest to ensure parity. *Id.* at § IV(d).

The Government also agreed to pay the EIC in future years. *Id.* at § IV(e). As an

---

[15] The reason for the different treatment of different tax years is that, in 1997 and 1998, it was possible to file an EIC claim, whereas, for all other years, DRT had asserted such claims would not be accepted (except that they were accepted in 2004 as well, but the time to file a 2004 claim was still open). *See* Settlement Agreement III(c), VI(b), Docket No. 383.

[16] The Settlement Agreement also contains "roll-over" provisions in which any remaining amounts in a particular year will be rolled-over to fund payments for certain other years. *See* Docket No. 383.

additional benefit to the Class, the Government agreed to make an initial, early payment to the Class of $10 million that had already been reserved under the prior settlements for tax year 1998 claims (and also to pay the few 1997 claims) upon preliminary approval of the Settlement Agreement. *See* Settlement Agreement § VI(e)(i)-(ii). Class members receiving such payments were given additional notice informing them that accepting the check would bind them to the Settlement Agreement *if* it received final approval, but they were also told that they could wait and still receive the check upon final approval if they preferred, and they were not bound to the Settlement Agreement unless it received final approval. *Id.* at § VI(e)(i)-(ii) and Ex. D.

The Settlement Agreement contained very specific funding mechanisms. *See* Settlement Agreement § V. Funding for the $90 million is to be obtained by devoting at least 15% of any amounts that are placed into the Government of Guam's Tax Refund Reserve Funds. *Id.* at § V(a). The tax refund reserve funds are the funds used to hold all of Guam's tax refunds before they are paid out, and the Government pledged not to pay tax refunds out of any other source during the life of the Settlement and to provide monthly reports to ensure compliance (which it has now done since February of 2007). *Id.* at § V(a)-(b).

Despite creating a class action, the Settlement Agreement avoids imposing an undue burden on the court, and any management difficulties that might otherwise arise, by utilizing existing DRT structures to process tax claims. *See* Settlement Agreement at § VI(a). The Settlement Agreement uses the EIC claim forms created pursuant to Executive Order 2005-001 and otherwise tracks Executive Order 2005-001 in terms of claims procedures (*see* Settlement Agreement § VI(b))—the same forms and procedures that were upheld by the court in *Simpao* over the objections of the Objectors in this case. *See Simpao* Docket No. 99 at 9-11.

## IV.   CLASS CERTIFICATION

In its Preliminary Approval Order (Docket No. 384), the court granted conditional class certification to the following settlement class:

> All persons who do not elect to request exclusion from the class under the procedures described [in the Settlement Agreement] and: (1) were subject to the Guam Territorial Income tax ("GTIT") established in 48 U.S.C. § 1421i for tax years 1995-1996 and/or 1999-2004 and would have been eligible to file for the EIC established in 26 U.S.C. § 32 (as it applied in each respective tax year) if that

9

program were applied in the Territory of Guam, and filed a timely tax return for the applicable tax year or year(s) in which the credit is sought; and/or (2) were eligible to receive an EIC credit under certain Guam territorial laws for tax years 1995-1996 and/or 1999-2004 that mirrored the federal EIC law (26 U.S.C. § 32), including the Guam Earned Income Program (Chapter 42 of 11 G.C.A.), and filed a timely tax return for the applicable tax year or year(s) in which the credit is sought; and/or (3) actually filed a claim for the EIC with DRT for tax year 1998 under the GTIT or Guam Earned Income Program (Chapter 42 of 11 G.C.A.) on or before April 15, 2002, and have not yet received full payment for that claim; and/or (4) actually filed a claim for the EIC with DRT for tax year 1997 under GTIT or Guam Earned Income Program (Chapter 42 of 11 G.C.A.) on or before April 16, 2001 and have not yet received full payment for that claim.

A party seeking class certification bears the burden to establish a prima facie showing of each of the prerequisites of Rule 23(a) of the Federal Rules of Civil Procedure and to establish an appropriate ground for class action under Rule 23(b). *Blackie v. Barrack*, 524 F.2d 891, 901 (9th Cir. 1975). This burden can be met by providing the court with a sufficient basis for forming a "reasonable judgment" on each requirement. *Id.*

Rule 23 provides in part:

(a) **Prerequisites to a Class Action**. One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is **so numerous** that joinder of all members is impracticable, (2) there are questions of **law or fact common** to the class, (3) the claims or defenses of the representative parties are **typical of the claims or defenses** of the class, and (4) the **representative** parties will **fairly and adequately protect** the interests of the class.

(b) **Class Actions Maintainable**. An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:

. . .

(3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

FED. R. CIV. P. 23(a) and (b)(3) (emphases added).

The first issue is whether Rule 23(a) is satisfied. The requirements of Rule 23(a) are commonly referred to as the requirements of numerosity, commonality, typicality, and adequate

///

10

1    representation. *See*, *e.g.*, *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9ᵗʰ Cir. 1998). Each of

2    these factors is satisfied as set forth below.

3         **A. Rule 23(a) Criteria**

4            **1. Numerosity.**

5        The first prerequisite under subsection (a) is that the class is so numerous that joinder of

6    all members would be impracticable. *See* FED. R. CIV. P. 23(a)(1). In satisfying this requirement

7    there is no exact numerical cut-off; the specific facts of each case must be examined to determine

8    if impracticability exists. *See*, *e.g.*, *Gen. Tel. Co. v. EEOC*, 446 U.S. 318, 330 (1980). A finding

9    of numerosity can be demonstrated through common sense assumptions. *In re Playmobil Antitrust*

10    *Litig.*, 35 F. Supp.2d 231, 239 (E.D.N.Y. 1998). In this case, DRT identified a class of persons

11    potentially eligible for the EIC of 49,378 persons, of which 24,108 filed claims. *See* Docket Nos.

12    493 at ¶ 2 and 495 at ¶ 2. These numbers far exceed that of cases in which other courts have found

13    sufficient numerosity to certify a class. *See*, *e.g.*, *Paper Sys., Inc. v. Mitsubishi Corp.*, 193 F.R.D.

14    601, 604 (E.D. Wis. 2000) (would-be class of greater than forty members held sufficient); *In re*

15    *Flat Glass Antitrust Litig.*, 191 F.R.D. 472 (E.D. Pa. 1999) (holding that "classes consisting of

16    hundreds (and potentially thousands) of putative plaintiffs have routinely satisfied the numerosity

17    requirement.") (citations omitted). To join that many members would clearly be impracticable.

18    Accordingly, the numerosity requirement is met as had been previously decided in the court's

19    Preliminary Approval Order. *See* Docket No. 384.

20            **2. Commonality.**

21        The second prerequisite for class certification is that there are questions of law or fact

22    common to the class. FED. R. CIV. P. 23(a)(2). To justify class action treatment, there must be

23    some issue involved "common to the class as a whole," and relief must "turn on questions of law

24    applicable in the same manner to each member of the class." *See Gen. Tel. Co. v. Falcon*, 457 U.S.

25    147, 155 (1982). Indeed, for the commonality requirement to be met, there must only be one single

26    issue common to the proposed class. *In re Telectronics Pacing Sys., Inc.*, 164 F.R.D. 222, 228

27    (S.D. Ohio 1995).

28    ///

1   Here, as the court previously observed in granting preliminary certification, the fact that

2   "Petitioners and class members have been denied both the opportunity to file for the EIC for

3   several years and the recovery of the same" satisfies the commonality requirement. *See* Docket

4   No. 384 at 5-6. This factor has not changed since the court issued its Preliminary Approval Order,

5   and the court again concludes that this requirement has been met. *See Id.*

6           **3. Typicality.**

7           In order to satisfy the third prerequisite for class certification, the claims or defenses of the

8   representative parties must be typical of the claims or defenses of the class. FED. R. CIV. P.

9   23(a)(3). A claim is typical if it: (1) arises from the same event or practice or course of conduct

10  that gives rise to the claims of other class members; and (2) is based on the same legal theory as

11  their claims. *Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992). The test requires that the

12  class representative "must be part of the class and possess the same interest and suffer the same

13  injury as the class members." *Falcon*, 457 U.S. at 156.

14          With respect to typicality, the court's Preliminary Approval Order granting preliminary

15  class certification found that "the Respondent's 'course of conduct' with respect to the various

16  plaintiffs, *i.e.*, its failure to allow EIC claims and subsequent payment thereof is exactly the same."

17  *See* Docket No. 384 at 6. On that basis, the court held that "Petitioners' claims are 'typical' of

18  those of the rest of the class." *Id.* No new facts have been introduced contradicting this prior

19  holding, and the court thus once again concludes that typicality is satisfied here on this same

20  ground.

21          **4. Adequacy of Representation.**

22          The final prerequisite to a class action under Rule 23(a) is that "the representative parties

23  will fairly and adequately protect the interests of the class." FED. R. CIV. P. 23(a)(4). According

24  to the Ninth Circuit, representation is "adequate" if: (1) the attorney representing the class is

25  qualified and competent; and (2) the class representatives do not have interests antagonistic to the

26  remainder of the class. *See Lerwill v. Inflight Motion Pictures, Inc.*, 582 F.2d 507, 512 (9th Cir.

27  1978). Santos and the class members possess the same interest in recovering the EIC and in the

28  implementation of the earned income tax credit program. Moreover, Santos has vigorously

12

pursued this action. *See* Docket No. 384 at 6.

The *Simpao* plaintiffs, Mary Grace Simpao and Janice Cruz, object to the adequacy of Santos' attorney, Michael F. Phillips. *See* Docket No. 427. Whether the class representative satisfies Rule 23(a)(4) depends on a variety of factors, including "the qualifications of counsel for the representatives, an absence of antagonism, a sharing of interests between representatives and absentees, and the unlikelihood that the suit is collusive." *Brown v. Ticor Title Ins. Co.*, 982 F.2d 386, 390 (9th Cir. 1992).

Many of the objections were previously made in their Opposition to Petitioner Santos' Amended Petition for Appointment of Lead Counsel. *See* Docket No. 354. The Objectors reiterate their claim that Attorney Phillips did not adequately identify or investigate the potential claims in this action or develop an understanding of the applicable law. They argued that his complaint was inadequate because it failed to state that Ms. Santos had met the statutory requirements of a tax refund action or had exhausted her administrative remedies. In addition, he allegedly failed to define the class in such a way that indicated that the members satisfied exhaustion requirements on a class-wide basis. While admitting, it is a hyper-technical criticism, the Objectors point out how Attorney Phillips named the wrong defendants.[17] They contend that counsel should have named only the Government of Guam as the defendant, the failure of which led to the protracted litigation between the Governor and the Attorney General as to who represented the Government of Guam.

The Objectors also take issue with Attorney Phillips' conduct regarding fee negotiations. The Objectors suggest that to negotiate fees at the same time as negotiating the terms of a settlement may be indicative of collusiveness with the defendant. However, there is no indication that Attorney Phillips acted in a collusive way. The EIC issue has been ongoing for years. This is not a case where within a few months a class action is explored and then all the terms of

---

[17] Michael F. Phillips, Esq. filed his complaint against named individuals such as Felix P. Camacho, Governor of Guam, Art Ilagan, Director of Department of Revenue and Taxation, Lourdes M. Perez, Director of Department of Administration, Douglas B. Moylan, Attorney General; and Government of Guam. *See Santos*, Docket No. 1.

13

settlement are reached. Moreover, discussions concerning attorneys' fees and costs took place on the last day of the mediation before Retired Judge Cahill,[18] on April 8, 2006, and only after the parties had already come to an agreement in principle on the core terms of the settlement eventually reduced to written form and executed on May 26, 2006. *See* Docket No. 331, Amended Motion for Fees, Statement Pursuant to Fed.R.Civ.P. 23(e)(2) at 23.

The Objectors again raise a concern that their counsel was unable to participate in the negotiation process. However, as this court previously noted in its January 9, 2007 Order, Judge Cahill assured this court that all parties had an opportunity to meaningfully participate in negotiations.[19]

Admittedly, the progress of this case has not been smooth. Yet, as this court remarked in its January 9, 2007 Order, many of the delays in this action were in large part due to the lack of a sitting district judge in this jurisdiction (six different designated federal judges handled various matters) and the dispute with the Attorney General over the legal representation of the Government and Governor of Guam. Attorney Phillips could not have foreseen these types of problems.

More importantly, the court must remain cognizant that Rule 23(g) governs the appointment of counsel and requires the court to consider the work counsel has done in "investigating potential claims in the action, counsel's experience in handling class actions, other complex litigation, and claims of the type asserted in the litigations, counsel's knowledge of the applicable law, and the resources counsel will commit to representing the class; . . . ." FED. R. CIV. P. 23(g)(1)(C). The court may also consider "any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class." *Id.* The court previously found in its Preliminary Approval Order that Attorney Phillips had the requisite experience in handling class

---

[18] *See* note 13, *supra*.

[19] In light of the concerns raised by the *Simpao* plaintiffs that counsel did not have a meaningful opportunity to participate in the negotiation process, this court contacted Judge Cahill. Such contact was only made after all the parties agreed on the record that the court could contact the mediator to discuss this matter. *See* Docket No. 379 (Minutes of January 4, 2007 hearing). As noted, Judge Cahill informed this court that he believed all the parties had had a meaningful opportunity to participate.

14

actions and was able to advocate on behalf of the Class. *See* Docket No. 384 at 10. The court noted at that time that Attorney Phillips had previously served as lead counsel in other class actions and complex cases and that he had a long history of taking on cases where the interests of the disenfranchised and downtrodden are involved. *Id.* Nothing has changed since the court's preliminary appointment of counsel in January 2007.

### B. Rule 23(b) Criteria

Having found that the requirements of Rule 23(a) are satisfied, the court now turns its attention to FED. R. CIV. P. 23(b)(3). Class certification can only be granted to the Petitioners if "[t]he court finds that the **questions of law or fact common to the members of the class predominate over any questions affecting only individual members**, and that a class action is **superior** to other available methods for the fair and efficient adjudication of the controversy." FED. R. CIV. P. 23(b)(3) (emphases added). The court has already found that common questions of law and fact exist in the instant action, however, it must go one step further and find that such common questions "predominate" the action, or else class certification is inappropriate. *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996). "Implicit in the satisfaction of the predominance test is the notion that the adjudication of common issues will help achieve judicial economy." *Id.* In other words, in determining if common issues of fact and law predominate the action, the court will also take into consideration whether the resolution of questions common to all the class members through a class action would be far more efficient than having a number of separate trials.

The Objectors claim that the Settlement Agreement creates class antagonism such that the "class predominance" inquiry of Rule 23(b)(3) is not met. They cite to four areas that purportedly create antagonism:

1. The settlement abandons interest for all tax years except for tax year 1997. This waiver, because of the passage of time and the compounding interest, hurts earlier years more than later years.

2. Tax year 1997 is first paid, then 1998, then 1995, 1996, 1999 and 2000 together, followed by 2001, 2002, 2003 and finally 2004. This creates antagonism since each tax year would

15

1　prefer to be at the head of the line.

2　　　3.  A condition precedent to any distribution to any tax year is the accumulation of funds

3　for that year.

4　　　4.  The settlement contains no provision to guarantee payment for all years.  Payment

5　amounts are predicated on the continued existence of the Reserve and Trust Funds.[20]  Each area

6　is discussed below.

7　　　The decision to forego interest was weighed and leveraged in the settlement negotiations,

8　particularly against the backdrop of a potential statute of limitations bar to recovery for the earlier

9　tax years.  While the Objectors contend there is no statute of limitations bar to recovery implicated

10　in the earlier years, this issue is certainly left open to debate.  Designated federal Judge Martinez

11　opined that absent some sort of settlement, many of the putative class members' claims would be

12　time barred.  *See Simpao* Docket No. 148 at 6 n.5.[21]  In light of the uncertainty, the claims for the

13　earlier years would be disproportionately less valuable.  Indeed, for purposes of settlement, these

14　are the claims that are receiving the benefit of the Governor's voluntary waiver of a statute of

15　limitations defense (26 U.S.C. § 6402) that might otherwise act as a bar to those claims.  *See*

16　discussion *infra*.  Further, the older years are receiving payment first, so their greater loss of

17　interest is partially offset by their earlier receipt of the monetary benefit of the Settlement.  These,

18　then, are rational distinctions based upon legitimate considerations.  *Cf. Bussie v. Allamerica Fin.*

19　*Corp.*, 50 F. Supp. 2d 59, 75-76 (D. Mass. 1999) ("any differences in the nature and value of the

20　benefits received by class members reflect the Settlement's fairness insofar as they are rationally

21　based on objective differences in the positions of the class members, such as the kind and size of

22

---

23　　　[20]  Under the Settlement Agreement, § V, the settling parties agreed that the Government
24　would devote a minimum of 15% of each amount set aside or earmarked by the Government or
　　Legislature for income tax refunds and placed into either the Income Tax Reserve Fund (Chapter
25　50 of Title 11 of the G.C.A.) or the Income Tax Refund Efficient Payment Trust Fund (Chapter
　　51 of Title 11 of the G.C.A.).

26　　　[21]  This court has stated:  "This Court notes that many putative class members may fare
27　better under a structured settlement agreement.  Should they proceed with a tax refund suit the
　　relief sought for many of the tax years in question may be barred because of a statute of limitations
28　problem."  Order, Docket No. 148.

16

1   their insurance policy, their status as a current or terminated policy owner, and, with respect to

2   those participating in the Alternative Dispute Resolution ("ADR") Process, the nature and relative

3   strength of their claim") (citations omitted).

4   As to the order of payment for the tax years in question, the court agrees with the

5   Respondents that it only makes sense that those taxpayers who had been waiting the longest should

6   be paid first: "first in, first out." It is not uncommon that different class members may receive

7   different benefits under the Settlement Agreement. Differences are permissible because they are

8   based on the differing circumstances of the class members' individual claims. *See*, *e.g.*, *Torrisi v.*

9   *Tucson Elec. Power Co.*, 8 F.3d 1370, 1377-78 (9th Cir. 1993) (approving disparate treatment of

10  class members that is based on the facts of the case and is not "irrational"). This type of balancing

11  is a rational distinction caused by the fact that the Government is paying the settlement over time.

12  As a result, someone thus has to be first in line and someone has to be last. Thus, the settling

13  parties addressed this as rationally as possible: tax years 1998 and 1997 were placed first because

14  all of those claims were already on file. Those years received the benefit of the "early payment,"

15  as all of the other years were opened for claim submission. After 1997 and 1998 came the oldest

16  years, the ones that gave up the most interest. Because these years have waited the longest, and

17  have also compromised more value for payment, it follows that they be paid next. The oldest years

18  are then followed in turn by each most recent year, such that the years that waited the longest and

19  waived the most interest are paid first, and those that are the most recent and waived the least

20  interest are paid last. It is, then, a compromise plan based on rational distinctions and legitimate

21  considerations. *Cohen*, 61 F.3d at 728.

22  The remaining areas of concern relate to the distribution of funds and the funding source.

23  As to the scheduling of disbursements, the settling parties tried to take into consideration the

24  Government's present and future ability to pay for the settlement. The settling parties agreed upon

25  a negotiated payment schedule which seems reasonable. The other areas of concern pertain to the

26  guarantee that the Government will continue to make the payments for all the years and the

27  ///

28  ///

17

1  continuation of the existing funding source, the Reserve and Trust Funds.[22]  As to the first of these

2  concerns, approximately $16 million has already been placed into the Reserve Fund or paid to the

3  Class.  *See* Docket No. 449 at ¶ 3 (total through June 2007); Docket No. 458, 484, 498, 563, 565,

4  574, 579 and 589 (subsequent months' reports).  If the Government  were, for some reason, to

5  discontinue its payments, the parties could bring the matter before the court for enforcement.

6        The fourth area of concern focuses on whether the Reserve Fund will be abolished by the

7  Legislature at some point in the future.  However, this concern is pure speculation.  There is no

8  guarantee that laws stay constant.  If settlement agreements were to be based on the promise of

9  laws not changing, none would ever receive approval.

10       In its Preliminary Approval Order the court found the Respondents' conduct with regard

11  to implementation of the EIC was the central issue concerning the Plaintiffs' cases.  *See* Docket

12  No. 384.  The objections provide no basis for this court to change its prior finding in this regard.

13  Consistent with its prior ruling, the court finds that common questions of law and fact predominate

14  in this case.

15       Having concluded that common questions of law and fact predominate, the second

16  consideration under Rule 23(b)(3) is whether a class action would be a superior form of resolution

17  in this case.  There are four factors to determine whether a class action would be a superior form

18  of resolution in this case.  The first factor for consideration is the interest of each member in

19  "individually controlling the prosecution or defense of separate actions." FED. R. CIV. P.

20  23(b)(3)(A). This factor is more relevant where each class member has suffered sizeable damages

21  or has an emotional stake in the litigation.  *See*, *e.g.*, *In re N. Dist. of Cal., Dalkon Shield, Etc.*, 693

22  F.2d 847, 856 (9th Cir. 1982).  Here, where the monetary damages each plaintiff  individually

23  suffered are not great, certifying a class action is favored.  *Id.*  A class action in this matter is

24  particularly appropriate where the individual plaintiff's claim is small in comparison to the

25  litigation costs associated with a  lawsuit.  There have been 42,773 accepted with a total value of

26

27

28    ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

[22]  As noted, under the Settlement Agreement, the Government pledged to only pay tax
refunds out of the Reserve and Trust Funds.  *See* Settlement Agreement § V(b).

$80,017,515.26 which works out to a total of approximately $1,870 per claim. *See* Docket No. 490 Ex. A. The court also notes that the EIC plaintiffs are lower income individuals who may not have the ability or inclination to retain counsel. Thus, under the circumstances, there appears to be no special desire to maintain individual actions.

The next factor to consider is "the extent and nature of any litigation concerning the controversy already commenced by or against members of the class." FED. R. CIV. P. 23(b)(3)(B). In the instant case, there were two other pending lawsuits. Because those lawsuits involved the same basic theories and claims of liability, it seems worthwhile to join together as many plaintiffs as possible to settle the matters. Indeed, the court notes that only a handful of persons have opted out, and that of the *Torres* and *Simpao* plaintiffs, three out of the four of them have remained in the action, thus helping to consolidate and resolve almost all outstanding claims.

The third factor to consider is "the desirability or undesirability of concentrating the litigation of the claims in the particular forum." FED. R. CIV. P. 23(b)(3)(C). In this case, where most of the potential plaintiffs are located in Guam, and where the witnesses and the particular evidence will also be found, it is especially efficient for this court to hear the action as a single class action as opposed to thousands of individual cases. Indeed, the last known address for 47,351 out of 49,378 potential class members identified was on Guam. *See* Docket No. 493 at ¶ 2.

Consideration of "the difficulties likely to be encountered in the management of a class action" is the fourth and final factor under FED. R. CIV. P. 23(b)(3)(D). This factor is commonly described as the manageability issue, "encompass[ing] the whole range of practical problems that may render the class format inappropriate for a particular suit." *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 164 (1974). However, for purposes of certifying a class for settlement purposes, this court need not consider this factor. *Amchem Prods. Inc. v. Windsor*, 521 U.S. 591, 620 (1997) (a district judge faced with a request to certify a settlement class "need not inquire whether the case, if tried, would present intractable management problems" under Rule 23(b)(3)).

In the context of a settlement, there must be compromise. Naturally neither party is going to secure the maximum benefit for their client that it may potentially receive in full litigation. When weighed against other important concerns such as the degree of risk involved in complete

19

litigation and, in the case of the Class, the desire for speedy and meaningful recovery, it is not difficult to understand that parties may forego litigation in favor of recovery through settlement.

It seems clear for settlement purposes that a class action is superior to other methods of litigation for the fair and efficient adjudication of the controversy. As noted, the Class is believed to consist of more than twenty thousand (20,000) taxpayers. Given the economic limitations of most, if not all of the class members, resolution by individual lawsuits would be unrealistic, if not impossible for many. It is unlikely that members would pursue separate lawsuits where the legal costs would probably exhaust any potential recovery. Multiple lawsuits would be an inefficient use of the limited resources of the parties. A class action will reduce litigation costs and promote greater efficiency, and in this instance, appears superior to other forms of resolution. Accordingly, the court next turns its attention to the issues of notice and final approval.

## V.    NOTICE

### A. Adequacy of Notice

Before certifying a class or approving a class settlement, the court must direct that notice of the proposed settlement be provided class members. In this instance, the court ordered two forms of notice: (1) mailing to the individual claimants, and (2) publication of the notice in the two Guam newspapers. "Due process requires that notice provide affected parties with the opportunity to be heard." *Torrisi,* 8 F.3d at 1374. Similarly, Rule 23(c)(2) requires "the best notice practicable under the circumstances." Fed.R.Civ.P. 23(c)(2). The rule provides:

> For any class certified under Rule 23(b)(3), the court must direct to class members the **best notice practicable** under the circumstances, including individual notice to all members who can be identified through reasonable effort. The notice must concisely and clearly state in plain, easily understood language:
>
> • the nature of the action,
> • the definition of the class certified,
> • the class claims, issues, or defenses,
> • that a class member may enter an appearance through counsel if the member so desires,
> • that the court will exclude from the class any member who requests exclusion, stating when and how members may elect to be excluded, and
> • the binding effect of a class judgment on class members under Rule 23(c)(3).

FED.R.CIV.P. 23(c)(2)(B) (emphasis added).

20

The Objectors assert that the notice provided to the Class was inadequate. Relying upon the opinion of their expert, Ms. Gina Intrepido, Vice President and Media Director of Hilsoft Notifications, Objectors attack the notice by publication and the methods of giving individual notice.[23] Ms. Intrepido made a number of comments about the inadequacy of the notice and concluded that the Notice Plan "was not the best practicable, and was not reasonably calculated to actually inform those affected by the Class Notice." *See* Docket No. 428 Ex. F at ¶ 4 (Intrepido Decl.). Ms. Intrepido further stated that the Notice Plan was "woefully inadequate and did not satisfy the due process obligations . . . ." *Id.* at ¶ 54.

The Objectors expressed concern over the "publication notice." According to Ms. Intrepido, the parties should have provided reader demographics, circulation, audience, and an analysis as to the "reach" of the publication. As noted, the Government gave notice by publication in the *Pacific Daily News* ("*PDN*") and the *Marianas Variety* that was repeated twice a week for four weeks. *See* Settlement Agreement § III(b). The Objectors point out the low readership of the PDN with a circulation of 20,116 and thus only reaching 13% of the island. They suggest that the best notice may have been through another form of media such as radio and television ads.

The Respondents admit that they did not spend funds to determine exactly how many people actually read the *PDN*. However, they argue that most households receiving the newspaper have more than one occupant. And, those newspapers brought into the workplace are often read by the office staff. Moreover, the Respondents state that by looking at the *PDN*'s ratecard, the *PDN* reaches: 78% of women, 77% of men; 74-80% of persons 18-80 depending on age; and 78% of households. *See* Docket No. 473, Ex. A.

///

---

[23]  At the outset, the court notes that while it appreciates the qualifications and expertise of Ms. Intrepido regarding notice generally, her two declarations fail to demonstrate any experience or familiarity with Guam (it appears she had never visited the island). Even counsel from the Seattle firm, Tousley Brain Stephens PLLC, showed a lack of familiarity with Guam. When referring to the Guamanian people, Attorney Pacharzina referred to them as "Guamites," a term that some could consider offensive. Clearly, the local law firm that Attorney Pacharzina was associated with should have sensitized her to Guam's culture.

Additionally, the settling parties contend that Guam is a small island, and while it may make sense to do demographic studies as to circulation and percentage of readership on the mainland where there may be several competing publications, on Guam there are only two newspapers of any significant general circulation – the *PDN* and the *Marianas Variety*. There is no need to do a "demographic analysis" as to what daily newspapers the people of Guam read. Moreover, this has been a very high profile case for Guam. The Settlement Agreement has received extensive coverage not only in the newspapers, but also on KUAM (both TV and radio), ABC-7 (since that station started to carry the news), K57 radio and several other radio stations. The court takes judicial notice of the fact (which all parties at argument conceded) that the EIC litigation, the Governor's Executive Order permitting the filing of claims, and the Settlement Agreement, have been the subject of scores of news stories on TV, on the radio, in print, and on the internet through Guam news outlets. This includes stories on both television stations that cover Guam local news (KUAM and ABC-7 TV (both of which also repeat their broadcasts on sister stations)), both newspapers of general circulation (the *PDN* and *Marianas Variety*), both local AM radio stations that offer "talk radio" (K57 and Isla 630), and websites covering local news (*e.g.*, http://kuam.com, http://www.guampdn.com, http://www.mvariety.com, and http://www.pacificnewscenter.com).

It is true that the settling parties did not undertake an analysis as to the "reach" of the mailing of the notice. Again, the settling parties claim that this kind of analysis might make sense in another jurisdiction and on the mainland, but here it makes no sense at all. DRT has the tax returns on file. If someone was potentially eligible for the EIC, DRT sent a notice to the person's last known address in DRT's computer system. If the person had no tax return on file and thus no address, the person still received notice by publication.

This is not a consumer class action in the United States mainland where there is little or no media coverage and the only way to reach a class member is through published notice. The court takes judicial notice that this is a very highly publicized case in a small, tightly knit community that is very much aware of the Settlement Agreement. It is most likely that if a family member moved off-island, contact would be maintained and that the prospects of a potential EIC settlement

22

1  would be brought to the attention of the off-island family member.  The Objectors point out that

2  the population receiving the EIC is mobile and it is likely that some were military members

3  stationed here.  However, as to military members, it is very likely that those who may have been

4  stationed here during the years in question did not become residents of Guam and still filed their

5  returns with the United States instead of Guam and thus received the EIC if they qualified.  Thus,

6  under the circumstances, it is highly questionable that the types of studies or analysis suggested

7  by the Objectors would have really benefitted the class or only served to deplete the fund and

8  hence reduce each class member's ultimate recovery.

9  Regarding dissemination of the notice, Ms. Intrepido suggests that merely mailing the

10  notices to the last known address of class members contained in the DRT database falls below

11  accepted class notice standards especially when Social Security numbers are known.  Where Social

12  Security Numbers ("SSN") are known, Ms. Intrepido states that there are many ways to quickly

13  and cheaply obtain updated addresses for class members.  *See* Docket No. 428  Fisher Decl., Ex.

14  F at ¶ 20 (Intrepido Decl.).  The parties could have employed the services of a reputable SSN look

15  up service.  *See* Docket No. 463 Ex. A (Supp. Intrepido Decl.) at ¶ 10.

16  However, the settling parties contend that such information is confidential.  26 U.S.C. §

17  6103(a) states the general rule that returns and return information shall be confidential, and section

18  6103(b) defines the terms "return" and "return information" broadly, to include, *inter alia*, the

19  taxpayer's identity, the nature, source and amount of his income, and whether his return is, was or

20  may be subject to examination or other investigation.  Section 6103(k)(6) provides an exception

21  to the general rule of confidentiality permitting disclosures in limited circumstances: the disclosure

22  must be "necessary" to obtain the information the IRS seeks, and the information must not be

23  "otherwise reasonably available."  Specifically, section 6103(k)(6) provides:

24

25  **(6) Disclosure by certain officers and employees for investigative purposes.**

26  An internal revenue officer or employee and an officer or employee of the Office
of Treasury Inspector General for Tax Administration may, **in connection with his
official duties relating to any audit, collection activity, or civil or criminal tax
investigation or any other offense under the internal revenue laws**, disclose
return information to the extent that such disclosure is necessary in obtaining
information, which is not otherwise reasonably available, with respect to the correct

27

28

1  determination of tax, liability for tax, or the amount to be collected or with respect

2  to the enforcement of any other provision of this title. Such disclosures **shall be made only in such situations and under such conditions as the Secretary may prescribe by regulation**.

3

4  (Emphasis added). Thus, under this section, confidential information can be disclosed in

5  connection with civil or criminal enforcement action. This is not the case here.

6  Individual notices were sent by mail based on the updated information taxpayers provided

7  DRT. DRT receives new tax returns, and/or change of address forms every day of the week it is

8  open. *See* Docket No. 450 at ¶ 3. These are entered into the system as soon as possible. *Id.* At

9  some point, however, there has to be a cut-off date in order to generate a mailing list and send out

10  the mailings, even if that means that a few new addresses may have been submitted and not entered

11  into the system at the time the list was generated. Using the most up-to-date address in the

12  computer system as of the date the mailing list is generated is all that is reasonable and practicable.

13  During argument at the fairness hearing, Objectors submitted supplemental authority,

14  arguing that disclosure was permitted under 26 U.S.C. § 6103(m)(1). The section provides that

15  the government "may" disclose "taxpayer identity information to the press and other media for the

16  purpose of notifying persons entitled to tax refunds when the Secretary, after reasonable effort and

17  lapse of time, has been unable to locate such person." 26 U.S.C. § 6103(m)(1). The court finds

18  this statute inapposite. The statute is permissive, not mandatory (*i.e.*, it says "may," not "shall"),

19  and thus, a third party (for example, the plaintiffs in this case) cannot compel the government to

20  release such information. *See Aronson v. IRS*, 973 F.2d 962, 967 (1st Cir. 1992) ("Congress has

21  decided that, with respect to tax returns, confidentiality, not sunlight is the aim"). Moreover, the

22  disclosure is "to the press or other media," and a Social Security "look up" service as suggested

23  by the Objectors is not the press or other media. *See id.* (improper to order the release of

24  information to non-media).

25  Furthermore, the disclosure permitted is of "taxpayer identity information," which under

26  section 6103 is a taxpayer's name, address, and Social Security Number. 26 U.S.C. § 6103(b)(6).

27  Publication of a list of persons owed the EIC implicitly discloses more than that – it discloses what

28  is defined in 26 U.S.C. § 6103(b)(2) as "return information" (*e.g.*, that the amount of income falls

24

within the EIC thresholds) – and that is not permitted by section 6103(m)(1). Finally, publication under section 6103(m)(1) requires that a taxpayer be owed a refund – but at the time of the notice of the Settlement Agreement, it is not known whether a taxpayer will necessarily qualify for a refund, or whether he or she will stay in the settlement and thus be entitled to a refund.

Ms. Intrepido's expert testimony strongly *supports* the adequacy of the notice process in this case. In her first declaration, Ms. Intrepido opines that a notice program is adequate if it reaches between 75%-90% of the class. *See* Docket No. 428 Ex. F at ¶ 29. Here, 49,378 notices were mailed; only 9,351 were returned. *See* Docket No. 493 at ¶¶ 2-3. Thus, the individual notices in this case reached their intended recipients approximately 81% of the time.[24]

Further, common sense dictates that some of the persons who received individual notice will not have received notice by publication, and some of the persons who received notice by publication will not have received individual notice. Thus, the actual success rate in this case would be greater than the 81% for individual notice, and the court has adequate grounds (based on the testimony of Objectors' own expert) for concluding that notice here was the best notice practicable under the circumstances.

"Neither [R]ule 23 nor due process requires that a settlement fund be depleted in efforts to perfectly address mailed claim notices. It is fair and reasonable to proceed, as the district court did here, by mailing claim notices to last known addresses of potential class members and by publication." *In re Gypsum Antitrust Cases*, 565 F.2d 1123, 1127, n.5 (9th Cir. 1977). "It is

---

[24] After the fairness hearing, the Objectors filed a Motion to Submit Supplemental Authority regarding the tax regulation found under 26 CFR §301.6212-2. *See* Docket No. 497. 26 CFR §301.6212-2 is an IRS regulation defining "last known address" for purposes of notice of assessment and for the IRS generally. Without ruling on the motion, the court gave the parties an opportunity to brief the matter. *See* Docket No. 510. After reviewing the briefing, the court finds that that regulation does not alter the court's conclusion that notice provided here was the best notice practicable under the circumstances of this case. The regulation provides for the IRS to update taxpayers addresses by referring to data accumulated and maintained by the United States Postal Service's (USPS) National Change of Address database. Guam has not adopted this regulation nor is it under any duty to do so pursuant to 48 U.S.C. § 1421(d)(2). Moreover, this court is not convinced that had Guam adopted this regulation, the notice in this case would have reached that many more potential class members. As noted herein, there already was an 81% notice rate.

widely recognized that for the due process standard to be met it is not necessary that every class member receive actual notice, so long as class counsel acted reasonably in selecting means likely to inform persons affected." *In re Prudential Sec. Inc. Ltd.*, 164 F.R.D. 362, 368 (S.D.N.Y. 1996) (citations omitted). *See also Grunin v. Internat'l House of Pancakes*, 513 F.2d 114, 121 (8th Cir. 1975) (notice by mail to class members' last known address satisfied requirements under due process even though one-third of class members were not reached). Accordingly, the fact that some class members may not have actually received the Notice does not render the whole mailing defective. *Id.*

Publishing the notice for four straight weeks in the *PDN* and *Marianas Variety*, combined with sending notice by first class mail to the last known address of class members seems practicable and reasonable, particularly in light of the strong concentration of class members in such a small geographic area as Guam. Indeed, this combination of individual notice and notice by publication in an applicable newspaper, especially in high publicity cases, has been widely approved as satisfactory by the federal courts. *See Pigford v. Veneman*, 355 F. Supp. 2d 148, 162 (D.D.C. 2005) (citing 3 NEWBERG ON CLASS ACTIONS § 22:85 (4th ed.) (noting that "courts have usually required a combination of first-class mailed notice to the identifiable members and publication in one or more newspapers" when difficulties arise locating all putative class members); *In re Cherry's Petition to Intervene*, 164 F.R.D. 630, 638 (E.D. Mich. 1996) (notice adequate where sent to last known address, published in employee publications, and case covered in newspaper stories); *White v. Nat'l Football League*, 822 F. Supp. 1389, 1401 (D. Minn. 1993) (in case involving nation-wide class, publication in national newspaper and individual notice by mail to last known address, and news coverage ensured adequate notice); *Burns v. Elrod*, 757 F.2d 151, 153-54 (7th Cir. 1985) (notice via last known address and publication in Chicago's two daily newspapers adequate even when 500 of 700 notices were returned undelivered); *Herm v. Stafford*, 461 F. Supp. 502, 507 (D. Ky. 1978) (notice adequate where accomplished by last known address and publication in local newspapers of general circulation).

Indeed, the court notes that the rate of publication – a total of sixteen separate instances of publication over a four-week period – exceeds the rate of publication in many other cases. *E.g.*

26

*White*, 822 F. Supp. at 1400 (publication only occurred once, on March 12, 1993); *see also Bynum v. Gov't of Dist. of Columbia*, 384 F. Supp. 2d 342, 353-54 (D.D.C. 2005) (ordering notice twice a week for two weeks). It also notes that, with the agreement of the other parties, the Government went back to this court and secured permission to give an additional form of notice in March 2007 when there was a question regarding notice of early payments to persons subject to offsets, demonstrating a commitment by the settling parties to ensuring the best notice practicable in the case. *See* Docket No. 400.

### B. Adequacy of the Form of the Notice

Ms. Intrepido is even more critical of the design of the actual mailing and published notice. She states that the "Class Notice, even if received by any substantial percentage of class members is unlikely to have been noticed or understood." *See* Docket No. 428 Ex. F at ¶ 31 (Intrepido Decl.). She found that the notice did not follow in any way the model notices she has designed in collaboration with the Federal Judicial Center: it does not contain a "callout" headline to capture attention; it is difficult to read with its lengthy, small text; it does not invite response; and it does not incorporate any design features that are standard practice in the legal notification field. *Id.* at ¶¶ 31-35. She goes on to explain that such a notice increases the likelihood that it will be discarded as junk mail and even if read, not understood. *Id.* at ¶¶ 36-42.

Ms. Intrepido also questions the content of the notice, claiming that the notice:

> is not written in plain language or . . . designed to be readable and understandable. Many class members would have a difficult if not impossible time understanding their rights and options in the lawsuit. From a communications perspective, the language used to inform Class members of their rights and options – both the words and the way in which they were written – is inadequate.

*See* Docket No. 428 Ex. F at ¶ 43 (Intrepido Decl.) In addition, she expresses concern over the inclusion of settlement checks with the notice for tax year 1998. However, this issue has previously been addressed and the court found that the early payment as to tax year 1998 was admittedly an inducement to get potential members to enter into the proposed Settlement Agreement. The court did not find this to be a coercive provision or anything other than what it was intended to be, which was simply an inducement.

The primary issue with a notice is whether it accurately informs class members of their

27

1    rights and ability to be heard. *In re Gypsum Antitrust Cases*, 565 F.2d 1123, 1125 (9th Cir. 1977)

2    ("The purpose of this notice requirement . . . is to present a fair recital of the subject matter of the

3    suit and to inform all class members of their opportunity to be heard.") (citations omitted). As

4    such, "[a] class certification notice should advise the class members of their rights and obligations

5    if they elect to remain class members." *McCarthy v. Paine Webber Group, Inc.,* 164 F.R.D. 309,

6    312 (D. Conn. 1995). The settling parties claim that the notice accomplishes this central purpose.

7         While the notice may not conform to the "model" as proposed by Ms. Intrepido, it does tell

8    the members how to respond (and in fact, tens of thousands responded by filing claims, while a

9    very few responded with opt-out notices). Admittedly, the notice is lengthy, but this is the

10   settlement of a tax case with thousands of members and the treatment of a number of different tax

11   years in question. By necessity there are simply more issues to include in the notice in this case

12   (*e.g.*, the requirement of tax returns, the application of offsets, the federal statute governing false

13   EIC claims, etc.) than might apply in a less complex class action, such as a products liability case.

14        Under the circumstances, the settling parties did what they needed to do, which was to

15   design a notice that informed the Class of how to join the settlement or opt-out. *See Eisen*, 417

16   U.S. at 173-77 (holding that individual notice to class members identifiable through reasonable

17   efforts is mandatory in 28 U.S.C. § 6103(b)(3) actions). In this instance, individualized efforts

18   were undertaken, and notice provided to the Class was adequate and comported with the

19   requirements of due process.

20        **C. The Claims Filing Procedures.**

21        To make a claim under the Settlement Agreement, Class members must file a form for each

22   year in which they believe they are owed the EIC.[25] *See* Settlement Agreement, § VI(b). Objectors

23

24        [25]  In January 2005, the Governor issued Executive Order 2005-001, requiring DRT to
25   create supplemental EIC forms and to accept the submission of the EIC claims under territorial
     and, to the extent applicable, federal law. The forms are to be used for the tax years 1995-1996
26   and 1999-2004, and into the future. There are no forms for the years 1997-1998, as DRT had
     already created a form for the those years and had accepted claims. The Executive Order expressly
27   states that tax returns may be amended as part of such a submission, although amendments are
28   limited to three years as provided under federal law. Pursuant to the Executive Order, the EIC

28

challenge this process as "unduly burdensome." *See* Docket No.426 at 27. The Objectors assumed

that part of the process would require class members to find each of their old tax returns or, if they

could not find them, to order them from DRT at their own expense in order to make a claim.

However, upon review of the actual claims form, there seemingly is no such requirement. The

claim forms were designed to avoid requiring the attachment of the previous years' tax return.

Specifically, the Executive Order 2005-001 states:

> **WHEREAS**, taxpayers should not have to bear the primary burden of determining whether they are eligible for the EITC in past tax years, or in what amounts, and to expect them to do so could at a minimum require them to obtain copies of all relevant back years' tax returns, at substantial cost and burden to both taxpayers and DRT; and
>
> **WHEREAS**, the use of a new simplified claim form for EITC claims, which requires only information not already known to DRT from taxpayers' previously submitted tax returns, would minimize the burden on taxpayers of making EITC claims and would allow DRT to determine the eligibility and calculate the amount of the legitimate claims of each taxpayer submitting the simplified form in the fastest possible time; and

*Simpao* Docket No. 77 at Ex. 1. The Executive Order then goes on to order in paragraphs 2 and

3 of the Order:

> 2. Pursuant to the authority vested in it by 11 G.C.A. §§ 42102 and 42103, DRT shall prepare simplified forms to permit submission of EITC claims for tax years 1995-1996 and 1999-2004, together with explanatory materials as necessary to inform taxpayers about the procedures and plans for administration of such claims. The simplified forms shall require only information not already provided to DRT in tax returns and necessary for DRT to determine taxpayers' eligibility, calculate the amount of taxpayers' legitimate claims, and detect duplicative, mutually inconsistent, and fraudulent claims. Submission of a claim under the Guam Earned Income Program shall constitute submission of a claim for the federal EITC to the extent the federal EITC applies to Guam. However, any taxpayer who has not yet filed a tax return as to a given tax year shall be required to file that tax return for that tax year along with a simplified EITC claim form in order to be eligible for the EITC under the Guam Earned Income Program for that tax year.
>
> 3. DRT shall use information submitted by taxpayers on the form described in paragraph 2, together with information already in DRT's possession, to determine taxpayers' eligibility, calculate the amount of taxpayers' legitimate claims, and promptly communicate that information to taxpayers submitting the form. Submitted information must be truthful, and the form shall require that its contents

---

claims submitted under this procedure were to constitute sufficient claims for the EIC under the
GTIT.

29

be submitted under penalty of perjury. The provisions of 26 U.S.C. 32 (k) will in all other respects apply to claims under the Guam Earned Income Program pursuant to 11 G.C.A. § 42102.

Objectors complain that a taxpayer who submitted a false claim could forfeit eligibility. That provision is, however, based on federal law. *See* 26 U.S.C. § 32(k).[26] Moreover, the Government will not penalize someone who has submitted a claim that is subsequently found to be non-qualifying. It will only consider the forfeiture of eligibility for the submission of false statements.

The Objectors also complain that class members must make a separate claim for each year. There is a need to fill out a form for each year because the EIC program has changed from year to year and because each class member's own status and eligibility may have changed from year to year (*e.g.,* number of dependents or income changes). *See* 26 U.S.C. § 32 (setting forth the EIC requirements and showing amendments and changes from 1995-2004). Moreover, each year a taxpayer has to fill out his or her return and no one has complained that doing so is too burdensome.

After reviewing the process, the court does not find the requirement of filing separate claims for each year to be unduly burdensome. The forms themselves are not difficult to fill out

---

[26] 26 U.S.C. § 32(k) provides:

**(k) Restrictions on taxpayers who improperly claimed credit in prior year**

**(1) Taxpayers making prior fraudulent or reckless claims**
**(A) In general**
No credit shall be allowed under this section for any taxable year in the disallowance period.

**(B) Disallowance period**
For purposes of paragraph (1), the disallowance period is—
(i) the period of 10 taxable years after the most recent taxable year for which there was a final determination that the taxpayer's claim of credit under this section was due to fraud, and

(ii) the period of 2 taxable years after the most recent taxable year for which there was a final determination that the taxpayer's claim of credit under this section was due to reckless or intentional disregard of rules and regulations (but not due to fraud).

30

1   and are adequately designed to meet the goals of determining whether the class member is entitled

2   to the EIC for a particular year. In fact, with respect to these forms, designated federal Judge

3   Martinez stated that "the Government of Guam has taken efforts to create forms, that would allow

4   it to process the claims in the event it is found responsible for paying the claims." *See Simpao*

5   Docket No. 99 at 11.

6         The Objectors also argue that based upon the number of claims denied, there must be some

7   problem with the process. On average, 20% of the claims filed have been denied. *See* Docket No.

8   490, Ex. A. The settling parties argue that the rate of denials is the result of the liberal claim filing

9   procedure adopted by Executive Order 2005-001, which is in turn adopted in the Settlement

10  Agreement. When the Executive Order was adopted, the Government specifically waived the

11  requirement that the taxpayer determine for themselves whether or not they qualified for the EIC.

12  *See Simpao* Docket No. 77 at Ex. 1. The taxpayer was only required to submit his or her claim

13  form which would permit the Government to determine his or her potential eligibility. The

14  Government took upon itself the burden of determining eligibility, reasoning that this was both

15  more than fair and cost efficient than requiring taxpayers to find their returns from years past and

16  determine whether they fell within the EIC threshold for each year.

17        The Governor's policy decision most likely accounts for the higher rate of rejection of

18  claims. If taxpayers do not have to review past tax filings to determine their eligibility, it is fairly

19  predictable that more non-qualifying claims will be filed that exceed the income limitation or other

20  requirements, hence resulting in a higher denial rate.

21  **VI.   NECESSARY INFORMATION TO APPROVE SETTLEMENT AGREEMENT**

22        The Objectors argue that the settling parties have not provided the court with enough

23  information to approve the Settlement Agreement. Basic to the process of deciding whether a

24  proposed compromise is fair and equitable, a court must "apprise [itself] of all facts necessary for

25  an intelligent and objective opinion of the probabilities of ultimate success should the claim be

26  litigated." *Weinberger v. Kendrick*, 698 F.2d 61, 74 (2nd Cir. 1982) (citation omitted). "Ultimately,

27  the district court's determination is nothing more than 'an amalgam of delicate balancing, gross

28  approximations and rough justice.'" *Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 615, 625

31

(9th Cir.1982) (*quoting City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 468 (2nd Cir. 1974)).

For the court's consideration, the settling parties provided the following data:

### 1. "The Value of the Claims Filed"

For tax years 1995-1996, and 1999-2000, which are being paid a total of $15 million, the figures are as follows:[27]

| TAX YEAR | NO. OF CLAIMS | "A" STATUS[28] | "S" STATUS[29] |
|---|---|---|---|
| 1995 | 1,693 | $2,506,700.00 | $0.00 |
| 1996 | 1,879 | $3,068,007.00 | $0.00 |
| 1999 | 3,185 | $5,809,403.00 | $0.00 |
| 2000 | 3,344 | $6,162,078.00 | $4,532.00 |
| **TOTAL** | **10,101** | **$17,546,188.00** | **$4,532.00** |

Thus, for those tax years, class members have stated claims valued (without interest) at $17.5 million and will receive 85%[30] of the value of those claims.

For tax year 1997, which is being paid at 100% plus interest (which was agreed to simply to ensure parity throughout tax year 1997 as almost all 1997 tax years claims already were paid in the past), there were 237 valid claims, worth $551,589.06 (of which $106,946.80 was subject to offsets). *See* Docket No. 490, Ex. A.

For tax year 1998, which is receiving $15 million total, there were 11,540 claims accepted with a face value of $20,607,153.00 (without interest). Class members will receive $15 million for those claims or about 73% of the value of those claims (but also the early payout that, as

---

[27] The figures found in the chart are found at Docket No. 490, Ex. A.

[28] The "A" represents those claims accepted and processed.

[29] Claims with an "S" status ("Suspended") presumably are pending additional information from the taxpayers. Processing of the claims cannot be completed without the additional information. The Government is treating them as though they may be accepted in terms of presenting the total potential liability.

[30] This figure is arrived at by dividing the $15 million dollars allotted for tax years 1995, 1996, 1999, and 2000 by the $17,546,188.00 claimed.

32

Objectors point out, places 1998 in a favored position).

Finally for tax years 2001 -2004, which will be entitled to receive up to $15 million per year, with any unpaid amounts from the preceding year flowing into the next, the data is as follows:

| TAX YEAR | NO. OF CLAIMS | "A" STATUS | "S" STATUS |
|---|---|---|---|
| 2001 | 3,735 | $7,219,610.00 | $7,352.00 |
| 2002 | 4,166 | $8,784,431.00 | $21,650.00 |
| 2003 | 4,465 | $9,576,827.00 | $7,314.00 |
| 2004 | 7,452 | $15,838,664.00 | $33,304.00 |
| **TOTAL** | **19,818** | **$41,419,532.00** | **$69,620.00** |

Thus, each of these years except 2004 has totaled less than the $15 million allocated for it and will end up receiving 100% of their value (without interest). Further, considering the fact that tax year 2004 will receive the unused portion of the monies from the prior years, 2004 will end up being fully funded at 100% of the value of the claims (without interest). *See* Settlement Agreement §IV(a)(iv).

In sum, the class members are recovering anywhere from 73% to 100% of the value of their claims (without interest).

### 2. Value of Offsets

The Objectors also argue that the court should be aware of the value of the offsets the Government will apply to the claims. The settling parties argue that the amount of offsets are irrelevant in determining the fairness of the Settlement Agreement. This is because Federal law provides that all tax refunds are subject to offsets for unpaid taxes, back child support, and certain other obligations to the Government. 26 U.S.C. § 6402. The EIC is treated as a tax refund for this purpose. Since the Government is agreeing to pay back-owed EIC in the settlement, it is obligated by federal law to apply the offsets owed for back taxes, child support, etc., whatever that amount may be. *Id.*

The settling parties claim it is not practical to supply the court with the exact number of

33

class members facing offsets or the dollar amounts of such offset, because the procedure involved in preparing tax refund checks. For example, before the Government issues a tax refund, it performs a check for offsets owing. *See* Docket No. 450 at ¶ 5. The check is not prepared until a particular EIC refund is ready to be paid under the Settlement Agreement. Moreover, it may be an idle task to even attempt such calculations. Assuming a taxpayer owed a $100 offset as of the present date that does not mean he or she will still owe that amount when the check is issued at a later date. The taxpayer might well pay back the obligation in the interim.

However, since payments have been made under the "early payment" provisions as to the years 1997 and 1998, the settling parties provide the following to give the court an idea of the percentage of the claims that could be offset.

| TAX YEAR | NO. OF CLAIMS | CHECKS WRITTEN | OFFSETS | TOTALS |
|---|---|---|---|---|
| 1997 | 237 | $444,642.26 | $106,946.80 | $551,589.06 |
| 1998 | 11,540 | $8,246,208.04 | $1,765,521.24 | $10,011,729.28 |
| **TOTAL** | **11,777** | **$8,690,850.30** | **$1,872,468.04** | **$10,563,318.34** |

From the data, the claims in 1997 were subject to offsets equaling about 20% of their value and claims in 1998 were subject to offsets equally about 18% of their value.

The Government suspects that offsets are likely to fall in the range of around 20% of the value of the total claims paid. The Government also contends that the court does not need this information to determine if the Settlement Agreement is fair. The court agrees. The class member subject to an offset is still receiving, dollar-for-dollar, the same value as every other class member. The difference is that the payment is subject to first being offset with the payment of back taxes, child support and other obligations owing to the Government.

### 3. Number of Claims Made

Objectors also claim that the court should know the number of claims filed in comparison to the number of claims that could have been filed. The settling parties provided the following data:

| YEAR | NUMBER OF CLAIMS FILED | THEORETICAL MAXIMUM POTENTIAL CLAIMS[31] |
|---|---|---|
| 1995 | 2,699 | 13,212 |
| 1996 | 2,932 | 14,518 |
| 1997 | 904 | 0 |
| 1998 | 13,143 | 0 |
| 1999 | 4,438 | 14,828 |
| 2000 | 4,678 | 13,881 |
| 2001 | 5,028 | 13,816 |
| 2002 | 5,331 | 13,542 |
| 2003 | 5,761 | 13,084 |
| 2004 | 9,355 | 10,091 |
| **TOTAL** | 54,269[32] | 106,972[33] |

As can be seen from the data, there are fewer claims filed in earlier years. The settling parties argue that the reason for the reduced number of claims is that many taxpayers chose to forego making new claims for old years. However, a claims filing process was necessary because the rules changed from year to year and because of the information required by 26 U.S.C. § 32. In fact, 26 U.S.C. § 32(c)(1) (G) actually forbids granting the EIC if a taxpayer has not proved a qualifying child's taxpayer identification number. And 26 U.S.C. § 32(k) regulates false EIC claims, thus requiring an express claim be made.

In sum, the settling parties argue that the filing of almost 93% of potential 2004 claims demonstrates that the class members were aware of the Settlement Agreement and understood how to file claims. After that year, the rate of claims filed drops to about half as many in 2003, and then progressively drops in each of the following years thereafter. Objectors suggest that the claims

---

[31] DRT determined the theoretical maximum potential number of claims that could exist solely based on the information of a taxpayer's tax return. *See* Docket No. 450 at ¶ 7.

[32] Not all claims turned out to be valid. Those that were denied are denoted with a "D" of the chart that is Exhibit A to the Camacho Decl. *See* Docket No. 490.

[33] *See* Docket No. 450 at Ex. A.

35

1  process was unfair because of the fewer number of claims filed in earlier years. But the success

2  of 2004 shows that the main factor in whether a claim was submitted is not the filing system or a

3  lack of notice to the taxpayer (2004 used the same system as all of the other years), but whether

4  or not taxpayers had to go back in time to file new claims for old years. Thousands of taxpayers

5  took that opportunity, but some thousands of others did not.

6         Indeed, additional data further shows a substantially high percentage of class participation.

7  As noted, DRT sent out 49,378 notices to unique individuals. *See* Docket 493 at ¶ 2. The total

8  number of unique individuals who actually filed claims is 24,108. *See* Docket 495 at ¶ 2. Thus,

9  just under half (approximately 48.8%) of the theoretical maximum number of persons in the class

10 filed claims. This compares extremely favorably to most other class actions. *E.g. Cullen v.*

11 *Whitman Med. Corp.*, 197 F.R.D. 136, 148 (E.D. Pa. 2000) (approving settlement where 2,000 out

12 of 5,300, or 37.7%, of possible class members returned claim forms); *In re Educ. Testing Serv.*

13 *Praxis Principles of Learning and Teaching, Grades 7-12 Litig.*, 447 F. Supp. 2d 612, 625-26

14 (E.D. La. 2006) (approving settlement where overall participation rate was 16%, and especially

15 noting that one subset of class had participated at 49.5% rate); *Hughes v. Microsoft Corp.*, 2001

16 WL 34089697, at *8 (W.D. Wash. 2001) (approving settlement where "[o]ver 37,000 notices were

17 sent and over 3,600 class members contacted class counsel wanting to participate. After the

18 settlement was announced, 2,745 class members (some of whom had previously contacted class

19 counsel) wrote to class counsel wanting the benefits of the settlement.").

20        Lastly, at the conclusion of the Fairness Hearing, Objectors asked for a calculation of the

21 number of claims filed before Notice was issued, and the number of claims filed after the notice

22 was issued. This concern arose because of the unique circumstances of this case, where the

23 Government started accepting claims almost two years before the settlement notice was published

24 because of the Governor's issuance of Executive Order 2005-001. The requested data shows that,

25 of the 24,108 individual taxpayers who filed claims, 20,567 filed claims solely before the first date

26 of publication; and 3,578 filed claims after the date of publication (of which 2,181 had already

27 filed claims before the date of publication, and then filed additional claims after notice was

28 published). *See* Docket No. 522 at ¶ 2.

36

The fact that 20,567 claims were filed before notice, and 3,578 claims were filed after notice was published does not point to any failure of the notice program. But for the Executive Order already permitting claims to be filed pre-notice, it has to be assumed that all 24,108 claims would have been filed during the notice period. Indeed, the amount of pre-notice claims simply confirms this court's conclusion as to the high degree of publicity and public awareness this class action received, which confirms the adequacy of notice. In any case, it would be unfair to draw an adverse inference against the notice program simply because prior actions already had obtained most of the claims that were likely to be filed. The fact remains that any figure approaching a 50% success rate is quite substantial, and points to a successful notice (and in this case, pre-notice) program. *See In re Educ. Testing Serv.*, 447 F. Supp. 2d at 625-26 (49.5% rate of claims being filed for subset of class is "unusually high" and strongly supports settlement).

## VI. FAIRNESS OF SETTLEMENT AGREEMENT

The settling parties seek final approval of the Settlement Agreement pursuant to the terms of the agreement and Rule 23 of the Federal Rules of Civil Procedure. Rule 23 (e) (1)(C) provides that "the court may approve a settlement, voluntary dismissal, or compromise that would bind class members only after a hearing and on finding that the settlement, voluntary dismissal, or compromise is fair, reasonable, and adequate." FED.R.CIV.P. 23(e)(1)(C). The settling parties submit that the Settlement Agreement reached in this matter meets the requirements of law and accordingly seek this court's final approval.

Before the court can approve a proposed settlement, it must find that the agreement is fair, adequate and reasonable, and is not the product of fraud by, or collusion among, the negotiating parties. *Ficalora v. Lockheed Cal. Co.*, 751 F.2d 995 (9th Cir. 1985). There is a "strong judicial policy that favors settlements, particularly where complex class action litigation is concerned." *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992) (citing *Officers for Justice v. Civil Serv. Comm'n,* 688 F.2d 615, 625 (9th Cir. 1992) ("[V]oluntary conciliation and settlement are the preferred means of dispute resolution. This is especially true in a complex class action litigation . . . ").

In reviewing a proposed settlement, a court is not presented with a choice between

37

alternative remedies. While a court may wish to modify a settlement where shortcomings are found, it ultimately must consider the proposal as a whole and as submitted. Approval must then be given or withheld. In short, the settlement must stand or fall as a whole. *Pettway v. Am. Cast Iron Pipe Co.*, 576 F.2d 1157, 1172 (5th Cir. 1978).

As noted a class action "should be approved if it is fundamentally fair, adequate and reasonable." *Torrisi*, 8 F.3d at 1375. Such determination is committed to the sound discretion of the district court and will not be overturned except on a showing that the district court clearly abused its discretion. *Wiener v. Roth*, 791 F.2d 661 (8th Cir. 1986). In determining whether a settlement agreement is fair, adequate, and reasonable to all concerned, a district court may consider some or all of the following factors:

> (1) the strength of plaintiffs' case;
> (2) the risk, expense, complexity, and likely duration of further litigation;
> (3) the risk of maintaining class action status throughout the trial;
> (4) the amount offered in settlement;
> (5) the extent of discovery completed, and the stage of the proceedings;
> (6) the experience and views of counsel;
> (7) the presence of a governmental participant; and
> (8) the reaction of the class members to the proposed settlement.

*Torrisi,* 8 F.3d at 1375.

"This list is not exclusive and different factors may predominate in different factual contexts." *Id.* at 1376 (citation omitted). One factor alone may prove determinative. *See id.* "The relative degree of importance to be attached to any particular factor will depend upon and be dictated by the nature of the claim(s) advanced, the type(s) of relief sought, and the unique facts and circumstances presented by each individual case." *Officers for Justice*, 688 F.2d at 625. The court must consider the relevant factors but need not "reach any ultimate conclusions on the contested issues of law and fact which underlie the merits of the dispute, for it is the very uncertainty of the outcome of litigation and avoidance of wasteful and expensive litigation that induce consensual settlements." *Id.* "Ultimately, the district court's determination is nothing more than an 'amalgam of delicate balancing, gross approximations, and rough justice.'" *Id.* (quoting *City of Detroit*, 495 F.2d at 468). "The initial decision to approve or reject a settlement proposal is committed to the sound discretion of the trial judge." *Officers for Justice*, 688 F.2d at 625.

38

Where as here, a settlement is presented to the court prior to certification of the class, the court must exercise heightened scrutiny. *Stanton v. Boeing Co.*, 327 F.3d 938, 952 (9th Cir. 2003). *See also In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liability Litig.*, 55 F.3d 768, 805 (3rd Cir. 1995) ("We affirm the need for courts to be even more scrupulous than usual in approving settlements where no class has yet been formally certified").

The discussion of each of the relevant factors enunciated in the *Torrisi* case is as follows:

### 1. Strength of the Plaintiffs' Case

"An important consideration in judging the reasonableness of a settlement is the strength of the plaintiffs' case on the merits balanced against the amount offered in the settlement." 5 MOORE FED. PRACTICE, § 23.85[2][b] (Matthew Bender 3d. ed.). However, in balancing, "a proposed settlement is not to be judged against a speculative measure of what might have been awarded in a judgment in favor of the class." *Id.* As noted by the Ninth Circuit:

> [T]he settlement or fairness hearing is not to be turned into a trial or rehearsal for trial on the merits. Neither the trial court nor [the Court of Appeals] is to reach any ultimate conclusions on the contested issues of fact and law which underlie the merits of the dispute, for it is the very uncertainty of outcome in litigation and avoidance of wastefulness and expensive litigation that induce consensual settlements.

*Officers for Justice*, 688 F.2d at 625.

The strength of class members' positions as to the early years is precarious. The statute of limitations is a defense which has to be taken seriously. Designated federal Judge Martinez in *Simpao* had expressed the view that some years were possibly time barred under 26 U.S.C. § 6535.[34]

Title 26 U.S.C. § 6532 was enacted by Congress as a specific waiver of sovereign immunity to suit, making it a statute of limitations that is jurisdictional in nature. Under 26 U.S.C. § 6532(a)(1), "[n]o suit or proceeding under section 7422(a) for the recovery of any internal revenue tax . . . shall be begun . . . after the expiration of 2 years from the date of mailing by certified mail or registered mail by the Secretary to the taxpayer of a notice of the disallowance

---

[34]*See* Note 21, *supra.*

39

1  of the part of the claim to which the suit or proceeding relates."

2  The tax return forms for tax years 1995-1996 and 1999-2003 stated on their face that the

3  EIC would not be applied.  It is arguable that the tax return forms served as actual notice that the

4  claim was denied and thereby triggering section 6532(a)(1) time limitations.  The Objectors

5  suggest that the issue would be whether the notice of disallowance had to be certified by mail.  The

6  Objectors insist that there must be such mailings and if not, equitable estoppel would bar a statute

7  of limitations defense.

8  Admittedly, the Government acted in ways which prevented taxpayers from asserting EIC

9  eligibility and entitlement.  However misguided or wrong the Government was, there is no

10  equitable tolling in a tax refund suit, absent very narrow grounds.  In *United States v. Brockamp*,[35]

11  519 U.S. 347 (1997), the United States Supreme Court left no doubt that in tax refund claims

12  "Congress did not intend the 'equitable tolling' doctrine to apply to § 6511's time limitations." *Id.*

13  at 354. As grounds for this clear conclusion, Justice Breyer, writing for the Court, stated, "[i]In

14  addition, § 6511 sets forth explicit exceptions to its basic time limits, and those very specific

15  exceptions do not include "equitable tolling."  *Id.*  The court in *Sullivan v. United States,* 46

16  Fed.Cl. 480, 489 (Fed.Cl. 2000) held that:

17  Section 6511's detail, its technical language, the iteration of the limitations in both
   procedural and substantive forms, and the explicit listing of exceptions, taken
18  together, indicate to us the Congress did not intend courts to read other
   unmentioned, open-ended, "equitable" exceptions into the statute that it wrote.

19

20

---

[35]  *Brockamp* concerned two taxpayers who were mentally disabled and unable to comply
with the statute of limitations filing requirements for a refund. *United States v. Brockamp*, 519 U.S.
347 (1997). Each taxpayer asked the court to extend the statutory period for an "equitable" reason,
namely, that he had a mental disability (senility or alcoholism) that caused the delay.  Such a
reason is not mentioned in 28 U.S.C. § 6511, but, in both cases, the Ninth Circuit read the statute
as if it contained an implied "equitable tolling" exception.  The Supreme Court then applied equity
principles to each case, found that those principles justified tolling the statutory period, and
permitted the actions to proceed.  As noted, the Supreme Court found that Congress had exempted
the government from equitable tolling in I.R.C. § 6511.

In 1998, Congress amended the statute to permit tolling when a taxpayer, like those in
*Brockamp*, is prevented by a disability from seeking a refund. However, Congress's decision to
specify further exceptions to the statute of limitations - without adding a general equitable tolling
provision–may serve to further justify the Supreme Court's reading of the statute in *Brockamp*.

40

There are no counter-indications. Tax law, after all, is not normally characterized by case-specific exceptions reflecting individualized equities.

Whether or not the Government is considered equitably tolled from asserting a statute of limitations defense would clearly be an issue that is uncertain and may very well go against the class members.[36]  However, for purposes of approving the proposed Settlement Agreement, this issue should not pose a problem.   "[A] district court in reviewing a settlement agreement 'should not attempt to decide the merits of the controversy . . . [because] [a]ny virtue which may reside in a compromise is based upon doing away with the effect of such a decision.'" *Air Line Stewards & Stewardesses Ass'n, Local 550 v. Trans World Airlines, Inc.,* 630 F.2d 1167 (7th Cir. 1980) (citations omitted).

If the class members were to lose the equitable tolling issue, the amount of recovery under the figures (which included interest) given by the Objectors would only amount to $66,447,076.10,[37] with attorneys' fees and costs to be subtracted from that amount.

**2. Risk, Expense, Complexity and Likely Duration of Further Litigation**

"In most situations, unless the settlement is clearly inadequate, its acceptance and approval are preferable to lengthy and expensive litigation with uncertain results."  4 A CONTE & H. NEWBERG, NEWBERG ON CLASS ACTIONS, § 11:50 at 155 (4th ed. 2002).   As observed in *Oppenlander v. Standard Oil Co. (Ind.)*, 64 F.R.D. 597 (D. Colo. 1974):

> The Court shall consider the vagaries of litigation and compare the significance of immediate recovery by way of the compromise to the mere possibility of relief in the future, after protracted and expensive litigation. In this respect, "It has been held proper to take the bird in hand instead of a prospective flock in the bush."

---

[36]   However, whether or not the statute of limitations has begun to run, 26 U.S.C. § 6532(a)(2) provides: "Extension of time.-The 2-year period prescribed in paragraph (1) shall be extended for such period as may be agreed upon in writing between the taxpayer and the Secretary or his delegate." 26 U.S.C. § 6532(a)(2). The Governor claims that it is within his power to waive the statute through the Settlement Agreement and he will do so with the parties.  The non-litigating parties assume the risk of litigating this matter.

[37]   This figure represents the amount of recovery with interest proposed by the Objectors for the years 2001, 2002, 2003 and 2004. *See* Objections, Docket No. 426, at 10. If the statute of limitations issue was litigated, all prior years (i.e. 2000 and prior) would be time barred.

41

64 F.R.D. at 624.

In this instance, as discussed above, there is an issue concerning whether the statute of limitations would bar claims for the earlier years. There would most likely be litigation over the issue. It is also likely that an appeal would follow any decision on that matter. In addition, there may even be an appeal or reconsideration of the issue on whether the payment of the EIC applies to Guam (where there is no federal funding source) or whether the filing of the tax return did in fact serve to satisfy the requirement that taxpayers exhaust administrative remedies before filing suit thereby giving this court jurisdiction over this matter. Litigating the resolution of any or all of these issues would be expensive and protracted. Avoiding such litigation in this complex case strongly militates in favor of settlement rather than further protracted and uncertain litigation.

### 3. The Risk of Maintaining Class Action Status Throughout the Trial

The parties question whether this matter would be able to proceed as a class action should it go to trial. Generally tax refund actions cannot be handled as a class action because of all the individualized issues. *See Saunooke v. United States*, 8 Cl. Ct. 327, 330-331 (1985) (holding that tax refund cases were ill-suited for class treatment). Since *Saunooke,* other courts suggest that a class action may be appropriate where it is the most fair and efficient method of resolving a dispute. *Fisher v. U.S.,* 69 Fed. Cl. 193, 204 (2006). However, in this instance, the management of a class action might pose a hardship because there would likely be significant difficulties in determining individual class members' entitlement to refunds in light of potential offsets for each tax year in question. Accordingly, it is not clear that this case could have proceeded as a class action had it gone to trial.

### 4. The Amount Offered In Settlement

As noted in assessing the consideration obtained by the class members in a class action settlement, "[i]t is the complete package taken as a whole, rather than the individual component parts, that must be examined for overall fairness." *Officers for Justice*, 688 F.2d at 628. In this regard, it is well-settled law that a proposed settlement may be acceptable even though it amounts to only a fraction of the potential recovery that might be available to the class members at trial.

42

1   *See Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1242 (9th Cir. 1998); *see also Williams v.*

2   *Vukovich*, 720 F.2d 909, 922 (6th Cir. 1983) (court may not withhold approval merely because

3   settlement is only a fraction of what a successful plaintiff would have received in a fully litigated

4   case).

5        Here, along with the general benefit that a prompt settlement brings as compared to the

6   indefinite nature of protracted litigation, a few of the Government's concessions in the Settlement

7   Agreement bear particular emphasis.  For example, the following concessions are of real value:

8   (1) payment of $90 million and payment of the EIC in future years; (2) waiver of the statute of

9   limitation in 26 U.S.C. § 6532; (3) proceeding as a class action; and (4) no further contest on the

10  issue of jurisdiction.

11       In this instance the settling parties have agreed that the sum of $90 million will be available

12  at a rate of $15 million per year for each year that timely claims were made.  Looking at the figures

13  provided by the Government, the class members will be receiving somewhere between 73% and

14  100% of the value of their claims per year (not including interest).  This amount of recovery is

15  more than reasonable, especially given the risks of litigation for the class. *See* discussion *supra*.

16  Indeed, even had the percentage of compensation been substantially lower, the value of a

17  settlement can fall within the reasonable range of the value of the class claims.  As has been

18  explained:  "[T]he fact that a proposed settlement constitutes a relatively small percentage of the

19  most optimistic estimate does not, in itself, weigh against the settlement: rather, the percentage

20  should be considered in light of the strength of the claims." *In re Ikon Office Solutions, Inc., Sec.*

21  *Litig.*, 194 F.R.D. 166, 184 (E.D. Pa. 2000); *Linney*, 151 F.3d at 1242 ("The fact that a proposed

22  settlement may only amount to a fraction of the potential recovery does not, in and of itself, mean

23  that the proposed settlement is grossly inadequate and should be disapproved.") (citation omitted);

24  *See also Boyd v. Bechtel Corp.*, 485 F. Supp. 610, 617-618 (N.D. Cal. 1979) ("[S]imply because

25  a settlement may amount to only a fraction of the potential recovery does not in itself render it

26  unfair or inadequate. Compromise is the very nature of settlement.").  "[T]he very essence of a

27  settlement is compromise, a yielding of absolutes and an abandoning of highest hopes.'" *Linney*,

28  151 F.3d at 1242 (citation and quotation marks omitted).

43

The concessions on the part of the Government and settlement amount promised by the Government provides for an award which is significant to the Island of Guam and meaningful to the Class. Undoubtedly, the financial amount of the individual claims will be less than what some class members feel they deserve but, conversely, more than they are entitled to if they were to lose on any of the following issues: 1) the class members' failure to exhaust administrative remedies; 2) the statute of limitations bar to claims or 3) whether the EIC applies to Guam. The concessions made on both sides are precisely the give and take process from which negotiated settlements are made.

### 5. The Extent of Discovery Completed and the State of the Proceedings

In determining the adequacy of the parties' knowledge of the case, it may be relevant to consider the extent of discovery. A settlement following sufficient discovery and genuine arms-length negotiation is presumed fair. *See City P'ship Co. v. Atlantic Acquisition Ltd. P'ship*, 100 F.3d 1041, 1043 (1st Cir. 1996).

This case has been ongoing for years. The very issue of whether the EIC applied to Guam was addressed by the Supreme Court of Guam before the matter eventually made its way to this court. In this instance, the settling parties have researched the potential number of claimants and possible amounts of claims at issue. The settlement was achieved only after lengthy negotiations among the parties and after mediation with an experienced settlement judge. It should be noted that the settling parties engaged the process of mediation more than once.

### 6. The Experience and Views of Counsel

The Settlement Agreement was presented to the court after extensive negotiations among the settling parties. Both sides desire to settle. In reviewing the opinions of counsel, "great weight" is accorded to the recommendation of the attorneys. They are the ones who are most closely acquainted with the facts of the underlying litigation. *In re Painewebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 125 (S.D.N.Y.1997). "Parties represented by competent counsel are better positioned than courts to produce a settlement that fairly reflects each party's expected outcome in the litigation." *Pac. Enters. Sec. Litig.*, 47 F.3d at 378. Thus, "the trial judge, absent fraud, collusion, or the like, should be hesitant to substitute its own judgment for that of counsel." *Cotton*

44

1  *v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977); *Hanrahan v. Britt*, 174 F.R.D. 356, 366-368 (E.D.

2  Pa. 1997) (presumption of correctness applies to a class action settlement reached in arms'-length

3  negotiations between experienced, capable counsel after meaningful discovery) (citing MANUAL

4  FOR COMPLEX LITIGATION, SECOND § 30.41 (1985) and *Ratner v. Bennett*, No. 92-4701, 1996 WL

5  243645, *5 (E.D. Pa. May 8, 1996)).

6      Class Counsel believes that the Settlement Agreement is a fair, adequate, and reasonable

7  resolution of the Class's dispute with the Government and is preferable to continued litigation.

8  Class Counsel has demonstrated competence in the litigation of this case. Class Counsel has the

9  requisite experience in handling class actions and has ably advocated on behalf of the Class.

10     **7.  The Presence of a Governmental Participant**

11     There is no dispute that the Government would be unable to pay the settlement amount at

12  once.  However, it has indicated certain funding sources for the payment of the settlement amount

13  and a timetable in which the payments would be made.  Given the financial state of the Government

14  and the need for finality in this case, the Settlement Agreement seems fair and reasonable.[38]

15     **8.  Reaction of the Class Members to the Settlement Agreement**

16     "The reactions of the members of a class to a proposed settlement is a proper consideration

17  for the trial court." 5 MOORE'S FED. PRACTICE, § 23.85[2][d] (Matthew Bender 3d ed.). In this

18  regard, "[t]he representatives' views may be important in shaping the agreement and will usually

19  be presented at the fairness hearing; they may be entitled to special weight because the

20  representatives may have a better understanding of the case than most members of the class."

21  MANUAL FOR COMPLEX LITIGATION, THIRD § 30.44 (1995).

22     On January 9, 2007, the court entered the Preliminary Approval Order, which preliminarily

23  approved the Proposed Settlement, approved the proposed Notice, and scheduled a Final Approval

24  Hearing.  Docket No. 384.  The Notice that the court approved also instructed class members as

25  to the manner in which class members could object to the Proposed Settlement.

26

27  ───────────────

28  [38] The Objectors have expressed concern over these funding sources. Discussion regarding
these concerns are addressed further herein.

1  The court should carefully weigh the number and nature of objections while keeping in

2  mind that a settlement can be fair even if a large number of class members oppose it. *Reed v. Gen.*

3  *Motors Corp.*, 703 F.2d 170, 174 (5th Cir. 1983). Out of the thousands of potential class members,

4  only four class members opted out: Young Kwon, Ella Cruz on behalf of Linda Cruz, Gerardo

5  C. Vitug and Christina M. Naputi. *See* Docket Nos. 403, 406, 408 and 409. The Objectors claim

6  that there is such a low number of opt-outs because of the relatively low number of claims. While

7  it is true that the number of claims made decrease in numbers for the later years (*e.g.* fewer claims

8  made for the early years of 1995, 1996 as compared to the later years of 2003, 2004 etc.), there was

9  still more than 90% of possible claims filed for the year 2004 and still very few numbers of opt-

10  outs. As noted, there have only been two class members to have filed objections: Janice Cruz and

11  Mary Grace Simpao. The number of objections here is small by any standard. *See In re Sumitomo*,

12  189 F.R.D. 274, 281 (S.D. N.Y. 1999) (finding that fewer than 1% of class members requesting

13  exclusion "strongly favor[ed] approval of the proposed settlement"). The small number of

14  objections and low percentage of opt-outs in this case strongly favor the settlement.

15  It should not "be forgotten that compromise is the essence of a settlement. The trial court

16  should not make a proponent of a proposed settlement 'justify each term of settlement against a

17  hypothetical or speculative measure of what concessions might have been gained; inherent in

18  compromise is a yielding of absolutes and an abandoning of highest hopes.'" *Cotton v. Hinton*, 559

19  F.2d 1326, 1330 (5th Cir. 1977) (citation omitted). While a settlement stands or falls on its merits

20  and not on a head count between its proponents and objectors, the overwhelming support for the

21  settlement carries some persuasive force. *Id.* In this instance, there has been near-unanimous

22  support for the Settlement Agreement. There is no reason not to approve the Settlement Agreement.

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

46

## VII.  OTHER OBJECTIONS

### A.  Organic Act and Guam Law

Objectors claim that the Settlement Agreement must comply with the Organic Act and Illegal Expenditure Act and that any judgment must be funded from unencumbered funds pursuant to 48 U.S.C. 1421i(h)(2) which provides:

> (h) Jurisdiction of District Court; suits for recovery or collection of taxes; payment of judgment
>
> . . .
>
> (2) Suits for the recovery of any Guam Territorial income tax alleged to have been erroneously or illegally assessed or collected, or of any penalty claimed to have been collected without authority, or of any sum alleged to have been excessive or in any manner wrongfully collected, under the income-tax laws in force in Guam, pursuant to subsection (a) of this section, may, regardless of the amount of claim, be maintained against the government of Guam subject to the same statutory requirements as are applicable to suits for the recovery of such amounts maintained against the United States in the United States district courts with respect to the United States income tax. When any judgment against the government of Guam under this paragraph has become final, the Governor shall order the **payment of such judgments out of any unencumbered funds in the treasury of Guam**.

(Emphasis added).

While the statute states that the payment of any judgment shall be paid out of unencumbered funds it does not state that that is the "only" way such a judgment can be paid. Undoubtedly, if the Government had unencumbered funds in the amount of $90 million it would be preferable to make one lump payment to the class.  However, the court takes judicial notice that the Government simply does not have it (and has not had unencumbered funds for years).[39]  It will take years for there to be $90 million in unencumbered funds given a current Government deficit

---

[39]  The term unencumbered funds is not defined in the Organic Act.  The Objectors suggested that it was not synonymous with unappropriated funds, but rather referred to funds that are not pledged to support bonds or that are not federal grant money that can only be used for designated purposes.  Assuming *arguendo* this were true, and a $90 million or higher judgment was entered against the Government, such a judgment would bankrupt the Government if it had to pay it all at once, as the Government only has a yearly budget of less than $500 million, *see* Guam Public Law 29-19 (Sept. 29, 2007), and a deficit that already exceeds that amount.  The court sees little value to the Class in insisting on a construction of a statute that would either bankrupt the Government, or leave the Class in a position where it must constantly come back to this court in an effort to be paid.

47

in excess of $524 million. *See* Docket No. 449 at ¶ 2. In light of the circumstances, the settling parties have agreed to a method to pay the judgment over time from the Income Trust and Reserve Funds. Had the payment of the EIC been timely, these monies would have been paid from the designated funds now being used to fund the settlement. Chapters 50 and 51 of the 11 G.C.A. create reserve and trust funds (the "funds") that both state they can be used to pay tax refunds, "earned income tax credits," and the child tax credit. 11 G.C.A. § 50101, *et seq.* and § 51101, *et seq.* Given that these statutes expressly permit expenditures from these funds to pay the EIC, the settling parties utilized these to support the Settlement Agreement.

The Objectors contend that only the Legislature can authorize the funding of the judgment from the "funds." Objectors argue that the Settlement Agreement violates the Legislature's power over appropriations under 48 U.S.C. § 1423j. Chapters 50 and 51 of 11 G.C.A. state that funds therein can be spent on projected "income tax refunds, earned income tax credits, child tax credits [and] tax rebate relief . . . ." 11 G.C.A. § 50105. Nowhere in the statutes does it state that the "projected" EIC that can be paid is only for future years – "projected EIC payments" are still "projected EIC payments," whether they are payments for 1995 or 2005. In other words, unpaid EIC payments are "projected" if they have not been paid. Accordingly, the Government's pledge of 15% of the amount that goes into those funds is consistent with the Legislature's appropriation of monies that go into the Chapter 50 and 51 trust and reserve funds for "projected . . . earned income tax credits." 11 G.C.A. § 50103.

### B. The Illegal Expenditures Act

Lastly, the Objectors contend that the Settlement Agreement violates the Illegal Expenditures Act, 5 G.C.A. § 22401. First, they argue that the Governor entered into the contract "prior to an appropriation." But there is an appropriation – Chapters 50 and 51 of 11 G.C.A. authorize expenditures on the EIC. The Settlement Agreement provides for payment of the EIC and this complies with that statutory requirement.

Second, Objectors argue that the Settlement Agreement authorizes an expenditure "from a fund in excess of the amount available therein." *See* Docket No. 426-2, p. 39. But the settlement only guarantees 15% of whatever is placed in those funds – whether 15% of $10 million or $100

48

1 million. There has been no promise that any particular amount will be in the funds at any time or

2 paid at any time, and nowhere has the Governor authorized an expenditure "from a fund in excess

3 of the amount available therein."

4       Third, Objectors point to the promise to pay the EIC in future tax years as violating the

5 Illegal Expenditures Act. The promise made in the Settlement Agreement is that "EIC claims for

6 tax years 2005 and future tax years shall be funded in compliance with Chapters 50 and 51 of Title

7 11 of the G.C.A." Settlement Agreement § V(g). Again, thus, there is no promised expenditure

8 "from a fund in excess of the amount available therein"; future EIC payments will only be paid in

9 the ordinary course as funds become available for tax refunds and the EIC. This is lawful.

10       In sum, the court hereby **GRANTS** the motions for final class certification and final

11 approval, and **DENIES** all objections submitted.

12 **VIII. ATTORNEYS FEES AND REIMBURSEMENT OF COSTS**

13       Under the terms of the Settlement Agreement, and subject to the court's approval, Class

14 Counsel may seek reasonable attorneys' fees. In June 2006, the *Santos* and *Torres* plaintiffs

15 moved for the recovery of attorneys' fees and costs. *See* Docket Nos. 328, 331. On June 8, 2007,

16 the *Simpao* plaintiff moved for the recovery of attorneys' fees and reimbursement of costs. *See*

17 Docket No. 414. Rule 23(h) provides in pertinent part that "[i]n an action certified as a class

18 action, the Court may award reasonable attorneys' fees and nontaxable costs authorized by law or

19 by agreement of the parties . . . ." FED. R. CIV. P. 23(h).

20       On January 9, 2008, the court heard argument on these motions and objections. The court

21 awards the attorneys' fees and costs as set forth herein.

22     **A. Common Fund Doctrine**

23       Under the common fund doctrine, attorneys may recover fees from the damage award

24 obtained." *In re Inforspace, Inc. Sec. Litig.*, 330 F. Supp. 1203, 1206 (W.D. Wa. 2004). The Ninth

25 Circuit has explained:

26       The common fund doctrine provides that a private plaintiff, or his attorney, whose
      efforts create, discover, increase or preserve a fund to which others also have a

27       claim is entitled to recover from the fund the costs of his litigation, including
      attorneys' fees. The doctrine is "employed to realize the broadly defined purpose

28       of recapturing unjust enrichment." [Dawson, Lawyers and Involuntary Clients:

49

Attorney Fees from Funds, 87 Harv.L.Rev. 1597 (1974).] That is, the doctrine is designed to spread litigation costs proportionately among all the beneficiaries so that the active beneficiary does not bear the entire burden alone and the "stranger" beneficiaries do not receive their benefits at no cost to themselves.

*Vincent v. Hughes Air West, Inc.*, 557 F.2d 759, 769 (9th Cir. 1977).

The common fund doctrine is rooted in concepts of quasi-contract and restitution. *Id.* at 770. District courts in the Ninth Circuit have discretion to award attorney fees in common fund class actions in one of two ways: (1) a percentage of the funds created; or (2) the lodestar method. *In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig.*, 109 F.3d 602, 607 (9th Cir. 1997). Either method is acceptable for determining a reasonable award of fees. *Id.*

Under the lodestar method, the court calculates the fee award by multiplying the number of hours reasonably spent by a reasonable hour rate and then enhancing that figure, if necessary, to account for the risks associated with the representation. *Paul, Johson, Alston & Hunt v. Graulty*, 886 F.2d 268, 272 (9th Cir. 1989). There is a strong presumption that the lodestar amount is reasonable. *Fischer v. SJB-P.D., Inc.*, 214 F.3d 1115, 1119 n.4 (9th Cir. 2000). Additionally, courts will often use the lodestar method as a cross-check on the percentage method in order to ensure a fair and reasonable result. *See In re Immunex Sec. Litig.*, 864 F. Supp. 142, 144 (W.D. Wa. 1994).

Pursuant to Section II(a)(iv) of the Settlement Agreement, fees are to be provided as follows:

> So that the [EIC] class may be advised of the pending motion in the class notice discussed below, counsel for Santos and/or Torres must file any motion(s) for attorneys' fees and costs within seven days of the execution of this Agreement. Attorneys' fees or costs awarded to the counsel for the EIC class are to be determined by the Court following such a motion which shall be made under Federal Rules of Civil Procedure 23(h).

Settlement Agreement § II (a)(iv).

Class Counsel requests an award of his nontaxable costs, as well as total attorneys' fees in the amount of ten-percent (10%) of the total amount recovered by and for the common benefit of the Class by virtue of the Settlement Agreement. *Torres* counsel requests an award of their nontaxable costs. With regard to attorneys' fees, counsel for *Torres* and Class Counsel agreed during the April 6-8, 2006 mediation with Judge Cahill, that counsel for *Torres* would receive eleven (11%) of the first $5 million of the fee award, and then twenty-five percent (25%) of the amount of the award exceeding $5 million, provided that the court awarded fees based on the

50

percentage-of-the-fund method. The total award of attorneys' fees being sought is not greater than ten percent (10%), with counsel for *Torres* only receiving a percentage of the award based on the actual dollar amount awarded.

In the event the court awards attorneys' fees based on the lodestar method, Class Counsel and counsel for *Torres* seek an award of fees they believe they are entitled to based on the hours each firm has devoted to the litigation and resolution of the matter.

**B. Reasonableness of Fees**

Attorneys' fees provisions included in proposed class action settlement agreements are, like every other aspect of such agreements, subject to the court's scrutiny for fairness, reasonableness, and adequacy. *Staton v. Boeing Co.*, 327 F.3d 938, 963 (9th Cir. 2003). "Thus, to avoid abdicating its responsibility to review the agreement for the protection of the class, a district court must carefully assess the reasonableness of a fee amount spelled out in a class action settlement agreement." *Id.* "'Because in common fund cases the relationship between plaintiffs and their attorneys turns adversarial at the fee setting stage, courts have stressed that when awarding attorneys' fees from a common fund the district court must assume the role of fiduciary for the class plaintiffs." *In re Wash. Pub. Power Supply Sys. Sec. Litig.,* 19 F.3d 1291, 1302 (9th Cir. 1994) (citations omitted).

The parties urge the court to bear in mind that the Ninth Circuit has set 25% of a settlement fund as a "benchmark" award for attorneys' fees in common fund cases. *Torrisi*, 8 F.3d at 1376. In light of the 25% benchmark, a fee request of 10% of the common fund here appears at first impression reasonable.[40] However, as can be seen herein, after doing a lodestar cross-check with the percentage requested, this request of 10% seems far less reasonable – particularly in light of the fact that the Class represents the "working poor."

### 1. *PETITIONERS' ATTORNEYS' FEES AND COSTS*

Class Counsel and the *Torres* counsel have submitted their billing statements.[41] As of

---

[40] The requested 10% award of the common fund translates to $9 million dollars.

[41] Attorney Phillips did not keep billing records and has since compiled them in hindsight.

October 31, 2007, Attorney Phillips claims that he has spent a total of 1,437.75 hours at a rate of $250 per hour, resulting in a fee amount of $359,437.50. *See* Docket No. 552 Errata to Decl. of Michael F. Phillips. His associates, Mr. Ricardo D. Bordallo, Esq. worked 935.50 hours at an hourly rate of $150 for a total of $140,325; Ms. Leslie A. Travis, Esq. worked 54 hours at an hourly rate of $150 for a total of $8,100 and Ms. Darleen H. Invencion, Esq. worked 31.50 hours at an hourly rate of $150 for a total of $4,725. In sum the firm billed $512,587.50 in fees for 2,458.75 total billing hours, plus "out-of-pocket" expenses of $12,041.65, for a total amount sought of $524,629.15. *See* Docket No. 552, Errata to Decl. of Michael F. Phillips, at p. 39.

Mr. Perez, counsel for the *Torres* plaintiffs, has claimed that his firm has expended 1226.65 hours in work totaling a cost of $290,852.85.[42] *See* Docket No. 542 at 51. In addition, he claims expenses of $25,751.21, for a total of $316,604.06. *Id.* at 53. The two law firms of Phillips & Bordallo and Lujan, Aguigui & Perez have submitted bills totaling in excess of $840,000.

Using the figures provided by Class Counsel and *Torres* counsel, the attorneys have spent a combined 3685.40 hours on this case amounting to a total expenditure of $803,440.35 in legal fees. If this court agreed with counsel's request, and awarded $9 million in fees representing 10% of the common fund, the multiplier would be 11.2 ($9,000,000 ÷ $803,440.35). This would result in an unreasonably high multiplier. *See George v. Bay Area Rapid Transit, Dist.*, 2007 WL 2778784 (N.D. Cal. 2007) (refusing to apply requested multiplier of 2.0 or 3.0 because case was not "rare" or "exceptional.").

It seems quite clear that the requested 10% of the common fund would be unreasonable. *Staton v. Boeing Co.*, 327 F.3d 938, 963 (9th Cir. 2003) (court must consider the fairness and reasonableness of request). Accordingly, the court finds it must either apply the lodestar amount or apply a much lower percentage fee which would be consistent with the lodestar figures. *See Torrisi,* 8 F.3d at 1377 (In circumstances where a percentage recovery would be too large in light

---

[42] Attorneys Anthony Perez, Peter Perez, Ike Aguigui, and John Unpingco bill an hourly rate of $250, attorneys Delia Lujan and Eliseo Florig bills at an hourly rate of $195 and attorney David Lujan bills at a rate of $325 an hour. The billing statements also list initials of EOL, who bills at a rate of $100 an hour. *See* Docket No. 542.

52

of the hours worked the "benchmark percentage should be adjusted or replaced by a lodestar calculation.").

Moreover, an award of fees under the lodestar or at a lower percentage makes sense given the minimal amount of discovery conducted. No written discovery was conducted.[43] Nor were there any pre-trial or trial proceedings. Any litigation principally concerned the dispute between the Governor and the Attorney General as to who represented the Government under the circumstances. Class Counsel argues that an award of fees based upon the lodestar amounts will only encourage over-billing and reward firms that overly allocate associates to "work" a case. The court does not agree. If an award of fees is based upon the lodestar amounts, the court is still responsible to ensure that the fees awarded are reasonable. A careful review of the submitted billings should alert the court to any concerns or abuses.

The litigation of the three cases consisted largely of the following that might have benefitted the class: the filing of the complaints; ongoing litigation regarding the first *Santos* settlement (without benefit of court assistance); opposition to dismiss each in *Torres* and *Simpao*; three mediation sessions; participation in drafting of the final settlement agreement and the filings of the settlements and class certification by *Santos* and *Torres* counsel.

### 2. SANTOS ATTORNEYS FEES AND COSTS

#### a. NUMBER OF HOURS REASONABLY EXPENDED

Looking at the request for fees by Attorney Phillips, the Government makes a number of objections.[44] First, the Government contends that all the entries concerning the time period from 1996 to November 2003 are not reasonable. The Government claims that to the extent that time was being used to prepare a complaint and proceed with suit, counsel did that work again in November 2003 to February 2004, expending 138 hours researching and drafting the complaint.

---

[43] The *Simpao* plaintiffs sought to serve discovery requests; however that was only after the *Santos* plaintiffs had entered into a settlement.

[44] The court commends the Governor's attorney, Daniel Benjamin, for his efforts in trying to safeguard the Government's coffers. His objections as to the requested fee awards are well taken.

1   Accordingly, the Class should not have to double pay.

2       Second, the Government claims that not all of the work done from 1996 to November 2003
3   was even related to the lawsuit that was eventually brought before the court. For example, 60
4   hours billed are for drafting a complaint for a Superior Court of Guam action in 1998 that was
5   never filed. Also from November 1999 to January 2001, 52 hours were devoted to research
6   regarding the Guam Legislature's action against the Governor regarding the EIC. The Government
7   contends that it is difficult to understand how this research benefitted the class.

8       The standard regarding an award of attorneys' fees was announced by the Supreme Court
9   in *Hensley v. Eckerhart*, 461 U.S. 424 (1983). The Court held that a prevailing attorney is entitled
10  to compensation for time "reasonably expended on the litigation." *Hensley* 461 U.S. at 435. Time
11  is reasonably expended on the litigation when it is "useful and of a type ordinarily necessary to
12  secure the final result obtained from the litigation." *Webb v. Bd. of Educ. of Dyer County*, 471 U.S.
13  234, 242 (1985). Counsel has not provided a response to the Government's contentions. However,
14  it is counsel's burden to demonstrate that the number of hours spent was "reasonably necessary"
15  to the litigation. *Hensley*, 461 U.S. at 243. Counsel bears the burden of submitting detailed time
16  records justifying the hours claimed to have been expended. *Id.* The court may reduce hours
17  where documentation of the hours is inadequate; if the case was overstaffed and hours are
18  duplicated; if the hours expended are deemed excessive or otherwise unnecessary. *Id.* at 433-34.
19  The court should reduce hours unreasonably spent, or where excessive time is spent on particular
20  tasks, or where there is redundant and/or ambiguity in the billing. *Id.*

21      Class Counsel has failed to provide a basis as to why the class should pay for work
22  conducted several years prior to the filing of the present suit.

23      Accordingly, the court reduces 312 of Attorney Phillips billing hours and another 208
24  billing hours from Attorney Bordallo as follows:

25  ///

26  ///

27

28

54

| DATE | ATTORNEY | RATE | REDUCTIONS TO HOURS | TASK |
|---|---|---|---|---|
| Jan. - June 1996 | Ricardo Bordallo | $150/hour | 20 hours | Research re: jurisdiction of Governor/Tax Commissioner |
| | Ricardo Bordallo | $150/hour | 32 hours | Research re: options available to Taxpayers as to EIC |
| | Michael Phillips | $250/hour | 32 hours | Research re: applicability of the EIC to Guam. |
| 1997-1998 | Michael Phillips | $250/hour | 40 hours | Research re: jurisdiction of Legislature/Superior Court |
| May - August 1998 | Ricardo Bordallo | $150/hour | 40 hours | Research re: filing of complaint |
| | Ricardo Bordallo | $150/hour | 60 hours | Draft initial complaint for Superior Court |
| | Ricardo Bordallo | $150/hour | 40 hours | Draft initial complaint for District Court |
| March-Oct. 1999 | Michael Phillips | $250/hour | 32 hours | Research re: Tax Commissioner's discretion |
| | Ricardo Bordallo | $150/hour | 16 hours | Research re: mandamus claims |
| Nov. 1999-April 2000 | Michael Phillips | $250/hour | 24 hours | Research re: Tax Payer standing |
| | Michael Phillips | $250/hour | 12 hours | Research re: Legislature standing |
| | Michael Phillips | $250/hour | 16 hours | Research re: effect of Superior Court declaration |
| | Michael Phillips | $250/hour | 18 hours | Research re: necessity for legislative appropriation |
| | Michael Phillips | $250/hour | 12 hours | Review of sufficiency of statutory language regarding amounts appropriated |

55

| May 2000- Jan. 2001 | Michael Phillips | $250/hour | 12 hours | Review Legislature's Petition for Declaratory Relief |
| | Michael Phillips | $250/hour | 5 hours | Research re: Tax Commissioner's discretion |
| | Michael Phillips | $250/hour | 1 hour | Attend Supreme Ct. Hearing |
| | Michael Phillips | $250/hour | 12 hours | Research re: filing individual taxpayer suit in Superior Ct. |
| | Michael Phillips | $250/hour | 12 hours | Research Supreme/Superior Ct. requirement of case or controversy |
| Feb. 2001- Oct. 2003 | Michael Phillips | $250/hour | 8 hours | Review/Research Supreme Ct. Opinion |
| | Michael Phillips | $250/hour | 40 hours | Research need for mandamus proceeding |
| | Michael Phillips | $250/hour | 12 hours | Research consequences of no appropriations for tax years 2002-2003 |
| | Michael Phillips | $250/hour | 24 hours | Research Governor's Organic Action discretion to pay tax refunds |

| | **ATTORNEY** | **RATE** | **HOURS EXCLUDED** | **AMOUNTS** |
|---|---|---|---|---|
| | Ricardo Bordallo | $150/hour | 208 hours | $31,200.00 |
| | Michael Phillips | $250/hour | 312 hours | $78,000.00 |
| **TOTAL REDUCED HOURS AND AMOUNTS** | | | **520 hours** | **$109,200.00** |

The Government also takes issue with the time counsel spent on petitioning fees (22.5 hours for Attorney Phillips and 6 hours by Attorney Bordallo). The Government contends that such time spent confers no benefit to the class.

Courts have denied compensation for time spent litigating the propriety of the fee award in common fund cases on the theory that the class is not benefitted thereby. Courts have also said that because the attorneys' compensation is

56

derived from the fund itself, the attorneys' interests in litigation over the amount of the fee are in direct conflict with those of the class members.

*In re Nucorp Energy, Inc.*, 764 F.2d 655, 661 (9th Cir. 1985).

The court finds that in light of the fact that no benefit is conferred upon the class by petitioning fees the following reductions in hours are in order:

| DATE | ATTORNEY | RATE | REDUCTIONS TO HOURS | TASK |
|---|---|---|---|---|
| 06/17/04 | Michael Phillips | $250/hour | 1 hour | Prepare Order re: Atty Fees |
| 6/24/04 | Michael Phillips | $250/hour | .25 hour | Review Order re: Atty Fees |
| 7/12/04 | Michael Phillips | $250/hour | 6 hours | Research re: Atty Fees |
| | Ricardo Bordallo | $150/hour | 6 hours | Research re: Atty Fees |
| 11/14/05 | Michael Phillips | $250/hour | 3 hours | Motion for Atty Fees |
| 05/31/06 | Michael Phillips | $250/hour | 6 hours | Motion for Atty Fees |
| 06/01/06 | Michael Phillips | $250/hour | 2 hours | Motion for Atty Fees |
| 06/02/06 | Michael Phillips | $250/hour | 1 hour | Motion for Atty fees |
| 06/06/06 | Michael Phillips | $250/hour | 1 hour | Motion for Atty Fees |
| 06/22/07 | Michael Phillips | $250/hour | .5 hour | Review Response re: Atty Fees |
| 06/25/07 | Michael Phillips | $250/hour | .25 hour | Review Joinder re: Response to Atty Fees |
| 10/12/07 | Michael Phillips | $250/hour | 1.5 hours | Decl. re: Atty Fees |
| | Michael Phillips | $250/hour | 1 hour | Review Declaration re: Atty Fees |

57

| | ATTORNEY | RATE | HOURS EXCLUDED | AMOUNTS |
|---|---|---|---|---|
| | Ricardo Bordallo | $150/hour | 6 hours | $900.00 |
| | Michael Phillips | $250/hour | 23.5 hours | $5,875.00 |
| **TOTAL REDUCED HOURS AND AMOUNTS** | | | **29.5 hours** | **$6,775.00** |

The Government also objects to several billing entries that it claims are administrative tasks that should not be billed. While not all of the disputed billings pertain to administrative tasks, the court finds that many of the entries are billed at a minimum increment of .25/hour when at most .10/hour should be billed.[45] Accordingly, billings for the following tasks are reduced from .25 to .10 hour.

| DATE | ATTORNEY | RATE | HOURS CLAIMED | REVISED HOURS | TASK |
|---|---|---|---|---|---|
| 03/11/04 | Michael Phillips | $250/hour | .25 hour | .10 hour | Review Stipulation |
| 07/07/04 | Michael Phillips | $250/hour | .25 hour | .10 hour | Review Order re: Due Dates[46] |
| 07/14/04 | Michael Phillips | $250/hour | .25 hour | .10 hour | Review Order re: Continuance[47] |
| 08/02/04 | Ricardo Bordallo | $150/hour | .25 hour | .10 hour | Review Order re: Excess Pages[48] |

---

[45] For example, counsel has billed for preparing certificates of service where ordinarily secretaries prepare these documents. Nevertheless, if counsel did prepare them, they should not have taken more than .10 hour to prepare.

[46] *See* Docket No. 24. The order is one paragraph long.

[47] *See* Docket No. 38. The order is one paragraph long.

[48] *See* Docket No. 65. The order is two paragraphs long.

58

| 11/08/04 | Michael Phillips | $250/hour | .25 hour | .10 hour | Review Order re: Reference to Magistrate Judge[49] |
|----------|------------------|-----------|----------|----------|---------------------------------|
| 11/09/04 | Michael Phillips | $250/hour | .25 hour | .10 hour | Review Entry of Appearance[50] |
| 11/12/04 | Michael Phillips | $250/hour | .25 hour | .10 hour | Review Order re: Def. Right to be Heard[51] |
| 11/24/04 | Michael Phillips | $250/hour | .25 hour | .10 hour | Review Entry of Appearance[52] |
| 12/14/04 | Michael Phillips | $250/hour | .25 hour | .10 hour | Review Order re: Continuance[53] |
| 01/11/05 | Michael Phillips | $250/hour | .25 hour | .10 hour | Review Ninth Circuit Order re: voluntary dismissal[54] |
| 02/03/05 | Michael Phillips | $250/hour | .25 hour | .10 hour | Review Entry of Appearance[55] |
| 02/15/05 | Michael Phillips | $250/hour | .25 hour | .10 hour | Review Order re: Referral[56] |
| 02/25/05 | Michael Phillips | $250/hour | .25 hour | .10 hour | Review Joinder[57] |

---

[49] *See* Docket No. 85.  The order is one sentence long.

[50] *See* Docket No. 86.  The document is one sentence long.

[51] *See* Docket No. 90.  The order is one paragraph long.

[52] *See* Docket No. 91.  The document is one sentence long.

[53] *See* Docket No. 121.  The order is one paragraph long.

[54] *See* Docket No. 132.  The order is one paragraph long.

[55] *See* Docket No. 154.  The document is one paragraph long.

[56] *See* Docket No. 159.  The order is one paragraph long.

[57] *See* Docket No. 169.  The document is one sentence long.

59

| | | | | | |
|---|---|---|---|---|---|
| | Michael Phillips | $250/hour | .25 hour | .10 hour | Review Joinder[58] |
| 03/04/05 | Michael Phillips | $250/hour | .25 hour | .10 hour | Review Joinder[59] |
| 03/28/05 | Michael Phillips | $250/hour | .25 hour | .10 hour | Review Joinder[60] |
| 06/28/05 | Michael Phillips | $250/hour | .25 hour | .10 hour | Review Order re: Status Hearing[61] |
| 07/25/05 | Michael Phillips | $250/hour | .25 hour | .10 hour | Review Joinder[62] |
| 09/29/05 | Michael Phillips | $250/hour | .25 hour | .10 hour | Review Substitution of Counsel[63] |
| 10/04/05 | Michael Phillips | $250/hour | .25 hour | .10 hour | Review Joinder[64] |
| 10/06/05 | Michael Phillips | $250/hour | .25 hour | .10 hour | Review Order re: Substitution[65] |
| 10/17/05 | Michael Phillips | $250/hour | .25 hour | .10 hour | Review Order re: Objections to Magistrate Judge's Order[66] |

---

[58] *See* Docket No. 170.  The document is one sentence long.

[59] *See* Docket No. 180.  The document is one sentence long.

[60] *See* Docket No. 197.  The document  is two sentences long.

[61] *See* Docket No. 218.  The Order is two sentences long.

[62] *See* Docket No. 225.  The document is two sentences long.

[63] *See* Docket No. 244.  The document is one sentence long.

[64] *See* Docket No. 249.  The document is two sentences long.

[65] *See* Docket No. 245.  The document is one sentence long.

[66] *See* Docket No. 253.  The order is two paragraphs long.

60

| 10/21/05 | Michael Phillips | $250/hour | .25 hour | .10 hour | Review Order re: Motion to File Amended Petition[67] |
|---|---|---|---|---|---|
| 10/24/05 | Michael Phillips | $250/hour | .25 hour | .10 hour | Review Order re: amended court order[68] |
| 11/23/05 | Michael Phillips | $250/hour | .25 hour | .10 hour | Review Stipulation[69] |
| 11/28/05 | Michael Phillips | $250/hour | .25 hour | .10 hour | Review Notice of Non-Opposition[70] |
| 11/29/05 | Michael Phillips | $250/hour | .25 hour | .10 hour | Review Notice of Non-Opposition[71] |
| 03/10/06 | Michael Phillips | $250/hour | .25 hour | .10 hour | Review Order re: Stipulation[72] |
| | Michael Phillips | $250/hour | .25 hour | .10 hour | Review Order re: Amended Comp.[73] |
| | Michael Phillips | $250/hour | .25 hour | .10 hour | Review Order re: Status[74] |

---

[67] *See* Docket No. 254.  The Order is one paragraph long.

[68] *See* Docket No. 255.  The Order is one sentence long.

[69] *See* Docket No. 279.  The document is one paragraph long.

[70] *See* Docket No. 280.  The document is one sentence long.

[71] *See* Docket No. 283.  The document is one sentence long.

[72] *See* Docket No. 284.  The Order is one sentence long.

[73] *See* Docket No. 288.  The Order is one paragraph long.  The billing entry states that the Order concerns an extension of time.  In fact, the Order concerns an amended motion for leave to file an amended petition.

[74] *See* Docket No. 289.  It is one paragraph long.   The billing entry states that the Order concerns objections to September 19, 2005 Order.  In fact, the Order sets forth a date for a status hearing.

61

| | | | | | |
|---|---|---|---|---|---|
| 03/21/06 | Michael Phillips | $250/hour | .25 hour | .10 hour | Review Order re: Settlement Conf.[75] |
| | Michael Phillips | $250/hour | .25 hour | .10 hour | Review Notice of withdrawal[76] |
| 04/21/06 | Michael Phillips | $250/hour | .25 hour | .10 hour | Review Joinder[77] |
| 04/27/06 | Michael Phillips | $250/hour | .25 hour | .10 hour | Review Order re: Status Report[78] |
| 06/08/06 | Michael Phillips | $250/hour | .25 hour | .10 hour | Review Order re: Ninth Circuit[79] |
| 06/21/06 | Michael Phillips | $250/hour | .25 hour | .10 hour | Review Order by Ninth Circuit[80] |
| 06/21/06 | Michael Phillips | $250/hour | .25 hour | .10 hour | Review Am. Order by Ninth Circuit[81] |
| 08/11/06 | Michael Phillips | $250/hour | .25 hour | .10 hour | Review Notice of Non-Opposition[82] |
| 11/28/06 | Michael Phillips | $250/hour | .25 hour | .10 hour | Review Order re: Status Hearing[83] |

[75] *See* Docket No. 309.  The Order is one paragraph long.

[76] *See* Docket No. 310.  The document is one paragraph long.

[77] *See* Docket No. 316.  The document is one sentence long.

[78] *See* Docket No. 318.  The Order is two paragraphs long.

[79] *See* Docket No. 333.  The Order is one paragraph long.

[80] *See* Docket No. 335.  The Order is one sentence long.

[81] *See* Docket No. 337.  The Order is one sentence long.

[82] *See* Docket No. 352.  The document is two sentences long.

[83] *See*  Docket No. 356.  The Order is one paragraph long.

62

| 11/29/06 | Michael Phillips | $250/hour | .25 hour | .10 hour | Review Joinder[84] |
|---|---|---|---|---|---|
|  | Michael Phillips | $250/hour | .25 hour | .10 hour | Review Motion re: Telephonic Appearance[85] |
|  | Michael Phillips | $250/hour | .25 hour | .10 hour | Review Status Report[86] |
| 12/28/06 | Michael Phillips | $250/hour | .25 hour | .10 hour | Review Request to Use Electronic Equip.[87] |
| 03/09/07 | Michael Phillips | $250/hour | .25 hour | .10 hour | Review Joinder[88] |
| 03/13/07 | Michael Phillips | $250/hour | .25 hour | .10 hour | Review Order re: *Ex Parte* Request[89] |
| 05/16/07 | Michael Phillips | $250/hour | .25 hour | .10 hour | Review Order re: EIC Appl.[90] |
| 06/12/07 | Michael Phillips | $250/hour | .25 hour | .10 hour | Review Joinder[91] |
| 06/22/07 | Michael Phillips | $250/hour | .25 hour | .10 hour | Prepare Certificate of Service |
|  | Michael Phillips | $250/hour | .25 hour | .10 hour | Review Certificate of Service |

---

[84] *See* Docket No. 358. The document is one paragraph long.

[85] *See* Docket No. 360. The document is one paragraph long.

[86] *See* Docket No. 361. The document is one paragraph long.

[87] *See* Docket No. 377. The document is one paragraph long.

[88] *See* Docket No. 398. The document is one sentence long.

[89] *See* Docket No. 400. The Order is one paragraph long.

[90] *See* Docket No. 412. The Order is one sentence long.

[91] *See* Docket No. 421. The document is one sentence long.

63

| | | | | | |
|---|---|---|---|---|---|
| 06/25/07 | Michael Phillips | $250/hour | .25 hour | .10 hour | Review Joinder[92] |
| 06/26/07 | Michael Phillips | $250/hour | .25 hour | .10 hour | Review Order re: Fairness Hearing[93] |
| 06/29/07 | Michael Phillips | $250/hour | .25 hour | .10 hour | Review Stipulation[94] |
| 07/26/07 | Michael Phillips | $250/hour | .25 hour | .10 hour | Review Motion to file excess pgs[95] |
| | Michael Phillips | $250/hour | .25 hour | .10 hour | Review Joinder[96] |
| 07/27/07 | Michael Phillips | $250/hour | .25 hour | .10 hour | Review Order re: Excess pgs[97] |
| 09/04/07 | Michael Phillips | $250/hour | .25 hour | .10 hour | Review Order[98] |
| 09/05/07 | Michael Phillips | $250/hour | .25 hour | .10 hour | Review Joinder[99] |
| | Michael Phillips | $250/hour | .25 hour | .10 hour | Review Joinder[100] |
| | Michael Phillips | $250/hour | .25 hour | .10 hour | Review Order to Show Cause[101] |

[92] *See* Docket No. 434. The document is one sentence long.

[93] *See* Docket No. 437. The Order is two paragraphs long.

[94] *See* Docket No. 440. The document is one sentence long.

[95] *See* Docket No. 447. The document is two paragraphs long.

[96] *See* Docket No. 455. The document is one sentence long.

[97] *See* Docket No. 457. The Order is one sentence long.

[98] *See* Docket No. 467. The Order is one paragraph long.

[99] *See* Docket No. 470. The document is one sentence long.

[100] *See* Docket No. 475. The document is one sentence long.

[101] *See* Docket No. 472. The Order is one paragraph long.

64

| Date | Attorney | Rate | Hours | Hours | Description |
|---|---|---|---|---|---|
| 09/07/07 | Michael Phillips | $250/hour | .25 hour | .10 hour | Review Order re: Order to Show Cause[102] |
| 09/18/07 | Michael Phillips | $250/hour | .25 hour | .10 hour | Review Request to Use Electronic Equipment[103] |
| | Michael Phillips | $250/hour | .25 hour | .10 hour | Review Order re: Use of Equipment[104] |
| 10/16/07 | Michael Phillips | $250/hour | .25 hour | .10 hour | Review Order re: Supplemental Authority[105] |

| | **ATTORNEY** | **RATE** | **HOURS CLAIMED** | **TOTAL REVISED HOURS** | **REDUCTIONS TO HOURS** |
|---|---|---|---|---|---|
| | Michael Phillips | $250/hour | 15.5 hours | 6.2 hours | 9.3 hours |
| | Ricardo Bordallo | $150/hour | .25 hour | .10 hour | .15 hour |

| **TOTAL REDUCED HOURS** | **9.45 hours** |
|---|---|

The Government also claims that the billing entries on July 26, 2004, by Attorney
Bordallo for two hours of drafting a motion to exceed page limit and finalizing the motion is
excessively billed. After reviewing the actual filing the court finds that two hours is excessive.
*See* Docket No. 60. The time of .50 hour allotted for both tasks is more than enough.
*See Jordan v. Multnomah County*, 815 F.2d 1258, 1263 n.8 (9th Cir. 1987) (noting that a fee
claimant must show that counsel made a good faith effort to exclude hours that are excessive,
redundant or unnecessary). Accordingly, the court reduces 1.5 hours from Attorney Bordallo's

---

[102] *See* Docket No. 480. The Order is one sentence long.

[103] *See* Docket No. 487. The document is one sentence long.

[104] *See* Docket No. 488. The Order is one sentence long.

[105] *See* Docket No. 510. The Order is one paragraph long.

65

billing entries as follows:

| DATE | ATTORNEY | RATE | HOURS CLAIMED | REVISED HOURS | TASK |
|---|---|---|---|---|---|
| 7/26/04 | Ricardo Bordallo | $150/hour | 1 hour | .25 hour | Research and Draft Motion to File in Excess of 20 pgs. |
| 7/26/04 | Ricardo Bordallo | $150/hour | 1 hour | .25 hour | Finalize Motion to File in Excess of 20 pgs. |
| | ATTORNEY | RATE | HOURS CLAIMED | TOTAL REVISED HOURS | REDUCTIONS TO HOURS |
| | Ricardo Bordallo | $150/hour | 2 hours | **.50 hour** | 1.5 hours |

The court notes that there are other objectionable billings. There appears to be duplicated efforts billed. For example, two attorneys that attended mediation in the Spring of 2005 and three attorneys attended the fairness hearing. The court expects that lead counsel, Michael F. Phillips, would have been sufficiently familiar with the facts and supporting evidence to be effective at the mediation without the assistance another attorney. As to the additional two lawyers at the fairness hearing, they were associates who appeared to have minimal involvement in the case,[106] and were more likely present for educational purposes. The Class, however, should not have to pay for educating attorneys.

"Good billing judgment requires that time spent in conference among multiple attorneys be billed to only one of those attorneys." *Strand v. Auto. Machinists Pension Trust*, 2007 WL 2029068, at *6 (D. Or. 2007). In this case, it is appropriate to exclude the duplicative hours billed by Attorney Phillips' associates who were billing at the lower rates. *See Farris v. Cox*, 508 F.Supp. 222, 226 (N.D. Cal. 1981) (reduction of time where multiple attorneys attended depositions and hearings). Accordingly, the court excludes the following hours as duplicative

---

[106] This is especially clear when one considers the total hours each worked on the case. Attorney Travis worked 54 hours and Attorney Invencion worked 31.5 hours and each attorney spent 27.5 hours preparing for the fairness hearing and attending it.

66

from the lodestar calculations:

| DATE | ATTORNEY | RATE | REDUCTIONS TO HOURS | TASK |
|---|---|---|---|---|
| 03/31/05 | Ricardo Bordallo | $150/hour | 11 hours | Mediation |
| 04/01/05 | Ricardo Bordallo | $150/hour | 11 hours | Mediation |
| 04/02/05 | Ricardo Bordallo | $150/hour | 14 hours | Mediation |
| 09/18/07 | Leslie A. Travis | $150/hour | 4 hours | Prepare for Hearing |
| | Darleen Invencion | $150/hour | 4 hours | Prepare for Hearing |
| 09/19/07 | Leslie A. Travis | $150/hour | 4 hours | Prepare for Hearing |
| | Darleen Invencion | $150/hour | 4 hours | Prepare for Hearing |
| 09/20/07 | Leslie A. Travis | $150/hour | 7.5 hours | Attend Ct. Hearing[107] |
| | Darleen . Invencion | $150/hour | 7.5 hours | Attend Ct. Hearing |
| 09/21/07 | Leslie A. Travis | $150/hour | 12 hours | Attend Ct. Hearing |
| | Darleen  Invencion | $150/hour | 12 hours | Attend Ct. Hearing |
| | **ATTORNEY** | **RATE** | **HOURS REDUCED** | |
| | Ricardo Bordallo | $150/hour | 36 hours | |
| | Leslie A. Travis | $150/hour | 27.5 hours | |
| | Darleen Invencion | $150/hour | 27.5 hours | |
| **TOTAL REDUCED HOURS** | | | **91 hours** | |

Other than the reduction of 651.45 hours noted above, the remaining hours have been sufficiently documented and they appear to be reasonable and necessary. Accordingly, the

---

[107] It should be noted that upon review of the minutes, the court hearings on September 20, 2007 and September 21, 2007 were 5.5 hours in length each day. It may be that counsel arrived early to speak to co-counsel and prepare. Attorney Peter Perez from the Lujan firm billed 10 hours for preparation and hearing on each day.

67

1  court finds that Class Counsel reasonably expended 1807.30[108] hours in litigating this case.

2  **b. REASONABLE HOURLY RATE**

3  Next the court must determine what is a reasonable hourly rate. "In determining a

4  reasonable hourly rate, the district court should be guided by the rate prevailing in the

5  community for similar work performed by attorneys of comparable skill, experience, and

6  reputation." *Chalmers v. City of Los Angeles*, 796 F.2d 1392, 1405 (9th Cir. 1986). The hourly

7  rates as requested ($250/hour for a partner in the firm, Attorney Phillips, and $150/hour for his

8  associates) seem very reasonable considering counsel's experience, skill and reputation.[109]

9  **c. HOURS MULTIPLIED BY RATES**

10  Multiplying the documented hours Class Counsel reasonably spent by the reasonable

11  hourly rates charged, the following resulting lodestar amounts are as follows:

| ATTORNEY | RATE | HOURS CLAIMED | REQUESTED FEES | HRS RDCD | TOTAL HRS AWARDED | TOTAL FEES ALLOWED |
|---|---|---|---|---|---|---|
| Michael Phillips | $250/hr | 1437.75 | $359,437.50 | 344.8 | 1092.95 | $273,237.50 |
| Ricardo Bordallo | $150/hr | 935.50 | $140,325.00 | 251.65 | 683.85 | $102,577.50 |
| Leslie Travis | $150/hr | 54 | $8,100.00 | 27.50 | 26.5 | $3,975.00 |
| Darleen Invencion | $150/hr | 31.50 | $4,725.00 | 27.50 | 4 | $600.00 |
| TOTAL | | 2458.75 | **$512,587.50** | 651.45 | 1807.3 | **$380,390.00** |

22  ///

---

24  [108]  This figure is arrived at by subtracting the 651.45 hours reduced from Class Counsel's total hours claimed of 2,458.75 hours. *See* Docket No. 552.

26  [109]  In addition, reviewing the bills submitted by the other two local firms, the rates as requested fall within the prevailing rates for Guam. The declarations submitted establish a range for experienced partners from approximately $200/hour to a high of $325/hour. Attorney Phillips, is an able, experienced lawyer with a solid reputation. His billing rates are very reasonable in light of his qualifications.

68

#### d. REIMBURSEMENT FOR EXPENSES

In addition, Class Counsel seeks recovery of his litigation expenses of $12,041.65 for photocopying costs, mediation fees, and attorney service fees which were reasonably incurred. An award of expenses should be limited to typical out-of-pocket that are charged to a fee-paying client and should be reasonable and necessary. *Harris v. Marhoefer*, 24 F.3d 16, 19 (9th Cir. 1994). After reviewing the list of expenses, it does not seem that counsel is billing enough for his expenses. For example, counsel does not seem to charge any photocopying charges for several documents that he filed and presumably served on the parties. In other instances, the page numbers of documents filed do not match the number of pages he describes in his billings. For example, counsel states in a billing entry that the document has 36 pages when it appears from the docket it has 40 pages. Nevertheless, it is counsel's burden to provide the court with an adequate description of costs. *See In re Prudential Ins. Co. of Am. Sales Practice Litig.*, 148 F.3d 283, 333-34 (3rd Cir. 1998) (an attorney submitting an application for an award of fees and expenses has the burden of establishing entitlement to such monies). Accordingly, based upon the amount of expenses requested the court awards **$12,003.15**[110] for reimbursement of expenses.

#### e. ADJUSTMENT TO THE LODESTAR

The court may adjust the lodestar figure if various factors overcome the presumption of reasonableness.[111] *Hensley*, 461 U.S. at 433-34. In this instance, Class Counsel is looking at an

---

[110] The court deducted $38.50 in expenses for what appeared to be a double-billing. See Docket No. 552, Ex. A at 35 (entries for July 26, 2007 and July 27, 2007).

[111] The court may adjust the lodestar with a "multiplier," if necessary, to arrive at a reasonable fee by considering factors including:
> (1) the time and labor required, (2) the novelty and difficulty of the questions involved, (3) the skill requisite to perform the legal service properly, (4) the preclusion of other employment by the attorney due to acceptance of the case, (5) the customary fee, (6) whether the fee is fixed or contingent, (7) time limitations imposed by the client or the circumstances, (8) the amount involved and the results obtained, (9) the experience, reputation, and ability of the attorneys, (10) the "undesirability" of the case, (11) the nature and length of the professional relationship with the client, and (12) awards in similar cases.

69

1    award of **$380,390.00** in attorney fees and an award of **$12,003.15** in costs for a total amount

2    of **$392,393.15**, an amount far short of the anticipated 10% recovery (the $9 million).  The

3    court must consider whether it finds the lodestar amount is unreasonably low and whether

4    under the circumstances this is a "rare" or "exceptional case" supporting an upward adjustment

5    to that amount.  *See Guarantee Mut. Life Co. v. Van Gerwen*, 214 F.3d 1041, 1045 (9th Cir.

6    2000) ("The lodestar amount is presumptively the reasonable fee amount, and thus a multiplier

7    may be used to adjust the lodestar amount upward or downward only in '"rare" and

8    "exceptional" cases, supported by both "specific evidence" on the record and detailed findings

9    by the lower courts' that the lodestar  amount is unreasonably low or unreasonably high").

10          When considering whether to adjust upward the lodestar amount to determine a

11   reasonable amount in fees, the court can look to see if there were exceptional results.  The

12   result achieved is a significant factor to be considered in making a fee award.  *Hensley*, 461

13   U.S. at 436 (holding that the "most critical factor is the degree of success obtained.")   Here,

14   Class Counsel was able to obtain a common fund of $90 million for the Class's claims for the

15   tax years 1995 through 2004.  It is an overdue and exceptional result in favor of the class. This

16   is one of the largest class action common recoveries in the territory.  The result is particularly

17   positive given the high degree of risk involved on the merits of the question presented. The

18   Settlement Agreement contains significant concessions or obligations on the part of the

19   Government with respect to the payment of the EIC on a forward going basis.

20           Additionally, this settlement represents the vindication of an important public policy of

21   the Government in terms of its ongoing responsibilities and commitment to those in greater

22   need.  It should be noted that no other attorney was pursuing the rights of these taxpayers when

23   it was so much of a gamble and the costs had to be solely shouldered by attorney Michael F.

24

25

26   *Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67, 71 (9th Cir. 1975).
            In addition, the court may reduce the fee award "if the relief, however significant, is limited

27   in comparison to the scope of the litigation as a whole." *Hensley*, 461 U.S. at 440.  Although the
     court should consider the factors as set out in *Kerr*, it need not discuss each factor.  *Sapper v.*

28   *Lenco Blade, Inc.,* 704 F.2d 1069, 1073 (9th Cir. 1983).

Phillips.  Only when there was a proposed settlement and the possibility of millions of dollars in attorney fees to be awarded did other firms apparently become interested and join in the efforts.  Based on the significant results achieved through the efforts of Class Counsel in creating the funds for settlement and in light of case law, the court should find that this factor weighs strongly in favor of granting counsel a multiplier of 8.  Accordingly, counsel is entitled to **$3,043,120.00 ($380,390.00  x 8)**.

### *3. TORRES ATTORNEYS' FEES*

#### *a. NUMBER OF HOURS REASONABLY EXPENDED*

The *Torres* counsel state that they spent 1,226.65 hours working on this case and have incurred $25,751.21 in expenses, for a total bill of $316,604.06.  *See* Docket No. 542.  The Government makes a number of objections.  It first objects to the block billing which make it difficult to determine the reasonableness of the hours claimed.  *See Harolds Stores, Inc. v. Dillard Dep't Stores, Inc.*, 82 F3d 1533, 1554 n.15 (10th Cir. 1996) (explaining that the block billing method refers to the time-keeping by which each lawyer enters the total daily time spent working on a case, rather than itemizing the time expended on specific tasks). It is true that block billing entries make it difficult to assess the amount of time spent on each particular task. However, in several of the billing entries, there is enough detail provided to indicate that the tasks contained in the block billings of three or more hours generally are related, such that the failure to segregate tasks is not fatal.  *See Hensley*, 461 U.S. at 433, 437 n.12, 103 S.Ct. 1933 ("Plaintiff's counsel, of course, is not required to record in great detail how each minute of his time was expended. But at least counsel should identify the general subject matter of his time expenditures."). Therefore, the court denies the Government's request to deny fees for all "block-billed" entries.

The Government next takes issue with the administrative costs assessed by an employee known as "EOL" for work that consists of  "processing various tasks."  Upon review of these billing entries, they all appear to be for secretarial duties.  While the costs do not seem to add

71

up to a great amount ($620),[112] there is no way to determine what "processing" means or why the class should pay for what appears to be costs that would ordinarily be absorbed as overhead by the firm.   Accordingly, the court excludes all hours and amounts billed by EOL.

The Government also argues that any time spent on the attorneys' fees motions should be excluded.  For the reasons set forth previously as to denying Class Counsel such fees, the court excludes the following hours:

| DATE | ATTORNEY | RATE | REDUCTIONS TO HOURS | TASK |
|------|----------|------|---------------------|------|
| 06/02/06 | Peter Perez | $250/hour | 2 hours[113] | Motion for Atty Fees |
| 06/05/06 | Ignacio Aguigui | $250/hour | 4.25 hours | Revise Motion for Atty Fees |
| 06/06/06 | Ignacio Aguigui | $250/hour | 1.75 hours | Revise Motion for Atty Fees |
| 06/25/07 | Peter Perez | $250/hour | .5 hour[114] | Review Filing on Atty Fees |
| 06/29/07 | Peter Perez | $250/hour | .5 hour[115] | Review Filing on Atty Fees |
| 09/27/07 | Ignacio Aguigui | $250/hour | 1.25 hours | Review Filing on Atty Fees |
| 10/09/07 | Peter Perez | $250/hour | 2 hours | Motion for Atty Fees |
| 10/10/07 | Peter Perez | $250/hour | 2 hours | Motion for Atty fees |

---

[112]  The Government states that the amount billed is $505, however, the amount appears to add up to $620.

[113]  Attorney Perez blocked billed 7 hours on this date.  He did not divide his time and allocate time to the various tasks.  Accordingly, the court deducts 2 hours from the 7 hours billed.

[114]  Attorney Perez blocked billed 1 hour on this date.  He did not divide his time and allocate time to the various tasks.  Accordingly, the court deducts .5 hour from the 1 hour billed.

[115]  Attorney Perez blocked billed 1 hour on this date.  He did not divide his time and allocate time to the various tasks.  Accordingly, the court deducts .5 hour from the 1 hour billed.

72

| | ATTORNEY | RATE | HOURS EXCLUDED | AMOUNTS |
|---|---|---|---|---|
| | Peter Perez | $250/hour | **7 hours** | $1,750.00 |
| | Ignacio Aguigui | $250/hour | **7.25 hours** | $1,812.50 |

Although not raised by the Government, there are additional reasons to reduce the hours claimed by the *Torres* counsel. The Lujan firm billed an inordinate amount of time for interoffice conferences. In reviewing the bills, there are numerous occasions in which one or more of the attorneys consulted and coordinated with one another. In some instances conferences were among five billing attorneys. Although it has been recognized that "the participation of more than one attorney does not necessarily constitute an unnecessary duplication of effort," *McGrath v. County of Nev.*, 67 F.3d 248, 255 (9th Cir. 1995)), the court finds that the firm inappropriately billed for communicating with one another.

Counsel submitting fee applications shall exclude hours that are "excessive, redundant, or otherwise unnecessary, just as a lawyer in private practice ethically is obligated to exclude such hours from his fee submission." *Hensley*, 461 U.S. at 432-34. While a private client is free to hire and pay for as many lawyers as it wishes, in this context, the Class had no opportunity to negotiate for these kinds of fees and should not have to pay for the duplication of such efforts.

Therefore, when the billing entry indicates a meeting and/or conference among two or more attorneys, the court will only give credit to two of the attorneys, and the other attorneys' time is excluded as duplicative from the lodestar calculations as follows:[116]

///

///

---

[116] The court notes that in several instances the billing entries are "block billed." In such instances, the court therefore has estimated the reduced time by reviewing all of the billing entries of the attorneys who participated in the conference. For example, if there is an interoffice conference between four attorneys, and only one of the attorneys has listed the meeting as taking 0.5 hour and the others have combined other tasks within their billing entry the court will assume the meeting among all counsel was 0.5 hour.

73

| Date | Attorney | Rate | Reductions to Hours | Task |
|------|----------|------|---------------------|------|
| 07/01/04 | John Unpingco | $250/hour | .5 hour | Tele conf. w/ co-counsel |
| 07/06/04 | Peter Perez | $250/hour | 1 hour | Conference w/ co-counsel |
| | Anthony Perez | $250/hour | 1 hour | Conference w/ co-counsel |
| 07/08/04 | Ignacio Aguigui | $250/hour | .75 hour | Conference w/ co-counsel |
| | John Unpingco | $250/hour | .75 hour | Conference w/ co-counsel |
| 08/02/04 | Ignacio Aguigui | $250/hour | .25 hour | Conference w/ co-counsel |
| | John Unpingco | $250/hour | .25 hour | Conference w/ co-counsel |
| 08/04/04 | Ignacio Aguigui | $250/hour | .50 hour | Conference w/ co-counsel |
| 08/06/04 | Ignacio Aguigui | $250/hour | .50 hour | Conference w/ co-counsel |
| 08/11/04 | Ignacio Aguigui | $250/hour | .75 hour | Conference w/ co-counsel |
| 08/13/04 | Ignacio Aguigui | $250/hour | .25 hour | Conference w/ co-counsel |
| 08/27/04 | Ignacio Aguigui | $250/hour | .25 hour | Conference w/ co-counsel |
| 02/25/05 | Ignacio Aguigui[117] | $250/hour | .25 hour | Conference w/ co-counsel |
| 03/01/05 | Peter Perez | $250/hour | .50 hour | Conference w/ co-counsel |
| | Delia Lujan | $195/hour | .25 hour | Conference w/ co-counsel |
| 05/06/05 | Delia Lujan | $195/hour | .75 hour | Conference w/ co-counsel |
| 05/10/05 | Delia Lujan | $195/hour | .50 hour | Conference w/ co-counsel |
| 05/24/05 | Delia Lujan | $195/hour | .25 hour | Conference w/ co-counsel |
| 06/14/05 | Delia Lujan | $195/hour | .50 hour | Conference w/ co-counsel |
| 06/16/05 | Delia Lujan | $195/hour | .50 hour | Conference w/ co-counsel |
| 06/22/05 | Delia Lujan | $195/hour | .50 hour | Conference w/ co-counsel |
| 06/23/05 | Delia Lujan | $195/hour | .25 hour | Conference w/ co-counsel |
| 06/27/05 | Ignacio Aguigui | $250/hour | 1 hour | Conference w/ co-counsel |
| | Delia Lujan | $195/hour | 1 hour | Conference w/ co-counsel |
| 07/08/05 | Delia Lujan | $195/hour | .3 hour | Conference w/ co-counsel |

---

[117] In this instance, it appears that Attorney Aguigui doubled billed for the meeting. Accordingly, the time is reduced for the double billing.

74

| 07/12/05 | Peter Perez | $250/hour | 1 hour | Conference w/ co-counsel |
|----------|-------------|-----------|--------|--------------------------|
|          | Delia Lujan | $195/hour | 1 hour | Conference w/ co-counsel |
| 03/13/06 | Peter Perez | $250/hour | 1 hour | Conference w/ co-counsel |
|          | Delia Lujan | $195/hour | 1 hour | Conference w/ co-counsel |
|          | Ignacio Aguigui | $250/hour | 1 hour | Conference w/ co-counsel |
| 03/14/06 | Delia Lujan | $195/hour | 1 hour | Conference w/ co-counsel |
| 03/24/06 | Peter Perez | $250/hour | .25 hour | Conference w/ co-counsel |
| 04/03/06 | Peter Perez | $250/hour | .50 hour | Conference w/ co-counsel |
| 04/06/06 | Peter Perez | $250/hour | .50 hour | Conference w/ co-counsel |
| 04/07/06 | Peter Perez | $250/hour | 1 hour | Conference w/ co-counsel |
|          | Delia Lujan | $195/hour | 1 hour | Conference w/ co-counsel |
| 04/08/06 | Peter Perez | $250/hour | 1 hour | Conference w/ co-counsel |
| 04/10/06 | Delia Lujan | $195/hour | .50 hour | Conference w/ co-counsel |
| 01/09/07 | Delia Lujan | $195/hour | .25 hour | Conference w/ co-counsel |
| 06/08/07 | Delia Lujan | $195/hour | .50 hour | Conference w/ co-counsel |
| 09/24/07 | Peter Perez | $250/hour | .50 hour | Conference w/ co-counsel |

|  | **ATTORNEY** | **HOURLY RATE** | **HOURS EXCLUDED** | **AMOUNTS** |
|--|--------------|-----------------|--------------------|-------------|
|  | Delia Lujan | $195/hour | 10.05 hours | $1,959.75 |
|  | Peter Perez | $250/hour | 7.25 hours | $1,812.50 |
|  | Ignacio Aguigui | $250/hour | 5.5 hours | $1,375.00 |
|  | John Unpingco | $250/hour | 1.50 hours | $375.00 |
|  | Anthony Perez | $250/hour | 1 hour | $250.00 |
| **TOTAL REDUCED HOURS AND AMOUNTS** | | | **25.3 hours** | **$5,772.25** |

The firm is also requesting fees for services provided by more than one attorney. There are instances where more than two attorneys are billing to review or work on the same document. In those instances where the court finds it unnecessary for more than two attorneys to provide the same service, the fees are reduced as follows:

75

| DATE | ATTORNEY | RATE | REDUCTIONS TO HOURS | TASK |
|---|---|---|---|---|
| 04/04/06 | Delia Lujan | $195/hour | 1.5 hours | Review Mediation Statement |
| 04/28/06 | Delia Lujan | $195/hour | .5 hour | Review Court Order |
| **TOTAL  REDUCED HOURS** | | | **2 hours** | |

Additionally more than one attorney prepared and attended the mediation sessions and/or attended status hearings.  Again, as with Class Counsel, the court reduced the following hours as duplicative  from the lodestar figures:

| DATE | ATTORNEY | RATE | REDUCTIONS TO HOURS | TASK |
|---|---|---|---|---|
| 03/14/06 | Peter Perez | $250/hour | 1 hour[118] | Attend Status Hearing |
| | Anthony Perez | $250/hour | 1 hour | Attend Status Hearing |
| | Delia Lujan | $195/hour | 1 hour | Attend Status Hearing |
| 04/05/06 | Peter Perez | $250/hour | 3 hours | Prepare for Mediation |
| 04/06/06 | Peter Perez | $250/hour | 11 hours | Attend Mediation |
| 04/07/06 | Peter Perez | $250/hour | 11 hours | Attend Mediation |
| | Delia Lujan | $195/hour | 4.5 hours | Attend Mediation |
| 04/08/06 | Peter Perez | $250/hour | 9 hours | Attend Meditation |
| | Delia Lujan | $195/hour | 4.5 hours | Prepare/Attend Meditation |
| 12/01/06 | Peter Perez | $250/hour | 2.5 hours | Prepare/Attend Status Hearing |
| 01/04/07 | Delia Lujan | $195/hour | 3.0 hours | Prepare/Attend Hearing |

[118] In the event the counsel's billing entries are blocked billed, the court will exercise its discretion and make what it considers to be reasonable reductions.

76

| | ATTORNEY | RATE | TOTAL HRS REDUCED | |
|---|---|---|---|---|
| | Peter Perez | $250/hour | **37.5 hours** | |
| | Anthony Perez | $250/hour | **1 hour** | |
| | Delia Lujan | $195/hour | **13 hours** | |

The Government also takes issue with the amount of time spent opposing a motion to dismiss. From March 2, 2005, through May 23, 2005, *Torres* counsel devoted approximately 190.5 hours (well over 50 hours on argument preparation alone) to researching, drafting, and arguing the Motion to Dismiss the case. After reviewing the opposition, it should not have taken almost five full weeks of attorney time at a cost of approximately $39,688.25 to draft the opposition. Accordingly, the court makes the following reductions:

| DATE | ATTORNEY | RATE | HOURS CLAIMED | REDUCED HOURS | HOURS AWARDED | TASKS |
|---|---|---|---|---|---|---|
| 03/02/05-05/23/05 | Delia Lujan | $195/hr | 129.5 hours[119] | **49.5 hours** | 80 hours | Prepare for Oral Arg. Research and Draft Opp. |

In addition, the court reduces the hours Attorney Delia Lujan spent in preparing and attending the Fairness Hearing given her minimal participation, if any, at the hearing.

///

///

///

///

---

[119] **129.5 hours** was arrived at by taking into consideration the following billing entries: 03/02/05 - **2** hours; 03/03/05 - **3** hours; 03/18/05 - **2.50** hours; 04/05/05 - **3** hours; 04/06/05- **4** hours; 04/07/05 - **3** hours; 04/11/05 - **5.5** hours; 04/12/05 - **6** hours; 04/13/05 - **7** hours; 04/14/05 - **7** hours; 04/15/05 - **10.75** hours; 05/03/05 - **2.75** hours; 05/04/05 - **6** hours; 05/11/05 - **2** hours; 05/12/05 - **2** hours; 05/13/05 - **3** hours; 05/16/05 - **8** hours; 05/17/05 - **4** hours; 05/18/05 - **4** hours; 05/19/05 - **7** hours; 05/20/05 - **9** hours; 05/21/05 - **10** hours; 05/22/05 - **10** hours; and 05/23/05 - **8** hours.

77

| DATE | ATTORNEY | RATE | REDUCTIONS TO HOURS | TASK |
|------|----------|------|---------------------|------|
| 09/18/07 | Delia Lujan | $195/hour | 5 hours | Prepare for Hearing |
| 09/20/07 | Delia Lujan | $195/hour | 7 hours | Prepare/Attend Hearing |
| 09/21/07 | Delia Lujan | $195/hour | 2 hours | Prepare/Attend Hearing |
| **TOTAL REDUCED HOURS AND AMOUNT** | | | **14 hours** | **$2,730.00** |

### b. REASONABLE HOURLY RATE

The Lujan firm requests an hourly rate of $325/hour for its more senior partner, Mr. David Lujan; $250/hour for its other partners; and $195/hour for its associates.   As discussed previously, the prevailing hourly rate for a partner in Guam, appears to range from $200/hour to Mr. Lujan's rate of $325/hour.  Although Mr. Lujan is renowned for his legal skills and reputation as a first class criminal defense attorney and for his work in a high profile civil case, this is a tax case.  There is nothing before the court to indicate that he possessed "expertise" in tax law, such that he made a more significant contribution to the settlement than Class Counsel. Accordingly, Mr. Lujan's hourly rate is capped at $250/hour.

### c. HOURS MULTIPLIED BY RATES

Multiplying the documented hours *Torres* counsel reasonably spent by the reasonable hourly rates charged, the following lodestar amounts are as follows:

///

///

///

///

///

///

///

///

78

| ATTORNEY | RATE | HRS CLAIMED | REQUESTED FEES | HOURS REDUCED | TOTAL HRS AWARDED | TOTAL FEES ALLOWED |
|---|---|---|---|---|---|---|
| David Lujan | $250/hr[120] | 39.41 | $12,808.25[121] | 0 | 39.41 | $9,852.50 |
| John Unpingco | $250/hr | 7.83 | $1,957.50 | 1.5 | 6.33 | $1,582.50 |
| Peter Perez | $250/hr | 380.75 | $95,187.50 | 51.75 | 329 | $82,250.00 |
| Anthony Perez | $250/hr | 43.25 | $10,812.50 | 2 | 41.25 | $10,312.50 |
| Ignacio Aguigui | $250/hr | 424.93 | $106,232.50 | 12.75 | 412.18 | $103,045.00 |
| Delia Lujan | $195/hr | 319.78 | $62,357.10 | 88.55 | 231.23 | $45,089.85 |
| Eliseo Florig | $195/hr | 4.5 | $877.50 | 0 | 4.5 | $877.50 |
| TOTAL | | 1220.45 | $290,23 2.85[122] | | | **$253,009.85** |

### d. REIMBURSEMENT FOR EXPENSES.

*Torres* Counsel seeks $25,751.21 in reimbursement of costs. This is more than twice the amount sought by Class Counsel and there is no supporting documentation for such a request. For example, *Torres* counsel seeks reimbursement for photocopying charges. "Reimbursement for photocopying charges are regularly reimbursed, although courts are careful not to "award for excessive copies, excessive costs per page, or copying documents not reasonably related to the litigation."" *In re Media Vision Tech. Serv. Sec. Litig.*, 913 F.Supp. 1362, 1368 (N.D. Cal., 1996) (citations omitted). However, there is no way for this court to determine whether the photocopying costs were necessary and/or reasonable. Counsel provides

[120] As discussed herein, Attorney Lujan's rate has been reduced from $325/hour to $250/hour.

[121] This amount represents the hours billed at an hourly rate of $325/hour.

[122] This amount takes into consideration the reduced rate of $250/hour awarded to Attorney Lujan instead of the requested $350/hour.

79

1   the court with an over simplified, general summary of expenses.  Counsel provides monthly

2   sums for photocopying and facsimiles (*e.g.* Jul-01-04 Costs for copies $57.00, facsimiles for

3   April 2006 $4.20).  This kind of supporting documentation is clearly inadequate.  There is no

4   description of the documents photocopied or the costs per page charged.

5          Likewise lacking in documentary support are the charges for online research.  Counsel

6   provides a monthly accounting, but again, there is no description of the type of research done

7   or the time allocated for each research session.  Given the lack of specificity or description, the

8   court cannot assess the propriety of the expenses; therefore, the reimbursement for these costs

9   shall be denied.  The only costs that are subject to verification are the costs associated with

10  filing fees and the mediation costs.  All other costs are simply not described in enough detail

11  for this court to make any meaningful assessment as to the necessity or the reasonableness of

12  the costs.  Accordingly, the court awards the following reimbursement costs:

| DATE | EXPENSE | COSTS |
|------|---------|-------|
| 08/06/04 | Filing Fee | $150.00 |
| 04/03/06 | JAMS, Inc. Inv.  Mediation | $9,916.67 |
| 05/02/06 | Travel Exp. Mediation | $510.77 |
| **TOTAL** | | **$10,577.44** |

#### e. ADJUSTMENT TO THE LODESTAR

As with Class Counsel, the court may adjust the lodestar figure if various factors

overcome the presumption of reasonableness.  *Hensley*, 461 U.S. at 433-34. In this instance, an

award of  **$253,009.85** in attorneys' fees and an award of **$10,577.44** in costs for a total amount

of **$263,587.29** seems more than adequate for the amount of work done by the *Torres*

counsel.[123]  The bulk of the work and moving the case towards settlement was mostly

_____

[123]  Several entries do not provide sufficient detail for the court to determine if the charges
are reasonable.  For example, although the attorneys indicate that they conducted research, very
rarely do they describe the type of law they researched.  In one instance, on July 13, 2005,
Attorney Anthony Perez billed 1.25 hours for "research."  This type of billing method is difficult

80

accomplished by Class Counsel by the time the *Torres* counsel first made their appearance in the matter. The court therefore finds no adjustment is warranted and that the amount awarded remains at the lodestar figure.

### 4. *SIMPAO ATTORNEYS' FEES*

The attorneys for the *Simpao* plaintiffs ("Objectors") also move this court for an award of attorneys' fees in the amount of 5% of the common fund ($90 million) plus $46,909.88 in costs. *See* Docket No. 501 at ¶ 11. They suggest the court accommodate their request by either reducing the *Santos/Torres* award by half or by increasing the total fee award to 15% of the fund, which they claim is still well below the Ninth Circuit benchmark of 25%.

If the court is considering an award based upon lodestar figures, the *Simpao* attorneys state as of October 11, 2007 the firm of Shimizu Canto & Fisher (formerly Van de Veld Shimizu Canto & Fisher) devoted a total of 2603.89[124] professional hours of services by attorneys at an hourly rate of $200, resulting in a lodestar amount of $520,778.[125] *See* Docket No. 501 at ¶ 3, Ex. 1. In addition, the firm of Shimizu Canto & Fisher spent a total of $19,222.99 in unreimbursed costs. *Id.,* at Ex. 2.

The firm of Tousley Brain Stephens PLLC, counsel for the *Simpao* plaintiffs, claims a lodestar amount of $699,379[126] and $27,686.89[127] in unreimbursed expenses. The combined total of the lodestar calculations of the two firms is $1,220,157 for a combined $46,909.88 in unreimbursed costs. *Id.* at ¶ 11. They contend that the litigation in their case provided significant improvement in the final settlement. They summarized the benefits as follows:

---

to review as there is no way to determine whether the time spend on this task was being duplicated by another attorney. In short, this type of billing makes it impossible for the court to assess whether the request is excessive.

[124] *See* Docket No. 501. However, after further accounting review, the court finds that this total hours claimed is inaccurate.

[125] This figure is the amount claimed by the Shimizu Canto & Fisher firm based on the inaccurate hours billed.

[126] *See* Docket No. 501 at ¶ 10, Ex. 6 (Decl. of Nancy Pacharzina) attached thereto.

[127] *Id.*

| DATE | ACTION | DATE | CORRELATING BENEFIT TO SETTLEMENT |
|------|--------|------|-----------------------------------|
| Dec. 3, 2004 | *Simpao* Complaint filed<br><br>• alleged injury from Guam's ongoing failure to establish EIC claims process<br><br>• proposed class includes 1995-2004 claimants | Jan. 12, 2005 | Executive Order 2005-01 issued by Governor Camacho<br><br>• created EIC claims process |
| Mar. 17, 2005<br><br>June 15, 2005 | *Simpao* prevails against Government's motion to dismiss<br><br>*Simpao*'s partial summary judgment granted<br>• Court holds Guam must pay EIC<br><br>• Court holds filing of tax return satisfies jurisdictional requirement for claimants | June 20, 2005 | Governor agrees to *Santos II*<br><br>Settlement fund is increased from $60 million to $90 million<br><br>• Class expanded to include 1995 and 2004 tax years (these were always part of *Simpao* action) |
| Aug. 11, 2006 | *Simpao* files opposition to *Santos II* raising jurisdictional issues among other things | Dec. 7, 2006 | Court orders supplemental briefing regarding issues raised by *Simpao's* opposition<br><br>• Whether court has jurisdiction over non-filers<br><br>• Early pay-outs to 1997 and 1998 claimants |
| Jan. 8, 2007 | *Santos* and *Torres* modify third proposes settlement<br><br>• Change resolves jurisdictional issued raised by *Simpao's* opposition | Jan. 9, 2007 | Court preliminarily approves third settlement<br><br>• Court notes that *Simpao* raised "key issues regarding jurisdiction" |

In addition to providing substantial benefits to the Class, *Simpao's* counsel state that they performed an enormous amount of work in connection with the advancement and settlement of this case, including (but not limited to) the following:

*///*

82

1  • Objecting to the settlement first proposed in the *Santos* case and moving to intervene

2  in that action.

3  *The court notes however that this motion was denied and thus of no benefit to the Class.*

4  • Preparing pleadings and filing a separate action after *Santos* intervention was denied.

5  *However, by the time the Simpao attorneys filed their action, the court finds it was the*

6  *third of three separate actions filed and again, of no benefit to the Class.*

7  • Drafting motions and other court filings, and arguing those motions before the court,

8  including defending against the Government's Motion to Dismiss as well as bringing a Partial

9  Summary Judgment Motion.

10  *Yet, by the time these occurred, the same results already were contained in the Santos II*

11  *settlement's term sheet.  Although designated federal Judge Martinez granted summary*

12  *judgment, he did so in part because the matter was conceded by the Government.  Additionally,*

13  *the same issue was brought before the Supreme Court of Guam, a decision favorably decided*

14  *and much considered by Judge Martinez.[128]  While concededly an important decision for the*

15  *Class, it was not necessary since the parties had already entered into a settlement.*

16  • Preparing and filing a motion for class certification.

17  *The court finds this was of no benefit to the Class.  The motion was never heard and in*

18  *fact, the court was concerned that a parallel class action could jeopardize the settlement*

19  *process.*

20  • Interviewing fact witnesses.

21  *There is no indication that any interview somehow aided the class.*

22  • Retaining experts to analyze Guam's potential liability.

23  *The court finds that there was no expert retained or offered by the Simpao parties that*

24  *has been relied upon by the court which could conceivably be seen as a benefit to the class.*

25

26  [128]  The *Simpao* plaintiffs cited to the Supreme Court of Guam Opinion in their Motion for

27  Summary Judgment.  *See In re Request of I Mina'Bente Sing'Kona Liheslaturan Guahan Relative to the Application of the Earned Income Tax Credit Program to Guam Taxpayers ("The EIC*

28  *Question"),* 2001 Guam 3, 2001 WL 113985 (Guam 2001).

83

1    • Extensively analyzing Guam's tax laws and legislative history relating to EIC.

2    *These matters had already been considered in the Supreme Court of Guam Opinion and*

3    *by the parties.*

4    • Analyzing and formulating strategy to meet the Government's challenges.

5    *There is no indication that such strategy sessions benefitted the Class.*

6    • Formulating evidence to prove total losses suffered by the Class.

7    *It is unclear how this information was beneficial to the Class.*

8    • Attending several hearings on Guam, requiring Mr. Stephens and Ms. Pacharzina to

9    travel to Guam from Seattle, Washington.

10    *There is no reason why either counsel felt it necessary to attend the hearings in person.*

11    *Local counsel was available, and they could have easily appeared by video teleconference.*

12    • Participating in mediation held on Guam.

13    *Simpao counsel never joined the settlement, therefore it is unclear how their*

14    *participation in the mediation benefitted the Class.*

15    • Communicating with Government officials in order to determine whether the

16    Government had funds to pay the EIC, as well as determine the history of payment of the EIC

17    in Guam.

18    *There is no indication that any such communication was of benefit to the Class.*

19    • Conducting research and developing evidence for motions and eventual trial on the

20    merits.

21    *This was of no benefit to the Class, which had already committed to trying to settle the*

22    *case.*

23    • The *Simpao* attorneys state they are entitled to their fees and costs for their role as

24    plaintiffs and for their role as Objectors. They argue that because of their work, they basically

25    "won" the case. They make this claim based upon the following rulings they received: 1) the

26    court has jurisdiction; 2) the Class exhausted its administrative remedies; and 3) the

27    Government is required to pay the EIC.

28    *///*

84

1    *Yet based on the rulings in Simpao, it was nearly inevitable that the Class would obtain*

2    *an excellent recovery, whether by settlement or judgment.*

3    *In addition, they claim they benefitted the class by increasing its scope.* <u>In re Domestic</u>

4    <u>Air Transp. Antitrust Litig.</u>, 148 F.R.D. 297 (N.D. Ga. 1993) *(class was benefitted by efforts to*

5    *streamline and simplify the claims process, thereby increasing number of eligible class*

6    *members). The Simpao plaintiffs claim that they always sought recovery for taxpayers from*

7    *1995 to the present. However, it should be noted that at the outset of the Santos case, the*

8    *Simpao plaintiffs opposed the inclusion of these taxpayers because of a statute of limitations*

9    *bar. See Mot. to Intervene, Docket No. 18. ("There is a proposed settlement agreement*

10   *between the parties to this action, through which the parties seek to compensate persons for*

11   *claims which lie beyond the statute of limitations of actions for recovery of unpaid money*

12   *under the tax code."). At that time the class included taxpayers for years 1996, 1998, 1999,*

13   *2000 through 2003. It was actually Plaintiff Torres who sought to expand the class and*

14   *include taxpayers for the year 1995. Accordingly, it is the Torres counsel who should be given*

15   *the credit for trying to expand the Class to these members.*

16   • The Objectors also state that their efforts and filing of a complaint resulted in the

17   Governor's Executive Order 2005-01 which provided a claims mechanism for a taxpayer to file

18   his or her claim.

19   *It is unclear how the Objectors could make such a claim. In fact, the Objectors actually*

20   *challenged these procedures and forms and moved unsuccessfully for a partial summary*

21   *judgment order in this regard. The court denied the motion and approved the Executive Order*

22   *and forms over Simpao plaintiff's counsel's objections. See Docket No. 99, pp. 10-11 ("This*

23   *Court has reviewed the forms and notes that at the time they were created, the issue of the EIC*

24   *had not been decided. It seems to reason that in drafting the documents, the Government*

25   *wanted to preserve its rights should a Court subsequently rule that it had no legal obligation to*

26   *pay the EIC. Despite a history of non-payment by the Government, the Court finds the*

27   *Government of Guam has taken efforts to create forms that would allow it to process the claims*

28   *in the event it is found responsible for paying the claims."). There simply is no evidence that*

85

1  *the Governor ordered that the forms be issued in response to anything done by the*

2  *Simpao plaintiffs.*

3  • As Objectors, the *Simpao* plaintiffs claim they played an important role in assisting

4  the court in making sure the settlement was fair. *See Howes v. Atkins*, 668 F. Supp. 1021, 1027

5  (E.D. Ky. 1987) (awarding 10% of the common fund to objectors because, by making a

6  "vigorous" attack on the settlement, they assisted the court in determining that the proposed

7  settlement was fair).

8  *It is true that at the time of the hearing on the preliminary approval of the class action*

9  *settlement the Simpao attorneys raised an important issue concerning jurisdiction and argued*

10  *that the class be narrowed to those taxpayers who had actually filed their tax returns in a*

11  *timely manner. Accordingly, a reasonable award of attorneys' fees may be warranted for this*

12  *work.* See Vizcaino v. Microsoft Corp., 290 F.3d 1043, 1052 (9th Cir. 2002) ("*In the absence*

13  *of a showing that objectors substantially enhanced the benefits to the class under the*

14  *settlement, as a matter of law they were not entitled to fees.").*

15  ### a. NUMBER OF HOURS REASONABLY EXPENDED

16  Therefore, as to the *Simpao* billings, the court limited its review of the firms' billings.

17  The court reviewed only the hours "reasonably" spent on the issue concerning narrowing the

18  class to those taxpayers who had timely filed their tax returns. The following concerning the

19  firm of Shimizu Canto & Fisher is based on a review of the billings and the time allocated to

20  the limited matter concerning jurisdiction.

| DATE | ATTORNEY | HOURS | TASK |
|---|---|---|---|
| 05/26/06 | JLC | 1.5 hours | Review Joint Motion for Preliminary Approval |
| 08/10/06 | JLC | 6.5 hours | Prepare Portion of Opp. |
| 08/15/06 | JLC | .5 hour | Teleconference re: Opp. |
| 08/15/06 | JLC | .5 hour | Conference re: Opp. |
| 08/21/06 | JLC | 3.5 hours | Revise and Edit Opp. |
| 08/21/06 | JLC | .5 hour | Prepare Portion of Opp. |
| 12/08/06 | JLC | .5 hour | Teleconference re: Reply Brief |

86

| 12/08/06 | JLC | .25 hour | Review court order for submissions |
| 12/09/06 | JLC | 2.5 hours | Research 26 U.S. § 6532 issue |
| 12/11/06 | JLC | 3 hours | Research issues for supplemental brief |
| 12/12/06 | JLC | 1.75 hours | Research 26 U.S. § 6532 issue |
| 12/13/06 | JLC | 3.25 hours | Research jurisdictional issues for Supp. Brief |
| 12/14/06 | JLC | 4 hours | Prepare Supplemental Brief re: Jurisdiction |
| 12/14/06 | JLC | .5 hour | Teleconference re: Supplement Brief |
| 12/15/06 | JLC | .25 hour | Teleconference re: Supplement Brief |
| 12/16/06 | JLC | 1 hour | Review Supplemental Memo |
| 12/17/06 | JLC | 1 hour | Review Government Brief |
| 12/18/06 | JLC | 2.75 hours | Draft Reply |
| 12/19/06 | JLC | .25 hour | Teleconference re: Reply Brief |
| 12/20/06 | JLC | 3.25 hours | Prepare Reply Brief |
| 12/20/06 | JLC | 2.25 hours | Prepare Reply Brief |
| 12/21/06 | JLC | 1.75 hours | Prepare Reply Brief |
| 12/22/06 | JLC | 4 hours | Prepare Reply Brief |
| 12/22/06 | JLC | .5 hour | Teleconference re: Reply Brief |
| 01/04/06 | JLC | 1 hour | Attend Preliminary Approval Hearing |
| 01/04/06 | JLC | 3 hours | Prepare for Preliminary Approval Hearing |
| 05/27/06 | TF | 5.33 hours | Review joint motion for preliminary approval and declarations of counsel |
| 05/31/06 | TF | 3 hours | Review counsel's declaration |
| 08/03/06 | TF | 5.33 hours | Research on Opposition |
| 08/04/06 | TF | .5 hour | Research on Opposition |
| 08/05/06 | TF | 2 hours | Research and Draft Opposition |
| 08/07/06 | TF | 3 hours | Research and Draft Opposition |
| 08/08/09[129] | TF | 5.83 hours | Continued Research and Draft Opp |
| 08/09/06 | TF | 10 hours | Continued Research and Draft Opp |

[129] The court assumes this date is actually August 8, 2006.

87

| 08/11/06 | TF | 4.5 hours | Research and Draft Opposition |
|---|---|---|---|
| 08/03/06 | TF | 3 hours | Research on Opposition |
| 12/07/06 | TF | .16 hour | Review court order |
| 12/16/06 | TF | 1.33 hours | Review Supplemental Motion |
| 12/16/06 | TF | .83 hour | Review Governor's Brief |
| 12/22/06 | TF | .5 hour | Review Santos Reply Brief |
| 12/22/06 | TF | .33 hour | Review Governor's Reply Brief |
| 12/29/06 | TF | .33 hour | Email from TBS re: hearing |
| 01/03/06 | TF | 5 hours | Prepare for Hearing |
| 01/04/06 | TF | 6 hours | Meet with co-counsel/attend hearing |
| 05/26/06 | CCV | 1.5 hours | Review Joint Motion Prelim Approval |
| 12/08/06 | CCV | .25 hour | Review court order for submissions |
| 12/14/06 | CCV | .5 hour | Teleconference re: Supplement Brief |
| 12/16/06 | CCV | 1 hour | Review Supplemental Memo |
| 12/17/06 | CCV | 1 hour | Review Government Brief |
| | **ATTORNEY** | **TOTAL HOURS** | |
| | JLC | 49.75 hours | |
| | TF | 56.97 hours | |
| | CCV | 4.25 hours | |

As with the other firms, there is duplicative billing that serves no benefit to the Class's settlement. Accordingly, the court does not award fees for the following duplicative hours.

| DATE | ATTORNEY | HRS. REDUCED | TASK |
|---|---|---|---|
| 01/04/06 | CCV | 1 hour | Attend Preliminary Approval Hearing |
| 01/04/06 | CCV | 3 hours | Prepare for Preliminary Approval Hearing |
| | | **TOTAL HRS. REDUCED** | |
| | | 4 hours | |

///

88

As to the hours awarded to the firm of Tousley Brain Stephens PLLC the court finds the following hours should be awarded:[130]

| DATE | ATTORNEY | HOURS | TASK |
|------|----------|-------|------|
| 06/06/06 | Kim Stephens | .7 hour | Worked on Opposition to Preliminary App. |
| 12/07/06 | Nancy Pacharzina | 2 hours | Reviewed Court Order |
| 12/08/06 | Nancy Pacharzina | 2 hours | Worked on Supplemental Briefing |
| 12/11/06 | Nancy Pacharzina | 2 hours | Worked on Supplemental Briefing |
| 12/14/06 | Nancy Pacharzina | 1.8 hours | Worked on Supplemental Briefing |
| 12/18/06 | Nancy Pacharzina | 2 hours | Reviewed Opp. Briefing/Tele. Conference |
| 12/19/06 | Nancy Pacharzina | 7 hours | Worked on Reply Brief |
| 12/20/06 | Nancy Pacharzina | 5 hours | Worked on Reply Brief |
| 12/21/06 | Nancy Pacharzina | 11.5 hours | Worked on Reply Brief |
| 12/26/06 | Nancy Pacharzina | .8 hour | Worked on Hearing Preparation |
| 12/27/06 | Nancy Pacharzina | 1.2 hours | Prepared for Preliminary Approval Hearing |
| 12/29/06 | Nancy Pacharzina | 4 hours | Prepare for preliminary approval hearing |
| 01/03/06 | Nancy Pacharzina | 15 hours | Prepared for hearing; Attended hearing; Conference with co-counsel; Attended second hearing; Drafted Correspondance |
|  | **ATTORNEY** | **TOTAL HOURS** |  |
|  | Kim Stephens | .7 hour |  |
|  | Nancy Pacharzina | 54.3 hours |  |

Undoubtedly, the *Simpao* attorneys believe they contributed a great deal to the case, but as stated earlier, the judge must assume the role of the fiduciary for the class plaintiffs when

---

[130] The court only awarded hours where the task billed for was clear. Where the tasks were block billed and unclear, no award of time was given. Additionally, no time was given for travel time. As noted herein, there was no reason for off-island counsel to attend any of the hearings in person, as they could have availed themselves of the court's video teleconferencing.

1   awarding attorneys' fees from a common fund.  *In re Wash. Pub. Power Supply Sys. Sec. Litig.,*

2   19 F.3d at 1302.  In this court's role, some of the hours proposed by the *Simpao* attorneys are

3   reasonable.  While they may have advanced the case in a very limited way as previously

4   discussed, they likewise spent a great deal of time frustrating the settlement process and

5   expended needless hours in pursuit of other endeavors that were of no benefit to the Class.

6   Moreover, the salient points of the settlement had already been established before  they made

7   their appearance.  The announcement of a large settlement in a class action, with the possibility

8   of $9 million for attorneys' fees, apparently attracted them with hopes of increasing the size of

9   the settlement.  Tellingly, they had nothing to do with instigating this case when there was no

10  settlement on the horizon.  It should also be noted that their contributions did not increase the

11  size of the fund or otherwise provide any tangible benefits to the Class.

12                          **b.  REASONABLE HOURLY RATE**

13          Having concluded that Objectors' counsel may recover **165.97 hours** for their work, the

14  court must determine a reasonable hourly rate for such work.  The fees requested by the

15  Objectors are quite excessive and as a whole, completely unreasonable.  Off-island counsel

16  seek reimbursement for an hourly billing rate of $750.

17  ///

18  ///

19  ///

20  ///

21  ///

22  ///

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

1   There simply is no justification that can support an award of $750/hour which is

2   apparently the prevailing rate of a Seattle lawyer with class action expertise.[131]  "In determining

3   _____

4   [131]  The charts and table below are based on figures and amounts claimed by the attorneys

    in their filings, without correction by the court.



| LAW FIRM | BILLED HOURS | TOTAL FEES REQUESTED |
|---|---|---|
| Phillips & Bordallo | 2458.75 | $512,587.50 |
| Lujan Aguigui & Perez LLP | 1226.65 | $290,852.85 |
| Shimizu Canto & Fisher | 2603.89 | $520,778.00 |
| Tousley Brain Stephens PLLC | 1372.90 | $699,379.00 |



91

a reasonable hourly rate, the district court should be guided by the rate prevailing in the

community for similar work performed by attorneys of comparable skill, experience, and

reputation." *Chalmers*, 796 F.2d at 1405. There is nothing in the record showing that local

counsel was incapable of litigating this matter and that off-island counsel was specifically

required. Accordingly, any award of fees should be capped to off-island counsel at $250/hour

and $200/hour as requested by local counsel.

| ATTORNEY | RATE | HOURS AWARDED | TOTAL FEES ALLOWED |
|---|---|---|---|
| James Canto | $200/hr | 49.75 hours | $9,950.00 |
| Tom Fisher | $200/hr | 56.97 hours | $11,394.00 |
| Curtis Van de Veld | $200/hr | 4.25 hours | $850.00 |
| Kim Stephens | $250/hr | .7 hour | $175.00 |
| Nancy Pacharzina | $250/hr | 54.3 hours | $13,575.00 |
| TOTAL | | 165.97 hours | $35,944.00 |

While the court limited its review, it points out the egregiousness of some of the billing

practices of off-island counsel. Counsel seek to recover their fees for drafting an appellate

brief which was never filed.[132] They seek to bill hundreds of hours for opposing preliminary

and final approval of the Settlement Agreement from which they now seek to recover millions

of dollars in fees. Attorney Stephens, billing a total 267.50 hours at a total cost of $200,625.00,

claims almost all of that amount in travel time. He traveled to Guam to attend a status hearing

and a mediation in 2006. He billed 78.7 hours for the two trips. *See* Canto Decl. at Ex. A

(Stephens's entries for March 12 and 13, 2006 (22.8 hours), March 15, 2006 (16 hours),

///

///

---

[132] Counsel seeks to bill the class for hours spent in August through November 2004 for
researching and drafting an opening brief for the appeal from the denial of intervention. Objectors
ultimately dismissed the appeal and filed the third class action concerning the EIC.

92

April 3, 2006 (20 hours) and April 8 and 12, 2006 (19.9 hours)).[133]  This is clearly excessive as counsel could have easily appeared at the status hearing and/or mediation by video teleconference, telephone or had local counsel attend in his stead.  There are also similar billings for Attorney Nancy Pacharzina, constituting thousands of dollars more in time.[134]

The court finds questionable the billing for the time spent establishing a relationship between the Tousley Brain Stephens firm and local counsel.  Attorney David Hoff spent 16 hours at a rate of $750/hour for a total of $12,000 creating such a relationship.  *See* Canto Decl. at Ex. A, p. 4.  Similarly, corresponding entries can be found in local counsels' billings.

### c. REIMBURSEMENT FOR EXPENSES

As noted, the Objectors seek $46,909.88[135] in costs.  Clearly, this is an unreasonable amount.  The court limits the reimbursable costs to the mediation costs of $9,433.34 and $200 in filing fees which are provable and reasonable.[136]  The costs of travel are simply unwarranted. There was no need for off-island counsel to travel to Guam.  As noted, they could have easily appeared by video teleconference, telephone, or more appropriately, should have had local counsel attend the hearing and/or mediation sessions.  The other costs requested lack enough specificity to determine either the necessity or reasonableness of them.

| EXPENSE | COSTS |
| --- | --- |
| Filing Fees | $200.00 |
| JAMS, Inc. Inv.  Mediation | $9,433.34 |
| **TOTAL REIMBURSEMENT COSTS** | **$9,633.34** |

---

[133]  Some of this time is block billed, but some time is pure travel time, and it is unclear which amount of time represents travel and which portion constitutes time otherwise spent.

[134]  The attorneys seek reimbursement of $16,765.94 in travel costs.

[135]  Shimizu Canto & Fisher seek $19,222.99 and the Tousley Brain Stephens firm seeks $27,686.89 in costs.

[136]  The Objectors should recover these costs, as the Class would be paying these whether there were two or more parties involved in the mediation.  In other words, if the cost of mediation was $30,000, the Class pays this amount.  Whether that fee is then split between two or more parties is of little consequence to the end cost.

93

**IX. CONCLUSION**

In sum, this court is tasked with determining whether the terms of the Settlement Agreement are fair, adequate and reasonable and not the product of fraud by or collusion among the settling parties. Under the circumstances, the terms suggest that the settlement is fair, adequate and reasonable. There is no indication that the settling parties collusively reached this agreement other than with arms-length negotiations and in good faith. As noted, this is the product of mediation with the assistance of an experienced settlement judge. The termination of this lawsuit by means of settlement brings about not only finality, but also substantial justice. Approval of the Settlement Agreement is in the paramount interest of the Class, the court, and the people of Guam. Accordingly, the court hereby **GRANTS** the Motion for Final Certification of the EIC Class; **CONFIRMS** appointment of Class Representative and Class Counsel Michael F. Phillips and **APPROVES** the Settlement Agreement. Finally, pursuant to this court's fiduciary role for the Class, the court hereby **AWARDS** attorneys' fees as follows:

| LAW FIRM | FEES AWARDED |
|---|---|
| Phillips & Bordallo | $3,043,120.00[137] |
| Lujan Aguigui & Perez LLP | $253,009.85[138] |
| Shimizu Canto & Fisher | $22,194.00[139] |
| Tousley Brain Stephens PLLC | $13,750.00 |

**SO ORDERED.**[140]

**/s/ Frances M. Tydingco-Gatewood**
**Chief Judge**
**Dated: Apr 23, 2008**

---

[137] Expenses are awarded in the amount of $12,003.15.

[138] Expenses are awarded in the amount of $10,577.44.

[139] Expenses are awarded in the amount of $9,633.34.

[140] The court finds that this Order resolves all outstanding motions. Parties that believe otherwise shall file a status report regarding which motions they think are outstanding, no later than May 1, 2008.

94